IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION



FILED
NOV 1 3 2020
Clerk, U.S. District Court
Eastern District of Texas

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § § | SEALED |
| V. | § § | Case No. 4:20-CR-00 318 |
| KEITH TODD ASHLEY | § § | Judge MAZZANT |

### INDICTMENT

THE UNITED STATES GRAND JURY CHARGES:

### General Allegations

At all times material to the facts set forth in this Indictment:

1. **Keith Todd Ashley** ("**Ashley**") was an individual residing in Collin County, Texas, in the Eastern District of Texas.

2. KBKK, LLC, ("KBKK") was a Texas company. **Ashley** was the Chief Executive Officer and Owner of KBKK, LLC.

3. North Texas Money Management ("NTMM") was a Texas company. **Ashley** was the Principal of NTMM.

4. Branch Banking & Trust Company, headquartered in Lumberton, North Carolina, was a financial institution insured by the Federal Deposit Insurance Corporation.

5. Bank of America, headquartered in Winston Salem, North Carolina, was a financial institution insured by the Federal Deposit Insurance Corporation.

6. Texas Capital Bank, headquartered in Dallas, Texas, was a financial institution insured by the Federal Deposit Insurance Corporation.

Indictment– Page 1

7. Chase Bank, N.A., headquartered in New York, New York, was a financial institution insured by the Federal Deposit Insurance Corporation.

8. Parkland Securities, LLC, formerly known as Sammons Securities Company, LLC, was a broker-dealer that offered life insurance underwritten by Midland National. **Ashley** was a Registered Representative for Sammons Securities Company, LLC.

9. Hennion and Walsh was a broker-dealer that offered a product called SmartTrust which had Unit Investment Trusts ("UITs") as an investment option.

10. Midland National, a subsidiary of Sammons Financial Group, was a life insurance and annuity company. **Ashley** was a Registered Representative for Midland National.

11. City Hospital of White Rock was a medical facility in Dallas, Texas. **Ashley** was a nurse and worked at City Hospital of White Rock.

## COUNTS 1 – 6

**Violation**: 18 U.S.C. § 1343 (Wire Fraud)

The General Allegations section of this indictment is realleged and incorporated by reference as though fully set forth herein.

### The Scheme

12. From on or about December 23, 2013, and continuing through on or about May 14, 2020, in the Eastern District of Texas, and elsewhere, the defendant, **Keith Todd Ashley ("Ashley")**, knowingly devised and intended to devise a scheme and

artifice to defraud victim investors, and to obtain money and property from victim investors by means of materially false and fraudulent pretenses, representations and promises and for the purpose of executing the scheme and artifice, and attempting to do so, transmitted and caused to be transmitted by way of wire communication in interstate commerce writings, signs, signals, pictures, and sounds, and did so with specific intent to defraud, all in violation of 18 U.S.C. § 1343.

## Manner and Means

The manner and means by which the defendant sought to accomplish the purpose of the scheme and artifice included, among others, the following:

13.  On or about June 21, 2002, **Ashley** opened a personal bank account at Bank of America, account number XXXXXX4804. The address listed for this account, as well as **Ashley**'s home banking branch, was located in the Eastern District of Texas.

14.  On or about January 19, 2010, **Ashley** opened a personal bank account at Chase Bank, N.A. account number XXXXXX2589, in the name of North Texas Money Management ("NTMM"). The address listed for this account, as well as **Ashley**'s home banking branch, was located in the Eastern District of Texas.

15.  On or about June 6, 2013, **Ashley** opened a business bank account at Citibank, N.A., now Branch Banking & Trust Company ("BB&T"), account number XXXXXX8725, in the name of KBKK, LLC. The address listed for this account, as well as **Ashley**'s home banking branch, was located in the Eastern District of Texas.

16.  **Ashley** controlled, used, and maintained the above accounts to further his

unlawful scheme, to receive and deposit funds from individuals who thought they were investing in legitimate investments and to exchange and transfer the funds between the accounts.

17. Beginning in or about 2003, **Ashley**, a financial advisor, marketed and sold legitimate financial products, such as mutual funds and Variable Annuity Life insurance products to individuals via his company, NTMM.

18. Beginning on or about December 23, 2013, **Ashley** solicited money from individuals representing that he was investing funds with Parkland Securities and SmartTrust in what was called a Unit Investment Trust (UIT). In general, **Ashley** deposited and comingled the investor funds in the BB&T account number XXXXXX8725.

19. Beginning on or about December 23, 2013, **Ashley** solicited money from individuals in person, by email, and by use of other wire transmissions in interstate commerce.  As a part of these solicitations, **Ashley** made false statements, representations, and promises to potential "investors," including that the "investments" would result in guaranteed returns totaling between 3%, 6% to 7% and 8% to 9% per year on their funds, there was no risk to the individual's initial principal investment, and the funds would be invested through SmartTrust or Parkland Securities in a UIT. **Ashley** communicated with "investors" via phone and email communications on a regular basis.

20. After **Ashley** received money from the individuals, instead of investing the funds through SmartTrust or Parkland Securities in a UIT as he had represented, stated, and promised would occur, he kept a significant portion of the money for his own

personal use and wire transferred or direct transferred the balance from BB&T account number XXXXXX8725, to Bank of America account number XXXXXX4804, Chase Bank, N.A., bearing account number XXXXXX2589, and other bank accounts he controlled. The funds were commingled with funds that other individuals provided **Ashley**. In total, **Ashley** received in excess of approximately $1,311,200 from individuals to whom he had made the materially false representations, pretenses, and promises related to investing funds with SmartTrust or Parkland Securities in a UIT.

21. **Ashley** was personally enriched by the scheme and artifice. **Ashley** personally took and spent in excess of approximately $1,143,288 in investor funds and while he returned approximately $81,325 to investors, he used the remaining bulk of the funds for a variety of personal expenses and personal benefit, such as brewery expenses, spending at casinos, payments on personal credit cards, legal fees, cash withdrawals, mortgage payments, college tuition and student loan payments, and utilities.

## The Execution of the Scheme Against L.S.

22. In or about 2014, **Ashley** began communicating with L.S., an individual known to the Grand Jury, and soliciting money from L.S. to "invest" through Parkland Securities in a UIT. During the course of their communications, **Ashley** met personally with L.S. in Plano, Allen and Frisco, Texas, all located in the Eastern District of Texas, to market his investment scheme. As he was seeking money from L.S., **Ashley** falsely stated and represented to L.S. that the UIT investment had guaranteed returns, was tax deferred, there would be a 6% to 7% return, the investment would never lose money, the funds would expire and L.S. would get his money back. **Ashley** did not tell L.S. that he would

Indictment– Page 5

utilize L.S.'s money to make payments to other **Ashley** victims/investors and then transfer a portion of the remainder to his personal bank account held at Bank of America, bearing account number XXXXXX4804.

23. On or about March 12, 2019, in furtherance of the scheme, **Ashley** sent a text message by electronic transmission from **Ashley**'s phone to L.S.'s phone. Within this text message, **Ashley** falsely stated and represented that there was an offering for an investment in a 24 month UIT by stating, "Are you interested in 24 month UIT I spoke to you about?"

24. On or about March 21, 2019, in furtherance of the scheme, **Ashley** sent a cell phone text message from **Ashley**'s phone to L.S.'s phone. Within this message, **Ashley** falsely stated and represented that the percentage of return for the UIT was "8-9%."

25. Based on **Ashley**'s false representations, pretenses, and statements, L.S. provided funds to **Ashley** that L.S. believed **Ashley** would invest in a UIT investment through Parkland Securities: on or about December 10, 2019, L.S., at the request of and with the knowledge of **Ashley**, signed and caused the deposit of a check payable to KKBK and in the amount of $20,000 in BB&T bank account number XXXXXX8725. **Ashley** transferred a portion of these funds to a checking account that he controlled, and another portion to another investor.

26. All told, L.S. provided $221,200 to **Ashley** to invest through Parkland Securities in a UIT investment. None of LS's funds were ever invested in a Parkland Securities UIT investment. L.S. suffered a net loss of approximately $124,113.58 as a

Indictment– Page 6

result of **Ashley**'s fraud scheme.

## The Execution of the Scheme Against J.S.

27.  In or about February of 2016, in response to **Ashley**'s representations, statements, and promises, J.S. began providing money to **Ashley** for what J.S. understood was an investment backed by Parkland Securities.

28.  On April 26, 2016, J.S. sent an email to **Ashley**'s email address keith@northtexasmoney.com. In the email, J.S. asked **Ashley** about depositing "Some more cash in either one of the accounts? I have a lot of money sitting on the sidelines right now, so 3% might be a good tact at this point in time." Later the same day, **Ashley** sent a reply to J.S.'s email above by means of interstate wire transmission, and asked when they could meet to discuss J.S.'s investment options.

29.  On April 27, 2016, J.S. sent a reply email to **Ashley** and stated, "Let's just talk over the phone. I was just thinking of $150,000 in the 3% grouping for the first contract." **Ashley** sent a reply email to J.S. in which he stated, "Ok let me get some info gathered I will call you Monday??"

30.  On or about May 2, 2016, **Ashley** caused an interstate wire transmission to be sent in the form of an email from a SmartTrust UIT investment prospectus that J.S. would be investing by a SmartTrust UIT investment advisor. Attached to the email was a personalized SmartTrust UIT investment prospectus that J.S. would be investing $150,000 in diversified common stocks and closed-end funds.

31. Based upon and in response to **Ashley**'s false representations, pretenses, and statements, J.S. provided $150,000 to **Ashley** to be invested in a UIT investment through SmartTrust. On or about May 5, 2016, J.S. caused an interstate wire transfer of funds in the amount of $150,000 from J.S.'s Texas Capital Bank account XXXXXX7979 to KBKK BB&T Bank account number XXXXXX8725. The wire transfer electronically passed through the State of North Carolina.

32. In the weeks following the deposit described above, **Ashley** made a transfer of a portion of the deposit to the account of L.S., another **Ashley** investor, and two transfers of portions of the deposit to his own account. These transfers included a wire transfer in the amount of approximately $40,000 that **Ashley** made on or about May 6, 2016, from KBKK BB&T account number XXXXXX8725 to **Ashley**'s personal Bank of America account number XXXXXX4804. Additionally, from these funds, **Ashley** made another transfer on or about June 23, 2016 in the amount of $15,000, from KBKK BB&T account number XXXXXX8725 to **Ashley**'s personal Bank of America account number XXXXXX4804. Both of these wire transfers electronically passed through the State of North Carolina.

33. These transfers also included a wire transfer in the amount of approximately $1,200, which electronically passed through the State of North Carolina which **Ashley** made on or about June 3, 2016, from KBKK BB&T account number XXXXXX8725 to an account at Bank of America for the benefit of L.S. another **Ashley** investor.

34. All told, J.S. provided $770,000 to **Ashley** to invest through Parkland Securities in a UIT investment. In the end, J.S. suffered a net loss of approximately $687,392.96 as a result of **Ashley**'s fraud scheme.

### The Execution of the Scheme Against D.W.

35. In or about 2017, **Ashley** began communicating with D.W., an individual known to the Grand Jury, soliciting money from D.W. related to the UIT investment scheme. During the course of their communications, as he was seeking money from D.W., **Ashley** falsely stated and represented to DW that the investment would be a SmartTrust UIT that would be a three-year investment which was tax free. **Ashley** did not tell D.W. he actually would use D.W.'s money to make payments to other **Ashley** "investors" and then transfer a portion of the remainder to his personal bank account held at Bank of America, bearing account number XXXXXX4804. Based on **Ashley**'s representations, pretenses, and statements, D.W. provided approximately $145,000 to **Ashley** to be invested through SmartTrust in a UIT investment.

36. On or about March 14, 2019, D.W. wrote a $20,000 check, made payable to KBKK, and forwarded it to **Ashley** to invest. **Ashley** caused the $20,000 check from D.W. to be deposited into the KBKK BB&T account number XXXXXX8725.

37. On April 26, 2020, in furtherance of the scheme, **Ashley** caused an electronic communication to be sent by D.W., via email, to **Ashley**'s email address keith@northtexasmoney.com. In the email titled "KBKK Update," D.W. stated, "hi keith, Just wanted to update you on our KBKK bank deposits. Here is the deposit dates that indicate one month is still missing: October 18, 2019, $645.54, Last old deposit amount.

Indictment– Page 9

November 26, 2019, $770.79, New deposit amount. December 31, 2019, $770.79, New deposit amount. January 2020, $0, No deposit. February 24, 2020, $1,541.59, Deposit for both January and February at new amount. March 2020, $0, No Deposit. April 24, 2020, $770.79, New Deposit amount (It seems this should have also including (sic) March). Also, maybe the random dates may suggest something about the problem. Likely not. Let me know Monday what you think. Thanks." Later the same day, **Ashley** responded to D.W.'s email and stated "I will call you Monday. **Keith Ashley**."

38.  On or about March 14, 2019, D.W. provided a check in the amount of $20,000, made payable to KBKK, to **Ashley**, which was subsequently deposited into the KBKK, LLC, BB&T account number XXXXXX8725. D.W. intended these funds to be placed into a SmartTrust UIT investment as explained to him by **Ashley**, but they were not. During the remainder of March, 2019, **Ashley** caused portions of the funds D.W. provided to be transferred both to other investors and to an account that **Ashley** controlled. For example, on March 25, 2019, **Ashley** wire transferred $2,500 of the deposited funds from KBKK BB&T account number XXXXXX8725 to **Ashley**'s personal Bank of America account number XXXXXX4804; this wire transfer caused an electronic transmission from Texas through the state of North Carolina.

39.  All told, D.W. provided $145,000 to **Ashley** to invest through SmartTrust in a UIT investment. In the end, D.W. suffered a net loss of approximately $97,328.51 as a result of **Ashley**'s fraud scheme.

### The Execution of the Scheme Against R.G.

40.     In or about 2019, **Ashley** began communicating with R.G., an individual known to the Grand Jury, and soliciting money from R.G. for what **Ashley** described as a UIT investment through Parkland Securities. During the course of their communications, **Ashley** met with R.G. in the Eastern District of Texas to market his investment scheme to R.G. As he was seeking money from R.G., **Ashley** falsely stated and represented to R.G. that the UIT though Parkland Securities was an "alternative investment" which paid a guaranteed rate of return. **Ashley** did not tell R.G. he would actually use R.G.'s money to make payments to other **Ashley** victims/investors and then transfer a portion of the remainder to his personal bank account held at Bank of America, account number XXXXXX4804.

41.     On or about February 5, 2020, in furtherance of the scheme, **Ashley** sent a cell phone text to R.G.'s phone. In this message, **Ashley** stated, "Sent you the wire info. I let Parkland know it will be coming today or tomorrow." R.G. responded by cell phone text message to **Ashley**, "Ok, so it goes to Parkland or Branch Banking and Trust Co." **Ashley** replied by cell phone to R.G., "Branch Banking Trust. Every transaction we do is monitored and approved through Parkland. They are our broker dealer. Call me and I will explain. You will have sub accounts inside Parkland and this UIT is one of them." These statements and representations that **Ashley** made were false in that **Ashley** never invested any of R.G.'s funds with Parkland Securities.

42. On or about February 6, 2020, in furtherance of the scheme, **Ashley** sent a cell phone text message to R.G.'s phone. In this message, **Ashley** stated, "Please try to get wire done today. I do not want to have to redo paperwork." R.G. responded by cell phone text message to **Ashley**, "Ok, 75K right?" **Ashley** replied by cell phone text message, "Yes." A short time later R.G. sent another cell phone text message to **Ashley** asking, "So after this UIT is purchased will I get a statement or shares or anything?" **Ashley** responded by cell phone text message to R.G., "Yes, it will be on your Parkland statement, just like all your other statements but in a brokerage account we can hold UIT/Stocks/LP/Ex." These statements and representations that **Ashley** made were false in that **Ashley** never invested any of R.G.'s funds with Parkland Securities.

43. On or about February 6, 2020, at the request of and with the knowledge of **Ashley**, and based on **Ashley**'s representations, pretenses, and statements, R.G. wire transferred the amount of $75,000 from NDBTC account number XXXXXX0960 to KBKK BB&T account number XXXXXX8725. This wire transfer caused an interstate electronic transmission from Texas through the State of North Carolina. R.G. intended for these funds to be placed into a Parkland Securities UIT investment as explained to him by **Ashley**. After these funds were deposited by **Ashley**, **Ashley** caused over $40,000 of the funds to be transferred to the NTMM Chase account, number XXXXXX2589, that he controlled. These transfers included a transfer on or about February 7, 2020, in the amount of approximately $16,496.15 that **Ashley** made from KBKK BB&T account number XXXXXX8725 to NTMM chase account number XXXXXX2589; this wire

transfer caused an interstate transmission from Texas through the state of North Carolina. These transfers also included a transfer on or about February 10, 2020, in the amount of approximately $12,000 that **Ashley** made from KBKK BB&T account number XXXXXX8725 to NTMM Chase account number XXXXXX2589; this wire transfer caused an interstate transmission from Texas through the State of North Carolina. These transfers also included a transfer on or about February 12, 2020, in the amount of approximately $13,500 that **Ashley** made from KBKK BB&T account number XXXXXX8725 to NTMM Chase account number XXXXXX2589; this wire transfer caused an interstate transmission from Texas through the state of North Carolina.

44. All told, R.G. provided $75,000 to **Ashley** to invest through Parkland Securities in a UIT investment, and in the end, R.G. suffered a net loss of approximately $74,742.19 as a result of **Ashley**'s fraud scheme.

## Acts in Execution of the Scheme and Artifice

On or about the dates specified below, in the Eastern District of Texas and elsewhere, for the purpose of executing and attempting to execute the above-described scheme and artifice to defraud and obtain money from the victim investors, by means of false and fraudulent pretenses, representations, and promises, the defendant, **Keith Todd Ashley**, knowingly transmitted and caused to be transmitted by means of wire communication in interstate and foreign commerce the writings, signs, signals pictures, and sounds described below:

| Count | Date On or About | Description of Interstate Transmission |
|---|---|---|
| 1 | May 5, 2016 | Interstate wire transfer of funds from TCB account number XXXXXX5105 to KBKK BB&T account number XXXXXX8725, in the amount of approximately $150,000 |
| 2 | August 19, 2019 | Interstate wire transfer of funds from UMB Bank XXXXXX1411 to KBKK BB&T XXXXXX8725, in the amount of approximately $25,000 |
| 3 | February 6, 2020 | Interstate wire transfer of funds from NDBTC XXXXXX0960 to KBKK BB&T XXXXXX8725, in the amount of approximately $75,000 |
| 4 | February 7, 2020 | Interstate wire transfer of funds from KBKK BB&T XXXXXX8725 to **Ashley** Chase XXXXXX2589, in the amount of approximately $16,495.15 |
| 5 | February 10, 2020 | Interstate wire transfer of funds from KBKK BB&T XXXXXX8725 to **Ashley** Chase  XXXXXX2589, in the amount of approximately $12,000 |
| 6 | February 12, 2020 | Interstate wire transfer of funds from KBKK BB&T XXXXXX8725 to **Ashley** Chase XXXXXX2589 in the amount of approximately $13,500 |

## NOTICE OF INTENT TO SEEK CRIMINAL FORFEITURE
Pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)

1. The allegations contained in Counts 1 – 6 of this indictment are realleged and incorporated by reference as though fully set forth herein for the purpose of alleging forfeiture to the United States of America of certain property in which the defendant has an interest.

2. Upon conviction of any violation of 18 U.S.C. § 1343, the defendant, **Keith Todd Ashley**, shall forfeit to the United States any property, real or personal, that constitutes or is derived from proceeds traceable to a violation of any offense constituting "specified unlawful activity," or a conspiracy to commit such offense, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).

3. The property which is subject to forfeiture, includes but is not limited to the following:

   Cash Proceeds:

   A sum of money equal to $1,143,000.00 in United States currency, and all interest and proceeds traceable thereto, representing the proceeds of the offense, for which the defendant is personally liable.

4. Pursuant to 21 U.S.C. § 853(p), as incorporated by reference by 18 U.S.C. § 982(b), if any of the forfeitable property, or any portion thereof, as a result of any act or omission of the defendant:

   a. Cannot be located upon the exercise of due diligence;

   b. Has been transferred, or sold to, or deposited with a third party;

   c. Has been placed beyond the jurisdiction of the Court;

   d. Has been substantially diminished in value; or

  e. Has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States to seek the forfeiture of other property of the defendant up to the value of the above-described forfeitable properties, including, but not limited to, any identifiable property in the name of **Keith Todd Ashley**.

  5. By virtue of the commission of the offenses alleged in this indictment, any and all interest the defendant has in the above-described property is vested in the United States and hereby forfeited to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).

  6. All pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), and the procedures set forth at 21 U.S.C. § 853, as made applicable through 18 U.S.C. § 982(b)(1).

         A TRUE BILL

         _____
         GRAND JURY FOREPERSON

STEPHEN J. COX
UNITED STATES ATTORNEY

_____    11/12/2020
HEATHER RATTAN          Date
Assistant United States Attorney

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | **SEALED** |
| | § | |
| V. | § | Case No. 4:20-CR-00 |
| | § | Judge |
| KEITH TODD ASHLEY | § | |

## NOTICE OF PENALTY

### Counts 1 - 6

Violation:	18 U.S.C. § 1343 (Wire Fraud)

Penalty:	Imprisonment for a term not to exceed twenty (20) years; a fine not to exceed $250,000, or if any person derives pecuniary gain from the offense, or if the offense results in pecuniary loss to a person other than the defendant—then a fine not more than the greater of twice the gross gain to the defendant or twice the gross loss to individual(s) other than the defendant; or both such imprisonment and fine; and a term of supervised release of not more than three (3) years.

.

Special Assessment:	$100.00

Notice of Penalty – Page 16