```
 1                  UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF TEXAS
 2                       SHERMAN DIVISION

 3      UNITED STATES OF AMERICA      |  DOCKET 4:20-CR-318
                                      |
 4                                    |  SEPTEMBER 27, 2022
        VS.                           |
 5                                    |  8:27 A.M.
                                      |
 6      KEITH TODD ASHLEY             |  SHERMAN, TEXAS

 7      -----------------------------------------------------

 8            VOLUME 2 OF 8, PAGES 276 THROUGH 539

 9           REPORTER'S TRANSCRIPT OF JURY TRIAL

10        BEFORE THE HONORABLE AMOS L. MAZZANT, III,
            UNITED STATES DISTRICT JUDGE, AND A JURY
11      -----------------------------------------------------

12
        FOR THE GOVERNMENT:     HEATHER HARRIS RATTAN
13                              JAY COMBS
                                U.S. ATTORNEY'S OFFICE - PLANO
14                              101 E. PARK BOULEVARD, SUITE 500
                                PLANO, TX 75074
15
                                JASON FINE
16                              DALLAS COUNTY D.A.'S OFFICE
                                133 N. RIVERFRONT BOULEVARD
17                              DALLAS, TX 75207

18
        FOR THE DEFENDANT:      JAMES P. WHALEN
19                              RYNE THOMAS SANDEL
                                WHALEN LAW OFFICE
20                              9300 JOHN HICKMAN PKWY, SUITE 501
                                FRISCO, TX 75035
21

22      COURT REPORTER:         CHRISTINA L. BICKHAM, CRR, RDR
                                FEDERAL OFFICIAL REPORTER
23                              101 EAST PECAN
                                SHERMAN, TX 75090
24

25         PROCEEDINGS RECORDED USING MECHANICAL STENOGRAPHY;
          TRANSCRIPT PRODUCED VIA COMPUTER-AIDED TRANSCRIPTION.
```

1                          INDEX

2

3                                                    PAGE

4   COURT'S PRELIMINARY INSTRUCTIONS TO THE JURY     287

5   OPENING STATEMENT BY MS. RATTAN                  300

6   OPENING STATEMENT BY MR. WHALEN                  325

7   DENNY MAURICE WILLMON
         DIRECT EXAMINATION BY MS. RATTAN            333
8        CROSS-EXAMINATION BY MR. WHALEN             349
         REDIRECT EXAMINATION BY MS. RATTAN          352
9
    JEANNY GALLOT
10       DIRECT EXAMINATION BY MS. RATTAN            355
         CROSS-EXAMINATION BY MR. SANDEL             372
11
    MATTHEW WYLIE
12       DIRECT EXAMINATION BY MS. RATTAN            377
         CROSS-EXAMINATION BY MR. WHALEN             390
13       REDIRECT EXAMINATION BY MS. RATTAN          395
         RECROSS-EXAMINATION BY MR. WHALEN           395
14
    LEONID SHTEYNGART
15       DIRECT EXAMINATION BY MS. RATTAN            396
         CROSS-EXAMINATION BY MR. WHALEN             410
16
    MATTHEW WYLIE
17       DIRECT EXAMINATION BY MS. RATTAN            412
         CROSS-EXAMINATION BY MR. WHALEN             419
18
    DENNY MAURICE WILLMON
19       DIRECT EXAMINATION BY MS. RATTAN            423
         CROSS-EXAMINATION BY MR. WHALEN             425
20
    ROBERT GREENING
21       DIRECT EXAMINATION BY MR. FINE              426
         CROSS-EXAMINATION BY MR. SANDEL             459
22
    MATTHEW WYLIE
23       DIRECT EXAMINATION BY MS. RATTAN            474
         CROSS-EXAMINATION BY MR. WHALEN             504

24

25

1   ALICIA MOLINA
        DIRECT EXAMINATION BY MS. RATTAN           513
2       *VOIR DIRE* EXAMINATION BY MR. WHALEN       515
        CONTINUED DIRECT EXAMINATION BY MS. RATTAN  515
3       CROSS-EXAMINATION BY MR. WHALEN             517

4   JOHN COSENZA
        DIRECT EXAMINATION BY MS. RATTAN           519
5       CROSS-EXAMINATION BY MR. WHALEN             529

6   COURT REPORTER'S CERTIFICATION                 539

7

8

9

10                  INDEX OF EXHIBITS

11                                                PAGE

12  Government's Exhibit 45A                       340

13  Government's Exhibit 46                        343

14  Government's Exhibit 45A                       348

15  Government's Exhibit 8B                        357

16  Government's Exhibit 49 and 55                 360

17  Government's Exhibit 55                        363

18  Government's Exhibits 52B, C, and D            365

19  Government's Exhibit 52C                       367

20  Government's Exhibit 52D                       368

21  Government's Exhibit 8B                        372

22  Government's Exhibit 55                        373

23  Government's Exhibit 47                        382

24  Government's Exhibit 45A                       384

25  Government's Exhibit 47                        388

1    Government's Exhibit 42B                              403

2    Government's Exhibits 43A and B                       403

3    Government's Exhibits 43A and 43B                     406

4    Government's Exhibit 43A                              413

5    Government's Exhibits 44A and 44B                     413

6    Government's Exhibit 44B                              416

7    Government's Exhibit 48                               436

8    Government's Exhibit 50                               451

9    Government's Exhibit 51                               451

10   Government's Exhibit 48                               452

11   Government's Exhibit 48                               463

12   Government's Exhibit 49                               475

13   Government's Exhibit 52A                              476

14   Government's Exhibits 53B and 54                      483

15   Government's Exhibit 55                               484

16   Government's Exhibits 55, 56A, and 56B                484

17   Government's Exhibit 56B                              491

18   Government's Exhibit 57                               496

19   Government's Exhibit 57                               498

20   Government's Exhibit 52A                              504

21   Government's Exhibits 56A and 56B                     505

22   Government's Exhibit 57                               506

23   Government's Exhibit 59                               514

24   Government's Exhibit 59                               515

25   Government's Exhibit 59                               520

1    Government's Exhibit 60                                    523

2    Government's Exhibit 60                                    525

3    Government's Exhibit 59                                    530

4    Government's Exhibit 60                                    533

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1            (Open court, defendant and jury not present.)

 2            THE COURT:  Please be seated.

 3            I think we have all the jury here, but I did want

 4    to raise an issue.  Ms. Conrad was notified last night by

 5    Juror Number 10 asking to be released.  Juror Number 10, I

 6    think, indicated to her that -- she, I think, is a

 7    hairdresser and she thought that her employer would pay her

 8    while she was doing jury service, but they won't because

 9    she gets paid for her jury time.  And so she was asking to

10    be released.

11            Any thoughts?  I'm inclined not to.  I'm just

12    saying -- but I wanted to hear from the parties.  I mean, I

13    made it very clear when I gave the example of the

14    anniversary plans; and there were other people that have

15    commission-based work.  If she had voiced that issue, I

16    would have probably let her -- I'm sure I would have let

17    her go just like we let the others go based on hardship,

18    but typically I don't do it once -- that's why I said raise

19    it now.

20            But, you know, if both sides agree to do

21    something, then I'm always open to it but --

22            MS. RATTAN:  May I talk to Mr. Whalen?

23            THE COURT:  Yes, please.

24            (Off-the-record discussion among counsel.)

25            MS. RATTAN:  Thank you, your Honor.  We've

 1   conferred.

 2          THE COURT:  Yes.  And what would you like to do?

 3          MS. RATTAN:  It is the government's belief that

 4   just based on the possible length of the trial and that we

 5   only have two alternates, that we can't release her at this

 6   point.

 7          MR. WHALEN:  Your Honor, we would be okay with

 8   releasing her.  I'm optimistic that we have two alternates

 9   and we could make it through.  And I think she learned

10   about -- she learned about it at the end, you know,

11   probably when she got home and then realized she couldn't;

12   so she didn't know to bring it up.  It wasn't an issue

13   until then.

14          THE COURT:  I understand.  Again, unless there is

15   an agreement, I am not going to release the juror.  I made

16   it very clear that they had to speak up then on any issues

17   with hardship so -- that doesn't mean this won't become a

18   problem, but hopefully the juror will continue to show up.

19          What I will do is I'll just have Ms. Conrad at the

20   break go and indicate to her that she needs to -- I'm not

21   going to release her.

22          Okay.  So I just also have been notified that the

23   city had a waterline break, and so we do not have any water

24   in the courthouse.  So we're going to go ahead and -- we'll

25   go ahead and start.  We'll see what we have -- which means

 1   there will be no bathroom availability in the courthouse.

 2   So we'll go ahead and start, and then we'll see where we're

 3   at at the break if they have fixed it.

 4          MR. WHALEN:  And, your Honor, I just want to put

 5   on the record that since -- Juror Number 10, if she's the

 6   hairdresser, I believe she was Juror Number 29; and that

 7   was somebody that we had an issue with, we would have used

 8   a strike on.  And so I just want to make clear for the

 9   record that we're not opposed to letting her go and also

10   just tying those two pieces together.  That's somebody we

11   would have used a strike on, so we will re-urge our motion.

12          THE COURT:  Well, I understand and, again, we'll

13   see where things -- how things pan out but, again, I'm not

14   going to release her at this time at least so -- whether we

15   revisit it later, we'll see, but -- and I don't have a

16   problem -- well, we'll just deal with that later.  But I

17   mean, currently at the break I'll have my staff talk to her

18   and let her know that I'm not releasing her at this time.

19          Okay.  Anything else?

20          MS. RATTAN:  Yes, your Honor, a couple of things.

21   Back to the Robert Greening motion *in limine*.  We've

22   included a summary of Mr. Greening's testimony in our

23   opening statement.  We don't believe that the motion *in*

24   *limine* -- well, it's been granted; but it's our position

25   that his testimony is relevant and admissible.  The whole

 1    issue there was the fact that Mr. Greening is a lawyer who

 2    previously represented the defendant on a minor car

 3    accident.

 4            THE COURT:  Yes, and I understand -- Mr. Whalen, I

 5    know -- I'm going to overrule any objection you have to

 6    that testimony.  I mean, it is -- he's not in the

 7    capacity -- this idea that just because they were at one

 8    time his lawyer, that extends some privilege to any

 9    communication, that's not the way that the law works.

10            I mean, in terms of whether the evidence is

11    admissible is all whether there was an attorney-client

12    relationship that was existing for what was happening.  And

13    that's clearly not the case based on what the government

14    has represented, so I'm denying that request.

15            MR. WHALEN:  And, your Honor, just for the record

16    purposes, is it -- since you're denying that, do I need to

17    object to his testimony each time he's asked a question; or

18    will the Court consider that I've preserved that objection

19    as is it relates to his testimony and any exhibits related

20    to his testimony?

21            THE COURT:  Well, what I would say is object the

22    first time; and then if you want to ask for a running

23    objection, I'll grant that --

24            MR. WHALEN:  Thank you, your Honor.

25            THE COURT:  Okay.

1           MS. RATTAN:  And the second issue, yesterday the

2    Court twice asked how the government would propose to go

3    forward on Counts 17 and 18.  With the Court's permission,

4    we'd like to move forward only on Count 18 and submit the

5    (j), at the issue, the 924(c)(j) issue, as a special issue

6    in the jury instructions.

7           THE COURT:  Okay.  So the government is asking to

8    essentially dismiss Count 17?

9           MS. RATTAN:  Yes, your Honor.

10          THE COURT:  Okay.

11          MS. RATTAN:  We believe it's a lesser included

12   offense of Count 18 and would be able to be submitted that

13   way to the jury.

14          THE COURT:  I agree.

15          I assume there is no opposition from the defense.

16          MR. WHALEN:  No, your Honor.  I think that's the

17   proper way to do it.  And you had asked me about whether to

18   do it as a special issue, as an element.  I agree it would

19   be cleaner to do it as a special issue.

20          THE COURT:  I agree, so I think we're all in

21   agreement.

22          Okay.  So for my preliminary instructions I won't

23   mention Count 17.  It will just be Count 18.

24          MS. RATTAN:  Great.

25          THE COURT:  Okay.  Anything else?

1            MS. RATTAN:  No, your Honor.

2            THE COURT:  Let's go ahead and bring the jury in,

3  then.

4            THE COURT SECURITY OFFICER:  One of the jurors

5  just went out to their car.  They forgot their glasses.

6            THE COURT:  Okay.

7            And then I would just say if for some reason we

8  don't get the water restored, that could impact our ability

9  to continue today, having no restroom abilities in the

10  building.

11            MS. RATTAN:  Your Honor, May we approach to be

12  heard on the issue of scheduling?

13            THE COURT:  Yes.

14            (Sidebar conference, off the record.)

15            (The jury enters the courtroom, 8:39 a.m.)

16            THE COURT:  Please be seated.

17            Okay.  So, ladies and gentlemen, I just want to

18  advise you that, if you haven't already heard, that the

19  city of Sherman has had a waterline break; and so I'm

20  having my staff figure out is it contained just to

21  downtown, is it beyond downtown.  We're going to begin, and

22  then we'll see what we do.

23            So at the current stage, if the whole city isn't

24  out of water, just downtown, we'll probably just take a

25  longer break, let everyone go and have a little break.  It

1   will delay things, but at least we can try to still proceed

2   but -- unless the whole city is out, and then we'll address

3   that at the break.  But I'm aware of it.  We're looking at

4   what our options are.

5          Okay.  Welcome back.  So, members of the jury, now

6   that you have been sworn, I'm going to give you some

7   preliminary instructions to guide you in your participation

8   in the trial.

9          It will be your duty to find from the evidence

10  what the facts are.  You and you alone will be the judges

11  of the facts.  You will then have to apply to those facts

12  the law as the Court will give it to you.  You must follow

13  that law whether you agree with it or not.

14         Nothing the Court may say or do during the course

15  of the trial is intended to indicate, or should be taken by

16  you as indicating, what your verdict should be.

17         The evidence from which you will find the facts

18  will consist of the testimony of witnesses, documents, and

19  other items received into the record as exhibits and any

20  facts the lawyers agree to or stipulate to or that the

21  Court instructs you to so find.

22         There are certain things that are not evidence and

23  must not be considered by you.  I will list them now.

24         First, statements, arguments, and questions by the

25  lawyers are not evidence.

1           Second, objections to questions are not evidence.

2   Lawyers have an obligation to their clients to make

3   objections when they believe evidence being offered is

4   improper under the rules of evidence.  You should not be

5   influenced by the objection or by the Court's ruling on the

6   objection.  If the objection is sustained, ignore the

7   question.  If the objection is overruled, treat the answer

8   like any other.  If you are instructed that some item of

9   evidence is received for a limited purpose only, you must

10  follow that instruction as well.

11          Third, testimony that the Court has excluded or

12  told you to disregard is not evidence and must not be

13  considered by you.

14          And, fourth, anything you have seen, heard, or

15  read outside of the courtroom is not evidence and must be

16  disregarded.  You are to decide the case solely on the

17  evidence presented here in the courtroom.

18          Now, as mentioned earlier during the *voir dire*

19  process, there are two kinds of evidence, direct and

20  circumstantial.  Direct evidence is direct proof of a fact,

21  such as the testimony of an eyewitness.  Circumstantial

22  evidence is proof of facts from which you may infer or

23  conclude that other facts exist.  I will give you further

24  instructions on these as well as other matters at the end

25  of the case, but keep in mind that you may consider both

1    kinds of evidence.

2            It will be up to you to decide which witnesses to

3    believe, which witnesses not to believe, and how much of

4    any witness' testimony to accept or reject.  I will give

5    you some guidelines for determining the credibility of

6    witnesses at the end of the case.

7            Now, as you already know, this is a criminal case.

8    There are three basic rules about a criminal case that you

9    must keep in mind.

10           First, the defendant is presumed innocent until

11   proven guilty.  The Indictment brought by the government

12   against the defendant is only an accusation, nothing more.

13   It is not proof of guilt or anything else.  The defendant,

14   therefore, starts out with a clean slate.

15           Second, the burden of proof is on the government

16   until the very end of the case.  The defendant has no

17   burden to prove his innocence or to present any evidence or

18   even to testify.  Since the defendant has the right to

19   remain silent, the law prohibits you from arriving at your

20   verdict by considering that the defendant may not have

21   testified.

22           And, third, the government must prove the

23   defendant's guilt beyond a reasonable doubt.  I will give

24   you further instructions on this point later, but bear in

25   mind that in this respect a criminal case is different than

1    a civil case.

2          Now, in this case the defendant is charged with

3    multiple offenses, called counts, as set forth in the

4    Fourth Superseding Indictment.  I will give you detailed

5    instructions on the law at the end of the case, and those

6    instructions will control your deliberations and decision.

7    But in order to help you follow the evidence, I will give

8    you a brief summary of the elements for each offense that

9    the government must prove beyond a reasonable doubt to make

10   its case.

11         So, Counts 1 through 6, Counts 9 through 14, and

12   Count 20 are wire fraud or attempted wire fraud.  The

13   defendant is charged in Counts 1 through 6, 9 through 14,

14   and Count 20 of the Fourth Superseding Indictment with the

15   offense of wire fraud and attempted wire fraud, in

16   violation of Title 18 United States Code, Section 1343.

17   Section 1343 makes it a crime for anyone to use interstate

18   wire communications in carrying out a scheme to defraud.

19         For you to find the defendant guilty of these

20   crimes, you must be convinced that the government has

21   proved each of the following beyond a reasonable doubt:

22         First, that the defendant knowingly devised or

23   intended to devise any scheme to defraud.  The scheme

24   charged in this case is a scheme in which the defendant

25   solicited money from victim investors for purported

1    investments, when in reality, the funds were used for

2    personal enrichment and other nonbusiness purposes.

3         Second, that the scheme to defraud employed false

4    material representations, false material pretenses, or

5    false material promises.

6         Third, that the defendant transmitted, or caused

7    to be transmitted, by way of wire communications, in

8    interstate commerce, any writing, sign, signal, picture, or

9    sound, for the purpose of executing such scheme.

10        And, fourth, that the defendant acted with a

11   specific intent to defraud.

12        Counts 15 and 16 charge mail fraud and attempted

13   mail fraud.

14        The defendant in this case is charged in Counts 15

15   and 16 of the Fourth Superseding Indictment with the

16   offense of mail fraud and attempted mail fraud, in

17   violation of Title 18 United States Code, Section 1341.

18   Section 1341 makes it a crime for anyone to use the mails,

19   including any private or commercial interstate carrier, in

20   carrying out a scheme to defraud.

21        For you to find the defendant guilty of these

22   crimes, you must be convinced that the government proved

23   each of the following beyond a reasonable doubt:

24        First, that the defendant knowingly devised, or

25   intended to devise, a scheme to defraud.  Here, the

1    defendant is charged with a scheme to obtain money by means

2    of false and fraudulent pretenses and representations.

3            Second, that the scheme to defraud employed false

4    material representations, false material pretenses, or

5    false material promises.

6            Third, that the defendant mailed something or

7    caused something to be sent and/or delivered through the

8    U.S. Postal Service or a private or commercial interstate

9    carrier for the purpose of executing such scheme or

10   attempting to do so.

11           And, fourth, that the defendant acted with a

12   specific intent to defraud.

13           Count 8 *(sic)*, carrying or discharging a firearm

14   during a crime of violence or possession of a firearm in

15   furtherance of a crime of violence.

16           The defendant is charged in Count 18 of the Fourth

17   Superseding Indictment with the offense of carrying or

18   discharging a firearm during a crime of violence or

19   possession of a firearm in furtherance of a crime of

20   violence under Title 18 United States Code,

21   Section 924(c)(1) and 924(j).  Section 924(c) makes it a

22   crime for anyone to knowingly use or carry a firearm during

23   and in relation to a crime of violence or to knowingly

24   possess a firearm in furtherance of a crime of violence.

25   Section 924(j) makes it a crime for anyone, when in the

1   course of a violation of Subsection (c), causes the death

2   of a person through the use of a firearm.

3          For you to find the defendant guilty of this crime

4   under Subsection (c), you must be convinced that the

5   government has proven each of the following beyond a

6   reasonable doubt:

7          First, that the defendant committed the crime of

8   affecting commerce by robbery, in violation of Title 18

9   United States Code, Section 1951(a), which I will explain

10  in a moment.  I instruct you that affecting commerce by

11  robbery is a crime of violence.

12         And, second, that the defendant knowingly used or

13  carried a firearm during and in relation to the defendant's

14  commission of the crime of affecting commerce by robbery,

15  or that the defendant knowingly possessed a firearm and

16  that possession was in furtherance of the defendant's

17  commission of the crime of affecting commerce by robbery.

18         Title 18 United States Code, Section 1951(a),

19  makes it a crime for anyone to obstruct, delay, or affect

20  commerce by robbery.

21         "Robbery" means the unlawful taking or obtaining

22  of or attempting or conspiring to unlawfully take or obtain

23  personal property from the person or in the presence of

24  another, against his will, by means of actual or threatened

25  force or violence or fear of injury, immediate or future,

1    to his person or property or anyone in his company at the

2    time of the taking or obtaining.

3            For you to find that the defendant committed this

4    crime, you must be convinced that the government has proved

5    each of the following beyond a reasonable doubt:

6            First, that the defendant unlawfully obtained or

7    attempted to obtain personal property from a person or in

8    his presence, against his will;

9            Second, that the defendant did so by means of

10   actual or threatened force or violence or fear of injury,

11   immediate or future, to his person or property, property in

12   his custody or possession, or anyone in his company at the

13   time of the taking or obtaining; and,

14           Third, that the defendant's conduct in any way or

15   degree obstructed, delayed, or affected commerce or the

16   movement of any article or commodity in commerce.

17           Title 18 United States Code, Section 111(a) makes

18   it a crime for anyone to murder another human being with

19   premeditation in the commission of or attempted commission

20   of certain felonies.

21           For you to find the defendant committed this

22   crime, you must be convinced that the government proved

23   each of the following beyond a reasonable doubt:

24           First, that the defendant unlawfully killed J.S.;

25           Second, that the defendant killed J.S. with malice

1    aforethought;

2           Third, that the killing was premeditated; and,

3           Fourth, that the killing took place within the

4    territorial jurisdiction of the United States.

5           Count 19, bank fraud *(sic)* or attempted bank

6    theft.

7           The defendant in this case is charged in Count 19

8    of the Fourth Superseding Indictment with the offense of

9    bank theft and/or attempted bank theft under Title 18

10   United States Code, Section 2113.  Section 2113 makes it a

11   crime for anyone to take and carry away, with the intent to

12   steal or purloin, any property or money or any other thing

13   of value exceeding $1,000 belonging to or in the care,

14   custody, control, management, or possession of any

15   federally-insured bank.

16          For you to find the defendant guilty of this

17   crime, you must be convinced that the government proved

18   each of the following beyond a reasonable doubt:

19          First, that the defendant did or did attempt to

20   take and carry away money and property belonging in the

21   care, custody, control, management, possession of Texas

22   Capital Bank;

23          Second, that at that time Texas Capital Bank had

24   its deposits insured by the Federal Deposit Insurance

25   Corporation;

1          Third, that the defendant did or did attempt to

2     take and carry away such money and property with the intent

3     to steal; and,

4          Fourth, that such money and property exceeded

5     $1,000 in value.

6          Now, I know I went through all of these elements.

7     I will just explain further that when I give you my final

8     instructions which will control your deliberations, you

9     will each have a copy of the charge which will set out all

10    of the elements for each of these counts.  So you don't

11    have to remember those.  It's really just to give you an

12    overview.  I just want you to understand that at the end of

13    the day when we give you the final instructions, you will

14    each have a copy of that to take back with you which will

15    outline all of these again.

16         Now let me give you a few words about your conduct

17    as jurors.

18         During the course of the trial, do not speak with

19    any witness or with the defendant or any of the lawyers in

20    the case.  Please do not talk with them about any subject

21    at all.  You may be unaware of the identity of everyone

22    connected with the case.  Therefore, in order to avoid even

23    the appearance of impropriety, do not engage in any

24    conversation with anyone in or about the courtroom or the

25    courthouse.  It is best that you remain in the jury room

 1    during breaks in the trial and do not linger in the hall.

 2              In addition, during the course of the trial, do

 3    not talk about the trial with anyone else -- not your

 4    family, not your friends, not the people with whom you

 5    work.  Also, do not discuss this case among yourselves

 6    until I have instructed you on the law and you've gone to

 7    the jury room to make your decision at the end of the

 8    trial.

 9              Otherwise, without realizing it, you may start

10    forming opinions before the trial is over.  It is important

11    that you wait until all the evidence is received and you've

12    heard my final instructions on the rules of law before you

13    deliberate among yourselves.

14              Now, you, as jurors, must decide this case based

15    solely on the evidence presented here within the four walls

16    of the courtroom.  This means that during the trial you

17    must not conduct any independent research about this case,

18    the matters in this case, and the individuals involved in

19    the case.  In other words, you should not consult

20    dictionaries or reference materials; search the Internet,

21    websites, or blogs; or use any other electronic tools to

22    obtain information about this case or to help you decide

23    the case.  Please do not try to find out any information

24    from any source outside the confines of what you see and

25    hear in the courtroom.

1          I know that many of you have cell phones and use

2    the Internet and other tools of technology.  You must not

3    talk to anyone at any time about this case or use these

4    tools to communicate electronically with anyone about the

5    case.  This includes your family and friends.  You may not

6    communicate with anyone about the case through any means,

7    including your cell phone, through email, BlackBerry,

8    iPhone, text messaging, Snapchat, Twitter, or through any

9    blog or website, including Facebook, Google, MySpace,

10   LinkedIn, or YouTube.  And you may not use any other

11   similar tools of social media, even if I haven't

12   specifically mentioned it here.  It seems like new ones are

13   created every day.  At least that's what my kids tell me.

14         I expect you will inform me as soon as you become

15   aware of another juror's violation of these instructions.

16   A juror who violates these restrictions jeopardizes the

17   fairness of these proceedings; and a mistrial could result,

18   which would require the entire trial process to start over.

19         Now, if you would like to take notes during the

20   trial, you may do so.  On the other hand, you are not

21   required to take notes if you prefer not to do so.  Each of

22   you should make your own decision about this.

23         If you decide to take notes, be careful not to get

24   so involved in the note-taking that you become distracted

25   from the ongoing proceedings.  Your notes should be used as

1    memory aids.  You should not give your notes precedence

2    over your independent recollection of the evidence.  If you

3    do not take notes, you should rely upon your own

4    independent recollection of the proceedings; and you should

5    not be unduly influenced by the notes of other jurors.

6         Notes are not entitled to any greater weight than

7    the memory or impression of each juror as to what the

8    testimony may have been.  Whether you take notes or not,

9    each of you must form and express your own opinion as to

10   the facts of the case.

11        As you will note, I have an official court

12   reporter -- and she's amazing, does a great, great job --

13   who is making a record of the trial.  However, we will not

14   have typewritten transcripts of this record available for

15   your use in reaching a decision.

16        Now let me give you a grief roadmap to help you

17   follow what will happen over the entire course of the

18   trial.  First, the government will make an opening

19   statement, which is simply an outline to help you

20   understand the evidence as it is going to be admitted.

21        Next, the defendant's attorney may, but they don't

22   have to, make an opening statement.  Remember, opening

23   statements are neither evidence and they're not arguments

24   either.

25        The government will then present its witnesses,

 1   and the counsel for the defense may cross-examine them.

 2   Following the government's case the defendant may, if he

 3   wishes, present evidence whom the government may also

 4   cross-examine.

 5           If the defendant decides to present evidence, the

 6   government has the opportunity to introduce rebuttal

 7   evidence.

 8           After all the evidence is in, the attorneys will

 9   then present their closing arguments to summarize and

10   interpret the evidence for you; and then I will instruct

11   you on the law.  After that, you will retire to deliberate

12   to reach your verdict.

13           And now the trial will now begin.  I will call

14   upon the government to make their opening statement.

15           MS. RATTAN:  Thank you, your Honor.  May it please

16   the Court?

17           THE COURT:  Yes.

18           MS. RATTAN:  Counsel, members of the jury, good

19   morning.

20           As you know from *voir dire* yesterday, this case is

21   the United States of America, the citizens of the United

22   States, versus Keith Todd Ashley, the defendant.  And he

23   was introduced to you yesterday.

24           Of course, every criminal defendant has a right to

25   be present at their trial, as is this defendant's right.

 1    This is the defendant, Keith Todd Ashley.  He's a former

 2    police officer, a paramedic, a nurse, a financial advisor,

 3    a life insurance agent, and a brewery owner.  All of these

 4    things combined into a cauldron that allowed him to commit

 5    the crimes that you'll hear about in this case.  He stole,

 6    and he killed.  Stealing and killing is what happened in

 7    this case, and that's what the evidence will show.

 8            Judge Mazzant just went over with you what the

 9    charges are.  There are multiple counts.  But just an

10    overview of the charges:  He's been charged with wire

11    fraud, mail fraud, bank theft, and use of a firearm during

12    a crime of violence; and the crime of violence in this case

13    is a robbery.

14            Mail fraud and wire fraud are the federal theft

15    statutes.  Essentially, if you lie to someone to get their

16    money and then you use the mail or you use a fax or an

17    email, anything like that, to advance the scheme or to move

18    their money, then that's your federal theft statute, wire

19    fraud, bank fraud.

20            Now, the use of a firearm during a crime of

21    violence, the robbery, you're going to hear evidence about

22    that.  Essentially, it's a high-tech, very sophisticated

23    robbery scheme that was devised by the defendant using the

24    special skills he had as a former police officer with

25    specialized training, as a nurse, paramedic, life insurance

 1  agent, and financial advisor, the cauldron of skills that

 2  he had to ultimately commit this crime; and I'll review

 3  with you the specific facts in just a minute.

 4       And then bank theft.  As part of the robbery and

 5  as part of the killing of the victim, James Seegan, he

 6  accessed the victim's bank account after he was dead and

 7  took $20,000 of his money.  He didn't use to it give to the

 8  victim's wife, as you would expect a financial advisor

 9  would.  He didn't use it for anything except selfish

10  reasons.  He used it to pay lulling payments to people he

11  was stealing from and for personal gain.  That's what he

12  used the money that he stole from the bank for.

13       Wire fraud, mail fraud, bank theft, and use of a

14  firearm during a crime of violence; and that is a robbery.

15       Jay Combs yesterday, when he was talking to you

16  when you were potential jurors during *voir dire*, talked to

17  you about what a Ponzi pyramid scheme is.  In this case

18  it's not a complicated scheme.  Essentially what happens is

19  I'm the schemer and I approach Special Agent Rennie and I

20  tell him, "I've got a great investment for you."  We know

21  each other.  We have a rapport, a relationship.  He trusts

22  me.  And I tell him, "It's a SmartTrust UIT.  Here is the

23  percentage return you're going to get, and you can invest

24  in it."

25       Agent Rennie says, "That sounds good.  I trust

1    you."  He gives me $20,000.  I take his $20,000; and I'm

2    like SmartTrust, Schmart Trust.  The money is going to me.

3          The money goes into my bank account, and you'll

4    see a CPA financial analyst from the FBI will tell you that

5    he tracked the money and exactly where it went.  None of

6    the money went to any investments for the victims.  It all

7    went to the personal aggrandizement of the defendant.  He

8    paid what anyone would pay if they had extra money.  He

9    paid on his mortgage.  He gambled on -- I'm not sure all of

10   us would do that, but certainly that was something that he

11   did.  He paid on his credit cards.  Those are the sorts of

12   things that he did.

13         So here's what happens.  I've taken Agent Rennie's

14   money and I've told him that I've invested it when I really

15   haven't.  So what am I going to do?

16         Enter Jason Fine.  I go to Jason Fine.  "Jason

17   Fine, I have an investment."  I tell him about the same

18   product.  Jason Fine says, "I trust you."  He gives me his

19   money.  He gives me $20,000.

20         What do I do with his $20,000?  Well, at this

21   point Special Agent Rennie is expecting to get monthly

22   payments as the return on his investment; but we all know I

23   don't have that money because I never made the investment.

24         So what do I do with the money Jason Fine gives

25   me?  I don't give it all back to Special Agent Rennie

1  because it's about me, after all, and I have things that I

2  want to do with the money.  Instead, I take a portion of

3  the money that I have received, a portion of the $20,000

4  and I give it and say, "Oh, these are the monthly payments

5  from your investment."  I give it to the original investor,

6  and then I steal this investor's money as well and so on.

7          It's a pyramid scheme.  It builds on the

8  recruitment of additional investors.  So there's no real

9  scheme -- there's no real investment.  Money's stolen; it's

10 not invested.  It just goes to the schemer, and the

11 investment money is used to pay other investors.  And

12 that's basically what the scheme is.

13         So you've got your first investors who pay out the

14 money to the schemer.  The schemer steals the money.  But

15 then there is a second round of investors where they pay

16 money to the schemer.  The schemer pays some of it to the

17 first investors to make the whole thing look real but keeps

18 most of it.  That's the pyramid scheme.  That's what this

19 defendant was participating in.

20         And really when you listen to the forensic

21 accountant, the CPA that works for the FBI -- his name is

22 Matt Wylie -- he looked in the accounts.  He looked at all

23 the evidence.  He looked to see whether any of the money

24 was invested, and it wasn't.  And he'll tell you where it

25 went and the things that this defendant did with the

1    victims' money.

2              So the victims of the scheme who you will hear

3    about, one of them was James Seegan.  Now, James Seegan

4    ultimately became the victim of the defendant's ultimate

5    biggest scheme; and that is, he murdered him.  But before

6    he murdered James Seegan to obtain the life insurance money

7    on the policy that he had sold James Seegan, he stole money

8    from James Seegan in a pyramid scheme.

9              And here's -- you're going to see emails between

10   the defendant, James Seegan.  You're going to see the money

11   that James Seegan gave to the defendant.  And then you'll

12   hear the analysis of the CPA forensic accountant about how

13   the money was actually stolen.

14             So the emails you'll see will be just like you

15   would send any email with a financial advisor.  (As read):

16   "Let's just talk over the phone.  I was just thinking about

17   putting $150,000 in the 3 percent grouping for the first

18   contract."

19             And then Ashley replies (as read):  "Okay.  Let me

20   get some information gathered for you and I'll call you on

21   Monday."

22             These are just sample conversations between Ashley

23   and the victim.

24             So then the victim pays $150,000.  He wires it

25   from his account to the Defendant Ashley 's account.  And

1   that's the thing, too, because the defendant is telling the

2   investors that all of this is being overseen by a company

3   where I have a relationship, Parkland.

4          But the money is not going to Parkland.  The

5   victims are sending the money to a personal account that's

6   the defendant's account, and you'll hear it's called

7   Ashley's account that he invests at KBKK.  That's his

8   account.

9          So then you'll hear the financial analysis; and

10  the CPA will tell you where, in fact, where the $150,000

11  went.  This doesn't account for every penny of it; but for

12  opening statement, I just wanted to give you an idea of

13  what he did with it.

14         You'll hear that $1,200 of it went to Leonid

15  Shteyngart.  And who do you think that's going to be?

16  That's someone he had taken money from before.  It's part

17  of the Ponzi scheme.

18         And that's one thing the forensic accountant will

19  tell you that he looks for to see, when a victim gives over

20  money, is a portion of it going to the previous investors;

21  and the answer is yes.

22         So one thing that the accountant sees is that it's

23  going to a previous investor.  So, remember, James Seegan's

24  money never went to be invested at all.  The accountant

25  didn't find that.  What he found was he's paying off

1   another investor, which is the hallmark of a pyramid Ponzi

2   scheme.

3          He took out about $40,000 of it in cash, just for

4   himself.  They were able to trace about $30,000 to his use

5   of it in casinos; and then he made a big payment to his

6   mortgage, almost $7,000 to his mortgage.  These are just

7   sample things that he did with the money that he got from

8   Mr. Seegan.

9          Now, this is one of the investment victims that

10  you saw Mr. Seegan's money went to; and it follows the same

11  pattern.  There's messages between the defendant and the

12  victim, the victim turns over the money, and then there is

13  financial analysis to see what happened to the money.

14         (As read):  "Are you interested in a 24-month UIT

15  that I spoke to you about?  The percentage of the return

16  for the UIT is 8 to 9 percent."  So he's soliciting him to

17  invest his money.

18         And Mr. Shteyngart will tell you that he did.

19  This is just an example.  He invested, well, more than

20  $20,000; but you will see this is an example.  He sent

21  $20,000; and, again, he sent it to Ashley's bank account.

22  It doesn't go to Parkland Securities or anything like that.

23  It goes directly into Defendant Ashley's bank account.

24         And then the forensic accounting analysis, these

25  are just some bullet points about what happened to

 1   Mr. Shteyngart's hard-earned money.  $4,181 to James

 2   Seegan, lulling payments.  Don't worry.  Your money's fine.

 3   I'm taking money from Leonid Shteyngart, and I'm paying it

 4   to another investor.  $50,800 to cash; hits his mortgage

 5   again for $3,000; and then writes a $1,300 check to

 6   himself.  These are just samples.  That's not a full

 7   accounting of the $20,000; but that's what happened to the

 8   money.

 9           Another victim.  This will be the first person who

10   you hear testify this morning, Mr. Willmon.  Mr. Willmon

11   will tell you that he's been married for 50 years.  He

12   retired after 40 years' service with the company.  He knew

13   the defendant.  The defendant was recommended to him by

14   somebody else.  And he'll tell you he invested with him.

15           Same thing.  You see emails between the two of

16   them.  At this point Mr. Willmon is getting a little

17   concerned; and he's telling him that some of the payments

18   are missing, because the victims are supposed to get

19   monthly payments as return on their investment.

20           And so what happens here is -- subject line:

21   "KBKK" -- well, you'll come to hear and know that KBKK is

22   Keith Ashley.  (As read):  "Hi Keith.  Just wanted to

23   update you on our KBKK bank deposits.  Here is the deposit

24   dates that indicate that one month it missing."

25           He missed the payment.  Was he short on money?

1   Did he need to recruit another investor so he could steal

2   their money and make a payment to Mr. Willmon?  What was

3   going on?  But Mr. Willmon is calling him on it and saying,

4   hey, I'm missing some money.

5          And so what does the defendant say in response?

6   He says (as read):  "I will call you on Monday."  We'll

7   talk about it on Monday.

8          But Mr. Willmon will tell you he was having a hard

9   time getting ahold of him; and so finally he emailed him

10  and told him (as read):  "What's going on here?"

11         What happened to Mr. Willmon?  And again this is

12  just a sample.  He invested more than $20,000.  But you'll

13  see an example of $20,000 that was invested; here it was

14  stolen.

15         The forensic accountant will tell you that $2,000,

16  approximately, went to James Seegan.  Again, you should

17  never see that coming out of somebody's account.  That's a

18  red flag hallmark that a Ponzi scheme is going on, when

19  money is coming out of the defendant's personal account and

20  going to someone who thought they were investing.

21         Ooh, we've got another lulling payment to make

22  Mr. Shteyngart feel secure.  He takes Denny Willmon's

23  money, and he gives it to two previous investors.

24         Oh, he hits the casino again, over $2,000.

25         Makes an over $7,000 payment on his credit cards

1   and $1,500 to his mortgage.

2          These are victims.  It's a pyramid scheme, classic

3   pyramid scheme.  Give me your money.  Trust me.  I will

4   invest it for you.  It's not invested; it's stolen.  And

5   then the stolen money from later investors is used -- a

6   small portion of it because he kept most of it -- to pay

7   off the previous investors.

8          Robert Greening, another victim.  The pattern is

9   the same.  Text messages, $75,000, this is going to be a

10  UIT.  (As read):  "Am I going to get a statement or shares

11  or something?"

12         (As read):  "Oh, yes.  It's going to be on your

13  Parkland statement."

14         By the way, it never was, never showed up.  Once

15  he gets the money, then he just gives them the lulling

16  payments.

17         The money transfers, a $75,000 wire.

18         And again bullet points there at the bottom of

19  what happened to the money.  What did he do with it?  What

20  happened?  Did he act as a financial advisor?  Did he carry

21  out the trust?  Did he invest it?  No.

22         About $6,000 to cash.  He pays on his mortgage

23  again.  He's a gambler, $16,000 to gambling.  12,000 to pay

24  on a loan.  Oh, and he's got a brewery, a vanity project.

25  He opens a brewery in Allen, Texas.  It's called "Nine Band

1    Brewery."  It's a brewery/restaurant, as you would imagine.

2    And a lot of money goes to his brewery.  He's investing in

3    his brewery with Robert Greening's money and the other

4    people who think that they are investing in a legitimate

5    product.

6            So the defendant has a lot of financial stress.

7    The brewery is not doing well.  As I said, it's a vanity

8    project.  And you'll hear a financial analysis that it was

9    in the red, doing badly.  In 2018 it lost that amount of

10   money.  In 2019 it lost that amount of money.  And in

11   January to June of 2020 it lost that amount of money.  It

12   was in the red, as they say.  He could not steal enough

13   from these investors to make his brewery go.

14           And in February, early 2020, he's got monthly

15   obligations, not including his $30,000 credit cards that

16   he's built up, but he's got monthly obligations of $30,000.

17   So to stay afloat, every month he has to come up with

18   $30,000.  So he has significant financial stress.  The

19   brewery's going under; and he's got $30,000 a month in

20   payments.

21           So now we get into the scheme.  We've talked about

22   the stealing.  Now let's talk about the killing.  And the

23   killing has everything to do with stealing.  It's robbing.

24   It's all wrapped up in a cauldron together.

25           So here's how he accomplishes killing James

1   Seegan.  Here's the plan.  In January and February of 2016
2   Ashley sells James Seegan a $2 million life insurance
3   policy.  He's his life insurance agent.  He knows he has
4   this policy.

5          Then flash-forward a few years.  In April of 2019
6   Ashley becomes the independent executor of James Seegan's
7   will and trust.  Mr. Seegan trusts him.  He trusts him to
8   take care of his finances.  He doesn't know what you know
9   from those previous screens, and that is that he was
10  actually stealing from him and taking all of his money.
11  Mr. Seegan trusts him.  He makes the defendant the
12  independent executor of his will and trust.

13         Then in January, January 29th of 2020, James
14  Seegan's trust becomes the beneficiary of the $2 million
15  life policy.  Okay?

16         So think about this.  If James Seegan dies,
17  $2 million is going to go to his trust.  The $2 million on
18  his death goes to his trust.  But you go back to April of
19  2019.  Who's going to be in charge of the trust?  It's
20  going to be this defendant.  $2 million.  He'll be in
21  charge of the trust, just him, nobody else.

22         You'll hear there was another life insurance
23  policy and James Seegan's wife, Dida -- and she'll
24  testify -- was the beneficiary of that life insurance
25  policy, a $400,000 life insurance policy.

1          So on James Seegan's death, this defendant's

2    approach to Dida was, "You've been well cared for.  Here is

3    a $400,000 life insurance policy just for you and your son.

4    You all will be taken care of."

5          But what really was there?  There was 2.4 million

6    in two policies because the defendant was going to be in

7    control of the $2 million life policy.  It was going to be

8    his piggy bank.  James Seegan's will and trust was going to

9    become this defendant's piggy bank, and he wasn't going to

10   be in the red anymore with his brewery.  Stress, financial

11   stress.

12         He sets it up right here, a $2 million life

13   policy.  He's known for a long time Mr. Seegan had it.  He

14   becomes the independent executor of the will and trust.

15   And then when James Seegan signs agreeing to allow this

16   trust to become the beneficiary of the $2 million life

17   insurance policy, Mr. Seegan doesn't know it; but he's

18   signing his own death warrant because the defendant has a

19   plan in place and that's to kill Mr. Seegan to get control

20   over the $2 million.

21         So as we say, upon James Seegan's death, Ashley

22   controls everything; and the paperwork shows that.

23         Three weeks later -- look at that last date right

24   there, January 29th of 2020.  That's when the trust becomes

25   the beneficiary and Ashley controls the trust, three weeks

```
 1    later.  What are the events of January 19th through

 2    2020 (sic)?  It's a robbery by this defendant with death

 3    resulting.  That seems like complicated language maybe,

 4    "robbery with death resulting."  Let's call it what it is.

 5    He murdered him.

 6              But it really is a sophisticated kind of high-tech

 7    robbery that's been a long time in the planning.  And when

 8    you think about the robbery, there is the obvious victim of

 9    the robbery, of course, because he took Mr. Seegan's life;

10    and, of course, Mr. Seegan's wife and his son, they are

11    victims of the robbery as well.

12              But what kind of robbery is this?  When we hear

13    the term "robbery," just in everyday life, we think of a

14    stickup and a grab-and-go.  You run into 7-Eleven, you pull

15    out a gun and you say, "Give me your money" and take the

16    money.  That's what we think of when we think of a robbery.

17              But you have to remember here you're dealing with

18    a former police officer, a financial advisor, a paramedic,

19    a nurse.  Special skills.  So this is a special type of

20    robbery.

21              And here's how he does it.  He sold Mr. Seegan

22    this life insurance policy; and he's told him that to

23    update the policy, he's going to have to continue to draw

24    blood.  Don't worry about it.  I have special skills at

25    drawing blood because I'm a nurse.
```

1            And what you'll hear is that Mr. Seegan, on his

2    calendar on the day that he's murdered -- it's his

3    iCalendar, his electronic calendar -- it says, "9:00 a.m.,

4    Keith, blood."  9:00 a.m.  James Seegan's iCalendar says he

5    has an appointment at 9:00 a.m. and it says, "Keith blood."

6            Now, is anyone going to get on the stand and tell

7    you that the defendant said, "Hey, I'm coming over in

8    relation to the life insurance policy to draw your blood"?

9    No, nobody's going to say that.  Of course Mr. Seegan is

10   deceased.  But what we do is we use common sense, and we

11   make reasonable inferences based on the evidence.

12           On that date Keith was coming over and he was

13   going to draw blood, probably with the ruse that it's based

14   on the insurance policy.

15           The Google Nest camera -- Mr. Combs asked you

16   about any knowledge that you might have about recording

17   systems at your home yesterday during *voir dire*.  Well,

18   Mr. Seegan did have a Google Nest camera; and it shows that

19   Ashley arrived right on time, 9:31 a.m.  The calendar said

20   he was going to get there at 9:00, and he was there at

21   9:31 a.m.

22           At 9:33 a.m. the analysis that law enforcement

23   does on Mr. Seegan's phone shows that his last step was

24   logged at 9:33 a.m.

25           And at 9:42 a.m. the final call was answered on

1    Mr. Seegan's phone.

2         So after he's found dead, analysis is done on the

3    victim's phone and his last step was at 9:33 a.m. that

4    morning and the final call was answered at 9:42 a.m. that

5    morning.  Google Nest shows who's at the house.  It's that

6    defendant.

7         10:15 a.m. there's a Google Nest camera in the

8    garage; and it records a sound, a loud sound, a firearm

9    sound.  It records that sound at 10:15 a.m.  And this

10   sound, the loud sound that sounds like a firearm going off,

11   is recorded and the law enforcement listened to it on

12   Mr. Seegan's phone and they have their recording of them

13   listening to it.

14        At 10:17 a.m. a document is printed on the printer

15   in James Seegan's office at his house.  10:15, loud sound,

16   sounds like a firearm.  10:17 a.m., a document is printed

17   on the printer.

18        Well, there at the crime scene, where Mr. Seegan

19   is found dead with a gunshot wound to his head in his

20   office, is a suicide note.  It's a typewritten suicide note

21   to his wife.  It's about two and a half lines, very short.

22   (As read):  "Dear Dida, I'm sad.  I committed suicide.

23   Call my dearest friend Keith Ashley.  Here is his phone

24   number, and he'll help you."  That's the suicide note,

25   printed out.  And at 10:17 a.m. something printed on the

1    printer in Mr. Seegan's office.

2          10:21 a.m. Google Nest captures this defendant

3    leaving.  You'll see the video.  He leaves James Seegan's

4    house at 10:21 a.m.

5          Then throughout the day there are text messages

6    where the defendant, Keith Ashley, is texting the victim.

7    He tries to text him; it's unread.  He calls; there's no

8    answer.  This is 10:24, 10:33, 10:34.

9          Then the defendant goes back to the victim's

10   house.  We don't know why.  Did he forget something?  Is he

11   returning to the scene of the crime?  Did he leave the band

12   on his arm?  What happened?  He goes back to his house, is

13   there very quickly, and then leaves again.

14         Then you'll see throughout the day he continues to

15   try to call him, texts and calls and texts and calls.

16   These are unresponded to and unanswered.

17         Then James Seegan was a late-life parent, and he

18   had left his job and was the stay-at-home dad taking care

19   of their son.  He was supposed to pick up their son at

20   school that day.  He never showed up.  And so, of course,

21   the school called the mom.

22         The mom went and picked up their son; and their

23   6-year-old son and James Seegan's wife, Dida, arrived at

24   the house.  What did they find?  They found this

25   defendant's handiwork.  He had murdered their husband and

1    father for the life insurance policy that he would solely

2    be in charge of and in control of.

3           They entered the house.  They thought something

4    might be wrong because he had never picked him up and they

5    saw his car in the garage.  They held hands and walked

6    upstairs, and they saw James Seegan dead.

7           They didn't know whether he was dead or not.  They

8    saw something in the room that looked unusual, so they

9    called 9-1-1 and paramedics and police responded.

10          So the paramedics get there.  Captain Patrick King

11   is a first responder with the Carrollton Police Department.

12   He'll tell you that he entered, he saw the room, and he

13   said this scene doesn't look right.  Something is not right

14   here.  He believed that it looked like a staged suicide;

15   and, in fact, the evidence shows that that's what it was.

16          And who would be in the perfect position to stage

17   a suicide?  Who has those kind of skills and knowledge?

18   It's this defendant, Keith Todd Ashley.

19          And what do we know?  He's dead from a gunshot

20   wound to the head.  The firearm -- of course use of a

21   firearm, it's a federal crime to use a firearm during a

22   robbery.

23          And here's what we found in the Seegan home.

24   There was a gun found in James Seegan's wrong hand.  It's

25   in his left hand, that his wife will tell you he's not

1    left-handed.  He's right-handed.

2          You put it in the wrong hand.

3          Seegan has no firearms.  They're not allowed in

4    the home.  He's a conscientious objector to firearms.  He

5    doesn't even allow their son to have toy guns.  There are

6    no firearms, nothing related to firearms in the Seegans'

7    home except one firearm, and that's the firearm that's in

8    the wrong hand in the victim's -- kind of on his leg and

9    his lap.  Nothing related to firearms in the house.

10         Law enforcement goes a couple of months later and

11   they search Ashley's home and they found an empty gun case

12   that could house the firearm that was found at the Seegan

13   house.  They find multiple firearms.

14         You'll see on the Google Nest that he enters the

15   Seegans' home with a backpack.  Well, when the police come

16   over to the house they find that he, in fact, keeps a gun

17   in his backpack.  They find a backpack with a gun found in

18   it.  The same caliber ammunition is found as was found at

19   the Seegans' home that was used to kill Mr. Seegan.  And we

20   know, of course, that Ashley has experience with firearms.

21   He's a former police officer.

22         Then the ATF gets involved, and they trace the

23   last known transaction related to that firearm.  It was

24   5 miles from the defendant's house.  Can anyone say that

25   that was the defendant, Keith Ashley's firearm?  No.  But

1    the last registered owner of that firearm is within 5 miles

2    of where Ashley's house is.

3            So on February 20th, next day, 2020, Ashley calls

4    Midland life; and he says that James Seegan passed away

5    last night.  He's giving the death notification.

6            He calls again on that same day and he says, "Lock

7    the account down.  We don't want any funny business or

8    hanky-panky.  Make sure nobody else can access this account

9    that has to do with the life insurance policy."

10           Then as part of the scheme, the next day James --

11   the defendant, Ashley, accesses Mr. Seegan's bank account.

12   Mr. Seegan is dead.  Gunshot wound to the head.  He's been

13   murdered.  And what happens is Ashley attempts to transfer

14   $20,000 from the bank account; but it's a dual factor

15   authentication.  He needs Mr. Seegan's identification

16   information.

17           So he goes to the Seegans' house and he meets with

18   the wife and the son and he says, "I'm going to need the

19   phone to be able to help you out."  And Mr. Seegan's wife

20   sees him erasing some text messages while he's in there and

21   she says, "What are you doing?"

22           "Oh, don't worry.  I just don't want anyone to see

23   these sad messages."

24           But what does he do while he's got the phone?

25   Dual factor authentication.  Now he has the second number

1    that he needs.  He accesses the bank account, and he

2    obtains $20,000.

3            So back to the financial tracing.  What does he do

4    with this $20,000 that he's stolen?  Well, we've still got

5    the pyramid scheme problem going on.  So he's going to put

6    $1,500 of it to Denny Willmon; $1,600 to Leonid Shteyngart;

7    $9,000 of it to his brewery that's going under; college

8    tuition; credit cards; cash.  This is $20,000 that he takes

9    out of James Seegan's bank account after James Seegan is

10   dead.

11           Now, what you're going to hear is that the medical

12   examiner in this case originally fell for the scheme and

13   said that this was a suicide; but it's not.  The toxicology

14   report in the medical examiner's findings showed that there

15   was etomidate in James Seegan's blood.  And the records and

16   evidence in this case will show that this defendant knows

17   what etomidate is.

18           When his home was searched, there were records

19   there showing that he had been tested on etomidate.  He's a

20   paramedic.  He's a nurse.  And about two months before

21   Mr. Seegan was murdered, he, this defendant, where he

22   worked at the hospital, City Hospital, White Rock City

23   Hospital, had access on December 17th of 2019, the records

24   show, to this very drug, etomidate.

25           Now, etomidate, you'll hear from an expert

 1  witness, is a fast-acting sedative.  You remember the

 2  iPhone entry, "Keith 9:00 a.m. blood"?  It appears that

 3  what the defendant did was inject Mr. Seegan with

 4  etomidate.  It's a fast-in, fast-out substance that renders

 5  somebody very quickly unable to do anything.  It knocks

 6  them out very quickly.

 7          There is etomidate in James Seegan's blood, and

 8  that is in the autopsy report.  The defendant wants to know

 9  does the medical examiner, do the police know what I did?

10  Am I going to get caught?

11          So he has an employee at the brewery order a copy

12  of the autopsy.  He doesn't order it himself.  A man named

13  Paul Villareal orders a copy of the autopsy, and a copy of

14  James Seegan's autopsy is found when the defendant's house

15  is searched.

16          The medical examiner mails to James Seegan the

17  autopsy report to Paul Villareal.  The toxicology shows

18  that someone who has unique knowledge and unique

19  understanding about etomidate has the toxicology report at

20  their house.

21          So not everything was able to be recovered from

22  the defendant's phone when it was searched, but these are

23  some Google searches that the defendant ran:

24          "Can a Nest camera indoor detect sound if no

25  motion?"  Why would he be running that?  Remember the

1   Google Nest camera detected sound at 10:15 a.m. on

2   February 19th of 2020, a loud sound that sounded like a

3   firearm.  This is what is a Google search that the

4   defendant does in April of 2020.

5          In May of 2020 he's googling "Manslaughter

6   Deferred Adjudication Texas," "Manslaughter Jail Time."

7   This is what he's googling.

8          September of 2020, "Can manner of death be changed

9   by medical examiner," "Can police overrule medical

10  examiner."

11         These are undated, but he was looking up the time

12  of death calculator.  How can you find out if a case is

13  going to grand jury?

14         You will also hear that he googled four letters,

15  "QTOF," Q-T-O-F.  What is that?  When we see it, it doesn't

16  really mean anything.  But it's very interesting because

17  the defendant googled QTOF and QTOF is the exact

18  sophisticated test that SWIFS, the medical examiner in

19  Dallas, used to evaluate James Seegan's blood and find the

20  etomidate.

21         So he wants to know, when he sees the toxicology

22  report, how did they know?  How did they catch me?  And

23  he's googling "QTOF," using his specialized knowledge once

24  again to try to figure it out.

25         He has information about etomidate.  The medical

1  examiner's report shows etomidate.

2          This is an overview of the case.  So basically

3  what you have is stealing and killing, just like I said.

4  The killing was part of a robbery.  Don't be fooled just

5  because he didn't walk into a 7-Eleven and use a gun to

6  stick somebody up.  This is a robbery, no doubt, a robbery

7  that resulted in death.

8          The victims of the robbery were, of course, James

9  Seegan who lost his life, his family who lost a husband and

10  a father, but also Midland life insurance company.  Midland

11  life insurance company really was the intended victim here

12  for the defendant, because just like when you walk into a

13  7-Eleven as a robber, if I am the robber and I shoot and

14  kill the person behind the counter, I'm not getting one

15  penny of their money.  I'm taking Southland Corporation's

16  money.  I'm taking 7-Eleven's money.

17          So when James Seegan was killed on February 19th

18  of 2020, it was to get the control of the trust, yes; but

19  it was about the payout, the $2 million payout by Midland

20  life insurance company.

21          And he didn't stop robbing there.  What did he do?

22  Within 48 hours of murdering James Seegan, he was on his

23  phone taking $20,000 out of his account.

24          He's a former police officer, a nurse, a

25  paramedic, a brewery owner -- a brewery that was doing

 1  badly -- a financial advisor, and a life insurance agent.

 2  It's a cauldron, a cauldron that resulted in crime, killing

 3  and stealing.

 4       And it will be based on this evidence that we

 5  present to you that we ask you in the end to find the

 6  defendant guilty of what he is guilty of.

 7       Thank you, your Honor.

 8       THE COURT:  Thank you, Ms. Rattan.

 9       Mr. Whalen, would the defense like to make an

10  opening statement?

11       MR. WHALEN:  We do, your Honor.

12       Can I grab the podium?

13       THE COURT:  Yes, of course.

14       MR. WHALEN:  Good morning.  Thank you for being

15  here today.

16       And part of opening statement is to give you a

17  roadmap of what the government expects the evidence to

18  show, but also it's our opportunity to explain to you what

19  we think the evidence will show and what it won't show.

20       And I have to tell you, this is a complicated

21  case.  They may talk about certain things, but this is

22  complicated.  It is probably one of the most complicated

23  cases I've been a part of in my career, because you're

24  going to hear about autopsies, you're going to hear about

25  nursing, you're going to hear about wills and trusts,

 1   you're going to hear about science, firearms, ammunition,

 2   middle school sound experiments.

 3        But I think when you get the law in the case that

 4   the judge told you -- and I'm going to go over some of

 5   those elements with you -- the evidence that they're going

 6   to present you is not proof to you beyond a reasonable

 7   doubt of the crimes they have charged him with.  I'm going

 8   to kind of go through that with you.

 9        So let's talk about wire fraud, okay?  They talk

10   about a Ponzi scheme and all this stuff, but wire fraud has

11   elements and the judge went over those elements with you,

12   okay?  A couple things.  There has to be a false statement.

13   But also part of that, it has to be material, okay?

14        And you're going to get instructions about this.

15   You're going to -- you're going to get a lot of

16   instructions about this; and I implore you to take your

17   time to go through them, because there also has to be the

18   specific intent to defraud.  There also has to be material

19   misrepresentations.  There also has to be a wire.  And

20   those elements are all equally important.

21        When you heard Mr. Sandel talk to you about --

22   yesterday about baking a cake, all of those elements have

23   equal weight.  And if they fail to prove any element to you

24   beyond a reasonable doubt, it requires you to find him not

25   guilty of those counts.

1            And so I ask you to make sure you take notes.  Pay

2    attention.  It's going to be important because a lot of

3    what I say now is not going to make any sense until you

4    hear the evidence; and then at the end, at the closing when

5    I come and talk to you about that, you'll see why I believe

6    the evidence is not going to prove to you beyond a

7    reasonable doubt that Mr. Ashley is guilty of what they

8    have charged him with.

9            MS. RATTAN:  Your Honor, I'll have to object to

10   counsel expressing his personal opinion.

11           THE COURT:  Sustained.

12           MR. WHALEN:  So let's talk about what the

13   government has presented to you.  And I think they're

14   looking at it from the standpoint of this scheme and this

15   murder and everything else, and I think what is important

16   is that timing is going to be important, because when they

17   talk to you about -- take example for the Google searches.

18           There is going to be evidence that shows that when

19   they showed September 3rd, that date, I think that date

20   will be important.  Pay attention to September 3rd.  What

21   information did he learn on September 3rd that led to the

22   searches?  What information did he know -- learned that led

23   to some searches?  Timing is important.  Pay attention to

24   dates because those are going to be very significant for

25   you to look at because it explains a lot of different

1    things.

2          But also look at will -- you know, they talk about

3    this trust.  I think it's going to be important to look at

4    the timing of the trust.  The dates are there.  But I think

5    what you're going to learn about the trust and about the

6    will is that the beneficiaries of the trust or the

7    beneficiaries of the will and the trust was his wife, his

8    son, and his nephew, okay?

9          Also in the trust there is another executor, his

10   nephew.  And I think it's a reasonable inference and I ask

11   you that it's a reasonable inference that when you develop

12   trusts and you put people in there to watch after your

13   children or to be your executor, you let them know.  And I

14   think that's important.

15         And I think it's also going to be important

16   because we believe the evidence will show that shortly at

17   the end of February, Mr. Ashley resigned his position as

18   executor or trustee of the trust.

19         So I think it's important just because he's the --

20   he was named the executor or the trustee, there was other

21   people part of that.  So --

22         And also when you talk about there's phone calls

23   to Midland and they showed that screen about Midland, that

24   he called and said Mr. Seegan had died, it's recorded.

25   Everything Midland does is recorded.  He knows that.

1              So think about what -- the evidence they have and

2     how everything is out in the open.  It's recorded.  There's

3     a Nest video.  So just think about those items when you go

4     through this.

5              I think the other question, too, that you're going

6     to look at because elements matter -- when we look at this

7     robbery, okay, I think you really have to look at all the

8     elements because the Court gave you in the preliminary

9     instructions, one, they have to show that he possessed a

10    firearm, okay?  That 9-millimeter they found in

11    Mr. Seegan's house, they have to show that Mr. Ashley

12    possessed that beyond a reasonable doubt.

13             And they want you to say -- infer that because he

14    had a firearm at his house they found at a search seven

15    months later, that means he had a firearm in that backpack

16    in February.  Or that because he had ammunition of the same

17    caliber, that he had ammunition in that backpack.

18             We believe they're going to ask you to make

19    inference upon inference upon inference, and that's not

20    proof beyond a reasonable doubt.  So that's the first

21    element.

22             The second element is this robbery issue, okay?

23    The judge gave you instructions about that and what the

24    elements are.  And you talk about different elements of

25    robbery.  They're equally important.  There has to be a

 1   taking by force, and it has to have an effect on interstate

 2   commerce.

 3        Why do we mention things like interstate commerce?

 4   Because we're in federal court.  If there's no interstate

 5   commerce, then it's not a federal charge.  They have to

 6   prove that to you beyond a reasonable doubt.  They have to

 7   prove that element to you beyond a reasonable doubt.

 8        They have to prove that it was taken by force.

 9        And when they talk about murder -- you heard the

10   elements of murder the judge gave you.  One of those

11   elements, it has to be in the territorial jurisdiction of

12   the United States.

13        You're going to get definitions of those.  They're

14   extremely important for you to look at and consider because

15   just because they provide you evidence, it doesn't mean

16   it's proof beyond a reasonable doubt.

17        The other issue I think you're going to have to

18   consider in this case and why the firearm carrying, I

19   think, is going to be a real important issue is because you

20   heard Mr. Combs talk about, in *voir dire*, venue, how the

21   Eastern District is composed of different counties and the

22   Northern District of Texas is different counties.

23        Mr. Seegan's house in Carrollton, Texas, is in

24   Dallas County.  That is in the Northern District of Texas,

25   not the Eastern District of Texas.  We anticipate that

1  you'll get an instruction on venue.  It's not an element

2  they have to prove to you beyond a reasonable doubt, but

3  it's something they have to prove to you by preponderance

4  of the evidence.  So that matters.  That's why that was --

5  I anticipate that's why that was brought up.  And so that's

6  going to be an issue.

7          I think when you look at firearms -- we're going

8  to talk about that because it was mentioned that the

9  original purchaser lived 5 miles from his house.  But I

10  think -- I think the ATF agent -- I think the evidence

11  would show that they only keep records of the original

12  purchaser.  And I can only imagine how many firearms are

13  sold in Collin County in any particular year.

14          So they're asking you -- I think they're asking

15  you to infer and infer and infer, and we believe at the end

16  we'll be able to say that --

17          MS. RATTAN:  Your Honor, I object this is

18  argumentative.

19          THE COURT:  Sustained.

20          MR. WHALEN:  I will tell you, too, that it's

21  important that I ask you this:  Wait to the end.

22          You heard some jurors yesterday who were jurors

23  who said, yeah, I formed my opinion halfway through or

24  within the first day.  And you've heard a lot of salacious

25  words or -- "vanity projects" and words like that.  You

1  have to be objective.

2          And some of this evidence you're going to see is

3  not pleasant.  The topic is not pleasant.  None of this is

4  pleasant.  But you took an oath to wait to the end.  And as

5  I said, this is a very complicated legal case and factual

6  case; and I need you to just simply wait to the end because

7  I think -- I believe at the end the evidence will show to

8  you that the government can't bear the burden they've taken

9  on, to prove these elements to you beyond a reasonable

10 doubt, because the facts don't fit what they charged.

11         And it's going to require you to make a very

12 difficult decision, but it's going to require you to find

13 him not guilty.  And that's what we ask you to do.  Thank

14 you.

15         THE COURT:  Thank you very much.

16         Does government want to call their first witness?

17         MS. RATTAN:  Thank you, your Honor.  The United

18 States calls Denny Willmon.

19         And may we, your Honor, have a moment to move

20 the --

21         THE COURT:  Yes, you may.

22         MS. RATTAN:  Thank you.

23         THE COURT:  Can I have counsel approach?

24         And, ladies and gentlemen, when we have a bench

25 conference, you're welcome to stand and stretch, too, so --

```
 1            (Sidebar conference, off the record.)
 2            THE COURT:  Go ahead, sir.  You can approach.
 3            Sir, if you'll raise your right hand to be sworn
 4  in.
 5            (The oath is administered to the witness.)
 6            THE COURT:  Okay.  Go ahead and proceed.
 7            MS. RATTAN:  Thank you, your Honor.
 8            DIRECT EXAMINATION OF DENNY MAURICE WILLMON
 9               CALLED ON BEHALF OF THE GOVERNMENT
10  BY MS. RATTAN:
11  Q.  Please state your name --
12            THE COURT:  Is your mic on, Ms. Rattan?
13            MS. RATTAN:  Thank you, your Honor.
14  BY MS. RATTAN:
15  Q.  Please state your name.
16  A.  Denny Maurice Willmon.
17  Q.  Okay.  And, Mr. Willmon, there is a microphone; and the
18  acoustics in here are very difficult.  Yes.
19            Please state your name.
20  A.  Denny Willmon.
21  Q.  Will you please spell your name.
22  A.  D-E-N-N-Y -- do you want the middle name?
23  Q.  No, sir.  That's all right.
24  A.  Willmon is W-I-L-L-M-O-N.
25  Q.  And, Mr. Willmon, let me ask you about your background.
```

1  Are you currently retired?

2  A.  Yes.

3  Q.  How long have you been retired?

4  A.  I retired in 2008, December.

5  Q.  Before you retired, can you tell us when you did?

6  A.  I worked for Xerox Corporation.  I was a technical

7  trainer, ran a training operation in Houston.

8  Q.  A technical trainer and you ran a training operation in

9  Houston?

10  A.  Correct.

11  Q.  For what company did you work?

12  A.  Xerox Corporation.

13  Q.  How long did you work for Xerox Corporation before you

14  retired?

15  A.  Forty-one years.

16  Q.  And where did you grow up?  Where are you from?

17  A.  Originally from Arkansas; and right out of high school,

18  I moved to Houston.

19         Sorry about my voice.  It's hoarse right now.

20         So I spent the rest of my life -- I got married --

21  down in Houston, and I've been there ever since.

22  Q.  So you grew up in Arkansas, and you moved to Texas?

23  A.  Correct.

24  Q.  And you worked for Xerox Corporation for about 40

25  years, and you spent that time in Houston?

```
1   A.  Yes.

2   Q.  And you're married?

3   A.  Yes.

4   Q.  How long have you been married?

5   A.  Fifty-three years.

6   Q.  And you and your wife have children?

7   A.  Yes, two daughters.

8   Q.  Two daughters.

9        So let me ask you about someone by the name of

10  Keith Ashley.  Did you meet at some point Keith Ashley?

11  A.  Yes.

12  Q.  Can you tell us how you met him?

13  A.  I was referred to him -- when I retired, I was looking

14  for a money manager; and I was referred to him by one of my

15  fellow employees that had previously retired.

16  Q.  So you got a reference.  And did you meet with Keith

17  Ashley after he was referred to you?

18  A.  Yes.

19  Q.  Around when was this?

20  A.  That was during the time that I was retiring, so it

21  would have been in probably December of 2008.

22  Q.  So you're in Houston, but Keith Ashley was

23  headquartered in the Dallas area; is that right?

24  A.  Right.

25  Q.  So how did that work?
```

1    A.  Well, it worked out okay.  He would travel to Houston.

2    He had other clients, so he would travel to Houston and

3    meet with me ever so often and go over my investment

4    portfolio.

5    Q.  And then as time passed, how would you describe your

6    relationship with Keith Ashley?

7    A.  Well, I would say we became friendly in our business

8    relationship and -- and initially very successful in what

9    was taken care of.

10   Q.  Things went well at first?

11   A.  Yes.

12   Q.  And you felt like he was friends, or friendly; is that

13   right?

14   A.  Sure.

15   Q.  Did you trust him?

16   A.  I'm sorry?

17   Q.  Did you trust him?

18   A.  Yes.

19   Q.  You were giving him your money; is that right?

20   A.  Yes.

21   Q.  At some point did you become concerned or suspicious?

22   A.  Well, yes.

23   Q.  Was there an investment that you made with him that you

24   became concerned about?

25   A.  Yes.

1    Q.  Can you describe for the jury what happened?

2    A.  Well, I got some money from the sale of a home and I

3    had some money that I needed to invest and Keith

4    recommended that I put it in a UIT and it was -- the

5    company was SmartTrust that I understood it was among.

6    Q.  So you got some money from the sale of a house.  Was

7    that your mother's house in Arkansas?

8    A.  That's correct.

9    Q.  So you had some money from the sale of your mother's

10   house in Arkansas, and you wanted to invest that money?

11   A.  Correct.

12   Q.  So you asked Keith Ashley what you should do, and he

13   talked to you about a SmartTrust UIT?

14   A.  Yes.  And eventually I got information in a portfolio.

15   That was a problem, however.

16   Q.  What do you mean by "that was a problem"?

17   A.  Well, I had asked for that kind of document where I

18   would understand the money and how it was -- how it was

19   financed; and it took a while to get a document, quite some

20   time.  So that was -- that was a bit bothersome.

21   Q.  So you wanted to see it, you wanted to know --

22   A.  Right.

23   Q.  -- and it took a while?

24   A.  That's correct.

25              MR. WHALEN:  Your Honor, if we may approach

 1  briefly?

 2          THE COURT:  Yes.

 3          (Sidebar conference, off the record.)

 4          THE COURT:  Okay.  So the Rule has been invoked,

 5  which just means that witnesses who are not excused cannot

 6  be in the courtroom.  So if there is any witness in the

 7  courtroom, I'm going to ask you to leave at this time.

 8          Otherwise, Ms. Rattan, go ahead and continue.

 9  BY MS. RATTAN:

10  Q.  So there was a SmartTrust UIT that Keith Ashley told

11  you about.  And what happened?

12  A.  Well, initially it appeared to be that I was making

13  nice interest payments monthly; and that seemed to be

14  meeting the criteria that was explained to me.  So, you

15  know, it looked like a good, positive investment.

16  Q.  So at first things looked pretty good.  But did

17  something happen eventually?

18  A.  Well, at one point just the communication about it,

19  like I was not getting a quick response.  He was always

20  busy or had some kind of reason where I never really got

21  the details of the -- but eventually he sent me a document

22  that looked like a portfolio but -- so I accept -- you

23  know, I thought that's what it really was.

24  Q.  And at that point had you already given him your money?

25  A.  Yes, and I -- and more than just the money from the

1   property that was sold.  So I gave him quite a lot more

2   than that.

3   Q.  About how much money in total would you estimate that

4   you gave Keith Ashley to invest for you?

5   A.  It was somewhere around $190,000.

6   Q.  A hundred and -- pardon me?

7   A.  A hundred -- Well, initially it said 151,000; and it

8   got up to over that because I was able to make -- add

9   installments to the plan.  So those were --

10  Q.  So, in total, how much would you estimate that you gave

11  Keith Ashley to invest on your behalf?

12  A.  Around $190,000.

13  Q.  $190,000.

14  A.  Right.

15  Q.  And how much money would you say that you lost, that

16  you never got back from that?

17  A.  Well, he returned around 20,000 in those installments

18  monthly.  So you could do the math there how much is left.

19  Q.  So he gave 20 back, so you lost about $170,000; is that

20  right?

21  A.  That's correct.

22  Q.  Now, when you would give Keith Ashley money for this

23  SmartTrust UIT that he told you about, would you give him

24  checks; or how would you pay him?

25  A.  They were checks.

1   Q.  Let me ask you to look on the stand in front of you.  I

2   know it's kind of a tight space there.  But there is a

3   notebook, and I've opened it to a page.  It's Government's

4   Exhibit Number 45A.  I ask you -- and 45A --

5           MS. RATTAN:  May I approach the witness, your

6   Honor?

7           THE COURT:  Yes.

8   A.  I see it here.

9   BY MS. RATTAN:

10  Q.  Oh, okay.  Let me direct your attention to 45A, page 1.

11  And then I'm also going to ask you to look at 46.

12  A.  Okay.

13          MS. RATTAN:  May I return, your Honor?

14          THE COURT:  Yes.

15  BY MS. RATTAN:

16  Q.  So, Mr. Willmon, 45A, page 1, is that an example of a

17  check that you wrote to Keith Ashley to invest for you with

18  the SmartTrust UIT investment?

19  A.  Yes.

20          MS. RATTAN:  Your Honor, may we publish -- or

21  offer, I guess, Government's Exhibit 45A?

22          MR. WHALEN:  No objection, your Honor.

23          THE COURT:  Okay.  45A will be admitted, and you

24  may publish.

25                              *

1   BY MS. RATTAN:

2   Q.  Now, Mr. Willmon, of course you have the check in front

3   of you; but if you look to your right, there is also a

4   screen.

5   A.  Yes.

6   Q.  This is Government's Exhibit 45A, and is this a

7   check -- and you wrote him a number of checks, but is this

8   an example of a check that you wrote to Keith Ashley?

9   A.  Yes.

10  Q.  Now, the check says "Mr. or Mrs. Denny Willmon."

11  That's you and your wife, is that right, here at the top?

12  A.  Oh, yes.  Yes.

13  Q.  And then the date that you wrote it is right here,

14  March 12th of 2019?

15  A.  Correct.

16  Q.  Now, you thought you were investing in a SmartTrust UIT

17  with Keith Ashley; but the check says "Pay to the order of

18  KBKK."  Who told you to put "KBKK" there?

19  A.  Keith Ashley.

20  Q.  And then the amount of money that's invested, $20,000,

21  how did you come up with that amount?

22  A.  It was -- I don't remember specifically, but it was

23  collected money that I had accumulated I was trying to

24  invest.

25  Q.  Okay.  And, again, you said that in total it was about

 1   $190,000; and this is just one sample check?

 2   A.   Yes.

 3   Q.   And then, of course, you signed it.

 4   A.   Right.

 5   Q.   And then this has an account listed over here.  What

 6   were you referencing there?

 7   A.   I think that had to do with the bank, the Prosperity

 8   Bank.

 9   Q.   And where would you have received that information?

10   A.   From -- from -- hmm.  I'm sorry.  I'm not exactly, you

11   know, positive what that account references.  I assume it

12   had to do with the Prosperity Bank --

13   Q.   Okay.

14   A.   -- for my checking account.

15   Q.   Okay.  And you wrote it out to KBKK for $20,000; is

16   that right?

17   A.   That's correct.

18   Q.   Now, at some point you said -- you've testified that

19   you became concerned and that you weren't getting the

20   payments you thought you were going to get?

21   A.   Yes.  There was a few instances where the payment was

22   missed and I had to go back and find out and we talked

23   about it and then there was a double payment made to make

24   up for it.  That happened a couple of times.

25   Q.   And you would try to reach him and tell him?

1  A.  Yes.  But I began to have trouble, you know, getting in
2  touch and follow-up; and by this time, visiting and coming
3  to go over my portfolios seemed to be a problem.
4  Q.  He stopped coming to Houston?
5  A.  Yes.
6  Q.  So did you send him an email and ask him what was going
7  on?
8  A.  I did email him regarding this kind of communication,
9  yes.
10 Q.  And then let me ask you.  On the stand there in front
11 of you I showed you Government's Exhibit 46.  Is that a
12 sample of an email that you sent him asking what was going
13 on?
14 A.  46?
15 Q.  Yes, sir.
16 A.  Goes from 45A to 45B --
17         MS. RATTAN:  May I approach, your Honor?
18         THE COURT:  Yes.
19         MS. RATTAN:  Thank you.
20 A.  Oh, I just didn't turn enough pages.
21 BY MS. RATTAN:
22 Q.  Is it there?
23 A.  Yes.  I finally turned the --
24 Q.  Oh, okay.
25 A.  -- saw this tab out here.

 1   Q.  Oh, okay.  Sorry.

 2           Do you recognize that as an email that you sent to

 3   him?

 4   A.  Yes.

 5           MS. RATTAN:  Your Honor, we'll offer Government's

 6   Exhibit 46.

 7           MR. WHALEN:  No objection, your Honor.

 8           THE COURT:  46 will be admitted.

 9           MS. RATTAN:  And may we publish it?

10           THE COURT:  Yes, you may.

11   BY MS. RATTAN:

12   Q.  Now, just like any email, you have to read it from the

13   bottom up because the bottom is the person sending the

14   email.

15           MS. RATTAN:  And if we can start right here and

16   highlight that.

17   BY MS. RATTAN:

18   Q.  So this is sent on April 26th of 2020, so you've

19   invested quite a bit of money at this point; is that fair

20   to say?

21   A.  Yes.

22   Q.  And you're emailing because it says, "Thanks.  Take

23   care, Denny" down here at the bottom.  And Denny, that's

24   you.

25   A.  Yes.

1  Q.  And you say, "Hi Keith, Just wanted to update you on

2  our KBKK bank deposits."

3        What are you talking about there when you say the

4  "KBKK bank deposits"?

5  A.  Well, that deposit location is how he was receiving the

6  money to be invested.  That was my understanding.

7  Q.  You were sending the money to KBKK.

8  A.  Yes.

9  Q.  You made your money out to KBKK.

10 A.  Right.

11 Q.  So you're telling him there's a problem at KBKK?

12 A.  Yeah.  I mean, I didn't -- I didn't know exactly

13 what -- at that point I was wondering how this was all

14 working, I guess.

15 Q.  Okay.  So you tell him (as read), "Here is the deposit

16 dates that indicate that one month is still missing."  And

17 then you give him the rundown.  October 18th of 2019, it's

18 the "last old deposit amount."  And then you say, 770, the

19 "new deposit amount."

20        Anyway, you run it down to January of 2020 and you

21 tell him that there is no deposit there; is that right?

22 A.  Correct.

23 Q.  So what are you trying to tell him?  What's happening

24 here?

25 A.  Well, I assumed at that point there was just some

 1  mistake or problem that he had or the company had.  I

 2  guessed it was about the company where I thought this money

 3  was deposited.  It's smart finance -- SmartTrust company,

 4  that they weren't -- they were making mistakes or something

 5  in getting it deposited.

 6  Q.  That's what you thought was happening?

 7       That's what you thought was happening?

 8  A.  Yes.  I thought there was just mistakes.

 9  Q.  So then the January 2020 no deposit and then

10  February 24th of 2020, it looks like a makeup amount; is

11  that right?

12  A.  Yes.

13  Q.  For both January and February.

14       And then we come down to March and what happens?

15  A.  Well, the same thing happened basically again.

16  Q.  No money coming in?

17  A.  Yeah.

18  Q.  So you're notifying him that something seems to be

19  wrong; is that right?

20  A.  Yes.

21       MS. RATTAN:  And then if we can back out and look

22  at the response to this email, at the top of the page.

23  BY MS. RATTAN:

24  Q.  So here we've captured the top of your email to him.

25  It's on April 26th of 2020.

1          But then above that is his response to you.  He's

2     emailing you from keith@northtexasmoney.com.  He responds

3     the same day, and it's about the KBKK update.  And what

4     does he tell you?

5     A.  Well, he's going to call me on Monday or -- that's what

6     it's -- and that response, I remember getting that.

7     Q.  And pardon me?

8     A.  I remember getting that response, yeah.

9     Q.  This "I'll call you Monday" response?

10    A.  Yeah.

11    Q.  So eventually what happened?

12    A.  Well, in these -- both cases he made the adjustment, I

13    think, in the payment; and so I assumed that it was getting

14    taken care of, that he was contacting this company that was

15    managing the portfolio and getting it fixed.

16    Q.  Did you ultimately find out that there was no

17    SmartTrust UIT investment on your behalf?

18    A.  Yeah, eventually it became obvious to me that the

19    document was created.

20    Q.  When you say "the document was created," what do you

21    mean by that?

22    A.  Well, the portfolio document that was sent, after

23    looking at it closely, it seemed that it was not really

24    from the company that I assumed it was.

25    Q.  It was just a document that he provided you to get your

1    money to get you to invest?

2    A.  Yes.

3    Q.  Okay.  And, in fact, you trusted him and you did that;

4    is that right?

5    A.  Yes.

6    Q.  So, in total, you're saying that you lost about

7    $170,000; is that right?

8    A.  Yes.

9         MS. RATTAN:  Now may I approach the witness, your

10   Honor?

11        THE COURT:  Yes.

12        MS. RATTAN:  If we can re-publish Government's

13   Exhibit 45A.

14   BY MS. RATTAN:

15   Q.  And, Mr. Willmon, this is the check that we went

16   through just a minute ago with you; and I'm just going to

17   ask you to look at that and tell me whether this blowup of

18   a check, which is marked Government's Exhibit 45A, is the

19   same check that we analyzed.

20   A.  Yes.

21   Q.  Okay.  And, again, the defendant told you to write it

22   out to KBKK, that was your $20,000, and that's your

23   signature; is that right?

24   A.  Yes.

25   Q.  Okay.  Now, Mr. Willmon, Keith Ashley was your

1  financial advisor; and you worked with him for a number of

2  years.  Do you see him in the courtroom today?

3  A.  Yes, I see him.

4  Q.  Can you point to him and identify something that he's

5  wearing?

6  A.  He's over here (indicating) and he's in a suit.

7  Q.  Okay.  Now, if this is Person Number 1, this is 2, this

8  is 3, and this is 4, what number would he be?

9  A.  4.

10         MS. RATTAN:  Your Honor, may the record reflect

11  that the witness has identified the defendant, Keith Todd

12  Ashley?

13         THE COURT:  The record will so reflect.

14         MS. RATTAN:  And I'll pass the witness.

15         THE COURT:  Cross-examination?

16         CROSS-EXAMINATION OF DENNY MAURICE WILLMON

17  BY MR. WHALEN:

18  Q.  Mr. Willmon, good morning.

19  A.  Good morning.

20  Q.  My name is James Whalen.  I represent Mr. Ashley.  I

21  just have some questions for you.  And if I ask something

22  you don't understand, just tell me, okay?

23  A.  All right.

24  Q.  Okay.  This SmartTrust investment you talked about, was

25  there any paperwork or any contract that you signed as

 1  related to that?

 2  A.  I'm thinking about it.  I don't remember that there was

 3  anything signed.

 4  Q.  Okay.  And so this is all based on a conversation that

 5  you had with Mr. Ashley; is that correct?

 6  A.  Most everything about it was verbal, yeah.

 7  Q.  Okay.  And just so we're clear for the record, every

 8  time you gave Mr. Ashley money, it was through a check,

 9  correct?

10  A.  Yes.

11  Q.  Okay.  And the email that you sent in April that we saw

12  on the screen, 26th of 2020, did anything particular cause

13  you to send that email?

14  A.  Well, I mean, I guess the answer to that would be I

15  hadn't received a payment so I wanted to know why.

16  Q.  Okay.  Had you been contacted yet by either a private

17  investigator or law enforcement, in April of 2020?

18  A.  I -- a detective did call me.

19  Q.  Okay.  Do you know when that was?

20  A.  That -- I might have it noted somewhere, but I couldn't

21  remember -- I don't remember exactly.

22  Q.  Okay.  So just so we're clear, the check that we saw

23  today and the email, is that the sum and substance of the

24  paperwork that you have as it relates to the money you sent

25  to Keith Ashley?

 1   A.  Repeat that one more time.

 2   Q.  Sure.

 3         As far as this email that you sent him about the

 4   payments, is that the only email you sent him laying out

 5   what payments were missed or behind?

 6   A.  I don't -- yes.

 7   Q.  Okay.

 8   A.  I can't remember another one like that.

 9   Q.  All right.  And the checks for -- we saw a check for

10   $20,000.  Do you have the checks for the -- what you say

11   the $190,000?

12   A.  I have the -- I have the checks and copies of them

13   for -- that support the $190,000.

14   Q.  Okay.  And just again, as far as this investment in

15   KBKK, it was all a verbal exchange, correct, with

16   Mr. Ashley?

17   A.  Yes, the --

18   Q.  Okay.

19   A.  -- the information to deposit the money against the UIT

20   investment was verbal.

21   Q.  Okay.  Thank you.

22         MR. WHALEN:  I'll pass the witness.

23         THE COURT:  Anything additional?

24         MS. RATTAN:  Just real briefly.

25                              *

1              REDIRECT EXAMINATION OF DENNY MAURICE WILLMON

2  BY MS. RATTAN:

3  Q.  Mr. Willmon, you emailed with him about the investment.

4  In fact, we saw the email; is that right?

5  A.  Yes.

6  Q.  Did you talk to him on the phone about the investment?

7  A.  I know I tried to.  That was at times difficult to get

8  in touch with him, but I did in one of those cases.  And

9  that happened twice, okay, that I remember.  So I did talk

10 to him at least one time regarding that.

11 Q.  On the phone?

12 A.  Yes.

13          MS. RATTAN:  I'll pass the witness.

14          THE COURT:  Anything else?

15          MR. WHALEN:  No, your Honor.

16          THE COURT:  Can this witness be fully excused?

17          MS. RATTAN:  Yes, please.

18          MR. WHALEN:  Yes.

19          THE COURT:  Sir, you are free to leave.  Thank

20 you.

21          So I think we'll go ahead and take our morning

22 break.  Ladies and gentlemen, I will tell you that I

23 believe the water situation has improved so -- I think we

24 have 50 percent pressure, so I think that all of the

25 facilities in the courthouse are now operational.

1            So we'll go ahead and take 15 minutes.  One thing
2    I will tell you every time we break is please don't discuss
3    the case among yourself or anyone else.  Don't do any
4    outside research.  We'll take 15 minutes and come back and
5    continue.
6            If you go upstairs and there is a problem with the
7    bathroom -- my understanding is I have a report that they
8    are working -- then we'll figure out Plan B.  But for now,
9    let's take 15 minutes and come back and continue.  Thank
10   you.
11           (The jury exits the courtroom, 10:15 a.m.)
12           THE COURT:  Anything further from the government?
13           MS. RATTAN:  No, your Honor.
14           THE COURT:  Defense?
15           MR. WHALEN:  Your Honor, I do -- I mean, nobody's
16   maybe ever raised this; but I am concerned.  On the third
17   floor I believe the women's -- I don't know what bathroom
18   they use in the jury room, but on the third floor there is
19   a poster of the 15 most wanted people by the U.S. Marshals
20   hanging on the wall.  And I don't know to what extent the
21   jurors walk back there, but it is concerning to me that
22   they would be able to be exposed to that during the trial.
23   And so I bring it to the Court's attention that if there is
24   a way to remedy that, that is my request.
25           THE COURT:  Let me check and see.  I don't

1    think -- I think they use the bathroom in the jury room,

2    but let me just ask if our court security officer can

3    answer that question.

4            THE COURT SECURITY OFFICER:  They do use the

5    hallway.

6            THE COURT:  Okay.  So they do use that as an

7    overflow, so I will check with the marshals to see if they

8    can remove that poster during the pendency of the trial.

9    No one's ever raised that issue before so --

10           MR. WHALEN:  All right.

11           THE MARSHAL:  And we've never had that issue.  In

12   all of the trials we've been in, we've never had that

13   issue.

14           THE COURT:  I understand.

15           MR. WHALEN:  I'm just a little more conscientious

16   than everybody else, Judge.

17           THE COURT:  Well, I don't know if it makes a

18   difference; but we'll go ahead and see about taking care of

19   that.

20           MR. WHALEN:  Okay.  Thank you.

21           THE COURT:  Okay.  See you back in 15 minutes.

22           (Recess, 10:17 a.m. to 10:34 a.m.)

23           (Open court, defendant present, jury present.)

24           THE COURT:  Please be seated.

25           Okay.  Your next witness?

1              MS. RATTAN:  Your Honor, the United States calls

2    Jeanny Gallot.

3              THE COURT:  Ma'am, if you'll raise your right hand

4    and be sworn in.

5              (The oath is administered to the witness.)

6              THE COURT:  Go ahead and proceed.

7              MS. RATTAN:  Thank you, your Honor.

8                   DIRECT EXAMINATION OF JEANNY GALLOT

9                   CALLED ON BEHALF OF THE GOVERNMENT

10   BY MS. RATTAN:

11   Q.  Please state your name.

12   A.  My name is Jeanny Gallot.

13   Q.  And, Ms. Gallot, it's hard to hear in here and it may

14   feel like you're speaking right on it; but as closely as

15   you can, speak into the microphone.

16             Will you spell your name, please.

17   A.  J-E-A-N-N-Y.  Last name, G-A-L-L-O-T.

18   Q.  And that's perfect.  We can hear you, I think, well.

19             Ms. Gallot, will you tell the jury where you work?

20   A.  I work at BB&T, now Truist, as an operations leader.

21   Q.  Can you explain to the jury, what is BB&T?

22   A.  BB&T is a bank.

23   Q.  So Branch Banking and Trust, BB&T.  And you say now

24   BB&T, Branch Banking and Trust, is called Truist?

25   A.  Correct.  We just merged with SunTrust, and we are now

1    Truist.

2    Q.  Now, before BB&T, Branch Banking and Trust, was Truist

3    was it another bank before that?

4    A.  In Texas it was Colonial Bank or Citibank.

5    Q.  Citibank.

6           So whether it's Citibank or Branch Banking and

7    Trust -- we're calling BB&T -- or Truist, how long have you

8    worked there?

9    A.  Seventeen years.

10   Q.  So through each change, you've been there with the

11   bank?

12   A.  Correct.

13   Q.  And then you said what you do there.  Can you describe

14   what your position is?

15   A.  We take care of operations, whether it be fraud,

16   facilities, anything operational in the branches.

17   Q.  And the bank -- and when I say the bank, whether it's

18   Citibank or BB&T or Truist -- is the bank that you work for

19   and have worked for 17 years -- is it FDIC-insured?

20   A.  Yes, it is.

21   Q.  Federal Deposit Insurance Corporation-insured bank?

22   A.  Yes, it is.

23   Q.  Now, let me ask you, did we ask you to focus on a

24   specific account when we were reviewing the records?

25           Did we ask you to look at the KBKK account?

 1   A.  Yes, you did.

 2   Q.  And let me ask you to look on the stand in front of

 3   you.  There is a book, and I've opened it to Government's

 4   Exhibit 8B.  I'll ask you if you see that.

 5   A.  Yes, I do.

 6   Q.  Okay.

 7           MS. RATTAN:  May I approach the witness, your

 8   Honor?

 9           THE COURT:  Yes, you may.

10   BY MS. RATTAN:

11   Q.  We have a chart here and this chart is labeled as

12   Government's Exhibit 45A and it's a check; is that right?

13   A.  That is correct.

14   Q.  Now, the check says "Pay to the order of KBKK"; is that

15   right?

16   A.  Yes.

17   Q.  So let's see who KBKK is -- because the KBKK account is

18   at your bank; is that right?

19   A.  Yes, it is.

20           MS. RATTAN:  Your Honor, we'll offer Government's

21   Exhibit 8B.

22           MR. WHALEN:  No objection, your Honor.

23           THE COURT:  8B will be admitted.

24           MS. RATTAN:  May we publish it?

25           THE COURT:  Yes, you may.

 1  BY MS. RATTAN:

 2  Q.  So, Ms. Gallot, is this the signature card with the

 3  Citibank, which was the name of the bank before it became

 4  Branch Banking and Trust?

 5  A.  Yes, it is.

 6  Q.  And is it the Citi card associated with this business

 7  name, KBKK, LLC?

 8  A.  Yes, it is.

 9  Q.  And does it tell us who KBKK is?

10  A.  It does.

11  Q.  And who is that?

12  A.  Keith Ashley.

13  Q.  So the first and last name of the person who holds the

14  account KBKK is Keith Ashley; is that right?

15  A.  Correct.

16  Q.  Let me direct your attention to page 2 of Government's

17  Exhibit 8B.

18          MS. RATTAN:  We can publish that.

19  BY MS. RATTAN:

20  Q.  Of course, this is also a document of your bank.  And

21  does it also tell us who KBKK is, who is it behind that

22  account?

23  A.  Yes, Keith Ashley.

24  Q.  Okay.  And it says "Keith Ashley."  It's also got

25  "Brandi Ashley"; is that right?

```
 1    A.  Correct.

 2    Q.  And it shows an address of 1211 Boerne Court in Lucas,

 3    Texas; is that right?

 4    A.  Correct.

 5    Q.  And then it says the name -- or the signer and then

 6    they've got a tax ID number there and again we've got

 7    "Keith Ashley"; is that right?

 8    A.  Correct.

 9    Q.  So the account there at BB&T for KBKK -- the account

10    holder, in fact, is Keith Ashley; is that right?

11    A.  Correct.

12    Q.  Now let me ask you about wires that go through your

13    bank, out of your bank, into your bank.

14          Do all wires that come in and out of your bank

15    cross through another state?

16    A.  Our wire room is in North Carolina.

17    Q.  So the wire room for your bank is in -- what part of

18    North Carolina?

19    A.  Lumberton.

20    Q.  So Lumberton, North Carolina.

21          So every wire that passes through your bank or is

22    involved with your bank is going to pass through Lumberton,

23    North Carolina?

24    A.  Correct.

25    Q.  Okay.
```

```
 1            MS. RATTAN:  May I approach the witness, your
 2   Honor?
 3            THE COURT:  Yes.
 4   BY MS. RATTAN:
 5   Q.  Now, did you review some wires before you came to court
 6   today?
 7   A.  Yes, I did.
 8   Q.  And did you assure yourself that those were wires from
 9   your bank and that they, in fact, would have passed
10   interstate?
11   A.  Yes.
12   Q.  Okay.  Let me show you what's been marked -- and it's
13   in your book as well -- as Government's Exhibit 49 and 55.
14            MS. RATTAN:  We'll offer those, your Honor, 49 and
15   55.
16            THE COURT:  Any objection?
17            MR. SANDEL:  No objection, your Honor.
18            THE COURT:  Okay.  49 and 55 will be admitted.
19            MS. RATTAN:  And if I can use the stand to display
20   this chart, which is Government's Exhibit --
21            THE COURT:  Yes.
22            MS. RATTAN:  Thank you.
23            THE COURT:  Yes, go ahead.
24   BY MS. RATTAN:
25   Q.  Ms. Gallot, I want to make it so that you can see this
```

1  but also so the jury can see it.  So, let's see, it's

2  Government's Exhibit 49.  Can you see it?

3  A.  Yeah, I'm getting it.

4  Q.  Okay.  I know the pages are kind of hard to turn in the

5  book.

6  A.  I can see it here.

7  Q.  Okay.  So, again, we're referencing Government's

8  Exhibit 49; and I'm asking you about BB&T.  That's the name

9  of your bank, Branch Banking and Trust?

10  A.  Correct.

11  Q.  Okay.  And these are wire transfer operations; is that

12  right?

13  A.  Correct.

14  Q.  Now, this wire transfer is related to the account that

15  we just looked at, which was KBKK, Keith Ashley.

16  A.  Correct.

17  Q.  So we've got KBKK, LLC, listed there and it's located,

18  it says, in Allen, Texas; is that right?

19  A.  That is correct.

20  Q.  Now walk us through what is going on here with this

21  wire.

22  A.  This appears that they received a credit, meaning the

23  money came into his account.

24  Q.  So this money is going into the KBKK account?

25  A.  Correct.

1    Q.  And how much is going into the account?

2    A.  75,000.

3    Q.  $75,000.

4         And who is sending the money into the account?

5    A.  Robert V. Greenling *(sic)*.

6    Q.  Is it Robert L. Greening?

7    A.  Sorry.  I read it wrong.  Greening, yes.

8    Q.  Okay.  So it says "Investment," from Robert L., Lee,

9    Greening; is that right?

10   A.  Correct.

11   Q.  So this is the investor, Robert L. Greening; and then

12   it's going to the KBKK account.  And we know that's the

13   Keith Ashley account; is that right?

14   A.  Correct.

15   Q.  And it's $75,000; and the date of the transfer is

16   February 6th of 2020?

17   A.  Correct.

18   Q.  Now, this transfer, this wire transfer that's

19   Government's Exhibit Number 49, would this have been an

20   interstate wire transfer?

21        MR. WHALEN:  Objection -- oh, that's you.

22        THE COURT:  Overruled but --

23   A.  It would have come through North Carolina, yes.

24   BY MS. RATTAN:

25   Q.  Okay.  So it would have gone through North Carolina and

1   been an interstate wire; is that correct?

2   A.  Yes.

3   Q.  Let me direct your attention now to Government's

4   Exhibit 55?

5           MS. RATTAN:  And we'll offer this as well, your

6   Honor.

7           THE COURT:  55 has already been admitted.

8           MS. RATTAN:  Oh, thank you.

9           THE COURT:  You've already offered it, and it's

10  been admitted.

11          MS. RATTAN:  May I publish it?

12          THE COURT:  Yes.

13  BY MS. RATTAN:

14  Q.  Now the same questions with this, Ms. Gallot.  Can you

15  explain -- this is Government's Exhibit 55 -- what this is?

16  A.  This is also a credit; and it came from a bank for

17  150,000.

18  Q.  Okay.  So the amount is right here; and it's 150,000.

19          And when you say a "credit," does that mean that

20  it's money going into BB&T's account?

21  A.  Yes, it does.

22  Q.  Okay.  Whose account at BB&T is it going to?

23  A.  Mr. Ashley.

24  Q.  Because we've got the "KBKK, LLC," right here --

25  A.  Correct.

```
 1    Q.  -- in Lucas, Texas; is that right?

 2    A.  Correct.

 3    Q.  So that's the Keith Ashley.

 4          And the amount that's going in there is $150,000;

 5    is that right?

 6    A.  That is correct.

 7    Q.  And do we have the originator or who's sending the

 8    $150,000?

 9    A.  James Seegan.

10    Q.  So James Seegan is the originator and he's sending

11    $150,000 to KBKK; is that right?

12    A.  Correct.

13    Q.  Now, what is the date of this transfer?

14    A.  You'll need to make it bigger.

15    Q.  Okay.

16          MS. RATTAN:  Can we blow up the middle portion of

17    it, please, where it says "Input Cycle date."

18    A.  5-5-16.

19    BY MS. RATTAN:

20    Q.  So the date is right here and that's when it took

21    place; is that right?

22    A.  Correct.

23    Q.  So this transfer from James Seegan of $150,000 to KBKK,

24    which is Keith Ashley, would this have been an interstate

25    wire transfer?
```

1    A.   (Moving head up and down.)

2         It would have gone through North Carolina.

3         MS. RATTAN:  May I return to the podium, your

4    Honor?

5         THE COURT:  Yes.

6         MS. RATTAN:  Okay, thanks.

7    BY MS. RATTAN:

8    Q.   Now, although we've looked at the large blowups of the

9    wire transfers, the two that we just focused on, there were

10   other wire transfers that involved your bank that you

11   reviewed; is that correct?

12   A.   Correct.

13   Q.   Okay.  So let me direct your attention on the stand in

14   front of you to the notebook, Government's Exhibit 52B, C,

15   and D.

16   A.   I'm not seeing it.

17   Q.   Do you see it?

18         MS. RATTAN:  May I approach, your Honor?

19         THE COURT:  Yes.

20   BY MS. RATTAN:

21   Q.   That book ends with 50, so that's why you don't see it.

22   I'm sorry.

23         MS. RATTAN:  May I return?

24         THE COURT:  Yes.

25                              *

                                 Jury Trial, Volume 2                        366

```
 1  BY MS. RATTAN:
 2  Q.  And have you previously reviewed Government's
 3  Exhibits 52B, C, and D?
 4  A.  Yes, I have.
 5  Q.  And then let me ask you to also look at Government's
 6  Exhibit 55 in the book, which I think we just reviewed that
 7  on the chart.
 8  A.  Okay.
 9  Q.  And you recognize all of those?
10  A.  Yes.
11        MS. RATTAN:  Your Honor, we'll offer Government's
12  Exhibits 52B, C, and D.
13        MR. SANDEL:  No objection, your Honor.
14        THE COURT:  Okay.  52B, C, and D will be admitted.
15        MS. RATTAN:  And may we publish Government's
16  Exhibit 52?
17        THE COURT:  52B or --
18        MS. RATTAN:  52B.  Sorry.  Thank you.
19        THE COURT:  Yes.
20  BY MS. RATTAN:
21  Q.  Okay.  Ms. Gallot, can you explain to the jury what
22  this is?
23  A.  This is a wire outgoing, meaning it was taken from the
24  account to another account.
25  Q.  And it's going from what account?
```

1    A.   KBKK.

2    Q.   And that, we know, is the Keith Ashley account.

3              And the amount of the wire is how much?

4    A.   16,496.15.

5    Q.   And what date is the wire sent?

6    A.   2-7-2020.

7    Q.   And it's being sent from where?

8    A.   From BB&T.

9    Q.   And the originator is there, KBKK; is that right?

10   A.   KBKK, LLC, yes, uh-huh.

11   Q.   And then you've also got the beneficiary name down

12   here.  Who is that?

13   A.   It says it's NTMM-Keith Ashley.

14   Q.   And as you've said, of course, this wire would have had

15   to have transferred through North Carolina; is that right?

16   A.   Correct.

17   Q.   Now let me direct your attention Government's

18   Exhibit 52C.

19             What is this?

20   A.   This is also an outgoing wire.  Money was sent to

21   another institution.

22   Q.   And how much is it?

23   A.   12,000.

24   Q.   And it was sent -- who was the originator?

25   A.   KBKK, LLC.

1   Q.  And then it's sent to another Keith Ashley account; is

2   that right?

3   A.  Correct.

4   Q.  So it's KBKK, Keith Ashley, sending money to Keith

5   Ashley?

6   A.  Correct.

7   Q.  By wire?

8   A.  Yes.

9   Q.  And, of course, same question.  Would this have

10  transferred through North Carolina?

11  A.  Correct.

12  Q.  And then let me direct your attention to Government's

13  Exhibit 52D.

14          What is this?

15  A.  Another outgoing wire.

16  Q.  And what's the amount here?

17  A.  13,500.

18  Q.  And it's from who and --

19  A.  KBKK.

20  Q.  Okay.  It's from Keith Ashley, KBKK.

21          And it's going where?

22  A.  Keith Ashley.

23  Q.  So just transferring it to another account, and it's by

24  wire?

25  A.  Correct.

 1   Q.  And this wire would have gone through North Carolina?

 2   A.  Correct.

 3   Q.  Well, let me ask you about the effect that fraud and

 4   financial transfers have on the banking industry and on

 5   your bank specifically.

 6              MR. SANDEL:  Objection, your Honor.  That calls

 7   for opinion testimony.

 8              THE COURT:  Overruled.

 9   BY MS. RATTAN:

10   Q.  If a transaction with the bank -- specifically with

11   your bank, BB&T -- is conducted fraudulently, can the bank,

12   BB&T, be held responsible or liable?

13              MR. SANDEL:  Objection, calls for speculation,

14   your Honor.

15              THE COURT:  Overruled.

16              If you can answer.

17   A.  For any outgoing wires, we could be held responsible,

18   yes.

19   BY MS. RATTAN:

20   Q.  And could the bank be sued potentially by Ponzi scheme

21   victims?

22              MR. SANDEL:  Objection, speculation, your Honor.

23              THE COURT:  Overruled.

24              If you can answer.

25   A.  I don't know.

1   BY MS. RATTAN:

2   Q.  Does BB&T invest time and money in preventing crime and

3   fraudulent wires and money laundering?

4   A.  Yes, we do.

5   Q.  Okay.  Does that affect BB&T as an institution?

6           MR. SANDEL:  Objection, calls for speculation,

7   your Honor.

8           THE COURT:  Overruled.

9           If you know.

10  A.  I would assume.

11  BY MS. RATTAN:

12  Q.  Does it cost you-all money and manpower to do those

13  things?

14  A.  Yes.

15  Q.  So what sort of things does BB&T do to detect and

16  prevent fraud in the abuse of your accounts?

17  A.  We have --

18          MR. SANDEL:  Objection, relevance, your Honor.

19          THE COURT:  Overruled.

20  A.  We have multiple departments that handle it.  We have a

21  fraud department.  We have a wire department.  We have our

22  branches.  And they're all trained to review and know our

23  clients prior to sending wires.

24  BY MS. RATTAN:

25  Q.  Okay.  So the fraud department is focusing on whether

1  any of your accounts are being used for crime; and it's

2  also looking at whether any money involved in crime is

3  being transferred, laundered?

4  A.  Correct.

5  Q.  And it's important for the bank to know its customers;

6  is that right?

7  A.  Correct.

8  Q.  In fact, that's what you're charged with doing and you

9  have divisions that do that; is that correct?

10  A.  Correct.

11  Q.  Could the reputation of the institution also be

12  affected by these fraudulent accounts?

13        MR. SANDEL:  Objection, your Honor.  Calls for a

14  legal conclusion and speculation.

15        THE COURT:  Overruled.

16  A.  Yes, it could be.

17  BY MS. RATTAN:

18  Q.  Okay.  When you say that, explain to us what you mean.

19  How could fraud in BB&T's accounts affect the reputation of

20  the institution?

21  A.  If we're involved in fraud -- well, if somebody commits

22  fraud, whether it be fraudulent accounts or money

23  laundering through wires, our reputation could be tarnished

24  if the person is actually convicted of it.

25  Q.  And, of course, the reputation of a bank affects

1  business and who wants to come there and bring their money

2  there; is that right?

3  A.  Correct.

4  Q.  So if BB&T does detect fraud as you continue to

5  evaluate accounts, what is done if an account is believed

6  to be involved in fraud?

7  A.  We block the account, we review the account, and we

8  submit -- I'm sure when security gets involved, they submit

9  the proper paperwork.

10  Q.  So if a transaction is conducted fraudulently in BB&T's

11  account, will that affect BB&T?

12  A.  It will.

13          MS. RATTAN:  I'll pass the witness.

14          THE COURT:  Cross-examination?

15                CROSS-EXAMINATION OF JEANNY GALLOT

16  BY MR. SANDEL:

17  Q.  Ms. Gallot, good afternoon.  How are you?

18  A.  I'm fine, thank you.  How about you?

19  Q.  I'm good.  Did I pronounce your last name correct?

20  A.  Yes, you did.

21  Q.  Okay.  Just a few questions.

22          MR. SANDEL:  First, if we could, can we put

23  Government's Exhibit 8B on the screen.

24  BY MR. SANDEL:

25  Q.  Okay.  Ms. Gallot, you testified on direct that this

1   was a signature card for a KBKK account, correct?

2   A.  Correct.

3   Q.  Now, when we look at this number here, what is that

4   number?

5   A.  That's the account number.

6   Q.  Okay.  And what are the last four digits of that

7   account number?

8   A.  It's 1166.

9   Q.  Okay.

10          MR. SANDEL:  If we can now, please, look at

11  Government's Exhibit 55.

12          Thank you.

13  BY MR. SANDEL:

14  Q.  And when you testified about this exhibit -- remind me

15  what this exhibit was.

16  A.  That was a credit, an incoming wire.

17  Q.  An incoming wire.

18          And so can you tell, by looking at Exhibit 55,

19  what account that was being credited to?

20  A.  Can you blow it up?

21  Q.  Sure.  Which -- do you want the top section or this

22  middle section?

23  A.  8725.

24  Q.  8725 is the account number there?

25  A.  (Moving head up and down.)

1  Q.  And so that's a different account than the signature

2  page we just looked at; is that right?

3  A.  When we -- when we bought Citibank, the account numbers

4  had to change.

5  Q.  Okay.  So it could be a different account; it could be

6  the same account?

7  A.  Correct.

8  Q.  But they're definitely two different numbers.

9  A.  Yes.

10  Q.  Okay.  Thank you.  I appreciate that.

11        Now, you testified that when Citibank or Truist

12  Bank detects fraudulent activity, some of the steps you

13  take are to block or flag the account, correct?

14  A.  Correct.

15  Q.  Was the KBKK or one of the accounts ever blocked or

16  flagged?

17  A.  I don't know.

18  Q.  Now, currently your own -- it's Truist Bank, correct?

19  A.  Correct.

20  Q.  Do you know about how much Truist Bank is worth?

21  A.  No, I don't.

22  Q.  Okay.  Would it be safe to say that it's a

23  billion-dollar corporation at least?

24  A.  I would assume.

25  Q.  Okay.  And with FDIC-insured -- what does

1    "FDIC-insured" mean?

2    A.  It means that the government backs a certain dollar

3    amount in each account.

4    Q.  Okay, it backs a certain dollar amount.  And do you

5    know what that number is?

6    A.  250,000.

7    Q.  In each account?

8    A.  Per owner.

9    Q.  Per owner, okay, per owner.

10          And is the FDIC -- that insurer, is that something

11   that's regulated by Congress?  If you know.

12   A.  I don't know.

13   Q.  Don't know, okay.

14          Okay, ma'am.  Going back to that FDIC-insured

15   status, are there certain things that you have to do to

16   maintain that FDIC-insured status?

17   A.  I don't know.

18   Q.  Are there certain reporting requirements and audit

19   requirements that you have to take?

20   A.  Yes, there are.

21   Q.  And are some of those requirements to maintain that

22   insured status some of the things that Ms. Rattan asked you

23   about, some of the fraud detection and money laundering

24   detection?

25   A.  I don't know.

Jury Trial, Volume 2                                     376

```
 1  Q.  And wouldn't it be true that regardless of if fraud is
 2  being perpetrated or not, you have to do those things in
 3  order to maintain FDIC-insured status?
 4  A.  I wouldn't know.
 5  Q.  Okay.  But if so, if those are things that you have to
 6  do, that would be a normal cost of business for an FDIC
 7  bank; isn't that true?
 8  A.  Can you repeat that again?
 9  Q.  If those steps, those fraud prevention steps, are
10  required to maintain your status as being FDIC, then
11  whether or not fraud is occurring doesn't matter because
12  those are things you have to do anyway, correct?
13  A.  Correct.
14          MR. SANDEL:  Pass the witness, your Honor.
15          THE COURT:  Anything additional from this witness?
16          MS. RATTAN:  No, your Honor.  Thank you.
17          THE COURT:  Can this witness be fully excused?
18          MS. RATTAN:  Yes, please.
19          MR. SANDEL:  Yes, your Honor.
20          THE COURT:  You are free to leave.  Thank you.
21          Okay.  Your next witness?
22          MS. RATTAN:  Matt Wylie.
23          THE COURT:  Sir, if you'll raise your right hand
24  and be sworn in.
25          THE WITNESS:  I'm unable to raise my --
```

1           THE COURT:  Oh, sorry.

2           (The oath is administered to the witness.)

3           THE COURT:  Sorry about that.

4           THE WITNESS:  That's okay.

5           MS. RATTAN:  May I approach, your Honor?

6           THE COURT:  Yes, you may.

7           MS. RATTAN:  And then, your Honor, with this

8   witness I'm going to ask him to turn to his left and

9   explain his testimony; so may I provide him with a lapel

10  mic so he's not --

11          THE COURT:  Yes, of course.

12          Yeah, the acoustics in here aren't very good.  So

13  it's not that we couldn't hear you; it's that it makes it

14  easier.

15          MS. RATTAN:  I don't know.  Maybe put it on your

16  left side since you're going to turn left.

17          THE WITNESS:  Does that work?

18          MS. RATTAN:  Uh-huh.  And then to turn it on,

19  press it; and then it will turn green.  Okay.  It's on.

20          Okay.  May I return?

21          THE COURT:  Yes.

22              DIRECT EXAMINATION OF MATTHEW WYLIE

23              CALLED ON BEHALF OF THE GOVERNMENT

24  BY MS. RATTAN:

25  Q.  Please state your name.

1   A.  Matthew Wylie.

2   Q.  And where do you work?

3   A.  FBI.

4   Q.  Well, I don't know what the best thing to do is.  Maybe

5   when we're talking speak closely into this microphone; and

6   then hopefully as we review your charts, you'll turn to

7   your left and this one will pick up your voice.

8   A.  Okay.

9   Q.  Matthew Wylie, and you work for the FBI?

10  A.  Correct.

11  Q.  Will you spell your name, please.

12  A.  M-A-T-T-H-E-W.  Last name is Wylie, W-Y-L-I-E.

13  Q.  And you said you work for the FBI.  Will you describe

14  for the jury what you do?

15  A.  My position title is forensic accountant, so I handle

16  the financial aspect of cases.

17  Q.  And what is your educational background that qualifies

18  you to work as a forensic accountant for the FBI?

19  A.  I have a bachelor's degree in accounting from The

20  University of Texas San Antonio.

21          I have a master's degree in accounting from

22  Western Governors University.

23          I also have a master's degree in exercise science

24  from University of Louisiana Monroe.

25          I've also been a licensed CPA for over two years

1   and been in my current position at the FBI for three and a

2   half years.  And included in that, when we're onboarded as

3   forensic accountants we go through a five-week training on

4   the fundamentals in Quantico.

5   Q.  In Quantico, Virginia, FBI training?

6   A.  Yes, ma'am.

7   Q.  I don't know.  It might be just me.  But if you could

8   just raise that mic and speak into it a little more

9   closely.

10  A.  Is that better?

11  Q.  I think so, yes.

12       So that's your background.  As a forensic

13  accountant and a CPA, can you tell the jury, what is a

14  Ponzi scheme?

15       MR. WHALEN:  Your Honor, I'm going to object.

16  That calls for a legal conclusion.  They haven't even laid

17  the predicate for that.

18       THE COURT:  Well, if you want to maybe lay a

19  little more foundation or --

20       MS. RATTAN:  Yes, your Honor.

21  BY MS. RATTAN:

22  Q.  Based on your experience and your knowledge, your

23  education and your training, are you familiar with schemes

24  that are used to take money, steal money from people?

25  A.  I am.

1   Q.  And is one of these schemes kind of colloquially called

2   a Ponzi scheme or a pyramid scheme?

3   A.  It is.

4   Q.  Are you familiar with the use of Ponzi or pyramid

5   schemes?

6   A.  I am.

7   Q.  Have you reviewed documents and had training on exactly

8   what to look for and what these are?

9   A.  I have.

10  Q.  And can you explain to the jury what is a Ponzi or a

11  pyramid scheme?

12  A.  Essentially, it's a scheme where money is deposited

13  from investors and then -- with the promise of a certain

14  rate of return, and that is eventually paid off with

15  additional money provided by new investors.

16  Q.  So you get money from the first investor, and what do

17  you do with it?

18  A.  A lot of times it's used for personal expenses.  In a

19  Ponzi scheme traditionally, it's never actually invested or

20  used for the stated purpose.

21  Q.  So the schemer gets money from the investor and never

22  invests it, essentially?

23  A.  Correct.

24  Q.  And then what else are you looking for, as a forensic

25  accountant, when you investigate a Ponzi scheme or a

 1  pyramid scheme?

 2  A.  First looking for the uses of funds, specifically

 3  are -- is it being invested, are other investors being paid

 4  with those funds and, if not, what are the actual uses of

 5  those funds.

 6  Q.  So you're looking for what happened to the money?

 7  A.  Correct.

 8  Q.  Are you looking to see whether it got invested in

 9  anything?

10  A.  Yes.

11  Q.  And then because it's a pyramid scheme, you're also

12  looking to see were other investors paid off with that

13  money?

14          MR. WHALEN:  Objection as to leading.

15          THE COURT:  Just rephrase the question.

16  BY MS. RATTAN:

17  Q.  Is that something that's important to look for, is a

18  red flag when you're evaluating a Ponzi scheme?

19  A.  Yes, it's important.

20  Q.  Now, in this case did you evaluate the accounts and

21  money that was provided to Keith Ashley?

22  A.  I did.

23  Q.  And did you focus on specific times when large, bulk

24  money was provided?

25  A.  Yes.

1   Q.  And did you analyze what happened to the bulk money?

2   A.  I did.

3   Q.  Now I'm going to ask you about a specific victim or

4   investor, Denny Willmon.  Did you review records as it

5   related to Denny Willmon?

6   A.  Yes.

7   Q.  And did you prepare a chart analyzing -- or to explain

8   your analysis to the jury?

9   A.  Yes.

10  Q.  And will it help them in understanding what happened to

11  Mr. Willmon's money?

12  A.  Yes.

13          MS. RATTAN:  Your Honor, we'll offer Government's

14  Exhibit 47.

15          MR. WHALEN:  Your Honor, we'd object to lack of

16  predicate.

17          THE COURT:  Do you want to maybe ask him a couple

18  more follow-up questions about the creation of this

19  document?

20          MS. RATTAN:  I can.

21          THE COURT:  Okay.

22  BY MS. RATTAN:

23  Q.  Can you explain how this document was created?

24  A.  Yes.

25          So these were created by analyzing the bank

1  accounts of Mr. Ashley.  When a deposit of a large sum of

2  money would come in, an accounting principle was used

3  called first in/first out because the account balance at

4  the time of these large deposits was usually very low.

5          So, for instance, if $100,000 was deposited into

6  the account, the first $100,000 withdrawn from the account

7  was used to come up with these figures on these charts that

8  will be shown.

9          MS. RATTAN:  And, your Honor, we'll offer

10 Government's Exhibit 47.

11         MR. WHALEN:  Renew my objection, your Honor.

12         THE COURT:  Objection overruled.  47 will be

13 admitted.

14         MS. RATTAN:  May we publish it, your Honor?

15         THE COURT:  Yes, you may.

16 BY MS. RATTAN:

17 Q.  So on the screen to your right but also to your left is

18 the same exhibit.  It's Government's Exhibit Number 47.

19 And is this the analysis that you did on the money that was

20 provided to Keith Ashley by Denny Willmon?

21 A.  Yes.

22 Q.  And what amount of money was that?

23 A.  $20,000 was deposited by Denny Willmon into the KBKK,

24 LLC, BB&T account ending in 8725.

25 Q.  And so the timing of your analysis, what time period

1   were you looking at?

2   A.  For this one in particular, it started when the check

3   from Denny Willmon was deposited, on 3-14-2019; and the

4   funds were all used by 4-2-2019.

5   Q.  Okay.  And before we display the chart, you talked

6   about the accounting principle of first in/first out.

7           Looking at the chart, will you tell us how you

8   used that principle and applied it here?

9   A.  Yes.

10          So immediately prior to the deposit from

11  Mr. Willmon being made, the account balance of the KBKK

12  account was $238.25.  So I used the first in/first out

13  principle because there weren't any -- there weren't

14  sufficient funds to make these withdrawals that you see on

15  here with the prior balance.

16          MS. RATTAN:  May I approach the witness, your

17  Honor?

18          THE COURT:  Yes.

19  BY MS. RATTAN:

20  Q.  So the first thing you're looking at, I guess, is the

21  fact that Denny Willmon provided $20,000; is that right?

22  A.  Correct.

23  Q.  So let me show you what's previously been admitted as

24  Government's Exhibit 45A.

25          So that is Denny Willmon writing a check for

 1   $20,000 to KBKK; is that right?

 2   A.  Correct.

 3   Q.  And this is the $20,000 that Mr. Willmon provided that

 4   you're analyzing?

 5   A.  Yes.

 6   Q.  And the check is deposited on March 14th of 2019?

 7   A.  Yes.

 8   Q.  And your analysis is from March of 2019 to April of

 9   2019?

10   A.  Yes.

11   Q.  So it looks like roughly a two-week period?

12   A.  Correct.

13   Q.  And then as far as the first in/first out, what was the

14   account balance when the $20,000 from Mr. Willmon went in?

15   A.  $238.25.

16   Q.  And that's right here, account balance?

17   A.  Correct.

18   Q.  So you show the $20,000 going in; and there is not much

19   money in the account when Mr. Willmon's money comes in?

20   A.  Correct.

21   Q.  So what happens with Mr. Willmon's $20,000?

22           Did you see any investments going to

23   SmartTrust UIT?

24   A.  No.

25   Q.  Did you see any investments on behalf of Mr. Willmon

1   going anywhere?

2   A.   No.

3   Q.   Tell us what you saw happening to the money.

4   A.   I saw $7,075 be transferred to a account titled "Keith

5   or Brandi Ashley" at Bank of America.

6   Q.   Now, as part of this $7,075 was there a wire sent?

7   A.   I believe so.

8   Q.   And then that would have been a wire from the BB&T

9   account to the BoA account; is that right?

10   A.   Correct.

11   Q.   And that's Bank of America?

12   A.   Yes.

13   Q.   So you saw the 20,000 come in and 7,000, roughly, goes

14   over to Keith Ashley's Bank of America account?

15   A.   Yes.

16   Q.   What else did you see?

17   A.   I saw $2,072 be spent at casinos.

18   Q.   So money going to casinos.  And that's from

19   Mr. Willmon's money; is that right?

20   A.   Yes.

21   Q.   What else?

22   A.   $2,043 was sent to James Seegan.

23   Q.   Now, was this significant, the fact that $2,000,

24   approximately, was sent to James Seegan?

25   A.   Yes.

1   Q.  And did you use that fact in analyzing whether this was

2   a Ponzi or a pyramid scheme?

3   A.  Yes.

4   Q.  How was that significant?

5   A.  Because James Seegan also deposited large sums of money

6   with Mr. Ashley.

7   Q.  And did similar things happen to Mr. Seegan's money?

8   A.  Yes.

9   Q.  So you immediately see that Denny Willmon's money is

10  going to someone else who appears to be an investor with

11  Keith Ashley; is that right?

12  A.  Correct.

13  Q.  Did you see any other investors being paid with

14  Mr. Willmon's money?

15  A.  I did.

16  Q.  And who did you see?

17  A.  Leonid Shteyngart.

18  Q.  And that was about $1,664?

19  A.  Correct.

20  Q.  So at this point $7,000 had gone to his personal

21  banking account that he shares with his wife; and then you

22  see he's gambling and he's paying off other investors?

23  A.  Yes.

24  Q.  What else do you see?

25  A.  He also transferred $6,000 to another KBKK account at

1    Commercial Bank of Texas.

2    Q.  And that's right here?

3    A.  Correct.

4    Q.  And then what's happening here on the right side of the

5    slide, Government's Exhibit 47?

6    A.  Then those funds were used to pay off brewery expenses

7    and also credit cards.

8    Q.  You say "brewery expenses."  What are you talking about

9    there?

10   A.  Mr. Ashley owned the Nine Band Brewery in Allen, and

11   those funds were used to pay for expenses related to that

12   brewery.

13   Q.  And, again, this is all within that two-week period

14   after Mr. Willmon has provided his money; is that right?

15   A.  Correct.

16   Q.  What else did you determine happened to Mr. Willmon's

17   money?

18   A.  Also $562 was returned to Mr. Willmon, of his own

19   money.

20   Q.  Is that something that you will see in a pyramid or

21   Ponzi scheme?

22   A.  Yes.

23   Q.  Explain that.

24   A.  The funds deposited by the investor are usually paid to

25   pay back old investors as well as that investor, that same

1   investor, to basically keep them on the line and keep them

2   happy and thinking that they're getting a return on their

3   investment.

4   Q.  And then what did you see down here, in the bottom

5   right corner of the analysis?

6   A.  From the KBKK account at BB&T, $181 was used to pay off

7   credit cards as well.

8   Q.  And then what is this $2,271?

9   A.  Another $2,271 was used from the KBKK account at

10  Commercial Bank of Texas to also pay off credit cards.

11  Q.  Okay.  So you've got about twenty-two- -- almost $2,500

12  going to credit cards.  But you've also got, from this

13  $7,000 transfer to his Bank of America account, another

14  payment to the credit cards over here; is that right?

15  A.  Correct.

16  Q.  And these were all Keith Ashley's credit cards?

17  A.  Correct.

18  Q.  So you've got five -- a little over $7,000 going to pay

19  on his credit cards from Mr. Willmon's money?

20  A.  Yes.

21  Q.  And then here, on the far left side of Government's

22  Exhibit 47, what's happening?

23  A.  $1,500 was used to pay off his mortgage; and $1,000 was

24  used for medical expenses.

25  Q.  And that's the $1,500 on his own mortgage and $1,000 on

1   medical?

2   A.  Yes.

3   Q.  Were you able to determine whether any of Mr. Willmon's

4   $20,000 was invested?

5   A.  Yes.  It was not.

6   Q.  Okay.

7           MS. RATTAN:  May I return, your Honor?

8           THE COURT:  Yes.

9           MS. RATTAN:  I'll pass the witness.

10          THE COURT:  Cross-examination?

11              CROSS-EXAMINATION OF MATTHEW WYLIE

12  BY MR. WHALEN:

13  Q.  Good morning.  How are you?

14  A.  Good morning.  Doing well.

15          MR. WHALEN:  If we could bring that exhibit back

16  up, that would be great.

17  BY MR. WHALEN:

18  Q.  Okay.  So -- just so I understand, in your creating of

19  this chart, what all documents did you look at in order to

20  create this chart?

21  A.  I looked at the bank statements for the KBKK, LLC, BB&T

22  account ending in 8725 as that was the account that the

23  funds were deposited into.

24          And then I also looked at Keith or Brandi Ashley

25  Bank of America account ending in 4804 since transfers were

1    made to that account.

2              And then I looked at the KBKK, LLC, Commercial

3    Bank of Texas account ending in 4943 as funds were also

4    transferred to that account.

5    Q.  Okay.  And so when you're reviewing the documents,

6    reviewing the bank records, are you looking at checks and

7    also what the entries are of who they're paid to, correct?

8    A.  Yes.

9    Q.  So if we take, for instance, credit cards, you're just

10   seeing a payment to whatever credit card, correct?

11   A.  Yes.

12   Q.  Did you ever look at the credit card statement?

13   A.  No.

14   Q.  Okay.  So as it relates to the credit cards, same with

15   the casinos, you're just seeing a payment to a casino.  You

16   don't know what it was used for, correct?

17   A.  Correct.

18              In my experience, though, payments to casinos and

19   credit cards are not traditional investment vehicles.

20   Q.  Okay.  That wasn't my question.

21   A.  Okay.

22   Q.  You don't know what it was for?

23   A.  Correct.

24   Q.  Okay.  So when you just say it's a casino, that's all

25   you're saying that chart says is $2,000 and -- $2,072 went

 1    to a casino, correct?

 2    A.  Correct.

 3    Q.  Now, you also indicated -- show business expenses,

 4    correct?

 5    A.  Correct.

 6    Q.  Okay.  The check was made out to KBKK, LLC, correct?

 7    A.  Yes.

 8    Q.  Okay.  And an LLC is a type of entity, correct?

 9    A.  Yes.

10    Q.  Okay.  And is it normal for LLCs -- or people who own

11    businesses to create LLCs?

12    A.  It is.

13    Q.  Okay.  And also LLCs generally are treated as an

14    S corp, correct, for tax purposes, correct?

15    A.  Yes.

16    Q.  And LLCs can then be a flow-through to a -- so if

17    someone takes a distribution from an LLC, that's a

18    flow-through to their personal tax return, correct?

19    A.  Yes.

20    Q.  And they pay taxes on that, correct?

21    A.  Uh-huh, yes.

22    Q.  Okay.  So if I'm an owner of an LLC and I make money or

23    profit, I can take a distribution from the LLC, correct?

24    A.  Yes.

25    Q.  Okay.  And KBKK, you learned, also owned Nine Band

1   Brewery, correct?

2   A.  Yes.

3   Q.  Okay.  So if money is going into the business expenses,

4   you determined that is going to Nine Band Brewery, correct?

5   A.  Yes.

6   Q.  That is a business, correct?

7   A.  Yes.

8   Q.  That existed, correct?

9   A.  Yes.

10  Q.  Okay.  If money is being put into the brewery, that can

11  make money to then pay and give a return to people who

12  invested in KBKK, correct?

13  A.  Yes.

14  Q.  And all the checks you looked at as relates to the

15  $20,000 and others, they went to KBKK, LLC, correct?

16  A.  Correct.

17  Q.  Okay.  And Nine Band Brewery was a viable business

18  working to make a profit, correct?

19  A.  I don't know if I would characterize it as viable, but

20  yes.

21  Q.  Okay.  But it's a business, right?

22  A.  It is.

23  Q.  And everybody is in business to make a profit, correct?

24  A.  Yes.

25  Q.  Okay.  So would it be logical that you spend money in

 1  order to invest in a business to make a profit?

 2  A.  Yes.

 3  Q.  Okay.  And also is it normal for businesses to use

 4  money or loans in order to have capital to run the

 5  business?

 6  A.  Yes.

 7  Q.  And so as far as your analysis, you just looked at it

 8  from this time frame from March 14th of 2019 to April 2nd,

 9  correct?

10  A.  Yes, because that's the -- I chose that time frame

11  because that's the time it took to use the $20,000 from

12  Mr. Willmon.

13  Q.  Okay.  And James Seegan and Mr. Shteyngart, they wrote

14  checks directly to KBKK, correct?

15  A.  Yes.

16  Q.  So it would make sense that if they wrote checks to

17  KBKK, that money would come out of KBKK back to them.

18  Would you agree with that?

19  A.  It depends on what was told to them about their

20  investment.

21  Q.  Okay.  And that, you don't know.

22  A.  Correct.

23          MR. WHALEN:  I'll pass the witness.

24          THE COURT:  Anything additional?

25          MS. RATTAN:  Just briefly.

1              REDIRECT EXAMINATION OF MATTHEW WYLIE

2    BY MS. RATTAN:

3    Q.  Did you see anything going out of this account from the

4    money Denny Willmon sent going to SmartTrust UIT?

5    A.  I did not.

6            MS. RATTAN:  May I approach, your Honor?

7            THE COURT:  Yes.

8    BY MS. RATTAN:

9    Q.  And on this business theory, the only amount that went

10   to the business is this right here, $3,700; is that right?

11   A.  Correct.

12   Q.  The rest went to personal account, mortgage, medical

13   expenses, casinos, other victims, and credit cards; is that

14   right?

15   A.  Correct.

16           MS. RATTAN:  I'll pass the witness.

17           THE COURT:  Anything else?

18            RECROSS-EXAMINATION OF MATTHEW WYLIE

19   BY MR. WHALEN:

20   Q.  Mr. Wylie, as it relates to the credit cards, is it

21   fair to say people can use credit cards to then fund their

22   business and consider it a personal distribution or a cash

23   contribution to their business?

24   A.  It is.

25   Q.  Okay.  And so then if they get money into that, LLC,

 1  they can use that to pay off their credit cards to repay

 2  themselves for their cash contribution to the business?

 3  A.  Yes.

 4  Q.  And were you aware or do you know if there was any

 5  other businesses that he owned or breweries that he owned?

 6  A.  Other businesses, yes.  Other breweries, no.

 7  Q.  You're not aware of that?

 8  A.  Correct.

 9          MR. WHALEN:  I'll pass the witness.

10          THE COURT:  Can this witness be fully excused?

11          MS. RATTAN:  Not fully, your Honor.

12          THE COURT:  Okay.  So, sir, you are subject to

13  recall.  Thank you.

14          What's next, Ms. Rattan?

15          MS. RATTAN:  Your Honor, the United States calls

16  Leonid Shteyngart.

17          THE COURT:  Sir, if you'll raise your right hand

18  to be sworn in.

19          (The oath is administered to the witness.)

20          THE COURT:  Go ahead and proceed.

21          DIRECT EXAMINATION OF LEONID SHTEYNGART

22          CALLED ON BEHALF OF THE GOVERNMENT

23  BY MS. RATTAN:

24  Q.  Please state your name.

25  A.  Leonid Shteyngart.

1   Q.  Will you spell your name, please.

2   A.  L-E-O-N-I-D.  Last name is S-H-T-E-Y-N-G-A-R-T.

3   Q.  It's really difficult to hear in here and you may feel

4   like you are awkwardly close to the microphone, but if you

5   could get very close to the microphone.

6   A.  Okay, sure.

7   Q.  Okay.  That's better.

8           Mr. Shteyngart, can you tell us where you work?

9   What do you do?

10  A.  I'm a registered nurse, RN.

11  Q.  How long have you been a registered nurse?

12  A.  About 22 years.

13  Q.  Around when were you registered?  Around 1999?

14  A.  Yes.  I graduated from nursing school that year.

15  Q.  And did you immigrate to the United States?

16  A.  Yes, in 1994.

17  Q.  Where did you emigrate from?

18  A.  Moscow.

19  Q.  Russia?

20  A.  Yes.

21  Q.  When you were in Russia, did you have any educational

22  background or training there?

23  A.  Yes.  I was medical student of second -- two years,

24  medical student.

25  Q.  So in Russia you were a medical student?

 1    A.   And paramedic before.

 2    Q.   Pardon?

 3    A.   I was a paramedic before I went to medical school in

 4    Russia.

 5    Q.   A paramedic?

 6    A.   Uh-huh.

 7    Q.   And then you immigrated to the United States and you

 8    trained in nursing here?

 9    A.   Uh-huh, in The University of Texas at Arlington, UTA.

10    Q.   And what type of nursing do you do?

11    A.   Only ER, emergency room nursing.

12    Q.   And where do you work?

13    A.   I work in two hospitals, Baylor Plano and Baylor

14    Frisco.

15    Q.   And if you could just move a little closer to the

16    microphone.  I know.

17         So you work at two hospitals, Baylor Plano and

18    Baylor Frisco?

19    A.   Correct.

20    Q.   At some point in your nursing career, did you meet

21    someone by the name of Keith Ashley?

22    A.   Yes, I did.

23    Q.   How was it that you met him?

24    A.   At that time I was working in different hospital, which

25    is now Medical City McKinney.  And I worked there, and I

 1  met him over there.

 2  Q.  So you met him.  Was he a nurse as well?

 3  A.  He was a paramedic tech in the ER.

 4  Q.  And what would he do as a paramedic tech in the ER?

 5  A.  He was helping nurses, doing some assigned duties and

 6  taking care of patients.

 7  Q.  At some point did you talk to him or did he talk to you

 8  about investments?

 9  A.  Yes, uh-huh.

10  Q.  Can you explain what happened?

11  A.  He introduced me to the life insurance policy that

12  eventually would give -- will grow with profit, like with

13  some sort of interest or benefit.

14  Q.  And did you do?  Did you buy that?

15  A.  Uh-huh, yes, I did.  I invested at that time.

16  Q.  At some point did he talk to you about other

17  investments?

18  A.  Several years after that, he told me that there is

19  different opportunities with even more profit.

20  Q.  He told you about different opportunities?

21  A.  Different financial opportunities and better

22  investments.

23  Q.  Okay.

24  A.  Plans.

25  Q.  And did you do that as well?

```
 1   A.  Yes, uh-huh.
 2   Q.  And so you moved -- or provided money for another
 3   investment --
 4   A.  Right.
 5   Q.  -- to Keith Ashley; is that right?
 6   A.  Yeah.  Since it was later, after, I was able to
 7   accumulate some funds that he advised me to move to
 8   different investments that would give better return.
 9   Q.  Did he talk to you about a UIT investment?
10   A.  Yeah.  I believe that's what he called this type of
11   investment.
12   Q.  Okay.  So he told you that there was a UIT investment
13   available?
14   A.  Correct, yeah, uh-huh.
15   Q.  And he talked to you about the return that would be
16   available or how much money you would get on the UIT
17   investment?
18   A.  Right.  He told me about between 8 to 9 percent.
19   Q.  8 to 9 percent return --
20   A.  Uh-huh.
21   Q.  -- if you did the UIT investment with him?
22   A.  Right.
23   Q.  Well, did you do that?
24   A.  I did, uh-huh.
25   Q.  What happened?  What did you do?  How exactly did you
```

1    invest in that?

2    A.  First, he just moved money from life policy.  I think

3    first it was -- I believe that it was Prudential, like just

4    mutual fund.  And then from mutual fund to the UITs.

5    Q.  Okay.

6    A.  And then I made several installments throughout the

7    years.  I think since 2015 I made some contribution to UIT

8    since it was doing so well according to him.

9    Q.  So according to him, the UIT was doing well; so you

10   made additional investments in the UIT?

11   A.  Correct.

12   Q.  Now, did you ever give Keith Ashley any money to invest

13   in anything other than the UIT?

14   A.  I don't believe I did.

15   Q.  Did you ever give him any money for personal use?

16   A.  No.  That's certainly not the case, no.

17   Q.  Did you believe that your money was being invested in

18   this UIT investment?

19   A.  Yeah.  I hundred percent believed in it.

20   Q.  How much money did you lose with Keith Ashley that you

21   thought was being invested in this UIT investment?

22   A.  I believe close to $130,000.

23   Q.  $130,000?

24   A.  Uh-huh.

25   Q.  At some point did you text with Keith Ashley about your

```
 1   investments?
 2   A.  Certain times that payments was late and I was just
 3   texting him to get clarification, then the money would
 4   appear in my banking account.  And sometimes I would get a
 5   text offers from him about better opportunities and
 6   reinvestments.
 7   Q.  So sometimes he would ask you about investing money;
 8   but sometimes you would follow up with him and say, hey,
 9   the money is late?
10   A.  Yeah, couple days.  Couple days.  I was just making
11   sure that, you know, it's not some --
12   Q.  That there wasn't a problem?
13   A.  Right, uh-huh.
14   Q.  Okay.
15   A.  But always -- it was always resolved.
16   Q.  Always resolved?
17   A.  Always resolved, yes.
18   Q.  And when you say it was always resolved, how would it
19   get resolved?
20   A.  After I would talk to him, money would be appearing on
21   my checking account.
22   Q.  Okay.
23           MS. RATTAN:  May I approach the witness, your
24   Honor?
25           THE COURT:  Yes.
```

```
 1              MS. RATTAN:  May I return?

 2              THE COURT:  Yes.

 3  BY MS. RATTAN:

 4  Q.  So, Mr. Shteyngart, I just reviewed with you exhibits;

 5  and you indicated that you recognized them.  Were those

 6  texts that you traded with Keith Ashley?

 7  A.  Yes, uh-huh.

 8  Q.  You texted with him?

 9  A.  Uh-huh.

10  Q.  And all -- that was Government's Exhibit 42B.

11              And then I showed you checks which were

12  Government's Exhibit 43A; is that correct?

13  A.  Yes.

14  Q.  And you can identify both of those?

15  A.  Right, uh-huh.

16  Q.  So that would be Government's Exhibit 42B and 43A and

17  B; is that right?

18  A.  Correct.

19              MS. RATTAN:  Your Honor, we'll offer those,

20  Government's Exhibit 42B and 43A and B.

21              MR. WHALEN:  No objection.

22              THE COURT:  Okay.  42B will be admitted as well as

23  43A and B.

24              MR. WHALEN:  No objection.

25              MS. RATTAN:  And then may we publish 42B?
```

```
 1            THE COURT:  Yes, you may.

 2  BY MS. RATTAN:

 3  Q.  And, Mr. Shteyngart, over to your left -- I don't know

 4  if you can see that.  It's the same thing that's in the

 5  book in front of you.  I'm going to ask you about this part

 6  right here.

 7            These are text messages between you and Keith

 8  Ashley; is that right?

 9  A.  Yes, I believe so, uh-huh.

10  Q.  It is?

11            And this would be in March of 2019; is that right?

12  A.  Right.

13  Q.  And this says that it's from Keith Ashley?

14  A.  Uh-huh.

15  Q.  Did you let law enforcement review your phone and take

16  information out of your phone?

17  A.  Yes, I did, uh-huh.

18  Q.  So this, March 12th of 2020 (sic), it's from Keith

19  Ashley and he's saying, "Are you interested in 24 month UIT

20  I spoke to you about?"

21            So can you explain what's going on here?

22  A.  Because, like I said, he would present me with new

23  opportunities to invest more money.  So I think that

24  email (sic) was about asking for more investment.

25  Q.  So asking --
```

```
 1   A.  Giving me chance to invest more.
 2   Q.  Okay.  Put more money in?
 3   A.  Right, put more money in.
 4   Q.  So at this point you'd already put money in, and he's
 5   just telling you here is an opportunity and you can put
 6   some more money in; is that right?
 7   A.  Right, more money or I believe, if I remember
 8   correctly, reinvest the previous funds, because he told me
 9   that certain UITs would expire and I have to, like, renew
10   them.
11   Q.  Okay.  So rather than --
12   A.  And would you like to add more money into the accounts.
13   Q.  So rather than taking your UIT back or your money back,
14   he just wanted you to reinvest it?
15   A.  I believe so, uh-huh.
16          MS. RATTAN:  Now let's look at page 2 of
17   Government's 42B.  42B, page 2.
18   BY MS. RATTAN:
19   Q.  And this is part of the incoming to you from Keith
20   Ashley on March 21st of 2019.  And here Keith Ashley is
21   telling you, "I believe 8-9%.  I will check once I get home
22   tonight at office."
23          So what's going on here?
24   A.  If I remember correctly, maybe I was asking him about
25   what kind of interest, is this going to be the same
```

 1  interest or not.  I don't hundred percent remember that

 2  particular email *(sic)* -- I mean the texts, but we were

 3  just -- it was for clarification of terms.

 4  Q.  On the UIT investment?

 5  A.  On UIT investment.  Sorry, uh-huh.

 6  Q.  And here it says 8 to 9 percent?

 7  A.  Right, yeah.  It has always been around that interest,

 8  like that.

 9  Q.  That's what he told you?

10  A.  Uh-huh, yes, correct.

11  Q.  And then you looked at two checks that you've provided

12  to Keith Ashley; is that right?

13  A.  Yeah.

14  Q.  And those are Government's Exhibits 43A and 43B.  And

15  you recognize those as checks that you provided to him?

16  A.  Oh, yes, uh-huh.

17         MS. RATTAN:  Your Honor, we'll offer Government's

18  Exhibit 42A and B.

19         THE COURT:  Well, B is already admitted so --

20         MS. RATTAN:  Oh, rather, pardon me, 43A and B.

21         THE COURT:  You already did, and I've already

22  admitted those.

23         MS. RATTAN:  And then may we publish Government's

24  Exhibit 43A?

25         THE COURT:  Yes, you may.

1   BY MS. RATTAN:

2   Q.  Mr. Shteyngart, can you explain what this is for the

3   jury?

4   A.  Was checks written in addition to that money was

5   already in UITs.  So I added more money, presumably for

6   more profit.

7   Q.  And then that's you, of course.  That's your name; is

8   that right?

9   A.  Yes, uh-huh.

10  Q.  And then that's the date, 8-17 of 2018?

11  A.  Yep.  It's my personal check.  Both of them is copy of

12  my personal checks.

13  Q.  And then you made the check out to KBKK; is that right?

14  A.  Right, uh-huh.

15  Q.  And it's for $25,000?

16  A.  Yes.

17          MS. RATTAN:  And then if we can look at

18  Government's Exhibit 43B, page 1.

19  BY MS. RATTAN:

20  Q.  Is this another check that you made out to KBKK?

21  A.  Correct.

22  Q.  And this one was in 2019.  It looks like October 17th

23  of 2019.

24  A.  It was December, yes.

25  Q.  Oh, rather, 12.

```
 1  A.  Uh-huh, 12-10-19.

 2  Q.  Okay.  12-10-19.

 3          And that's for $20,000?

 4  A.  Correct, yes.

 5  Q.  And it's to KBKK as well?

 6  A.  Uh-huh.

 7          MS. RATTAN:  May I approach, your Honor?

 8          THE COURT:  Yes, you may.

 9  BY MS. RATTAN:

10  Q.  And this is Government's 43A.

11          MS. RATTAN:  If we can publish Government's 43A.

12  BY MS. RATTAN:

13  Q.  Let me ask you if this is a big copy, a blown-up copy

14  of the check you wrote to KBKK?

15  A.  Yes.  It's my handwriting and my --

16  Q.  And that's your account?

17  A.  And my check, uh-huh.

18  Q.  And it was for $25,000?

19  A.  Correct.

20          MS. RATTAN:  May I return, your Honor?

21          THE COURT:  Yes.

22  BY MS. RATTAN:

23  Q.  Now, you knew Keith Ashley and you worked with him as a

24  nurse and you knew that he worked at the hospital; is that

25  correct?
```

1   A.  Uh-huh, yeah, at hospital and also in a care -- not

2   care flight but flight ambulance, like a helicopter.

3   Q.  And are these emergency-type situations when you're

4   using a helicopter, a care flight helicopter?

5   A.  Not me, him.  He was working on helicopter as a

6   nurse/paramedic.

7   Q.  And would that mean that it's kind of an emergency

8   situation when you're working on a helicopter, that he is?

9   A.  I assume.  I assume so.  It's very intense, yes.

10  Q.  Yes.

11       Do you see Keith Ashley in the courtroom today,

12  who you invested this money with?

13  A.  Right.

14  Q.  Can you point to him and identify him?

15  A.  Right there (indicating).

16  Q.  If this is Person Number 1 right here, 2, 3, and 4, who

17  person number would he be?

18  A.  Number 4.

19       MS. RATTAN:  Your Honor, may the record reflect

20  that the witness has identified the defendant, Keith Todd

21  Ashley?

22       THE COURT:  The record will so reflect.

23       MS. RATTAN:  And I'll pass the witness.

24       THE COURT:  Cross-examination?

25                          *

```
 1              CROSS-EXAMINATION OF LEONID SHTEYNGART

 2   BY MR. WHALEN:

 3   Q.  Mr. Shteyngart, how are you today?

 4   A.  Well.  Good morning.

 5   Q.  Just so I'm clear, the check that you sent in December

 6   of 2019 for $20,000, was that the last check you sent to

 7   Mr. Ashley?

 8   A.  Yes, I did.  I did not send it; I gave it to him in

 9   person.

10   Q.  You gave it to him?

11   A.  Uh-huh.

12   Q.  Okay.  And you always gave him checks, correct?

13   A.  Yes.

14   Q.  Okay.  And those -- both of those checks were made out

15   to KBKK, correct?

16   A.  Correct.

17   Q.  Okay.  And so when did you first meet him?

18   A.  I believe 2002.

19   Q.  Okay.  And did you know about the brewery?

20   A.  Never knew until the police told me.

21   Q.  When did you first learn about it?

22   A.  From Carrollton PD, about two years ago.

23   Q.  Okay.  When was the first time Carrollton contacted

24   you, PD?

25   A.  I think about end of August 2020.
```

```
 1  Q.  Okay.  But on 2019, that was the last check you sent,
 2  correct?
 3  A.  Correct.
 4  Q.  Okay.  And we saw this communication in your cell phone
 5  from March of 2019, correct?
 6  A.  Uh-huh, yes.
 7  Q.  Okay.  And did you have anything or anything in writing
 8  or a contract or anything as related to this what you
 9  referred to as a UIT?
10  A.  No.
11  Q.  No, okay.
12          MR. WHALEN:  I'll pass the witness.
13          THE COURT:  Anything else?
14          MS. RATTAN:  No, your Honor.
15          THE COURT:  Can this witness be fully excused?
16          MS. RATTAN:  Yes, please.
17          THE COURT:  Mr. Whalen?
18          MR. WHALEN:  Yes.
19          THE COURT:  Sir, you are free to leave.  Thank
20  you.
21          Okay.  Your next witness?
22          MS. RATTAN:  The United States recalls Matt Wylie.
23          THE COURT:  Mr. Wylie, you understand you're still
24  under oath?
25          THE WITNESS:  Yes, sir.
```

 THE COURT: Okay. Go ahead, Ms. Rattan.

MS. RATTAN: Thank you, your Honor.

DIRECT EXAMINATION OF MATTHEW WYLIE

RECALLED ON BEHALF OF THE GOVERNMENT

BY MS. RATTAN:

Q. Please state your name again.

A. Matthew Wylie.

Q. Okay. And, of course, you just testified; and you're with the FBI as a forensic accountant?

A. Correct.

Q. Let me ask you if you did a forensic analysis on money that was provided to Keith Ashley by Leonid Shteyngart.

A. I did.

Q. And were you able to reach some conclusions based on your analysis of his money?

A. Yes.

Q. And then have you prepared charts to assist the jury in understanding your analysis?

A. Yes.

Q. And you analyzed two different amounts of money that he provided. One was $25,000 and one was $20,000; is that right?

A. Correct.

MS. RATTAN: May I approach the witness, your Honor?

```
 1            THE COURT:  Yes.

 2    BY MS. RATTAN:

 3    Q.  Let me show you Government's Exhibit 43A.  This is a

 4    blowup of one of the checks that Mr. Shteyngart gave to

 5    Keith Ashley, KBKK; and it says "$25,000."

 6            Is this part of what you analyzed?

 7    A.  Yes.

 8    Q.  Okay.  So you did a $20,000 analysis and a $25,000

 9    analysis?

10    A.  Correct.

11            MS. RATTAN:  May I return, your Honor?

12            THE COURT:  Yes.

13    BY MS. RATTAN:

14    Q.  So let's focus first on Government's Exhibit 44A.

15            MS. RATTAN:  If we can -- we'll offer 44A and 44B,

16    your Honor.

17            THE COURT:  Any objection?

18            MR. WHALEN:  Predicate, your Honor.

19            THE COURT:  Well, if you want to just follow up

20    with a couple more questions.

21    BY MS. RATTAN:

22    Q.  Did you use the same forensic accounting techniques

23    that you described in your previous testimony when you did

24    the analysis on the money that was provided by Denny

25    Willmon?
```

1   A.  Yes.

2   Q.  Can you explain what you did, what technique you used

3   when you analyzed the money that Mr. Shteyngart provided?

4   A.  So same as the previous one.  I used the first in/first

5   out method to take the deposit that was made and then the

6   first, in this instance, $25,000 out of the account.  I

7   took those totals and put them in a chart to illustrate how

8   the funds were used.

9           MS. RATTAN:  Your Honor, based on that, we'll

10  offer Government's Exhibit 44A and 44B.

11          MR. WHALEN:  Same objection.

12          THE COURT:  Okay.  Overruled.  44A and B will be

13  admitted.

14          MS. RATTAN:  If we can publish Government's

15  Exhibit 44A.

16          THE COURT:  Yes.

17  BY MS. RATTAN:

18  Q.  Can you explain to us what this is?

19  A.  So this is a chart illustrating the $25,000 check that

20  was deposited into KBKK, LLC, account at BB&T ending in

21  8725 from Mr. Shteyngart.

22          And then it shows the uses of those $25,000.

23          MS. RATTAN:  And then if I can approach?

24          THE COURT:  Yes.

25                              *

```
 1    BY MS. RATTAN:
 2    Q.  If we can just look at the chart here.  You've got the
 3    dates that you analyzed.  Of course, the check is dated
 4    August 17th of 2018; and so you began your analysis around
 5    when the check was deposited or received?
 6    A.  Yes.  It was also deposited on the 17th.
 7    Q.  Okay.  So same day?
 8    A.  Correct.
 9    Q.  So your analysis goes from 8-17 to 8-23, so that's
10    about a week.
11    A.  Correct.
12    Q.  So this time how much money was in the account when you
13    began your analysis?
14    A.  So immediately prior to the deposit from
15    Mr. Shteyngart, the account balance was $5,829.09.
16    Q.  So how did you handle that?
17    A.  So I handled this one the same way.  The $25,000 was
18    deposited; and then I took the first $25,000 out of the
19    account to illustrate these uses.
20    Q.  And what did you see here?
21    A.  I saw the largest outflow was $14,363 was sent to Fred
22    Reeves.
23    Q.  And then what happened with this $9,000?
24    A.  It was spent at casinos.
25    Q.  And then you had $1,000 go where?
```

1   A.  To another account owned by Mr. Ashley.  It was titled

2   "Keith Ashley D/B/A NTMM," and that was a Chase account

3   ending in 2589.

4   Q.  And did you see anytime in here that any of this was

5   invested with a SmartTrust UIT investment?

6   A.  No.

7           MS. RATTAN:  And now if we can publish the other

8   chart.  I think it's 43B -- or, rather, 44B.

9   BY MS. RATTAN:

10  Q.  Is this analysis of another amount of money that

11  Mr. Shteyngart gave to Keith Ashley?

12  A.  It is.

13  Q.  And this is $20,000?

14  A.  Yes.

15  Q.  So what time period are you looking at over here?

16  A.  So the check was deposited on 12-10-2019; and I

17  analyzed from that date, 12-10-2019, to 12-31-2019.

18  Q.  So a fairly short time period.

19  A.  Yes.

20  Q.  And the account balance at this time, when the $20,000

21  came in, was what?

22  A.  The account balance immediately prior to the deposit

23  from Mr. Shteyngart was $286.75.

24  Q.  And then following the money, did you see that another

25  investor was paid?

1    A.  Yes.

2    Q.  And did that concern you in terms of what we were

3    talking about a Ponzi scheme or a pyramid scheme?

4    A.  Yes, it did.

5    Q.  And why is that?

6    A.  Because other investors are being paid with investor

7    money.

8    Q.  Okay.  So you saw about $4,181 goes to James Seegan;

9    and then you saw a cash withdrawal of how much?

10   A.  $2,750.

11   Q.  And then tracking over here to the right side of the

12   slide, what's going on?

13   A.  $2,600 was transferred to another account owned by

14   Mr. Ashley titled "KBLS1996, LLC."

15   Q.  And then out of that account, what happened?

16   A.  Out of that account $1,300 was withdrawn in cash and

17   $1,300 was used to make checks payable to Keith Ashley.

18   Q.  So that's the right side of the chart.  You've got the

19   account balance very low.  The $20,000 comes in.

20          And here again you've got the return.  You've

21   noted 1,664.  What is that?

22   A.  That was the amount returned to Mr. Shteyngart from his

23   own money.

24   Q.  Okay.  And, again, is that something that you commonly

25   see in a scheme?

1   A.  It is.

2   Q.  So rather than going into any investment, some money

3   goes back to the purported investor?

4   A.  Correct.

5   Q.  We've got essentially two investors getting money back?

6   A.  Yes.

7   Q.  So then going over to the left side of the screen, walk

8   us through your analysis here.

9   A.  So I saw $8,588 he transferred from the KBKK, LLC,

10  account to the Bank of America account titled "Keith or

11  Brandi Ashley" ending in 4804.

12  Q.  And that's the one that we saw money going into before

13  from the Mr. Willmon investment?

14  A.  Correct.

15  Q.  And what happened with this $8,500 from the victim?

16  A.  $2,910 was spent towards a personal mortgage payment;

17  and then $3,003 was sent to another Bank of America account

18  titled "Kade, Brandi or Keith Ashley."

19  Q.  And then, of course, out of that account what do you

20  have?

21  A.  $339 was spent on various retail restaurant payments;

22  and $1,842 was withdrawn in cash.

23  Q.  So then cash, I guess, coming out of this victim's

24  investment -- you've got three different instances of cash?

25  A.  Correct.

 1   Q.  And also a check made payable to Keith Ashley?

 2   A.  Correct.

 3   Q.  But just focusing on the cash that came out, you've got

 4   roughly 3,000, 4,000 -- almost $6,000.  Is that fair to

 5   say?

 6   A.  Correct.

 7   Q.  So out of this victim's investment money, $6,000, it

 8   looks like, in cash went to Keith Ashley?

 9   A.  Correct.

10   Q.  And then the rest would just be to his mortgage,

11   retail, entertainment, and another victim; is that right?

12   A.  Correct.

13          MS. RATTAN:  May I return, your Honor?

14          THE COURT:  Yes.

15          MS. RATTAN:  I'll pass the witness.

16          THE COURT:  Cross-examination?

17          <u>CROSS-EXAMINATION OF MATTHEW WYLIE</u>

18   BY MR. WHALEN:

19   Q.  Mr. Wylie, how are you again?

20   A.  Doing well still.

21   Q.  Okay.

22   A.  How about yourself?

23   Q.  I'm doing great.

24          Let me ask you this:  When you go through this

25   process, does the agent just give you the documents and

1   say, "Do an analysis and let me know what you find"; or do

2   they direct you and tell you what they're looking for?

3   A.  They do not direct me.

4   Q.  Okay.  And so what information are you provided before

5   you look at these records?

6   A.  So I did research and analysis to identify which

7   accounts Mr. Ashley has.  We subsequently gained those

8   accounts through subpoena, and then I analyzed those

9   accounts to come to these charts and conclusions.

10  Q.  Okay.  So what you're telling me is you have no

11  information on why you're requesting these?

12  A.  I wouldn't say "no information."

13  Q.  Okay.  But you do have some information?

14  A.  Yes.

15  Q.  There is an investigation, right?  You do know that.

16  A.  Correct.

17  Q.  Okay.  And then your office, you're in the -- are you

18  in the same building as the FBI headquarters in Dallas?

19  A.  I'm in Dallas, yes.

20  Q.  Okay.  And so this time frame that you looked at as --

21  who directed you to just break it down to a week?  Was that

22  your choice or --

23  A.  It was my choice because that's how long it took the

24  $20,000, in this instance from Mr. Shteyngart, to be

25  depleted.

1  Q.  Okay.  And in the one example there was a beginning

2  balance of $5,000 -- or over $5,000.

3  A.  Correct.

4  Q.  Did you go back and look to see what the sources were

5  of that $5,000?

6  A.  So from an analysis done on the account done as a

7  whole, almost primarily it was funded by checks from

8  investors.

9  Q.  Okay.  And all those checks were made out to KBKK?

10 A.  Correct.

11 Q.  Okay.  And they all came in, a majority of them, in the

12 form of checks, not a wire transfer, correct?

13 A.  There were a few wires as well.

14 Q.  Okay.  But Mr. Shteyngart was all checks, correct?

15 A.  Correct.

16 Q.  And Mr. Willmon was all checks, correct?

17 A.  Correct.

18 Q.  They did not come in as a wire transfer, correct?

19 A.  Not the ones we talked about, no.

20 Q.  Okay.

21         MR. WHALEN:  I'll pass the witness.

22         THE COURT:  Anything else?

23         MS. RATTAN:  No, your Honor.

24         THE COURT:  Is this witness subject to recall

25 again or --

MS. RATTAN: Yes.

THE COURT: Okay. Sir, you are subject to recall; but you can leave now.

We're going to go ahead and break for lunch. Before I do, I have been notified that we have some cars that are parked in the lot east of the courthouse on the northeast corner of Pecan and Walnut. They are not -- that's not a permissible place to park, and the owner is indicating they will tow the vehicles. The license plate numbers are LLT4336, a white Ford car. Then the other one is NJW2110, a white Honda car. Then there is a government vehicle, Elantra, license plate 2698X. So I would just advise you over the lunch hour, move those and don't park back in that lot. If any of those cars are the jurors', just ask court security officer and, you know -- because you can actually park on the street with your juror placard put in the thing and you won't get a ticket.

Okay. So, again, please don't discuss the case among yourself or anyone else. Go have a good lunch and -- again, don't do any outside research. Have a good lunch, and we'll start back at 1:00. Have a good one.

(The jury exits the courtroom, 11:59 a.m.)

THE COURT: Anything further from the government?

MS. RATTAN: No, your Honor.

THE COURT: Defense?

1          MR. WHALEN:  No, your Honor.

2          THE COURT:  Okay.  See you back at 1:00.

3          (Recess, 12:00 p.m. to 1:02 p.m.)

4          (Open court, defendant present, jury present.)

5          THE COURT:  Please be seated.

6          Your next witness?

7          MS. RATTAN:  Your Honor, the United States would

8    recall Denny Willmon.

9          MR. WHALEN:  Your Honor, can we approach, please?

10         THE COURT:  Yes.

11         (Sidebar conference, off the record.)

12         MS. RATTAN:  May I proceed, your Honor?

13         THE COURT:  Yes.

14         MR. WHALEN:  And, your Honor, just for the record,

15   we're going to object to the recall of this witness.

16         THE COURT:  Okay.  Overruled.

17         DIRECT EXAMINATION OF DENNY MAURICE WILLMON

18             RECALLED ON BEHALF OF THE GOVERNMENT

19   BY MS. RATTAN:

20   Q.  Please state your name.

21   A.  Denny Willmon.

22   Q.  Okay.  Mr. Willmon, you testified this morning; is that

23   right?

24   A.  Yes.

25   Q.  This morning you were asked about whether you received

```
 1  any documents or paperwork from Keith Ashley; is that
 2  right?
 3  A.  Yes.
 4  Q.  Did he give you any paperwork that looked like you had
 5  a real SmartTrust UIT?
 6  A.  Yes.
 7  Q.  He did.
 8        And did you call or look up online the company
 9  SmartTrust UIT?
10  A.  Yes.
11  Q.  Were you able to call them?
12  A.  I actually got connected but --
13  Q.  Okay.  And did you ask them, "Do I have an account with
14  SmartTrust UIT?"
15  A.  I wasn't able to determine an account at all.
16  Q.  So you asked them if you had an account, and what did
17  they say?
18        MR. WHALEN:  Objection as to hearsay, your Honor.
19        THE COURT:  Sustained.
20  BY MS. RATTAN:
21  Q.  After you got off the phone, Mr. Willmon, with
22  SmartTrust UIT, did you believe that you had an account
23  there?
24        MR. WHALEN:  Objection, your Honor.  It calls for
25  hearsay.  It's based on hearsay.
```

```
 1            THE COURT:  Well, overruled.
 2   A.  The answer is -- I believe, based on the way you worded
 3   the question it would be, yes, I understood I didn't have
 4   an account.
 5            MS. RATTAN:  Thank you, your Honor.
 6            THE COURT:  Any questions?
 7            CROSS-EXAMINATION OF DENNY MAURICE WILLMON
 8   BY MR. WHALEN:
 9   Q.  Mr. Willmon, just so I'm clear, I think previously you
10   were asked whether or not -- let me ask you this:  What you
11   just testified to you didn't testify to on direct
12   examination, did you?
13            MS. RATTAN:  Your Honor, I think that's confusing.
14            THE COURT:  Overruled.
15   A.  Direct examination?
16   BY MR. WHALEN:
17   Q.  When the government lawyer called you the first time,
18   you didn't mention anything about making a phone call or
19   anything like that, did you?
20   A.  No.
21            MR. WHALEN:  I'll pass the witness.
22            THE COURT:  Okay.  You may step down, sir.  Thank
23   you.
24            Okay.  What's next?
25            MR. FINE:  Your Honor, we'll call Robert Greening,
```

1    your Honor.

2            THE COURT:  Turn your mic on.

3            MR. FINE:  United States will call Robert

4    Greening, your Honor.

5            MR. SANDEL:  And, Judge, just for clarity of the

6    record, we would object to this witness based on the

7    grounds we discussed in pretrial this morning and ask for a

8    running objection to all questions.

9            THE COURT:  Well, that's not the way that works.

10   I will overrule your objection.  And when they ask an

11   objectionable question, then you can certainly object and

12   then ask later in that continuing line of questioning.

13           MR. SANDEL:  Understood.

14           THE COURT:  Sir, if you'll raise your right hand

15   and be sworn in.

16           (The oath is administered to the witness.)

17           THE COURT:  Go ahead and proceed.

18           MR. FINE:  Thank you, your Honor.

19               DIRECT EXAMINATION OF ROBERT GREENING

20               CALLED ON BEHALF OF THE GOVERNMENT

21   BY MR. FINE:

22   Q.  Good afternoon, Mr. Greening.  How are you, sir?

23   A.  I'm fine.  How are you?

24   Q.  Will you please introduce yourself to the ladies and

25   gentlemen of the jury and spell your last name for the

 1    court reporter.

 2    A.  My name is Robert Greening, Green with I-N-G on the

 3    end, G-R-E-E-N-I-N-G.

 4    Q.  And, Mr. Greening, how are you employed?

 5    A.  I'm self-employed.

 6    Q.  And what kind of work do you do?

 7    A.  I'm a lawyer.

 8    Q.  And what type of law do you practice?

 9    A.  I do personal injury and death cases on the plaintiff

10    side of the docket.

11    Q.  And how long have you been a licensed attorney in the

12    state of Texas?

13    A.  About -- I think it's -- I was licensed in 1990.  So

14    was that 32 years, I guess?

15    Q.  Close enough on my math, yeah.

16    A.  Long time.

17    Q.  And did you grow up here in the Dallas-Fort Worth area?

18    A.  I grew up in Dallas, yes.

19    Q.  All right.  And have family here in the area?

20    A.  I actually have a sister that lives down the road in

21    Van Alstyne.

22    Q.  All right.  And are you married?

23    A.  I am.

24    Q.  And how long have you been married for?

25    A.  Thirty-four -- 35 years.

```
 1   Q.  And children as well?
 2   A.  Yes.
 3   Q.  And how old are your children?
 4   A.  I have a 22-year-old son who is a senior in college,
 5   and I have a 19-year-old daughter who is a freshman in
 6   college.  So we're new empty-nesters.
 7   Q.  And, Mr. Greening, you know why you're here today,
 8   correct?
 9   A.  Yes.
10   Q.  And fair to say you're not used to being on that side
11   of the witness stand; is that fair?
12   A.  That's a fair statement.
13   Q.  So I want to start with this.  Do you know a man named
14   Keith Ashley?
15   A.  I do.
16          MR. SANDEL:  Your Honor, at this time we'd object
17   based on the grounds previously argued.
18          THE COURT:  Overruled.
19   BY MR. FINE:
20   Q.  And how did you first know Keith Ashley?
21   A.  I think I first met him somehow -- I don't remember
22   how, but he acted as an expert witness in a case that I
23   had.
24   Q.  And when you say "an expert witness in a case," you
25   were the lawyer on it; is that correct?
```

1   A.  Yes.

2   Q.  And what sort of expertise did he provide in that case?

3   Just sort of the general area.

4   A.  It was a case that actually went to trial, and I

5   believe it was -- I mean, I don't know how much you want to

6   know about it; but it was a -- it was a paramedic/EMT

7   malpractice case against -- I believe it was the City of

8   Dallas, I think.

9          And it went to trial in Dallas County, and he --

10  whenever you have a case like that, a health care liability

11  claim, you have to have an expert witness to provide

12  testimony about whether or not the standard of care was met

13  or not met; and he was our expert in that case for the

14  paramedic or EMT care.

15  Q.  Okay.  And do you see Keith Ashley in the courtroom

16  today?

17  A.  Yes.

18  Q.  And if this is Chair 1, 2, 3, and 4, which chair is

19  Mr. Ashley sitting in?

20  A.  Four.

21         MR. FINE:  Your Honor, let the record reflect the

22  witness has identified the defendant in open court.

23         THE COURT:  The record will so reflect.

24  BY MR. FINE:

25  Q.  And so, Mr. Greening, he was an expert witness for you.

1   Did y'all remain friendly after that or -- or not?

2   A.  I really can't -- I mean, yes, we remained friendly.

3   We lost touch and then we got back in touch, but I don't

4   remember when or any of that but -- I guess the short

5   answer is yes.

6   Q.  Okay.  And you said he was an expert witness for you

7   sometime in the '90s.  When did you sort of get back in

8   touch with him?

9   A.  I really don't remember.  The only thing that comes to

10  my mind is we'd sort of lost touch, and I seem to remember

11  seeing him at the hospital when my father -- I believe my

12  father was in the hospital in the early 2000s.

13          And he was getting on the elevator as I was

14  getting on the elevator and his wife was on, I think, the

15  same floor as my dad or something like that and we -- I

16  hadn't seen him in a long time.  That's just something

17  coming to my mind that makes me think that's when we

18  probably got back in touch.

19  Q.  And is that somewhere around 2003?  Is that accurate?

20  A.  I would think so, something like that, because my

21  father passed away in 2003 and --

22  Q.  And so --

23  A.  Or it was maybe late 2002.

24  Q.  Okay.  So around 20 years ago?

25  A.  Yeah.

1   Q.  Now, you said you knew Keith Ashley, the defendant, as

2   an expert witness.  Did there come a time where you knew

3   him more of as a financial advisor?

4   A.  Yes.

5   Q.  And explain to the jury how that -- how it went from an

6   expert paramedic to a financial advisor.  How did that

7   work?

8   A.  To be honest with you, I don't remember.  I just don't

9   remember.  I just remember that he was -- had taken the

10  test or something and had become -- he was doing the

11  paramedic work but also being a financial advisor, and we

12  just -- he told me about that.

13          But I don't remember anything more than that.  I'm

14  sorry.

15  Q.  And did y'all have conversations about your personal

16  finances?

17  A.  Yes.

18  Q.  And did he try to get you to invest money with him?

19  A.  Yes.

20  Q.  And did you invest money with him?

21  A.  Yes.

22  Q.  Do you remember around what year you started investing

23  money with the defendant?

24  A.  I don't.  I'm sorry.

25  Q.  Do you remember what sort of money we're talking about

1   initially?  Are we talking about a couple hundred?  A few

2   thousand?  Tens of thousands?

3   A.  You mean at first?

4   Q.  Yes.

5   A.  I really -- I don't remember.  I know that he -- he got

6   my firm going with a -- you know, a 401(k) or a simple

7   plan.  He helped our firm get that done, and we started

8   investing in that.

9            And I know I bought some other products from him,

10  you know, financial products; but I don't remember the

11  amounts at first or anything like that.  I'm sorry.  I just

12  don't.

13  Q.  No, that's fine.

14           And did you trust him at the time?

15  A.  Yes.

16  Q.  Did he seem like he knew what he was talking about?

17  A.  Yes.

18  Q.  Are you an expert in the area of financial planning or

19  investments, anything along those lines?

20  A.  No, and I don't like anything -- I just don't -- it's

21  nothing that really interests me.

22  Q.  So, you know, there's some people who are kind of

23  amateur investors that dabble in the market, things like

24  that.  Is it fair to say you didn't really want to have

25  anything to do with that and that's where you allowed the

1  defendant to sort of manage your money?

2  A.  Yes.

3  Q.  When he would talk to you about different products, did

4  he make -- did he make any sort of promises to you about

5  returns on those investments?

6  A.  At times, yes.

7  Q.  Okay.  And I want to talk about specifically something

8  called a UIT.  Are you familiar with that?

9  A.  I mean, I'm familiar with the term; but that's about as

10  far as it goes.

11  Q.  And that's -- that was going to be my next point.  The

12  term -- you know the UIT.  You don't know the ins and outs

13  of it.  Is that fair to say?

14  A.  That's fair to say, yes.

15  Q.  Did the defendant try to explain to you how a UIT

16  works?

17  A.  Yes.

18  Q.  Did you understand how it worked, from the defendant?

19  A.  Not really; but, I mean, I trusted Keith to tell me

20  what it was and -- I mean, I just trusted him to tell me.

21  Q.  Had you invested money with him before he talked about

22  the UIT?

23  A.  Yes.

24  Q.  Had you bought products from him before he talked about

25  the UIT?

1   A.  Yes.

2   Q.  And up until that point, were you happy with your

3   investments with him?

4   A.  Yes.

5   Q.  Did you see returns on those investments?

6   A.  Yes.

7   Q.  And so initially when he talked to you about the UIT,

8   did you agree to purchase the UIT?

9   A.  Not at first.  I mean, I think he talked about it -- he

10  talked about it for a while every once in a while when we

11  would meet up to talk about my other investments.  And I

12  didn't do it at first, but then I did it later.

13  Q.  And let's talk about the early conversations about the

14  UIT.  What kind of financial investment was he talking

15  about moneywise?

16  A.  At first?

17  Q.  Yeah.

18  A.  He never really gave me a specific number.

19  Q.  Did there become a time where he did give you a

20  specific number?

21  A.  Not really.  I mean, it was more just sort of "whatever

22  you want to do" kind of thing.  You know, he told me

23  what -- he told me what I would receive, like what kind of

24  interest rate or whatever I would get and that kind of

25  thing; but it was never, like, a specific number.  It was

1   kind of left to me.

2   Q.  Do you remember what the interest rate was that he

3   promised you on that?

4   A.  I don't.  I really don't.

5   Q.  Did he --

6   A.  I mean, it was a guaranteed rate of return; but I

7   don't -- I just don't remember.  I'm sorry.

8   Q.  That's -- you don't need to apologize.

9           Were the payments for those returns supposed to be

10  set up monthly?

11  A.  Yes.

12  Q.  And eventually did you agree to purchase a UIT with the

13  defendant?

14  A.  Yes.

15  Q.  What was the amount of money that you gave him?

16  A.  $75,000.

17  Q.  And during the course of these communications, even

18  leading up to the point where you bought the UIT, did you

19  guys have conversations over the phone about the UIT?

20  A.  I believe so.  I mean, probably we did.  Probably we

21  did.  It may have been in person, may have been both.  I

22  just -- I don't recall exactly.

23  Q.  What about text messages about the UIT?  Do you

24  remember --

25  A.  Probably.

1    Q.  Okay.  After you purchased the UIT, did you actually

2    have a conversation with him over text?

3    A.  Yes -- or when I decided to do it, yes.

4    Q.  Okay.  If you'll take a look at the binder in front of

5    you --

6    A.  Okay.

7    Q.  -- Government's Exhibit 48.

8    A.  Yes.

9    Q.  And have you reviewed that before?

10          Are those text messages between you and the

11   defendant?

12   A.  Yes.

13          MR. FINE:  Your Honor, at this time we'd offer

14   Government's 48.

15          MR. SANDEL:  No objection, your Honor.

16          THE COURT:  48 will be admitted.

17          MR. FINE:  Permission to publish, your Honor?

18          THE COURT:  Yes, you may.

19   BY MR. FINE:

20   Q.  All right, Mr. Greening.  We're going to go through the

21   texts real quick on Exhibit 48, Government's Exhibit 48.

22          The gray is the defendant, Keith Ashley, correct?

23   A.  Yes.

24   Q.  And green is you; is that correct?

25   A.  That's correct.

1    Q.  Okay.  So you be you and I'll be the defendant and

2    we'll just go through this.  And there might be times where

3    we stop and kind of -- I want to get your thoughts on

4    what's going on in the text conversation.

5    A.  Okay.

6    Q.  So before we start this, explain to the jury.  Why was

7    this conversation happening?

8    A.  Okay.  This was more than two years ago; but my best

9    recollection when I look at this is that when Keith sent me

10   the wiring instructions for me to wire the money, the

11   $75,000 for the UIT, the wiring instructions didn't make

12   sense to me based upon what he had told me about where the

13   money was going to go.

14         So this is me questioning him because I was -- not

15   that I didn't trust him but that I -- it just wasn't what

16   he said and I didn't want $75,000 getting wired to

17   someplace that was wrong.

18         You see what I mean?

19   Q.  Of course.

20         And 75,000, that's a lot of money, correct?

21   A.  It's a lot of money to me.

22   Q.  Sure.

23         And had you actually received an inheritance from

24   your mother?

25   A.  Yeah.  I mean, part of that money was, you know -- in

1    my mind I sort of have where money came from; and part of

2    that money was from the money I got when my mom and dad

3    passed away, yeah.

4    Q.  And before you invested it in the UIT, where was that

5    money invested, if anywhere?

6    A.  Nowhere.

7    Q.  So it was essentially in a checking account or savings

8    account?

9    A.  It was in a savings account.  It was just -- I never

10   really felt like it was my money, so I just kind of let it

11   sit there.

12   Q.  And was that part of the sell that the defendant gave

13   you of, hey, it's just sitting in this account not making

14   any interest.  Why don't you put it in this UIT and make a

15   little money?

16   A.  Yeah, because it was guaranteed.

17   Q.  Right.

18          Okay.  So you will read the gray part as the

19   defendant.

20          "Sent you wire info.  I let Parkland now" -- I

21   think know -- "it will be coming today or tomorrow?"

22          And then your part?

23   A.  "Ok.

24          "So it goes to Parkland or Branch Banking and

25   Trust Co."

1  Q.  "Branch Banking Trust.

2        "Every transaction we do is monitored and approved

3  through Parkland.  They are our broker dealer.  Call me and

4  I will explain.

5        "You will have sub accounts inside Parkland and

6  this UIT is one of them.

7        "Also, call me on your new guys potential deal.  I

8  have a better idea."

9  A.  "Ok.  Call me I'm done."

10 Q.  And do you remember if he called you at that point?

11 A.  I don't remember.  I just don't.

12 Q.  All right.  So then the next day, on February 6th,

13 2020, at 9:20 a.m.:  "Just got another approach I can pass

14 along to you.

15       "Please try and get wire done today," underlined,

16 "I do not want to have to redo paperwork.  Thank you."

17 A.  "Ok.

18       "75k right?"

19 Q.  And so looking at the 10:52 a.m. text, when he says, "I

20 do not want to have to redo paperwork," underlines "today,"

21 what was going through your mind when you're reading that

22 text?

23 A.  Nothing, because that's typical of me being busy and

24 not getting stuff done, like this -- my own personal stuff

25 done; and that's typical of Keith saying, come on, let's

 1  get it done, you know.  I didn't think anything really

 2  about that.

 3  Q.  Looking back on it, knowing what you know now, how does

 4  it look to you?

 5  A.  It -- well, looking back on it, knowing what I know

 6  now, it makes me feel pressured, like he was trying to

 7  pressure me.

 8  Q.  I mean, it's fair to say he's underlining "today."  I

 9  don't want to have to redo the paperwork.  It's give me

10  that 75,000 now, now, now, now.

11          Is that how it looks?

12  A.  Yes.

13  Q.  And, again, 75,000 is a lot of money, correct?

14  A.  Yes.

15  Q.  All right.  So then he says, "Yes."

16  A.  And then I said, "Keith" -- because I guess I was at

17  the bank or something when this was happening, when we were

18  trying to get the wire done.

19          Anyway, I said, "Keith:  KBKK's address

20  autopopulated as your home address.  Is this correct?"

21  Q.  And so KBKK -- you didn't think that that should have

22  his home address as the address for KBKK.  Is that fair to

23  say?  Something didn't make sense to you?

24  A.  Yeah.  That didn't make sense to me.

25  Q.  And why didn't that make sense to you?

1   A.  Because I thought I was -- I thought it was going to

2   Parkland.

3   Q.  Okay.  Explain to the jury.  What is your understanding

4   of who Parkland or what that institution is.

5   A.  My understanding was Parkland was where Keith had his

6   license or that was his broker.  That's really all I knew.

7   Q.  And so as we look at his response at 11:46 -- "It is

8   attached to Parkland so yes and no.

9         "I am a registered rep everything I do is attached

10  to Parkland so yes it will.

11        "Everything I do has to be approved by Parkland

12  Securities."

13        So is it fair to say there it's kind of some

14  hedging back and forth, yes and no, I'm with Parkland, I'm

15  not, it's got my home address?  I mean, does that seem a

16  little confusing to you?

17  A.  I mean, looking at it now, it does.  Then, I just took

18  whatever he told me at face value and --

19  Q.  Well, because you trusted --

20  A.  My big concern was what I said next, which was:  "I

21  just wanted to make sure that wasn't a mistake," because my

22  biggest concern was I did not want this money going

23  someplace it wasn't supposed to go and I'm just

24  double-checking with him about that.

25  Q.  And so after you said, "I just wanted to make sure that

 1    wasn't a mistake," what did you say next?

 2    A.   "So after this UIT is purchased will I get a statement

 3    or shares or anything?"

 4    Q.   And why did you want -- why did you want that?  Why did

 5    you want a statement?

 6    A.   So I could keep up with what I was buying and so I

 7    could -- everything else I've ever bought from him, I

 8    always got a statement.  I would get a statement telling me

 9    how much money it earned over the last quarter or what have

10    you, and I was just making sure I was going to get the same

11    thing for this because it was a little bit different kind

12    of investment and I just wanted to make sure I was going to

13    get -- at least the way he described it, it wasn't like an

14    annuity I was purchasing or something like that.  I was

15    actually purchasing -- I thought I was purchasing shares in

16    something.

17           So I was like, well, okay, am I going to get

18    something, a document or something showing shares or

19    something like that?

20    Q.   Did you ever receive any documentation?

21    A.   No.

22    Q.   Did that concern you?

23    A.   I really forgot about it, to be honest with you,

24    because I was getting the amount of money that he said I

25    would get every month in my account.  And so I thought, oh,

1    well, maybe the paperwork -- he just hasn't gotten me the

2    paperwork yet.

3             I mean, I totally trusted him; so it just didn't

4    really concern me because I thought, well, the money's

5    being deposited and Keith probably just hasn't gotten

6    around to getting me the paperwork yet.

7    Q.  And so he responded after you asked for a statement:

8    "All registered reps have to have a licensed address of

9    record through FINRA.

10            "Yes it will be on your Parkland statement."

11            And how did you respond?

12   A.  It looks like maybe he tried to call me because I said,

13   "Sorry can't pick up.  All good, it's been sent."

14   Q.  And when you say "it's been sent," at that point did

15   you wire $75,000 to that account?

16   A.  Yes.

17   Q.  And we'll get to that in a moment.

18            The response is:  "Just like all your other

19   statements but in a brokerage account we can hold

20   UIT/Stocks/LP/Ex."

21            And your response?

22   A.  "Ok no prob.  Also that other 75k will it have a

23   separate account so I can track it or is it going to be

24   dumped into an existing account."

25   Q.  And then he responds with:  "It will be in Parkland as

1  well so you will be able to track it as well."

2  A.  And I said, "Awesome thanks Keith."

3  Q.  "You should receive Parkland statement in the next few

4  weeks via email.

5          "How much do you want from Williams 529 account?"

6  A.  "Not sure yet."

7  Q.  "Ok.  Also have paperwork I need your original

8  signature on I should have got the other day you in office

9  tomorrow.  It is updated client data sheet and UIT

10  disclosures."

11          And then you say?

12  A.  I said, "I am out of town tomorrow."

13  Q.  "Ok next week what days.

14          "What day can I swing by and get your signature to

15  get all your account stuff finalized?"

16  A.  "I am around all afternoon today."

17          (As read):  "Or Wednesday."

18  Q.  "Wednesday is better.  What time?"

19  A.  And then it just says, "Anytime" -- I think that's

20  "but," but I'm not sure.

21  Q.  And then that's the end of that text exchange, which is

22  over the course of a couple of days, correct?

23  A.  Yes.

24  Q.  So at this point you have wired $75,000 into what you

25  believed was a UIT, correct?

```
 1   A.  Yes.

 2   Q.  That's what the defendant told you, correct?

 3   A.  Yes.

 4   Q.  Did he ever say that any of that money was going to go

 5   to casinos?

 6   A.  No.

 7   Q.  Did he ever say that money was going to go to his

 8   personal bank account?

 9   A.  No.

10   Q.  Did he ever say that was going to go to his credit

11   debts?

12   A.  No.

13   Q.  Did he ever say it was going to go to his mortgage?

14   A.  No.

15   Q.  Tell this jury exactly where he said that money was

16   going to go, $75,000.

17   A.  To the unit investment trust.

18   Q.  And he promised you a return on that investment,

19   correct?

20   A.  Yes.

21   Q.  And he actually delivered, for a few months, a return

22   on that investment, correct?

23   A.  Yes.

24   Q.  All right.

25            MR. FINE:  Permission to publish State's (sic) 49,
```

 1  your Honor.  It's already been --

 2          THE COURT:  Yes, go ahead.

 3          MR. FINE:  Government's 49.

 4  A.  Do you want me to go to that?

 5  BY MR. FINE:

 6  Q.  You can actually -- if you look, there should be a

 7  screen -- you can see that.

 8  A.  Yes.

 9  Q.  Really all I wanted to point out here, Mr. Greening, is

10  this the wire transfer that was completed back on

11  February 6th, 2020, that we talked about in those text

12  messages?

13  A.  Yes.

14  Q.  And -- well, I just circled right over your name.

15  That's not going to help.

16          Is that your name there, "Robert Greening"?

17  A.  Yes.

18  Q.  Is that the amount, $75,000?

19  A.  Yes.

20  Q.  And did it get sent to KBKK, LLC?

21  A.  Yes.

22  Q.  What was your understanding of what KBKK, LLC, was?

23  A.  Whatever was in that text message he told me.

24  Q.  Okay.  I mean, is it fair to say that you felt that

25  this is a legitimate investment into a financial

1   institution?

2   A.   Yes.

3   Q.   Not into the defendant's own pocket, correct?

4   A.   That's correct.

5   Q.   Not to pay off any of his debts, correct?

6   A.   Correct.

7   Q.   Now, moving ahead a little bit to September 20th of

8   2020, did you actually loan the defendant another $75,000?

9   A.   I mean, I -- I don't know if it was a -- I guess it was

10  a loan.  It was to his brewery.  It wasn't to him; it was

11  to his brewery for an investment in the hand sanitizer

12  business he was doing.

13  Q.   Okay.  Explain to the jury about that, the brewery,

14  hand sanitizer.  We're September -- September 20 of 2020,

15  we're in the middle of the pandemic.  Explain to them what

16  you mean by the hand sanitizer.

17  A.   Keith had a brewery and he told me he was transitioning

18  the brewery, or some of it, over to -- because, you know,

19  the beer business was not that great at that point because

20  nobody was going out because it was the pandemic.

21       So he said that he was converting -- it so happens

22  that the beer business, the way you make beer, you can make

23  hand sanitizer, too.

24       And so he was converting it all over to do that

25  and they had orders coming in for hand sanitizer hand over

1  fist and he needed capital to keep up with the orders, to

2  buy the bottles and all the raw materials and everything

3  that he needed to keep up with orders.

4        And, you know, he didn't want to go to a bank.

5  He'd rather just have friends invest and he had friends

6  investing so, you know, he gave me the opportunity, so to

7  speak, to invest in that and that's what I did.

8  Q.  And did you make that investment?

9  A.  I did.

10  Q.  And what was the amount of that investment?

11  A.  $75,000.

12  Q.  And what was the arrangement in terms of how you were

13  to be paid back or was there going to be interest on it?

14  A.  It was a promissory note.  And I haven't reviewed that

15  promissory note in a long time, so I don't remember the

16  terms of it.  But it was a promissory note that, you know,

17  we exchanged for that.

18  Q.  And did you feel like you were kind of just helping out

19  a friend there, in a way?

20  A.  I did.  But, I mean, the terms were good on it.  But I

21  did feel I was helping him, and I felt like he was a really

22  good businessman and so why not do it.

23  Q.  Did he tell you why he chose to not go to a bank for

24  that -- for that loan or that amount of money?

25  A.  I -- he may have, but I don't remember what he said if

 1    he did.

 2    Q.   But he told you that he was not going to a bank for

 3    that money?   That's what he told me?

 4    A.   That was my -- that's my recollection.   That's my best

 5    recollection.

 6    Q.   So that $75,000, that was clearly going to the brewery

 7    for the hand sanitizer business, correct?

 8    A.   Yes.

 9    Q.   Versus the other $75,000 which was clearly going to a

10    UIT, correct?

11    A.   Yes.

12    Q.   All right.   Two separate transactions there?

13    A.   Yes.

14    Q.   Two separate investments.

15             All right.   Now --

16    A.   Yes.

17    Q.   -- sometime after September of 2020, probably towards

18    the end of October 2020, did the Carrollton Police

19    Department contact you?

20    A.   Yes.

21    Q.   And tell the jury what that was in regards to.

22    A.   A detective from Carrollton Police called me and

23    started asking me questions about --

24             MR. SANDEL:   Objection to the hearsay, your Honor.

25             THE COURT:   Sustained.

 1   BY MR. FINE:

 2   Q.  Without getting into what was said, at the conclusion

 3   of that conversation, did you have concerns about the

 4   defendant?

 5   A.  Yes.

 6   Q.  Did you have concerns about your money?

 7   A.  Yes.

 8   Q.  And so did you end up having a Zoom call with the

 9   defendant?

10   A.  Yes.

11   Q.  And did that Zoom call take place on October 30th,

12   2020?

13   A.  Yes.

14   Q.  And was that, give or take, maybe about a week after

15   the conversation with Carrollton PD?

16   A.  It was after it.  I don't remember when, how much after

17   it.  But it was after I had received a call from Carrollton

18   Police.

19   Q.  And so this is February 6, $75,000 into the UIT.

20   September 20th, another 75,000 for the hand sanitizer.  You

21   have this phone call with Carrollton PD and then this Zoom

22   call, correct?

23   A.  Zoom call with Keith, yes.

24   Q.  Zoom call with Keith.

25           And we've reviewed that call, correct?

 1  A.  Yes.

 2  Q.  And within Government's Exhibit 50 is a recording of

 3  that call that we reviewed, correct?

 4  A.  Yes.

 5          MR. FINE:  We would offer Government's Exhibit 50

 6  at this time, which is the Zoom call.

 7          MR. SANDEL:  Your Honor, at this time we'd renew

 8  our previously stated objection.

 9          THE COURT:  Okay.  Overruled.  50 will be

10  admitted.

11          MR. FINE:  And we would also offer

12  Government's 51, which is a transcript of that same call.

13          MR. SANDEL:  Same objection, your Honor.

14          THE COURT:  Okay.  Overruled.  51 will be

15  admitted.

16          MR. FINE:  Permission to publish Government's 50,

17  your Honor?

18          THE COURT:  Yes, go ahead.

19          (Audiovisual presentation to the jury.)

20  BY MR. FINE:

21  Q.  All right.  So, Mr. Greening, some follow-up on that

22  conversation.  You mentioned to the jury before that going

23  into that conversation, you had some concerns about your

24  money and the defendant; is that correct?

25  A.  Yes.

1   Q.  And so were those concerns alleviated by that

2   conversation, or did they become greater after that

3   conversation?

4   A.  They became greater.

5   Q.  And I want to point out a few things, the difference

6   between text messages and the Zoom call.

7           MR. FINE:  So permission to publish Government's

8   Exhibit 48 again, your Honor?

9           THE COURT:  Yes, go ahead.

10          MR. FINE:  So if we could go down just a little

11  bit to the 2:54 text.

12  BY MR. FINE:

13  Q.  So in this conversation -- this is February 6th of

14  2020.  The defendant says, "You will have subaccounts

15  inside Parkland and this UIT is one of them," correct?

16  A.  Yes.

17  Q.  And so it's clear you're talking about a UIT here in

18  terms of the investment product, correct?

19  A.  Yes.

20  Q.  On the Zoom call when you talked to him about the UIT,

21  he sort of acts like he doesn't even know what the UIT is.

22  Is that fair to say?

23  A.  Well, all of a sudden he said, "No, you didn't do that.

24  You did an alternative investment."  And I -- so -- he

25  called it something different.

1   Q.  Right.  And this is -- I mean, it's pretty clear.  In

2   this text message right here he mentioned UIT and it's

3   going to be inside of the Parkland account, correct?

4   A.  Yes.

5   Q.  And now on October 30th it's, well, this is an

6   alternative investment.  It's not really a UIT.

7           He's kind of flimflamming, right?

8   A.  Yes.

9           MR. FINE:  And if we could scroll down.

10          Keep going.

11          Keep going to page 3 on there at 11:46 a.m.

12  BY MR. FINE:

13  Q.  So this text -- when you asked him about the

14  autopopulated home address on there, he says, "It is

15  attached to Parkland," right?

16  A.  Yes.

17  Q.  And then in the Zoom call he specifically says, "Oh,

18  no, this isn't linked to Parkland at all," right?

19  A.  Right.

20  Q.  So, again, what are your thoughts on that?  He's saying

21  Parkland here; and then all of a sudden you've got these

22  concerns and he goes, oh, you know, this isn't anything to

23  do with Parkland.

24          What are your thoughts on that?

25  A.  Well, I'd already received a call from Carrollton

 1   Police when he told me on Zoom, no, that wasn't a UIT; that

 2   was an alternative -- or an alternate investment.

 3          And I'm sitting there thinking, no.  This is the

 4   first time you've ever said it was an alternate investment.

 5   I don't even know what that is.  But I didn't want to

 6   necessarily confront him on the Zoom call.

 7          It was just different, I guess, than what he had

 8   said it was.  Put it that way.

 9   Q.  There is a clear difference between the text messages

10   when he's trying to get you to invest and when you've

11   already invested and you're sort of calling him on it a

12   little bit, for lack of a better word; is that right?

13   A.  Yes.

14   Q.  All right.

15          MR. FINE:  And if we could scroll down to

16   11:53 a.m.

17   BY MR. FINE:

18   Q.  It's pretty clear the defendant says, "It will be on

19   your Parkland statement," correct?

20   A.  Yes.

21   Q.  And when you asked him about that -- because you say,

22   "Hey, it's been, you know, eight months.  I still don't

23   have this statement."

24          He says, "Oh, well, you'll get it on your annual

25   once-a-year statement."

```
 1            That was his response, right?
 2   A.  Yes.
 3   Q.  And did you ever receive anything on your statement
 4   about the UIT?
 5   A.  No.
 6   Q.  Or about this alternative investment that suddenly the
 7   semantics have changed?  Anything about that?
 8   A.  No.
 9   Q.  All right.
10   A.  I never got anything.
11   Q.  After the Zoom call -- at that point you had a total of
12   a hundred and -- well, you had more but at least $150,000
13   invested in the hands of Keith Ashley, correct?
14   A.  Yes.
15   Q.  Did you actually have more than the 150,000?
16   A.  Yes.
17   Q.  About how much more did you have?
18   A.  I don't know.  I don't know because I -- I mean, it's
19   not that I'm a wealthy person.  It's just I've tried to
20   forget all of this right now, so I don't know the amount
21   exactly.  I had some annuities invested with him, some life
22   insurance, whole life policies, my 401(k) --
23   Q.  And let me ask you this:  The money that you had with
24   him, what was that going to be earmarked for?  Was that for
25   your retirement?  For your kids down the line?  For things
```

 1  like that?

 2  A.  Which money?

 3  Q.  All the money you had with him.

 4  A.  Yes.

 5  Q.  I mean, was that going to help fund college for your

 6  kids?

 7  A.  Potentially.

 8  Q.  Was that going to help if there was wedding expenses

 9  down the line?

10  A.  Yes.

11  Q.  Was that going to help your retirement?

12  A.  Yes.

13  Q.  Was that there in case, god forbid, anything happened

14  to you or your family's health in the future?

15  A.  Yes.

16  Q.  I mean, that was your nest egg, correct?

17  A.  Yes.

18  Q.  You had worked 30-plus years saving that money up,

19  correct?

20  A.  Well, some of it; and then some of it I inherited.

21  Q.  Sure.

22        Did you ever get any of the money back?

23  A.  Yes.

24  Q.  How much money did you get back?

25  A.  I asked at some point -- after this Zoom call, I was

1  very uncomfortable; and I asked Keith to just give me back

2  the 75,000 for the UIT investment since he was calling it

3  something different.

4          And I didn't say all that to him.  I just said,

5  "I'd really like to have that money back.  I'm not

6  comfortable anymore with this and that was money that I got

7  from my parents and I don't -- I'm just not comfortable

8  with it."  And he gave it back to me.

9  Q.  Do you know where that $75,000 came from?

10 A.  I mean, the way I looked at it, it was my money.  He

11 gave it back to me.  But I don't know where he -- I don't

12 know where it came from.

13 Q.  You received -- you put in 150,000.  You got $75,000

14 back in your pocket, correct?

15 A.  Yes.

16 Q.  You don't know if that was $75,000 from other investors

17 or anywhere.  You just know you got 75.  But you're still

18 out the other 75, correct?

19 A.  I am.

20 Q.  Is that the total loss that you received from the

21 defendant, or was it more than that financially?

22 A.  Well, as far as I know, that's the total loss.

23 Q.  And when you say as far as you know, is it fair to

24 say -- you know, we talked about it.  You put your trust

25 into this man to handle your nest egg.  Outside of you

 1  going and forensically accounting for every bit of money,

 2  is it hard for you to know exactly how much money he stole

 3  from you?

 4  A.  Well, I mean, immediately upon getting the phone call

 5  from Carrollton Police, I called every place where I had

 6  accounts through Keith and made sure that the money was

 7  there, right?

 8          So -- I think what I meant was that I don't know

 9  what -- I don't really know how much money I maybe lost in

10  investments and things like that because I bought annuities

11  and maybe that wasn't the right thing to do.  I don't know.

12  Maybe it made -- you know, I just don't know.

13          But as far as I know for sure, I have not -- I

14  invested that $75,000 in the hand sanitizer with the

15  promissory note; and I haven't -- I don't have that money.

16  Q.  Okay.  Did you want to be down here today testifying

17  about this?

18  A.  Absolutely not.

19  Q.  How does it make you feel to have to come down here and

20  testify?

21  A.  How does it make me feel?

22  Q.  Yeah.

23  A.  Embarrassed and -- I've moved on from this, and so this

24  is something I just -- you know, it's over with for me.  I

25  mean, it's -- it's uncomfortable.  Put it that way.  I

1   just -- I don't like being here.

2   Q.  And being in your shoes and knowing the defendant for

3   25 to 30 years, is it easy to see how he is able to swindle

4   people?

5           MR. SANDEL:  Objection, speculation, your Honor.

6           THE COURT:  Overruled.

7           You can answer.

8   A.  You know, I can only speak for myself, okay?  I can't

9   speak for other people.  But it's just a sense of betrayal

10  because I thought that we were friends first and -- yes --

11  I think the question was am I surprised by how he could

12  deceive me.

13          And the answer to that is yes, because it's a real

14  sense of betrayal but -- I don't know if I'm answering your

15  question, but it's -- I don't -- I don't enjoy being here.

16  Put it that way.

17  BY MR. FINE:

18  Q.  All right.  Thank you, Mr. Greening.

19          MR. FINE:  I'll pass the witness, your Honor.

20          THE COURT:  Cross-examination?

21          CROSS-EXAMINATION OF ROBERT GREENING

22  BY MR. SANDEL:

23  Q.  Good afternoon, Mr. Greening.  How are you?

24  A.  I'm good.  How are you?

25  Q.  My name is Ryne Sandel; and you and I have not had the

1   opportunity to meet yet, have we?

2   A.  No, we haven't.

3   Q.  Okay.

4   A.  Let me just get some water real quick.

5   Q.  Please.  Take your time.

6   A.  Okay.  Go ahead.  Sorry.

7   Q.  I've just got a few follow-up questions based on some

8   of the information from your direct examination.  But if I

9   ask you a question and you need me to rephrase it, just let

10  me know and I'm happy to do that, okay?

11  A.  Okay.

12  Q.  On direct examination when Mr. Fine was asking you

13  about your experience with financial deals, I think what

14  you said is that's certainly not an expertise of yours,

15  correct?

16  A.  Correct.

17  Q.  And I think what I remember you saying is it's not even

18  really something that interests you a great deal.

19  A.  Not really.

20  Q.  Okay.  So when you were discussing these different

21  investments with Mr. Ashley, fair to say that you may have

22  had a basic understanding of what these investments were

23  but you didn't know the ins and outs and the nuances of how

24  they work, correct?

25  A.  No, I didn't know the nuances.  No.

1   Q.  Now, we talked about that $75,000 transaction --

2   because -- we'll say the first $75,000, okay?  So when I

3   say "the first $75,000," do you know which one I'm

4   referring to?

5   A.  The UIT?

6   Q.  Correct, yeah, the one that you were referring to with

7   Mr. Fine as the UIT or the alternative investment, that

8   75,000.

9           When you were discussing that with Mr. Fine, you

10  said that at some point you had reached out to Mr. Ashley

11  and said, "Hey, I'm uncomfortable and I'd like that money

12  back."

13          Do you recall that?

14  A.  Would you ask me that one more time?  I'm sorry.

15  Q.  Sure.

16          Regarding that first $75,000 investment, at some

17  point on direct examination you discussed with Mr. Fine you

18  reached out to Mr. Ashley and you said, "Hey, I'm

19  uncomfortable.  I'd like that $75,000 back," correct?

20  A.  Yes.

21  Q.  And when you reached out to him about getting that

22  money back, how did you reach out to him?

23  A.  I don't remember.

24  Q.  Would it have been an email maybe?

25  A.  I truly do not remember.

1   Q.  If I were to hand you an email, might that refresh your

2   recollection?

3   A.  Yes.

4           MR. SANDEL:  May I approach, your Honor?

5           THE COURT:  Yes.

6   A.  Do you want me to read --

7   BY MR. SANDEL:

8   Q.  No, I don't want you to read aloud.  I just want you to

9   review it and see if that refreshes your recollection.

10  A.  Okay.

11          Okay.

12  Q.  Having reviewed that, did your recollection get a bit

13  refreshed on --

14  A.  Yes.

15  Q.  Okay.

16          MS. RATTAN:  Your Honor, may we approach?

17          THE COURT:  Yes.

18          MS. RATTAN:  Thank you.

19          (Sidebar conference, off the record.)

20  BY MR. SANDEL:

21  Q.  Okay, Mr. Greening.  So -- having had your recollection

22  refreshed there, so how did you reach out to Keith

23  requesting a refund of that $75,000?

24  A.  I guess through that email --

25  Q.  Okay.

 1   A.  -- that you showed me.

 2   Q.  And that email was sent on a Friday; is that right?

 3   A.  I'm sorry.  I don't -- I didn't look to see what day it

 4   was.  I hate for you to have to come back up here but --

 5   Q.  Well, tell me this --

 6   A.  If you say so, I --

 7   Q.  If you can recall, how soon after sending that email to

 8   Mr. Ashley did that refund of $75,000 occur?

 9   A.  Relatively soon.

10   Q.  Fair to say within one business day; is that fair?

11   A.  I don't remember but it was relatively soon, but it

12   felt like forever.

13   Q.  It was very quick, correct?

14   A.  It was relatively soon.

15   Q.  Okay.

16          MR. SANDEL:  Now if we could pull up Exhibit 48,

17   please, and go to page 2.

18   BY MR. SANDEL:

19   Q.  All right.  You recall looking at this text message

20   exchange with Mr. Fine?

21   A.  Yes.

22   Q.  Now, Mr. Fine asked you some questions about the amount

23   of money that Mr. Ashley wanted you to invest.  Do you

24   recall him asking you those questions?

25   A.  Yes.

 1    Q.  And I think -- and please correct me if I'm wrong --

 2    what you had testified to on direct was that the amount was

 3    really whatever you want to do?

 4    A.  I -- that was my recollection.

 5    Q.  And there was never a specific number that Mr. Ashley

 6    was pushing you to invest; is that fair?

 7    A.  I don't recall being pushed to invest a certain amount.

 8    Q.  And do you recall at any point -- if you said, "Hey, I

 9    want to do $75,000," did Mr. Ashley ever pressure you to

10    invest more?

11    A.  I don't recall anything about how we arrived at the

12    amount.  I can say I don't ever recall being pressured --

13    Q.  Okay.

14    A.  -- to put a certain amount, though.

15    Q.  Fair enough.

16            And on this Exhibit 48, page 2, Mr. Fine brought

17    your attention to this text message from Mr. Ashley at

18    10:52 a.m.

19            Do you see that there on the screen?

20    A.  Yes.

21    Q.  And I think he brought your attention to where "today"

22    was underlined.  Do you recall him asking about that?

23    A.  Yes.

24    Q.  And do you recall on direct you said that in looking at

25    this today, it feels like he's pressuring you, right?  He

1   needs it right now?

2   A.  Yes.

3        MR. SANDEL:  If we could go to page 5 of this

4   exhibit.

5   BY MR. SANDEL:

6   Q.  Do you see down at the bottom of this screen where the

7   word "tomorrow" is underlined?

8   A.  Yes.

9   Q.  Okay.

10        MR. SANDEL:  If we could go to page 6 of this

11   exhibit, please.

12   BY MR. SANDEL:

13   Q.  Okay.  And the green text messages, those are you,

14   correct?

15   A.  Yes.

16   Q.  Do you see where "tomorrow" is underlined at the

17   5:07 p.m. text message?

18   A.  Yes.

19   Q.  And you didn't underline "tomorrow" when you sent that,

20   did you?

21   A.  I have no idea.

22   Q.  Okay.  It's certainly not something you remember doing?

23   A.  No.

24   Q.  Now, do you recall if this phone was a Samsung?

25   A.  Probably.

1   Q.  Are you aware that Samsung has the ability to

2   automatically highlight and underline references to days

3   and dates to allow you to automatically add a meeting to

4   your calendar?

5   A.  No.

6   Q.  Okay.

7   A.  I'm not aware --

8   Q.  Might that have been something that is going on here as

9   you see "tomorrow" keeps getting underlined?

10  A.  I have no idea.

11  Q.  No idea, okay.

12          So when Mr. Fine is asking you, as you look back

13  on it now, when he underlines "today," it feels pressuring.

14  But as you sit here, you have no idea if he underlined that

15  or if your phone did that as part of the operating system,

16  correct?

17  A.  About the underline?

18  Q.  Correct.

19  A.  Correct.

20  Q.  Okay.  Now, when you had that Zoom call with

21  Mr. Ashley, you spoke about a couple of different topics;

22  and I wanted to just ask you about a few of those.

23          At some point you mentioned Keith's wife.  Who is

24  Keith's wife?

25  A.  Her name is Brandi.

1   Q.   And did you have a personal relationship with Brandi as

2   well?

3   A.   I mean, I met Brandi one time, I believe.

4   Q.   Okay.  And then there were several conversations about

5   football and the son -- was that in reference to

6   Mr. Ashley's son?

7   A.   So my son is a -- was a -- or still is a student at

8   SMU.

9   Q.   Okay.

10  A.   And Keith's son, Kade, was playing football for SMU.

11  Q.   Okay.

12  A.   And so we both had kids at SMU, and that's what we were

13  talking about.

14  Q.   Okay.  And did your sons know each other; or is it just

15  you both know you have a son at SMU, that sort of thing?

16  A.   Well, when we found out that Kade was coming to SMU, he

17  was transferring in, my son had already been at SMU for I

18  want to say a year.  And so I think I -- my recollection is

19  I arranged for my son, William, to get together with Kade;

20  and I think that they got together, I think, at SMU and

21  William showed Kade around SMU because he was transferring.

22          I asked my son to do that.  I can't remember if

23  they actually did it or not.

24  Q.   Sure.

25  A.   But -- so I think that -- so I know they talked.

1    Q.  Okay.

2    A.  I just don't know the extent of it.

3             Does that answer your question?

4    Q.  It did.   Thank you.

5             Another topic of conversation in that Zoom call

6    was the hand sanitizers, right?

7    A.  Yes.

8    Q.  Now, could you remind me?  What was the hand sanitizer

9    conversation about?

10   A.  I was -- well, okay, so I had invested $75,000 in the

11   hand sanitizer business and I was -- part of the

12   conversation was me joking with him, saying, "Hey, can you

13   get me some because, I mean, I've invested in it."  And

14   hand sanitizer was hard to come by in September of 2020.

15   So I thought since I've invested in it, can I have some,

16   you know; and that was sort of a joke.

17            And then the other part was me asking him about,

18   well, how's it going, because I had invested quite a bit of

19   money and I wanted to know what he was going to say when I

20   asked him about Kroger and some of these other orders that

21   he had been saying they were getting and the school

22   district --

23   Q.  Sure.

24   A.  -- and stuff like that.  So that's what that was.

25   Q.  And in terms of the hand sanitizers, you kind of just

1  touched on it; but this was in September of 2020, correct?

2  A.  The Zoom call?

3  Q.  The Zoom call.

4  A.  I think it was.

5  Q.  And do you remember when, estimate, this hand sanitizer

6  idea really kind of first started?  When did he approach

7  you, and when did you invest in this hand sanitizer

8  business idea?

9  A.  I don't remember.

10  Q.  Would it have been just a few months prior to this?

11  Had you invested in it a long time, or was it just --

12  A.  No.  I mean, it was not that long --

13  Q.  Okay.

14  A.  -- before -- it hadn't been that long but, I'm sorry, I

15  just can't remember when.

16  Q.  Well, and safe to say it came about after we really hit

17  the high point of the pandemic, correct?

18  A.  I mean, it came about after March or April of 2020

19  whenever the pandemic really closed stuff down.

20  Q.  And that's when everything got shut down, right?

21  A.  Yeah.

22  Q.  And one of the businesses that would have been shut

23  down would be the brewery, correct?

24  A.  Well, I don't know if he got shut down; but he was

25  telling me that it was, you know -- nobody was going out

 1   and a lot of their business was from bars and stuff like
 2   that, so he had found a way to keep it open and -- and that
 3   was the hand sanitizer.
 4   Q.  And so this -- the hand sanitizer, that was a way to
 5   try and keep the brewery profitable during this time,
 6   correct?
 7   A.  Yes.
 8   Q.  Which made sense, right?
 9   A.  Yes.
10   Q.  And I think in that Zoom call you said at some point
11   you were out in the public and you saw the hand sanitizers,
12   right?
13   A.  Yeah.  I was up at our church, our old church, and they
14   have a farmers market and they were -- I guess they were
15   still having those because it was outside.  And I saw the
16   hand sanitizer that -- on one of the, you know, people
17   selling stuff, they had it actually sitting on their
18   counter, you know, for their own personal use, I think.
19   Q.  So reasonable to infer that that person had bought that
20   hand sanitizer from somewhere, correct?
21   A.  I guess so, yeah.
22   Q.  And so these hand sanitizers were real.  They existed.
23   Fair?
24   A.  Sure.
25   Q.  Now, the other thing that you talked about with

1    Mr. Fine on your direct examination was at some point after

2    you email Mr. Ashley in September asking for your money

3    back, at some point after Carrollton PD contacts you, you

4    said you called all of the different places where you had

5    accounts invested with Keith Ashley; is that true?

6    A.   Okay.  That was a really big question and I don't mean

7    to be like a lawyer here, but I can't help it.  So let

8    me --

9    Q.   Okay.

10   A.   Let me ask you -- let me answer -- I can answer all

11   those questions, but I'd prefer to have one at a time.

12   Q.   Let me -- let me break it down.

13   A.   Okay.

14   Q.   At some point after you became concerned, did you call

15   all of the different places where you had accounts that

16   were opened by Mr. Ashley?

17   A.   I either called or I went online and looked.

18   Q.   And you said that you had several accounts in several

19   different places?

20   A.   Yes.

21   Q.   And did you identify any issues with any of those

22   accounts, or were they all where they were supposed to be?

23   A.   Everything looked like it was where it was supposed to

24   be.

25   Q.   So the only issue was with this $75,000 investment,

1    correct?

2    A.   When?

3    Q.   The first, initial investment.  That was the only

4    investment that you made with Mr. Ashley that you had an

5    issue with?

6    A.   At what point in time are you asking me?

7    Q.   Well, at any point in time.

8            Was that the only investment that you ever voiced

9    a concern about?

10   A.   Okay.  The only investment I voiced a concern about to

11   Keith was the UIT.

12   Q.   Okay.

13   A.   If that's what you're asking me.

14   Q.   That -- and I think that's what I'm asking.

15   A.   Did I have a concern about the other 75,000 that I had

16   a promissory note on for the brewery and the hand

17   sanitizer?  Yes.

18   Q.   Sure.  And this --

19   A.   But I also had a promissory note.

20   Q.   I didn't mean to cut you off.

21   A.   I had a promissory note for that.

22   Q.   And --

23   A.   I didn't have anything for the UIT.

24   Q.   Okay.  Regarding the promissory note, what were the

25   terms of the repayment of that promissory note and, if you

 1   recall, how long did Mr. Ashley have to pay you that money

 2   back?

 3   A.  I don't recall, but it wasn't due or anything like

 4   that, you know, for a while.

 5   Q.  Okay.  And this would have been, you said, sometime

 6   around that April of 2020?

 7   A.  I don't remember exactly when, but it had to be

 8   sometime after March or April of 2020 and before September

 9   of 2020.

10   Q.  Okay.  So when we're looking at October of 2020, your

11   recollection is that promissory note wasn't due yet?

12   A.  Correct.

13   Q.  Okay.  Mr. Greening, the Zoom call that we were

14   referenced, when you recorded that, did anybody ask you to

15   create that recording; or did you do that on your own

16   volition?

17   A.  I can't remember.

18   Q.  But that call happened after you had spoken to

19   Carrollton PD, correct?

20   A.  Yes.

21          MR. SANDEL:  Pass the witness, your Honor.

22          THE COURT:  Additional questions?

23          MR. FINE:  Nothing further, your Honor.

24          THE COURT:  Okay.  Can this witness be fully

25   excused?

```
 1              MR. FINE:  Yes, your Honor.

 2              MR. SANDEL:  Yes, your Honor.

 3              THE COURT:  Okay.  You are free to leave.  Thank

 4  you.

 5              THE WITNESS:  Thank you, your Honor.

 6              THE COURT:  What's next?

 7              MS. RATTAN:  Your Honor, the United States recalls

 8  Matt Wylie.

 9              May I approach?

10              THE COURT:  Yes.

11              Sir, you understand you're still under oath?

12              THE WITNESS:  Yes, your Honor.

13              MS. RATTAN:  May I return?

14              THE COURT:  Yes.

15                   DIRECT EXAMINATION OF MATTHEW WYLIE

16                   RECALLED ON BEHALF OF THE GOVERNMENT

17  BY MS. RATTAN:

18  Q.  Please state your name.

19  A.  Matthew Wylie.

20  Q.  And, of course, you've testified a few times now; is

21  that right?

22  A.  Correct.

23  Q.  And you're a forensic accountant/CPA with the FBI?

24  A.  Correct.

25  Q.  So you've testified about what happened to Denny
```

1  Willmon's money, Leonid Shteyngart's money.  Now let's

2  focus on what happened to Robert Greening's money.

3         And, of course, each time it's just a snapshot of

4  a check or a wire that they have provided; is that right?

5  A.  Correct.

6  Q.  Every time they gave money, you didn't do a full

7  financial analysis; is that right?

8  A.  Correct.

9  Q.  So let's focus on Mr. Greening.  Mr. Greening provided

10  a wire of $75,000; is that right?

11  A.  Correct.

12         MS. RATTAN:  May I approach, your Honor?

13         THE COURT:  Yes.

14  BY MS. RATTAN:

15  Q.  And we've got a blowup of the wire that was provided

16  that a couple of different witnesses have looked at.  It's

17  Government's Exhibit 49.

18         MS. RATTAN:  May I publish it?

19         THE COURT:  Yes.

20  BY MS. RATTAN:

21  Q.  So this is a wire, a $75,000 wire; and it's to KBKK,

22  LLC, which is Keith Ashley, in Allen, Texas.

23         And it's to this bank, Branch Banking and Trust, a

24  wire transfer for $75,000.

25         It's from Robert Greening who is the investor.

1            And it's sent on February 20th of -- what's the

2   date of 2020?  Oh, 2-6 of 2020.

3            Is that your understanding?

4   A.  Yes, it is.

5   Q.  Okay.  And this is the wire that you did analysis of to

6   tell us what happened to this $75,000 after it was wired

7   into Keith Ashley's KBKK account; is that right?

8   A.  Correct.

9   Q.  And then on the stand in front of you, do you have a

10  summary chart that you created to explain to the jury what

11  happened to the $25,000 -- I mean, rather, the $75,000?

12  A.  I do.

13  Q.  And is that marked as Government's Exhibit 52A?

14  A.  It is.

15  Q.  Can you explain to us how Government's 52A was created?

16  A.  So this exhibit was created in the same way as the

17  other ones.  The financial technique called first in/first

18  out was used for this one as well due to the account

19  balance immediately prior to the wire being low.

20           In this instance it was $2,655.69 before the

21  account received the $75,000 wire from Mr. Greening.

22           Just as the last exhibits, the first $75,000 out

23  of the account were used to show this chart and formulate

24  the totals shown on here.

25           MS. RATTAN:  Your Honor, we'll offer Government's

```
 1    Exhibit 52A.

 2              MR. WHALEN:  Your Honor, we have an objection to

 3    the exhibit, some of the writing on the exhibit.  So can we

 4    approach about it?

 5              THE COURT:  Yes, if you want to approach.

 6              (Sidebar conference, off the record.)

 7              MR. WHALEN:  Your Honor, we'd object to the

 8    exhibit under 404(b), 403, and 401.

 9              THE COURT:  Okay.  I'll overrule the objections.

10    52A will be admitted.

11              MS. RATTAN:  May we publish it, your Honor?

12              THE COURT:  Yes.  Just turn your mic back on.

13    Yes.

14              MS. RATTAN:  May I approach?

15              THE COURT:  Yes.

16    BY MS. RATTAN:

17    Q.  Okay.  Let me direct your attention to

18    Government's 52A.  And, of course, we've seen multiple

19    charts like this, your financial analysis to tell us what

20    happened to the money.

21              So the wire transfer was on February 6th of 2020

22    of $75,000; is that right?

23    A.  Correct.

24    Q.  So you start your analysis on February 6th of 2020, the

25    date the wire came in?
```

1   A.  Correct.

2   Q.  And then your analysis goes through February 19th.  How

3   did you determine what days to include?

4   A.  That time range was the time it took the account to

5   deplete the whole $75,000 that were wired in.

6   Q.  So first in/first out.  You're doing the same type of

7   analysis?

8   A.  Correct.

9   Q.  So the $75,000 is wired in; and what happens?

10  A.  So the account balance immediately prior to the wire

11  being received was $2,655.69.

12          A total of $10,052 was spent to casinos.

13          A total of $3,813 was withdrawn in cash.

14  Q.  We've got the $10,000 that goes to casinos here; is

15  that right?

16  A.  Correct.

17  Q.  And while we're talking about casinos and gambling,

18  right here, what's happening here?

19  A.  $6,025 was sent to the Clark County District Attorney.

20  Q.  So what is this?

21  A.  That's an unpaid --

22          THE COURT:  Wait --

23  A.  -- gambling debt.

24          THE COURT:  -- one second.

25          MR. WHALEN:  Your Honor, I'm going to object to

1    the answer, ask that it be stricken, move for a mistrial.

2           THE COURT:  Well, I'll sustain the objection.  The

3    jury should disregard the last answer.

4           I'm denying a mistrial.  Go ahead.

5    BY MS. RATTAN:

6    Q.  So the $6,000 went to an unpaid gambling debt?

7    A.  Correct.

8    Q.  And then the $10,000 went to casinos?

9    A.  Correct.

10   Q.  So total, looks like, of about $16,000 on gambling?

11   A.  Yes.

12   Q.  And then moving right here, what happened here?

13   A.  $3,813 were withdrawn in cash.

14   Q.  And then continuing over to the right, what happens?

15   A.  A total of $41,996 was wired to a account titled "Keith

16   Ashley D/B/A NTMM," which is a Chase Bank account ending in

17   2589.

18   Q.  And that's another account of Keith Ashley's?

19   A.  Correct.

20   Q.  Then from that account, another 4,499, what happens?

21   A.  That was also spent in casinos.

22   Q.  So you've got -- 10,000; 16,000; another 4 -- about

23   $20,000 in gambling out of the 75?

24   A.  Correct.

25   Q.  And then what else happens?

1    A.   From that NTMM account $2,700 was withdrawn in cash and

2    $34,549 was sent to another account owned by Keith Ashley

3    titled "KBLS1996, LLC," which is an American National Bank

4    of Texas account ending in 9251.

5    Q.   Okay.  And that's that right here?

6    A.   Correct.

7    Q.   So you've got $20,000 goes to gambling; and then you

8    have roughly $7,000 going to cash to Keith Ashley?

9    A.   Correct.

10   Q.   And then about $34,000 goes into one of Ashley's other

11   accounts.

12          And what else happens?

13   A.   After that account receives those transfers, $10,800

14   was transferred to an account titled "Keith or Brandi

15   Ashley," American National Bank of Texas, ending in 9269;

16   and $26,059 was sent to another KBKK, LLC, account at

17   American National Bank of Texas ending in 9210.

18   Q.   So the money is skipping around pretty significantly,

19   would you say?

20   A.   Yes.

21   Q.   And then once this money -- this is going to be about

22   $35,000, totaling these two -- gets into KBKK, LLC, what

23   happens?

24   A.   $20,340 were spent on Nine Band Brewery expenses; and

25   $12,249 were sent to another account owned by Keith Ashley,

1    ABB Prestige, LLC, at Happy State Bank, ending in 6985,

2    where it was then used to make a payment on a loan for

3    9 Prestige Circle.

4    Q.  Right here, the loan for 9 Prestige Circle?

5    A.  Yes.

6    Q.  And then going back over to the left side of the board,

7    of course, and still evaluating what happened to the

8    $75,000, what happened over here?

9    A.  $10,200 was sent to an account titled "Keith or Brandi

10   Ashley" at Bank of America ending in 4804.

11           And from there, a total of $3,685 were used to pay

12   a personal mortgage; and a total of $2,337 were used to pay

13   off credit cards.

14   Q.  So if we're estimating a total of the $75,000 that went

15   to pay off Keith Ashley's credit card debt, you've got

16   almost $4,000 coming from this side of the chart as it

17   flows down and a little over $2,000 right here; is that

18   correct?

19   A.  Correct.

20   Q.  So over $5,000 went to his personal credit card debt?

21   A.  Yes.

22   Q.  And so that's from the date that it goes in,

23   February 6th of 2020, through February 19th of 2020; is

24   that right?

25   A.  Correct.

```
 1              MS. RATTAN:  May I return, your Honor?

 2              THE COURT:  Yes.

 3   BY MS. RATTAN:

 4   Q.  Now, as we've said, you've provided a financial

 5   analysis on what happened to Denny Willmon and Leonid

 6   Shteyngart and also now Robert Greening.  Was there another

 7   victim whose financial -- or money you analyzed as it

 8   related to Keith Ashley?

 9   A.  Yes.

10   Q.  And was that James Seegan?

11   A.  Yes.

12   Q.  And, of course, Mr. Seegan is deceased; is that

13   correct?  He's not here and available to testify?

14   A.  Correct.

15              MR. WHALEN:  Your Honor, I'm going to object to

16   the form of the question.

17              THE COURT:  Overruled.

18   BY MS. RATTAN:

19   Q.  To your knowledge, is Mr. Seegan available to come and

20   testify?

21   A.  No, he is not.

22   Q.  Did you use the same tools that you used as you

23   evaluated these other victims' finances to determine what

24   happened to Mr. Seegan's money and Mr. Seegan's

25   investments?
```

1   A.  Yes, I did.

2   Q.  And, again, you didn't take every single investment.

3   You took an investment and did a snapshot; is that right?

4   A.  Correct.

5   Q.  So let's talk about Mr. Seegan.  Did you review emails

6   that were retained or saved related to James Seegan and the

7   defendant, Keith Ashley?

8   A.  Yes.

9          MS. RATTAN:  Your Honor, we'll offer Government's

10  Exhibits 53B, 54.

11         THE COURT:  Any objection?

12         (Off-the-record discussion among counsel.)

13         MR. WHALEN:  Your Honor, we'd object to the email

14  based on predicate.

15         THE COURT:  Ms. Rattan?

16         MS. RATTAN:  It's my understanding there is an

17  objection to the foundation, so we'll lay the foundation

18  and then -- but go ahead and cover the financial with this

19  witness.

20         THE COURT:  Go ahead.

21  BY MS. RATTAN:

22  Q.  Did you analyze or determine whether $150,000 was

23  provided from Mr. Seegan to the defendant, Ashley?

24  A.  Yes, I did.

25  Q.  And did you do the same type of analysis that you've

1  described previously with the other victims?

2  A.  Yes, I did.

3  Q.  Let me direct your attention to Government's

4  Exhibit 55.

5          MS. RATTAN:  May I approach the witness, your

6  Honor?

7          THE COURT:  Yes, you may.

8  BY MS. RATTAN:

9  Q.  Government's Exhibit 55 and 56A and 56B, are you

10  familiar with each one of these exhibits?

11  A.  I am.

12  Q.  And, again, did you use the same techniques and

13  financial analysis on 56A and 56B that you've described

14  with the other victims?

15  A.  Yes, I did.

16          MS. RATTAN:  Your Honor, we'll offer Government's

17  Exhibits 55, 56A, and 56B.

18          THE COURT:  55 is already admitted, but any

19  objection to 56A and B?

20          MR. WHALEN:  May we approach?

21          THE COURT:  Yes.

22          (Sidebar conference, off the record.)

23          THE COURT:  Do you want to state your objection

24  for the record?

25          MR. WHALEN:  Your Honor, we'll object to the

 1    exhibit based on the characterizations and descriptions on

 2    the exhibit.

 3              THE COURT:  Okay.  Are you making that objection

 4    to both 56A and B?

 5              MR. WHALEN:  Yes, your Honor.

 6              THE COURT:  Okay.  The objection is overruled.

 7    56A and B will be admitted.

 8              MS. RATTAN:  Okay.  And then may we publish

 9    Government's Exhibit 56A?

10              THE COURT:  Yes, you may.

11              MS. RATTAN:  And then may I approach the witness?

12              THE COURT:  Yes.

13    BY MS. RATTAN:

14    Q.  First, let's focus on the wire transfer.  And that, as

15    the Court pointed out, has previously been admitted as

16    Government's Exhibit 55.

17              So this is the wire transfer; and it goes to Keith

18    Ashley, which is KBKK, in Lucas, Texas.  And then the

19    amount of the funds is $150,000 and it says that it's from

20    James Seegan; is that right?

21    A.  Correct.

22    Q.  So it goes from James Seegan, $150,000.  It's wired

23    through North Carolina and it's on May the 5th of 2016; is

24    that right?

25    A.  Correct.

1   Q.  And then it ends up in Keith Ashley's KBKK account?

2   A.  Correct.

3   Q.  And that's the analysis that you're doing on the KBKK

4   account?

5   A.  Yes.

6   Q.  So let's focus on your analysis.  And as you've told

7   us, you focus on May 5th of 2016 because that's the date

8   that the -- on or about that the wire is going in.

9   A.  Correct.

10  Q.  So May 5th of 2016, and this time you're going through

11  September of 2016.  So that's a broader date?

12  A.  Yes, it is.

13  Q.  Because?

14  A.  It took longer to deplete the funds received from this

15  wire.

16  Q.  So you focus on depletion.  The other times have been

17  smaller, but it took longer here and it's a larger amount

18  of money.

19  A.  Correct.

20  Q.  So the account balance at the time that the $150,000

21  from James Seegan is wired into the account is how much?

22  A.  Immediately prior to the wire being received, the

23  account balance was $63.68.

24  Q.  So pretty low, would you say?

25  A.  Yes.

1  Q.  So the account has $150,000; and it's almost all from

2  James Seegan?

3  A.  Correct.

4  Q.  Does a portion of it go back to James Seegan?

5  A.  Yes.  $532 were sent back to James Seegan.

6  Q.  And, again, is this something that's consistent with

7  what you see in a Ponzi or pyramid scheme?

8  A.  Yes.

9  Q.  And, in fact, when we talk about Ponzi and pyramid

10  scheme, do you also see it going back to another investor?

11  A.  Yes.  $1,200 was sent to Leonid Shteyngart.

12  Q.  And that's reflected on the right-hand side of your

13  chart; is that right?

14  A.  Yes.

15  Q.  So you've got the account balance, the time period.

16  You've got the pyramid scheme where the money is flowing

17  back to the investor and also flowing to another investor.

18          So if we go here, to the right side, just walk us

19  through this.  What happens?

20  A.  $20,982 was spent at casinos.

21  Q.  Okay.

22  A.  $15,000 was sent to another KBKK, LLC, account at

23  Commercial Bank of Texas ending in 4943, where it was then

24  spent on Nine Band Brewery expenses.

25  Q.  And the spending of investors' money on the Nine Band

 1   Brewery expenses, is that a theme that you're seeing as

 2   well?

 3   A.  Yes.

 4   Q.  Okay.  And not the entire amount, of course, because a

 5   lot of personal things are involved, but small amounts of

 6   it go to the Nine Band Brewery?

 7   A.  Correct.

 8   Q.  So continue walking us through what happened to the

 9   money.

10   A.  So $5,175 were spent on retail, restaurant, and

11   entertainment purchases.

12   Q.  Okay.

13   A.  $4,500 was sent to Keith Ashley D/B/A NTMM, which is a

14   Chase Bank account, ending in 2589.

15           From there, $4,472 of those dollars were spent at

16   casinos.

17   Q.  So if we again add up the amount of the $150,000 that

18   went to casinos, you've got the 20,000 up here and then

19   you've got this flowing down but then back up.  So you've

20   got roughly twenty-thousand four hundred and twenty-four

21   hundred dollars; is that right?

22   A.  Correct.

23   Q.  So what else happens?

24   A.  $10,500 were spent on legal fees.

25   Q.  Right here.

```
 1   A.  $2,084 were spent to pay off credit cards.

 2   Q.  Okay.

 3   A.  $26,066 were withdrawn in cash.

 4          $58,500 were sent to a Bank of America account

 5   titled "Keith or Brandi Ashley" ending in 4804.

 6   Q.  Going back up here?

 7   A.  Correct.

 8   Q.  Okay.

 9   A.  From there, $37,698 were sent to a Bank of America

10   account titled "Kyler, Brandi or Keith Ashley" ending in

11   3662; and that amount was subsequently sent back to the

12   Bank of America account ending in 4804.

13   Q.  So it just made a circle?

14   A.  Correct.

15   Q.  Okay.

16   A.  $13,210 were sent to Midland National Life Insurance

17   Company.

18          $6,830 were spent on personal mortgage payments.

19   Q.  And, again, is that a consistent theme that you're

20   seeing with the investor money?

21   A.  Yes.

22   Q.  What else?

23   A.  $3,506 were used to pay insurance premiums.

24          $2,950 were sent to Brenda and Tommy Stewart.

25          $2,501 were used to pay off a student loan.
```

 1              And $1,226 were used to pay a loan on a BMW.
 2   Q.  Okay.  And then you've got the additional --
 3   A.  Yes, one last one.  $6,685 were spent on legal fees.
 4              And then also, moving to the right $5,802 were
 5   spent to pay off credit cards.
 6   Q.  So total from the one-fifty that went to credit cards,
 7   you've got about 8,000?
 8   A.  Correct.
 9   Q.  And then total in cash withdrawn from the $150,000,
10   you've got about $30,000 in cash?
11   A.  Correct.
12   Q.  So about $25,000 in gambling; $30,000 in cash; and then
13   $7,000 to credit cards?
14   A.  Correct.
15   Q.  And then, of course, we've walked through the other
16   personal expenditures over here.
17   A.  Yes.
18   Q.  And the same question as with the other investors.  Did
19   you show any of the money that Mr. Seegan was investing
20   going to any investment vehicles?
21   A.  No.
22   Q.  Now, this Midland National Life Insurance Company, what
23   is that?  Could you tell what that was?
24   A.  I -- not for certain.
25   Q.  Okay.  Did you see it going into any Parkland

 1  investments or SmartTrust UIT, anything like that?

 2  A.  No.

 3  Q.  Now, this is a $150,000 wire from Mr. Seegan that you

 4  evaluated.  As another snapshot of the relationship between

 5  Keith Ashley and James Seegan, did you evaluate $120,000

 6  that Mr. Seegan provided?

 7  A.  I did.

 8  Q.  And then let me direct your attention to 56B.  And

 9  that's your analysis?

10  A.  Yes.

11        MS. RATTAN:  Your Honor, I think I've already

12  offered this.  May we publish it?

13        THE COURT:  Yes.

14  BY MS. RATTAN:

15  Q.  Let's focus on Government's Exhibit 56B.  Now, this is

16  evaluating $120,000 that came from James Seegan into the

17  KBKK account; is that right?

18  A.  Yes.

19  Q.  And it came in on June 23rd of 2016.  And so you

20  evaluated the amount of time that it took to use the

21  $120,000?

22  A.  Correct.

23  Q.  So that's going to be from June 16 to September

24  of 2016?

25  A.  Correct.

1  Q.  So again you're showing that $120,000 comes in; and

2  then there is a payment that turns around where Mr. Seegan

3  is given $2,600 of his own money back?

4  A.  Yes.

5  Q.  Okay.  Explain that to us.  What does that mean to you

6  as a forensic accountant?

7  A.  Once again, that's indicative of a pyramid scheme.

8  Q.  And then just going down right here, first -- I mean,

9  we can walk through the whole thing.  But what is this

10 right here, in the far right bottom corner?

11 A.  That's a $3,600 payment to Leonid Shteyngart, who is

12 another investor.

13 Q.  And what does that mean to you?

14 A.  Once again indicative of a pyramid scheme.

15 Q.  So you've got money going back to the original investor

16 and then money going to another investor.

17         So then going back up here to the top, can you

18 just walk us through what happens with Mr. Seegan's

19 $120,000?

20 A.  Yes.  So $7,298 were withdrawn in cash.

21         $18,500 were sent to another KBKK, LLC, account --

22 this one is at Commercial Bank of Texas -- ending in 4943.

23         From there, $7,735 were used to pay a loan for

24 Nine Band Brewery and $8,852 were sent to ABB Prestige,

25 LLC, Commercial Bank of Texas account ending in 5056, where

1   $7,153 were then also used to pay for a loan by Nine Band

2   Brewery.

3   Q.  Okay.  So about $14,000, maybe closer to $15,000, goes

4   to the Nine Band Brewery loan?

5   A.  Correct.

6   Q.  And what else?

7   A.  $3,388 were spent on retail, restaurant, and

8   entertainment purchases.

9           $5,180 were spent at casinos.

10          $2,110 were used to pay off credit cards.

11          $13,300 were spent on legal fees.

12          $53,500 were transferred to an account titled

13  "Keith or Brandi Ashley" at Bank of America ending in 4804.

14          From there, $11,507 were sent to Midland National

15  Life Insurance Company.

16  Q.  Over here on the far left.

17  A.  $3,079 were used for payments on a loan at BMW.

18          $7,119 were used to pay off a personal mortgage.

19          $4,063 were used for college tuition.

20          $1,265 were used for utility and home maintenance

21  payments.

22          And $3,000 was sent to a Chase account titled

23  "Keith Ashley D/B/A NTMM" ending in 2589 where it was then

24  spent at casinos.

25  Q.  So the casino -- we covered one on this side as well.

1  So on this $120,000, about $8,000 is going to casinos?

2  A.  Correct.

3          And then $10,068 were used to pay off credit

4  cards.

5          And, lastly, $10,407 were used for legal fees.

6  Q.  And then on the credit cards, if you add up the credit

7  cards from both sides, it's about $12,000 that went to the

8  defendant's credit card accounts; is that right?

9  A.  Correct.

10 Q.  And, again, both of these are just a snapshot of

11 investments and what happened to Mr. Seegan's money; is

12 that right?

13 A.  Yes.

14         MS. RATTAN:  May I return, your Honor?

15         THE COURT:  Yes.

16 BY MS. RATTAN:

17 Q.  Now, you've walked us through the flow of money on four

18 separate victims and focused on specific instances with

19 each one of the four victims.

20         Did you also do just a global financial analysis

21 to give the jury an idea of financial stress or pressure

22 that the defendant, Keith Ashley, was under?

23         MR. WHALEN:  Your Honor, I'm going to object to

24 the form of the question about financial stress or

25 pressure.  It's leading.

1          THE COURT:  Well, just rephrase the question,

2    Ms. Rattan.

3    BY MS. RATTAN:

4    Q.  Did you evaluate the defendant's financial status as of

5    late 2019?

6    A.  Yes.

7    Q.  And were you able to determine whether he was doing

8    well or whether he was someone who would have significant

9    financial stress?

10   A.  Yes.

11         MR. WHALEN:  Your Honor, I would once again object

12   to the form of the question.

13         THE COURT:  Okay.  Overruled.

14   BY MS. RATTAN:

15   Q.  And based on your analysis and your review of his

16   finances, obligations, and expenditures, what were you able

17   to determine?

18   A.  His obligations far outweighed the cash he had on hand

19   and the ability he had to pay those obligations.

20   Q.  And that would be as of 2019 and going into 2020; is

21   that right?

22   A.  Correct.

23   Q.  Did you prepare a chart to help the jury understand

24   your analysis and your conclusion that he was under

25   significant financial stress during this time?

 1    A.  Yes.

 2    Q.  Let me ask you to look at Government's Exhibit

 3    Number 57 and tell us whether that's the chart that you

 4    prepared to assist the jury in understanding your analysis.

 5    A.  It is.

 6            MS. RATTAN:  Your Honor, we'll offer Government's

 7    Exhibit Number 57.

 8            THE COURT:  Any objection?

 9            MR. WHALEN:  No objection, your Honor.

10            THE COURT:  57 will be admitted.

11            MS. RATTAN:  And may we publish it?

12            THE COURT:  Yes, you may.

13            Why don't we go ahead and take our afternoon

14    break.  We've been going for a couple hours.

15            So, ladies and gentlemen, again, please don't

16    discuss the case among yourself or anyone else.  Don't do

17    any outside research.  We'll take 15 minutes.  I will

18    remind you, too, we are only going to go to 4:15 today

19    because of an obligation I have; so we'll come back from

20    the break and go about another hour.  Have a good break.

21            (The jury exits the courtroom, 3:00 p.m.)

22            THE COURT:  Anything further from the government?

23            MS. RATTAN:  Just in terms of the 4:15, I'm not

24    sure we're going to have witnesses all the way up to 4:15.

25    We'll have the cross, and then we have two witnesses who

1    are short who we'd like to get on.  But we may not go quite

2    until 4:15, if that's all right with the Court.

3              THE COURT:  That's fine.

4              Anything from defense?

5              MR. WHALEN:  Yes, your Honor.  Considering that it

6    appears to me that the witness was not informed about the

7    motion or the correction to the exhibit, I'd like to be

8    able to ask some questions about it; but I don't want him

9    to blurt out an answer regarding the District Attorney's

10   Office.

11             THE COURT:  Well, I understand.

12             And, Ms. Rattan, just talk to the witness about

13   that.  Remind him about that issue.

14             Mr. Whalen, I think that will be fine.

15             MR. WHALEN:  What?

16             THE COURT:  I asked Ms. Rattan to just talk to the

17   witness at the break.  I don't think there will be any --

18   there shouldn't be a problem.

19             MR. WHALEN:  Okay.  Thank you, your Honor.

20             THE COURT:  Okay.  We'll be in recess for

21   15 minutes.

22             (Recess, 3:02 p.m. to 3:20 p.m.)

23             (Open court, defendant present, jury present.)

24             THE COURT:  Okay.  Please be seated.

25             Ms. Rattan, go ahead and continue.

 1             MS. RATTAN:  Thank you, your Honor.

 2   BY MS. RATTAN:

 3   Q.  You were talking about preparing Government's

 4   Exhibit 57 as essentially a summary of your analysis of the

 5   financial stress that the defendant was under in 2019 and

 6   2020; is that right?

 7   A.  Correct.

 8   Q.  And Government's Exhibit 57, which is displayed on the

 9   monitor, is this your summary explanation of his situation?

10   A.  Yes.

11   Q.  Can you walk us through it?

12   A.  Yes.

13             MS. RATTAN:  If we can look at Government's

14   Exhibit 57, page 1.

15   A.  So these are the total cash on hand that Mr. Ashley had

16   on February 1st, 2020.  The combined balance of all of his

17   personal bank accounts was $12,864.52.

18             The combined balance of all of his business

19   accounts as $5,528.95.

20             And then he also had a few Ashley family living

21   trust accounts; and the balance of those on February 1st,

22   2020, was $37.80.

23   BY MS. RATTAN:

24   Q.  So as you've titled it, cash on hand; and you looked at

25   personal, business, and trust accounts.  And you came up

1    with a total cash on hand of what?

2    A.  $18,431.27.

3    Q.  Then this is page 2 of Government's Exhibit 57 -- or,

4    rather, 3 of Government's Exhibit 57.  So you're looking

5    now at what his obligations are.  So we just saw what does

6    he have and now what does he owe.

7    A.  Correct.

8    Q.  So walk us through this.

9    A.  So these are the financial obligations that he had for

10   February 2020.

11         So his monthly mortgage payment that was due was

12   $3,731.97.

13         The total monthly disbursements that he owed to

14   investors for February was $13,389.76.  And that was

15   comprised of $3,485 owed to Leonid Shteyngart; $1,541 owed

16   to Denny Willmon; and $8,362 owed to James Seegan.

17   Q.  So, obviously, the person he owes the most to is James

18   Seegan; is that right?

19   A.  Correct.

20   Q.  Okay.  And this is as of what date that he owes James

21   Seegan over $8,000?

22   A.  By the end of February 2020.

23   Q.  Okay.  So then take us on down.  What's happening here

24   with his financial obligations?

25   A.  So the monthly payment that he owed for brewery

 1   property/equipment loans was $14,001.

 2           The total outstanding balance that he had on his

 3   credit cards on 2-1-20, he had two Chase credit cards, one

 4   ending in 0600.  The outstanding balance on that one was

 5   $17,715.20.  Then he had another Chase credit card ending

 6   in 7680 with an outstanding balance of $13,327.65.

 7   Q.  Okay.  And then he's got Ford credit loans?

 8   A.  Yes, he has Ford credit loans.  The monthly payments

 9   for those were $1,048 a month.

10   Q.  So when you talk about his financial obligations, is

11   this what he owes each month?

12   A.  Yes.  However, the credit cards -- the minimum monthly

13   payment could have been made for those, and the total

14   outstanding balance might not have been owed.

15   Q.  Okay.  So if you just make the minimum on this right

16   here, then this amount would go down; is that right?

17   A.  Correct.

18   Q.  So what we're looking at is the difference between what

19   he has and what he owes.

20   A.  Correct.

21   Q.  And so the cash on hand that he has, which is on the

22   previous page, is $18,000?

23   A.  Correct.

24   Q.  So there's a difference in $40,000, roughly; is that

25   right?

 1    A.  It is.

 2    Q.  Okay.  And that's just in one month.  So after he

 3    depletes this $18,000, the next month he has nothing.

 4    A.  Correct.

 5    Q.  So that would mean, if you go with your analysis on

 6    what he owes, that this -- and you could subtract out the

 7    credit cards.  Even if we subtract that out, he still owes

 8    $30,000 a month.

 9    A.  Correct.

10    Q.  Okay.  So if he pays the $18,000 in the first month,

11    that's gone.

12    A.  Yes.

13    Q.  So then he's still going to owe these amounts going

14    forward, and he has a balance of zero.

15    A.  Correct.

16    Q.  So would you say that he's in a pretty serious

17    financial situation?

18    A.  Yes.

19    Q.  And then the monthly disbursements owed to investors,

20    these three investors right here, those are three of the

21    victims who we talked about in your earlier analysis; is

22    that right?

23    A.  Correct.

24    Q.  So the mere fact that he owes these monthly

25    disbursements to these people, is that a red flag for a

1  pyramid scheme that James *(sic)* Ashley personally owes them

2  those disbursements?

3  A.  Keith Ashley, yes.

4  Q.  I mean Keith Ashley.

5         Okay.  So if it were true investments, then he

6  personally shouldn't have to pay that; is that correct?

7  A.  Correct.

8  Q.  Now, did you analyze his casino activity?

9  A.  Yes.

10 Q.  And walk us through that.

11 A.  So the monthly casino activity that was calculated

12 based on expenditures that we saw that Mr. Ashley spent at

13 casinos and then was offset by any cash he deposited or any

14 checks that he deposited from casinos.  In addition, any

15 cash withdrawals that he had at casino locations were also

16 subtracted from this.

17        So from November -- for the month of

18 November 2019, he had a net loss of $24,000 at casinos.

19        For the month of December 2019, he had a net gain

20 of approximately $10,000.

21        In January of 2020, he had a net gain of

22 approximately $2,500.

23        And then from February 1st, 2020, to

24 February 19th, 2020, he had a net loss of approximately

25 $30,000.

1          So from November 2019 to February 19th, 2020, he

2   had a net loss of $41,000 at casinos.

3   Q.  So he's $41,000 down on his gambling?

4   A.  Correct.

5   Q.  And then did you look at the performance of his

6   business, Nine Band Brewery?

7   A.  Yes.

8   Q.  And evaluated the financial situation that Nine Band

9   Brewery was in?

10  A.  Yes.

11         MS. RATTAN:  Let's look at page 5 of Government's

12  Exhibit Number 57.

13  BY MS. RATTAN:

14  Q.  Can you walk us through this?

15  A.  Yes.  So these are the net losses or net gains -- in

16  this instance they were all losses -- for Nine Band Brewery

17  for 2018, 2019, and the first half of 2020.

18         These amounts were calculated by taking the

19  deposits made into Nine Band Brewery bank accounts,

20  subtracting out any payroll expenses, inventory expenses,

21  distribution expenses, utilities, and any other

22  miscellaneous expenses.

23         For 2018 a net loss of $158,000 was calculated.

24  For 2019 the net loss increased to $241,000.  And then for

25  January 1st, 2020, to June 30th, 2020, a net loss of

 1    $335,000 was observed.

 2    Q.  Okay.  So the -- personally he's in the red, and his

 3    business is in the red as well?

 4    A.  Correct.

 5    Q.  So would you conclude that he has significant financial

 6    stress, both personally and in his business?

 7    A.  Yes.

 8    Q.  And that's in 2019 and early 2020; is that correct?

 9    A.  Correct.

10            MS. RATTAN:  I'll pass the witness.

11            THE COURT:  Cross-examination?

12            MR. WHALEN:  If we could start with 52A, please.

13            CROSS-EXAMINATION OF MATTHEW WYLIE

14    BY MR. WHALEN:

15    Q.  Okay.  Mr. Wylie, as far as Exhibit 52A, there is a

16    column in there that says "Unpaid Gambling Debt."  Do you

17    see that?

18    A.  Yes.

19    Q.  Okay.  And that was money owed to Golden Nugget,

20    correct?

21    A.  Correct.

22    Q.  Okay.  And other than knowing it was owed to Golden

23    Nugget, was there any itemization of what that money was

24    paid for?

25    A.  No, other than the fact that Golden Nugget is a casino.

1   Q.  Okay.  But there's other things you can do at a casino

2   other than gamble, correct?

3   A.  Correct.  But to my knowledge, casinos don't usually

4   offer investments.

5   Q.  That wasn't my question.

6   A.  Okay.

7   Q.  Okay?  You don't have to add on.  We're not talking

8   about investments.

9          I asked you what -- you can buy other things at a

10  casino, correct?

11  A.  Correct.

12  Q.  Okay.  So to say it was a gambling debt is an

13  assumption on your part, correct?

14  A.  Correct.

15         MR. WHALEN:  Could we go to 56A, please --

16  actually -- sorry.  We can go back to 52A.

17  BY MR. WHALEN:

18  Q.  Mr. Wylie, down at the bottom it says "Loan, 9 Prestige

19  Circle."  Do you know what that is?

20  A.  The location of Nine Band Brewery.

21  Q.  All right.

22         MR. WHALEN:  We can go to 56A.

23         And if we can go on to 56B, please.

24  BY MR. WHALEN:

25  Q.  Okay.  On this one -- there is an overlap between 56A

 1   and 56B, correct?

 2   A.  Correct.

 3   Q.  Okay.  So when we look at the $30,000 that is in his

 4   account balance, that also relates to 56A a little bit,

 5   correct?

 6   A.  Correct.

 7   Q.  Okay.  And did you prepare these charts, or did

 8   somebody do them at your direction?

 9   A.  I did them.

10   Q.  Okay.  Did you notice -- you put down your dates of

11   June 23rd, 2016, to September 31st of 2016.

12   A.  Yes.

13   Q.  Okay.  How many days are there in September?

14   A.  Is it 30?

15   Q.  I think so, yes.

16   A.  I'm sorry.

17   Q.  Okay.  Was there entries on a document that led you to

18   put down "September 31st" that you saw, or did you just

19   make a mistake?

20   A.  Might have been a mistake.

21   Q.  Okay.  All right.

22        MR. WHALEN:  Let's goes to Exhibit 57, please.

23        All right.  We can go to page 2.

24   BY MR. WHALEN:

25   Q.  Okay.  Now, this one you just entitled "Cash On Hand."

```
 1   Is it my understanding that you just looked at what cash
 2   was in the bank accounts?  Is that correct?
 3   A.   Correct.  As -- cash on hand in this scenario I meant
 4   his bank account balances.
 5   Q.   Okay.  So you're just going off bank account balances?
 6   A.   Correct.
 7   Q.   Okay.
 8           MR. WHALEN:  Go to page 3, please.
 9   BY MR. WHALEN:
10   Q.   Okay.  So then you have a monthly payment for brewery
11   property and equipment loan, correct?
12   A.   Correct.
13   Q.   Okay.  Did you look at any of the loan documents?
14   A.   Yes.
15   Q.   Okay.  Was that in KKKB (sic)?
16   A.   KBKK.
17   Q.   Okay.  KBKK was on the loan for the equipment, correct?
18   A.   I believe ABB Prestige might have been as well.
19   Q.   Okay.  And did you figure out what the value of the
20   equipment was?
21   A.   Yes.
22   Q.   What's the value of the -- what was the value of the
23   equipment?
24   A.   I can't say off the top of my head.
25   Q.   Okay.  Was it more than $14,000?
```

1   A.  Yes.

2   Q.  Okay.  Is it $100,000?  $200,000?

3   A.  I can't say for certain.

4   Q.  Okay.  Was there any -- were you able to determine or

5   did you determine whether there was equity in the brewing

6   equipment?

7   A.  I can't say without knowing the true market value of

8   it.

9   Q.  Okay.  And you would agree with me that if there was

10  equity in equipment and things got to a point where we have

11  to liquidate some things, that would be a source of income,

12  would it not?

13  A.  Assuming the equity is more than the loan, yes.

14  Q.  Okay.  And as relates to the property, did you

15  determine the value of the land that Nine Band Brewery was

16  on?

17  A.  I believe so, yes.

18  Q.  Okay.  What was the equity in the property?

19  A.  I can't say off the top of my head.

20  Q.  Okay.  And that could be a source of income.  You can

21  get a loan or things like that, correct?

22  A.  Correct.

23  Q.  And as far as the credit cards, you correctly said he

24  could just pay the minimum payments.  So that would go down

25  to $30,000 right off the top, right?

```
 1   A.  Correct.
 2   Q.  Okay.  So did you do a net worth statement for him of
 3   what his total net worth was; or you just looked at here's
 4   his obligations, here's his cash on hand, and that's really
 5   the analysis that you did?
 6   A.  That's approximately what I did.
 7   Q.  Okay.
 8           MR. WHALEN:  We can go to page 4.
 9   BY MR. WHALEN:
10   Q.  Okay.  I just want to understand your testimony about
11   how you calculated the gains and losses.  How did you
12   calculate the gains and losses, again?
13   A.  So the -- there was payments to casinos usually via
14   debit card.  I took those, added those with ATM withdrawals
15   that were made at casinos, usually in Durant, Oklahoma; and
16   then I offset that with any cash that was deposited into
17   the account and any checks that were deposited from
18   casinos.
19   Q.  Okay.  Did it factor in any -- sometimes do they pay
20   out cash at casinos?
21   A.  Correct.
22   Q.  Okay.  So if someone pays out cash, that may not get
23   deposited in a bank account; and that may not be reflected
24   in your analysis, correct?
25   A.  Correct, if it wasn't deposited.
```

```
 1    Q.  Okay.  All right.
 2          MR. WHALEN:  And we can go to page 5.
 3    BY MR. WHALEN:
 4    Q.  Before we get to that, did you take into account the
 5    value of his personal property, vehicles or anything, the
 6    equity that he had in those?
 7    A.  Not for -- in terms of this.
 8    Q.  Okay.  Now, as far as the net income/loss of the
 9    brewery, is this -- just so I'm clear, is this a cumulative
10    total?
11    A.  No.
12    Q.  Okay.  So as far as -- you say he lost 158,000 in 2018,
13    correct?
14    A.  Correct.
15    Q.  Okay.  Now, is that loss coming off of just doing bank
16    account numbers?
17    A.  Correct.
18    Q.  Okay.  You didn't look at tax returns or anything like
19    that?
20    A.  No.  I based it off the bank records showing deposits
21    coming into the bank account, or revenue, and then
22    subtracted out expenses from the bank accounts such as
23    payroll, wages, utilities, those kind of things.
24    Q.  Okay.  And how did you calculate revenue?
25    A.  Incoming deposits into the account from places like
```

 1    Ben E. Keith, Osage Casino, those kind of places.

 2    Q.  Okay.  Osage Casino, do you know what that was?

 3    A.  I believe he had some sort of station in the casino

 4    selling his beer.

 5    Q.  Okay.  So that was another source of revenue?

 6    A.  Correct.

 7    Q.  Okay.  Then when you get down to -- well, let me ask

 8    you this:  Is it also true that sometimes in a given year

 9    you may defer some income or not deposit income until the

10    next year in order to help yourself on taxes?

11    A.  Correct.

12    Q.  Okay.  And you don't know -- and you didn't look at any

13    of the tax returns or any of the profit and loss statements

14    or anything like that, did you?

15    A.  No.  But in terms of this, there's no point in

16    deferring this big of a loss because it will just carry

17    over by year.

18    Q.  Okay.  But you can choose to do that if you want.

19    A.  You can.

20    Q.  Okay.  And then when we get to the last year of 2020,

21    as far as the loss, COVID started in March of 2020, full

22    swing by April?

23    A.  Correct.

24    Q.  Okay.  So as far as losses, it would be expected to

25    have a loss -- a business could potentially have a loss in

1    2020 due to COVID?

2    A.  Correct.  That would be another stressing factor.

3    Q.  Okay.  But that didn't occur until April, May, June

4    of 2020, correct?

5    A.  I believe it started around March.

6    Q.  Okay.  So we're going through -- so when you look at

7    this loss and you factor in COVID -- nobody knew in

8    February of 2020 COVID was coming and we were all getting

9    shut down, right?

10   A.  Correct.

11   Q.  We were all -- we were still hoping there would be the

12   Final Four tournament, right?

13   A.  Yeah.

14   Q.  Okay.  So just so I'm clear, you just -- you just

15   looked at bank accounts.  You didn't look at net worth.

16   You didn't look at equity of property to complete his whole

17   financial picture.  This is just based on his bank accounts

18   that you reviewed, correct?

19   A.  Correct.

20   Q.  All right.

21            MR. WHALEN:  I'll pass the witness.

22            THE COURT:  Anything additional?

23            MS. RATTAN:  No, your Honor.  Thank you.

24            THE COURT:  Okay.  Is he going to be called back

25   again?

```
 1           MS. RATTAN:  Not soon, but yes.

 2           THE COURT:  Okay.  You're still subject to recall,

 3  sir.

 4           THE WITNESS:  Okay.

 5           THE COURT:  Okay.  What's next?

 6           MS. RATTAN:  The United States calls Alicia

 7  Molina.

 8           THE COURT:  Ma'am, if you'll raise your right hand

 9  to be sworn in.

10           (The oath is administered to the witness.)

11           MS. RATTAN:  Your Honor, the witness doesn't have

12  her glasses.  May she be excused to step out?

13           THE COURT:  Yes.

14           (Off the record briefly.)

15           THE COURT:  Okay.  Go ahead and proceed.

16           MS. RATTAN:  Thank you, your Honor.

17               DIRECT EXAMINATION OF ALICIA MOLINA

18               CALLED ON BEHALF OF THE GOVERNMENT

19  BY MS. RATTAN:

20  Q.  Please state your name.

21  A.  Alicia Molina.

22  Q.  Okay.  Ms. Molina, can you get as close as you can to

23  the microphone?

24  A.  Okay.

25  Q.  Will you spell your first name and your last name?
```

1   A.  It's A-L-I-C-I-A, M-O-L-I-N-A.

2   Q.  And, Ms. Molina, what kind of work do you do?

3   A.  I am an accountant, and I also do notary -- I'm a

4   notary public.

5   Q.  A notary public.

6        And where is your business?

7   A.  I have an office, 1902 Country Club Drive, Suite 100.

8   It's in Carrollton, Texas, 75006.

9   Q.  Okay.  Let me show you -- on the stand in front of you

10  is a book, and I opened it to Tab Number 59.  I'll ask you

11  to look at that, Number 59.

12       And let me direct your attention to page 8 of

13  Government's Exhibit 59.  The page numbers are at the

14  bottom.

15  A.  Yes.

16  Q.  And then I'm going to show you page 8 and ask you if

17  you recognize that.

18  A.  Yes.  That's my signature and my name.

19  Q.  Okay.  And is that your notary stamp?

20  A.  Yes, it is.

21       MS. RATTAN:  Your Honor, we'll offer Government's

22  Exhibit Number 59.

23       THE COURT:  Any objection?

24       MR. WHALEN:  Can I take her on a brief *voir dire*,

25  your Honor?

1              THE COURT:  Okay.

2              *VOIR DIRE* EXAMINATION OF ALICIA MOLINA

3  BY MR. WHALEN:

4  Q.  Ms. Molina, I know you said that was your notary stamp

5  on the document.  Do you recognize the document as a whole?

6  A.  Just -- the protocol that I use when somebody comes to

7  my office is that they come and I see their ID and --

8  that's what I do.  I see the ID that is the same name on

9  the document that they are going to sign, and then I tell

10  the person to sign in front of me.

11  Q.  Okay.  All right.

12              MR. WHALEN:  Thank you, your Honor.  No objection,

13  your Honor.

14              THE COURT:  Okay.  59 will be admitted.

15              MS. RATTAN:  May we publish it, your Honor?

16              THE COURT:  Yes, you may.

17              MS. RATTAN:  Let's look at Government's

18  Exhibit 59, page 1.

19              CONTINUED DIRECT EXAMINATION OF ALICIA MOLINA

20  BY MS. RATTAN:

21  Q.  Ms. Molina, you said you're a notary public in

22  Carrollton, Texas.  And this is a document that you

23  notarized; is that right?

24              This is the first page of Government's Exhibit 59.

25  It is the Last Will and Testament of James E. Seegan; is

 1    that right?

 2    A.  Yes.

 3    Q.  Let me show you now -- that's just the first page.

 4          So let's look at the notary stamp which is

 5    Government's Exhibit 59, page 8, that you identify.  And is

 6    that your stamp there?

 7    A.  Yes.

 8    Q.  And then that's your signature right there?

 9    A.  Yes, that's correct.

10    Q.  And this is on April 8th of 2019; is that correct?

11    A.  That's correct.

12    Q.  Now, tell us what procedure -- you explained it a

13    little bit just now.  What procedure do you follow when

14    someone comes in to have you notarize something?

15    A.  Okay.  I ask them to show me their proof of identity,

16    that should be like a photo -- with a photograph,

17    unexpired.

18          And then I look at the name on the ID and then

19    look at the name of the signature name that they are going

20    to sign.

21          I tell them to sign in front of me, and I record

22    the signature on my book.

23    Q.  And that's what you do every time?

24    A.  Yes.

25    Q.  And that's what you did this time; is that right?

 1  A.  Yes.

 2  Q.  And this was signed on April 8th of 2019 and the person

 3  whose signature you witnessed was James E. Seegan; is that

 4  right?  James E. Seegan.

 5  A.  Yes.  Yes.

 6  Q.  And this was the document that they brought to you to

 7  be notarized; is that right?

 8  A.  Yes, that's the -- they were -- they brought me the

 9  document, yes.

10          MS. RATTAN:  I'll pass the witness, your Honor.

11          THE COURT:  Cross-examination?

12          MR. WHALEN:  Can you bring up 59, please.

13          THE WITNESS:  I couldn't hear you -- oh, okay.

14          MR. WHALEN:  We can go to the last page.

15              CROSS-EXAMINATION OF ALICIA MOLINA

16  BY MR. WHALEN:

17  Q.  Ms. Molina, do you -- did you -- you checked the ID,

18  but did you keep your book?

19  A.  Yes.

20  Q.  Okay.  Did you -- when we say "keep the book," you have

21  a notary book; is that correct?

22  A.  Yes.

23  Q.  Okay.  And you have -- you write in the person's name

24  who appeared before you, the form of identification; is

25  that correct?

1   A.  That's correct.

2   Q.  And then you have them sign your book; is that correct?

3   A.  That's correct.

4   Q.  Okay.  And I noticed that on the page, there's two

5   witnesses to the will, a Lawrence Ahee and a Rosalinda

6   Gomez.

7           Do you see that on the screen?

8   A.  Yes.

9   Q.  Do you get their IDs as well and have them sign the

10  book?

11  A.  Yes.  I have both persons sign my book.  And Rosalinda

12  is one of my associates at the office, and I have her ID

13  also.

14  Q.  Okay.  So Rosalinda is a -- Ms. Gomez is an associate

15  at your office, and she acted as a witness; is that

16  correct?

17  A.  Yes, just -- she does the same thing that I did, just

18  look at the person and see them sign the document.

19  Q.  Okay.  And other than the fact that your notary stamp

20  is on here, do you remember anything about this

21  interaction?

22  A.  No.  It was long time ago.

23  Q.  No, I understand.

24          All right.  Thank you.

25          MR. WHALEN:  Pass the witness.

1          THE COURT:  Anything further?

2          MS. RATTAN:  No, your Honor.

3          THE COURT:  Can this witness be fully excused?

4          MS. RATTAN:  Yes, please.

5          THE COURT:  Ma'am, you are free to leave.  Thank

6   you.

7          What's next?

8          MS. RATTAN:  The United States calls John Cosenza.

9          THE COURT:  Sir, if you'll raise your right hand

10  to be sworn in.

11         (The oath is administered to the witness.)

12         THE COURT:  Go ahead and proceed.

13         MS. RATTAN:  Thank you, your Honor.

14              DIRECT EXAMINATION OF JOHN COSENZA

15              CALLED ON BEHALF OF THE GOVERNMENT

16  BY MS. RATTAN:

17  Q.  Please state your name.

18  A.  John Cosenza.

19  Q.  Will you spell it, please.

20  A.  C-O-S-E-N-Z-A.

21  Q.  Mr. Cosenza, what do you do for a living?

22  A.  I'm an attorney.

23  Q.  How long have you been practicing law?

24  A.  2003 in Texas.

25  Q.  And what type of law do you practice?  What do you do?

     1   A.  Wills and trust, estate planning.

     2   Q.  Well, let me direct your attention.  On the stand in

     3   front of you there is a notebook and there is a tab and at

     4   the bottom of each page it says "59," "059."  That's

     5   Government's Exhibit Number 59.

     6           Do you see it?

     7   A.  Yes, ma'am.

     8   Q.  And I don't believe this is a will that you prepared,

     9   but I want to ask you some questions about it.  If you'll

    10   look at page 8 of Government's Exhibit Number 59.

    11           MS. RATTAN:  If we can publish that, your Honor?

    12           THE COURT:  Yes.

    13           MS. RATTAN:  Government's Exhibit 59, page 8.

    14   BY MS. RATTAN:

    15   Q.  Do you recognize this name, James E. Seegan?

    16   A.  Yes, I do.

    17   Q.  And he's listed here as the person who signed this; is

    18   that correct?

    19   A.  Yes.

    20   Q.  And it appears to have been signed on April 8th of

    21   2019, and then we've got the notary and the witnesses who

    22   were witnessing it; is that correct?

    23   A.  Yes.

    24   Q.  So this is pretty standard in wills and trusts and

    25   estates in Texas; is that right?

1   A.   Yeah.   That's a self-proving affidavit that should be

2   on every will.

3   Q.   Okay.   So let's look at Government's Exhibit 59,

4   page 1.   This is the Last Will and Testament of James E.

5   Seeing; is that right?

6   A.   Yes.

7   Q.   And it says that his wife's name is Sakdida Seegan and

8   that he has one son; is that right?

9   A.   Yes.

10  Q.   Now, in this will -- let me direct your attention to

11  page 3 of Government's Exhibit 59, page 3.   It talks about

12  executor and trustee appointments, and this is Article VI,

13  A.

14          Here it says -- and this is as of April 8th of

15  2019 -- "Executor and Trustee.   I appoint my friend, Keith

16  Ashley, to be Independent Executor of my Will and estate

17  and Trustee of all trusts created by my Will.   If Keith

18  Ashley fails to qualify, dies, resigns, becomes

19  incapacitated, or otherwise ceases to serve, I appoint my

20  nephew, Kerby K. Keller, to be Independent Executor of my

21  Will and estate and Trustee of all trusts created by my

22  Will."

23          So tell us what's going on here.   What's

24  happening?

25  A.   In his will he decided to name his friend as his

1   executor to handle his estate upon his death.

2   Q.  And that would be Keith Ashley; is that right?

3   A.  Yes.

4   Q.  And is it only if Keith Ashley becomes unavailable or

5   incapacitated that the second person would step in?

6   A.  Exactly.

7   Q.  So he has to resign or somehow become incapacitated

8   before the second person steps in?

9   A.  Yes.

10  Q.  So this is as of April 8th of 2019?

11  A.  Correct.

12  Q.  The date of the will.

13          MS. RATTAN:  And then if we can look at

14  Government's Exhibit 59, page 4, right here in the middle,

15  "Executor and Trustee Powers."

16  BY MS. RATTAN:

17  Q.  "Each Executor and Trustee" -- and that's going to be

18  Keith Ashley according to this will; is that right?

19  A.  Yes.

20  Q.  -- "shall, to the extent permitted by law, act

21  independently and free from the control of any court as to

22  my estate and as to every trust established under this Will

23  (as to all of the property of my estate and all of the

24  property of every trust created under this Will)."

25          So what's going on here?

1   A.   It's an independent clause.  It means that the

2   administrator of the estate or of the trust can act

3   independently.  It saves a lot of time when you're dealing

4   with the estate in probate or if it's in a trust to be able

5   to act without having to get permission from everybody.

6   Q.   Okay.  And in this case who is it who is going to have

7   to act without getting permission from anybody?

8   A.   The named executor.

9   Q.   And who is the executor?  Was that Keith Ashley?

10  A.   Mr. Ashley, yes.

11  Q.   Now, this is the will, James Seegan's will.  And that

12  is his will as of April of 2019; is that right?

13  A.   Yes.

14  Q.   Now let me direct your attention on the stand in front

15  of you to Government's Exhibit Number 60.

16          And if you look to the last page, Government's

17  Exhibit 60, page 22, I'll ask you if you recognize your

18  signature.

19  A.   Yes.  That is my signature and my notary stamp.

20          MS. RATTAN:  We'll offer, your Honor, Government's

21  Exhibit Number 60.

22          MR. WHALEN:  No objection, your Honor.

23          THE COURT:  60 will be admitted.

24          MS. RATTAN:  And may we publish Government's

25  Exhibit 60?

1              THE COURT:  Yes, you may.

2    BY MS. RATTAN:

3    Q.  So this is page 1 of Government's Exhibit Number 60.

4    Can you explain to us what your involvement with this

5    document was?

6    A.  Yes.  He asked me to create a trust for him to handle

7    his estate, and I created it according to his wishes.

8    Q.  And what did you create?  What happens here in this

9    document?

10   A.  So, you know, in the typical estate plan, the trust and

11   will can work together; or they can work separately.  In

12   this case this was a trust to handle any assets that will

13   go into the trust in the future or that he wants to put in

14   to allow that asset to transfer without probate.

15   Q.  So could you make a life insurance policy the

16   beneficiary of a trust -- a trust a beneficiary of a life

17   insurance policy?

18   A.  Yes.

19   Q.  That's possible.

20          So if the beneficiary of a life insurance policy

21   is the trust, then who would control the money from the

22   life insurance?

23   A.  The trustee in the trust controls it, but they control

24   it for the benefit of the beneficiary.

25          MS. RATTAN:  Okay.  And if we can look at page 22.

 1    BY MS. RATTAN:

 2    Q.  You said that you're the one who prepared this and you

 3    recognize this as being your signature and your notary

 4    stamp?

 5    A.  Yes.

 6    Q.  And then this was on April 16th of 2019?

 7    A.  Yes.

 8    Q.  And let's look, if we can, about what the powers and

 9    trustee appointments are in this document.

10          MS. RATTAN:  If we can look on page 5,

11    Government's Exhibit 60, page 5.

12    BY MS. RATTAN:

13    Q.  At the very bottom it talks about the trustee

14    appointments.  So it says "Trustee Appointments."

15          "Article V, Trustee Appointments.

16          "A, Successor Trustee.  If James E. Seegan dies,

17    resigns, becomes incapacitated, or otherwise ceases to

18    serve as Trustee of a trust created under this Trust

19    Agreement, then KEITH ASHLEY shall become Trustee of such

20    trust."

21          Then if Keith Ashley fails to qualify, dies or

22    resigns, then it would be Mr. Seegan's nephew, Kerby

23    Keller; is that right?

24    A.  Yes.

25    Q.  Okay.  So Mr. Seegan is in charge of the trust; is that

 1   right?

 2   A.  He is the trustee.

 3   Q.  And if anything happens, if he dies, who becomes in

 4   charge of the trust?

 5   A.  Keith Ashley.

 6   Q.  So that will be Keith Ashley.

 7          And then let's look at the powers of the trustee.

 8          MS. RATTAN:  If we can look at page 6 of

 9   Government's 60, paragraph D.

10   BY MS. RATTAN:

11   Q.  (As read):  "Expenses and Compensation.  Every Trustee

12   shall be reimbursed for the reasonable costs and expenses

13   incurred in connection with the Trustee's duties."

14          So what's going on here?

15   A.  You know, being a trustee can be a lot of work; and you

16   want to make sure there's clauses in there to make sure

17   your trustee is taken care of.

18   Q.  And that's one of those?

19   A.  Yes.  Pretty standard.

20          MS. RATTAN:  And then if we can look at

21   Government's Exhibit 60, page 10, the Trustee Provisions.

22   BY MS. RATTAN:

23   Q.  These are the powers of the trustee.  The trustee will

24   have the -- "all of the powers and authorities conferred

25   upon trustees by statute."

1              And then it lists the power that the trustee has;

2    is that right?

3    A.  Yes.

4    Q.  To retain, without liability for any depreciation or

5    loss, any property; to exchange, sell, or lease for cash,

6    any property or credit; to borrow money from any source,

7    including the trustee, and to mortgage or pledge any other

8    manner encumbered the assets; to invest and reinvest each

9    of the trust estates in any kind of property whatsoever,

10   real or personal.

11             So these are the powers that the trustee is going

12   to have; is that right?

13   A.  Yes.

14             MS. RATTAN:  And if we can look at the next page,

15   Government's Exhibit 60, page 11.

16   BY MS. RATTAN:

17   Q.  The trustee --

18             MS. RATTAN:  If we can just back out.

19   BY MS. RATTAN:

20   Q.  The trustee is going to be able to employ attorneys,

21   register any securities, enter into any transaction on

22   behalf of the trust, including making any loans.  Anything

23   that needs to be done, the trustee is going to be in charge

24   and responsible; is that right?

25   A.  Yes.

1  Q.  And it's going to be up to the trustee's discretion to

2  make any distributions; is that right?

3  A.  Yes, depending on the continuing trust clause in there.

4         But pretty much this gives broad powers unless,

5  you know, the person wanting to write it decides to ask

6  that some powers get eliminated.  But the default is pretty

7  much you give everybody full power, and this is what this

8  did.

9  Q.  Okay.  So when James Seegan died, Keith Ashley was

10  going to have -- and I think the term you used was "full

11  power."

12  A.  Yeah.  He would control the trust.

13  Q.  Okay.

14         MS. RATTAN:  And then if we can look at

15  Government's Exhibit 60, page 13.

16  BY MS. RATTAN:

17  Q.  And as you say, he can lend money, he can invest the

18  trust assets.  He can do all these things; is that right?

19  A.  Yes.

20         MS. RATTAN:  Page 14.

21  BY MS. RATTAN:

22  Q.  He's going to be able to invest and reinvest all or

23  part of the assets of any of the trust, open and maintain

24  margin accounts or similar accounts with brokerage firms,

25  continue any business that's going on.

```
  1            MS. RATTAN:  And if you page down?
  2   BY MS. RATTAN:
  3   Q.  He can execute leases -- execute a lease.
  4            Anyway, pages 10 through 15 of this document talk
  5   about the enormous power that the trustee has over the
  6   trust.  Is that fair to say?
  7   A.  Yes.  It gives some pretty broad powers.
  8   Q.  And I think, as you said, it would be full control?
  9   A.  Correct.
 10   Q.  And in this instance James Seegan did die, and it was
 11   on February 19th of 2020; is that right?
 12   A.  I was not notified of his death, so I do not know the
 13   exact date.
 14   Q.  But you know he's died?
 15   A.  Yes, I do.
 16   Q.  And upon his death, who would be in full control of his
 17   estate?
 18   A.  That would be Mr. Ashley's job to administer anything
 19   that's in the trust.
 20            MS. RATTAN:  I'll pass the witness.
 21            THE COURT:  Cross-examination?
 22            CROSS-EXAMINATION OF JOHN COSENZA
 23   BY MR. WHALEN:
 24   Q.  Mr. Cosenza, good afternoon.  I'm James Whalen.  I
 25   represent Mr. Ashley.
```

1    A.  Good afternoon.

2    Q.  You said you've practiced law in Texas since 2003.  Did

3    you practice law in another state?

4    A.  I was licensed in another state but never practiced.

5    Q.  Okay.

6           MR. WHALEN:  If we can go to see Exhibit 59,

7    please.

8    BY MR. WHALEN:

9    Q.  If you look at Exhibit 59, that's the will, correct?

10   A.  Yes.

11   Q.  Okay.  In the Disposition of Property -- when you look

12   at the section called "Disposition of Property," does

13   the -- does this will -- if there is property that's not in

14   the trust, anything in the will goes into the trust?  Is it

15   a pour-over will?  Is that term right?

16   A.  Yeah, it's meant to be a pour-over will; but it can be

17   used stand-alone also.

18   Q.  Okay.  So either -- so if property is not put into the

19   trust, if the trust isn't funded, then there is nothing to

20   manage, correct?

21   A.  Yeah.  A trust is only as valuable as how it's used, if

22   it's funded, if it's used as a beneficiary, et cetera.

23   Q.  Okay.

24           MR. WHALEN:  We can go to page 2.

25                              *

1    BY MR. WHALEN:

2    Q.  Okay.  If we look at Article V, Contingent

3    Beneficiaries, what does it mean to be a beneficiary of a

4    will?

5    A.  That's who gets the money from the estate.

6    Q.  Okay.  And in page 2 there's three paragraphs there.

7    Who gets -- who are the beneficiaries of the will?

8    A.  40 percent to his wife, 40 percent to his son, and

9    20 percent to his nephew.

10   Q.  Okay.  And is Mr. Ashley ever mentioned in this will as

11   a beneficiary?

12   A.  No.

13   Q.  Okay.

14          MR. WHALEN:  If we can go to -- well, if we go

15   down to the next page, please.

16   BY MR. WHALEN:

17   Q.  On the executor and trustee he named Mr. Ashley; but he

18   also appointed his nephew, Kerby Keller, correct?

19   A.  Yes.

20   Q.  Okay.  How many wills and trusts have you done in your

21   practice?

22   A.  I mean, well over a thousand.

23   Q.  Okay.  Is it standard, if you're going to name somebody

24   as a trustee or a standby trustee or a guardian of your

25   kids, that you talk to them ahead of time and let them know

1  that you would like to name them?

2  A.  Conceivably, yes, you should.  I mean, I've seen people

3  not; but you should be having those conversations with your

4  people.

5  Q.  Okay.  Because you want to make sure that they're

6  willing to accept the appointment and willing to act in

7  that capacity, correct?

8  A.  Yes.  I mean, it would be worthless if you had somebody

9  who wouldn't act.

10  Q.  Okay.  And so when we look at the bottom in

11  Article VII, Guardian Provisions, he's named Kerby Keller

12  as a guardian for his son if he were to die after his wife;

13  is that correct?

14  A.  Yes.

15  Q.  Okay.  So is it fair to say that if you are going to

16  name a guardian to your kids, you'd want to let that person

17  know I want you to watch my kids if something happens to

18  me?

19  A.  Yes.  They would need to know because, you know, you

20  don't want the kids to be taken into County custody or

21  whatever, I mean, be able to get the kids right away

22  before, you know, you have to wait for probate.

23  Q.  Okay.  Well, and talk about when we -- the way the will

24  is designed and the trust is designed to avoid probate.

25  Why is it done -- why do we want to avoid probate?

1   A.  People are scared of probate.  It costs money.  It

2   costs time.  In some cases probate is good.  But in most

3   cases if you can do an estate plan to avoid it, it saves a

4   lot of steps, makes things easier.

5   Q.  Okay.

6          MR. WHALEN:  We can go to Exhibit 60.

7   BY MR. WHALEN:

8   Q.  Okay.  When we look at the trust, it has the

9   distributions, correct, on the first page, Exhibit 60?

10  A.  It should be page 3.

11  Q.  Okay.  Okay.  Page 3, beneficiaries of the trust.  Who

12  is the first beneficiary of the trust?

13  A.  It matches the will.

14  Q.  Okay.

15  A.  First one is his wife.

16  Q.  Second one is his son; and on page 4 is Mr. Keller,

17  correct?

18  A.  Yes.

19  Q.  Okay.  Now, when you executed this will for Mr. Seegan,

20  do you recall that interaction at all?

21  A.  Yes and no.  I mean, it wouldn't be a perfect

22  recollection; but there is things I specifically remember.

23  Q.  Okay.  Did he come by himself?

24  A.  I actually went to his home.

25  Q.  You went to his home.

 1            Was his wife home?

 2   A.  Not on that first -- not on the first meeting when we

 3   met.

 4   Q.  Okay.  Did you meet his wife?

 5   A.  I think at some point I might have barely met his wife,

 6   but it was -- all the interaction was with him.  He knew

 7   exactly what he wanted.  It was kind of a slam dunk.

 8   Q.  Okay.  And so you went to his home in Carrollton,

 9   Texas; is that correct?

10   A.  Yes.

11   Q.  Okay.  And you drafted these documents?

12   A.  Yes.

13   Q.  And you went over them with him; is that correct?

14   A.  Yeah, I emailed -- I did a consultation, got all the

15   information.  Then usually I will follow up and email them

16   to him for him to review.

17            Now, once he approves it, then we can talk about

18   executing, you know, assets and so forth.

19   Q.  Okay.  And so you do -- so when did you go to his --

20   how many times did you go to his house, again?

21   A.  At least twice.

22   Q.  Okay.  And at least one of those times, his wife was

23   present?

24   A.  I think.

25   Q.  Okay.  Now let's talk about the trust again.

1   Mr. Ashley is simply the trustee, not the beneficiary of

2   the trust, correct?

3   A.  Correct.

4   Q.  Okay.  And isn't it true -- is it true or not?  If

5   you're named as a trustee, do you have to accept the

6   appointment?

7   A.  No, you don't -- you're not forced to do anything.

8   Q.  Okay.  So is there a proceeding where -- if someone

9   dies with a trust, does the trustee have to execute any

10  documents saying I'm accepting the appointment as a

11  trustee?

12  A.  Not that I'm aware of.

13  Q.  Okay.  Can they execute a document saying they are

14  declining to be the executor or the trustee?

15  A.  Yes.  It's called a revocation.

16  Q.  Okay.  And when somebody does a revocation, that no

17  longer gives them any control over the trust, correct?

18  A.  I mean, if revocation is presented to the bank, to the

19  title company or whatever -- I mean, revocation only means

20  something if it's recorded properly or used properly.

21  Q.  Okay.  If it's provided to an attorney who's handling

22  the estate or probating the estate or helping the family,

23  that would be significant, would it not?

24  A.  Yes, it would be.

25  Q.  Okay.  When somebody becomes a trustee, do they become

1  the owner of the assets; or do they control the assets?

2  What's their ability -- what are their abilities with the

3  assets?

4  A.  They are not the owner.  What their job is to do is to

5  follow the provisions in the trust.  If the trust says that

6  it should be distributed to my beneficiaries or if it

7  should be held in trust for my beneficiaries or -- you

8  know, there's trusts that you do that you're the trustee

9  for life.  You're job -- I mean, you have a lot of power;

10 and your job is to -- it's kind of -- it's administering

11 the estate without being an executor.

12 Q.  Okay.  And I think you said before it's okay to take --

13 for a trustee to be compensated, right?  Is that correct?

14 A.  Yes.

15 Q.  Okay.  And it has to be reasonable, of course, right?

16 A.  Yes.

17 Q.  Okay.  Do you know -- if you know -- whether or not

18 your office or if, in your interaction with Mr. Seegan, he

19 made his wife aware or Mr. Keller aware that he executed

20 these documents?

21 A.  I am not aware.  He was -- he pretty much -- because I

22 asked about his wife.  We talked a little bit about

23 community property and all like that; and he was like, "I

24 handle everything."

25          So I am not where -- I think she knew that he did

 1   it, but I can't a hundred percent say how she knew or when

 2   she knew.

 3   Q.  Okay.

 4         MR. WHALEN:  I'll pass the witness.

 5         THE COURT:  Anything else, Ms. Rattan?

 6         MS. RATTAN:  No, your Honor.

 7         THE COURT:  Can this witness be fully excused?

 8         MS. RATTAN:  Yes, please.

 9         THE COURT:  Okay.  Sir, you are free to go.  Thank

10   you.

11         Well, ladies and gentlemen, there is not a

12   four-minute witness; so we're going to stop for the day.

13   Again, please don't discuss the case among yourself or

14   anyone else.

15         Let me just see counsel just real quick.

16         (Sidebar conference, off the record.)

17         THE COURT:  Okay.  So, ladies and gentlemen,

18   again, please don't discuss the case among yourself or

19   anyone else.  Don't do any outside research.  I'm going to

20   give you a half-hour back.  I think we're going fine on

21   time, so we'll start tomorrow at 9:00.  We always have the

22   option to bring it back to 8:30 if things slow down, but I

23   think we're going at a good pace.  So just be in the jury

24   room before 9:00 and we'll start.

25         I also said I would bake for you so I'm planning

```
 1   on doing that tomorrow night so I'll bring you something on
 2   Thursday.  I told you you would get something and so -- I'm
 3   trying to manage your expectations.  It won't be tomorrow,
 4   but it will be Thursday is my plan.
 5        So have a good evening.  Have a safe drive home,
 6   and we'll see you back tomorrow right before 9:00.  Thank
 7   you.
 8        (The jury exits the courtroom, 4:13 p.m.)
 9        THE COURT:  Anything further from the government?
10        MS. RATTAN:  Yes.  We just want to be clear on
11   something.  I think the Court's order on the government's
12   motion in limine covers this.  But we're going to release
13   the AT&T record custodian; and that relates to Government's
14   Exhibits 4A, 4B, and 95.
15        THE COURT:  The issue -- I mean, I think they have
16   agreed to the records custodian.  Whether they have other
17   objections to the substantive, I don't know about that.
18        But it's true, Mr. Whalen, you are not objecting
19   to the records custodian and they can let that witness go?
20        MR. WHALEN:  Yeah, that's correct.  We may have
21   other objections to the records but not the records
22   custodian.
23        THE COURT:  Okay.  Then very well.
24        What else, Ms. Rattan?
25        MS. RATTAN:  That's all.  Thank you, your Honor.
```

1          THE COURT:  Anything further from defense?

2          MR. WHALEN:  No, your Honor.

3          THE COURT:  Okay.  Well, again, if there are any

4  other issues, just be here before 9:00; but, otherwise,

5  I'll see you back at 9:00.  Thank you.

6          (Proceedings adjourned, 4:14 p.m.)

7  COURT REPORTER'S CERTIFICATION

8          I HEREBY CERTIFY THAT ON THIS DATE, OCTOBER 29,

9  2022, THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD

10  OF PROCEEDINGS.

11

12          ___/s/_____
                CHRISTINA L. BICKHAM, CRR, RDR
13

14

15

16

17

18

19

20

21

22

23

24

25