```
 1                  UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF TEXAS
 2                       SHERMAN DIVISION

 3    UNITED STATES OF AMERICA      |  DOCKET 4:20-CR-318
                                    |
 4                                  |  SEPTEMBER 28, 2022
      VS.                           |
 5                                  |  9:03 A.M.
                                    |
 6    KEITH TODD ASHLEY            |  SHERMAN, TEXAS

 7    ----------------------------------------------------------

 8           VOLUME 3 OF 8, PAGES 540 THROUGH 822

 9           REPORTER'S TRANSCRIPT OF JURY TRIAL

10        BEFORE THE HONORABLE AMOS L. MAZZANT, III,
            UNITED STATES DISTRICT JUDGE, AND A JURY
11    ----------------------------------------------------------

12
      FOR THE GOVERNMENT:     HEATHER HARRIS RATTAN
13                            JAY COMBS
                              U.S. ATTORNEY'S OFFICE - PLANO
14                            101 E. PARK BOULEVARD, SUITE 500
                              PLANO, TX 75074
15
                              JASON FINE
16                            DALLAS COUNTY D.A.'S OFFICE
                              133 N. RIVERFRONT BOULEVARD
17                            DALLAS, TX 75207

18
      FOR THE DEFENDANT:      JAMES P. WHALEN
19                            RYNE THOMAS SANDEL
                              WHALEN LAW OFFICE
20                            9300 JOHN HICKMAN PKWY, SUITE 501
                              FRISCO, TX 75035
21

22    COURT REPORTER:         CHRISTINA L. BICKHAM, CRR, RDR
                              FEDERAL OFFICIAL REPORTER
23                            101 EAST PECAN
                              SHERMAN, TX 75090
24

25        PROCEEDINGS RECORDED USING MECHANICAL STENOGRAPHY;
       TRANSCRIPT PRODUCED VIA COMPUTER-AIDED TRANSCRIPTION.
```

1                                INDEX

2

3                                                          PAGE

4     JOHN ALEXANDER MCCLELLAN, II
          DIRECT EXAMINATION BY MS. RATTAN             545
5         CROSS-EXAMINATION BY MR. SANDEL              553

6     JASON RENNIE
          DIRECT EXAMINATION BY MS. RATTAN             560
7         CROSS-EXAMINATION BY MR. WHALEN              605
          REDIRECT EXAMINATION BY MS. RATTAN           622
8         RECROSS-EXAMINATION BY MR. WHALEN            627

9     JENNIFER LYNN JENNINGS
          DIRECT EXAMINATION BY MS. RATTAN             629
10        CROSS-EXAMINATION BY MR. WHALEN              639
          REDIRECT EXAMINATION BY MS. RATTAN           643
11        RECROSS-EXAMINATION BY MR. WHALEN            647

12    RACHEL APPEL
          DIRECT EXAMINATION BY MS. RATTAN             648
13        CROSS-EXAMINATION BY MR. WHALEN              654

14    PAULA DIAZ
          DIRECT EXAMINATION BY MS. RATTAN             659
15        CROSS-EXAMINATION BY MR. WHALEN              664

16    JENNIFER BAUMAN
          DIRECT EXAMINATION BY MS. RATTAN             667
17        CROSS-EXAMINATION BY MR. WHALEN              673

18    COURTNEY JACOBSON
          DIRECT EXAMINATION BY MS. RATTAN             677
19        CROSS-EXAMINATION BY MR. WHALEN              707
          REDIRECT EXAMINATION BY MS. RATTAN           718
20
      JASON RENNIE
21        DIRECT EXAMINATION BY MS. RATTAN             720
          CROSS-EXAMINATION BY MR. WHALEN              732
22        REDIRECT EXAMINATION BY MS. RATTAN           738
          RECROSS-EXAMINATION BY MR. WHALEN            742
23        FURTHER REDIRECT EXAMINATION BY MS. RATTAN   743

24

25

1   SAKDIDA SEEGAN
        DIRECT EXAMINATION BY MR. FINE              744
2       CROSS-EXAMINATION BY MR. SANDEL             786
        REDIRECT EXAMINATION BY MR. FINE            807
3       RECROSS-EXAMINATION BY MR. SANDEL           809

4   BRETT LEATHERMAN
        DIRECT EXAMINATION BY MS. RATTAN            812
5       CROSS-EXAMINATION BY MR. WHALEN             820

6   COURT REPORTER'S CERTIFICATION                  822

7

8

9                          INDEX OF EXHIBITS

10                                                 PAGE

11   Government's Exhibit 8A                         562

12   Government's Exhibit 47                         567

13   Government's Exhibit 45B                        568

14   Government's Exhibit 47                         569

15   Government's Exhibit 8A                         569

16   Government's Exhibits 20, 21, 22, and 23        575

17   Government's Exhibit 20                         576

18   Government's Exhibit 21                         576

19   Government's Exhibit 47                         576

20   Government's Exhibit 22                         577

21   Government's Exhibit 23                         578

22   Government's Exhibit 55                         578

23   Government's Exhibit 56A                        579

24   Government's Exhibit 47                         580

25   Government's Exhibit 52A                        581

 1    Government's Exhibit 52B                          582

 2    Government's Exhibit 52C                          582

 3    Government's Exhibit 52D                          583

 4    Government's Exhibit 44B                          586

 5    Government's Exhibit 47                           587

 6    Government's Exhibit 56A                          588

 7    Government's Exhibit 56B                          589

 8    Government's Exhibits 14A, 35, and 36            591

 9    Government's Exhibit 35                           592

10    Government's Exhibit 14A                          594

11    Government's Exhibit 36                           597

12    Government's Exhibit 109                          600

13    Government's Exhibit 59                           601

14    Government's Exhibit 60                           603

15    Government's Exhibit 47                           608

16    Government's Exhibit 52A                          610

17    Government's Exhibit 59                           614

18    Government's Exhibit 60                           617

19    Government's Exhibit 52A                          624

20    Government's Exhibit 52B                          627

21    Government's Exhibits 62 and 63 and 72 and 73    631

22    Government's Exhibit 62                           632

23    Government's Exhibits 72 and 73                   635

24    Government's Exhibit 71                           643

25    Government's Exhibits 63 and 64                   650

| | | |
|---|---|---|
| 1 | Government's Exhibit 71 | 653 |
| 2 | Government's Exhibits 65 and 66 | 661 |
| 3 | Government's Exhibit 71 | 663 |
| 4 | Government's Exhibit 66 | 663 |
| 5 | Government's Exhibits 74 and 75 | 669 |
| 6 | Government's Exhibit 75 | 679 |
| 7 | Government's Exhibit 71 | 682 |
| 8 | Government's Exhibit 29A | 689 |
| 9 | Government's Exhibit 71 | 695 |
| 10 | Government's Exhibit 71 | 710 |
| 11 | Government's Exhibit 29A | 713 |
| 12 | Government's Exhibit 76 | 718 |
| 13 | Government's Exhibit 68 | 720 |
| 14 | Government's Exhibit 69 | 721 |
| 15 | Government's Exhibits 4A and B | 726 |
| 16 | Government's Exhibit 66 | 729 |
| 17 | Government's Exhibit 4A and B | 730 |
| 18 | Government's Exhibit 132 | 738 |
| 19 | Government's Exhibit 4B | 740 |
| 20 | Government's Exhibit 132 | 741 |
| 21 | Government's Exhibits 77 and 78 | 767 |
| 22 | Government's Exhibit 68 | 779 |
| 23 | Government's Exhibit 68 | 791 |
| 24 | Government's Exhibits 91A and 91B | 809 |
| 25 | 91B | 817 |

```
 1              (Open court, defendant present, jury present.)

 2              THE COURT:  Please be seated.

 3              Welcome back, ladies and gentlemen.  I hope you

 4   had a good evening.

 5              And let me ask the government for their next

 6   witness.

 7              MS. RATTAN:  Your Honor, the United States calls

 8   John McClellan.

 9              THE COURT:  Sir, if you'll raise your right hand

10   and be sworn in.

11              (The oath is administered to the witness.)

12              THE COURT:  Okay.  Go ahead and proceed.

13          DIRECT EXAMINATION OF JOHN ALEXANDER McCLELLAN, II

14                 CALLED ON BEHALF OF THE GOVERNMENT

15   BY MS. RATTAN:

16   Q.  Please state your name.

17   A.  John Alexander McClellan, II.

18   Q.  The acoustics in here are bad and it may be awkward,

19   but we need you to speak directly into the microphone as

20   much as you can.

21   A.  Sure.  Is that better?

22   Q.  Much better, thank you.

23              State your name, please.

24   A.  John Alexander McClellan, II.

25   Q.  Will you spell your first and last -- well, John,
```

1  J-O-H-N?

2  A.  Yes.

3  Q.  Okay.  And your last name?

4  A.  McClellan, M-C-C-L-E-L-L-A-N.

5  Q.  Mr. McClellan, can you tell the jury where you work?

6  A.  I work at Parkland Securities in Ann Arbor, Michigan.

7  Q.  And what is Parkland Securities?

8  A.  Parkland is an investment firm, so a broker dealer that

9  offers securities to investing clients.

10  Q.  And will you tell us what your background, your

11  education and training is that qualify you for your

12  position there at Parkland?

13  A.  Yes.  I have a degree in finance from Western Michigan

14  University.  I passed several examinations in our industry,

15  known as a Series 7, Series 24, Series 53.  And I have the

16  certified regulatory compliance professional designation.

17  It is a three-year program with Wharton Business School and

18  FINRA.

19        And I started -- I've been at Parkland since 2002

20  when it started, and I became chief compliance officer in

21  2007.

22  Q.  And you said that you have different series of

23  licenses.  What is a series?  What does that mean?

24  A.  Those are examinations offered by our regulator to

25  allow people to either offer securities, different

1   securities products, or to supervise people who do offer

2   those securities products.

3   Q.  And as chief compliance officer, what does that mean?

4   What do you do?

5   A.  So I oversee the firm from a rules and regulations

6   standpoint.  I have a team of employees who are compliance

7   officers who try to ensure that our financial advisors all

8   sell securities to the investing public and do it

9   accordingly to rulings and regulations.

10  Q.  Follow the rules.

11  A.  Correct.

12  Q.  Let's go back to where you work, Parkland Securities,

13  and let's talk about what the investment products are.

14          What does Parkland Securities do?

15  A.  Parkland Securities offers a wide range of investments,

16  so similar to other bigger firms that people might have

17  heard of like Morgan Stanley or Merrill Lynch or Raymond

18  James.  But generally mutual funds, annuities, stocks,

19  bonds are the main products that we offer.

20  Q.  Has there been a product that Parkland Securities

21  offered that was called the SmartTrust UIT?

22  A.  Yes.

23  Q.  What was that?

24  A.  A UIT is a unit investment trust.  It's a type of

25  investment similar to a mutual fund that is a basket of

 1  securities that tracks an index.

 2  Q.  Let me talk to you about the name Keith Ashley.

 3          Are you familiar with the name Keith Ashley?

 4  A.  Yes.

 5  Q.  And are you familiar with Keith Ashley and his

 6  relationship with Parkland Securities?

 7  A.  Yes.

 8  Q.  Will you describe that for the jury?

 9  A.  Mr. Ashley was one of our financial advisors with

10  Parkland.

11  Q.  When you say a "financial advisor," what do you mean by

12  that?

13  A.  So he was an independent contractor with Parkland, and

14  he was licensed to offer securities to his clients through

15  Parkland.

16  Q.  How do you become an independent contractor with

17  Parkland?  What would he have had to do?

18  A.  He would have had to have passed a FINRA examination

19  like I mentioned, a Series 6 or a Series 7 exam, and then

20  apply for application with Parkland Securities.

21  Q.  And did he do that?

22  A.  Yes.

23  Q.  What licensure did he have?

24  A.  The Series 6.

25  Q.  And around when was it that he became a licensed

 1   agent/broker with Parkland Securities?

 2   A.  In 2002.

 3   Q.  Now, Keith Ashley is a licensed broker with Parkland

 4   Securities, and that would be in 2018, 2019, 2020, all the

 5   way from 2002; is that right?

 6   A.  Correct.

 7   Q.  And at some point during that time period, one of the

 8   products that Parkland Securities sold was a

 9   SmartTrust UIT; is that right?

10   A.  That's right, yes.

11   Q.  Would there have been paperwork associated with the

12   SmartTrust UIT explaining what it was?

13   A.  Yes.

14   Q.  And would the brokers, Keith Ashley, have been able to

15   show a client that paperwork?

16   A.  Yes.

17   Q.  And that could be used to solicit an investment; is

18   that right?

19   A.  Correct.

20   Q.  Can a broker ever guarantee or promise a rate of return

21   to an investor?

22   A.  No.

23   Q.  Explain that to us.  Why not?

24   A.  One of the tenets, one of the main rules of our

25   industry is that you can never promise a client a

 1  guaranteed rate of return.  The stock market, as I think

 2  most people know, is very volatile, or it can be volatile

 3  and so investments that we offer are subject to risk and,

 4  therefore, we can't offer a guarantee on a return.

 5  Q.  Now, if a client gives money to a broker, gives money

 6  to one of your independent contractors, how should the flow

 7  of money work if it's a legitimate transaction?

 8  A.  So if a transaction is consummated -- so if an

 9  investment is sold to a client, the client would write a

10  check payable to a qualified custodian, so like -- we use

11  National Financial Services, so they write the check

12  payable to National Financial Services.

13  Q.  So the check should say "Pay to the order of National

14  Financial Services"?

15  A.  Correct.

16  Q.  Because that's the trust account that Parkland

17  Securities uses; is that right?

18  A.  Yes.

19  Q.  Now, would a licensed broker with Parkland who is

20  marketing any of your products, a SmartTrust UIT, ever --

21  should a licensed broker ever accept money and put it into

22  their personal account, their business account, anything

23  like that?

24  A.  No.

25  Q.  The only place that the money should go would be to

```
 1   Parkland Securities' trust account?
 2   A.  The only place would be -- yeah.  So a check can't even
 3   be made payable to Parkland.  It needs to be made payable
 4   to the custodian, which is National Financial.
 5   Q.  Now we're talking about a check.  What about a wire
 6   transfer?  How would that work?
 7   A.  The same way.  A wire could only be made -- the
 8   recipient could only be National Financial.
 9   Q.  Okay.  So if a client is investing money and it's
10   someone that Keith Ashley has solicited, should it go to
11   "Pay to the order of KBKK"?
12   A.  No.
13   Q.  Is that even an account that you recognize?
14   A.  No.
15   Q.  So no money should be going to KBKK?
16   A.  Correct.
17   Q.  Well, let me ask you about alternative investments.
18   What is that?
19   A.  Alternative investments are generally known as a more
20   risky investment.  They're generally a liquid and it's for
21   high-risk customers, offered by financial advisors with a
22   Series 7 license and there is generally higher requirements
23   for customers to have before they can buy them.
24   Q.  Was your broker, Keith Ashley, authorized to even sell
25   alternative investments?
```

1    A.  No.

2    Q.  Explain that to us.

3    A.  So Mr. Ashley had the Series 6 license, which is not

4    appropriate for that type of investment.  You would need a

5    Series 7 license to offer an alternative investment.

6    Q.  Now, what about communication between your brokers and

7    the potential clients or the clients?  What sort of

8    interaction do you expect?

9         Are your brokers permitted to text with potential

10   clients or clients?

11   A.  No.

12   Q.  And explain that to the jury.  Why should they not be

13   texting?

14   A.  So we have a requirement as an investment firm that we

15   monitor and retain all electronic communications with our

16   advisors and their clients.  And so we do allow email

17   because we're able to monitor and capture and retain email,

18   but text messages were not a permissible communication

19   method for that reason.

20   Q.  So the money, whether it's a check or a wire or cash,

21   should always go to National Financial Services?

22   A.  Yes.

23   Q.  A legitimate broker should never be texting with a

24   client or a potential client?

25   A.  Correct.

```
 1              MS. RATTAN:  I'll pass the witness, your Honor.
 2              THE COURT:  Cross-examination?
 3         CROSS-EXAMINATION OF JOHN ALEXANDER McCLELLAN, II
 4    BY MR. SANDEL:
 5    Q.  Mr. McClellan, how are you?  Good morning.
 6    A.  Good morning.
 7    Q.  My name is Ryne Sandel, and I represent Keith Ashley in
 8    this case.
 9              You just spoke with Ms. Rattan about Mr. Ashley;
10    and I believe you said he was an independent contractor,
11    correct?
12    A.  Correct.
13    Q.  Do you know how many independent contractors Parkland
14    currently employs?
15    A.  Roughly 350.
16    Q.  Okay.  And are those independent contractors all within
17    the state of Texas, or are they kind of all over?
18    A.  They're nationwide.
19    Q.  Nationwide.
20              And where is Parkland centrally located?  Are they
21    a Texas corporation, or are they located somewhere else?
22    A.  Our main office is Ann Arbor, Michigan.
23    Q.  Okay.  Now, when somebody becomes an independent
24    contractor for Parkland, you said that there are certain
25    steps that they have to take, correct?
```

1    A.   Yes.

2    Q.   And once they have passed their exams and they have

3    submitted their application and they become an independent

4    contractor, does Parkland register their information in a

5    database?

6    A.   Yes.

7    Q.   And the information that Parkland registers, is one of

8    those data points the independent contractor's address?

9    A.   Yes.

10   Q.   So where they are located?

11   A.   Yes.

12   Q.   And would it be uncommon for that address to be their

13   home address if they operate out of their home?

14   A.   That's not uncommon.

15   Q.   Another point of data that you would register is the

16   phone number of that independent contractor; is that

17   correct?

18   A.   Yes.

19   Q.   Now, you said that Parkland is required to keep a log

20   of all emails between a financial advisor and their

21   clients, correct?

22   A.   Yes, correct.

23   Q.   Now, I want to talk to you about, I guess, how that

24   happens.  Does Parkland provide them with a specific email

25   address, or does the contractor give you this is the email

 1   address that I use?

 2   A.  Good question.  A combination.

 3          So we provide an email address.  However, if the

 4   registered representative has an email address that they

 5   wish to use and they own that email address, we're able to

 6   register that on our servers and still capture it according

 7   to rules.

 8   Q.  Okay.  So if we see emails between Keith Ashley and his

 9   clients and it doesn't necessarily say it's coming from

10   Parkland.com, that wouldn't be uncommon, correct?

11   A.  That's correct.

12   Q.  Because that would have been an email address that was

13   registered with you that you're still able to capture that

14   information?

15   A.  Correct.

16   Q.  As you sit here today, do you know what email address

17   Mr. Ashley had registered with Parkland Securities?

18   A.  I believe it was northtexasmoney.com.

19   Q.  Okay.  Now, you talked a little bit about financial

20   advisors promising rates of return.  Do you recall those

21   questions?

22   A.  Yes.

23   Q.  Now, my understanding is your testimony says that they

24   are not allowed to guarantee a rate of return.

25          Is that true?

 1   A.   That's true.

 2   Q.   But are financial advisors allowed to give their

 3   clients an estimate of the types of returns they could

 4   expect?

 5   A.   With qualifications, yes.

 6   Q.   Okay.   What sort of qualifications are you referring to

 7   there?

 8   A.   Generally that rates of return are subject to change

 9   and based on fluctuations of the stock market, you know,

10   but certain investment types have different -- you could

11   estimate a rate of return based on that.

12   Q.   And in terms of kind of these certain investment types,

13   it's fair to say that there are certain investments which

14   are more aggressive, right, and certain investments that

15   are more conservative?

16        Is that a fair way to state that?

17   A.   That is fair, yes.

18   Q.   And so maybe on a more aggressive investment, it might

19   have a wider range or a wider estimate of what the return

20   might look like; is that fair?

21   A.   It is, yes.

22   Q.   And then the -- a conservative estimate would be a

23   narrower range; is that fair?

24   A.   Generally, yeah.

25   Q.   Okay.   Now, you talked about the SmartTrust UIT; and I

1    believe you said that's similar to a mutual fund?  Is that

2    what you --

3    A.  That's probably the closest type of investment, yes.

4    Q.  Now, would that be considered -- the UIT, would that be

5    considered a more aggressive or a more conservative type of

6    investment?

7    A.  Somewhere in the middle.

8    Q.  Somewhere in the middle.

9         So it's not a highly aggressive investment, but

10   it's not a very-little-to-no-risk investment; is that fair?

11   A.  That's correct.

12   Q.  Okay.  Now, with the SmartTrust UIT that Parkland

13   offered, you said that there was paperwork that contractors

14   could give to their clients to kind of explain to them what

15   the investment is, right?

16   A.  Yes.

17   Q.  Is them giving that paperwork to the client a

18   requirement, or is it just -- is that a tool that financial

19   advisors have if they want to give the person some more

20   information?

21   A.  The latter.  It's a tool.

22   Q.  So they're not required to give that paperwork.  They

23   can, instead, just have a conversation with their client

24   and explain what it is, correct?

25   A.  Correct.

Jury Trial, Volume 3

1  Q.  Now, if a client decides, hey, I want to invest in this

2  SmartTrust UIT, you said that they would make a check or a

3  wire or money order and that would get paid to National

4  Financial Services?

5  A.  Yes.

6  Q.  Is there additional paperwork that's required that

7  would get sent to Parkland to say this client now owns this

8  UIT?

9  A.  So with those types of investments, you can also just

10  buy them in a brokerage account; so there may not be

11  required paperwork for that.

12  Q.  Okay.  So if a client were to have told Keith Ashley,

13  "Hey, I want to invest in this UIT," other than him saying

14  that and sending the money, there may not have been any

15  additional paperwork that was required?

16  A.  Correct.

17  Q.  We talked about the email capturing and registering an

18  email with Parkland.

19        Is that a requirement of somebody being an

20  independent contractor with Parkland?  You have to agree to

21  that?

22  A.  Can you rephrase the question?

23  Q.  Sure.

24        We talked earlier about your independent

25  contractors can register an email through Parkland.  You

```
 1    remember us talking about that, correct?

 2    A.  Yes.

 3    Q.  And that that is so Parkland can log all of the emails

 4    that are sent from that account, correct?

 5    A.  Correct.

 6    Q.  Now, is that a requirement that Parkland has with all

 7    of their independent contractors where the independent

 8    contractors have to sign something saying we agree that all

 9    of our communications will be through email through this

10    account?

11    A.  Yes.

12    Q.  Okay.  And is that something that exists on a form

13    somewhere that Keith Ashley would have signed?

14    A.  It would have been an attestation, yes.

15    Q.  An attestation, okay.

16           And that would have been part of his initial

17    application through Parkland, correct?

18    A.  Potentially.  You're going back 20 years.  I don't know

19    if it was in then or not.

20           But we have an annual attestation as well where

21    advisors attest every year that they use their compliant

22    email address.

23    Q.  Okay.

24           MR. SANDEL:  Pass the witness, your Honor.

25           THE COURT:  Anything additional?
```

1          MS. RATTAN:  No, your Honor.

2          THE COURT:  Can this witness be fully excused?

3          MS. RATTAN:  Yes, please.

4          MR. SANDEL:  Yes, your Honor.

5          THE COURT:  You are free to leave.  Thank you,

6    sir.

7          Okay.  What's next?

8          MS. RATTAN:  Special Agent Jason Rennie.

9          THE COURT:  Agent, if you'll raise your right hand

10   to be sworn in.

11         (The oath is administered to the witness.)

12         THE COURT:  Go ahead and proceed.

13              DIRECT EXAMINATION OF JASON RENNIE

14              CALLED ON BEHALF OF THE GOVERNMENT

15   BY MS. RATTAN:

16   Q.  Please state your name.

17   A.  Jason Rennie.

18   Q.  And will you spell your name, please.

19   A.  It's J-A-S-O-N R-E-N-N-I-E.

20   Q.  Where do you work?

21   A.  I'm a special agent with the FBI.

22   Q.  And will you tell the jury what your background is that

23   qualifies you to be a special agent with the FBI?

24   A.  I obtained a degree in information systems from The

25   University of Texas at Dallas; and I attended a 21-week

 1   course in Quantico, Virginia, which is the FBI Academy.

 2   And I've been an FBI agent now for 18 years.

 3   Q.  And can you give the jury an overview of your various

 4   assignments within the FBI over the 18 years?

 5   A.  Sure.

 6           I graduated from Quantico in 2005, went to

 7   Chicago, worked organized crime.

 8           I transferred actually to Sherman, Texas.  I spent

 9   about a year and a half in Sherman, Texas, where I worked

10   bank robberies, kidnappings, white-collar crime, violent

11   crime.

12           And then I transferred to a white-collar crime

13   squad in Frisco where I work Ponzi schemes, securities

14   fraud, general white-collar crime matters.

15   Q.  And then that's where you are assigned now; is that

16   right?

17   A.  I am.

18   Q.  And you're the lead agent on this case, *United States*

19   *versus Keith Todd Ashley*?

20   A.  I am.

21   Q.  Let me direct your attention -- yesterday when the

22   representative was testifying from the Branch Banking and

23   Trust bank, an issue came up about the bank having

24   previously been Citibank; is that right?

25   A.  Yes.

1    Q.  And on cross-examination there was a question about

2    whether the wires were actually linked to Keith Ashley's

3    account because the account number on the wires was

4    different from the original signature card; is that right?

5    A.  I recall.

6    Q.  Have you researched that, and can you explain that to

7    the jury?

8    A.  Sure.

9         When the -- when the account was originally

10   opened, it was a Citibank account --

11         MR. WHALEN:  Objection.  It calls for hearsay,

12   your Honor.  It's based on hearsay documents that he may or

13   may not -- he may have reviewed from BB&T.

14         THE COURT:  Okay.  Sustained.

15         MS. RATTAN:  We'll offer Government's Exhibits 8A

16   and 8B -- I believe 8B is already in evidence.  We'll offer

17   Government's Exhibit 8A.

18         THE COURT:  Any objection to 8A?  8B is already

19   admitted.

20         (Off-the-record discussion among counsel.)

21         MR. WHALEN:  Can we approach, your Honor, just

22   briefly?

23         THE COURT:  Yes.

24         (Sidebar conference, off the record.)

25         THE COURT:  So I will go ahead and conditionally

1   admit Exhibit 8A subject to some redactions we'll take care

2   of later.

3            Go ahead and proceed.

4            MS. RATTAN:  Thank you, your Honor.

5   BY MS. RATTAN:

6   Q.  So, Agent Rennie, did you review Government's

7   Exhibit 8A and determine whether, in fact, the account

8   changed account numbers so that the Citi card that we saw

9   with Keith Ashley's name and account number on it was

10  linked to the wires that were displayed before the jury?

11  A.  I did.

12  Q.  And will you explain to the jury what it showed?

13  A.  Sure.

14           Simply, when the account was opened, it was opened

15  under a Citibank name and an account number.  And then my

16  understanding is in the acquisition by BB&T, the

17  transferral of the Citibank assets and Citibank

18  documentation into BB&T documentation, that the account

19  number changed.

20  Q.  So it was the same account.  It was Keith Ashley's

21  account with BB&T?

22  A.  Yes.  Actually, the closing balance of the Citibank,

23  the last Citibank statement, became the opening balance of

24  the new account number.

25           MS. RATTAN:  And if we can publish Government's

1  Exhibit 8B, which was previously admitted; and it's the

2  original signature card for the Citibank.

3  BY MS. RATTAN:

4  Q.  And this is page 1.  So this is the Citibank card that

5  the jury previously saw with the Branch Banking and Trust

6  witness yesterday; is that right?

7  A.  Correct.

8  Q.  And it indicates that the business is KBKK and it's

9  Keith Ashley; is that right?

10  A.  Correct.

11  Q.  And this is going to be as of 2013.

12  A.  Correct.

13  Q.  But you reviewed it to assure the jury that this

14  account became the same account with BB&T?

15  A.  Correct.

16        MS. RATTAN:  And then let's look at page 2 of

17  Government's Exhibit 8B.

18  BY MS. RATTAN:

19  Q.  And again this is the signature card for Citibank and

20  then became the signature card for BB&T bank.

21        And let's look at this right here.

22  A.  That's Mr. Ashley's former home address, 1211 Boerne

23  Court, Lucas, Texas, 75002.  The residence is located in

24  the Eastern District of Texas.

25  Q.  And you say his former address.  Did he move?  Explain

 1  that to us.

 2  A.  He did.  I believe in 2020, late 2020, he moved to

 3  another residence, which is in Allen, Texas, which is also

 4  in the Eastern District of Texas.

 5  Q.  And then all of his business addresses that he would

 6  list on various documents, were those located in the

 7  Eastern District of Texas?

 8  A.  Correct.  As far back as documents -- earliest

 9  documents that we had, Mr. Ashley had an address in

10  Princeton, Texas; had an address in McKinney, Texas; had

11  multiple P.O. Boxes in Allen, Texas; had the 9 Prestige

12  Circle in Allen, Texas; had the 1211 Boerne Court address;

13  and then his current address which is in Allen, all of

14  which are in the Eastern District of Texas.

15  Q.  Now let's shift subjects here and talk about the

16  victims in the case.  Yesterday the jury heard from three

17  of the victims who gave money to Keith Ashley, KBKK.

18          Have you reviewed the records as they relate to

19  the victims in the case, Denny Willmon, Leonid Shteyngart,

20  and James Seegan?

21  A.  I have.

22  Q.  And based on those financial records and financial

23  analysis, have you been able to determine the loss amounts

24  for those victims?

25  A.  I have.

1  Q.  And can you explain those to the jury, if we can first

2  focus on Mr. Denny Willmon.

3  A.  Right.  Mr. Willmon, I believe he expressed --

4        MR. WHALEN:  Your Honor, I'm going to object to

5  predicate and qualifications to give this opinion.

6        MS. RATTAN:  May I be heard?

7        THE COURT:  Yes.

8        MS. RATTAN:  I think the witness just laid them

9  and explained that he'd reviewed the records and conducted

10  a financial analysis.

11        Clearly, the witness has a background with the

12  FBI, 18 years' experience doing white-collar investigations

13  included in that experience; and he's qualified to evaluate

14  the records.

15        THE COURT:  Overruled.

16  BY MS. RATTAN:

17  Q.  Focusing now on Denny Willmon, can you give us an

18  overview of that?

19  A.  Mr. Willmon -- I believe he testified in this Court

20  that he gave in excess of $150,000 to Mr. Ashley during the

21  scheme.  I reviewed multiple checks, to include a $20,000

22  check; $25,000 check; as well as an earlier $100,000 check

23  which was provided to KBKK in 2017.  I don't have the

24  Indictment in front of me; but the total loss to

25  Mr. Willmon was between a hundred and twenty-five and

1    $175,000.

2    Q.  Okay.  And that was just for Mr. Willmon?

3    A.  Correct.

4    Q.  Now let's look at the records as they relate to

5    Mr. Willmon.

6            MS. RATTAN:  If we can look at Government's

7    Exhibit Number 47.

8    BY MS. RATTAN:

9    Q.  This is one of the records that was previously

10   presented to the jury by CPA/Forensic Accountant Matt

11   Wylie; is that right?

12   A.  That's correct.

13   Q.  And you just mentioned $20,000 as an example that went

14   to KBKK?

15   A.  That's correct.

16   Q.  And this is an amount that you included in your

17   conclusion about the loss amount?

18   A.  Right.

19   Q.  And then, of course, we see that the $562 went back to

20   Mr. Willmon.

21           But let me direct your attention to this right

22   here, the $7,075 that went from KBKK at the Branch Banking

23   and Trust account to Keith or Brandi Ashley at Bank of

24   America.  Can you talk to us about these transactions right

25   here?

1   A.  Sure.  After the testimony, to ensure there was no

2   confusion by the jury, I reviewed the time frame of 3-14-19

3   through 4-2 of '19 to see the outgoing transfers money sent

4   to 4804 to include wire transfers during that time frame.

5           Included in that amount is a $2,500 wire transfer

6   that Mr. Ashley sent to himself during that time frame.

7   Q.  Okay.  And so the time frame is this right here, the

8   time frame from which the check was deposited until all of

9   the money -- all of the $20,000 was gone?

10  A.  Correct.

11          MS. RATTAN:  And if we can publish Government's

12  Exhibit 8B.

13          Oh, let me get Exhibit 45B, rather.

14  BY MS. RATTAN:

15  Q.  If you can explain what this is.

16  A.  Sure.  As I referenced, during the time frame of -- the

17  time frame it took for Mr. Willmon's $20,000 to be

18  completed, one of the -- one of the transfers out of the

19  KBKK 8725 account to 4804 was this wire transfer.  So it's

20  included in the $7,000 figure that's located on the chart

21  that we just showed.

22  Q.  Okay.  So there's the $2,500, the wire, right there.

23          And there is the date of the wire.

24          And then it's going from KBKK into another Keith

25  Ashley account; is that right?

 1  A.  Correct.

 2        MS. RATTAN:  So if we can go back to Government's

 3  Exhibit 47.

 4  BY MS. RATTAN:

 5  Q.  That wire is included in this amount right here, and

 6  it's going from a Keith Ashley account to another Keith

 7  Ashley account; is that right?

 8  A.  Correct.

 9  Q.  And it's part of Mr. Willmon's money, the $20,000?

10  A.  That's correct.

11  Q.  And we know that the balance at the very beginning was

12  only $238?

13  A.  Correct.

14  Q.  Now going back to Mr. Willmon's loss amounts, let me

15  direct your attention to Government's Exhibit 8A.

16        MS. RATTAN:  And if we can look at 180.  8A, 180.

17  BY MS. RATTAN:

18  Q.  Can you explain what this is?

19  A.  Sure.  This is a -- looks like the second page of a

20  bank statement.  I can't see the date.  It would probably

21  be the page up.

22        But suffice to say the $2,500 wire transfer that

23  we just saw from 8725 to 4804 is referenced on the line

24  there next to the yellow.  3-25, that is the line item

25  notation on the bank statement that corresponds to the wire

1  transfer, which also corresponds to the $7,000 on the chart

2  which we showed previously.

3  Q.  Okay.

4       MS. RATTAN:  And then if we can look at 8A, 256.

5  BY MS. RATTAN:

6  Q.  What is this?

7  A.  At the very bottom there, there is a 10-26.  This, I

8  believe, is a 2017 -- October 2017 bank statement for KBKK

9  8725.

10       As I referenced previously, I reviewed

11  documentation which includes a $100,000 deposit made by

12  Mr. Ashley pursuant to a check presented to him by

13  Mr. Willmon.  That 10-26 entry on the bank statement is the

14  deposit of the $100,000 provided by Mr. Willmon to

15  Mr. Ashley.

16  Q.  So this is part of Mr. Willmon's money?

17  A.  It's part of his investment, correct.

18  Q.  And part of what you've calculated as being his loss?

19  A.  Correct.

20  Q.  Now let's focus on Leonid Shteyngart.  Can you give us

21  an overview of the loss related to him?

22  A.  Sure.

23       Mr. Shteyngart, he was also an investor with

24  Mr. Ashley.  His -- I can't -- his -- I can't pinpoint his

25  exact loss amount right now.  I'm trying to think of the

 1  checks that I've seen from Mr. Shteyngart.

 2          I believe Mr. Wylie testified to his estimated

 3  loss amount, but I don't have it on the tip of my tongue at

 4  this time.

 5  Q.  Okay.  Let me direct your attention to the effect of

 6  fraud on a financial institution.

 7  A.  Sure.

 8  Q.  Can you talk to us about that?

 9          MR. WHALEN:  Your Honor, I'm going to object.

10  This calls for a legal conclusion.  It's outside the scope

11  of his expertise.

12          MS. RATTAN:  I think the agent, based on the

13  background and experience that he's described for the

14  Court, can render an opinion about the effect that fraud,

15  especially since that's what he's investigated and been

16  involved with the FBI for 18 years -- what effect fraud can

17  have on financial institutions and certainly the civil and

18  criminal liabilities that these financial institutions can

19  face.

20          THE COURT:  Overruled.

21          MR. WHALEN:  Your Honor, I'm going to further my

22  objection that --

23          THE COURT:  Your mic is not on --

24          MR. WHALEN:  -- BB&T and the best witness to do

25  that would be BB&T and not this agent.

```
 1            THE COURT:  Overruled.  Go ahead.

 2   BY MS. RATTAN:

 3   Q.  Can you talk to us about the effect that this type of

 4   crime, this type of fraud has on financial institutions?

 5   A.  It's significant.

 6            MR. WHALEN:  Your Honor, I'm going to object to

 7   the form of the question.  That's not the legal standard.

 8            THE COURT:  Overruled.

 9   A.  The effect on banks is significant.

10            Codified in law, there's Bank Secrecy Act

11   regulations that banks must follow.  They must have robust

12   money laundering compliance, know your customer,

13   monitoring, surveillance, programs that are in place to

14   detect anything from terrorist financing to illegal money

15   transfer businesses, to investment fraud schemes.

16            The most -- the best example I can give you is in

17   2014 JPMorgan Chase was indicted by the --

18            MR. WHALEN:  Object to the narrative and the

19   relevance, your Honor.

20            THE COURT:  Sustained.  If you want to ask another

21   question.

22   BY MS. RATTAN:

23   Q.  Can you talk to us about possible criminal liability

24   that these financial institutions would have based on

25   criminal acts?
```

```
 1  A.  Sure.  Liability would be they would face criminal or

 2  civil penalties for not following the law, which is the

 3  bank secrecy act.

 4       I can give an example if that's necessary, but

 5  fair to say that the banks are -- they're not obligated;

 6  they're required by law to know their customer, monitor

 7  anything that's going on within or through their bank, and

 8  take actions to notify law enforcement, notify regulators

 9  if they detect that.

10       And the effect it has on the bank is the bank's --

11       MR. WHALEN:  Object to the narrative and to the

12  legal conclusion.

13       THE COURT:  Sustained.  Just ask another question.

14       MS. RATTAN:  Yes, your Honor.

15  BY MS. RATTAN:

16  Q.  What is the effect that it could have on a bank?

17  A.  The effect that it has on the bank, it costs the

18  bank -- I would -- I'm guessing but hundreds of millions of

19  dollars a year to employ these people, the systems that are

20  required.

21       In addition, if they don't do things like --

22       MR. WHALEN:  Objection to the narrative.

23       THE COURT:  Sustained.

24  BY MS. RATTAN:

25  Q.  Along with employing and using devices to detect fraud,
```

1  what else could banks be required or do?

2  A.  Banks could -- if they are found in violation of the

3  law, they could face severe civil or criminal penalties.

4  Q.  And focusing specifically on investment fraud and wire

5  fraud, that type of fraud, could the banks be liable for

6  the amount of money that the victims lost?

7  A.  Of course.  So --

8  Q.  And as -- go ahead.

9  A.  No.  They could be liable for the amount the victims

10 lost if they are found to be in noncompliance with the

11 regulations that they -- that they operate under, such as

12 JPMorgan Chase in 2014.

13        MR. WHALEN:  Your Honor, I'm going to object to

14 relevance and the narrative.

15        THE COURT:  Sustained.

16 BY MS. RATTAN:

17 Q.  Can you give us an example of what you're talking

18 about?

19 A.  Sure.  In 2014 JPMorgan Chase was indicted --

20        MR. WHALEN:  Objection to the relevance, your

21 Honor.

22        THE COURT:  Sustained.

23 BY MS. RATTAN:

24 Q.  Well, let me direct your attention to the banks that

25 were involved in this case.  There were multiple banks; is

 1  that right?

 2  A.  There were.

 3  Q.  And we've talked about and seen testimony from a

 4  representative from Branch Banking and Trust bank where the

 5  defendant had one of his accounts, the KBKK account; is

 6  that right?

 7  A.  That's correct.

 8  Q.  Is that bank FDIC-insured?

 9  A.  It is.

10  Q.  And what is FDIC, and what does it mean to be

11  FDIC-insured?

12  A.  FDIC is a regulatory body for the banking industry that

13  insures federal deposits up to $250,000.  If they are

14  considered a financial institution, for the most part, in

15  the United States, they are FDIC-insured, which gives

16  customers a level of comfort about their money and if their

17  money -- if the bank fails, the U.S. Government is backing

18  deposits to a certain amount.  And it also has some legal

19  ramifications as they are financial institutions.  So the

20  FDIC has regulatory authority over the banks.

21  Q.  And then have you reviewed Government's Exhibits 20,

22  21, 22, and 23?

23          Are those the certificates that indicate that the

24  banks involved in this case are FDIC insured?

25  A.  They do.

1              MS. RATTAN:  Your Honor, we'll offer Government's

2    Exhibits 20, 21, 22, and 23.

3              MR. WHALEN:  No objection, your Honor.

4              THE COURT:  Okay.  These exhibits will be

5    admitted.

6              MS. RATTAN:  May we publish Government's

7    Exhibit 20, your Honor?

8              THE COURT:  Yes, you may.

9    BY MS. RATTAN:

10   Q.  Let me direct your attention to Government's

11   Exhibit 20, page 5.

12             Can you explain what this is?

13   A.  Sure.  This is an FD -- what they refer to as an FDIC

14   certificate.  This is from the Federal Deposit Insurance

15   Corporation which ensures that as of the date there, May

16   the 27th of 1995, that that Branch Banking and Trust

17   company is an FDIC-insured bank.

18   Q.  Okay.  And then let me direct your attention to

19   Government's Exhibit 21.

20             MS. RATTAN:  And if we can look at page 5.

21   A.  Sure.  This is the same certificate but this time for

22   Bank of America, which is just saying as of July 23rd of

23   1999 Bank of America and all of its branches are FDIC

24   insured.

25             MS. RATTAN:  And if we can look at Government's

 1  Exhibit 47.

 2  BY MS. RATTAN:

 3  Q.  So again this is the flow of money that Mr. Willmon

 4  provided; and again it's just an example of the $20,000

 5  that he provided.

 6          And we're talking about the banks, and here we

 7  have Branch Banking and Trust and the moneys going to Bank

 8  of America.  Are both of these banks FDIC-insured?

 9  A.  They are.

10  Q.  Now let me direct your attention to Government's

11  Exhibit 22.

12          MS. RATTAN:  If we can look at page 5.

13  BY MS. RATTAN:

14  Q.  What bank is this for?

15  A.  This is an FDIC certificate for Texas Capital Bank.  It

16  just ensures that as of December 18th of 1998 that the bank

17  and its branches are FDIC-insured.

18  Q.  And that's Texas Capital Bank.

19          Did one of the victims in this case have an

20  account at Texas Capital Bank?

21  A.  Yes.

22  Q.  And who was that?

23  A.  The deceased, James Seegan.

24  Q.  So Mr. Seegan's account was at Texas Capital Bank?

25  A.  He did have an account there, yes.

1   Q.  And then, finally, let me direct your attention in

2   terms of FDIC-insured to Government's Exhibit 23, page 5.

3           And what is this?

4   A.  It's an FDIC certificate for JPMorgan Chase Bank; and

5   it just ensures that as of November 13th, 2004, JPMorgan

6   Chase and all of its branches were FDIC-insured -- or are

7   currently and were FDIC-insured.

8   Q.  Now let me change the subject again and talk to you

9   about the wire transfers that took place between the

10  victims in this case and the defendant, Keith Ashley.

11          You're familiar with the wires?

12  A.  I am.

13  Q.  And they've been presented through testimony to the

14  jury; is that right?

15  A.  They have.

16  Q.  Let me ask you about the wire transfer which was

17  $150,000 from James Seegan to the defendant, Keith Ashley.

18          Are you familiar with that transfer?

19  A.  I am.

20          MS. RATTAN:  May I approach the witness, your

21  Honor?

22          THE COURT:  Yes, you may.

23  BY MS. RATTAN:

24  Q.  Okay.  I'm holding up a chart, and this is Government's

25  Exhibit Number 55; is that right?

1   A.  I can't see the sticker there.

2   Q.  Oh, sorry.  It's right there.

3   A.  I'll take your word for it.

4   Q.  Okay.  And what is this?

5   A.  It's a wire transfer manifest.

6   Q.  And what's happening here?

7   A.  It's just indicating that there is a wire transfer that

8   was sent from an originator to a beneficiary, sometimes

9   through a correspondent bank but this one is from bank to

10  bank.

11  Q.  And it's from James Seegan's bank account, $150,000;

12  and then it goes to KBKK at Branch Banking and Trust?

13  A.  That's exactly right.  And it went from Texas Capital

14  Bank to Mr. Ashley's account, BB&T, to the business -- or

15  to the account named KBKK, LLC.

16  Q.  Okay.  And then both of these banks we just saw on the

17  certificates are FDIC-insured?

18  A.  We did.

19          MS. RATTAN:  May I return, your Honor?

20          THE COURT:  Yes, you may.

21          MS. RATTAN:  And then if we can look at

22  Government's Exhibit 56A.

23  BY MS. RATTAN:

24  Q.  What is this?

25  A.  This is a flowchart related to the $150,000 that we

1   just referenced on the exhibit.  It just shows the flow of

2   the investment money provided by Mr. Seegan to Mr. Ashley

3   via KBKK, LLC.

4          The date of the wire was May 5th of 2016, and this

5   chart essentially shows -- details the depletion of the

6   investment funds between the dates of May 5th of 2016 to

7   September 13th of 2016.

8   Q.  And then the next wire -- and we've already talked

9   about this in your testimony this morning -- would be the

10  Denny Willmon wire, the $2,500 wire that was sent.

11         And you've testified about that this morning; is

12  that right?

13  A.  That's correct.

14  Q.  And that would be, the Denny Willmon wire, Government's

15  Exhibit 47.

16         And, again, that was the wire that was encompassed

17  in the $7,000 that went from KBKK to Bank of America; is

18  that right?

19  A.  That's correct.

20  Q.  And the third wire I want to direct your attention to

21  is the $75,000 wire that was sent by Robert Greening.

22         And that was sent on February 6th of 2020; is that

23  right?

24  A.  Correct.

25  Q.  And can you tell us what happened there?

 1  A.  Mr. Greening, I believe, testified in this Court.  He

 2  provided, pursuant to an understanding that he was

 3  investing in a SmartTrust UIT through Mr. Ashley --

 4          MR. WHALEN:  Your Honor, I'm going to object to

 5  the cumulative testimony.

 6          THE COURT:  Overruled.

 7          MS. RATTAN:  If we can publish Government's

 8  Exhibit 52A.

 9  BY MS. RATTAN:

10  Q.  We're talking about the $75,000.  And this was a wire

11  that Mr. Greening sent; is that right?

12  A.  Correct.

13  Q.  And what happened here?

14  A.  It shows that on 2-6 of '20, Mr. Greening wire

15  transferred $75,000 from his North Dallas Bank & Trust

16  account to KBKK, LLC, account at Branch Banking and Trust

17  ending in 8725 controlled by the defendant, Keith Ashley.

18          And it shows essentially, as I stated before, the

19  75,000 that Mr. Greening understood was being invested in a

20  SmartTrust UIT was actually -- according to this chart and

21  the investigation and the evidence in this case, that it

22  was depleted on personal items, personal debts.  And on

23  this occasion it did not go -- it does not appear to be

24  utilized to pay other investors.

25  Q.  And it was depleted in, it looks like, about 13 days;

 1   is that right?

 2   A.  That's correct.

 3   Q.  And that's an overview, but let me ask you about the

 4   wires.  We know that this was a wire that went into the

 5   account.  Were there additional wires that the defendant,

 6   Keith Ashley, used after the $75,000 came into his account?

 7   A.  There are.

 8           MS. RATTAN:  If we can publish Government's

 9   Exhibit 52B.

10   BY MS. RATTAN:

11   Q.  What is this?

12   A.  It's a wire transfer that was provided by BB&T bank.

13   Q.  And it's for $16,496; is that right?

14   A.  Correct.

15   Q.  And what's going on here?

16   A.  It's a wire transfer from KBKK, LLC, at BB&T to a --

17   what I know to be North Texas Money Management-Keith

18   Ashley, the account ending in 2589 at JPMorgan Chase Bank.

19   Q.  And it's the day after Mr. Greening wires the $75,000;

20   is that right?

21   A.  That's correct.

22   Q.  February 7th of 2020.

23           And then let me direct your attention to

24   Government's Exhibit 52C.

25           MS. RATTAN:  If we can publish that.

 1   BY MS. RATTAN:

 2   Q.  What's going on here?

 3   A.  Sure.  It's a wire transfer from KB -- on 2-10,

 4   February 10th of '20, in the amount of $12,000 from KBKK,

 5   LLC, BB&T account ending in 8725 to North Texas Money

 6   Management-Keith Ashley's account at JPMorgan Chase ending

 7   in 2589.

 8   Q.  So again it's Robert Greening's money going in, and

 9   then the date of this one is February 10th of 2020.  So

10   four to five days after Mr. Greening's money goes in, Keith

11   Ashley transfers the money from himself to himself; is that

12   right?

13   A.  Correct.

14   Q.  Now let me direct your attention to Government's

15   Exhibit 52D.

16          Can you explain this to us?

17   A.  Sure.

18          It's a February 12th, 2020, wire transfer of

19   $13,500, again from KBKK, LLC, BB&T account ending in 8725

20   to North Texas Money Management-Keith Ashley's account at

21   JPMorgan Chase Bank ending in 2589.

22   Q.  So again it's Keith Ashley transferring Robert

23   Greening's money from his account to another Keith Ashley

24   account?

25   A.  Correct.

 1   Q.  And the amount of money involved here is $13,500?

 2   A.  Correct.

 3   Q.  And that's within six days, approximately, of

 4   Mr. Greening's wire going into Keith Ashley's KBKK account?

 5   A.  Correct.

 6   Q.  And then each one of these wires that we've reviewed --

 7   the $150,000; the $20,000; the $75,000; and then these

 8   three that we've just reviewed, Government's Exhibits 52 B,

 9   C, and D -- were those interstate wire transfers?

10   A.  They were.

11   Q.  So let's shift gears again and talk about a Ponzi or a

12   pyramid scheme.  We've talked to Matt Wylie about it; and

13   he's, of course, a CPA.

14          But you've investigated fraud schemes and Ponzi

15   schemes; is that right?

16   A.  I have.

17   Q.  Can you give the jury an overview of Ponzi schemes,

18   fraud schemes?  What are you looking for as an FBI agent?

19          MR. WHALEN:  Objection as to relevance, your

20   Honor.

21          THE COURT:  Overruled.

22   A.  A Ponzi scheme essentially, in its purest form, is

23   paying old investors with new investor money.  But it

24   requires a few things.  It requires a constant influx of

25   money so that -- therefore, the new investors -- in order

1    to satisfy the old investors.

2           Ponzi schemes can be very simple.  If the

3    investors that are investing in the purported scheme are

4    not requiring payouts that are immediate, they may have

5    less investors in the scheme.

6           The reason is is if, say, you give me your money

7    and I say, "Well, I can't pay you back for three years,"

8    you give me a large sum of money, if I'm the Ponzi schemer,

9    I can use your money the way I wish.  I can use it on a

10   lavish lifestyle.  I can use it to pay my kid's private

11   school tuition.  And the window or the horizon to make

12   payments to satisfy you is longer.

13          There's other Ponzi schemes where --

14          MR. WHALEN:  Objection as to the narrative, your

15   Honor.

16          THE COURT:  Okay.  Sustained.

17   BY MS. RATTAN:

18   Q.  And what other types of Ponzi schemes or hallmarks do

19   you see in those schemes?

20   A.  No real investment, again paying old investors with new

21   investor money, paying current investors with their own

22   money.

23          And Ponzi schemes really end two ways, either

24   there is not enough money to keep the scheme going or

25   there's a large amount of investors that ask for their

1    money back.

2    Q.  And then it comes to light?

3    A.  Then it comes to light.

4    Q.  Let me direct your attention to Government's

5    Exhibit 44B.

6            MS. RATTAN:  If we can publish that.

7    BY MS. RATTAN:

8    Q.  This is Mr. Leonid's money, the $20,000 that he put in

9    and invested with the defendant, Keith Ashley.

10           One of the things that you're looking for in the

11   pyramid or Ponzi scheme, you said, is the payment of old

12   investors.

13           So what's happening here?

14   A.  Sure.  Just as I was stating, in this example the

15   balance of 286.75 is not adequate to make -- it's not

16   adequate to make any payment or transfer on that chart at

17   all.  Every dollar amount you see there exceeds the balance

18   before the money came in.  So immediately you can see that

19   anything that goes on, it's common sense that it's

20   Mr. Shteyngart's money.

21           In addition, there's two individuals on this chart

22   that are investors that are being paid with the money that

23   just funded the account.  Mr. Seegan is being paid $4,000;

24   and Mr. Shteyngart is being paid $1,600, which is really

25   just turning -- even if you gave the max benefit of the

1   doubt, $286, you subtract that, Mr. Shteyngart is

2   essentially getting approximately $1,300 of his own money

3   back as soon as he gave it to Mr. Ashley.

4   Q.  And are these hallmarks of Ponzi schemes that you've

5   investigated?

6   A.  Correct.

7        And you have to couple this with the fact that

8   there is no investment --

9        MR. WHALEN:  Objection to the narrative.

10        THE COURT:  Overruled.

11   BY MS. RATTAN:

12   Q.  What else would you consider?

13   A.  Sure.  You have to couple this with the fact that there

14   is no investment.  If somebody says they're taking in an

15   investment, the money that they repay to the investor has

16   to be returns on the investment for which they invested in.

17   If there is no investment, there can be no returns.

18        So anything that's being paid to purported

19   investors that's not returns on investment, that's a --

20   that's a hallmark of fraud.

21   Q.  So let me direct your attention -- this is Leonid

22   Shteyngart; and two of the payments there are going to

23   victims, himself and also James Seegan.

24        Now let me direct your attention to Government's

25   Exhibit 47, if we can look at Mr. Willmon's money and

 1  evaluate it for a pyramid or a Ponzi scheme.
 2  A.  Sure.  Again, it's, you know, second verse, same as the
 3  first.  Mr. Willmon is putting in $20,000.  The balance on
 4  the account again doesn't satisfy any of the movement of
 5  money besides one, the $181 to a credit card payment.
 6        But Mr. Willmon is receiving his own money back,
 7  and then Mr. Seegan and Mr. Shteyngart are receiving money
 8  that Mr. Willmon paid in.
 9        And look at it from an investor.  If you were
10  receiving payments from somebody, if you had known that you
11  were receiving payments that was provided by other
12  investors, would you remain in the investment, A, or, B, if
13  you were told that at the beginning, would you have
14  invested at all?  And the answer, logically, is no.
15        Mr. Willmon is understanding that money is returns
16  on an investment that he intended to make, not a return of
17  his own money.
18  Q.  And then that's the money, of course -- an example of
19  money that was provided by Denny Willmon.
20        Let me direct your attention to money that was
21  provided by James Seegan.
22        MS. RATTAN:  If we can look at Government's
23  Exhibit 56A and publish that.
24  BY MS. RATTAN:
25  Q.  And do you see hallmarks here of the scheme that you've

1  described?

2  A.  Right.  It's the same as the last chart.  Again, the

3  opening balance and the daily balance on -- when you

4  evaluate bank accounts and bank statements -- and what we

5  do is with he schedule these to see the timing of the

6  movement of the money.

7          If you ever look at the bottom of your statement,

8  you'll see a daily balance.  Well, what that does is that

9  tells you when money comes in and when money is going out.

10         When this money came in, the daily balance was

11  $63.68.  And if there is no other deposits, the only money

12  that's being moved here, if you look at all of those

13  transfers short $63 -- essentially, as easy as I can

14  explain it is that is Mr. Ashley spending Mr. Seegan's

15  money.  That's all that shows in a visual format, that all

16  of those expenditures are being used by money that has been

17  taken by Mr. Ashley under false and fraudulent pretenses.

18         MS. RATTAN:  And now if we can focus on another

19  James Seegan investment and look at Government's

20  Exhibit 56B.

21  BY MS. RATTAN:

22  Q.  Again, when you evaluate this for a Ponzi or pyramid

23  scheme, tell us what you, as a trained investigator/FBI

24  agent, see.

25  A.  Sure.  Again, there's two investors being paid.  Albeit

1    the balance on this one is higher, if we -- if I looked at

2    this -- now, the CPA's method, first in/first out.  But

3    given the way you would give the benefit of the doubt to

4    the individual who owns the account is just automatically

5    take away the $30,000, okay?  So if there is $30,000 even,

6    you know, the lines on the left side -- whatever adds up to

7    30,000, just eliminate that.  That depletes the account to

8    zero.  Then everything else is Mr. Seegan's money.

9           It's still a significant that is -- you know,

10   essentially -- and that's another hallmark in Ponzi schemes

11   is a lot of times the individual, the defendants are

12   spending money like it's not theirs.  That's because it

13   isn't theirs.  So expenditures at casinos, expenditures on,

14   you know, tuition.  A lot of times you'll see on these

15   cases payments on school loans --

16          MR. WHALEN:  Objection as to relevance as to other

17   cases, your Honor.

18          THE COURT:  Sustained.

19   BY MS. RATTAN:

20   Q.  Well, and spending the money like it's not theirs, just

21   in this -- on this chart alone it looks like there's $8,000

22   that goes to casinos; is that right?

23   A.  That's correct.

24   Q.  And then there is the money, the significant amount of

25   money that's going to the brewery as well?

 1   A.  That's correct.

 2   Q.  So with each victim, in each instance, did you evaluate

 3   the money and the flow of the money to determine whether

 4   the defendant was involved in a Ponzi scheme?

 5          MR. WHALEN:  Objection.  Calls for a legal

 6   conclusion.

 7          THE COURT:  Overruled.

 8   A.  Based upon the evidence in the case, the financials,

 9   it's clear that an investment fraud was being -- had been

10   hatched by the defendant, that that had been running for

11   some time.  And the evidence and the financial movement and

12   the payment of former investors -- or new investors and old

13   investors and the use of the funds is indicative of what we

14   would commonly -- what the common nomenclature is a Ponzi

15   scheme.

16   BY MS. RATTAN:

17   Q.  Now let's focus on Keith Ashley and who he is.  Did you

18   look into his background?

19   A.  I did.

20   Q.  And, in fact, does he have background and training as a

21   nurse?

22   A.  He does.  I believe he is a registered nurse.

23   Q.  And background and training as a police officer?

24   A.  He does.

25          MS. RATTAN:  Your Honor, may we offer Government's

 1  Exhibits 14A, 35, and 36?

 2          THE COURT:  Any objection?

 3          MR. WHALEN:  May we approach, your Honor?

 4          THE COURT:  Yes.

 5          (Sidebar conference, off the record.)

 6          THE COURT:  I will conditionally admit Exhibit 14

 7  and also conditionally admit Exhibit 35.  I will fully

 8  admit 36 and 37.

 9          Go ahead and proceed, Ms. Rattan.

10          MS. RATTAN:  Thank you, your Honor.

11          May we publish Government's Exhibit 35, page 10?

12          THE COURT:  Yes, you may.

13  BY MS. RATTAN:

14  Q.  Now, Government's Exhibit 35 are records relating to

15  the defendant's nursing career; is that right?

16  A.  Correct.

17  Q.  And if we can look -- I think we're on page 10.  Does

18  this indicate that the defendant is, in fact, a nurse?

19  A.  Right.  It looks like an Affidavit of Graduation.

20          Looks like he completed an associate degree of

21  nursing and it looks to be dated at the bottom May 20th

22  of -- I actually don't see it at the bottom there, but the

23  seal is May 20th.  It's dated at the bottom.

24          And actually I think maybe the graduation date is

25  crossed out by the yellow line there but, yes, that's an

1   Affidavit of Graduation according to the Board of Nurse

2   Examiners of Texas.

3   Q.  Okay.  So indicating that the defendant, in fact, is a

4   nurse; is that right?

5   A.  Correct.  It looks like he completed the requirements

6   in 2004.

7          MS. RATTAN:  And then if we can look at

8   Government's Exhibit 35, page 17.

9   BY MS. RATTAN:

10  Q.  What is this?

11  A.  It's a work history for Mr. Ashley that was provided to

12  the Board of Nurse Examiners.  It just shows he was a -- at

13  the current time when this was filled out, he worked at

14  North Texas Medical Center.  He was a paramedic in the ER.

15         Prior to that, he worked for an ambulance service

16  where he was a paramedic; and then prior to that, it

17  appears he worked at Southwest Helicopters as a flight

18  paramedic.

19  Q.  So this lists three different positions that he's had

20  within the health care/medical field; is that right?

21  A.  Correct.

22  Q.  And, of course, it's got his name on here, Keith Todd

23  Ashley; and it's work history with the Board of Nurse

24  Examiners?

25  A.  Correct.

1    Q.  And then let's focus on Government's Exhibit 14A.

2            If we can look at page 1, which is displayed, is

3    this the defendant -- Keith Ashley's application for

4    employment that lists what his employment history is?

5    A.  Correct.

6    Q.  And this was his application for employment with one of

7    his jobs, and that would be with City Hospital White Rock

8    in Dallas?

9    A.  Correct.

10   Q.  So he lists here this address.  Are you familiar with

11   this address?

12   A.  I am.  That was his residence in Lucas, Texas, which is

13   in the Eastern District of Texas.

14           MS. RATTAN:  And then if we can look at page 2 of

15   14A.

16   BY MS. RATTAN:

17   Q.  It has his employment history, and what is his

18   employment history?

19   A.  Looks like in 2004 to 2014 he worked for PHI, which is

20   a -- he was a flight paramedic on a helicopter.

21           And it looks like he was a representative of PHI

22   from '08 to 2015.

23           And then above that, it shows his certifications

24   related to his employment.

25           MS. RATTAN:  And then if we can look at the next

1   page, 14A, page 3.

2   BY MS. RATTAN:

3   Q.  More of his employment history.  Does he list "NTMM,

4   Business Owner"?  What is that?

5   A.  I'd referenced that earlier.  The JPMorgan Chase

6   account is in the name NTMM, which is North Texas Money

7   Management.

8   Q.  Okay.  And was that Keith Ashley?

9   A.  It was.

10  Q.  And then we've got the PHI here again.  What is that?

11  A.  That's the helicopter medivac company that -- for which

12  Mr. Ashley worked as a flight paramedic.

13  Q.  And then down here it talks about AMR, critical care

14  flight paramedic; is that right?

15  A.  That's correct.

16  Q.  And then if we can go on -- and it's got the dates

17  listed, 1996 to 2000.

18          MS. RATTAN:  And if we can look at page 4.

19  BY MS. RATTAN:

20  Q.  Page 4, he's working AMR, emergency medical technician

21  and paramedic; worked full-time in an emergency response

22  setting in the city of Princeton and the city of Wylie; is

23  that right?

24  A.  Correct.

25  Q.  And then he lists other experience in the medical field

1    here, January of 1990 through 1996.  What's going on here?

2    A.  It looks like he was in the Navy Reserve as a hospital

3    corpsman from '90 to '96 in Dallas.

4         And then maybe concurrent with that, he was an

5    emergency medical technician in Dallas.

6         And, actually, I failed -- on the page before

7    this, I failed to indicate that there is a -- there is a

8    slot where he does indicate that he had become an RN; so he

9    was a flight paramedic/RN.

10   Q.  Okay.  And that's on 14A, page 3.

11   A.  Right there, 2002 to 2004.  Correct.

12   Q.  That's the RN that you're talking about right there?

13   A.  Correct.

14        MS. RATTAN:  And then if we can go back to page 4,

15   14A page 4.

16   BY MS. RATTAN:

17   Q.  And he lists what his licenses and certificates are.

18   What are those?

19   A.  It looks like emergency medical technician licensure

20   certification, paramedic certificate, pre-hospital trauma

21   life support certificate, critical care certification,

22   instructor certification, registered nurse, Series 6,

23   Series 63, registered nurse, as well as he graduated in

24   2004 from the registered nursing program.

25   Q.  So that is essentially an overview of his background

 1   and employment as a health care professional; is that

 2   right?

 3   A.  That's correct.

 4   Q.  Working in emergency settings, he's a registered nurse,

 5   an RN, and has a number of years' experience and training?

 6   A.  Correct.

 7   Q.  So let me ask you about his police background.  Did you

 8   look at that?

 9   A.  I did.

10          MS. RATTAN:  If we can publish Government's

11   Exhibit Number 36.

12   BY MS. RATTAN:

13   Q.  This is page 1 of Government's Exhibit 36, and it's the

14   Texas Commission on Law Enforcement.  What is that?

15   A.  It's a regulatory agency that oversees police

16   departments, anybody who's a sworn law enforcement officer

17   in the state of Texas.

18          MS. RATTAN:  And if we can look at page 3 of

19   Government's Exhibit 36.

20   BY MS. RATTAN:

21   Q.  What is this?

22   A.  This is the filing.  I believe this was filed -- my

23   understanding is this was filed when he separated as a law

24   enforcement officer.  But it still indicates Mr. Ashley's

25   information.  At the time it looks like he was employed

1  with the Wylie Police Department in Wylie, Texas, which is

2  Collin County, which is within the Eastern District of

3  Texas.

4  Q.  Okay.  And we've got "Collin County," "Wylie Police

5  Department," and it's Keith Ashley?

6  A.  Right.  And it looks like the date of separation was

7  February 17th of 1998.

8        MS. RATTAN:  And then if we can look at the next

9  page, Government's Exhibit 36, page 4.

10       And if we can page down, right here, Service

11  History.

12  BY MS. RATTAN:

13  Q.  Does this explain his experience as a law enforcement

14  officer?

15  A.  It does.

16  Q.  And what is it?

17  A.  Looks like he was with the Krugerville Police

18  Department on two occasions, in '95 and again '96-'97.

19       He was also with the fire department as a peace

20  officer for four months in McKinney, Texas.

21       And again with the Wylie Police Department for

22  approximately nine months from '97 to '98.

23       So it looks like he has approximately two years --

24  well, it says there "Total officer time" -- two years as a

25  law enforcement officer in North Texas.

1           MS. RATTAN:  And then if we can page a little bit

2    down on the same page, I think there is a date that he

3    became inactive.

4    A.  Yes.  That -- for the peace officer license, it looks

5    like it was -- the license was inactive -- became inactive

6    in 2020.

7    BY MS. RATTAN:

8    Q.  Okay.  And then -- that's his nursing background and

9    also his law enforcement background.

10          You also looked at KBKK, and can you tell the

11   jury -- we've heard about the account KBKK at the Branch

12   Banking and Trust bank.  Can you tell us what KBKK was?

13   A.  It was formed by Mr. Ashley.  And the investigation

14   shows -- my understanding is that K, B, K, and K is

15   actually the initials of Mr. Ashley and his family members.

16   I believe it's Keith, Brandi his wife, Kade and Kyler,

17   which are his children.  So that's KBKK, LLC.  That's what

18   the initials stand for.

19   Q.  So he has the nursing background, the police background

20   and he's also involved in private business but he's also,

21   through Parkland Securities, offering products; is that

22   right?

23   A.  Correct.

24   Q.  So he's got multiple things going on.  Is that fair to

25   say?

1    A.   That's correct.

2    Q.   And as part of your investigation, did you look at

3    where he lived and the house that he had?

4    A.   I did.

5         MS. RATTAN:  Your Honor, we'll offer Government's

6    Exhibit 109, page 1.

7         THE COURT:  Any objection?

8         MR. WHALEN:  No objection.

9         THE COURT:  Okay.  Government's Exhibit 109 will

10   be admitted.

11        MS. RATTAN:  May we publish it?

12        THE COURT:  Yes, you may.

13   BY MS. RATTAN:

14   Q.   This is Government's Exhibit 109, page 1.  Can you

15   explain to us what this is?

16   A.   Mr. Ashley's residence in 1211 Boerne Court, Lucas,

17   Texas, which is within the Eastern District of Texas.

18   Q.   And that's the address that we've seen on multiple

19   documents; is that right?

20   A.   Correct.  I think that was the address of record for

21   Parkland.  That was the address of record for the bank

22   accounts.  That was the address of record -- his license

23   came back to that, KBKK, LLC.  So that was the center of

24   business activity.

25   Q.   And not specifically but generally, when did he live

1   here?

2   A.  I believe -- I believe he bought the house at Boerne

3   Court prior to 2010 is my understanding, maybe 2007; and

4   then I believe it was sold in late 2020.

5   Q.  Late 2020?

6   A.  Correct.  He owned -- he owned it for a considerable

7   amount of time.  The 2007 number might have been a little

8   bit earlier than that, but it was a considerable amount of

9   time.

10  Q.  So that's an overview of Keith Ashley's background.  Is

11  that fair to say?

12  A.  Yes.

13  Q.  Now let's switch gears again, and let me focus back on

14  James Seegan.

15       James Seegan was someone who had invested a

16  significant amount of money with Keith Ashley; is that

17  right?

18  A.  He did.

19  Q.  And yesterday we heard testimony about Mr. Seegan's

20  will and Mr. Seegan's trust; is that right?

21  A.  Correct.

22       MS. RATTAN:  If we can publish Government's

23  Exhibit 59.

24  BY MS. RATTAN:

25  Q.  This was presented yesterday through the notary,

1    Ms. Molina, Alicia Molina, who notarized Mr. Seegan's will;

2    is that right?

3    A.  That's correct.

4    Q.  And it was done on April 8th of 2019?

5         MS. RATTAN:  If we can look at Government's 59,

6    page 8.

7    BY MS. RATTAN:

8    Q.  This is the will, and it was done April 8th of 2019.

9         MS. RATTAN:  And if we can look at Government's

10   Exhibit 59, page 4.

11   BY MS. RATTAN:

12   Q.  It talks about, right here, the powers of the executor

13   and the trustee.  And what does it, just generally, say

14   about the powers of the trustee?

15   A.  Says (as read):  "Each Executor and Trustee" -- or "act

16   independently and free from the control of any court as to

17   my estate and as to every trust established under this Will

18   (and as to the property of my estate and all the property

19   of every trust created under this Will).  Each Executor and

20   Trustee shall have and possess all powers and authorities

21   conferred by statute or common law in any jurisdiction in

22   which such Executor and Trustee may act, and include powers

23   and authorities conferred by the Texas Estates Code and

24   Texas Trust Code, and by any future amendments thereto,

25   except for any instance in which such powers and

 1  authorities may conflict with the express provisions of

 2  this Will, in which case the express provisions of this

 3  Will shall control."

 4  Q.  Okay.  So the trustee is going to act independently and

 5  free from control; is that right?

 6  A.  That's correct.

 7  Q.  And let me direct your attention to Government's

 8  Exhibit 59, page 3 at the top.

 9       And it says the executor is going to be -- the

10  trustee is going to be who?

11  A.  "I appoint my friend, Keith Ashley, to be Independent

12  Executor of my Will and estate and Trustee of all trusts

13  created by my Will."

14  Q.  And then if we can -- that's the will.  Now let's focus

15  on the trust, Government's Exhibit 60.

16       MS. RATTAN:  If we can publish that.

17  BY MS. RATTAN:

18  Q.  And is this a trust that was created on April 16th of

19  2019?

20  A.  That's correct.

21  Q.  And it's of James Seegan, one of Keith Ashley's

22  investment clients; is that right?

23  A.  Correct.

24  Q.  And does this, in fact, appoint Keith Ashley to be the

25  trustee?

```
 1   A.  It does.

 2           MS. RATTAN:  If we can look at page 5 of

 3   Government's Exhibit 60, Article V.  Page 5, Article V.

 4   BY MS. RATTAN:

 5   Q.  It says Keith Ashley is going to be the trustee; is

 6   that right?

 7   A.  Correct.

 8           MS. RATTAN:  May I approach the witness, your

 9   Honor?

10           THE COURT:  Yes.

11   BY MS. RATTAN:

12   Q.  Now, we've just reviewed two documents, Government's

13   Exhibit 59 and 60, the will and trust.  And do those

14   indicate that the defendant, Keith Ashley, became the

15   independent executor of James Seegan's will and trust?

16   A.  They do.

17   Q.  And that would be on April 8th of 2019 and April 16th

18   of 2019?

19   A.  Correct.

20           MS. RATTAN:  I'll pass the witness, your Honor.

21           THE COURT:  Cross-examination?

22           Why don't we do this.  Why don't we go ahead and

23   take our morning break, and then we'll do

24   cross-examination.

25           Ladies and gentlemen, again, please don't discuss
```

1  the case among yourself or anyone else.  Don't do any

2  outside research.  We'll take 15 minutes and then continue.

3  Thank you.

4          (The jury exits the courtroom, 10:26 a.m.)

5          THE COURT:  Anything further from the government?

6          MS. RATTAN:  No, your Honor.

7          THE COURT:  Defense?

8          MR. WHALEN:  No, your Honor.

9          THE COURT:  Okay.  See you back in 15.

10         (Recess, 10:26 a.m. to 10:44 a.m.)

11         (Open court, defendant present, jury present.)

12         THE COURT:  Please be seated.

13         Mr. Whalen, cross-examination?

14             CROSS-EXAMINATION OF JASON RENNIE

15  BY MR. WHALEN:

16  Q.  Agent Rennie, good morning.

17  A.  Mr. Whalen, how are you, sir?

18  Q.  I'm doing well.  Good to see you.

19  A.  Very good to see you again.

20  Q.  All right.  First of all, I just want to ask you a few

21  questions.  You had talked about financial institutions and

22  things like that, correct?

23  A.  Sure.

24  Q.  Okay.  Would you agree with me that the banking

25  industry is heavily regulated by Congress?

 1    A.  Yes.

 2    Q.  Okay.  And so every time there's a new regulation,

 3    Congress imposes that on banks; is that correct?

 4    A.  I think a bank is heavily regulated; and I think that

 5    if Congress makes a decision and they push it down to the

 6    banks, that affects the banks, yes.

 7    Q.  Okay.  So if I'm a bank doing business in the United

 8    States, that's the cost of doing business, correct?

 9    A.  Regulation -- I think to be a bank, I think the cost of

10    doing business is you have to abide by the regulations that

11    are set by the regulators.

12    Q.  Okay.  And you don't really have a choice in that,

13    correct?

14    A.  I think if you want to be a financial institution in

15    the United States, you don't -- yeah, it's kind of a

16    take-it-or-leave-it.

17    Q.  Okay.  And it's kind of like when you talked about

18    money laundering, things like that, that if there is a --

19    if I deposit more than $10,000 cash, that creates a

20    reporting requirement on the bank, correct?

21    A.  The banks have requirements that -- that -- you know,

22    based upon BSA rules that they have to file.  Without being

23    specific, yes, they have to file reports on certain things.

24    Q.  So they have to file reports on bulk cash transactions,

25    correct?

 1    A.   Correct.

 2    Q.   And if they think something is suspicious, they are

 3    required to file those reports and things like that?

 4    A.   Correct.

 5         They are required to have monitoring and

 6    surveillance programs which -- a lot of times it's

 7    automated these days, but there are physical people that

 8    sit and review what the -- what the systems deem

 9    suspicious.

10    Q.   Okay.  And that's -- as they said, that's imposed on

11    them by Congress and the banking regulations?

12    A.   Right.  It's in law that they must have these programs

13    and abide by them.

14    Q.   Okay.  And if you know, as it relates to FDIC-insured,

15    are the requirements if I elect to be FDIC-insured, that

16    there's requirements as a bank I -- they have to fulfill?

17    A.   I'm certain there are.  I don't know what the exact

18    requirements are to meet FDIC.

19         I know what the insurance amounts are.  Actually,

20    I think I stated earlier it was 250.  It's actually -- I

21    think it's more than that now.

22         But regulations imposed by the FDIC, I wouldn't be

23    able to speak to that.

24    Q.   Okay.  But fair to say -- or is it logical to believe

25    that if you're going to be an insured, there's probably

1   rules that you've got to follow to maintain that

2   certificate?

3   A.  I would agree with that.

4   Q.  Okay.  And then as far as part of your investigation as

5   far as BB&T or now Truist, how big of a bank is

6   BB&T/Truist, if you know?

7   A.  I don't know how much they have under management, but

8   I'm certain that they are a fairly large bank.  I don't

9   think they are as large as Chase, but they are a large

10  bank.

11  Q.  Are we talking billions or trillions?

12  A.  It would be speculating.

13  Q.  Okay.  And is that not -- that's something you haven't

14  looked into as part of your --

15  A.  No.  I don't know how large they are, but I will

16  concede that they are a large -- they are a large bank.

17  Q.  Okay.  Okay.  Let's go to --

18          MR. WHALEN:  If we can see Exhibit 47, please.

19  BY MR. WHALEN:

20  Q.  Okay.  In Exhibit 47 I think you testified that part of

21  the $7,075 was a wire; is that correct?

22  A.  Right.  Part of the outgoing money from the account,

23  which included wires I believe on that month, were -- was

24  the $2,500.

25  Q.  Okay.  And that $2,500 was part of the $20,000,

 1    correct?  Is that --

 2    A.  Right.  Based upon the balance that is left in the

 3    account, my understanding is the 20,000 came in and a

 4    portion of that money shortly -- well, during the time

 5    frame listed there, there was a wire transfer of $2,500.

 6           I believe it was March 25th of 2019.

 7    Q.  Okay.  And that went to his personal bank account,

 8    correct?

 9    A.  It went to -- right.  In the name of Keith or Brandi

10    Ashley BoA ending in 4804.

11    Q.  And if we look on the flow here, none of that $2,500

12    that went into his personal account came back out to go to

13    either Mr. Seegan or Mr. Shteyngart, correct?

14    A.  Right.  It looks like -- it doesn't like there is

15    any -- the only outflow from the account looks like it's

16    for credit cards, a personal mortgage, and medical expenses

17    but nothing to the other investors from that account, that

18    particular account.

19    Q.  Okay.  And as far as it relates to Denny Willmon, is

20    this $20,000 check the last check he wrote to KBKK?

21    A.  I can't recall.  He had a 20- and a $25,000 check.  I

22    can't sit here and say exactly which one was last.  I

23    believe this one was last; but if you had a record to

24    refresh my recollection, I could probably give you a better

25    answer.  But it was one of the two.  It was either 20- or

 1  25- was the last check he provided.

 2  Q.  Okay.  And just so we're -- and they both were in the

 3  form of a check, correct?

 4  A.  Right.  I believe Mr. Willmon -- all of the money that

 5  Mr. Willmon provided, my understanding is they were checks.

 6  Q.  Okay.

 7         MR. WHALEN:  If we can go to Exhibit 52A.

 8  BY MR. WHALEN:

 9  Q.  Okay.  This is the chart as relates to Mr. Greening's

10  75,000, correct?

11  A.  Yes, sir.

12  Q.  Okay.  And I believe you testified that there was three

13  wires in this series of cash flow; is that correct?

14  A.  Correct.

15  Q.  Okay.  I think you talked about the first wire was in

16  February -- February 7th of 2020; is that correct?

17  A.  Was that a $16,000 wire?

18  Q.  Yeah, $16,496.15.

19  A.  Correct.

20  Q.  Okay.  That went to the Chase account; is that correct?

21  A.  Correct.

22  Q.  Okay.  And is that part of the 41,996?

23  A.  So if you add up the -- if you add up the amounts on

24  52B, C, and D, it actually adds up to $41,996.15.  That

25  number was rounded down to include the flow, 41,996.

1    Q.  Okay.  So when you talked about the three wires -- one

2    on February 7th, February 10th, and February 12th -- that

3    was all included in that 41,996, correct?

4    A.  Correct.

5    Q.  Okay.  And that's going to Mr. Ashley, correct?

6    A.  It's going to -- it went to Mr. Ashley; and then he

7    moved it to another account that he controls, North Texas

8    Money Management.

9    Q.  Okay.  And that money is included as part of the

10   $75,000 that came from Mr. Greening, correct?

11   A.  Right.  Just based upon the fact that the balance was

12   so low, at least, if you're being deferential to

13   Mr. Ashley, all but $2,600 would have to be Mr. Greening's

14   money.

15   Q.  Okay.  And then if we look at the money coming out of

16   that NTMM account, based on this flowchart, none of the

17   money in that went to any investors, correct?

18   A.  Correct.  None of the money -- based upon this chart,

19   none of the 41,996 that went into North Texas Money

20   Management appears to have gone to any other investors of

21   Mr. Ashley -- with Mr. Ashley.

22   Q.  Okay.  On the flowcharts, I think we heard testimony

23   that Mr. Wylie created these.  Did you participate in the

24   creation of the flowcharts?

25   A.  The creation of the chart itself, no, I did not.

1   Q.  Okay.  Did you participate in what went on the

2   flowcharts or the data?  How did you participate in the --

3   if you didn't create the flowchart -- let me back up.  Let

4   me start over.

5            You didn't physically personally create this

6   chart, correct?

7   A.  I did not.

8   Q.  Okay.  Did you aid Mr. Wylie in creating it?

9   A.  The way the relationship between the forensic CPA and

10  the agent are is we provide the bank records.  The bank

11  records are scheduled.  Then we receive a -- "scheduled"

12  means put them in an Excel spreadsheet, essentially.

13           And then we receive that, evaluate that based upon

14  the evidence and the narrative in the case.  Then we have a

15  back-and-forth on, you know, show me where this money --

16  how it was spent.

17           And then the CPA is the expert on the finances.

18  So based upon what they see and based upon what they know

19  about the case, they create the charts.

20  Q.  Okay.  And what they know about the case is provided by

21  you, correct?

22  A.  Well, I mean, they have access to the case file.  They

23  are a participant in the case, so they have access to all

24  of the reports that are written.  They have access to the

25  grand jury documents.  Obviously they have access to the

```
 1   financials.  And on multiple occasions they participated in

 2   meetings.  We have meetings about the case so --

 3   Q.  So fair to say actively involved?

 4   A.  Yes, correct.

 5   Q.  Okay.  You talked earlier about one of the FDIC

 6   certificates for Texas Capital Bank; is that correct?

 7   A.  That's correct.

 8   Q.  Okay.  Did you do some research into Texas Capital

 9   Bank?

10   A.  I know they are a bank that's based in Dallas, and --

11   Q.  Okay.

12   A.  -- I think their consumer division is possibly

13   BankDirect.  They have a consumer division which is a

14   subsidiary of a larger bank.

15          But other than that, I think that's about what I

16   know besides what they were provided.

17   Q.  Okay.  So they are based in Dallas, correct?

18   A.  They are based in Dallas; and I believe the FDIC

19   certificate said Dallas, yes.

20   Q.  Okay.  And did it have any branches that you know of?

21   A.  Oh, I'm certain they do.

22   Q.  Okay.  Do they have any branches in the Eastern

23   District of Texas?

24   A.  I'm not certain if they do or not.  I know they have

25   one in Richardson.  I'm not -- I can't speak to that.
```

 1  Q.  Okay.  If they did, is that something you would

 2  remember, would be important?

 3  A.  If I looked into where their branch locations were, I

 4  would remember.  But I know that they have -- I think they

 5  are based downtown on McKinney.

 6  Q.  Okay.

 7  A.  And I know they have one in Richardson.

 8  Q.  Okay, in Dallas County.  City of Dallas is -- well, not

 9  all of the city of Dallas.  But McKinney Avenue in Dallas,

10  Texas, is part of the Northern District of Texas, correct?

11  A.  That would be the Northern District.  As you know, the

12  Eastern District/Northern District line is fuzzy around

13  certain parts of the area.  But, yes, on McKinney Avenue in

14  Dallas, Texas, is the Northern District.

15  Q.  Okay.

16          MR. WHALEN:  Okay.  If we can go to Exhibit 59,

17  please.

18  BY MR. WHALEN:

19  Q.  Okay.  And we see there that the will was made in

20  Dallas County, Texas; is that correct?

21  A.  Correct.

22  Q.  Okay.  And not to state the obvious; but that's in the

23  Northern District of Texas, correct?

24  A.  Dallas County, I believe, yes, is entirely in the

25  Northern District.

```
 1   Q.  Okay.  And just so there is not any confusion, there's

 2   portions of the city of Dallas that sit in Denton County

 3   and Collin County, correct?

 4   A.  Correct.

 5   Q.  Okay.

 6   A.  But those are -- those are -- but those portions of

 7   Dallas are different counties, not Dallas County.

 8   Q.  Okay.  So Dallas County is part of the Northern

 9   District of Texas?

10   A.  Correct.

11   Q.  Okay.  And your office, the FBI office in Dallas, is

12   part of the Northern District of Texas, correct?

13   A.  Correct.  And my office is in Frisco, Texas, which is

14   in Collin County, which is in the Eastern District of

15   Texas.

16   Q.  Eastern District of Texas, okay.

17           MR. WHALEN:  If we can go to page 2.

18   BY MR. WHALEN:

19   Q.  Okay.  And if we look at page 2, you see a section

20   called Contingent Beneficiaries; is that correct?

21   A.  I do.

22   Q.  Okay.  You heard Mr. Cosenza testify yesterday; is that

23   correct?

24   A.  I did.

25   Q.  Okay.  And the beneficiaries of this will are
```

 1   Ms. Seegan who gets 40 percent, correct?

 2   A.  Correct.  The contingent beneficiaries are Ms. Seegan,

 3   correct.

 4   Q.  And his son, correct?

 5   A.  Correct.

 6   Q.  And Kerby Keller, his nephew, gets 20 percent, correct?

 7   A.  Correct.

 8   Q.  Okay.

 9           MR. WHALEN:  We can go to page 3.

10   BY MR. WHALEN:

11   Q.  Okay.  And he named Mr. Ashley; but he also named

12   Mr. Keller as a backup executor, correct, trustee?

13   A.  That's correct.

14   Q.  Okay.

15           MR. WHALEN:  Can you zoom back out, please.

16           All right.  We can go down to the bottom where it

17   says "Guardian Provisions."

18   BY MR. WHALEN:

19   Q.  Correct?  That he named Kerby Keller to be the guardian

20   of his son in case his wife predeceased him and then he

21   passed away; is that fair?

22   A.  That's fair.

23   Q.  Okay.

24           MR. WHALEN:  We can go to page 4.  Maybe we can

25   just look at the whole page.

BY MR. WHALEN:

Q.  All right.  And you were asked this question, and you were asked to read Article VIII.  And I think the question was -- or stated that Mr. -- the executor or trustee would be free from control.  But it also says "of any court," correct?

A.  As to any court, right.

Q.  Okay.  So -- and you heard Mr. Cosenza testify yesterday that part of the way Wills are structured in the state of Texas is the way you do them is to avoid probate, correct?

A.  I don't recall exactly what Mr. Cosenza said, but he said that probate is involved when there is a will and a trust.

Q.  Okay.  But it also says under these powers that the person has to follow all the rules and regulations of the Texas Estates Code and the Texas Trust Code, correct?

A.  It does say that, correct.

Q.  Okay.

        MR. WHALEN:  All right.  If we can go to Government's Exhibit 60, please.

BY MR. WHALEN:

Q.  And you had a chance to review this, correct?

A.  I did.

Q.  Okay.  And it also had the same distribution for

1  beneficiaries, correct?

2  A.  That's my recollection, yes.

3  Q.  Okay.

4        MR. WHALEN:  We can go to page 2.

5        Let's go to page 3.

6  BY MR. WHALEN:

7  Q.  All right.  If we look at Article III, Beneficiaries,

8  once again consistent.  Ms. Seegan 40 percent, his son

9  40 percent, and then Mr. Keller on the next page gets

10  20 percent, correct?

11  A.  Correct.

12  Q.  Okay.  And once again, as far as the trustee section

13  goes, he named Mr. Ashley; but he also named Kerby Keller,

14  correct?

15  A.  Do you have that section?

16  Q.  Sure.

17        MR. WHALEN:  Can you go to the next -- page 5.  I

18  think it's on page 5.

19  BY MR. WHALEN:

20  Q.  Okay.  Trustee Appointments, do you see that?

21        Successor Trustee.  It's Keith Ashley; and if he

22  fails to qualify or resigns, then it's Kerby Keller,

23  correct?

24  A.  Correct.

25  Q.  Okay.  Now, in relation to that, you -- you weren't the

 1    original case agent; but you took the case over, correct?

 2    A.  Correct.

 3    Q.  Okay.  And you reviewed the file, your file, but as

 4    well as did you review Carrollton PD's file?

 5    A.  I did.

 6    Q.  Okay.  And would you -- did you learn through the

 7    review of that file that at some point Mr. Ashley

 8    resigned --

 9         MS. RATTAN:  Your Honor, I object.  I think this

10    calls for hearsay, a hearsay response, based on the agent's

11    review of the file.  We don't know what the answer is, but

12    it's a hearsay concern and I object.

13         THE COURT:  Just rephrase the question.

14    BY MR. WHALEN:

15    Q.  As part of your investigation, did you come to learn

16    that Mr. Ashley resigned as trustee?

17         MS. RATTAN:  I object.  It's a leading question.

18    That calls for --

19         MR. WHALEN:  I get to lead on cross.

20         MS. RATTAN:  He does, but it calls for -- oh,

21    pardon me.  It calls for hearsay.

22         THE COURT:  Well, overruled.

23    BY MR. WHALEN:

24    Q.  Did you learn that he declined to continue to be his

25    trustee or executor of the will?

```
 1   A.  There were circumstances surrounding that, but at one
 2   point Mr. Ashley did resign as the executor.
 3   Q.  Okay.  And was that in February of 2020?
 4   A.  Late February of 2020, if I recall.
 5   Q.  Okay.  Do you know -- I know I asked you about
 6   Mr. Willmon.  Was the last check Mr. Shteyngart sent in
 7   December of 2019?
 8   A.  That would be my recollection, yes.
 9   Q.  Okay.  And as far as Mr. Greening, he simply had the
10   $75,000 in February; is that correct?
11   A.  That's correct.
12   Q.  Okay.  And then as far as Mr. Seegan, when was the last
13   time he sent any money to Mr. Ashley?
14   A.  I believe it was the $150,000 check --
15   Q.  Okay.  So --
16   A.  -- or, excuse me, wire transfer.
17   Q.  Okay.  So in 2016 the $150,000 was the last amount of
18   money sent to Mr. Ashley from Mr. Seegan; is that correct?
19   A.  I can't say it's the last amount of money.  It's the
20   last amount of money that we've covered here, but there may
21   have been a transfer of money between them that wasn't --
22   that hasn't been presented as evidence.  But I would have
23   to review the complete financials to say that is the last,
24   but suffice to say that was received by Mr. Ashley.
25   Q.  Okay.  But obviously you worked -- we've seen the
```

 1   flowcharts.  If there was another wire that came through

 2   from Mr. Seegan, would it be reasonable we would have seen

 3   it?

 4   A.  If it was -- if it was a wire transfer or a large

 5   amount that was tied to investment activity, I think it's

 6   fair to say we would have displayed it.

 7   Q.  Okay.  Also we saw in the nursing -- his resumé to

 8   apply for City Hospital, it said he had a Series 63

 9   license.

10   A.  Uh-huh.

11   Q.  Do you know what a Series 63 license is?

12   A.  A Series 63 -- he had a Series 6 and a Series 63.  I

13   believe 63 is for life insurance and 66 -- excuse me --

14   Series 6 is for mutual funds or they're -- or I have them

15   backwards, one or the other.

16        He doesn't have a securities license --

17   Q.  Okay.

18   A.  -- which is a Series 7.

19        But those two licenses together allow him to be a

20   financial planner, offer investment vehicles such as mutual

21   funds and life insurance.

22   Q.  Okay.  And variable annuities?

23   A.  Correct.

24   Q.  And unit investment trusts?

25   A.  I believe, based upon the information we have from

 1   Parkland, that he was able to provide those types of

 2   investment opportunities, yes.

 3   Q.  Okay.

 4          MR. WHALEN:  I'll pass the witness.

 5          THE COURT:  Anything additional?

 6          MS. RATTAN:  Yes, your Honor.  Thank you.

 7             REDIRECT EXAMINATION OF JASON RENNIE

 8   BY MS. RATTAN:

 9   Q.  Agent Rennie, counsel was asking you about the Eastern

10   District of Texas.  Let's focus on Keith Ashley and the

11   Eastern District of Texas.

12          Was his house at all times, regardless of what

13   residence he lived at, during the time period of the

14   investigation in the Eastern District of Texas?

15   A.  It was.

16   Q.  Were his businesses, whether it's North Texas Money

17   Management, KBKK, the Nine Band Brewery, all of his

18   businesses, were those located in the Eastern District of

19   Texas?

20   A.  They were.

21   Q.  And based on your investigation, the business that he

22   was conducting as a financial advisor, was that

23   headquartered and grounded in the Eastern District of

24   Texas?

25   A.  It was.

1    Q.  Now, the money that he was taking from the investors

2    and not investing, was a portion of that money spent on the

3    brewery, the defendant's business, located in the Eastern

4    District of Texas?

5    A.  It was.

6    Q.  And what about the money -- and we've seen on the

7    charts the money that was coming from the investors that

8    wasn't being invested.  Was it being spent on paying the

9    defendant's mortgage?

10   A.  It was.

11   Q.  And was that mortgage on a house that was in the

12   Eastern District of Texas?

13   A.  It was.

14   Q.  So he lives here, his business is here, and he's taking

15   the diverted money and spending it on his business and his

16   house here in the Eastern District of Texas?

17   A.  Correct.

18        And, in addition, he's paying off credit cards for

19   which he's utilizing to make purchases as he lives and

20   works in the Eastern District for purchases in the Eastern

21   District of Texas, which the investment money is being

22   utilized to satisfy the balances on a monthly basis on

23   those credit cards.

24   Q.  Okay.  And then counsel was asking you on

25   cross-examination about the wires.  There were three wires

 1  sent after Mr. Greening sends $75,000 in.

 2          MS. RATTAN:  So if we can look at -- I think it's

 3  Government's Exhibit 52A.

 4  BY MS. RATTAN:

 5  Q.  52A, Mr. Greening sends -- wires in $75,000 to KBKK.

 6  And defense counsel was asking you what happened to the

 7  other wires.  There were three other wires.

 8          And you said those totaled about $41,000; is that

 9  right?

10  A.  That's correct.

11  Q.  So this $41,000 here, would that be the three

12  additional wires -- so there's this wire and then three

13  more, so four wires in total related to Mr. Greening.

14          Were those three wires that were sent from BB&T to

15  Keith Ashley's other account there at Chase Bank?

16  A.  Correct.  They were all -- the money that Mr. Greening

17  provided funded entirely that 41,000, the three wires that

18  totaled 41,996 actually and 15 cents; and all four wires,

19  the three that totaled 41,996.15 and the $75,000 wires,

20  were all interstate wire transfers.

21  Q.  Okay.  So all four of these are interstate wire

22  transfers?

23  A.  Correct.

24  Q.  And counsel made the point that this money, the

25  $41,000, didn't go to pay off previous investors as part of

1    a scheme; is that right?

2    A.   Correct.   According to the flowchart, it did not.

3    Q.   It went to gambling, though.   Is that an investment?

4    A.   Not a good investment.

5    Q.   So let me ask you about the loss amounts to the

6    victims.   Denny Willmon, what's the approximate loss

7    amount, in total, to Denny Willmon?

8    A.   Sure.   I misspoke previously.   Mr. Willmon lost just

9    short of $100,000.   $97,300, approximately.

10   Q.   And then what about Leonid Shteyngart?

11   A.   Leonid -- Mr. Shteyngart lost approximately $124,000.

12   Q.   And then Mr. Seegan, James Seegan?

13   A.   Mr. Seegan lost about $687,000; and Mr. Greening lost,

14   as he testified, approximately $75,000.

15   Q.   Now, Mr. Greening invested $75,000.   But then after he

16   made the video recording and there were the "I never said

17   UIT," "I never mentioned Parkland," everything that we

18   heard yesterday, Mr. Greening asked for his money back; is

19   that right?

20   A.   He did.

21   Q.   And the defendant gave money back?

22   A.   He gave money back, not the original money back, but he

23   did give $75,000 back.

24   Q.   Well, what do you mean by that?

25   A.   As we've shown on the previous exhibit, Mr. Greening's

1   money went to Mr. Ashley's personal expenses and business

2   expenses.  So the money that was provided back to

3   Mr. Greening was other money; but it wasn't his original

4   $75,000.

5   Q.  So after James Seegan was murdered, the defendant

6   resigned --

7          MR. WHALEN:  Your Honor, I'm going to object to

8   that characterization.  There is no evidence in the record

9   about that.  Counsel is testifying.

10          THE COURT:  Okay.  Sustained.

11          MR. WHALEN:  Ask the jury to disregard.

12          THE COURT:  The jury will disregard the last

13   statement by counsel.

14   BY MS. RATTAN:

15   Q.  On February 19th of 2020, did James Seegan die of a

16   gunshot wound to his head?

17   A.  He did.

18   Q.  And after that happened, eventually did the defendant,

19   Keith Ashley, resign as the executor of the trust?

20   A.  He did.  Those are the circumstances for which I was

21   referring earlier.

22   Q.  And was it also after that that he gave Mr. Greening

23   his money back?

24   A.  He did.

25          MS. RATTAN:  I'll pass the witness.

```
 1              THE COURT:  Any additional questions?
 2              RECROSS-EXAMINATION OF JASON RENNIE
 3  BY MR. WHALEN:
 4  Q.  Agent Rennie, is it fair to say that the FBI didn't get
 5  involved into this case or started their investigation --
 6  was a direct result of the death of Mr. Seegan, correct?
 7  A.  I'm sorry.  Could you rephrase?
 8  Q.  Yeah.  That was poorly worded.
 9          Okay.  So you have the death of Mr. Seegan,
10  correct?
11  A.  Sure.
12  Q.  Then Carrollton PD is investigating the case.
13  A.  Correct.
14  Q.  And then eventually the FBI gets involved, correct?
15  A.  Correct.
16  Q.  Okay.  So when did the FBI get involved?
17  A.  The FBI got involved -- it would have been late summer,
18  early fall of 2020.
19  Q.  Okay.
20          MR. WHALEN:  Now if we can go look at 52B, please.
21  BY MR. WHALEN:
22  Q.  Now, this is the wire on February 7th of 2020, correct?
23  A.  Correct.
24  Q.  Okay.  And it has the originator as KBKK, LLC, correct?
25  A.  Correct.
```

1    Q.   And in viewing this wire sheet but also the bank

2    records, those are consistent and accurate, correct?

3    A.   Yes.

4    Q.   Okay.  And then the beneficiary is JPMorgan Chase, the

5    NTMM bank account; is that correct?

6    A.   Correct.

7    Q.   And that information is accurate, correct?

8    A.   This is provided by the bank, so I would assume that

9    the wire transfer manifest is accurate as provided by BB&T.

10   Q.   Okay.  Because it -- well, it fair to say that if there

11   is anything wrong on the manifest or the wire request, it's

12   not going to go through?  Is that correct?

13   A.   I mean, I can't speak to, you know, their -- the

14   regulations or what the system checks.  I would imagine if

15   the account number doesn't exist by the receiving bank, it

16   will not be executed.  It might be held.

17        But, again, it was originated from an account held

18   by BB&T; so if there was some error, it would be -- my

19   guess would be the account number.

20   Q.   Okay.

21   A.   If it wasn't correct and it didn't match up with who

22   the intended beneficiary was, it might then be flagged or

23   held or canceled.

24   Q.   Okay.  And same with the other two wire transfers.

25   Those were initiated, went through, and were successful,

 1    correct?

 2    A.   Yes.

 3    Q.   Okay.

 4            MR. WHALEN:  I'll pass the witness.

 5            THE COURT:  Anything else, Ms. Rattan?

 6            MS. RATTAN:  No, your Honor.

 7            THE COURT:  Agent, you may step down.

 8            THE WITNESS:  Thank you, your Honor.

 9            THE COURT:  And what's next?

10            MS. RATTAN:  The United States calls Jennifer

11    Jennings.

12            THE COURT:  Ma'am, if you'll raise your right hand

13    and be sworn in.

14            (The oath is administered to the witness.)

15            THE COURT:  Go ahead and proceed.

16            <u>DIRECT EXAMINATION OF JENNIFER LYNN JENNINGS</u>

17                <u>CALLED ON BEHALF OF THE GOVERNMENT</u>

18    BY MS. RATTAN:

19    Q.   Please state your name.

20    A.   Jennifer Lynn Jennings.

21    Q.   And would you spell your name, please.

22    A.   My first name is J-E-N-N-I-F-E-R.  L-Y-N-N.

23    J-E-N-N-I-N-G-S.

24    Q.   Ms. Jennings, where do you work?

25    A.   Midland National Life Insurance.

1    Q.  Where do you work?  Physically where is your office?

2    A.  Sioux Falls, South Dakota.

3    Q.  And so you've come from Sioux Falls, South Dakota, to

4    testify?

5    A.  Yes.

6    Q.  How long have you worked for Midland life insurance?

7    A.  It was five years last May?

8    Q.  And can you explain to the jury what your job is at

9    Midland life insurance?

10   A.  I am in-force customer contact.  When a policy is

11   active and needs servicing by the agent or by the client,

12   those phone calls are directed to our team; and we assist

13   as a customer service role for the caller.

14   Q.  So you say "for the caller."  Is the role that you play

15   to answer incoming calls and assist with policies by taking

16   the calls?

17   A.  It is mostly by taking the calls.  We do also process

18   written communication.  However, the majority is over the

19   phone.

20   Q.  So let me ask you.  Before coming to court today, did

21   you listen to two recordings and review transcripts related

22   to phone calls that you took as part of your work at

23   Midland Life?

24   A.  Yes.

25   Q.  And did those phone calls, the recorded calls,

 1  accurately reflect the calls that you had coming in on the

 2  lines there at Midland life?

 3  A.  Yes.

 4  Q.  There had been no additions, changes, or alterations?

 5  A.  No.

 6  Q.  You recognized your voice?

 7  A.  Yes.

 8  Q.  And the conversation?

 9  A.  Yes.

10         MS. RATTAN:  Your Honor, we'll offer Government's

11  Exhibits 62 and 73.  And each of them has a transcript, so

12  it would be 62 and 63 and 72 and 73.

13         THE COURT:  Okay.  So can you say that again?

14  62 --

15         MS. RATTAN:  Let's see.  The recording is

16  Government's Exhibit 61, and the transcript is Government's

17  Exhibit 62.

18         THE COURT:  Okay.

19         MS. RATTAN:  And then the recording is

20  Government's Exhibit 73 and -- rather, 72; and the

21  transcript is Government's Exhibit 73.

22         THE COURT:  Okay.  Any objection?

23         MR. WHALEN:  We'll just object to predicate, your

24  Honor.

25         THE COURT:  I'll overrule that.

1                So 61 and 62 will be admitted, and 72 and 73 will

2       be admitted.

3                MS. RATTAN:  Your Honor, may we publish

4       Government's Exhibits 61 and 62?

5                THE COURT:  Yes, you may.

6                MS. RATTAN:  Thank you.

7                (Audiovisual presentation to the jury.)

8       BY MS. RATTAN:

9       Q.  So let me ask you some questions about the call.

10               MS. RATTAN:  If we can publish Government's

11      Exhibit 62, page 1.

12      BY MS. RATTAN:

13      Q.  This is the transcript of the call that was showing as

14      the call was playing.  So the call comes in on January 21st

15      of 2020; is that right?

16      A.  Yes, that is correct.

17      Q.  And it says that the participants in the conversation

18      are you, Jennifer Jennings; and the other person is

19      identified as Keith Todd Ashley; is that correct?

20      A.  Yes.

21      Q.  Now, when the call comes in, you answer.  You say,

22      "This is Jennifer.  May I have your name and the policy

23      number?"

24               And then the agent code is also discussed.

25               So what's going on there?

1   A.  We are required to verify our callers.  Whether they

2   are policy owners or agents, we have to ensure that they

3   are authorized to receive information on the policy.

4       When we are speaking with an agent, we ask for

5   their active Midland agent code to ensure that they are

6   properly authorized on the policy.

7   Q.  And so the caller says, "My name is Keith Ashley" and

8   provides his agent code.

9       Are you able to realtime verify that?

10  A.  Yes.

11  Q.  And then he says that he's calling about -- "and I am

12  calling about the last name is Seegan."

13      The last name Seegan and he gives his policy

14  number.  So what does that mean to you?

15  A.  That tells me that he is an agent calling to service

16  one of his clients' policies, and at that point I would

17  have waited patiently until I was provided the policy

18  number.

19      MS. RATTAN:  And then if we can look at

20  Government's Exhibit 62, page 1 and focus on lines 19

21  through 22.

22  BY MS. RATTAN:

23  Q.  Here you say, "How can I help?"

24      And he says, "Yes, this client sent, I guess" --

25  he says -- "a beneficiary change form."

1            So what's going on here?

2   A.  When a client wishes to change the beneficiary of their

3   life insurance policy -- it is a very common occurrence --

4   we have a prepared form that we do require the clients to

5   complete and submit back to our office for processing of

6   that requested change.

7            MS. RATTAN:  And then let's look at Government's

8   Exhibit 62, page 2, lines 1 through 4.

9   BY MS. RATTAN:

10  Q.  And, in fact, does the agent, Keith Ashley, tell you

11  what the change is going to be?

12  A.  Yes, he did.

13  Q.  What did he say?

14  A.  He said that he was going to be making his trust a

15  beneficiary.

16  Q.  The trust was going to be the beneficiary?

17  A.  Yes.

18  Q.  The beneficiary of the life insurance policy?

19  A.  Correct.

20  Q.  And that's the change he's trying to make?

21  A.  Yes.

22  Q.  So then as we page down, we see there is some -- you

23  call him Jason and he corrects you and he says (as read),

24  "No, it's Keith.  I'm Keith."

25            Is that right?

 1   A.  That's correct.

 2   Q.  So as far as who you're talking to, he's provided his

 3   name, Keith Ashley.  You've verified his agent code.  And

 4   he's also told you twice it's Keith, it's Keith, on lines

 5   11 and 12.

 6   A.  Yes.

 7   Q.  "My name's Keith."

 8           And so what do you tell him is happening with the

 9   change in the beneficiary?

10   A.  At that point I was able to verify that the paperwork

11   had been received the previous day.  There was no

12   indication of it being completed or processed at that time,

13   so I was not able to comment on the status of the change.

14   But I was able to confirm that the appropriate paperwork

15   had been received.

16   Q.  And so that was on January 21st of 2020?

17   A.  Correct.

18   Q.  Now, you identified two conversations that you had with

19   the Midland life agent Keith Ashley.  The next one happened

20   on January 27th of 2020, about a week later.

21           And have you reviewed that conversation?

22   A.  Yes.

23           MS. RATTAN:  Your Honor, may we publish

24   Government's Exhibit 72 and the transcript, 73?

25           THE COURT:  Yes, you may.

1              (Audiovisual presentation to the jury.)

2    BY MS. RATTAN:

3    Q.  And you're checking with your fax team, as you tell

4    him?

5    A.  Yes, that is correct.

6              (Audiovisual presentation continues.)

7              MS. RATTAN:  And I don't know if we can skip

8    forward to the spot -- okay.

9              (Audiovisual presentation continues.)

10   BY MS. RATTAN:

11   Q.  Okay.  So what's going on in this call on January 27th

12   of 2020?

13   A.  When I received this call, I -- when -- excuse me.

14             Receiving a call requesting if a form has been

15   received, we do have to research the method in which it was

16   sent, either via mail, fax, or email.

17             So at that time because I was informed it was

18   received via fax, I was reaching out to our correspondence

19   team, provided them the fax number that I was given and the

20   page count to verify if anything had been received at that

21   time frame.

22             Confirming that no, there was nothing that had

23   shown come through, I did offer to provide my work email

24   address for a direct contact so I could ensure that the

25   paperwork is submitted for processing as quickly as

1    possible.

2    Q.  Okay.

3          MS. RATTAN:  And let's look at Government's

4    Exhibit 73, which is the transcript.

5    BY MS. RATTAN:

6    Q.  And again you identify yourself, Jennifer Jennings.

7    And the agent calling in identifies that his name is Keith

8    and he provides his agent code of record again; is that

9    right?

10   A.  Yes.

11   Q.  And you're able to verify that as he's calling in?

12   A.  Yes.

13   Q.  And he tells you who he's calling you about.  He says

14   that he's calling about Seegan, S-E-E-G-A-N.  The name is

15   James.  And he talks about that policy; is that right?

16   A.  Yes.

17   Q.  And again he tells you, just like he did on the earlier

18   call, that he sent up a beneficiary change form that was to

19   make his testamentary trust the beneficiary --

20   A.  Yes.

21   Q.  -- is that right?

22   A.  That's correct.

23   Q.  So that's what he's trying to accomplish, make the

24   trust the beneficiary?

25   A.  Yes.

```
 1            MS. RATTAN:  And then if we can look at
 2   Government's Exhibit 73, page 2, lines 4 through 6.
 3            Let's see.  73, page 2.  And we can broaden it
 4   out.  Lines 4 through 10.
 5   BY MS. RATTAN:
 6   Q.  And, in fact, he says in here that they faxed it and
 7   refaxed it and wanted to make sure and they faxed it; is
 8   that right?
 9   A.  Yes.
10   Q.  So he's calling you about it, he's telling you that he
11   faxed it, and then he's telling you again that he's going
12   to email it to you; is that right?
13   A.  Yes.
14   Q.  And this is all to ensure that the Midland life team
15   gets in place this beneficiary change?
16   A.  Correct.
17   Q.  And the beneficiary change, according to what Keith
18   Ashley is telling you on the calls, is going to be that the
19   trust, the Keith Ashley trust, is going to become the
20   beneficiary of the Midland life policy?
21   A.  He told me the trust, yes.  Yes.
22            MS. RATTAN:  May I approach the witness, your
23   Honor?
24            THE COURT:  Yes.
25                              *
```

```
 1   BY MS. RATTAN:
 2   Q.  Now, we just listened to the January 27th of 2020 call.
 3   Let me show you this.  It was Keith Ashley.  And he said
 4   that he faxed, he was going to email, and he called you --
 5   and you're Midland life; you're an employee of Midland
 6   life -- about the beneficiary documents changing James
 7   Seegan's beneficiary to his trust; is that right?
 8   A.  Correct.
 9           MS. RATTAN:  I'll pass the witness, your Honor.
10           THE COURT:  Cross-examination?
11           MR. WHALEN:  Your Honor, we would ask the
12   government to take down the exhibit, the board, please.
13           Thank you, Jay.
14           CROSS-EXAMINATION OF JENNIFER LYNN JENNINGS
15   BY MR. WHALEN:
16   Q.  Ms. Jennings, how are you?  Good morning.
17   A.  Good morning.
18   Q.  How long have you worked at Midland National Life?
19   A.  It has been five years last May.
20   Q.  Last May.
21           And you said you came in from Sioux Falls, South
22   Dakota; is that correct?
23   A.  That's correct.
24   Q.  Okay.  Back in January of 2020, were you still working
25   in the office back then?
```

1   A.  January of 2020, yes, we were.

2   Q.  Okay.  So you were physically located in Sioux Falls,

3   South Dakota?

4   A.  Yes.

5   Q.  Okay.  Every phone call that comes in to Midland

6   National Life is recorded, correct?

7   A.  Correct.

8   Q.  Okay.  And they've been doing that for how many years?

9   A.  Longer than I've been there.  I believe as long as the

10  technology has been available.

11  Q.  Okay.  So if I'm an agent -- life insurance agent and I

12  call in to the line, I know everything is being recorded,

13  correct?

14  A.  Correct.

15  Q.  Okay.  And as far as these phone calls that you had,

16  when somebody asks you about a policy, you're on a

17  computer, correct?

18  A.  Correct.

19  Q.  And you look up based on the policy number, correct?

20  A.  Yes.

21  Q.  And you have information there to review, correct?

22  A.  Yes.

23  Q.  And you can see everything that's going on with the

24  policy, correct?

25  A.  Yes.

1   Q.   Okay.  Now, you don't -- if you -- if Mr. Ashley

2   received this beneficiary change form, you don't do

3   anything with it other than forward it on to the

4   appropriate people, correct?

5   A.   Correct.

6   Q.   You don't have any decision-making authority to change

7   a policy or reduce a policy or do anything like that,

8   correct?

9   A.   No.

10  Q.   Your role is to be a customer service representative,

11  to answer questions and direct information to the right

12  people, correct?

13  A.   Yes.

14  Q.   Okay.  So if I called up and said I want to speak to

15  somebody about increasing or decreasing my life insurance,

16  that's not your department?

17  A.   I would answer your questions.  I would provide you

18  with the appropriate forms or paperwork that would be

19  needed.

20  Q.   Okay.

21  A.   I would walk you through that, but I would not make the

22  change.

23  Q.   Okay.  So -- and just so we're clear, anytime anybody

24  calls concerning a specific policy, those calls are

25  recorded?

1    A.  Yes.

2    Q.  Great.  All right.

3          Oh, well, let me ask you this, too:  If there is a

4    change -- if you know, if there is a change to a policy,

5    significant change or any change, does that generate a

6    letter to the client?

7    A.  Yes.

8    Q.  Okay.  And so if the beneficiary is changed, amounts

9    increase, Midland National is going to generate a letter

10   and send it to the insured's address, correct?

11   A.  Correct.

12   Q.  Okay.  And that happens automatically?

13   A.  Yes.

14   Q.  In every situation?

15   A.  Yes.

16   Q.  And if I'm an agent of Midland National, I know that,

17   correct?

18   A.  Yes.

19   Q.  Okay.  And is there a way to opt out of that or --

20   A.  No.

21   Q.  -- everything gets mailed?

22   A.  No, there is not a way to opt out of it.  Everything is

23   mailed to the policy owner.

24   Q.  Okay.  And that happens in every occasion.  If there is

25   a change, something gets mailed?

```
 1   A.  Yes, that's correct.
 2   Q.  Okay.
 3          MR. WHALEN:  I'll pass the witness.
 4          THE COURT:  Anything additional?
 5          MS. RATTAN:  Yes, your Honor.
 6          May I approach the witness?
 7          THE COURT:  Yes.
 8          And would you move the exhibit book to the back so
 9   it doesn't block any view?
10          MS. RATTAN:  Yes, your Honor.
11          THE COURT:  Thank you.
12          MS. RATTAN:  May I return?
13          THE COURT:  Yes.
14          REDIRECT EXAMINATION OF JENNIFER LYNN JENNINGS
15   BY MS. RATTAN:
16   Q.  Ms. Jennings, we spoke a moment ago about the phone
17   call that you had with Mr. Ashley; is that right?
18   A.  Yes.
19   Q.  And at the end of the phone call, you gave him your
20   email address so that he could email you the documents that
21   he was talking about to be sure that Midland life got them.
22   A.  Correct.
23   Q.  And I've just directed your attention, when I was at
24   the stand with you, to Government's Exhibit Number 71; is
25   that right?
```

1   A.  Yes.

2   Q.  Do you recognize that as being the email that you, in

3   fact, received from Keith Ashley --

4   keith@northtexasmoneymanagement.com on that same day,

5   January 27th of 2020?

6   A.  Yes.

7           MS. RATTAN:  And, your Honor, we'll offer

8   Government's Exhibit 71.

9           MR. WHALEN:  No objection, your Honor.

10          THE COURT:  71 will be admitted.

11          MS. RATTAN:  Okay.  And can we publish it?

12          THE COURT:  Yes, you may.

13  BY MS. RATTAN:

14  Q.  Okay.  Ms. Jennings, can you explain to us what this

15  is?

16  A.  This is the email that I received with a -- with the

17  attachment of the beneficiary change form.

18          I submitted the beneficiary change form to our

19  processing team later that day to ensure that the change

20  was in for processing as needed.

21  Q.  Okay.  So he told you that he was faxing it.  He's

22  calling you about it.  And now here he's following up and

23  emailing you about it; is that right?

24  A.  Yes.

25  Q.  So let's look at Government's Exhibit 71, page 2.  And,

 1   of course, this is Midland life Insurance Company; and

 2   that's where you work.

 3            And what's the name of this document?

 4   A.  The Beneficiary Change Request form.

 5   Q.  The Beneficiary Change Request form.

 6            And who is the insured?

 7   A.  The insured is James Seegan.

 8   Q.  James Seegan.

 9            And is that the person who Keith Ashley mentioned

10   to you when he called?

11   A.  Yes.

12   Q.  And so this is going to be about changing James

13   Seegan's beneficiary to his life insurance policy?

14   A.  Correct.

15            MS. RATTAN:  And if we can look at the top of

16   Government's 71, page 4.

17   BY MS. RATTAN:

18   Q.  What's going on here?

19   A.  This is indicating that the requested change is to make

20   a James Seegan Revocable Trust 100 percent primary

21   beneficiary.

22   Q.  So all of the life insurance money is going to go into

23   the James Seegan Revocable Trust?

24   A.  Yes.

25   Q.  And then there's initials and a date over here, and it

1    looks like January 24th of 2020; is that right?

2    A.  Yes.

3    Q.  And it looks like KTA and JS, which could be Keith Todd

4    Ashley and James Seegan; is that right?

5    A.  Yes.

6           MS. RATTAN:  And then if we can look on

7    Government's Exhibit 71, page 5.

8    BY MS. RATTAN:

9    Q.  What's going on here?

10   A.  This is the signature page for the Beneficiary Change

11   Request form itself.  Required signature is the policy

12   owner and the spouse if in a community property state.

13   Q.  And that's dated January 24th of 2020?

14   A.  Yes.

15          MS. RATTAN:  And then if we can look at the next

16   page, which is Government's Exhibit 71, page 6.

17   BY MS. RATTAN:

18   Q.  And what's going on here?

19   A.  This is the Certification of Trust Agreement providing

20   the information that we require on the trust when we are

21   changing the beneficiary to a trust.

22          This form is completed as a testamentary trust.

23   So the form was not fully completed towards the end -- to

24   the end as a trust would be, a revocable trust would be.

25   Q.  Okay.  What do you mean by that?

1   A.  When a trust is a testamentary trust, we only ask the

2   policyholder or trustee to fill out the first half of the

3   page.

4           If it is a trust that is in force as of that date,

5   then we do ask to provide the rest of the information as

6   far as the trustees.

7   Q.  And so this is what was filled out on this date, and

8   it's for the James E. Seegan Revocable Trust; is that

9   right?

10  A.  Yes.

11  Q.  And it has the trust effective date here of April 16th

12  of 2019; is that right?

13  A.  Yes.

14          MS. RATTAN:  And I'll pass the witness, your

15  Honor.

16          THE COURT:  Additional questions?

17          RECROSS-EXAMINATION OF JENNIFER LYNN JENNINGS

18  BY MR. WHALEN:

19  Q.  Ms. Jennings, is it -- it's not uncommon for agents to

20  help their clients make changes to their policies, correct?

21  A.  Correct.

22  Q.  Okay.

23  A.  It is not uncommon.

24  Q.  So you field calls from agents as well as insureds on a

25  regular basis, correct?

```
 1   A.  Yes, sir.

 2   Q.  Okay.  So the fact an agent called you to assist with

 3   the change of beneficiary form, that's not unusual,

 4   correct?

 5   A.  It is not unusual, no, sir.

 6   Q.  Okay.  Thank you very much.

 7           THE COURT:  Can this witness be fully excused?

 8           MS. RATTAN:  Yes, please.

 9           MR. WHALEN:  No objection, your Honor.

10           THE COURT:  Okay.  Ma'am, you are free to leave.

11   Thank you.

12           What's next?

13           MS. RATTAN:  Rachel Appel.

14           THE COURT:  Ma'am, if you'll raise your right hand

15   to be sworn in.

16           (The oath is administered to the witness.)

17           THE COURT:  Go ahead and proceed.

18           MS. RATTAN:  Thank you, your Honor.

19                  DIRECT EXAMINATION OF RACHEL APPEL

20                  CALLED ON BEHALF OF THE GOVERNMENT

21   BY MS. RATTAN:

22   Q.  Would you please state your name.

23   A.  My name is Rachel Appel.

24   Q.  And how do you spell your name?

25   A.  My first name, R-A-C-H-E-L.  My last name, A-P-P-E-L.
```

```
1   Q.  And where do you work?

2   A.  I currently -- currently?

3   Q.  Yes.

4   A.  I work for Coldwell Banker, Tony Bachman Group.

5   Q.  Did you previously work for Midland life?

6   A.  I did.

7   Q.  And when did you work for Midland life?

8   A.  I worked in -- at Midland since October of 2017 until

9   November of 2020.

10  Q.  And will you describe when you worked for Midland life

11  what your job was there?  What did you do?

12  A.  I started out in policy billing and accounting and

13  then -- so I handled premium changes, draft information,

14  and more of the processing aspect.

15          Then I moved to customer contact where we fielded

16  calls, incoming and outgoing phone calls with agents and

17  policyholders and internal phone calls as well, just to see

18  how we could assist and make sure that it got in the right

19  processing hands and things got handled properly.

20  Q.  And in January of 2020, is that the position that you

21  had?

22  A.  Yes.

23  Q.  And did you receive a phone call from an agent who

24  identified themselves as Keith Ashley?

25  A.  Yes.
```

1   Q.  Have you reviewed that call before coming to court

2   today?

3   A.  Yes.

4   Q.  And is it accurate as far as what happened?

5   A.  He had called in to check on the status of a

6   beneficiary change form.  We were looking at why it was

7   returned as what we call NIGO, or not in good order, and --

8           MR. WHALEN:  Objection as to the narrative, your

9   Honor.

10          THE COURT:  Go ahead and ask another question.

11  BY MS. RATTAN:

12  Q.  So Keith Ashley, Agent Keith Ashley called in; is that

13  right?

14  A.  That's correct.

15  Q.  And you've listened to the call before coming to court

16  today?

17  A.  Yes.

18  Q.  And the call is accurate about what happened; is that

19  right?

20  A.  Yes.

21          MS. RATTAN:  Your Honor, may we publish

22  Government's Exhibit -- well, first offer Government's

23  Exhibits 63 and 64?

24          MR. WHALEN:  Predicate and authentication.

25          THE COURT:  Well, Ms. Rattan?

 1              MS. RATTAN:  I can ask her some more questions.

 2              THE COURT:  Okay.  Go ahead.

 3  BY MS. RATTAN:

 4  Q.  Did you listen to this, and did you identify your

 5  voice?

 6  A.  Yes.

 7  Q.  And have there been any additions, changes, or

 8  alterations to the call?

 9              Is it different from the call that you had that

10  was recorded on January 23rd of 2020?

11  A.  No.

12              MS. RATTAN:  Your Honor, we would offer this.

13  It's Government's Exhibit 63 as the recording and 64 as the

14  transcript.

15              MR. WHALEN:  Same objections, your Honor.

16              THE COURT:  Okay.  Overruled.  63 and 64 will be

17  admitted.

18              MS. RATTAN:  And may we publish it?

19              THE COURT:  You may.

20              (Audiovisual presentation to the jury.)

21  BY MS. RATTAN:

22  Q.  So basically what's going on in this call?

23  A.  He had called in to check on the status of a

24  Beneficiary Change Request, so we pulled up the request

25  item that is our method of communication between us and the

 1  processors.

 2       So the processors had noted back before they sent

 3  it as not in good order back to us -- or sent out a letter,

 4  kind of depending on the circumstances.  I'm not sure which

 5  one they did in that instance.  But they would send it back

 6  for either a callback or a letter being sent to the policy

 7  owner just to let them know of those updates that needed to

 8  be made to the form to put that change into effect.

 9  Q.  Okay.  And let me direct your attention --

10       MS. RATTAN:  If we can focus on Government's 64,

11  page 2.

12       64, page 2.  And look at lines 15 through 18.

13       Back it up and do 14, sorry, 14 through 18.

14  BY MS. RATTAN:

15  Q.  Okay.  This is the agent, Ashley; and he tells you what

16  the policy number is.  He tells you who the policy is for,

17  and that's Seegan; is that right?

18  A.  Yes.

19  Q.  And Ashley, the agent, is telling you that it's about a

20  beneficiary change form and he needs to know what the

21  status on it is; is that right?

22  A.  Yes.

23  Q.  And, again, this phone call that you took is on

24  January 23rd of 2020; is that right?

25  A.  Yes.

1   Q.  And then the rest of the phone call is all about how to

2   get this policy change form to make the trust the

3   beneficiary in place?

4   A.  Yes.

5   Q.  And then you're telling him that it needs to be

6   corrected; and he's saying that he's going to correct it,

7   is that right, and send it back?

8   A.  Yes.

9   Q.  And that the corrections need to be initialed; is that

10  right?

11  A.  Yes.

12  Q.  Let me show you Government's Exhibit Number 71.

13          MS. RATTAN:  If we can publish that, Government's

14  Exhibit 71, page 2.

15  BY MS. RATTAN:

16  Q.  And then this is a Beneficiary Change Request form with

17  Midland National Life Insurance Company; is that right?

18  A.  Yes.

19  Q.  And it has the name of the insured, James Seegan.  Is

20  that the name of the insured that you were talking to Agent

21  Keith Ashley about?

22  A.  Yes.

23  Q.  And let me direct your attention to page 4 of

24  Government's Exhibit 71.

25          And your -- the call that you had came in on the

 1   23rd, and this looks like the initials are KTA and JS.  And

 2   that's the next day, the 24th; is that right?

 3   A.  Yes.

 4   Q.  And this is talking about the primary beneficiary, and

 5   it's going to be the James E. Seegan Revocable Trust; is

 6   that correct?

 7   A.  Yes.

 8   Q.  Okay.

 9        MS. RATTAN:  I'll pass the witness, your Honor.

10        THE COURT:  Mr. Whalen, I don't know how many

11   questions you have, if we can maybe finish the witness

12   before the lunch break or --

13        MR. WHALEN:  Yeah, I think we can.

14        THE COURT:  Okay.  Go ahead.

15               CROSS-EXAMINATION OF RACHEL APPEL

16   BY MR. WHALEN:

17   Q.  Hi, Ms. Appel.  How are you?

18   A.  I'm well.  How are you?

19   Q.  Okay.

20        When you took this call, were you in -- where were

21   you located when you took this call?

22   A.  In the Sioux Falls, South Dakota, office in customer

23   contact.

24   Q.  Okay.  And just once again, every phone call that ever

25   comes in to that customer contact is recorded, correct?

 1   A.  Yes, sir.

 2   Q.  And every agent knows that, correct?

 3   A.  Yes.

 4   Q.  And I think in this phone call you indicated that

 5   something was mailed out that something was wrong with the

 6   form, correct?

 7   A.  I believe so, yes.

 8   Q.  Okay.  So if the form comes in and something is wrong

 9   with it, that generates a letter from Midland National to

10   the policy owner, correct?

11   A.  Typically there would be a letter typed by the

12   processing team to just -- more clearly than just like an

13   automated letter so we can make sure we kind of nip it in

14   the bud.

15   Q.  Okay.  And it seemed to me that you mentioned something

16   was mailed out because that was what was indicated on your

17   screen, correct?

18   A.  I believe so, yes.

19   Q.  Okay.  And that would go to Mr. Seegan notifying him

20   that there was something wrong with the change of

21   beneficiary form, correct?

22   A.  Yes.  It would go to Mr. Seegan as well as -- as long

23   as he had an active agent, so Mr. Ashley as well.

24   Q.  Okay.  So it would send out two letters?

25   A.  Correct.

 1   Q.  Okay.  But one letter is always going to the

 2   policyholder?

 3   A.  Always, yes.

 4   Q.  Okay.

 5           MR. WHALEN:  I'll pass the witness.

 6           THE COURT:  Anything additional?

 7           MS. RATTAN:  No, your Honor.

 8           THE COURT:  Okay.  Can this witness be fully

 9   excused?

10           MS. RATTAN:  Yes, please.

11           MR. WHALEN:  Yes, your Honor.

12           THE COURT:  Ma'am, you are free to leave.  Thank

13   you.

14           At this time we're going to go ahead and take our

15   lunch break.  Ladies and gentlemen, again, please don't

16   discuss the case among yourself or anyone else.  Don't do

17   any outside research, and we'll come back at 1:00.  Have a

18   good lunch.

19           (The jury exits the courtroom, 12:00 p.m.)

20           THE COURT:  Anything further from the government?

21           MS. RATTAN:  Your Honor, in terms of the timeline,

22   that's been marked as an exhibit; and it's on the exhibit

23   list.  We'll be building it as the evidence is presented,

24   but we are going to offer it as an exhibit and I believe

25   it's perfectly appropriate to display it.

 1          MR. WHALEN:  We would object to that.  It has

 2   items on it that have not been proven up yet, and it -- on

 3   the timeline that I saw -- and it has a lot of -- it's more

 4   argument than it is factual.

 5          THE COURT:  Well, Ms. Rattan, you're talking about

 6   the timeline that you're putting up on the board right now?

 7          MS. RATTAN:  Yes, your Honor.

 8          THE COURT:  I mean, I don't see a problem with

 9   that, Mr. Whalen.  What's wrong with that?

10          MR. WHALEN:  Okay.  Well, I misunderstood because

11   she said she's offering the timeline.  And if she's

12   offering the completed timeline, which was Exhibit 71, then

13   I'm objecting to that.

14          THE COURT:  Well, I assume she's not going to

15   offer it until she completes the timeline.

16          MS. RATTAN:  That's correct.

17          THE COURT:  But then she is going to offer that.

18          MR. WHALEN:  Okay.

19          THE COURT:  So she's not offering it now.

20          MS. RATTAN:  We're not.  But in the interim, I

21   believe it's appropriate to display it to the jury and I

22   don't believe we have to turn it away from the jury.

23          THE COURT:  Oh, that's the issue.

24          MS. RATTAN:  Yes.

25          THE COURT:  Okay.

 1              MR. WHALEN:  Well, I believe they do because it's

 2     a demonstrative that they don't get -- the jury doesn't get

 3     to focus on that the entire time.

 4              And if they want to use it with a witness, that's

 5     fine; but they need to take it down.

 6              THE COURT:  Well, Ms. Rattan, I think it's fair

 7     until it is offered.  It's a demonstrative during your --

 8     like any other demonstrative, when the other side is doing

 9     their part, the demonstrative doesn't have to be displayed.

10     So just as a courtesy, do that until it is fully admitted;

11     and then, you know, we can talk about whether it's

12     published at that point.

13              MS. RATTAN:  Yes, your Honor.

14              THE COURT:  But also you're going to -- when it's

15     fully admitted, you're also going to have a reduced version

16     to submit as an exhibit.

17              MS. RATTAN:  Yes, your Honor.

18              THE COURT:  Just following the pattern from prior

19     cases with you, I understand that's where we're going so --

20     okay.  But that's fine.  If you'll just have your staff or

21     have someone just automatically -- when you're done and

22     when you pass the witness, then it can be turned back

23     upside down so he doesn't have to ask; and then we'll deal

24     with it later when it is fully admitted.  Okay?

25              MR. WHALEN:  That's fine.  Thank you, your Honor.

```
 1              THE COURT:  See y'all back in an hour.

 2              (Recess, 12:02 p.m. to 1:01 p.m.)

 3              (Open court, defendant present, jury present.)

 4              THE COURT:  Please be seated.

 5              Ladies and gentlemen, I hope you had a nice lunch.

 6              Okay.  What's next?

 7              MS. RATTAN:  Your Honor, the United States calls

 8   Paula Diaz.

 9              THE COURT:  Ma'am, if you'll raise your right hand

10   and be sworn in.

11              (The oath is administered to the witness.)

12              THE COURT:  Go ahead and proceed.

13                   DIRECT EXAMINATION OF PAULA DIAZ

14                   CALLED ON BEHALF OF THE GOVERNMENT

15   BY MS. RATTAN:

16   Q.  Please state your name.

17   A.  Paula Diaz.

18   Q.  Ms. Diaz, where do you work?

19   A.  Midland National.

20   Q.  Midland National Life Insurance Company?

21   A.  Yes, ma'am.  Sorry.

22   Q.  Okay.  So that's where you work.  Where physically is

23   your workplace, your work site?

24   A.  Sure.  Our -- my office location is in Sioux Falls,

25   South Dakota.
```

1    Q.  And you came here from Sioux Falls, South Dakota, to

2    testify?

3    A.  Yes, ma'am.

4    Q.  Can you tell the jury what you do at Midland life?

5    A.  Yes, absolutely.

6          Currently I work for our claims department.  Prior

7    to -- three years I've done that in our claims department.

8    Prior to that, I did work in our life customer contact

9    department.

10   Q.  And so in January of 2020, what were you doing?

11   A.  I was working half-days in our life customer contact

12   department and half-days in our claims department as a

13   transition period.

14   Q.  And did you review a phone call that you received while

15   you were working in that capacity at Midland life?

16   A.  Yes.

17   Q.  And did you listen to the call?

18   A.  Yes, ma'am.

19   Q.  Did you hear your voice?

20   A.  Yes, ma'am.

21   Q.  Did you make sure the call was accurate and that there

22   hadn't been any changes, additions, alterations, anything

23   like that?

24   A.  Yes, ma'am.

25   Q.  And did you identify that it was an agent who called in

1   whose ID you had verified when the call came in?

2   A.  Yes, ma'am.

3          MS. RATTAN:  Your Honor, we'll offer Government's

4   Exhibit 65, which is the call, and 66, which is the

5   transcript.

6          MR. WHALEN:  No objection, your Honor.

7          THE COURT:  Okay.  65 and 66 will be admitted.

8          MS. RATTAN:  And may we publish them?

9          THE COURT:  Yes, you may.

10          (Audiovisual presentation to the jury.)

11   BY MS. RATTAN:

12   Q.  Okay.  Let me ask you some questions, Ms. Diaz, about

13   the call.  It came in, again, on January 24th of 2020; is

14   that right?

15   A.  Yes, ma'am.

16          MS. RATTAN:  And if we can publish Government's

17   Exhibit 66 on page 1.

18   BY MS. RATTAN:

19   Q.  You've got the date there at the top, and the

20   participants in the call are you and Keith Ashley; is that

21   right?

22   A.  Yes.

23   Q.  And you say, "Thank you for calling customer contact."

24          And there on lines 23 and 24 he identifies who he

25   is.  He gives his name, Keith Ashley, and his agent code so

1    that you know it's him.

2            And you verified the code?

3    A.  Yes, ma'am.

4            MS. RATTAN:  And then if we can look at

5    Government's 66, page 2, at the top of the page.

6    BY MS. RATTAN:

7    Q.  He says what he's calling about.  He's calling about

8    the name of the insured and he says it's Seegan.  "Last

9    name, Seegan."

10           And he spells it out and says the first name is

11   James; is that right?

12   A.  Yes.

13   Q.  And he says he's just left his house.

14   A.  Yes.

15   Q.  Now, he says that he wants to be sure that he gets it

16   right for him; and he talks about --

17           MS. RATTAN:  If we can look at lines 20 through

18   25.

19   BY MS. RATTAN:

20   Q.  He says -- and this is Ashley.  "So, the first thing I

21   believe was on page 3 of 7, Section 4A.  He had put 'NA.'

22   Now he has put 'James E. Seegan revocable trust,' and

23   100 percent as the primary beneficiary."

24           And then the date of birth is the date of the

25   trust; is that right?

 1   A.  Yes.

 2   Q.  Let me direct your attention to Government's

 3   Exhibit 71.

 4          MS. RATTAN:  If we can look at page 4.  71,

 5   page 4.

 6   BY MS. RATTAN:

 7   Q.  Let me show you this Beneficiary Change Request.  And

 8   it says "Primary Beneficiary(ies)," and it says the

 9   "James E. Seegan Revocable Trust"; is that right?

10   A.  Yes.

11   Q.  And then as the date of birth, he says the date of

12   birth is going to be the date that the trust was created?

13   A.  Yes, ma'am.

14   Q.  And that this document lists April 16th of 2019?

15   A.  Yes, ma'am.

16   Q.  And then you see some initials over here, and it looks

17   like KTA and JS and the date January 24th of 2020.

18   A.  Yes, ma'am.

19          MS. RATTAN:  Now let's go back to the transcript,

20   Government's Exhibit 66, page 3 now.

21          Let's go on to the next page and look at the top

22   of the page through line --

23   BY MS. RATTAN:

24   Q.  Okay.  So he says that's the primary beneficiary.  The

25   trust is going to be the primary beneficiary.

1         And then he says that he and his wife signed it on

2    the certificate of trust agreements.  Is that what he

3    represents to you?

4    A.  That is what he said, yes.

5         MS. RATTAN:  And then if we can look at

6    Government's Exhibit 66, page 5.

7    BY MS. RATTAN:

8    Q.  And then it seems that he is still trying to get the

9    document right, the change of trust, the beneficiary; is

10   that right?

11   A.  It sounds like he still has questions about that, yes.

12   Q.  And here -- and this is at the end of the call -- he

13   says, "And then there's no need for a trustee signature."

14        So he wants to confirm that the trustee doesn't

15   have to sign on the change of beneficiary form; is that

16   right?

17   A.  Yes, ma'am.

18   Q.  Okay.

19        MS. RATTAN:  I'll pass the witness.

20        THE COURT:  Cross-examination?

21             CROSS-EXAMINATION OF PAULA DIAZ

22   BY MR. WHALEN:

23   Q.  Good afternoon, Ms. Diaz.  How are you?

24   A.  Good.  How are you?

25   Q.  I'm doing well.

1              First time to Texas?

2    A.  No.

3    Q.  Oh, good.  Welcome back.

4    A.  Thank you.

5    Q.  You're welcome.

6            Just so -- you've worked -- how many years have

7    you worked at Midland National?

8    A.  December of this year will be ten years.

9    Q.  Okay.  And fair to say that every phone call that comes

10   into that office, customer care, is recorded?

11   A.  Yes.  That is very true, yes.

12   Q.  Okay.  And everybody -- every agent and every policy

13   owner knows that when they call in, correct?

14   A.  Yes, sir.

15   Q.  Okay.  And anytime there is a change to a policy, a

16   letter is mailed to the owner, correct?

17   A.  Yes, sir.

18   Q.  Okay.  And that happens automatically.  No one can

19   change that, correct?

20   A.  That is correct, sir.

21   Q.  Okay.  And it appeared, based on the phone call --

22   there is a reference to "in the letter."  He referred to a

23   letter.  You remember that?

24   A.  Yes.

25   Q.  Would that seem to indicate to you that Midland

```
 1  National had sent a letter to the policy owner explaining
 2  what was wrong with the form?
 3  A.  That is what it sounds like to me, yes.
 4  Q.  Okay.  And as you're sitting at your computer, the data
 5  that you have there can tell you when letters have been
 6  mailed, et cetera, correct?
 7  A.  Yes, sir.
 8  Q.  Okay.  And are they sent regular mail generally, or are
 9  they certified mail or just regular mail?
10  A.  Our letters are mailed via USPS first class mail.
11  Q.  Okay.  And it's going to go to the address of the owner
12  that's named on the policy; is that correct?
13  A.  Any letters that generate go to the owner's address,
14  and it cc's to the agent of record as long as they are
15  active.
16  Q.  Okay.  And you were asked about where it said a
17  trustee's signature is not required.  Do you know anything
18  about wills and trusts or anything like that?
19  A.  I know the business need of what I need to know about a
20  trust.
21  Q.  Okay.  That's all you -- that's all you know.
22  A.  Yes.
23  Q.  Fair enough.
24          MR. WHALEN:  I'll pass the witness.
25          THE COURT:  Anything else?
```

```
 1            MS. RATTAN:  No, your Honor.

 2            THE COURT:  Can this witness be fully excused?

 3            MS. RATTAN:  Yes, please.

 4            MR. WHALEN:  Yes, your Honor.

 5            THE COURT:  Ma'am, you are free to leave.  Thank

 6  you.

 7            THE WITNESS:  Thank you.

 8            THE COURT:  What's next?

 9            MS. RATTAN:  The United States calls Jennifer

10  Bauman.

11            THE COURT:  Ma'am, if you'll raise your right hand

12  to be sworn in.

13            (The oath is administered to the witness.)

14            THE COURT:  Go ahead and proceed.

15            DIRECT EXAMINATION OF JENNIFER BAUMAN

16            CALLED ON BEHALF OF THE GOVERNMENT

17  BY MS. RATTAN:

18  Q.  Please state your name.

19  A.  Jennifer Bauman.

20  Q.  And would you please spell your name.

21  A.  First and last?

22  Q.  Yes, please.

23  A.  Okay.  J-E-N-N-I-F-E-R and then Bauman, B, as in "boy,"

24  A-U-M-A-N.

25  Q.  And we can hear you pretty well, but your voice is a
```

1   little soft so --

2   A.  Okay.

3   Q.  -- as much as you can, will you speak into the

4   microphone?

5   A.  Yeah, I'll do my best -- ooh.

6   Q.  No, that's good.

7   A.  Okay.

8   Q.  Have you worked at Midland life insurance company?

9   A.  Have I?  Yes.

10  Q.  Did you work there?

11         Can you describe for the jury when it was that you

12  worked there?

13  A.  I worked from March of 2014 till April of 2020.

14  Q.  And what did you do when you worked at Midland life?

15  A.  I worked in their customer service department.  I took

16  phone calls from agents and policy owners.  I answered

17  policy questions, helped agents with information to do

18  their job.

19         I moved on to helping with beneficiary changes,

20  like helping them fill out their forms, doing statements of

21  insurance, billing changes, statements of insurance, things

22  like that, and then promoted up to helping with annuity

23  calls as well.  So then I was doing both.

24  Q.  So let me ask you about January 29th of 2020.  Is that

25  the job that you had working for Midland life?

```
 1   A.  Yes, it was.

 2   Q.  And the duties that you described, that's what you were

 3   doing on that day?

 4   A.  Yes, I was.

 5   Q.  Did you answer a call from an agent by the name of

 6   Keith Ashley?

 7   A.  Yes, I did.

 8   Q.  Have you reviewed that call before coming to court

 9   today?

10   A.  I did.

11   Q.  And did you recognize your voice?

12   A.  Actually, I did.

13   Q.  And was the call accurate?  There had been no changes

14   or alterations, additions, deletions, anything like that?

15   A.  No.  It was exactly as -- as it was.

16   Q.  Okay.  And did you have some memory of the call?

17   A.  Actually, I did, yeah.

18          MS. RATTAN:  Your Honor, we'll offer Government's

19   Exhibit 74, the audio, and 75, the transcript.

20          MR. WHALEN:  No objection, your Honor.

21          THE COURT:  Okay.  74 and 75 will be admitted.

22          MS. RATTAN:  And may we publish it, your Honor?

23          THE COURT:  Yes, you may.

24          (Audiovisual presentation to the jury.)

25                                 *
```

1    BY MS. RATTAN:

2    Q.  Okay.  So let me direct your attention to the

3    transcript of the call.  It's Government's Exhibit 75.

4          MS. RATTAN:  If we can publish that.

5    BY MS. RATTAN:

6    Q.  So as you've said, the date is January 29th of 2020;

7    and, of course, you're identified and the agent who you are

8    talking to is Keith Todd Ashley.

9    A.  Yes.  Yes, it is.

10   Q.  And you're able to realtime verify that that's an agent

11   with Midland life at the time that the call comes in?

12   A.  Absolutely.  We have agent codes and we pull up their

13   code with our systems and it will verify what standing they

14   are in.  And if it's their policy and they're active, we're

15   able to assist them.

16   Q.  And he tells you his name and his agent code.

17   A.  Uh-huh.

18   Q.  And then he tells you what he's calling about.  He

19   says, line 25, "to submit a change of beneficiary form."

20          He's talking about one of his clients wanting to

21   submit a change of beneficiary; is that right?

22   A.  Yes, it is.

23   Q.  And he says that they have tried faxing it, the client

24   tried to fax it, he tried to fax it?

25          MS. RATTAN:  And if we can look at 75, page 2,

 1  lines 9 and 10.

 2  BY MS. RATTAN:

 3  Q.  It says, "I just want to make sure it's in the system."

 4        He wants to make sure it's in place.  Is that your

 5  understanding?

 6  A.  Yes, ma'am.

 7  Q.  And then he tells you who the client is on lines 12 and

 8  13.

 9  A.  Yes.

10  Q.  "Last name is Seegan."  He spells it out.  And he says,

11  "First name is James"; is that right?

12  A.  Yes, it is.

13  Q.  And then he tells you exactly what the -- what's going

14  on on lines 19 and 20 -- I guess 18, 19, and 20.

15  A.  Correct.

16  Q.  He says, "It's for a $2 million policy.  He's changing

17  the beneficiary to his trust."

18  A.  Correct.

19  Q.  He tells you exactly what he's trying to do there.

20  A.  Right.

21  Q.  And then if we can look on that same page, 75, page 2,

22  at the very bottom, lines 24 and 25.  You say, "Let's take

23  a peek here."

24        And then you tell him that it's what?

25  A.  It's been completed.

1   Q.  So as of this morning -- and if we page down you say,

2   "It has been completed as of this morning."

3           And then he asks you, on line 4, "It is in good

4   order" -- he wants to know if it's in good order.

5           And you say, "Everything's done."

6           MS. RATTAN:  And if we can look at lines 6 through

7   9.

8   BY MS. RATTAN:

9   Q.  "Everything's done.  James E. Seegan" --

10          He says, "Oh, okay."

11          And you say (as read):  "The revocable

12  testamentary trust is 100 percent the primary beneficiary."

13          So you confirmed that for him in this call on

14  January 29th of 2020?

15  A.  Yes.

16  Q.  And then on lines 15 and 16, you tell him that a

17  confirmation letter is generating.

18          What is that?

19  A.  Anytime there is a change to a policy, regardless of

20  what type of change it is, a confirmation letter will

21  always generate just confirming what has happened; and it

22  goes to the policy owner.

23          And that way if for some reason it's not what they

24  wanted or there is a typo, they have a chance to review it

25  and we can always make corrections.  But it's just to

```
 1  confirm the change has been made.

 2  Q.  So here we are.  You're taking a call from the agent,

 3  Keith Ashley and it's January 29th of 2020 and you're

 4  telling him it's a done deal, it's in place.

 5  A.  Uh-huh.

 6  Q.  And what's in place is that the $2 million life policy

 7  for James Seegan, the beneficiary is now the trust?

 8  A.  Correct.

 9          MS. RATTAN:  I'll pass the witness.

10          THE COURT:  Cross-examination?

11             CROSS-EXAMINATION OF JENNIFER BAUMAN

12  BY MR. WHALEN:

13  Q.  Ms. Bauman, good afternoon.  How are you?

14  A.  I'm good.

15  Q.  Just a couple questions just to go over the fact

16  that -- you said a letter was being generated that day,

17  correct?

18  A.  Uh-huh.

19  Q.  You have to say "yes."  Sorry.

20  A.  Oh, I'm sorry.  Yes.

21  Q.  And so a letter would get generated and get mailed out

22  that day, correct?

23  A.  Correct.

24  Q.  And that was on January 29th of 2020?

25  A.  It should have been.  The only caveat -- and this is
```

 1  something I typically would say when something is being

 2  generated.  When we do our confirmation letters, they will

 3  come back to us.  We will review them for accuracy.  If we

 4  have a typo and notice it, we may regenerate the letter.

 5  Q.  Okay.

 6  A.  And so it might have another day or so date, but that's

 7  why we keep it pretty vague about when we're going to send

 8  it.

 9        But if -- I have not seen the confirmation letter

10  to confirm when it was generated.

11  Q.  Okay.

12  A.  That's my only caveat.

13  Q.  Okay.  Fair enough.

14        But it's not going to take months or weeks for

15  that letter to go out, correct?

16  A.  Oh, heavens, no.

17  Q.  Okay.  What is the standard turnaround time for a

18  letter to be generated and mailed, on average, at Midland

19  National?

20  A.  Well, as soon as you make the change, the confirmation

21  letter is the next step.

22  Q.  Okay.

23  A.  And so it shouldn't take long at all.

24  Q.  And is it your job as the customer care to review that

25  letter, or does it go to the a different department?

1   A.  Those that work remotely have to rely on in-house

2   people to review it for you; and if they have questions,

3   they send it to you and say, "Hey, will you review this?"

4        If you work in-office, then you get your own mail

5   back.  You stuff it in the envelope.  You review it,

6   everything, and it goes out.

7   Q.  Okay.  Were you working in-office on January 29th of

8   2020?

9   A.  I was remote.

10  Q.  You were remote, okay.

11       Where were you when you took the call?

12  A.  I was at my home in Sioux Falls.

13  Q.  Okay.  So you were still in South Dakota?

14  A.  Oh, yeah.

15  Q.  Okay.  And when that letter is generated, it comes by

16  email to you?  How does it --

17  A.  I -- well, I didn't make any changes.  I just confirmed

18  that it was being made.

19       And I couldn't see it in the file.  But because of

20  our procedures, once the change is made, the confirmation

21  letter generates; and then it goes.

22  Q.  Okay.

23  A.  So trusting that the process is normal, it should have.

24  Q.  Gone immediate?

25  A.  Uh-huh (moving head up and down).

 1   Q.  Okay.  Fair enough.

 2            And, once again, everything is recorded, correct?

 3   A.  Everything is recorded.

 4   Q.  Every agent knows that, correct?

 5   A.  Yeah.  Yeah, they know.

 6   Q.  And every agent knows that mail is going to be

 7   generated to go to the owner of the policy?

 8   A.  Absolutely.

 9   Q.  Okay.  And the reason -- I think what you alluded to is

10   the reason why that letter is generated is then the policy

11   owner can get the letter, review it to make sure the

12   changes are in accordance with their wishes, correct?

13   A.  Yes.

14   Q.  Or if they are not, then they would reach back out to

15   you all and say, "Hey, I need to make a change" or "I

16   didn't want to do this," correct?

17   A.  Right, or maybe "This wasn't the request I made."

18   Q.  Okay.

19   A.  You know, we can always review why and fix it.

20   Q.  Okay.

21            MR. WHALEN:  I'll pass the witness.

22            Thank you very much.

23            THE COURT:  Anything additional?

24            MS. RATTAN:  No, your Honor.

25            THE COURT:  Can this witness be fully excused?

 1              MS. RATTAN:  Yes, please.

 2              THE COURT:  Mr. Whalen?

 3              Mr. Whalen, can the witness be excused?

 4              MR. WHALEN:  Oh, yeah.  Absolutely.

 5              THE COURT:  Okay.  Ma'am, you are free to leave.

 6     Thank you.

 7              THE WITNESS:  Oh, I'm so sorry.  Thanks.

 8              THE COURT:  No, you're fine.

 9              What's next?

10              MS. RATTAN:  The United States calls Courtney

11     Jacobson.

12              THE COURT:  Ma'am, if you'll raise your right hand

13     and be sworn in.

14              (The oath is administered to the witness.)

15              THE COURT:  Go ahead and proceed.

16              MS. RATTAN:  Thank you, your Honor.

17              DIRECT EXAMINATION OF COURTNEY JACOBSON

18                CALLED ON BEHALF OF THE GOVERNMENT

19     BY MS. RATTAN:

20     Q.  Please state your name.

21              THE COURT:  Will you turn your mic on, Ms. Rattan?

22              MS. RATTAN:  Oh, pardon me, your Honor.

23     BY MS. RATTAN:

24     Q.  Please state your name.

25     A.  Courtney Jacobson.

```
 1    Q.  And where do you work?

 2    A.  Midland National Life Insurance.

 3    Q.  And what's your position with Midland National Life

 4    Insurance?

 5    A.  I am the AVP, associate chief underwriter.

 6    Q.  And what does that mean?

 7    A.  I lead the underwriting production teams that

 8    underwrite the cases for life insurance.

 9    Q.  What does it mean to be an insurance underwriter?  What

10    is that?

11    A.  Essentially, an insurance underwriter is someone that

12    assesses the risk of the insured.  So we look at blood,

13    urine, and determine the price of the ultimate policy.

14    Q.  And determine the price of the policy?

15    A.  The risk of the policy.  Excuse me.

16    Q.  The risk of the policy.

17    A.  Uh-huh.

18    Q.  Okay.  What is your background and training that

19    qualifies you to be an insurance underwriter at Midland

20    life?

21    A.  I started with Midland National about 16 years ago as

22    an underwriting trainee and Midland National trained me as

23    a trainee and we met with many medical directors, had

24    significant training in anatomy and physiology, and then

25    ultimately did, you know, case studies throughout it to
```

1  learn how to underwrite.

2         I also am essentially certified as an underwriter.

3  I have many designations, one of which is the Fellow,

4  Academy of Life Underwriting, which is similar to a

5  master's in underwriting.

6  Q.  Okay.  So you have a master's, essentially, in

7  underwriting.  What's your undergraduate education?

8  A.  I am -- I got a B.A. at University of South Dakota in

9  audiology and Spanish -- audiology, speech language

10  pathology, and Spanish.

11  Q.  Okay.  Audiology, speech pathology, and Spanish?

12  A.  Correct.

13  Q.  Now, let me ask you.  We just heard from Jennifer

14  Bauman who used to work at Midland life; is that right?

15  A.  Correct.

16  Q.  And we've been listening to phone calls that came in on

17  the Midland life recorded line, which is standard.  Midland

18  life records calls; is that right?

19  A.  Correct.

20  Q.  Let me direct your attention to a transcript and a

21  phone call that we just reviewed.

22         MS. RATTAN:  If we can look at Government's

23  Exhibit 75, page 2.

24         MR. WHALEN:  Your Honor, may we approach briefly?

25         THE COURT:  Yes.

```
 1               (Sidebar conference, off the record.)

 2               MR. WHALEN:  Your Honor, for the record, we object

 3      under 702, a lack of notice.

 4               THE COURT:  Well, she hasn't really stated any

 5      opinions; so I'll overrule the objection.  There is nothing

 6      to object to yet so --

 7               MR. WHALEN:  Okay.

 8               THE COURT:  Go ahead, Ms. Rattan.

 9               MS. RATTAN:  Okay.  If we can look at 75, page 1,

10      first at the heading at the top, the date and the

11      participants.

12      BY MS. RATTAN:

13      Q.  So this is a call that comes in to Midland life on

14      January 29th of 2020, and then Jennifer Bauman is the

15      Midland life employee and Keith Todd Ashley is the agent

16      calling in.

17               So at the bottom of 75, page 1, they are talking

18      about a beneficiary form, right here.  That's the subject

19      of the call.

20               MS. RATTAN:  And then if we can go to page 2 and

21      look at lines 11 through 14.

22      BY MS. RATTAN:

23      Q.  (As read):  "And the client's policy -- the last name

24      is Seegan."  He spells it.  "And the first name is James."

25               So they're talking about James Seegan's policy and
```

1   the beneficiary change on it, and then they talk exactly

2   about what it will be on lines 17 through 20.

3           Okay.  So Ashley, agent, says, "It's for a

4   $2 million policy.  He's changing the beneficiary to his

5   trust."

6           So you're an underwriter with Midland life.

7   A.  Uh-huh (moving head up and down).

8   Q.  And an agent calls in.  The agent is Keith Ashley.  And

9   it's January 29th of 2020; and he's saying that the client,

10  James Seegan, is changing the beneficiary of his $2 million

11  life policy to his trust.

12          So would it be important to Midland life to know

13  whether the agent, Keith Ashley, is the executor of that

14  trust that's now going to be the beneficiary of the

15  $2 million?

16  A.  Yes.

17  Q.  Okay.  Why is that important to know?  Why would

18  Midland life care about that?

19  A.  Because it's a conflict of interest to have -- be

20  involved in a trust and on a policy.

21  Q.  And I know it's hard, but can you speak closer --

22  A.  Oh, sorry.

23  Q.  -- to the microphone?

24  A.  Because it's a conflict of interest.

25  Q.  And you said "conflict of interest."  As the

1  underwriter for Midland life, what do you mean by that?

2  A.  You want to look at the insurability of anyone that

3  would get the proceeds of a life insurance policy.

4  Q.  If Keith Ashley, the agent calling in on January 29th

5  of 2020, had said in this call or in a letter or a fax or

6  any communication with Midland life, "I am the executor of

7  this trust that's going to be the beneficiary of the

8  $2 million life policy," what would have happened?  What

9  would Midland life have done?

10  A.  We wouldn't have allowed it.

11  Q.  And --

12  A.  We would have asked a couple of more questions and

13  essentially not allowed it.

14  Q.  Okay.  Because it's a conflict of interest --

15  A.  Correct.

16  Q.  -- as you say?

17  A.  Uh-huh.

18  Q.  If he had told you that he was the executor of the

19  will, would that have been a concern to Midland life?

20  A.  Yes.

21  Q.  And why is that?

22  A.  For the same reasoning, because it's a conflict of

23  interest.

24  Q.  Let me direct your attention to Government's

25  Exhibit 71.

 1          MS. RATTAN:  If we can look at page 2.

 2   BY MS. RATTAN:

 3   Q.  This is a Beneficiary Change Request with Midland

 4   National Life Insurance Company; and it's for the insured

 5   who we were just talking about from the January 29th, 2020,

 6   call.  It's James E. Seegan.  And that's the policyholder,

 7   is that right, the insured?

 8   A.  That's correct.

 9   Q.  And then let me direct your attention to Government's

10   Exhibit 71, page 4.

11          Okay.  This is the, again, Beneficiary Change

12   Request.  If you can tell us as an underwriter what's going

13   on over here on the left side of the page.

14   A.  That is where they list the change to the beneficiary

15   to be a James E. Seegan Revocable Trust.

16          And then it looks like the agent initialed and

17   dated the form.

18   Q.  Now, again, if Midland life had known that Keith Ashley

19   was the beneficiary of this James E. -- or the trustee,

20   rather, of this revocable trust, would you have approved

21   this change?

22   A.  No.

23          MS. RATTAN:  And then let's look at Government's

24   Exhibit 71, page 5.

25                              *

 1   BY MS. RATTAN:

 2   Q.  This is another section of the beneficiary change form.

 3   What's going on here?  Can you explain this portion of the

 4   form to us?

 5   A.  This is the signature page where they date and sign.

 6           So it has the owner's signature and then the

 7   signature of the spouse, Sakdida.

 8   Q.  Okay.  So this purports to be the owner's signature on

 9   January 24th of 2020; and then this says the owner's

10   spouse, which is required --

11   A.  It does.

12   Q.  -- in these states; and Texas is one of them?

13   A.  Correct.

14   Q.  And it purports to be the signature of the spouse of

15   the owner of the policy?

16   A.  Correct.

17   Q.  If Midland life believed that this was a forged

18   signature, would you, as an underwriter on behalf of

19   Midland life, have concerns?

20   A.  Yes.

21   Q.  Explain that.

22   A.  Essentially, it's misrepresentation of the contract and

23   the form; and so we would have the right to decline and/or

24   contest.

25   Q.  So if Midland life knew that this was a forged

 1  signature, this wouldn't go through?

 2  A.  Correct.

 3  Q.  If Midland life knew that the agent, Keith Ashley, was

 4  the executor of the trust or the will, it wouldn't go

 5  through?

 6  A.  Correct.

 7  Q.  Conflict of interest?

 8  A.  Yes.

 9  Q.  Potentially fraud?

10  A.  Yes.

11  Q.  Why do you say that, potentially fraud?

12  A.  Essentially, any forged signature on a form within the

13  contract would be fraud.

14  Q.  Now, in the calls that have been played for the jury

15  this afternoon that the Midland life employees have

16  testified to receiving, there have been representations

17  made that the policyholder, the insured, James Seegan, was

18  calling in to Midland life, too, and that he wanted to make

19  sure that this happened.

20         Has Midland life -- and, of course, among your

21  duties you're a custodian of the records at Midland life.

22  A.  Uh-huh.

23  Q.  Has Midland life reviewed its records to determine

24  whether James Seegan called in to check on this change?

25  A.  We were not able to tie the numbers with James Seegan's

 1  numbers, so no.

 2  Q.  So you've checked, and you haven't been able to find

 3  any --

 4  A.  Recover any calls, correct.

 5  Q.  From James Seegan on your recorded lines.

 6          What is the 800 number that someone would call in

 7  on Midland life?

 8  A.  I don't know that offhand.

 9  Q.  If I called it out, would you recognize it?

10  A.  Probably not.

11  Q.  Oh, okay.

12  A.  There's many.

13  Q.  Okay.

14  A.  You could try.

15  Q.  Okay.

16  A.  I'll give you my honest opinion.

17  Q.  All right.  Well, 800-843-3316.

18  A.  I would say typically our numbers start with 866 or

19  877.

20  Q.  Okay.  That's --

21  A.  So that doesn't sound familiar.

22  Q.  Okay.  That's not one that you recognize?

23  A.  Correct.

24  Q.  Let's talk about a blood draw as part of the life

25  insurance process.

1           Is that part of it?

2   A.  It is.

3   Q.  Explain that to the jury.

4   A.  Yeah.  So when individuals apply for life insurance,

5   they have to show that they are insurable from a medical

6   perspective.  So we take blood to look -- and an

7   underwriter will review the blood to give them the rating

8   or risk classification.

9   Q.  And that's an important part of the process?

10  A.  It is.

11  Q.  And is a beneficiary change like what we're looking at

12  here that we just reviewed, Government's Exhibit 71 -- is a

13  new blood draw required to change the beneficiary?

14  A.  Not to change the beneficiary, only if there were

15  changes to the policy.

16  Q.  So it wouldn't be required?

17  A.  Correct.

18  Q.  Now, let's say that your agent, your registered agent

19  for Midland life -- in this case Keith Ashley -- is a

20  registered nurse.

21  A.  Uh-huh.

22  Q.  I know you said that a blood draw is not required.  But

23  if it were a situation where a blood draw was required,

24  where there is a change in the amount in the policy or a

25  new policy, would it be appropriate for your agent to do a

 1  blood draw on the insured?

 2  A.   No.   Again, that would be a conflict of interest

 3  because you want an unbiased, neutral party taking the

 4  blood that would qualify them for life insurance.

 5  Q.   And that's what you all would require?

 6  A.   Correct.

 7  Q.   And what type of third-party vendor do you-all use?   Is

 8  it standard to use a third-party vendor?

 9  A.   It is, yes.

10  Q.   And how is that done?

11  A.   It's a lab company.   And, then, they have paramedical

12  vendors where phlebotomists get registered with and are

13  able to draw it on behalf of the lab company.

14  Q.   And so an agent wouldn't be part of the blood draw

15  process?

16  A.   No.

17  Q.   Okay.   But the client, the insured, wouldn't

18  necessarily know what Midland's procedure is; is that

19  right?

20  A.   That's right.

21  Q.   Now let me ask you.   We've talked about the beneficiary

22  change on Mr. Seegan's policy and we've talked about what

23  was going on in late January of 2020, but let me back up

24  and talk about the original policies that Mr. Seegan had

25  and focus on what they were with Midland life.

```
 1              And so this would be one of the policies that was

 2   being changed in January of 2020.

 3              MS. RATTAN:  So, your Honor, we'll offer

 4   Government's Exhibit 29A.

 5              THE COURT:  Any objection?

 6              MR. WHALEN:  I'm looking, Judge.

 7              No objection, your Honor.

 8              THE COURT:  29A will be admitted.

 9   BY MS. RATTAN:

10   Q.  So as we saw in the call, there is a $2 million life

11   policy that James Seegan has in January of 2020.  But let's

12   focus on where -- or when that $2 million life policy came

13   to be.

14              So let me direct your attention to Government's

15   Exhibit 29A.

16              MS. RATTAN:  If we can look at pages 190 through

17   198.

18   BY MS. RATTAN:

19   Q.  Can you describe for us -- and this is 29A,

20   government's exhibit, 190 -- what this is?

21   A.  This is the application for life insurance.

22   Q.  So it's the original application; and it has James

23   Seegan, first name, last name.

24   A.  Correct.

25   Q.  And it's got all of his personal identifiers, date of
```

1  birth and where he lives in Carrollton, Texas, and

2  everything that you would expect to see on the original

3  application; is that right?

4  A.  That is correct.

5          MS. RATTAN:  And then if we can look at page 198.

6  BY MS. RATTAN:

7  Q.  And what is this?

8  A.  This is the final page of the application, where the

9  insured, James Seegan, signed with a date in Carrollton,

10 Texas.

11 Q.  And so that would be January 26th of 2016?

12 A.  Correct.

13 Q.  And then you've got the insured's signature here, James

14 Seegan.

15          And then at the bottom of the page, does it show

16 who the agent is?

17 A.  It does.  It says "Signature of Soliciting Agent"; and

18 then it says "Keith Ashley," the agent.

19 Q.  Okay.  So Keith Ashley is the agent?

20 A.  Correct.

21 Q.  Now, of course, as an underwriter for Midland life, are

22 you all concerned about the health of the insured?

23 A.  Yes.

24 Q.  And do you evaluate that as part of the process in

25 determining whether to issue the policy, how much the

 1  policy will cost, all of those sorts of things?

 2  A.  We do.

 3  Q.  And did you all do that in this case?

 4  A.  We did.

 5  Q.  Let me direct your attention to Government's

 6  Exhibit 29A, pages 75 and 76.

 7          What is this?

 8  A.  This is the actual policy that was issued.  So it's the

 9  policy pages.

10  Q.  And when you say "the actual policy that was issued,"

11  what do you mean by that?

12  A.  This is the policy that goes out to the agent presented

13  on -- or presented by the agent to the client so that they

14  can have their policy.

15          MS. RATTAN:  And then if we can look at page 76.

16  BY MS. RATTAN:

17  Q.  What's going on here?

18  A.  This essentially is the contract language regarding the

19  policy, but it shows the type of policy.  So it was an

20  indexed universal life; premium class, preferred,

21  non-tobacco.

22          The amount -- or the face amount of the policy was

23  $2 million.

24          And then it kind of just goes through the outlay

25  of the planned premium and some of the guarantees in the

 1  contract language.

 2  Q.  So let me ask you about this right here, the "premium

 3  class, male preferred, non-tobacco."

 4        Can you kind of explain, for people who aren't

 5  involved in insurance, what that means?

 6  A.  Yes.  So I would say standard non-tobacco is the

 7  majority of where the population lies.  It's a really

 8  standard mortality class.

 9        Preferred non-tobacco is a better-than-standard

10  class, so they are healthier than the average person.

11  Q.  So Mr. Seegan is someone you want to insure?

12  A.  Correct.

13  Q.  He looks like a good -- someone who is good and

14  healthy?

15  A.  Yeah.

16  Q.  As a matter of fact, healthier than the average

17  population?

18  A.  Correct.

19  Q.  And then this here, on Government's 29A, page 76,

20  initial specified amount, what is that?

21  A.  That is the -- what we issued the policy.  So that's

22  the policy face amount, and it says "$2 million."

23  Q.  So he's very healthy, and the policy is for how much?

24  A.  $2 million.

25  Q.  And so is this the policy -- flash-forward -- I know

1   here we're in 2016, but flash-forward to 2020.  Is this the

2   policy that's being changed, the beneficiary is being

3   changed?

4   A.  I don't recall if it's --

5   Q.  So let me ask you --

6           MS. RATTAN:  If we can look at Government's

7   Exhibit 29A, page 104.

8   BY MS. RATTAN:

9   Q.  And this has the initial specified amount as well; is

10  that right?

11  A.  Correct.

12  Q.  So that's the -- what is that?

13  A.  That's the $2 million face amount.

14          MS. RATTAN:  And then if we can look at

15  Government's Exhibit 29A, page 55.

16  BY MS. RATTAN:

17  Q.  What is this?

18  A.  It looks like --

19  Q.  Okay.  Go ahead.

20  A.  It just looks like a cover page that goes into our

21  imaging system.

22  Q.  Okay.  And I misspoke.

23          MS. RATTAN:  Government's Exhibit 29A, page 155.

24  BY MS. RATTAN:

25  Q.  Here, is this part of the policy; and as part of the

 1   $2 million policy, is there a suicide clause?

 2   A.  There is.  This is part of the contract language that

 3   goes in all of our policies, and it outlines the suicide

 4   clause that we do not pay out the policy if there is any

 5   suicide within the first two years of issuance of the

 6   policy.

 7        MS. RATTAN:  And so if we can just blow that

 8   suicide clause up and look at that.

 9   BY MS. RATTAN:

10   Q.  So you said (as read):  "If the insured commits suicide

11   within two years from the effective date of any increase in

12   the specified amount, our liability with respect to such

13   increase is limited to the cost of the insurance charged

14   for such increase."

15   A.  Correct.

16   Q.  So what does that mean?

17   A.  That means that we would pay back the policy premiums

18   that the insured paid to our company but we would not pay

19   the death benefit.

20   Q.  Okay.  You give the premiums back, but there is no

21   benefit?

22   A.  Correct.

23   Q.  But if it's outside of the two years, what happens?

24   A.  Then that clause no longer exists.  Then we would

25   investigate it just as a normal claim, or handle the claim.

 1    Q.   Now let me direct your attention, focusing still on

 2    Government's Exhibit 29A, to page 1687.

 3            MS. RATTAN:   1687.

 4    BY MS. RATTAN:

 5    Q.   And what is this?

 6    A.   This is the beneficiary change form.

 7    Q.   And we looked at this earlier when we were looking at

 8    Government's Exhibit 71, is that right, earlier in your

 9    testimony?

10    A.   Correct.

11    Q.   So this is the Midland life record that documents the

12    Beneficiary Change Request on this $2 million life policy

13    that we have just reviewed from 2016?

14    A.   Correct.

15    Q.   So, again, is there a requirement of another blood draw

16    in order to do a beneficiary change?

17    A.   There is not.

18    Q.   And if Midland life knew that the agent was the

19    executor or in any way involved with the trust that was

20    going to be the beneficiary of the $2 million, would this

21    have been approved?

22    A.   No.

23    Q.   So this is the beneficiary change.

24            MS. RATTAN:   And if we can look at 29A, page 1691.

25                                    *

1    BY MS. RATTAN:

2    Q.   What is this?

3    A.   This is a Certification of Trust Agreement that

4    outlines the name of the insured and then the full name of

5    the trust, the effective date; and then, yeah, there is,

6    you know, a signature and a date recording a testamentary

7    trust.

8    Q.   So the effective trust date is listed as April 16th of

9    2019?

10   A.   Correct.

11   Q.   And the insured is James Seegan and the trust is going

12   to be the beneficiary and it's the James E. Seegan

13   Revocable Trust?

14   A.   Correct.

15   Q.   Now let me direct your attention to page 1693,

16   Government's 29A, page 1693.

17        This is a letter and it's dated January 29th of

18   2020 and it's sent to James Seegan at his address there in

19   Carrollton, Texas, and it's about the policy number -- his

20   policy.

21        And so can you explain to us what's happening

22   here?

23   A.   Yes.  It's a letter that the claims department sent out

24   to James E. Seegan thanking him for the request to change

25   the beneficiary designation and an endorsement -- this is

1    essentially an endorsement that goes into the policy that

2    shows that we changed the beneficiary as outlined on that

3    form.

4    Q.   Okay.  And, again, that's sent on January 29th of 2020;

5    and it's to Mr. Seegan.

6              And who is copied on it?

7    A.   Keith T. Ashley.

8    Q.   And he is the agent; is that right?

9    A.   Correct.

10             MS. RATTAN:  May I approach the witness, your

11   Honor?

12             THE COURT:  Yes.

13   BY MS. RATTAN:

14   Q.   Let me show you this.  It says, "January 9th of 2020."

15   And it says a letter was sent confirming the change of

16   beneficiary in James Seegan's trust to Ashley.

17   A.   Correct.

18   Q.   Is that accurate?

19   A.   Yep.

20   Q.   Now, we just went through the original documents

21   related to the creation of the $2 million policy originally

22   in January of 2016; is that right?

23   A.   Can you repeat that question?

24   Q.   Yes.

25             MS. RATTAN:  May I approach?

```
 1              THE COURT:  Yes.
 2    BY MS. RATTAN:
 3    Q.  In Government's Exhibit 29A that we just walked
 4    through --
 5    A.  Okay.
 6    Q.  -- we talked about when Mr. Seegan's policy was
 7    originally created, and that would have been in 2016; is
 8    that right?
 9    A.  Correct.
10    Q.  And then there was an update to it in the documents.
11    And we didn't walk through this, but I think it's in the
12    documents of --
13    A.  Yeah.
14    Q.  -- February 25th of 2016.
15              Have you reviewed these dates as it relates to
16    Government's Exhibit 29A?
17    A.  I have.
18    Q.  Okay.  And does it -- do they show -- the documents
19    show that Ashley, Keith Ashley, sold James Seegan
20    originally a $1.1 million life insurance policy and then in
21    February of 2016 it was increased and that's the $2 million
22    life policy that we've been talking about?
23    A.  Correct.
24    Q.  Okay.  Is this accurate?
25    A.  Yes, it's accurate.  Correct.
```

```
 1   Q.  Okay.  So here we have, in 2016, your agent sells James

 2   Seegan -- originally it's a million dollars, and then it's

 3   increased to $2 million; is that right?

 4   A.  That is right.

 5   Q.  And then unknown to you, Ashley becomes the independent

 6   executor of James Seegan's will and trust, James Seegan who

 7   you all sold the $2 million life policy?

 8   A.  Correct.

 9   Q.  And Ashley is your representative, Midland life's

10   representative; is that right?

11   A.  He is an agent that was contracted, yes.

12   Q.  Okay, contracting agent.

13   A.  Uh-huh.

14   Q.  Then in January of 2020, you all, Midland life, send a

15   letter, and that confirms that the beneficiary of the

16   $2 million is now the trust for James Seegan; is that

17   right?

18   A.  That is right.

19   Q.  Okay.  But Midland life doesn't know this important

20   fact.

21   A.  Correct.

22   Q.  And that's that Keith Ashley is now the executor of the

23   trust that's going to be the beneficiary of the $2 million.

24   A.  Correct.

25           MS. RATTAN:  Now let's go back to Government's
```

```
 1    Exhibit 29A; and if we can look at page 917, 9-1-7.

 2    BY MS. RATTAN:

 3    Q.  Can you explain to the jury what this is?

 4    A.  This is the check that was being paid out to the

 5    James E. Seegan Revocable Trust for $2 million.

 6    Q.  And so it's paid out on May the 13th -- the check is

 7    dated May 13th of 2020?

 8    A.  Correct.

 9    Q.  And it's to -- just as the paperwork indicates that was

10    finalized in late January of 2020, that the James E. Seegan

11    Revocable Trust is going to receive the money?

12    A.  Correct.

13    Q.  And then the amount here is over $2 million that was

14    paid out?

15    A.  It is, yes.

16    Q.  Why did Midland life pay out over $2 million on this

17    policy?

18    A.  It's generally having to do with interest on the type

19    of policy that was issued.

20    Q.  So the policy was for 2 million, but it gained

21    interest --

22    A.  Correct.

23    Q.  -- and so you paid out more?

24    A.  Yes.

25    Q.  And why did you have to pay out $2 million plus
```

1  interest?

2  A.  Because the insured passed away and that was a part of

3  our contract.

4  Q.  Okay.  Now, if Midland life had known that Keith Ashley

5  was involved as the executor of the trust, would you ever

6  have approved this?

7  A.  No.

8  Q.  So is it a concern to you that Midland life had to pay

9  out this money to the revocable trust that Keith Ashley was

10  the executor of?

11  A.  Yes.

12  Q.  And why is that?

13  A.  Because there -- again, it is a conflict of interest

14  and it's against our compliance as an organization.

15  Q.  So let me ask you -- let's leave the $2 million policy

16  for a minute.

17  A.  Okay.

18  Q.  And let's talk about did James Seegan have another life

19  insurance policy with Midland life?

20  A.  He did.

21  Q.  There was a second policy?

22  A.  There was a second policy.

23  Q.  And have you reviewed Midland life's records and

24  documents as they relate to the second policy?

25  A.  I have.

```
 1   Q.  And was that second policy ultimately for $400,000?

 2   A.  Yes, it was.

 3   Q.  Let me direct your attention to Government's

 4   Exhibit 29A.

 5           MS. RATTAN:  If we can look at pages 1164, start

 6   at 1164.

 7   BY MS. RATTAN:

 8   Q.  Okay.  Can you describe for us what this is?

 9   A.  This is the life insurance application.

10           MS. RATTAN:  And if we can look at 1172.

11   BY MS. RATTAN:

12   Q.  That's for James Seegan; is that right?

13   A.  That is correct.  It's the signature pages with the

14   agent and the applicant both signing.

15   Q.  And again the registered soliciting agent is Keith

16   Ashley on this policy as well?

17   A.  Correct.

18   Q.  And this policy was also initiated in 2016; is that

19   correct?

20   A.  That is correct.

21           MS. RATTAN:  And if we can look at 1063,

22   Government's Exhibit 29A, page 1063.

23   BY MS. RATTAN:

24   Q.  What is this?

25   A.  This is the policy pages again of the issued policy
```

```
 1   that go out to the applicant.
 2   Q.  Okay.  So a "policy page," what does that mean?
 3   A.  It's essentially the contract that outlines the
 4   provisions of the policy, the details of what we issued the
 5   policy and all the exclusions, the suicide exclusion, all
 6   of that within there.
 7   Q.  Okay.  And it's the same as the previous policy?
 8   A.  Yes, it's the same.
 9           MS. RATTAN:  So if we can look at page 1064.
10   BY MS. RATTAN:
11   Q.  Again, can you tell us what the amount is for this
12   policy?
13   A.  This policy was for a million dollars, and again --
14   yeah, a million dollars.
15   Q.  Now, was this policy -- in the next couple of years
16   after it was initiated, was it reduced?
17   A.  It was.
18   Q.  So was this policy reduced from a million dollars to
19   $400,000?
20   A.  Yes.
21   Q.  Now, this policy, the beneficiary of the policy was not
22   a trust; is that right?
23   A.  That is correct.
24   Q.  The beneficiary of this policy was Mr. Seegan's wife.
25   A.  Correct.
```

1    Q.  And her name was Sakdida Seegan.

2    A.  Correct.

3          MS. RATTAN:  Let's look at Government's

4    Exhibit 29A, page 1455.

5    BY MS. RATTAN:

6    Q.  If you can tell us what this is.

7    A.  This is email correspondence that is asking -- it is

8    email correspondence from Keith Ashley to individuals in

9    our office asking for an in-force illustration for the

10   amounts of 400,000 and 695,000.

11   Q.  And he's saying that he needs them as soon as possible?

12   A.  Correct.

13   Q.  And eventually this policy that we're talking about,

14   the second policy, was reduced to 400,000; is that right?

15   A.  That is right.

16          MS. RATTAN:  And if we can look at 1456.

17   BY MS. RATTAN:

18   Q.  And what's happening here?

19   A.  There was email correspondence because there were some

20   emails that they wanted to lower the policy even more, to

21   200- or 275- and we weren't able to do that.

22   Q.  Okay.  So the lowest that you-all were able to go on

23   the second policy was 400,000?

24   A.  Correct.

25          MS. RATTAN:  And if we can look at 1563, 29A,

1    1563.

2    BY MS. RATTAN:

3    Q.  So what happens here finally?

4    A.  This is an endorsement page that goes out on the policy

5    to -- and it shows the owner's name, which is James Seegan,

6    issued on the life of James Seegan, and then the changed

7    coverage amount to 400,000.

8            And so we changed the policy.  It's a confirmation

9    of changing the policy.

10   Q.  Okay.  And that's as of December 16th of 2018?

11   A.  Correct.

12   Q.  And the beneficiary on this policy is Sakdida Seegan?

13   A.  Correct.

14           MS. RATTAN:  Now if we can look at 29A, page 1119.

15   1119.

16   BY MS. RATTAN:

17   Q.  Does this second policy also have a suicide clause?

18   A.  Yes, it does.

19   Q.  And you've said that it's very standard?

20   A.  Yes.

21   Q.  And it's the same thing.  If the suicide happens within

22   two years, the only payout will be for the premiums paid?

23   A.  Correct.

24   Q.  Otherwise, nobody gets $400,000?

25   A.  Correct.

 1   Q.  And so the $400,000 on the second policy became

 2   effective on December 16th of 2018?

 3   A.  Correct.

 4   Q.  Let me direct your attention to 29A, page 1631.

 5          Can you explain to the jury what this is?

 6   A.  Yes.

 7          This is the check for the claim that was paid to

 8   the order of the beneficiary, Sakdida Seegan, for

 9   $400,158.74.

10   Q.  And again the policy value was $400,000; but you paid

11   extra because of interest?

12   A.  Correct.

13   Q.  And then the same question.  Why was Midland life

14   forced to pay $400,000?

15   A.  Because the insured passed away and a claim was filed

16   on behalf of the insured to receive the funds of the life

17   insurance.

18          MS. RATTAN:  May I approach the witness, your

19   Honor?

20          THE COURT:  Yes.

21   BY MS. RATTAN:

22   Q.  Now, we've been talking about the second policy on

23   James Seegan's life.  Earlier we talked about the first

24   policy, the $2 million policy; but now we're talking about

25   the second policy.

```
 1              And let me ask you to look at this.  On March 9th
 2   of 2016 Keith Ashley, the agent, sold James Seegan a
 3   $1 million life policy; and Seegan's wife, Sakdida Seegan,
 4   was the beneficiary?
 5   A.  Correct.
 6   Q.  Okay.  And then on December 16th of 2018, the policy
 7   was reduced.  They wanted to reduce it lower; but the
 8   lowest that Midland life would go was to $400,000?
 9   A.  Correct.
10   Q.  And so this is accurate?
11   A.  That is accurate.
12           MS. RATTAN:  I'll pass the witness, your Honor.
13           THE COURT:  Cross-examination?
14             CROSS-EXAMINATION OF COURTNEY JACOBSON
15   BY MR. WHALEN:
16   Q.  Is it "Ms. Jacobson"?
17   A.  Yes, sir.
18   Q.  Good afternoon.  How are you?
19   A.  I'm good.
20   Q.  Good.  I'm James Whalen.  Nice to meet you.
21   A.  Nice to meet you.
22   Q.  Okay.  Just -- I want to go over your -- I heard some
23   of your qualifications.  What job do you do at Midland
24   National?
25   A.  I am the associate chief underwriter, so I lead the
```

1  underwriting teams.

2  Q.  Okay.  And so underwriting, you evaluate people's

3  insurability, use actuarial tables, correct?

4  A.  We don't necessarily use actuary tables; we use

5  underwriting guidelines to assess the risk based off of the

6  data or the information that we receive.

7  Q.  Okay.  And when you talk about assessing risk, when it

8  comes to life insurance companies, you want to minimize

9  your risk, correct?

10 A.  Correct.

11 Q.  Okay.  Because you -- at the end of the day, even

12 though you are agreeing to pay people money for their life

13 insurance, you want to make money at being a life insurance

14 provider, correct?

15 A.  We are a life insurance organization, yes.

16 Q.  Right.  And you're there to make a profit, correct?

17 A.  We're there to issue life insurance, yes.  Yes.

18 Q.  But you're there -- I mean, you don't do it for free,

19 right?

20 A.  Correct.

21 Q.  All right.  And you want to minimize your risk, right?

22 A.  Correct.

23 Q.  Okay.  Okay.  And so when we talked -- you were asked a

24 bunch of questions about this beneficiary change, correct?

25 A.  Correct.

```
 1   Q.  Okay.  So -- and you've listened or read all the
 2   transcripts for the phone calls, correct?
 3   A.  I have not listened or read all of them, no.
 4   Q.  Okay.  In one of the transcripts or one of the calls,
 5   one of the customer care persons made a statement to the
 6   effect, "We go through these change of beneficiary requests
 7   with a fine-toothed comb when it involves a trust,"
 8   correct?
 9   A.  I didn't listen to that.
10   Q.  Okay.  But as an underwriter, if it's changed to a
11   trust, you're a little bit more -- you're more thorough in
12   vetting that change of beneficiary, correct?
13   A.  If we're aware of it, yes.
14   Q.  Okay.  Well, if somebody fills out a form saying, "I
15   want to name a trust," you become aware of it, correct?
16   A.  Not in this case, no.
17   Q.  Okay.  So it never went to underwriting?
18   A.  It went through the claims department.  Not that --
19   Q.  Okay.
20   A.  -- I'm aware of anyway.
21   Q.  Okay.  So as the -- senior vice-president?
22   A.  AVP, assistant.
23   Q.  Assistant vice-president?
24   A.  Yes.
25   Q.  Okay.  Of underwriting?
```

1    A.  Uh-huh.

2    Q.  Do you train your claims people on change of

3    beneficiary forms when it comes to trusts?

4    A.  I personally do not but, yes, there is training

5    regarding that, yes.

6    Q.  Okay.  And if somebody is wanting to change a life

7    insurance -- the beneficiary from an individual to a trust,

8    do you require the trust documents?

9    A.  I'm not aware of that from their lens -- from an

10   underwriting lens, typically, no.  We use the form.

11   Q.  Okay.  And so who created the form?

12   A.  I am unaware of who created the form.

13   Q.  Okay.  All right.

14          MR. WHALEN:  So if we can look at Exhibit 71,

15   page 6, please.

16   BY MR. WHALEN:

17   Q.  Okay.  Are you familiar with this form?

18   A.  Yes.  This looks familiar.

19   Q.  Okay.  Did you have any part of creating it or anything

20   like that?

21   A.  No.

22   Q.  Okay.  And -- so let me ask you a few questions about

23   it.  You see in this -- there is a section down here that

24   says "Name/Address of all current Trustee(s)."

25          Do you see that section?

 1   A.  I do.

 2   Q.  Okay.  And that is blank on the form, correct?

 3   A.  That is correct.

 4   Q.  Okay.  Is that something that should have been filled

 5   out?

 6   A.  Typically when they are -- when they check the

 7   testamentary trust, we do not require that information

 8   because it's gathered upon the death of the insured, is my

 9   understanding.

10   Q.  Okay.  So if you -- if it's a testamentary trust, you

11   don't require that information; is that correct?

12   A.  Correct, not until --

13   Q.  Okay.  If we go down to the second half of it --

14           MR. WHALEN:  How do I clear this?  How do I clear

15   my --

16           Okay, great.  Super.

17   BY MR. WHALEN:

18   Q.  All right.  Do you see the bottom half of this screen?

19   A.  I do.

20   Q.  Okay.  There is a section:  "The above referenced Trust

21   Agreement requires that: (Please Mark the appropriate

22   box.)"  "all Trustees," "a majority of Trustees," "any

23   Trustee."

24           What is the purpose of that line?

25   A.  Again, if it's a testamentary trust, all we need is the

1    information on the top piece of the form.

2    Q.  Okay.  And why do you make a distinction between a

3    testamentary trust versus any other trust?

4    A.  I am not a legal expert.  But on -- when it's a living

5    trust and the individual dies, our understanding is that we

6    obtain that information upon the death of the insured.

7    Q.  Okay.  Okay.  And then you see Line Number 2 -- do you

8    see that?

9    A.  I do.

10   Q.  And it reads:  "The insurance agent or any person

11   affiliated with the insurance agent is not a beneficiary of

12   the above referenced trust."

13          Do you see that?

14   A.  I do.

15   Q.  Okay.  And that is blank, correct?

16   A.  Correct.

17   Q.  Okay.  And is that required to be filled out for this

18   change of beneficiary form?

19   A.  Not for the type of trust that was selected.

20   Q.  Okay.  And do you know the difference between a

21   beneficiary and a trustee?

22   A.  I wouldn't be able to share that in great detail.

23   Q.  Okay.  But, I mean, do you know or have a general --

24   A.  Yeah.  A beneficiary essentially -- I mean, and a

25   trustee is there to execute on behalf of the trust

```
 1  executor, I guess, if you will.
 2         So essentially they are paying out to whatever the
 3  beneficiary is of the trust.  They have control of the
 4  trust.
 5  Q.  Okay.  Now, as a owner of an insurance policy --
 6         MR. WHALEN:  You can take that down.  Thank you.
 7  BY MR. WHALEN:
 8  Q.  If I buy an insurance policy, I'm an owner, correct?
 9         If I'm the owner of the insurance policy, let's --
10  A.  If you're the owner of the insurance policy, yes.
11  Q.  Okay.  As an owner, I get to decide who the beneficiary
12  is, do I not?
13  A.  As the owner of the life insurance policy, yes.
14  Q.  Okay.  And that's why you make sure you send -- every
15  time there is a change in beneficiary, you make sure you
16  send a letter to the owner's address to make sure he made
17  the change, correct?
18  A.  Correct.
19  Q.  Okay.
20         MR. WHALEN:  If we could, let's go to Exhibit 29A,
21  page 904, please.
22  BY MR. WHALEN:
23  Q.  Do you see that on the screen there?
24  A.  I do.
25  Q.  Okay.  And what is this we're looking at?
```

```
 1   A.  This is a form, the Proof of Death Claimant's

 2   Statement.  So essentially it's a form that outlines the

 3   insured -- excuse me -- the name of the deceased and the

 4   name of the beneficiary.

 5   Q.  Okay.  And you see there that this claim is filed by

 6   the trustee.  Do you see that?

 7          It says, "In what capacity do you file this

 8   claim?"

 9   A.  I do see that.

10   Q.  Okay.  And it's listed as "Trustee," correct?

11   A.  That is correct.

12   Q.  Okay.  And then they have to check the box that they

13   want to have a check issued; is that correct?

14   A.  They do, a lump sum via check.

15   Q.  Okay.

16          MR. WHALEN:  If we can go to the next page,

17   please.

18          And the next one.

19          Okay.  If we can stop right there.

20   BY MR. WHALEN:

21   Q.  Is this the signature of the trustee who filed this

22   claim?

23   A.  I don't know who that signature is.

24   Q.  Okay.  It's hard to read.  Would you agree with that?

25   A.  Agree.
```

 1   Q.  Okay.

 2          MR. WHALEN:  If we go to the next page.

 3   BY MR. WHALEN:

 4   Q.  Okay.  And what is this we're looking at?

 5   A.  I'm not familiar with this one.

 6   Q.  Okay.  Well, let me just go over it.  Does it have the

 7   name of the undersigned trustee as Kerby Keller?

 8   A.  It does.

 9   Q.  Okay.  And it's a notarized document that seems to

10   indicate that they are going to hold Midland National

11   harmless regarding any tax liability and things of that

12   nature, correct?

13   A.  I haven't read the form.

14   Q.  Okay.  You're not familiar with it?

15   A.  I'm not familiar with it, no.

16   Q.  Okay.

17          MR. WHALEN:  If we could go to the next page.

18   BY MR. WHALEN:

19   Q.  And they provided a Death Certificate, correct?

20   A.  Correct.

21   Q.  Okay.

22          MR. WHALEN:  You can take that down.

23          I think we -- well, let me go to 29A, page 155.  I

24   think that -- hopefully I did this right.

25          Nope, that's not it.  Let's try 1687.

```
 1            MS. RATTAN:  Mr. Whalen, what number?

 2            MR. WHALEN:  What number is the check?  Do you

 3     remember?

 4            MS. RATTAN:  The first one or second one?

 5            MR. WHALEN:  First one.

 6            MS. RATTAN:  917.

 7            MR. WHALEN:  917?

 8            MS. RATTAN:  Yes, sir.

 9            MR. WHALEN:  Could you go to that page.

10     BY MR. WHALEN:

11     Q.  Okay.  So this is the check that got issued, correct?

12     A.  Correct.

13     Q.  Okay.  And the date of the check is May 13th, 2020?

14     A.  Correct.

15     Q.  And it went to the trust; and the address is in

16     Pennsylvania, correct?

17     A.  Correct.

18     Q.  And if we look at the previous form of the trustee of

19     Kerby Keller, his address is the same, correct?

20     A.  I don't remember that address.

21     Q.  Okay.  If that's what it says, would you take my word

22     for it?

23     A.  Maybe.

24     Q.  Maybe?  Okay, fair enough.

25            Okay.  So, now, if you look at the date, on
```

1    May 13th, 2020, if somebody passes away and they notify

2    you, they have to file this death of claimant's (*sic*)

3    statement in order for you to start the process to issue a

4    check; isn't that fair?

5    A.  They have to go through the form process in order for

6    us to issue the check, yes.

7    Q.  Okay.  So until that form gets issued, you're not

8    writing a check, correct?

9    A.  Correct.

10   Q.  Okay.  So depending on how long it takes will depend on

11   how soon they file that certification of death, correct, or

12   that claim?

13   A.  Correct.

14   Q.  Okay.  And then once they do that -- that has to happen

15   first before anything else happens, correct?

16   A.  Can you rephrase that?

17   Q.  Let me rephrase it.

18          The process to process a claim is not going to

19   start until that death of claim statement (*sic*) is filed,

20   correct?

21   A.  I'm not aware of, like, the exact process; but my

22   understanding is that we would need the forms and the

23   details before processing any claim.

24   Q.  Okay.  And once that starts, then you'll look into --

25   you'll look into the claim and then agree to pay it,

 1  correct?

 2  A.  In some circumstances, yes.

 3  Q.  Right, okay.

 4       And there was a statement made that you were

 5  forced to pay this claim.  Did the Midland National feel

 6  forced to pay this claim, or is that your contractual

 7  obligation?

 8  A.  It's our contractual obligation.

 9  Q.  Okay.  And on the $400,000 policy, that wasn't made to

10  the beneficiary of the trust, correct?

11  A.  I believe the $400,000 was made to the spouse.

12  Q.  Okay.

13       MR. WHALEN:  I'll pass the witness.

14       THE COURT:  Anything additional?

15       MS. RATTAN:  May I approach the witness, your

16  Honor?

17       THE COURT:  Yes.

18       MS. RATTAN:  May I return?

19       THE COURT:  Yes.

20       REDIRECT EXAMINATION OF COURTNEY JACOBSON

21  BY MS. RATTAN:

22  Q.  Let me direct your attention on the stand in front of

23  you to Government's Exhibit Number 76.  Do you recognize

24  that?

25  A.  I do.

 1   Q.  And is that a Midland life document?

 2   A.  It is.

 3   Q.  And it's been, of course, provided here by Midland

 4   life?

 5   A.  Yes.

 6          MS. RATTAN:  Your Honor, we'll offer Government's

 7   Exhibit 76.

 8          THE COURT:  Any objection?

 9          MR. WHALEN:  No, your Honor.

10          THE COURT:  76 will be admitted.

11          MS. RATTAN:  And may we publish it?

12          THE COURT:  Yes, you may.

13   BY MS. RATTAN:

14   Q.  And, Ms. Jacobson, this is the same letter that we

15   discussed when you testified before.  It's January 29th of

16   2020; so it's redundant of the Exhibit 29A, page 1693.  And

17   it's the letter that was mailed to the insured verifying

18   the policy change; is that correct?

19   A.  Correct.

20   Q.  And the agent was copied on it, Keith Ashley?

21   A.  Correct.

22          MS. RATTAN:  I'll pass the witness, your Honor.

23          THE COURT:  Anything else?

24          MR. WHALEN:  Nothing further, your Honor.

25          THE COURT:  Can this witness be fully excused?

1           MS. RATTAN:  Yes, please, your Honor.

2           MR. WHALEN:  Yes, your Honor.

3           MS. RATTAN:  Oh, no, not yet.  We may recall her.

4           THE COURT:  So you're not excused.  You can leave

5  the stand, but you are subject to recall.

6           THE WITNESS:  Okay.  Thank you.

7           THE COURT:  What's next?

8           MS. RATTAN:  Special Agent Jason Rennie.

9           THE COURT:  Agent, you understand you're still

10 under oath.

11          THE WITNESS:  Yes, your Honor.

12          THE COURT:  Okay.  Ms. Rattan, go ahead.

13              DIRECT EXAMINATION OF JASON RENNIE

14             RECALLED ON BEHALF OF THE GOVERNMENT

15 BY MS. RATTAN:

16 Q.  Please state your name.

17 A.  Jason Rennie.

18 Q.  And, of course, you're the lead agent; and you've

19 testified already in this case.

20 A.  Yes, ma'am.

21 Q.  Let me direct your attention to Government's Exhibit

22 Number 68, if you'll look in the book.

23          Do you recognize that?

24 A.  I do.

25          MS. RATTAN:  Your Honor, we'll offer Government's

 1  Exhibit 68.

 2          MR. WHALEN:  I have no objection.

 3          THE COURT:  Okay.  68 will be admitted.

 4          MS. RATTAN:  And if we can publish Government's

 5  Exhibit Number 68.

 6  BY MS. RATTAN:

 7  Q.  Can you describe what this is, Agent Rennie?

 8  A.  Yes.  It's a Beneficiary Change Request form that was

 9  provided by Midland National Life Insurance Company.

10          MS. RATTAN:  And if we can look at the top left

11  corner.

12  BY MS. RATTAN:

13  Q.  Can you explain or describe what this is in the top

14  left corner of Government's 68, page 1?

15  A.  That's a -- that's a fax stamp, which typically occurs

16  when you receive a fax from a different telephone number.

17  On -- it appears, based upon the document, on January

18  the 27th of 2020, 8:35 a.m., the fax was received from

19  9725291732.

20  Q.  So January 27th of 2020, that morning, a fax is coming

21  in to Midland National from this number; is that correct?

22  A.  That's correct.

23          MS. RATTAN:  And, let's see, we'll offer

24  Government's Exhibit 69.

25          THE COURT:  Any objection?

1    A.   Pardon me.   I think you -- I think you referenced

2    Exhibit 69.   I think it's Exhibit 68.

3    BY MS. RATTAN:

4    Q.   68 is the fax that we just reviewed, and now we're

5    offering Government's 69.

6    A.   Understood.

7              THE COURT:   Mr. Whalen?

8              MR. WHALEN:   Just a moment, your Honor.

9              No objection.

10             THE COURT:   69 will be admitted.

11             MS. RATTAN:   So if we can focus on Government's

12   Exhibit 68, page 1.   Back to Government's Exhibit 68,

13   page 1.

14   BY MS. RATTAN:

15   Q.   This document is the Beneficiary Change Request that

16   we've been talking about this afternoon and it's the

17   James E. Seegan request and this is January 27th of 2020

18   and it's being sent in; is that right?

19   A.   That's correct.

20   Q.   And, in fact, during the testimony from the Midland

21   life witnesses and the recorded conversations, did the

22   defendant, Keith Ashley, tell Midland life that he was

23   trying to fax this beneficiary change form in?

24   A.   He did.

25   Q.   And does this form represent a fax that indicates that,

 1  in fact, he did fax the Beneficiary Change Request form in?

 2  A.  Yes.

 3  Q.  Now let's look at the fax number, 9725291732.

 4        So this would purport to be a fax sent from that

 5  number to Midland life?

 6  A.  Yes.

 7  Q.  So let me direct your attention to Government's

 8  Exhibit 69, page 1.

 9        This is a letterhead for North Texas Money

10  Management and it says, "Keith Ashley, Registered

11  Representative."

12        So based on your investigation, what was North

13  Texas Money Management?

14  A.  It was a company -- it was an investment firm or a

15  financial firm for which Mr. Ashley was a registered

16  representative.

17  Q.  And, in fact, that's his email address that we've seen

18  before, keith@northtexasmoney.com; is that right?

19  A.  Correct.

20  Q.  And so as part of the letterhead, it says, "North Texas

21  Money Management, Keith Ashley, Registered Representative,"

22  has a location in McKinney, Texas, and it provides a fax

23  number; is that right?

24  A.  It does.

25  Q.  Now, when you compare the fax number on the letterhead

1  to the fax that was sent to Midland life on January 27th of

2  2020, is that the same fax number?

3  A.  They are -- they are identical.

4        MS. RATTAN:  And if we can do, I don't know, a

5  side-by-side on 68, page 1 and 69, page 1.

6  BY MS. RATTAN:

7  Q.  So you have the fax here that was sent sending to

8  Midland life, and then you have the fax here that's Keith

9  Ashley's letterhead.

10        Are they the same number?

11 A.  They are.

12 Q.  And, again, that was discussed in the calls that Keith

13 Ashley was trying to send in -- fax in the beneficiary

14 change form; is that right?

15 A.  That's correct.

16        MS. RATTAN:  May I approach the witness, your

17 Honor?

18        THE COURT:  Yes.

19 BY MS. RATTAN:

20 Q.  Let me show you -- you've been present in the courtroom

21 as the various Midland life witnesses have testified; is

22 that right?

23 A.  I have.

24 Q.  Was there a witness who testified that on January 24th

25 James Seegan's trust became the beneficiary of James

 1   Seegan's $2 million life policy?

 2   A.  That's correct.

 3   Q.  And that Keith Ashley called Midland life about the

 4   documents on January 24th of 2020?

 5   A.  He did.

 6   Q.  Now, one thing that the Midland life employees didn't

 7   know that Courtney Jacobson made clear is that Keith Ashley

 8   was the executor of the trust that was going to be the

 9   beneficiary of the $2 million; is that right?

10   A.  That's correct.  Mr. Ashley did not disclose that fact.

11   Q.  Okay.  But that's on this slide; is that right?

12   A.  Correct.

13   Q.  And this is accurate?

14   A.  It is.

15   Q.  So on January 24th of 2020, James Seegan's trust with

16   Ashley as the executor became the beneficiary of the

17   $2 million life policy?

18   A.  Correct.

19   Q.  And Ashley called Midland life to check on the

20   documents?

21   A.  He did.

22   Q.  And then on the 27th, he continued to fax and email and

23   call.  As a matter of fact, the fax that we see on the

24   screen that's still displayed is January 27th of 2020; and

25   it was faxed in, him asking is this beneficiary change in

1    place.

2            So he's faxing, emailing -- we saw the email to

3    Jennifer Jennings -- and he's calling Midland life about

4    the documents changing James Seegan's 2 million life

5    beneficiary to his trust?

6    A.  Correct.

7    Q.  And then on January 29th, Courtney Jacobson has

8    testified that a letter was mailed saying it's done?

9    A.  Correct.

10   Q.  So let me ask you if I can direct your attention to

11   this date, January 24th of 2020.

12           Have you reviewed Keith Ashley's cell records as

13   they relate to January 4th (*sic*) of 2020 and the phone call

14   that was being placed to Midland life?

15   A.  I have.

16           MS. RATTAN:  And, your Honor, if they haven't

17   previously been admitted, we'll offer the AT&T records

18   which are Government's Exhibits 4A and B.

19           THE COURT:  Any objection?

20           MR. WHALEN:  No, your Honor.

21           THE COURT:  Okay.  4A and B will be admitted.

22   BY MS. RATTAN:

23   Q.  And, Agent Rennie, would you describe what 4A and B

24   are?  What are these records?

25   A.  4A is at least two sets of records received pursuant to

 1   the investigation from AT&T, different time frames during

 2   late 2019 through mid 2020 for -- initially it was for

 3   Mr. Ashley's cell phone, and then there was additional --

 4   actually, I think it was for records attached to all the

 5   cell phones on Mr. Ashley's cell phone account with AT&T.

 6   Q.   Okay.  So these are his cell phone records?

 7   A.   Correct.

 8   Q.   Keith Ashley's cell phone records?

 9   A.   Correct.

10   Q.   And do the cell phone records, just like an

11   old-fashioned phone bill, show numbers incoming and

12   outgoing?

13   A.   Sure.  It's just a -- it's just what they call toll

14   records.  It shows incoming and outgoing calls, shows times

15   and text messages.

16   Q.   And now you can look up your bill online and see calls

17   that were coming and going?

18   A.   Correct.

19   Q.   But do the records that you received from AT&T go a

20   step farther and provide cell site information about where

21   Keith Ashley's phone was at various times?

22   A.   Correct.

23   Q.   Okay.  And will you explain to the jury what cell site

24   information is?

25   A.   Cell site information are the towers, the locations,

1   the latitude and longitude data of the tower locations when

2   the call was taking place.

3         So very generically, when you're driving, your

4   phone connects to a tower.  It connects to a sector on the

5   tower.  And then if you're moving, then it passes from

6   tower to tower.

7         In certain, you know, cases law enforcement will

8   request cell site data to put a very distinct location on

9   the phone when calls and text messages are taking place.

10  It's not all of the time where the phone is; it's only when

11  it's connected to the tower through a phone call or text

12  message.

13        With that --

14        MR. WHALEN:  Objection to a narrative.

15        THE COURT:  Go ahead and ask another question.

16  BY MS. RATTAN:

17  Q.  What else do you know about cell site information?

18  A.  It's only attainable by a search warrant.  So through

19  the course of the investigation, these items were obtained

20  via search warrant.  As a normal subpoena that we would

21  acquire cell phone records, toll records we could obtain;

22  but you cannot obtain the location of the -- where the

23  towers were when the call was taking place without a search

24  warrant.

25        MS. RATTAN:  And then if we can publish

1   Government's Exhibit 66, please.

2   BY MS. RATTAN:

3   Q.  This is the call that we heard through witness Paula

4   Diaz, and it's a call on January 24th of 2020 between Paula

5   Diaz and Keith Ashley.

6         MS. RATTAN:  And if we can look at Government's

7   Exhibit 66, page 2, lines 20 through 25.

8   BY MS. RATTAN:

9   Q.  And what they're talking about here is James E.

10  Seegan's Revocable Trust.  100 percent is going to be the

11  primary beneficiary, and the date of birth is going to be

12  the date of the trust.

13        So what are they talking about here in this call?

14  It's Paula Diaz on January 24th of 2020 talking to the

15  defendant, Keith Ashley.

16  A.  They're talking about the change of the beneficiary for

17  Mr. Seegan's $2 million policy from his wife to the

18  irrevocable (sic) trust.

19  Q.  And again who is the executor of the trust?

20  A.  The defendant, Keith Ashley.

21  Q.  So this would be January 24th of 2020, Ashley calls

22  Midland life about the documents?

23  A.  Correct.

24  Q.  Did you check Keith Ashley's cell phone records and

25  look at the cell site information, where was his phone when

1   this call took place on January 24th of 2020?

2   A.  I did.

3   Q.  And can you tell the jury, using Government's

4   Exhibit 4A and B, where the defendant's phone was when this

5   call was placed on January 24th of 2020?

6   A.  On January 24th of 2020, Mr. Ashley's cell phone during

7   the call with Midland life was located in the Eastern

8   District of Texas.

9   Q.  Now let me direct your attention to Government's --

10  rather, January 27th of 2020.

11          And again on January 27th of 2020, Ashley is

12  faxing, emailing, and calling Midland life about the

13  beneficiary change for the $2 million.

14          Did you check to see whether he called Midland

15  life from a specific location on January 27th of 2020?

16  A.  I did.

17  Q.  And can you describe for the jury where Keith Ashley's

18  phone was on January 27th of 2020?

19  A.  During the call to Midland life on January 27th of

20  2020, Mr. Ashley's phone was located in the Eastern

21  District of Texas.

22  Q.  Now, as it says on the slide, he didn't just call.  He

23  also emailed and he faxed.

24          Were you able to determine a location for him for

25  the email and the fax as well?

 1  A.  I did.  A review of the phone records during the times

 2  that those emails were sent and the fax was sent, it

 3  appears that the calls and text messages that bracket those

 4  times, that Mr. Ashley was located also in the Eastern

 5  District of Texas.

 6  Q.  So you checked the time that the email was sent and you

 7  checked the time that the fax was sent and his phone was

 8  sending and receiving messages at that same time in the

 9  Eastern District of Texas?

10  A.  Yes.  It wasn't during the exact time.  But when -- a

11  call we have the exact time, obviously, because the call

12  time is the call.

13        When it's -- when it's an email that has a time on

14  it or it's a fax that has a time on it, if we don't have

15  something going on that's concurrent with that, then

16  usually what we do is we bracket.

17        If it's an 8:05 call we can look where was he

18  calling from at 7:45, where was he calling from at 8:15.

19  If those are both in the Eastern District of Texas, then

20  it's reasonable to assume that between those times he was

21  in the Eastern District of Texas.

22        MS. RATTAN:  I'll pass the witness, your Honor.

23        THE COURT:  Cross-examination?

24                              *

25                              *

1                    CROSS-EXAMINATION OF JASON RENNIE

2    BY MR. WHALEN:

3    Q.  Agent Rennie, Mr. Ashley's house -- well, let me ask

4    you this:  The locations that you say he was in the Eastern

5    District of Texas, what area of the Eastern District of

6    Texas was he in?

7    A.  For the January 24th call, I believe the call started

8    in the Northern District of Texas; but before the call

9    ended, it was passed to a tower that's located in the

10   Eastern District, actually north of George Bush in Plano,

11   Texas, east of 75, if I recall correctly.

12           And for the January --

13   Q.  Let me stop you right there.

14   A.  Sure.

15   Q.  Okay.  So on the 24th, January 24th's call, it was

16   initiated in the Northern District, correct?

17   A.  Correct.

18   Q.  Okay.  Then according to the data, it may have -- it

19   connected to another tower, correct?

20   A.  That's my interpretation.  That's correct.

21   Q.  Okay.  That's your interpretation of it.

22   A.  Correct.

23   Q.  Isn't it true --

24   A.  I believe --

25   Q.  -- that cell towers can cover up -- how many square

1    miles can cell towers cover?

2    A.  I don't know the exact figure but -- it's not a finite

3    point.  The tower itself is the finite point that I'm

4    drawing on, but the tower does cover some area.  I don't

5    know how long.  I think it depends on topography.  I think

6    it depends on, you know, buildings and how far it is.  I

7    don't know if it's an exact science.

8    Q.  Okay.  So it's a -- fair to say it's an estimate.  I

9    mean, you can't be certain that --

10   A.  I can -- I can -- yeah, I can be certain of where the

11   tower is.  The tower that it's touching is in the Eastern

12   District.  That is the latitude and longitude of the tower.

13          Fair to say what sector of the tower, meaning

14   sector -- if you have a pie, it's 1, 2, 3, 4 -- if you

15   divide it what side of the tower they're on.  So fair to

16   say that that call touched a tower in the Eastern District

17   of Texas.

18          But to your point, if there was a radius and the

19   circumference of how that covers, there may be a portion of

20   it that's not in the Eastern District, a portion that is.

21          But I can tell you that the call did touch a tower

22   in the Eastern District.

23   Q.  Okay.  All right.  And then you also talked about -- as

24   far as the fax, you mentioned the fax machine.

25   A.  Yes, sir.

 1   Q.  Okay.  Did you review any records about where that was

 2   initiated from?

 3   A.  Well, the fax number I could only tie to a physical

 4   location.  The physical location -- the 972 -- I forget the

 5   telephone number but -- 1732, I believe it was.  We tie it

 6   to Mr. Ashley's letterhead.  We also tie it to

 7   circumstantially that Mr. Ashley is talking about faxing a

 8   document on January 27th, talking about faxing the

 9   beneficiary change document on January 27th.

10         And then Midland life receives a fax that we can

11   connect to open source as North Texas Money Management and

12   then documents provided by an investor, letterhead with

13   Mr. Ashley's name on it with a fax that says 1732.

14   Q.  Sure.  I mean, I get that.  I get that part.

15         The question I guess I need to ask better is:  Do

16   you know where that fax was initiated from?

17   A.  At the time it was sent, I don't know where it was

18   initiated from.

19   Q.  Okay.  And you also talked about an email on

20   January 27th.  Did you talk about the email on

21   January 27th?

22   A.  Yes.

23   Q.  Okay.  And as far as the email goes -- let me go back

24   to the fax real quick.

25   A.  Sure.

1    Q.  Nowadays the fax machine is like an antiquated device,

2    correct?

3    A.  Well, the FBI still has one so --

4    Q.  Okay.

5    A.  -- it's not that antiquated.

6    Q.  All I can remember about the fax machine is on *Office*

7    *Space* when they beat it with a baseball bat.  It's just an

8    old thing, right?

9    A.  The one we have looks exactly like that one.

10   Q.  Okay.  Now you have services like eFax and things like

11   that that you can fax and have a number but do it through

12   email or directly from a website and just upload a document

13   and you fax it; is that true?

14   A.  Yes.  Those programs do exist, yes.

15   Q.  Okay.  Now, as far as the January 27th telephone call,

16   what did you testify about as relation to that?

17   A.  So we had a 24th call, a --

18   Q.  Right.

19   A.  -- 27th telephone call --

20   Q.  Yeah.  Let's talk about the 27th telephone call.

21   A.  Sure.

22   Q.  Okay.  Where was that -- what's your testimony about

23   where that was initiated?

24   A.  It was initiated -- actually, it appears based upon the

25   tower, it was actually at the brewery, Nine Band Brewery in

1   Allen, Texas, which is in the Eastern District.

2   Q.  Okay.  But all you can say is it connected to that

3   tower?

4   A.  Sure.  But no matter what the radius or circumference

5   and the coverage tower (sic) of that tower, Allen is, as

6   you know, very far into the Eastern District.  It's not

7   close to the border.  So my assumption would be the entire

8   tower coverage during that time would be in the Eastern

9   District.

10  Q.  Okay.  But you don't know -- personally looked at the

11  data, the coverage of the tower or the bandwidth or

12  anything like that?

13  A.  No, sir.

14  Q.  Okay.  All right.  And then as far as the email goes,

15  have you -- did you talk about the email at all?

16  A.  The email was referenced.  The email, I believe, was

17  sent at 11:24 on January -- I would -- the date -- I

18  believe it was January the 27th as well.

19          What I did is I took Mr. Ashley's cell records and

20  just bracketed the time.  I think he had a call -- he had a

21  phone call 4 or 5 minutes before that time was -- that

22  email was sent and then maybe 15 or 20 minutes after or it

23  was a call and a text message.

24          And both of those hit towers that were near the

25  brewery, the same tower as the call.  So based upon that,

```
 1  one would assume that he was in the Eastern District during
 2  that time.
 3  Q.  Okay.  So you're just basing it on the fact that there
 4  were some phone calls around it, and so then you're just --
 5  then you're saying, as you said, making an assumption that
 6  it was there.  Is that --
 7  A.  Yeah.  So he made a phone call 5 minutes before that
 8  email was sent and that was from the brewery, and then he
 9  had a text message 15 minutes after that was sent and that
10  tower is at the brewery.  So I think that's a reasonable
11  assumption.
12  Q.  Okay.  That's your reasonable assumption?
13  A.  Yeah, I --
14          MS. RATTAN:  Your Honor, I'd object.  It's
15  argumentative.
16          THE COURT:  Well, just rephrase the question.
17  BY MR. WHALEN:
18  Q.  Isn't it true that other people can have access to
19  email accounts online and send emails and it appears that
20  it's -- and it can be coming from that email account, but
21  they could be in a totally different place?
22  A.  Are you saying that just because he sent an email
23  doesn't mean he was where his phone was at the time?
24  Q.  Correct.
25  A.  That's possible.
```

```
 1   Q.  Okay.  All right.

 2            MR. WHALEN:  I'll pass the witness.

 3            THE COURT:  Anything additional?

 4            MS. RATTAN:  Yes, your Honor.  Thank you.

 5            Thank you, your Honor.

 6            May it please the Court?

 7            THE COURT:  Yes, go ahead.

 8              REDIRECT EXAMINATION OF JASON RENNIE

 9   BY MS. RATTAN:

10   Q.  Agent Rennie, the questions that defense counsel was

11   asking you about the location of the phone, did you, in

12   fact, prepare some detailed charts that explain your

13   analysis of what happened and where it happened?

14   A.  I did.

15   Q.  Okay.  And are those contained in Government's

16   Exhibit 132?

17   A.  They are.

18            MS. RATTAN:  Your Honor, we'll offer Government's

19   Exhibit 132.

20            MR. WHALEN:  No objection, your Honor.

21            THE COURT:  132 will be admitted.

22            MS. RATTAN:  And may we publish Government's

23   Exhibit 132, page 1?

24            THE COURT:  Yes.

25                              *
```

```
 1   BY MS. RATTAN:
 2   Q.  Okay.  So 132, page 1, it's the Paula Diaz phone call
 3   on January 24th of 2020 at 9:04 a.m.; and this is Count 9
 4   of the Indictment.
 5         And you said -- you testified on direct that you
 6   did analysis of where the phone call came from.  Can you
 7   use this chart, Government's Exhibit 132 page 1, to explain
 8   what your analysis showed?
 9   A.  Sure.
10         So actually if you scroll to page 2.
11         So the bottom of page 2, right here in the black
12   and white, you see that's a snippet from the AT&T record
13   itself.  So that's a snippet from the search warrant that's
14   provided directly from AT&T.
15         On the right side there, those are the latitude
16   and longitude coordinates of the tower for which
17   Mr. Ashley's cell phone was bouncing off of during this
18   call.
19         And most calls, if you're stationary, will only
20   have -- if you see it says, the very top line, the very
21   last -- the very last notation on the first line is a
22   negative.  So it's negative 96.89:32.977.  That's the
23   coordinate.
24         In this call you can -- you can tell that
25   Mr. Ashley was moving during this call because there's
```

 1  actually two sets of coordinates.

 2          So the first one, -96.8909:32.977.  If you scroll

 3  up to the first page, that's entered into Google.

 4          And you see it just below the picture there.  It

 5  says "32.977, -96.8909."

 6          And it plots in minutes north and west.  There is

 7  a conversion.  It plots that and it says at that time, in

 8  fact, it appears to be that Mr. Ashley was at the

 9  deceased's home, James Seegan, during the -- at least the

10  initiation of this call.

11  Q.  Okay.  And what happened as the call continued?

12  A.  Correct.

13          And so on the second page, the second set of

14  coordinates, which is different, obviously, than the first,

15  those are also plotted.  It's 33.01 and then -96.807.  And,

16  as I said, it's -- it plots here, which is north of George

17  Bush.

18          North of George Bush -- and, actually, I take that

19  back.  It was -- I misstated.  I said it was Central

20  Expressway.  That's actually George Bush and the Dallas

21  North Tollway.

22  Q.  And that would be in the Eastern District of Texas?

23  A.  Yes.  That's well within the Eastern District of Texas.

24  Q.  And then although this is Government's Exhibit 132, you

25  listed down here Government's Exhibit 4B and the page

1  number that you took the cell site information from; is

2  that right?

3  A.  Exactly.

4         So if you were to look at the actual record,

5  4B001, Entry 7080, it would have that telephone call.

6  Q.  So you took the cell site information off of the

7  defendant's phone and you took the coordinates and you

8  entered the coordinates to determine the location of the

9  phone when the call was made?

10  A.  Correct.

11         MS. RATTAN:  Now if we can look at

12  Government's 132, page 3.

13  BY MS. RATTAN:

14  Q.  Again, this is January 27th of 2020; and that's the

15  call that was made with Jennifer Jennings at 10:26 a.m.  So

16  he's calling Midland life again to check on the status of

17  this change.

18         And you did your analysis on where the phone was;

19  is that right?

20  A.  I did.

21  Q.  And what did it show?

22  A.  Again, at the very bottom of this page, that's the

23  snippet, so Entry 7216 on the actual records provided by

24  AT&T, which is Exhibit 4B, page 2.

25         You take the coordinates, which are 33.093227 and

1    96.67326.  You enter that in.  There is a slight conversion

2    due to minutes and seconds.  And it plots the tower, which

3    based upon -- based upon the investigation, the evidence

4    shows that that tower is very, very close to 9 Prestige

5    Circle, Allen, Texas, which is Nine Band Brewery, which is

6    owned by the defendant, Keith Ashley.

7            MS. RATTAN:  And then if we can look at the next

8    page, Government's Exhibit 132, page 4.

9            This is a call that we haven't covered yet, so we

10   can cover this later.

11           We'll pass the witness, your Honor.

12           THE COURT:  Anything additional?

13           MR. WHALEN:  Yes.

14                RECROSS-EXAMINATION OF JASON RENNIE

15   BY MR. WHALEN:

16   Q.  Agent Rennie, isn't it true that if I am near a tower

17   and it's full, it's going to push me to another tower and,

18   if that's full, push me to another tower and connect with

19   that?

20   A.  I generally understand that; but, again, I don't -- I

21   don't know what would cause that.  I can't speak

22   intelligently about how it pushes things if it's overflowed

23   or it's down or something.

24   Q.  Okay.  So you don't have any personal knowledge or

25   expertise in that area to articulate that or not, correct?

1  A.  I do not.

2  Q.  All right.

3          MR. WHALEN:  I'll pass the witness.

4          MS. RATTAN:  Just briefly.

5          THE COURT:  Go ahead.

6          MS. RATTAN:  Thank you.

7          FURTHER REDIRECT EXAMINATION OF JASON RENNIE

8  BY MS. RATTAN:

9  Q.  Did the defendant, Keith Ashley, have any property

10 outside of the Eastern District of Texas?

11 A.  Not to my knowledge.

12 Q.  Was his business in the Eastern District?

13 A.  It was.

14 Q.  Was his house in the Eastern District?

15 A.  It was.

16         MS. RATTAN:  That's all, your Honor.

17         THE COURT:  Okay.  Agent, you may step down.

18         THE WITNESS:  Thank you, your Honor.

19         THE COURT:  So why don't we go ahead and just take

20 our afternoon break at this time.  Again, ladies and

21 gentlemen, please don't discuss the case among yourself or

22 anyone else.  Don't do any outside research.  We'll take

23 15 minutes, come back, and continue.  Thank you.

24         (The jury exits the courtroom, 2:56 p.m.)

25         THE COURT:  Anything further from the government?

```
 1              MS. RATTAN:  No, your Honor.

 2              THE COURT:  Defense?

 3              MR. WHALEN:  No, your Honor.

 4              THE COURT:  Okay.  See you back in 15.

 5              (Recess, 2:57 p.m. to 3:14 p.m.)

 6              (Open court, defendant present, jury not present.)

 7              MS. RATTAN:  We have an issue to bring up before

 8   the jury comes in.

 9              THE COURT:  Oh, yes, you may approach.

10              (Sidebar conference, off the record.)

11              (The jury enters the courtroom, 3:14 p.m.)

12              THE COURT:  Please be seated.

13              Okay.  Your next witness?

14              MR. FINE:  We'll call Sakdida Seegan, your Honor.

15              THE COURT:  Ma'am, if you'll raise your right hand

16   to be sworn in.

17              (The oath is administered to the witness.)

18              THE COURT:  Okay.  Go ahead and proceed.

19              MR. FINE:  Thank you, your Honor.

20                 DIRECT EXAMINATION OF SAKDIDA SEEGAN

21                  CALLED ON BEHALF OF THE GOVERNMENT

22   BY MR. FINE:

23   Q.  Good afternoon, Mrs. Seegan.  How are you?

24   A.  Good afternoon.  I'm good.

25   Q.  And so, Mrs. Seegan, you speak very softly.  You're
```

     1  going to have to speak directly into that microphone so

     2  that the jury and everybody in here can hear you.  Okay?

     3  A.  Okay.

     4  Q.  Will you please introduce yourself to the ladies and

     5  gentlemen of the jury and spell your first and last name

     6  for the court reporter?

     7  A.  All right.  My name is Sakdida Seegan, S-A-K-D-I-D-A

     8  S-E-E-G-A-N.

     9  Q.  And, Mrs. Seegan, does everybody call you Dida?

    10  A.  Yes, sir.

    11  Q.  Okay.  Is it all right if I call you Dida?

    12  A.  Yes.

    13  Q.  Okay.  All right.  That's how we've come to know each

    14  other, correct?

    15  A.  Yes.

    16  Q.  All right.  So I want you to tell the jury -- let's

    17  start with this:  Where were you born?

    18  A.  I born in Thailand.

    19  Q.  And how long did you live in Thailand for?

    20  A.  How long?

    21  Q.  Yeah.  About what -- I'm not meaning to embarrass you.

    22  I'm not going to make you say how old you are.  But at what

    23  age did you come over to the United States?

    24  A.  2008.

    25  Q.  Okay.  And you've been here for about 14 years now?

```
 1   A.  Yes.
 2   Q.  Did you -- when you moved from Thailand, did you move
 3   to the Dallas-Fort Worth area?
 4   A.  Yes.
 5   Q.  And what city, specifically, did you move to?
 6   A.  Carrollton.
 7   Q.  Okay.  And what was your address -- what was the
 8   address where you lived in Carrollton?
 9   A.  2114 Cannes Drive, Carrollton, Texas, 75006.
10   Q.  And do you still live there today?
11   A.  Yes.
12   Q.  Who -- when you moved to Carrollton, did you know a man
13   named James Seegan?
14   A.  Yes.
15   Q.  And tell the jury, who was James Seegan to you?
16   A.  He was a very wonderful husband and dad and wonderful
17   son to his mom and wonderful brother to his brother.
18   Q.  And was James also known as Jim?
19   A.  Yes.
20   Q.  Did you call him Jim or James?
21   A.  I call him both, sometimes James, sometimes Jim, mostly
22   called him James.
23   Q.  Did a lot of his friends call him Jim?
24   A.  Yes.
25   Q.  And before we talk about Jim --
```

```
 1    A.  Yes.

 2    Q.  -- do you work, Dida?

 3    A.  Yes, I work.

 4    Q.  What kind of work do you do?

 5    A.  I am massage therapy.

 6    Q.  Massage therapy?

 7    A.  Yes.

 8    Q.  And how long have you been doing that for?

 9    A.  I think maybe two years.

10    Q.  Okay.

11    A.  Yeah.

12    Q.  And I want to talk a little bit about Jim.  Is that

13    okay?

14    A.  Yes.

15    Q.  Tell the jury, first of all, where did Jim -- where was

16    he born?  Where did he grow up?

17    A.  He born on Pittsburgh, and then he grew up over there.

18    But then he moved to Oklahoma for his school.

19    Q.  And after Oklahoma, eventually he moved to the Dallas

20    area?

21    A.  Yes.

22    Q.  And then he moved to Carrollton?

23    A.  Yes.

24    Q.  And did he actually own the house -- that house before

25    y'all met?
```

1  A.  Yes.

2  Q.  And after you guys met, eventually you got married?

3  A.  Yes.

4  Q.  And what year did you marry Jim?

5  A.  2008.

6  Q.  2008.

7       And so y'all were married about 12 years?

8  A.  Yes.

9  Q.  And did you have any children together?

10 A.  I have one boy.  Now he's 8 years old.

11 Q.  And tell the jury about -- your son's name is Josh,

12 correct?

13 A.  Yes.  He is 10.  I said 8.

14 Q.  Tell the jury a little bit about Josh.

15 A.  Josh, he's very smart; and then he very attached to his

16 dad so much.

17 Q.  And what grade is he in now?

18 A.  Fourth.

19 Q.  And he's in school -- well, he's probably -- I guess

20 he's just about getting out of school right now, right?

21 A.  Yes.

22 Q.  And does he go to school in the Carrollton area?

23 A.  Yes.

24 Q.  All right.  And what was Jim's relationship with Josh

25 as a father-son?

1  A.  He is -- he was the most caring and amazing dad to his

2  son; so he would do everything for Josh, everything.  He

3  even retired early because of Josh alone.  He want to spend

4  time with him as much as he could.

5  Q.  And I was going to -- that's actually where I was going

6  to go next.

7          In terms of Jim, at the time of his death he was

8  retired, correct?

9  A.  Yes.

10  Q.  What did he do for a living before he retired?

11  A.  He work for IBM company as a sales representative.

12  Q.  For IBM?

13  A.  For IBM.

14  Q.  And what did he do with IBM?

15  A.  What I know, he do different thing.  He do consultant.

16  He do for -- like teach people how to sell, and he sell

17  also.

18  Q.  Okay.  So he was in sales with IBM?

19  A.  Yes.

20  Q.  And was he a supervisor as well?  Did he supervise

21  other people?

22  A.  Yes.

23  Q.  And about how long did he work at IBM?

24  A.  Thirty years.

25  Q.  Thirty years.

```
 1             Did he work most of his entire career at IBM?

 2  A.  Yes.

 3  Q.  What year did he retire?

 4  A.  I forgot what year, but he (indiscernible) -- 60.

 5  Q.  At 60?

 6  A.  Yes.

 7  Q.  Okay.  Josh was born in twenty- --

 8  A.  '12.

 9  Q.  -- '12?

10  A.  Yes.

11  Q.  When Josh was born, was Jim still working?

12  A.  Yes.

13  Q.  About how old was Josh when Jim stopped working, when

14  he retired?

15  A.  I would say 5.

16  Q.  Okay.

17  A.  5, almost 6 years old.

18  Q.  And was that when Josh started going to elementary

19  school?

20  A.  Yes.

21  Q.  And was that part of the reason why Jim stopped

22  working, retired early?

23  A.  Yes, because of Josh.

24  Q.  And was that part of the routine?  Jim would take Josh

25  to school every morning?
```

```
 1   A.  Yes.

 2   Q.  Would he pick him up from school every afternoon?

 3   A.  Yes.

 4   Q.  Was that something Jim loved doing?

 5   A.  Yes.

 6   Q.  Did he love spending time with Josh?

 7   A.  Yes.

 8   Q.  Do you -- obvious question.  Do you love spending time

 9   with Josh?

10   A.  Yes.

11   Q.  The three of you as a little family --

12   A.  Yes.

13   Q.  -- were those special times for you?

14   A.  Yes.

15   Q.  What about -- you know, when people retire, they have

16   hobbies, right?

17   A.  Right.

18   Q.  Tell the jury some of the hobbies that Jim had.

19   A.  He liked to work in the garden in the backyard, the

20   front yard, and volunteer for our neighbor to work -- I

21   don't know what they call.  Like they have somebody, like,

22   plant the flower or something like that for the community.

23   Q.  Like a community garden-type thing?

24   A.  Something like that.

25   Q.  Okay.
```

 1  A.  And he loved to go to the gym.  He loved to read.

 2  Q.  Was he also sort of working on your house --

 3  A.  Yes.

 4  Q.  -- doing some remodeling?

 5  A.  Yes.

 6  Q.  And tell the jury about that.

 7  A.  He was planning to do new flooring, change air

 8  condition, the cooling/heating, and change all the floor in

 9  the house and fix things around the house.

10  Q.  Okay.  So you talked about flooring --

11  A.  Yes.

12  Q.  -- air-conditioning?

13  A.  Yes.

14  Q.  These were some pretty major projects.

15  A.  Very major, yes.

16  Q.  And when he -- upon his passing, did he still have

17  these projects in the works, basically?

18  A.  Yes.

19  Q.  After he died, were packages still coming to your house

20  to refurbish and do home remodeling?

21  A.  Yes.

22  Q.  In fact, were there still supplies in one of the rooms

23  in your house for flooring and things like that?

24  A.  Yes.

25  Q.  Was this something that he was looking forward to

 1  doing?

 2  A.  Yes.

 3  Q.  Did he enjoy fixing things up like that?

 4  A.  Yes.

 5  Q.  Did he also enjoy working with computers?

 6  A.  Yes.

 7  Q.  Was he a football fan as well?

 8  A.  Yes.

 9  Q.  Do you remember who his favorite team was?

10  A.  No, I don't.  I don't interested in football.

11  Q.  If there were some items in your house -- in the

12  bedroom there was a calendar, a football calendar.  Do you

13  remember that?

14  A.  Yes.  Yes.

15  Q.  Do you remember what team that was?

16  A.  No, I don't know.

17  Q.  If I told you the Pittsburgh Steelers, does that sound

18  right?

19  A.  Yes.

20  Q.  All right.  And there is -- in the office -- and this

21  jury is going to get a chance to see these photographs.

22  But in the office were there pictures of Josh all through

23  Jim's office?

24          No, it's not there yet.  I'm just sort of asking

25  you --

```
 1   A.  Oh.

 2   Q.  -- to describe it.

 3   A.  Okay.

 4   Q.  No, my mistake.

 5           Were there pictures of Josh all through Jim's

 6   office?

 7   A.  Yes.

 8   Q.  Some sports memorabilia as well?

 9   A.  Yes.

10   Q.  Pictures and things of -- did Josh play T-ball at some

11   point?

12   A.  Yes.

13   Q.  Did Jim help with that?

14   A.  Yes.

15   Q.  Was he proud of that, too?

16   A.  Yes.

17   Q.  Were those things in the office also?

18   A.  Yes.

19   Q.  All right.  You know why you're here today, correct?

20   A.  Yes.

21   Q.  I assume you're nervous to testify.  Is that --

22   A.  Yes.

23   Q.  -- fair to say?

24   A.  Yes.

25   Q.  All right.  I want to ask you if you know a man named
```

1   Keith Ashley.  Does that name sound familiar to you?

2   A.  Yes.

3   Q.  Do you -- would you recognize Keith Ashley if he was in

4   the courtroom today?

5   A.  I don't see him.

6   Q.  Okay.  How well did you know Keith Ashley?

7   A.  Not well.

8   Q.  Did you ever go out to dinner with him or anything like

9   that or have any social interactions or just kind of see

10  him from time to time?

11  A.  Time to time.  I think maybe I -- I saw him a few time.

12  Q.  And what did you know about Keith Ashley?

13  A.  I know only he was working for Bob, my husband's

14  brother, for financial.  That's all I know.

15  Q.  Okay.  He worked with Jim's brother, Bob, doing --

16  A.  Yes.

17  Q.  -- some finances --

18  A.  Something --

19  Q.  You don't know specifically but something with

20  finances?

21  A.  Exact, yes.

22  Q.  And did he work with Jim in regards to finances as

23  well?

24  A.  I did not --

25  Q.  Okay.

1   A.  -- know that.

2   Q.  When it came to finances and the house -- you were

3   working, right?

4   A.  Right.

5   Q.  Jim was retired?

6   A.  Right.

7   Q.  Did Jim have a pension as well?

8   A.  Yes.

9   Q.  And was that helping -- between your salary and the

10  pension, was that helping to cover the bills and help with

11  expenses around the house?

12  A.  Probably.

13  Q.  Okay.

14  A.  Yeah.

15  Q.  Is it -- and tell me if I'm wrong on this.  Is it fair

16  to say when it came to Jim's finances, you didn't really

17  know a lot about it?

18  A.  No, I did not know a lot about it.

19  Q.  Y'all -- you and Josh and Jim, y'all lived a

20  comfortable life.  Is that fair to say?

21  A.  Yes.

22  Q.  And you had things that you needed, right?

23  A.  Yes.

24  Q.  But were you really that interested in how much money

25  Jim had or where money was coming from or anything like

 1  that?

 2  A.  No.  I never.

 3  Q.  Okay.  I want to turn your attention to February 19th,

 4  2020.

 5  A.  Okay.

 6  Q.  I know this is going to be difficult, but I want to

 7  start with that morning.

 8  A.  Okay.

 9  Q.  Did you see Jim that morning?

10  A.  I did.

11  Q.  And what was his -- what was his demeanor like that

12  morning?  How was he acting?

13  A.  He told me that he ordered two shoes for Josh.  He said

14  when the shoe arrive, just let Josh try on first.  If Josh

15  doesn't like it, we can return it back.  If he like them,

16  we can keep it.

17  Q.  So basically he had bought Josh two pairs of shoes --

18  A.  Yes.

19  Q.  -- right?

20  A.  Right.

21  Q.  And it was one of those things, let Josh figure out

22  which pair he likes --

23  A.  Yes.

24  Q.  -- and the other pair is going to go back to the store,

25  right?

```
 1   A.  Yes.
 2   Q.  And he told you that that morning, that his plan was he
 3   was going to return whatever pair of shoes he didn't like,
 4   right?
 5   A.  Yes.
 6   Q.  Do you remember -- and I know it's difficult.  I'm not
 7   trying to pin you down on a specific time.  But do you
 8   remember around what time of the morning that was when you
 9   had that conversation?
10   A.  I think maybe sometime before 7:00 --
11   Q.  Okay.
12   A.  -- a.m., yes.
13   Q.  What time did y'all wake up generally on a school day?
14   A.  6:00.
15   Q.  6:00?
16   A.  Uh-huh.
17   Q.  And what time would Jim take Josh to school?
18   A.  I'm not recall exactly time, but we could be there
19   before 7:30.
20   Q.  Okay.  Had to be there --
21   A.  At school.
22   Q.  -- to school around 7:30?
23   A.  Yes.
24   Q.  And so you had a conversation talking about shoes.  Was
25   it a normal morning?
```

1   A.  Yes, normal.

2   Q.  Nothing out of the ordinary?

3   A.  No.

4   Q.  So you have this conversation around 7:00.  Did Jim

5   take Josh to school around 7:30 in the morning?

6   A.  Yes.

7   Q.  Did he come back after dropping off Josh --

8   A.  Yes --

9   Q.  -- at the school?

10  A.  -- he came back.

11  Q.  And what were you doing when he came back?

12  A.  I was riding a exercise bike.

13  Q.  Okay.  Was that in the house, the exercise bike?

14  A.  Yes, in the house.

15          And then I was asking him how was the weather

16  outside and then -- I just want to make sure that I bring

17  my jacket, the right one.  It might be over or just like

18  light -- sometime it's not cold but I bring really heavy

19  jacket.

20          So I ask him how is the weather look like so I can

21  bring the right jacket when I go to work.

22  Q.  And did he tell you what the weather was like outside?

23  A.  He said, like, you -- I can bring something like

24  medium, not too heavy.

25  Q.  Because it's February in Texas.  It could be 90, or it

```
 1   could be --

 2   A.  Yes.

 3   Q.  -- freezing, right?

 4   A.  Yes.

 5   Q.  And so medium jacket.

 6        Again normal conversation with Jim?

 7   A.  Yes.

 8   Q.  And did you leave to go to work that morning?

 9   A.  Yes, I did.

10   Q.  About what time did you leave to go to work?

11   A.  I remember I leave around 9:00, a little bit up, like

12   9:00 and 5 minute or something like that.  I'm not really

13   recall it exactly.

14   Q.  And that's fine.

15        So give or take, around 9:00 in the morning you

16   left?

17   A.  Yeah.

18   Q.  Was that your normal routine?

19   A.  Yeah, my normal routine.

20   Q.  When you left at 9:00 in the morning, was there

21   anything out of the ordinary that you saw from Jim at all?

22   A.  No.

23   Q.  Did he tell you what his plans were that day?

24   A.  No.

25   Q.  When you left, where was Jim?
```

```
 1   A.  He was upstair in his office.

 2   Q.  Was that normal for him --

 3   A.  Normal.

 4   Q.  -- to be upstairs?

 5   A.  Normal.

 6   Q.  And so you leave to go to work, right?

 7   A.  Yes.

 8   Q.  And unbeknownst to you at the time, you would never see

 9   your husband again, correct?

10   A.  Correct.

11   Q.  I want to move forward through your day.  Did you and

12   Jim talk at all during the day when you worked?

13   A.  No.

14   Q.  Was that out of the ordinary, or was it sort of you

15   would go to work and then you would meet up afterwards and

16   talk at that point?

17   A.  Yes.

18   Q.  Okay.  Some -- you know, some people, they can text and

19   call during the day.  At your job is that something you can

20   really do, be on your phone or text and call too much

21   during the day?

22   A.  No.  I don't text or call him during the day.  I work

23   until I get home.

24   Q.  And when you get home --

25   A.  Yes.
```

1  Q.  -- on a normal day -- let's take February 18th.

2  A.  Yes.

3  Q.  Okay.  On February 18th or any normal day, what time

4  would you usually get home?

5  A.  Depends.  Sometimes I get home at 8:00, sometimes 7:30.

6  So it's almost bedtime for everyone already.

7  Q.  And would -- on the 18th was Jim home when you got

8  home?

9  A.  Yes.

10  Q.  Was he with Josh?

11  A.  Yes.

12  Q.  Did he pick up Josh every day from school?

13  A.  Yes.

14  Q.  Was that his thing?

15          He loved doing that, right?

16  A.  Yeah, he loved to do that, yes.

17  Q.  And was there ever a time where he didn't pick up Josh

18  from school?

19  A.  No, never.

20  Q.  And so you're at work on February 19th, and did you

21  receive a call sometime around 3:30 or 4:00 in the

22  afternoon?

23  A.  Yes.

24  Q.  And tell the jury, what was the -- what was that call

25  about?

```
 1   A.  I got phone call from school, said that my husband did
 2   not come and pick up Josh.  So I told -- I told them that
 3   it's never been like this.  Maybe he might be in a meeting
 4   or something.  Let me call him first.
 5          So I was trying to call him many times.  So he did
 6   not answer the phone, so I wait.
 7          After that, school called me again that they still
 8   haven't heard from my husband.
 9   Q.  And was that something that really concerned you?
10   A.  Yes, very.
11   Q.  Had that ever happened before?
12   A.  Never, ever.
13   Q.  And so what did you do after the school called you back
14   for the second time?
15   A.  I told him I will go and pick up Josh.
16   Q.  And did you --
17   A.  So I --
18   Q.  Go ahead.
19   A.  I drove from work to school.
20   Q.  And about how far is that drive from your work to
21   Josh's school?
22   A.  On that day I remember it was raining a lot and raining
23   all day.  It take -- like traffic.  It take me like maybe
24   40 minute to be at school.
25   Q.  And during that 40-minute drive, what was going through
```

```
 1   your head?

 2   A.  I -- I think on -- to my work from school (sic), I

 3   think he might be in a meeting or maybe something that he

 4   could not answer the phone or something.  But I don't think

 5   anything bad yet during my work to school because I'm

 6   worried about Josh, that nobody pick him up and he might

 7   very scare.

 8   Q.  And Josh -- back in February of 2020, he was 8; is that

 9   right?

10   A.  7.

11   Q.  7?

12   A.  Uh-huh.

13   Q.  So was he in second grade?

14   A.  Yeah.

15   Q.  All right.  And --

16   A.  He in the first grade.

17   Q.  First grade?

18   A.  Yes.

19   Q.  Okay.  So you've got a first-grader that is kind of

20   stranded at school.  You're trying to focus and get your

21   son.  Is that fair to say?

22   A.  Yes.

23   Q.  When you got to school, had you heard from Jim?

24   A.  No.

25           When I get at school and then the teacher told me
```

1    that they send the police to my house to check that he is

2    home or not.

3            So at that point my feeling something really,

4    really bad might be happen to him.  So I grab Josh right

5    away, "Hey, Josh, let's go home now and to see what your

6    dad doing and what happened to him."

7            So I drove home.

8    Q.  And about how far is that drive from school to your

9    home?

10   A.  Around 8 minute.

11   Q.  And what was that 8 minutes like for you?

12   A.  It is like something really bad.  And then I'm thinking

13   what I going to do without him, what Josh going to be like

14   without his dad that -- they attach to each other so much

15   and then they love each other so, so much.

16           So I can't imagine if Josh without his dad and

17   then what I going to do because I feel something to me --

18   like the more I drove close to my home, the more my

19   feeling, like my heart pounding so loud, like get out from

20   my body.

21   Q.  And did y'all eventually get back home?

22   A.  Yes.  When I get back home, I turn on the garage; and I

23   saw his car in there.  It mean he home.

24   Q.  And what did you think when you saw his car?

25   A.  I think something bad happen.

1    Q.  What did you do next?

2    A.  I went upstair and call him, "Daddy," because -- I call

3    him Daddy because of Josh call him Daddy.

4          So no response, no answer.  So I went upstair to

5    the second floor.  I look through his office, and then I

6    saw him just in the chair and just like some -- just like

7    some -- someone sleeping in the -- in the chair.

8    Q.  You went upstairs.  Where was Josh when you went

9    upstairs?

10   A.  He went with me.

11   Q.  The two of you went upstairs together?

12   A.  Together.  We see thing together.

13   Q.  Okay.  And the jury is going to get to see what the

14   inside of your home looked like later.  But just so they

15   get an understanding, it's a two-story home; is that right?

16   A.  Right.

17   Q.  And so you go in the garage; and you go upstairs and

18   basically you turn the corner, right?

19   A.  Right.

20   Q.  And as you look into the office, you saw your husband;

21   and it looked like he was sleeping on a chair?

22   A.  Right.

23   Q.  What did you do then?

24   A.  I call him.

25   Q.  And did he respond?

1  A.  No.

2  Q.  What did you do after that?

3  A.  Josh pulled me out from that scene.  He said, "Mom,

4  let's get out of here.  Someone is still here.  Let's go

5  get out the house like as soon as we can.  So let's get

6  into the car now."

7        So we ran into the car; and I told him, like,

8  before we get out from house, "Can I call 9-1-1"?

9        And then he said, "Yes."

10       So then I call 9-1-1.

11 Q.  And did you call 9-1-1?

12 A.  Yes, I did.

13 Q.  And was that at about 5:22 p.m. on February 19th?

14 A.  Yes.

15 Q.  And we listened to your 9-1-1 call.  I think it was, I

16 don't know, last week or a couple weeks ago.  The days kind

17 of go together.

18       We had a chance to review it, correct?

19 A.  Yes.

20 Q.  The 9-1-1 call that I played for you, was that the call

21 that you made on February 19th?

22 A.  Yes.

23 Q.  All right.

24       MR. FINE:  At this time the government would offer

25 Exhibits 77 and 78, which is the 9-1-1 call and the

 1   transcript.

 2            MR. SANDEL:  No objection, your Honor.

 3            THE COURT:  Okay.  77 and 78 will be admitted.

 4            MR. FINE:  Permission to publish Government's 77,

 5   your Honor?

 6            THE COURT:  Yes, you may.

 7            (Audiovisual presentation, no tape counter.)

 8            THE COURT:  Ma'am, would you like to take a break?

 9            We're going to go ahead and take a break.  Ladies

10   and gentlemen, again, please don't discuss the case among

11   yourself or anyone else.  We'll come back here shortly.

12   Thank you.

13            (The jury exits the courtroom, 3:42 p.m.)

14            MR. FINE:  May I approach the witness?

15            THE COURT:  Yes.

16            Okay.  We'll take a few minutes and then come

17   back.

18            (Recess, 3:44 p.m. to 3:49 p.m.)

19            (Open court, defendant present, jury not present.)

20            THE COURT:  Ma'am, are you ready to proceed?

21            THE WITNESS:  (Moving head up and down.)

22            THE COURT:  Let's go ahead and bring the jury in.

23            MR. WHALEN:  Mr. Sandel just went to the restroom.

24            THE COURT:  Oh, okay -- oh, he's right there.

25            MR. WHALEN:  Okay.

```
 1              (The jury enters the courtroom, 3:51 p.m.)

 2              THE COURT:  Please be seated.

 3              Go ahead and continue.

 4              MR. FINE:  Thank you, your Honor.

 5    BY MR. FINE:

 6    Q.  Dida, you're the same Sakdida Seegan who was on the

 7    stand before we took a break, correct?

 8    A.  Yes.

 9    Q.  And you know you're still under oath, right?

10    A.  Yes.

11    Q.  And you're here to tell the jury the truth; is that

12    fair?

13    A.  Yes.

14    Q.  Okay.  After you went upstairs and came back down and

15    called 9-1-1, did you at that point realize that Jim had

16    been shot in the head?

17    A.  No, I did not realize that.

18    Q.  Did you even see a gun in his hand or anything?

19    A.  No.

20    Q.  When you walked into that room, was it pretty dark in

21    the room?

22    A.  I did not walk to the room.  I just look through the

23    door that been opened.

24    Q.  Okay.  Eventually the police got there, the Carrollton

25    Police Department, right?
```

```
 1   A.  Yes.
 2   Q.  Paramedics, firefighters, what you would expect in that
 3   situation; is that fair?
 4   A.  Yes.
 5   Q.  And when did you find out that Jim had died?
 6   A.  So when all the firemen came, they came upstair -- I
 7   told him, "My husband upstair.  Can you come and take a
 8   look?"
 9            And 5 minute later, my son Josh was asking, "How
10   is my dad?"
11            And they said like, "Your dad passed."
12   Q.  And when they said that to you and Josh, did you at
13   that point know that he had been shot in the head?
14   A.  I did not know that.
15   Q.  When did you find that out?
16   A.  I find out when Detective Duncan --
17   Q.  Can you repeat that?
18   A.  I not recall when, but maybe 40 minute later or
19   something they came downstair and I ask him how my husband
20   die.
21   Q.  And is that when you found out they said that he was
22   shot in the head?
23   A.  Yes.
24   Q.  And what was going through your mind when you heard
25   that?
```

1    A.  I said, "Impossible."

2    Q.  And why did you say, "Impossible"?

3    A.  Because he hated gun.  He against gun.  He never had

4    gun.  And then even I bought toy gun for my son, Josh.  He

5    told me, like, "You know that, right?  You shouldn't have

6    bring gun, even toy, into the house" and said -- because of

7    his sister die because of gun and then it make him like

8    hate to have gun in the house, even toy.

9    Q.  And so Jim told you that he hated guns?

10   A.  Yes.  He against that.

11   Q.  Were there any guns in your home?

12   A.  No.

13   Q.  Was there any ammunition in your home?

14   A.  No.

15   Q.  You even said Jim didn't want toy guns in the home?

16   A.  No.

17   Q.  So you're hearing that Jim was shot in the head.  If it

18   wasn't his gun and there weren't any guns in the home, what

19   did you think had happened?

20   A.  I have no idea.  Even --

21   Q.  Did you -- I'm sorry.  Go ahead.

22   A.  Even like he shot himself, I not even believe that.  I

23   didn't have idea where the gun come from.

24   Q.  And so let's talk about that.

25   A.  Yes.

```
 1   Q.  If he had shot himself --

 2   A.  Yes.

 3   Q.  -- you have no idea where the gun came from, right?

 4   A.  Right.

 5   Q.  He had plans to continue remodeling the house?

 6   A.  Right.

 7   Q.  He had plans to return shoes, right?

 8   A.  Right.

 9          And he was to surprise Josh on the day that he got

10   his iPad.  So he was planning to surprise him on that day

11   after school.

12   Q.  And did -- he had ordered an iPad for Josh, right?

13   A.  Yes.

14   Q.  Did that iPad arrive that day, on February 19th?

15   A.  18th.

16   Q.  The 18th?

17   A.  Yes.

18   Q.  And tell the jury.  What was Jim's plan with that iPad?

19   A.  He was planning to surprise him after Josh school and

20   then he gonna play robots together.

21   Q.  So he was planning on giving Josh an iPad that

22   afternoon?

23   A.  Right.

24   Q.  He was planning on returning shoes the next day?

25   A.  Yes.
```

```
 1   Q.  Did he ever express any thoughts of killing himself to
 2   you at all?
 3   A.  No.  He -- on the 19th he even doing laundry.  He clean
 4   the kitchen.  He do laundry.
 5   Q.  And when you -- when everything -- I say "settled
 6   down."  I don't even think that's a fairway to characterize
 7   it.  But when you were able to take a minute to look
 8   around, you mentioned to me something about the Roomba in
 9   your --
10   A.  Yes.
11   Q.  -- in your home, the little --
12   A.  Yes.
13   Q.  -- robot vacuum.
14   A.  Right.
15   Q.  Tell the jury about that.
16   A.  He still turn on Roomba on that day, too.
17   Q.  He had run the Roomba that day?
18   A.  Yes, and doing laundry.
19   Q.  He was doing laundry that day?
20   A.  Yes.
21   Q.  And -- let's talk about Jim's thoughts on vaccines.
22   What were his thoughts on vaccines?
23   A.  He against that.
24   Q.  Was Josh --
25   A.  He did not believe in the vaccine, and Josh never had
```

 1   one.

 2   Q.  Did -- what were his thoughts on medication in general?

 3   A.  He against that, too.  He doesn't believe on that.  He

 4   says so much chemical, so he just eat something healthy.

 5   It's better than take medicine, what he thought.

 6   Q.  And tell the jury about Jim's lifestyle in terms of how

 7   he ate.

 8   A.  So he ate all organic food, be like free-range chicken;

 9   and sometime he order some beef that organic.  If they

10   don't have it here, he order from Switzerland or New

11   Zealand.  Even for Josh milk, it's from England.  Anything

12   the best for health.  He just into it.

13   Q.  You said he went to the gym?

14   A.  He went to the gym.  He work out a lot, yeah.  He order

15   sauna to do sauna at home after workout.  He had what they

16   call vitamin D that turn on at home.  So he has everything.

17   Q.  Did you ever see him inject himself with any drugs

18   whatsoever?

19   A.  Never, ever.  He hate that.

20   Q.  Was there any evidence in your home whatsoever about

21   any drug use with Jim?

22   A.  No.

23   Q.  The way that your house is set up with the office and

24   where Jim was found, would it have been easy and it ended

25   up being easy for Josh to have seen his father like that?

1   A.  You mean --

2   Q.  Bad question.  Let me rephrase this again.

3   A.  Okay.

4   Q.  The office where you found Jim --

5   A.  Yes.

6   Q.  -- was that easy for Josh to access, to go into?

7   A.  Yes.

8   Q.  Is that a place where automatically he would run to

9   look for his dad?

10  A.  Yes.

11  Q.  And you talked about the relationship that Josh and Jim

12  had.

13  A.  Yes.

14  Q.  Would that make any sense to you that if he were going

15  to kill himself, he would do it in a place where his 6-,

16  7-year-old son would run up and see him?

17          MR. SANDEL:  Objection to the speculation, your

18  Honor.

19          THE COURT:  Well, go ahead and just rephrase the

20  question.

21  BY MR. FINE:

22  Q.  I'm going to rephrase the question.

23  A.  Okay.

24  Q.  Jim loved Josh, correct?

25  A.  Yes.

1   Q.  Do you believe, as his wife of 12 years, that he would

2   have wanted Josh to see him dead in that situation?

3   A.  I'm not even believe he going to do that to himself,

4   not -- not only Josh can see that, how much he love Josh.

5   I know that.

6        So even impossible that he gonna do that and keep

7   the door open and even not his regular position that he

8   sit.  That position, he never sit there before.

9   Q.  And let's talk about that.  So the way that the office

10  is set up, there's two long desks, right, almost like an L

11  shape?

12  A.  Right.

13  Q.  And so would Jim normally sit --

14  A.  In the --

15  Q.  -- under -- under the desk?

16  A.  Yes.

17  Q.  And so where you found him, was he sitting under the

18  desk?

19  A.  No.  He is in front of the closet.

20  Q.  And had you ever seen him sit in that position before?

21  A.  Never.

22  Q.  Does it make any sense to you that --

23  A.  No.

24  Q.  -- he would just be --

25  A.  Even Josh said that "My dad never sit here."

1   Q.  There was a note that was a typed-up note that was on

2   the desk; is that correct?

3   A.  I did not know about a note until the detective gave it

4   to me.

5   Q.  And that's what I was going to ask you.  Did they --

6   did the detective show you that note?

7   A.  Yes.

8   Q.  And did that note -- the way that it was written, did

9   it sound like anything Jim would have written at all?

10  A.  No, never.

11  Q.  Tell the jury why it didn't sound like something he

12  would have written.

13  A.  He just like kind of well -- even he email to me, he

14  talk like business talk, like very polite, really like -- I

15  don't know how to describe, but it something different.

16          Because when I see the note, I said that is not

17  him.  He never wrote anything like that.

18  Q.  And did you tell the police that?

19  A.  I told -- I told him that it's not my husband.  He

20  never wrote anything like that.

21  Q.  When Jim would be in the house, was it his routine to

22  lock the doors?

23  A.  Yes.

24  Q.  Okay.  Because some people if they're in a house by

25  themself, sometimes people leave the door open.  Some

```
 1  people sometimes lock it, and some people don't.
 2          Jim always locked the doors?
 3  A.  Yes.
 4  Q.  All right.  And so if the door was not -- the front
 5  door was not locked, that would not be normal for something
 6  Jim would do, correct?
 7  A.  Correct.
 8  Q.  On the note that the police showed you, was Keith
 9  Ashley's name on that note?
10  A.  Correct.
11  Q.  And did you contact Keith Ashley?
12  A.  Police contact him.
13  Q.  And did he come over to your house the morning of the
14  20th, February 20th?
15  A.  Yes.
16  Q.  And what did he come over for?
17  A.  The first day, I remember he came for help with
18  cleaning stuff and looked through all the paperwork, like
19  trust and will for my husband.
20  Q.  And did he tell you that he would take care of the
21  finances?
22  A.  Yes.
23  Q.  Did you trust Keith Ashley?
24  A.  No.
25  Q.  Why not?
```

1   A.  Because I don't know him well.  Only my husband know

2   him.  Only my husband trust him.  It doesn't mean I trust

3   him, right?  So I don't trust him.

4   Q.  I want you --

5           MR. FINE:  Actually, your Honor, permission to

6   publish Government's 68, which has been previously

7   admitted.

8           THE COURT:  Go ahead.

9           MR. FINE:  And if we could scroll -- I think it's

10  going to be on page 5.

11          No.  Let's keep going.

12          It's actually page 4.

13  BY MR. FINE:

14  Q.  Dida, do you see that?  You're looking at the screen.

15  Are you able to see that?

16  A.  Yes.

17  Q.  So I'm going to circle a signature here.  Is that your

18  signature on Government's 68, page 4?

19  A.  No.

20  Q.  Did you ever sign that document?

21  A.  No.

22  Q.  Does this look like a signature that you signed at one

23  time?

24  A.  Correct.

25  Q.  Tell the jury about that.

 1  A.  I would sign like this for my U.S. citizen, only one

 2  time alone; and I never sign it again.

 3  Q.  And so this was how you signed for your citizenship

 4  paperwork, right?

 5  A.  That's -- yes.

 6  Q.  Sort of a flowing, nice, fancy signature, right?

 7  A.  Yes.

 8  Q.  Does that look anything like the way that you sign any

 9  of your documents now or since you got your citizenship?

10  A.  No.

11  Q.  And your citizenship paperwork, where was that located

12  in your home?

13  A.  In my husband office.

14  Q.  And you're telling this jury you did not sign this?

15  A.  I did not sign.  I did not even see that paper before,

16  until now.

17  Q.  After -- well, let me ask you this:  Before Jim was

18  shot in the head, did you know much about his will or trust

19  or anything like that?

20  A.  I did not.

21  Q.  Did Keith Ashley tell you about his will or his trust,

22  your husband's will or trust?

23  A.  Before he passed or after?

24  Q.  After he passed.

25  A.  After, yes.

```
 1   Q.  Okay.  And what did he tell you?
 2   A.  He did not tell me everything.  He just come for help
 3   and then just he brought the trust and will for my husband
 4   office and I had no chance to read it, but he go through
 5   everything for me.
 6   Q.  Did you ever know that he was the executor of the
 7   trust?
 8   A.  I did not know until I see the trust and will later.
 9   Q.  And that signature on Government's 68 was part of two
10   signatures on there, correct?
11          You saw the top signature, which is your
12   husband's?
13   A.  Correct.
14   Q.  And that document basically changed the beneficiary of
15   a $2 million life insurance policy to be the trust that
16   Keith Ashley was the executor of.  Did you have any idea
17   about that at all?
18   A.  I have no idea at all.  I not even know that I have --
19   we got 2 millions.
20   Q.  Would you have signed a document giving him control
21   over $2 million coming to you and your son?
22   A.  Never, ever.
23   Q.  Let's talk about February 21st.  Now, you said on the
24   20th he came over, talked a little bit about finances, and
25   helped with the cleanup because --
```

1   A.  Yeah.

2   Q.  -- you had to live in that house, unfortunately.

3   A.  Right.

4   Q.  Let's talk about February 21st.  Did Keith Ashley come

5   over again on February 21st?

6   A.  Yes.

7   Q.  Did he ask you to look at your husband's phone?

8   A.  Yes.

9   Q.  And tell me.  Why did he say he needed to look at your

10  husband's phone?

11  A.  I did not recall why he want that.  He want some -- to

12  go through something like password, something on my husband

13  phone.  I do not recall why he want my husband phone that

14  time.

15  Q.  Okay.  And did you give him your husband's phone?

16  A.  Yes, I did.

17  Q.  And was he able to unlock that phone?

18  A.  Josh helping.

19  Q.  And tell the jury how Josh helped him unlock the phone.

20  A.  Before my husband passed -- so he told Josh if

21  something going to happen to him, like he pass out or fall

22  in the floor, something like that, put his like fingerprint

23  or password and call 9-1-1.  So he told Josh that.  That's

24  why Josh know his password on his phone.

25  Q.  And was Josh able to unlock the phone for Keith Ashley?

```
 1   A.  Yes.
 2   Q.  And did you see Keith Ashley do something with the
 3   phone?
 4   A.  Yes.
 5   Q.  What did you see him do?
 6   A.  He was asking me did I see his messages between him and
 7   Jim.
 8   Q.  And how did you respond?
 9   A.  I said, "Yes."
10   Q.  And what did he do?
11   A.  He deleted.
12   Q.  He deleted the text messages between your husband and
13   him?
14   A.  Yes.
15   Q.  And did he say why he deleted them?
16   A.  He said like, "Oh, wow, I deleted."
17            And I said, "It's okay.  You can delete on my
18   husband phone; but the rest of the message still in his
19   phone, too."
20            But then he said like he deleted his message every
21   day.
22   Q.  So he told you that -- so he took your husband's phone
23   who was shot in the head 48 hours before -- less than 48
24   hours before, had your son unlock the phone?
25   A.  Yes.
```

1   Q.  Then deleted text messages off of that phone?

2   A.  Yes.

3   Q.  And then tried to make it seem like it was an accident?

4   A.  Yes.

5   Q.  Well, was it an iPhone?

6   A.  Not iPhone.  Maybe Samsung.

7   Q.  Samsung?

8   A.  Yeah, something like that.

9   Q.  So on a -- I have an iPhone.  But on a Samsung -- tell

10  me if I'm wrong on this.

11          When you delete a text message --

12  A.  Yes.

13  Q.  -- do you know if it still has something where it says

14  "Are you sure you want to delete" or something like that?

15  A.  Yes.

16  Q.  So it's pretty hard to accidentally delete text

17  messages.  Would you agree?

18  A.  Yes.

19  Q.  Did you find that odd, that he would be erasing text

20  messages between him and your husband who was shot in the

21  head 36 hours before?

22  A.  I'm sorry?

23  Q.  Did you find that odd?  Did you find it strange?

24  A.  Yeah, yeah.

25  Q.  Did it concern you?

1  A.  Yeah.  I concern.  I concern even the -- the first day

2  so --

3  Q.  And let me ask you this:  Later on, through the

4  investigation of the Carrollton Police Department, you

5  found out that Keith Ashley took $20,000 out of a bank

6  account belonging to you and your husband, correct?

7  A.  Yeah, belong to my husband from the --

8  Q.  And --

9  A.  -- bank.

10  Q.  -- did you give him permission to take that $20,000?

11  A.  No, I never.

12  Q.  Did he ask you for permission?

13  A.  No.

14  Q.  If he had asked you for permission to take $20,000 out

15  of that account, would you have given him permission?

16  A.  No.

17  Q.  How did it feel when you found out that he stole

18  $20,000 from you?

19  A.  I had a shock.  I could not believe he done that.

20  Q.  And did you later find out not only did he steal

21  $20,000 from you --

22          MR. SANDEL:  Objection to the characterization of

23  "steal," your Honor.

24          MR. FINE:  Well, your Honor, if she didn't give

25  permission to take the money and it's taken, that's --

```
 1            THE COURT:  Overruled.

 2            MR. FINE:  Okay.  Thank you, your Honor.

 3   BY MR. FINE:

 4   Q.  How did it make you feel not only that he stole $20,000

 5   from you, from your husband's bank account, but it was two

 6   days after he was killed?  How did that make you feel?

 7   A.  Really bad.

 8            MR. FINE:  I'll pass the witness.

 9            THE COURT:  Cross-examination?

10            MR. SANDEL:  Thank you, your Honor.

11            CROSS-EXAMINATION OF SAKDIDA SEEGAN

12   BY MR. SANDEL:

13   Q.  Good afternoon, Mrs. Seegan.

14   A.  Good afternoon.

15   Q.  My name is Ryne Sandel.  And you and I have never met

16   before, correct?

17   A.  Correct.

18   Q.  I represent Keith Ashley in this case; and I just have

19   a few questions for you, okay?

20   A.  Yes.

21   Q.  And as I ask these questions, if you need me to

22   rephrase them, I'm happy to do that.  So just let me know,

23   okay?

24   A.  Okay.

25   Q.  Now, when you were speaking to Mr. Fine, he asked you
```

1    about life insurance.  Do you remember that?

2    A.  Yes.

3    Q.  Now, did you know that James had life insurance at all?

4    A.  I know he has life insurance.

5    Q.  Okay.  What did you know about him having life

6    insurance?

7    A.  I don't know anything, just that he has life insurance.

8    Q.  So you know -- you knew he had it, but you weren't

9    aware of what those details were --

10   A.  No.

11   Q.  -- is that fair?

12   A.  No, I did not know the detail.

13   Q.  Okay.  Did James ever talk to you about life insurance

14   or what would happen if he were to pass away?

15   A.  He used to talk about that like many years ago, and

16   then he never talk about it again.

17   Q.  So you didn't know specifically how many life insurance

18   policies James had?

19   A.  I did not know.

20   Q.  And that's not something that he ever discussed with

21   you, correct?

22   A.  No.

23   Q.  Did you know what James' net worth was?

24   A.  I don't know.

25   Q.  Was that ever something that he discussed with you?

```
 1   A.  No.
 2   Q.  Were you aware of what James' monthly income was, how
 3   much money he was making?
 4   A.  I don't know.  I don't ask.
 5   Q.  And that's not something that he ever discussed with
 6   you either?
 7   A.  No.  I don't care to ask him.
 8   Q.  Okay.  Now, did you hear anything or did James tell you
 9   anything about a trust being created?
10   A.  He told me that, but I don't know detail in the trust.
11   Q.  When do you remember James telling you that a trust got
12   created?
13   A.  We were talking about that on -- on 2019.
14   Q.  So in 2019 you remember James speaking to you about him
15   creating a trust?
16   A.  Yeah, we both going to a trust, not only him.  I do my
17   side, he do on his trust, too.
18   Q.  Oh, okay.  So you guys had conversations about him
19   creating a trust and then you creating a trust?  Is that
20   right?
21   A.  Yes.
22   Q.  But did you ever create a trust for you?
23   A.  I did.
24   Q.  You did?
25   A.  Yes.
```

```
 1    Q.  Did you do that through a lawyer's office?

 2    A.  My husband took care everything.  I have no idea.

 3    Q.  So your husband took care of that part?

 4    A.  Yes.

 5    Q.  Do you remember meeting a lawyer that came to your

 6    house to talk to James about the trust and to sign some

 7    documents?

 8    A.  I do not recall.  I know now from you.  I have no idea.

 9    Q.  Okay.  So as you sit here, you don't specifically

10    remember that; but it could have happened?

11    A.  No.

12    Q.  Okay.  Which one?  Do you think it could have happened

13    and you just don't remember, or do you not think that

14    happened?

15    A.  I don't remember.

16    Q.  Okay.

17    A.  Yeah.

18    Q.  And that's fair.  That's fine.

19          Were you aware that not only did James create a

20    trust in 2019; but were you aware that he redid his will in

21    2019, in April?

22    A.  No.

23    Q.  So that's not something that he talked about with you,

24    either?

25    A.  No.
```

1    Q.  Now, in terms of bank accounts --

2    A.  Yeah.

3    Q.  -- do you know how many bank accounts James had?

4    A.  I don't know.

5    Q.  Do you know where he banked, what his bank was?

6    A.  I don't know.

7    Q.  Did you have your own bank accounts when you spent

8    money or did James give you a card or how did that work?

9    A.  I have my credit card.  I use my credit card.

10   Q.  You have a credit card?

11   A.  Yes.

12   Q.  And would James take care of paying that credit card

13   bill?

14   A.  Yes.

15   Q.  So when you would get paid through your job, would you

16   deposit that money into your account; or did you just give

17   that to James and he took care of it?

18   A.  I took in my account.

19   Q.  It's in your account?

20   A.  Yes.

21   Q.  So you have your own bank account, correct?

22   A.  Yes.

23   Q.  Okay.  Now, the credit card that you would use --

24   A.  Yes.

25   Q.  -- you said that was something that James took care of,

     1   right?

     2   A.  Yes.

     3          MR. SANDEL:  If we could see Government's

     4   Exhibit 68, page 4, please.

     5          Thank you, ma'am.

     6   BY MR. SANDEL:

     7   Q.  Mrs. Seegan, do you remember looking at this document

     8   with Mr. Fine?

     9   A.  No.

    10   Q.  And I don't mean before today.  I mean just a few

    11   moments ago, do you remember looking at this document --

    12   A.  Oh, yes --

    13   Q.  -- when the other lawyer was --

    14   A.  -- yes.

    15   Q.  Yes, okay.

    16          Now, he drew your attention to where it looks like

    17   your name is signed.  Do you see that?

    18   A.  Yes.

    19   Q.  And do you see a date next to where that signature is?

    20   A.  Yes.

    21   Q.  What date is there?

    22   A.  24.

    23   Q.  The 24th of?

    24   A.  January.

    25   Q.  January in 2020?

```
 1   A.  Yes.

 2          MR. SANDEL:  If we could see page 5 of that

 3   document, please.

 4   BY MR. SANDEL:

 5   Q.  Okay.  Now, I know that you say you've never seen this

 6   document before, correct?

 7   A.  Correct.

 8   Q.  But do you see, right here, a signature that looks like

 9   it is that of James?

10   A.  No.

11   Q.  You don't think that's James' signature there?

12   A.  I do not recall.  I did not see that.

13   Q.  Okay.  Now, do you see a date next to that signature,

14   right where I circled in the yellow?

15   A.  Yes.

16   Q.  And what date is there?

17   A.  23rd January.

18   Q.  So that would have been the day before the date on the

19   last page, correct?

20   A.  Correct.

21          MR. SANDEL:  And if we could go back to page 4.

22   BY MR. SANDEL:

23   Q.  Now, Mrs. Seegan, are you familiar with your husband's

24   signature?

25   A.  No.
```

```
 1    Q.  Okay.  So you don't know, one way or another, if that
 2    top signature is James'?
 3    A.  I do not recall.  I do not remember the whole thing --
 4    Q.  Okay.
 5    A.  -- of his signature.
 6    Q.  Now, as far as you know, had James ever signed your
 7    name on a document before?
 8    A.  No.  He just asked me easy to sign.  I do it right
 9    away, no question asked.
10    Q.  So normally what would happen is he would bring you
11    something and say, "Hey, please sign this"?
12    A.  Yes, but I need to read first --
13    Q.  Okay.
14    A.  -- before I sign.
15    Q.  And if you were ever unavailable, did he ever sign your
16    name for you?
17    A.  No.  He never.
18           MR. SANDEL:  Thank you.  You can take that down.
19    Thank you so much.
20    BY MR. SANDEL:
21    Q.  Now, you said that James had a brother, Bob; is that
22    right?
23    A.  Right.
24    Q.  Did Bob pass away?
25    A.  Yes, he did.
```

```
 1   Q.  When was that?

 2   A.  2019, I believe.

 3   Q.  In 2019?

 4   A.  Yeah.

 5   Q.  And do you recall how Bob died?

 6          MR. FINE:  Your Honor, I'm going to object to

 7   relevance.

 8          MR. SANDEL:  Can we approach, your Honor?

 9          THE COURT:  Yes.

10          (Sidebar conference, off the record.)

11          THE COURT:  Go ahead and proceed.

12   BY MR. SANDEL:

13   Q.  Okay.  Mrs. Seegan, I believe that the question I had

14   asked, how did Bob pass away?  How did he die?

15   A.  He kill himself.

16   Q.  Bob committed suicide?

17   A.  Yes.

18   Q.  And did that have an impact on James?

19   A.  I don't think so because he -- he kind of have like

20   depress before, and Jim did know all that so --

21   Q.  When you say he had been depressed before, who were you

22   referring to?

23   A.  Bob.

24   Q.  Bob had been depressed.

25   A.  So Jim know the whole time.  It not surprise him
```

```
 1  something happen because he knows the same beginning until
 2  the last.  So he -- he kind of get ready for that.  It
 3  doesn't have something like to sudden happen.
 4  Q.  So fair to say that James may not have been shocked by
 5  the suicide; but he was still sad about it, correct?
 6  A.  Of course.  His brother.
 7          But he's not, like, sad that he gonna kill himself
 8  because of his brother.
 9  Q.  And you said that Bob had been depressed.  Do you know
10  if he had been diagnosed with any mental health issue or
11  just generally depressed?
12  A.  I -- what I -- I don't know.  What I know, I know
13  really depressed.  But other than that, I don't know.
14  Q.  Okay.  And that's fair.
15          I believe you also said that James had a sister
16  that passed away, correct?
17  A.  Correct.
18  Q.  And I think what you testified to is she died from a
19  gunshot?
20  A.  Yes.
21  Q.  When did that happen?
22  A.  I did not know.  Maybe like since -- I don't know how
23  long but since his -- now his nephew 40.  When he was 7
24  years old, that his dad shot her.  So it's long, long time
25  ago.
```

```
 1   Q.  Okay.  So she was killed by her dad?

 2   A.  Her husband.

 3   Q.  Her husband?

 4   A.  Yes.

 5   Q.  Okay.  And this happened when James was young?

 6   A.  I think so.  I don't know.

 7   Q.  Okay.

 8   A.  Just --

 9   Q.  Now, did James have a friend named Lawrence Ahee?

10   A.  Yes.

11   Q.  He might have called him Larry.  Do you remember that

12   name?

13   A.  Yes.

14   Q.  Who was Larry?

15   A.  Larry his friend that I know.  He come to our house

16   often, and I cook him food.

17   Q.  Was he a fairly close friend of James?

18   A.  Yeah, I think so.

19   Q.  Prior to February of 2020, did Larry pass away, too?

20   A.  I forgot when he pass.

21   Q.  You forgot when he passed?

22   A.  Yeah.

23   Q.  But at some point Larry passed away, too, correct?

24   A.  Yes.

25   Q.  Now, one of the things that I believe Mr. Fine asked
```

 1  you was would you sign a document that gave Mr. Ashley

 2  control over the money.

 3          Do you remember -- do you remember Mr. Fine asking

 4  you that?

 5  A.  Yeah, I remember.

 6  Q.  And do you remember your answer was, "Never," you would

 7  never do that?

 8  A.  No, I never do that.

 9  Q.  Do you know how trusts work?

10  A.  I don't.  I have no idea.

11  Q.  Do you know the difference between a trustee and a

12  beneficiary?

13  A.  I know the beneficiary, but I don't know the trustee.

14  Q.  So you know what a beneficiary is, but you don't know

15  what a trustee does?

16  A.  I don't know.

17  Q.  And so fair to say when Keith Ashley was designated as

18  a trustee, you weren't sure what that meant, correct?

19  A.  Correct.

20  Q.  But he did tell you that you were the beneficiary of a

21  policy, right?

22  A.  Yes.

23  Q.  And what is your understanding of what a beneficiary

24  is?

25  A.  Something that I can, you know, get something from my

 1    husband.

 2           But I do not know how much I gonna get or what in

 3    there, in the trust and in the will.

 4    Q.  Did you ever ask Mr. Ashley for copies of the trust

 5    documents?

 6    A.  My friend asked.

 7    Q.  Your friend asked?

 8    A.  Uh-huh (moving head up and down).

 9    Q.  And were they given to your friend?

10    A.  Gave it to me.

11    Q.  They gave them to you?

12    A.  Yeah, he gave it to me; and I gave to my friend to keep

13    it.

14    Q.  And who is "he"?  You said, "he gave it to" --

15    A.  Keith gave it to me.

16    Q.  Mr. Ashley gave it to you?

17    A.  Yes.

18    Q.  Okay.  So when you asked, "Hey, can I see a copy of the

19    trust," Mr. Ashley gave that to you?

20    A.  Yes, before he asked me for, yes.

21    Q.  Did you ask him any questions about what it meant?

22    A.  We have no chance to talk about that yet.

23    Q.  You didn't get a chance to talk about that?

24    A.  Yes, because I have something more important than that

25    to talk about.

```
 1   Q.  Of course.

 2   A.  So that's why I did not ask.

 3   Q.  After James died --

 4   A.  Yes.

 5   Q.  -- did you go to a lawyer to help figure out all of the

 6   probate things and that sort of stuff?

 7   A.  Yes.

 8   Q.  What was that lawyer's name?  Do you remember?

 9   A.  I remember his name is Paul, Paul Lieck (phonetic

10   spelling).

11   Q.  Paul Lieck?

12   A.  Yeah.

13   Q.  Okay.  And the documents that Mr. Ashley gave you, the

14   trust documents, did you give those to Mr. Lieck?

15   A.  Yes.

16   Q.  And did he -- did Mr. Lieck explain to you about how

17   that all worked and what that meant?

18   A.  Yes.

19   Q.  Okay.  Now, you said that when Keith came over on the

20   20th, one of the things he said to you was that he would

21   take care of the finances, correct?

22   A.  Correct.

23   Q.  What was your understanding of what that meant?

24   A.  I had no idea.  I'm out.  I'm lost.  I don't know

25   anything so -- I concern only how my husband pass.  So I
```

1    don't care about the financial, so I have no idea.

2    Q.  When the $20,000 was moved, that was done on the Apple

3    computer in James' desk -- in James' office, correct?

4    A.  The 20,000?

5    Q.  Correct.

6    A.  No, not his computer.

7    Q.  Where was that done?

8    A.  What I believe on that day -- on the second day he

9    passed -- on the second day he came and he left; and then

10   he might do something to go through his bank account and he

11   is gonna send text to my husband phone to have, like, code

12   to go through his account.

13          So I remember my friend asking me -- like Keith

14   asking me to give the password to him through my husband

15   phone.  So I check my husband phone, and then I text him

16   back what the code is.

17   Q.  Okay.  So that back-and-forth of a pass code, you said

18   that was done via text?  You texted the pass code to Keith?

19   A.  Yeah, I -- I think so.  I not recall, but I didn't know

20   what it is.  I did not -- I don't -- I have no clue why he

21   need the code, what the code for.  I have no idea so --

22   Q.  And you've made a couple references to a friend, your

23   friend that --

24   A.  Yeah.

25   Q.  -- was helping.  Who -- what's your friend's name that

 1  was helping you through that?

 2  A.  Satomi.

 3  Q.  Satomi?

 4  A.  Yes.

 5  Q.  Is that her first name or last name?

 6  A.  Her first name.  I forgot her last name.  Kind of

 7  difficult to pronounce.

 8  Q.  Okay.

 9  A.  Japanese name, yes.

10  Q.  Can you spell her last name?

11  A.  S-A -- S-A-T-O-M-I.

12  Q.  So that's Satomi.  That's her first name, correct?

13  A.  Yes.  Yes.

14  Q.  What's her last name?

15  A.  I forgot.

16  Q.  Oh, forgot.  Okay.

17  A.  Yeah.

18  Q.  Does she live in the Dallas area?

19  A.  Yes.

20  Q.  Where does she live?

21  A.  Lewisville.

22  Q.  In Lewisville?

23  A.  Yes.

24  Q.  And so she was with you and helping you through some of

25  this time?

1   A.  Yeah.  She came even the first day I call her.  After I

2   call 9-1-1, I call her.

3   Q.  And she's the one that said, "Hey, you need to give

4   this pass code to Keith"?

5   A.  She said, like, Keith want me to check on my husband

6   phone to give him the pass code.

7   Q.  Okay.

8   A.  So I have no idea what a pass code is.  We have no idea

9   because he not at home at that time.  He was outside.

10  Q.  Now, you said that you had suspicions about James'

11  death, correct?

12  A.  Correct.

13  Q.  And you thought a lot of things about that were weird,

14  right?

15  A.  Right.

16  Q.  Did you tell all of your concerns to the policemen and

17  the firemen that were there at the scene that day?

18  A.  I tell them about -- about -- I don't understand the

19  question.  Sorry.

20  Q.  Did you tell the police that you were suspicious about

21  the way that James died?

22  A.  Of course.  I tell them I don't believe my husband die

23  how he shot himself.  I don't believe that.  I strong

24  disbelieve that what happened to him and everything.

25  Q.  And when did you tell the police that information?  Was

 1   it right away?

 2   A.  Right away.  Once I know that how -- I asked first how

 3   my husband die.  They said he shot himself.  I told them

 4   right away that impossible.

 5   Q.  Okay.  And did you tell that to multiple police

 6   officers, that you thought something was wrong here?

 7   A.  Yes.

 8   Q.  Okay.

 9   A.  Because I told them about how I feel and how I thought

10   about it.

11   Q.  And do you remember the police officers writing that

12   down and taking note of that?

13   A.  I did not recall because they have so many.

14   Q.  Now, we talked a little bit about James' cell phone,

15   right?

16   A.  Yes.

17   Q.  When James was in his office, was there a stand where

18   he would set his cell phone that would charge it?

19   A.  I'm not sure he has that because so many thing in his

20   office.  But he has charger in his office; but I'm not sure

21   about a stand, something.

22   Q.  So he's got a phone charger in his office.  You just

23   weren't sure if it was a stand-up one or not?

24   A.  Yeah, but he has charger.

25   Q.  Now, you talked about the text messages that you said

 1  Mr. Ashley deleted.  Do you remember talking about that?

 2  A.  Yes.

 3  Q.  I think what you said -- correct me if I'm wrong -- is

 4  that before Mr. Ashley deleted anything, he asked you,

 5  "Hey, did you see these text messages," right?

 6  A.  Correct.

 7  Q.  Okay.  So he asked you, "Did you see this text

 8  conversation?"

 9  A.  He said did you read the text between him and my

10  husband.  I said, "Yes, I did."

11  Q.  And so you told Keith, "Yes, I saw that and I read it"?

12  A.  Yes.

13  Q.  Okay.  And then at some point did a police officer ask

14  you if they could take James' phone so that they could look

15  at it?

16  A.  Yes.

17  Q.  And did they take it and keep it with them, or did they

18  just look at it and give it back?

19  A.  They keep it then.

20  Q.  They kept it with them?

21  A.  Yeah.

22  Q.  Mrs. Seegan, do you recognize the name Kerby Keller?

23  A.  Yes.

24  Q.  Who is Kerby Keller?

25  A.  My husband nephew.

```
 1   Q.  Your husband's nephew?

 2   A.  Yeah.

 3   Q.  And what is -- what was James' relationship like with

 4   Kerby?

 5   A.  Uncle.

 6   Q.  I mean, but was it a close relationship?

 7   A.  Oh, very close because he been tooken care of Kerby a

 8   lot and, you know, like become a dad to Kerby also even

 9   though they don't live close.

10   Q.  Okay.  So Kerby and James were very close?

11   A.  Very close.

12   Q.  Were you aware that Kerby was named as the guardian for

13   Josh in the event that you and James passed away at the

14   same time?  Were you --

15   A.  Yes.  We talk about that.

16   Q.  Okay.  And when you say "We talked about that," that's

17   something that you and James talked about?

18   A.  Yeah.  We talk about like if something happen, then

19   Kerby gonna take care of Josh.  That's in case something

20   happen at the same time.

21   Q.  Right.

22   A.  And then Kerby take care of Josh.

23   Q.  Do you know if James talked to Kerby about that?

24   A.  I think he talk about at -- they have like boy trips

25   together to make them, like, bonding.
```

1   Q.  They had boy trips so that they could bond?

2   A.  Yes.

3   Q.  Okay.

4   A.  And then they planning to do on 2020.  They plan to go

5   to Pittsburgh --

6   Q.  Okay.

7   A.  -- to take Josh to where he came from, to see Kerby

8   family side.  They planned to do that before he passed.

9   Q.  So that it -- it was not a secret that if something

10  were to have happened to James and you, that Kerby was the

11  one that would have been taking care of Josh, correct?

12  A.  Yes, correct.

13  Q.  And how soon after James passed did Kerby start helping

14  out with the finances and the lawyers and that sort of

15  thing?

16  A.  I think maybe on the weekend.  He came on --

17  Q.  Pretty shortly after James passed?

18  A.  Yeah, not only him decide.  We all decide, me, him, and

19  my friends.

20  Q.  Okay.

21  A.  It's not only him alone.

22  Q.  Okay.

23  A.  Yes.

24          MR. SANDEL:  Pass the witness, your Honor.

25          THE COURT:  Additional questions?

```
 1              MR. FINE:  Brief, your Honor.
 2              REDIRECT EXAMINATION OF SAKDIDA SEEGAN
 3   BY MR. FINE:
 4   Q.  Dida, I forgot to ask you on direct examination.  But
 5   was Jim right-handed or left-handed?
 6   A.  Right.
 7   Q.  Did he ever have any major medical procedures, like a
 8   few days before he was shot?
 9   A.  No.
10   Q.  Nothing where he would have been put under sedation or
11   major surgeries or anything like that?
12   A.  No.
13   Q.  Did Keith Ashley ever tell you that the life
14   insurance -- or one of the life insurance policies was
15   worth $2 million?
16   A.  No.
17   Q.  Did he ever give you any specifics on the amount of
18   money that you and Josh were looking at as beneficiaries?
19   A.  What I remember he wrote in the yellow paper on the
20   first day he came.  What I remember, he said like I would
21   get 3.5 million, not -- not yet.  It still have more to
22   come.  Just only this amount first, for now.
23   Q.  And did he tell you at the time that he was the
24   executor or in charge of those financial decisions?
25   A.  No.  I did not know.
```

```
 1   Q.  Did he give you the documents about the trust right

 2   away?

 3   A.  No.

 4         My friend ask him.  Then he gave it to my friend.

 5   I did not see through what in the paper; but I know that

 6   trust, will.

 7   Q.  So it wasn't until your friend mentioned a couple

 8   things that then he provided the documents?

 9   A.  Right, because my friend asking him did I have that;

10   and then he said, "No."

11         And then she said, "Why don't you just give it to

12   her?"

13         And then he gave it to me.

14   Q.  And were you aware when he resigned as executor of the

15   trust?  Do you know when that happened?

16   A.  I did not know.

17   Q.  Okay.  You said that you gave Jim's cell phone to the

18   Carrollton Police Department so that they could take a look

19   at it; is that correct?

20   A.  Yes.  Yes.

21   Q.  And did you ever get it back from them?

22   A.  I do not recall because they want it and then -- I'm

23   not recall it if they are giving it back to me or not in

24   that time, but I just gave it to them.

25   Q.  Okay.  But you gave them consent to do whatever they
```

 1  needed with the cell phone, correct?

 2  A.  Exactly, yes.

 3          MR. FINE:  We'll offer Government's 91A and 91B at

 4  this time, which is James Seegan's cell phone extraction

 5  and report.

 6          MR. SANDEL:  At this time we would object under

 7  authentication and predicate purposes.

 8          THE COURT:  Response?

 9  BY MR. FINE:

10  Q.  Dida, do you -- what did Carrollton Police Department

11  ask for the cell phone; what did they want to do with it?

12  A.  They don't tell me.

13  Q.  Okay.

14  A.  Because when I go there, they said like -- they asking

15  for my husband phone, and I gave to them.

16          MR. FINE:  That's fine, your Honor.  We'll get it

17  in with another witness.

18          THE COURT:  Okay.

19          MR. FINE:  I'll pass the witness.

20          THE COURT:  Anything additional?

21          RECROSS-EXAMINATION OF SAKDIDA SEEGAN

22  BY MR. SANDEL:

23  Q.  So, Mrs. Seegan, I believe what you just testified to

24  was at some point Mr. Ashley comes over and writes on a

25  piece of yellow paper --

 1  A.  Yes.

 2  Q.  -- how much money you'd be getting?

 3  A.  Yes.

 4  Q.  And what you said was he said you're going to be

 5  getting about $3.5 million?

 6  A.  Yeah, for now.

 7  Q.  For now?

 8  A.  For now.  Still have more, not as of yet.

 9  Q.  Okay.  And you talked about the trust documents and

10  that Mr. Ashley gave them to your friend.

11  A.  Gave it to me.

12  Q.  Gave them to you after your friend asked him, correct?

13  A.  Yes.

14  Q.  Did he ever tell you, "No, you can't have these"; or

15  did he just give them to you when he was asked?

16  A.  Yeah, he gave it to me.

17  Q.  Thank you very much.  I really appreciate your time.

18          MR. SANDEL:  Nothing further, your Honor.

19          THE COURT:  Anything else?

20          MR. FINE:  No, your Honor.

21          THE COURT:  Can this witness be fully excused?

22          MR. FINE:  Yes, your Honor.

23          MR. SANDEL:  Yes, your Honor.

24          MR. FINE:  Subject to recall, but yes.

25          THE COURT:  Okay.  Well, that's not fully excused,

1    then.  So she's subject to recall?

2           MR. FINE:  We can let her go, your Honor.

3           MR. SANDEL:  I'm fine with that, your Honor.

4           THE COURT:  Okay.  Ma'am, you are free to leave.

5    Thank you.  You can step down.

6           THE WITNESS:  Thank you so much.

7           THE COURT:  What's next?

8           MS. RATTAN:  We have one short witness, your

9    Honor, with the Court's permission.  We'd call Brett

10   Leatherman.

11          THE COURT:  Sir, if you'll raise your right hand

12   and be sworn in.

13          (The oath is administered to the witness.)

14          MR. WHALEN:  May we approach, your Honor?

15          THE COURT:  Yes.

16          (Sidebar conference, off the record.)

17          (The following proceedings were conducted at

18   sidebar with all parties represented.)

19          MR. WHALEN:  Your Honor, Agent Leatherman is being

20   taken out of order.  I have agreed to that, that his

21   testimony be offered conditionally because he is going to

22   testify about things that are not in evidence and it be

23   conditional until they offer those and make it relevant.

24   So with that stipulation, we're allowing him to go on now.

25          THE COURT:  Okay.  That's fine.

1          Ms. Rattan, do you want to just confirm that?

2          MS. RATTAN:  Yes, your Honor.  That's an agreement

3   we have.  Thank you.

4          THE COURT:  Okay.  Very good.  That's fine.

5          (Sidebar conference concluded.)

6          THE COURT:  Go ahead and proceed.

7          MS. RATTAN:  Thank you, your Honor.

8          DIRECT EXAMINATION OF BRETT LEATHERMAN

9          CALLED ON BEHALF OF THE GOVERNMENT

10  BY MS. RATTAN:

11  Q.  Please state your name.

12  A.  Brett Leatherman.

13  Q.  And would you spell your name, please.

14  A.  Yes.  B-R-E-T-T L-E-A-T-H-E-R-M-A-N.

15  Q.  And where do you work?

16  A.  The Federal Bureau of Investigation, Dallas Division.

17  Q.  And what do you do with the FBI?

18  A.  I'm currently the assistant special agent in charge for

19  national security.

20  Q.  How long have you been with the FBI?

21  A.  Over 19 years.

22  Q.  And can you give us an idea of what sort of positions

23  you've held, what types of investigations you've done with

24  the FBI?

25  A.  My current role is to oversee FBI Dallas

```
 1    counterterrorism and special operations throughout North
 2    Texas.
 3            Just prior to this, I was the assistant special
 4    agent in charge also over our counterintelligence and cyber
 5    national security missions.
 6            Prior to this job, I was the cyber national
 7    security supervisory special agent, so managing cyber
 8    operational work related to nation state threats
 9    throughout -- throughout north connection.
10            Most of my FBI career has been either working
11    criminal investigations related to white-collar crime,
12    public corruption, child exploitation, or working in our
13    cyber mission set, which includes both criminal and
14    state-sponsored cyber work.
15    Q.  And what's your educational background?
16    A.  I graduated with an undergrad degree in business
17    administration and computer information systems and then a
18    graduate degree from Georgetown University this year in
19    cybersecurity risk management.
20    Q.  And can you describe for the jury your experience and
21    your skills with cell phone analysis?
22    A.  Yeah.  So I have several certifications, some of which
23    include information systems.  A cell phone is, in essence,
24    part of an information system.  It, in and of itself, is an
25    information system.  It's an endpoint that's unique.  It's
```

1    similar to laptop servers, a similar kind of device.

2           So I have a CISSP certification, which is

3    certified information systems security professional; GIP,

4    which is GIAC certified information security professional;

5    and then a GI -- GCIH, which is GIAC certified

6    information -- incident handler, which is really doing

7    incident response and learning PIN testing, adversarial

8    techniques against information systems, working more at the

9    operating system level.

10          So whether it's laptops, servers, desktops, cell

11   phones, it's really understanding what is on the operating

12   system, how the operating systems work, how applications

13   work within those operating systems.

14          Part of that over the 19 years has involved doing

15   analysis of cell phones, desktop computers, laptop

16   computers in cyber investigations, you know, criminal

17   investigations, and similar.

18   Q.  Can you explain how a cell phone can be exploited

19   investigatively?  What would be the first step?  What would

20   you do?

21   A.  Yeah.  So a cell phone can be analyzed in a couple

22   different ways.

23          In one case, depending on an investigator's

24   capability and what the threat is, you can do a physical

25   manual analysis of the cell phone, which is where you

 1  actually physically go through the cell phone, try to take

 2  photographs or, you know, document evidence from it doing a

 3  manual review.

 4        Forensically you can do a review in a number of

 5  different ways.  You can do a full file system extraction

 6  through Cellebrite or a similar tool.  You can do memory

 7  dumps and memory analysis.  And then you take the artifacts

 8  from that, and you analyze it away from the device itself.

 9  Q.  You mentioned Cellebrite.  What is that?  You said it's

10  a tool, an investigative tool to use with a phone.  Will

11  you explain that?

12  A.  Yeah.  So you can connect a cell phone to a Cellebrite

13  or similar -- GrayKey-similar software and hardware-based

14  infrastructure, extract data from that to a hard drive or

15  to another physical medium.  That way you can analyze a

16  logical dump or physical dump of the operating system and

17  all its contents away from the device itself.

18  Q.  And were you asked in this case to review a Cellebrite

19  download of the victim's phone, James Seegan's phone?

20  A.  I was.

21  Q.  And what analysis did you do on the victim James

22  Seegan's phone?

23  A.  So in this case I analyzed Apple Health data.

24        It was an Apple iPhone running an iOS operating

25  system.  Within the iOS operating system, Apple installs an

1    application called Health; and that tracks certain metrics.

2    Q.  And what were you looking for?  What were you

3    evaluating on the victim's phone?

4    A.  Basically physical -- physical manifestations of data.

5            So in this case it was similar to what you would

6    see as a pedometer.  Basically, Apple Health will allow you

7    to track steps, flights climbed, so physical

8    characteristics of what may have been occurring on a

9    certain date and time period.

10   Q.  And did you look at James Seegan's phone and the

11   Cellebrite download to determine when the last step was

12   logged on James Seegan's phone on February 19th of 2020?

13   A.  I did.

14   Q.  And will you tell the jury what your evaluation was and

15   what you concluded?

16   A.  Yeah.  So the iPhone itself measures step and flights

17   climbed data based on a gyroscope and an accelerometer.

18   Basically, it takes what Apple has programmed in as what

19   would be constituted as human step data or flights climbed

20   data; and it logs it to the Apple Health app.

21           It can also do that using external media like an

22   Apple Watch, for example.  So within that logging it will

23   tell you where that data came from, whether it came from

24   the phone, an external device.

25           In this case the review showed that the steps and

 1    the flights climbed came from the cell phone itself, and it

 2    showed a variety of steps on the date in question as well

 3    as flights climbed that day.

 4    Q.  So on the date in question, February 19th of

 5    2021 *(sic)*, it showed that there was movement or steps

 6    logged; is that right?

 7    A.  Correct.

 8    Q.  And did you look at the phone and evaluate when that

 9    movement stopped to determine when the last step logged by

10    James Seegan was according to his phone?

11    A.  I did.

12    Q.  And what were you able to determine?

13    A.  I don't have the log file in front of me.  Is it in the

14    exhibits by chance?

15    Q.  Yes.  It's 91B.

16            MS. RATTAN:  May I approach the witness, your

17    Honor?

18            THE COURT:  Yes, you may.

19    A.  Do you want me to go ahead and answer?

20    BY MS. RATTAN:

21    Q.  Uh-huh.

22    A.  Okay.  So the last step recorded in --

23            MR. WHALEN:  Your Honor, I'm going to object to

24    him reading from a document not in evidence and --

25            THE COURT:  Ms. Rattan?

 1          MR. WHALEN:  If it's admitted conditionally with

 2   that limitation, I'm going to object to him reading from

 3   something not in evidence.

 4          MS. RATTAN:  May I be heard?

 5          THE COURT:  Yes.

 6          MS. RATTAN:  A couple of things.  We can

 7   conditionally offer Government's 91B, or the witness can

 8   certainly use it to refresh his memory for his testimony.

 9          THE COURT:  Well, which would you prefer?

10          MS. RATTAN:  We'll offer it conditionally.

11          THE COURT:  Well, I'll conditionally admit it.  I

12   understand it will be proven up later, or it has to be

13   so -- okay.  Go ahead.

14   A.  And I do recall these conversations in preparation for

15   this.  But it was 9:32 a.m., that morning.

16   BY MS. RATTAN:

17   Q.  Okay.  So at 9:32 a.m. what happened?

18   A.  So at 9:32 a.m. the iPhone stopped recording the last

19   set of steps that had occurred that morning.  That was the

20   last identified steps during the morning.

21          There was also -- I'm sorry.  At approximately

22   9:33 a.m. would have been the last steps.

23          9:32 a.m. was the point at which it stopped

24   recording an elevation increase, so going up a flight of

25   stairs.

1              So 9:32, simultaneous to the time frame by which
2    an individual was walking, the individual was both walking
3    and going up steps.
4              And then at 9:33 a.m. it stopped recording steps
5    at that point.
6    Q.  Okay.  So at 9:32 was the last elevated movement, as if
7    someone were walking upstairs; is that right?
8    A.  Correct.
9    Q.  Okay.  And then at 9:33, that was the last logged step
10   or the last, I guess, movement?  How would you phrase that?
11   A.  That would have been the last indication that the
12   iPhone recorded an actual physical step being taken.
13             MS. RATTAN:  May I approach the witness, your
14   Honor?
15             THE COURT:  Yes.
16   BY MS. RATTAN:
17   Q.  Let me show you this and ask you if that accurately
18   reflects your testimony from here to here.
19   A.  It does.
20   Q.  And that is that on February 19th of 2020 at
21   9:33:41 a.m., the last step was logged on James Seegan's
22   phone?
23   A.  Correct.
24   Q.  And that would be immediately after logging going up or
25   stepping --

 1   A.  That's correct.

 2   Q.  Okay.

 3           MS. RATTAN:  I'll pass the witness, your Honor.

 4           THE COURT:  Cross-examination?

 5               CROSS-EXAMINATION OF BRETT LEATHERMAN

 6   BY MR. WHALEN:

 7   Q.  Agent Leatherman, how are you?

 8   A.  Good afternoon.  I'm well.  Thank you.

 9   Q.  It's been awhile.  Good to see you.

10   A.  Good to see you.

11   Q.  As far as when you -- you looked at the Cellebrite

12   records; is that correct?

13   A.  Correct.

14   Q.  Okay.  Did you do anything to verify whether the

15   extraction was done correctly so you knew the data that you

16   were reviewing was reliable and accurate?

17   A.  No.  I was relying on the data as provided to me by

18   Special Agent Rennie.

19   Q.  Okay.  So when it -- and so you only looked at the

20   health data; is that correct?

21   A.  Correct.

22   Q.  Okay.  And is that -- if you don't have an Apple

23   Watch -- the phone itself is predicated on the idea that

24   it's on your person, correct?

25   A.  That's correct, unless you have another device

 1  connected to it.

 2          In this case it was the actual device that was

 3  recording the events, so you would have had that on your

 4  person.

 5  Q.  Okay.  So if I take my phone, my iPhone, and don't have

 6  an Apple Watch and place it on a table and leave it there,

 7  it is not going to record steps or elevation or anything

 8  like that; is that correct?

 9  A.  Correct.

10  Q.  Okay.

11          MR. WHALEN:  I'll pass the witness.

12          THE COURT:  Anything additional?

13          MS. RATTAN:  No, your Honor.

14          THE COURT:  Can this witness be fully excused?

15          MS. RATTAN:  Yes, please.

16          THE COURT:  Mr. Whalen?

17          MR. WHALEN:  Yes, he can be excused.

18          THE COURT:  You are free to leave.  Thank you.

19          And at this time we'll go ahead and stop for the

20  day.  Again, ladies and gentlemen, please don't discuss the

21  case among yourself or anyone else.  Don't do any outside

22  research, and we'll just start back tomorrow --

23          Is 9:00 still --

24          MS. RATTAN:  Yes, your Honor.

25          MR. WHALEN:  Yes, your Honor.

```
 1            THE COURT:  We'll start back at 9:00 in the

 2   morning, so just be here right before that.  And I will

 3   make you something tonight so -- I promise that, so I'll do

 4   that tonight.

 5            So have a good evening and safe drive home.

 6            (The jury exits the courtroom, 4:57 p.m.)

 7            THE COURT:  Anything further from the government?

 8            MS. RATTAN:  No, your Honor.

 9            THE COURT:  Anything further from defense?

10            MR. WHALEN:  No, your Honor.

11            THE COURT:  Very well.  See y'all tomorrow morning

12   at 9:00.

13            (Proceedings adjourned, 4:58 p.m.)

14   COURT REPORTER'S CERTIFICATION

15            I HEREBY CERTIFY THAT ON THIS DATE, OCTOBER 29,

16   2022, THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD

17   OF PROCEEDINGS.

18

19                      /s/
                      CHRISTINA L. BICKHAM, CRR, RDR
20

21

22

23

24

25
```