1              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF TEXAS
2                 SHERMAN DIVISION

3    UNITED STATES OF AMERICA        |  DOCKET 4:20-CR-318
                                     |
4                                    |  SEPTEMBER 29, 2022
     VS.                             |
5                                    |  8:58 A.M.
                                     |
6    KEITH TODD ASHLEY               |  SHERMAN, TEXAS

7    ------------------------------------------------------

8         VOLUME 4 OF 8, PAGES 823 THROUGH 1100

9          REPORTER'S TRANSCRIPT OF JURY TRIAL

10      BEFORE THE HONORABLE AMOS L. MAZZANT, III,
        UNITED STATES DISTRICT JUDGE, AND A JURY

11   ------------------------------------------------------

12
     FOR THE GOVERNMENT:     HEATHER HARRIS RATTAN
13                           JAY COMBS
                             U.S. ATTORNEY'S OFFICE - PLANO
14                           101 E. PARK BOULEVARD, SUITE 500
                             PLANO, TX 75074
15
                             JASON FINE
16                           DALLAS COUNTY D.A.'S OFFICE
                             133 N. RIVERFRONT BOULEVARD
17                           DALLAS, TX 75207

18
     FOR THE DEFENDANT:      JAMES P. WHALEN
19                           RYNE THOMAS SANDEL
                             WHALEN LAW OFFICE
20                           9300 JOHN HICKMAN PKWY, SUITE 501
                             FRISCO, TX 75035
21

22   COURT REPORTER:         CHRISTINA L. BICKHAM, CRR, RDR
                             FEDERAL OFFICIAL REPORTER
23                           101 EAST PECAN
                             SHERMAN, TX 75090
24

25      PROCEEDINGS RECORDED USING MECHANICAL STENOGRAPHY;
     TRANSCRIPT PRODUCED VIA COMPUTER-AIDED TRANSCRIPTION.

1                          <u>INDEX</u>

2

3                                                        <u>PAGE</u>

4     PATRICK KING
          DIRECT EXAMINATION BY MR. FINE              830
5         CROSS-EXAMINATION BY MR. WHALEN             849
          REDIRECT EXAMINATION BY MR. FINE            855
6         RECROSS-EXAMINATION BY MR. WHALEN           856

7     PARKER POWELL
          DIRECT EXAMINATION BY MR. FINE              857
8         CROSS-EXAMINATION BY MR. SANDEL             910

9     ANDREW WITHERS
          DIRECT EXAMINATION BY MS. RATTAN            937
10        CROSS-EXAMINATION BY MR. SANDEL             946

11    MARK SEDWICK
          DIRECT EXAMINATION BY MR. COMBS             951
12        *VOIR DIRE* EXAMINATION OF MARK SEDWICK     960
          CONTINUED DIRECT EXAMINATION BY MR. COMBS   960
13        CROSS-EXAMINATION BY MR. SANDEL             986

14    BRENT WAYNE GRESHAM
          DIRECT EXAMINATION BY MS. RATTAN            995
15        CROSS-EXAMINATION BY MR. WHALEN             1009
          REDIRECT EXAMINATION BY MS. RATTAN          1016
16
      KRISTINA KORT
17        DIRECT EXAMINATION BY MS. RATTAN            1017
          CROSS-EXAMINATION BY MR. SANDEL             1023
18
      MELANIE FLINN-OVIEDO
19        DIRECT EXAMINATION BY MS. RATTAN            1025
          CROSS-EXAMINATION BY MR. SANDEL             1031
20
      SARAH HUGHES
21        DIRECT EXAMINATION BY MR. COMBS             1040
          CROSS-EXAMINATION BY MR. WHALEN             1053
22        REDIRECT EXAMINATION BY MR. COMBS           1057

23    BRANDON BONNER
          DIRECT EXAMINATION BY MR. FINE              1058
24
      COURT REPORTER'S CERTIFICATION                  1100
25

1                          <u>INDEX OF EXHIBITS</u>

2

3                                                          <u>PAGE</u>

4    Government's Exhibit 79                         843

5    Government's Exhibit 79                         879

6    Government's Exhibit 80                         888

7    Government's Exhibit 81                         898

8    Government's Exhibit 82                         898

9    Government's Exhibits 93A, B, C and D           904

10   Government's Exhibit 94A                        905

11   Government's Exhibit 131                        907

12   Government's Exhibit 79                         925

13   Government's Exhibit 79                         929

14   Government's Exhibits 91A and B                 939

15   Government's Exhibit 79                         940

16   Government's Exhibits 125A, 125B, 126, 127A,    942
     127B, 128A and 128B
17
     Government's Exhibit 88                         943
18
     Government's Exhibit 88                         946
19
     Government's Exhibits 4A, and then 4B           956
20
     Government's Exhibit 96                         959
21
     Government's Exhibit 79                         966
22
     Government's Exhibit 81                         996
23
     Government's Exhibit 83                         999
24
     Government's Exhibit 84                         1006
25
     Government's Exhibit 111                        1008

| 1 | Government's Exhibit 85 | 1016 |
| 2 | Government's Exhibit 14A | 1018 |
| 3 | Government's Exhibit 14B | 1019 |
| 4 | Government's Exhibit 14B | 1023 |
| 5 | Government's Exhibit 14B | 1029 |
| 6 | Government's Exhibit 14C | 1030 |
| 7 | Government's Exhibit 14B | 1032 |
| 8 | Government's Exhibit 14C | 1033 |
| 9 | Government's Exhibit 98 | 1047 |
| 10 | Government's Exhibit 98 | 1051 |
| 11 | Government's Exhibit 93A | 1068 |
| 12 | Government's Exhibit 93B | 1068 |
| 13 | Government's Exhibit 93C | 1068 |
| 14 | Government's Exhibit 93D | 1068 |
| 15 | Government's Exhibit 94A | 1069 |
| 16 | Government's Exhibit 113 | 1074 |
| 17 | Government's Exhibit 93A | 1079 |
| 18 | Government's Exhibit 93C | 1081 |
| 19 | Government's Exhibit 93B | 1082 |
| 20 | Government's Exhibit 93D | 1083 |
| 21 | Government's Exhibit 94A | 1083 |
| 22 | Government's Exhibit 80 | 1086 |
| 23 | Government's Exhibits 94B and C | 1087 |
| 24 | Government's Exhibit 79 | 1090 |
| 25 | Government's Exhibit 86 | 1095 |

1                (Open court, defendant present, jury not present.)

2                THE COURT:  Okay.  Please be seated.

3                It's my understanding we have a couple issues to

4       address before we bring the jury in?

5                MS. RATTAN:  Yes, your Honor.

6                MR. WHALEN:  Your Honor, I think the main issue we

7       want to take up is as it relates to the crime scene photos

8       that they intend to offer.  Let me see if we -- we had any

9       agreements.  No, we didn't.

10               So we just want to make sure the Court can look at

11      those exhibits and then make our objections and then that

12      way we don't have to renew them -- we can just renew them

13      in front of the jury.

14               THE COURT:  Okay.  What are the issues and which

15      exhibits?

16               MR. WHALEN:  Your Honor, do you want -- can we

17      just give you the exhibit and then tell you the pages that

18      are relevant to it?  What works best for you?

19               THE COURT:  That's fine.

20               MR. WHALEN:  It's Exhibit 79.

21               THE COURT:  Okay.

22               MR. WHALEN:  Okay.  So we are objecting to

23      page 25.

24               THE COURT:  Okay.  Why?

25               MR. WHALEN:  It's prejudicial.

Jury Trial, Volume 4                          828

1           THE COURT:  Well, I'm going to overrule that

2    objection.  I mean, it's --

3           MR. WHALEN:  Okay.  We're objecting to page 26.

4           THE COURT:  Ms. Rattan or Mr. Fine?

5           MR. FINE:  Your Honor --

6           THE COURT:  If you'll turn your mic on.

7           MR. FINE:  I can tell you globally with these

8    photos, your Honor.  There were hundreds of crime scene

9    photos.  We went through and picked out approximately 42

10   that best showed the crime scene.  There is going to be

11   blood.  There is going to be pictures that aren't pleasant,

12   but it's a murder so --

13          THE COURT:  I understand.  I'm going to overrule

14   the objections.  I mean, they're not overdone, I mean --

15          MR. WHALEN:  All right.  Your Honor, just so the

16   record is clear, we are objecting to page 25, 26, 33, 34,

17   35, 36, 37, 38 and then we're objecting to -- as overly

18   prejudicial; and then as far as pages 43, 45, 46, and 47 on

19   hearsay grounds, your Honor.

20          THE COURT:  Okay.  As to the issue of highly

21   prejudicial, those are overruled.  These aren't -- they're

22   part of the story, and so that is not a proper objection.

23   I understand you have to make an objection.  It's the only

24   one you have.  But there is no basis for that, considering

25   what the charges are in this case.

1          Now, the issue of the hearsay, which ones are

2    those?

3          MR. WHALEN:  That's 43, 45, 46, and 47.  They are

4    photographs of a phone and text messages.

5          THE COURT:  Mr. Fine?

6          MR. FINE:  Your Honor, they are the defendant's

7    own statements; so it's an admission by a party opponent.

8          THE COURT:  Oh, those are the defendants' --

9          MR. FINE:  Yes, your Honor.

10         THE COURT:  Okay.  That will be overruled.

11         MR. WHALEN:  That's all the objections that we

12   needed to take up.

13         THE COURT:  Okay.  Anything else to take up, then?

14         MR. FINE:  No, your Honor.

15         THE COURT:  And then one thing just in terms of

16   timing today.  The Court has a 1:00 Zoom call with another

17   judge.  It won't be more than 30 minutes.  So the question

18   is do we go till 12:30 and take a later lunch 12:30 to

19   1:30, or do we just stop at noon and give the jury and

20   everyone an hour and a half lunch?  It's really a

21   question -- it seems like we're going quick on time.  What

22   are the parties' desires?

23         MS. RATTAN:  I think we're doing well on time; so

24   I think if the Court were to do a 1 1/2-hour lunch, that

25   would be fine.

1          MR. WHALEN:  I agree, your Honor.

2          THE COURT:  Okay.  That's fine.  I just wanted to

3   consult with y'all.  It didn't matter to me.

4          Okay.  We can go ahead and bring the jury in.

5          (The jury enters the courtroom, 9:03 a.m.)

6          THE COURT:  Please be seated.

7          Welcome back, ladies and gentlemen.

8          Okay.  What's next?

9          MR. FINE:  United States calls Patrick King, your

10  Honor.

11         THE COURT:  Sir, if you'll raise your right hand

12  to be sworn in.

13         (The oath is administered to the witness.)

14         THE COURT:  Mr. Fine, go ahead and proceed.

15         MR. FINE:  Thank you, your Honor.

16              <u>DIRECT EXAMINATION OF PATRICK KING</u>

17              <u>CALLED ON BEHALF OF THE GOVERNMENT</u>

18  BY MR. FINE:

19  Q.  Good morning, Captain King.  How are you, sir?

20  A.  Good.  Thank you.

21  Q.  Will you please introduce yourself to the ladies and

22  gentlemen of the jury and spell your first and last name

23  for the court reporter.

24  A.  Yes, sir.  Good morning.  My name is Patrick King,

25  P-A-T-R-I-C-K; last name, King, K-I-N-G.

1    Q.  And I called you Captain King.  You're retired,

2    correct?

3    A.  Yes, sir.

4    Q.  Tell the jury what you did up until pretty recently.

5    A.  I spent 22 years in the fire service, the last of which

6    14 years was with the Carrollton Fire Rescue Fire

7    Department.  I retired a captain.

8    Q.  And explain to the jury what -- in terms of a rank of

9    captain, how do you receive that rank?

10   A.  So I'm the -- how do you receive it?  You promote

11   through the system.  You start off as a firefighter.  Then

12   you promote to second driver, then to driver, and then

13   ultimately to captain which you are in charge of your own

14   fire station.

15   Q.  And in Carrollton how many fire stations are there?

16   A.  We have eight fire stations.

17   Q.  And are you assigned to one particular station, or do

18   you guys rotate through?

19   A.  One station.

20   Q.  And what station were you assigned to?

21   A.  For this particular call, I was at Fire Station 5.

22   Q.  Okay.  And are you the captain of that one station?

23   A.  Yes, sir.

24   Q.  Okay.  So there's eight captains total in the --

25   A.  There's 24, so there's three shifts, so there's a

1  little bit more than just the eight, one per station.

2  Q.  And I was going to ask you about that next, actually.

3  In terms of a firefighter with the Carrollton Fire

4  Department, how does that work in shifts?

5  A.  You work a 24-hours-on/48-hour shift schedule.  So

6  you'll start at 7:00 a.m. and you'll go until 7:00 a.m. the

7  following shift, following day, and then you'll get 48

8  hours of off time.

9  Q.  And so during that 24 hours, you are responding to any

10  calls that may come in pursuant to your station,

11  essentially?

12  A.  That and any and all districts.  And then also we do a

13  quad-cities response; so we also respond to Addison,

14  Farmers Branch -- I'm drawing a blank here -- Coppell, and

15  then, of course, Carrollton.

16  Q.  Is it fair to say it's a pretty busy job?

17  A.  Correct.  We average about 12,000 calls a year.

18  Q.  Now, in terms of your training, let's go back.

19  Fourteen years as a Carrollton firefighter.  What did you

20  do before that?

21  A.  So I was a contract fireman for Kellogg Brown & Root as

22  a civilian overseas.  I worked in Kosovo, Bosnia.  I also

23  worked in Afghanistan.  And then prior to that, I was in

24  United States Air Force for six years.

25  Q.  And did you also receive firefighter training in the

 1  Air Force as well?

 2  A.  Correct.  That's when I started my career.

 3  Q.  And what made you decide to get into that career?

 4  A.  I just always liked the idea of working that type of

 5  work and helping folks and having some sort of meaning

 6  behind the job so --

 7  Q.  And so in total, with your entire career as a

 8  firefighter, you're well over 20 years, correct?

 9  A.  Correct.

10  Q.  And when did you retire?

11  A.  I retired in April of this year.

12  Q.  And where do you currently reside?

13  A.  I live in a little town in the Blue Ridge Mountains in

14  the South Carolina called Simpsonville.

15  Q.  Are you enjoying retirement?

16  A.  It's fantastic.

17  Q.  All right.  We'll try to get you back to the mountains

18  as quick as possible.

19  A.  I'm here for you guys so --

20  Q.  So I want to turn your attention to February 19th,

21  2020.  Will you tell the jury where you were stationed that

22  day?

23  A.  So that day I was at Fire Station 5.

24  Q.  And did you receive a call that day?

25  A.  So yeah.  So we were actually coming back from training

1  from Lewisville; and we were passing through District 2,

2  which is where this call took place.  A call came out over

3  the radio.  They dispatched the engines and medics from

4  Fire Station 2 for an unresponsive patient.

5          I happened to be listening to the radio, looked at

6  my location, realized I could -- I could beat that engine

7  into the district, called dispatch and said, "Hey, ship me

8  that call.  We'll go ahead and take that in lieu of

9  Truck 112," who was responding.

10 Q.  So the information you had to respond to the call was

11 an unresponsive person, correct?

12 A.  Correct.  It just came in as an unresponsive -- it's

13 been a few years; but it was unresponsive elderly male

14 patient, I believe, is how it came in.

15 Q.  And so when you hear that, unresponsive male, that

16 could be a lot of different things.  Is that fair to say?

17 A.  Correct.  That's a pretty routine call.  Most of the

18 time it's for low blood sugar or it's a mistaken, you know,

19 passed out person or -- it could be a myriad of different

20 things.

21 Q.  And so was that call responsive to 2114 Cannes Drive in

22 Carrollton?

23 A.  I'm sorry?

24 Q.  Was it 2114 Cannes Drive?

25 A.  I believe.  It's been three years and I don't have the

1    report, but I take it that's the address that we went to.

2    Q.  And so when you're responding over there, you're in a

3    fire truck, correct?

4    A.  Yes, sir.

5    Q.  And I should have asked you this before, but are you

6    also trained in the field of paramedics?

7    A.  Correct.  Most of the folks that come through the fire

8    department are trained as paramedics.

9    Q.  And so on your truck -- you're on the truck.  How many

10   other firefighters are on that truck?

11   A.  So we were actually on an engine.  There is a little

12   bit of difference between the language between a truck and

13   a fire engine.  But we were on the engine and there was

14   three of us and I was a paramedic at the time, I believe.

15   I'm trying to remember if I had dropped my patch yet.  But

16   pretty sure I was a paramedic at that -- in that time.

17   Q.  And so you've got three firefighters including

18   yourself.  You're trained as a paramedic.

19          When you responded to the scene, had an ambulance

20   already arrived as well?

21   A.  They arrived right about the same time we did, so yes.

22   Q.  And is that common for a fire engine or fire truck to

23   show up with an ambulance?

24   A.  Every call -- just about every call.

25   Q.  And so do you remember how many medics were on that

1   ambulance?

2   A.  We always keep two paramedics on the ambulance.

3   Q.  Did those two paramedics -- did they get into the house

4   a little bit before you did?

5   A.  Correct.

6   Q.  And when I say "a little bit," I mean, are we talking a

7   few minutes or literally a few seconds before?

8   A.  Few seconds.

9        So typically -- and I'm trying to remember on this

10  call.  I know we pulled up roughly the same time.

11       As the officer, I'm pretty hands-off on calls.  I

12  kind of supervise and make sure everybody has assignments

13  and everything is being carried out the way it is; and

14  typically I'll make contact with family or friends, whoever

15  called 9-1-1, to gather more information.

16  Q.  And did you do that in this case?

17  A.  I did.  His wife and I believe his son were out on the

18  front porch.  When I approached them, everybody else went

19  into the house.

20  Q.  And did you speak to them briefly?

21  A.  Very briefly.  I just -- I'm trying to think.  I said

22  something in a consoling matter of, "Hey, we're here.

23  We're going to take over and your loved one is in good

24  hands."

25  Q.  Was there any mention at that point about this being a

1  victim of a gunshot wound?

2  A.  Not at all, no.

3  Q.  And so you're out front.  Paramedics go in a few

4  seconds ahead of you.  Eventually do you go into the house

5  as well?

6  A.  Yes.  My conversation with the family was less than

7  5 seconds at most, and then I carried my way back into the

8  house.

9       I believe I asked her where exactly the patient

10  was located so that we could get a better understanding of

11  where I need to go in the house, and then I quickly made my

12  way to the second floor office area where she had stated

13  her husband was.

14  Q.  And what did you find in that office?

15  A.  So immediately I walked in and two medics were on scene

16  and one of the medics was starting to call -- through

17  protocol I believe he was -- he was basically calling for

18  equipment to begin resuscitative measures.

19       And I saw that there was a gun laying in his hand

20  and there was, you know, an obviously traumatic injury to

21  the person; and I just told everybody, "Hey, stop.  Stop

22  what you're doing.  There is a gun in his lap."

23       And so everybody stepped back.  I walked over to

24  the patient.  We confirmed that there was injuries

25  incompatible with life, so we didn't proceed further and --

1    it just looked very odd; so I just said, "Hey, everybody

2    just get out of the room."

3            Because the call came in as an unresponsive

4    patient that the wife had found or somebody had found; and

5    that's pretty atypical to have something that obvious with

6    a gun and a massive head injury, to call that in as an

7    unconscious patient.  So things started to not --

8            MR. WHALEN:  Objection to the narrative, your

9    Honor.

10           THE COURT:  Just ask another question.

11   BY MR. FINE:

12   Q.  And so you said you called everybody out of the room?

13   A.  Correct.

14   Q.  Had -- when you got into the room, was anybody touching

15   the complainant, Mr. Seegan?

16   A.  I believe one of the patients *(sic)* may have been

17   checking a carotid pulse to check for a heartbeat.

18   Q.  Okay.

19   A.  But that's the extent of touching and handling the

20   patient.

21   Q.  And is that standard protocol, to check on the neck

22   generally for a pulse?

23   A.  Correct.

24   Q.  Generally you guys don't check the wrist, correct?

25   A.  You can, but in this case they didn't check the hand

 1  because they didn't see the gun so they went -- they

 2  checked the carotid pulse, I think.

 3  Q.  And that's actually what I was going to ask next.

 4        The paramedics that were there right before you

 5  got in, had any of them even seen the gun?

 6  A.  No, and I was -- that's why I called everybody out of

 7  the room; and my first conversation with them was, like,

 8  "How did you guys miss this weapon in his lap?"

 9        And they hadn't seen it.  For some reason they got

10  tunnel vision.  I was with a pretty young crew.  And so for

11  just a brief moment we said, "Hey, how did you miss that?"

12  And then I said, "Okay.  Everybody, you know, get the

13  equipment out of the room.  Let's reevaluate what we've got

14  here because now we've got something more serious.  Make

15  sure you keep everybody out of the room, family members.

16  Make sure they don't come in the room."  And so that's what

17  we -- that's how we proceeded.

18  Q.  And at that point it's a potential crime scene,

19  correct?

20  A.  Correct.

21  Q.  And so it's important to do the best you can --

22  obviously, Goal Number 1 is to save lives, correct?

23  A.  Correct.

24  Q.  Once you realized that Mr. Seegan -- I should say the

25  patient was James Seegan, correct?

1    A.  Correct.

2    Q.  Once you realize that he is dead, then Goal Number 2 is

3    preserving the crime scene; is that fair?

4    A.  Correct.

5    Q.  And so when you got in there, outside of one of the

6    paramedics maybe touching his neck briefly, was anybody

7    else messing with Mr. Seegan's body?

8    A.  Not that I'm aware of; and I gave, you know, strict

9    direction as the officer on scene, "Hey, nobody touch him.

10   Nobody touch anything.  You know, let's clear the room and

11   get police involved."

12   Q.  And did they follow your orders and get out of the

13   room?

14   A.  To my knowledge, yes.

15   Q.  And did they wait outside until police arrived, at

16   least to your knowledge?

17   A.  They either were outside the room or they were pretty

18   distant from the patient so as not to touch anything or

19   step on anything.  And I believe I -- me and eventually a

20   police officer were the only ones going back in and out of

21   the room.

22   Q.  So you mentioned something wasn't right.  When you

23   looked at the scene in that room, what did you notice?

24   What drew your attention?  Outside of just the fact that

25   there is a gunshot wound and a gun there --

 1  A.  Correct.

 2  Q.  -- tell the jury what you saw.

 3  A.  So the whole call was odd because it came in as an

 4  unconscious patient with somebody who actually made contact

 5  with the patient and failed to see the firearm or to convey

 6  that information over a 9-1-1 call.  So that was the first

 7  red flag of something very wrong is going on here if that's

 8  the way the call came in.  That's a pretty -- pretty big

 9  misstep.

10          I say that, but my own guys had missed that as

11  well coming into the room.  It was -- the lights were off

12  in the room, but it wasn't quite dark.  I think it was

13  twilight, so you could potentially obviously miss something

14  like that.

15          But, more importantly, the gun was laying

16  perfectly in his lap with his hands on it.  And so if

17  you've -- and the injury was to the parietal area of the

18  skull, which is up above the ear.  So I'm looking at this,

19  thinking -- if you've ever fired a pistol or a handgun --

20          MR. WHALEN:  Objection to the narrative.

21          THE COURT:  Well, go ahead and ask another

22  question, I mean --

23  BY MR. FINE:

24  Q.  So you were discussing what you found to be odd.  You

25  mentioned that the gun was basically in his lap, correct?

1    A.   Correct.

2    Q.   And you mentioned with the positioning of the entrance

3    wound to sort of the back left side of his head; is that

4    correct?

5    A.   At the time I didn't even think that was the entrance

6    wound because there was another small hole on the right

7    side of his temple, on the right side.  So that kind of

8    threw it all -- the gun is in his left hand on his lap.

9    What appears to be an entry wound is on the right upper

10   side of his head.  Then you have a pretty massive head

11   wound with brain tissue exposed on the upper left side.

12   Q.   And so -- have you responded to suicides before?

13   A.   I have.

14   Q.   Have you responded to suicides by gunshot before?

15   A.   I have.

16   Q.   Through those -- through that experience, did this look

17   similar to those circumstances or different?

18   A.   No.

19   Q.   And tell the jury what was different about this scene

20   versus those other gunshot suicides.

21   A.   I can't recall in -- a lot of that stuff I try to block

22   out with previous calls, but subconsciously I knew it

23   didn't add up.

24        And then, again, the gun would kick out from the

25   head; so it should have been on the floor with his arm -- I

1  mean, it should not have somehow gone from the side of his

2  held, pull the trigger, with the recoil, and then swing

3  around perfectly on his lap in his hand.  That didn't add

4  up to me.

5  Q.  If you'll take a look --

6        MR. FINE:  Your Honor, may I approach the witness?

7        THE COURT:  Yes.

8  BY MR. FINE:

9  Q.  I think the binder is actually behind you.

10 A.  There is a binder right here, sir.

11 Q.  Let's see which numbers those are in front of you.

12       Okay.  I'm going to have you take a look at

13 State's *(sic)* 79.  If you'll open that up and take a look

14 at Photo 25, so page 25 and page 30 on Government's 79.

15 A.  Okay, 25.  Yes, sir.

16 Q.  Did you take a look at 25?

17 A.  Yes, sir.

18 Q.  And will you take a look at 30 as well on

19 Government's 79?

20 A.  Yes.

21 Q.  And do those appear to be sort of what you described to

22 the jury, the condition of Mr. Seegan's body and the gun

23 being on his lap in his left hand?

24 A.  Correct.

25       MR. FINE:  We would offer Government's 79, just

 1    Photo 25 and 30 at this time, your Honor.

 2            THE COURT:  Say the numbers again, please.

 3            MR. FINE:  It's 25 and 30, your Honor.

 4            THE COURT:  Okay.

 5            MR. WHALEN:  Renew our previous objection to 25,

 6    your Honor.

 7            THE COURT:  Overruled.  Government's (*sic*) 25 and

 8    30 will be admitted.

 9            MR. FINE:  Permission to publish?

10            THE COURT:  Yes.  And this is actually Exhibit 79,

11    pages 25 and 30.

12            MR. FINE:  25 and 30, yes, your Honor.

13    BY MR. FINE:

14    Q.  All right, Captain King.  Looking at Government's 79,

15    page 25, you mentioned the gun being in his left hand and

16    sort of wrapped around the armrest.  Is that what we're

17    looking at here?

18    A.  Correct.

19    Q.  And did this look -- did this look right to you?

20    A.  No.

21            MR. FINE:  Let's go ahead and look at page 30.

22    BY MR. FINE:

23    Q.  And same thing here.  This is a close-up of the left

24    hand.  Is this what you're talking about, how it's kind of

25    resting on his lap?

1   A.  It looks very -- yes.  It looks odd.

2   Q.  And even in terms of -- so you've got a chair with an

3   armrest, right, two armrests; and his arm is actually

4   wrapped around the outside of the armrest there, correct?

5   A.  Correct.

6   Q.  Not even dropping down inside.

7   A.  So how would that happen?

8   Q.  Is that what was going through your mind?

9   A.  Exactly.  That's exactly what was going through my

10  mind.

11  Q.  And then going back to page 25 on Government's 79 --

12  and we'll take a look at that more specifically with later

13  witnesses, but was there a letter that was also found on

14  that desk?

15  A.  That was the second -- or one of -- one of many red

16  flags that gave me pause.  Yes, there was a -- I remember

17  it just being very short and typed, which didn't add up for

18  somebody if they were going to do this.  They would -- I

19  would think they would freehand and sign it.  And to log

20  into a computer, create a Word document, type this up, save

21  it, print it, it just seemed like -- again, it added

22  another layer of something that was odd.

23  Q.  And, Captain King, you're not just talking as somebody

24  who is just opining.  You're somebody that's responded to

25  multiple suicides by gunshot before, correct?

1    A.  I have been on suicides by gunshot.

2    Q.  And have you seen a note like that on any other --

3    A.  Not that I can recall.

4    Q.  Okay.  What about in terms of other suicides that

5    you've gone out to, the condition of the house?  What

6    generally is the condition of the house like in the ones

7    that you've gone to?

8    A.  Usually it's unkept (*sic*) and -- you know, starts off

9    with the yard is unkept, the house is unkept, and

10   ultimately, you know, you can kind of see the manifestation

11   of someone's life just kind of spiraling out and then they

12   take their life.  So typically it -- from what I can

13   remember, homes are usually not as neat as this home.

14   Q.  And was the Seegans' home neat?

15   A.  Yes.  It was very, very neat.

16   Q.  Did you also speak to Mrs. Seegan about which hand --

17   A.  Correct.

18   Q.  -- James Seegan's --

19         What was his dominant hand?

20   A.  So -- yes.  As I was looking at everything and things

21   didn't add up, I went down and talked to her and

22   consoled -- tried to console her and her son and started

23   asking some typical questions, "Does your -- did your

24   husband ever suggest suicide or had he been talking about

25   suicide?"

1          She had stated no --

2          MR. WHALEN:  Objection as to hearsay, your Honor.

3          MR. FINE:  Your Honor, it goes to his state of

4    mind in terms of --

5          THE COURT:  Overruled.

6    BY MR. FINE:

7    Q.  Go ahead.

8    A.  And so kind of went through a checklist, does he have

9    health problems, does he have terminal illnesses, any

10   recent financial problems.  And this is things that I have

11   experienced with people who have taken their life

12   usually -- or not usually.  They've had one of those that

13   have come up, and that's why I ask those types of

14   questions.

15          And as she's saying no to all these things and I

16   kept thinking about what I thought would be the gunshot

17   wound on the temple with the exit wound on the parietal

18   area and the gun being in his left hand and knowing that a

19   small percentage of the population is left-handed, I then

20   asked her, "Is your husband left- or right-handed?"

21          And she said, "Right-handed."

22          And then I thought, okay, this is really odd,

23   then, because who would -- who would -- you know, the last

24   thing you do on this planet if you're going to take your

25   own life, would you ever use your nondominant hand to do

```
 1   that?  And that would strike me as extremely odd or rare.
 2   Q.  And so February 19th comes and goes.  You continue on
 3   your career responding to emergencies for the next several
 4   months, correct?
 5   A.  Yes, sir.
 6   Q.  And eventually did there come a time where the
 7   Carrollton Police Department -- where you were in contact
 8   with the Carrollton Police Department?
 9   A.  Correct.  And then I ultimately made an affidavit with
10   Detective Bonner on what happened and what I could recall.
11   Q.  Had you ever -- had you ever made an affidavit before
12   in a criminal case like this?
13   A.  I'm trying to think.  I might have done one for a child
14   abuse case years ago, but it's very rare and I can't speak
15   to how many.  I know it's rare.  I can't recall but maybe
16   one other.
17   Q.  And does that just, again, go to the oddness of this
18   entire situation from your vantage point?
19   A.  Correct.
20        I talked about this call quite a bit with
21   coworkers and family members, of just how different and odd
22   it was.
23   Q.  And did it bother you over --
24   A.  Very much.
25   Q.  -- those months?
```

1  A.  Correct.  It did.

2          MR. FINE:  I'll pass the witness.

3          THE COURT:  Cross-examination?

4              CROSS-EXAMINATION OF PATRICK KING

5  BY MR. WHALEN:

6  Q.  Mr. King, good morning.

7  A.  Good morning.

8  Q.  Okay.  So if I understand correctly, when you arrive at

9  the scene, you encounter Mrs. Seegan and her son, correct?

10  A.  Yes, sir.

11  Q.  Okay.  And in the meantime -- other crew members enter

12  the house at that point, correct?

13  A.  Yes, sir.

14  Q.  Okay.  How many crew members entered the house at that

15  point?

16  A.  I know of at least two.

17  Q.  Okay.  And do they immediately travel upstairs?

18  A.  I -- I'm not sure.  I'm not sure if they found -- or

19  asked the wife where he was located.  So I'm not sure if

20  they went directly to the patient or if they looked

21  downstairs first.

22  Q.  Okay.  And then eventually you said you enter the

23  house, correct?

24  A.  Yes, sir.

25  Q.  Okay.  And then when you enter the house, you go

 1  upstairs to the office, correct?

 2  A.  Yes, sir.

 3  Q.  Okay.  And at that point how many of your crew members

 4  are in the room at that point?

 5  A.  I believe two or three.

 6  Q.  Okay.  And are they near Mr. Seegan at that time?

 7  A.  One -- one crew member was, yes.

 8  Q.  Okay.  And from the time you -- they entered that

 9  office and the time you got there, how much time elapsed,

10  if you can recall?

11  A.  Maybe -- it's hard to say.  Maybe 5 to 10 seconds.

12  Q.  Okay.  But they were already -- one person was already

13  near Mr. Seegan and touching his neck for his pulse,

14  correct?

15  A.  I'm -- I'm trying to think.  I'm imagining that's what

16  happened because I remember them calling for -- him calling

17  for equipment when I entered the room.

18  Q.  Okay.  When you say he called for equipment, was he

19  using the radio; or was he yelling out --

20  A.  No, he was giving -- so he's the lead paramedic; and so

21  he'll start calling and -- I'm guessing at this point --

22  trying to go down the advanced cardiac life support

23  protocol.  And that's where I stopped it.

24  Q.  Okay.  And so then you asked everybody to back out of

25  the room at that point?

 1  A.  Yes, sir.

 2  Q.  Correct, okay.

 3        Now, you -- at that point you called law

 4  enforcement, right?  You called the PD at that point?

 5  A.  Yes.

 6  Q.  Okay.  Then -- you stated that out of the three

 7  paramedics that went in first, none of them saw the

 8  firearm, correct?

 9  A.  I don't believe so.

10  Q.  Okay.  You were the first one to see the firearm?

11  A.  I believe so.

12  Q.  Okay.  Then when you -- you also testified, too, that

13  when you viewed Mr. Seegan, you thought -- you believed

14  that the entry wound was on the right side of the body --

15  right side of the head, correct?

16  A.  I'm -- yes.  I'm not an expert, and I only -- just

17  looking at a small hole from what I know of how bullets

18  fragment, if -- it just seemed like the small hole on the

19  right side would make sense as the entry wound and the

20  large avulsion on the left -- upper left parietal area

21  would be the exit wound.  But that's just me thinking

22  without any kind of specialization on --

23  Q.  Okay.  So you don't have any specialized knowledge or

24  anything --

25  A.  No, sir.

```
 1    Q.  Okay.  And when -- you talked about that you've been on

 2    suicide calls before.  How many have you been on?

 3    A.  I'd be guessing if I had to say a number.  I'm not

 4    sure.

 5    Q.  Okay.  Are we less than 50?

 6    A.  Probably less than -- more than -- more than 5, less

 7    than 50.

 8    Q.  Okay.  And so you're basing your opinion based on that

 9    subset of less than 50, more than 5, suicides that you've

10    been on, correct?

11    A.  I'm basing it on that as well as anecdotally

12    conversations with different officers and folks that I had

13    talked to in the station saying, "Hey, does any of this add

14    up or" --

15    Q.  Okay.  Well, let me stop you there.

16            When -- you say you talked to people afterwards

17    but --

18    A.  Correct.

19    Q.  -- you said you had this initial impression --

20    A.  Yes, sir.

21    Q.  -- when you walked in, correct?

22    A.  Correct.

23    Q.  Okay.  And you were basing that off of less than 50,

24    more than 5, calls that you've been on of suicides,

25    correct?
```

1   A.  Yes.

2   Q.  Okay.  But you haven't gone out and done any studies

3   yourself and looked at crime scenes and looked at suicides

4   to determine --

5   A.  No.  It was -- it was just the progression of the call

6   and the positioning of the gun and subconsciously probably

7   some of the things I've picked up over the years on calls

8   such as these.

9   Q.  Okay.  And so that was your opinion; and that was your

10  impression, correct?

11  A.  Yes, sir.

12  Q.  Okay.  Then you also -- when you had these concerns,

13  okay -- now, it seems that you talked to Detective Bonner

14  much later on, in September.

15  A.  Yes, sir.

16  Q.  Okay.  Did you express those concerns to Detective

17  Duncan who was on scene that night?

18  A.  I'm not sure who Detective Duncan is but I definitely

19  conveyed to the first arriving officer all of my concerns

20  and we actually went to the room and I talked through

21  everything that I had just previously testified to.

22  Q.  Okay.  So you relayed that information to the

23  Carrollton Police Department that night, correct?

24  A.  Yes, sir.

25  Q.  Okay.  Were you on scene when the medical examiner came

```
 1   in?
 2   A.  No.
 3   Q.  Okay.  Did you have any conversations with the medical
 4   examiner?
 5   A.  No, sir.
 6   Q.  Okay.  Then you also talked about, based on your
 7   opinion, that because the house was neat, that stood out to
 8   you, correct?
 9   A.  It was -- it wasn't as significant.  It was
10   circumstantial combined with everything else, the fact that
11   he had a really nice Tesla in the garage, I remember.  It
12   seemed very affluent, and there didn't seem to be an
13   outstanding reason for him to have taken his own life.
14   Q.  Okay.  But people can take their own lives for a
15   variety of --
16   A.  Sure.
17   Q.  -- reasons, right?
18   A.  Yes, sir.
19   Q.  Even if they appear on the outside to be successful and
20   happy, correct?
21   A.  Absolutely.
22   Q.  Okay.  And somebody could have a neat house because
23   they get everything in order so other people who have to
24   deal with the aftermath don't have to deal with a mess,
25   correct?
```

```
 1   A.  I've never experienced that, but I imagine it --
 2   Q.  So just because you've gone to houses that are unkempt
 3   and the yard is undone and all that stuff, that in and of
 4   itself doesn't mean just because that didn't exist here,
 5   suicide is not a possibility.
 6   A.  Correct.
 7   Q.  Okay.
 8            MR. WHALEN:  I'll pass the witness.
 9            THE COURT:  Anything additional?
10            MR. FINE:  Briefly, your Honor.
11                REDIRECT EXAMINATION OF PATRICK KING
12   BY MR. FINE:
13   Q.  Captain King, did anybody administer etomidate to James
14   Seegan that night?
15   A.  No, sir.
16   Q.  And would there have been any reason to do so?
17   A.  No.  We did not perform any resuscitative measures or
18   use any medications on him.
19   Q.  So -- and defense counsel brings up sort of looking at
20   one piece and then another piece and another piece.  Is it
21   fair to say that your concerns about the crime scene
22   weren't based on just one specific thing; it was a totality
23   of all of these things going on?
24   A.  The totality of everything added up to it being a
25   problem with how I reconciled the scene.
```

1  Q.  And through your 20-plus years of being a firefighter

2  in various aspects of -- throughout the world, had you ever

3  experienced a crime scene like that before?

4  A.  Not that -- no, definitely not.

5          MR. FINE:  That's all I have.  I'll pass the

6  witness.

7                  RECROSS-EXAMINATION OF PATRICK KING

8  BY MR. WHALEN:

9  Q.  Was one of the biggest pieces was the -- if I

10 understood your testimony correctly -- was the fact that it

11 came out as an unresponsive person, correct?

12 A.  I think the biggest one is the handgun on the lap.

13 Q.  Okay.  And you don't have any degrees in biomechanics

14 or any of that?

15 A.  I have an aeronautical science degree.

16 Q.  Okay.  Did you do any of that to -- ever study

17 biomechanics versus --

18 A.  No.

19 Q.  Okay.  So you haven't done any biomechanics or --

20 A.  No, sir.

21 Q.  Okay.

22          MR. WHALEN:  Pass the witness.

23          THE COURT:  Anything else, Mr. Fine?

24          MR. FINE:  No, your Honor.  Nothing further.

25          THE COURT:  Can this witness be fully excused?

 1            MR. FINE:  Yes, your Honor.

 2            MR. WHALEN:  Yes, your Honor.

 3            THE COURT:  You are free to go back to your

 4   vacation.

 5            THE WITNESS:  Thank you, your Honor.

 6            THE COURT:  What's next?

 7            MR. FINE:  Your Honor, the United States calls

 8   Officer Parker Powell.

 9            THE COURT:  Sir, if you'll raise your right hand

10   to be sworn in.

11            (The oath is administered to the witness.)

12            THE COURT:  Go ahead and begin.

13            MR. FINE:  Thank you, your Honor.

14                 DIRECT EXAMINATION OF PARKER POWELL

15                 CALLED ON BEHALF OF THE GOVERNMENT

16   BY MR. FINE:

17   Q.  Good morning, Officer Powell.  How are you?

18   A.  Good morning.  Doing well.

19   Q.  Would you please introduce yourself to the ladies and

20   gentlemen of the jury and spell your last name for the

21   court reporter.

22   A.  Yes.  I'm Crime Scene Investigator Parker Powell.  Last

23   name is P-O-W-E-L-L.

24   Q.  And will you tell the jury, starting with your --

25   what's your educational background?

1   A.  I have a biology degree from Baylor University and a

2   forensic science minor from there as well.  That's the

3   education.

4   Q.  And how did you become a crime scene investigator for

5   the Carrollton Police Department?

6   A.  I had to apply for it.  I had some internships with

7   other agencies and different educational backgrounds that

8   allowed me to apply for the position and get the job out of

9   college.

10  Q.  And so outside of your education, what sort of training

11  did you receive to become a crime scene investigator?

12  A.  So when you start at Carrollton, you have six months of

13  training where you shadow a crime scene investigator; and

14  you're going out to every scene and being educated on what

15  to do and how the process works.

16          Outside of that, we also are sent to a lot of

17  different trainings from various forensic science and crime

18  scene classes that help to educate you on how to perform

19  your job.

20  Q.  And when you start out with the Carrollton Police

21  Department in the Crime Scene Unit, do you start out as a

22  crime scene investigator?

23  A.  No.

24  Q.  What position do you start out?

25  A.  You start out as a crime scene technician.  That's the

 1    Level 1 position.

 2    Q.  And how do you advance to become a crime scene

 3    investigator?

 4    A.  With training and experience.  So you have to have

 5    worked for a year of crime scene work by yourself, and then

 6    you also have to have a certain amount of trainings to be

 7    able to promote.

 8    Q.  What's the difference between a crime scene technician

 9    and a crime scene investigator?

10    A.  The responsibilities would be the same.  The difference

11    is education and training.

12    Q.  And how long have you been with the Carrollton Police

13    Department's Crime Scene Unit as a whole?

14    A.  I've worked there for about five years.

15    Q.  And that was straight out of college, correct?

16    A.  Yes.

17    Q.  And how long as a crime scene investigator?

18    A.  I'm now advanced past that.

19    Q.  Okay.

20    A.  So I was a crime scene investigator for, I think, maybe

21    a year and a half before I promoted to the third level.

22    Q.  And what's the third level?

23    A.  It's technically called criminalist, but it's the same

24    job responsibilities.

25    Q.  Do you have supervisory responsibilities now as well?

1  A.  No.

2  Q.  How many -- in the Carrollton Police Department, how

3  many members in total are in the Crime Scene Unit?

4  A.  We have three people that are involved in the Crime

5  Scene Unit.

6  Q.  And so in regards to when you have a crime, how is it

7  decided which crime scene investigator or technician or

8  criminalist goes out to a scene?

9  A.  So we respond to all sorts of major crimes.  Typically

10  only one crime scene investigator will respond to each of

11  those; and that's determined by who what we call is "on

12  call," which means that person responds to anything at any

13  time of the day.  Whether that's 2:00 a.m. or over the

14  weekend, that person is the one that responds out.  That's

15  how it's determined.

16  Q.  And were you called out to a scene at 2114 Cannes

17  Drive?

18  A.  I responded to it, but I wasn't the one called out.

19  Q.  And so explain how that -- how that process works.

20  A.  So one of my other investigators, Crime Scene

21  Investigator Kelsey Bell was the on-call; and she is the

22  one that received that call.  There were some suspicious

23  circumstances; and so we decided together that I would tag

24  along, be another set of eyes, and assist her with the

25  investigation.

1    Q.  So normal protocol is one crime scene -- I'll just

2    use -- crime scene technician/investigator, one crime scene

3    person, right?

4    A.  That's correct.

5    Q.  In this case y'all decided to bring two people out from

6    the beginning?

7    A.  That's right.  The only time we have more than one

8    person is typically with your larger cases where it's a lot

9    of area or with murder cases where we need more hands on

10   deck.

11   Q.  On a run-of-the-mill suicide, do you normally have one

12   investigator go out or two?

13   A.  Only one.

14   Q.  And Crime Scene Investigator Bell, she no longer works

15   at Carrollton, correct?

16   A.  Correct.

17   Q.  Where does she work now?

18   A.  She moved to go work where her husband works, so she's

19   out in East -- or West Texas.

20   Q.  Okay.  Wasn't fired or anything like that, just moved

21   with her husband to El Paso; is that right?

22   A.  She got married.

23   Q.  Okay.  So let's talk about this crime scene itself.

24   Tell the ladies and gentlemen of the jury -- we talked

25   about the location.  What kind of house was it?

 1  A.  It was a two-story house.  Downstairs had a living

 2  room, a kitchen, standard stuff.  Upstairs was bedrooms and

 3  bathrooms and things like that, office.

 4  Q.  And was there a specific room inside of this home that

 5  ended up being your crime scene?

 6  A.  Yes.

 7  Q.  And which room was that?

 8  A.  It was primarily located in the office.  It was the

 9  northwest corner of the house, and it was an office space.

10  Q.  And did you enter that office?

11  A.  Yes.

12  Q.  And when you entered that office, was the room -- was

13  the house and the room secured in terms of nobody in and

14  out of there that didn't belong in there?

15  A.  That's correct.

16  Q.  And why is that important?

17  A.  To make sure that nothing's left the crime scene or

18  entered it.  We make sure that we have officers that secure

19  it, and those officers stay and secure the scene the

20  entirety that we're there.

21  Q.  And do y'all actually keep a log about who goes in and

22  out of the crime scene?

23  A.  Yes, for major cases we do.

24  Q.  And was that done in this case?

25  A.  I believe so.

1    Q.  As far as you're concerned, was the scene secured

2    properly?

3    A.  Yes.

4    Q.  Was it contaminated in any way?

5    A.  Not that I'm aware of.

6    Q.  And obviously in any case and in this case, a lot of

7    times you'll have paramedics or firefighters going to the

8    scene before y'all get there.  Is that fair to say?

9    A.  Almost always.

10   Q.  And once they're at the point where they realize that

11   lifesaving measures are no longer appropriate, is the

12   correct measure for them to then exit the scene?

13   A.  Yes.

14   Q.  And did they do that here?

15   A.  Yes.

16   Q.  So tell the jury a little bit about the office itself.

17   Just sort of describe how it's situated and what you saw in

18   the office.

19   A.  When you enter, there is a desk on the left side.

20   There is a large area of desk in front of you and on the

21   right.  There are several computers and monitors up.  It's

22   clearly something that has office chairs and desks.  There

23   is a closet in that room as well.

24         That's kind of the layout, is several desks with

25   computers and stuff on them.  I think there is a Lego

```
 1  spaceship in the room.  That's kind of the setup.
 2  Q.  Just your normal home office kind of setup?
 3  A.  Yes.
 4  Q.  And within that home office did you -- somebody you
 5  later knew to be James Seegan, did you find his body in
 6  there?
 7  A.  Yes.
 8  Q.  Tell the jury sort of how his body was positioned.
 9  A.  So Seegan's body was sitting in one of the rolling
10  chairs in the office.  His head was slumped backwards, and
11  both arms were generally in his lap.  He had a gun in his
12  left hand, and that gun was resting on his left leg.  And
13  his feet were in front of him in just a standard sitting
14  with head back, gun in left hand.
15  Q.  Have you responded to suicides before?
16  A.  Yes.
17  Q.  Have you responded to suicides by gunshot before?
18  A.  Yes.
19  Q.  Quite a few?
20  A.  A lot, yeah.
21  Q.  Have you responded to murders as well?
22  A.  Yes.
23  Q.  And so in this case you already talked about how two
24  members of the crime scene team were out there, correct?
25  A.  Correct.
```

1  Q.  As you looked at the crime scene initially, did you see

2  anything that appeared to be out of the ordinary?

3  A.  When we responded, we were filled in on some red flags,

4  is what they're called, which are things to keep note of

5  and make sure to see if they match up with the crime scene

6  as we're trying to understand the scene and the body and

7  the weapon.

8          So we were told on the front end, you know,

9  that -- some information that we --

10         MR. SANDEL:  Object to the hearsay, your Honor.

11         MR. FINE:  Goes to his state of mind, your Honor.

12         THE COURT:  Overruled.

13 A.  We were told that Seegan was right-handed, and we were

14 told that Seegan didn't have any guns.

15         I was there when his wife was talking about the

16 guns; and she said that he doesn't own guns, he doesn't let

17 his son have guns, water guns, Nerf guns, anything like

18 that, doesn't own or have guns in the house.

19         So those are two things that we're keeping note

20 of.  When I walk into the actual office, the first thing

21 that strikes me is the blood and the bloodstains that are

22 present there.

23 BY MR. FINE:

24 Q.  And what struck you about that?

25 A.  When Bell had been called to respond to the scene, one

1    of the suspicious things that we were told was that the

2    office chair had been moved into the bloodstain and had

3    been rolled.

4           And as typically with suicides by gunshot, when a

5    body is shot, that body doesn't move itself; and so that

6    was something suspicious that we were looking for.

7    Q.  And through your training and experience, is that

8    something that you would look at, to see if things were

9    moved in the room?

10   A.  Yes, that's one of the things.

11   Q.  And did you take a look at the rolling chair or the

12   bloodstains or patterns around the rolling chair?

13   A.  Yes.  I spent a significant time looking at it.

14   Q.  And did you form a conclusion about the rolling chair,

15   whether it was moved or not?

16   A.  I did.

17   Q.  And what was that conclusion?

18   A.  That it hadn't been moved.

19   Q.  Okay.  And how did you come to that conclusion?

20   A.  So when I was first looking at the scene, right, we

21   were told that the chair had been rolled; so we go in with

22   that expectation.

23          But the physical evidence on scene didn't tell me

24   that.  What I saw and what's typical of bloodstains is that

25   from a wound, blood will drip.  And at shooting suicides,

 1  we can sometimes have a large pool of blood underneath a

 2  person's body; so that's pretty typical.

 3          What was different about this one is that the

 4  blood hadn't just pooled around his body, it actually

 5  spattered out.  And "spattered" is just the technical term

 6  for splashing out.  But that blood had spattered out in all

 7  directions around -- from basically right under and behind

 8  the rolling chair, which is where Seegan's head had been

 9  tilted at.

10          And it appeared -- and based off of the

11  bloodstains -- that all of that had come from right behind

12  the chair.  And my best conclusion was that some brain

13  matter and something heavy had actually landed in the pool

14  of blood and had caused the spattering out in all

15  directions because it was a far distance for the blood to

16  travel and not something that would have happened just by

17  blood dripping.

18          And there was large chunks of possible brain

19  matter in the blood; and so that was my best possible

20  conclusion, is that that brain matter had landed in the

21  pool of blood, causing it to spatter out in all directions

22  at pretty high force.

23          If you can imagine stepping on a catsup packet and

24  that catsup kind of flying in all directions kind of at a

25  fast speed, that's the kind of force we're looking at.

1    There is nothing else in that bloodstain that would have

2    caused that except chunks of what looked like brain matter.

3            And we're also look at what's called voids.  Voids

4    are anywhere the blood isn't present.  So, you know, if

5    I've got my hand here and blood is flying by, no blood

6    would be anywhere behind my hand because it's blocking the

7    bloodstains from flying.

8            So we're also looking at the voids present; and

9    the voids match up with where the chair was, in that exact

10   position, telling me that -- and with Seegan's legs and

11   some other things present -- telling me that everything

12   that I could see there was present in that position when

13   the bloodstain occurred, which spattered in all directions.

14   Q.  And so your conclusion was he was shot in that chair in

15   that spot?

16   A.  Based off of the bloodstains and -- based off the

17   bloodstains, all I can say is that he was in that position

18   when that event occurred, when the spray happened.

19           Based on other information, I can say that he was

20   sitting there.

21   Q.  And on the desk next to Mr. Seegan was a typewritten

22   note, correct?

23   A.  That's correct.

24   Q.  Was there any blood on that note?

25   A.  Not that I'm aware of.

 1   Q.  Was it a relatively bloody scene?

 2   A.  It -- the distance that the blood had traveled was

 3   larger than I've ever seen at any scene.  That amount of

 4   blood isn't uncommon for a head wound that's pooled, but

 5   the distance was what was remarkable to me.

 6   Q.  And you didn't see any blood on the note that was next

 7   to Mr. Seegan, correct?

 8   A.  I personally didn't, no.

 9   Q.  All right.  What about the positioning of his hand?

10   You said that the gun was in his left hand.  Did you find

11   anything odd about the positioning of his hand?

12   A.  So with suicides by gun, sometimes -- it's about 50/50

13   shot that the gun remains still in the person's hand.

14   Sometimes the gun has fallen or gone somewhere else; but

15   about 50 percent of the time, the gun remains in that

16   person's hand.

17         We're looking for possible -- it's called back

18   spatter.  When someone fires a gun, most of the blood

19   travels with the bullet and exits; and that's called

20   forward spatter.  But some of the blood will also exit

21   through the entry wound and can get on the person's hand

22   that fired the weapon, and so we're looking for possible

23   back spatter that might be on that person's hand.

24         So the position of the gun -- it is possible that

25   it could have landed there and the gun could have stayed in

1   his hand, and we also had bloodstains -- two very small

2   droplets on his hand that could have been back spatter.  So

3   those didn't jump out as inconsistent with the crime scene.

4   Q.  And in regards to the note that was there -- I guess

5   you would refer to that as a suicide note, right --

6   A.  Yes.

7   Q.  -- in terms of the content of it?

8           When you responded to suicides before, is there

9   always a note there?

10  A.  No.

11  Q.  Is it actually more common that there is not a note, in

12  your experience?

13  A.  Yes.

14  Q.  When there are notes, is it more common for those notes

15  to be handwritten or typed?

16  A.  I've only seen either handwritten suicide notes or

17  texts, and both of those are the most common things.  I've

18  never seen a typed suicide note before.

19  Q.  You mentioned what Mrs. Seegan said in terms of guns.

20  Is part of your job working the crime scene to take a look

21  around the house?

22  A.  Yes.

23  Q.  Not just in the room itself but around the rest of the

24  house for potential evidence or other circumstances that

25  might help figure out this case.  Is that fair to say?

Jury Trial, Volume 4

 1  A.  Yes.

 2  Q.  And was there any evidence in the home of any firearms

 3  being in that home?

 4  A.  No.

 5  Q.  Any firearm ammunition?

 6  A.  No.

 7  Q.  Any firearm cases?

 8  A.  No.

 9  Q.  Was there any evidence in the home of syringes?

10  A.  No.

11  Q.  Needle drugs?

12  A.  No.

13  Q.  IVs?

14  A.  No.

15  Q.  Medication?

16  A.  Yes.

17  Q.  Tell the jury about medication.

18  A.  Something we look at at all death investigations is

19  what that person may have been taking prescription

20  medication wise, and that can help in assessing the body

21  and the results of toxicology and different things like

22  that.  So we're always looking for what medications that

23  person might be on.  The medical examiners that respond to

24  scenes are always wanting that information.

25          And so I recall seeing and being pointed out that

1   there was a trash can in the master bathroom that was full

2   of at least -- I think -- I could see four prescription

3   medication bottles that were all kind of on top of the

4   trash can.

5          And then on top of that, it looked like someone

6   had dumped out the contents of a -- of a vacuum.  So kind

7   of dust and particulate like that had been dumped on top of

8   what looked like several medication bottles.

9   Q.  And did you later find out that the medication was for

10  a splinter that had been taken out?

11  A.  I never saw or removed the medication, so I didn't

12  personally do that.

13  Q.  Okay.  Did you see any evidence in the house of a drug

14  called etomidate?

15  A.  No.

16  Q.  Have you -- did you find any evidence at all that that

17  handgun that was in Mr. Seegan's left hand was in the home

18  at all?

19  A.  No.

20  Q.  Did you find that to be odd?

21  A.  It -- typically what we will see is a gun box,

22  ammunition, something of that nature when it comes to

23  suicides by gun.  Someone will have someplace that they

24  kept the gun with ammunition, even if it's not something

25  that they regularly shoot, or an heirloom.  In this case we

 1  didn't see any of that.

 2  Q.  And through your experience of having attended

 3  suicides -- there's two kinds of suicides.  There is a

 4  planned suicide and more of a spontaneous suicide.  Is that

 5  fair to say?

 6  A.  Yes.

 7  Q.  And so with a suicide note, would that show that there

 8  was a planned suicide?

 9  A.  Yes.

10  Q.  I mean, you're not going to just decide to kill

11  yourself and there is suddenly a note that appears, right?

12  A.  Right.

13  Q.  And so if it's a planned suicide and there is a

14  typewritten note there, you would expect to see some

15  evidence of a firearm beforehand, correct?

16  A.  Yes.

17  Q.  Because it would go into the planning of that suicide.

18  A.  Right.

19  Q.  Did you check the exterior of the home as well for any

20  signs of forced entry?

21  A.  I did.

22  Q.  Were there any signs of forced entry?

23  A.  No.

24  Q.  And what does that tell you?

25  A.  There were two doors that were unlocked, so the -- both

```
 1  fences -- both fence gates were unlocked.  The exterior

 2  back door and the interior back door were both unlocked.

 3          So entry was possible; but I don't have any broken

 4  windows, any broken doors or any indication that someone

 5  broke into the house forcibly.

 6  Q.  Did you -- as part of your job, do you also look for

 7  fingerprints?

 8  A.  Yes.

 9  Q.  And did you do that here?

10  A.  On scene we rarely look for fingerprints and will

11  typically transport evidence to our laboratory to a

12  closed-in environment, and we'll process things for prints

13  there.

14  Q.  And explain to the jury why -- you see on TV people are

15  going around dusting for prints and all that.  That's not

16  really reality, correct?

17  A.  Correct.

18  Q.  And why is that?

19  A.  Only if we are trying to figure out exactly what was

20  touched or we have, you know, some environment where we

21  have no clue who was present would we go and dust every

22  single item.

23          Typically we dust items that would typically be

24  touched or used in any kind of scene.  And when it comes to

25  items, we can get fingerprints off of a lot of items; but
```

1   it's not something that we can typically get off of

2   everything and certainly less than you'd see on a TV show.

3   Q.  Did you attempt to look for prints on the printer in

4   the office?

5   A.  I -- when I saw the printed-out suicide note, I want to

6   make sure that there's a printer present, that there's --

7   that printer has paper.  So I went over and in the office

8   there was two printers side by side -- or two blacks things

9   that -- I'm not sure if they were both printers.

10         But I looked for and confirmed that there was

11  paper in the printer; and I noticed that the printer was

12  covered in dust and that there were finger marks that had

13  been left in the dust, meaning that parts of the dust had

14  been removed by fingers based off of some recent activity

15  on the printer.  So they're covered in dust.  They've been

16  handled recently because I've got finger marks left in the

17  dust.

18  Q.  So just because there's finger marks in the dust, does

19  that mean that you could actually pull fingerprints from

20  those marks?

21  A.  No.  So --

22  Q.  Explain to the jury about that.

23  A.  A lot of people will have their car stolen and we'll

24  process it and their car is covered in pollen and dust.

25  And what typically happens is when a finger touches a

1  smooth surface, oils left -- from your finger are left on

2  that smooth surface.

3        When something is covered in a layer of dust or

4  dirt, typically the finger will lift off that dirt instead

5  of leaving an impression; and so what you're left with is a

6  void where you can tell it's been touched but there is no

7  actual fingerprint present.

8  Q.  And is that what you had with the printer here?

9  A.  Yes.

10  Q.  You had a void where you could tell it had been

11  touched, but you weren't able to recover any prints to tell

12  who touched it?

13  A.  That's correct.

14  Q.  What about the gun itself?  Did you process the gun?

15  A.  I did.

16  Q.  And explain to the jury.  So you have a piece of

17  physical evidence in a crime scene, this being a gun.  How

18  do you go about collecting it?

19  A.  Very carefully.  In this case, you know, it's a loaded

20  gun.  We have to be very careful that we don't accidentally

21  fire it.

22        So it's collected both in a way that's safe for

23  everyone present but also in a way that preserves any kind

24  of evidence that might be on the gun.  In this case there's

25  some hairs and human tissue on the gun, and we want to make

1   sure that's preserved as well as anything that might be on

2   it.  So we're very careful in how we pick it up and how we

3   package that, making sure it's secure and safe.

4   Q.  And did you collect and package the gun according to

5   your protocols?

6   A.  I personally didn't, but Investigator Bell did.

7   Q.  And did you -- did you see the gun, though?

8   A.  I saw the gun, yes.

9   Q.  And eventually back at Carrollton Police Department,

10  did you process the gun and look for fingerprints?

11  A.  I did.

12  Q.  And explain to the jury.  Is that the same process you

13  talked about before, or is it a little bit different when

14  you're in a sterile environment?

15  A.  There's lots of ways to look for fingerprints.  When

16  we're on scenes, typically we use what's called black

17  powder; and we're dusting for fingerprints.

18          In our laboratory we can use a lot more -- a lot

19  better techniques that are better for finding fingerprints,

20  especially on different surfaces.  And so in a sterile

21  environment, we have access to our tools and resources.

22  Q.  And did you use those tools in this case?

23  A.  I did.

24  Q.  Were you able to find any fingerprints on that firearm,

25  that gun?

1   A.  I was not.

2   Q.  And just so the jury is aware, the gun that was found

3   there, it is a firearm, correct?

4   A.  Yes.

5   Q.  A firearm is a deadly weapon?

6   A.  Yes.

7   Q.  And after you process the gun, do you also sometimes

8   send it off to check to see if DNA can be found on it?

9   A.  Yes.

10  Q.  And is DNA found on every single item?

11  A.  No.

12  Q.  Sometimes it is, and sometimes it isn't.  Is that fair

13  to say?

14  A.  That's correct.

15  Q.  And again, you know, we talk a lot about TV and *CSI* and

16  all those shows and everything.  But in reality, as

17  somebody who deals in crime scenes, a lot of times you

18  don't get fingerprints, fair?

19  A.  Fair.

20  Q.  A lot of times you don't get DNA, fair?

21  A.  Fair.

22  Q.  But it's your job to process that scene, collect

23  everything, photograph everything so that we can document

24  and try our best to recover physical evidence, correct?

25  A.  That's correct.

1   Q.  Did you do that in this case?

2   A.  Yes.

3   Q.  Did you take photographs in this case as well?

4   A.  I didn't take any photographs in regards to the scene

5   or the items collected.

6   Q.  Did you -- were -- well, I guess -- that was a bad

7   question.

8            Bell took the photographs, correct?

9   A.  That's correct.  She was primary.

10  Q.  You reviewed the photographs, though?

11  A.  I certainly did.

12  Q.  And we've taken a look at them.  I mean, fair to say

13  hundreds of photographs were taken just at the crime scene,

14  correct?

15  A.  I don't know the exact amount but over a hundred.

16  Q.  And did we sort of cull those down and come up with a

17  collection of photographs to be able to illustrate this to

18  the jury?

19  A.  We did.

20  Q.  And you've had a chance to review those?

21  A.  Yes.

22            MR. FINE:  All right.  At this time the government

23  would offer the entirety of Government's 79.

24            MR. SANDEL:  We would renew our previously stated

25  objection, your Honor.

 1          THE COURT:  Okay.  Overruled.  79 will be admitted

 2   in full.

 3          MR. FINE:  Permission to publish Government's 79,

 4   your Honor?

 5          THE COURT:  Yes, you may.

 6          MR. FINE:  Starting with page 1.

 7   BY MR. FINE:

 8   Q.  And Officer Powell, I think what we'll do is there's, I

 9   believe, 40-something photos here.  We'll just kind of go

10   through them one by one, and what I'll ask you to do is

11   basically on each one explain the significance of what

12   we're looking at; is that fair?

13   A.  Yes.

14   Q.  All right.  So looking at page 1, what are we looking

15   at here?

16   A.  This is the exterior of 2114 Cannes Drive and it's

17   clearly raining and it's dark.  We arrived on scene at

18   6:21 p.m.  By that time it's dark and it's kind of stormy.

19   Q.  Looking at page 2, is this the front entry?

20   A.  Yes.

21   Q.  And are these packages that appear to have been

22   recently delivered?

23   A.  Yes.

24   Q.  And, again, you weren't there; so you don't know.  It's

25   possible the packages were out there for weeks and weeks.

 1    But through common sense, if you're not at home during the

 2    day sometimes packages pile up on your front porch,

 3    correct?

 4    A.  Yes.

 5    Q.  Does that appear to be what happened here?

 6    A.  Yes.

 7         MR. FINE:  Let's look at page 3.

 8    BY MR. FINE:

 9    Q.  I want to point out one thing on the front porch.  Do

10    you know what that is right there that I've circled?

11    A.  I do.

12    Q.  And what is it?

13    A.  It's a doorbell camera.

14    Q.  Is it one of those Ring/Nest cameras that, you know,

15    you get video off of it?

16    A.  Yes.

17    Q.  And we're going to talk about that in a second, but do

18    you know for a fact that that was actually working that

19    night?

20    A.  I do, yes.

21    Q.  Okay.  Were you actually able to review some video from

22    that camera?

23    A.  Yes.

24    Q.  All right.

25         MR. FINE:  Let's go to page 4.

```
 1   BY MR. FINE:
 2   Q.  What room are we looking at here on page 4?
 3   A.  I don't know what I would call the room, but it's the
 4   room right as you enter.  That's going to be on your left
 5   and has kind of various equipment in it.
 6   Q.  And over here, is that a ladder and maybe some painting
 7   supplies and things like that, looks like what would be
 8   used for home improvements?
 9   A.  Yes.
10   Q.  And as you're entering the house, that room is to the
11   left, correct?
12   A.  Directly to the left.
13   Q.  Okay.
14           MR. FINE:  Let's go to page 5.
15   BY MR. FINE:
16   Q.  So what are we looking at here?
17   A.  This is the stairwell to get to the second floor.
18   Q.  And the office is on the second floor, correct?
19   A.  That's correct.
20           MR. FINE:  All right.  Let's look at page 6.
21   BY MR. FINE:
22   Q.  Now we're heading up the stairs?
23   A.  Yes.
24   Q.  And as we're heading up the stairs, is the office to
25   the right?
```

 1   A.  It's going to be around the corner, on your right.

 2   Q.  Basically right and right?

 3   A.  Yes.

 4   Q.  Okay.

 5         MR. FINE:  Let's look at 7, please.

 6   BY MR. FINE:

 7   Q.  Is this now we're upstairs?  We've turned to the right;

 8   and the room on the right, is that going to be the office?

 9   A.  Yes.

10         MR. FINE:  All right.  Let's go to 8, please.

11   BY MR. FINE:

12   Q.  Is this a view looking into the office?

13   A.  It is.

14   Q.  From just outside the hall?

15   A.  Yes.

16         MR. FINE:  9, please.

17   BY MR. FINE:

18   Q.  Is this the view as you went into the room, sort of the

19   first view that you see going in?

20   A.  Yes.

21   Q.  And so obviously we see Mr. Seegan on the left side.

22   We see a lot of office supplies, a couple of monitors,

23   multiple desks; is that fair?

24   A.  Yes.

25   Q.  Do you see what I'm circling here on page 9?

```
 1   A.  I do.

 2   Q.  What does that look like to you?

 3   A.  It looks like a shower -- like a shower stool,

 4   something.

 5   Q.  And that's basically right up next to where Mr. Seegan

 6   is dead, correct?

 7   A.  Yes.

 8           MR. FINE:  All right.  Let's go to page 10.

 9   BY MR. FINE:

10   Q.  And as we start looking closer at Mr. Seegan, you can

11   see blood pooling, some blood spatter all throughout the

12   floor; is that correct?

13   A.  Yes.

14           MR. FINE:  Let's go to 11, please.

15   BY MR. FINE:

16   Q.  And so looking at 11, appear to be pictures of his son

17   throughout the office; is that right?

18   A.  Yes.

19   Q.  You've got a dartboard up here, some T-ball pictures,

20   correct?

21   A.  Yes.

22   Q.  A picture -- looks like a Franco Harris picture here.

23   A.  I don't know who that is.

24   Q.  We won't hold that against you.

25           MR. FINE:  Let's go to 12.
```

BY MR. FINE:

Q.  And so are we looking at here -- we're now in the

office, and we're kind of at what I would say is the back

corner looking towards the door; is that right?

A.  The farthest corner from the door.

        MR. FINE:  Let's go to 13, please.

BY MR. FINE:

Q.  And this is the other side of the office; is that

right?

A.  Yes.

Q.  And, again, we're looking at another little T-ball

picture here, just, again, what you would see in your

typical home office?

A.  Yes.

        MR. FINE:  14, please.

BY MR. FINE:

Q.  This view -- what are we looking at here in this view?

A.  This is taken from behind the monitor, on the far

side's desk.  It shows a picture of Seegan's head.

Q.  And through your investigation, were you able to

determine which side of the head the entrance wound was on?

A.  Yes.

Q.  And what side is that?

A.  That would be the left side.

Q.  And that's the large wound here above his left ear,

1   towards the back of his head, correct?

2   A.  That's correct.

3   Q.  And so the bullet -- were you able to actually figure

4   out the general trajectory in which the bullet went?

5   A.  Yes.

6   Q.  And which way did it go?

7   A.  So the pattern on the left side first is what's called

8   a stellate pattern.  That's what we typically see with

9   close contact gunshot wounds.  The gun is so close that the

10  gases cause the skin to rip and cause a star pattern to

11  show up.  That's how we're able to approximate which was

12  entry versus exit.  That's very typical of what we see with

13  guns close up or right up against the head.

14          Then the trajectory side, we have an exit wound on

15  the right side of the head; and almost directly next to the

16  head, on this door --

17          Am I able to draw on this?

18  Q.  You can actually -- you should be able to draw on that

19  screen.

20  A.  So right underneath this jacket, in the door frame --

21  in the wood of the door is a bullet mark showing that the

22  bullet struck and glanced off the door and then entered the

23  closet wall, the far wall of the closet.

24          And all of that was at pretty much the same level

25  of height and direction of coming out of the head, striking

1   the door, glancing off, and then entering the wall of the

2   closet.

3           MR. FINE:  And let's go to page 15 and we'll see a

4   little bit better view of what you were talking about.

5   BY MR. FINE:

6   Q.  Can you circle where that bullet hole is?

7   A.  Yes.

8   Q.  And so that's the bullet hole going from Mr. Seegan's

9   left side of his head through the right side of his head,

10  all the way through the closet; and we'll see eventually

11  where it came to rest as well, correct?

12  A.  Yes.

13          MR. FINE:  Let's go to page 16, please.

14  BY MR. FINE:

15  Q.  What room are we looking at here, on page 16?

16  A.  The master bedroom.  It's upstairs, right across from

17  the office.

18          MR. FINE:  And page 17.

19  BY MR. FINE:

20  Q.  Just kind of a little bit different view, a little bit

21  lighter picture; is that correct?

22  A.  Yes.

23  Q.  Does this appear to be like a home sauna?

24  A.  That's what it looks like.

25          MR. FINE:  Let's go to 18.

1    BY MR. FINE:

2    Q.  So 18 here, we're looking sort of closer -- if we were

3    standing by the sauna, looking into that master closet; is

4    that correct?

5    A.  Yes.

6           MR. FINE:  And let's go to 19.

7    BY MR. FINE:

8    Q.  What is the significance of this photo?

9    A.  So this wall is directly on the other side of the wall

10   in the closet in the office.  So if the bullet has passed

11   through that side of the wall, we would expect it to exit

12   this side of the wall.

13   Q.  And, Officer Powell, we were able to put together some

14   diagrams of the home and the room where Mr. Seegan was

15   found, correct?

16   A.  Yes.

17   Q.  And you reviewed those?

18   A.  Yes.

19   Q.  And they are not going to be exactly to scale; but they

20   appear to be fair and accurate to give the jury an

21   understanding of what the home looked like and the

22   different rooms, correct?

23   A.  That's correct.

24          MR. FINE:  At this time government would offer

25   Government's 80.

```
 1              MR. SANDEL:  No objection, your Honor.

 2              THE COURT:  80 will be admitted.

 3   BY MR. FINE:

 4   Q.  So what I'm going to do --

 5              MR. FINE:  Permission to approach the witness,

 6   your Honor?

 7              THE COURT:  Yes.

 8   BY MR. FINE:

 9   Q.  I'm trying to think of the best way to do this; but I

10   think we'll just go old-fashioned, hold something up here.

11              MR. FINE:  And, your Honor, may the witness step

12   down briefly?

13              THE COURT:  Yes.  Let me get a lapel mic for him,

14   though.

15   BY MR. FINE:

16   Q.  Sorry.  I'm making this difficult here.

17   A.  That's okay.

18   Q.  So looking at Government's 80, this is basically the

19   setup of the office; is that correct?

20   A.  From a bird's-eye view overhead.

21   Q.  And show the jury.  Just kind of point out where

22   Mr. Seegan is.

23   A.  This would be Seegan's body in the rolling chair in

24   that corner of the office.

25   Q.  And -- I'll try to hold it a little higher.
```

1                Show the jury where the closet is.

2    A.  This would be the closet that the bullet ends up going

3    through.

4    Q.  Okay.  And then looking at 80, which is a view of the

5    office and then the master bedroom as well, kind of again

6    show the jury where the bullet went through and where

7    eventually it rested.

8    A.  So again here is Seegan's body and the rolling chair.

9    The gun is in his left hand.  We have an entry hole in the

10   left side of his head, exit in the right side.

11               The bullet then glances off this door right in the

12   corner of it at an angle which enters through this part of

13   the wall and exits right here, and this is where we find

14   the bullet.

15   Q.  And that's where you can kind of see how the walls

16   connect.  The two closets share a wall, correct?

17   A.  Correct.

18   Q.  All right.  You can be seated.

19               So, Officer Powell, we're looking now at the

20   master closet with that shared wall.  Going -- this is

21   page 19 we're looking at right here.

22               MR. FINE:  Let's go to page 20.

23   BY MR. FINE:

24   Q.  What is this defect in the wall right there?

25   A.  That would be a bullet hole.  You can see from how the

 1  parts of the wall are pointed out that the bullet has

 2  exited through that wall.

 3  Q.  And so this is that bullet going through Mr. Seegan's

 4  head left to right, through the office closet, into the

 5  adjoining wall, into the master closet?

 6  A.  That's correct.

 7  Q.  All the way through, correct?

 8  A.  Yes.

 9          MR. FINE:  And let's go to page 21.

10  BY MR. FINE:

11  Q.  And what is that right there in the midst of all that

12  dust and plaster?

13  A.  That's a fired bullet.

14          MR. FINE:  And let's go to 22.

15  BY MR. FINE:

16  Q.  And is that the bullet right there?

17  A.  It is.

18  Q.  And was that -- basically you took it out of that dust

19  and took a better photograph of that -- or Bell took a

20  better photograph?

21  A.  That's correct.

22          MR. FINE:  Let's go to 23.

23          And then to 24.

24  BY MR. FINE:

25  Q.  So 23 was the trash can with some of those medications

 1   bottles.  24 is a little bit better photo of it.  Is this

 2   what you were talking about, how there was some

 3   prescription medication and some -- it's like if you take,

 4   I don't know, a Dustbuster or a vacuum and dump all the

 5   stuff on top of it, is that kind of what it looks like

 6   here?

 7   A.  That's what I was discussing, yes.

 8   Q.  All right.

 9            MR. FINE:  And going to 25.

10   BY MR. FINE:

11   Q.  Is 25 showing sort of the gun laying on Mr. Seegan's

12   lap a little bit in his left hand?

13   A.  The gun -- it does show that the gun is leaning on his

14   left lap, yeah.

15            MR. FINE:  And zooming back -- actually, zoom back

16   in where we were before.

17   BY MR. FINE:

18   Q.  You talked about blood spatter.  Does it appear -- I

19   guess -- could you go ahead and on the screen point out

20   some areas of blood spatter on there on the back wall.

21            And on that shower seat, does there appear to be a

22   little bit as well?

23   A.  No.  It -- there is a desk leg that's blocked any blood

24   from traveling on that side of the desk.

25            So the blood's originating behind the chair, the

 1  rolling chair that Seegan is in, and is spattering out.

 2  There is a big leg that's blocked the blood from traveling,

 3  so this whole area is void of bloodstains.

 4        Whereas the back wall and everything in front does

 5  have bloodstains on it.

 6  Q.  And you've actually got -- you've got some spatter here

 7  as well on the front of the desk; is that correct?

 8  A.  That's correct.

 9  Q.  And then, obviously, back on the closet door and

10  then --

11        MR. FINE:  If we could even zoom in, yep, on this

12  area here.

13  BY MR. FINE:

14  Q.  It's a lot of blood spatter.  Fair to say?

15  A.  It is, a lot of blood spatter.

16        MR. FINE:  All right.  Let's go to -- let's go to

17  27, actually.

18  BY MR. FINE:

19  Q.  So in 27 you see Mr. Seegan's left hand gripped around

20  the gun.  Is this the alleged suicide note that you were

21  talking about?

22  A.  Yes.

23  Q.  And this is the note.  You had never seen a note like

24  this before in your suicides, correct?

25  A.  I've never seen a printed-out suicide note.

 1   Q.  And you said you couldn't find any blood on it,

 2   correct?

 3   A.  I didn't see any blood on it.

 4          MR. FINE:  Let's go to page 30, please.

 5   BY MR. FINE:

 6   Q.  You mentioned that potential blood spatter on the hand

 7   basically after a gunshot because you get -- probably not

 8   the right term -- some blowback basically?

 9   A.  Back spatter.

10   Q.  Back spatter.

11          Do we see that in this picture here, what you

12   thought you might see as back spatter?

13   A.  There's two tiny droplets of blood on the left hand of

14   Seegan, both right there.

15          I thought it was possible that that was related to

16   back spatter.

17   Q.  And in regards to back spatter, there could -- you

18   know, there could be those two tiny drops.  We don't see a

19   lot of back spatter on his hand, though, correct?

20   A.  No, we don't.

21   Q.  And again there is significant blood loss.  Fair to

22   say?

23   A.  Yes.

24   Q.  Significant blood spatter throughout the room?

25   A.  Yes.

1   Q.  Pooling as well?

2   A.  Yes.

3   Q.  Drops?

4   A.  Yes.

5   Q.  I mean, this is -- would you agree this is one of the

6   bloodier scenes that you've attended?

7   A.  It's certainly the largest area, from a single person,

8   of blood that I've seen.

9   Q.  And the most that you could find on Mr. Seegan's hand

10  is potentially -- we don't know for sure -- potentially

11  these two little spots here, correct?

12  A.  On his hand, yes.

13  Q.  Okay.

14          MR. FINE:  Let's go to page 35, please.

15  BY MR. FINE:

16  Q.  So what are -- outside of a large pool of blood and

17  spatter, what is the significance of 35?

18  A.  So there's a lot going on with blood.  The longer blood

19  stays out of the body, it begins to clump together.  It's

20  called coagulation.  But that blood will start to clump

21  together.  It will also start to separate into its

22  components, so the serum part of blood will slowly start to

23  separate and seep out.  So in regards to this photo, this

24  lighter section right there is the serum starting to

25  separate.

1          The middle section back here is very clumpy but

2   not in the way that looked like coagulation, the way

3   that -- to me, it looked like brain matter likely dropped

4   into the pool.  And, you know, if you look at that area

5   being the center of the stain, the blood stains in every

6   direction from there are pointed out.  So the stains are

7   going in every direction, these directions.

8          And I'd like to point out the void area.

9          Do you know how to erase these?

10  Q.  Just -- you've read my mind.  That was the next thing I

11  was going to do is ask you to point out that void area

12  where initially, you know, some of the first responding

13  officers thought that the chair had been moved.  If you

14  could point that out to the jury.

15  A.  Right.  So they told us the chair had been pushed into

16  the blood.  So when I get out there, I am able to see that

17  this area right here has what's called a void.  The blood

18  basically was blocked with the wheel that's present there,

19  and any blood that struck the wheel didn't continue forward

20  and so we've got the void there.

21          There's voids on every single wheel as well as

22  this middle section that's blocking some blood going that

23  way.

24          The blood that strikes this portion of the bottom

25  part of the chair eventually starts to drip down; and

 1    that's why we have this row of blood that's in just a

 2    straight line, because all the blood that struck that

 3    portion of the chair eventually will drip and drip just

 4    underneath it.  That's gravity.

 5    Q.  I think for Government's 79 that's all we'll go through

 6    right now.

 7          You said that you did end up recovering the gun,

 8    correct?

 9    A.  Yes.

10    Q.  You processed it?

11    A.  (Moving head up and down.)

12    Q.  After you're done processing a gun, do you keep it in a

13    secure area at the Carrollton Police Department?

14    A.  Yes.

15    Q.  Was that done in this case?

16    A.  Yes.

17    Q.  Did you bring the gun as well as a casing down here

18    today?

19    A.  I did.

20    Q.  Did y'all take it out of your secured evidence storage

21    to bring it down here?

22    A.  Yes.

23    Q.  Was it tampered with in any way?

24    A.  No.

25          MR. FINE:  Permission to approach, your Honor?

1          THE COURT:  Yes.

2    BY MR. FINE:

3    Q.  Officer Powell, I'm going to show you what has been

4    marked as Government's Exhibit 81.

5          Do you recognize that?

6    A.  I do.

7    Q.  Is that the same firearm that was recovered that was in

8    the hand of James Seegan?

9    A.  It is.

10   Q.  I'm also going to show you what's been marked as

11   Government's 82.  Do you recognize that?

12   A.  Yes.

13   Q.  Is that the casing that was found as well?

14   A.  It is.

15          MR. FINE:  At this time the government would offer

16   Government's 81 and 82.

17          MR. SANDEL:  No objection, your Honor.

18          THE COURT:  81 and 82 will be admitted.

19          MR. FINE:  Permission to publish Government's 81,

20   your Honor?

21          THE COURT:  What are you planning on doing?

22          MR. FINE:  I was going to have the witness step

23   down, show the firearm, and also explain the mechanism of

24   it.

25          THE COURT:  That's fine.  I just want to make sure

1    you weren't going to hand it to them.

2         MR. FINE:  No.  No, no, no, no, no.

3         THE COURT:  Well, "publish" has different meanings

4    so --

5    BY MR. FINE:

6    Q.  And so the jury knows and for the record, this gun has

7    been cleared by the Carrollton Police Department, correct?

8    A.  Yes.

9    Q.  It cannot be fired.  It's not loaded.

10        It's also been cleared by the marshal as well,

11   correct?

12   A.  Yes.

13   Q.  All right.  So if you'd go ahead -- it's zip-tied up

14   now to keep it in storage.  If you'll take the zip ties

15   off, and then let's explain the mechanism of the gun to the

16   jury.

17   A.  I'm going to leave this in here.

18   Q.  Yeah, that's fine.

19        MR. FINE:  And, your Honor, permission for the

20   witness to step down?

21        THE COURT:  Yes, go ahead.

22   BY MR. FINE:

23   Q.  So, Officer Powell, this is Government's 81.  This is

24   the weapon that you found and recovered that was in

25   Mr. Seegan's hand that ultimately killed him, correct?

 1  A.  It is.

 2  Q.  And 82 -- we're not going to open it up because it was

 3  in a pool of blood.  But it is a fired casing, correct?

 4  A.  Yes.

 5  Q.  So explain to the jury a little bit about a firearm.

 6  Is this -- what type of firearm is this?

 7  A.  So it's a semiautomatic 9-millimeter handgun.  It

 8  shoots 9-millimeter ammo and can be fired

 9  semiautomatically.

10  Q.  And when you say "semiautomatically," what does that

11  mean?

12  A.  It means that you can't hold down the trigger and fire

13  off unlimited amount of shots.  You have to pull the

14  trigger each time you want to shoot it.

15  Q.  And so with a gun -- with this particular gun or any

16  semiautomatic gun, after you fire does it basically expel a

17  casing out of it?

18  A.  Typically when a -- typically when a gun is fired, the

19  bullet is fired out of it and a spent casing, the casing

20  containing the explosive material, is ejected out of the

21  gun.

22  Q.  And so if you could explain -- when we have a casing,

23  explain what is loaded into this gun.  You have a bullet.

24  Within the bullet there's gunpowder, correct?

25  A.  Correct.

1  Q.  And there is a casing that is around the bullet as

2  well, correct?

3  A.  Yes.

4       So you've got a magazine inside the gun.  The

5  magazine is full of a stack of bullets.  The top bullet

6  will be racked into what's called the chamber, meaning it's

7  lined up and ready to be fired.

8       When you pull the trigger, a firing pin strikes

9  the back of the bullet, causing the explosion to happen.

10  With the explosion the bullet is fired forward.  The top

11  half of the gun will slide backwards; and as it does, it

12  ejects the casing portion, which is the portion that's not

13  needed anymore for the bullet to travel, backwards and a

14  new bullet will be racked into the chamber, ready to be

15  fired if you pull the trigger again.

16  Q.  And was that the case here, with this gun?

17  A.  Yes.

18  Q.  The bullet was expelled out, went through Mr. Seegan's

19  head, went through the wall, rested in the closet; casing

20  came out of the gun, landed in basically a pool of blood?

21  A.  Yes, and a new bullet was chambered.

22  Q.  Right.

23       And in this case, though, the evidence was that

24  only one shot was fired, correct?

25  A.  Correct.

1   Q.  But when you recovered the gun, you said it was loaded.

2   Was there another bullet basically ready to go if somebody

3   were to pull the trigger?

4   A.  Yes.

5   Q.  Okay.  You could be seated.

6           All right.  Officer Powell, I wanted to talk about

7   one other thing at this crime scene; and then we'll recap

8   that you went to another scene for a search warrant as

9   well, correct?

10  A.  Correct.

11  Q.  All right.  So in regards to this scene, when y'all

12  were there -- and at any crime scene there's a lot of

13  officers around, right?

14  A.  Typically.

15  Q.  And so there is some time where officers are standing,

16  waiting, letting crime scene do their thing, letting

17  detectives do their thing.  Medical examiner technicians

18  come in, right?

19  A.  Yes.

20  Q.  And so you guys could be at these crime scenes

21  sometimes for hours?

22  A.  Yes.

23  Q.  So while you were there at the scene, did you have a

24  chance to take a look at the doorbell camera?

25  A.  I did.

1   Q.  And how did that happen?

2   A.  We were able to access James Seegan's cell phone, which

3   was present in the office.

4            From there, we were able to access the video

5   camera footage of the doorbell.  And that's something that

6   we look at at any scene that has video footage.  We want to

7   make sure we put eyes on it.

8   Q.  And when you reviewed that footage, did you see a man

9   go into the home?

10  A.  Yes.

11  Q.  Did you see a man leave the home?

12  A.  Yes.

13  Q.  Did you see a man later go back into the home?

14  A.  The same one.

15  Q.  And then leave again?

16  A.  Yes.

17  Q.  And in regards to that video, at the time did you know

18  who that man was?

19  A.  No.

20  Q.  And that's something that detectives who later came to

21  work the scene, they could figure out, correct?

22  A.  Correct.

23  Q.  Did I have you review those four video clips?

24  A.  You did.

25  Q.  And when you reviewed them, were they the same clips

1   that you watched out there at the scene?

2   A.  They were.

3   Q.  Had anything been added, altered, deleted in any way?

4   A.  No.

5   Q.  All right.

6           MR. FINE:  At this time we'd offer

7   Government's 93A, B, C and D.

8           MR. SANDEL:  Judge, we would object to

9   authentication and predicate.

10          MR. FINE:  Your Honor, he said that he watched

11  those videos, those same videos that are on there.  Nothing

12  has been added, altered, deleted.  It's exactly the same.

13          THE COURT:  Okay.  Objection overruled.  93A, B,

14  C, and D are admitted.

15  BY MR. FINE:

16  Q.  And, Officer Powell, did you also look at a video from

17  the garage cam as well?

18  A.  Yes.

19  Q.  Tell the jury about that.

20  A.  While we were on scene and watching the footage from

21  that day, we came across a video that contained a loud

22  sound like a boom happening.  And it was recorded in the

23  garage video camera.

24  Q.  And you don't know what that sound is, correct?

25  A.  We weren't able to tell.

 1   Q.  But was it something, again, that could be significant

 2   in an investigation?

 3   A.  Yes.

 4   Q.  And were you able to -- was that video able to be saved

 5   directly off of the cell phone?

 6   A.  I personally didn't save it off the cell phone, so I'm

 7   not sure.

 8   Q.  Was it -- was it viewed on -- did you have a body cam

 9   that day?

10   A.  No.

11   Q.  Did other officers have body cams?

12   A.  Yes.

13   Q.  And was one of the officers wearing a body cam

14   basically watching the video on Mr. Seegan's cell phone?

15   A.  Yes.

16   Q.  And was the body cam from that officer recording the

17   video -- recording a recording, basically?

18   A.  Yes.

19   Q.  And did you review that as well?

20   A.  I did.

21   Q.  And the body cam recording, which is Government's 94A,

22   was that an exact recording of what you viewed that night?

23   A.  It is.

24   Q.  Any additions, alterations, deletions, anything changed

25   whatsoever?

```
 1   A.  No.

 2         MR. FINE:  We would offer Government's 94A at this

 3   time.

 4         MR. SANDEL:  Your Honor, may we approach briefly?

 5         THE COURT:  Yes.

 6         (Sidebar conference, off the record.)

 7         MR. FINE:  May I proceed, your Honor?

 8         THE COURT:  Yes, you may.

 9         MR. FINE:  So we would go ahead and offer

10   Government's 94A at this time.

11         MR. SANDEL:  And we would lodge the objections we

12   lodged at the bench, your Honor.

13         THE COURT:  Well, you need to see them for the

14   record.

15         MR. SANDEL:  We would lodge objections to

16   predicate, authentication, and the best evidence rule.

17         THE COURT:  Overruled.  94A will be admitted.

18   BY MR. FINE:

19   Q.  Officer Powell, you also later on went to Nine Band

20   Brewery as well, correct?

21   A.  I did.

22   Q.  Subsequent to a search warrant, same kind of situation

23   there, you're collecting evidence, taking photographs,

24   documenting the scene, correct?

25   A.  Correct.
```

 1   Q.  And did you do that in this case?

 2   A.  I did.

 3   Q.  Did you take photographs of the brewery?

 4   A.  I did.

 5          MR. FINE:  At this time the government would offer

 6   Government's 131, which are photographs from that brewery.

 7          MR. SANDEL:  No objection, your Honor.

 8          THE COURT:  Okay.  131 will be admitted.

 9   BY MR. FINE:

10   Q.  After you left on February 19th, were you riding back

11   in a car with another officer?

12   A.  Yes.

13   Q.  And which officer was that?

14   A.  Detective Juvensio Vazquez.

15   Q.  And did you and Detective Vazquez receive a call on his

16   cell phone?

17   A.  Yes.

18   Q.  Was it on speaker?

19   A.  He was driving at the time, and so he put his cell

20   phone on speaker.

21   Q.  And could you hear the phone call?

22   A.  Definitely.

23   Q.  And who called on Detective Vazquez's cell phone?

24   A.  Keith Ashley.

25   Q.  And what did Keith Ashley say on that phone call?

Jury Trial, Volume 4                    908

1   A.  He was informing us of information that he stated he

2   had just found out.  He made statements saying, "I just

3   found out that Seegan's dad has passed away," "I just found

4   out that James had found his brother -- or had found his

5   best friend had died," "I just found out that James'

6   brother had committed suicide in the last year."

7           And he went on to make quite a few statements

8   predicated with "I just found this out" -- "I didn't know

9   this before" or "I just found this out" and repeating that

10  and informing us the information.

11  Q.  And what did you take from that call?  What was your

12  opinion?

13  A.  Those statements were statements I had previously just

14  seen in the suicide note written -- or typed and at the

15  crime scene.

16  Q.  And at that point had anybody outside of the Carrollton

17  Police Department or paramedics been able to see that

18  suicide note?

19  A.  No.

20  Q.  Was it released to the media?

21  A.  No.

22  Q.  And so did you find it strange that he was talking

23  about things that he just found out that were in a suicide

24  note that was found at a crime scene that only y'all had

25  access to?

1   A.  Yes.

2   Q.  And so it was clear at that point, on the night of

3   February 19th, that Mr. Ashley knew there was a police

4   investigation?

5   A.  Yes.  I witnessed a phone call informing him of the

6   death and our investigation.

7            MR. FINE:  I'll pass the witness.

8            THE COURT:  Okay.  Thank you.

9            At this time we're going to go ahead and take our

10  morning break.  Again, ladies and gentlemen, please don't

11  discuss the case among yourself or anyone else.  We'll take

12  15 minutes and come back and continue.  Thank you.

13           (The jury exits the courtroom, 10:37 a.m.)

14           THE COURT:  Anything further from government?

15           MS. RATTAN:  No, your Honor.

16           THE COURT:  Defense?

17           MR. WHALEN:  No, your Honor.

18           THE COURT:  Okay.  See you back in 15.

19           (Recess, 10:38 a.m. to 11:21 a.m.)

20           (Open court, defendant present, jury present.)

21           THE COURT:  Please be seated.

22           Ladies and gentlemen, sorry for the interruption.

23  We're not sure why the fire alarm went off.  It was a false

24  alarm, and it went off on its own.  The fire department --

25  no one could seem to get it off, but the repair people are

```
 1   coming out to figure out what the problem is.

 2           Okay.  Cross-examination?

 3           MR. SANDEL:  Thank you, your Honor.

 4                 CROSS-EXAMINATION OF PARKER POWELL

 5   BY MR. SANDEL:

 6   Q.  Investigator Powell, good morning.

 7   A.  Good morning.

 8   Q.  And just so we have a really nice, clean record, you're

 9   the same Parker Powell that was testifying right before we

10   took a break, correct?

11   A.  That is correct.

12   Q.  And you recall that you were placed under oath?

13   A.  Yes.

14   Q.  Now, I apologize in advance.  I'm going to jump around

15   a little bit because I was taking notes during your direct

16   testimony and I want to touch on several things that I

17   remember you saying, okay?

18   A.  Okay.

19   Q.  But if I ask a question and you're not sure what I'm

20   asking, just ask me to rephrase it; and I'm happy to do

21   that.

22   A.  Okay.

23   Q.  So the first thing that I want to ask you, you said

24   that in this case you took two crime scene investigators or

25   technicians to the scene with you; is that true?
```

1   A.  We took two crime scene investigators to the scene.

2   Q.  And that was you, and what was the name of the second

3   crime scene technician?

4   A.  Crime Scene Investigator Kelsey Bell.

5   Q.  Kelsey Bell.

6           And I believe what you said on direct is that that

7   is atypical for a suicide call.  Is that true?

8   A.  That's true.

9   Q.  So having two investigators there would be more typical

10  of when murder is suspected?

11  A.  That's correct, or suspicious circumstances.

12  Q.  So fair to say that even before you had arrived at the

13  scene, there was somebody that had communicated to you that

14  there was a level of suspicion here?

15  A.  That's correct.

16  Q.  Now, I also believe that I remember you testifying that

17  while you were looking around the scene, you noticed some

18  what you called red flags.  Do you recall that?

19  A.  I was told some red flags when I arrived at the scene.

20  Q.  And do you recall who it was that communicated some of

21  those red flags to you?

22  A.  So when we arrive on scene, we typically will go and

23  meet with what's called the primary officer or the primary

24  sergeant on the scene.  That's the person who's probably

25  been there the longest and knows the most information about

1   the scene.  And they'll fill us in on what they've found,

2   what people have said, thing of that nature.

3           In this case Sergeant Schroeder was the primary

4   sergeant on scene.

5   Q.  So Sergeant Schroeder was the primary sergeant; and he

6   is the one that communicated some of these suspicions to

7   you, correct?

8   A.  I believe so.

9   Q.  Okay.  Now, you would agree with me that red flags

10  aren't necessarily proof of anything, right?

11  A.  When we are at scenes, we are assessing all of the

12  information we're given and what we can see based off of

13  physical evidence.  And anytime something stands out as

14  uncommon or like it doesn't necessarily belong, that's

15  something that we would call a red flag.

16          It doesn't necessarily mean that there is

17  suspicious circumstances, but it does mean that it's

18  something we're keeping an eye on.  And the more red flags

19  we find, the more suspicious we think the circumstances

20  might be.

21  Q.  And you've been with Carrollton PD for five years, you

22  said?

23  A.  That's correct.

24  Q.  And you would agree with me that in prior

25  investigations you've had some red flags that turned out to

 1  be fairly innocuous, right?

 2  A.  I have had scenes where I've had a red flag, and one on

 3  its own isn't necessarily evidence of suspicious

 4  circumstances.

 5  Q.  Okay.  Talking about some of these circumstances or

 6  items that you saw at the scene, one of the items that

 7  Mr. Fine discussed with you was the gun placement in

 8  Mr. Seegan's hand.

 9        Do you recall testifying about that?

10  A.  I do.

11  Q.  Now, I think -- and correct me if I'm wrong -- that

12  your testimony was it's about a 50/50 chance that in a

13  suicide the gun remains in the victim's hand.  Is that

14  true?

15  A.  That's true, in my experience.

16  Q.  Another -- kind of keeping on Mr. Seegan's hand,

17  another item that you discussed with Mr. Fine was the

18  possible back -- I think you called it back splatter,

19  correct?

20  A.  Back spatter.

21  Q.  Back spatter.  Thank you.

22        And you recall you identified a few droplets of

23  blood that could be potential back spatter?

24  A.  It's possible.

25  Q.  Now, is back spatter -- when we're talking about an

1    incident of a gunshot wound, is back spatter something that

2    happens relatively immediately?

3    A.  Yes.

4          When the bullet is fired and the -- and it

5    penetrates into the head or some kind of part of the body,

6    that's when your forward spatter, which goes along with the

7    bullet, happens and when the back spatter related to the

8    bullet entering happens.  It happens in that instant.

9    Q.  So back spatter is an immediate reaction to the gunshot

10   wound, correct?

11   A.  Correct, to the bullet.

12   Q.  Now, you talked a lot about the blood pooling at the

13   scene, correct?

14   A.  Correct.

15   Q.  And I think a couple of times you said that in terms of

16   crime scenes you've investigated, this was one of the

17   larger areas in terms of how far that spatter had traveled,

18   correct?

19   A.  Correct.

20   Q.  Now, when you were discussing that, the conclusion that

21   you drew was that most of that spatter happened well after

22   the initial shot, right?  It was from items falling into

23   the pooling of blood?

24   A.  Right.

25          For what I saw, based off of physical evidence,

1    that pool of blood had already been dripping and formed and

2    then something fell into that pool of blood, causing the

3    large area and force in all directions.  So that would have

4    occurred, yes, after the pool was already present.

5    Q.  So when Mr. Fine was discussing this being a very

6    bloody scene, based on your investigation, most of that

7    occurred well after Mr. Seegan had been shot, correct?

8    A.  I believe so.

9    Q.  Okay.  Now, another thing that you discussed with

10   Mr. Fine was the suicide note that was on the desk, right?

11   A.  Yes.

12   Q.  Now, you said that you hadn't personally seen typed

13   suicide notes before, correct?

14   A.  Correct.

15   Q.  But I believe what you also said is it's actually most

16   common for there not to have been any note at all?

17   A.  In -- in my experience, probably about 30 percent of

18   the time do I see some kind of a suicide note; and from

19   that 30 percent, they are typically handwritten or texted

20   nowadays.

21   Q.  Now, did you do any research into, kind of, suicide

22   globally to see if your experience lines up with nationwide

23   statistics; or is that just kind of anecdotally what you

24   personally have experienced?

25   A.  So I respond to crime scenes in the city of Carrollton

1   and my experience is only within the city of Carrollton and

2   this happened in the city of Carrollton.

3   Q.   Okay.

4   A.   So that's my experience of over a hundred suicides.

5   Q.   That's fair.

6        But when you're saying that -- "based on my

7   experience," it's a small subset of global suicides,

8   correct?

9   A.   Yes.  I haven't been all across the nation.  I only

10  work in the city of Carrollton.

11  Q.   And you haven't done any outside research or looked at

12  any studies that relate to that, have you, at all?

13  A.   I haven't.

14  Q.   Now, I think that one of the other items you discussed

15  with Mr. Fine was the difference between a planned suicide

16  and a spontaneous suicide, correct?

17  A.   Correct.

18  Q.   And the presence of a note led you to believe that this

19  was a planned suicide, not a spontaneous one, correct?

20  A.   That's typically what we see.

21       If someone, you know, spontaneously decides to

22  kill themselves, typically there is not a lot of planning.

23  It's only what's available and that's what's used and it's

24  an immediate kind of thing.

25       If something is planned out, sometimes it can be

 1  in calendars and you can write out notes and plan out when

 2  you want to do something and how you want it to occur.

 3  Some people will leave notes for the cops that respond and

 4  do all sorts of things.

 5          So there is a difference between those, yes.

 6  Q.  So -- and I think what you're saying is in terms of

 7  planned suicide, the level of planning really varies

 8  greatly; is that fair?

 9  A.  That's fair.

10  Q.  And so I think you said some people plan it a little

11  bit; they may leave a note.  But some people are meticulous

12  planners; and they have calendar events and everything

13  else, correct?

14  A.  That's correct.

15  Q.  So when you were talking with Mr. Fine about this being

16  a planned suicide, one of the items that was discussed was

17  you would expect to see evidence in the house of firearms

18  being present if a gun was used.

19          Do you remember that part of your testimony?

20  A.  I do.

21  Q.  But wouldn't it be fair to say that if somebody is

22  planning a suicide, they may dispose of a gun box or

23  ammunition if they don't want that laying around the house?

24  Is that fair?

25  A.  That's certainly possible.

 1  Q.  Now, we looked at a picture of the trash can that had

 2  some prescription bottles in it.

 3  A.  Yes.

 4  Q.  Do you remember how many prescription bottles were in

 5  that trash can?

 6  A.  I don't.  I only viewed it with the vacuum stuff on top

 7  of it.

 8  Q.  There were multiple, though, correct?

 9  A.  Yes.

10  Q.  Do you remember the name that was on those prescription

11  bottles?

12  A.  I believe -- and I haven't seen them since the night,

13  but I believe that they were James Seegan's.

14  Q.  Now, I want to talk to you a little bit about

15  fingerprints.  You talked with Mr. Fine about

16  fingerprinting procedures.  Remember that?

17  A.  Yes.

18  Q.  And you said that as it relates to the firearm, you

19  took that back to your laboratory to process for

20  fingerprints, correct?

21  A.  Investigator Bell is the one that physically moved it

22  from the crime scene to our laboratory; but back at our

23  laboratory, I was the one that processed it for

24  fingerprints.

25  Q.  And so when you were processing that firearm for

1    fingerprints, did you just process the exterior of the

2    firearm; or did you process different individual

3    components?

4    A.  So what we typically do with firearms, we're looking

5    for surfaces that someone might have touched.  So the

6    magazine that's inside the gun is something that people

7    readily handle, the bullets that are put in, and that

8    magazine is put in and the exterior.

9            So I did not disassemble the firearm in any way

10   nor does -- that's not our standard protocol.  I processed

11   the exterior of the gun, the magazine, and the bullets that

12   had been inside the gun.

13   Q.  Okay.  So you processed the exterior of the gun for

14   fingerprints, correct?

15   A.  Yes.

16   Q.  And were any found?

17   A.  No.

18   Q.  You processed the magazine that was loaded into the

19   gun, correct?

20   A.  Yes.

21   Q.  Were any fingerprints found there?

22   A.  No.

23   Q.  And I believe you said you also processed the bullets

24   that were loaded into the magazine because somebody would

25   have had to use their thumb to push those in, correct?

1  A.  You could use any finger but yes, correct.

2  Q.  Okay.  And were any fingerprints found on any of those

3  bullets?

4  A.  No.

5  Q.  Did you also process the shell casing that was

6  recovered from the scene?

7  A.  I did not.

8  Q.  Okay.  Now, staying on fingerprints for a moment,

9  Mr. Fine asked you if it's typical for you to process the

10  scene as a whole for fingerprints.  Do you recall that?

11  A.  Yes.

12  Q.  And I think you said that it's not common for you to

13  dust the scene of a crime for fingerprints.  Is that true?

14  A.  No.

15  Q.  Okay.  So explain to me that again.  How does that

16  decision get made, whether or not you dust the scene for

17  fingerprints?

18  A.  So the majority of the time we're dusting a scene for

19  fingerprints will be something like a burglary call where

20  someone has broken in and we want to see if someone might

21  have not been wearing gloves and touched items in the house

22  maybe where they broke in or things that we know that they

23  handled, in regards to a burglary.

24         When it comes to larger scenes, we would have to

25  have a lot of suspicious circumstances needed; and we would

1    need to know that we're looking for someone who wasn't

2    present or find out who was at a scene.  So if we know who

3    is at a scene, we don't necessarily have to do that.

4           We expect Seegan's prints to be on stuff because

5    he lives there and the family.  So it was determined that

6    we would -- we didn't need to fingerprint anything at the

7    scene.

8    Q.  Who ultimately is responsible for making that decision?

9    A.  So the primary investigator -- crime scene investigator

10   discusses with the primary detective.  The primary

11   detective on scene was Detective Lauryl Duncan, so they

12   would have talked about that together and come to a

13   conclusion.

14   Q.  And so would that have been Crime Scene Investigator

15   Bell?

16   A.  Yes.

17   Q.  And you said Detective Lauryl Duncan?

18   A.  That's correct.

19   Q.  And they would have discussed whether or not it was

20   necessary to fingerprint any areas of the home, correct?

21   A.  They would discuss what items they want collected --

22   when we're talking a full crime scene, we have the

23   capability of looking for DNA.  We could spend hours going

24   through the carpets, going through every object looking for

25   DNA, trace particles of fibers.  It really depends on what

1   we deem is necessary for the crime scene as to what

2   techniques we'll use.  Only on something that we know is a

3   murder scene will we, you know, spend eight hours combing

4   through every fiber of the carpet.

5   Q.  And I think what you said a moment ago was that a big

6   determining factor in that decision is whether or not you

7   think there had been somebody in the scene that needed to

8   be identified.  Is that true?

9   A.  When we're looking for fingerprints, that would be the

10  purpose of it, yes, trying to identify someone.

11  Q.  Now, you recall Mr. Fine asking you about some Ring

12  camera footage, correct?

13  A.  Yes.

14  Q.  And you --

15  A.  It was Nest video footage.

16  Q.  Nest, okay.

17       And that was video camera footage that you

18  reviewed there at the scene, correct?

19  A.  I did.

20  Q.  And did Detective Duncan view that video?

21  A.  I remember that night we were looking at someone -- a

22  phone.  I believe it was Seegan's phone.  And there were a

23  lot of us standing around watching that.

24       As she was the primary detective, my assumption is

25  that she probably viewed that as well; but I don't recall

 1    who all was standing around watching it.

 2    Q.  And in those videos you said that you saw a man coming

 3    in and leaving the home, correct?

 4    A.  Yes.

 5    Q.  At that point in the investigation, had that individual

 6    been identified?

 7    A.  I'm not aware that that individual had been identified.

 8    Q.  Now, is a doorknob something that you would be able to

 9    get fingerprints off of?

10    A.  In TV shows you can get fingerprints off of lots of

11    surfaces.  In real life most door handles have a matte

12    finish.  The reason is so that you don't leave

13    fingerprints, because most people don't want fingerprints

14    on all of your stuff.  So I rarely find usable fingerprints

15    on door handles.

16    Q.  What about the wooden area of a door above or beyond --

17    above or below where the door is when somebody's opening or

18    closing it?

19    A.  Doors are another surface that I rarely am able to, at

20    least in my experience, get fingerprints from.

21    Q.  You said that the back doors of Mr. Seegan's home were

22    unlocked, correct?

23    A.  Correct.

24    Q.  Was there any attempt made to look for fingerprints on

25    either of those back doors?

1   A.  Not that I'm aware of.

2   Q.  Going back quickly to the Nest videos, okay, you said

3   you saw those videos on Mr. Seegan's phone?

4   A.  I believe so.

5   Q.  Was the phone unlocked and you were able to just open

6   up the application?

7   A.  If my understanding is correct, I recall that there was

8   a cell phone and an iPad present in that office.  I believe

9   the officers and detectives worked together with Seegan's

10  wife to make sure we had access to the phone and then were

11  able to view what information was present on it.

12  Q.  And so when you were looking through the videos, did

13  you look through all of the different camera feeds or just

14  the doorbell camera?

15  A.  I only watched what was presented to me.  I never

16  handled the phone personally.

17          But I do recall an officer or detective calling us

18  over and viewing that footage on a cell phone.

19  Q.  Now, Mr. Seegan had multiple cameras inside of his

20  home, correct?

21  A.  I don't know that answer.

22  Q.  So you're not aware if there was a camera in the

23  kitchen?

24  A.  I only know that there was one in the garage and the

25  front.

Jury Trial, Volume 4                                925

1  Q.  Okay.  And you aren't aware that there was one in the

2  living room?

3  A.  Not to my knowledge.

4  Q.  Okay.

5          MR. SANDEL:  If we could pull up Government's

6  Exhibit 79, page 1, please.

7  BY MR. SANDEL:

8  Q.  Okay.  You recall looking at this picture, correct?

9  A.  Yes.

10  Q.  Okay.  Now, looking at the front of the home, do you

11  know which of these front window rooms is the office?

12  A.  Yes.

13  Q.  Okay.  Could you point that out to the jury.

14  A.  It is the one with the lamp on.  It's the northwest

15  upstairs room.

16  Q.  Okay.  So that's the office?

17  A.  It is.

18  Q.  One thing I don't see here is the garage.  Where is the

19  garage in this home?

20  A.  It's located on the back half of the house.

21  Q.  So for those of us less familiar with Carrollton, is

22  this one of the neighborhoods where the houses have

23  rear-facing garages and there is an alleyway that runs

24  between the rows of houses?

25  A.  I don't know.

1    Q.  Okay.  But in this case the garage was on the back of

2    the house, correct?

3    A.  I do know that.

4    Q.  So coming in, is this -- where basically the

5    photographer is standing, is this Cannes Drive?

6    A.  This is Cannes Drive.

7    Q.  Okay.  So to access the garage, you have to go back to

8    the alleyway to pull into the garage, correct?

9    A.  I would assume that there is an alleyway to access the

10   back.

11   Q.  Now, the back door that you said was unlocked, is that

12   also on that rear of the house?

13   A.  Yes.

14   Q.  Do you recall in that back alleyway, does the, for lack

15   of a better word, across-the-street neighbor -- does their

16   garage face Mr. Seegan's garage?

17   A.  My responsibilities on scene were to check the

18   perimeter for any signs of forced entry; so my attention

19   was on every single window on the first floor, every single

20   door and access point.  I didn't spend any time looking at

21   any other houses around the area.

22   Q.  So you just don't know one way or the other?

23   A.  I never viewed the houses around Seegan's house.

24          MR. SANDEL:  Thank you, ma'am.  We can pull that

25   down.

BY MR. SANDEL:

Q.  You talked a little bit about how blood reacts once it's outside the body.

     Do you recall that part of your testimony?

A.  I don't know if I would use "reacts," but how blood interacts with surfaces.

Q.  Okay.  Well, specifically, you were saying that after a certain amount of time, blood will coagulate.

A.  Yes.

Q.  Okay.  Do you have any knowledge or understanding of how long that process takes?

A.  It's very dependent on a lot of factors.

Q.  Okay.

A.  The temperature inside the room, if it's a fast -- it will begin to separate and coagulate faster in hot temperatures; whereas in colder temperatures, it can stay together a lot longer.  It depends on surfaces and what's in the bloodstream.

     So it's very individual, but there is guesses that can be made.

Q.  And is that -- did you do any of those calculations or anything like that during your work on this case?

A.  I did no calculations on this case.

Q.  Okay.  So on direct examination you said that when you were reviewing the scene, as far as you could tell, the

 1  blood pool had not yet begun to coagulate; is that fair?

 2  A.  The blood pool had started to separate.

 3  Q.  Okay.

 4  A.  The serum had started to flow out of the main pool of

 5  blood, and there were certainly chunks in the middle

 6  section.  I didn't poke or prod those chunks, but my

 7  assumption was that they were brain matter.  I'm not sure

 8  if any of those chunks could have been coagulation, but I'm

 9  sure there's a lot of things present.

10  Q.  Are calculations like that -- could they be useful in

11  determining time of death?

12  A.  It's possible.  Again, there is a lot of external

13  factors.  We need to know what's in the bloodstream, what

14  his body is like.  We'd need to know the temperature.

15  There is a lot that an expert would have to take into

16  account.

17  Q.  But it's a calculation that's possible, correct?

18  A.  I -- I think that there is -- someone could make an

19  opinion on it.  I don't think there would be any kind of

20  hard science to say exactly the time of death, but

21  someone -- an expert could make an opinion on it.

22  Q.  Now, in terms of those variables that you spoke of that

23  would need to be known, one of them is temperature of the

24  room, right?

25  A.  Yes.

1    Q.  And this happened indoors, correct?

2    A.  What happened indoors?

3    Q.  This -- where James Seegan died.  He was inside,

4    correct?

5    A.  Yes.

6    Q.  Okay.  So this scene was indoors, right?

7    A.  Yes.

8    Q.  And the temperature was controlled by the HVAC unit,

9    correct?

10   A.  Yes.

11   Q.  So that would be a variable that we could find an

12   answer to, correct?

13   A.  It was 74 degrees Fahrenheit.

14   Q.  74 degrees.

15        In terms of what was in Mr. Seegan's body, again,

16   that's a variable that we could find an answer to, correct?

17   A.  It's possible.

18   Q.  Okay.  And as far as you know -- and I know that your

19   role in this investigation was limited.  But as far as you

20   know, nobody did those types of calculations here, correct?

21   A.  A bloodstain pattern analyst wasn't called out to the

22   scene.

23        MR. SANDEL:  If we could pull up Government's 79,

24   page 13.

25                              *

 1  BY MR. SANDEL:

 2  Q.  Okay.  Investigator Powell, this is a shot from inside

 3  the office; is that correct?

 4  A.  It is.

 5  Q.  All right.  Now, if you know, if we look here, do you

 6  know if that is the stand where Mr. Seegan's phone was

 7  located?

 8  A.  I believe so.

 9        MR. SANDEL:  Thank you, ma'am.  We can pull that

10  down.

11  BY MR. SANDEL:

12  Q.  When you were at the scene, did you have any

13  conversations with the medical examiner?

14  A.  I left the scene as the medical examiner arrived.

15  Q.  What about Investigator Bell?  Was she still there when

16  you left?

17  A.  Investigator Bell was still there when I left.

18  Q.  Would it be standard for the crime scene investigator

19  to discuss his findings with the medical examiner when they

20  arrive on scene?

21  A.  Yes.

22  Q.  Do you -- and you may not.  Do you have any idea if

23  Investigator Bell did that in this case?

24  A.  I wasn't there.

25  Q.  Okay.  But that is something that would be typical of

1  how you would operate in a situation like this?

2  A.  Yes.

3  Q.  Now, the chief investigator, you said that was

4  Detective Duncan, right?

5  A.  She was the primary investigator.

6  Q.  The primary investigator was Investigator Duncan.

7         Would it also be typical for the crime scene

8  investigator to give a rundown to Detective Duncan of all

9  of the things they have observed and found?

10 A.  They would have been working heavily together at the

11 scene.

12 Q.  So safe to say that any information that you or

13 Investigator Bell had would have been given to Detective

14 Duncan, correct?

15 A.  Not on scene necessarily.

16 Q.  Okay.  But there would be an ongoing communication on

17 the scene between Detective Duncan and Investigator Bell?

18 A.  Usually, yes.

19        It's possible that the investigator could be busy

20 getting witness statements or doing something else and not

21 be available or that the crime scene investigator may be

22 busy taking photographs.  So that readily sharing of

23 information isn't always possible, but the attempt is made

24 to share information.

25 Q.  One of the other things that I recall you testifying

1   about was a telephone conversation that happened while you

2   were riding with Detective Vazquez.

3           Do you remember that?

4   A.  Yes.

5   Q.  And you testified that while you were in the car,

6   Mr. Ashley called Detective Vazquez to give Detective

7   Vazquez some information, correct?

8   A.  Yes.

9   Q.  Do you recall when that happened?

10  A.  Yes.

11  Q.  When was that?

12  A.  So I left the scene when the medical examiner arrived.

13  At that point Kelsey Bell would have continued the

14  investigation.  I got off work at 7:00.  And so after I had

15  been there for a while, myself and Detective Vazquez left

16  the scene.  So that would have been still during the

17  investigation.

18          I arrived at 6:21 p.m.  I don't -- I don't know

19  for sure the exact time I left the scene, but I would guess

20  that it was probably an hour later.  It could have been an

21  hour and a half later; but that would have been 7:30, maybe

22  8:00.  But while the investigation was still going on at

23  the scene is when the phone call occurred.

24  Q.  And by this point Mr. Ashley had already been contacted

25  by Carrollton PD, correct?

1  A.  He had been contacted by Detective Duncan.

2  Q.  Okay.  So a detective calls Mr. Ashley and informs him

3  what's going on, correct?

4  A.  That's what happened, yes.

5  Q.  And then sometime later Mr. Ashley calls Detective

6  Vazquez to give -- and I apologize.  Is Detective Vazquez

7  male or female?

8  A.  Male.

9  Q.  Male.

10        So he calls Detective Vazquez to give him some

11  more information that he feels is pertinent, correct?

12  A.  Yes.

13        My best guess is that Detective Vazquez's phone

14  had been used when Duncan called Keith Ashley and that then

15  Keith Ashley responded to the same phone number, resulting

16  in him calling Detective Vazquez.

17  Q.  Because there is no other way he would have Detective

18  Vazquez's phone number, correct?

19  A.  Correct.

20  Q.  Now, were you aware or were you ever made aware of what

21  kind of relationship Mr. Ashley had with Mr. Seegan?

22  A.  Keith Ashley's name is in the suicide note; and so his

23  name was definitely one used on scene to determine who this

24  person is, you know, if he is listed in the suicide note.

25  There was definitely a determination on who is this person,

1  yes, on scene.

2  Q.  So it was clear that there was a relationship there,

3  correct?

4  A.  His name was in the suicide note.

5  Q.  Are you aware of the relationship between Mr. Ashley

6  and Mr. Seegan's nephew, Kerby Keller?

7  A.  I don't know of that nephew.

8  Q.  So when Mr. Ashley calls Detective Vazquez and he's

9  providing Detective Vazquez with this -- what he feels is

10  relevant information, was it discussed where he learned

11  about those items?

12  A.  He would say "I just found this out" or "I just heard

13  this," meaning that he didn't know the information prior

14  to.

15          And he would say "I just found this out," "I just

16  heard this information," and then would state a statement

17  that I'd seen in the suicide note.

18  Q.  So it stands to reason that Mr. Ashley is speaking to

19  somebody, learning information, and then wanting to pass

20  that information along to Detective Vazquez, correct?

21  A.  It's not necessarily that he is talking to someone.  He

22  certainly wants to tell us that he is.

23  Q.  Okay.  But it's a reasonable interpretation that that's

24  what's going on.  Wouldn't you say that's fair?

25  A.  It's coming across -- his words are communicating that

 1  he's learning information from someone else, whether or not

 2  that's true or not.

 3  Q.  Now, when you were in Detective Vazquez's patrol car --

 4  it was a patrol car, correct?

 5  A.  I don't know.  Our detectives drive detective vehicles.

 6  My best guess is that it was a detective vehicle and not a

 7  patrol car.

 8  Q.  Do you know if Detective Vazquez was wearing a body

 9  camera during that car ride?

10  A.  I know that he had a body camera and that was not on.

11  Q.  It was not turned on?

12  A.  That's correct.

13  Q.  Okay.  Before Detective Vazquez answered that phone

14  call from Mr. Ashley, was he able to determine from the

15  caller ID who was calling?

16  A.  I don't believe so.

17  Q.  When Detective Vazquez answered the phone, did

18  Mr. Ashley identify himself pretty immediately?

19  A.  Yes.

20  Q.  So at the very beginning of that phone call, Detective

21  Vazquez knew he was speaking to somebody that was relevant

22  to this investigation, correct?

23  A.  Detective Vazquez was actively driving while it was

24  raining.

25  Q.  Okay.

```
 1  A.  And he got a random phone number -- phone call and

 2  answered it and then was presented with the information

 3  that this is Keith Ashley.

 4  Q.  Investigator Powell, thank you.

 5          MR. SANDEL:  I'll pass the witness, your Honor.

 6          THE COURT:  Additional questions?

 7          MR. FINE:  None from the government, your Honor.

 8          THE COURT:  Can the witness be fully excused?

 9          MR. FINE:  Yes, your Honor.

10          MR. SANDEL:  Yes, your Honor.

11          THE COURT:  Sir, you are free to leave.  Thank

12  you.

13          THE WITNESS:  Thank you.

14          THE COURT:  Let me ask -- let me have counsel

15  approach.

16          (Sidebar conference, off the record.)

17          THE COURT:  Okay.  Ladies and gentlemen, we're

18  going to go until about 12:30 and just finish another

19  witness and take lunch a little bit later.  Sorry.  I know

20  the alarm has -- I was going to give you a longer lunch

21  today; but because of the alarm, we got delayed a little

22  bit.  I apologize for that.

23          So, government, if you will call your next

24  witness.

25          MS. RATTAN:  Thank you, your Honor.  The United
```

```
 1   States calls Detective Andrew Withers.

 2           THE COURT:  Sir, if you'll raise your right hand

 3   to be sworn in.

 4           (The oath is administered to the witness.)

 5           THE COURT:  Go ahead and proceed.

 6           MS. RATTAN:  Thank you, your Honor.

 7               DIRECT EXAMINATION OF ANDREW WITHERS

 8               CALLED ON BEHALF OF THE GOVERNMENT

 9   BY MS. RATTAN:

10   Q.  Please state your name.

11   A.  My name is Andrew, A-N-D-R-E-W, Withers, W-I-T-H-E-R-S.

12   Q.  And where do you work?

13   A.  The Carrollton Police Department.

14   Q.  What do you do there?

15   A.  A lot of things, but one of my duties is a detective.

16   I do digital forensics.

17   Q.  And your voice kind of trails.  Can you speak directly

18   into the microphone?

19   A.  Okay.

20   Q.  The acoustics in here are very hard.

21   A.  I apologize.

22   Q.  Okay.  So your duties at the Carrollton Police

23   Department?

24   A.  I do digital forensics, amongst other things.

25   Q.  And when you say "digital forensics," what is that?
```

1  A.  So I analyze phones, data from phones, data from

2  computers, obtain data from computers.  I do some video

3  forensic work as well.

4  Q.  And can you describe for the jury what your education

5  is?  What's your background?

6  A.  So I have a bachelor's of science in computer science

7  from The University of Texas at Dallas.

8  Q.  And then how long have you been with the Carrollton

9  Police Department?

10  A.  I was hired in July 7th of 2004.

11  Q.  And then what specialized training do you have in the

12  analysis of cell phones, computers, the investigations that

13  you're involved in?

14  A.  So in 2017 I went to a Cellebrite class for a

15  Cellebrite certification at the company in equipment that

16  extracts data from cell phones and also teaches you how to,

17  like, parse the data or determine what data is on the

18  phones.

19         I've also been to a class hosted by the NCFI, the

20  Secret Service -- effectively a sponsored program for

21  digital evidence recovery from computers.

22         And I've been to other classes as well.

23  Q.  And in this case were you involved in the downloads of

24  the phones and computers?

25  A.  Most of them, yes.

1   Q.  Maybe not every single one of them, but you played a

2   large role in supporting the lead detectives in downloading

3   the phones and computers; is that right?

4   A.  Yes, ma'am.

5   Q.  And, of course, this case would be *United States versus*

6   *Keith Ashley*; is that right?

7   A.  That's correct.

8   Q.  So the victim was James Seegan.

9   A.  Yes, ma'am.

10  Q.  Were you asked to download James Seegan's phone?

11  A.  Yes, ma'am.

12          Carrollton Detective Duncan requested that I

13  obtain data from the deceased's phone and then later the

14  computer.

15  Q.  And then you used a forensic tool to do a download from

16  James Seegan's phone.  What was that?

17  A.  So I used Cellebrite.  There is a technique that

18  allowed a full file system or effectively the -- most of

19  the data off the phone.  So I used that technique and

20  obtained a full file system download of that phone.

21  Q.  And then before you came into court today, you

22  identified Government's Exhibits 91A and B as being the

23  download of the victim James Seegan's phone; is that right?

24  A.  Yes.  It's the report of the data on the phone, yes,

25  ma'am.

1          MS. RATTAN:  Your Honor, we'll offer Government's

2   Exhibits 91A and B.

3          MR. SANDEL:  No objection, your Honor.

4          THE COURT:  Okay.  91A will be fully -- will be

5   admitted.  91B had been conditionally admitted before, and

6   I will fully admit it now.

7   BY MS. RATTAN:

8   Q.  And were you able to review the phone for -- to

9   determine the last call that was answered on the phone,

10  James Seegan's phone?

11  A.  Yes.

12  Q.  And, in fact, there's a photograph of that as well; is

13  that right?

14  A.  Yes, ma'am.

15         MS. RATTAN:  Your Honor, may we publish

16  Government's Exhibit 79, page 46?

17         THE COURT:  Yes, you may.

18         Let's see.  Government's Exhibit 79, page 46.

19  BY MS. RATTAN:

20  Q.  I ask you to look at that and tell us if that is part

21  of the download of the victim James Seegan's phone?

22  A.  Yes.  That's the photograph of the phone, which

23  corresponds to the information that I was able to obtain

24  from it.

25  Q.  And then here we have, at 9:42 a.m., the last call; is

1    that right?

2    A.  Yes.

3    Q.  Now, there's multiple calls after that, 11:08, 3:39,

4    3:53.  But the last answered incoming call was at

5    9:42 a.m.; is that correct?

6    A.  That's correct.

7    Q.  And then there was also analysis done of the last step

8    logged on James Seegan's phone; is that right?

9    A.  Yes, ma'am.  Apple will -- Apple iPhones will log what

10   they believe is the person's activity because of the phone

11   movement, and it was able to -- Cellebrite was able to pull

12   that data from the phone and then analyze that data to show

13   the activity.

14          MS. RATTAN:  May I approach the witness?

15          THE COURT:  Yes, you may.

16   BY MS. RATTAN:

17   Q.  Let me show you this.  And the date is February 19th of

18   2020 that we're focused on.

19          And let me ask you if this is accurate.

20   A.  Yes, ma'am.  That appears accurate to me.

21   Q.  Okay.  So on February 19th of 2020 at 9:33:44 a.m.,

22   James Seegan's last step was logged on his phone?

23   A.  Correct.

24   Q.  And at 9:42 a.m. a final call was answered on James

25   Seegan's phone?

```
 1  A.  Yes, ma'am.

 2          MS. RATTAN:  May I return, your Honor?

 3          THE COURT:  Yes.

 4  BY MS. RATTAN:

 5  Q.  Now, did you also do a forensic evaluation or download

 6  of Keith Ashley's phone?

 7  A.  Yes, ma'am.

 8  Q.  And have you reviewed those exhibits before coming to

 9  court today?

10  A.  Yes, ma'am.

11  Q.  And those would be Government's Exhibits 25A and B, 26,

12  27A and B, and 28A and B; is that right?

13  A.  I thought it was 125.

14  Q.  Oh, I may have misspoken.

15          125A and B --

16  A.  Yes, ma'am.

17  Q.  -- 126, 127A and B, 128A and B.

18  A.  Yes, ma'am.

19  Q.  Okay.  Thank you.

20          MS. RATTAN:  Your Honor, we'll offer those

21  exhibits.

22          MR. SANDEL:  Your Honor, we would object

23  consistent with Document 102.

24          THE COURT:  Okay.  Anything, Ms. Rattan, in

25  response?
```

```
 1              MS. RATTAN:  I'm not certain what the objection

 2   is, your Honor.

 3              THE COURT:  I'm not either.

 4              MR. SANDEL:  May we approach, your Honor?

 5              THE COURT:  Yes.

 6              (Sidebar conference, off the record.)

 7              THE COURT:  The objection will be overruled.  I'll

 8   go ahead and admit 125A and B, 126, and 127A and B, and

 9   then 128A and B as well.

10              Did I do that all right, Ms. Rattan?

11              MS. RATTAN:  Yes, your Honor.  Thank you.

12              THE COURT:  Go ahead and proceed.

13              MS. RATTAN:  Okay.  Thank you.

14   BY MS. RATTAN:

15   Q.  So we've talked about the victim, James Seegan, and

16   your download of his phone and then Keith Ashley and your

17   download of his phone.

18              Let's go back to James Seegan.  Did you do some

19   forensic analysis in relation to James Seegan's computers?

20   A.  Yes, I did.  Again, Detective Duncan requested that I

21   analyze his cell phone and then also some computers from

22   Mr. Seegan's residence.

23   Q.  And then before coming to court today, did you look at

24   Government's Exhibit Number 88; and is that the computer

25   download of James Seegan's computer?
```

1  A.  It is documents that were found on Mr. Seegan's

2  computer, or copies of documents that were found.

3  Q.  And you were able to forensically retrieve them, and

4  now they are on Government's Exhibit Number 88?

5  A.  Yes, ma'am.

6  Q.  And Government's Exhibit 88 represents the items from

7  James Seegan's computer?

8  A.  Yes, ma'am.

9        MS. RATTAN:  We'll offer Government's Exhibit 88,

10 your Honor.

11       MR. SANDEL:  No objection, your Honor.

12       THE COURT:  Okay.  88 will be admitted.

13 BY MS. RATTAN:

14 Q.  Did you also focus on James Seegan's computer and

15 printer?

16 A.  To a certain extent.  I was analyzing the computer to

17 see if anything was printed from it.  I didn't analyze the

18 printer itself.  I don't have the technical knowledge to do

19 that.

20 Q.  So you looked at the computer, and you were trying to

21 determine whether anything had been printed from the

22 computer?

23 A.  Correct.

24 Q.  And were you able to tell whether on the morning or

25 during the day of February 19th of 2020 anything had been

1   printed using that computer?

2   A.  I did.  The Apple OS will log print jobs; and in

3   multiple places I was able to locate artifacts that would

4   indicate that the computer sent a print to a Canon printer,

5   I believe -- a print job to a Canon printer.

6   Q.  And what were you able to conclude, if anything, in

7   terms of a time that there was a print job in relation to

8   the computer that was in James Seegan's office?

9   A.  So it would have been at 10:17 a.m., that morning.

10  Q.  So at 10:17 a.m. on February 19th of 2020, based on

11  your analysis, what happened?

12  A.  A print job from that computer originating from the

13  program Microsoft Word printed a document that was named --

14  I believe it was "Microsoft Word-Document 1" -- at that

15  time.

16  Q.  Were you ever able to find Document 1 which appeared to

17  be what was presented at 10:17 a.m.?

18  A.  No.  I was able to locate evidence that Microsoft Word

19  was opened and was basically the focus of that computer,

20  but I was never able to find the actual document.

21  Q.  And did you try to locate a suicide note on James

22  Seegan's computer?

23  A.  I did.

24  Q.  And were you able to find a suicide note on James

25  Seegan's computer?

 1  A.  No, I was not.

 2          MS. RATTAN:  May I approach the witness, your

 3  Honor?

 4          THE COURT:  Yes.

 5  BY MS. RATTAN:

 6  Q.  Okay.  So we're talking about Mr. Seegan's study there

 7  and his computer in his study; and it's February 19th of

 8  2020 at 10:17 a.m., a document was printed at James

 9  Seegan's home.

10  A.  That is accurate.

11          MS. RATTAN:  May I return?

12          THE COURT:  Yes.

13          MS. RATTAN:  Thank you, your Honor.  I'll pass the

14  witness.

15          THE COURT:  Cross-examination?

16          <u>CROSS-EXAMINATION OF ANDREW WITHERS</u>

17  BY MR. SANDEL:

18  Q.  Officer Withers, good morning.  How are you?

19  A.  Doing well.  Yourself?

20  Q.  Pretty good.

21          Just a couple of questions for you.  In discussing

22  Government's Exhibit 88, I believe you said that that was

23  an image of certain documents from Mr. Seegan's computer?

24  Did I hear that correctly?

25  A.  So that was -- sort of.

1          So that wasn't all the documents from that

2    computer.  That was a segment of documents that I

3    identified when I was examining the computer and exported

4    out for, at the time, Detective Duncan to look at.

5    Q.  So Exhibit 88 is not a complete image of everything

6    that was on that computer, correct?

7    A.  That is correct.

8    Q.  Now, you talked about a document that was seemingly

9    printed from that computer at around 10:17 a.m., correct?

10   A.  That's correct.

11   Q.  Now, where did that 10:17 time come from?

12   A.  So it comes from two places.  One was the file -- so

13   there is a CUPS file that's created, which is a -- it's

14   like a service that is run to print jobs in Apple and UNIX

15   and Linux operating systems.  And that file create time was

16   10:17 if we take into account UTC offsets.

17          And then there is also a log file that logs the

18   CUPS activity that came from there as well, and those times

19   match up.

20   Q.  And when I'm on a computer and I hit "print," does that

21   CUPS file get created immediately; or does it only get

22   created when the printer has accepted the print job?

23   A.  So actually the file is created when the job is

24   initiated.  The log file actually will show job creation,

25   and then there is like three sets -- job creation and I

1  think it returns back that it was created and sent okay.

2  And they were, I think, the exact same second.

3  Q.  And you said that when you're kind of doing that math,

4  you have to calculate for UTC offset and --

5  A.  Correct.

6  Q.  -- that sort of thing?

7  A.  Yes, sir.

8  Q.  Okay.  How long has the Cellebrite technology been

9  available for the forensic imaging of cell phones?

10  A.  Oh, as long -- I know longer than I have been doing it,

11  which is in 2017.  I don't know the exact date when it

12  started.

13  Q.  And when you do a Cellebrite download of a cell phone,

14  it's a complete image of everything that's on that phone,

15  correct?

16  A.  So -- I won't say that.

17  Q.  Okay.

18  A.  I will say both the victim's -- or the deceased's and

19  the defendant's images were file system downloads, which

20  means it should contain -- or does contain, I think is

21  probably a better way, all of the known files on that -- on

22  the known -- I'm trying to figure out a way to word this.

23          Like if you were looking at a computer and you see

24  your C drive, it's going to have all of those.  It may not

25  have some of the background information, the background

1  files that allow the firmware of the phone; and it doesn't

2  have empty space on the phone because of the way it works.

3          So there are phones and devices that we can get

4  like a computer where we can get that empty space, but it's

5  not technically everything on -- every bit on a storage

6  device.

7  Q.  And you talked with Ms. Rattan about an Apple iPhone

8  logging step activity.  Do you recall that?

9  A.  I do.

10  Q.  Now, the step activity is logged through the cell

11  phone's gyroscope, correct?

12  A.  Yes, effectively.

13  Q.  So in order for that activity to be logged, somebody

14  has to be carrying their phone with them, correct?

15  A.  Yes.

16  Q.  So if my phone is over on counsel table, it's not

17  logging my steps right now, correct?

18  A.  Correct, unless you have an Apple Watch, but yes.

19          MR. SANDEL:  Pass the witness, your Honor.

20          THE COURT:  Anything additional?

21          MS. RATTAN:  No, your Honor.

22          THE COURT:  Can this witness be fully excused?

23          MS. RATTAN:  Yes, please.

24          MR. SANDEL:  Yes, your Honor.

25          THE COURT:  Thank you, sir.  You are free to

 1   leave.

 2           We'll go ahead and take our lunch break now.

 3   We'll go a little bit longer.

 4           And then let me just advise I've been informed

 5   regarding the issue with the fire alarm being set off.

 6   Someone apparently was vaping in the elevator.

 7           One thing is, smoking and vaping is not permitted

 8   in the courthouse; and if vaping devices are found, the

 9   court security officers will confiscate those or make you

10   take them and put them back in your vehicle.

11           So that's what has been explained to us is what

12   set the alarm off.  We knew it was elevator-generated, but

13   that's what we were able to determine.  So I just wanted to

14   apprise everyone of what caused that situation.  It is not

15   the first time we've had someone try to smuggle vaping

16   things into the courthouse; but, again, it is not

17   permissible.

18           So I hope you have a good lunch.  We'll go ahead

19   and come back at 1:30, again, because I have a conference

20   call from 1:00 to 1:30 for something unrelated to this

21   case.

22           So please don't discuss the case among yourself or

23   anyone else.  Don't do any outside research.  We'll start

24   back at 1:30.  Have a good lunch.

25               (The jury exits the courtroom, 12:16 p.m.)

 1          THE COURT:  Anything further from the government?

 2          MS. RATTAN:  No, your Honor.

 3          THE COURT:  Anything further from defense?

 4          MR. SANDEL:  No, your Honor.

 5          THE COURT:  Okay.  See you back at 1:30.

 6          (Recess, 12:17 p.m. to 1:32 p.m.)

 7          (Open court, defendant present, jury present.)

 8          THE COURT:  Okay.  Please be seated.

 9          Your next witness?

10          MR. COMBS:  The government calls Special Agent

11   Mark Sedwick.

12          THE COURT:  Sir, if you'll raise your right hand

13   to be sworn in.

14          (The oath is administered to the witness.)

15          MR. COMBS:  May I proceed, your Honor?

16          THE COURT:  Yes, you may.

17          MR. COMBS:  Thank you.

18                DIRECT EXAMINATION OF MARK SEDWICK

19                CALLED ON BEHALF OF THE GOVERNMENT

20   BY MR. COMBS:

21   Q.  Sir, could you please state your name and spell your

22   last name.

23   A.  Mark Sedwick, S-E-D-W-I-C-K.

24   Q.  And where are you employed?

25   A.  I'm a special agent with the Federal Bureau of

```
 1    Investigation in the Dallas office.
 2    Q.  How long have you been with the FBI, Special Agent
 3    Sedwick?
 4    A.  Over 24 years.
 5    Q.  Tell us -- why don't you tell the jury about your
 6    education before you came to the FBI.
 7    A.  I have a Bachelor of Science in history from the United
 8    States Naval Academy.
 9    Q.  And so you were Naval Academy.  Did you go into the
10    Navy or the Marine Corps?
11    A.  I was in the Marine Corps for five years as an
12    artillery officer.
13    Q.  So after your time in the Marine Corps, what did you
14    do?
15    A.  That's when I came into the Bureau.
16    Q.  So did you come into the Bureau as a special agent?
17    A.  Yes, sir.
18    Q.  Tell the members of the jury what training you had when
19    you became a special agent.
20    A.  Had the academy at Quantico which covers pretty much
21    everything to be a basic agent.
22         Then I was assigned to the Houston office where I
23    worked illegal narcotics and then -- for several years,
24    spent a small stint in counterterrorism, then started
25    working violent crime in Houston.
```

1              Then I transferred -- in 2012 I transferred to the

2    Dallas office, worked public corruption for about a year,

3    then went back to work in violent crime, and then

4    started -- in 2014 I became a member of the CAST team and

5    started doing that full-time.

6    Q.  You said a CAST unit.  What is -- is that an acronym?

7    A.  Yes, sir.

8    Q.  What does it stand for?

9    A.  The CAST team is the Cellular Analysis Survey Team.

10   Q.  And what does the CAST team do?

11   A.  What the CAST team is is a group of specially trained

12   agents and task force officers who have been certified as

13   experts in the analysis of historical call detail records.

14   Q.  So what type of cases does the CAST teamwork on?

15   A.  Our priorities are first any threat to life, as in

16   kidnapping, missing persons.  We do a lot of fugitive

17   investigations.

18              And then we'll work any Bureau cases; but the CAST

19   unit was actually created to assist state and local

20   agencies in homicide investigations, violent crime, stuff

21   like that.

22   Q.  So when we receive Amber alerts on our phones, those of

23   us in the courtroom, are you on the other end of -- the

24   important end of trying to determine where that person is

25   sometimes?

1   A.   That's what -- one of the biggest things we do as a

2   CAST unit is we will use our skills to locate that victim.

3   Q.   Okay.  And have you had success in doing that, in

4   rescuing people in the past?

5   A.   Yes, sir.

6   Q.   You said the other side of that was part of the

7   investigative side, right?  So you have a reactive side you

8   just talked about, and then there is the investigative

9   side.  Tell the members of the jury what the investigative

10  side is.

11  A.   It will vary by case, but I tend to -- actually most of

12  my work tends to be for state or local cases.  So I will be

13  contacted either through -- by a detective, a assistant

14  district attorney, or just through the CAST unit itself and

15  be asked if I can assist in a case.

16          And I'll be given the call detail records, the

17  phone records for certain devices and then the basics of

18  the investigation.  I don't need to know the full -- what

19  everything is; but I need to know the pertinent time

20  frames, the pertinent phones, the pertinent locations so I

21  can determine the approximate location of phones or devices

22  during those pertinent time frames.

23  Q.   And you have tools that help you do that, right?

24  A.   Yes, sir.

25  Q.   What are the tools that you use?

1  A.  We just use a -- we use different mapping softwares.

2  When I first started, we did it pretty much by hand in what

3  was called Streets & Trips; and now we just have more

4  robust mapping software to assist us.

5        But I just use mapping software to take the towers

6  and then the usage of the devices to show physically on the

7  ground the approximate location of those devices.

8  Q.  Do you use typically the phone download, the download

9  of a phone; or do you use a different source of data?

10 A.  No.  What we use it what's referred to as call detail

11 records, or CDRs; and these are records that are kept in

12 the normal course of business by the phone company.

13       And what a CDR is is basically your phone bill.

14 It has the date and time a call or text was made, if it was

15 an incoming/outgoing call, the two numbers involved, the

16 length of the call.  But for me most importantly, it gives

17 me the tower and sector of the tower that the -- that

18 device utilized for that call.

19       Based on that data and the ensuing network -- like

20 for AT&T, knowing where that tower is and all of the

21 surrounding towers are, I can determine the approximate

22 location that device had to be when that call or text

23 occurred.

24 Q.  With this specialized skill that you have, are you

25 frequently called upon to testify?

```
 1   A.  Yes, sir.

 2   Q.  Have you testified as an expert before?

 3   A.  Yes, sir.

 4   Q.  How many times?

 5   A.  Over 90 times in both state and federal court.

 6          MR. COMBS:  Your Honor, the government would move

 7   to admit Special Agent Sedwick as an expert in historical

 8   call detail record analysis.

 9          MR. SANDEL:  No objection, your Honor.

10          THE COURT:  Okay.  He'll be treated as such.

11          MR. COMBS:  Thank you.

12   BY MR. COMBS:

13   Q.  Sir, as a part of your investigation of this case --

14   that is, the case that's involving Keith Todd Ashley --

15   were you called upon to review certain records?

16   A.  Yes, sir.

17          I was provided AT&T records for a device that I

18   was told was associated with Mr. Ashley.

19   Q.  All right.

20          MR. COMBS:  May I approach the witness, your

21   Honor?

22          THE COURT:  Yes, you may.

23   BY MR. COMBS:

24   Q.  Sir, I'm showing you what's been marked as Government's

25   Exhibit 4A, which is a disk, and then 4B, which are already
```

 1   in evidence.

 2            Are those some of the call detail records that you

 3   were asked to evaluate in this case?

 4   A.  Yes, sir.

 5   Q.  All right.  Thank you.  We'll put that behind you so it

 6   doesn't obstruct the jurors' view.

 7            When these call detail records come to you, are

 8   they fairly voluminous?

 9   A.  Yes, sir.

10   Q.  Hundreds of pages long?

11   A.  Yes, sir.

12   Q.  And the -- you also have a different side to that, and

13   that is the location of the cellular towers; is that right?

14   A.  Yes, sir, what we refer to as a tower list.

15   Q.  Okay.  And do you marry those two things up?

16   A.  Yes, sir.

17            In my general analysis I'll take the call detail

18   records I'm provided and then the tower list from the

19   contemporaneous time frame, because I might work an

20   historical case where -- you know, a case from back in

21   2017, '18, sometimes even farther.

22            I don't want to use the towers that are in

23   existence now because the network is not the same, so I'll

24   use the towers in existence at the time that I'm analyzing

25   along with the call detail records.

 1   Q.  Okay.  So you figure out what the relevant time is,
 2   right?
 3   A.  Yes, sir.
 4   Q.  And then you marry those records up with what was
 5   existing at that time?
 6   A.  Yes, sir.
 7   Q.  Okay.  And, in fact, do towers change?  Like they may
 8   go from one technology in a tower to a different
 9   technology?
10   A.  Yes, sir.  They'll -- they can -- there are several
11   ways -- like as they have evolved from 2G to 3G to 4G, they
12   sometimes don't have to change antennas or anything.
13   They'll just change the software behind it so it now
14   becomes a 4G tower, not a 3G tower.
15          Or they sometimes have to build new structures.
16   As populations increase they will need to sometimes build
17   new structures in an area to provide that service.
18   Q.  And it's important for you to know that so that you can
19   make the right calculations as you do your analysis; is
20   that right?
21   A.  Yes, sir.
22   Q.  Okay.  And if you were to sit here with the jury and
23   take the latitude and longitude of every time a phone
24   pinged off the tower and put it onto a map for them, would
25   that take hours, if not days?

```
 1   A.  Yes, sir.

 2   Q.  Do you shrink that down into a fairly concise report to

 3   prepare for the jury?

 4   A.  Yes, sir, I do.

 5           MR. COMBS:  Your Honor, the --

 6   BY MR. COMBS:

 7   Q.  And, actually, if you could look with me --

 8           MR. COMBS:  May I approach, your Honor?

 9           THE COURT:  Yes, you may.

10   BY MR. COMBS:

11   Q.  Let me show you what's been marked as Government's

12   Exhibit 96.  It's probably in the binder in front of you.

13   A.  Yes, sir, it is.

14   Q.  Okay.

15   A.  96?

16   Q.  Yes.

17           Looks like you've got a handle on it, so I'm going

18   to return.

19           Do you recognize that?

20   A.  Yes, sir.  It's a copy of my report.

21   Q.  Okay.  That's the report you prepared in this case

22   based on those voluminous records?

23   A.  Yes, sir.

24   Q.  All right.

25           MR. COMBS:  Your Honor, the government would move
```

 1   to admit Government's Exhibit 96.

 2          MR. SANDEL:  Your Honor, may I take him on just a

 3   brief *voir dire*?

 4          THE COURT:  Yes, go ahead.  You can do it from

 5   there.

 6              *VOIR DIRE* EXAMINATION OF MARK SEDWICK

 7   Q.  Agent Sedwick, when you're examining Exhibit 96 --

 8   A.  Yes, sir.

 9   Q.  You said the records that you used to compile that were

10   provided by AT&T, correct?

11   A.  Yes, sir.

12   Q.  Did you have to utilize any information from

13   Mr. Ashley's physical phone?

14   A.  No, sir.

15          MR. SANDEL:  Thank you, your Honor.  No objection.

16          THE COURT:  Okay.  96 will be admitted.

17          MR. COMBS:  All right.  Thank you.

18          May we publish page 1 of 96?

19          CONTINUED DIRECT EXAMINATION OF MARK SEDWICK

20   BY MR. COMBS:

21   Q.  And what is this?

22   A.  This is basically just a cover sheet.  It shows the

23   telephone number that I did my analysis on, or numbers,

24   depending on the case, and then the date my report was

25   finalized.

 1   Q.  Okay.

 2          MR. COMBS:  Next page, please.

 3   BY MR. COMBS:

 4   Q.  Walk through the jury.  How do you conduct this

 5   analysis?

 6   A.  First, I -- for background, I was asked by the U.S.

 7   Attorney's Office to analyze phone records for telephone

 8   number 972-658-6113, believed associated with a homicide on

 9   February 19th of 2020.

10          The methodology I've talked about a little before.

11   I take those call detail records and then the concurrent

12   call tower list -- the cell tower list, excuse me.

13          And I will first map all the cell towers on the

14   map, and then I'll map the individual usages as there was

15   usage on the phone.

16          And then I can -- by that, I can determine the

17   approximate location of the device when those calls or

18   texts were made.

19   Q.  Okay.  And what about cell site locations?

20   A.  Just as I stated, that's --

21   Q.  Okay.

22   A.  -- basically the latitude and longitude of where those

23   cell towers are.

24          And then my conclusions will be in the following

25   slides.

```
 1   Q.  Okay.

 2        MR. COMBS:  If we could go to the next slide,

 3   please.

 4   BY MR. COMBS:

 5   Q.  Is sector orientation and understanding sector

 6   orientation important for the jury as we move on to the

 7   next slides?

 8   A.  Yes, sir.

 9   Q.  It's very important for them to understand the

10   methodology you're using so they can understand the slides

11   that follow; is that right?

12   A.  Yes, sir, and how -- also how the phone and the network

13   are designed to interact.

14   Q.  Okay.  Can you explain what the members of the jury are

15   looking at there?

16   A.  Yes.

17        So what this is is on the left side your typical

18   cell phone tower that you'll see on the side of the

19   highway.  But if you've ever actually taken the time to

20   actually look at one, you'll notice that there are three

21   distinct sides to that tower.

22        The vast majority of towers in the United States

23   are broken up into three sectors or pieces of pie.  Those

24   sectors each cover approximately 120 degrees.  It's

25   actually a little larger than 120 degrees for some overlap
```

1    in coverage.

2            But in the records what I'm given is not only the

3    tower and sector but what azimuth or the orientation of the

4    center of that sector is.  So if I'm given an orientation

5    of 60 degrees, that tower will cover from approximately

6    0 degrees to 120 degrees.

7            On a clock face, every hour is equal to

8    30 degrees, 360 degrees in a circle; so an azimuth of

9    60 degrees would be 2:00.  So that sector would cover

10   approximately from 12:00 to 4:00 on a clock face.

11   Q.  Okay.

12   A.  And then -- and that's basically how the network -- the

13   towers themselves are built in the network.

14   Q.  Okay.  Now --

15           MR. COMBS:  Next slide, if we could.

16   BY MR. COMBS:

17   Q.  And there is an illustration of how that works?

18   A.  Yeah.  This demonstrates how I'm going to display the

19   approximate coverage area of a cell tower in the following

20   slides.

21           As you can see, in this case this tower is

22   oriented at 0 degrees; so it's oriented straight up.  You

23   see that sector arms to either side of that, 60 degrees to

24   either side of that center azimuth.

25           And then that shaded area is just to show how the

1    energy goes out from the tower in an upside down funnel

2    kind of shape.  It's not inclusive of the coverage area.

3    The coverage area is actually larger than the shaded area.

4    It's determined by the other towers around.  I can't say

5    exactly where the coverage area of one tower ends.  That's

6    why we use that small shaded area, just to kind of show how

7    the energy is going out from the tower.

8    Q.  Okay.  And let's talk about coverage areas there.  On a

9    cell tower what is -- what controls the area of coverage,

10   that is, how far out a phone can be and still use that

11   particular tower?

12   A.  That's all going to depend on where you are on the

13   planet.  In urban areas towers are much closer together.

14   In, like, Downtown Dallas the towers might be only a couple

15   blocks apart; so it would be very small coverage areas.

16        You get to suburbs, it tends to be a mile, mile

17   and a half.

18        You get out into East Texas where there's not a

19   lot of population, it could be 10 or 15 miles between

20   towers.

21        It all just depends on the population base in that

22   area so they can -- the companies can provide the service

23   to their customers.

24   Q.  And if you're in, you know, a football stadium, how

25   much coverage is a tower going to have?

```
 1   A.  I used -- I'm from Ohio originally, so I use the Ohio
 2   State horseshoe stadium.
 3           During the week when there is no game on, there is
 4   a couple big towers outside the stadium that provide plenty
 5   of coverage to that area.
 6           When there's a game, they turn on what they call
 7   little picocells.  They're small little cells.  They're
 8   360 degrees, but they might cover a hundred feet.  And
 9   there are hundreds of them inside the horseshoe so --
10   because everyone -- you know, nowadays people are watching
11   the game -- half the people are watching the game on their
12   phone at the game.  They're texting their friends.  So they
13   have to turn all those on during a football game to provide
14   the coverage; and then when it's not, they'll turn them
15   off.
16   Q.  So sometimes some towers may only cover a couple
17   hundred meters or feet even --
18   A.  Yes, sir.
19   Q.  -- is that right?
20           Okay.
21           MR. COMBS:  Could we go to the next slide, please.
22   BY MR. COMBS:
23   Q.  What's the jury looking at here?
24   A.  This is the -- basically the target phone and map
25   legend.  So I was provided records for telephone number
```

1    972-658-6113.  Its provider is AT&T.

2           And I was told this phone was associated with a

3    Mr. Keith Ashley.  And then I was provided three addresses,

4    crime scene of 2114 Cannes Drive in Carrollton, Texas;

5    Mr. Ashley's residence, 1211 Boerne Court in Allen, Texas;

6    and then his business, Nine Band Brewing, 13 Prestige

7    Circle in Allen, Texas.

8           And then also when you'll see the following maps,

9    there will be blue dots all over them.  Every little blue

10   dot is an AT&T tower.

11   Q.  All right.

12          MR. COMBS:  And while we're still on this slide,

13   could we pull up Government's Exhibit 79, page 28.

14   BY MR. COMBS:

15   Q.  This is already in evidence.  And I haven't covered

16   this with you, but this is something the jury has already

17   seen.  Now, this is a purported suicide note; and the last

18   line of that says, "My last friend Keith Ashley."

19          Is that the person whose name was associated with

20   the phone number you were given?

21   A.  Yes, sir.

22   Q.  And then on this purported suicide note it has a number

23   of 972-658-6113.  Is that the same number you analyzed?

24   A.  Yes, sir.

25   Q.  Okay.

1            MR. COMBS:  Thank you.  We can take that down.

2            And go to the next page, please, page 6.

3    BY MR. COMBS:

4    Q.  You had said earlier that you were asked to look at

5    these records for February 19th, 2020, right?

6    A.  Yes, sir.

7    Q.  When did you begin your analysis that morning?

8    A.  I basically began 7:29 a.m., that morning; and then I

9    ran through about till 9:00 that evening.

10   Q.  Okay.  Looking at the -- I guess the right half of this

11   slide, this area right here --

12           MR. COMBS:  Could we zoom in on that, please.

13   BY MR. COMBS:

14   Q.  What are we looking at here?

15   A.  This is the usage of the device at 7:29 and 7:32.

16   There are two outgoing calls.

17           And I don't think I stated how the phone actually

18   interacts with the cell tower.

19   Q.  Uh-huh.

20   A.  So when your phone is just sitting in your pocket, we

21   refer to it as "idle mode."  You're not actively in a call

22   or a text.  What an AT&T phone is going to look for, the

23   AT&T towers; and it's going to look for the tower that has

24   the strongest signal with the least amount of interference,

25   generally the closest tower.

1           And when you're not using your phone, it will what

2    we refer to as "camp" on that tower.  Every tower is

3    constantly broadcasting a signal over a control channel.

4    That's what the phone is listening for.  When you hit

5    "send" on your phone, you reach out on that control

6    channel; and that is the tower and sector that is populated

7    into the call detail records, the tower that the phone

8    chose at the beginning of the call.

9           For an incoming call, the network doesn't track

10   where every single phone is camped on.  It just knows the

11   general area.  Like right now the network knows my devices

12   are in the Sherman, Texas, area.

13          So if my phones were actually on and I got a phone

14   call, the network would page all the towers in the Sherman

15   area; and I would respond to the tower I see the best at

16   that moment in time.  That would be what would populate the

17   call detail records with the tower and sector the phone

18   sees the best at that point in time.

19   Q.  Okay.  So you said earlier that the green square is

20   Mr. Ashley's home, right?

21   A.  Yes, sir.

22   Q.  That was in the legend.

23          And then there are these two outgoing calls at

24   7:29 and 7:32.  And is it -- this the tower that

25   Mr. Ashley's phone saw the best --

 1   A.  Yes --

 2   Q.  -- or --

 3   A.  -- for those two calls.

 4         And what I can say is that cell tower has a

 5   coverage area that includes his residence.

 6   Q.  Okay.  And the two arms that are coming out from that,

 7   what are those?

 8   A.  That's -- this tower is oriented at 128 degrees.  So

 9   that's the 60 degrees to either side of that 128-degree

10   center azimuth.

11   Q.  Okay.  So that's the sector that's capturing this

12   phone.  So if you drew those lines out, we would see that

13   the phone comes into -- is somewhere within this sector; is

14   that right?

15   A.  Yes, sir.

16   Q.  And can you say whether it was down here at Giant Party

17   Sports Paintball & Airsoft Park or whether it was here at

18   the house?

19   A.  No, sir.  All I can say is that the phone was within

20   the coverage area of that tower and sector when that call

21   was made.

22   Q.  Okay.

23   A.  I can't say where within the sector.

24   Q.  But you know it's 7:29 a.m. and it's in the sector that

25   includes Mr. Ashley's home?

1    A.  Yes, sir.

2    Q.  Okay.  All right.

3           MR. COMBS:  If we could zoom back out and go into

4    the other side there.

5    BY MR. COMBS:

6    Q.  Explain for the jury what's happening here.

7    A.  So obviously I can only plot when there is usage on the

8    device; so if there is no calls or texts being made, there

9    is nothing for me to plot.

10          So after 7:32 there is about an hour and

11   11 minutes and then the next activity on the phone was an

12   incoming call at 8:43 a.m. and at this time the phone was

13   utilizing a tower and sector that has a coverage area that

14   includes the Nine Band Brewing.

15   Q.  All right.  And am I correct that the Nine Band

16   Brewing and the tower are very close to each other?

17   A.  Yes, sir.  They're -- it's just immediately behind the

18   building.

19   Q.  Okay.  And have you gone out and driven this route just

20   to get your eyes on what's happening in these areas?

21   A.   In every case if I can't do a drive in the area, I will

22   at least do a map reconnaissance, Google Earth or something

23   like that, to determine the towers are there, where the

24   devices -- what it actually looks like on the ground.

25          Some cases I'm able to do that.  Other cases,

1   especially if it's out of town, I might fly in the morning

2   of the testimony and not have the ability to do that.

3           But I will always at least do a map reconnaissance

4   to determine the terrain and everything in the area.

5   Q.  Okay.  And you did reconnaissance in this case?

6   A.  Yes, sir.  I did this actually on Tuesday.

7   Q.  Okay.

8           MR. COMBS:  All right.  If we could zoom out and

9   go to the next slide, please.

10          And zooming in to this area here, if we could.

11  BY MR. COMBS:

12  Q.  We have the house on the right-hand side, the Nine Band

13  Brewing up at the top in the center, and then a blue dot in

14  the middle with the sector mark.  What's happening here?

15  A.  Basically this is -- this time frame is going to be

16  from 8:49 to 8:57, and it just kind of shows the -- this

17  time frame on several slides is going to show the movement

18  of the device.

19          But at 8:49 there are two incoming calls actually

20  one second apart.  But the phone has now moved south, most

21  logically down 75, and has moved south from the brewery.

22  Q.  Okay.  Any chance that that phone is still sitting up

23  here at the brewery and pinging off this tower down here?

24  A.  No, sir.

25  Q.  Okay.  Why not?

1   A.   As you can see, there are several towers in between;

2   and also the orientation is away from that location.  The

3   engineers who design the networks -- there is a built-in

4   overlap because since phones are mobile, they want you to

5   be able to see multiple sectors at one time just so as you

6   are moving around there is not a hard line between.

7          But they don't want more than, you know, a couple

8   layers of towers.  If there is more than one layer of

9   towers, they don't want those towers interfering with each

10  other because that can cause just network interference

11  within the network.

12  Q.   And I notice as we're looking at this map, if you look

13  over here in more rural areas like near Murphy or the large

14  Bob Woodruff Park, the towers are very far apart.

15         But as we get further south and we are down into

16  Plano and particularly along the corridor of --

17         Is this the George Bush right here?

18  A.   Yes, sir.

19  Q.   -- and along the George Bush corridor the towers get

20  very close together.  Why is that?

21  A.    Just because there's more people, so they need to have

22  more towers to provide that proper coverage.

23  Q.  So would you expect that as a -- as you get closer and

24  you're in these areas, these built-up areas where there's

25  many towers that are close together, that you're going to

1   be -- get a more accurate designation of where that phone

2   is?

3   A.  I could just say it will be just a smaller coverage

4   area.

5   Q.  Uh-huh.

6   A.  So I could, you know, say it's a smaller coverage area;

7   but I can still only say the phone is within the coverage

8   area of that tower and sector.

9   Q.  Okay.

10          MR. COMBS:  If we could zoom out and go to the

11  next call, please.

12  BY MR. COMBS:

13  Q.  So we looked just now at from 8:49 to 8:57 and then to

14  the next slide.

15  A.  So this is the next in that time frame to 8:50.  So the

16  phone has started to move or possibly because the overlap

17  in the network, but it is in the same general area at this

18  time, but it's still within, you know, kind of the 75

19  corridor.

20  Q.  Uh-huh.  So at 8:49 there is a call that is a -- that's

21  in this area of Plano, right?

22          And then at 8:50 there is an SMS.  What's an SMS?

23  A.  That's a text message.

24  Q.  Okay.  So there's a text message.  Is that -- can you

25  tell from looking at the call records whether it was sent

1  or received?

2  A.  No, sir.  Just the way our -- with AT&T records I'd

3  have to look at the raw records to see if it was an

4  incoming or outgoing text.

5  Q.  Uh-huh.  So -- but an SMS was either sent or received,

6  and he's a little further south -- or the phone is a little

7  further south when that happens; is that right?

8  A.  Possibly.

9  Q.  Okay.  Or at least he's pinging off a tower that's a

10  little further south --

11  A.  Yes, sir.

12  Q.  -- a minute later.

13         Okay.

14         MR. COMBS:  Next slide.

15  BY MR. COMBS:

16  Q.  What's happening here?

17  A.  So as we continue -- and that's why I said "possibly,"

18  because you can see at 8:50 it's on the tower a little to

19  the south.  8:51 it's to the -- that tower to the north.

20  So that's that built-in overlap of the network because that

21  phone logically is traveling down 75; so, you know, it just

22  saw a slightly better signal from the one from the north at

23  8:51.

24         But then if we go to the next slide, it drops back

25  to that other tower immediately after that.  But that's --

1  that's a very -- for me, that makes perfect sense even if

2  he's traveling -- the device, excuse me, is traveling down

3  75 because of the built-in overlap of the network.

4  Q.  Okay.  Why would a device change from tower to tower as

5  you travel along an area?

6  A.  It could be just a slight terrain difference.  You

7  know, that overlap, if you're in that sweet spot, it can be

8  a matter of moving 10 feet.

9        I had -- the best example I ever had is I had a

10  fugitive case where when I looked at his records in the

11  morning his phone -- he used one tower, and then in the

12  afternoon he used another tower.  They faced each other,

13  and his house was almost equidistance between the two.

14        When we arrested him, I just asked him, "Man,

15  where do you hang out?"

16        He goes, "Well, during the day I hang out in this

17  room because we move the AC in that room; and then at night

18  when we go to the bedroom, I move over to this side of the

19  house and we take the AC unit in there."

20        And that was the sides of the house that is closer

21  to those towers; so that movement of literally 10 feet

22  caused, you know, the tower to shift.  But that house sat

23  right in the overlap of those two towers.

24  Q.  Okay.

25        MR. COMBS:  Could we go to the next slide, please.

```
 1   BY MR. COMBS:

 2   Q.  We're still from 8:49 to 8:57 a.m.

 3   A.  And as I said, you know, at 8:51 and 8:52 it moved back

 4   down to the more southern tower; so it's still tracking

 5   with the phone traveling down -- south down 75.

 6   Q.  Okay.  A lot of outgoing calls and incoming calls

 7   during this time.

 8   A.  Yes, sir.

 9          MR. COMBS:  Next slide.

10   BY MR. COMBS:

11   Q.  We're still on the same time frame.  What's happening?

12   A.  So at 8:54 the phone has moved farther west.  So

13   logical route, again, would be it jumped onto the George

14   Bush Turnpike.

15   Q.  Okay.  And, in fact, it's pinging off a tower that's

16   right next to the George Bush Turnpike --

17   A.  Yes, sir.

18   Q.  -- is that right?

19          MR. COMBS:  And if we could zoom out on that same

20   one.

21   BY MR. COMBS:

22   Q.  What is the red mark that we're looking at over here?

23   A.  Yes, sir.  That's the crime scene.

24   Q.  All right.

25          MR. COMBS:  Next page.
```

 1   BY MR. COMBS:

 2   Q.  And what's happening here?

 3   A.  And then just at 8:57 the phone continues to move west.

 4   Q.  Okay.  So this is the call that we looked at on the

 5   last slide; and this is the next new call, is that right,

 6   3 minutes later, moving a little further west on the

 7   George -- or in the vicinity of the George Bush?

 8   A.  Yes, sir.

 9   Q.  Okay.

10            MR. COMBS:  Next slide.

11   A.  This --

12   BY MR. COMBS:

13   Q.  Now, does this slide change time periods?  We've been

14   looking at the time period of 8:49 to 8:57.  What time

15   period are we looking at here?

16   A.  This is 9:10 a.m. to 10:21 a.m. on February 19th.

17   Q.  Why is there a 13-minute gap there where there is no --

18   you end off at 8:57 and you pick back up at 9:10.  Why is

19   that?

20   A.  There is no activity on the phone for that 13 minutes.

21   Q.  Okay.  So where is he when he picks up on the phone, or

22   where is -- what tower is he pinging off of?

23   A.  He's utilizing two towers but -- you know, 9:10 to

24   10:21 a.m. it's utilizing those two towers; and both of

25   those towers with that overlap have a coverage area that

 1   includes the crime scene.

 2          And then at 9:11 a.m. there is a phone call from

 3   the phone associated with Mr. Ashley to the device -- to

 4   the victim's device that lasts 45 seconds.

 5   Q.  And on the screen to your -- which will be to your

 6   right there, if you turn around and look at the screen to

 7   your right, you can write on that screen.

 8   A.  Ah.

 9   Q.  Can you highlight for the members of the jury the call

10   you're talking about that is associated with the victim's

11   phone?

12   A.  It's going to be this one down here, 9:11 and

13   24 seconds.

14   Q.  Okay.  9:11 and 24 seconds is when this -- is it an

15   outgoing call to the victim's phone or incoming?

16   A.  It's an outgoing call from the phone associated with

17   Mr. Ashley to the number that I was told was the victim's

18   phone number.

19   Q.  Okay.  And so how long is the phone associated with

20   Mr. Ashley in this sector here?

21   A.  Basically from 9:10 to 10:21 a.m., so roughly an hour

22   and 10 minutes.

23   Q.  Okay.  And he doesn't ping off any other towers during

24   that time?

25   A.  The tower -- just that also tower just to the north of

1    the crime scene --

2    Q.  Okay.

3    A.  -- also has activity during this time frame.

4    Q.  Now, that ends off at 10:21 a.m., that particular

5    slide.

6            MR. COMBS:  Could we go to the next slide.

7    BY MR. COMBS:

8    Q.  And can you tell the members of the jury, when does

9    that slide pick up, the very next slide?

10   A.  So the next activity on the phone was at 10:33 and

11   the -- again, I just broke up this into two different

12   slides.  But from 10:33 to 10:34 it's utilizing a tower

13   that has a coverage area along the George Bush Turnpike a

14   little to the north and east of the crime scene, and there

15   were two calls.

16           At 10:33 a.m. there was a call to the victim's

17   device.  And the victim also had an AT&T phone.  I did not

18   have records for the victim's phone.  But one of the quirks

19   of AT&T records, if you call -- if an AT&T phone calls an

20   AT&T phone, I see the other side of that transaction.  I

21   don't get tower information for that.  I'll just see -- so

22   I can tell what the completion was.

23           So based on that, I could tell that that call at

24   10:33 a.m. went to the voicemail of the victim's phone.

25   Q.  Okay.  So that was not a call that was picked up?

1  A.  No, sir.  It went to voicemail.

2  Q.  All right.

3       MR. COMBS:  Could we zoom out here?

4  BY MR. COMBS:

5  Q.  So at 10:33:50 the phone associated with Mr. Ashley

6  that's on the purported suicide note is no longer near the

7  crime scene; is that right?

8  A.  No, sir.

9  Q.  Okay.

10      MR. COMBS:  Could we go to the next slide.

11  BY MR. COMBS:

12  Q.  What's happening here?

13  A.  10:34 a.m. again there was another call from the device

14  associated with Mr. Ashley to the victim's phone, and it

15  has moved to a tower just to the south.

16      So it's possible the phone turned around; or it's

17  possible it was still going -- you know, this close in

18  time, these two towers right next to each other, with that

19  overlap being built in, I can't say what happened; but it

20  did move to the tower to the south.

21  Q.  Okay.

22      MR. COMBS:  Could we go back to page 13, please.

23  BY MR. COMBS:

24  Q.  So last we knew, at 10:21 -- that is, right down here,

25  this outgoing call -- the phone associated with Mr. Ashley

1    was in -- somewhere in that area?

2    A.  Yes, sir.

3    Q.  Okay.

4         MR. COMBS:  Now if we could go to Slide 16.

5    BY MR. COMBS:

6    Q.  And then it had traveled northbound; is that right?

7    A.  Yes, sir, north and west -- or, excuse me, north and

8    east.  I apologize.

9    Q.  Okay.  Now, what happens next?

10   A.  These were -- well, you jumped ahead so --

11   Q.  Okay.

12        MR. COMBS:  Can we go back a slide?  I'm sorry.

13   A.  Yeah.

14        So we have at 10:33 and 10:34 the two calls.  One

15   went to voicemail; one basically was a zero-second.  So he

16   dialed it and then hung up, most likely, with zero seconds;

17   so it probably never made a connection to the other device.

18        And then there is a 14-minute gap in time.

19        If we go to the next slide.

20        MR. COMBS:  Next slide.

21   A.  There is a 14-minute gap in time, and then it -- the

22   phone is moved just slightly farther along the George Bush

23   Turnpike corridor.

24   BY MR. COMBS:

25   Q.  And that's the 10:48 call?

1    A.  Yes, sir.

2    Q.  And 10:49?

3    A.  It continues traveling east.

4    Q.  Okay.

5          MR. COMBS:  Next slide.

6    BY MR. COMBS:

7    Q.  And then what?

8    A.  Then I did from 11:08 to 11:23 a.m.  The device is back

9    in the area utilizing the tower that has a coverage area

10   that includes the brewery.

11         And there was also another call at 11:08 a.m. that

12   lasted 30 seconds from the device associated with

13   Mr. Ashley to the victim's phone that also went to

14   voicemail.

15   Q.  Okay.

16         MR. COMBS:  Zoom back out if we would.

17   BY MR. COMBS:

18   Q.  And this is back at Nine Band Brewery, and Mr. Ashley's

19   residence is over to the right of that slide; is that

20   right?

21   A.  Yes, sir.

22   Q.  Okay.

23         MR. COMBS:  Next slide.

24   BY MR. COMBS:

25   Q.  And what are we looking at here?

1   A.  12:11 to 12:13, the device utilizes two different

2   towers that have coverage areas that include his residence.

3   So the device has moved away from the brewery and is now in

4   the area of his residence.

5   Q.  Okay.

6          MR. COMBS:  And then the next slide.

7   A.  And this is 12:41 to 2:45.  The phone is back in the

8   area of the brewery.  As you can see, it uses the -- at one

9   time it uses the 248 azimuth, so the sector facing to the

10  southwest; and then the rest is on the tower -- that tower

11  literally sits right behind that brewery.

12          There is a back lob off of it; so, you know, that

13  phone for that 12:41 could have been away from the brewery

14  and then moved back but -- not unusual to see that with

15  something so close to a tower.  But what I can say is that

16  12:41 to 2:45 p.m., that device is in the area of using

17  towers and sectors that have a coverage area that includes

18  the brewery.

19  Q.  Okay.

20          MR. COMBS:  And the last slide.

21  A.  And then 3:44 p.m. to 9:01 p.m., the phone moves back

22  away from the brewery back in the general area of his

23  residence; and there are also a few more calls to the

24  victim's phone.

25                              *

1  BY MR. COMBS:

2  Q.  And there are three different towers that are selected

3  there.  Is Mr. Ashley's residence within the sector of all

4  of those towers?

5  A.  Yes, sir.

6        The 3:45, the one in the north, would probably be

7  the one that probably would -- if it has coverage, it would

8  be very limited; but it's still in that general area of his

9  residence.

10  Q.  Uh-huh.  Okay.

11  A.  And there were two calls -- I just don't know if you

12  can zoom out.

13  Q.  Sure.

14  A.  At 5:01 and 5:02 there were two more calls from the

15  phone associated with Mr. Ashley to the victim's device, a

16  6-second voicemail and then a 29-second voicemail.

17  Q.  Okay.  Now, we've been talking a lot about the

18  locations and those being in Plano and Allen and all that;

19  is that right?

20  A.  Yes, sir.

21  Q.  Is the -- is Plano in the Eastern District of Texas?

22  A.  Yes, sir, it is.

23  Q.  How about Allen?

24  A.  Yes, sir.

25  Q.  So the brewery, is that in the Eastern District of

1  Texas?

2  A.  The brewery and the victim's residence -- excuse me --

3  the defendant's residence are both in the Eastern District

4  of Texas.

5  Q.  And as the phone -- if it traveled down 75 until it got

6  to the George Bush, would that be in the Eastern District?

7  A.  Yes, sir.

8  Q.  And is the George Bush generally in the Eastern

9  District?

10  A.  It's kind of -- that's kind of the dividing line

11  between the Eastern District and the Northern District, in

12  that area.

13  Q.  Okay.  In that area?

14  A.  Yes, sir.

15  Q.  So it's the Collin County line, right?

16  A.  Yes, sir.

17  Q.  If you're in Collin County, you're in the Eastern

18  District; is that right?

19  A.  Yes, sir.

20  Q.  If you're in Dallas County, you're in the Northern

21  District?

22  A.  Yes, sir.

23  Q.  Okay.  And the victim's home was in the -- was in the

24  Northern District; is that right?

25  A.  Yes, sir.  The victim's home is in the Northern

```
 1   District, in Dallas County.
 2   Q.  Okay.  But the route of travel that morning was from
 3   the Eastern District down to the Northern District?
 4   A.  Yes, sir.
 5   Q.  And then back up to the Eastern District after some
 6   time down in the vicinity of the victim's home?
 7   A.  Yes, sir.
 8   Q.  Okay.  Thank you.
 9          MR. COMBS:  No further questions.  Pass the
10   witness.
11          THE COURT:  Cross-examination?
12                CROSS-EXAMINATION OF MARK SEDWICK
13   BY MR. SANDEL:
14   Q.  Good afternoon, Agent Sedwick.  How are you?
15   A.  Good, sir.
16   Q.  My name is Ryne Sandel, and I represent Keith Ashley.
17          You and I haven't had a chance to talk before
18   today, correct?
19   A.  No, sir.
20   Q.  Okay.  Just have a couple of questions for you.  The
21   first relates to kind of how cell towers work.
22   A.  Okay, sir.
23   Q.  Now, you said on your direct that as populations
24   increase, they need to build more cell towers, right?
25   A.  They'll either have to put up a whole new structure,
```

1  they can add more antennas onto an existing structure, but

2  the engineers will do something to make sure the coverage

3  area -- the usage is good so there is not dropped calls so

4  their customers are happy.

5  Q.  And is that due to the fact that each cell tower or

6  each cell antenna has a limited number of traffic that it

7  can handle at any one given time?

8  A.  Yes, sir.

9        A cell tower does have a capacity, but the network

10  is designed -- the engineers design it so a tower in its

11  normal course of life, business -- you know, the normal

12  flow is no more than about 50 percent of its max capacity,

13  for the normal course of business.

14  Q.  Okay.  So if I understand right, the towers are

15  designed that at any given time they are only going to be

16  running at about 50 percent capacity, correct?

17  A.  No, sir, that the average traffic across that tower is

18  about 50 percent of its capacity.

19  Q.  Understood.

20        So if it looks like one tower is routinely getting

21  above 50 percent of its capacity, that's how AT&T knows,

22  hey, we may need another tower that can cover that area?

23  A.  Possibly or a new set of antennas.  The engineers are

24  paid a lot of money to -- that's their job.

25  Q.  Okay.  And I think the other part of your direct

1  testimony that I recall is when a cell device sees that a

2  call is coming in, right, I think you said it will page all

3  of the towers in the area to determine which tower to use

4  to service that call.

5           Is that correct?

6  A.  No, sir.  The towers are sending out the page.

7  Q.  Okay.

8  A.  So the towers send out that page.  The phone will

9  reply, on the control channel that it is camped on, the

10  tower it sees the best at that moment in time.

11  Q.  And you said that generally the tower that a cell

12  device will connect to might be the closest tower.  But

13  that's not always the case, correct?

14  A.  No, sir.

15  Q.  Okay.  So if we use -- just kind of by way of an

16  illustration, if we use this room -- which is roughly a

17  rectangle, correct?

18  A.  Yes, sir.

19  Q.  If there were a cell tower in each one of the corners,

20  okay?  You follow me so far?

21  A.  Yes, sir.

22  Q.  And if I'm standing directly in the middle so I'm

23  equidistant from every cell tower, what are some of the

24  variables that would come into play that would determine

25  which tower services my call?

 1    A.  In that situation it could be where the phone is.  You

 2    know, if the phone is slightly closer to that one, that

 3    would have an effect.

 4         You know, terrain can have an effect if there's --

 5    obviously in this area we don't have a ton of terrain; so

 6    it's a minimal effect, if any, in this area.  But you get

 7    to more mountainous regions, you can have where, you know,

 8    there is a building, there is a mountain, and there is a

 9    hill that the signal has to go around, so there could be a

10    dead spot on the other side.

11         So that tower is technically closest, but the way

12    I do it is -- the analogy I use, if I'm here and I see a

13    tower direct line of sight that's half a mile away and

14    there is one that's, you know, just under half a mile away

15    but there is a structure in between me or a hill, by the

16    line of sight I'll probably choose that farther tower

17    because that would be a cleaner, stronger signal.

18    Q.  Okay.  So there is a couple different variables that

19    will determine which tower a cell phone connects to,

20    correct?

21    A.  Yes, sir.

22    Q.  Is traffic another one of those determining

23    characteristics?

24         If Cell Phone Tower 1 is close to that capacity

25    number, will it automatically push me to Cell Phone

```
 1  Tower 2?
 2  A.  No, sir.
 3       The phone is listening and going on over the
 4  control channel.  That channel -- the phone has no idea how
 5  busy the tower is.  So the analogy I like to use is if
 6  I'm -- you know, I'm a student.  I'm in Classroom A.
 7  That's my tower.  I raise my hand to ask a question, I have
 8  to wait my turn.  I can't go to Classroom B and ask that
 9  question.
10       So, you know, if a tower is too busy, that call
11  will fail.  And I think everyone's kind of experienced that
12  at least once in their life.  You make a call.  It fails.
13  You hit "send" again, and it goes through.  You just -- you
14  were just out of line in, you know, getting shuttled to the
15  tower.  But the phone is in charge at the beginning of that
16  call, so it can't jump to another tower.
17  Q.  So in terms of -- you talked about coverage areas and
18  that sort of thing in your direct.  Correct me if I'm
19  wrong.  I believe what you said was the amount of distance
20  that a specific tower can cover really varies quite a great
21  deal, correct?
22  A.  It varies depending on where you are on the planet.
23  The more closer towers are built, by just the way the
24  network works, they will have smaller coverage areas.
25  Q.  So if you're in a densely populated area or a city-type
```

1  area, like you said downtown, you get smaller coverage

2  areas; and then as you leave kind of that city, the

3  coverage areas expand a little bit as you get out.  Is that

4  right?  Is that fair to say?

5  A.  Yes, sir.

6  Q.  Okay.  And so an individual cell phone tower, in terms

7  of distance, I mean, it's not unreasonable for that

8  distance to be 3 miles away from that tower; or is it

9  always going to be bigger or always going to be smaller?

10 A.  In this area the majority of the towers -- I mean, in

11 this area where I looked at, the majority of towers

12 probably had a coverage area from three-quarters of a mile

13 to a mile and a half.  That's general broad of the area

14 that this phone traversed during this time frame.

15 Q.  So most of these towers cover just under or just over

16 about 1 mile away, and that's -- when we say 1 mile, we

17 mean as the crow flies.  Straight line of sight, 1 mile

18 away, that's about the distance that that tower will cover,

19 correct?

20 A.  Roughly, sir, yes.

21 Q.  Okay.  And then in your PowerPoint presentation, you

22 had that circle that kind of showed the sector, right, the

23 sector that a certain tower will cover?

24 A.  Yes, sir.  We referred to a piece of pie or whatever

25 you want to call it, yes, sir.

1    Q.  And that sector that an individual tower will cover,

2    that's roughly -- what did you say?  About 120 degrees?

3    A.  We used 120 degrees; but it's slightly larger because,

4    as I stated, there's overlap between towers.  There's

5    actually overlap between sectors on a tower also.

6    Q.  Okay.

7    A.  So it's roughly 130, but we display it as 120.

8    Q.  Okay.  Which that roughly equates to about a third of a

9    center, right?

10   A.  Yes, sir.

11   Q.  Okay.  So when we're looking at, you know, how much

12   coverage area a specific tower has -- how good are you at

13   geometry?

14   A.  I can -- I've done this before, sir; so if you don't

15   mind I'll do it real quick.

16           Pi r squared is the area so -- pi is 3.14.  If

17   you'll let me round that to 3 to make my math easier.

18   Q.  Sure.

19   A.  If I have a tower that's a mile, I'm using one third of

20   that tower; so it's basically 1 squared.  So roughly a

21   sector of a mile-radius tower will cover roughly a square

22   mile.

23   Q.  So you've got about a 1-square-mile kind of margin for

24   error, I'll say, where you can't pinpoint within where that

25   1 square mile the phone is.  You just know it's kind of

1    somewhere in there, correct?

2    A.  Yes, sir.  As I stated, I can only say the device was

3    in the coverage area of that particular tower and sector.

4    Q.  Right.  So when we were talking about George Bush --

5    and I think that Mr. Combs was saying that's kind of a

6    dividing line of sorts, right?

7    A.  Yes, sir.

8    Q.  Whether it was on the north side of George Bush, the

9    south side of George Bush, or dead smack in the middle of

10   George Bush, we don't know.  We just know it was kind of

11   somewhere in that vicinity.

12   A.  Yes, sir.

13          When it's traversing east-west along the George

14   Bush, I can't say if -- you know, a lot of those towers are

15   right on or just north or just south; so we'll have

16   coverage areas on both sides of the George Bush.

17   Q.  And in terms of, you know, your PowerPoint, we kind of

18   saw that as sometimes the towers would bounce back and

19   forth that are inconsistent with somebody traveling in a

20   straight line.  But that more has to do with at any given

21   point either Tower 1 or Tower 2 can be giving a stronger

22   signal, right?

23   A.  Yes, sir.  As he's traveling south initially -- excuse

24   me -- the device is traveling south initially, there is one

25   point where it jumps to a tower north and then jumps back

  1  down; and that could be, you know, a slight terrain feature

  2  or something.  But then, you know, I think it was almost

  3  10 seconds later it's back on that other tower.

  4          But when you do all of it together, it's

  5  consistent with that device traveling south and then west

  6  towards the crime scene from the brewery.

  7  Q.  Now, the crime scene, that's located in the Northern

  8  District of Texas, correct?

  9  A.  Yes, sir.

 10  Q.  Okay.  All right.  Agent Sedwick, I greatly appreciate

 11  it.

 12          MR. SANDEL:  I'll pass the witness, your Honor.

 13          THE COURT:  Anything additional?

 14          MR. COMBS:  No, your Honor.

 15          THE COURT:  Can this witness be fully excused?

 16          MR. COMBS:  Yes, please, your Honor.

 17          MR. WHALEN:  Yes, your Honor.

 18          THE COURT:  You are free to leave.  Thank you.

 19          THE WITNESS:  Thank you, your Honor.

 20          THE COURT:  Okay.  What's next?

 21          MS. RATTAN:  The United States calls Special Agent

 22  Brent Gresham.

 23          THE COURT:  Okay.  If you'll raise your right hand

 24  and be sworn in.

 25          (The oath is administered to the witness.)

```
 1            THE COURT:  Go ahead and proceed.

 2            MS. RATTAN:  Thank you.

 3          DIRECT EXAMINATION OF BRENT WAYNE GRESHAM

 4            CALLED ON BEHALF OF THE GOVERNMENT

 5  BY MS. RATTAN:

 6  Q.  Please state your name and, if you would, spell your

 7  name.

 8  A.  My name is Brent Wayne Gresham.  My last name is

 9  spelled G-R-E-S-H-A-M.

10  Q.  And where do you work?

11  A.  I'm employed by the Bureau of Alcohol, Tobacco,

12  Firearms & Explosives.

13  Q.  And what do you do with ATF?

14  A.  I investigate violations of federal firearms laws.

15  Q.  Are you a special agent?

16  A.  Yes, I am.

17  Q.  Can you tell us what your background and training is

18  that qualify you to be a special agent with ATF?

19  A.  Well, prior to coming to ATF, I spent four and a half

20  years in the United States Army as an infantry personnel.

21            I've got a bachelor's degree in criminology and

22  criminal justice from UTA.

23            After coming out of the military, I joined ATF.

24  I've been with ATF for over 21 years.  A part of my

25  training was down at the FLETC for CITP and NPT and
```

 1   additionally, going to Redstone Arsenal, I've been through

 2   ATF's firearms interstate nexus school.

 3   Q.  And in this case were you asked to evaluate a firearm

 4   in support of an investigation that the Carrollton Police

 5   Department and the FBI were doing?

 6   A.  Yes, I was.

 7   Q.  And what were you asked to do?  How were you involved?

 8   A.  I was asked to take a look at that firearm and

 9   determine whether that firearm traveled in interstate

10   and/or foreign commerce.

11          MS. RATTAN:  And may I approach the witness, your

12   Honor?

13          THE COURT:  Yes.

14   BY MS. RATTAN:

15   Q.  Let me show you Government's Exhibit 81 and ask you --

16          MS. RATTAN:  May I return?

17          THE COURT:  Yes.

18   BY MS. RATTAN:

19   Q.  -- if you're familiar with that, Government's

20   Exhibit 81.

21   A.  Yes, I am.

22   Q.  And, in fact, did you evaluate that firearm and conduct

23   an analysis of it to determine whether it had, in fact,

24   traveled in interstate commerce?

25   A.  I did.

1   Q.  And can you describe for the jury what you did to

2   evaluate that firearm?

3   A.  So in looking at this firearm right here, I was able to

4   observe the manufacturer of it, the serial number.  I was

5   also able to look at the importer and the importer's city

6   and state; and I was also able to look at the firearm and

7   know that it was made in Turkey.

8   Q.  And how was it that you were able to conclude that it

9   had traveled in interstate commerce and that it was made in

10  Turkey?  How did you know that?

11  A.  So not only is it on the firearm but having done this

12  for as many years, I'm intimately familiar with a Stoeger,

13  number one.  Because it was manufactured in Turkey, it also

14  has to be brought into this country legally through an

15  importer, which is in Accokeek, Maryland.

16          So this firearm, in order to be brought into the

17  United States, would have to come through an importer.

18  Subsequently from coming in through an importer, in order

19  for it to be here in Texas, it would have had to have

20  traveled in interstate and/or foreign commerce.

21  Q.  And so this firearm, in fact, hasn't just traveled

22  interstate commerce; it's also traveled in foreign

23  commerce?

24  A.  That is absolutely correct.

25  Q.  Now, did ATF also do a tracing of this firearm?

```
 1   A.  They did.

 2   Q.  And let me --

 3        MS. RATTAN:  May I approach?  Let me move that box

 4   out of -- it's kind of covering your --

 5   BY MS. RATTAN:

 6   Q.  So not only did you evaluate this firearm, Government's

 7   Exhibit 81, to see if it traveled in interstate and foreign

 8   commerce, you also did a tracing of the firearm.

 9        Will you explain to the jury what a firearm

10   tracing is?

11   A.  So firearms tracing is from the manufacturer, in this

12   case Stoeger.  It -- tracing actually starts from the

13   manufacturer and then it traces basically the lineage of

14   where that firearm goes to, ultimately ending up in its

15   sale at an FFL to a first-line purchaser.

16        (Interruption, off the record briefly.)

17        MS. RATTAN:  May I proceed, your Honor?

18        THE COURT:  Yes, you may.

19   BY MS. RATTAN:

20   Q.  So back to the tracing of the firearm which is

21   Government's Exhibit 81, did ATF do a tracing of this

22   firearm?

23   A.  Yes.

24   Q.  And will you describe for the jury what the conclusions

25   were?  What was determined?
```

1    A.  In that trace right there, it was determined that that

2    firearm was manufactured and came originally from Turkey.

3    Q.  And then what about the last sale or the last known

4    sale of the firearm?

5    A.  Can I look at -- what exhibit was it again?  Sorry.

6    Q.  I think it's Government's Exhibit 83.

7             MS. RATTAN:  May I approach the witness, your

8    Honor?

9             THE COURT:  Yes, you may.

10            MS. RATTAN:  May I return?

11            THE COURT:  Yes.

12   BY MS. RATTAN:

13   Q.  And can you describe what Government's Exhibit 83 is?

14   A.  It's the Firearms Trace Summary.

15   Q.  And what is a firearm tracing report?

16   A.  It is a trace summary identifying where this gun was

17   manufactured; and then it does provide its lineage, as I

18   said, and tracks where that gun went to, ultimately ending

19   up at an FFL and its sale to a first-line purchaser.

20   Q.  And when you say "ending up at an FFL," what is an FFL?

21   A.  It's a federal firearms licensee.

22   Q.  So it's trying to trace the firearm to its last known

23   location?

24   A.  It's tracing the firearm to the first-line purchaser.

25            Now, there is -- on the secondary market there

1    could be a secondary trace.

2    Q.  So did you conduct every trace that was possible or

3    available with ATF on this firearm?

4    A.  With this firearm here, possible, yes.  This is -- yes.

5    Q.  And what do you mean by "possible"?

6    A.  Well, there's -- so in this case right here you can

7    have a -- a firearms trace on the very beginning would

8    trace to a first-line purchaser, like the very first person

9    who ever purchased that firearm.

10          Now, that gun could be sold, for example, to a

11   pawnshop and then another person come in and purchase that.

12   They would also purchase that on a 4473, which would also

13   create the secondary trace.

14   Q.  So ATF traces firearms where the transfer is required

15   to be documented; is that right?

16   A.  Yes.

17   Q.  Now, can you run a person?  Like could you run me and

18   determine whether I've ever purchased any firearms?

19   A.  I could not do that just running your name like that.

20   I could only get that if it was a multiple sale.  But I

21   couldn't do that on just an individual firearms

22   transaction, no, ma'am.

23   Q.  So ATF can't track people, but ATF can track a firearm

24   and transactions that are required to be reported that

25   relate to that firearm?

```
 1   A.  Yes.

 2   Q.  Okay.

 3          MS. RATTAN:  We'll offer Government's Exhibit 83.

 4          MR. WHALEN:  No objection, your Honor.

 5          THE COURT:  83 will be admitted.

 6          MS. RATTAN:  And may we publish it?

 7          THE COURT:  Yes, you may.

 8   BY MS. RATTAN:

 9   Q.  And can you describe what this is for the jury?

10   A.  That right there is the response to certification

11   request for ATF to produce the trace.

12          MS. RATTAN:  And if we can look at the next page.

13   BY MS. RATTAN:

14   Q.  That's -- what is this?

15   A.  That is the seal of it.

16          MS. RATTAN:  And if we can look at page 3 of

17   Government's Exhibit 83.

18   BY MS. RATTAN:

19   Q.  Certification?

20   A.  That's the certification from the individual from ATF

21   certifying that record.

22          MS. RATTAN:  And page 4.

23   BY MS. RATTAN:

24   Q.  Okay.  And is this the certification of the firearm,

25   the tracing?
```

 1   A.  That is the Firearms Trace Summary, yes.

 2          MS. RATTAN:  And if we can blow up the top half of

 3   it.

 4   BY MS. RATTAN:

 5   Q.  Can you explain what this is?

 6   A.  So what you see right there at the Firearms Trace

 7   Summary, right underneath that, that is the trace number

 8   that is assigned to it and the request date to the right of

 9   that of when it came in.

10          Just below the trace number is who at Carrollton

11   Police Department requested the trace and/or put the trace

12   in themselves through the eTrace system, along with their

13   badge number and investigation number.

14   Q.  Okay.

15   A.  Over to the right under -- on the firearm information,

16   that is the information for the actual firearm itself.

17   Q.  And this firearm is Government's Exhibit 81 that you

18   testified had transferred in interstate and foreign

19   commerce?

20   A.  That is correct.

21          MS. RATTAN:  And if we can look at the bottom half

22   of this document.

23          And here if we can go to the middle portion.

24   BY MS. RATTAN:

25   Q.  Okay.  So what are we seeing here?

1  A.  So on the left side there at the purchaser information,

2  it has the purchase date of 11-7 of 2013.  Gregory Robert

3  Frame at that listed address with those identifiers, that

4  is the first-line purchaser there.

5  Q.  So when you say "first-line purchaser," explain what

6  you mean.

7  A.  So -- so in this case right here --

8          THE WITNESS:  Go to the bottom on the summary

9  result right here.  This might have been my secondary trace

10  here.  Let me see it.

11  A.  Yeah, so this one came up from multiple sales.  So

12  Gregory Robert Frame there, that is your first-line

13  purchaser for the firearm.

14  BY MS. RATTAN:

15  Q.  And when was this?

16  A.  That purchase date was on 11-7 of 2013.

17  Q.  So 11-7 of 2013 it's documented that this person,

18  Gregory Robert Frame, at that address on Warwick Court in

19  Wylie, Texas, purchased that firearm?

20  A.  That's correct.

21  Q.  And then we've got recovery information over here on

22  the right.  So that would be the date that the firearm was

23  again contacted; is that right?

24  A.  That is the recovery date of the firearm.

25  Q.  And what do you mean by "recovery date"?

1   A.   That's when it came into law enforcement hands, for

2   whatever reason.

3   Q.   And then we have dealer information included here.

4   What is that?

5   A.   So that is going to be the FFL, the federal firearms

6   licensee number over on the far right; but this is the

7   federal firearms licensee that conducted this transaction.

8   Q.   So where was the last documented -- the last paperwork

9   that ATF has on this firearm?

10          Where was this firearm last known to be, according

11  to ATF, before the date it was recovered on February 19th

12  of 2020?

13  A.   The first place it would have been would have been at

14  Texas Dollar Pawn and then purchased by Gregory Robert

15  Frame.

16  Q.   So it goes --

17  A.   And they're both in Wylie, Texas.

18  Q.   Okay.  So it goes from Texas Dollar Pawn, and then it

19  goes to Gregory Robert Frame in Wylie, Texas; is that

20  right?

21  A.   Correct.

22  Q.   Now, the defendant in this case is Keith Todd Ashley.

23  Were you provided an address -- a home address associated

24  with Keith Todd Ashley?

25  A.   I was.

 1   Q.  And did you determine what the distance is between the

 2   last known documented location of this firearm and Keith

 3   Todd Ashley's known residence?

 4   A.  Yes.

 5   Q.  And approximately how far is it from the last known

 6   documented possession of this firearm, Government's

 7   Exhibit 81, and the defendant, Keith Todd Ashley's

 8   residence?

 9   A.  It's approximately 5 miles.

10          MS. RATTAN:  May I approach the witness, your

11   Honor?

12          THE COURT:  Yes.

13   BY MS. RATTAN:

14   Q.  So ATF has, as the last documented transfer of the

15   firearm, November 7th of 2013; is that right?

16   A.  Yes.

17   Q.  And the last documented transfer is approximately

18   within 5 miles of Keith Ashley's house?

19   A.  Correct.

20   Q.  Now, that's in 2013.  So in order to know after that

21   exactly what happened to the firearm, Mr. --

22          MS. RATTAN:  If we can put that back on the

23   screen.  Sorry.  It's Government's Exhibit 83.  I think it

24   was page 4.

25                              *

 1   BY MS. RATTAN:

 2   Q.  To know what happened to the firearm after that,

 3   someone would have to investigate and contact Mr. Robert

 4   Frame, is that right, Gregory Robert Frame?

 5   A.  Yes.

 6   Q.  And find out from him what he did with the firearm?

 7   A.  Yes.

 8   Q.  But what we know from the paperwork is it's within

 9   5 miles, approximately, of the defendant's house; is that

10   right?

11   A.  Yes.

12   Q.  Now let me direct your attention to Government's

13   Exhibit 84 and ask you if that's a map that you're familiar

14   with.

15   A.  Yes.

16          MS. RATTAN:  Your Honor, we'll offer

17   Government's 84.

18          MR. WHALEN:  No objection.

19          THE COURT:  84 will be admitted.

20          MS. RATTAN:  May we publish it?

21          THE COURT:  Yes, you may.

22   BY MS. RATTAN:

23   Q.  And, in fact, this is just an illustration of what we

24   have just been talking about in terms of the firearm; is

25   that right?

1  A.  That's correct.

2  Q.  And that's the distance between the defendant's house

3  and the last documented location of Government's

4  Exhibit 81?

5  A.  Correct.

6  Q.  Now, also in this case were you asked to look at a

7  firearm case that was seized from the defendant, Keith

8  Ashley's house and give an opinion about whether the

9  firearm, Government's Exhibit 81, that was found or

10  recovered at the victim's house -- whether the firearm

11  would fit into or could be used with that empty case that

12  was ultimately found at Keith Ashley's house?

13  A.  Yes.

14  Q.  And can you describe for the jury whether that empty

15  case that was found at the defendant's house was capable of

16  housing the firearm that was found at James Seegan's house?

17  A.  That particular case would house this firearm

18  particularly, yes.

19  Q.  Now, it wasn't a distinctive case that brand-matched

20  the firearm; is that right?

21  A.  Yeah.  The case was not necessarily a Stoeger case.  If

22  I recall it when I looked at it, it's a Doskocil case.

23  It's not a Stoeger-branded case.

24  Q.  Now let me ask you not just about a case for a firearm

25  but about casings, shell casings, a shell casing in

 1 | particular.
 2 |         Did you go to the Carrollton Police Department and
 3 | not just evaluate the firearm, but did you also evaluate a
 4 | shell casing?
 5 | A.  I -- yes, many shell casings -- or many rounds of
 6 | 9-millimeter and a shell casing, yes.
 7 | Q.  And did you compare that to a shell casing that was
 8 | found at the victim's house in Carrollton, Texas, James
 9 | Seegan's house in Carrollton, Texas?
10 | A.  Yes.
11 | Q.  And will you describe what you were able to determine
12 | when you compared the ammunition that was found at the
13 | defendant's house to the shell casing that was at the
14 | victim's house?
15 | A.  They are the same caliber.
16 |         MS. RATTAN:  May I have just a minute, your Honor?
17 |         THE COURT:  Yes.
18 |         MS. RATTAN:  May I have just a minute?
19 |         THE COURT:  Yes.
20 |         MS. RATTAN:  May I approach the witness?
21 |         THE COURT:  Yes, you may.
22 | BY MS. RATTAN:
23 | Q.  We talked about a case that you evaluated.  Let me show
24 | you this -- it's Government's Exhibit 111 -- and ask you if
25 | this is the case that you used to determine whether it

 1  could house Government's Exhibit 81, the firearm.

 2          So this is Government's Exhibit 111.  I'll show

 3  you that and ask you if that's the case that you evaluated

 4  that was found empty at the defendant's house.

 5  A.  It is the case.

 6  Q.  And then you looked at Government's Exhibit 81, which

 7  is the firearm; and you assessed whether that case could

 8  house that firearm?

 9  A.  Correct.

10  Q.  And you concluded?

11  A.  It could fit in this case.

12          MS. RATTAN:  May I return, your Honor?

13          THE COURT:  Yes.

14          MS. RATTAN:  I'll pass the witness.

15          THE COURT:  Cross-examination?

16          CROSS-EXAMINATION OF BRENT WAYNE GRESHAM

17  BY MR. WHALEN:

18  Q.  Agent Gresham, how are you?

19  A.  Good.

20  Q.  Good afternoon.  Good to see you.

21          MR. WHALEN:  Where is the case?  Where'd that go?

22          MS. RATTAN:  And, your Honor, we'll go ahead and

23  offer Government's Exhibit 111.

24          THE COURT:  Any objection?

25          MR. WHALEN:  No objection.

```
 1            THE COURT:  Okay.  111 will be admitted.
 2   BY MR. WHALEN:
 3   Q.  You just talked about this case, correct?
 4   A.  Yes.
 5   Q.  Okay.  And is that -- is that case similar?  That would
 6   fit a 9-millimeter, correct?
 7   A.  Yes.
 8   Q.  Okay.  Would it fit a .38?
 9   A.  .38-caliber?
10   Q.  Caliber.
11   A.  Yeah.
12   Q.  Yeah.  And could it fit a .45, depending on size?
13   A.  Sure.
14   Q.  Okay.  This case could fit multiple firearms, correct?
15   A.  Absolutely.
16   Q.  Okay.  So just the fact that a 9-millimeter may fit in
17   there doesn't mean it couldn't have been used for other
18   cases, correct -- other firearms?
19   A.  That's correct.  Other firearms could fit in there,
20   yes.
21   Q.  Okay.  And is that case -- it doesn't say "Glock" on
22   it.  But Glock cases are pretty distinctive in that they
23   have the eggshell foam in their cases, correct?
24   A.  Yes.  A lot of manufacturer cases have the eggshell --
25   Q.  Okay.
```

1  A.  -- yes.

2  Q.  So -- but that's -- but just saying it could fit in

3  there doesn't mean that's the only type of firearm that

4  could fit in that case, correct?

5  A.  Correct.

6  Q.  Okay.  And then also you talked about ammunition,

7  saying it was the same caliber.  Did you check to see if it

8  was the same brand?

9  A.  I did.

10  Q.  And are they the same brand?

11  A.  Not all of them are the same brand, no.

12  Q.  Okay.  So what was found in the Stoeger was Winchester,

13  correct?

14  A.  I would have to look at those again, but I believe that

15  is correct.

16  Q.  Okay.  And the brand that was found in the house was

17  different, correct?

18  A.  Yes.  There were -- to my knowledge, there was three

19  different brands there total, yes.

20  Q.  Okay.  But none of them were Winchester, correct?

21  A.  No, there were Winchester rounds there, yes.

22  Q.  Okay.  But it was the same -- okay.  What were the

23  other two brands that you found?

24  A.  There was FC, which is Federal Corporation.

25  Q.  Okay.

 1   A.  And then there was RP-headstamped ammunition, which
 2   stands for Remington-Peters.
 3   Q.  Okay.  Now, when we talk about tracing and -- well, let
 4   me ask you this:  How many guns are sold in just the
 5   Eastern District of Texas on a yearly basis?
 6   A.  I would have no earthly idea.
 7   Q.  I mean, are we talking hundreds?  We talking thousands?
 8   A.  Thousands.
 9   Q.  Okay.  Thousands?
10   A.  Yes.
11   Q.  Okay.  And then did you trace whether or not -- it gets
12   imported to the importer in Maryland, correct?
13   A.  Yes.
14   Q.  Okay.  Do you have any -- is there any documentation
15   between the sale from the importer to the pawnshop in
16   Wylie?
17   A.  Are you asking from -- going from the importer going
18   anywhere else, like to the wholesaler?
19   Q.  Correct.
20   A.  Yeah, I'm sure there is.  I don't know that it was in
21   that trace.  I could look at it if you want me to do that.
22   Q.  Okay.  Well, were you asked to do that, though, to look
23   at the -- trace it all the way to the pawnshop?
24   A.  No.  When we did the trace, ultimately when it came
25   back, I saw that it actually ultimately ended up at that

 1    pawnshop.

 2    Q.  Okay.  And so it looked at the bottom, too, that it was

 3    part of a multiple firearms sale, correct?

 4    A.  Yes.  If I read that correctly, it's part of a multiple

 5    sale, yes.

 6    Q.  Okay.  So Mr. Frame -- from reading that, Mr. Frame

 7    bought multiple firearms, correct?

 8    A.  That's correct.

 9    Q.  Okay.  And then did you look to see -- at the secondary

10    paperwork for the multiple firearms sale?

11    A.  No.  I did not look at the other firearms, no.

12    Q.  Okay.  Is it true that when somebody does a multiple

13    firearms sale, there is additional paperwork that gets

14    filled out for that?

15    A.  Yes.  From the FFL he must fill out paperwork within

16    five business days documenting the multiple sale of those

17    firearms, yes.

18    Q.  Okay.  And did you review those documents?

19    A.  I did not review the multiple sale documents.

20    Q.  Okay.  So then when I purchase a firearm, if I'm the

21    first-time purchaser, first-line purchaser, I fill out the

22    form, correct?

23    A.  You'd fill out an ATF 4473, yes.

24    Q.  Okay.  And then they do the background check, correct?

25    A.  Correct.

1   Q.  And then if that comes back clear, then the FFL hands

2   me the firearm?

3   A.  If it comes back proceed, that transaction will happen

4   right then and there, yes.

5   Q.  Okay.  Or if I have a license to carry?

6   A.  Then you would not be subject to the NICS and Brady

7   check.  That transaction would happen without that check

8   happening.

9   Q.  Okay.  So -- and then all ATF does is maintain

10  that's -- that's the only record you keep is the first-time

11  purchaser, correct?

12  A.  As far as tracing, that's what -- that's what 4473s do

13  is document first-line purchasers.

14  Q.  Okay.  So then as a private owner of firearms, I can

15  sell my firearm to a private citizen; and I don't have to

16  document that with ATF, correct?

17  A.  On a private sale, no, you do not.

18  Q.  Okay.  However, can I do a private sale or a private

19  transfer through an FFL to document it?

20  A.  Yes, you can do those.

21  Q.  Okay.  So if I wanted to document the sale, I could go

22  to an FFL, use them as an intermediary; and they would run

23  a background check on the person that I'm selling it to,

24  correct?

25  A.  Yes.

1    Q.  Okay.  And if somebody did that, then there would be a

2    record of it, correct?

3    A.  Yes.  If you go into an FFL and do it that way on a

4    4473, there would be a record, yes.

5    Q.  Okay.  If I used a website and posted my firearm on a

6    website, like Texas Gun Trader or something like that,

7    would that still be a private sale?

8    A.  Yes.

9    Q.  Okay.  So does the website have any duty to maintain

10   records of that sale, or does it just allow me to post my

11   firearm on that website?

12   A.  Some of them may require you to go through an FFL like

13   when they ship it and do a transfer, but I'm sure there are

14   other websites out there that do not do that at all.

15   Q.  Okay.  And so just because Mr. Frame bought it in

16   Wylie, Texas, doesn't mean he transferred those guns to

17   somebody else in Wylie, Texas, does it?

18   A.  State that again.

19   Q.  Okay.  Just because Mr. Frame lived in Wylie at the

20   time he purchased it -- just because he purchased it in

21   Wylie doesn't mean he transferred it to somebody in Wylie,

22   Texas, correct?

23   A.  Oh, no.  No.

24   Q.  Okay.  He could have taken it to a flea market and sold

25   it there?

1    A.  Yes.

2    Q.  And that happens frequently, does it not?

3    A.  Yes.

4    Q.  Okay.  And there is no way to know from a private sale

5    point of view other than Mr. Frame saying, "I sold it to

6    this person" or "I disposed of the firearms in this way,"

7    correct?

8    A.  Yeah.  I mean, you'd have to start with Mr. Frame and

9    figure out who he sold it to and then trace that lineage

10   back.

11   Q.  Okay.

12           MR. WHALEN:  I'll pass the witness.

13           THE COURT:  Anything further of this witness?

14           MS. RATTAN:  Just one more thing, your Honor.

15           REDIRECT EXAMINATION OF BRENT WAYNE GRESHAM

16   BY MS. RATTAN:

17   Q.  Let me ask you, in the notebook in front of you, if you

18   can look at Government's Exhibit 85.

19           And do you recognize that?  On your direct

20   testimony you testified that you evaluated the firearm,

21   Government's Exhibit 81, to determine whether it had an

22   interstate nexus; is that right?

23   A.  Correct.

24   Q.  And did you do a report concluding that it did?

25   A.  I did.

Jury Trial, Volume 4                          1017

1   Q.  Is Government's Exhibit 85 your report?

2   A.  Yes, ma'am, it is.

3           MS. RATTAN:  Your Honor, we'll offer Government's

4   Exhibit 85, the firearm and ammunition interstate nexus

5   determination.

6           MR. WHALEN:  No objection, your Honor.

7           THE COURT:  85 will be admitted.

8           MS. RATTAN:  And I'll pass the witness.

9           THE COURT:  Anything additional?

10          MR. WHALEN:  No, nothing further, your Honor.

11          THE COURT:  Can this witness be fully excused?

12          MS. RATTAN:  Yes, please.

13          MR. WHALEN:  Yes, your Honor.

14          THE COURT:  Sir, you are free to leave.

15          THE WITNESS:  Thank you.

16          THE COURT:  What's next?

17          MS. RATTAN:  Kris Kort.

18          THE COURT:  Ma'am, if you'll raise your right hand

19  to be sworn in.

20          (The oath is administered to the witness.)

21          THE COURT:  Go ahead and proceed.

22              DIRECT EXAMINATION OF KRISTINA KORT

23              CALLED ON BEHALF OF THE GOVERNMENT

24  BY MS. RATTAN:

25  Q.  Please state your name.

1   A.  Kristina Kort.

2   Q.  And how do you spell your name?

3   A.  K-R-I-S-T-I-N-A K-O-R-T.

4   Q.  Ms. Kort, where do you work?

5   A.  White Rock Medical Center, formerly City Hospital.

6   Q.  City Hospital White Rock?

7   A.  Yes, ma'am.

8   Q.  Where is that?

9   A.  It's located at 9440 Poppy Drive in Dallas.

10  Q.  And what do you do there?

11  A.  I'm the human resources manager.

12  Q.  And, of course, as part of your duties there, you're a

13  custodian of records there at City Hospital?

14  A.  Yes, ma'am.

15  Q.  And let me direct your attention to Government's

16  Exhibit 14A.  Have you reviewed those records before you

17  came into the courtroom this afternoon?

18  A.  Yes, ma'am.

19  Q.  Okay.  And are those records records of City Hospital?

20  A.  Yes.

21  Q.  Are those records made at or near the time of the event

22  that's being recorded there in the hospital?

23  A.  Yes.

24  Q.  And are they made by someone who has knowledge of the

25  event that's being recorded?

 1  A.  Yes, ma'am.

 2          MS. RATTAN:  Your Honor, we'll offer Government's

 3  Exhibit 14A.

 4          THE COURT:  Any objection to fully admitting this?

 5          MR. SANDEL:  If I could just have one second, your

 6  Honor.

 7          MS. RATTAN:  And we'll offer 14B as well.  14A and

 8  B are both City Hospital records.  I think 14A was

 9  previously conditionally admitted.

10          THE COURT:  It was.

11          MS. RATTAN:  And so we'd offer it for all purposes

12  at this point, A and B.

13          (Off-the-record discussion among counsel.)

14          MR. SANDEL:  No objection, your Honor.

15          THE COURT:  Okay.  14A will be fully admitted, and

16  14B is admitted.

17  BY MS. RATTAN:

18  Q.  14B, if we can focus on 14B.

19          MS. RATTAN:  And may we publish that?

20          THE COURT:  Yes, you may.

21  BY MS. RATTAN:

22  Q.  Okay.  Now, this is kind of small and hard to read, but

23  you've reviewed it before testifying; is that right?

24  A.  Yes.

25  Q.  And it's a record of White Rock hospital there in

1  Dallas, Texas --

2  A.  Yes.

3  Q.  -- City Hospital at White Rock?

4  A.  Yes, ma'am.

5  Q.  Now, this says that the source system here is the Pyxis

6  MedStation system.  What is the Pyxis MedStation system

7  there in the hospital?

8  A.  It's the medication dispensary system that we use.

9  Q.  When you say "medication dispensary," what is that?

10  A.  It's similar to -- I guess you could call it like a

11  Coke machine.  You put in a code, because every person who

12  has access to it has a code; and it will dispense whatever

13  they're looking for.

14  Q.  So if somebody is working there in the hospital as a

15  nurse, an ER nurse, and they want to access medication

16  that's controlled there in the machine, the Pyxis machine,

17  they have to enter what?  How do they access the

18  medication?

19  A.  I'm not exactly sure.

20  Q.  Oh, I thought you just said a code --

21  A.  Well, I mean, it's -- it's my understanding that each

22  nurse or pharmacist would have a code to that -- specific

23  to that person.

24  Q.  Now, this is the Pyxis MedStation system, and it's

25  documented a transaction time here; is that right?

1    A.   Yes.

2    Q.   And the transaction time is December 17th of 2019?

3    A.   Yes.

4    Q.   And the system also documents the person who is using

5    the system; is that right?

6    A.   Yes.

7    Q.   And the record here shows that it's Keith Ashley?

8    A.   Yes, ma'am.

9    Q.   And then the person accessing the system has a user ID;

10   is that right?

11   A.   Yes, ma'am.

12   Q.   Now, on this document, Government's Exhibit 14B, we've

13   blacked out the patient's name; but in the actual record --

14   and we've left the initials.  But in the actual record it

15   contains the patient's name; is that right?

16   A.   Yes, ma'am.

17   Q.   And it shows the type of medication, the description of

18   the medication; is that right?

19   A.   Yes.

20   Q.   And does it say that the medication that's being

21   dispensed on December 17th of 2019 to Keith Ashley there in

22   the hospital is etomidate?

23   A.   Yes.

24   Q.   E-T-O-M-I-D-A-T-E, etomidate?

25   A.   Yes.

```
 1              MS. RATTAN:  May I approach the witness, your
 2   Honor?
 3              THE COURT:  Yes, you may.
 4   BY MS. RATTAN:
 5   Q.  Let me show you this.  It has the date of December 17th
 6   of 2019, Keith Ashley receiving etomidate there at the
 7   hospital.
 8   A.  Yes, ma'am.
 9   Q.  And that's what your records document?
10   A.  Yes.
11              MS. RATTAN:  Now if we can look at and publish the
12   next page of that exhibit, page 2.
13   BY MS. RATTAN:
14   Q.  Is this a record of daily staffing or Daily Assignment
15   Sheet there in the hospital?
16   A.  Yes.
17   Q.  And is it for that same date, December 17th of 2019?
18   A.  Yes.
19   Q.  And does it show that from 7:00 a.m. to 7:00 p.m., an
20   RN in the name Keith was doing a shift there at the
21   hospital?
22   A.  Yes.
23              MS. RATTAN:  I'll pass the witness, your Honor.
24              THE COURT:  Cross-examination?
25                                      *
```

```
 1              CROSS-EXAMINATION OF KRISTINA KORT

 2   BY MR. SANDEL:

 3   Q.  Good afternoon, Ms. Kort.  How are you?

 4   A.  Doing well.  Thank you.  How are you?

 5          MR. SANDEL:  If we could please put

 6   Government's 14B, page 1, back on the screen.

 7          And if we could just zoom in.  There you go.

 8   Thank you so much.

 9   BY MR. SANDEL:

10   Q.  Ms. Kort, you recall looking at this exhibit on your

11   direct examination, correct?

12   A.  Yes.

13   Q.  I just wanted to ask you a couple of follow-up

14   questions about this.

15          When you were asked about this entry over here,

16   the med description -- do you see that where I've circled?

17   A.  Yes.

18   Q.  Does it show what quantity of drug was removed from the

19   Pyxis?

20   A.  I don't know how to read that.  I'm not a pharmacist.

21   Q.  Okay.  So do you see here where it says (as read):

22   "20-milliliter vial"?

23   A.  Yes.

24   Q.  Okay.  Now, how familiar are you with the Pyxis system?

25   A.  I just know that people are issued an identification
```

```
 1   number code to get into it.
 2   Q.  Okay.  And with --
 3   A.  And that it holds medication.
 4   Q.  And without that identification number, that Pyxis is
 5   locked and it's not just anybody can access it, correct?
 6   A.  Correct.
 7   Q.  Do you know if that Pyxis is audited every night to
 8   make sure that nothing is missing that hasn't been logged?
 9   A.  I don't know.
10   Q.  You wouldn't be the person to ask about that?
11   A.  No, sir.
12   Q.  Who would be the right person to ask about those types
13   of questions?
14   A.  That would be somebody in the pharmacy.
15   Q.  Somebody in the pharmacy, okay.
16   A.  Either the manager or director of the pharmacy.
17   Q.  All right.  Thank you, Ms. Kort.
18            MR. SANDEL:  Nothing further, your Honor.
19            THE COURT:  Anything additional?
20            MS. RATTAN:  No, your Honor.
21            THE COURT:  Can this witness be fully excused?
22            MS. RATTAN:  Yes, please.
23            THE COURT:  Well, hearing no objection from
24   defense, go ahead.  You may leave, ma'am.  Thank you.
25            Okay.  What's next?  Oh, we'll go ahead and --
```

1   let's go ahead and take our afternoon break.  It's a little

2   after 3:00.

3          Okay.  Ladies and gentlemen, again, please don't

4   discuss the case among yourself or anyone else.  Don't do

5   any outside research.  We'll take 15 minutes, come back,

6   and continue.  Thank you.

7          (The jury exits the courtroom, 3:03 p.m.)

8          THE COURT:  Anything further from the government?

9          MS. RATTAN:  No, your Honor.

10          THE COURT:  Defense?

11          MR. SANDEL:  No, your Honor.

12          THE COURT:  Okay.  See you back in 15.

13          (Recess, 3:04 p.m. to 3:20 p.m.)

14          (Open court, defendant present, jury present.)

15          THE COURT:  Please be seated.

16          What's next, Ms. Rattan?

17          MS. RATTAN:  The United States calls Melanie

18   Flinn-Oviedo.

19          THE COURT:  Ma'am, if you will raise your right

20   hand to be sworn in.

21          (The oath is administered to the witness.)

22          DIRECT EXAMINATION OF MELANIE FLINN-OVIEDO

23             CALLED ON BEHALF OF THE GOVERNMENT

24   BY MS. RATTAN:

25   Q.  Would you please state your name.

```
 1    A.   My name is Melanie Flinn.

 2    Q.   And can you spell it for us.

 3    A.   M-E-L-A-N-I-E F, as in "Frank," L-I-N-N.

 4    Q.   And, Ms. Flinn, where do you work?

 5    A.   I work at White Rock Medical Center.

 6    Q.   And is that in Dallas?

 7    A.   That's in Dallas, Texas.

 8    Q.   Is it a hospital, essentially?

 9    A.   Yes, it's a hospital.

10    Q.   Can you describe for the jury what you do at the

11    hospital?

12    A.   I'm actually the ancillary director, and I am the

13    director of pharmacy.

14    Q.   What's an ancillary director?

15    A.   I help supervise the ancillary departments, such as the

16    lab, respiratory, physical therapy, and other areas of the

17    hospital.

18    Q.   And then your relationship with the pharmacy, your role

19    there in the pharmacy, what is it?

20    A.   I'm the director of pharmacy.

21    Q.   And when you say "director of pharmacy," what are your

22    responsibilities?

23    A.   I oversee the pharmacy operations.

24    Q.   How long have you been working at the hospital?

25    A.   I have been at the hospital since 2009.
```

1  Q.  Can you describe for the jury what your educational

2  background is that qualifies you as the director of the

3  pharmacy?

4  A.  I have a license in pharmacy from the State Board of

5  Texas.  I have been in hospital pharmacy for over 30 years.

6  Q.  And does the hospital have the Pyxis system?

7  A.  Yes, ma'am.

8  Q.  And when we say "Pyxis," is that P-Y-X-I-S?

9  A.  Yes, ma'am.

10  Q.  Pyxis.

11        Can you explain what the Pyxis system is?

12  A.  The Pyxis system is an automated dispensing machine.

13  It's a way to secure medications and help us keep an

14  inventory of medications.

15  Q.  And how does it work?

16  A.  Typically, you get an order from a physician; and you

17  would find the patient in the machine from being admitted

18  to the hospital.  If it's an emergent situation, then a

19  staff member is going to put the information in the system.

20        You match the drug with the order, and it allows

21  you to pull out the dose that's prescribed.

22  Q.  Is it a sort of a security system?

23  A.  It is.  It's sort of like an ATM, I would say.

24  Q.  An ATM for medication in the hospital?

25  A.  Correct.

1    Q.  So it makes sure that the medication is secure.  Is it

2    also -- does it also have an inventory function?

3    A.  It does.

4    Q.  So you keep the medication safe, and you know how much

5    you have?

6    A.  Yes, ma'am.

7    Q.  How does a hospital employee access the medications

8    that are kept secure in the Pyxis system?

9    A.  We have a form that's filled out when the staff member

10   comes.  And if they are of a certain discipline, then their

11   manager fills out a form for the staff member; and they are

12   entered into the system by pharmacy personnel.

13   Q.  And if an employee, a registered nurse, needs to get

14   something out of the Pyxis system, a medication, physically

15   how do they do that?

16   A.  They will pull up the patient.  They will pull up the

17   order.  And if the medication is stored in the Pyxis,

18   they'll choose the medication; and a drawer will pop open.

19   Mostly the drawers do have a secure flap on the top.

20   Q.  So the employee would have to enter a unique number

21   that's unique to them?

22   A.  Yes.

23   Q.  And the system would record that happening?

24   A.  Yes, ma'am.

25   Q.  Can you describe what the drug etomidate is, not

 1   specifically but just globally?

 2   A.  Etomidate is a short-acting sedative.

 3   Q.  And so would the hospital keep etomidate in the Pyxis

 4   system?

 5   A.  Yes, ma'am, in certain areas.

 6   Q.  And what do you mean by "certain areas"?

 7   A.  In certain areas of the hospital, we keep emergent

 8   drugs, being an OR, ER, ICU.

 9   Q.  So sometimes the etomidate would not be in Pyxis?

10   A.  Correct.

11   Q.  And that's if it's in a special unit, because there

12   might be an emergency situation?

13   A.  Yes, ma'am.

14   Q.  Now let me ask you --

15           MS. RATTAN:  May I approach the witness, your

16   Honor?

17           THE COURT:  Yes.

18   BY MS. RATTAN:

19   Q.  There is a notebook on the stand in front of you; and I

20   want to show you Government's Exhibit 14C, which you could

21   probably turn to but just let me -- oh, that's in the other

22   book.

23           MS. RATTAN:  May I return, your Honor?

24           THE COURT:  Yes, you may.

25           MS. RATTAN:  And may we publish Government's

1    Exhibit 14B?  I said C a minute ago, but if we can publish

2    14B, rather.

3            THE COURT:  Yes, go ahead.

4    BY MS. RATTAN:

5    Q.  Okay.  Ms. Flinn, this is Government's Exhibit 14B.

6    Can you explain to the jury what this is?

7    A.  This is an electronic record that is produced out of

8    our Pyxis system.  Our Pyxis system keeps an electronic

9    record of anytime anyone accesses the Pyxis or moves

10   anything from the Pyxis, inventories, anything.

11   Q.  And so this is the Pyxis system.  It has the date

12   December 17th, 2019.  The user name is Keith Ashley.  We've

13   redacted or covered the patient's name for their privacy.

14   And then it indicates the drug that was accessed; is that

15   right?

16   A.  Yes, ma'am.

17   Q.  So Pyxis, December 17th, 2019, Keith Ashley, and the

18   drug is etomidate?

19   A.  Yes, ma'am.

20   Q.  And let me direct your attention to Government's

21   Exhibit 14C.  Do you recognize that as being an example of

22   what etomidate would look like?

23   A.  Yes, that is an example.

24           MS. RATTAN:  Your Honor, we'll offer Government's

25   Exhibit 14C.

```
 1              MR. SANDEL:  No objection, your Honor.

 2              THE COURT:  Okay.  14C will be admitted.

 3              MS. RATTAN:  And may we publish it?

 4              THE COURT:  Yes, you may.

 5   BY MS. RATTAN:

 6   Q.  Okay.  Will you describe just what this is?

 7   A.  This is just a picture of an etomidate vial.

 8   Q.  And so this is what would be held in the Pyxis machine

 9   that an employee with their secure ID or secure number

10   could access?

11   A.  This is an example, yes, ma'am.

12   Q.  Okay.

13              MS. RATTAN:  I'll pass the witness.

14              THE COURT:  Cross-examination?

15              CROSS-EXAMINATION OF MELANIE FLINN-OVIEDO

16   BY MR. SANDEL:

17   Q.  Good afternoon, Ms. Oviedo.  How are you?

18   A.  Good, thank you.

19   Q.  And did I pronounce your last name, correctly?

20   A.  My actual name is Melanie Flinn.  Oviedo is my married

21   name.

22   Q.  Okay.  And would you prefer I call you --

23   A.  My license is in my married (sic) name, as Flinn.

24   Q.  So would you --

25   A.  I mean my -- sorry.
```

```
 1   Q.  Would you prefer I call you "Ms. Flinn"?

 2   A.  Yes.

 3   Q.  Okay.  Ms. Flinn, how are you?

 4   A.  Good, thank you.

 5   Q.  I just had a couple of questions for you following up

 6   on what you just spoke with Ms. Rattan about, okay?

 7   A.  Okay.

 8           MR. SANDEL:  If we could start by looking at 14B,

 9   page 1.

10           Thank you, ma'am.

11   BY MR. SANDEL:

12   Q.  All right.  Ms. Flinn, you recall looking at this

13   screen, right?

14   A.  Yes, sir.

15   Q.  Okay.  I wanted to ask you some specific questions

16   about this screen.  Now, the first thing is I want to draw

17   your attention to these columns over here.  Do you see

18   where I've circled?

19   A.  Yes, sir.

20   Q.  Can we tell by this screen how much of that drug was

21   dispensed to Mr. Ashley?

22   A.  Yes, you can.

23   Q.  Okay.  And how much was dispensed?

24   A.  20 MLs.

25   Q.  20 MLs.
```

1          MR. SANDEL:  And so if we can quickly look at

2     Government's Exhibit 14C.

3     BY MR. SANDEL:

4     Q.  And so that would be consistent with this vial that we

5     looked at here, correct?

6     A.  Yes, sir.

7     Q.  Okay.

8          MR. SANDEL:  So going back to 14B now.

9     BY MR. SANDEL:

10    Q.  If Mr. Ashley had wanted multiple vials of this

11    etomidate, would there be multiple entries; or would it

12    just indicate that over there in the description?

13    A.  It would tell us how many that he removed.

14    Q.  Okay.  So if he removed more than one vial, it would --

15    it would indicate that here?

16    A.  Yes, sir.

17    Q.  Okay.  Now, the other thing I wanted to draw your

18    attention to, we talked about this patient name which has

19    been redacted, correct?

20          When a nurse removes a drug from the Pyxis system,

21    do they always have to link that drug with a specific

22    patient?

23    A.  Unless a person comes in as a John Doe, yes, sir.

24    Q.  Okay.  And why is that important?

25    A.  Can you rephrase that?

1  Q.  Sure.

2       Why would the Pyxis system be set up to where it

3  has to dispense a drug linked to a specific patient?

4  A.  Patient safety.

5  Q.  Patient safety.

6       And what do you mean by that?

7  A.  Making sure the patient gets the correct drug.

8  Q.  And so we want to avoid a situation where if a -- for

9  example, if a patient is allergic to a certain drug, the

10 system would not let a nurse get a drug that that patient

11 was allergic to, correct?

12 A.  That's not necessarily the case.  It would let the --

13 it would alert the nurse that the patient has an allergy to

14 the drug, yes, sir.

15 Q.  Now, before a nurse can retrieve a drug linked to a

16 specific patient, you testified about an order has to be

17 processed.  What is that procedure?

18 A.  On the normal floor we're gonna -- unless it's in an

19 emergent situation, we're going to have a patient order for

20 the drug.

21      In the emergency room you may not necessarily have

22 an order for a drug if it's an emergent situation.  There

23 are some drugs that are on override.

24 Q.  Okay.  So there are certain drugs that you don't need

25 an order for; but the typical way is a doctor has to order

1   a specific drug for a specific patient, correct?

2   A.  Correct.

3   Q.  And then the pharmacy department inputs that order into

4   the Pyxis system?

5   A.  No, sir.

6   Q.  Talk me through that.

7   A.  The physician will enter the order.

8   Q.  The physician enters the order into the Pyxis system,

9   correct?

10  A.  Into the electronic medical record.

11  Q.  Okay.

12  A.  There are actually no orders entered into a Pyxis

13  system.

14  Q.  Okay.  So how does Pyxis communicate with the

15  electronic system to know when a specific drug has been

16  ordered for a specific patient?

17  A.  Via interface.

18  Q.  Okay.  So those two systems talk to one another?

19  A.  Yes, sir.

20  Q.  Okay.  But in any event, typically what happens is a

21  physician will order this drug for this patient; and then

22  through some communication, Pyxis then knows that if a

23  nurse comes and tries to dispense that product, there has

24  been a physician order for that, correct?

25  A.  Typically, yes, sir.

1   Q.  Now, can we tell, from looking at this screen, if it

2   was a situation like that or if it was a situation where

3   this was what you called an override?  Can we tell from

4   this screen?

5   A.  No, you cannot.

6   Q.  Okay.  Now, the other thing that I recall you saying on

7   direct examination is sometimes drugs like etomidate aren't

8   located in the Pyxis system.

9        Do you recall testifying to that?

10  A.  Yes, sir.

11  Q.  Okay.  And I think you said that's when they're in a

12  special unit?

13  A.  Not in a special unit but in a box, a lockbox located

14  in the Pyxis.  So not in a special unit.

15  Q.  Okay.  So you said --

16  A.  So if a nurse was to get a box with drug in it, they

17  would have to log in to the Pyxis and pull the box out of

18  the Pyxis.  So there would be an electronic record of that.

19  Q.  Okay.  So tell me if I'm summarizing this right.  What

20  you're saying is that sometimes you can log into the Pyxis

21  and get just a box that has various medications in it and

22  one of those medications is etomidate?

23  A.  There is a box, an RSI box -- there was.  There is not

24  anymore.

25  Q.  Okay.

1  A.  But I think you'll find in normal standing operating

2  procedures, there is a rapid sequence intubation box in

3  most facilities; and there are two drugs located in that

4  box, one being etomidate.

5  Q.  Okay.

6  A.  To get that box out of the Pyxis, you will need to

7  enter your credentials and a patient name to get that box.

8  Q.  Got it.

9      Okay.  So we would still see a Pyxis entry.  It

10 just may not say etomidate specifically; it would say that

11 they got the RSI box out of it?

12 A.  Correct.

13 Q.  Okay.  That makes sense.

14      Now, you said that etomidate and similar drugs are

15 typically used in emergency situations, correct?

16 A.  Yes, sir.

17 Q.  So -- and we look here; and the station we're in, we're

18 in the ER, correct?

19 A.  Yes, sir.

20 Q.  Now, the ER at the hospital, is that area accessible to

21 the public?

22 A.  No, sir.

23 Q.  How would one gain access to the ER?

24 A.  Do you want to rephrase that?

25 Q.  So if Mr. Ashley was working as an ER nurse, how does

1    he get back to the emergency room?  Does he have a key

2    card?

3    A.  Currently we have a badge system.

4    Q.  A badge system.

5         Do you know what the system was back in December

6    of 2019?

7    A.  No, sir, I do not.

8    Q.  But is it fair to say there was some security measure

9    that would log who was coming into and out of the ER?

10   Correct?

11   A.  Yes, sir.

12   Q.  Okay.  And so to get to the emergency room, you either

13   have to badge in or punch in a code or something to get

14   back there, correct?

15   A.  Correct.

16   Q.  And that -- again, for security, that keeps people like

17   me who have no business in an ER from just walking back in

18   an emergency room, fair?

19   A.  Yes, sir.

20   Q.  And does the hospital have a log so that at any given

21   point you can see who had badged in or out of the emergency

22   room?

23   A.  I do not have access to that information.

24   Q.  But do you know that that -- if that information is

25   accessible by someone?

```
 1   A.  Yes, sir.

 2   Q.  Okay.  Thank you, ma'am.

 3           MR. SANDEL:  I'll pass the witness, your Honor.

 4           THE COURT:  Anything further?

 5           MS. RATTAN:  No, your Honor.

 6           THE COURT:  Can this witness be fully excused?

 7           MS. RATTAN:  Yes, please.

 8           MR. SANDEL:  Yes, your Honor.

 9           THE COURT:  Ma'am, you are free to leave.

10           What's next?

11           MS. RATTAN:  Your Honor, I'd like to offer

12   globally a number of exhibits, with the Court's permission.

13           THE COURT:  Okay.

14           MS. RATTAN:  And we'll offer the following exhibit

15   numbers:  1, 2, 3, 5, 6, 7A, 7B --

16           8A was previously conditionally admitted.  We'd

17   offer 8A for all purposes.

18           -- 9, 10, 11A, 11B, 13, 16, 17, 19, 24, 25, 26,

19   27, 29B, 31, 32, 33A, 33B, 34, 38, 40, 42A, 45B, 53B, 54,

20   86, 87, 95, 98, 99, 100, 103A, 103B, 104, 105, 106, 107,

21   108, 109 --

22           I believe page 1 of 109 was previously admitted.

23   We'll offer that for all purposes at this point.

24           -- 110, 112A, 112B, 113, 114, 118A, 118B, 118C,

25   119A, 119B, 122, 123A -- at this point we will not be
```

 1  offering 123A yet.

 2          And I'll skip to 124A, 124B.  That's our offer at

 3  this point, your Honor -- oh, may I have a moment?

 4          THE COURT:  Yes.

 5          (Off-the-record discussion among counsel for the

 6  government.)

 7          MR. WHALEN:  Your Honor, we have no objection to

 8  those.

 9          THE COURT:  I'll go ahead and admit all those

10  exhibits.

11          MS. RATTAN:  Thank you, your Honor.

12          THE COURT:  What's next?

13          MR. COMBS:  The government calls Sarah Hughes.

14          THE COURT:  Okay.  If you'll raise your right hand

15  to be sworn in.

16          (The oath is administered to the witness.)

17          THE COURT:  Go ahead and proceed.

18          MR. COMBS:  Thank you.

19                  DIRECT EXAMINATION OF SARAH HUGHES

20                  CALLED ON BEHALF OF THE GOVERNMENT

21  BY MR. COMBS:

22  Q.  Ma'am, can you please state your name.

23  A.  Sarah Hughes.

24  Q.  And how do you spell your last name?

25  A.  H-U-G-H-E-S.

1   Q.  And where are you employed, Ms. Hughes?

2   A.  I work at the Southwestern Institute of Forensic

3   Sciences.

4   Q.  What are your duties there?

5   A.  I'm a toxicologist there.

6   Q.  How does one become a toxicologist?

7   A.  So my educational background is I have a Bachelor of

8   Science degree in chemistry from The University of Texas at

9   Arlington.

10          I also am licensed with the Texas Forensic Science

11  Commission as a non-interpretive toxicologist.

12  Q.  What's a non-interpretive toxicologist?

13  A.  So as a non-interpretive toxicologist, I test

14  samples -- biological samples, primarily blood -- for a

15  variety of compounds, drugs, and metabolites.

16          But I can testify to the whole process -- sample

17  preparation, instrumentation, data processing, that sort of

18  thing -- but I cannot tell you anything or testify about

19  the effects that that might have on the body.

20  Q.  Okay.  And you said that you are with the Southwestern

21  Institute for Forensic Sciences.  That's a mouthful.  Do

22  people call that by an abbreviation?

23  A.  SWIFS, yes.

24  Q.  SWIFS, that's what everybody calls it by?

25  A.  That's correct.

1   Q.  How long have you been at SWIFS?

2   A.  I've been employed at SWIFS for a little over eight

3   years now.

4   Q.  During that time have you been in the toxicology

5   department the whole time?

6   A.  No.  I started in the controlled substance laboratory.

7   I was there for approximately a year, and then I

8   transferred down to the toxicology lab.

9   Q.  All right.  What do you do on a -- on a day-to-day

10  basis?  What's your job there at SWIFS?

11  A.  So I do bench chemistry to prepare samples for

12  analysis.  I spend -- most days I do some sort of

13  extraction in the lab, and then I put them on analytical

14  instruments and process the data.

15  Q.  And do you -- what type of substance do you test -- or

16  what type of substances do you test?

17  A.  We test for a lot of different things, both controlled

18  substances and pharmaceutical drugs, even just other

19  compounds, metabolites, too.  We detect and report.

20  Q.  Now, are you testing a -- you know, blood, urine; or

21  are you testing the substances themselves to see if they

22  are, you know, cocaine or methamphetamine or whatever?

23  A.  So I test the biological samples.  It's primarily blood

24  that we test.  However, sometimes we also test urine,

25  vitreous fluid, even muscle homogenates if there is no

1   blood available.

2   Q.  Okay.  And over the course of your career, how many

3   vials of blood have you tested?

4   A.  That's a very hard number to estimate.  A typical batch

5   that I run might have one or two dozen samples; and I run

6   probably four or five batches a week, so quite a few.

7   Thousands.

8   Q.  Quite a few, okay.

9           And have you ever testified before?

10  A.  Yes.

11  Q.  How many times?

12  A.  I've only testified once before.

13  Q.  Okay.  And was that in state court?

14  A.  Yes.

15  Q.  Okay.  Where was that?

16  A.  Dallas, Texas.

17  Q.  All right.  And can you tell -- you talked about

18  testing blood, primarily blood.  When you're asked to test

19  a sample of blood, how do you know what you're going to

20  test it for?

21  A.  So we have a laboratory information management system,

22  a computer software program we call LIMS.  And I look in

23  that software at our testing queues, what kind of tests

24  need to be ran for the day.  And depending on the needs of

25  the lab, what queues are high, I'll select one to test; and

 1    I'll just go ahead right down the row, the oldest cases

 2    first.  I'll grab a handful of them and select those for

 3    testing.

 4    Q.  All right.  And do you -- how do you associate that

 5    test with yourself?  I mean in the computer system.

 6    A.  So in the computer system I can assign my name to that

 7    task, and that takes it out of the testing queue.

 8    Q.  Okay.  Do you have to scan anything, scan your badge or

 9    enter a PIN, anything like that?

10    A.  So whenever I go into the laboratory and I retrieve the

11    sample for testing, I take it out of our toxicology storage

12    refrigerator.

13           I will then take it to the computer and scan the

14    tube and my badge and input my PIN to electronically

15    transfer it into my custody.

16    Q.  All right.  And the tube that contains blood, in this

17    case what we're talking about is -- does that have a unique

18    identifier on it?

19    A.  Yes.  All of our tubes will have unique identifying

20    numbers.

21    Q.  Okay.  And so, now, is that unique identifier

22    associated with you and your name so that we marry up the

23    test with the chemist?  Is that right?

24           Or the substance that's being tested with the

25    chemist.

 1   A.  I'm not quite sure what you're asking.  The case itself

 2   will have the unique number, an IFS number; and then --

 3   that's the case number.  And then each tube is also

 4   numbered.

 5   Q.  Okay.

 6   A.  Did that answer your question?

 7   Q.  Sure.

 8        So the tube has a sub number on it; is that right?

 9   A.  Yes.

10   Q.  So there may be multiple tubes in a particular case?

11   A.  Yes.  Usually there are.

12   Q.  All right.  And then now the -- does the computer --

13   once you've scanned your badge and entered your PIN, does

14   the computer recognize that you're the person who is

15   testing the substance?

16   A.  Yes.

17   Q.  And so --

18   A.  It -- my name is assigned in the computer system as

19   being on that test, and my name is then next to the tube.

20   If you were to look up the location of the tube, my name

21   would appear next to it.

22   Q.  Okay.  And so then are reports eventually prepared

23   regarding your results?

24   A.  Yes, they are.

25   Q.  Okay.  Once you run the test -- and we'll get into some

1    more detail in a little bit about the test itself.  But

2    once you run the test, is anything done to confirm your

3    tests?

4    A.  If we have a positive result for anything, that sends

5    the case back for further testing.  We always have a

6    confirmation test whenever there is a positive result.

7    Q.  Every time?

8    A.  Yes.

9    Q.  Okay.  And then does it go through any sort --

10   A.  I'm sorry.  Can I clarify something?

11   Q.  Yes, certainly.

12   A.  On very rare occasions, with limited specimen, we may

13   only test once; but we would have a clarifying statement on

14   the report saying, "Due to limited specimen, the results

15   are only reflective of one analysis."

16   Q.  Okay.  So after there is a test and then a confirmatory

17   test, does it go through any supervisory or next-level

18   review?

19   A.  Yes.

20           After the analysts have performed the testing,

21   before the case is finalized, it goes to a technical

22   reviewer; and they will review the whole case as a whole,

23   all of the data contained in it, before the report is

24   finalized.

25   Q.  Okay.  And we kind of jumped right into the middle of

```
 1   it and I apologize, but where do most of your samples come
 2   to you from?
 3   A.  The majority of the samples that we test in the lab are
 4   medical examiner cases from autopsies.
 5   Q.  So they refer the blood over to be tested by you and
 6   your lab?
 7   A.  That's correct.
 8          MR. COMBS:  If we could pull up Government's
 9   Exhibit 98, page 1.  It's previously been admitted.
10          And zoom in on the first probably third.
11   BY MR. COMBS:
12   Q.  Looking right here, this Southwestern Institute of
13   Forensic Sciences, is that where you work?
14   A.  Yes, it is.
15   Q.  But you don't work in the office of the medical
16   examiner, right, or do you?
17   A.  It's the same building.  I'm in the forensic chemistry
18   department on the third floor of that building.
19   Q.  Okay.  Same building.
20          And you said earlier that there was -- the tubes
21   would be assigned -- or a case would be assigned an IFS
22   number.
23          Do you see an IFS number on this autopsy report?
24   A.  Yes.
25   Q.  Where is that?  You can circle on the screen there.
```

1    A.   (Complying.)

2    Q.   Okay.  So that's the IFS-20-03172, and then it has a

3    "-ME."  What the does "ME" stand for?

4    A.   Medical examiner.

5    Q.   Okay.  So did you test any samples in that particular

6    case?

7    A.   Yes, I did.

8    Q.   And what type of substance were you called upon to

9    test?

10   A.   So I --

11   Q.   Or, I mean, like what type of bodily fluid were you

12   asked to perform a test on?

13   A.   There's blood in the case and that's the preferred

14   specimen, so I tested the blood.

15   Q.   Okay.  And when you tested it -- you said earlier when

16   we were talking about when you assign a case out to

17   yourself or a sample out to yourself, there's tests that

18   have been ordered, right?

19        So do you decide what tests to perform on that

20   particular blood, or does somebody else ask you to perform

21   particular tests?

22   A.   So the medical examiner cases almost always have the

23   same standard four tests required.  That's an alcohol

24   analysis; an ELISA test; and then two different drug

25   screens, an acid neutral drug screen and the QTOF drug

 1  screen which looks for more basic analytes.

 2  Q.  Okay.  And which of those screens did you do?

 3  A.  I performed the QTOF test.

 4  Q.  Okay.  Explain for the jury.  What does -- first of

 5  all, what does "QTOF" stand for?

 6  A.  So QTOF, it's actually -- the full name of the

 7  instrument is a liquid chromatography quadrupole

 8  time-of-flight mass spectrometer, or LC QTOF MS.  But for

 9  simplicity, we call it a QTOF.

10  Q.  Okay.  Is that a fairly sophisticated machine?

11  A.  Yes.

12  Q.  Does every lab in the country have them?

13  A.  No.  They're very expensive.  So I think it would be

14  ideal for every lab to have it, but they're cost

15  prohibitive.

16  Q.  Okay.  But your lab is one of the ones that does have

17  it; is that right?

18  A.  That's correct.

19  Q.  Okay.  Could you describe just very briefly what -- how

20  does a QTOF work?  What does it do to test the blood?

21  A.  Sure.

22       So the sample first has to be prepared to be

23  suitable to put on the instrument.  After the extraction

24  and it's prepared, I will place the extracted sample into

25  the LC side, the liquid chromatography side; and it will

1   separate out first the component, the prepared sample.

2          Then it moves on to the second part, the QTOF

3   side; and that's responsible for identifying the components

4   within the sample.

5          So first it will scan a range of molecular masses

6   and stabilize one at a time going through the first part,

7   the quadrupole.  It sends it to a collision cell where that

8   molecule is broken apart into pieces, fragments, fragment

9   ions.

10         And then it goes into the time-of-flight tube

11  last, and there the fragments are separated based on size

12  as they go through the tube.

13         They hit a detector, and the fragments and their

14  abundances are plotted on something called the mass

15  spectrum.  And that the computer software will use to

16  search a library database of standards to look for a

17  potential match.

18  Q.  And you said the QTOF is what you performed in this

19  particular case?

20  A.  That's correct.

21  Q.  And how many different substances were you looking for?

22  What was kind of the library of substances that you were

23  looking for to see if they were in, in this case,

24  Mr. Seegan's blood?

25  A.  We look for approximately 300 different drugs in that

1  test.

2  Q.  Okay.  And when you performed this test, did you -- out

3  of those 300 drugs, how many of them came up as positive?

4  A.  I found only one match, etomidate.

5  Q.  Etomidate.  And --

6          MR. COMBS:  Could we go to Government's

7  Exhibit 98, page 4, please.

8  BY MR. COMBS:

9  Q.  And do you recognize that?

10  A.  Yes.

11  Q.  Okay.  Now, where -- circle, if you would, on your

12  screen, using your finger -- on the screen to your right --

13  which one of those tests you performed.

14  A.  (Complying.)

15  Q.  And that's the "Drug Screen (QTOF) etomidate detected";

16  is that right?

17  A.  That's correct.

18  Q.  And what does that mean when it says "Item# 005-005"?

19  A.  That's the tube number associated with the case.  If

20  you look just above, the evidence submitted, there's all

21  the different items.  They all have their own sub number.

22  Q.  Okay.  So this was the -- this tube of Mr. Seegan's

23  blood; is that right?

24  A.  That's correct.

25  Q.  Okay.  And that's the one that you tested using the

```
 1   QTOF machine.  And out of several hundred substances you

 2   were looking for, one was detected; and that was etomidate?

 3   A.  Yes.

 4          MR. COMBS:  Could we go to the next page, please.

 5   BY MR. COMBS:

 6   Q.  And ultimately your results go to a medical examiner;

 7   is that right?

 8   A.  Yes.

 9   Q.  Go back to the medical examiner who referred the

10   samples to you?

11   A.  That's correct.

12   Q.  And then they eventually issue a report; is that right?

13   A.  Yes.

14   Q.  And in this case what was the date of the report?

15   A.  The medical examiner report?

16   Q.  The medical examiner report.  That's right.

17   A.  It was April 1st of 2020.

18   Q.  Okay.

19          MR. COMBS:  May I approach, your Honor?

20          THE COURT:  Yes.

21   BY MR. COMBS:

22   Q.  And so on April 1st of 2020, the medical examiner's

23   report documents that etomidate was in James Seegan's

24   blood.  And that's based on the QTOF test that you

25   performed and the toxicology report that was forwarded to
```

1   the medical examiner; is that accurate?

2   A.  Yes, that is.

3   Q.  Okay.  Thank you.

4           MR. COMBS:  Pass the witness.

5           THE COURT:  Cross-examination?

6               CROSS-EXAMINATION OF SARAH HUGHES

7   BY MR. WHALEN:

8   Q.  Ms. Hughes, how are you today?

9   A.  I'm fine.  Thank you.

10  Q.  All right.  Just so we're clear, so you work for SWIFS,

11  correct?

12  A.  That's correct.

13  Q.  Okay.  And so is that run or controlled by Dallas

14  County?

15  A.  Well, we're a fee-for-service lab; so we'll test

16  anything that is provided so long as you pay the fee.  But

17  we primarily work with Dallas County.

18  Q.  Okay.  And just so I understand the testing that you

19  did, you just did the QTOF testing, correct?

20  A.  Yes.

21  Q.  Okay.  And what date, if you can recall, you did that

22  testing?

23  A.  February 27th, 2020.

24  Q.  Okay.  So you did that testing on February 27th, 2020.

25          And did you get that result on February 27th of

```
 1   2020?
 2   A.  I likely processed it a day later, so it would probably
 3   be February 28th that I went through my data.
 4   Q.  Okay.  So you had that result by February 28th of 2020,
 5   correct?
 6   A.  May I reference my case file?
 7   Q.  Absolutely.  If you need to look at your case file to
 8   refresh your memory, that's fine.
 9   A.  Thank you.
10   Q.  Okay.
11   A.  I don't know exactly when I reported etomidate, but I
12   believe it was the next day.  Typically we process in a
13   timely fashion.
14   Q.  Okay.  And I think you said if you get a positive
15   result, then you retest; is that correct?
16   A.  It goes for further testing.  That is correct.
17   Q.  Okay.  Did you -- and who does that further testing?
18   A.  Just another analyst.  In this case it was another
19   analyst in the lab, Amanda Rausche.
20   Q.  Okay.  So it is a separate person, then?
21   A.  Oh, I'm sorry.  No, it could have been me.  It's
22   whoever -- we look at the testing queues.  Whatever needs
23   to be done for the day, we'll just select it.  It's more
24   random.
25   Q.  Okay.  And then you also talked about that it pushes
```

1   through this machine and then it compares itself to this

2   library of standards, correct?

3   A.   That's correct.

4   Q.   Okay.  And where do the standards come from?

5   A.   Through certified reference materials that the lab has

6   purchased and ran on the instrument to create our library.

7   Q.   Okay.  And how often do you update the standards to

8   verify that the standard is accurate and a good standard?

9   A.   I believe we've only ran them once since we've had the

10  machine.

11        We do rerun every once in a while for different

12  concentrations because the fragmentation abundance might be

13  slightly different at larger or very low concentrations,

14  but typically once.

15  Q.   Okay.  So when did you-all get the QTOF machine?

16  A.   I believe it was around 2017 or 2018 is when we got our

17  first QTOF.

18  Q.   Okay.  And so then -- just so I understand it because

19  I'm not very good at science.  When you get the machine,

20  you run the standards through it, once you get the machine,

21  to make sure it's in good working order, correct?  Is

22  that --

23  A.   Yes.  There is a validation process that we go through

24  and we run the standards, build our library.

25  Q.   Okay.  And then so how often do you recheck the library

1   to make sure that the QTOF is, one, in good working order

2   but also capable of giving a reliable result?

3   A.  So we check our QTOF every day it's ran.  We run a tune

4   and a system suitability test.

5           Also with every set that we run, we have

6   calibrators and controls we run.  So the very day that I

7   ran in this case, I ran a calibrator that contained

8   etomidate and had an appropriate library match.

9   Q.  Okay.  And, once again, you got that result on

10  February 28th -- maybe give or take a day, February, maybe

11  March because there's only 28 days of February, around that

12  time, correct?

13  A.  Yeah.  The data was acquired on February 27th.  I

14  probably sat down and processed it on or around

15  February 28th.

16  Q.  Okay.  And then after you get that data, since it's an

17  ME sample, it then gets forwarded to the medical examiner's

18  office, right?

19  A.  Could you repeat the question?

20  Q.  Yeah.

21          So you get this result -- you've been tasked with

22  running this blood, correct?

23  A.  Correct.

24  Q.  Okay.  And then you take your results and you send them

25  to Dr. Ogden, correct, or her office?

 1  A.  After the confirmation?

 2  Q.  Yes.

 3  A.  After the technical review, the report when it's

 4  finalized, that's when it will be sent to the medical

 5  examiner.

 6  Q.  Okay.  And then as far as you know, they'll review

 7  that; and then they issue their report, correct?

 8  A.  As far as I know, yes.

 9  Q.  Okay.  And the report that we saw here was issued on

10  April 1st of 2020, correct?

11  A.  Yes.

12  Q.  All right.  Thank you.

13          MR. WHALEN:  I'll pass the witness.

14          THE COURT:  Anything additional?

15          MR. COMBS:  Yes, your Honor, just briefly.

16          REDIRECT EXAMINATION OF SARAH HUGHES

17  BY MR. COMBS:

18  Q.  Ma'am, you said that Amanda Rausche tested the -- did

19  the confirmatory test in this particular case; is that

20  right?

21  A.  That's correct.

22  Q.  And you used Test Tube Number 5, you said, the vial of

23  blood with Number 5.  Did she use the same vial?

24  A.  No, she didn't.  She tested another vial.

25  Q.  Why do you do that?  Why do you test a different vial?

```
 1  A.  It adds confidence to our results that this is truly in
 2  the case, it's nothing by chance, no contamination.  It
 3  just adds a lot of strength to our data.
 4  Q.  And she came up with the same results you did; is that
 5  right?
 6  A.  That's correct.  She also found etomidate.
 7  Q.  Okay.  Thank you.
 8           MR. COMBS:  Pass the witness.
 9           THE COURT:  Anything additional?
10           MR. WHALEN:  Nothing further, your Honor.
11           THE COURT:  Can the witness be fully excused?
12           MR. COMBS:  Yes, please, your Honor.
13           MR. WHALEN:  Yes, your Honor.
14           THE COURT:  Okay.  Ma'am, you are free to leave.
15  Thank you.
16           What's next?
17           MR. FINE:  We'll call Detective Brandon Bonner,
18  your Honor.
19           THE COURT:  Sir, would you raise your right hand
20  to be sworn in.
21           (The oath is administered to the witness.)
22              DIRECT EXAMINATION OF BRANDON BONNER
23               CALLED ON BEHALF OF THE GOVERNMENT
24  BY MR. FINE:
25  Q.  Good afternoon, Detective Bonner.  Will you please
```

 1   introduce yourself to the ladies and gentlemen of the jury.

 2          THE COURT:  Is your mic on?  Maybe it died.

 3          MR. FINE:  There we go.

 4   BY MR. FINE:

 5   Q.  Good afternoon, Detective Bonner.  How are you?

 6   A.  Good afternoon.  Thank you.  Doing good.

 7   Q.  Will you please introduce yourself to the ladies and

 8   gentlemen of the jury and spell your last name for the

 9   court reporter.

10   A.  I'm a Carrollton Police detective.  Bonner,

11   B-O-N-N-E-R.

12   Q.  And I probably gave it away by calling you Detective

13   Bonner, but how are you employed?

14   A.  I'm a detective with the City of Carrollton Police

15   Department.

16   Q.  How long have you been with the Carrollton Police

17   Department?

18   A.  Since 2007.

19   Q.  And so let's go back to 2007.  How did you become a

20   police officer with the City of Carrollton?

21   A.   I worked for a former police department, but I applied

22   with the City of Carrollton and got hired in 2007.  I was

23   in previous law enforcement for five years, starting in

24   2002.

25   Q.  And was that your first job in law enforcement, in

```
 1   2002?

 2   A.  Yes, sir.

 3   Q.  And where was that at?

 4   A.  So the Dallas Area Rapid Transit Police Department in

 5   Dallas.

 6   Q.  So sometimes called DART as well?

 7   A.  Yes, sir.

 8   Q.  And so in order to become a DART officer before you

 9   were a Carrollton officer, did you have to attend a police

10   academy?

11   A.  Yes, sir.

12   Q.  And tell the jury a little bit about what that

13   encompasses.

14   A.  It's about six months of training every day, Monday

15   through Friday, classroom and practical studies, learning

16   the law and then, obviously, how to apply it and different

17   investigations and things of that nature.

18   Q.  And so as part of your occupation, do you also receive

19   continuing updated education?

20   A.  Yes, sir.

21   Q.  And when you came over to Carrollton in 2007, what was

22   your position with the Carrollton Police Department?

23   A.  I got hired as a patrol officer.

24   Q.  And so tell the ladies and gentlemen of the jury.

25   What's a patrol officer do?
```

1  A.  It's basically what you think.  It's working the

2  streets, answering -- responding to calls and assisting

3  anywhere needed.  But any call that comes in, it's your

4  job.

5  Q.  And after you were a patrol officer, what was your next

6  spot with Carrollton?

7  A.  I applied and was accepted into the criminal

8  investigations division as a detective.

9  Q.  And what year was that?

10  A.  It was in 2015 or 2016.  I don't recall exactly the

11  year.

12  Q.  All right.  And so as a detective in the criminal

13  investigation unit at Carrollton, what were your

14  responsibilities there?

15  A.  For that, would be to investigate cases.  We take the

16  initial report that was taken by the officers on the

17  street; and then we would do follow-up investigation with

18  that, just to turn over every rock we could to make sure we

19  got to the bottom of it.

20  Q.  And how big an agency is Carrollton?

21  A.  Roughly about 160, 170 sworn.

22  Q.  And how many detectives do y'all have?

23  A.  Currently, I believe it's 16, if I'm not mistaken.

24  Q.  And so are you still in the criminal intelligence

25  division?

 1   A.  Criminal investigations.

 2   Q.  Criminal investigations.

 3   A.  Yes, sir.

 4   Q.  So do y'all -- some agencies, they have specific

 5   detectives for homicide or for child abuse or for burglary

 6   or for other crimes.  How does that work at Carrollton?

 7   A.  Yes.  So our CID unit has multiple different areas, as

 8   you've stated.  Several detectives may be assigned to

 9   crimes against children, some in financial crimes, some in

10   what we call major crimes, which would involve anything

11   from homicide to robberies of that nature, things like

12   that.

13   Q.  And is that where you are currently assigned, to major

14   crimes?

15   A.  It is.

16   Q.  And how long have you been with major crimes?

17   A.  For the previous four years, I believe.

18   Q.  And during the course of your time with major crimes,

19   have you investigated homicides?

20   A.  I have.

21   Q.  Do you also go out to scenes of suicides?

22   A.  I do.

23   Q.  And so tell the jury about that.  You know, again, TV

24   and everything like that, you may not think that you'd have

25   a homicide detective go out to a suicide.  But why do you

```
 1   guys do that?

 2   A.  Any death -- normally we will respond on any death, and

 3   that could mean especially on a suicide.  Again, we're

 4   there just to make sure that what we see, what we -- you

 5   know, the family may believe or whoever may believe is to

 6   be true based off of the evidence we find there at the

 7   scene.

 8   Q.  And so on a suicide case, would a major crimes

 9   detective be assigned to that?

10   A.  Yes.

11   Q.  And so I want to turn your attention to February 19th,

12   2020.

13          Were you on call that day?

14   A.  I was not on call that day.

15   Q.  And so there was a call that came in about a deceased

16   male at 2114 Cannes Drive in Carrollton, correct?

17   A.  That is correct.

18   Q.  And that man's name is James Seegan?

19   A.  Yes, sir.

20   Q.  So you were not on call that day.  Were you assigned to

21   that case initially?

22   A.  I was not.

23   Q.  And so how does that work?  Who gets assigned to a

24   case?

25   A.  The way that works if it's after hours, which most of
```

```
 1   our detectives leave around 6:00 p.m. and so -- roughly
 2   between 5:00 and 6:00 all our detectives start leaving to
 3   go home.  And so there is an on-call detective at all
 4   times, meaning after hours when there is no longer
 5   detectives in the building, if a call comes in, the call
 6   will go to that detective who is on call during that week.
 7   Q.  And do you know who was on call that week?
 8   A.  It was Detective Duncan.
 9   Q.  Is that Detective Lauryl Duncan?
10   A.  That is correct.
11   Q.  And so initially she was assigned to this case.  Is
12   that fair to say?
13   A.  Yes, sir.
14   Q.  And so you -- and we'll get to exactly how you got
15   assigned this case.
16          It occurred in early April; is that correct?
17   A.  When I got assigned to it?
18   Q.  Yes.
19   A.  Yes, sir.
20   Q.  I want to talk to you, though, because even though you
21   weren't out there on February 20th, eventually you became
22   the lead detective on this case, correct?
23   A.  That is correct.
24   Q.  And so as the lead detective, did you go back and
25   review information starting on February 20th?
```

1    A.  I did.

2    Q.  And is it fair to say that the Carrollton Police

3    Department y'all's unit in major crimes, you guys work

4    cases as a team as well?

5    A.  Very much so.

6    Q.  And so when I refer to you or the Carrollton Police

7    Department, it's one and the same; is that correct?

8    A.  Yes, sir.

9    Q.  And so in a case like this or in any homicide case,

10   would the lead detective do absolutely everything on their

11   own?

12   A.  No.

13   Q.  Do you rely on each other to assist?

14   A.  Yes, we do.

15   Q.  And do you communicate with each other and share

16   information?

17   A.  Yes, sir, we do.

18   Q.  And is that part of your training and experience in

19   order to effectively investigate a major case?

20   A.  Yes, sir, that is.

21   Q.  So let's go back to February 19th, 2020.  A call comes

22   out, unresponsive male.  Later find out he died of a

23   gunshot wound; is that correct?

24   A.  That is correct.

25   Q.  What -- initially were there some suspicious

1   circumstances out there at the scene?

2   A.  There were some things that were odd at the scene, yes,

3   sir.

4   Q.  And tell us about those circumstances.

5   A.  Well, from learning from Detective Duncan, some of the

6   initial things that they observed that were odd was the

7   positioning of the firearm that was resting in his hand.

8           And then as well as there was a typed note,

9   believed to be a suicide note, left next to him.  It just

10  appeared a little odd.

11          And as well as there was some Nest camera

12  activation for the home.

13  Q.  And so was the name Keith Ashley mentioned right from

14  the beginning?

15  A.  Yes, it was.

16  Q.  And why was that?  How did the name Keith Ashley come

17  up?

18  A.  On the suicide note itself.  His name was in the

19  suicide note.

20  Q.  And do you see Keith Ashley in the courtroom today?

21  A.  Yes, I do.

22  Q.  If I -- or if this is Chair 1, 2, 3, and 4, which chair

23  is Mr. Ashley sitting in?

24  A.  Chair 4.

25          MR. FINE:  Let the record reflect the witness has

```
 1   identified the defendant, your Honor?

 2            THE COURT:  The record will so reflect.

 3   BY MR. FINE:

 4   Q.  So, Detective Bonner, going back, initially Keith

 5   Ashley's name pops up.  It's in the alleged suicide note.

 6            And the Ring -- you talked about the Ring camera

 7   footage from the doorbell, right?

 8   A.  Yes, sir.  There was Nest doorbell footage, and I

 9   believe Detective Duncan and other officers that responded

10   could see the decedent's phone did have activation on it.

11   Q.  And through that video -- you've reviewed that video as

12   well, correct?

13   A.  I have.

14   Q.  Who enters the house at 9:31 a.m.?

15   A.  Mr. Keith Ashley.

16   Q.  And who leaves the house at 10:21 a.m.?

17   A.  Keith Ashley.

18   Q.  And who then returns to the house at 10:37 a.m.?

19   A.  Keith Ashley.

20   Q.  And who leaves at 10:40 a.m.?

21   A.  Keith Ashley.

22            MR. FINE:  And, your Honor, permission to publish

23   Government's 94A followed by B, C, and D at this time?

24            THE COURT:  Go ahead.

25            MR. FINE:  Let's start with 94A.
```

1          Actually, I apologize.  93A, B, C, and D.  We'll

2    get to 94 next.  So start with 93A.

3          (Video presentation to the jury.)

4          MR. FINE:  And if we could go to 93B, please.

5          (Video presentation to the jury.)

6          MR. FINE:  And now to 93C, please.

7          (Video presentation to the jury.)

8          MR. FINE:  And let's stop for a moment before we

9    do 93D.

10   BY MR. FINE:

11   Q.  So 93C, that's the defendant arriving back at 10:37,

12   correct?

13   A.  Yes, sir.

14         MR. FINE:  And let's go ahead and play 93D.

15   BY MR. FINE:

16   Q.  This will be him leaving at 10:40, correct?

17   A.  Yes, sir.

18         (Video presentation to the jury.)

19   BY MR. FINE:

20   Q.  Did you also review the body cam video of the garage

21   camera as well?

22   A.  Yes, sir, I did.

23   Q.  All right.  And on that body cam, can you hear a loud

24   bang at 10:15 in the morning?

25   A.  Yes, sir.

```
 1              MR. FINE:  Permission to publish Government's 94A
 2   at this time, your Honor?
 3              THE COURT:  Yes, go ahead.
 4   BY MR. FINE:
 5   Q.  And let me ask you this while we're trying to get 94A
 6   up and running:  What was significant to you in terms of
 7   that loud bang at 10:15 in the morning, initially?
 8   A.  Well, looking at it, there was supposed to be only two
 9   people in the home at that time.  And then when you see the
10   camera activation and hear that loud noise and then, of
11   course, to learn that -- of Mr. Seegan's death, later I
12   thought it was highly suspicious.
13   Q.  And given 93A and B, we know that the defendant was in
14   the home at the time as well; is that correct?
15   A.  That is correct, yes, sir.
16   Q.  Okay.
17              MR. FINE:  Let's try for 94A again.
18              (Audiovisual presentation to the jury.)
19              MR. FINE:  Can we play that one more time.
20              (Audiovisual presentation to the jury.)
21   BY MR. FINE:
22   Q.  Sort of that -- that loud noise that we hear, correct?
23   A.  Yes, sir.
24   Q.  It's not easy to hear, but that's the noise that we're
25   talking about?
```

 1   A.  That's correct, yes, sir.

 2   Q.  And so we have all that information early on from

 3   February 19th.  The case at that point, was it -- in terms

 4   of the Carrollton Police Department, was it closed as a

 5   suicide?

 6   A.  It was not.

 7   Q.  Tell the jury what happened from basically

 8   February 19th until April 1st, and then we'll talk about

 9   April 1st.

10   A.  Detective Duncan was still the lead detective with that

11   case at that time, and she was looking at all the evidence

12   that she could at that moment while still awaiting autopsy

13   results and other evidence to come in.

14            And so while we discussed the case, I was not the

15   lead on it; but we were still -- some suspicious things

16   that she observed and discussed with other detectives.

17   Q.  And so is it fair to say that it was an open case at

18   that point?

19   A.  Yes, it was.

20   Q.  And so on April 1st -- what happened on April 1st?

21   A.  I believe that is the day the autopsy results came back

22   to the police department.

23   Q.  And within those results was there a toxicology report

24   as well?

25   A.  Yes, sir.

 1    Q.   And what was found in the toxicology report?

 2    A.   A drug called etomidate.

 3    Q.   And at that point did you know much about etomidate?

 4    A.   I did not.

 5    Q.   Did your department look into what etomidate was?

 6    A.   We did right away, yes, sir.

 7    Q.   And through your research, what did you find out about

 8    etomidate?

 9    A.   We learned it was like a fast-acting anesthetic

10    commonly used by emergency medical professionals in the

11    emergency room or on an ambulance, stuff like that.  And we

12    learned that it was usually -- I have some friends that are

13    firefighters and EMS, and they described it as something

14    they would give to a patient to make them unconscious

15    whenever they were going to do intubation or something of

16    that nature.

17    Q.   So it's something out in the field a paramedic if they

18    need to do an emergency procedure to put somebody under

19    real quick?

20    A.   Yes, sir.

21    Q.   Is it your understanding it's fast-acting?

22    A.   Yes, sir.

23    Q.   Sort of in and out of your system quick and -- quick

24    and dirty, basically?

25    A.   Yes, sir.

1    Q.   All right.  Now, at that point, when the Carrollton

2    Police Department gets the autopsy result, they see the

3    toxicology with etomidate, did you become more involved in

4    the case?

5    A.   Yes, sir.  I was -- sorry.

6    Q.   I was going to say, in fact, did you become the lead on

7    the case?

8    A.   Yes, sir.  When that evidence came in, we determined

9    this was, again, highly suspicious; and so then the case

10   was then assigned to me as the lead.

11   Q.   So let me ask you this:  At that point you are now the

12   lead detective on this case.  Was there any evidence in the

13   home of Mr. Seegan of etomidate?

14   A.   There was not.

15   Q.   Any syringes?

16   A.   No, sir.

17   Q.   Needles?

18   A.   No, sir.

19   Q.   And did you find out through your research how

20   etomidate would be administered to somebody?

21   A.   It would be through an injection, intravenously.

22   Q.   Okay.  There is not a pill form of etomidate.  The only

23   way you can do it is to push it through an IV, correct?

24   A.   As I understand it, yes, sir.

25   Q.   So now you have this drug in Mr. Seegan's system that

1   certainly doesn't look like it fits.  Is that fair to say?

2   A.  That is correct.

3   Q.  You have no evidence of it in the home at all.

4   A.  Correct.

5   Q.  Is it a street drug?

6   A.  I've never seen it on the streets in my 20 years.

7   Q.  Something that people buy and sell, black market,

8   anything like that?

9   A.  No, sir.  I've never heard of etomidate until that day,

10  never heard of it sold anywhere like that.

11  Q.  And so we had mentioned Keith Ashley before, the

12  defendant in this case.  You knew the name.  You knew he

13  was in the home.  Did you start looking at him as a person

14  of interest at that point?

15  A.  We did.

16  Q.  And did you find out a little bit more about the

17  defendant's background?

18  A.  We did.

19  Q.  And tell the jury a little bit about his medical

20  background and what piqued your interest with that.

21  A.  We discovered that he was previously employed with an

22  air medical, like a helicopter medical team called PHI.

23          And then we also learned that he was -- either

24  currently or just before that, he was employed as a nurse

25  at a hospital in Dallas.

 1  Q.  And so let's talk about in terms of him being a

 2  paramedic.  Did y'all actually request some records of his

 3  and find out that on a test that he had taken, a paramedics

 4  test, that there were questions on there about etomidate?

 5  A.  That is correct, yes, sir.

 6          MR. FINE:  And, your Honor, permission to publish

 7  Government's 113?

 8          THE COURT:  Go ahead.

 9          MR. FINE:  Starting on page 11.

10          So if we could zoom in on the bottom.  There we

11  go.

12  BY MR. FINE:

13  Q.  So Question 57, "What is the correct dosage of

14  etomidate," correct?

15  A.  Yes, sir.

16          MR. FINE:  And if we go back to the first page on

17  Government's 111 *(sic)*.

18          Just the first page.

19          113.  I'm sorry.

20  BY MR. FINE:

21  Q.  Whose name is on that SKYMED Flight Team Academy Final

22  Test?

23  A.  K. Ashley.

24  Q.  And is that Keith Ashley?

25  A.  Yes, sir.

 1   Q.  All right.

 2           MR. FINE:  And if we could go to page 19, please,

 3   on Government's 113.

 4           And Question 7.

 5   BY MR. FINE:

 6   Q.  Choice D, does that also mention etomidate?

 7   A.  Yes, sir, it does.

 8   Q.  All right.

 9           MR. FINE:  And then looking at page 22 as well.

10   BY MR. FINE:

11   Q.  And again "What is the correct dosage of etomidate,"

12   correct?

13   A.  Yes, sir.

14   Q.  So you now have the defendant who was in Mr. Seegan's

15   home, you have etomidate in the system of Mr. Seegan, and

16   you have the defendant who has some knowledge of etomidate,

17   correct?

18   A.  That is correct.

19   Q.  And so is this starting to build a little bit in your

20   case?

21   A.  Yes, sir, it is.

22   Q.  And, in fact, did you find out later on that the

23   defendant had actually checked out etomidate from City

24   Hospital where he worked on December 17th, 2019?

25   A.  Yes, sir.

1  Q.  And so -- now, listen, we're not going to tell the jury

2  that you know for sure that that etomidate was used to

3  inject Mr. Seegan; is that fair?

4  A.  True.  Correct.

5  Q.  But you've got somebody who now has checked it out, who

6  knows how to use it, who was in the home, right?

7  A.  Yes, sir.

8  Q.  And in terms of being the lead detective on this case

9  or any detective in a major crime, is it important to

10 continue to build your case that way?

11 A.  It is, to follow the evidence, yes, sir.

12 Q.  And that's what I was going to say next.  Do you go

13 where the evidence takes you or where you want to go?

14 A.  You follow the evidence.

15 Q.  And so in this case are you following the evidence at

16 this point?

17 A.  Yes, sir.

18 Q.  And where is the evidence leading you?

19 A.  It was all leading to Mr. Ashley.

20 Q.  And so at that point did you just stop and say, "Well,

21 it had to be him.  He murdered Mr. Seegan"; or did you

22 continue to investigate?

23 A.  We continued much further with the investigation.

24 Q.  And so did you look in Mr. Seegan's phone and find a

25 calendar entry for 9:00 a.m. on February 19th, 2020?

```
1   A.  Yes, sir, we did.

2   Q.  And what did that calendar entry say?

3   A.  It stated, "Keith blood."

4   Q.  And so what did you take that to possibly mean?

5   A.  My theory was that -- once we learned that Mr. Ashley

6   had sold life insurance to Mr. Seegan in a large amount, we

7   learned that normally when a life insurance policy is that

8   large, that someone has to have a --

9          MR. WHALEN:  Your Honor, I'm going to object.  It

10  calls for -- based on hearsay.

11         MR. FINE:  Your Honor, it goes to the course of

12  the investigation and the steps that he took.

13         THE COURT:  Overruled.

14  A.  Again, our theory was based of that, again, him selling

15  him the large life insurance and that with a large life

16  insurance policy we have learned that it is normal custom

17  to get a physical exam done either yearly or every other

18  year to keep that policy current.  And then part of that

19  physical would be a blood draw, you know, examination of

20  the blood.

21  BY MR. FINE:

22  Q.  And through your review of the background of the

23  defendant, do you believe that he would have had the

24  expertise to draw blood?

25  A.  Yes, sir.
```

 1  Q.  And so the defendant having that expertise to draw

 2  blood, is it fair to say that in order to draw blood, you

 3  need to access a vein?

 4  A.  Yes, sir.

 5  Q.  And in order to inject etomidate into somebody, you

 6  also need to access a vein, correct?

 7  A.  Yes, sir.

 8  Q.  And so drawing blood, you pull out.  Etomidate, push

 9  in.

10  A.  That's correct.

11  Q.  And through your investigation, did it seem like

12  Mr. Seegan trusted the defendant?

13  A.  It did.

14  Q.  Did it seem like they, at least from Mr. Seegan's

15  standpoint, were friends?

16  A.  Yes.

17  Q.  And you mentioned that he had bought financial products

18  from the defendant, correct?

19  A.  Yes, sir.

20  Q.  And tell the jury a little bit about -- you mentioned

21  the life insurance.  What happened with the life insurance?

22  A.  We observed that -- again that Mr. Ashley sold

23  Mr. Seegan life insurance, and I believe the amount was

24  initially -- eventually around 2.4 million, somewhere in

25  there.  I know there was $2 million roughly.

 1              And that also Mr. Ashley was listed as the

 2     executor of his will and that -- and if Mr. Seegan were to

 3     pass, the life insurance would go to the trust, which at

 4     that point Mr. Ashley would be the executor of that as

 5     well; so he had access to that money.

 6     Q.  And so he wouldn't be the beneficiary; but as the

 7     executor, he would have access and control over the money?

 8     A.  That is correct.

 9     Q.  And even though motive is not something that

10     necessarily -- you don't -- every murder case you don't

11     find motive.  Is that fair to say?

12     A.  That's true.

13     Q.  In this case did that start developing a potential

14     motive for you?

15     A.  It did.

16     Q.  And at this point did you go back and review the

17     doorbell camera again?  Did you start looking at it more

18     closely?

19     A.  We did.

20              MR. FINE:  And so if we could -- permission to

21     publish Government's 93A through D again.

22              THE COURT:  Go ahead.

23     BY MR. FINE:

24     Q.  And so Detective Bonner when we pull up 93A --

25              MR. FINE:  We can start with that.

```
 1              (Video presentation to the jury.)

 2              MR. FINE:  And if we could just pause it right

 3   there.

 4              (Video presentation paused.)

 5              MR. FINE:  That's actually the perfect spot.

 6   BY MR. FINE:

 7   Q.  What is this on the defendant's back?

 8   A.  It's a backpack.

 9   Q.  Okay.  In terms of him walking up to the door, do you

10   notice anything unusual or strange about how he is walking

11   up to the door in 93A?

12   A.  In this video he appeared very calm and casual and not

13   in a hurry.

14   Q.  Okay.  And this is at 9:31 a.m.?

15   A.  Correct.

16   Q.  And we know that Mr. Seegan has an entry for a

17   9:00 a.m., "Keith blood," correct?

18   A.  That's correct.

19   Q.  All right.

20              MR. FINE:  And if we could continue publishing

21   93A.

22              (Video presentation resumed.)

23   BY MR. FINE:

24   Q.  And so looking at 93A, he rings the doorbell, correct?

25   A.  Yes, sir.
```

1    Q.  It appears he waits for somebody to answer the door.

2    And who do you believe that person was that answered the

3    door?

4    A.  I believe that was Mr. Seegan.

5    Q.  And does it appear they had a friendly interaction and

6    he went into the house?

7    A.  It does.

8    Q.  Okay.

9         MR. FINE:  Let's publish 93C, which will be the

10   second entry, at 10:37 a.m.

11        (Video presentation to the jury.)

12        MR. FINE:  Pause real quick.

13        (Video presentation paused.)

14   BY MR. FINE:

15   Q.  Do you notice anything different about the defendant at

16   this point?

17   A.  I believe he is moving a step faster and possibly not

18   carrying his backpack as well.

19   Q.  And what about where he's parked?

20   A.  This time he's directly in front of the home.

21   Q.  And does it appear he's walking faster?

22   A.  Yes, sir.

23   Q.  Okay.

24        MR. FINE:  Let's go ahead and continue with 93C.

25        (Video presentation resumed.)

```
 1   BY MR. FINE:
 2   Q.  And so, Detective Bonner, as the lead detective in this
 3   case, looking at 93C, what did you notice -- well, did you
 4   notice anything that was different from 93A?
 5   A.  Yes, sir.
 6          As well as moving a step faster this time, his
 7   hand was noticeably shaking as he was reaching for the
 8   doorbell; and he was also touching the doorknob at the
 9   exact same time that he was ringing the doorbell and
10   instantly seemed to let himself in.
11   Q.  Did it appear that he spoke to Mr. Seegan this time?
12   A.  It did not.
13   Q.  Did it appear that he waited for somebody to answer the
14   door?
15   A.  It did not appear so.
16   Q.  Did it appear that he knew that the door was unlocked?
17   A.  It appeared he did know that.
18          MR. FINE:  And if we could play 93B now, which is
19   the exit -- the first exit at 10:21.
20          (Video presentation to the jury.)
21   BY MR. FINE:
22   Q.  So, Detective Bonner, looking at 93B, what were your
23   observations about this exit?
24   A.  Again, like he was a step faster than when he initially
25   arrived; and then he also -- we noticed that when he
```

1  arrived, he walked along the sidewalk and then the walk

2  path up to the door.  And as he's leaving, he kind of takes

3  a quick cut across the grass to get to his vehicle.

4  Q.  What about in terms of how he closes the door?  Does he

5  appear to say good-bye to anybody?

6  A.  He does not.

7  Q.  Does he appear to be rushing to leave?

8  A.  I wouldn't call it rushing, but he seems to be leaving

9  with a little faster step.

10 Q.  Okay.  And then looking at 93D --

11         MR. FINE:  If we could publish that.

12         (Video presentation to the jury.)

13 BY MR. FINE:

14 Q.  In 93D is it clear he does not have that backpack that

15 he had when he entered initially?

16 A.  That is correct.

17 Q.  And is he even quicker in terms of closing the door

18 behind him?

19 A.  Yes, sir.

20 Q.  Does he appear to be saying good-bye to anybody or any

21 good wishes or anything like that?

22 A.  He does not.

23 Q.  All right.  Now, we played 94A, which was that noise at

24 10:15 in the morning.  You mentioned that that could be

25 significant, correct?

 1   A.  Yes, sir.

 2   Q.  And so what did you try to do to figure out what that

 3   noise could have been?

 4   A.  We ran a couple of our own tests inside the home with

 5   Mrs. Seegan's permission.  We did some tests using a

 6   decibel reader and cameras, just four different tests

 7   inside the home to see if we could activate the Nest camera

 8   with sound alone.

 9   Q.  And so, essentially, did you try to re-create different

10   scenarios and see if that camera would pick up on sound?

11   A.  Yes, we did.

12   Q.  And you talked about different calibrations.  Did you

13   set the camera to different sensitivities?

14   A.  Yes, sir, we did.

15   Q.  And did you record that as well?

16   A.  We did.

17   Q.  Did you -- what sort of noises did y'all try to make?

18   A.  We did a slamming of the office door --

19            MR. WHALEN:  Your Honor, at this time we're going

20   to object to our previous objection under 702 and -- that

21   it's an experiment and scientific.

22            THE COURT:  Okay.  Overruled.

23   BY MR. FINE:

24   Q.  You can go ahead.

25   A.  So, yes, we did four tests, the first one being a

1   slamming of the office door.

2          MR. WHALEN:  And, your Honor, we'd object and ask

3   for a running objection to the testimony.

4          THE COURT:  I'll grant that.

5          MR. WHALEN:  Thank you, your Honor.

6          THE COURT:  Go ahead.

7   BY MR. FINE:

8   Q.  You can continue.

9   A.  So, again, we slammed the office door that Mr. Seegan

10  was found deceased in.

11         We dropped a book of a certain weight, kind of a

12  heavy book, on the floor in that same office.

13         Then we slammed a car door outside of the

14  garage -- the rolltop garage door.  We slammed a car door

15  in the driveway to see if any of those would activate the

16  camera.

17         And then we fired the same model handgun and with

18  ammunition into ballistic gel in the same office and same

19  area that Mr. Seegan was found.

20  Q.  Same exact-type gun?

21  A.  Yes, sir.

22  Q.  Same exact ammunition?

23  A.  Yes, sir.

24  Q.  And --

25         MR. FINE:  Permission to approach the witness,

```
 1   your Honor?

 2           THE COURT:  Yes.

 3   BY MR. FINE:

 4   Q.  In terms of where the garage is located in the home in

 5   relation to the office -- looking at Government's 80, where

 6   is the garage in relation to the office?  Because this is

 7   upstairs.

 8   A.  Correct.

 9           I believe it was just below the master bedroom.

10   Q.  Okay.  So basically just -- not directly below the

11   office but just -- just to the side of it?

12   A.  Yes, sir.

13   Q.  All right.  And so you did all these tests.  You

14   mentioned a few different sounds that you tried to make.

15   And eventually you fired a gun as well, correct?

16   A.  Yes, sir.

17   Q.  And when you dropped the book, did the garage camera

18   pick up?

19   A.  It did not.

20   Q.  When you slammed the door, did the garage camera pick

21   up?

22   A.  It did not.

23   Q.  When you -- what else -- what were the other ones?

24   A.  Closed the office door.

25   Q.  The office door, did it --
```

```
 1   A.  And the --

 2   Q.  -- pick up?

 3   A.  -- car door.

 4           None of those activated the camera.

 5   Q.  Did anything activate the camera?

 6   A.  The shooting of the firearm did.

 7   Q.  That was the only thing?

 8   A.  Yes, sir.

 9   Q.  All right.  And you recorded that as well?

10   A.  We did.

11           MR. FINE:  At this time the government would offer

12   Government's 94B and C.

13           MR. WHALEN:  We'd object for the same reasons as

14   to the testimony, your Honor.

15           THE COURT:  Okay.  Overruled.

16           MR. FINE:  Permission to publish Government's 94B,

17   your Honor?

18           THE COURT:  Yes, go ahead.  And I'll go ahead and

19   admit B and C.

20           MR. FINE:  Thank you, your Honor.

21           (Audiovisual presentation to the jury.)

22           MR. FINE:  And permission to publish

23   Government's 94C, your Honor?

24           THE COURT:  Yes, go ahead.

25           (Audiovisual presentation to the jury.)
```

 1   BY MR. FINE:

 2   Q.  So, Detective Bonner, after you ran that re-creation,

 3   what was your belief in terms of what the sound was that

 4   picked up on the garage camera on February 19th?

 5   A.  It was our belief that it was the firing of the weapon

 6   that activated the camera.

 7   Q.  And so what was the significance of that in the

 8   investigation?

 9   A.  That Mr. Ashley was in the home with Mr. Seegan at that

10   time.

11   Q.  And through that, did you believe that you had obtained

12   essentially a time of death?

13   A.  We believed so, yes, sir.

14   Q.  And what would that time have been?

15   A.  At the time of that sound was 10:15, I believe.

16   Q.  All right.  Now, based on the re-creation, based on the

17   sound, you believe now the time of death is at 9:15 *(sic)*.

18            There is only two people in the home at that

19   point, correct?

20   A.  At 10:15, yes, sir.

21   Q.  Right.  And one of them is the defendant?

22   A.  That is correct.

23   Q.  And the other is Mr. Seegan who is dead?

24   A.  That is correct.

25   Q.  So we talked about some of the discrepancies in the

 1  defendant's behavior entering the Seegans' home at 9:31

 2  versus at 10:37 and then leaving as well.

 3          Through your investigation did you come to find

 4  out if Mr. Seegan generally locked his doors?

 5  A.  We believe he did lock his doors.

 6  Q.  And in this case, again through your investigation,

 7  upon arrival of the first responders was the front door

 8  locked?

 9  A.  I don't recall, as I didn't initially respond to the

10  scene, if they were met with locked doors or not.

11  Q.  The backpack that the defendant had on him the first

12  time in and then leaving, did you find out anything

13  significant about that backpack?

14  A.  We learned later on that he normally did keep a firearm

15  in that backpack.

16  Q.  And subsequently -- and we'll go through the timeline.

17  But eventually did you execute a search warrant on the

18  defendant's home?

19  A.  We did.

20  Q.  And did you actually find that backpack?

21  A.  Yes, we did.

22  Q.  And what was inside of the backpack?

23  A.  Another firearm.

24  Q.  And was that consistent with the information that you

25  received that he always had a firearm in that backpack?

1    A.  Yes, sir.

2    Q.  And if you were wanting to knock somebody out with

3    etomidate, you would have to have a vial of etomidate,

4    correct?

5    A.  Yes, sir.

6    Q.  And something -- a strap and something to inject the

7    etomidate with; is that --

8    A.  That's correct.

9    Q.  And could those have fit into a backpack as well?

10   A.  Yes, sir.

11   Q.  In fact, as you went back and looked at crime scene

12   photos -- is that part of the investigation as well?

13   A.  Yes, sir.

14   Q.  And so even though you weren't at the scene, you have

15   access to photos.  And did you go back and look at crime

16   scene photos?

17   A.  I did.

18   Q.  And looking at the crime scene photos, did you find

19   something on Mr. Seegan's left arm, sort of in the crux of

20   his arm, that you believed was consistent with a puncture

21   mark?

22   A.  I did.

23          MR. FINE:  And permission to publish

24   Government's 79, page 29 at this time, your Honor?

25          THE COURT:  Go ahead.

1   BY MR. FINE:

2   Q.  And Detective Bonner, you can actually draw on the

3   screen.  If you could circle what you believe to be a small

4   puncture mark.

5   A.  (Complying.)

6   Q.  And is it your belief that is consistent with the area

7   of the arm that if somebody were wanting to draw blood,

8   that they would potentially go into?

9   A.  Yes, sir.

10  Q.  And did you also believe -- is it fair to say, you

11  know, crime scene photos, sometimes things come out easier

12  to see than other times?

13  A.  That's correct.

14  Q.  Did you ever see anything that looked like a potential

15  strap mark on Mr. Seegan's left arm as well?

16  A.  We did.

17  Q.  And looking at Government's 79 --

18          MR. FINE:  Let's go to page 25, please.

19  BY MR. FINE:

20  Q.  So let's talk about this photo.  Did this photo have

21  significance to you in your investigation?

22  A.  It did.

23  Q.  And tell the jury why.

24  A.  The way that the firearm was resting in his hand and

25  also the design of the chair to where he is located, it is

 1  my belief that if he would have fired the shot himself, A,

 2  the gun would have likely possibly fallen out of his hand

 3  and, B, if it did not, his arm would have instantly come

 4  down, straight down, and it would have missed -- I mean, he

 5  had to miss the desk; and then it was tucked up underneath

 6  the armrest.  We thought that would be highly unlikely to

 7  happen if he were to have shot himself.

 8  Q.  So what did it look like to you had happened?

 9  A.  It looked like the gun was placed there after he was

10  shot.

11  Q.  And in your investigation of the defendant, did you

12  find that he had a law enforcement background?

13  A.  We did.

14  Q.  And in law enforcement background, part of it, did he

15  attend a police academy?

16  A.  That's correct.

17  Q.  And as part of essentially any police academy in the

18  state of Texas, do you receive basic crime scene

19  investigation techniques and education?

20  A.  We do.

21  Q.  And zooming back out, talk to us about the placement of

22  the chair.  Do you find anything significant with that?

23  A.  Yes, sir.

24          Also after learning about the possible blood draw

25  or pushing of etomidate, he was -- we noticed he was seated

 1   off to the side of the desk; and we believed it was also in

 2   a position that he could have sat his arm out as if one

 3   were to donate or give blood or to receive an injection.

 4   Q.  And would that be consistent with the left arm puncture

 5   wound that you saw?

 6   A.  That is correct.

 7   Q.  And this little seat right here that I'm circling, do

 8   you find any significance with that?

 9   A.  Just that it was pushed back underneath.  We did not

10   know exactly where it belonged in the office beforehand,

11   but it was possibly seated in a position right where

12   someone would be seated as if they were administering or

13   giving a blood draw.

14   Q.  And so you -- have you had your blood drawn before?

15   A.  Yes, sir.

16   Q.  And somebody sits down, right?  They tie off the little

17   thing and they take your blood, right?

18   A.  That's correct.

19   Q.  And so looking at this photograph here, does that seem

20   consistent with that scenario where somebody is going to

21   take somebody's blood like that?

22   A.  It does.

23   Q.  Does it seem -- you've attended how many suicides, do

24   you think?

25   A.  Too many to count.  I would say a hundred, I don't

 1    know, roughly.  It's been a lot.

 2    Q.  And does this strike you, just looking at the crime

 3    scene photos, as any other suicide that you've seen?

 4    A.  No.  With all the things we see, no, it does not look

 5    exactly like other suicide scenes.

 6    Q.  Now let's talk about Mr. Seegan's phone as well.  We

 7    talked about an extraction that was done on the phone.

 8    Through that, were you able to figure out when his last

 9    step or last movement was?

10    A.  We did.

11    Q.  And was that at approximately 9:33 and 41 seconds?

12    A.  Yes, sir.

13    Q.  And did you also see, about 9:32, that Mr. Seegan

14    climbed a flight of stairs?

15    A.  That's correct.

16    Q.  And would that be consistent with the defendant showing

17    up at 9:31, Mr. Seegan greeting him, going upstairs, and

18    then being seated at that chair or in that office?

19    A.  That's correct.

20    Q.  And was there a call that also came in at about 9 -- a

21    call that was made about 9:42 in the morning?

22    A.  Yes, sir.

23    Q.  And was there any activity at all on Mr. Seegan's cell

24    phone after 9:42 in the morning?

25    A.  No, sir, I don't believe so.

1   Q.  Did the defendant text him multiple times after 9:42?

2   A.  Yes, he did.

3   Q.  Did he try calling him multiple times?

4   A.  Yes, he did.

5   Q.  And so what did you take -- what did you make of that,

6   of the texts and calls from the defendant to Mr. Seegan

7   after his death?

8           MR. WHALEN:  Objection, calls for speculation.

9           THE COURT:  Overruled.

10          If you can answer.

11  A.  At that time of the investigation, once we were that

12  far along, it was our belief that it was an attempt to show

13  that he was -- that he cared, but just to give that image.

14  BY MR. FINE:

15  Q.  And so through the course of the investigation, do you

16  believe that the crime scene was staged?

17  A.  We did.

18  Q.  Do you believe that the defendant, through various

19  areas of expertise, would have the ability to stage a scene

20  like that?

21  A.  We did.

22  Q.  You mentioned the note that was found next to

23  Mr. Seegan.

24          MR. FINE:  And permission to publish

25  Government's 86 which is that note, your Honor?

```
 1              THE COURT:  Go ahead.
 2   BY MR. FINE:
 3   Q.  Now, Detective Bonner, looking at this note -- and if
 4   you could go ahead and read it to the jury.
 5   A.  Sure.  "Dida, I have been struggling for a while.  My
 6   dad dies years ago and my brother killed himself last year.
 7   My best friend died, that I found dead in his house.  I
 8   want you to love Josh with all your heart.  I can not take
 9   this pain anymore.  My last friend Keith Ashley will help
10   you with" -- the phone number.  "I love you."
11   Q.  And through the course of your investigation, was this
12   the type of note that Mr. Seegan would have written?
13   A.  Not at all.
14   Q.  Did it sound like something he would have written?
15              MR. WHALEN:  Objection, calls for speculation.
16              THE COURT:  Yeah, rephrase the question.
17   BY MR. FINE:
18   Q.  Through your investigation, in talking to friends and
19   family of his and his wife, did this seem like something
20   that Mr. Seegan would have written?
21   A.  It did not.
22   Q.  Did it also strike you odd that it was typed?
23   A.  It did.
24   Q.  Through your investigations into suicide, do you see
25   many typewritten notes like this?
```

 1    A.  We do not.

 2    Q.  Do you see -- does every suicide, or every suicide

 3    you've gone to, is there even a note?

 4    A.  There's -- no, there's -- not at every one.

 5    Q.  Okay.  And looking at this note and seeing that it was

 6    printed, did y'all then try to figure out where it was

 7    printed from?

 8    A.  We did.

 9    Q.  And were you able to form a conclusion on where the

10    letter was printed from?

11    A.  We could not find a definite on where exactly that

12    document itself came from.

13    Q.  Do you believe you did everything you could to find out

14    that answer?

15    A.  Yes, we did.

16    Q.  Did you send the printer to be tested?

17    A.  We did.

18    Q.  Did you send the computer as well?

19    A.  We did.

20    Q.  Now, the computer itself showed a command being sent to

21    the printer; is that correct?

22    A.  That is correct.

23    Q.  And do you remember what time that command was?

24    A.  I believe it was two minutes after the loud noise.  I

25    believe it was at 10:10, if I'm not mistaken.

```
 1   Q.  And if -- again, based on your investigation, if the
 2   time of death was 10:15, would it have been possible for
 3   Mr. Seegan, who is dead, to print something at 10:17?
 4   A.  No, sir.
 5   Q.  And so if he didn't print it at 10:17, who else is in
 6   the home at that time?
 7   A.  Mr. Ashley.
 8   Q.  And so through your investigation, did you end up
 9   finding a note on the defendant's cell phone?
10   A.  We did.
11          MR. FINE:  And, your Honor, permission to
12   publish -- actually, I don't think we've offered it.  We
13   would offer Government's 128A and B.
14          MR. WHALEN:  I think it's already in.
15          MR. FINE:  Is it?
16          THE COURT:  128A and B I believe are --
17          MR. FINE:  Are they in?
18          THE COURT:  Let me double-check with my staff.
19          Yeah, we both have them --
20          MR. FINE:  Are they in?  Okay.  Permission to
21   publish 128A?
22          THE COURT:  Yes, go ahead.
23          MR. FINE:  Actually, can we publish 128B?
24          You don't have that?
25          Permission to approach the witness, your Honor?
```

```
1              THE COURT:  Yes.

2              MR. FINE:  Your Honor, permission to publish 86 as

3    well?

4              THE COURT:  Yes, go ahead.

5              MR. FINE:  Thank you.

6              THE COURT:  And my question is -- we're almost at

7    the 5:00 hour.  Do you want to just do this first thing in

8    the morning?

9              MR. FINE:  That -- whatever you want, your Honor.

10   I'm fine with whatever you want.

11             THE COURT:  Well, I'm just -- I'll leave it to

12   you.  We have, like, four minutes left.

13             MR. FINE:  We can -- yeah, we can break for the

14   day.

15             THE COURT:  Okay.

16             MR. FINE:  Yeah.

17             THE COURT:  Very good.

18             So, ladies and gentlemen, we're going to go ahead

19   and just stop for the day.  Again, please don't discuss the

20   case among yourself or anyone else.  Don't do any outside

21   research.  Have a safe drive home.  We'll see you back

22   tomorrow.  And we'll start back at 9:00, so just be here

23   right before 9:00.  Have a good evening.

24             (The jury exits the courtroom, 4:57 p.m.)

25             THE COURT:  Anything further from the government?
```

```
1              Anything further from the defense?

2              MR. WHALEN:  No, your Honor.

3              THE COURT:  Okay.  See y'all back tomorrow morning

4    at 9:00.

5              (Proceedings adjourned, 4:57 p.m.)

6    COURT REPORTER'S CERTIFICATION

7              I HEREBY CERTIFY THAT ON THIS DATE, OCTOBER 30,

8    2022, THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD

9    OF PROCEEDINGS.

10

11                    /s/_____
                      CHRISTINA L. BICKHAM, CRR, RDR
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```