1                  UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF TEXAS
2                        SHERMAN DIVISION

3     UNITED STATES OF AMERICA      |  DOCKET 4:20-CR-318
                                    |
4                                   |  SEPTEMBER 30, 2022
      VS.                           |
5                                   |  9:00 A.M.
                                    |
6     KEITH TODD ASHLEY            |  SHERMAN, TEXAS

7     ----------------------------------------------------------

8          VOLUME 5 OF 8, PAGES 1101 THROUGH 1384

9          REPORTER'S TRANSCRIPT OF JURY TRIAL

10      BEFORE THE HONORABLE AMOS L. MAZZANT, III,
           UNITED STATES DISTRICT JUDGE, AND A JURY
11    ----------------------------------------------------------

12
      FOR THE GOVERNMENT:     HEATHER HARRIS RATTAN
13                            JAY COMBS
                              U.S. ATTORNEY'S OFFICE - PLANO
14                            101 E. PARK BOULEVARD, SUITE 500
                              PLANO, TX 75074
15
                              JASON FINE
16                            DALLAS COUNTY D.A.'S OFFICE
                              133 N. RIVERFRONT BOULEVARD
17                            DALLAS, TX 75207

18
      FOR THE DEFENDANT:      JAMES P. WHALEN
19                            RYNE THOMAS SANDEL
                              WHALEN LAW OFFICE
20                            9300 JOHN HICKMAN PKWY, SUITE 501
                              FRISCO, TX 75035
21

22    COURT REPORTER:         CHRISTINA L. BICKHAM, CRR, RDR
                              FEDERAL OFFICIAL REPORTER
23                            101 EAST PECAN
                              SHERMAN, TX 75090
24

25        PROCEEDINGS RECORDED USING MECHANICAL STENOGRAPHY;
       TRANSCRIPT PRODUCED VIA COMPUTER-AIDED TRANSCRIPTION.

INDEX


                                                          PAGE

BRANDON BONNER
    CONTINUED DIRECT EXAMINATION BY MR. FINE      1108
    CROSS-EXAMINATION BY MR. WHALEN               1156
    REDIRECT EXAMINATION BY MR. FINE              1211
    RECROSS-EXAMINATION BY MR. WHALEN             1218
    FURTHER REDIRECT EXAMINATION BY MR. FINE      1222

HEIDI SCARBROUGH
    DIRECT EXAMINATION BY MS. RATTAN              1223
    CROSS-EXAMINATION BY MR. SANDEL               1240

STACEY HAIL
    DIRECT EXAMINATION BY MR. COMBS               1248
    CROSS-EXAMINATION BY MR. SANDEL               1266
    REDIRECT EXAMINATION BY MR. COMBS             1274
    RECROSS-EXAMINATION BY MR. SANDEL             1276

CARLA DENEUI-SIMONSEN
    DIRECT EXAMINATION BY MS. RATTAN              1278
    CROSS-EXAMINATION BY MR. WHALEN               1283
    REDIRECT EXAMINATION BY MS. RATTAN            1285

SAMANTHA LARSEN
    DIRECT EXAMINATION BY MS. RATTAN              1286
    CROSS-EXAMINATION BY MR. WHALEN               1290

COURTNEY JACOBSON
    DIRECT EXAMINATION BY MS. RATTAN              1292
    CROSS-EXAMINATION BY MR. WHALEN               1302
    REDIRECT EXAMINATION BY MS. RATTAN            1311

MELINDA MONTELONGO MONCADA
    DIRECT EXAMINATION BY MS. RATTAN              1313
    CROSS-EXAMINATION BY MR. SANDEL               1323
    REDIRECT EXAMINATION BY MS. RATTAN            1326

CINDY NORDQUIST
    DIRECT EXAMINATION BY MS. RATTAN              1330
    CROSS-EXAMINATION BY MR. WHALEN               1344

ARTHUR HILSON
    DIRECT EXAMINATION BY MS. RATTAN              1350
    CROSS-EXAMINATION BY MR. SANDEL               1362

1   JASON RENNIE
        DIRECT EXAMINATION BY MS. RATTAN              1366
2
    COURT REPORTER'S CERTIFICATION                    1384
3

4

5

6

7                    INDEX OF EXHIBITS

8                                                     PAGE

9   Government's Exhibit 86                           1110

10  Government's Exhibit 128B                         1111

11  Government's Exhibit 94A                          1114

12  Government's Exhibit 94C                          1115

13  Government's Exhibit 123A                         1126

14  Government's Exhibit 109                          1127

15  Government's Exhibit 113                          1129

16  Government's Exhibit 110                          1130

17  Government's Exhibit 114                          1137

18  Government's Exhibit 79                           1163

19  Government's Exhibit 112A                         1176

20  Government's Exhibit 122                          1176

21  Government's Exhibit 114                          1197

22  Government's Exhibit 127B                         1216

23  Government's Exhibit 14B                          1229

24  Government's Exhibit 127B                         1257

25  Government's Exhibit 98                           1259

| | | |
|---|---|---|
| 1 | Government's Exhibit 105 | 1279 |
| 2 | Government's Exhibit 106 | 1280 |
| 3 | Government's Exhibits 107 and 108 | 1287 |
| 4 | Government's Exhibit 118A | 1293 |
| 5 | Government's Exhibit 118C | 1301 |
| 6 | Government's Exhibit 118A | 1307 |
| 7 | Government's Exhibit 109 | 1316 |
| 8 | Government's Exhibit 118A | 1320 |
| 9 | Government's Exhibit 119A and 119B | 1336 |
| 10 | Government's Exhibit 118C | 1339 |
| 11 | Government's Exhibit 118A | 1341 |
| 12 | Government's Exhibit 118C | 1342 |
| 13 | Government's Exhibit 118A | 1346 |
| 14 | Government's Exhibit 10 | 1365 |
| 15 | Government's Exhibit 25 | 1368 |
| 16 | Government's Exhibit 10 | 1371 |
| 17 | Government's Exhibit 7A | 1372 |
| 18 | Government's Exhibit 8A | 1373 |
| 19 | Government's Exhibit 104 | 1375 |
| 20 | Government's Exhibit 133 | 1380 |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

```
 1              (Open court, defendant present, jury not present.)

 2              THE COURT:  I understand there is a quick issue to

 3    be taken up?

 4              Everyone can be seated.

 5              MR. COMBS:  Thank you, your Honor.

 6              We previously notified the Court and the defense

 7    that we have an expert testifying, we expect to testify

 8    this morning, Dr. Stacey Hail; and with leave of the Court,

 9    we would like to have her present during the remainder of

10    testimony until she testifies.  Defense, my understanding

11    is, does not object.

12              MR. WHALEN:  We don't object.  That's proper, your

13    Honor.

14              THE COURT:  Yeah, experts are excused from the

15    rule so --

16              MR. COMBS:  Thank you.

17              THE COURT:  Okay.  Anything else?

18              MS. RATTAN:  One other issue is Government's

19    Exhibit 123A.  123A.  It's a letter that was recovered

20    among the defendant's personal effects; and it's a letter

21    from a lawyer to the defendant, Keith Ashley, outlining the

22    lawyer's concern that the lawyer's client's funds are

23    missing.  And we are offering that.

24              MR. WHALEN:  We would object to that because

25    that's hearsay and it denies him the right of
```

 1    confrontation.

 2         MS. RATTAN:  Of course, it was found in a search

 3    of the defendant's personal property; and it's an

 4    indication of the stress that the defendant was under

 5    during this time period.

 6         Additionally, it's intrinsic to the events that

 7    are taking place in this case.  The letter is dated

 8    April of 2020.

 9         And it's not offered for the truth of the matter

10    asserted.  It's offered to demonstrate that the defendant

11    would have been under stress because he was receiving

12    letters like this requesting accounting for money.

13         MR. WHALEN:  And it's also related to unnamed --

14    potential victims not named in the Indictment, so we would

15    object to that as well under 404(b) and 403 and --

16         THE COURT:  Well, that would be -- that would

17    certainly be intrinsic, whether or not that victim -- or

18    alleged victim is in the endeavor or not.

19         So I agree with the government.  I'll overrule the

20    objection.  123A will be admitted.

21         MR. WHALEN:  Are you admitting it for the -- over

22    the hearsay objection because it goes to -- it's relevant

23    for that?

24         Are you going to give the jury an instruction for

25    the limitation it's being admitted for?

1          THE COURT:  If you want me to give a limiting
2    instruction, that's fine.  The question is what do you want
3    me to say in the limiting --
4          How do you want me to say that, Ms. Rattan, so
5    they know the purpose?
6          MS. RATTAN:  It's being admitted to show the state
7    of mind of the defendant.
8          THE COURT:  Okay.  That's fine.  And are you going
9    to be using this with a witness?
10          MS. RATTAN:  We will, your Honor.
11          THE COURT:  Okay.
12          MS. RATTAN:  It was found by Carrollton Police
13    Department.
14          THE COURT:  No, I understand.  So when you go to
15    do that, you can offer the exhibit at that time and --
16          You don't have to make your -- you don't have to
17    make all of your objection, and I'll just -- I'll give that
18    limiting instruction.
19          MR. WHALEN:  Okay.  And I just want to make it
20    really clear for the record.  We're also having a
21    confrontation clause issue objection to the paperwork
22    because we can't cross-examine, one, the lawyer who is
23    basing it on hearsay from his client; and then we would
24    have a right to confront Ms. Dietrick.  And so it's like
25    double hearsay; and it violates the confrontation clause,

1   your Honor.

2          THE COURT:  I understand.  I don't think that it

3   does.

4          Ms. Rattan, do you have any problem with the

5   confrontation clause here?  I don't think that --

6          MS. RATTAN:  I don't -- I don't think that's an

7   issue.

8          THE COURT:  I don't think so, either.

9          Okay.  Let's bring the jury in.

10          (The jury enters the courtroom, 9:04 a.m.)

11          THE COURT:  Please be seated.

12          Ladies and gentlemen, welcome back.

13          Officer, you understand you're still under oath?

14          THE WITNESS:  Yes, sir.

15          THE COURT:  Okay.  Go ahead and continue.

16          MR. FINE:  Thank you, your Honor.

17          CONTINUED DIRECT EXAMINATION OF BRANDON BONNER

18   BY MR. FINE:

19   Q.  Good morning, Detective Bonner.

20          For the record, your still the Detective Bonner

21   that testified yesterday afternoon?

22   A.  Yes, sir, I am.

23   Q.  Still under oath?

24   A.  Yes, sir, I am.

25   Q.  Still swear to tell the truth, correct?

1    A.   I do.

2    Q.   All right.  Let's start out this morning kind of going

3    back.  We looked at some magnets this morning in terms of

4    some of the things we went over yesterday in your

5    testimony.  Is that fair to say?

6    A.   Yes, sir.

7    Q.   And were they accurate in terms of your testimony that

8    you expressed to the jury yesterday?

9    A.   Yes, sir.

10   Q.   All right.  So on February 19th, 2020, we know that

11   James Seegan had an appointment in his iCalendar,

12   9:00 a.m., "Keith blood," correct?

13   A.   That is correct.

14   Q.   And we know at 9:31 a.m., based on the doorbell camera,

15   that the defendant arrived to Jim Seegan's house, correct?

16   A.   That is correct.

17   Q.   We know his last step was logged at 9:33 and

18   41 seconds.

19   A.   Yes, sir.

20   Q.   And we know that at 10:15 in the morning, the garage

21   camera activated with a loud noise.

22   A.   Yes, sir.

23   Q.   And you later did a re-creation where the only noise

24   that popped that camera back on was the gunshot, correct?

25   A.   Yes, sir.

```
 1   Q.  And then at 10:17 that document was printed, and we're
 2   going to take a look at that again in a moment.  Correct?
 3   A.  Yes, sir.
 4   Q.  And at 10:21 a.m. Keith Ashley left the home.
 5   A.  Correct.
 6   Q.  Came back at 10:37 a.m.  This time he did not have that
 7   backpack on that he had the first time in.
 8   A.  That's correct.
 9   Q.  So then he left the home again at 10:40; is that
10   correct?
11   A.  That is correct.
12   Q.  All right.
13            MR. FINE:  Permission to approach the witness,
14   your Honor?
15            THE COURT:  Yes.
16            MR. FINE:  And permission for the witness to step
17   down?
18            THE COURT:  Yes, we just need a lapel mic.
19            MR. FINE:  And permission to publish
20   Government's 86 and 128B to the jury?
21            THE COURT:  Go ahead.
22            MR. FINE:  Thank you, your Honor.
23   BY MR. FINE:
24   Q.  All right, Detective Bonner, if you'd step down here.
25   We've got Government's 86 and 128B.  Government's 86 was
```

1   the purported suicide letter from Jim Seegan, correct?

2   A.  Yes, sir.

3   Q.  And yesterday you stated that based on your

4   investigation, interviews with family, friends, it didn't

5   seem like this is a letter that Jim Seegan would have

6   written; is that correct?

7   A.  That is correct.

8   Q.  And we talked about how you ended up performing an

9   extraction on the defendant's cell phone as well.  Within

10  that extraction and on the defendant's cell phone in the

11  Notes section, did you find 128B?

12  A.  We did.

13  Q.  And so in terms of 128B, you took a look at that as

14  well?

15  A.  Yes, sir.

16  Q.  And did you find some similarities in the grammar and

17  some spelling errors, syntax, things like that between 86

18  and 128B?

19  A.  Yes, sir, we did.

20  Q.  And if you would go ahead and point out a few of those

21  things to the jury.  Some have been circled in red,

22  underlined in red.  If you'd go ahead and do that, please.

23  A.  Sure.  One of the things we noticed, in the opening of

24  someone's name, when they were leading, there would not be

25  a common that would be commonly placed behind the name.  We

1   noticed that here as well as when he's addressing his

2   children in this note, no comma behind the name there.

3          Also the opening statement was, "I have been

4   struggling for a while."  And then over here, "I have been

5   praying."  We noticed just, again, kind of common language

6   use there.

7          The tense in some of the words.  This one here,

8   "My dad dies years ago."  And then here we see, "If you are

9   reading this my prays."  Again kind of a tense error.

10          As well as here with a comma.  In some of the

11   sentences, there would be a space, then a comma and a

12   space.  Again, the same error was located here with some of

13   the punctuation, space comma space, here as well and here

14   with a space period space.

15          And then I think lastly was "can not," which

16   normally should be one word, with no space in between.

17   Notice the mistake there; and the same mistake was found

18   twice I believe in this note, those paragraphs.

19   Q.  And so what we know is Government's 128B was found in

20   the Notes section of the defendant's cell phone, correct?

21   A.  Yes, sir.

22   Q.  And so a reasonable conclusion, the defendant wrote

23   that note.  And so based on 128B, which is a note that we

24   know the defendant wrote, comparing it to Defendant's 86,

25   did you form a conclusion?

1    A.  We did.

2    Q.  And what was that conclusion?

3    A.  We believe that Mr. Ashley, who wrote this note, also

4    would have written this note as well.

5    Q.  And does that fit with the evidence of a print command

6    from 10:17 in the morning, two minutes after you believe

7    that Mr. Seegan was shot in the head?

8    A.  Yes, sir, it does.

9    Q.  And also with the fact that Mr. Ashley, the defendant

10   in this case, was in the home at the time as well?

11   A.  Yes, sir.

12   Q.  The only other person in the home?

13   A.  Yes, sir.

14   Q.  And, Detective Bonner --

15          MR. FINE:  Your Honor, permission to publish

16   Government's 128B on the screen at this time as well?

17          THE COURT:  Yes, go ahead.

18   BY MR. FINE:

19   Q.  So it might have been, on the blowup, a little

20   difficult to read each and every word; but we saw the

21   comparison there.

22          In terms of 128B, how would you explain to the

23   jury sort of the tone and tenor of this note from the

24   defendant?

25   A.  I gathered it was a possible suicide note in itself,

1    the fact that he -- it's like he had plans he was trying to

2    carry out that he may no longer be around, possibly taking

3    his own life, just by the verbiage of it.

4    Q.  And was this note created after the death of James

5    Seegan?

6    A.  I believe so.

7    Q.  Yesterday, we showed Government's 94A, B, and C for the

8    jury.  I failed to point something out yesterday.  In

9    Government's 94A, which was the body cam of a bunch of

10   officers listening for a noise, can you explain to the jury

11   why we have just a body cam and not the actual video from

12   that?

13   A.  Yes, sir.

14          So the evening that the officers and detectives

15   responded to the scene and they started looking through I

16   believe it was Mr. Seegan's cell phone, they could see the

17   Nest activation on there and they could go through and then

18   start seeing the videos.

19          The detectives attempted to save the videos that

20   they -- and I think one of them just -- the noise that

21   activated the camera in the garage, unfortunately, did not

22   save.  So all we had was the officers' body cam rolling as

23   they're watching that actual video.

24   Q.  In terms of the video itself, you hear sort of that

25   loud noise.  What happens after the loud noise on the video

1  itself?

2  A.  As far as -- the camera activates at the point of that

3  loud noise.

4  Q.  And so does it go from basically just a dark screen to

5  the camera activating and you see the garage?

6  A.  That's correct.

7  Q.  Okay.  You don't see any other movement other than

8  camera activates?

9  A.  That is correct.  There was no movement.

10  Q.  And is that the same thing that happened in

11  Government's 94C?

12  A.  That is correct.

13       MR. FINE:  And, your Honor, with permission, may

14  we publish 94A and C sort of in a split screen?

15       THE COURT:  Yes, go ahead.

16       MR. FINE:  Thank you.

17       (Two audiovisual presentations to the jury.)

18       MR. FINE:  And just one more time, 94A and 94C.

19       (Two audiovisual presentations to the jury.)

20  BY MR. FINE:

21  Q.  And, Detective Bonner, even the noise itself, does it

22  sound very similar in terms of what we're hearing?

23  A.  It does.

24  Q.  94C is a little bit louder, but it's a direct recording

25  versus a recording of a recording; is that fair?

1    A.   That's correct.

2    Q.   All right.

3            Now I want to move forward to February 21st.

4    During the course of your investigation, did you determine

5    that the defendant had access to Mr. Seegan's cell phone on

6    February 21st?

7    A.   Yes, we did.

8    Q.   And explain the circumstances to the jury.

9    A.   Well, in the note itself saying contact Keith Ashley.

10   Dida did reach out to him to assist with some of the

11   accounts and things of that nature that she knew she was

12   having problems with, did not have access to and needed

13   some assistance.

14   Q.   And did he end up accessing one of Mr. Seegan's bank

15   accounts on February 21st?

16   A.   He did.

17   Q.   Did he access it directly from a phone?

18   A.   He did.

19   Q.   And how was he able to do that?

20   A.   I believe Dida asked him to give them assistance and he

21   made some statements, from what she advised us, that he

22   needed to see the cell phone.

23           And the only way to get access was through

24   Mr. Seegan's thumbprint or the child Josh's thumbprint.  So

25   they used Josh's thumbprint, opened the phone; and then

1   that's when he had access to Mr. Seegan's phone.

2   Q.  And were you, through the course of your investigation,

3   able to determine that the defendant actually tried to get

4   into that bank account before?

5   A.  We did.

6   Q.  And was that also on February 21st?

7   A.  I believe so.  Possibly the 20th or 21st.

8   Q.  And where did he try to get access to that account

9   from?  What location?

10  A.  Initially it was from, I believe, his residence.

11  Q.  And did he access the account?

12  A.  He did not, due to not having the full authentication

13  from the other end.

14  Q.  And when you say "the full authentication," is that one

15  of those dual authentication things where you go in and you

16  type and then it says, you know, we're going to send you a

17  text message with a four-digit code or whatever and then

18  you've got to go from there?

19  A.  That is what we believe, yes, sir.

20  Q.  And is that for security purposes?

21  A.  Yes, sir.

22  Q.  So people can't access accounts and steal money?

23  A.  Correct.

24  Q.  And so in this case would the defendant have been able

25  to access that account without getting ahold of

 1    Mr. Seegan's cell phone?

 2    A.  He would not.

 3    Q.  And once he got ahold of Mr. Seegan's cell phone, was

 4    he able to access the account?

 5    A.  He did.

 6    Q.  And did he steal $20,000 out of that account?

 7    A.  We learned that he did.

 8    Q.  And so if you steal money from somebody after you kill

 9    them, is that a robbery?

10            MR. WHALEN:  Objection.  That's a legal

11    conclusion.

12            THE COURT:  Overruled.

13    A.  It is.

14    BY MR. FINE:

15    Q.  Did Mr. Seegan also have a sheet of paper with

16    passwords and accounts in his office?

17    A.  Yes, sir.

18    Q.  Was that easily accessible to somebody who was in the

19    office?

20    A.  Yes, sir, it was.

21    Q.  And did you also get information that the defendant

22    erased some text messages from Mr. Seegan's phone?

23    A.  From -- what Dida advised us was that as he is looking

24    through Mr. Seegan's phone, he went through the text

25    messages between himself and Mr. Seegan and erased all of

```
 1   them.
 2          She asked him why was he doing that.  Initially I
 3   think she said he said it was a mistake -- or an accident,
 4   I'm sorry.  And then she made a statement that, "Well,
 5   they'll be on your phone."
 6          And he made -- then replied to her, "Well, I
 7   delete all my messages between my clients and myself."
 8   Q.  And did that strike you as being odd?
 9   A.  Yes, it did.
10   Q.  Suspicious?
11   A.  Very much so.
12   Q.  And was that another factor, through the course of your
13   investigation, that led you to your final conclusions?
14   A.  It was.
15   Q.  All right.  On September 3rd the Carrollton Police
16   Department as well as the FBI conducted -- executed several
17   search warrants; is that correct?
18   A.  Yes, sir.
19   Q.  What locations were those search warrants executed at?
20   A.  One of them was for Mr. Ashley's residence, and one was
21   for the brewery that he owned.
22   Q.  Did you also access his truck as well?
23   A.  We did.
24   Q.  All right.  And let's start with the defendant's home.
25   Explain to the jury -- so when you have a search warrant --
```

1    well, let's start with that.  How do you obtain a search

2    warrant?

3    A.  You have to have probable cause.  You write up a

4    statement with the location or item that you are searching,

5    and you present that to a judge.  A judge makes the

6    determination if there is enough probable cause to then

7    sign the search warrant to give us the legal authority to

8    conduct that search.

9    Q.  And is that what happened in this case?

10   A.  Yes, sir.

11   Q.  And in regards to the defendant's home, did y'all

12   execute the search warrant?

13   A.  We did.

14   Q.  And approximately how many law enforcement agents were

15   there at that home?

16   A.  I'd say roughly 10 to 15, somewhere in there.

17   Q.  And when you're executing a search warrant in general,

18   do you go from room to room looking for potential evidence?

19   A.  We do.

20   Q.  And is it fair to say that you'd always rather

21   overcollect evidence than leave something there and have to

22   go get another search warrant?

23   A.  That is correct.

24   Q.  And so in this case talk to us about the types of items

25   that were seized from the defendant's home.

1  A.  I believe one of the items was in his home office we

2  located the same -- we believed the same black backpack.

3  It was an Under Armour with a white X on the front, also

4  with a firearm inside that backpack.

5         We noticed inside a bag, a trash bag in his

6  office, there was a envelope from the Dallas County Medical

7  Examiner's Office; and there was also a receipt.  I believe

8  it was for an autopsy report for Mr. Seegan.

9  Q.  And were you able to determine who that letter was

10  mailed to?

11  A.  It was mailed -- we learned that day that it was mailed

12  to an employee of Mr. Ashley's.

13  Q.  And was his name Paul Villarreal?

14  A.  Yes, sir.

15  Q.  And did Mr. -- did you have a conversation with

16  Mr. Villarreal?

17  A.  We did, on that same day, yes, sir.

18  Q.  And at the conclusion of that conversation, did you

19  form a conclusion as to who told Mr. Villarreal to order

20  that autopsy?

21         MR. WHALEN:  Objection as to hearsay, your Honor.

22         MR. FINE:  Again it goes to the state of mind of

23  the detective and the investigation.

24         THE COURT:  Okay.  Overruled.

25  A.  Yes.  Mr. Villarreal informed us that Mr. Ashley

1  approached him and informed him he was going to be sending

2  an autopsy to his home -- asked for his address and was

3  sending it to his home and that he was to bring it to him

4  once he received it.

5  BY MR. FINE:

6  Q.  And do you recall where Mr. Villarreal lived, what

7  city?

8  A.  I don't recall the exact city.  I know it was a little

9  bit of a drive.

10  Q.  Was the actual envelope and the receipt found in the

11  defendant's home?

12  A.  It was.

13  Q.  And that's the home in Lucas, Texas?

14  A.  That is correct.

15  Q.  Which is in the Eastern District?

16  A.  That is correct.

17  Q.  All right.  What did you make out of that, that the

18  defendant had one of his employees receive an autopsy

19  report of Jim Seegan?

20  A.  It was my belief that it was, in a way, to keep himself

21  removed from drawing suspicion that he was asking for a

22  copy of the autopsy report.

23  Q.  Can you think of a valid reason why somebody would ask

24  for an autopsy report?

25          MR. WHALEN:  Objection, calls for speculation.

```
 1              THE COURT:  Sustained.
 2    BY MR. FINE:
 3    Q.  Have you ever had a case before where a suspect
 4    requested an autopsy report?
 5    A.  None that I'm aware of.
 6    Q.  And, again, the defendant in this case, he does have
 7    knowledge in the field of medicine, correct?
 8    A.  He does.
 9    Q.  Between being a paramedic and a nurse?
10    A.  That's correct.
11    Q.  And in the autopsy report is there a toxicology
12    section?
13    A.  There is.
14    Q.  And also a cause of death as well?
15    A.  Yes, sir.
16    Q.  Did you also find several firearms in the defendant's
17    home?
18    A.  We did.
19    Q.  Approximately how many?
20    A.  I don't recall the exact number, but there were
21    multiple.  I think there were handguns and long guns.
22    Q.  And did you find ammunition in the defendant's home?
23    A.  We did.
24    Q.  Did you find 9-millimeter ammunition?
25    A.  We did.
```

```
 1   Q.  And to be fair, a 9-millimeter is a pretty common type
 2   of firearm, correct?
 3   A.  That is correct.
 4   Q.  And 9-millimeter ammunition would go in any
 5   9-millimeter handgun?
 6   A.  Yes, sir.
 7   Q.  But did you find any 9-millimeter ammunition in James
 8   Seegan's house?
 9   A.  We did not.
10   Q.  Did you find any gun cases?
11   A.  No, sir.
12   Q.  Did you find gun cases at the defendant's home?
13   A.  We did.
14   Q.  Did you find one that was empty?
15   A.  We did.
16   Q.  Did you find in that empty gun case -- that it would
17   fit a 9-millimeter handgun?
18   A.  Yes, sir.
19   Q.  Did you also find, between the brewery and the home,
20   syringes at the defendant's home or brewery?
21   A.  We did.
22   Q.  Did you find any syringes at James Seegan's home?
23   A.  No, sir.
24   Q.  And, again, to be fair, we're not saying that those
25   syringes were filled with etomidate, correct?
```

1   A.  That's correct.

2   Q.  But certainly a syringe would have been something that

3   you would need to administer etomidate?

4   A.  Yes, sir.

5   Q.  Did you also find, I guess, the long-sleeved sort of

6   jacket or top that Mr. Ashley was wearing that day?

7   A.  Yes, sir.

8   Q.  Did you ever find the jeans?

9   A.  We did not.

10  Q.  In the truck did you find the actual autopsy report of

11  James Seegan?

12  A.  Yes, we did.

13  Q.  And so this would have been the autopsy report that was

14  ordered and sent to Paul Villarreal?

15  A.  I believe so, yes, sir.

16  Q.  And so you've got the envelope and the receipt in the

17  defendant's home, correct?

18  A.  Yes, sir.

19  Q.  And the actual autopsy report in his vehicle?

20  A.  That is correct.

21  Q.  Did you also find a letter from an attorney in the

22  truck?

23  A.  We did.

24  Q.  And within that truck did you find anything else of

25  significance?

1   A.  There was a second, I believe, cell phone in there.

2   But other than that, I don't recall offhand.

3   Q.  All right.  And did you seize that letter as well?

4   A.  We did.

5   Q.  And when I say that you seize an item, after you seize

6   evidence, what do you -- when I say "you," the Carrollton

7   Police Department -- what do you do with that evidence?

8   A.  Well, depending on its nature, we determine if it needs

9   further investigation.  But, again, it will be held as

10  evidence.  We will, again, check that item over; and then

11  if it needs further -- like a cell phone or something of

12  that nature will require another search warrant to access

13  that cell phone.

14  Q.  And in this case did you bring that letter down to

15  court?

16  A.  We did.

17  Q.  Okay.  And is it identified as Government's 123A?

18  A.  I believe so.

19  Q.  If you'll in -- there should be a book.

20         MR. FINE:  May I approach the witness, your Honor?

21         THE COURT:  Yes, you my.

22  BY MR. FINE:

23  Q.  There's two of them.  There is one in front of you and

24  one behind.

25  A.  Yes, sir.

1   Q.  And so that is identified as Government's 123A,

2   correct?

3   A.  Yes.

4   Q.  Okay.

5          MR. FINE:  And, your Honor, permission to publish

6   Government's 109, which are photographs from the search of

7   the defendant's home?

8          THE COURT:  Go ahead.

9   BY MR. FINE:

10  Q.  And starting at page 1 here, what are we looking at?

11  A.  That looks like the front of Mr. Ashley's residence at

12  that time.

13  Q.  Okay.

14         MR. FINE:  If we could go to the next page,

15  please.

16  BY MR. FINE:

17  Q.  And what are we looking at here?

18  A.  It would be a firearm.

19  Q.  And is this one of several firearms found in the

20  defendant's home?

21  A.  Yes, sir.

22  Q.  Okay.

23         MR. FINE:  On to the next page, please.

24  BY MR. FINE:

25  Q.  And what are we looking at here?

1   A.  This would have been the garage and the large safe.

2   Q.  And circling down here, do you know what that is?

3   A.  Those appear to be gun cases for a long gun, rifle or

4   shotgun.

5            MR. FINE:  Next page, please.

6   BY MR. FINE:

7   Q.  Is this the backpack that we believe the defendant was

8   wearing when he went into Mr. Seegan's home?

9   A.  Yes, sir.

10  Q.  And you mentioned that there was a firearm in this

11  backpack?

12  A.  Yes, sir.

13  Q.  And through the course of your investigation, he was

14  known to carry a firearm in that backpack at all times?

15  A.  That is what we learned, yes, sir.

16           MR. FINE:  Next page, please.

17  BY MR. FINE:

18  Q.  What firearm are we looking at here?

19  A.  This would have been, I believe, the firearm located

20  inside the backpack at the time of the search warrant.

21  Q.  And it's a handgun as well?

22  A.  Yes, sir.

23           MR. FINE:  Next page.

24  BY MR. FINE:

25  Q.  What is this item in the middle of page 7 here?

1    A.  Syringes.

2    Q.  And was that found in the defendant's home?

3    A.  It was.

4           MR. FINE:  Next page, please.

5    BY MR. FINE:

6    Q.  And what is the PHI Air Medical Texas?  What was found

7    in this binder?

8    A.  This is some of the training that Mr. Ashley had

9    received from the PHI Air Medical as a medic.

10   Q.  And was this -- contained in this what we saw in

11   Government's 113 when we had those questions about

12   etomidate in there?

13   A.  Yes, sir.

14   Q.  And this is something that he kept in his home?

15   A.  Yes, sir.

16   Q.  Readily available to look at and reference,

17   potentially?

18   A.  Yes, sir.

19          MR. FINE:  Next page, please.

20   BY MR. FINE:

21   Q.  What are we looking at here?

22   A.  I believe that's 9-millimeter ammunition.

23   Q.  And, again, is 9-millimeter ammunition the type of

24   ammunition that was used to kill Mr. Seegan?

25   A.  It was.

 1   Q.  Okay.  And is that the empty gun case that we spoke of

 2   as well?

 3   A.  I believe so, yes, sir.

 4   Q.  Okay.  And that's actually Government's 110 which we

 5   have here in the courtroom as well.

 6   A.  Yes, sir.

 7   Q.  And that could house a 9-millimeter handgun?

 8   A.  Yes, sir.

 9   Q.  Did you find any other empty handgun cases in the

10   house?

11   A.  I don't believe we found other empty handgun cases.

12           MR. FINE:  Next page, please.

13   BY MR. FINE:

14   Q.  And you talked about his medical training.  Are these

15   two IDs which show he's a registered nurse at City Hospital

16   and a flight nurse as well?

17   A.  That is correct.

18   Q.  And is that consistent with the background that you

19   found out about Mr. Ashley?

20   A.  Yes, sir.

21           MR. FINE:  Okay.  Next page, please.

22   BY MR. FINE:

23   Q.  What are we -- what's significant about this trash bag

24   here?

25   A.  Well, as we were conducting a search on the home, we

 1  noticed it appeared they were packing for moving.  And this

 2  was located inside his home office and it was full of just

 3  documents, paper documents, and so that is where we

 4  searched that bag.  We located the receipt and the envelope

 5  that would have contained the autopsy report.

 6  Q.  Okay.

 7          MR. FINE:  Next page, please.

 8  BY MR. FINE:

 9  Q.  And is this the envelope from the Southwestern

10  Institute of Forensic Sciences addressed to Paul

11  Villarreal?

12  A.  It is.

13  Q.  And do you know if Farmersville, Texas, is also in the

14  Eastern District?

15  A.  I believe so.

16  Q.  And within this envelope would have been the autopsy

17  report found in his truck, correct?

18  A.  That is correct.

19  Q.  All right.

20          MR. FINE:  Next page, please.

21  BY MR. FINE:

22  Q.  And is this the receipt for $5 for the autopsy report

23  from James Seegan?

24  A.  That's correct.

25  Q.  It shows May 19th, 2020?

1    A.  Yes, sir.

2    Q.  Okay.

3             MR. FINE:  Next page, please.

4    BY MR. FINE:

5    Q.  We talked about his law enforcement background.  Does

6    this indicate that he attended basically a police academy?

7    A.  It does.

8    Q.  And we talked about within the police academy you

9    receive -- everybody in the state of Texas receives some

10   basic crime scene education as well?

11   A.  That is correct.

12   Q.  All right.

13            MR. FINE:  Next page, please.

14   BY MR. FINE:

15   Q.  And again is this another letter showing medical

16   background leading back to his time in the Navy as well?

17   A.  It appears so, yes, sir.

18            MR. FINE:  Next page, please.

19   BY MR. FINE:

20   Q.  What are we looking at here?

21   A.  These are some of the -- several of the IDs that were

22   located during the search of his home.

23   Q.  So City of Wylie Police.  We've got Health Network,

24   student.  We have Children's Health over here.  And then we

25   have another medical ID as well, correct?

 1   A.  Yes, sir.

 2   Q.  And his peace officer's license as well?

 3   A.  Yes, sir.

 4   Q.  All right.

 5          MR. FINE:  Next page, please.

 6   BY MR. FINE:

 7   Q.  And what are these that we're looking at here?

 8   A.  I believe that was from that large safe located in the

 9   garage of Mr. Ashley's home that we were --

10   Q.  Okay.

11   A.  -- able to access and the firearms we located.

12   Q.  And what type of firearms are these?

13   A.  They appear to be all long guns, a shotgun or rifle.

14   Q.  Several of them as well, correct?

15   A.  Yes, sir.

16   Q.  Okay.

17          MR. FINE:  Next page.

18   BY MR. FINE:

19   Q.  And what about here?  What are we looking at?

20   A.  Looks like we have two handguns and multiple magazines

21   for -- possibly three handguns, multiple magazines as well.

22          MR. FINE:  Next page.

23   BY MR. FINE:

24   Q.  Is this the defendant's -- appears to be his badge from

25   the City of Wylie Police Department?

1  A.  It appears so, yes, sir.

2  Q.  Okay.

3         MR. FINE:  Next page.

4  BY MR. FINE:

5  Q.  What is the significance of this shirt?

6  A.  We believe that to be the same shirt that was seen on

7  camera that he was wearing the day of Mr. Seegan's death.

8         MR. FINE:  Next page.

9  BY MR. FINE:

10 Q.  And again more certified flight emergency paramedic

11 type things here; and there is a document from Parkland

12 Securities as well, correct?

13 A.  Yes, sir.

14 Q.  And did you find out that he -- that the defendant was

15 affiliated with Parkland Securities through your

16 investigation?

17 A.  We did.

18         MR. FINE:  Next page.

19 BY MR. FINE:

20 Q.  What's the significance of this?

21 A.  It just -- it shows him -- appears to be on duty as a

22 medic treating a patient.

23 Q.  Okay.

24 A.  Assisting.

25 Q.  And what is he wearing here?

1  A.  Gloves.

2  Q.  And so this -- I mean, this might be kind of a silly

3  question.  But if somebody were wearing gloves during the

4  commission of a crime, would they leave fingerprints?

5  A.  They would not.

6  Q.  And when -- you said you've had your blood drawn

7  before.  Generally, does the person who draws your blood

8  wear gloves?

9  A.  They do.

10  Q.  And so would it be suspicious for somebody to put

11  gloves on if they were going to draw somebody's blood?

12  A.  It would not be.

13        MR. FINE:  Next page.

14  BY MR. FINE:

15  Q.  And again Certified Flight Registered Nurse here.

16        MR. FINE:  Next page.

17  BY MR. FINE:

18  Q.  Is this another handgun?

19  A.  Yes.  That may be one that we've seen from earlier, but

20  yes.

21  Q.  Okay.

22        MR. FINE:  Next page.

23        Is that the end?  Okay.

24  BY MR. FINE:

25  Q.  During the course of your investigation, did you come

 1   to find evidence of financial fraud involving the defendant

 2   as well?

 3   A.  We did.

 4   Q.  And did you bring the FBI in to assist in that

 5   investigation?

 6   A.  Yes, we did.

 7   Q.  And did you also find some paperwork designating the

 8   James Seegan trust as the executor of a life insurance

 9   policy?

10   A.  That is correct.

11   Q.  A $2 million life insurance policy?

12   A.  That's correct.

13   Q.  And on that paperwork -- was Jim Seegan's signature on

14   that paperwork?

15   A.  Yes.

16   Q.  And was Dida Seegan's signature on that paperwork?

17   A.  It was.

18   Q.  Did you later come to find out whether Dida's signature

19   was forged?

20   A.  As we interviewed her, she informed us -- we showed her

21   the document, and she stated right away that was not her

22   signature.

23   Q.  And did you believe that to be true?

24   A.  Yes.

25   Q.  Did she seem to have any idea about those documents

 1   whatsoever?

 2   A.  No.  Dida informed us fairly often --

 3           MR. WHALEN:  Objection as to hearsay, your Honor.

 4           THE COURT:  Sustained.

 5           MR. FINE:  Okay.

 6   BY MR. FINE:

 7   Q.  Through the search of the defendant's home, did you

 8   find other documents that appeared to be suspicious in

 9   terms of signatures?

10   A.  We did.

11   Q.  Specifically related to Jim Seegan?

12   A.  We did.

13           MR. FINE:  Permission to approach the witness,

14   your Honor?

15           THE COURT:  Yes, you may.

16   BY MR. FINE:

17   Q.  Detective Bonner, I'm going to show you Government's

18   Exhibit 114, which I believe has been admitted into

19   evidence.

20           MR. FINE:  Is that correct, your Honor, 114?

21           THE COURT:  114 has not been admitted.

22           MR. FINE:  We'll go through the predicate, then.

23   BY MR. FINE:

24   Q.  I want you to take a look at Government's Exhibit 114.

25           THE COURT:  Oh, I take that back.

```
 1            MR. FINE:  Is it in?
 2            THE COURT:  I'm sorry.  It's in a long list of
 3   exhibits that were admitted.
 4            MR. FINE:  And I had the same issue I was looking
 5   through.
 6            THE COURT:  I just haven't updated my form.  So it
 7   has been admitted.
 8            MR. FINE:  Okay.
 9   BY MR. FINE:
10   Q.  Take a look at 114.  I know we have an electronic copy,
11   but I want you to take a look at the physical copy on the
12   first two pages here.
13            Does there appear to be anything odd about those
14   first two pages?
15   A.  Yes.  There appears to be -- on the Gift Letter title
16   page there is a Wite-Out area around where the signature
17   would be located.
18            MR. FINE:  And permission to publish this directly
19   to the jury, your Honor?
20            THE COURT:  Yes, you may.
21   BY MR. FINE:
22   Q.  So on page 1 and page 2, there are some whited-out
23   areas, correct?
24   A.  Correct.
25   Q.  I'm going to give the jury a moment to look at that.
```

1           And so, Detective Bonner -- that's on a Gift

2   Letter, correct?

3   A.  Yes, sir.

4   Q.  What did you find significant about the Wite-Out on

5   that Gift Letter?

6   A.  Well, we located another copy of this Gift Letter with

7   the signature of Mr. Seegan placed in that area where the

8   Wite-Out was.

9   Q.  And so what conclusion did you form from that?

10  A.  Well, based off of the signature we found on the other

11  documents, we noticed there was an error in the signature

12  that -- where the natural signature form would dip below

13  the line, there were little marks or areas where they did

14  not show up; and that was copied over to the actual Gift

15  Letter.  It showed that it appeared to be just a copy and a

16  forgery.

17  Q.  And so that would constitute a forgery of Mr. Seegan's

18  signature?

19  A.  Correct.

20  Q.  And is that consistent with the evidence of a forgery

21  of Ms. Seegan's signature as well?

22  A.  It is.

23  Q.  And that is found directly in the defendant's home,

24  correct?

25  A.  Correct.

 1   Q.  All right.

 2        We talked about the cell phone extractions of the

 3   defendant.  In a cell phone extraction are you able to see

 4   searches as well, what people are searching for?

 5   A.  We are sometimes.

 6   Q.  And so in this case did you find some searches on the

 7   defendant's phone that were significant to you?

 8   A.  Yes, sir.

 9   Q.  And on April 30th did the defendant search asking if a

10   Nest camera -- an indoor Nest camera could detect sound if

11   no motion?

12   A.  Yes, sir.

13   Q.  And what did you take from that?

14   A.  Again, we thought it was a very odd thing to search

15   after the fact because -- we believed it was something very

16   suspicious.

17   Q.  And, I mean, in terms of the overall investigation, the

18   Nest camera, the indoor camera in the garage, that is

19   significant, correct?

20   A.  That is correct.

21   Q.  It constitutes a time of death potentially.

22   A.  Yes, sir.

23   Q.  And so on April 30th he's searching "can Nest camera

24   indoor detect sound if no motion"?

25   A.  That's correct.

1    Q.  On May 9th did he search "manslaughter jail time"?

2    A.  He did.

3    Q.  Did he search "manslaughter deferred adjudication in

4    Texas"?

5    A.  He did.

6    Q.  What did you take out of those searches?

7    A.  Again, I believed it was highly suspicious.

8    Q.  On September 3rd, 2020, did he search "can manner of

9    death be changed by medical examiner"?

10   A.  He did.

11   Q.  Did he also search "can police overrule a medical

12   examiner"?

13   A.  He did.

14   Q.  And then two other searches that did not have dates on

15   them, was one of those searches a time of death calculator?

16   A.  It was.

17   Q.  And was another one "how can you find out if a case is

18   going to grand jury"?

19   A.  Yes.

20   Q.  And, again, if you could tell the jury the significance

21   of that?

22   A.  Again, all those searches we believed to be highly

23   suspicious for someone in his position.

24   Q.  And Detective Bonner, again, here's another magnet that

25   I showed you earlier, correct?

1    A.  Yes, sir.

2    Q.  Initially, the medical examiner ruled this case a

3    suicide, correct?

4    A.  That is correct.

5    Q.  And the medical examiner and the police department,

6    they serve two different functions.  Is that fair to say?

7    A.  Yes, sir.

8    Q.  So what function does the medical examiner serve in

9    terms of an investigation?

10   A.  They're there to conduct the medical portion of their

11   investigation involving the body itself.

12   Q.  And when the case was ruled a suicide, did they have

13   the full case file in front of them?

14   A.  No, sir.

15   Q.  And, in fact, at that point did they have any of these

16   searches?  Did they have the fact that he was a nurse, that

17   he had access to etomidate, any of these things at all?

18   A.  No, sir.

19   Q.  And so within the medical examiner's findings,

20   basically in the report it states "gun found in hand,"

21   "contact wound," and "suicide note found next to body,"

22   correct?

23   A.  Yes, sir.

24   Q.  And so, realistically, you look at those factors just

25   in a vacuum, it looks like a suicide, right?

1   A.  That's correct.

2   Q.  So let me ask you this:  The medical examiner ruled it

3   a suicide.  Did the Carrollton Police Department ever rule

4   it a suicide?

5   A.  We did not.

6   Q.  Did they ever close the investigation?

7   A.  No, sir.

8   Q.  And so did the investigation remain pending?

9   A.  It did.

10  Q.  And so did the medical examiner's findings at that

11  point, initially, have any impact on your final

12  conclusions?

13  A.  It did not.

14  Q.  And why is that?

15  A.  Our job is to continue the criminal investigation and

16  just to get to the bottom of it to make sure everything

17  we're seeing is true and correct.

18  Q.  So, essentially, what you're left with at some point is

19  the first step, is it murder or is it a suicide, right?

20  A.  Correct.

21  Q.  And what do you believe it to be?

22       MR. WHALEN:  Objection, calls for a legal

23  conclusion, your Honor.

24       THE COURT:  Well, he can -- overruled.

25  A.  I'm sorry.  Could you restate the question?

```
 1   BY MR. FINE:
 2   Q.  Do you believe that the death of James Seegan was a
 3   murder or a suicide?
 4   A.  I believe it was a murder.
 5   Q.  And let's talk about the factors why you do not believe
 6   it was a suicide.
 7            What was James Seegan's position on firearms?
 8   A.  He was -- he did not like guns, and every friend and
 9   family member that we talked to stated as much.
10   Q.  Was there any evidence of guns in the home?
11   A.  There was not.
12   Q.  Ever any evidence of a gun purchased within days
13   leading up to this?
14   A.  There was not.
15   Q.  And did y'all look at Mr. Seegan's finances as well?
16   A.  We did.
17   Q.  The relationship with his son, Josh, did that factor
18   into your determination this was not a suicide?
19   A.  It did.
20   Q.  And how?
21   A.  He was ordering gifts for Josh to receive either the
22   next day or so, in the next coming days, that he was very
23   excited about.  He was planning things as if his normal
24   life was moving forward.  There was nothing that we found
25   that led us to believe he was suicidal in any way.
```

1  Q.  Did the note next to Mr. Seegan factor into your

2  determination it was not a suicide?

3  A.  It did.

4       Based off of the note and then other documents

5  we've located written by Mr. Seegan, they did not seem to

6  match at all.  Mr. Seegan was a very detailed person; and

7  everything we located on him just did not match with

8  someone of his stature taking their own life and

9  documenting it in that way or leaving a note in that way,

10  just did not match at all.

11  Q.  What about the fact that Mr. Seegan was right-handed?

12  Did that factor into your determination?

13  A.  It did.

14  Q.  How so?

15  A.  Again, it's a -- it is uncommon for someone to commit

16  suicide with their off hand, while not -- I won't say

17  never, but it is uncommon.

18  Q.  What about the placement of the chair in the room?  Did

19  that factor in?

20  A.  It did.

21  Q.  How so?

22  A.  Per Dida, his chair was never -- he never sat in that

23  position.  The chair was never over there.  And, again,

24  based off of our belief that Mr. Ashley was there to

25  conduct a blood draw on him, we thought his chair was in a

1   position where he could place his arm out to give blood.

2   Q.  What about -- we mentioned right hand versus left hand.

3   What about the positioning of Mr. Seegan's hand?

4   A.  Again, the -- with the gun being in his hand after a

5   contact wound to the head like that, it would -- just

6   extremely unlikely that the hand would fall with the gun

7   and then drawback up underneath the actual armrest of the

8   chair.  Just didn't make sense.

9   Q.  What about Mr. Seegan's positions on vaccines or the

10  lack of needles or syringes or anything IV-related in the

11  home?  Did that factor in?

12  A.  It did.

13  Q.  And how so?

14  A.  We learned, again through our investigation, that

15  Mr. Seegan held anti-vaxxer beliefs.  He did not wish his

16  son to be vaccinated on many vaccinations.

17          And even when he did take any kind of -- when he

18  had to have medication, Mr. Seegan himself, he would

19  document it in a journal and state how he felt and what it

20  was causing, things of that nature.

21  Q.  What about the etomidate itself?  Is that something

22  that would be readily available to any person?

23  A.  It would not be.

24  Q.  Something that's sold on the street like cocaine or

25  heroin or marijuana?

1    A.  No, sir.

2    Q.  What about the fact that you'd have to inject it into

3    yourself?  Did that factor as well?

4    A.  Yes, sir.

5    Q.  The note itself, the suicide note itself, did it have

6    any blood on it?

7    A.  It did not.

8    Q.  And did that factor into your determination this was

9    not a suicide?

10   A.  It was part of it, yes, sir.

11   Q.  What about the fact that Mr. Seegan had not expressed

12   any suicidal thoughts, depression, anything like that?  Did

13   that factor in as well?

14   A.  Yes, sir.

15   Q.  And so all these things that we talked about -- I think

16   there's about 15 things we just went over.  Is it fair to

17   say you could pull any one thing out and explain it?

18   A.  Sure.  Yes, sir.

19   Q.  But you would basically need 15 different explanations

20   to explain those 15 things.

21   A.  That's correct.

22   Q.  And so when you're conducting an investigation, do you

23   look at each individual thing in a vacuum; or do you look

24   at it globally as a totality of the evidence?

25   A.  We look at it as a totality.

```
 1    Q.  And so it's your belief this was a murder, correct?

 2    A.  Yes, sir.

 3    Q.  And so if it is your belief it is a murder, who do you

 4    believe committed that murder?

 5    A.  I believe it was Mr. Ashley.

 6    Q.  And let's talk about why you believe it was Mr. Ashley.

 7            Mr. Ashley had background in the field of

 8    medicine, correct?

 9    A.  Yes, sir.

10    Q.  He had checked out etomidate --

11            MR. WHALEN:  Objection to the leading, your Honor.

12            THE COURT:  Okay.  Sustained.  Just rephrase the

13    question.

14    BY MR. FINE:

15    Q.  Had he checked out etomidate on December 17th, 2019?

16    A.  He did.

17            MR. WHALEN:  Same objection, your Honor.

18            THE COURT:  Okay.  Just rephrase the question.

19    BY MR. FINE:

20    Q.  Was there any evidence that you found in regards to

21    etomidate and the defendant?

22    A.  Yes.

23    Q.  And what was that evidence?

24    A.  The system used at the hospital he worked at showed a

25    log of him checking out etomidate December 2019.
```

Jury Trial, Volume 5                    1149

1   Q.  And did you also find anything that would lead you to

2   believe he had training in the area of etomidate?

3   A.  We did.

4   Q.  And what was that?

5   A.  His testing for PHI Air Medical.  There was questions

6   that he answered on tests specifically related to

7   etomidate.

8   Q.  We talked about his law enforcement background.  What

9   was the significance of his training in law enforcement in

10  your investigation in determining that Mr. Ashley was the

11  one that committed this murder?

12  A.  We just determined it would -- he would certainly have

13  knowledge of a crime scene and how to possibly manipulate

14  one, if needed.

15  Q.  And was this scene staged pretty well?

16  A.  It was.

17  Q.  I mean, it certainly -- initial people on the scene --

18  to some people, off the bat it looked like a suicide,

19  correct?

20  A.  That's correct.

21  Q.  What about the text messages and phone calls that he

22  made throughout the day on February 19th 2020?  "He" being

23  the defendant in this case.

24  A.  Yes, sir.  Again, we thought they were odd, in a way to

25  possibly throw off suspicion, as if he were checking in on

 1   the deceased.

 2   Q.  And have you -- through the course of your training and

 3   experience, have you seen that before with suspects?

 4   A.  To try to lead us astray or lead evidence one

 5   direction, yes, sir.

 6   Q.  Or create an alibi?

 7   A.  Correct.

 8   Q.  And did the defendant attempt to do that here?

 9   A.  He did.

10   Q.  And, Detective Bonner, in terms of those text messages,

11   did they start as soon as 10:24 a.m.?

12   A.  They did.

13   Q.  And that was an unread text message, correct?

14   A.  That is correct.

15   Q.  And an unread text message and an unanswered call and

16   the phone never moving after 9:33, is that also consistent

17   with your theory that the death happened at 10:15?

18   A.  It is.

19   Q.  And were there calls at 10:33 and 10:34 from the

20   defendant to Mr. Seegan's phone?

21   A.  There were.

22   Q.  And were those unanswered?

23   A.  Correct.

24   Q.  And was there another call at 11:08 a.m. on

25   February 19th?

1    A.  Yes, sir.

2    Q.  Was that also unanswered?

3    A.  Yes, sir.

4    Q.  And was there another text message at 4:37 p.m.?

5    A.  That is correct.

6    Q.  And were there two more calls, at 5:01 and 5:02 p.m.?

7    A.  Yes, sir.

8    Q.  And that was right before Mr. Seegan's body was found

9    by his son and his wife, correct?

10   A.  That's correct.

11   Q.  And the 9-1-1 call came in at 5:22 p.m.

12   A.  Yes, sir.

13   Q.  We also mentioned that on May 20th, 2020, the medical

14   examiner mailed the autopsy to Paul Villarreal, correct?

15   A.  Yes, sir.

16   Q.  You've expressed to this jury you believe that a murder

17   was committed against James Seegan, you believe that a

18   robbery was committed against James Seegan, and you believe

19   that the defendant was the one that committed those crimes,

20   correct?

21   A.  That is correct.

22   Q.  And that is your role, as the lead detective from

23   Carrollton, to form those conclusions, correct?

24   A.  Yes, sir.

25   Q.  And did you determine a motive?  Why?

1   A.  We believed it to be financially --

2           MR. WHALEN:  Object.  Calls for speculation.

3           THE COURT:  Just rephrase the question.

4   BY MR. FINE:

5   Q.  Through the course of your investigation, were you able

6   to determine -- through interviews, through pouring through

7   evidence, through consulting with other investigators from

8   various law enforcement agencies, were you able to

9   determine what benefit the defendant would receive from

10  this?

11          MR. WHALEN:  Calls for speculation.

12          THE COURT:  Well, overruled.

13          If you can answer.

14  A.  We were.

15  BY MR. FINE:

16  Q.  And what was that?

17  A.  That he would financially gain from it.

18  Q.  And did he financially gain by stealing $20,000

19  36 hours after he killed Mr. Seegan?

20  A.  He did.

21  Q.  And could he have potentially benefited long-term by

22  the millions of dollars that he had in his control?

23  A.  That is correct.

24  Q.  And so the defendant ended up resigning as the executor

25  of the trust about a week after the murder, correct?

 1   A.  Yes, sir.

 2   Q.  What was your opinion on that, in terms of him

 3   resigning?

 4              MR. WHALEN:  Calls for speculation.

 5              THE COURT:  Overruled.

 6              If you can answer.

 7   A.  We believed that possibly some of the heat was coming

 8   on with questions being asked by Dida and other family

 9   members.  We think he was trying to remove himself at that

10   point.

11   BY MR. FINE:

12   Q.  And is that, again, consistent with the throwing off

13   suspicion, the alibis that we've seen consistently

14   throughout, February 19th all the way through the course of

15   your investigation?

16   A.  Yes, sir.

17   Q.  In terms of the firearm that was used to kill

18   Mr. Seegan, through a review of the cell phone records of

19   the defendant, were you able to determine the locations

20   where the gun could have been brought from?

21   A.  We believed it would have been from his home or his

22   brewery.

23   Q.  And are both of those in the Eastern District of Texas?

24   A.  They are.

25   Q.  And in terms of looking at the cell phone data, he left

1  his home in the early morning.  He went to the brewery,

2  correct?

3  A.  Yes, sir.

4  Q.  And from the brewery he traveled down 75 and across

5  George Bush?

6  A.  That is correct.

7  Q.  South to Mr. Seegan's home and arrived in the

8  neighborhood about 9:10 in the morning; is that correct?

9  A.  That is correct.

10 Q.  Were there any stops along the way other than his home

11 and the brewery?

12 A.  No, sir.

13 Q.  And it's your belief that gun certainly did not come

14 from Mr. Seegan's home?

15 A.  That is correct.

16 Q.  All the evidence in this case points to -- in terms of

17 the two homes, Seegan home, Ashley home, where is all the

18 evidence of anything involving a firearm?  Which home?

19 A.  All the evidence would have been located in

20 Mr. Ashley's home other than the firearm itself when it was

21 in Mr. Seegan's hand.

22 Q.  On September 3rd, did the defendant also search -- do a

23 Google search for "QTOF"?

24 A.  He did.

25 Q.  And at the time did you have any -- was that even

1   significant to you?

2   A.  We did not know it to be.

3   Q.  And, you know, one of the things I should have brought

4   out, an investigation, any investigation, especially a

5   homicide investigation, that continues throughout, correct?

6   A.  It does.

7   Q.  So if somebody came in here with new evidence today,

8   would you investigate it?

9   A.  Certainly.

10  Q.  Would you continue to investigate until any new

11  evidence was brought to you?

12  A.  Yes.

13  Q.  And so having said that, with QTOF, that was something

14  that recently you found out about; is that fair?

15  A.  That is correct.

16  Q.  What is QTOF?

17  A.  I believe it is the system used by the lab, whenever

18  they're checking the femoral blood drawn during the

19  autopsy, that locates any kind of narcotic or drug in the

20  actual blood of the person it was drawn from.

21  Q.  And up until, you know, recently, did you -- as a

22  trained investigator, a major crime investigator with the

23  Carrollton Police Department, did you even know what QTOF

24  was?

25  A.  I did not.

```
 1   Q.  But who was searching "QTOF" on his phone?

 2   A.  Mr. Ashley.

 3   Q.  The defendant in this case?

 4   A.  Yes, sir.

 5          MR. FINE:  I'll pass the witness.

 6          THE COURT:  Cross-examination?

 7          CROSS-EXAMINATION OF BRANDON BONNER

 8   BY MR. WHALEN:

 9   Q.  Detective Bonner, good morning.

10   A.  Good morning, sir.

11   Q.  Okay.  Let's start -- I'm going to try to do this

12   chronologically, but I'm sure my mind will jump back and

13   forth.  But try to stick with me if you can, okay?

14   A.  Yes, sir.

15   Q.  All right.  So let's start with February 19th, correct?

16   That's the day of this incident at Mr. Seegan's house,

17   correct?

18   A.  Yes, sir.

19   Q.  Okay.  So Detective Duncan is the investigator on call,

20   correct?

21   A.  Yes, sir.

22   Q.  Okay.  So she gets called out to the scene, correct?

23   A.  Yes, sir.

24   Q.  Okay.  And when you took over the case, did you review

25   the file and review body cam footage and things like that?
```

 1    A.  I did.

 2    Q.  Okay.  And from what I can tell is that -- well, let me

 3    back up.

 4         And Captain King was there that day, correct?

 5    A.  I believe so, yes, sir.

 6    Q.  Okay.  And we've learned that Captain King -- when he

 7    went in, he had some things that concerned him, correct?

 8    A.  Yes, sir.

 9    Q.  Okay.  And he relayed them to Sergeant Schroeder, or

10    Schroeder (pronouncing), correct?

11    A.  I believe so.

12    Q.  Okay.  And so, then, is it fair to say that Sergeant

13    Schroeder relayed them to Detective Duncan?

14    A.  I believe so.

15    Q.  Okay.  So -- and I think other people had some

16    potential concerns about it, correct?

17    A.  Yes, sir.

18    Q.  Okay.  And that was all relayed to Detective Duncan,

19    correct?

20    A.  Yes, sir.  It should have been.

21    Q.  And also we had -- they were able to see the Ring

22    doorbell camera, correct?

23    A.  Nest doorbell, yes, sir.

24    Q.  Okay.  Well, let me ask you this:  We're talking about

25    Nest and we're talking about Ring; so I want to make sure

 1    we're clear what we're talking about, okay?

 2         They were able to see -- the Ring doorbell is what

 3    we see in the picture of someone pressing that doorbell,

 4    correct?

 5    A.  I believe all the items are Nest products, if I'm not

 6    mistaken.

 7    Q.  Okay.  So they see the videos, correct?

 8    A.  Yes, sir.

 9    Q.  Okay.  So Detective Duncan knew that then, correct?

10    A.  I believe so.

11    Q.  Okay.  And -- because we've heard testimony from others

12    that they were able to access the phone and watch those

13    videos, correct?

14    A.  Yes, sir.

15    Q.  Okay.  And if we look -- so then the next thing is this

16    Nest cam that's in the garage, correct?

17    A.  Yes, sir.

18    Q.  Okay.  And we saw that little clip where people heard

19    that supposed noise, correct?

20    A.  Yes, sir.

21    Q.  Okay.  And just -- without having to pull it up, to the

22    right of that photograph we see a female person.  And is

23    that Detective Duncan?

24    A.  With the red hair, yes, sir.

25    Q.  With the red hair, okay.

```
1              So she's heard it, right?
2    A.  Yes, sir.
3    Q.  Okay.  Now, was this a video?
4    A.  Yes.  It was playing on, I believe, Mr. Seegan's cell
5    phone.
6    Q.  Okay.  So when we see the body cam footage, we just see
7    a bunch of people listening; but we don't see the actual
8    video, do we?
9    A.  That's correct.
10   Q.  Okay.  So did anybody at that time think it was
11   important to videotape the video?
12   A.  I don't believe so.
13   Q.  Okay.  So when we hear this sound coming from a video,
14   there is no video?
15   A.  From that moment, no, sir.
16   Q.  Okay.  But Detective Duncan knew all these different
17   things at the time, correct?
18   A.  She was learning them that day, yes, sir --
19   Q.  Okay.
20   A.  -- or evening.
21   Q.  And she's also -- correct me if I'm wrong.  The
22   Detective Duncan on scene, they will direct the crime scene
23   investigators on what pictures to take and what evidence to
24   collect, correct?
25   A.  Partially.  Crime scene investigators usually know the
```

1    scene and how to do that themselves.  Now, there will be

2    specific things a detective will ask for during but --

3    Q.  All right.  And let's talk briefly -- if you know,

4    Detective Duncan, how many years on the job did she have at

5    that point?

6    A.  I want to say over 20.

7    Q.  Okay.  So would you agree with me that she's a seasoned

8    law enforcement person?

9    A.  Yes.

10   Q.  Okay.  And when we talk about being in law enforcement,

11   if you're on patrol answering calls, you get to see a lot

12   of stuff, right?

13   A.  That is correct.

14   Q.  Okay.  And so you go to suicides as a patrol officer,

15   correct?

16   A.  That is correct.

17   Q.  You go to robberies, homicides.  You get to see it all,

18   correct?

19   A.  Yes, sir.

20   Q.  And as part of being a patrol officer, if you have a

21   desire to move up, is it fair to say that you're going to

22   sit and observe how the detectives handle their business,

23   correct?

24   A.  Yes.

25   Q.  Okay.  And so it's kind of like on-the-job training,

 1   right?

 2   A.   Yes, sir.

 3   Q.   Okay.  And so do you know how many years she was in

 4   patrol or how many years she was in the detective squad?

 5   A.   I don't know offhand.  I just -- I know she came into

 6   to the CID about the same time that I did.

 7   Q.   Okay.  And so she has a lot of experience, correct?

 8   A.   She does.

 9   Q.   Okay.  And we also -- so she knew all this information

10   at the time, correct?

11   A.   Yeah.  She was learning it that evening, yes, sir.

12   Q.   Okay.  And would you agree with me, based on when you

13   got the file, she concluded "scene consistent with

14   suicide," correct?

15   A.   I don't -- I wouldn't say that.  I think -- because,

16   again, I was not involved in the case for the first month

17   and a half or so.

18          I would hear her discussing it almost every day

19   with another seasoned detective, and they would go through

20   every piece of evidence they had up to that moment.

21          I could just hear them discussing it; and they

22   were trying to discuss whether they believed, you know, was

23   this a suicide versus a homicide and looking at all the

24   evidence.

25   Q.   Okay.  But if she wrote in a report "crime scene

1   consistent with suicide" --

2   A.  She may have.

3   Q.  Okay.  And that's -- and then she released the body to

4   the medical examiner, correct?

5   A.  We do that on every suicide, yes, sir --

6   Q.  Okay.

7   A.  -- or every death.

8   Q.  So if you were at a scene where you believed it was

9   more suspicious, would you conclude -- would you write

10  "seems suspicious, investigate further"?  Would you agree

11  with --

12  A.  Normally you would, yes, sir.

13  Q.  Okay.  And also if you thought it was suspicious, would

14  it cause you to do a more thorough search of the home at

15  that time?

16          Would you agree with that?

17  A.  Certainly if you thought it was a homicide, you would

18  do a further search of the home.

19  Q.  Okay.  And so because that wasn't concluded that night,

20  a more thorough search wasn't done of the home, correct?

21  A.  Well, there were numerous photographs taken; but we did

22  not do a complete search of every room and every drawer as

23  we would if it was -- we determined a homicide that same

24  evening.

25  Q.  Okay.  And did you learn that night that the back door

 1  and the back gate were unlocked?

 2  A.  That, I don't recall.

 3  Q.  Okay.  When did you learn that?

 4  A.  Well, again, I didn't come on to the investigation

 5  until, I believe, April.

 6  Q.  Okay.

 7  A.  And so then that's when I started going through all of

 8  the case reports and all the evidence.

 9  Q.  Okay.

10          MR. WHALEN:  If we can go to -- I think it's

11  Exhibit 79, please, page 2.

12  BY MR. WHALEN:

13  Q.  I want to talk to you about this -- the Ring.  You see

14  that Ring doorbell camera in Exhibit 79, page 2, correct?

15  A.  I do see the doorbell camera.

16  Q.  Okay.  And it's right here?

17  A.  Yes, sir.

18  Q.  Okay.  And then do you see this sticker, right there?

19  A.  I do.

20  Q.  Okay.

21          MR. WHALEN:  Can you blow that up, please.

22  BY MR. WHALEN:

23  Q.  Okay.  And does that sticker seem to indicate that

24  things are being videotaped and recorded?

25  A.  Yes, sir.

1  Q.  Okay.  And would you agree with me the Ring doorbell by

2  this time is pretty well known, correct?

3  A.  Yes, sir.

4  Q.  Okay.  And so average person would know that's a Ring

5  doorbell.  I'm on camera, correct?

6  A.  Yes, sir.

7  Q.  Okay.

8        MR. WHALEN:  If you can back out of that

9  photograph, please.

10  BY MR. WHALEN:

11  Q.  Well, let me back up, too, while I'm thinking about it.

12  In Carrollton -- does Carrollton have a program where if

13  you have -- if citizens have cameras in their garage and

14  things, that they can sign up -- I know they do in Dallas

15  and other cities -- that you can sign up and say, "Hey,

16  look, I've got a camera.  Law enforcement, if you need it

17  just reach out to me and I'll be happy to provide it"?

18  A.  We did obtain that.  I'm not for sure exactly the date

19  and time we did, but we do have something of that now.

20  Q.  Okay.  So you don't know when you started that program?

21  A.  I don't.

22  Q.  Okay.  And if you thought at the time that this was a

23  suspicious death or a homicide, would it have made sense to

24  canvas the neighborhood for any video and things of that

25  nature?

 1   A.  Yes, sir.

 2   Q.  Okay.  All right.  So getting back to Exhibit 79,

 3   page 2, you would agree with me that there's packages on

 4   the front step?

 5   A.  Yes, sir.

 6   Q.  Okay.  And without having to pull it up, if we went

 7   back to the Ring video, would you agree with me that

 8   looking at the video, when we see Mr. Ashley come in,

 9   there's no packages on the front step?

10   A.  It does not appear to be.

11   Q.  Okay.  So, then, my question to you is:  Did you go

12   back and look at the Ring video to see who delivered these

13   packages?

14   A.  I looked at the video of things that we learned.  I

15   think one of the videos I would see was a school employee

16   showing up, but I don't know that I recall seeing those

17   packages being delivered.

18   Q.  Okay.  So is it fair to say the Ring doorbell doesn't

19   capture everything?

20   A.  That's correct.

21   Q.  Okay.  So -- but looking at some of these, they were

22   from Amazon; is that fair?

23   A.  I don't know.

24   Q.  Okay.

25           MR. WHALEN:  Let's zoom in a little bit.

```
 1   BY MR. WHALEN:
 2   Q.  Okay.  Have you ever ordered anything from Amazon?
 3   A.  Yes, sir.
 4   Q.  Okay.  Does that black-and-blue tape look kind of
 5   familiar?
 6   A.  It does.
 7   Q.  Okay.  Would you agree with me that that's probably an
 8   Amazon package.
 9   A.  It's likely.
10   Q.  Okay.  And would you agree with me that Amazon, they
11   track everything?
12   A.  That, I can't answer to.
13   Q.  I mean, they are a behemoth just like Google is,
14   correct?
15   A.  They are.
16   Q.  Okay.  Did you ever go back and look at Mr. Seegan's or
17   Dida Seegan's Amazon account to see what packages were
18   delivered that day?
19   A.  I don't recall.
20   Q.  Okay.  Did you ever go back and find out who were the
21   delivery drivers who delivered it that day?
22   A.  No, sir.
23   Q.  Okay.  And is that something you would normally do?
24   A.  If I were conducting the investigation from the
25   beginning, I would.  Certainly if I saw those photographs,
```

1    I'd want to know probably that same night.

2    Q.  Okay.  Did you ever -- once you took over the

3    investigation, did you ever go back and look into that?

4    A.  I don't recall doing that.

5    Q.  Okay.  When you say you don't recall -- I mean, I know

6    you've done a lot of work in this.  But you document

7    everything you did in this case, right?

8    A.  Yes, sir.

9    Q.  Okay.  So if there is nothing in your report indicating

10   you did that, you didn't do it, correct?

11   A.  Yeah.  When I say I -- I don't recall.  I know there

12   was myself and Detective Duncan working side by side during

13   this, so we would each take tasks of things to do.  And I

14   can answer for myself.  I know I did not personally.

15   Q.  Okay.

16   A.  I don't know that Detective Duncan would have.  I can't

17   answer for her.

18   Q.  Okay.  And on direct when you started -- when you --

19   you talked about the collective "we investigated" as

20   Carrollton PD.  You don't recall ever doing this yourself

21   or Detective Duncan?

22   A.  I did not.  Correct.

23   Q.  Okay.  And did Detective Duncan ever go back out and

24   re-canvas the neighborhood?

25   A.  I believe we did.  I believe there were officers that

 1    did go a few houses down each direction to see if we could

 2    catch any kind of camera footage.

 3    Q.  Okay.

 4    A.  But, again, exactly the date, I don't recall.

 5    Q.  Okay.  When you go to find somebody deceased in a home,

 6    is there some --

 7         MR. WHALEN:  You can take 79 down, please.  Thank

 8    you.

 9    BY MR. WHALEN:

10    Q.  -- is there a death notification that has to be made?

11    A.  Yes.

12    Q.  Okay.  And a death notification would be that you

13    call -- sometimes -- obviously Mrs. Seegan knew.  But

14    somebody reached out to his mother, correct?

15    A.  I don't recall if they did that evening.  I, again,

16    wasn't on the scene.  I don't know if they called her that

17    evening or the next.

18    Q.  The next day, okay.

19         But do you recall that she -- his mother, Dorothy,

20    was called?

21    A.  I do know she was made aware.  I just don't know the

22    time frame.

23    Q.  Okay.  And is that standard in law enforcement, that

24    police will then make notification to the next of kin

25    concerning the loss of a loved one?

```
 1   A.  Yes.

 2   Q.  Okay.  And that's like -- and if you're trained as a

 3   police officer, that's something you know, correct?

 4   A.  Yes.

 5   Q.  Okay.  And at some point early -- in early February,

 6   did Mr. Ashley provide to the Carrollton Police Department

 7   a copy of the will and the trust agreement?

 8   A.  I believe he did.

 9   Q.  Okay.  And then at some point did you come to know of a

10   person named Kerby Keller?

11   A.  I did.

12   Q.  Okay.  And who is Kerby Keller?

13   A.  I believe he is Mr. Seegan's nephew.

14   Q.  Okay.  And did you review the AT&T phone records of

15   Mr. Ashley?

16   A.  I believe I did.

17   Q.  And did it appear to you -- or did the records show

18   that Mr. Ashley contacted Kerby Keller in February of 2020?

19   A.  I believe he did.

20   Q.  And they had a phone conversation, correct?

21   A.  I believe so.

22   Q.  Okay.  And then also are you aware that in Mr. Ashley's

23   conversation with Mrs. Seegan, that he told her that she

24   was going to come into about $3 1/2 million and there was

25   more on the way?
```

1   A.   I don't know the amount was said at that, but I do know

2   he was there to tell her about the money that would be

3   coming.

4   Q.   Okay.  And, in fact, he did tell her.

5   A.   I believe so.

6   Q.   Okay.  Now, as far as the -- let's talk about the

7   $20,000, okay?  You testified to that.

8   A.   Yes, sir.

9   Q.   Okay.  Were you aware -- well, let me back up.

10          Talked about the two-factor authentication,

11   correct?

12   A.   Yes, sir.

13   Q.   Okay.  Is that what -- do you know that for sure, or

14   that's what you were told?

15   A.   Well, I believe we spoke with the bank themselves --

16   Q.   Okay.

17   A.   -- and learned that that would be the reasoning why.

18   Q.   Okay.  And did you learn that Mrs. Seegan gave

19   Mr. Ashley the code?

20   A.   I don't know if that was done, again, until he was in

21   the home.  That, I don't know.

22   Q.   Okay.  But you do know that she did give him the code?

23   A.   I know she gave him the passcodes to -- that was listed

24   out on his -- in his office.  It had passcodes for

25   everything.

```
 1   Q.  Okay.

 2   A.  So I don't know about the code from the bank.  That, I

 3   don't know.

 4   Q.  Okay.  But in order to access, you needed the

 5   two-factor authentication, correct?

 6   A.  Yes, sir.

 7   Q.  So as you sit here today, you don't know that she gave

 8   him the four-digit code or six-digit code?

 9   A.  Yeah.  I don't recall hearing that, that she would have

10   given it to him --

11   Q.  Okay.

12   A.  -- he wasn't there in the home.

13   Q.  Okay.  Is that the first time you've heard of that?

14   A.  That she would have given it to him?

15   Q.  Yes.

16   A.  Yes.

17   Q.  Okay.  When -- you talked about the ME's office.

18   Detective Duncan had this information the night of the

19   death of Mr. Seegan, correct?

20   A.  Yes.

21   Q.  Okay.  About the concerns and everything else, correct?

22   A.  I think some of the -- a few of the things, yes.

23   Q.  Okay.  And so she never relayed that to the medical

24   examiner?

25   A.  That, I don't know.  I don't believe so, but I don't --
```

 1    I can't say for certain.  I wasn't --

 2    Q.  Okay.

 3    A.  -- there for the phone call.

 4    Q.  Is that something that she could have relayed to the

 5    medical examiner personnel that came to retrieve the body?

 6    A.  She could have.

 7    Q.  Okay.  In the course of your investigation -- well, let

 8    me do it this way.  I'm trying to do it chronologically by

 9    topic and I'm --

10          Let's talk about those deleted text messages that

11    we talked about.  At some point did you learn in --

12    sometime in April that you were contacted by a private

13    investigator?

14    A.  Yes.

15    Q.  Okay.  And his name was Mr. Freeman, correct?

16    A.  Yes.

17    Q.  Okay.  And the private investigator was hired by

18    Ms. Seegan's family and Kerby Keller, correct?

19    A.  That is correct.

20    Q.  Okay.  And they also had hired a lawyer to probate the

21    estate and the trust, correct?

22    A.  I believe so.

23    Q.  Okay.  And the private investigator had began his own

24    investigation into the situation, correct?

25    A.  I believe so.

1    Q.  Okay.  And so eventually you learned that the private

2    investigator -- he contacted you, correct?

3    A.  Yes.

4    Q.  Okay.  And that was in April of 2020, correct?

5    A.  I would assume.  I don't know the exact date without

6    looking up the documentation, but it would probably be

7    around then.

8    Q.  Okay.  And is it -- if you know, had the -- had

9    Mr. Freeman reached out and talked to Mr. Ashley?

10   A.  That, I'm not aware.

11   Q.  Okay.  Is it possible he could have?

12   A.  He certainly could have.

13   Q.  Okay.  And it would make sense, would it not?

14   A.  It would.

15   Q.  Okay.  And so I think when you talked about some of the

16   deleted texts as it related to the words "manslaughter" and

17   "deferred," that was in the end of April, beginning of May,

18   correct?

19   A.  Once we -- when they were actually searched, I don't --

20   again, I'd have to look at it.  But we didn't learn about

21   that until we actually searched Mr. Ashley's cell phone.

22   Q.  No, I understand that.

23         But what were the dates for those searches,

24   approximate dates of those searches?  Do you remember?

25   A.  Again, I'd have to pull it up to look at it.

```
 1    Q.  Okay.  Well, we'll find it later, a little bit later.

 2          And then you also were asked about -- there were

 3    some searches done about can an ME change the autopsy,

 4    correct?

 5    A.  I believe so.

 6    Q.  And the QTOF, correct?

 7    A.  Yes, sir.

 8    Q.  And grand jury, correct?

 9    A.  Yes, sir.

10    Q.  Okay.  And those were done on September 3rd, correct?

11    A.  I believe so.

12    Q.  Okay.  And that was your -- that was what was

13    represented to you, they were September 3rd?

14    A.  Yes, sir.

15    Q.  And September 3rd was a significant date, was it not?

16    A.  It was.

17    Q.  Okay.  Not only was there a search going on at his

18    residence --

19          MR. FINE:  Your Honor, may we approach?

20          THE COURT:  Yes.

21          (Sidebar conference, off the record.)

22          THE COURT:  Okay.  I think at this time, ladies

23    and gentlemen, we're just going to take our morning break.

24    Again, please don't discuss the case among yourself or

25    anyone else.  Don't do any outside research.  We'll take
```

 1  15 minutes, come back, and continue until lunch.  Thank

 2  you.

 3           (The jury exits the courtroom, 10:23 a.m.)

 4           THE COURT:  Anything further from the government?

 5  I think you were going to talk to the witness but -- based

 6  on our bench conference but --

 7           MS. RATTAN:  Yes, your Honor.  And nothing else

 8  beyond that.

 9           THE COURT:  Anything else from defense?

10           MR. WHALEN:  No, your Honor.

11           THE COURT:  Okay.  See you back in 15.

12           (Recess, 10:23 a.m. to 10:40 a.m.)

13           (Open court, defendant present, jury present.)

14           THE COURT:  Okay.  Please be seated.

15           MR. WHALEN:  May I proceed, your Honor?

16           THE COURT:  Yes.

17  BY MR. WHALEN:

18  Q.  Detective Bonner, I want to go back to something I

19  thought about.  As it relates to looking at Nest -- you

20  know, neighbors' cameras and things like that, in

21  Carrollton are there -- was that an alley system?

22  A.  I believe behind Mr. Seegan's home, yes.

23  Q.  Okay.  Did you look at any of the garbage routes or any

24  of the trash routes for Carrollton to see if they were

25  running that day around that time?

1    A.   I don't believe I did.

2    Q.   Okay.   Did anybody?

3    A.   That, I don't -- I don't believe so, but I don't know

4    for sure.

5    Q.   Okay.   And I want to get back to the issue of these

6    searches.

7          The letter went to Mr. Villarreal was on May 20th;

8    is that correct?

9    A.   I believe so.

10   Q.   Okay.

11         MR. WHALEN:   If we could pull up 122 -- is that

12   it?

13         Okay.   This is the autopsy.   If we can go to 112A

14   first.

15         Okay.   And if we can zoom in on that.

16   BY MR. WHALEN:

17   Q.   That has a postmark of May 20 of 2020; is that correct?

18   A.   It does.

19   Q.   Okay.

20         MR. WHALEN:   And if we can, then, go to 122,

21   please.

22         And go to the -- I'm not sure what page.   Try 2 or

23   3, please -- oh, 4.   I'm being told 4.

24   BY MR. WHALEN:

25   Q.   Okay.   If you look at page 4 -- do you see the

1   toxicology on page 4?

2   A.  Yes, sir.

3   Q.  Okay.  Do you see "Drug Screen (QTOF)"?

4   A.  Yes.

5   Q.  Okay.  And so that was contained in the medical

6   examiner's report, correct?

7   A.  Yes.

8   Q.  Okay.  And just so -- as far as someone asking for

9   someone's autopsy, that is a public record, is it not?

10  A.  I believe it is.

11  Q.  Okay.  So anybody from the public, if they have the

12  correct information, can make a request of the Medical

13  Examiner's Office and get a copy of an autopsy, correct?

14  A.  I believe so.

15  Q.  Okay.

16          MR. WHALEN:  We can go back to the first page of

17  the autopsy report.

18          Keep scrolling down, please.

19          Let's go to page 3.

20          I guess we're going to be on page 4 -- 5.  If we

21  can go to 5.

22  BY MR. WHALEN:

23  Q.  Okay.  If we look at the section called Conclusions --

24  okay.  And she signed this on April 1st of 2020, correct?

25  A.  Yes.

1    Q.   Okay.   In Conclusions it says based on the case history

2    and findings, she concludes it was a contact gunshot wound

3    to the head and the findings and available investigative

4    information are consistent with this being self-inflicted

5    and deliberate.

6           Do you see that there?

7    A.   I do.

8    Q.   Okay.   So she is referencing investigative information,

9    correct?

10   A.   Correct.

11   Q.   Okay.   And that could have been provided by Detective

12   Duncan, correct?

13   A.   It could have been, yes, sir.

14   Q.   Okay.

15          MR. WHALEN:   You can take that down.   Thank you.

16   BY MR. WHALEN:

17   Q.   Okay.   Let's go back to September 3rd.   It was kind of

18   a busy day, correct?

19   A.   Yes, sir.

20   Q.   Okay.   And on September 3rd you did have contact with

21   Mr. Ashley, did you not?

22   A.   I did.

23   Q.   Okay.   And in that contact with Mr. Ashley, you did

24   tell him that there was something found in Mr. Seegan's

25   system, correct?

1  A.  I -- I don't know that I did.  I don't know that I

2  actually made that statement to him.

3  Q.  Okay.  But you also, in that contact, informed him that

4  it was an ongoing investigation, correct?

5  A.  I did.

6  Q.  Okay.  And also in that interview, did you -- when

7  you --

8          MR. WHALEN:  I'll withdraw that question, your

9  Honor.

10 BY MR. WHALEN:

11 Q.  During that contact with him, you made some statements

12 to him; and I want to just ask you about those.  Did you

13 make a statement to him during your contact that everything

14 we looked at is suicide?

15 A.  I did make that statement.

16 Q.  Okay.  And did you also make a statement to him during

17 that contact that the medical examiner's decision is

18 conclusive?

19 A.  I don't believe I made that statement.  I --

20 Q.  Okay.

21 A.  -- stated that the medical examiner ruled it a suicide.

22 Q.  Okay.  But you agree with me you made the statement

23 everything we looked at is suicide, correct?

24 A.  I do believe I made that statement.

25 Q.  Okay.  And also would you agree with me during that

 1  contact you indicated that you were looking at all the

 2  options, correct?

 3  A.  I believe so.

 4  Q.  Okay.  And that was in response to a topic regarding

 5  whether or not Mr. Ashley assisted in suicide, correct?

 6  A.  I did broach that subject.

 7  Q.  Okay.  And your response was, "We're looking at all our

 8  options"?

 9  A.  I don't know if I worded it exactly like that but may

10  have.

11  Q.  Okay.  So the subject of assisted suicide did come up?

12  A.  It did.

13  Q.  Okay.  And you would agree with me that in the state of

14  Texas assisted suicide is a Penal Code violation?

15  A.  If I may correct that?

16  Q.  Sure.

17  A.  I don't believe I said assisted suicide when I -- I

18  think I believed that -- the possibility of Mr. Seegan

19  committing suicide with Mr. Ashley in the home.

20  Q.  Okay.  But was that, the words "assisted suicide,"

21  brought up during that contact?

22  A.  I don't believe it was.

23  Q.  Okay.  Or the idea that Mr. Ashley helped him commit

24  suicide?

25  A.  Again, I don't believe I made that statement.

1    Q.  Okay.  And so then if he made search -- so then we have

2    searches made on September 3rd.  It's the same day that you

3    had contact with him, correct?

4    A.  That is correct.

5    Q.  Okay.  Now let's talk about the firearm, okay?  You

6    learned -- we learned and you learned that Mr. Frame was

7    the original purchaser of that firearm, correct?

8    A.  Yeah.  I forget his exact name but, yes, we contacted

9    the person who was the last purchaser.

10   Q.  Okay.  And did you try to determine from him who he

11   sold his numerous firearms to?

12   A.  We did.

13   Q.  And he could not tell you, correct?

14   A.  That is correct.

15   Q.  And he also indicated he may have put them on a

16   website; is that correct?

17   A.  That is correct.

18   Q.  And did you do any efforts to contact the website to

19   see if there was any history of that?

20   A.  We did, along with the FBI.

21   Q.  Okay.  And did you do any photo lineup with him?

22   A.  No.

23   Q.  Okay.  You didn't show him any pictures to say whether

24   or not it could be a group of people that he sold it to?

25   A.  Correct.  We did not.

 1    Q.  Okay.  And did you determine how -- well, let me ask

 2    you this:  Did he keep any records of those sales?

 3    A.  Oh, I believe we asked the gentleman if he had any

 4    records of that; and I think he informed us he did a search

 5    himself through the websites and could not find anything

 6    and did not have any of his own as well.

 7    Q.  Okay.  Now, you testified that -- and I think the word

 8    you used is -- I think you made assume -- you said, well,

 9    you're assuming that Mr. Ashley had a firearm with him on

10    February 19th, 2020, correct?

11    A.  We believe so, yes, sir.

12    Q.  Okay.  But you also learned that he had a firearm --

13    always carried a firearm in his backpack, correct?

14    A.  We did learn he did often keep one in there.

15    Q.  And when you searched his home, you found a firearm in

16    the backpack?

17    A.  That is correct.

18    Q.  Okay.  But you don't have any direct evidence or any

19    knowledge that that firearm found at Mr. Seegan's house was

20    in that backpack, do you?

21    A.  We do not.

22    Q.  And we saw the photographs of the ammunition that was

23    found at his house, correct?

24    A.  Yes, sir.

25    Q.  Would you agree with me they are pretty distinctive?

1   A.  They are.

2   Q.  Okay.  And as far as 9-millimeter ammunition, was that

3   the only 9-millimeter ammunition that you found in that gun

4   case?

5   A.  No, we located lots of ammunition; but I don't know if

6   it was only that model of ammunition inside that was loose

7   in the -- in the gun case.

8   Q.  And that ammunition was different than what was found

9   in Mr. Seegan's house?

10  A.  That is correct.

11  Q.  Okay.  So if there was testimony that they were the

12  same, that's not true, correct?

13  A.  They are both 9-millimeter but not the same make.

14  Q.  Okay.  They're not the same make.  Okay.

15          And just so we're clear, you did not find any

16  ammunition of the same brand at Mr. Ashley's house that you

17  found in Mr. Seegan's house, correct?

18  A.  I believe that is correct.

19  Q.  Okay.  Now, in the course of your investigation, you

20  reached out to Google and did a search warrant for Google;

21  is that correct?

22  A.  I believe we did.

23  Q.  Okay.  And in your search of the house, is it true that

24  there were other cameras located in the kitchen and in the

25  living room?

1    A.  Yes, sir.

2    Q.  Okay.  And did you find any videos or activation from

3    the kitchen Nest camera or the living room camera?

4    A.  None that I recall.  I know from the detectives who

5    responded the evening of Mr. Seegan's death, they viewed

6    all the video footage and, again, tried to mark what they

7    could to save.

8            And so I, unfortunately, didn't get to see -- by

9    the time it came to me, all the evidence that would have

10   been on there was already off their system and gone; so I

11   just don't have any way of knowing.

12   Q.  Okay.

13   A.  But they didn't see anybody else, as far as I'm aware,

14   coming or going besides Mr. Ashley.

15   Q.  Okay.  And are those -- those cameras were

16   sound-activated and motion-activated as well?

17   A.  That, I don't recall a hundred percent, if they are

18   both or just one.

19   Q.  Okay.

20           Okay.  Let's talk about your experiment that you

21   did in the home, correct?

22   A.  Yes, sir.

23   Q.  All right.  Now, we saw some videos, correct?

24   A.  Yes, sir.

25   Q.  Okay.  And there's no videos of the actual camera being

1   activated, correct?

2   A.  Of -- from the day of Mr. Seegan's death?

3   Q.  Right.

4   A.  Correct.  We know we did not, unfortunately, get that

5   video saved.

6   Q.  Okay.  So the video that was in the garage, you guys --

7   there was nobody that had a body cam on or -- to show it

8   come on; is that correct?

9   A.  Correct.  They're just viewing it.  They don't --

10  unfortunately, didn't capture the screen itself to show it

11  activating.

12  Q.  Okay.  And at that time you -- during the course of

13  this, you had a -- did you have a decibel meter level?

14  A.  That, we did.

15  Q.  Okay.  And before you got there, you had to recalibrate

16  the Nest camera in the garage, correct?

17  A.  Yes.

18  Q.  Okay.  And it was your belief that because -- somebody

19  had changed the settings on it?

20  A.  Yes.  I believe it had lost service at some point in

21  between the time we got there and the time of Mr. Seegan's

22  death, so it was no longer -- so we had to turn it back on

23  and get it operating again.

24  Q.  Okay.  And so did anybody on the night of Mr. Seegan's

25  death determine what the settings were of the camera that

 1   evening?

 2   A.   That, I -- I don't believe so.

 3   Q.   Okay.  So when you went to redo the -- do your

 4   experiment, how did you determine what settings to put it

 5   on?

 6   A.   I believe we learned, once we activated it, that --

 7   once you turn it on for sound activation, it automatically

 8   would set to 75 percent sensitivity for sound activation.

 9   Q.   Okay.  Do you know whether that was the setting on the

10   night of -- or the day of the 19th?

11   A.   I do not know that.

12   Q.   Okay.  So you're just going off the assumption that

13   they're the same?

14   A.   Well, we weren't assuming they were exactly the same.

15   We were just going off of once we activated it, and then we

16   intentionally manipulated the sensitivity to do further

17   testing.

18   Q.   Okay.

19   A.   But I can't -- I can't say they were the same on the

20   night or the day of Mr. Seegan's death.

21   Q.   Okay.  And so when you say you manipulated the

22   settings, you changed the settings throughout the day to a

23   point where then it finally registered, correct?

24   A.   It registered on our first test with any kind of sound

25   activation.

1   Q.   Okay.  And did you -- but you didn't take any video of

2   that, of the garage Nest cam, correct?

3   A.   I believe we had a camera -- no, we did not have a

4   video inside the garage other than the Nest cam itself.

5   Q.   Okay.  And you said you dropped books and you closed

6   car doors and things of that nature, correct?

7   A.   Yes, sir.

8   Q.   Okay.  Did you videotape those scenarios or anything

9   like that?

10  A.   Yes, we did.

11  Q.   Okay.  And did you use -- at 75 decibels, did you do

12  any research on what other things can register above that

13  sound level?

14  A.   We set it at 75 percent sensitivity; but as far as

15  decibels itself, we did not check and study what multiple

16  different items would be.  We just ran these four tests.

17  Q.   Okay.  Did you do anything whether or not a garbage

18  truck going down the alley or a delivery truck going down

19  the alley could set it off?

20  A.   We did not.

21  Q.   And when you did your experiment, did you have -- were

22  there cameras in the living room and the kitchen as well?

23  A.   I don't recall if those were -- if we set them to be

24  active or not.  I know we were focused solely on the garage

25  camera.

1    Q.  And you would agree with me that the conditions in the

2    room were different than on the 19th?

3    A.  I believe the flooring was removed.

4    Q.  Okay.  And so the flooring removed -- did you have a

5    wood floor, a plywood wood floor?

6    A.  Correct.

7    Q.  Okay.  And do you know if the flooring that was removed

8    had a padding underneath it or any absorption in it?

9    A.  I wasn't there to see them remove it.  I don't -- don't

10   know.

11   Q.  Okay.  And would you agree with me that with the

12   flooring removed, that could change the acoustics in the

13   room?

14   A.  It's a possibility.

15   Q.  And as part of your investigation into a suspicious

16   death or a homicide, you also look to determine if there's

17   any alternative suspects, correct?

18   A.  We follow the evidence, yes, sir.

19   Q.  Okay.  And in the course of this, did you learn that

20   there was potential or possible marital difficulties

21   between Jim and Dida?

22   A.  We did.

23   Q.  Okay.  And you learned that from several -- a couple

24   different people, correct?

25   A.  Yes.

1    Q.  Okay.  And one of the people that you learned it from

2    was related to or friends with or the brother of Lawrence

3    Ahee, correct?

4    A.  I believe so.

5    Q.  Okay.  And Lawrence Ahee had passed away, correct?

6    A.  Yes, sir.

7    Q.  Okay.  And Lawrence was a close friend of Jim, correct?

8    A.  I believe so.

9    Q.  Okay.  And you learned from investigating Lawrence and

10   in talking to his brother, there was some suggestion or

11   history that if anything happened to me, look at Dida,

12   correct?

13   A.  I do believe he made that statement.

14   Q.  Okay.  And then you also learned through the text

15   messages or the phone of Mrs. Seegan -- there are some

16   individuals you contacted as a result of that, correct?

17   A.  That is correct.

18   Q.  And there was some suggestion that there may have been

19   some flirting or inappropriate comments, correct?

20   A.  Yes, sir.

21   Q.  Okay.  And there was also some suggestion that she was

22   complaining about her husband, correct?

23   A.  I believe so.

24   Q.  Okay.  And you talked to those folks, correct?

25   A.  I was able to get in touch with one of them.  The other

 1    gentleman I could not reach.

 2    Q.  Okay.  So suffice it to say there was some evidence

 3    through your investigation that there was some marital

 4    difficulty, correct?

 5    A.  Yes, sir.

 6    Q.  And they slept in separate beds, correct?

 7    A.  That is what Dida informed us, yes, sir.

 8    Q.  Okay.  Now, there was nothing taken from the house on

 9    the 19th, correct?

10    A.  That, I don't recall.  I don't believe so, but I don't

11    recall a hundred percent without looking at our evidence

12    log.

13    Q.  Okay.  Well, Dida never came in and said, "Well, this

14    is missing."  The only thing she said -- she talked about

15    was the $20,000, correct?

16    A.  I believe that was the day or two after, yes, sir, two

17    days after or so.

18    Q.  Now, you talked about the resignation letters, the

19    will, and the trust, correct?

20    A.  Yes, sir.

21    Q.  And you made a conclusion that -- you had the opinion

22    that Mr. Ashley must have done that because the heat was

23    on, correct?

24    A.  Yes.

25    Q.  Okay.  Well, you hadn't confronted him with anything

1    or -- until September, correct?

2    A.  I believe he did -- there was contact with him maybe a

3    week after and even -- well, the night of on the phone and

4    then the week after.

5    Q.  Okay.  And by this time there is a lawyer involved,

6    correct?

7    A.  For Mrs. Seegan?

8    Q.  For Mrs. Seegan, correct?

9    A.  I believe so.

10   Q.  Okay.  And then he signed relinquishing his rights

11   under the trust and the will, correct?

12   A.  I believe so.

13   Q.  Okay.  And so -- but he had told Dida about the will

14   and the trust, correct?

15   A.  I believe so.

16   Q.  Okay.  And she -- he told her that the day after

17   Mr. Seegan's death, correct?

18   A.  That, I can't attest to.  I'm not sure what day.

19   Q.  Okay.  Was it before the 27th when he resigned?

20   A.  Yes, I believe so.

21   Q.  Okay.  So he informs her of the fact there is a will

22   and a trust, correct?

23   A.  Yes.

24   Q.  Okay.  And so they hire -- and so Dida hires a lawyer

25   on her own, correct?

 1    A.   I believe her and Mr. Keller agreed to hire a lawyer.

 2    Q.   Okay.  And it wasn't a lawyer that Mr. Ashley directed

 3    them to, correct?

 4    A.   I don't believe so.

 5    Q.   Okay.  And so that lawyer then approaches Mr. Ashley

 6    and says, "Hey, will you resign these posts?"

 7               And he says, "Yes."

 8    A.   As far as I'm aware.

 9    Q.   Okay.  At this point Carrollton PD hasn't accused him

10    of anything at this point, correct?

11    A.   That is correct.

12    Q.   The autopsy is not even done yet, correct?

13    A.   Correct.

14    Q.   Now, you talked about this calendar entry about "Keith

15    blood draw," correct?  Do you remember talking about that?

16    A.   Yes, sir.

17    Q.   You would agree with me Mr. Seegan, from what you

18    learned, was an intelligent person, correct?

19    A.   Yes, sir.

20    Q.   You said he was detail-oriented, correct?

21    A.   Yes.

22    Q.   Okay.  And he had life insurance before, correct?

23    A.   As far as I'm aware.

24    Q.   Yeah.  So he had to undergo -- well, let me back up.

25    Life insurance that was sold to him by Mr. Ashley, correct?

 1   A.  Yes, sir.

 2   Q.  And it's true, based on your investigation, is it not,

 3   that he had blood tests done by a third party?  Correct?

 4   A.  I don't recall exactly when his first physical would

 5   have been done or how it was done.

 6   Q.  Okay.  But if the Midland National records -- or

 7   there's evidence from Midland National they use a

 8   third-party system, you wouldn't disagree with that, would

 9   you?

10   A.  I would not.

11   Q.  And so Mr. Seegan knew that in order to get life

12   insurance, a third party is going to do that, correct?

13   A.  To do the physical?

14   Q.  Yes, do the physical.

15   A.  I believe he would be made aware of that.

16   Q.  Okay.  And, once again, he was a smart, detail-oriented

17   person?

18   A.  Yes, sir.

19   Q.  Now let's talk about -- you said you did this note

20   comparison, correct?

21   A.  Yes, sir.

22   Q.  Okay.  The note that was found in Mr. Seegan's home was

23   a Word document, correct?

24   A.  I believe it was.

25   Q.  Okay.  Well, if Mr. Withers testified it was a Word

Jury Trial, Volume 5                    1194

 1  document, you would trust detective Withers?

 2  A.  I do trust him.

 3  Q.  Okay.  So that's a Word document.

 4       And then you said you found something on his

 5  phone, correct?

 6  A.  On Mr. Ashley's --

 7  Q.  Mr. Ashley's phone.

 8  A.  Yes, sir.

 9  Q.  Okay.  And so you're going on the conclusion that

10  because there is syntax errors and punctuation errors, they

11  are one and the same, correct?

12  A.  I just -- again, they would be very similar, yes, sir.

13  Q.  Okay.  And all you're saying is that it's similar, but

14  you don't know who wrote either -- you don't know who wrote

15  the note found in Mr. Seegan's home, do you?

16  A.  Again, through our investigation we believe it to be

17  Mr. Ashley.  But, again, to say did I see who wrote the

18  note, no.

19  Q.  Okay.  And if there is something on a phone, you would

20  agree with me that there is no way to cut and paste from a

21  phone to a computer.

22  A.  You can certainly send it via email and different ways,

23  Bluetooth it and things like that.

24  Q.  Okay.  And, of course, there was a search done of the

25  computer, correct?

 1    A.  Yes, sir.

 2    Q.  Okay.  And there was no suggestion or no emails found

 3    that were sent to that computer from Mr. Ashley that day

 4    with that verbiage, correct?

 5    A.  Correct.

 6    Q.  Okay.  Let's talk about -- you had testified that you

 7    believed that there was a puncture mark on Mr. Seegan's

 8    arm, correct?

 9    A.  Yes, sir.

10    Q.  Okay.  And -- or what could be determined a ligature

11    mark, correct?

12    A.  From one of the photos, it did appear to be.

13    Q.  Okay.  And you're just basing that off the photos,

14    correct?

15    A.  Correct.

16    Q.  Okay.  You would agree with me that Dr. Ogden viewed

17    the body doing the autopsy?

18    A.  Yes.

19    Q.  And you would agree with me that as part of a medical

20    examiner's determination of cause of death, they are going

21    to check the body and look for those types of things,

22    correct?

23    A.  Yes, sir.

24    Q.  Okay.  And you would agree with me that there -- in her

25    autopsy there is nothing to indicate that she observed any

1   type of puncture marks or ligature marks on his body?

2   A.  None were noted.

3   Q.  Okay.  And do you think it's reasonable that if she did

4   see them, she would note them?

5   A.  I do.

6          I approached her later with the photos, and she

7   basically made the statement that she could not rule it out

8   but --

9   Q.  Okay.

10  A.  -- could not rule it in, either way.

11  Q.  Okay.  Let's talk about that.  You sat down and met

12  with her, correct?

13  A.  I did.

14  Q.  And what date did you sit down and meet with her?

15  A.  That, I don't recall without --

16  Q.  All right.

17  A.  -- looking at my notes.

18  Q.  I'm going to -- I'm going to come back to that because

19  I want to talk about some other stuff first.

20         When -- you met with Mr. Shteyngart, correct?

21  A.  Yes, sir.

22  Q.  Okay.  When did you meet with him?

23  A.  Again, the exact dates I don't recall.  Myself and

24  Detective Duncan met with him.

25  Q.  Okay.  And same with Denny Willmon, correct?

 1   A.  I believe so.

 2   Q.  Okay.  And Mr. Greening, correct?

 3   A.  Again, I don't know if I personally met with him or

 4   Detective Duncan did; but one of us may have met with him.

 5   Q.  And so would it be fair to say that none of those

 6   individuals had had any contact with the Carrollton Police

 7   before you contacted them?  Correct?

 8   A.  Correct.  Not that I'm aware.

 9   Q.  Okay.  You are the ones that made the initial contact

10   with those individuals, correct?

11   A.  I believe so, yes, sir.

12   Q.  Okay.  And in the -- we talked about the backpack, and

13   you said there was a Gift Letter -- you talked about the

14   Gift Letter, correct?

15   A.  Yes, sir.

16           MR. WHALEN:  If we can go to 114.

17           Can you go to the next page.

18           The next page, please.

19   BY MR. WHALEN:

20   Q.  Okay.  Do you see 114, page 4?

21   A.  Yes, sir.

22   Q.  Okay.  And do you see -- what's the title of this?

23   A.  Promissory Note.

24   Q.  Okay.  And who is the lender?

25           It's the fourth line down from the top.

1   A.  The borrower there?

2   Q.  Okay.  Let's start with the borrower.  Who is the

3   borrower?

4   A.  Borrower is KBKK.

5   Q.  Okay.  Do you see who the lender is?

6   A.  Oh, sorry, there it is.  It's JES2, LLC.

7   Q.  Okay.  And is that an LLC created by Mr. Seegan?

8   A.  I believe so.

9   Q.  Okay.  And he owns -- it owned his mother's house or

10  his brother's house, correct?

11  A.  I believe so, yes, sir.

12  Q.  Okay.

13          MR. WHALEN:  We can go to the next page.

14          And keep going.

15  BY MR. WHALEN:

16  Q.  All right.  And that was signed -- appears to be signed

17  November 26th of 2019, correct?

18  A.  Yes, sir.

19  Q.  Okay.

20          MR. WHALEN:  We can go to the next page.

21  BY MR. WHALEN:

22  Q.  And does that appear to you to be an amortization

23  schedule?

24  A.  Yes, sir.

25  Q.  Okay.

```
 1              MR. WHALEN:  You can take that down for a second.

 2    BY MR. WHALEN:

 3    Q.  And so in -- we're going to find what we're looking

 4    for.

 5              But you saw there was a Promissory Note and there

 6    was a bunch of other documents, Promissory Notes and -- in

 7    there, right?

 8              MR. WHALEN:  If we can go to 114, page 10, please.

 9    BY MR. WHALEN:

10    Q.  All right.  Do you see 114, page 10, there?

11    A.  Yes, sir.

12    Q.  Okay.  And, once again, that's entitled "Promissory

13    Note"?

14    A.  Yes, sir.

15    Q.  And borrower and lender are the same?

16    A.  Yes, sir.

17    Q.  See that?

18              And do you see the effective date of that

19    Promissory Note?

20    A.  Yes, sir.

21    Q.  And what's that date?

22    A.  June 20th of 2016.

23    Q.  Okay.

24              MR. WHALEN:  And if we go to the next page.

25              And the next page.
```

```
 1   BY MR. WHALEN:

 2   Q.  Okay.  And do you see that there are signatures on it

 3   from June 1st of 2016?

 4   A.  Yes, sir.

 5   Q.  Okay.  And if we go to the next page, there is an

 6   amortization schedule as well?

 7          MR. WHALEN:  You can take that down.

 8   BY MR. WHALEN:

 9   Q.  Is that correct?  There is an amortization schedule?

10   A.  Yes, sir.

11   Q.  Okay.  So in the course of the investigation you found,

12   Promissory Notes, correct?

13   A.  Yes, sir.

14   Q.  Okay.  So going back to -- you had a meeting with

15   Dr. Ogden, correct?

16   A.  Yes, sir.

17   Q.  And that was on September 10th, correct?

18   A.  I believe so.  I don't have the exact date but --

19   Q.  Okay.  If I'm looking at your note and it says

20   September 10th, is that --

21   A.  That would be fair, yes, sir.

22   Q.  Okay.  Now, you said that she -- she also said she

23   couldn't tell you what the markings were, correct?

24   A.  Correct.  She couldn't rule them as -- rule them out or

25   in as what we were to believe them to be.
```

```
 1   Q.  Okay.  And so -- and then at that meeting -- who all

 2   was present at that meeting?

 3   A.  I believe it was just myself, Detective Chevalier

 4   (phonetic spelling), and Dr. Ogden.

 5   Q.  Okay.  Was any representatives from the D.A.'s Office

 6   with you or anything like that?

 7   A.  No, sir.

 8   Q.  Okay.  And during the course of this, during this

 9   meeting -- how long did this meeting take place?

10   A.  Oh, it was really short, ten minutes maybe.

11   Q.  Okay.  Had you sent her information ahead of time about

12   your investigation?

13   A.  Possibly.  I know we met -- I think we would have

14   brought some of our documentation in and informed her of

15   what we were looking at at that moment.

16   Q.  Okay.

17   A.  But I don't recall if I sent it to her or not.

18   Q.  Okay.  Did you discuss with her the etomidate issue?

19   A.  Yes.

20   Q.  Okay.  And so in that meeting you talked to her about

21   the etomidate, you talked to her about this puncture

22   mark -- you believed to be a puncture mark and you believed

23   to be a ligature mark, correct?

24   A.  It was my belief as a possibility.

25   Q.  Okay.  And what she said to you, being the medical
```

```
 1  doctor, she could not say what those markings were?

 2  A.  She said she couldn't rule definitively.

 3  Q.  Okay.  And she couldn't make a determination, correct?

 4  A.  Correct.

 5  Q.  And then that did not change so she -- she did change

 6  her opinion from suicide to unknown, correct?

 7  A.  Yeah, undetermined or unknown, yes, sir.

 8  Q.  Okay.  So she still -- would you agree with me at that

 9  point she still -- that would be a doubt about what

10  happened, correct?

11  A.  Yes, sir.

12  Q.  Okay.  Now, I think you testified that it's your belief

13  or -- you know, you talked about motive, correct?

14  A.  It was brought up, yes, sir.

15  Q.  Okay.  And it is your belief that Mr. Ashley motive was

16  to gain access to money, correct?

17  A.  Yes, sir.

18  Q.  Okay.  And you also understand he wasn't the

19  beneficiary of any will or any trust, correct?

20  A.  He was not the beneficiary.  Correct.

21  Q.  Okay.  And so based on your evidence, you believe that

22  that was his motive, correct?

23  A.  Yes, that coupled with the kind of hiding of what had

24  been happening leading up to that and then gaining access

25  to money certainly.
```

1    Q.  Okay.  So would you agree with me that if someone wants

2    to get away with something, you don't want to be detected?

3    Is that fair?

4    A.  Certainly.

5    Q.  Okay.  And so you wouldn't tell the wife about a will

6    and a trust and she's coming into $3 1/2 million, would

7    you?

8    A.  Well, I think it's, again, part of manipulation and how

9    it's worded.

10            What we learned from Mrs. Seegan, the way it was

11   worded was to not inform Mr. Keller about his portion of

12   the money that was coming in as possibly a way to squeeze

13   him out.  And then -- so this, in turn, made Mrs. Seegan

14   very suspicious of the way Mr. Ashley was acting.

15   Q.  But you testified earlier that he called Mr. Keller.

16   A.  He did.

17   Q.  Okay.  So if you're trying to squeeze somebody out,

18   you're not going to call him, are you?

19   A.  You would be surprised.

20   Q.  Okay.  So -- so we know that he tells Mrs. Seegan about

21   the money.  He tells her about the will.  He tells her

22   about the trust.

23   A.  Correct.

24   Q.  He talks to the lawyer.  He resigns his position.

25   A.  Yes, sir.

1    Q.  He knows there is a Ring doorbell.

2    A.  Yes, sir.

3    Q.  He knows that Midland National records phone calls.

4    A.  That, I'm not aware.

5    Q.  Okay.  And it's still your -- but it's still your

6    belief that he was trying to take the proceeds of the

7    trust?

8    A.  I think initially.

9            And as, again, questions were asked by Mrs. Seegan

10   and as he realized possibly things that were going to be

11   happening with the lawyer involved, he did not want -- he

12   couldn't stay involved that deep.

13   Q.  But if you're -- but there was some suggestion -- or

14   maybe you suggested it or Mr. -- by your questioning

15   suggested that there was some type of forgery on documents,

16   correct?

17   A.  Correct.

18   Q.  Okay.  So if there is forgery on documents -- and we

19   also learned that Mrs. Seegan didn't know much about the

20   finances, correct?

21   A.  That is correct.

22   Q.  And she didn't know much about that there was a trust,

23   correct?

24   A.  That, I'm not -- I don't know -- she didn't know much

25   about any of the finances, so I can't say exactly what she

 1   knew about the trust or not but --

 2   Q.  Okay.  So if we know she doesn't know much, would you

 3   agree with me it doesn't make sense to tell her about it?

 4   A.  No, I would not.

 5           MR. WHALEN:  Could we have a moment, your Honor?

 6           THE COURT:  Yes.

 7           (Off-the-record discussion among counsel for

 8   defendant.)

 9   BY MR. WHALEN:

10   Q.  Okay.  You mentioned -- there was some talk about that

11   Mr. Seegan didn't like guns or something to that effect,

12   correct?

13   A.  Correct.

14   Q.  Okay.  And isn't it true that at some point that Dida

15   found a receipt for a shotgun in the house?

16   A.  She did.

17   Q.  Okay.  So there was some evidence that he had purchased

18   a firearm at some point, correct?

19   A.  I don't know that the receipt stated he purchased it.

20           And Dida couldn't -- if I'm remembering

21   correctly -- could not recall -- she never saw the gun, but

22   she just said she searched and came across that.  I know it

23   was something several years old.

24           But she -- since she had known Jim, she had never

25   seen a firearm in the home or ever him --

1    Q.  And also during the course of your investigation, was

2    there some evidence or information you received regarding

3    either Jim giving guns to Larry or Larry giving guns to

4    Jim?

5    A.  There were some statements made.  I don't think that --

6    I think Larry was passing the firearms down to his

7    children.  And we knew that there were firearms in his home

8    when he passed away apparently.  So we certainly asked,

9    because they were friends, if any of those firearms did

10   come to Jim.

11   Q.  Okay.  Or that Jim gave them to Larry?

12   A.  He may have, yeah.  I don't -- again, that's a

13   possibility; but I don't recall a hundred percent.

14   Q.  Also, the other thing, too, on this, you saw evidence

15   about the etomidate at the hospital, correct, about the --

16   there was a record of it?

17   A.  Yes, sir.

18   Q.  Okay.  So if I'm a nurse going into the Pyxis, I know

19   that there is going to be a record created of me retrieving

20   it, correct?

21   A.  Correct.

22   Q.  And every nurse would know that, correct?

23   A.  They should, yes, sir.

24   Q.  Okay.  And you talked about that you had been on a

25   bunch of, you know, suicides in the past and everything

 1   else, correct?

 2   A.  Yes, sir.

 3   Q.  Okay.  And it's just your opinion that, you know, it

 4   wouldn't have happened -- you know, the gun wouldn't land

 5   the way it did, his arm wouldn't land the way it is,

 6   correct?

 7   A.  I believe this is a very low probability.

 8   Q.  Okay.  But you don't -- you didn't do any re-creations

 9   or studies of that to determine whether or not -- that's

10   just your opinion.

11   A.  That's correct.

12   Q.  Okay.  But you don't have any -- other than your

13   experience, you don't have any independent evidence to

14   show, okay, that's the way it happened or could have

15   happened?

16   A.  Correct.

17   Q.  Okay.  And another thing is that if -- Mrs. Seegan

18   didn't know about the trust or knew very little about the

19   finances and didn't know anything about insurance, correct?

20   A.  As far as I'm aware, she was -- did not have much

21   knowledge on it.

22   Q.  Okay.  And if I'm a trustee of a trust, I could -- if

23   somebody didn't know a trust existed -- let's say if -- let

24   me give you a hypothetical, okay?

25          A trust gets created, correct?

1    A.   Yes, sir.

2    Q.   And nobody knows it was created, correct?

3    A.   Okay.

4    Q.   And we make insurance be part of the trust, correct?

5    A.   Okay.

6    Q.   I could do all of that -- I could file the claim -- I

7    could get a Death Certificate, file the statement of claim,

8    and say I'm the trustee because I have the trust document;

9    and I could get paid for that and nobody would ever know,

10   correct?

11   A.   If you created it?

12   Q.   Yep.

13   A.   I believe so, yes, sir.

14   Q.   Okay.  So would you agree with me that if I'm trying to

15   do that, if the ultimate motive is that, I'm not going to

16   put my name and phone number in a note?

17   A.   I wouldn't agree with that.

18   Q.   Okay.  So you wouldn't agree with that it would be --

19   make more sense not to notify the entire family of your

20   name and number if your ultimate goal was to try to steal

21   money from people?

22   A.   I would not agree, based off of manipulation.

23   Q.   And did you, as part of your investigation, review the

24   ER records from the patient back on the 19th?

25   A.   I believe so, yes, sir.

 1   Q.  And that patient did exist, correct?

 2   A.  Yes, sir.

 3   Q.  And there were records for her, correct?

 4   A.  Yes, sir.

 5   Q.  Okay.  And did you see the ER records or just her

 6   admission records?

 7   A.  I don't recall which records they were actually labeled

 8   as, but it was a very large set of paperwork involving her

 9   treatment there for that -- for that event.

10   Q.  So when we look at that entry on the Pyxis and there is

11   a patient there, that was consistent with what happened

12   that day, correct?

13   A.  Yes, sir.

14   Q.  Okay.  And also the hospital has a system -- a badge

15   system.  Did you learn that?

16   A.  To be able to --

17   Q.  To access the Pyxis.

18   A.  Yes, sir.

19   Q.  Okay.  But also to get in and out of certain areas of

20   the hospital, correct?

21   A.  I believe so.

22   Q.  Okay.  And did you analyze those records?

23   A.  I don't believe we had those records.

24   Q.  Okay.  And did you learn through your investigation

25   that Mr. Ashley, other than the 19th, worked two more times

 1   after that?

 2   A.  I believe so.

 3   Q.  Okay.  And did you look into the days he worked and the

 4   types of cases he worked?

 5   A.  No.  I think we checked specifically around etomidate

 6   being used and then the timings of Mr. Ashley being there

 7   as well.

 8   Q.  Okay.  And the only thing that you came up with was

 9   December 19th of -- or December of 2019, correct?

10   A.  Yes, sir.

11   Q.  All right.  And that patient was intubated in the ER,

12   correct?

13   A.  I believe so.

14   Q.  Okay.  And that would have required etomidate, correct?

15   A.  Yes, sir.

16   Q.  And did you look at his E*TRADE account?

17   A.  Mr. --

18   Q.  Mr. Seegan's E*TRADE account.

19   A.  I believe I would have looked at it, yes, sir.

20   Q.  Okay.  And were you aware that at some point -- or if

21   you know -- that he was working to make the trust the

22   beneficiary of his E*TRADE account?

23   A.  That, I don't recall a hundred percent.

24   Q.  Okay.  Did you ever look at the trust account to see

25   what assets were named to the trust?

1    A.  I'm sure I did.  Again, it's been awhile since I've

2    looked at it.  Myself and Detective Duncan worked it side

3    by side.  She handled the majority of the financial

4    portion --

5    Q.  Okay.

6    A.  -- of the case, and I went more of the death portion.

7    Q.  And would you agree with me it was more than just the

8    life insurance?

9    A.  Again, I'd have to look at it to say a hundred percent.

10             MR. WHALEN:  Just one moment, your Honor.

11             THE COURT:  Yes.

12             (Off-the-record discussion among counsel for

13   defendant.)

14   BY MR. WHALEN:

15   Q.  Okay.  Detective Bonner, I know we've talked about it

16   but just -- after your meeting with Dr. Ogden, the best she

17   could do was say "unknown," correct?

18   A.  That is correct.

19             MR. WHALEN:  I'll pass the witness.

20             THE COURT:  Additional questions?

21             MR. FINE:  Yes, your Honor.

22             REDIRECT EXAMINATION OF BRANDON BONNER

23   BY MR. FINE:

24   Q.  Detective Bonner, the defense mentioned does this make

25   sense and does that make sense and a lot of that, correct?

 1    A.  Yes, sir.

 2    Q.  Well, the reality about this particular defendant is

 3    he's not your run-of-the-mill robber or murderer.  Is that

 4    fair to say?

 5    A.  Correct.

 6    Q.  I mean, he has a specialized set of skills.  Have you

 7    ever seen anybody with this set of skills like this before?

 8    A.  With this -- involved in this kind of crime, no, sir.

 9    Q.  He's got medical skills, correct?

10    A.  Correct.

11    Q.  He has access to etomidate, correct?

12    A.  Correct.

13    Q.  He has access to firearms?

14    A.  Correct.

15    Q.  He has police background?

16    A.  Correct.

17    Q.  He has financial background?

18    A.  Correct.

19    Q.  I mean, if you were going to put together the perfect

20    person to facilitate this crime, it would be Keith Ashley,

21    correct?

22    A.  Certainly.

23    Q.  And the reality is this wasn't some slam dunk, oh, this

24    is very easy to see what happened here.  It took a lot of

25    work to figure this out, correct?

1   A.  That's very true.

2   Q.  And is that consistent with somebody who is very good

3   at concealing their crimes?

4   A.  Yes, sir.

5   Q.  And, in fact, did he conceal this Ponzi scheme for

6   years, to the point where several individuals who are very

7   intelligent had no idea they were being scammed out of

8   money?

9   A.  That is correct.

10  Q.  And so he had been getting away with that for years,

11  correct?

12  A.  Yes, sir.

13  Q.  And so is it reasonable to believe that he could up the

14  ante and try to get away with a murder as well?

15  A.  Yes, sir.

16  Q.  And so when we talk about the scene, the crime scene

17  being consistent with a suicide, the reality is if you just

18  look at the scene, if you just look at James Seegan with a

19  gun in his hand and a contact wound to the back of his head

20  and a suicide note right next to him, that's consistent

21  with suicide, the scene, correct?

22  A.  Yes, sir.

23  Q.  But then we have to go back further and look at the

24  circumstances, correct?

25  A.  Yes, sir.

1   Q.  And is that where the Carrollton Police Department and

2   your entire team and the FBI came in?

3   A.  That is correct.

4   Q.  And is that what formed your conclusion that this was a

5   robbery and a murder?

6   A.  Yes, sir.

7   Q.  Was it one particular piece of evidence?

8   A.  No, sir.

9   Q.  What was it?

10  A.  It was the totality of everything, numerous things we

11  kept looking at that just -- we couldn't keep explaining

12  away.  They were all pointing in one direction.

13  Q.  And did you look at Dida as a potential person who

14  could have had something to do with this?

15  A.  Certainly.

16  Q.  And did you investigate her fully?

17  A.  We did.

18  Q.  And did you dig into her history?

19  A.  Yes, we did.

20  Q.  And her personal business?

21  A.  Yes, sir.

22  Q.  At the conclusion of that, do you believe that Dida had

23  anything to do with this whatsoever?

24  A.  Not at all.

25  Q.  And when we talk about what was the plan long-term

 1  here, we could have theories about that, correct?

 2  A.  Yes, sir.

 3  Q.  But it's impossible to know for sure because it didn't

 4  ever get to that point, correct?

 5  A.  True.

 6  Q.  And so what we do know for a fact is that 36 hours

 7  after he murdered Mr. Seegan, who's the person that takes

 8  $20,000, that steals $20,000 from Mr. Seegan?

 9  A.  Mr. Ashley.

10  Q.  And so we don't know what was going to happen down the

11  road; but we know within 36 hours this man stole $20,000

12  from the man that he killed, correct?

13  A.  That's correct.

14  Q.  Does that make any sense to you, if he had nothing to

15  do with this, that he would steal $20,000 from somebody

16  that just died?

17  A.  No.

18  Q.  And we know that his finances were in rough shape,

19  correct?

20  A.  Yes.

21  Q.  And we know that they were getting worse and worse and

22  worse leading up to this, correct?

23  A.  That's correct.

24  Q.  And in your line of work, you've seen desperate people

25  do things that are very, very evil, correct?

```
 1   A.  Yes.

 2   Q.  Because when you are desperate and you are against the

 3   wall, you really don't know what a human being is capable

 4   of.  Is that fair to say?

 5   A.  That is true.

 6   Q.  So if we want to crawl inside the mind --

 7            MR. WHALEN:  Objection as to leading, your Honor.

 8            THE COURT:  Okay.  Just rephrase your question.

 9   BY MR. FINE:

10   Q.  Are you able to crawl inside the mind of any defendant?

11   A.  No.

12   Q.  Do you form reasonable conclusions based on the

13   evidence?

14   A.  Yes.

15   Q.  And is that what you did here?

16   A.  Yes, sir.

17   Q.  And within Mr. Ashley's phone, did you also find a

18   photograph of him in sort of full medical gear as well?

19   A.  Yes, we did.

20   Q.  And if you'll take a look at the binder and look at

21   127B.

22            It might be the one behind you.

23            Is that the same picture that you found in

24   Mr. Ashley's phone?

25   A.  It is.
```

```
 1              MR. FINE:  Government offers government's 127B at

 2    this time.

 3              MR. WHALEN:  No objection, your Honor.

 4              THE COURT:  127B will be admitted.

 5              MR. FINE:  Permission to publish, your Honor?

 6              THE COURT:  Yes, you may.

 7    BY MR. FINE:

 8    Q.  And so, Detective Bonner, we talked about all of the

 9    things that led up to this and all of the tools that

10    Mr. Ashley had, correct?

11    A.  Yes, sir.

12    Q.  And one of things we didn't talk about, he also had

13    access to medical equipment as well, correct?

14    A.  Correct.

15    Q.  Gloves, a gown, whatever you might want to put on,

16    correct?

17    A.  Yes, sir.

18    Q.  And if somebody was wearing gloves or protective gear,

19    would they leave any DNA behind?

20    A.  Not much.

21    Q.  Would they leave any fingerprints behind?

22    A.  No, sir.

23    Q.  And in this case was there any DNA or fingerprints

24    outside of the victim in this case?

25    A.  None.
```

 1   Q.  And does that surprise you, given the circumstances?

 2   A.  No, sir.

 3   Q.  And does that surprise you, given the defendant's

 4   background?

 5   A.  No, sir.

 6   Q.  And his expertise?

 7   A.  No, sir.

 8   Q.  And the tools at his disposal?

 9   A.  No, sir.

10          MR. FINE:  I'll pass the witness.

11          THE COURT:  Additional questions?

12              RECROSS-EXAMINATION OF BRANDON BONNER

13   BY MR. WHALEN:

14   Q.  Detective Duncan *(sic)*, the reason -- did anybody look

15   for fingerprints at his house that day?

16   A.  I'm not sure what was dusted or looked for by the crime

17   scene at that time.  I don't -- that, I don't recall.  I

18   wasn't there.

19          But, again, normally our crime scene team would

20   if -- and especially if Detective Duncan would have asked

21   them to.  I don't know that she did.

22   Q.  Okay, because they didn't believe -- they believed it

23   to be a suicide, correct?

24   A.  At the time it had the appearance.

25   Q.  Okay.  So just because there's no fingerprints there

 1    doesn't mean they weren't there.  You-all just didn't look

 2    for them, correct?

 3    A.  Could be.

 4    Q.  And this picture that we have of protective gear, that

 5    was taken after -- well after this, correct?

 6    A.  I don't know the exact date on it, but I believe so.

 7    Q.  Okay.  This was during COVID, correct?

 8    A.  Yes, sir.

 9    Q.  Okay.  So let's talk about something you mentioned

10    earlier.  There was that trash bag, correct?

11    A.  Yes, sir.

12    Q.  And they were moving, correct?

13    A.  Yes, sir.

14    Q.  Okay.  They were selling that house, correct?

15    A.  That's correct.

16    Q.  Do you know what they got out of that house, how much

17    that house was worth?

18    A.  No idea.

19    Q.  Okay.  Did they earn money from that house?

20    A.  I would assume so.

21    Q.  Okay.  And during COVID would you agree with me that

22    there was a desperate need for nurses?

23    A.  Yes.

24    Q.  Okay.  So if somebody is financially stressed, they

25    have the ability to earn money as a nurse, they are in the

1   process of selling their house, those are assets and

2   resources somebody could have to live on and support their

3   family, correct?

4   A.  Certainly.

5   Q.  Okay.  So did you consider -- you didn't consider that

6   when you talked about whether or not he was under financial

7   stress, correct?

8   A.  I'm sorry.  What are you --

9   Q.  Did you consider his net worth, consider what value he

10  had in the business, what he -- other assets they have?

11  A.  Certainly.

12  Q.  Okay.  And so you're still sitting here today, even

13  though he had the ability to earn a living and he was

14  selling his house, that he was desperate for money?

15  A.  Yes, sir, based off of the fact that he was still

16  moonlighting as a nurse but he owned a brewery that we knew

17  was in kind of financial trouble and with his business work

18  in finances that weren't quite going well.

19          Once we discovered he was running the Ponzi

20  scheme, those things collapsed and it started falling in on

21  itself and that's what we believed was happening.

22  Q.  And that's what you believe, correct?

23  A.  Yes, sir.

24  Q.  Okay.  But you didn't look at those other parts of it,

25  did you?

 1   A.  As far as the finances from the home and working as a

 2   nurse?

 3   Q.  Correct.

 4   A.  We certainly took it into consideration, but we didn't

 5   believe that would be maybe enough money to get rid of the

 6   Ponzi scheme and pay everybody off.

 7   Q.  Okay.  But if you have Promissory Notes where you can

 8   pay them back over time -- did you do any calculations as

 9   it relates to that?

10   A.  No, sir.

11   Q.  And would you agree with me --

12            THE COURT:  Mr. Whalen, your mic is off.

13   BY MR. WHALEN:

14   Q.  And just so we're clear, too, you talked about -- you

15   used the word "probable cause," correct?

16   A.  Yes, sir.

17   Q.  And would you agree with me that's a lower standard

18   than beyond a reasonable doubt?

19   A.  I'd say it's pretty close.

20   Q.  Okay.  In your opinion, you believe that they are the

21   same?

22   A.  Yeah, pretty close.

23   Q.  Okay.

24            MR. WHALEN:  I'll pass the witness.

25            THE COURT:  Anything additional?

```
 1          MR. FINE:  One question, your Honor.

 2          THE COURT:  Okay.  Go ahead.

 3      FURTHER REDIRECT EXAMINATION OF BRANDON BONNER

 4  BY MR. FINE:

 5  Q.  Detective Bonner, the defense just brought up probable

 6  cause.  Let me ask you this:  Do you have any reasonable

 7  doubt whatsoever about your testimony here today?

 8  A.  I do not.

 9          MR. FINE:  I'll pass the witness.

10          MR. WHALEN:  Nothing further.

11          THE COURT:  Can this witness be fully excused?

12          MR. FINE:  Yes, your Honor.

13          MR. WHALEN:  Yes, your Honor.

14          THE COURT:  You are free to leave.  Thank you.

15          THE WITNESS:  Thank you, sir.

16          THE COURT:  Okay.  What's next?

17          MS. RATTAN:  The United States calls Heidi

18  Scarbrough.

19          THE COURT:  Ma'am, if you'll raise your right hand

20  to be sworn in.

21          (The oath is administered to the witness.)

22          THE COURT:  Go ahead and proceed.

23          MS. RATTAN:  Thank you, your Honor.

24                              *

25                              *
```

1              DIRECT EXAMINATION OF HEIDI SCARBROUGH

2               CALLED ON BEHALF OF THE GOVERNMENT

3   BY MS. RATTAN:

4   Q.  Please state your name.

5   A.  Heidi Scarbrough.

6   Q.  Please spell your name, please.

7   A.  H-E-I-D-I S-C-A-R-B-R-O-U-G-H.

8   Q.  And, Ms. Scarbrough, would you tell us where you work

9   now?

10  A.  I work for INTERLINK CancerCare.

11  Q.  Pardon?

12  A.  INTERLINK CancerCare.

13  Q.  INTERLINK CancerCare?

14  A.  Yes, ma'am.

15  Q.  And where is that located?

16  A.  Our corporate office is in Portland, Oregon; but I work

17  in the Rockwall, Texas, office.

18  Q.  What do you do there?

19  A.  I'm the president.

20  Q.  And what does -- what does that business do?

21  A.  We provide case management to cancer patients

22  nationally.

23  Q.  Let me ask you.  Before you moved to this position now,

24  did you work at the City Hospital at White Rock in Dallas,

25  Texas?

```
 1   A.  I did.

 2   Q.  And what did you do there?

 3   A.  I was the chief nursing officer.

 4   Q.  The chief nursing officer at City Hospital at White

 5   Rock?

 6   A.  Correct.

 7   Q.  Can you give the jury what your educational background

 8   is that qualified you to be the chief nurse at the hospital

 9   there?

10   A.  Sure.

11         Started my nursing career, I was a -- you asked

12   for my education, correct?

13   Q.  Yes.

14   A.  Education, I was a licensed vocational nurse from South

15   Plains College.  I then went back and got my registered

16   nursing degree from Covenant School of Nursing.  I then

17   went back and got my master's of nursing from University of

18   Phoenix.  And then I also have a bachelor's degree in human

19   development from Texas Tech.

20   Q.  So you have an LVN, an RN, a Bachelor of Science, and a

21   master's of nursing?

22   A.  Correct.

23   Q.  So you have four separate degrees in nursing?

24   A.  Correct.

25   Q.  Along with your education, do you also have training
```

```
 1   and seminars that you attend to educate you?
 2   A.  Correct.
 3   Q.  Can you give us an idea of what's required?
 4   A.  Workwise, I've been a nurse for 22 years.  I started my
 5   career at Medical Center of Plano.  I worked there for 12
 6   years.  It's an HCA-owned system.
 7          Worked my way up through the leadership tract
 8   (sic), started out as staff nurse, assistant nurse manager,
 9   charge nurse, manager, director, various positions from ER
10   to case management and worked in their trauma program.
11          When I left there, I was the director of clinical
12   excellence and then left and went to Texas Health Resources
13   where I did director of ICU, med/surg, and did more
14   operational work in terms of magnate, pathway to
15   excellence, and eventually became associate chief nursing
16   officer and then built more leadership skills and
17   eventually became chief nursing officer.
18          I'm triple certified in medical/surgical nursing,
19   case management, and board certified as a nurse executive.
20   Q.  Have you also served as a professor, an adjunct
21   professor in teaching in nursing?
22   A.  At Collin County Community College I serve as adjunct
23   faculty there.
24   Q.  Now let me direct your attention to your work as the
25   chief nurse there at City Hospital at White Rock.
```

```
 1            Did you become familiar with the name Keith
 2   Ashley?
 3   A.  Yes, ma'am.
 4   Q.  And did Keith Ashley work at the City Hospital as well?
 5   A.  He did.
 6   Q.  And what was Keith Ashley's job there?
 7   A.  Keith worked in our emergency department.  He was what
 8   we call PRN, or as needed.
 9   Q.  Okay.  At some point was he terminated from the City
10   Hospital at White Rock?
11   A.  He was.
12   Q.  And why was that?
13   A.  So when you work PRN, there is a minimum number of
14   shifts that you have to work in order to maintain
15   employment; and he --
16            MR. SANDEL:  Objection, your Honor.  May we
17   approach?
18            THE COURT:  Yes.
19            (Sidebar conference, off the record.)
20            THE COURT:  Go ahead and proceed.
21            MS. RATTAN:  Thank you, your Honor.
22   BY MS. RATTAN:
23   Q.  So you're familiar with Keith Ashley as an employee in
24   the hospital, and he no longer works there.  Is that your
25   understanding?
```

1  A.  Correct.

2  Q.  Let me ask you about the day of February 20th of 2019.

3  February 20th of 2019.  Was he scheduled to work on that

4  day?

5  A.  Correct.

6  Q.  And what happened?

7  A.  He called in.

8  Q.  What do you mean by "he called in"?

9  A.  So there was a scheduled shift, and he called in and

10  didn't come to work that day.

11  Q.  Okay.  So not February 19th of twenty- -- not

12  February 19th.  We're talking about February --

13  A.  The year.

14  Q.  -- 20th.  Okay.

15  A.  Yeah.

16  Q.  Right.  And he called in.

17  A.  That's what I was pausing to think about it, yes.

18  Q.  So let me talk to you -- let's shift gears here for a

19  minute and let's focus on a drug, a drug by the name of

20  etomidate.  Are you familiar with that drug?

21  A.  I am.

22  Q.  And can you describe for the jury just generally what

23  it is?

24  A.  Etomidate is a drug.  It's an anesthetic that we use in

25  hospitals typically during -- we use it in the emergency

 1   department for codes, to intubate patients.  It puts

 2   patients to sleep so that we can effectively intubate

 3   patients, and it's followed up typically by a paralytic.

 4   It's a short-acting anesthetic, doesn't last very long.

 5   Q.  And so you say that typically, or most often maybe,

 6   it's used in the emergency department?

 7   A.  Uh-huh.  Correct.

 8   Q.  And what department was it that Keith Ashley was

 9   specifically employed in?

10   A.  In the emergency department.

11   Q.  Now, is etomidate a controlled drug?

12   A.  It is not.

13   Q.  And when we say "controlled drug," what does that mean?

14   A.  So controlled drugs -- there are certain drugs that you

15   are required to count.  So things like narcotics like

16   morphine, Dilaudid, every time you get it, you have to have

17   a witness to its wastage.

18          And etomidate is not a drug that you have to

19   actually go and waste whatever is left over.  You don't

20   have to do that with etomidate.

21   Q.  So you just used a term or a phrase, that it has to be

22   wasted and a witness to the wasting.

23          Can you describe for the jury what that means?

24   A.  Sure.

25          So a physician orders 4 milligrams of morphine --

 1    let me back up.

 2          If a physician orders 2 milligrams of morphine but

 3    the packet, the vial that it comes in, is 4 milligrams of

 4    morphine.  That would leave 2 milligrams of morphine extra,

 5    and so I would have to get another nurse to witness that

 6    wastage of that other 2 milligrams of morphine.  They would

 7    have to watch me either put it down the drain or in a

 8    sharps container, whatever that process is at that

 9    particular hospital.

10          And then you would have to document that in the

11    electronic medical record, and so you would have the

12    primary nurse and a cosigner that you witnessed that

13    wastage.

14    Q.  So if a drug is not used up in the health care system,

15    someone has to witness it being wasted?

16    A.  Correct.

17    Q.  But is that true of etomidate?

18    A.  No.

19    Q.  So if there is any etomidate left over, nobody has to

20    witness the wasting?

21    A.  Correct.

22    Q.  Because it's not a controlled drug?

23    A.  Correct.

24          MS. RATTAN:  Your Honor, may we publish

25    Government's Exhibit 14B, page 1.

```
 1              THE COURT:  Yes, you may.
 2   BY MS. RATTAN:
 3   Q.  Let me direct your attention to a record of City
 4   Hospital at White Rock.  This is from the Pyxis system.
 5              Are you familiar with the Pyxis system there at
 6   the hospital?
 7   A.  I am.
 8   Q.  And, just generally, what is it?
 9   A.  A Pyxis is a machine in a department and it's full of
10   medications and it's logged in by users.  You have to have
11   a specific log-in.  And so the employee logs in and they
12   identify a patient and then they identify what drug they
13   want to pull and a drawer pops open and you pick that drug
14   and then it closes.
15   Q.  And this shows that on December 17th of 2019, Keith
16   Ashley accessed the drug etomidate; is that right?
17   A.  Correct.
18   Q.  And it's got a patient name, and we've removed the
19   patient name for privacy but left the initials.
20              Do you see that?
21   A.  I do.
22   Q.  Now, even if etomidate were used on this patient -- and
23   we'll say patient EC, first name/last name EC.  Even if
24   this etomidate were used on this patient EC, if some were
25   left over, would anyone have had to witness the wasting?
```

1  A.  No.

2  Q.  So whatever was left over would have been available; is

3  that correct?

4  A.  Correct.

5  Q.  Well, other than this, other than the Pyxis system, let

6  me ask you about other ways in the City Hospital there at

7  White Rock that an employee could access etomidate.

8          Is this the only way an employee could access

9  etomidate?

10  A.  No.

11  Q.  Can you describe for the jury other ways that an

12  employee would be able to get etomidate?

13  A.  Sure.

14          There are several other ways in which an employee

15  can obtain etomidate.  There is something called an RSI

16  box.  Whenever you have a code in a hospital, time is brain

17  death; and so you want to get that medication to the

18  patient as quickly as possible.

19          And you don't want an employee standing at the

20  Pyxis selecting each drug manually one by one.  That takes

21  a lot of time.  And so we create something called an RSI

22  box, which is a -- it's called rapid sequence intubation.

23          And they can just pull the box out and etomidate

24  can be in that box and so they just pull the box out and so

25  you wouldn't see it on a list specifically where they just

 1   pulled etomidate out by itself.  And so etomidate can be

 2   pulled through the RSI box.

 3          It can also be pulled through what's called a

 4   crash cart, and we have crash carts throughout the

 5   department.  And so an employee could just crack the crash

 6   cart and pull etomidate out through there.

 7   Q.  Okay.  So let me stop you.

 8   A.  Sure.

 9   Q.  The Pyxis system would document access to etomidate and

10   would access -- and would document access to the RSI box;

11   is that right?

12   A.  You pull the RSI box out through the Pyxis, correct.

13   Q.  So Pyxis is going to document both of those.

14          Now you've moved into a third way to access

15   etomidate in the hospital, and you said it's a crash cart?

16   A.  Correct.

17   Q.  Okay.  Is Pyxis going to document an employee's access

18   on a crash cart?

19   A.  No.

20   Q.  Okay.  Well, explain how an employee would get access

21   to etomidate on a crash cart.

22   A.  Anybody can.  There is no tracking mechanism for it.

23          A crash cart just has a little plastic lock on it.

24   Materials Management supplies the supplies that are in it.

25   There's lots of different things in a crash cart, from IV

1    fluids to IV tubing.  But Pharmacy brings up a medication

2    tray, and all the medications are in that tray.

3           And whenever you needed something, you'd just pop

4    the lock, take what you need if it's for a code, if you

5    just needed something you can't get in supplies; and you

6    would just call Pharmacy and say, "Hey, I had to pop the

7    lock.  Can you come change the lock out?"

8           There is really no mechanism to know why or what

9    was used specifically, and there is no way to really go

10   back and look at that.

11   Q.  And you said that Keith Ashley worked in the emergency

12   department?

13   A.  Correct.

14   Q.  Are there crash carts in the emergency department?

15   A.  There are.

16   Q.  How many crash carts would be in the emergency

17   department?

18   A.  My recollection, I think there's three in City

19   Hospital's.

20   Q.  Now, is there a requirement that after the crash cart

21   is used, that the employee self-report?

22   A.  No.

23   Q.  So what control is there over the drugs that are used

24   off the crash cart?

25   A.  There really isn't any.  Anybody can crack it and use

1    it.

2    Q.  And is that because at some point even though the

3    hospital tries to control and account for drugs, they've

4    got to be available in an emergency if they're needed?

5    A.  Correct.

6    Q.  So we've talked about the Pyxis, the RSI, the crash

7    cart.  What about if someone is not the primary nurse?

8         If you're a nonprimary nurse but assisting, does

9    that allow you to access drugs?

10   A.  Absolutely.

11   Q.  And describe that.

12   A.  Yeah, and I think that -- City Hospital doesn't have a

13   huge ER.  It's a very small ER.  I think it's either 16 or

14   18 beds, and it's staffed 4-to-1.  So there's probably only

15   four or five nurses working in the ER at the time, and it

16   takes about that many people to run a code.  So, basically,

17   when there is a code in that ER, that's the entire staff

18   working; so everybody is pulled to work that code.

19        And there is a primary nurse that's going to be in

20   there running the code.

21        You're going to have a recorder.

22        You're going to have somebody doing compressions.

23        You're going to have somebody bagging and somebody

24   pushing drugs.

25        And everybody's going to be in that room and

1    ultimately having access to whatever drugs are in that

2    room.

3          So although there is only one mar (phonetic

4    spelling) here that says etomidate was pulled, every code

5    that was run during that time, etomidate is going to be in

6    there; and anybody could have had access to it.

7    Q.  So these are basically four different ways that an

8    employee, especially in the emergency department, could

9    access etomidate and it not be documented in at least two

10   of the ways; is that right?

11   A.  Correct.

12   Q.  Now, in September of 2020, as the head nurse, the chief

13   nurse at the hospital, were you approached by the

14   Carrollton Police Department?

15   A.  It was before September of 2020, but yes.

16   Q.  Okay, before September of 2020.

17          So at some point in 2020, were you approached by

18   the Carrollton Police Department?

19   A.  On a couple occasions, yes.

20   Q.  And did they talk to you about etomidate?

21   A.  They did.

22   Q.  And did you become concerned about the security in the

23   hospital of that drug, etomidate?

24   A.  I did.

25   Q.  And will you describe for the jury what you did to

 1  determine whether etomidate could be accessed by a hospital

 2  employee?

 3  A.  So every morning, as the chief nursing officer, I round

 4  on the hospital.  On the employees I'm looking for safety

 5  issues, concerns, just general rounding on the hospital.

 6         And in September I was rounding in the ER.  And

 7  there are two main rooms in the emergency department that

 8  we do codes in.  They are the biggest rooms.  They are our

 9  trauma rooms.  And I had walked over there, and clearly on

10  that morning there had been a code.  There weren't any

11  patients around.  There weren't any employees around, but

12  the room was a disaster.  The doors to the cabinets were

13  open.  The crash cart was wide-open.  Sharps were readily

14  available.

15         I was very concerned because this is a -- it's a

16  Joint Commission violation.  It's obviously a safety issue,

17  right?  So as the chief nurse, I'm very concerned because

18  you've got some violations going on.

19         So I walk in the room to fix the issue.  I want to

20  make the room safe immediately.  And so I'm putting sharps

21  away.  I'm closing cabinets.  I'm making the room clean.

22  And I look over, and on the counter is this open vial of

23  etomidate.  It's full.  The top had been popped, but it's

24  very full.

25         And I think -- and, obviously, Carrollton PD had

 1   been there.  We had some concerns about how we were

 2   controlling etomidate in the hospital, what was our

 3   mechanism for wastage of etomidate -- not that it's

 4   controlled but still, all drugs we need to account for.

 5          And so I thought I want to know if -- what is our

 6   mechanism?  How are we tracking etomidate?  Is anybody ever

 7   going to know if this etomidate goes missing, because

 8   Carrollton PD had just asked me would somebody know if they

 9   took etomidate if it went missing.

10          So I slipped it in my pocket, secured the room.  I

11   went out and I talked to the charge nurse and I said, "Hey,

12   one, I've got this safety issue."  I addressed that issue

13   because I was very concerned about that.

14          "But also I want you to know I'm taking this

15   bottle of etomidate," because as the primary nurse of the

16   room, you should know exactly what meds are pulled, what

17   meds were given.  You need to be documenting them, because

18   all of that needs to be in the electronic medical record.

19          So is the primary nurse ever going to know it's

20   missing, is Pharmacy and our reconciliation process --

21          MR. SANDEL:  Your Honor, at this point I'd object

22   to the narrative.

23          THE COURT:  Just ask another question.

24   BY MS. RATTAN:

25   Q.  So after you got the etomidate out of the room, you

1    went to the charge nurse.  You explained what you were

2    doing --

3    A.  I wanted -- I wanted them to know I didn't take it, was

4    my point, that I wasn't diverting any kind of drug.

5          I then went up and called HR and told them

6    because they had been working --

7    Q.  Human -- human resources.

8    A.  -- with Carrollton PD, too, because I didn't, again,

9    want anyone to think I was diverting narcotics.

10          And at the end of -- I left City Hospital in --

11   that was in September.  I left City Hospital in March, the

12   following March; and it was still in my office locked up.

13   So I was technically able to divert etomidate, and nobody

14   was ever aware of it.

15   Q.  So from September of 2020 when you took the etomidate

16   out of the empty room where it looked like there had been

17   an emergency through your leaving in March of 2021, nobody

18   ever raised with you the fact that etomidate was missing?

19   A.  Didn't come up in any of the Pharmacy Diversion

20   Committee.  The primary nurse didn't note it that day, the

21   charge nurse.  No one ever brought it up.  Correct.

22   Q.  Let me ask if you've used etomidate.

23   A.  I have.

24   Q.  Can you estimate for the jury the number of times that

25   you've used etomidate?

```
 1    A.  I -- a lot.  I couldn't even count.  Hundreds.

 2    Q.  And how is etomidate administered?  How does a patient

 3    receive etomidate?

 4    A.  IV.

 5    Q.  So through a shot or a drip?

 6    A.  Uh-huh, correct.

 7    Q.  Can etomidate ever been taken orally?

 8    A.  I've never given it that way.

 9    Q.  So the many, many times you've done it, it's always

10    been IV?

11    A.  IV.

12    Q.  What about protective equipment there in the hospital?

13    Is that available to the employees?

14    A.  It is.

15    Q.  And when we say "protective equipment," I'm talking

16    about gowns, gloves, masks, all of these things.

17    A.  Correct.

18    Q.  And would that be available to all of the employees?

19    A.  Absolutely.

20    Q.  And in the emergency department?

21    A.  Uh-huh (moving head up and down).

22         MS. RATTAN:  I'll pass the witness.

23         THE COURT:  Okay.  It's the noon hour, so let's go

24    ahead and take our lunch break.

25         Again, ladies and gentlemen, please don't discuss
```

 1   the case among yourself or anyone else.  Don't do any

 2   outside research.  We'll come back in an hour, back at

 3   1:00.  Have a good lunch.

 4          (The jury exits the courtroom, 11:59 a.m.)

 5          THE COURT:  Anything further from the government?

 6          MS. RATTAN:  No, your Honor.

 7          THE COURT:  Anything from defense?

 8          MR. SANDEL:  No, your Honor.

 9          THE COURT:  Okay.  See you back at 1:00.

10          (Recess, 12:00 p.m. to 1:06 p.m.)

11          (Open court, defendant present, jury present.)

12          THE COURT:  Please be seated.

13          Ladies and gentlemen, I hope you had a nice lunch.

14          And cross-examination?

15          MR. SANDEL:  Thank you, your Honor.

16              CROSS-EXAMINATION OF HEIDI SCARBROUGH

17   BY MR. SANDEL:

18   Q.  Ms. Scarbrough, good afternoon.  How are you?

19   A.  I'm good.  Thank you.

20   Q.  My name is Ryne Sandel, and I represent Keith Ashley in

21   this case.  Okay?

22          And I've just got some questions that I wanted to

23   follow up with you on.  If at any time I ask you something

24   that you need me to rephrase, just ask me and I'm happy to

25   do that, okay?

1    A.  Sure.

2    Q.  All right.  We talked about etomidate on your direct

3    examination.  Do you recall that?

4    A.  I do.

5    Q.  And etomidate, you said, was one of the multitude of

6    drugs that is utilized in an emergency room setting,

7    correct?

8    A.  Correct.

9    Q.  Can etomidate be used in things besides just

10   intubation?

11   A.  It's used in other procedures besides the emergency

12   department.  It can be used in the OR, can be used in other

13   areas.

14   Q.  Okay.  So etomidate is a drug that is found in a couple

15   different places in the hospital, correct?

16   A.  Correct.

17   Q.  Now, when we talk about the emergency room, who all has

18   access -- or when we're looking back at 2019 because that's

19   the time frame we're talking about, correct?

20        So if you recall back to December of 2019, what

21   individuals would have access to the emergency room of the

22   hospital?

23   A.  To clarify, are you talking about Pyxis?  Are you

24   talking about the crash cart, RSI kits, or all of it?

25   Q.  Let's just say everything in the emergency room.  Who

```
 1  all would have access to that area of the hospital?
 2  A.  Potentially anybody.
 3          So the Pyxis, you have to have specific
 4  permission.  You have to have an --
 5  Q.  Okay.
 6  A.  -- ID that you're given to log in to the Pyxis so we
 7  can track that.
 8          The RSI kits are in the Pyxis.  We would know if
 9  you had access to either the Pyxis directly or to an RSI
10  kit.
11          If you're talking crash carts, potentially anybody
12  could.  But we would know if it -- who -- when a crash cart
13  was opened; but like I spoke about earlier, it could be for
14  any reason.
15  Q.  Now, when you say -- because I do want to make sure we
16  clarify.  When you say "potentially anybody," I mean, do
17  you mean hospital employees anybody; or do you mean anybody
18  anybody?
19          Could I walk into the emergency room?
20  A.  You could.
21  Q.  I could.
22          And the crash carts that we talked about, okay,
23  could I walk up to a crash cart and what you called pop the
24  lock and grab some drugs out of there?
25  A.  You could.
```

1    Q.  And so back in 2019, literally anybody could have just

2    walked in, opened a crash cart, and grabbed a bottle of

3    etomidate; is that fair?

4    A.  Fair.

5    Q.  Now, back in 2019, did your emergency room have

6    security cameras?

7    A.  They did.

8    Q.  And if you know the answer to this, how many security

9    cameras were in your emergency room?

10   A.  I don't know the answer to that.

11   Q.  What general areas did those cameras cover?

12   A.  I don't know the answer to that.

13   Q.  Do you know if there was one in every ER room?

14   A.  No.

15   Q.  There was not, or you're not sure?

16   A.  There was not.

17   Q.  There was not.

18        Were there cameras covering every hallway?

19   A.  I don't know the answer to that.

20   Q.  Do you know if there was a camera that covered where

21   the Pyxis vending machine was?

22   A.  I don't know the answer to that.

23   Q.  All right.  Now, we talked about these crash carts; and

24   you said that in order to get into them, a lock has to be

25   popped, correct?

 1   A.  Correct.

 2   Q.  When that lock gets popped and that crash cart gets

 3   used, who is responsible for restocking the supplies that

 4   were pulled?

 5   A.  It's a two-part process.  If it's a supply that's used,

 6   like IV tubing, we would call Materials; and they come up

 7   and supply that.

 8        If it's something from the med tray, we call

 9   Pharmacy and Pharmacy comes up and replaces that.

10   Q.  So fair to say that if somebody popped a crash cart and

11   pulled a vial of etomidate, Pharmacy would be the one in

12   charge of restocking that, right?

13   A.  Correct.

14   Q.  Now, I assume that the hospital Pharmacy Department

15   keeps a log of the different medications that they're

16   stocking in different places, correct, for inventory

17   purposes?

18   A.  Correct.

19   Q.  Because they need to know when do we need to reorder or

20   are we getting low on this drug, correct?

21   A.  Correct.

22   Q.  Okay.  So Pharmacy would be made aware or have a log or

23   a record of when a crash cart had to be refilled with

24   etomidate, correct?

25   A.  Correct.

```
 1   Q.  Okay.

 2          Okay.  I wanted to ask briefly about -- hope get

 3   this right.  I think it was called the RSI box; is that

 4   right?

 5   A.  Right.

 6   Q.  Okay.  Remind me what the RSI box is.

 7   A.  RSI is rapid sequence intubation.

 8   Q.  Rapid sequence --

 9   A.  Sequence --

10   Q.  -- intubation?

11   A.  -- intubation.

12          It's a box of medications used -- and you give

13   them in a certain sequence -- to intubate patients.

14   Q.  Okay.  And that is -- when you were speaking with

15   Ms. Rattan, that's another box that would have etomidate in

16   it, correct?

17   A.  Yes.

18   Q.  What else is in that RSI box?

19   A.  It -- so honestly, I don't know at some point.  There

20   are several medications in it.  And even in City Hospital,

21   not at all times did it have etomidate.

22   Q.  Okay.

23   A.  Which we explained to Carrollton PD when they came

24   because we had changed our process.  But it can --

25   sometimes it doesn't have etomidate.  There's other drugs
```

1    in it like succinylcholine, which needs to be refrigerated.

2         So it depends on where you keep it if it's in a

3    refrigerator or where it's not.  It depends on the

4    facility.

5    Q.  And the RSI box, that is located in the Pyxis, correct?

6    A.  Correct.

7    Q.  Now, does the RSI box contain any controlled drugs?

8    A.  It shouldn't, no.

9    Q.  It shouldn't, okay.

10        But it does contain things that require

11   refrigeration?

12   A.  It depends -- that depends on -- it can, depending on

13   if you're keeping it in a refrigerator.

14   Q.  Okay.

15   A.  If you keep your succs in the RSI box, then, yes, it

16   needs to be refrigerated.

17   Q.  Now, did you, when you were working with Carrollton PD,

18   review any of the camera footage from that December 2019

19   date at all?

20   A.  I didn't, no.

21   Q.  Okay.  Do you recall if that was requested?

22   A.  I don't recall that.

23   Q.  Thank you, Ms. Scarbrough.  I appreciate it.

24        MR. SANDEL:  I'll pass the witness, your Honor.

25        THE COURT:  Additional questions?

1            MS. RATTAN:  No, your Honor.

2            THE COURT:  Can this witness be fully excused?

3            MS. RATTAN:  Yes, please.

4            MR. SANDEL:  Yes, your Honor.

5            THE COURT:  Ma'am, you are free to leave.  Thank

6    you.

7            What's next?

8            MS. RATTAN:  May we approach, your Honor?

9            THE COURT:  Yes.

10           (Sidebar conference, off the record.)

11           THE COURT:  Ladies and gentlemen, I want to go

12   ahead and just clarify one thing.  The witness before the

13   last was Detective Brandon Bonner, and he stated some

14   opinions regarding whether certain events were robbery or

15   murder.  And what I'm going to instruct you is -- is that

16   that was his opinion; but the ultimate issue of whether

17   those two things happened in this case is up to you, the

18   jury.  So I would ask you to disregard his opinion, and

19   you'll make your own decision regarding -- when you look at

20   this case at the end when it's submitted.

21           Okay.  What's next?

22           MR. COMBS:  Your Honor, the government calls

23   Dr. Stacey Hail.

24           THE COURT:  Ma'am, if you'll raise your right hand

25   to be sworn in.

```
 1              (The oath is administered to the witness.)
 2              THE COURT:  Go ahead.
 3              MR. COMBS:  May I proceed?  Thank you, your Honor.
 4                  DIRECT EXAMINATION OF STACEY HAIL
 5                  CALLED ON BEHALF OF THE GOVERNMENT
 6   BY MR. COMBS:
 7   Q.  Ma'am, can you please state your name.
 8   A.  Yes.
 9          My name is Dr. Stacey Hail.
10   Q.  And how do you spell your last name?
11   A.  H-A-I-L, like a hailstorm.
12   Q.  Okay.  Ma'am, you said you're Dr. Stacey Hail.  And
13   what is -- are you a medical doctor?
14   A.  I am.
15   Q.  Can you describe for the members of the jury your
16   educational background?
17   A.  I received a Bachelor of Science in Chemistry from
18   Southern Methodist University in Dallas;
19          Followed by my medical doctor degree, which is
20   four years, at the Medical College of Georgia in Augusta,
21   Georgia;
22          Followed by a residency in emergency medicine at
23   Parkland Hospital, which is also part of UT Southwestern;
24          Followed by a two-year fellowship in medical
25   toxicology, also through Parkland and the North Texas
```

1   Poison Center.

2   Q.  And where are you currently employed?

3   A.  I'm an associate professor of emergency medicine and

4   medical toxicology at The University of Texas Southwestern.

5   Q.  Do you also work in the emergency department at

6   Parkland?

7   A.  Yes.

8          It's a unique arrangement where UT Southwestern

9   does have its own hospital and its own medical department;

10  but the faculty of UT Southwestern also staff Parkland, not

11  just in the ER but in all specialties.

12  Q.  Tell the jury kind of a day in the life of Dr. Hail.  I

13  mean, what do you do from day to day?

14  A.  Well, I don't live the same day twice; and that was by

15  design.  So some days I'm wearing my emergency medicine

16  hat.  And when I do that, I'm working in the Parkland

17  emergency department and those are nine-hour shifts and I

18  will see all comers to the ER, whether it's traumas or

19  heart attacks or strokes or overdoses, anything that comes

20  into the ER.

21         When I'm wearing my medical toxicology hat, this

22  is out of the North Texas Poison Center.  And we have

23  rounds every day Monday through Friday, except Thursdays;

24  and we round on patients that were called into the Poison

25  Center from all over North Texas.  I think a lot of people

 1   know parents may call a Poison Center if their kid gets

 2   into something but what a lot of people don't know is that

 3   other types of physicians also call the Poison Center for

 4   assistance with managing their poisoned patients.

 5          And sometimes when I'm wearing my associate

 6   professor hat, we are doing bedside teaching or kind of the

 7   traditional kind of teaching in a classroom type of

 8   setting.

 9   Q.  You said that you're board certified in medical

10   toxicology.  First of all, how many physicians across the

11   country hold that board certification?

12   A.  Less than 300.

13   Q.  What does that mean?

14          First of all, what does it take to get that

15   certification?

16   A.  Well, a lot of people are confused when they talk to

17   me, like you're an ER doctor but you're a toxicologist and

18   it doesn't make sense.

19          But just like a cardiologist, which is a heart

20   doctor, will do an internal medicine residency first and

21   then do a fellowship in cardiology, medical toxicology is a

22   fellowship after emergency medicine because most poisons

23   are acute.

24          They are emergencies; and they end up in the

25   emergency room, not your pediatrician's office or your

1    regular family practice office.

2           So snakebites and overdoses and chemical exposures

3    are all emergencies, and so it is a fellowship that can be

4    done after emergency medicine.

5           But you can't come straight out of medical school

6    and do a fellowship in medical toxicology.

7           So you first have to do a residency, typically in

8    emergency medicine, followed by the two-year fellowship in

9    medical toxicology.

10          And then you have to pass your toxicology boards

11   which have a very low pass rate because they are extremely

12   difficult.

13          And then you have to renew that every ten years.

14   Q.  So you've taken us through what it takes to become a

15   medical toxicologist.  What does a medical toxicologist do

16   or know that differentiates you from any other doctor?

17   A.  Well, we are the -- we are the specialty that are

18   experts all things poison.  And a poison can be an illicit

19   drug, any prescription drug, any kind of plant or mushroom

20   or sea creature, any kind of chemical pesticides.

21          We are the specialists not just in the poison but

22   managing poisoned patients.  We are a lot different from a

23   PhD type of toxicologist where they are chemists in a

24   laboratory and their interaction with a patient is a test

25   tube of blood or urine.  We are actually the ones that take

1    care of poisoned patients.

2            And we're different from medical examiners because

3    medical examiners have never really been trained in

4    treating any kind of patient.  My job is to make sure that

5    my patients don't meet the medical examiner.  And they are

6    also not -- besides not being trained in treating living

7    patients, they are not trained in toxicology, let alone

8    medical toxicology.

9    Q.  Have you written articles in the field of medical

10   toxicology?

11   A.  I'm sorry.  I can't hear you.

12   Q.  Have you written articles in the field of medical

13   toxicology?

14   A.  A few.

15   Q.  And you've given presentations; is that right?

16   A.  Yes.

17   Q.  And you teach frequently.  It's your job, in fact --

18   A.  Yes.

19   Q.  -- in this field.

20           Have you testified as an expert witness before?

21   A.  I have.

22   Q.  How many times?

23   A.  Today marks the 30th time in federal court and 14 times

24   in state court.

25   Q.  And there's been some fairly noteworthy cases; is that

 1   right?

 2   A.  Yes.

 3   Q.  Any recent noteworthy cases that you've testified in?

 4   A.  I recently testified in the case involving the fentanyl

 5   death of Tyler Skaggs, who was the Los Angeles Angels

 6   pitcher that came to Dallas with his team to play against

 7   the Texas Rangers.

 8          I have also testified in some cases involving rap

 9   stars that have dealt drugs and -- I guess those are just a

10   couple examples.

11   Q.  Okay.  And are you a contributor or a expert consultant

12   for any television networks?

13   A.  Yes.  I actually have a *Dateline NBC* episode coming out

14   in a couple weeks, and it involves a high-profile murder

15   death in Las Vegas.  At least I've been told it will come

16   out in a couple weeks.

17          And so I've been on several of those crime types

18   of TV shows.

19   Q.  Now, are you familiar with a drug by the name of

20   etomidate?

21   A.  I am.

22   Q.  Okay.  Have you worked with etomidate in the course of

23   your career?

24   A.  I have.

25   Q.  Many times or just a few times?

 1    A.   Too numerous to count times.

 2    Q.   Okay.  And in preparation for your testimony today,

 3    have you reviewed literature regarding etomidate?

 4    A.   I have.

 5    Q.   And can you summarize the literature that you've

 6    reviewed in preparation for your testimony?

 7    A.   Well, I was mainly interested in how many times

 8    etomidate has been used for homicide and -- or even suicide

 9    just to see because it is extremely odd and rare to see it

10    outside of the hospital setting and I have actually never

11    heard of a case involving etomidate outside of the hospital

12    setting.

13    Q.   Okay.

14         MR. COMBS:  Your Honor, at this time the

15    government would offer Dr. Stacey Hail as an expert in

16    medical toxicology and emergency medicine.

17         MR. SANDEL:  No objection, your Honor.

18         THE COURT:  She will be treated as such, then.

19         MR. COMBS:  Thank you.

20    BY MR. COMBS:

21    Q.   So tell the jury, basically -- you've been here for the

22    testimony today; is that right?

23    A.   That's correct.

24    Q.   And so you've heard the same testimony the jury has

25    heard, right?

1   A.  Yes.

2   Q.  And you heard the testimony about what etomidate is and

3   what it does, right?

4   A.  Correct.

5   Q.  What's your experience, and where have you most

6   experienced use of etomidate in a hospital setting?

7   Surgery?  Emergency room?  Where have you dealt with it the

8   most?

9   A.  Well, in the emergency department setting because I am,

10  after all, an emergency physician.

11  Q.  Okay.  And is your experience consistent with what

12  we've heard earlier this morning about the use and storage

13  of etomidate?

14  A.  Yes.

15  Q.  I'd like to talk to you a minute and -- step away from

16  etomidate for a minute and just talk generally about ER

17  procedures.

18          We've heard some talk about that today, right?

19  A.  Yes.

20  Q.  And what -- we've heard about coding earlier today.

21  What does that mean?  When a patient codes, what does that

22  mean?

23  A.  So a coding patient is a patient that has either

24  stopped breathing or their heart has stopped or -- probably

25  using "heart stopped" is not a very good medical way of

 1   describing it, but it can mean that they are in a rhythm

 2   that's not sustainable for life.

 3           And so you either need to secure an airway quickly

 4   and then start administering drugs that we call ACLS drugs,

 5   which is advanced cardiac life support medications, in an

 6   effort to resuscitate them.

 7   Q.  Okay.  And in that type of situation, is it fair to say

 8   that it's very important to get in and work on that patient

 9   quickly?  Is that true?

10   A.  Of course, yes.

11   Q.  So if that sort of thing is happening, do -- well, in

12   an ordinary situation when you're visiting a patient, do

13   you -- if you're going to do a procedure on a patient and

14   administer medicine, do you wear gloves?

15   A.  Yes.

16   Q.  Might you wear a gown, a paper gown or a plastic gown?

17   A.  Yes.

18   Q.  And may there be times where you put on booties?

19   A.  Yes.

20   Q.  And, you know, maybe even a face shield or a hair

21   thing, depending on the situation?

22   A.  Yes.

23   Q.  And when a person is coding and time is of the essence,

24   is it still important for you as a doctor to don protective

25   gear?

1    A.  Yes.

2    Q.  Why is that?

3    A.  Well, we're trying to prevent transmission of diseases.

4    But also specifically with a trauma patient, if they come

5    in bleeding we don't want to get any bloodborne infections.

6            So generally we have a heads-up before a patient

7    arrives into the emergency department coding, whether it be

8    from trauma or otherwise; and we don our personal

9    protective equipment prior to the arrival of the patient.

10   Q.  And over the time in working in the ER, do you become

11   very efficient at doing that?

12   A.  Yes.

13   Q.  You can do it very quickly.  Would you say you could

14   put a gown and a glove and a mask on in minutes or less

15   than a minute?

16   A.  Probably less than a minute.

17           MR. COMBS:  Could we pull up Government's

18   Exhibit 128B.  It's already been admitted into evidence.

19           Or, I'm sorry, 127B.

20   BY MR. COMBS:

21   Q.  Ma'am, now, this is a picture that's already been

22   admitted into evidence.  It's a picture of the defendant.

23           Are those some protective -- manners of protective

24   gear that you might see around a hospital?

25   A.  Yes.

1          And for what you were describing for a code or a

2    trauma patient, it would be all of that minus the

3    aqua-colored N95 mask that's underneath the surgical mask.

4    Q.  Okay.  And that's the type of equipment you talked

5    about you could don very quickly; is that right?

6    A.  Yes.

7    Q.  Now, that, you know, is on him there.  But when it's,

8    you know, folded up in its folded state, would all of

9    that -- that is, the gown and the mask and the face mask

10   and the head covering -- would that all be able to be

11   stuffed in a backpack fairly easily?

12   A.  Yes, because when you take it out of the bag that it

13   comes in, it's actually very compact.  And so a backpack

14   would be able to contain all of that rolled up as well,

15   yes.

16   Q.  Okay.  And there's been prior testimony that Mr. Ashley

17   arrived at Mr. Seegan's home at 9:31 a.m. and about 45

18   minutes later a garage camera activates, and there's

19   testimony that that's believed to be a gunshot that

20   activates that.

21          Is that plenty of time for somebody to don that

22   type of protective gear?

23   A.  Yes.

24   Q.  Now I'd like to --

25          MR. COMBS:  If we could take that down, please.

 1              Thank you.

 2   BY MR. COMBS:

 3   Q.  I'd like to talk to you a little bit more about

 4   toxicology.  Are you aware, because you've reviewed the

 5   materials in this case and listened to the testimony today,

 6   that Mr. Seegan was found to have etomidate in his blood?

 7   A.  Yes.

 8              MR. COMBS:  Can we pull up Government's

 9   Exhibit 98, page 4, please.

10              Page 4, please.

11   BY MR. COMBS:

12   Q.  And down in the Drug Screen section -- do you see that?

13   A.  Yes.

14   Q.  "Etomidate detected," is that what that says?

15   A.  Yes.

16   Q.  Now, if somebody comes in to the Medical Examiner's

17   Office and no medical procedures, either lifesaving or

18   resuscitative measures or any other medical procedures,

19   have been preformed on them within the last day, would you

20   ever expect to see etomidate in their blood?

21   A.  No.  That's a huge red flag.

22   Q.  Why?

23   A.  Because it would not be uncommon -- if somebody came in

24   as a trauma patient and had to get intubated because they

25   had a head injury and subsequent to your attempting to

1    resuscitate them they ended up dying and that becomes a

2    medical examiner case, the medical examiner is used to

3    finding some of our resuscitation drugs postmortem, like

4    atropine.  Atropine is a drug that we would uses to restart

5    the heart.

6           And obviously the atropine is not significant for

7    the cause of death, or the etomidate that's present or any

8    other drug that was used in resuscitation is not applicable

9    to why somebody died.  So they are used to seeing those

10   drugs in that circumstance.

11          If somebody was to die on the table during

12   anesthesia, you would find those anesthetic agents present;

13   but that's not applicable to the cause of death unless

14   somebody had a reaction to that drug.

15          So to find etomidate in this situation is a very

16   large red flag because this is in a patient that did not

17   have anything -- did not -- was not resuscitated in a

18   hospital setting or had a type of procedure in the hospital

19   setting.

20   Q.  Now, does etomidate last very long in the system?

21   A.  No.

22   Q.  Why not?

23   A.  Well -- so when we talk about different parameters in

24   pharmacology, which is the time of onset of a drug or the

25   duration of effect of a drug or the elimination half-life,

```
 1   these are different parameters of a medication.  And
 2   etomidate is what we call fast-on/fast-off kind of drug.
 3   So the time of onset is seconds, and the duration of effect
 4   is just a few minutes.
 5        And then even though the effect has worn off
 6   because we are trying to make somebody unconscious, which
 7   is in the brain, it's still going to be in the blood for
 8   some length of time.  And the half-life of etomidate,
 9   meaning how long it takes to split itself in half, is about
10   4 hours.
11        And in pharmacology we say that it takes about
12   five half-lives for a drug to completely become
13   undetectable.  So if the half-life is about 4 hours, then
14   in five half-lives, that's about 20.  So 20 -- after 20
15   hours it should be completely gone and not detected in the
16   body anymore.
17   Q.  So if the testimony was that Mr. Seegan was home the
18   night before and then went nowhere that morning until he
19   met Keith Ashley for his blood appointment at 9:30 and he
20   never went anywhere during this time and, in fact, his
21   phone doesn't move, would you expect etomidate to be in his
22   blood if he had received medical treatment days before?
23   A.  No.
24   Q.  The -- do you have an opinion, having reviewed the case
25   materials in this case, as to how long before Mr. Seegan
```

1  was shot that etomidate was administered to him?

2  A.  I would not be able to pinpoint an exact time just

3  knowing that etomidate is present.  And that's a huge red

4  flag in and of itself because it should not be there in any

5  circumstance.  But there is nothing that you can look at in

6  the toxicology testing to tell you what time the medication

7  was administered.

8  Q.  Okay.  If Mr. Seegan -- first of all, Mr. Seegan is not

9  a medical professional.  There's been testimony about that.

10 He's a retired person and has no access to emergency rooms.

11       Would you expect somebody in Mr. Seegan's position

12 to have access to or have etomidate?

13 A.  Absolutely not.

14 Q.  Is it even a drug that's widely known?

15 A.  No.  There are obviously drugs that are used in the

16 hospital setting, like fentanyl which, as you all know, has

17 a huge illicit street market problem going on right now.

18       Ketamine is another type of drug that we would use

19 for procedures, and that is known on the street as "Special

20 K."

21       So these are drugs that are used in the hospital

22 setting that have some sort of street market, but etomidate

23 is not one of those.  It is not a drug that I have ever

24 encountered -- in all of the legal cases that I review, I

25 have never seen it outside of the hospital setting until

 1  now.

 2  Q.  So the testimony up until now has been that there were

 3  no needles found in the house anywhere.  There's no vial of

 4  etomidate found in the house.

 5        So even if Mr. Seegan had been able to find a vial

 6  of etomidate and let's say he was sitting in his office and

 7  he shot himself with etomidate, would he have time before

 8  that etomidate took effect to take that vial, take that

 9  used syringe, go out to the alley, dump it in the trash can

10  out in the alley, walk back up the stairs, sit down, and

11  take his own life before that etomidate took effect?

12  A.  Absolutely not.

13        When I said that etomidate is a fast-on/fast-off

14  kind of drug, when we administer it in the emergency

15  department setting, the individual becomes incapacitated

16  within seconds.

17  Q.  Within seconds?

18  A.  Yes.

19  Q.  So may not even make it out of his chair or make it to

20  the door if he did that.  Is that fair?

21  A.  A minute tops.

22  Q.  A minute.

23        So you talked and there were some questions -- I'm

24  sorry.  You didn't talk about it, but there were some

25  questions earlier about the accessibility of etomidate to

 1   medical professionals within the hospital setting.

 2          Do you remember hearing that testimony?

 3   A.  Yes.

 4   Q.  And have you had a bit of experience -- in fact, quite

 5   a lot of experience -- in investigating medical

 6   professionals who are involved in poisonings, deadly

 7   poisonings?

 8   A.  Yes.

 9   Q.  Describe that for the members of the jury, please.

10   A.  Well, as a expert in medical toxicology, poisonings are

11   what we are always involved in.

12          And what is unusual is that health care workers,

13   whether it be doctors or nurses, tend to have an unusual

14   propensity to being poisoners.

15          We had lectures about this at one of our forensic

16   toxicology conferences where we discussed a lot of

17   historical poisonings over time committed by health care

18   workers.

19          And it's very, very strange mentality of these

20   individuals that would tend to cause them to poison and

21   there are a lot of theories as to why, but they do have a

22   tendency to use drugs or other kinds of poisons to attempt

23   or commit murder.

24   Q.  And you've worked on some fairly prominent cases

25   involving doctors and other medical professionals who have

 1   poisoned people; is that right?

 2   A.   Yes.

 3   Q.   There is one recently out of Houston.  Can you tell the

 4   jurors about that?

 5   A.   This --

 6            MR. SANDEL:  Object to the relevance, your Honor.

 7            MR. COMBS:  Goes to the scope of her knowledge,

 8   your Honor.

 9            THE COURT:  Overruled.

10   BY MR. COMBS:

11   Q.   Can you tell the jurors about the case in Houston?

12   A.   This was a case where a prominent oncologist -- and an

13   oncologist is a cancer doctor.

14            So at MD Anderson, which is the cancer center in

15   Houston, there was a female physician who had a type of

16   "fatal attraction" for her colleague who was also an

17   oncologist; and she poisoned him with ethylene glycol,

18   which is the chemical in antifreeze except for that this

19   ethylene glycol came from her research laboratory as pure

20   ethylene glycol.  And so she put the ethylene glycol in his

21   coffee, and that became an internationally known case on a

22   bunch of different crime shows.

23   Q.   So it's not unknown to you or your profession that

24   medical professionals would take their knowledge and turn

25   it toward murder; is that right?

```
 1   A.  That's right.

 2           And there is another case that I'm sure you've

 3   also heard about here in Dallas recently involving --

 4           MR. SANDEL:  Object to the relevance, your Honor.

 5           MR. COMBS:  The same, your Honor, the --

 6           THE COURT:  Overruled.

 7   A.  An anesthesiologist in Dallas within the last few

 8   weeks -- I'm sure you may have heard of on the news -- who

 9   tainted bags of IV fluids with bupivacaine, which is an

10   anesthetic.

11   BY MR. COMBS:

12   Q.  And did that result in death?

13   A.  It did.

14   Q.  Thank you.

15           MR. COMBS:  Pass the witness.

16           THE COURT:  Cross-examination?

17               CROSS-EXAMINATION OF STACEY HAIL

18   BY MR. SANDEL:

19   Q.  Good afternoon, Dr. Hail.  How are you?

20   A.  Fine.

21   Q.  Just a few questions.  I wanted to follow up on a few

22   things that you spoke with Mr. Combs about, okay?

23           First thing, when it comes to etomidate, I believe

24   you said that typically it's used in an emergency room

25   setting, correct?
```

1    A.  Correct.

2    Q.  However, it can be used in other areas of the hospital;

3    is that true?

4    A.  Yes.

5    Q.  And, you know, typically that would be other areas of

6    the hospital that would require anesthesia or those types

7    of procedures, right?

8    A.  Right.

9    Q.  So that might be an operating room, correct?

10   A.  Correct.

11   Q.  Could you potentially find etomidate, as it's an

12   intubation-type medication, on a standard wing of a

13   hospital in a crash cart or in something like that?

14   A.  I don't know if -- because I don't work in those areas

15   of the hospital.  But I will say that unlike the emergency

16   department where we have crash carts in our critical care

17   rooms, on the hospital floor generally those crash carts

18   are going to be kept in a secured area.

19   Q.  Would that be like a -- like a Pyxis machine?

20   A.  No.  It would be like in a closet that you would have

21   to badge into or out of.

22   Q.  I see.

23          So the general hospital area could have etomidate,

24   but you may have to badge-in to get to it?

25   A.  Yes.

```
 1            And, I mean, I heard the testimony that etomidate
 2   is in the crash carts in some facilities and it makes it
 3   sound like you can just waltz in and get it, but it's not
 4   as easy as that sounds.
 5   Q.  Okay.  Or at least it's not supposed to be.
 6   A.  Right.
 7   Q.  Okay.  Now, the other -- one of the other things you
 8   were speaking to Mr. Combs about as it relates to etomidate
 9   is its effects on an individual.
10            Do you recall that?
11   A.  Yes.
12   Q.  And I think you said that it would incapacitate a
13   patient within about a minute.  Is that fair?
14   A.  Yes.
15   Q.  Okay.  Now, that assumes that that patient has been
16   dosed properly, correct?
17   A.  Correct.
18   Q.  What is the -- if you know -- the standard
19   pharmacological dose of etomidate?  How much do you have to
20   give somebody to incapacitate them?
21   A.  Generally 20 milligrams.
22   Q.  20 milligrams.
23            And does that go up or down dependent on body
24   weight?
25   A.  It does.
```

1   Q.  Okay.  And can other factors go into that calculation?

2   For example, isn't it true that different individuals react

3   differently to medication?  Is that fair?

4   A.  Sure.

5   Q.  So is it true that whereas 20 milligrams might be

6   enough for one patient, another patient might require more

7   or less, depending on the individual?

8   A.  Yes.

9   Q.  Okay.  Do you know what would be the effect on an

10  individual if they're given, let's say, a half of a dose of

11  etomidate?

12  A.  Well, they would still suffer from pretty significant

13  central nervous system depression, meaning that they will

14  become very, very sleepy or very unaware of their

15  surroundings.

16  Q.  So sluggish, that sort of thing?

17  A.  Yes.

18  Q.  Now, another -- well, I'll ask it this way:  Have you

19  heard of the drug propofol?

20  A.  Yes.

21  Q.  What is propofol?

22  A.  Propofol is a similar medication to etomidate.

23  Propofol looks like white milk in an upside-down milk

24  bottle, and it is the agent that was actually used on

25  Michael Jackson that caused him to die.

1           And propofol is also a fast-on/fast-off type of

2    anesthetic and we can use those for procedures, and then we

3    also keep people sedated on a ventilator using propofol

4    dripping into the vein.

5    Q.  So -- and I -- you kind of read my mind.  So propofol

6    was the drug that became the context of discussion around

7    the Michael Jackson case, correct?

8    A.  Correct.

9    Q.  And the reason that he was being administered propofol

10   was basically to help him sleep; is that right?

11   A.  That's what I heard.  But we're talking about Michael

12   Jackson so --

13   Q.  Sure.

14          But it's fair to say that prior to that case, was

15   propofol a drug that the mainstream public had ever heard

16   about?

17   A.  No.

18   Q.  Okay.  And so we're talking about etomidate, and you

19   made some reference to ketamine and other emergency room

20   drugs that do have this presence on the street.

21          But there are drugs out there that are used in

22   illicit ways that maybe we just don't hear about very

23   often; is that fair?

24   A.  Yes, but remember that the propofol that was

25   administered to Michael Jackson was administered by his

 1   physician.

 2   Q.  And since that Michael Jackson issue, have you seen any

 3   type of increase in propofol or cases involving propofol?

 4   A.  No.

 5   Q.  Now, propofol and etomidate, you discussed those with

 6   Mr. Combs.  They both need to be administered

 7   intravenously, correct?

 8   A.  Yes.

 9   Q.  And do you know if they are ingested orally, would they

10   simply not work; or what would that do if somebody were to

11   just drink a vial of etomidate?

12   A.  Well, part of the metabolism of etomidate is that it is

13   metabolized by the liver.  And drugs that have what's

14   called a high first-pass effect, meaning that -- everything

15   that you ingest goes into your stomach and then into the

16   first part of your intestine and then it gets absorbed into

17   the liver and the liver does things to change that drug.

18          And so there are drugs that have such an extensive

19   first-pass mechanism going through the liver that it

20   renders them so ineffective, like, for example, Narcan.

21          Narcan is the drug that we use to resuscitate

22   people if they are, you know, opioid toxic like from

23   fentanyl or heroin.  And Narcan has such a high first-pass

24   effect that when taken orally, it doesn't do anything.  So

25   if somebody is unconscious and barely breathing from an

 1   opioid, you either have to give the Narcan through the nose

 2   or sublingual or IV.

 3           And so I suspect that if you were to give

 4   etomidate by mouth, that it would have such a high

 5   first-pass effect that it would be ineffective.  But truth

 6   be told, I've never tried that before.

 7   Q.  So based on your expertise and what you know, if

 8   somebody were to ingest etomidate, your best opinion would

 9   be it really wouldn't have an effect on them one way or the

10   other?

11   A.  It shouldn't -- it shouldn't have a large effect.

12   Q.  Do you know if it would still be detectable in the

13   person's bloodstream?

14   A.  Yes.  I would think that it would be absorbed.  But,

15   like I said, it would get metabolized to other metabolites

16   that are not active; and so it would probably be a lot

17   smaller amount than what you would see from IV.

18   Q.  Okay.  Now when we're talking about intravenous

19   injections, where typically -- if somebody is trained to

20   give an IV, where on the body do you typically do that?  Is

21   there a part of the body that's preferred?

22   A.  Well, obviously, we always look in the arms first.

23   But, you know, at Parkland where I work, we have a lot of

24   addicted patients that are IV drug users; and so we often

25   will puncture wherever we can find a vein in those

 1  circumstances.

 2  Q.  But typically when you're looking to give a patient an

 3  IV or administer an IV drug, you are looking at the arm

 4  first, correct?

 5  A.  Correct.

 6  Q.  And then could you also look maybe at the back of the

 7  hand?

 8  A.  Yes.

 9  Q.  Okay.  And that's kind of your first two stops on

10  administering an IV drug.  That's where a typical nurse

11  would look first, correct?

12  A.  Yes.

13  Q.  Okay.  Do you have any idea or is there any way to tell

14  how long it would take a puncture mark like that to heal?

15  A.  Well, that's a great question.  I don't know that there

16  is a straightforward answer to that because obviously doing

17  a lot of federal drug crime, I see a lot of patients that

18  have clearly died from fentanyl or from heroin that was

19  injected and you see the syringe and the needle at the

20  scene.  But then you look at the body and unless they have

21  track marks from using drugs a lot, puncture wounds can be

22  very, very difficult to see.

23  Q.  Okay.  And is that something that, you know, the

24  medical examiners are typically looking for when they are

25  examining those bodies?

1  A.  Yes.  I mean, they're supposed to write down all of

2  their findings.

3  Q.  Sure.

4       Going back to etomidate access, okay, you said

5  that it shouldn't be easy for just anybody to walk into a

6  hospital and get it, correct?

7  A.  Correct.

8  Q.  Now, when we're looking at the emergency room

9  specifically, is that area typically more secure than other

10 wings of the hospital?

11 A.  I would have to say that -- I mean, I work at Parkland

12 and we have our own police force so it's -- my perspective

13 may be not what is seen in the community.

14      But basically for -- you know, getting into any

15 part of the hospital requires some level of security; but

16 probably the emergency department may be one of the most

17 secure.

18 Q.  Okay.  Thank you, Dr. Hail.  I appreciate that.

19       MR. SANDEL:  Judge, I'll pass the witness.

20       THE COURT:  Additional questions?

21       MR. COMBS:  Yes, your Honor.

22            REDIRECT EXAMINATION OF STACEY HAIL

23 BY MR. COMBS:

24 Q.  Now, ma'am, if someone were to be giving blood and they

25 were sitting down like this and they had their arm propped

1   up and, unbeknownst to them, they got shot up with

2   etomidate rather than somebody taking their blood and they

3   quickly fell asleep or were sedated, would there be time

4   for the individual who just shot them with etomidate to

5   gown up, put on all the protective clothing so as not to

6   have blood spatter on them, and shoot that person before

7   they woke up?

8   A.  Well, yes, because the duration of effect of etomidate

9   is about 5 minutes.  And so that's why it is an ideal agent

10  to use for short procedures in the emergency department

11  where you don't want to snow somebody after a procedure in

12  the emergency department setting.  It's not like going and

13  getting a big surgery and getting anesthesia and then

14  you're groggy for hours and have to go to the recovery

15  room.  We want our patients to move quickly in and out of

16  the ER.

17          So if you're putting the shoulder back in or

18  cutting open an abscess and even after intubating somebody,

19  you have got about 5 minutes before you -- they start

20  waking up and bucking the vent and you need to start

21  another sedative.

22          So, you know, at least -- you have at least

23  5 minutes; and that could certainly be enough time to do

24  those things.

25  Q.  Okay.  Thank you.

1            MR. COMBS:  Pass the witness.

2            THE COURT:  Anything else?

3            MR. SANDEL:  Very briefly, your Honor.

4                 RECROSS-EXAMINATION OF STACEY HAIL

5    BY MR. SANDEL:

6    Q.  Mr. Combs just asked you about a hypothetical with

7    giving blood.

8            When etomidate is injected, that's in a syringe,

9    correct?

10   A.  Yes.

11   Q.  And when you're giving blood, that's usually done in

12   like a glass tube; is that fair?

13   A.  Yes, you can use a butterfly needle; and then it has a

14   long tube to put into a -- like a vacuum container.

15   Q.  Uh-huh.

16   A.  Or you can start an IV and draw blood out of the IV.

17   Q.  Okay.  And that would be more typical of if you were in

18   a hospital setting, correct?

19   A.  Yes.

20   Q.  Okay.  Now, you also talked about this kind of 5-minute

21   window and that at the end of that 5 minutes, the patient

22   may start, I think you said, bucking the tube.

23            Is that what you said?

24   A.  Yes, because having a tube down your throat is very

25   uncomfortable, as you can imagine.  And if you're being

1    intubated for a reason that doesn't affect your brain, like

2    you're having, you know, respiratory failure from pneumonia

3    but your brain is fine, you're going to wake up and you're

4    going to feel that tube and you're going to, you know,

5    start moving around a lot and it's uncomfortable.

6    Q.  And so if that occurs, you said what you have to do is

7    give them another dose of either etomidate or some other

8    sedative, correct?

9    A.  Yeah.  Generally, we would start dripping propofol.

10   Q.  Okay.  Thank you, Dr. Hail.

11          MR. SANDEL:  Nothing further, your Honor.

12          THE COURT:  Can this witness be fully excused?

13          MR. COMBS:  Yes, please, your Honor.

14          MR. SANDEL:  Yes, your Honor.

15          THE COURT:  Ma'am, you are free to leave.  Thank

16   you.

17          Okay.  What's next?

18          MS. RATTAN:  The United States calls Carla

19   DeNeui-Simonsen.

20          THE COURT:  Ma'am, if you'll raise your right hand

21   to be sworn in.

22          (The oath is administered to the witness.)

23          THE COURT:  Go ahead and proceed.

24          MS. RATTAN:  Your Honor, may we have just a

25   moment?

```
 1              THE COURT:  Yes.

 2              (Off-the-record discussion among counsel.)

 3              MS. RATTAN:  Thank you, your Honor.

 4          DIRECT EXAMINATION OF CARLA DENEUI-SIMONSEN

 5              CALLED ON BEHALF OF THE GOVERNMENT

 6   BY MS. RATTAN:

 7   Q.  Will you please state your name.

 8   A.  Carla DeNeui-Simonsen.

 9   Q.  And you have a soft voice.  Can you speak as closely to

10   the microphone as possible?

11   A.  Carla DeNeui-Simonsen.

12   Q.  Will you spell your last name.

13   A.  D-E-N, as in "Nancy," E-U-I-S-I-M-O-N-S-E-N.

14   Q.  And where do you work?

15   A.  Midland National Life.

16   Q.  Will you describe for the jury what you do at Midland

17   National Life?

18   A.  I am a call taker in the claims department.

19   Q.  Call taker in what department?

20   A.  Claims department.

21   Q.  The claims department.

22              So what are your responsibilities?

23   A.  I am in a call queue where I take calls as they come in

24   and answer.  They could be anywhere from death claims to

25   disability claims.
```

1   Q.  How long have you been working at Midland life?

2   A.  It will be 32 years in December.

3   Q.  Okay.  Let me ask you about the date of February 20th

4   of 2020.

5        So I know you may not be familiar with the chart

6   that we're working on here, but here's the date

7   February 19th of 2020; is that right?

8   A.  Yes.

9   Q.  So we're talking about the day after that,

10  February 20th of 2020.

11       Were you working on that date at Midland life?

12  A.  Yes.

13  Q.  Have you reviewed a call that you took on February 20th

14  of 2020?

15  A.  Yes.

16  Q.  And is that call accurate as far as what happened when

17  you took the call that day?

18  A.  Yes.

19  Q.  There haven't been any changes, additions, deletions,

20  anything like that?

21  A.  No.

22  Q.  And you recognized your voice?

23  A.  Yes.

24       MS. RATTAN:  Your Honor, I believe this has

25  already been admitted as Government's Exhibit 105.

```
 1              THE COURT:  Yes, it has.

 2              MS. RATTAN:  May we publish Government's

 3  Exhibit 105?

 4              THE COURT:  Yes, you may.

 5              (Audiovisual presentation to the jury.)

 6  BY MS. RATTAN:

 7  Q.  So what's going on in this conversation?

 8  A.  I was taking a death claim call.

 9  Q.  And it was from an agent; is that right?

10  A.  Correct.

11  Q.  And he identified himself as Keith Ashley?

12  A.  Yes.

13              MS. RATTAN:  Your Honor, may we publish

14  Government's Exhibit 106, page 1?

15              THE COURT:  Yes, you may.

16              MS. RATTAN:  And if we can look at the top of the

17  page.

18  BY MS. RATTAN:

19  Q.  It has the date there that we were talking about,

20  February 20th of 2020; your name, Carla; and then the agent

21  calling in is Keith Ashley; is that right?

22  A.  Yes.

23  Q.  And he identifies himself on line 14 and he says his

24  name is Keith Ashley and he gives his agent code and you

25  call him Keith; is that right?
```

1    A.  Yes.

2    Q.  Now let me direct your attention to the bottom of the

3    page, 106, page 1, line 25.

4           And you asked for the name of the insured.  And it

5    goes on to page 2 of Government's 106, rather.  And he

6    gives you the name of the insured.  He says it's James E.

7    Seegan.  And then you ask how you can help out on the

8    policy today; is that right?

9    A.  Yes.

10   Q.  And then what does he tell you?

11   A.  That he -- we needed to start a death claim.

12   Q.  Okay.  So basically that Mr. Seegan has died; is that

13   right?

14   A.  Yes.

15   Q.  That he's deceased.  So he's calling you the very next

16   day and telling you that Mr. Seegan has died?

17   A.  Yes.

18   Q.  And then you talk about what's going to happen, how

19   he's going to get the forms.

20          What's going on with that?  What is that

21   discussion?

22   A.  Just to be helpful, to let him know what our process is

23   and if he would like to pull the forms from the Web page,

24   that he is more than welcome to do that as well.

25   Q.  And is he concerned about -- or does he mention,

1  rather, I guess, the family being notified as well?

2  A.  Yes.

3        MS. RATTAN:  If we can look on 106, page 3,

4  lines 6 through 9.

5  BY MS. RATTAN:

6  Q.  Let's see.  He's the agent of record.  "But if you guys

7  are going to send 'em, I don't want to duplicate the family

8  members."

9        So is he asking if you are going to notify the

10 family, essentially?

11 A.  Yes.

12 Q.  Then if we look at 106, page 4, lines 5 through 7, you

13 say that you're going to locate the other one.  What do you

14 mean by "the other one"?

15 A.  At the beginning of the call, he had mentioned there

16 was a couple policies.

17 Q.  So you talk about the first policy because he's given

18 you that number, and now you're going to talk about the

19 second policy?

20 A.  Correct.

21 Q.  Okay.  And then this one, he says that there is a

22 spouse; is that right?

23 A.  Correct.

24 Q.  So what's kind of going on here?

25 A.  It would be the same with the first policy.  We would

```
 1   get both policies set up and get two claim packets sent
 2   out.
 3   Q.  Okay.  And then he gives you the address and you talk
 4   about emailing him the documents?
 5   A.  Yes.
 6   Q.  Okay.
 7           MS. RATTAN:  I'll pass the witness, your Honor.
 8           THE COURT:  Cross-examination?
 9           MS. RATTAN:  Oh, I have one more question.
10           THE COURT:  Go ahead.
11           MS. RATTAN:  May I?
12           Let me approach the witness -- with your
13   permission?
14           THE COURT:  Yes.
15   BY MS. RATTAN:
16   Q.  Let me show you this and ask you if this --
17   February 20th of 2020, Ashley calls Midland life and says
18   James Seegan passed away last night and tells -- talks
19   about the paperwork.
20   A.  Yes.
21           MS. RATTAN:  Thank you.  I'll pass the witness,
22   your Honor.
23           CROSS-EXAMINATION OF CARLA DENEUI-SIMONSEN
24   BY MR. WHALEN:
25   Q.  Good afternoon.  I apologize.  I didn't catch your
```

1  name.

2  A.  Carla DeNeui-Simonsen.

3  Q.  Okay.  Ms. Simonsen --

4  A.  That will work.

5  Q.  How are you today?

6  A.  I am well.  Thank you.

7          MR. WHALEN:  If we could go to 106, page 4,

8  please.

9  BY MR. WHALEN:

10  Q.  And we look at that exchange on line 15 through

11  line 19.  Do you see that there?

12  A.  Yes.

13  Q.  And you asked Mr. Ashley (as read):  "All right.  Are

14  there any changes to their address that we have in our file

15  that you know of?"

16          And what is his answer?  What does he say to you?

17  A.  He said, "No."  It is -- it is correct.

18  Q.  Okay.  If -- and I don't know.  If he had said, "Yes,

19  there are changes.  Let me give you a new address," would

20  you have changed it?

21  A.  We would have updated it.

22  Q.  Okay.  And you would have mailed it out to the address

23  that he gave you, correct?

24  A.  Correct.

25  Q.  Okay.  But the 2114 Cannes Drive in Carrollton, Texas,

 1    is what he gave you and said there were no changes,

 2    correct?

 3    A.  Correct.

 4    Q.  And basically what you're telling him in this phone

 5    call, that you're going to mail a packet out to the address

 6    in Carrollton, Texas; is that correct?

 7    A.  That is correct.

 8    Q.  And that would notify the family of what they need to

 9    do to file a claim to obtain the life insurance proceeds,

10    correct?

11    A.  Correct.

12    Q.  Okay.  And is it fair to say that if you don't file the

13    claim, you will not act on sending the proceeds?  Correct?

14    A.  Correct.

15    Q.  Okay.

16            MR. WHALEN:  I'll pass the witness.

17            THE COURT:  Anything additional?

18            MS. RATTAN:  Just briefly.

19            REDIRECT EXAMINATION OF CARLA DENEUI-SIMONSEN

20    BY MS. RATTAN:

21    Q.  Keith Ashley is an agent with Midland life, and he

22    gives you his agent number; is that right?

23    A.  That is correct.

24    Q.  Everybody knows the lines are recorded; is that right?

25    A.  Yes.

1          MS. RATTAN:  That's all, your Honor.

2          THE COURT:  Okay.  Can this witness be fully

3   excused?

4          MS. RATTAN:  Yes, please.

5          THE COURT:  Okay.  Ma'am, you are free to leave.

6   Thank you.

7          What's next?

8          MS. RATTAN:  Your Honor, may we approach?

9          THE COURT:  Yes.

10          (Sidebar conference, off the record.)

11          THE COURT:  Okay.  Your next witness?

12          MS. RATTAN:  Your Honor, the United States calls

13   Samantha Larsen.

14          THE COURT:  Can we get her a lapel mic?

15          Ma'am, I'm going to have you raise your right

16   hand -- you can stay seated, but if you'll raise your right

17   hand to be sworn in.

18          (The oath is administered to the witness.)

19          THE COURT:  Go ahead, Ms. Rattan.

20          MS. RATTAN:  May I proceed?

21          THE COURT:  Yes.

22              DIRECT EXAMINATION OF SAMANTHA LARSEN

23               CALLED ON BEHALF OF THE GOVERNMENT

24   BY MS. RATTAN:

25   Q.  Please state your name.

```
 1   A.  Samantha Larsen.

 2   Q.  Ms. Larsen, where do you work?

 3   A.  Midland National.

 4   Q.  And you spell Larsen, L-A-R-S --

 5   A.  E-N.

 6   Q.  L-A-R-S-E-N.

 7   A.  Uh-huh.

 8   Q.  What do you do at Midland National?

 9   A.  I'm a senior claims representative.

10   Q.  And what is Midland National?

11   A.  A life insurance company.

12   Q.  How long have you worked at Midland National Life?

13   A.  Sixteen years.

14   Q.  Let me ask you about February 20th of 2020.

15         Have you reviewed a call that you were involved in

16   from that date?

17   A.  Yes.

18   Q.  And have you made sure that the call is accurate and

19   there haven't been any changes to it?

20   A.  Yes.

21         MS. RATTAN:  Your Honor, I believe it's previously

22   been admitted as -- the call is 107 and the transcript is

23   108.

24         THE COURT:  That is correct.

25         MS. RATTAN:  May we publish both of them?
```

```
 1              THE COURT:  Yes, you may.

 2              MS. RATTAN:  Thank you.

 3              (Audiovisual presentation to the jury.)

 4              MS. RATTAN:  May we focus on the transcript, which

 5   is Government's Exhibit 108.

 6   BY MS. RATTAN:

 7   Q.  Now, this is one of the agents calling in; is that

 8   right?

 9   A.  Correct.

10   Q.  And he says his name is Keith Ashley?

11   A.  Correct.

12   Q.  He says he's calling about a specific policy.  And

13   whose policy is it?

14   A.  Mr. James Seegan.

15   Q.  James E. Seegan?

16   A.  Correct.

17   Q.  And does he tell you why he's calling about the policy?

18   A.  Later in the call he mentions that he passed away.

19   Q.  Does he say how recently he's passed away?

20   A.  In the call I believe he says he passed away the day

21   before.

22   Q.  And does he tell you how many policies he has?

23   A.  Two.

24   Q.  He says that they are filing a death claim.  And does

25   he seem concerned -- let me direct your attention to 108,
```

```
 1    page 2, lines 19 through 25.

 2            Can you see it on the screen at the --

 3    A.  Yes.

 4    Q.  -- front of the room?

 5    A.  Uh-huh.

 6    Q.  He says that the death claim is filed -- and this is

 7    line 19.  (As read):  "The death claim is filed.  He, uh,

 8    passed away last night.  But the question I have is will

 9    the family, now that we have filed the claim, be able to

10    access his accounts online or do you-all lock them."

11            And then you say?

12    A.  "It gets locked down."

13    Q.  And then on the next page, Government's 108 page 3, he

14    tells you -- if we look at lines 3 through 7, he says (as

15    read):  "Perfect.  That's just what we wanted to make sure

16    of."

17            And then he says, "because we don't want any

18    hankey (sic) stuff goin' on."

19            And is that the conversation that you had with

20    him?

21    A.  Yes.

22            MS. RATTAN:  I'll pass the witness.

23            THE COURT:  Cross-examination?

24                              *

25                              *
```

                    CROSS-EXAMINATION OF SAMANTHA LARSEN

BY MR. WHALEN:

Q.  Ms. Larsen, how are you?

A.  I'm good, sir.  How are you?

Q.  Real quick.  When it said a death claim had been filed,

a claim hadn't been filed.  You simply had received

notification that Mr. Seegan had passed, correct?

A.  I'm sorry.  Can you repeat that for me?

Q.  In the transcript it says a death claim had been filed.

A.  Correct.

Q.  A claim hadn't been filed yet, correct?

A.  No, the claim had been filed.  It was on the system.

Q.  Okay.  But is it a notification, or is there a form

that you have to file?

A.  When you're filing a claim, you can call in to our

office and file over the phone.

Q.  Okay.  And so -- but you also send out a packet,

correct?

A.  We do.

Q.  Okay.  And what's in the packet?

A.  A claims form.

Q.  Okay.  And do you have to send the claims form in with

a Death Certificate?

A.  Correct.

Q.  Okay.  So just because somebody has notified you of

1   someone's death, you're not going to be paying the claim

2   until you get that form back, correct?

3   A.  Correct.  We would need the form and Death Certificate

4   back for review.

5   Q.  Okay.  And when -- during this phone call there was a

6   mention of two policies; is that correct?

7   A.  Correct.

8   Q.  And there were, in fact, two policies, correct?

9   A.  I don't recall.

10  Q.  Okay.  And then as far as locking down the account, why

11  does Midland National do that?

12  A.  So that no additional changes can be made.

13  Q.  Okay.  And if I'm a family member and that's a question

14  I have, is that something I might ask my agent, "Am I going

15  to be able to access it online?"

16  A.  It can be asked both of the agent or a representative

17  over the phone.

18  Q.  Okay.  And so an agent could find out for me and tell

19  me, as the policyholder, "Yes, you're not going to be able

20  to access it because it's locked," correct?  Is that fair?

21  A.  Correct.

22          MR. WHALEN:  Okay.  I'll pass the witness.

23          THE COURT:  Anything else?

24          MS. RATTAN:  No, your Honor.  Thank you.

25          THE COURT:  Can this witness be fully excused?

```
 1              MS. RATTAN:  Yes, please.

 2              THE COURT:  Mr. Whalen?

 3              MR. WHALEN:  Yes, your Honor.

 4              THE COURT:  Okay.  Ma'am, you are free to leave.

 5    Thank you.

 6              THE WITNESS:  Thank you.

 7              THE COURT:  Ms. Rattan, what's next?

 8              MS. RATTAN:  We will re-call Courtney Jacobson.

 9              THE COURT:  You can go ahead and take the stand.

10              Ma'am, you understand you're still under oath from

11    your prior testimony?

12              THE WITNESS:  I do.

13              THE COURT:  Okay.  Ms. Rattan, go ahead.

14              MS. RATTAN:  Thank you, your Honor.

15              DIRECT EXAMINATION OF COURTNEY JACOBSON

16                RECALLED ON BEHALF OF THE GOVERNMENT

17    BY MS. RATTAN:

18    Q.  I know you've testified before, but please state your

19    name again.

20    A.  Courtney Jacobson.

21    Q.  And where do you work?

22    A.  Midland National Life Insurance.

23    Q.  And what are your duties there?

24    A.  I am the AVP, associate chief underwriter.  So I lead

25    the underwriting team.
```

1    Q.  And you've testified earlier in the trial?

2    A.  I have.

3    Q.  Now, the events that we testified -- or you testified

4    about earlier related to James Seegan, victim James Seegan,

5    who is one of your insureds; and you testified about paying

6    out two separate checks on the -- James Seegan's life

7    insurance policies; is that right?

8    A.  That is right.

9    Q.  Now, those policies were paid out, based on your

10   previous testimony, in the spring of 2020; is that correct?

11   A.  That is correct.

12   Q.  Now I want to back up to 2018 and ask you about your

13   agent, Keith Ashley, and a policy that he presented to

14   Midland life in 2018.

15        Let me direct your attention to Government's

16   Exhibit 118A, and it's on a person by the name of Paul

17   Villarreal.  Have you reviewed the documents that were

18   submitted to Midland life in relation to Paul Villarreal?

19        MS. RATTAN:  Your Honor, may we publish

20   Government's Exhibit 118A?

21        THE COURT:  Yes, you may.

22   BY MS. RATTAN:

23   Q.  And this is page 1 of Government's Exhibit 118A.  Can

24   you explain what this is?

25   A.  This is the application for life insurance.

 1   Q.  And it's, of course, with your company, Midland

 2   National Life.

 3   A.  Yes.

 4   Q.  And the name of the proposed insured is Paul

 5   Villarreal; is that right?

 6   A.  That is correct.

 7   Q.  And does it say where Mr. Villarreal works?

 8   A.  Yes.

 9   Q.  And what does it say?

10   A.  Nine Band Brewing Company.

11   Q.  Nine Band Brewing Company.

12           And it says what his job is.  What is that?

13   A.  A brewing assistant.

14   Q.  And does it say his annual income?

15   A.  Yes.

16   Q.  And what is that?

17   A.  50,000.

18   Q.  And does it say what his net worth is?

19   A.  Yes.

20   Q.  What is that?

21   A.  200,000.

22           MS. RATTAN:  And if we can go to -- down on the

23   same page, page down a little bit.

24           Right there.

25                               *

BY MS. RATTAN:

Q.  And this is the plan information.  So it has the amount
that's being applied for for Paul Villarreal, who works at
Nine Band Brewing as a brewery assistant.

    What's the amount of life insurance that's being
applied for for Mr. Villarreal?

A.  400,000.

Q.  And then let me direct your attention to Government's
Exhibit 118A, page 3.

    And then this is all part of the same application
for Paul Villarreal.

    MS. RATTAN:  And if we can look at the bottom of
page 3.

BY MS. RATTAN:

Q.  Okay.  Will you tell us what's going on here?

A.  This is the beneficiary section in which they name the
beneficiary of the policy that will receive the proceeds.

Q.  So it's going to be -- or proposed to be a $400,000
life policy on Paul Villarreal?

A.  Yes.

Q.  And then this is the section of the proposed policy
that says who's going to get the money if something happens
to Mr. Villarreal?

A.  Correct.

Q.  And who does it say that the beneficiary is going to be

1    if something happens to Mr. Villarreal?

2    A.   Keith Ashley.

3    Q.   And then when you testified before, you talked to the

4    jury about an insurable interest.  What is an insurable

5    interest?

6    A.   It must be present at the time of application.  It will

7    be either a dependent of the insured or someone who could

8    suffer a financial loss upon the death of the insured.

9    Q.   And so here, the relationship to the proposed insured,

10   is that why that question is asked on the application?

11   A.   Can you rephrase that question?  I'm not sure --

12   Q.   Well, as part of the application, Midland life wants to

13   know what the beneficiary's relationship is to the insured;

14   is that right?

15   A.   Yes.  We need to establish insurable interest prior to

16   approval.

17   Q.   So that's why you're asking the question?

18   A.   Correct.

19   Q.   And you want them to tell the truth; is that right?

20   A.   Correct.

21   Q.   Is that important?

22   A.   That is important.

23   Q.   And why is that?

24   A.   Because you would want the death benefit proceeds to go

25   to someone that, again, could suffer a financial loss in

1    the event of the death of a person rather than someone to

2    benefit from the death of a person.

3             MS. RATTAN:   And then let's continue on

4    Government's Exhibit 118A.   If we can look at page 4 and

5    the premium frequency at the bottom of the page.

6    BY MS. RATTAN:

7    Q.  So can you explain to us what this is?

8    A.  It's how often the client is selecting to pay.   So

9    it -- notice -- you would say annual, semiannual.   Then it

10   says quarterly, so direct billing, modal premium $7,000;

11   and there was nothing taken with the application.

12   Q.  Nothing is taken at the time that the application is

13   being made.

14            "Direct billing," what does that mean?

15   A.  It's a direct bill to the client.

16   Q.  And then what is the amount that's going to be paid?

17   A.  $7,000.

18   Q.  And how often is that supposed to be paid?

19   A.  According to the app, quarterly.

20   Q.  So $7,000 how often?

21   A.  There are four quarters in a year.

22   Q.  Okay.   So it will be, 4 times 7, $28,000 a year?

23   A.  Yes.

24   Q.  For this $400,000 policy?

25   A.  Correct.

1             MS. RATTAN:  So then if we can look at 118A,

2    page 7.

3    BY MS. RATTAN:

4    Q.  There are some health details; and it is filled in here

5    (as read):  "The client smokes marijuana on occasion,

6    approximately once a week."

7             Is this standard that you-all ask questions like

8    this.

9    A.  Yes.

10            MS. RATTAN:  And then 118A, page 9.

11   BY MS. RATTAN:

12   Q.  Again talking about health issues, visiting the doctor.

13   And it says, "Over 10 years ago.  Never sick, client

14   states."

15            So why is Midland life asking questions like this?

16   A.  Because we have to determine the insurability and the

17   health of the client prior to issuing a policy.

18   Q.  Okay.

19            MS. RATTAN:  And, finally, let's look at the last

20   two pages, Government's Exhibit 118A, page 10.

21   BY MS. RATTAN:

22   Q.  And this is the signature page.  It says "Paul

23   Villarreal," and then it's got the date -- like I said,

24   we're backing up in time.  So it's 2-26 of '18.

25            So what's happening here?

1    A.  This is the signature page on the final page of the

2    application and it appears that the proposed insured, Paul

3    Villarreal, signed it and he dated it 2-26-2018.

4    Q.  And then for spouse, it says "not applicable"; is that

5    right?

6    A.  Correct.

7            MS. RATTAN:  Then if we can look at the final page

8    of Government's Exhibit 118A.

9    BY MS. RATTAN:

10   Q.  What is this?

11   A.  This is the soliciting agent signature of the policy.

12   It states "Keith Ashley."

13   Q.  Okay.  And so when you say "soliciting agent," what

14   does that mean?

15   A.  The individual that solicited the application.

16   Q.  And that would be one of you-all's agents, Keith

17   Ashley?

18   A.  Correct.

19   Q.  So have you researched and reviewed what happened with

20   this policy?

21   A.  Yes.

22   Q.  What happened with this submitted policy?

23   A.  We received the blood, and we weren't able to offer

24   coverage on Paul Villarreal because of his lab results.

25   Q.  So you requested, as you do in all of these cases, is

1    that right, that blood be submitted?

2    A.  Correct.

3    Q.  Let me direct your attention to 118A, page 6.

4           And this says -- this is again in the original

5    application.  It says, "Special Requests or Details."  And

6    the agent indicates "I will order exam."

7           What does that mean?

8    A.  It means that the agent has a vendor and they'll order

9    the exam from that vendor.

10   Q.  And what would "exam" be referring to?

11   A.  A Part 2, so the fluids of the application.

12   Q.  Okay.  So these are the fluids that you're talking

13   about that were submitted, and Midland life had them

14   evaluated?

15   A.  Correct.

16   Q.  And Midland life's conclusion was what?

17   A.  We declined the policy based off of the lab results

18   received.

19   Q.  Okay.  Now let me direct your -- oh, go ahead and tell

20   us what the declination was.  What were the lab result

21   problems?

22   A.  The lab results indicated a high A1C which is

23   indicative of potential diabetes, and it was 12.4.

24   Q.  And so that's not something that Midland life -- or a

25   risk that Midland life was going to take?

```
 1  A.  Correct.  It's very uncontrolled diabetes.

 2  Q.  Okay.  And then let me direct your attention to

 3  Government's Exhibit 118C.

 4          MS. RATTAN:  I believe that's been admitted as

 5  well, your Honor.

 6          THE COURT:  Yes, it is.

 7  BY MS. RATTAN:

 8  Q.  This is an email.

 9          MS. RATTAN:  If I can publish that.

10  BY MS. RATTAN:

11  Q.  Do you recognize the name Cindy Nordquist?

12  A.  I do.

13  Q.  And who is that?

14  A.  She is a case manager for Midland National Life.

15  Q.  And this email was sent on February 27th of 2018, and

16  this is from Keith Ashley at -- keith@northtexasmoney.com

17  February 27th of 2018; and it's sent, it appears, to Cindy

18  there at Midland life.

19          And it says, "This client will be paying 7K

20  annually not quarterly.  Sorry for the confusion"; and then

21  it's signed by Keith Ashley.

22          So what's going on here?

23  A.  So as we talked about on the application, it indicated

24  7,000 quarterly.  This is an email indicating that he

25  selected quarterly in error and he wants it annually.
```

 1   Q.  Okay.  So it's not going to be $28,000 a month (*sic*),

 2   if it had been approved.  Rather, it's going to be --

 3   they're asking for $7,000 a year?

 4   A.  Correct.

 5   Q.  Okay.  And then, of course, Midland life responds to

 6   Cindy and says, "Thank you for the email.  I have updated

 7   the premium to 1,750 quarterly.  Thank you for your

 8   business."

 9         But we know ultimately that based on the blood

10   results, that Midland life declined to cover Paul

11   Villarreal; is that correct?

12   A.  That is correct.

13   Q.  And when you testified before -- but I just want to

14   make sure -- tell us where your office is.

15   A.  Sioux Falls.

16   Q.  Okay.  And that's in Sioux Falls, South Dakota?

17   A.  Yes, ma'am.

18   Q.  And, of course, Cindy Nordquist is there well; is that

19   right?

20   A.  Yes, ma'am.

21         MS. RATTAN:  I'll pass the witness, your Honor.

22         THE COURT:  Cross-examination?

23         CROSS-EXAMINATION OF COURTNEY JACOBSON

24   BY MR. WHALEN:

25   Q.  Ms. Jacobson, how are you?

```
 1   A.  I'm good.  How are you?

 2   Q.  I'm doing well.

 3          Okay.  Talk to me about this established insurable

 4   interest again because I didn't really understand it.

 5   A.  So at the time of application for a life insurance

 6   policy, insurable interest must be present at the time of

 7   receiving the application.

 8          And we, as underwriters, determine if insurable

 9   interest is present based off of if the beneficiary is

10   either dependent of the insured or perhaps would suffer a

11   financial loss in the event of the death of the insured.

12   Q.  Okay.  So -- I'm just trying to think of a hypo to try

13   to -- so I can understand it in my head.

14          So if I'm a single person -- if I'm single and I

15   want to get life insurance to -- for the benefit of a

16   friend of mine, is that -- is that okay to do that?

17   A.  We -- in underwriting we would ask additional questions

18   to be able to justify why a friend would be named as a

19   beneficiary.

20   Q.  Okay.  So if I'm a single person and don't have any

21   children or I have grown children and that's it, am I able

22   to get life insurance even if I'm the healthiest person in

23   the world?

24   A.  Yes, potentially.

25   Q.  Okay.
```

1    A.   Yes.

2    Q.   So you're going to look into that a little bit further?

3    A.   Yes.

4    Q.   Okay.  Now, if we saw the application --

5             MR. WHALEN:  And if we go to 118A, go to page 4.

6    BY MR. WHALEN:

7    Q.   Well, let me ask you another question before we get

8    there.

9             Okay.  You said you want to make sure somebody

10   doesn't have a financial interest because you don't want

11   them to benefit from their death, correct?

12   A.   Correct.

13   Q.   Okay.  So -- and I don't mean this to be funny or

14   anything like that, but it's -- I just want to understand

15   how you underwrite it as.

16            You know, I could be married and my spouse could

17   despise me and would benefit from my death, correct?  So

18   even though they are an insurable interest, they could

19   still benefit from my death and have an interest, right,

20   that could be adverse to me?  Is that --

21   A.   I mean, at the end of the day, the purpose of -- if you

22   look at the basic purpose of life insurance, which is what

23   this case is specifically about.

24   Q.   Okay.  Now, once I -- let me ask you this question:

25   Once I get the life insurance policy, am I free to change

 1  the beneficiaries as I see fit?

 2  A.  After the contract is in force?

 3  Q.  Yes.

 4  A.  Yes.

 5  Q.  Okay.  So as part of the initial application, you look

 6  at the insurable interest in order to decide whether to

 7  write the policy; but once I have the policy, as the owner

 8  I can change the beneficiary as I see fit, correct?

 9  A.  You -- the owner of the application has the ability to

10  change --

11  Q.  Okay.

12  A.  -- the beneficiary.

13  Q.  And does that require any additional underwriting?

14  A.  Not from an underwriting lens, no.

15  Q.  Okay.  And also a part of underwriting is -- you talked

16  about this medical exam.  You do the initial medical exam

17  for insurability, correct?

18  A.  Correct.

19  Q.  And is the medical exam kind of -- I don't know how to

20  describe it but, I mean, if you don't pass the medical

21  exam, you're not getting insurance.  That's the threshold

22  question, correct?

23  A.  It's not necessarily a pass/fail.

24  Q.  Okay.

25  A.  It depends on the impairment and the details that the

```
 1   applicant provides on that --

 2   Q.  Okay.

 3   A.  -- part.

 4   Q.  But nobody's escaping the blood draw on an initial

 5   application of a life insurance application, correct?

 6   A.  We do have an option to go nonfluid --

 7   Q.  Okay.

 8   A.  -- occasionally.

 9   Q.  And what -- and if you do that, your premium is pretty

10   significant, is it not?

11   A.  Not necessarily, no.

12   Q.  Okay.  And what would be a situation where you would go

13   nonfluid?

14   A.  They are healthy applicants in which we use third-party

15   data to assess the mortality versus medical data to assess

16   mortality.

17   Q.  Okay.  And what's third-party data?

18   A.  Third-party data would be like a motor vehicle report,

19   a prescription report, things of that nature.

20   Q.  Okay.  So you'd look at whether they've been prescribed

21   any medications; and that would be a workaround of the

22   blood test, correct?

23   A.  Correct.

24   Q.  Okay.

25   A.  Assuming --
```

1    Q.  Okay.  Now, once I get life insurance and say I've

2    taken a blood test and you've ruled me insured and as I

3    change the beneficiary, that doesn't require another blood

4    test, correct?

5    A.  Correct.

6    Q.  And you don't -- Midland National does not require

7    people to do annual physicals or annual blood work to

8    maintain insurability, correct?

9    A.  Correct.

10   Q.  Okay.

11           MR. WHALEN:  All right.  So let's go to 118A,

12   page 4.

13   BY MR. WHALEN:

14   Q.  Okay.  So you looked -- there's a section called

15   lifestyle information.  Do you see that there?

16   A.  I do.

17   Q.  Talks about cigarettes, nicotine patches, gum; and it

18   indicates -- "cigarettes" is checked and (as read):

19   "Cigarettes half a pack a day."

20           You see that there, correct?

21   A.  I do.

22   Q.  Okay.  And product use within the "last 12 months" was

23   checked, correct?

24   A.  Yes.

25   Q.  And this is important in your underwriting decision,

```
 1   correct?

 2   A.  Correct.

 3   Q.  Okay.  In the blood test is there a way to check for

 4   nicotine?

 5   A.  It is in a urine evaluation.

 6   Q.  Okay.  So when you did the urine screen of

 7   Mr. Villarreal, because you did do one, did it come back

 8   positive for -- that he has nicotine in his system?

 9   A.  I don't recall.

10   Q.  Okay.  All right.

11           MR. WHALEN:  If we go to page 6, please.

12           Wait.  Let me check.  Is that 6?  Let's try 5.

13           All right.  I think I was right the first -- go to

14   7 maybe.

15           Okay.  There we are.

16   BY MR. WHALEN:

17   Q.  If we go to "underwriting questions," okay, is this 31

18   and Section 32 entitled "Underwriting Questions," are all

19   the questions underwriting questions or just 31 and 32?

20   A.  Just 31 and 32.

21   Q.  Okay.  So it says, in A, "In the past 10 years, has the

22   Proposed Insured:

23           "Used barbiturates, hallucinatory drugs,

24   narcotics, crack, ecstasy, opium derivatives, marijuana,

25   LSD, PCP," et cetera, et cetera; and it's checked "Yes,"
```

 1   correct?

 2   A.   Uh-huh.

 3   Q.   And he indicated that he smoked marijuana on a regular

 4   basis, correct?

 5   A.   Yes.

 6   Q.   Okay.  Did that bear itself out in the lab results?

 7   A.   We don't test for marijuana in the labs.

 8   Q.   Okay.  So is it common knowledge that Midland

 9   National -- or would an agent know that he doesn't test

10   for -- you-all don't test for marijuana?

11   A.   I don't believe so.

12   Q.   Okay.

13        And so -- but, nonetheless, he checked the box

14   knowing -- not even knowing that you-all don't check for

15   marijuana, correct?

16   A.   Correct.

17   Q.   Okay.  So you would agree with me that this would be a

18   true -- is a true statement?

19   A.   Based off of the application, yes.

20   Q.   Okay.  And --

21        MR. WHALEN:  You can take that down.

22   BY MR. WHALEN:

23   Q.   And so if I'm an agent selling life insurance, I know

24   Midland National is going to require an exam for blood,

25   correct?

```
 1   A.  Yeah, blood, urine, and --

 2   Q.  Okay.

 3   A.  -- medical questions.

 4   Q.  So when you get the application in, you're not making

 5   any decisions until you get that blood work; is that fair?

 6   A.  Correct.

 7   Q.  Okay.  And so until you get that blood work and

 8   evaluate it, there are no decisions whether to insure or

 9   not insure a person, correct?

10   A.  Not necessarily.  I would say it depends on how they

11   answer some of the questions.

12   Q.  Okay.  So could you answer -- if you answer the

13   questions in a certain way, can you deny them coverage

14   writing -- even before you get to the blood test?

15   A.  Potentially.

16   Q.  Okay.  So if I say -- I put in my drug questionnaire I

17   use crack or heroin on a daily basis and then skydive,

18   that's a non -- would you agree?  Is that a nonstarter

19   before you even get to the blood test?

20   A.  Crack and heroin yes.  Skydiving, there is an

21   opportunity.

22   Q.  Okay.  So -- but fair to say that until you get that

23   blood test result, Midland National is not writing a

24   policy?

25   A.  Correct.
```

```
 1   Q.  Okay.  In this case you got the blood test results.
 2   You looked at the blood test results.  And based on that,
 3   you denied him coverage, correct?
 4   A.  Correct.
 5   Q.  Okay.  If the blood test results had come back, would
 6   you then look at the insurability interest, after that?
 7   A.  I would say we would look at that from the beginning.
 8   Q.  Okay.  But if he doesn't come back -- if the blood
 9   tests don't work, it doesn't matter at that point, correct?
10   A.  We would still ask questions.
11   Q.  Okay.  But if the blood -- if the blood test comes back
12   and he doesn't qualify, are you going to ask any additional
13   questions; or is it just a declination letter at that
14   point?
15   A.  It's a declination letter.
16   Q.  All right.
17            MR. WHALEN:  I'll pass the witness.
18            THE COURT:  Additional questions?
19            MS. RATTAN:  Just briefly.  Thank you, your Honor.
20            REDIRECT EXAMINATION OF COURTNEY JACOBSON
21   BY MS. RATTAN:
22   Q.  Ms. Jacobson, is it an important and material issue to
23   Midland life whether there, in fact, is an insurable
24   interest?
25   A.  Yes.
```

```
 1   Q.  You-all care?

 2   A.  Yes.

 3   Q.  It matters?

 4   A.  Definitely.

 5   Q.  So if somebody misrepresented their insurable interest,

 6   would that be an important and material issue to Midland

 7   life?

 8   A.  Yes.

 9            MS. RATTAN:  Pass the witness.

10            THE COURT:  Anything else?

11            MR. WHALEN:  No, your Honor.

12            THE COURT:  Can this witness be fully excused?

13            MS. RATTAN:  Yes, please.

14            MR. WHALEN:  Yes, your Honor.

15            THE COURT:  Ma'am, you are free to leave now.

16   Thank you.

17            THE WITNESS:  Thank you.

18            THE COURT:  Okay.  What's next?

19            MS. RATTAN:  The United States calls Melinda

20   Montelongo Moncada.

21            THE COURT:  Ma'am, if you'll raise your right hand

22   to be sworn in.

23            (The oath is administered to the witness.)

24                              *

25                              *
```

```
 1          DIRECT EXAMINATION OF MELINDA MONTELONGO MONCADA

 2              CALLED ON BEHALF OF THE GOVERNMENT

 3  BY MS. RATTAN:

 4  Q.  Would you please state your name.

 5  A.  Melinda Moncada.

 6  Q.  And how do you spell your name?

 7  A.  M-E-L-I-N-D-A.  Last name is M-O-N-C-A-D-A.

 8  Q.  And, Ms. Moncada -- am I pronouncing it correctly?

 9  A.  Yes.

10  Q.  Okay.  Ms. Moncada, did you know Paul Villarreal?

11  A.  Yes.

12  Q.  And was he your stepfather?

13  A.  Yeah.  That's my stepdad.

14  Q.  Okay.  And why do you describe him as your stepdad?

15  Explain your relationship to him.

16  A.  He was living with my mom for over 30 years, and he

17  helped raise my kids.

18  Q.  Okay.  How many children do you have?

19  A.  I have four girls.

20  Q.  And your daughters, did they consider him -- or do they

21  consider him their grandfather?

22  A.  That's their grandpa.

23  Q.  And how many years did you know Paul Villarreal?

24  A.  Close to 30 years.

25  Q.  Can you describe, in around 2018, where Paul Villarreal
```

```
 1    went to work?

 2    A.  At the Allen Nine Band Brewery.

 3    Q.  The Nine Band Brewery?

 4    A.  Yeah.

 5    Q.  Okay.  So in around 2018 he went to work at the Nine

 6    Band Brewery in Allen, Texas?

 7    A.  Correct.

 8    Q.  And what was your understanding of what his job was

 9    there?

10    A.  He made beer, packaged it, and sometimes delivered it.

11    Q.  Now, before Mr. Villarreal, your stepdad, went to work

12    at Nine Band Brewery, can you give the jury an idea of what

13    his employment was?  What did he do?

14    A.  Basically scrapped, pick up scrap and recycle cans,

15    pick up cans.

16    Q.  So he'd pick up cans and recycle them and try to make

17    money?

18    A.  Right.

19    Q.  So in 2018 he goes to work for Nine Band Brewery.  Did

20    you know who his supervisor or boss was at Nine Band

21    Brewery?

22    A.  Yes.  Mr. Keith Ashley.

23    Q.  And you said that he helped brew and deliver the beer

24    there at Nine Band Brewery?

25    A.  Correct.
```

```
 1    Q.  Did you help Mr. Villarreal with his medical issues and
 2    personal business?
 3    A.  Yeah.  I would often make appointments for him, make
 4    sure he was taking his -- the correct medicine.
 5    Q.  Okay.  And just generally try to help him out?
 6    A.  Right.
 7    Q.  And did you know whether Mr. Villarreal was getting
 8    paid -- or how he was getting paid by Nine Band Brewery,
 9    Keith Ashley?
10    A.  Yeah.  He had a card that he would go -- Mr. Ashley
11    would give him on Fridays and he'd go withdraw from the
12    bank and then he'd give the card back.
13    Q.  And would you see that?  Did you know that?
14    A.  Yes.
15    Q.  And when you say "a card," will you describe for the
16    jury what you mean by "a card"?
17    A.  It's like a debit card, but it's from the unemployment.
18    Q.  What do you mean "unemployment"?
19    A.  Like the unemployment workforce center.  When you
20    collect unemployment when you're not working, they pay you
21    on a card.  Yeah.
22    Q.  And so Mr. Villarreal would get that unemployment card
23    from Keith Ashley, and then he would get paid for working
24    at the brewery on the unemployment card?
25    A.  Correct.
```

1   Q.  And you, in fact, saw that card?

2   A.  Yes.

3   Q.  Let me ask you.  Was there ever a time when

4   Mr. Villarreal was expecting to receive a letter from -- or

5   for Mr. Ashley?

6   A.  Yes, there was.

7   Q.  And will you describe that for the jury?

8   A.  It was a letter that was coming to his home, and he was

9   to not open and just give directly to --

10          MR. SANDEL:  Objection, your Honor.  It's based on

11   hearsay.

12          THE COURT:  Ms. Rattan?

13          MS. RATTAN:  If the witness knows, I think she can

14   testify to it.

15          THE COURT:  Well, I'll sustain the objection

16   unless you know of an exception.

17          MS. RATTAN:  Okay.

18   BY MS. RATTAN:

19   Q.  Let me direct your attention --

20          MS. RATTAN:  If we can publish Government's 109,

21   page 11.

22   BY MS. RATTAN:

23   Q.  It will come up.

24          Do you see this letter?

25   A.  Yes.

1    Q.  And do you recognize that as being Paul Villarreal, who

2    you -- who is your stepdad?

3    A.  Correct.

4    Q.  I mean, is that his name there?

5    A.  Yes, and address.

6    Q.  And where did he and your mother live?

7    A.  In Farmersville at that address.

8    Q.  At that address?

9    A.  At that address.

10   Q.  That's their address?

11   A.  Yes.

12   Q.  And then the return address on that --

13          MS. RATTAN:  If we can focus on the return

14   address.

15   BY MS. RATTAN:

16   Q.  -- was for the Southwestern Institute of Forensic

17   Sciences at Dallas on Stemmons Freeway in Dallas, Texas; is

18   that right?

19   A.  Correct.

20   Q.  And you knew that Mr. Villarreal had was waiting on a

21   letter and had a plan on how he was going to handle that

22   letter; is that right?

23   A.  Yes.

24   Q.  What was that understanding?

25   A.  That he was to give it straight to --

 1              MR. SANDEL:  Objection, your Honor.  That's still

 2    hearsay.

 3              THE COURT:  Sustained.

 4              MS. RATTAN:  May I be heard on that?

 5              THE COURT:  Yes.

 6              MS. RATTAN:  It's not offered for the truth of the

 7    matter asserted.  It's just offered to explain what this

 8    witness knows about this letter and this envelope.  It's

 9    not offered to prove that that, in fact, was what

10    Mr. Villarreal was going to do with the letter, just that

11    that's what this witness believed about a letter that was

12    coming to her stepdad, Paul Villarreal.

13              MR. SANDEL:  Your Honor, I still think it's

14    hearsay; and then I would also object to, if it's being for

15    her mental state about a letter, the relevance to that.

16              THE COURT:  Well, I'll sustain the objection.

17    BY MS. RATTAN:

18    Q.  Did you ever see a letter that -- but did you know he

19    was expecting one?

20    A.  I knew that he was expecting one.

21    Q.  Let me ask you.  You said you were involved with

22    Mr. Villarreal's health issues.  Did he have health issues?

23    A.  Yes.

24    Q.  What were they?

25    A.  He was diabetic.  He had heart problems, pretty much --

```
 1  and high blood pressure.

 2  Q.  You said you helped him with medical issues.  Did you

 3  become aware that, in fact, Keith Ashley was going to give

 4  him a physical at some point?

 5  A.  Yes, I did.

 6  Q.  And you weren't there when it happened, but you were

 7  aware of it?

 8  A.  Correct.

 9  Q.  And that was talk within the family?

10  A.  Correct.

11  Q.  And what about life insurance?  Was there ever any

12  discussion about Keith Ashley taking out life insurance on

13  Paul Villarreal?

14  A.  Yes.

15  Q.  And what do you know about that?

16  A.  Just that he was --

17          MR. SANDEL:  Objection, your Honor.  It would be

18  based on hearsay.

19          THE COURT:  Well, I'm not sure where it's coming

20  from so --

21          What's the source of the information?  If you want

22  to set that.

23          MS. RATTAN:  Yes, your Honor.

24  BY MS. RATTAN:

25  Q.  How do you know about Mr. Villarreal getting life
```

```
 1  insurance?
 2  A.  He came home one day and he said that --
 3          MR. SANDEL:  Objection, your Honor, then that's
 4  hearsay.
 5          THE COURT:  Sustained.
 6  BY MS. RATTAN:
 7  Q.  Well, let me direct your attention to Government's
 8  Exhibit 118A.
 9          MS. RATTAN:  And if we can look at page 1.
10  BY MS. RATTAN:
11  Q.  You may not have seen this before.  But do you
12  recognize this name, the last name and the first name, Paul
13  Villarreal?
14  A.  Yes.  That's my stepdad.
15  Q.  And then, let's see, do you recognize this address
16  right here?
17  A.  Yes.  That's their home.
18  Q.  And that's the same address that was on the envelope
19  that we saw a minute ago?
20  A.  Correct.
21  Q.  And then it says that Paul Villarreal's job is at Nine
22  Band Brewing Company as a brewery assistant.
23          Is that your understanding?
24  A.  Yes.
25  Q.  And then he says that his annual income was $50,000.
```

1          Based on what you knew of Mr. Villarreal and your

2   mother's finances, would his annual income have been

3   $50,000?

4          MR. SANDEL:  Objection, your Honor, based on

5   hearsay.

6          MS. RATTAN:  She can answer if she knows.

7          THE COURT:  Overruled.

8   BY MS. RATTAN:

9   Q.  Do you know what Mr. --

10          THE COURT:  You can answer.

11  BY MS. RATTAN:

12  Q.  Do you know what Mr. Villarreal's income was?

13  A.  Well, I know he would bring home -- it was like 500 a

14  week.  I'm not too good at math, so whatever that would

15  equal up to a year.

16  Q.  Okay.  So $500 a week and then whatever that would turn

17  out to be in one year?

18  A.  Correct.

19  Q.  And that's what you knew about what he made?

20  A.  Right.

21  Q.  So at some point did your family and Mr. Villarreal

22  find out that somebody by the name of James Seegan had

23  died?

24  A.  Yes.

25  Q.  And did you know what Mr. Villarreal's reaction was to

 1  the fact that Mr. Seegan had died?

 2  A.  He became kind of afraid and kind of just watching his

 3  back a lot.

 4  Q.  Let me direct your attention to Government's

 5  Exhibit 118A.

 6          MS. RATTAN:  If we can look at page 3, at the

 7  bottom of the page.

 8  BY MS. RATTAN:

 9  Q.  This says "Beneficiary" and it says "Primary" and it

10  has the name "Keith Ashley"; is that right?

11  A.  Yes, ma'am.

12  Q.  And then it says (as read):  "Proposed relationship to

13  the insured," and it says "stepbrother."

14          So you knew Mr. Villarreal for about 30 years; is

15  that right?

16  A.  Yes, ma'am.

17  Q.  Did you know whether he had any siblings?

18  A.  Yes, ma'am.

19  Q.  What siblings did he have?

20  A.  He had three brothers.

21  Q.  And you knew that Mr. Villarreal was employed or

22  working for Keith Ashley at Nine Band Brewery?

23  A.  Correct.

24  Q.  Is it true that Keith Ashley was Mr. Villarreal's

25  stepbrother?

1   A.  He is not his stepbrother.

2   Q.  That's a lie?

3   A.  Yes, ma'am.

4        MS. RATTAN:  I'll pass the witness.

5        THE COURT:  Cross-examination?

6        CROSS-EXAMINATION OF MELINDA MONTELONGO MONCADA

7   BY MR. SANDEL:

8   Q.  Ms. Moncada, how are you?

9   A.  I'm fine.  Thank you.

10  Q.  Talking about Paul, you said he was working at the

11  brewery in 2018, correct?

12  A.  Correct.

13  Q.  Is that when he started at the brewery, or was he just

14  working there that year?

15  A.  He might have started late 2017, but he worked up until

16  they closed it down.

17  Q.  Okay.  And had Paul known Mr. Ashley before working at

18  the brewery, or is that where they met?

19  A.  That's where they met.

20  Q.  Now, you said that Mr. Villarreal was a diabetic,

21  correct?

22  A.  Correct.

23  Q.  How long had the family known about his diabetes?

24  A.  At least ten years maybe.

25  Q.  At least ten years?

1    A.   Right.

2    Q.   So in this 2018 it wasn't a secret.  He knew he was

3    diabetic, correct?

4    A.   He didn't know *per se*.  He had never gone to a doctor

5    to get that kind of help.

6    Q.   Okay.

7    A.   But he knew.  He more or less knew he had it.

8    Q.   So let's talk about that.  If he had never gone to the

9    doctor, how was it that he and the family knew about his

10   diabetes?

11   A.   Because he -- one day he woke up in the middle of the

12   night.  I checked his blood sugar and it was 600 and I took

13   him to the hospital.

14   Q.   Okay.

15   A.   That's how he realized, hey, I've got it.

16   Q.   Do you recall about when that was?

17   A.   That was about probably 2016-'17.

18   Q.   Okay.  So right around that time that he may have

19   started working at the brewery?

20   A.   Right.

21   Q.   Okay.  And was there any particular reason that he

22   didn't go to a doctor about that stuff?

23   A.   Because he didn't have insurance.

24   Q.   Didn't have insurance?

25   A.   Didn't have a job.

```
 1   Q.  Okay.  So he was concerned about the cost of going to a
 2   doctor?
 3   A.  Correct.
 4   Q.  Now, as part of him working at the brewery, what was
 5   his relationship like with Mr. Ashley in 2018 and 2019?
 6   A.  He always raved about him, about Mr. Ashley.
 7   Q.  Okay.  So the two were relatively close?  Would you say
 8   that?
 9   A.  Yeah, at work.
10   Q.  Okay.  After Mr. Villarreal applied for this life
11   insurance policy, did he ever follow up and go to a doctor
12   regarding his diabetes or any other conditions?
13   A.  I don't believe he applied for it --
14   Q.  Uh-huh.
15   A.  -- because, for one, that's not his handwriting.
16   Q.  Okay.
17   A.  Two, when he got admitted to the hospital, that's when
18   they began to do everything.  That was, like -- we're 2022.
19   So 2021, like in June, somewhere around there.
20   Q.  Okay.
21   A.  Yeah, he was admitted into the hospital.
22   Q.  And was that a result of the diabetes again or --
23   A.  (Moving head up and down.)
24   Q.  Okay.
25   A.  Correct.
```

```
 1              MR. SANDEL:  Pass the witness, your Honor.

 2              THE COURT:  Anything additional?

 3              MS. RATTAN:  Yes.  Thank you.

 4         REDIRECT EXAMINATION OF MELINDA MONTELONGO MONCADA

 5   BY MS. RATTAN:

 6   Q.  Now, along with working at the brewery, did

 7   Mr. Villarreal also work or do yard work, help out at

 8   Mr. Ashley's house?

 9   A.  Yeah, mostly at the mother-in-law's house.

10   Q.  At Mr. Ashley's mother-in-law's house?

11   A.  At his mother-in-law's house.  He'd do yard work.  He'd

12   do -- if he needed something getting fixed, like electrical

13   or plumbing, whatever.  Paul was a handyman, you know.  He

14   did everything.

15   Q.  So it wasn't just work at the brewery.  It was also

16   just errands and things that Keith Ashley needed done?

17   A.  Right.  When Mr. Ashley didn't have any beer to make,

18   he would send him to his mother-in-law's or to his house to

19   get some work done around there.

20   Q.  And then this would all be based on the card that he

21   would use once a week?

22   A.  Right.

23   Q.  And that's how he --

24   A.  Correct.

25   Q.  -- would get paid?
```

 1   A.  Yeah.

 2   Q.  Okay.  Now, of course, Mr. Villarreal is not here now;

 3   is that right?

 4           Can you explain what happened?

 5   A.  Correct.  He passed away this year, May 11th, from a

 6   massive heart failure.

 7           MS. RATTAN:  I'll pass the witness, your Honor.

 8           THE COURT:  Anything else?

 9           MR. SANDEL:  No, your Honor.

10           THE COURT:  Can this witness be fully excused?

11           MS. RATTAN:  Yes, please.

12           MR. SANDEL:  Yes, your Honor.

13           THE COURT:  Ma'am, you are free to leave.  Thank

14   you.

15           I think at this time we'll take our afternoon

16   break.  Again, ladies and gentlemen, please don't discuss

17   the case among yourself or anyone else.  Don't do any

18   outside research.  We'll take 15 minutes and come back and

19   continue.  Thank you.

20           (The jury exits the courtroom, 3:03 p.m.)

21           THE COURT:  Anything further from the government?

22           MS. RATTAN:  No.  But just in terms of where we

23   are this afternoon, let's see, we have three more witnesses

24   for this afternoon.

25           THE COURT:  Is that going to take us to 5:00?

```
 1              MS. RATTAN:  I don't know that it will.  And then

 2     we were hoping to rest on Monday.  We've got --

 3              THE COURT:  Well, I thought we were going to

 4     finish today with the evidence.

 5              MS. RATTAN:  Well, I'm not sure we're going to be

 6     able to.

 7              THE COURT:  Okay.  So three witnesses.  When is

 8     that going to take us till?

 9              MS. RATTAN:  I'm going to say, let's see, probably

10     4:15.

11              THE COURT:  Okay.  And then how much do you have

12     left on Monday?

13              MS. RATTAN:  I think we'll finish by midmorning,

14     maybe later.

15              THE COURT:  Okay.  And then is defense

16     anticipating putting anything on?

17              MR. WHALEN:  No, your Honor.

18              THE COURT:  Okay.  Well, then, we'll probably go

19     to the jury right after lunch.  That's probably the plan.

20     So we'll have the charge conference, you know, right after

21     we finish with evidence and plan for closing arguments

22     after lunch.

23              Why are you smiling?

24              MS. RATTAN:  May I have a minute with counsel?

25              THE COURT:  Right.
```

1           MR. WHALEN:  We had another idea, Judge, we'd like

2    to share.

3           THE COURT:  Well, I think that's been passed on to

4    my lawyer.  But the problem with that is that -- I'm just

5    respectful of the jury's time; and so, you know, that's a

6    long time to basically be done before lunch on a Monday and

7    then tell them to come back the next day.

8           We'll get you a draft of the charge here to take

9    home to look over over the weekend but -- y'all can

10   converse and talk about it; but, I mean, I just --

11          Also, the only venue challenge is to 19 and 20,

12   correct?

13          MR. WHALEN:  Let me think about it.  I think there

14   may -- potentially could be more.  Let me look at the

15   Indictment.

16          THE COURT:  That's fine.  The instruction we are

17   placing, it can be easily replicated in other counts.

18          MR. WHALEN:  Okay.

19          THE COURT:  I just -- that's the only two I

20   thought that you were challenging.

21          Okay.  Anything else?  Anything from defense?

22          MR. WHALEN:  No, your Honor.

23          THE COURT:  Okay.  See you back in 15 minutes.

24          (Recess, 3:06 p.m. to 3:18 p.m.)

25          (Open court, defendant present, jury present.)

```
 1              THE COURT:  Please be seated.

 2              Your next witness?

 3              MS. RATTAN:  Your Honor, the United States calls

 4    Cindy Nordquist.

 5              THE COURT:  Ma'am, if you'll raise your right hand

 6    and be sworn in.

 7              (The oath is administered to the witness.)

 8              THE COURT:  Go ahead and proceed.

 9              MS. RATTAN:  Thank you, your Honor.

10           DIRECT EXAMINATION OF CINDY NORDQUIST

11             CALLED ON BEHALF OF THE GOVERNMENT

12    BY MS. RATTAN:

13    Q.  Please state your name.

14    A.  Cindy Nordquist.

15    Q.  And can you speak as closely as possible into the

16    microphone.

17    A.  Cindy Nordquist.

18    Q.  And can you spell your last name.

19    A.  N, as in "Nancy," O-R-D, as in "David," Q-U-I-S, as in

20    "Sam," T.

21    Q.  And where do you work?

22    A.  Midland National Life Insurance in Sioux --

23    Q.  And -- oh, sorry.  Go ahead.

24    A.  -- in Sioux Falls, South Dakota.

25    Q.  Okay.  That's what I was going to ask you.
```

1           Where physically is your office?

2   A.  Sioux Falls, South Dakota.

3   Q.  Can you tell us what training you have there at Midland

4   Life?  What is your training there?

5   A.  I was trained as a case manager in the underwriting and

6   New Business Department.  So it is like the processing of

7   the paperwork and the applications that come in from

8   potential applicants.

9   Q.  And how long have you been working at Midland National

10  Life?

11  A.  It will be 27 years.

12  Q.  And when you say "New Business," what do you mean?

13  A.  That would be the new applicants, the potential clients

14  that are applying for life insurance, they would come in

15  through our New Business Department and go through our

16  underwriting process.

17  Q.  And you said also case manager.  Is New Business, case

18  manager kind of part and parcel?

19  A.  Yes.  I mean, I work in the New Business Department as

20  a case manager; so I am assigned -- when the applications

21  come through, they are assigned to a case manager to follow

22  them through the process.

23  Q.  So when an agent is presenting a new policy, you would

24  be someone who would be contacted?

25  A.  They would submit the application, yes, and I would

```
 1    be -- I would be their point of contact, yes.
 2    Q.  And so once they submit the application, then what
 3    happens?
 4    A.  The application comes in to New Business.  It's coded
 5    into our system.  It's assigned a policy number; and then
 6    it comes in through, like, the underwriting process and
 7    then either gets approved or we ask for more requirements,
 8    that type.  But I would be like their main point of contact
 9    for questions.
10    Q.  So kind of give us a timeline on when something comes
11    in as a new policy, how long can that take?
12    A.  It all depends on what the requirements are.  When the
13    application comes in, we usually try to get them coded
14    within 24 to 48 hours.  The initial review is done by an
15    underwriter; and then it would come to me if I have to
16    order any requirements such as medical records, do
17    follow-ups on labs, motor vehicle report, any of those
18    types of things.
19            If we have to order medical records, it could
20    take, you know, several weeks to several months depending
21    on the -- how long it takes to get them from the facility.
22    Q.  And how is the underwriter involved with you in new
23    cases and in New Business?
24    A.  They would add additional requirements other than the
25    standard requirements required for the age and face amount
```

 1  of the applicant.

 2  Q.  And is it a concern to a life insurance company to get

 3  someone's blood to ensure that they are someone that they

 4  want to insure?

 5       Is blood a requirement?

 6  A.  The blood is a requirement depending on the age and the

 7  face amount of the insured.

 8  Q.  And what do you mean by that?

 9  A.  There are certain requirements where it's -- it could

10  go through the WriteAway process depending on the age and

11  the face amount.  And then there's risk classifier, which

12  I'm not exactly sure what all of the -- what all they look

13  at for that.  But it's kind of a pass/fail so -- but, yeah,

14  most of our cases come through require a paramed exam,

15  blood and urine.

16  Q.  Most cases are going to require that?

17  A.  Yes.

18  Q.  So if a case is moving quickly -- how soon from new

19  case status, the application coming in, to being insured

20  could you expect if it's moving quickly?

21  A.  If it's moving quickly, if the agent has ordered the

22  paramed and labs, if they get an appointment, usually our

23  lab processing, which is clinical reference lab, we usually

24  get results within a week.

25  Q.  And then if something is drawn out, you're going to

1    need medical records, there are concerns on the face of it,

2    how long could that take?

3    A.   It could take months.

4    Q.   And then the declination process, how does that happen,

5    if you the decline to accept somebody for life insurance?

6    A.   The declination is actually done by the underwriter;

7    and that's based on any medical information that comes in,

8    which could be your urine results, your blood results,

9    medical records, criminal history, motor vehicle report.

10   There's quite a few dynamics that you could do a decline

11   for.

12   Q.   And how long does it take to figure out whether you're

13   going to decline someone, generally?

14   A.   I mean, it could be a couple days.  I mean, if we get

15   the lab results back in or -- like just, say, a motor

16   vehicle report and they have some history that is

17   uninsurable, it could be a couple days.  But we've -- it

18   could also be months, depending on if we're waiting for

19   medical records.

20   Q.   And is an A1C -- what is that?

21   A.   A1C is a blood test that is completed on all blood

22   specimens.

23   Q.   And what is it in relation to?

24   A.   I am not an underwriter or in the medical field.  But

25   an A1C is a blood test that if it's high, it's usually

```
 1   regarding diabetes.
 2   Q.  And, of course, Midland life is concerned about that?
 3   A.  Yes.
 4   Q.  And you could get declined based on a high A1C?
 5   A.  Yes.
 6   Q.  Well, let me direct your attention to February of 2018.
 7          Of course, you've been working at Midland life for
 8   many years.  Were you working at Midland life in February
 9   of 2018?
10   A.  Yes.
11   Q.  And what were your duties there during that time
12   period?
13   A.  I was a case manager.
14   Q.  So you would be dealing with new matters?
15   A.  Correct.
16   Q.  And did you take a call in February of 2019 (sic) that
17   was dealing, in fact, with a new matter?
18   A.  Of what year?
19   Q.  2018.
20   A.  Yes.
21   Q.  I may have said a different year, but I meant
22   February 2018.
23   A.  Yes.
24   Q.  And before coming to court today, have you reviewed
25   that call?
```

1   A.  Yes.

2   Q.  And are you sure that the call is accurate as far as

3   the one that you accepted on behalf of Midland life and

4   there haven't been any changes or deletions?

5   A.  Correct, yes.

6   Q.  The call is accurate?

7   A.  The call is accurate.

8   Q.  And, in fact, does it come from someone by the name of

9   Keith Ashley?

10  A.  Yes, it does.

11  Q.  And was that an agent with Midland life?

12  A.  Yes.

13  Q.  Did you remember Keith Ashley?

14  A.  I did remember the name, yes.

15  Q.  Okay.  So it was a name that was familiar to you before

16  you even reviewed the call?

17  A.  Yes.

18          MS. RATTAN:  Your Honor, I believe it's previously

19  been admitted.  If we can publish Government's Exhibit 119

20  and 120 -- oh, A and B, rather.

21          THE COURT:  Okay.  119A and B have been admitted,

22  yes.

23          MS. RATTAN:  Yes.

24          THE COURT:  Yes, you may.

25          (Audiovisual presentation to the jury.)

1          MR. FINE:  Okay.  May we publish the transcript,

2    your Honor?

3          THE COURT:  Yes, you may.

4    BY MS. RATTAN:

5    Q.  Okay.  Let me direct your attention to the transcript

6    of the call that we just heard.

7          MS. RATTAN:  And if we can look at the top of the

8    transcript.

9    BY MS. RATTAN:

10   Q.  It came in on February 27th of 2018 --

11   A.  Yes.

12   Q.  -- is that right?

13   A.  Yes.

14   Q.  And then it says that Cindy Lnu -- and do you recognize

15   your voice?

16   A.  Yes.

17   Q.  And then Keith Todd Ashley is the agent.  And you said

18   that you even have a memory of dealing with him as an

19   agent; is that right?

20   A.  Yes.

21   Q.  So just kind of give us an overview.  What's going on

22   in this call?

23   A.  On the application -- when I took the initial call, I

24   pulled up the application by the policy number.  So I -- I

25   have a double screen; so I had our input system on my left

1    and I pulled up a copy of the application on the right.

2           So as he was indicating the premium and kind of

3    what the call was about, I did verify that on the

4    application it was written in the dollar amount premium of

5    7,000 but he had marked "quarterly" for the premium mode.

6           So during the conversation, he wanted the premium

7    mode to be quarterly, paying 7,000 annual.  So that's why

8    we divided it by four and came up with the 1,750.

9    Q.  Okay.

10   A.  And so I made that change to the premium, put the case

11   notes in the file, and ended the call.

12   Q.  And so not $28,000 a year.  He wanted it to be $7,000 a

13   year; so it would be 7,000 divided by 4?

14   A.  Correct, yes.

15   Q.  And that's what y'all talked about?

16   A.  Yes.  And that's the change I made and then noted the

17   file and added the endorsement.

18          MS. RATTAN:  So if we can look on 119B, page 1, at

19   the bottom of the page, lines 20 through 25.

20   BY MS. RATTAN:

21   Q.  He says, "Hey, Cindy, Keith Ashley, how are you doing?"

22          And then he talks about emailing you earlier

23   today.

24          So he sent you an email?

25   A.  I checked in the file, and I didn't see an email.  But

1    in the part of the conversation where it talks about the

2    modified endowment, that's an automatic notation that the

3    underwriter -- or, I'm sorry, that the agents receive

4    because most policies you don't want them to be the

5    modified endowment.

6           So it made perfect sense when he's talking about

7    an email.  It was probably the system-generated email that

8    went out saying, hey, woohoo, this is going to be a

9    modified endowment.  And that's usually not what the

10   insureds want.

11   Q.  Well, let me show you -- you know Courtney Jacobson; is

12   that right?

13   A.  Yes.

14   Q.  She's an underwriter?

15   A.  Yes.

16   Q.  And, of course, a record custodian with Midland life.

17          We checked your records for an email.  And let me

18   direct your attention to Government's Exhibit 118C.

19          The call references an email and so we asked Cindy

20   about it -- I mean, rather, Courtney Jacobson.  And so

21   here, on February 27th of 2018, if you start at the bottom,

22   it's from Keith Ashley, keith@northtexasmoney.com, on

23   February 27th of 2018.  And then he says (as read):

24   "Cindy, this client will be paying 7K annually not

25   quarterly.  Sorry for the confusion."

1          So is this consistent with the call and discussion

2   that you-all had on the call?

3   A.  Yes.  I apologize.  That is an email that I would have

4   sent, yes.

5   Q.  No, no.  It's all right.  We had reviewed it with

6   Courtney Jacobson.

7   A.  With Courtney, okay.

8   Q.  Yes.

9          But it's referenced in your call.

10  A.  Okay, yes.  That is -- that is the conversation.

11  Q.  And then at the top, it's from you.  And is that your

12  email address?

13  A.  Yes, it is.

14  Q.  Okay.  And it's sent on February 27th, 2018.

15         And then you just affirm (as read):  "Thanks for

16  the email.  I have the update to the premium."  And then,

17  just like you testified earlier, it's going to be 1,750

18  quarterly.  "Thank you for your business."  Is that right?

19  A.  Yes.

20  Q.  So just because you-all are having this discussion,

21  does that mean that the policy is in place or that it will

22  be in place?

23  A.  No.  That just -- that just means that instead of being

24  an annual premium billing notice, it will be a quarterly

25  premium billing notice.

```
 1    Q.  So you're just talking hypothetically what might happen
 2    if the policy is approved?
 3    A.  Correct.
 4    Q.  So let me direct your attention to the policy.  And
 5    it's Government's Exhibit 118A.
 6           MS. RATTAN:  If we can publish it, page 1.
 7    BY MS. RATTAN:
 8    Q.  And you're in New Business.  So you're talking to him
 9    about this new policy; is that right?
10    A.  About this new application, yes.
11    Q.  Rather, new application.
12    A.  Yes.
13    Q.  And in the transcript of the call, you refer to Paul,
14    that you're talking about someone by the name of Paul.
15    A.  Yes.
16    Q.  An application for Paul.
17    A.  Yes.
18    Q.  And so this is the application for Paul Villarreal, in
19    fact; is that right?
20    A.  Yes.
21    Q.  And then on the $7,000 issue, the mistake that he's
22    talking about is 118A, page 4.
23           What's going on here?
24    A.  Yes.  And that's the billing mode premium section.  And
25    it's marked "quarterly" at 7,000 when they truly wanted,
```

1    per the conversation, to be quarterly with 7,000 divided by

2    4.

3    Q.  And so that's what the phone call was about?

4    A.  Yes.

5    Q.  Clearing that up?

6    A.  Yes.

7          MS. RATTAN:  And then if we can look at the

8    policy -- or the application, rather, which is 118A,

9    page 15.

10   BY MS. RATTAN:

11   Q.  We've got a signature that purports to be that of Paul

12   Villarreal on 2-26 of 2018, and then you've got the agent's

13   signature here also on 2-26 of '18; is that right?

14   A.  Yes.

15   Q.  So then in the phone call, the phone call is

16   referencing this application, which is Government's 118A?

17   A.  Yes.

18   Q.  And then also in the phone call you-all reference the

19   email that we discussed earlier and that's Government's

20   Exhibit 118C.

21   A.  Yes.

22   Q.  And then the amount of the policy -- or the requested

23   policy is listed; and that's in Government's Exhibit 118A,

24   page 1.  And that's for $400,000; is that right?

25   A.  Yes.

```
 1              MS. RATTAN:  Your Honor, may I approach the

 2   witness?

 3              THE COURT:  Yes.

 4              MS. RATTAN:  Thank you.

 5   BY MS. RATTAN:

 6   Q.  And let me show you this.  Based on the email and the

 7   phone call and the application that we reviewed, let me ask

 8   you to look at this.  It says (as read):  "February 26

 9   through 27 of 2018, Ashley" -- meaning Keith Ashley --

10   "creates emails and calls Midland life about a $400,000

11   life policy for Paul Villarreal."

12   A.  Yes.

13   Q.  Now, on here, at the bottom, it says Ashley is listed

14   as beneficiary as the stepbrother.  Did you -- let me show

15   you that.  Did you already review that?

16   A.  I did review it, yes.  That is the application.

17   Q.  And Ashley is listed on the application as a potential

18   beneficiary, and he claims that his insurable interest is

19   stepbrother; is that right?

20   A.  Yes.  His name is listed as the primary beneficiary.

21   Relationship, stepbrother.

22              MS. RATTAN:  May I return, your Honor?

23              THE COURT:  Yes.

24              MS. RATTAN:  Thank you.  I'll pass the witness.

25              THE COURT:  Cross-examination?
```

```
  1              CROSS-EXAMINATION OF CINDY NORDQUIST
  2   BY MR. WHALEN:
  3   Q.  Ms. Nordquist, how are you?
  4   A.  I'm good.  Thank you.
  5   Q.  All right.  Okay.  So I want to follow up on a couple
  6   things with you.  You've testified something that -- well,
  7   let me ask it this way:  Is there a scenario where I could
  8   file an application for life insurance and, depending on
  9   the amount of it, I can get approved without any medicals
 10   or anything like that?
 11   A.  Yes.
 12   Q.  Okay.  How much -- if you know, how much amount of life
 13   insurance is that?
 14   A.  Unfortunately, I do not know that.
 15   Q.  Okay.  Is that something an agent would know?
 16   A.  Yes.
 17   Q.  Okay.
 18   A.  It's published WriteAway guidelines.
 19   Q.  Okay.  So if I'm an agent with Midland National and I
 20   know the guidelines, I could know how to write a policy for
 21   a person to bypass medical, correct -- or wouldn't require
 22   medical, not bypass, wouldn't require it.
 23   A.  They would have to pass the risk classifier score,
 24   which is --
 25   Q.  Okay.
```

 1   A.   -- a lot of different information they pull in from

 2   outside sources.

 3   Q.   Okay.  And when you talk about risk classification

 4   score, what do you mean by that?

 5   A.   Unfortunately, I'm not an underwriter; so I don't have

 6   that information.  But it's a risk classifier score.  It's

 7   a pass/fail.  If you pass, it's potential to not have to

 8   have labs drawn or do the paramedic or medical records; and

 9   then if you fail, then obviously they do the labs,

10   paramedic, medical records, whatever other information they

11   need.

12   Q.   Okay.  And it's a risk classifier.  I kind of got a

13   hint you're going to look at have they had a bunch of car

14   wrecks.  Is that something you're going to look at?

15   A.   They do order motor vehicle reports, yes.

16   Q.   Okay.  If they have a criminal history, is that

17   something you-all look at?

18   A.   They do have access to that, yes.

19   Q.   Okay.  If they have a poor credit score, is that

20   something they would look at?

21   A.   That, I do not know.  I'm sorry.

22   Q.   Okay.  So just to be clear, there is a scenario that a

23   person could apply for life insurance and, if the amounts

24   are right and they have a low score, wouldn't require

25   medicals, correct?

1    A.  Actually, the risk classifier score has to be high.

2            But, yes, in your scenario it would be possible,

3    yes.

4    Q.  Okay.  And so in this application it said an exam would

5    be ordered, correct?  A medical exam would be ordered, on

6    the application, correct?

7    A.  That, I don't know if they were automatic requirements

8    or not.

9    Q.  Okay.  Let me --

10           MR. WHALEN:  If we could go to 118A, page 6,

11   please.

12   BY MR. WHALEN:

13   Q.  Do you see on the application here it says (as read):

14   "Special Requests.  I will order the exam"?

15           You see that?

16   A.  Yes.

17   Q.  Okay.  So going into this, an exam was going to be

18   ordered.  Is that fair to say?

19   A.  Yes.

20   Q.  Okay.  Now, just so I understand the process, so the

21   new application comes in and if -- it doesn't bind Midland

22   National yet.  There's -- you haven't agreed to contract

23   with the owner for life insurance yet, correct?

24   A.  Correct.

25   Q.  You review the application; but then you order the

 1  medicals, correct?

 2  A.  Yes.

 3  Q.  Okay.  And then once the -- and the medical -- the

 4  blood work and everything has to come back from an approved

 5  vendor, correct?

 6  A.  Yes.

 7  Q.  Okay.

 8  A.  An approved paramedic service approved through Midland

 9  National.

10  Q.  Okay.  And in order for that process to work, they

11  would get their ID to verify that it's the right

12  individual, correct?

13  A.  Who is "they"?

14  Q.  The paramedic, the vendor, because you want to make

15  sure they're drawing blood from the person --

16  A.  Yes.

17  Q.  -- that's applying, correct?

18  A.  Yes.

19  Q.  Okay.  And there's measures in place to make sure that

20  to be accurate, correct, if you know?

21  A.  I don't know, but I -- yes, I would sure hope so.

22  Q.  Okay.  And so it comes into the system.  Then you wait

23  for the medicals; and it could be a quick declination based

24  on the meds, correct?

25  A.  Correct, based on lab results or information provided

1    on the paramedic exam.

2    Q.  Okay.  And untreated diabetes is -- is it fair to say

3    that's a high risk factor that's going to lead to a

4    declination?

5    A.  It is very possible.  I am not an underwriter, so I'm

6    not involved in the medical aspect.

7    Q.  Okay.  So if a medical exam is ordered, you're not

8    going to issue a policy or look at it until that comes

9    back, correct?

10   A.  Correct.  The underwriter would look at it.

11   Q.  Okay.

12   A.  My job would be to follow up on it if it doesn't come

13   in.

14   Q.  Okay.  And then if you were to need medical records and

15   things, that's additional information you would gather, if

16   needed, if the underwriter directed it, correct?

17   A.  Correct.  They would order it and -- they would put out

18   the request and I would order, yes.

19   Q.  Okay.  So if the policy is declined, correct, and the

20   policy is not issued, does Midland National -- does

21   Mr. Villarreal or anyone else have to pay Midland National

22   any money?

23   A.  No.

24   Q.  Okay.  Does the agent get any commission for a declined

25   policy?

1   A.  Not that I'm aware of.

2   Q.  Okay.  And let me ask you this:  Once the policy is in

3   force, if the insured fails to pay the premiums and the

4   premium lapses, then there is no more life insurance,

5   correct?

6   A.  Correct.

7           If the policy is placed in force and the premiums

8   are not paid, then it goes into a grace period for a

9   certain amount of time; and then I believe letters are

10  probably sent out as a little reminder saying we haven't

11  received your premium and then a lapse notice.

12  Q.  Okay.  So in order for a policy to ever pay out,

13  premiums have to be paid in full at the time of someone's

14  death, correct?

15  A.  It would have to be current, yes.

16  Q.  Okay.

17          MR. WHALEN:  I'll pass the witness.

18          THE COURT:  Anything additional?

19          MS. RATTAN:  No, your Honor.

20          THE COURT:  Can this witness be fully excused?

21          MR. WHALEN:  Yes, your Honor.

22          MS. RATTAN:  Yes, please.

23          THE COURT:  Ma'am, you are free to leave.  Thank

24  you.

25          THE WITNESS:  Thank you.

```
 1              THE COURT:  What's next?

 2              MS. RATTAN:  United States calls Arthur Hilson.

 3              THE COURT:  Sir, if you'll raise your right hand

 4   to be sworn in.

 5              (The oath is administered to the witness.)

 6              THE COURT:  Go ahead and proceed.

 7              MS. RATTAN:  May I approach the witness, your

 8   Honor?

 9              THE COURT:  Yes.

10              MS. RATTAN:  May I return?

11              THE COURT:  Yes.

12              MS. RATTAN:  Thank you.

13              MR. SANDEL:  And, your Honor, may we approach

14   briefly?

15              THE COURT:  Yes.

16              (Sidebar conference, off the record.)

17              THE COURT:  Ms. Rattan, go ahead and proceed.

18              MS. RATTAN:  Thank you, your Honor.

19                  DIRECT EXAMINATION OF ARTHUR HILSON

20                  CALLED ON BEHALF OF THE GOVERNMENT

21   BY MS. RATTAN:

22   Q.  Would you please state your name.

23   A.  Arthur Hilson.

24   Q.  Okay.  And, Mr. Hilson, I hope I didn't turn your

25   microphone off.  I might have.
```

```
 1             But it's important, if you would -- the acoustics
 2   in here are difficult -- to --
 3   A.   Okay.
 4   Q.   -- speak as closely as you can into the microphone.
 5   A.   Sure.  Can you hear me?
 6   Q.   Yes, sir.
 7   A.   Arthur Hilson.
 8   Q.   And will you spell your name, please.
 9   A.   A-R-T-H-U-R H-I-L-S-O-N.
10   Q.   And, Mr. Hilson, where do you work?
11   A.   Texas Capital Bank.
12   Q.   And what do you do at Texas Capital Bank?  What are
13   your various duties there?
14   A.   So I'm a technology engineering manager there,
15   specifically over the treasury applications.
16   Q.   And what's your educational background that qualifies
17   you for your position?
18   A.   I have a computer engineering degree from Ohio State.
19   Q.   And how long have you worked at Texas Capital Bank?
20   A.   I started there in February of this year.
21   Q.   Let me ask you about one of your bank customers, a bank
22   account in the name of James Seegan.
23             Have you reviewed the bank records as they relate
24   to the bank account for James Seegan?
25   A.   Yes.
```

1   Q.  And, specifically, did you review the bank records for

2   your customer, James Seegan, on February 21st of 2020?

3   A.  Yes.

4   Q.  So that would be -- this is February 20th of 2020.

5   We're talking about the next day.  So it's February 21st of

6   2020; is that right?

7   A.  That's correct.

8   Q.  Now, did you review the bank records to determine

9   whether that account was accessed or attempted access

10  remotely?

11  A.  Yes.  So I reviewed the logs from our online banking

12  platform.

13  Q.  So we're looking to see whether there was an attempt to

14  access the James Seegan bank account at your bank on

15  February 21st of 2020, and that's what you looked for in

16  your logs?

17  A.  That's correct.

18  Q.  Could you tell, based on the bank logs, whether anyone

19  had attempted to access James Seegan's bank account on

20  February 21st of 2020?

21  A.  Yes.

22  Q.  And we're talking about a first attempted access; is

23  that right?

24  A.  That's correct.

25  Q.  Because there's more than one event?

1  A.  There is -- there are.  There were several on that day.

2  Q.  Can you describe for the jury the first attempted

3  access that you saw to James Seegan's bank account on that

4  day?

5  A.  Sure.

6         So on, you know, February 21st, 2020, the first

7  log-in attempt was 7:00 in the morning, 7:11 specifically

8  at 30 seconds.

9  Q.  You said 7:11:30 there is an attempted log-in?

10  A.  Correct.  And this was very short.  It was a 6-second

11  log-in.

12  Q.  Okay.  Then what happens next?

13  A.  So the system logs start at 7:11:30, and then the user

14  was prompted for what's called a TAC.  It's a temporary

15  access code.  Essentially, it's something that you would

16  get over your phone.  It's a -- this is like a couple

17  digits, and then you would enter it back in.  It's a

18  multifactor authentication.

19         And at 34 seconds -- no, it started at 30.

20         At 34 seconds it was prompted.  It displayed the

21  different targets for that TAC.  So that would be different

22  cell phones, like where do you want it to send, where do

23  you want to send it to.  And then the session ended 2

24  seconds later.

25  Q.  So just one short session; and it was at 7:11:30 a.m.,

1    in the morning?

2    A.  Correct.  It ended at 7:11:36.

3    Q.  And was that session successful?

4    A.  It was not.

5    Q.  Okay.  Why do you say that session wasn't successful?

6    A.  Because there was never -- when it asked for the

7    temporary access code, when it asked where to send it to,

8    it was never entered.  And then as soon as it displayed the

9    message saying, hey, which cell phones do you want to send

10   it to, the session ended.

11   Q.  Okay.  So it didn't go through.

12   A.  No.

13   Q.  Nothing came back, and the session just ended?

14   A.  Correct.

15   Q.  So were you able to tell, based on the system, what the

16   IP address was where this first attempt to access James

17   Seegan's bank account was made at 7:11 a.m.

18   A.  Yes.  That's part of the logs.

19   Q.  And can you tell us what the IP address was?

20   A.  Sure.  It's 47.186.106.152.

21   Q.  And so is it fair to say that that was a failed

22   attempt?

23   A.  That's correct.

24   Q.  Now, you said that that wasn't the only time that the

25   account was accessed on the same day, February 21st of

 1   2020; is that right?

 2   A.  Uh-huh.

 3   Q.  So after this one at 7:11 a.m., what happened?

 4   A.  So the next log-in happened at 8:42:23 (*sic*).  And this

 5   time it was not prompted for a temporary access code and

 6   access was granted and the session -- it was actually in

 7   the account.

 8   Q.  Okay.  You said it was actually in the account?

 9   A.  Yes.  There had -- it was -- the user had access to the

10   account at that point.

11   Q.  So the first time, they couldn't get access?

12   A.  Right.

13   Q.  But this time -- and this is at 8:44:23?

14   A.  Correct.

15   Q.  This time, they are able to get into James Seegan's

16   account?

17   A.  Correct.

18   Q.  How long is this session?

19   A.  Approximately 8 minutes.

20   Q.  And can you tell us what happened in this session?

21   A.  Sure.

22           There were several -- the user went through and

23   poked around, looked at secure messages --

24   Q.  Okay.  I'm sorry.  Will you say that again?  What

25   happened?

1   A.  The user was -- I could tell that they were looking

2   through different aspects of the account, just clicking

3   through the profile.  But specifically there was a wire

4   form submitted for a transaction form.

5   Q.  When you say a "wire form," what do you mean by that?

6   A.  So in banking when you want to send a wire, you would

7   have to fill out a form and give all the information, you

8   know, where you're going to send it to, how much you want

9   to send, a couple pieces of information.

10          That -- there was a form that was filled out and

11  submitted.  That was submitted at 8:51:30.

12  Q.  Okay.  So the access is at 8:44.  It's successful.

13  Then you can see the user looking around in the account,

14  and then you see that they've filled out a wire form?

15  A.  Correct.

16  Q.  And then what happens?

17  A.  So they filled it out and clicked "submit," and at that

18  point the wire form was submitted through the online

19  banking platform.  And that's when it moves into the next

20  system down the line called pay+.  And I have -- I -- I

21  don't know if you want to go into pay+ at this point, but I

22  can tell the transaction that they filled in the form.  I

23  can see that transaction in pay+, which is the next step in

24  actually transmitting the wire.

25  Q.  Okay.  So before we go to that, let me ask if you could

 1   tell the IP address on this second -- the first time, it

 2   was an attempt.  The second time, something actually

 3   happens; is that right?

 4   A.  That's correct.

 5   Q.  And were you able to see the IP address the second

 6   time?

 7   A.  Yes.  Its IP address was 24.243.84.26.

 8   Q.  And this second time, was it from 8:44 to 8:52?

 9   A.  Correct.

10   Q.  And then you said that they filled out a wire form and

11   submitted it, and you were getting ready to tell us what

12   happened next.

13   A.  So the way a wire is actually sent through the system,

14   it starts off -- it's initiated by the user through BankNow

15   or through BankDirect; and after they fill it out and it's

16   submitted, it flows downstream to a system called pay+.

17   And that's really where it's processed.

18          It will go through good funds check.  It will go

19   through --

20   Q.  What's good funds check?  What does that mean?

21   A.  To make sure they have enough money to actually send

22   the wire.

23          And from there it will actually flow through the

24   Fed, which is where it's paid.  And I can see from the logs

25   in pay+ that this wire did successfully make it to the Fed,

1    it was paid, because the Fed gives us -- it's an

2    acknowledgment number.  And so just like a receipt from the

3    Fed, that says, yes, it actually trans- -- it got paid.

4    Q.  So can you tell us when it was, what time it was when

5    this wire was paid?

6    A.  Sure.  It was at 8:52:34.

7    Q.  So the successful entry into the account was at 8:44

8    originally?

9    A.  Correct.

10   Q.  And then there is the peek-through and then the form

11   filled out, and then the form goes through the system.

12   It's approved.  The funds are there.

13          And then very quickly, really -- how long from the

14   access until the funds being available?  How much time

15   passes?

16   A.  So like I said, they logged in at 8:44:23.  Wire form

17   was submitted at 8:51:30.  And then I saw the wire being

18   acknowledged from the Fed at 8:52, so about a minute later.

19   Q.  Okay.  So let's focus on these two transactions and

20   make sure that we have the IP address down.

21          Okay.  So we've switched over the system here.

22   Now, you talked about the first attempt.  So I'm going to

23   say the date is February -- 2-21-20 and this is James

24   Seegan's account --

25          THE COURT:  Ms. Rattan, that's not showing up for

 1  us.

 2          MS. RATTAN:  Oh.

 3          THE COURT:  Maybe it's too high.  We can see your

 4  hand doing it, but I just --

 5          MS. RATTAN:  Maybe Ms. Adams can -- I'm not sure

 6  what I'm doing, zooming.

 7          Thank you.

 8  BY MS. RATTAN:

 9  Q.  So it's 2-21-20, and it's the James Seegan account; is

10  that right?

11  A.  Yes.

12  Q.  And so the first thing that happens that day in the

13  account is an attempt to access it, right?

14  A.  Correct.

15  Q.  And that attempt was very short, and I think you said

16  it was at 7:11 a.m.?

17  A.  7:11:30.

18  Q.  And it was just seconds long?

19  A.  6 seconds.  7:11:36.

20  Q.  And the IP address where that attempt was made was

21  what?

22  A.  47.186 --

23  Q.  47.186 --

24  A.  -- .106 --

25  Q.  106.

```
 1   A.  -- .152.

 2   Q.  .152.

 3           Okay.  And this was the unsuccessful one.

 4           And then the next time, this one went through.

 5   And what time was it?

 6   A.  It started at 8:44:23.

 7   Q.  8:44:23 a.m.

 8           And this was the longer one.

 9   A.  8:52:06.

10   Q.  Through 8:52:06?

11   A.  Yep, 06.

12   Q.  And then what was the IP address where this happened?

13   A.  24.243.84.26.

14   Q.  24.243.84.26?

15   A.  Correct.

16   Q.  And that's the IP address where this second one

17   happened.

18           So then the form is filled out, and it's

19   submitted.  The bank verifies that the money is available.

20   And then what happens?

21   A.  So at that point it flows into pay+, which is our wire

22   platform.  And I have a confirmation from the Fed at a time

23   stamp of 8:52:34 that I can see that the wire was submitted

24   to the Fed.  The Fed gave us an acknowledgment back.  It's

25   a really long number, but it's an acknowledgment.
```

1    Q.  Okay.

2    A.  And that means it passed, all the funds were

3    transferred so --

4    Q.  And we haven't talked yet about the amount of the

5    funds.  How much was transferred?

6    A.  It was $20,000.

7    Q.  Now, is this $20,000 going out of James Seegan's

8    account or into James Seegan's account?

9    A.  It was going out.

10   Q.  So someone has attempted to access James Seegan's

11   account.  And then they accessed the account.  And then

12   they fill out the form for the wire; and $20,000 goes out

13   of his account?

14   A.  That's correct.

15   Q.  When did the $20,000 go out?

16   A.  Well, it would have been -- we got the acknowledgment

17   from the Fed at Number 3, so 8:52:34 would be when the

18   funds were -- it was acknowledged from the Fed that it had

19   been transferred.

20   Q.  $20,000.

21        So we know that your bank has James Seegan's bank

22   account.  Can you tell us where this money went?

23   A.  So the form that was filled out, both from the logs --

24   I can tell what he filled in from the logs in our banking

25   platform, BankDirect, and in pay+.  The -- let's see,

```
 1    the -- we've got the Fed.  The amount was 20,000.  I have
 2    the "from" account number.
 3    Q.  That's your account number?
 4    A.  Well, that's James Seegan's account number, but yes.
 5    Q.  Right.  Your bank's account number.  Sorry.
 6          Okay.  So you have where it went from?
 7    A.  And then I have the beneficiary as KBKK; the
 8    beneficiary bank, Branch Banking and Trust Company.
 9          And then I have the "to" account, so the account
10    that it's being transferred to.
11    Q.  So the $20,000 at 8:52:34 goes to -- you said KBKK?
12    A.  Correct.  That's the beneficiary.
13    Q.  Okay.  I'm going to mark that out so we have it exact.
14          KBKK gets the money.
15          And then what's KBKK's bank?
16    A.  The beneficiary bank is called Branch Banking and Trust
17    Company.
18    Q.  Okay.  And it's fair to shorten that as BB&T?
19    A.  That's correct.
20          MS. RATTAN:  I'll pass the witness, your Honor.
21          THE COURT:  Cross-examination?
22          CROSS-EXAMINATION OF ARTHUR HILSON
23    BY MR. SANDEL:
24    Q.  Good afternoon, Mr. Hilson.  How are you?
25    A.  I'm doing well.
```

1   Q.  Just have a couple follow-up questions for you about

2   some of the things you spoke with Ms. Rattan about, okay?

3           I want to start by looking at that first event

4   that the logs show, okay, the one at 7:11, okay?

5   A.  Okay.

6   Q.  Now, my understanding is the account was -- somebody

7   started to access the account, correct?  And then a message

8   screen popped up that said where would you like us to send

9   this authentication code, fair?

10  A.  It's multifactor, yes.

11  Q.  Okay.  And at that point the Internet window was closed

12  or something happened because they never selected "send it

13  here."  True?

14  A.  That's true.

15  Q.  So on that event, that's as far as -- whoever that was,

16  that's as far as they ever got, correct?

17  A.  Yes.

18  Q.  And that's why you said that event lasted about

19  6 seconds.

20  A.  (Moving head up and down.)

21  Q.  Now, moving forward to the second event, okay, this is

22  the one that was, I believe, at 8:44, correct?

23  A.  Correct, 23.

24  Q.  Now, this is the one where the account was actually

25  accessed, right?

1   A.  Correct.

2   Q.  Now, what I couldn't tell and I wanted you to clarify

3   for me, on this second event was a message -- that

4   multifactor authentication message ever generated?

5   A.  Not that I could tell from the logs.

6   Q.  Okay.  So on this second event, there was never a need

7   to put in a code or anything like that, correct?

8   A.  Not from -- not -- after examining the logs, I didn't

9   see that.

10  Q.  And so, of course -- and we just talked about that

11  first event.  Even though the system asked where do you

12  want to send a code, a code was never generated, right?

13  A.  No.

14  Q.  Okay.  So now we are at this second event where the

15  person has logged in, okay?

16          And you said a form was created; is that right?

17  A.  It was submitted, yes.

18  Q.  Submitted.

19          And that was a form requesting a wire transfer,

20  correct?

21  A.  Filling out the information for a wire transfer, so

22  yes.

23  Q.  And am I correct in assuming that if the user had not

24  submitted that form, the wire would never have been

25  initiated, right?

1    A.  That's correct.

2    Q.  So the act that put into motion sending this money was

3    the filling out of that wire form, correct?

4    A.  Correct.

5    Q.  And that happened during that second event, you said?

6    A.  Yes, at --

7    Q.  And if you could, just re-read to me what the IP

8    address was of that second event.

9    A.  The second event was 24.243.84.26.

10   Q.  Thank you.

11        MR. SANDEL:  And if we could please look at

12   Government's Exhibit 10, page 2.

13        If you could zoom in there.

14   BY MR. SANDEL:

15   Q.  Mr. Hilson, do you see this number here at the top?

16   A.  Yes.

17   Q.  Does that number appear to match?

18   A.  Yes.

19   Q.  So this number on Government's Exhibit 10, this IP

20   address seems to be the same IP address where this second

21   event occurred, correct?

22   A.  From the logs, yes.

23        MR. SANDEL:  Thank you, your Honor.  I'll pass the

24   witness.

25        THE COURT:  Additional questions?

 1              MS. RATTAN:  No, thank you, your Honor.

 2              THE COURT:  Can this witness be fully excused?

 3              MR. SANDEL:  Yes, your Honor.

 4              MS. RATTAN:  Yes, please.

 5              THE COURT:  Sir, you are free to leave.  Thank

 6     you.

 7              THE WITNESS:  Yes, sir.

 8              THE COURT:  What's next?

 9              MS. RATTAN:  The United States calls Special Agent

10     Jason Rennie.

11              THE COURT:  Agent Rennie, you understand you're

12     still under oath?

13              THE WITNESS:  I do, your Honor.

14              THE COURT:  Go ahead.

15              MS. RATTAN:  Thank you, your Honor.

16                   DIRECT EXAMINATION OF JASON RENNIE

17                   CALLED ON BEHALF OF THE GOVERNMENT

18     BY MS. RATTAN:

19     Q.  Please state your name.

20     A.  Jason Rennie.

21     Q.  And, of course, you're the lead FBI agent on the case;

22     is that right?

23     A.  I am.

24     Q.  Were you in the courtroom when Arthur Hilson just

25     testified about the two events related to James Seegan's

 1   account on February 21st of 2020?

 2   A.  I was.

 3   Q.  And you also have reviewed the records and evaluated

 4   that event and what happened, or those events and what

 5   happened?

 6   A.  I did.

 7   Q.  So let me direct your attention first to the attempt

 8   that happened at 7:11:30 a.m., the 6-second event, if I can

 9   zoom it correctly this time.

10           So this is the first event, the attempt, right

11   here.

12   A.  Correct.

13   Q.  Have you reviewed the records to determine where this

14   IP address is where the first attempt that day was made to

15   access James Seegan's account?

16   A.  I have.

17   Q.  Now, of course, we all know this is February 21st of

18   2020 and Mr. Seegan died on February 19th of 2020; is that

19   right?

20   A.  Correct.

21   Q.  And then this is early morning, about a day after he's

22   died; is that right?

23   A.  Correct.

24   Q.  So you looked at the IP address, this one,

25   47.186.106.152, to determine where this happened?

1    A.  I did.

2    Q.  And did you use records -- phone records, IP address

3    records to determine that?

4    A.  I did.

5    Q.  Let me direct your attention to Government's

6    Exhibit 25, page 2.

7            And can you explain what this is?

8    A.  Sure.  It's a Frontier Communications.  It's

9    essentially a subscriber record that was received pursuant

10   to a subpoena from Frontier essentially giving the

11   subscriber for a certain IP address during a certain date

12   range.

13   Q.  And it's Frontier Communications, and this is the IP

14   address right here; is that right?

15   A.  That's correct.

16   Q.  And it also has the customer's name and the account

17   address; is that right?

18   A.  It does.

19   Q.  And who does it say the customer is for this account?

20   A.  Sure.  During the time frame between May 31st, 2019,

21   and April 12th of 2020, the subscriber for IP address

22   47.186.106.152 is Keith Ashley; and the account address is

23   1211 Boerne Court, Allen, Texas, 75002.

24   Q.  So that's Keith Ashley, and this is the IP address?

25   A.  Correct.

1    Q.  Now, it has a start and end session.  What is this?

2    A.  That's the date -- typically when you request a

3    subpoena, this -- you're trying to determine when

4    somebody -- if you have an IP address that's on an email,

5    while the email is dated May the 2nd, then you want to

6    know -- maybe this is crucial in your case -- May the 2nd.

7            You just don't want to know who owns the IP

8    address in February.  You want to know when that email was

9    sent who owns it at that date and time.  So typically on

10   these subpoenas, you'll request a range that includes the

11   evidentiary date and time that you're interested in.

12           And so, therefore, this session start session end

13   includes the date of the transfer which, as we just saw and

14   mentioned, was February 21st of 2020.

15   Q.  Okay.  So you wanted to know the length of service on

16   the account, but you also wanted to make sure when you made

17   your inquiry that it encompassed the time period that you

18   were focusing on of February 21st of 2019 *(sic)*?

19   A.  Correct.

20   Q.  I mean, rather, 2020.

21   A.  2020, correct.

22   Q.  Yeah, sorry.

23           So, when you evaluated this IP address and you

24   compared it against the IP address that attempted to access

25   the James Seegan account on February 21st of 2020, what did

1    you conclude?

2    A.  They're identical.

3    Q.  So if you could tell me, looking at this Frontier

4    Communications with Keith Ashley's account and the IP

5    address that's on here, right here, if you could tell me

6    what that is.

7              We'll switch back to the document cam.

8              And if you could tell me on Government's

9    Exhibit 25, page 2, what the IP address is on that.

10   A.  The IP address contained on page 2 of the Government's

11   Exhibit 25 is 47.186.106.152.

12   Q.  Dot 152.

13             And so based on this, what conclusion did you

14   reach?

15   A.  The attempt to access Mr. Seegan's Texas Capital Bank

16   account on 2-21-20 was accessed from the IP address

17   47.186.106.152, which is an IP address that is controlled

18   and subscribed to by Keith Ashley of Allen, Texas.

19   Q.  And that, of course, is in the Eastern District of

20   Texas?

21   A.  Yes, it is.

22   Q.  And that is from Government's Exhibit 25, page 2?

23   A.  Correct.

24   Q.  Now, did you also determine what happened on this

25   second event here, which is the same date?  And then here

1   we are at 8:44:23 through 8:52:06.

2           Did you evaluate this IP address?

3   A.  I did.

4   Q.  And let me direct your attention to Government's

5   Exhibit 10, page 2.

6           And we just saw this displayed by defense counsel.

7   Can you explain to us what this is?

8   A.  Yes.  It is a subscriber record for Charter

9   Communications -- I think they became Spectrum

10  Communications -- for a subscriber record for IP address

11  24.243.84.26 during the time frame of 2-21 of '20.  The

12  range of this IP which is subscribed to is July 26th of

13  2019 through August 27th of 2020.

14  Q.  Okay.  So let's do the same thing and look at that

15  second IP address; and now you're looking at the phone

16  record, which is Government's Exhibit 10, page 2.  And this

17  is the IP address on the time when the money actually was

18  transferred; is that right?

19  A.  Yes.  The successful attempt of $20,000 was done

20  between 8:44 and 8:52.

21  Q.  And what was the IP address on that one?

22  A.  The IP address is 24.243.84.26.

23  Q.  84.26.

24          So the location on the attempt is Ashley; and then

25  the location when the $20,000 goes through, that's at the

1    Seegan house?

2    A.  Right.  The subscriber is Sakdida Seegan, 2114 Cannes

3    Drive.

4    Q.  Now let's focus on the actual $20,000 transfer.  Did

5    you track what was described by the bank to verify this

6    transaction?

7    A.  I did.

8    Q.  And did you track it from both accounts?  Were you able

9    to find that $20,000 transaction in James Seegan's account,

10   and were you able to find that transaction also in Keith

11   Ashley's account where the money went?

12   A.  Yes.

13          The wire was debited from Mr. Seegan's Texas

14   Capital Bank account, and it was credited to Mr. Ashley's

15   bank account at the Branch Banking and Trust ending in

16   8725.

17          MS. RATTAN:  If we can look at Government's

18   Exhibit 7A, page 36.

19   BY MS. RATTAN:

20   Q.  Can you describe what this is?

21   A.  It's a bank statement for Mr. Seegan's Texas Capital

22   Bank account.  The statement ending date is February 29th

23   of 2020.

24   Q.  And then if we can look at that middle portion and you

25   can tell us what's happening here.

1  A.  Sure.  As you see, the second line from the bottom,

2  2-21 of '20, there is a wire transfer out, an outgoing wire

3  transfer.

4        Based upon other evidence in the case, KBKK was

5  the recipient, which it appears Texas Capital Bank puts

6  that on their bank statements.

7        And the amount of the outgoing debited wire

8  transfer was $20,000.

9        And the next line, there is a fee associated, as

10  we all know with wire transfers if you send a wire

11  transfer.  So the fee which would be withheld by the bank

12  was $35 in this case.

13  Q.  And so you were able to track the $20,000 transfer; and

14  it's in James Seegan's banking records showing that it went

15  to KBKK?

16  A.  That's correct.

17  Q.  And did you also look at KBKK's bank account which, as

18  we know, is the Branch Banking and Trust, BB&T?

19  A.  I did.

20  Q.  So let me direct your attention to Government's

21  Exhibit 8A, page 128.  And can you tell us what we're

22  seeing here?

23  A.  Sure.  This is the February of 2020 bank statement, or

24  a page of the bank statement, for KBKK, LLC, of Allen,

25  Texas, with account number ending in 8725.

1  Q.  And describe what's happening.

2  A.  Yes.  If you see the last line there, 2-21 of '20, it

3  denotes an incoming wire transfer with a wire reference

4  number in the amount of $20,000.

5        MS. RATTAN:  And if we can also look at

6  Government's Exhibit 8A, page 761.

7  BY MS. RATTAN:

8  Q.  Can you describe what this is?

9  A.  Sure.  This is essentially a wire transfer receipt, for

10  lack of a better term.  It's not a full wire transfer

11  manifest.  But it corresponds to that $20,000 credit that

12  we just saw.

13        So it's a transaction date 2-21 of '20.  Amount,

14  $20,000.  The beneficiary account is the account for which

15  this record was pulled from, KBKK, LLC.  The originator was

16  James Seegan.  Originating bank, Texas Capital Bank NA; and

17  the account number -- the entire account number is not

18  redacted.  The ending account of the recipient, beneficiary

19  bank is -- ends in 8725.

20  Q.  Okay.  So, again, it's February 21st of 2020.  There's

21  $20,000.  And it's going from James Seegan's account to

22  KBKK?

23  A.  That's correct.

24  Q.  And, again, who is KBKK?

25  A.  KBKK is owned and controlled by Keith Ashley, the

 1  defendant.

 2  Q.  Now let me direct your attention to Government's

 3  Exhibit 114 and ask you if you've reviewed Government's

 4  Exhibit 114.

 5  A.  I have.

 6  Q.  And will you explain what Government's Exhibit 114 is.

 7          Oh, pardon me.  I gave you the wrong exhibit

 8  number.  It's 104.

 9  A.  Thank you.

10          Yes, I previously reviewed it.

11          MS. RATTAN:  Your Honor, may we publish

12  Government's Exhibit 104?

13          THE COURT:  Yes, you may.

14  BY MS. RATTAN:

15  Q.  Okay.  And, Agent Rennie, would you explain to us what

16  this is?

17  A.  Sure.  Essentially, this details the use of the funds

18  that are -- that were received into the KBKK, LLC, account

19  on 2-21, the $20,000 that was received from Mr. Seegan's

20  Texas Capital Bank account.

21          This individual format just kind of explains, as

22  the jury has seen before, how the money is utilized.

23  Q.  Okay.  So the question is Keith Ashley took James

24  Seegan's money and what did he do with it.  Is that --

25  A.  Exactly.

1    Q.   -- what you're trying to answer?

2    A.   Yes.

3    Q.   And following the same format and analysis as we've

4    seen with Matt Wylie before, did you look at the account

5    balance, the KBKK BB&T account balance when the $20,000

6    came in?

7    A.   We did.

8    Q.   And what was it?

9    A.   Approximately $1,500.

10   Q.   So you've got the James Seegan $20,000 and it comes in

11   on February 21st of 2020 and it's evaluated through

12   March 4th of 2020.

13          And, again, why those dates?

14   A.   That was the amount of time that it took for the

15   $20,000 that came into the account to be depleted.

16   Q.   So we look down here, and we see Denny Willmon is paid

17   and Leonid Shteyngart is paid.  What's going on here?

18   A.   Sure.  As the other -- as previous testimony would

19   show, these are payments for investments that purported

20   that Mr. Willmon and Mr. Shteyngart believed that they had

21   invested with Keith Ashley; and these were their expected

22   returns.

23   Q.   So going back to the Ponzi scheme --

24   A.   Correct.

25   Q.   -- would what we see here with the $20,000 be

```
 1   consistent with what the Ponzi scheme had established

 2   previously?

 3   A.  Yes.

 4   Q.  Now, if Mr. Seegan hadn't died, would the defendant,

 5   Keith Ashley, have continued to owe him these Ponzi scheme

 6   payments monthly coming out of Keith Ashley's account?

 7   A.  He would have.

 8   Q.  So when Mr. Seegan died, did that, in and of itself,

 9   immediately benefit the defendant, Keith Ashley?

10          MR. WHALEN:  Objection, calls for speculation.

11          THE COURT:  Just rephrase the question.

12   BY MS. RATTAN:

13   Q.  Based on the financial analysis that has been done in

14   this case, was there a Ponzi scheme taking place?

15   A.  There was.

16   Q.  And monthly was the defendant, Keith Ashley, paying the

17   victims of the Ponzi scheme out of his account?

18   A.  He was.

19   Q.  And is that, in and of itself, a sign of a Ponzi

20   scheme?

21   A.  It is.

22   Q.  So when Mr. Seegan died, did it mean that Keith Ashley

23   would no longer have to pay him the Ponzi scheme money?

24          MR. WHALEN:  Objection, calls for speculation.

25          THE COURT:  Overruled.
```

```
 1   A.   That's correct.  With the death of Mr. Seegan, his
 2   financial -- his monthly financial obligation went away;
 3   and the money that Mr. Seegan had given to Mr. Ashley for
 4   the purported investment, which the evidence showed has
 5   been -- was spent on things other than investments, would
 6   never have to be repaid.
 7   BY MS. RATTAN:
 8   Q.   Okay.  So part of the $20,000 goes to the Ponzi scheme
 9   victims Denny Willmon and Leonid Shteyngart.  Can you walk
10   us through what happened to the rest of James Seegan's
11   $20,000?
12   A.   Sure.  As you're looking at the chart, to the left
13   $5,000 went to a personal account at Bank of America, which
14   a thousand of that went on to a personal account also at
15   Bank of America, which 900 was returned.  A portion of that
16   was used on retail and restaurants.
17           And if you travel down the left side of the chart,
18   almost -- you know, $1,549 went to a third personal
19   account, which it looks like a good portion of that was
20   used on tuition.  2,300-plus dollars was used on credit
21   cards.
22           And then on the right side, $10,000 of the money
23   that was stolen from Mr. Seegan --
24           MR. WHALEN:  Objection to the characterization it
25   was stolen.
```

```
 1              THE COURT:  Sustained.  Just --
 2   BY MS. RATTAN:
 3   Q.  What happened to the $10,000?
 4   A.  $10,000 was moved to Mr. Ashley's North Texas Money
 5   Management account at Chase.
 6              7,500 of that was moved to a KBLS1996 account
 7   that's controlled by Mr. Ashley.
 8              2,400 was moved to Nine Band Brewery.
 9              And then of the 7,500, it looks like that 7,500
10   was divided into a personal account at American National
11   Bank & Trust and 6,400 was moved to KBKK, LLC, which was
12   then moved also to Nine Band Brewery.
13              So the right side is essentially business
14   expenses.  The left side is essentially personal expenses.
15   And the middle is Ponzi payments.
16   Q.  And a cash withdrawal here of $1,500?
17   A.  Correct.
18   Q.  So you've got business, personal, Ponzi, and cash.
19   A.  Correct.
20   Q.  Did it appear, as you reviewed what happened to the
21   $20,000, that any of this $20,000 went to the benefit of
22   James Seegan's family?
23   A.  It did not.
24              MS. RATTAN:  I'll pass the witness.
25              THE COURT:  Cross-examination?
```

```
 1              MR. WHALEN:  No questions, your Honor.

 2              THE COURT:  Okay.  You may step down, Agent.

 3  Thank you.

 4              THE WITNESS:  Thank you, your Honor.

 5              MS. RATTAN:  Your Honor, may I offer this as an

 6  exhibit?  I'll just offer it as the next consecutive

 7  exhibit number.

 8              THE COURT:  That would be what number?

 9              MS. RATTAN:  133.

10              THE COURT:  Any objection?

11              MR. WHALEN:  Your Honor, I'd object.  It's an

12  improper -- it's a summary, which would be a demonstrative,

13  not an exhibit.

14              THE COURT:  Ms. Rattan?

15              MS. RATTAN:  I don't think it's a summary.  I

16  think it explains complicated testimony.

17              THE COURT:  Objection overruled.  It will be

18  admitted.

19              MS. RATTAN:  And then when I said I'll offer

20  "this," I don't think I was clear for the record.  I'll

21  offer a document that was created during two witnesses'

22  testimony.  The witnesses were Arthur Hilson and Special

23  Agent Jason Rennie.

24              The document reflects the attempted access to

25  James Seegan's account and a then-consummated $20,000
```

1  transaction and it includes the IP addresses.  And I've

2  marked it, offered it, and the Court has admitted it as

3  Government's Exhibit 133.

4          THE COURT:  Okay.  Thank you.

5          What's next?

6          MS. RATTAN:  Pardon me?

7          THE COURT:  What's next?

8          MS. RATTAN:  Oh, may we approach, your Honor?

9          THE COURT:  Yes.

10         (Sidebar conference, off the record.)

11         THE COURT:  Okay.  So, ladies and gentlemen, we're

12  going to stop just a little bit early.  We're still on

13  track so -- so, again, please don't discuss the case among

14  yourself or anyone else.  Please don't do any outside

15  research.

16         Have you finished the coffee cake?

17         A JUROR:  Yes.

18         THE COURT:  Okay.  I'll see what I can do.  I'm

19  not going to promise anything.  I'm going to the Baylor

20  game this weekend so I don't know what I'll have a chance

21  to bake on Sunday, but I'll see what I can do.  No

22  promises, but I'll try.

23         But have a safe weekend.  Have a safe drive home.

24  We'll see you Monday.  And we'll start back at 9:00, so

25  just be here right before 9:00 on Monday.  Have a good

 1    weekend.

 2              (The jury exits the courtroom, 4:35 p.m.)

 3              THE COURT:  So what I will do is I will go ahead

 4    and have my lawyer send you a PDF of the proposed charge

 5    and verdict here before we leave today.  If you have any

 6    major issues, just please email him back over the weekend

 7    so that we can look at those just to make things smoother

 8    on Monday.

 9              The other thing is I think Ms. Conrad is going to

10    have y'all maybe start looking at the exhibits and also if

11    you'll come and look at the redacted Indictment -- because

12    I send it back to the jury -- so you can sign off on that.

13              Anything else from the government?

14              MS. RATTAN:  No, your Honor.

15              THE COURT:  Anything else from defense?

16              MR. WHALEN:  Your Honor, once again I'm going to

17    object to the board being up continuously.  I mean, the

18    jury is just staring at it the entire time and it's a

19    demonstrative that normally would not be up in front of the

20    jury on a regular basis and it's been -- it's prejudicial.

21    And so we would object that it's been up and continues to

22    be up.

23              And so we would ask that the government continue

24    to pull it down when -- only have it up whenever they are

25    using it versus keeping it up during the time of their

 1   entire presentation.

 2           MS. RATTAN:  May I be heard?

 3           THE COURT:  Yes.

 4           MS. RATTAN:  Your Honor, may the record reflect

 5   that Mr. Combs has continuously and conscientiously turned

 6   the board when we've passed the witness and that's how it's

 7   been handled.  So we're aware of the defense's request, and

 8   we're trying to accommodate it.  We think it's appropriate

 9   to display the board when the government's presenting

10   witnesses.

11           THE COURT:  Well, and I agree with the government.

12   Mr. Whalen, Mr. Combs has been flipping it when you do

13   cross-examination.  They just finished a witness that you

14   didn't cross-examine so --

15           And the other thing is, too, I don't believe your

16   characterization that the jury is focused on that because

17   it's behind them.  The witness is here, so they are not --

18   I mean, I can see them.  They are not staring at the board

19   when they are watching the witnesses, so I don't

20   necessarily agree with your characterization.

21           But I don't know -- there is nothing for me to

22   instruct them because Mr. Combs has done exactly what

23   you've asked.

24           MR. WHALEN:  No, but I think also later this

25   afternoon -- I don't -- when Mr. Sandel has been up, I

Jury Trial, Volume 5                                    1384

1    think it has remained up.

2          THE COURT:  Well, again, I noticed he's been doing

3    it.  So certainly if we -- if it got missed, all you had to

4    do was ask and it would have been flipped.

5          But, again, I don't -- they are going to offer

6    that as a -- they are going to offer that as an exhibit, I

7    know, when this is over.  And the Court is going to allow

8    that, so the jury is going to have it back as one of their

9    exhibits.

10         MR. WHALEN:  Well, and we -- I mean, I -- okay.

11   We'll object when the time comes.

12         THE COURT:  Oh, I know.  I understand.

13         MR. WHALEN:  Right.

14         THE COURT:  Well, just considering their past

15   behavior in other trials, I know that's coming.

16         MR. WHALEN:  Right.  I understand.

17         THE COURT:  Okay.  Anything else, Mr. Whalen?

18         MR. WHALEN:  No, not that I can think of.

19         THE COURT:  Okay.  Very good.  Well, I'll see

20   y'all Monday at 9:00 a.m.  Thank you.

21         (Proceedings adjourned, 4:39 p.m.)

22   COURT REPORTER'S CERTIFICATION

23         I HEREBY CERTIFY THAT ON THIS DATE, OCTOBER 31,
     2022, THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD
24   OF PROCEEDINGS.

25                    /s/
                      CHRISTINA L. BICKHAM, CRR, RDR