1              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF TEXAS
2                   SHERMAN DIVISION

3    UNITED STATES OF AMERICA      |  DOCKET 4:20-CR-318
                                   |
4                                  |  OCTOBER 3, 2022
     VS.                           |
5                                  |  8:54 A.M.
                                   |
6    KEITH TODD ASHLEY            |  SHERMAN, TEXAS

7    ----------------------------------------------------------

8         VOLUME 6 OF 8, PAGES 1385 THROUGH 1637

9         REPORTER'S TRANSCRIPT OF JURY TRIAL

10      BEFORE THE HONORABLE AMOS L. MAZZANT, III,
         UNITED STATES DISTRICT JUDGE, AND A JURY

11   ----------------------------------------------------------

12
     FOR THE GOVERNMENT:     HEATHER HARRIS RATTAN
13                           JAY COMBS
                             U.S. ATTORNEY'S OFFICE - PLANO
14                           101 E. PARK BOULEVARD, SUITE 500
                             PLANO, TX 75074
15
                             JASON FINE
16                           DALLAS COUNTY D.A.'S OFFICE
                             133 N. RIVERFRONT BOULEVARD
17                           DALLAS, TX 75207

18
     FOR THE DEFENDANT:      JAMES P. WHALEN
19                           RYNE THOMAS SANDEL
                             WHALEN LAW OFFICE
20                           9300 JOHN HICKMAN PKWY, SUITE 501
                             FRISCO, TX 75035
21

22   COURT REPORTER:         CHRISTINA L. BICKHAM, CRR, RDR
                             FEDERAL OFFICIAL REPORTER
23                           101 EAST PECAN
                             SHERMAN, TX 75090
24

25      PROCEEDINGS RECORDED USING MECHANICAL STENOGRAPHY;
     TRANSCRIPT PRODUCED VIA COMPUTER-AIDED TRANSCRIPTION.

1                              INDEX

2

3                                                        PAGE

4    MATTHEW WYLIE
           DIRECT EXAMINATION BY MS. RATTAN           1399
5          CROSS-EXAMINATION BY MR. WHALEN            1410

6    JASON RENNIE
           DIRECT EXAMINATION BY MS. RATTAN           1412
7          CROSS-EXAMINATION BY MR. WHALEN            1506

8    UNITED STATES RESTS                              1522

9    DEFENSE RESTS                                    1526

10   UNITED STATES CLOSES                             1526

11   DEFENSE CONDITIONALLY CLOSES                     1526

12   RULE 29 MOTION FOR A JUDGMENT OF ACQUITTAL       1528

13   OBJECTION TO THE COURT'S CHARGE TO THE JURY      1541

14   DEFENSE RENEWS RULE 29 MOTION                    1541

15   CLOSING ARGUMENT BY MS. RATTAN                   1546

16   CLOSING ARGUMENT BY MR. WHALEN                   1588

17   REBUTTAL ARGUMENT BY MR. COMBS                   1619

18   COURT REPORTER'S CERTIFICATION                   1637

19

20

21

22

23

24

25

 1                         INDEX OF EXHIBITS

 2

 3                                                        PAGE

 4    Government's Exhibit 56A                            1400

 5    Government's Exhibit 56B                            1400

 6    Government's Exhibit 8A                             1401

 7    Government's Exhibit 8A                             1406

 8    Government's Exhibit 11A                            1409

 9    Government's Exhibit 97                             1413

10    Government's Exhibit 134                            1415

11    Government's Exhibit 56A                            1417

12    Government's Exhibit 49                             1421

13    Government's Exhibit 134                            1421

14    Government's Exhibit 52B                            1422

15    Government's Exhibit 52C                            1423

16    Government's Exhibit 134                            1424

17    Government's Exhibit 134                            1428

18    Government's Exhibit 4B                             1430

19    Government's Exhibit 134                            1435

20    Government's Exhibit 97                             1439

21    Government's Exhibit 134                            1446

22    Government's Exhibit 134                            1449

23    Government's Exhibit 79                             1453

24    Government's Exhibit 88A                            1455

25    Government's Exhibit 88A                            1460

| | | |
|---|---|---|
| 1 | Government's Exhibit 88A | 1460 |
| 2 | Government's Exhibit 127A | 1463 |
| 3 | Government's Exhibit 125B | 1464 |
| 4 | Government's Exhibit 17 | 1465 |
| 5 | Government's Exhibit 29A | 1467 |
| 6 | Government's Exhibit 109 | 1470 |
| 7 | Government's Exhibit 113 | 1470 |
| 8 | Government's Exhibit 124A | 1475 |
| 9 | Government's Exhibit 79 | 1479 |
| 10 | Government's Exhibit 133 | 1481 |
| 11 | Government's Exhibit 98 | 1484 |
| 12 | Government's Exhibit 98 | 1485 |
| 13 | Government's Exhibit 127A | 1486 |
| 14 | Government's Exhibit 99 | 1488 |
| 15 | Government's Exhibit 125B | 1489 |
| 16 | Government's Exhibit 126 | 1497 |
| 17 | Government's Exhibit 127A | 1499 |
| 18 | Government's Exhibit 125B | 1517 |
| 19 | Government's Exhibit 10 | 1519 |
| 20 | Government's Exhibit 22 | 1586 |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

```
 1              (Open court, defendant present jury not present.)

 2              THE COURT:  Please be seated.

 3              First thing, I just wanted to advise the parties

 4     that Juror Number 14 reached out, yesterday tested positive

 5     for COVID; so I released Juror 14 to come today.

 6              What else?  Was there some other issue y'all

 7     wanted to raise?

 8              MR. WHALEN:  Yes, your Honor.

 9              Last night -- our paralegal, Ms. Wilson, is a

10     member of a Facebook group called Official McKinney Moms.

11     I think you have a copy of it there.  And someone posted

12     last night -- it says (as read):  "Has anyone served on a

13     jury for murder?  I feel like I have some traumatic

14     response to what I saw and heard.  I cannot sleep at all.

15     Wondering if anyone has had similar experience.  Just

16     desperately wanting sleep.  I'm so exhausted."

17              And then on the second page of what we've tendered

18     somebody replied, a Heidi Weiss (as read):  "If this was

19     recent, I may know the case you heard.  If so, I'm so

20     sorry.  I know way too many details and the whole situation

21     makes my mama heart hurt.  I would say talking to someone

22     would help, possibly counseling.  If you want to message me

23     and it's the case that I think it went to trial last week,

24     you are welcome to.  I can listen.  Regardless, prayers,

25     you find peace and rest."
```

 1          So we have -- I have no -- whether it's related to

 2   this case or not.  But the fact it is in McKinney, which is

 3   in the Eastern District, and it relates to a case that

 4   started or was heard -- started to be heard last week and

 5   there is that reference to last week, we would request or

 6   think it would be prudent for the Court to inquire of the

 7   jurors to see whether or not anyone at all has posted

 8   anything to Facebook and has been contacted by somebody

 9   outside of that.

10          THE COURT:  Well, have you checked to see -- I

11   mean, none of these are jurors in this case, correct?

12          MR. WHALEN:  The post was anonymous; so there is

13   no way to know exactly who posted it, from what -- our

14   initial review of it.

15          THE COURT:  Ms. Rattan?

16          MS. RATTAN:  Well, the post, of course, as the

17   Court points out, is anonymous.  But even if it were one of

18   our jurors, this doesn't violate any order that the Court

19   has given the jury.  The Court told the jury you can tell

20   people that you're serving on a jury.  What they've done

21   here is said, "I'm serving on a murder jury" and, very

22   understandably, they're upset.  Nothing about this is

23   outside the instructions that the Court has given this

24   jury.

25          Additionally, we've checked with Collin County

1   District Attorney's Office; and they've reported that they

2   had two murder cases go to trial last week.  So that would

3   also be consistent with this type of an email (*sic*).

4        Additionally, it's not unheard of that someone

5   would move to another county and stay in the same friend

6   group; and Mr. Fine reports that there are also murder

7   cases that went to trial in Dallas County last week.

8        So there's no way to tie this directly to this

9   case; and even if there were, the person has done nothing

10  inappropriate.

11       THE COURT:  Well, I don't feel compelled to

12  inquire of the jury of this, Mr. Whalen.  I will again

13  repeat my instructions, you know, at the end of today about

14  reminding them not to look at anything -- any newscasts and

15  I'll expand that to -- because there has at least been one

16  story about the case but also, you know, don't look at any

17  social media referring to the case and again reminding them

18  they shouldn't be posting anything about the case or

19  anything like that, too.  So I will do that.

20       I don't think -- there is nothing that ties this

21  to our case directly so -- and I think Ms. Rattan is right.

22  I mean, if this is a juror that posted this, other than

23  they are not supposed to be posting about the case, I don't

24  think it's that egregious so --

25       MR. WHALEN:  And the only thing I would say that

```
 1  the concern is that somebody said "if you need to reach out
 2  to me," whether or not there were some conversations.  And
 3  that's really the bigger concern, is whether there is some
 4  outside influence.  So --
 5          THE COURT:  Well, again --
 6          MR. WHALEN:  And also I understand, too -- we
 7  don't have the ability to search Collin County to see what
 8  cases went to trial last week.
 9          THE COURT:  Right.
10          MR. WHALEN:  And so we understand that.
11          But I would like -- I understand the
12  Court's ruling.  We would like to have that marked as --
13  whether it's Defendant's Exhibit 1 -- as part of the record
14  for purposes of appeal.
15          THE COURT:  I understand.
16          MR. WHALEN:  All right.
17          THE COURT:  And I will certainly do that.
18          MR. WHALEN:  All right.  Thank you.
19          THE COURT:  I will give it to my courtroom deputy
20  after -- I'm leaving it on my desk here so I can remind
21  myself to make sure I say something at the end of the day.
22          MR. WHALEN:  Thank you, your Honor.
23          THE COURT:  Anything else?
24          MS. RATTAN:  No, just in terms of the schedule
25  this morning.  The government will call two more witnesses,
```

1  and then we plan to rest.

2          THE COURT:  Okay.

3          MR. WHALEN:  And, your Honor, the government

4  tendered a copy of a PowerPoint they're going to use with

5  Agent Rennie.  We do have some objections to it, and I

6  don't know whether you want us to take them up now or later

7  on.

8          THE COURT:  I assume that's their second witness?

9          MS. RATTAN:  It is.

10         THE COURT:  So I guess we should take it up now --

11         MR. WHALEN:  Okay.

12         THE COURT:  -- because I assume the first witness

13 is not very long.

14         Okay.  Go ahead, Mr. Whalen.

15         MR. WHALEN:  Your Honor, as it -- do you have the

16 exhibit?

17         THE COURT:  I do not.

18         MS. RATTAN:  May I approach?

19         THE COURT:  Yes.

20         MS. RATTAN:  It's been added to the Court's book.

21 Additionally, here is --

22         THE COURT:  Oh, I'm sorry.

23         MS. RATTAN:  -- just a loose copy.

24         No, no.  We should have told you.  134.

25         THE COURT:  Okay.  I have it.

1          MR. WHALEN:  Your Honor, if you would turn your

2    attention to page 28 of the slide.  I think it's listed as

3    134028.

4          THE COURT:  Ms. Rattan, there is a page of, I

5    think, some notes.

6          MS. RATTAN:  Oh, may I approach?

7          THE COURT:  So if you want to approach and get

8    that.

9          MS. RATTAN:  That would be inadvertent.

10          THE COURT:  No, I understand.  I haven't looked

11    it, just --

12          MS. RATTAN:  Thank you.

13          THE COURT:  Okay.  Page 28.

14          MR. WHALEN:  Yes, your Honor.  Under the

15    caption "February 19, 2020," it states on the slide -- the

16    proposed slide "Keith Ashley carries/possesses in

17    furtherance a firearm to James Seegan's residence."

18          We believe that is a jury issue and improper

19    testimony and prejudicial for that to be listed on the

20    slide.  That's a legal conclusion that the jury is supposed

21    to decide, not for Agent Rennie to testify about.

22          THE COURT:  Ms. Rattan?

23          MS. RATTAN:  That would be something that goes to

24    the weight, not the admissibility of the language.  That's

25    something that can be brought up on cross-examination,

 1  perhaps highlighted through an objection at the time that

 2  the witness reaches it.

 3          THE COURT:  Okay.  Overruled.

 4          What else?

 5          MR. WHALEN:  And then we would object to page 30

 6  with the caption that says "Keith Ashley attempts to take."

 7  That with Agent Rennie testifying to the word "attempt,"

 8  that is a legal definition that the jury is entitled to

 9  figure out on their own; and it would be improper for Agent

10  Rennie to make a legal conclusion and supplant his opinion

11  for that of the jury.

12          MS. RATTAN:  It's already been testified to.

13  Arthur Hilson was the bank representative of Texas Capital

14  Bank; and he very clearly testified that the morning of

15  February 21st someone attempted, from the defendant's IP

16  address, to reach Mr. Seegan's bank account.

17          THE COURT:  Okay.  Overruled.

18          MR. WHALEN:  And we would object to Slide --

19  page 31, (as read):  "Keith Ashley takes 20,000 from James

20  Seegan's account."  I think the word "take" in this

21  particular case, with Agent Rennie testifying to, it is

22  different because the jury charge does have a -- you know,

23  the statute has the word "take" in it and therefore, once

24  again, it is him opining and reaching a legal conclusion

25  and supplanting his view for that of the jury and it would

1  be improper for him to do so and we would object to that

2  slide as well and any testimony around it.

3          THE COURT:  Ms. Rattan, same --

4          MS. RATTAN:  Yes, your Honor.

5          THE COURT:  Okay.  Overruled.

6          Anything else, Mr. Whalen?

7          MR. WHALEN:  Not at this time, your Honor.

8          THE COURT:  Okay.  Very good.

9          And let me just ask a question before we bring the

10  jury in.  I didn't get any comments from the government

11  regarding the charge; but from the defense, you had raised,

12  I think, six issues.  The one about --

13          MR. WHALEN:  Before I cut you off, your Honor, I

14  think the government did respond late last night --

15          THE COURT:  Oh, okay.  I didn't see that.

16          MR. WHALEN:  -- to that -- at 11:54 p.m.

17          MS. RATTAN:  We work late.

18          THE COURT:  Okay.  My lawyer didn't get that so --

19          MS. RATTAN:  Sorry.  May we resend it, your Honor?

20          THE COURT:  Yeah, please do.

21          And there is a question maybe on the spelling.

22  Also just go ahead and add in Ms. Conrad to it, too, so I

23  can see that.

24          Okay.  So Number 1, of course, I'll remove the

25  issue regarding -- that was only -- the issue of the

1    defendant testifying was only put in there with the

2    prospects of if he would.

3           On the second issue was -- I typically don't name

4    all of the experts, so I just have a general expert issue,

5    so I don't usually -- I mean, we declared certain people to

6    be held as experts; but usually I don't include all their

7    names.

8           The third one was the confession instruction.

9    I'll remove that.

10          The fourth one was the issue of deliberate

11   ignorance.  Ms. Rattan, what's the government's -- I don't

12   know that it's appropriate in this case to include that.

13          MS. RATTAN:  We agree.

14          THE COURT:  Okay.  It was something you requested

15   but -- so I'll remove that as well.

16          Number 5 was the issue regarding attempt and a

17   conspiracy for the robbery language.  I think he is correct

18   on that.  Ms. Rattan, you agree or disagree?

19          MS. RATTAN:  We agree, and that's -- we suggested

20   it in our email as well.

21          THE COURT:  Okay.  So, yeah, I'll go ahead and

22   remove that.

23          And then the last one was the definition of

24   "territorial jurisdiction."  We're going to add that, of

25   course.

 1            The only thing I'm going to change is the venue --

 2    the general venue instruction is going to be moved over to

 3    924(c) charge.  It's not part of the murder.  The murder is

 4    the territorial jurisdiction of the United States.

 5            We can talk about that later; but, I mean, we did

 6    not have the definition, which is an element of the offense

 7    under 1111 so -- but I thought it would be confusing, so we

 8    moved the general venue instruction which is applicable to

 9    the 924(c) count.

10            MS. RATTAN:  Yes, your Honor.

11            THE COURT:  Okay.

12            MS. RATTAN:  Well, and we raised multiple issues

13    and commented on the defendant's.  I don't know.  Maybe --

14    because I cut and pasted Mr. Ruiz's email.  Anyway, we've

15    just resent it.

16            THE COURT:  Okay.  He's going to forward it to me

17    and -- I haven't looked at those yet, so we'll deal with

18    that afterwards.

19            Okay.  Anything else before I bring the jury in?

20            MS. RATTAN:  No, your Honor.

21            MR. WHALEN:  No, your Honor.

22            THE COURT:  Okay.  Let's go ahead and bring the

23    jury in.

24            (The jury enters the courtroom, 9:06 a.m.)

25            THE COURT:  Okay.  Please be seated.

1                Ladies and gentlemen, welcome back.  I hope you

2    had a nice weekend.  It was a complete washout for my

3    football teams although I won in my fantasy football

4    league, but all of my other teams lost but -- sorry, I

5    digress.  But welcome back.  Hope your teams all won.

6                Okay.  The government's next?

7                MS. RATTAN:  Thank you, your Honor.  The United

8    States recalls Matt Wylie.

9                THE COURT:  Sir, you understand you're still under

10   oath?

11               THE WITNESS:  Yes, your Honor.

12               THE COURT:  Okay.  Go ahead, Ms. Rattan.

13               MS. RATTAN:  Thank you, your Honor.

14                  DIRECT EXAMINATION OF MATTHEW WYLIE

15                  RECALLED ON BEHALF OF THE GOVERNMENT

16   BY MS. RATTAN:

17   Q.  Please state your name and go ahead and spell your last

18   name again.

19   A.  Matthew Wylie, W-Y-L-I-E.

20   Q.  And, of course, you work for the FBI.  You're a CPA and

21   a financial analyst.

22   A.  Correct.

23   Q.  You've testified multiple times in this trial about

24   financial issues and essentially what happened to the Ponzi

25   scheme victims' money; is that right?

```
 1  A.  Correct.

 2          MS. RATTAN:  May we publish Government's

 3  Exhibit 56A?

 4          THE COURT:  Yes, you may.

 5  BY MS. RATTAN:

 6  Q.  Now, this is a slide that you've testified to before.

 7  It essentially is what happened to James Seegan's $150,000

 8  that he gave to the defendant; is that right?

 9  A.  Correct.

10  Q.  And we did an overview of this, and none of it went to

11  an investment; is that correct?

12  A.  Correct.

13  Q.  And, in fact, you saw money going back to other

14  investors and money going to Mr. Seegan?

15  A.  Correct.

16  Q.  Then let's look at Government's Exhibit 56B.  That was

17  $150,000.

18          MS. RATTAN:  Now 56B, page 1.

19          56B, page 1.

20  BY MS. RATTAN:

21  Q.  Okay.  And this is Victim James Seegan as well, and

22  this was $120,000; is that right?

23  A.  Correct.

24  Q.  Okay.  So those are two instances that you've already

25  covered in terms of what happened to Mr. Seegan's money
```

1  that he thought he was investing with the defendant

2  historically.

3         Let's move forward in time and I want to ask you

4  about the time period of April of 2019 and I want to look

5  at Mr. Seegan's investment with the defendant in April of

6  2019.

7         Did you review Keith Ashley's records as it

8  relates to the month of April of 2019 to determine whether

9  there was another amount of money that James Seegan gave to

10 the defendant?

11 A.  Yes, I did.

12 Q.  Okay.  Let me direct your attention to Government's

13 Exhibit 8A, page 175.

14         Okay.  Can you explain to us -- we're just jumping

15 into a record here.  Can you explain to the jury what this

16 record is?

17 A.  This is a bank statement provided by BB&T for the KBKK,

18 LLC, account ending in 8725.

19 Q.  Okay.

20 A.  This page right here shows -- at the top it's

21 withdrawals, and at the bottom it's the deposits into the

22 account.

23 Q.  And this account is KBKK and it's BB&T, Branch Banking

24 and Trust.  And that was the defendant, Keith Ashley's bank

25 account; is that right?

1  A.  Correct.

2  Q.  So we're looking at April of 2019 and we were talking

3  about money from James Seegan and down here, under

4  "Deposits, credits and interest," it says that there was an

5  incoming wire transfer of $225,000; is that right?

6  A.  Correct.

7  Q.  And could you tell, based on these records, where the

8  $225,000 came from?

9  A.  Yes.

10 Q.  Let me direct your attention to Government's 8A,

11 page 822.

12         Is this the $225,000 transfer?

13 A.  It is.

14 Q.  Okay.  So it comes in on April 1st of 2019, and it's

15 from who?

16 A.  James Seegan.

17 Q.  James Seegan is the originator.  That's the person

18 sending it.

19         And the beneficiary is who?

20 A.  KBKK, LLC.

21 Q.  And then, in fact, it has Keith Ashley's name there; is

22 that right?

23 A.  Yes.

24 Q.  So April of 2019 $225,000 come into Keith Ashley's

25 account from James Seegan.

1         MS. RATTAN:  And let's go back to page 175.  8A,

2   157.

3   BY MS. RATTAN:

4   Q.  And can you give us an overview of what was going on

5   with this money?

6   A.  So after the money came in, it was disbursed to a few

7   other accounts owned by Mr. Ashley; and then there was also

8   significant activity at casinos.

9   Q.  So the first thing you said is that a portion of the

10  $225,000 went to other accounts that were Mr. Ashley's?

11  A.  Correct.

12  Q.  And is that consistent with how you saw him move

13  investor money?

14  A.  Yes.

15  Q.  Comes into KBKK and he puts it out in his other

16  accounts?

17  A.  Yes.

18  Q.  Now, in this instance he did that but then he also used

19  this account, his KBKK account, and made expenditures; is

20  that right?

21  A.  Yes.

22  Q.  So if you could just -- and you can touch the screen up

23  there and direct us to certain events.

24         But is he spending money at casinos?

25  A.  Yes.

1    Q.  Can you walk us through that?

2    A.  So on 4-4 there are two debit card purchases at Choctaw

3    Casino, here and there.

4            On 4-12 there's two purchases at American

5    Airlines, there and there.

6            On 4-12 there is another debit card purchase at

7    Choctaw Casino.

8            On 4-16 there's two more purchases at Choctaw

9    Casino.

10           On 4-22, three additional purchases at Choctaw

11   Casino.

12           And then on 4-29 there's one, two, three, four,

13   five, six -- seven purchases at Golden Nugget Casino in Las

14   Vegas.

15   Q.  So there's -- would you say significant involvement

16   with two separate casinos in two separate states?

17   A.  Correct.

18   Q.  He's spending money in Oklahoma at Choctaw and in Las

19   Vegas, Nevada, at the Golden Nugget?

20   A.  Correct.

21   Q.  And based on your evaluation of this $225,000 coming

22   in, does it appear that Mr. Seegan's money, James Seegan's

23   money, was spent by the defendant, Keith Ashley, gambling?

24   A.  Yes.

25   Q.  Now, also in here we see where it says "ACH

 1  settlement," right there.

 2  A.  Yes.

 3  Q.  What is "ACH settlement"?  What does that mean?

 4  A.  Those are account-to-account transfers from the

 5  account.

 6  Q.  So sending money from KBKK just to another account?

 7  A.  Correct.

 8  Q.  And did you check to see what money was being

 9  transferred?

10  A.  Yes.

11  Q.  And to what accounts?

12  A.  Yes.

13  Q.  Let me direct your attention to 8A, page 1180.

14          MS. RATTAN:  I believe it's 8A, 1180.

15          Maybe 7A?

16  BY MS. RATTAN:

17  Q.  And while we're attempting to pull it up, these were

18  account-to-account transfers, the ACH transfers, in

19  April of 2019, correct?

20  A.  Correct.

21  Q.  Can you tell the jury where those account transfers --

22  where was the money going?

23  A.  Other investors.

24  Q.  And when you say "other investors," what do you mean?

25  A.  Mr. Shteyngart, Mr. Willmon, and Mr. Seegan.

1   Q.   So the $225,000 comes in from Mr. Seegan in April of

2   2019; and it goes to -- the money goes to Choctaw, Golden

3   Nugget, and other investors?

4   A.   Correct.

5   Q.   Does this appear to be a Ponzi scheme to you?

6   A.   Yes.

7   Q.   And does it look like Mr. Seegan's money was diverted

8   for entertainment for the defendant?

9   A.   Yes.

10  Q.   Now let me ask direct your attention to February

11  of 2020.  So now we're moving into this time period right

12  here, February of 2020.  And let's look at the defendant,

13  Keith Ashley's actual banking records and see what he was

14  doing in February of 2020.

15          MS. RATTAN:  If we can look at 8A, page 127.

16  BY MS. RATTAN:

17  Q.   Okay.  Can you explain to us what this is?

18  A.   This is an account statement for February 2020 for the

19  KBKK, LLC, account at BB&T ending in 8725.

20  Q.   So -- this is the end of the month, so it's going to

21  summarize the month of February of 2020?

22  A.   Correct.

23  Q.   So tell us what was happening in this month.

24  A.   So in this month it received $20,000 from James Seegan;

25  and then it has various activity, including additional

 1  withdrawals at casinos.

 2  Q.  And go ahead and point out the casino withdrawals for

 3  us.

 4  A.  So on 2-10 we have three debit card purchases at

 5  Choctaw Casino as well as two ATM withdrawals in Durant,

 6  Oklahoma, which is the location of Choctaw Casino.

 7          MS. RATTAN:  And then if we can look at page 128.

 8  8A, page 128.

 9  BY MS. RATTAN:

10  Q.  And this is that same February statement.  You said

11  that there was a wire coming in and that that was from

12  Mr. Seegan; is that right?

13  A.  Correct.

14  Q.  And that was $20,000 and it's on February 21st of 2020;

15  is that right?

16  A.  Correct.

17  Q.  So the $20,000 wire came in.  And then what's going on

18  in the account?  We covered the first page, and now let's

19  look at the second page.

20  A.  So prior to that wire, there were other debit card

21  purchases at casinos, there, there;

22          Another ATM withdrawal at Durant, Oklahoma, which

23  is the location of Choctaw Casino;

24          Outgoing wires to other accounts owned by Keith

25  Ashley;

1            Another debit card purchase at a travel plaza in

2    Durant, Oklahoma, the location of Choctaw Casino.

3    Q.  Okay.  So the day that the wire comes in is

4    February 21st of 2020.  But the day before, February 20th

5    of 2020, he is in Durant, Oklahoma; is that right?

6    A.  So for this one he's in Durant, Oklahoma, 2-18; and

7    then the charge posts on 2-20.

8    Q.  Okay.  It posts 2-20.

9            But on 2-18 it looks like he's in Durant,

10   Oklahoma; is that right?

11   A.  Correct.

12   Q.  And, of course, 2-18 of 2020 is the day before James

13   Seegan dies; is that right?

14   A.  Correct.

15   Q.  And it looks like James -- or, rather, Keith Ashley is

16   in Durant, Oklahoma.  And we know from his previous history

17   that he goes to Choctaw there; is that right?

18   A.  Correct.

19   Q.  Now, we've also got credit card records for the

20   defendant; is that right?

21   A.  Correct.

22   Q.  And did you check his credit card records for

23   February 18th of 2020?

24   A.  Yes.

25   Q.  And did the credit card records show that on

1  February 18th of 2020, that the defendant was in Durant,

2  Oklahoma?

3  A.  Yes.

4  Q.  And gambling?

5  A.  Yes.

6  Q.  Let me direct your attention to Government's

7  Exhibit 11A.

8         MS. RATTAN:  If we can look at page 2025.

9  BY MS. RATTAN:

10  Q.  Okay.  Can you explain to us what this is?

11  A.  This is a bank statement from Chase for the account

12  ending in 2589, which is owned by Mr. Ashley.

13  Q.  And it's for February of 2020; is that right?

14  A.  Correct.

15  Q.  And what does it show is going on on February 18th of

16  2020?

17  A.  On February 18th there were three debit card purchases

18  at Choctaw Casino in Durant, Oklahoma, totaling

19  approximately $6,000.

20  Q.  Okay.  So here's the purchases right here the night

21  before or the day before Mr. Seegan dies; and then the

22  amounts are two, four, six -- eight; is that right?

23         Two, four, six --

24  A.  Yes, 6,000 --

25  Q.  Oh, wait.

 1  A.  -- approximately.

 2  Q.  Okay.  I included the 11th.

 3          So if we're just looking at the 18th -- because

 4  he's at Choctaw on the 3rd, spends $2,000;

 5          The 7th, $2,000;

 6          The 7th, $2,000;

 7          The 11th, $2,000; and,

 8          Then on the 18th, the day before Mr. Seegan dies,

 9  there's 18, 18, 18, 2, 4, 6, and then an ATM withdrawal

10  back in Allen for $600; is that right?

11  A.  Yes.

12          MS. RATTAN:  Thank you, your Honor.  I'll pass the

13  witness.

14          THE COURT:  Cross-examination?

15          <u>CROSS-EXAMINATION OF MATTHEW WYLIE</u>

16  BY MR. WHALEN:

17  Q.  Mr. Wylie, how are you?

18  A.  Doing well.

19  Q.  You stated on direct examination, or seemed to agree

20  with Ms. Rattan, that there is an entry in the bank records

21  and, therefore, that meant Mr. Ashley was in Durant,

22  Oklahoma.

23          Do you remember that?

24  A.  Yes.

25  Q.  Okay.  And is it fair to say that from the bank records

 1   you cannot say who used the card, correct?

 2   A.  I believe Mr. Ashley was the only authorized signer on

 3   the card.

 4   Q.  But have you ever known someone to give their card to

 5   somebody else?

 6   A.  Yes.

 7   Q.  Okay.  So fair to say just because there is a bank

 8   entry in there -- all it says is money was withdrawn using

 9   that card, correct?

10   A.  Correct.

11   Q.  Okay.

12           MR. WHALEN:  I'll pass the witness.

13           THE COURT:  Anything additional?

14           MS. RATTAN:  No, your Honor.

15           THE COURT:  Can the witness be fully excused at

16   this time?

17           MS. RATTAN:  Yes, please.

18           MR. WHALEN:  Yes, your Honor.

19           THE COURT:  Okay.  Sir, you are free to leave.

20   Thank you.

21           THE WITNESS:  Thank you.

22           THE COURT:  Okay.  What's next?

23           MS. RATTAN:  We'll recall Jason Rennie, Special

24   Agent Jason Rennie.

25           THE COURT:  Okay.  Agent Rennie, you understand

```
 1   you're still under oath?

 2          THE WITNESS:  I do, your Honor.

 3          THE COURT:  Ms. Rattan, go ahead.

 4          MS. RATTAN:  Thank you.

 5             DIRECT EXAMINATION OF JASON RENNIE

 6             RECALLED ON BEHALF OF THE GOVERNMENT

 7   BY MS. RATTAN:

 8   Q.  Please state your name again.

 9   A.  Jason Rennie.

10   Q.  And, of course, you're the lead FBI agent on this

11   investigation, this case, this prosecution?

12   A.  I am.

13   Q.  In support of the evidence here, did you evaluate the

14   evidence and determine what the interstate nexus and venue

15   was on the different counts that have been charged in the

16   Indictment?

17   A.  I did.

18   Q.  And did you prepare something to aid the jury in

19   understanding your testimony?

20   A.  I did.

21          MS. RATTAN:  Your Honor, at this point we'll offer

22   Government's Exhibit 134 and 97.

23          THE COURT:  Which exhibits, Ms. Rattan?

24          MS. RATTAN:  134 and 97.

25          THE COURT:  Okay.
```

1          MR. WHALEN:  Your Honor, as it relates to

2   Exhibit 97, we would object to predicate and

3   authentication; and as to 134, we will renew our previous

4   objections stated to the Court.

5          THE COURT:  Okay.  Ms. Rattan?

6          MS. RATTAN:  I can ask the agent some questions

7   about Exhibit 97, your Honor.

8          THE COURT:  Go ahead.

9          MS. RATTAN:  Okay.  Thank you.

10  BY MS. RATTAN:

11  Q.  Agent Rennie, you're familiar with Government's

12  Exhibit 97; is that right?

13  A.  I am.

14  Q.  And can you describe what Exhibit 97 is?

15  A.  Actually, do you have a copy of it?

16  Q.  Let's see.  It's the tracking that was based on Agent

17  Sedwick's --

18  A.  Oh, yes.

19          It's a video which essentially mirrors Agent

20  Sedwick's testimony related to the location of Mr. Ashley's

21  cell phone, the cell tower locations during the day -- the

22  morning of February 19th of 2020.

23  Q.  And was it prepared based on Agent Sedwick's testimony

24  but also using the cell tower information that was obtained

25  under a search warrant from AT&T, which was the defendant's

 1  cell phone carrier?

 2  A.  It was.

 3  Q.  And, in fact, is it a presentation that tracks the

 4  defendant's cell site records and also uses Agent Sedwick's

 5  explanation to explain to the jury where the defendant was

 6  and what he was doing on February 19th of 2020?

 7  A.  Sure.

 8       It's just a video depiction of the data that was

 9  utilized with Agent Sedwick during his testimony which was

10  received pursuant to a search warrant from AT&T.

11  Q.  Okay.

12       MS. RATTAN:  Your Honor, I believe that supports

13  the admission of Government's Exhibit 97.

14       MR. WHALEN:  Same objection, your Honor.  Doesn't

15  state who created it.

16       MS. RATTAN:  It's not relevant who created it.

17  This witness has reviewed it and adopted it.

18       THE COURT:  Okay.  Overruled.  97 will be

19  admitted.

20  BY MS. RATTAN:

21  Q.  And, of course, you did review and adopt Exhibit 97?

22  A.  I did.

23  Q.  And it's accurate?

24  A.  It is.

25  Q.  And you carefully used the cell site tower information

 1    to prepare it?

 2    A.  Correct.

 3    Q.  So back to interstate nexus and venue.  Government's

 4    Exhibit 134 combined with Government's Exhibit 197 *(sic)*

 5    focuses on that, on the interstate nexus and the venue for

 6    the counts in the Indictment; is that right?

 7    A.  It does.

 8    Q.  Well, let me direct your attention to Government's 134,

 9    page 1.

10          Can you explain what this is?

11    A.  Sure.

12          It's the start of a PowerPoint.  Page 1 is a

13    depiction of the interstate and venue for Count 1 in the

14    Indictment, which is a $150,000 wire transfer on May

15    the 5th, 2016.

16    Q.  Okay.  And Count 1 of the Indictment, as you've noted

17    here, charges the defendant with wire fraud.  And that

18    would be the $150,000 wire that was sent by James Seegan to

19    BB&T and the defendant's bank; is that right?

20    A.  Correct.

21    Q.  So you evaluated that wire, and you analyzed it for the

22    interstate nexus and the venue; is that right?

23    A.  Correct.

24    Q.  Okay.  Explain that to the jury, please.

25    A.  As the jury heard during the testimony of the BB&T

1   banking witness, the BB&T banking witness confirmed that

2   all wire transfers that involve BB&T contained within the

3   evidence that's been presented at trial all pass through --

4   were interstate and pass through Lumberton, North Carolina.

5           Therefore, on May the 5th of 2016, when the

6   victim, James Seegan, sent $150,000 to KBKK, LLC, account

7   at BB&T ending in 8725, based upon the testimony and the

8   evidence that's been presented, the wire transfer was

9   interstate, thus passed from Mr. Seegan's account in Texas

10  through Lumberton, North Carolina, ultimately -- with the

11  ultimate beneficiary being a bank at KBKK, LLC, which is

12  based in the Eastern District of Texas --

13          MR. WHALEN:  Objection to the narrative.

14          THE COURT:  Just ask another question.

15  BY MS. RATTAN:

16  Q.  And where is that branch of the bank based, the KBKK

17  bank, which is BB&T?

18  A.  The banking records would show -- the signature card

19  would show when it was first established.  It was

20  established in the Eastern District of Texas and remained

21  in the Eastern District of Texas throughout the course of

22  the investigation.

23  Q.  In fact, based on your investigation would you say that

24  everything associated with this defendant, Keith Ashley --

25  his home, his business, his bank, his bank accounts -- is

 1  located where?

 2  A.  In the Eastern District of Texas.

 3  Q.  Okay.  Now, let's talk a little bit more -- let's look

 4  at page 2 -- about Count 1.

 5          And what is this?

 6  A.  It's the wire transfer manifest for the $150,000 wire.

 7  Q.  And this is the one that you just analyzed in terms of

 8  the interstate nexus and the venue?

 9  A.  Correct, for Count 1.

10  Q.  And like you said, it went to KBKK; and there is the

11  address right there, Lucas, Texas, in the Eastern District

12  of Texas?

13  A.  Correct.

14          MS. RATTAN:  And then if we can look at page 3 of

15  Government's 134.

16  BY MS. RATTAN:

17  Q.  This we just saw again with Matt Wylie; is that right?

18  A.  Correct.

19  Q.  And this is the "what happened to the $150,000 wire"

20  slide?

21  A.  Correct.

22  Q.  And as you've noted here, it's Government's

23  Exhibit 56A?

24  A.  Correct.

25  Q.  Okay.  And that's Count 1 of the Indictment.  That's

 1    the interstate nexus and the venue.

 2            Let's focus on Count 2.  What happens in Count 2

 3    of the Indictment?

 4            MR. WHALEN:  Your Honor, at this time we'd object

 5    that it's an improper summary witness and it's cumulative

 6    testimony.

 7            THE COURT:  Ms. Rattan?

 8            MS. RATTAN:  I think it's appropriate in a -- as

 9    Mr. Whalen pointed out in his opening statement -- in a

10    complicated case to review the venue and interstate issues

11    with the jury.  It's been a lengthy trial with a lot of

12    documents, and I think it's appropriate to review this

13    evidence with them.

14            THE COURT:  Overruled.

15            MR. WHALEN:  And, your Honor, may we have a

16    running objection to his entire testimony, your Honor?

17            THE COURT:  No.

18            MR. WHALEN:  Just object each time?

19            THE COURT:  If you so desire.

20            MR. WHALEN:  Okay.

21    BY MS. RATTAN:

22    Q.  Agent Rennie, will you go over the interstate nexus and

23    the venue for Count 2 of the Indictment?

24            MR. WHALEN:  Your Honor, once again we would

25    object that it is an improper summary witness and

```
 1  cumulative of the testimony.
 2          THE COURT:  Overruled.
 3  A.  As stated previously, all BB&T wires must pass through
 4  North Carolina; thus, it establishes the interstate nexus
 5  of the wire transfer.
 6          This wire transfer, on May the 25th of 2019 for
 7  $2,500, which is Count 2, passed from the Eastern District
 8  of Texas through North Carolina and returned to the Eastern
 9  District of Texas, as they were both -- it was a "Keith
10  Ashley to Keith Ashley" transfer.
11  BY MS. RATTAN:
12  Q.  And, again, you've noted down here that the victim was
13  Denny Willmon.  What do you mean by that?
14  A.  The money that was being transferred by Mr. Ashley from
15  account to account was money that he received from the
16  victim, Denny Willmon.
17          MS. RATTAN:  And then if we can look at the next
18  page, which is page 5.
19  BY MS. RATTAN:
20  Q.  Is this the wire that you were talking about?
21          MR. WHALEN:  Your Honor, once again we would
22  object.  This is cumulative testimony.
23          THE COURT:  Overruled.
24  A.  It is.  It's a $2,500 wire transfer.  And as you see
25  there in the originator, the originator, as I stated, was
```

 1   Keith Ashley and his address on Boerne Court, which is

 2   located in the Eastern District of Texas.

 3   BY MS. RATTAN:

 4   Q.  So it was Mr. Willmon's money, but it's going from

 5   Keith Ashley to Keith Ashley?

 6   A.  Correct.

 7   Q.  And was that common in the scheme that he was

 8   operating?

 9   A.  He often transferred victim money between his personal

10   accounts and his business accounts.

11   Q.  Let me direct your attention to Count 3, which is

12   page 6 of Government's 134.

13           Will you explain the interstate nexus and venue

14   here?

15           MR. WHALEN:  Your Honor, we would object to this

16   exhibit as he's an improper summary witness and cumulative

17   of the testimony.

18           THE COURT:  Overruled.

19   A.  Sure.

20           Count 3, $75,000 wire transfer February of 6th of

21   2020 from North Dallas Bank & Trust which is owned by

22   Mr. Robert Greening to KBKK, LLC, at BB&T ending in 8725.

23           As stated before, it is a BB&T wire so it had to

24   go through Lumberton, North Carolina; therefore, it went

25   from Mr. Greening's account through Lumberton, North

```
 1  Carolina, and ultimately was received in the Eastern

 2  District of Texas at BB&T.

 3  BY MS. RATTAN:

 4  Q.  And as you've said, that was Mr. Greening's money.  It

 5  came directly from him.  It was $75,000.

 6          MS. RATTAN:  And then if we can look at the next

 7  page, we'll see the wire.

 8  A.  Correct.

 9  BY MS. RATTAN:

10  Q.  And that was Government's Exhibit 49.

11  A.  Correct.

12  Q.  And this is the $75,000.  It went from Mr. Greening to

13  the defendant, his business, KBKK?

14  A.  It did.

15  Q.  And then the next page focuses -- it's Government's

16  Exhibit 134, page 8.  And now --

17          MR. WHALEN:  Your Honor, once again we object to

18  this as a summary witness, improper summary witness and

19  cumulative of the testimony.

20          THE COURT:  Overruled.

21  BY MS. RATTAN:

22  Q.  And now we're focusing on Count 4 of the Indictment.

23  What's happening here?

24  A.  Sure.  On February the 7th of 2020 a $16,496.15 wire

25  transfer was sent between -- again between Mr. Ashley's
```

```
 1   accounts, one originating at Chase Bank and benefitting

 2   KBKK, LLC, BB&T ending in 8725.

 3           As stated previously, all wires for BB&T had to

 4   pass through Lumberton, North Carolina; so this one went

 5   from the Eastern District of Texas through Lumberton and

 6   then returned to the Eastern District of Texas.

 7   Q.  Okay.  And then, again, this was Mr. Greening's money.

 8   So he gave $75,000; and then the defendant, Keith Ashley,

 9   moved Mr. Greening's money around; is that right?

10   A.  Correct.

11   Q.  Was any of Mr. Greening's money invested in a UIT?

12   A.  It was not.

13   Q.  Was any of his money invested with Parkland Securities?

14   A.  It was not.

15   Q.  Now let's focus on Count 4.  The next page is page 9.

16           MR. WHALEN:  Which again, your Honor, we would

17   object.  This is cumulative.

18           THE COURT:  Overruled.

19   BY MS. RATTAN:

20   Q.  And this was Government's Exhibit 52B.  And is this the

21   $16,496 that is Count 4?

22   A.  It is.

23           And you see the originator there, KBKK, LLC, with

24   an address in the Eastern District of Texas.

25   Q.  And then let me direct your attention to page 10.  This
```

 1   is Count 5.

 2         MR. WHALEN:  Once again, your Honor, we would

 3   object as an improper summary witness and cumulative of the

 4   testimony.

 5         THE COURT:  Overruled.

 6   BY MS. RATTAN:

 7   Q.  Can you give us an overview of what's happening in

 8   Count 5?

 9   A.  Sure.

10         Count 5, $12,000 wire transfer on February 10th of

11   '20 from Keith Ashley's Chase Bank account to Keith

12   Ashley's KBKK, LLC, BB&T account ending in 8725.  This is

13   again movement of Mr. Greening's money between Keith

14   Ashley's accounts.

15         And, as previously stated, all wires for BB&T

16   passed through Lumberton, North Carolina.  So this wire

17   transfer went from the Eastern District of Texas through

18   Lumberton, North Carolina, and ultimately ended up

19   terminating in the Eastern District of Texas.

20   Q.  And then Count 5, as you point out, is the $12,000 from

21   Mr. Greening?

22   A.  Correct.

23   Q.  And so that would have been Government's Exhibit 52C.

24   Here is the $12,000; and it's going into the defendant's

25   account there in the Eastern District of Texas?

 1    A.  Correct.

 2    Q.  And then let's focus on Count 6, which is page 12 of

 3    Government's Exhibit 134.

 4            MR. WHALEN:  Your Honor, once again we would

 5    object as an improper summary witness and cumulative of the

 6    testimony.

 7            THE COURT:  Overruled.

 8    BY MS. RATTAN:

 9    Q.  And what's going on here?

10    A.  Count 6, a $13,500 wire transfer on February 12th of

11    '20 from Keith Ashley's Chase Bank account to KBKK, LLC, at

12    BB&T ending in 8725.  Again this is movement of

13    Mr. Greening's -- a portion of Mr. Greening's original

14    $75,000 between accounts controlled by Mr. Ashley.

15            Again, as stated previously, all BB&T wires must

16    pass through Lumberton, North Carolina.  So this wire

17    originated in the Eastern District, passed through the

18    state of North Carolina, and benefited KBKK, LLC, account

19    at BB&T which is located in the Eastern District of Texas.

20    Q.  So the wire follows.

21            The next page, page 13 --

22    A.  Correct.

23    Q.  -- is this the wire that's Count 6 of the Indictment?

24    A.  It is.  Yes, it is.

25    Q.  And, again, as you said, KBKK in the Eastern District

1    of Texas and there it is, $13,500.

2    A.  Correct.

3    Q.  And that was Mr. Greening's money that was being moved

4    around?

5    A.  Correct.

6    Q.  Okay.  Now, that's Counts 1 through 6; and those deal

7    with the investor money and how the defendant used the

8    investor money.

9    A.  Correct.

10   Q.  So let's shift focus and start looking at the

11   defendant's contact with the life insurance company,

12   Midland National Life.

13          So there's no Count 7 in the Indictment.  There's

14   no Count 8 in the Indictment.  The next count is Count 9;

15   is that correct?

16   A.  That's correct.

17   Q.  And at Count 9 in the Indictment, is there a focus on

18   how the defendant interacts with Midland life?

19   A.  Correct.

20   Q.  So the first interaction the defendant has with Midland

21   life that's captured in the Indictment is Count 9, and

22   that's --

23          MR. WHALEN:  Your Honor, once again we would

24   object.  This is an improper use of a summary witness and

25   cumulative testimony.

```
 1              THE COURT:  Okay.  Overruled.

 2   BY MS. RATTAN:

 3   Q.  And that's on January 24th of 2020; is that right?

 4   A.  Correct.

 5   Q.  And what happens here?

 6   A.  On January 24th of 2020 at 9:04 a.m., approximately

 7   9:04 a.m., there is a telephone call from the defendant,

 8   Keith Ashley, to Midland National Life Insurance.

 9          The call is received by Midland National Life

10   Insurance by their agent, Paula Diaz.

11   Q.  Okay.  And that's Count 9?

12   A.  Correct.  And the -- based upon the cell site location

13   of Mr. Ashley during the time of the call, Mr. Ashley was

14   utilizing his cell phone and was located in the Eastern

15   District of Texas.

16          The call was received, as testimony has shown, by

17   the Midland National representative, Paula Diaz, in Sioux

18   Falls, South Dakota.

19   Q.  And so that would be right here, "Ashley calls Midland

20   life about the documents"; is that right?

21   A.  Correct.

22   Q.  And that's January 24th of 2020.  And the documents

23   that he's calling about are what?

24   A.  Are the change of the beneficiary to the trust, to the

25   James Seegan revocable trust to which Mr. Ashley became the
```

1  executor.

2  Q.  So that's Count 9, right there, this phone call.

3  A.  Correct.

4  Q.  So you've checked, you said, the cell site information

5  on the defendant, Keith Ashley's phone.  And it shows that

6  he was where when he was making this call?

7  A.  For a portion of the call, Mr. Ashley was located --

8  the telephone tower Mr. Ashley was bouncing off of while

9  utilizing the phone during the phone call was in the

10 Eastern District of Texas.

11 Q.  Now let's focus on page 16, which covers Counts 10, 11,

12 and 12.  What's going on here?

13        MR. WHALEN:  Your Honor, we would object to the

14 testimony, improper use of a summary witness and it's

15 cumulative.

16        THE COURT:  Overruled.

17 A.  Sure.  Again, on January 27th of 2020, there was a

18 telephone call and an email and a return email and also a

19 fax between the defendant, Keith Ashley, and Midland

20 National Life Insurance related to, again, the change of

21 the beneficiary on Mr. Seegan's life insurance policy.

22        Again Mr. Ashley was located in the Eastern

23 District of Texas during the telephone call, and again it

24 was received by a Midland agent located in Sioux Falls,

25 South Dakota.  So the map depicts the interstate nexus and

1    the venue of these counts, 10 through 12.

2    BY MS. RATTAN:

3    Q.  And, in fact, the next slides on Counts 10 through 12,

4    did you evaluate the location of Keith Ashley when these

5    events were taking place?

6    A.  I did.

7    Q.  And so that would be Government's Exhibit 134, page 17?

8    A.  Correct.

9    Q.  And explain to us what's happening here.

10   A.  Again --

11        MR. WHALEN:  Your Honor, once again we would

12   object to improper use of a summary witness and it's

13   cumulative.

14        THE COURT:  Overruled.

15   A.  Again, the bottom is a snippet of the actual AT&T

16   record depicting the latitude and longitude on the very

17   bottom right there.

18   BY MS. RATTAN:

19   Q.  And that's the exhibit number for the AT&T records?

20   A.  It is, 004B002.

21        And then if you put that into Google, it converts

22   it to minutes and seconds which gives you a coordinate

23   which places it on the map there which, as we know, is the

24   tower that's -- I think the testimony was -- across the

25   street or directly behind Nine Band Brewery at 9 Prestige

1    Circle, Allen, Texas, which is within the Eastern District

2    of Texas.

3    Q.  Okay.  And that's Counts 10 through 12.

4    A.  Correct.

5    Q.  All happening on January 27th?

6    A.  Correct.

7    Q.  And that's faxing, emailing, and calling about the

8    beneficiary change?

9    A.  Correct.

10   Q.  And again focused on the $2 million life policy that he

11   will be the executor of if Mr. Seegan dies?

12   A.  Correct.

13   Q.  Now let's look at Count 13.  Can you give us an

14   overview of Count 13 and your analysis of Count 13?

15           MR. WHALEN:  Your Honor, we'd object.  This is an

16   improper summary witness, and it's cumulative.

17           THE COURT:  Overruled.

18   A.  Sure.  Count 13 relates to a February 20th of 2020 call

19   which occurred approximately 12:38 p.m. from the defendant,

20   Keith Ashley, to Midland National Life Insurance.

21           It was -- during the time of the call, the

22   defendant was located, based upon cell site location, in

23   the Eastern District of Texas; and it was received by

24   Midland National Life Insurance Agent Samantha Larsen, as

25   testimony has shown, that she was located in Sioux Falls,

1  South Dakota.

2         MS. RATTAN:  And if we can look at the next page,

3  19.

4  BY MS. RATTAN:

5  Q.  This is your cell site analysis on Count 13 when that

6  phone call was made on February 20th of 2020?

7  A.  That's correct.  The snippet is at the bottom from the

8  record, which is Exhibit 4B, page 3.

9         Again, the cell site location and the conversion

10  of the minutes and seconds puts it again in Allen, Texas,

11  which is within the Eastern District of Texas.

12  Q.  So there's two calls that he makes the day after Jim

13  Seegan dies, and he makes both of those calls to Midland

14  life; is that right?

15  A.  Correct.

16  Q.  And one of them is "I want to let you know Mr. Seegan

17  passed away," and then the other call is "Make sure it's

18  locked down.  We don't want any hanky panky"; is that

19  right?

20         MR. WHALEN:  Objection as to the form of the

21  question, leading, and improper use of a summary witness

22  and cumulative.

23         THE COURT:  Just rephrase the question.  I'll

24  overrule his second objection.

25         MS. RATTAN:  Yes, your Honor.

```
 1  BY MS. RATTAN:
 2  Q.  How many calls were there by the defendant to Midland
 3  life the day after Mr. Seegan died?
 4  A.  Two.
 5  Q.  And can you give us, like, an overview of those calls?
 6  A.  Sure.  The first call was very --
 7          MR. WHALEN:  Once again I would object.  It's
 8  cumulative, improper use of a summary witness.
 9          THE COURT:  Overruled.
10  A.  There were two calls.  The one earlier in the morning,
11  a review of the cell site location would indicate that
12  Mr. Ashley's phone was bouncing off the cell tower at the
13  victim's house, Mr. Seegan.  The telephone call was very
14  somber in tone.
15          The later telephone call, which is this call --
16          MR. WHALEN:  Objection as to his characterization
17  of --
18          THE COURT:  Sustained.
19  A.  The second call, which is this call --
20          THE COURT:  Well, wait for another question.
21  BY MS. RATTAN:
22  Q.  What was the second call?
23  A.  The second call, which was this call, February 20th,
24  which was in the Eastern District of Texas, is where
25  Mr. Seegan -- excuse me -- Mr. Ashley was requested or
```

 1   confirmed that the account was going to be locked down as

 2   he didn't want any hanky -- he made some statement that he

 3   didn't want any funny business.  Paraphrasing.

 4   Q.  And that's Count 13 in the Indictment?

 5   A.  Correct.

 6   Q.  And that's the day after Mr. Seegan dies; is that

 7   right?

 8   A.  Correct.

 9   Q.  Now let's focus on the next count, Count 14 of the

10   Indictment.  What's going on here?

11         MR. WHALEN:  Your Honor, we would object once

12   again, improper use of a summary witness; and it's

13   cumulative.

14         THE COURT:  Overruled.

15   A.  Count 14 is a wire transfer on February 21st of 2020

16   from Texas Capital Bank owned by the deceased, James

17   Seegan, to KBKK, LLC, BB&T ending in 8725.

18         Again, as stated by the BB&T witnesses, all wire

19   transfers related to BB&T must pass through Lumberton,

20   North Carolina.  So this wire transfer started in

21   Mr. Seegan's Texas Capital Bank account, passed through

22   Lumberton, North Carolina, and where it ultimately

23   benefited BB&T 8725 owned by the defendant, which is

24   located in the Eastern District of Texas.

25         MS. RATTAN:  Okay.  And if we can look at page 21.

```
 1  BY MS. RATTAN:

 2  Q.  Is this, in fact, the wire that we've heard about?

 3  A.  It is.

 4  Q.  And this is the wire that was the $20,000 that was

 5  transferred after Mr. Seegan died?

 6  A.  Correct.

 7        MS. RATTAN:  May I approach the witness, your

 8  Honor?

 9        THE COURT:  Yes.

10  BY MS. RATTAN:

11  Q.  We're talking about February 21st of 2020.  Let me show

12  you this and ask you if you can review that and tell me

13  whether it's accurate.

14  A.  It is accurate.

15  Q.  So February 21st of 2020, Ashley attempts to transfer

16  $20,000 from James Seegan's bank account.  Then Ashley

17  obtains James Seegan's cell phone, erases text messages,

18  obtains bank information and, finally, Ashley transfers

19  $20,000 from Seegan's account to Ashley's account?

20  A.  Correct.

21        MR. WHALEN:  Objection as to leading, improper use

22  of a summary witness, and cumulative.

23        THE COURT:  Well, just rephrase the question and

24  I'll overrule the rest of the objection.  It was leading.

25        MS. RATTAN:  May I return, your Honor?
```

```
 1            THE COURT:  Yes.
 2   BY MS. RATTAN:
 3   Q.  So this is the $20,000 wire transfer; and that's
 4   Count 14?
 5   A.  That's correct.
 6   Q.  And Count 14 charges wire fraud; is that right?
 7   A.  It does.
 8   Q.  Now let me direct your attention to Count 15 of the
 9   Indictment.  Did you analyze Count 15 of the Indictment for
10   venue?
11            MR. WHALEN:  Your Honor, once again we'd object as
12   it's improper use of a summary witness and it's cumulative.
13            THE COURT:  Overruled.
14   A.  Yes, I did.
15   BY MS. RATTAN:
16   Q.  And what happened here?
17   A.  On January 29th of 2020, Midland National Life
18   Insurance mailed a letter to both Mr. James Seegan and
19   Mr. Keith Ashley related to the confirmation of the change
20   of beneficiary of Mr. Seegan's life insurance policy.
21   Q.  So the previous counts that we've been looking at were
22   wire fraud; is that right?
23   A.  That's correct.
24   Q.  And this count is mail fraud; is that right?
25   A.  That's correct.
```

 1    Q.  And so this time a letter is mailed from Midland life;

 2    is that correct?

 3    A.  It is.

 4          MS. RATTAN:  And if we can look at page 23 of

 5    Government's Exhibit 134.

 6    BY MS. RATTAN:

 7    Q.  What is this?

 8    A.  This is the letter from Midland life confirming the

 9    change of beneficiary.

10    Q.  Okay.  So it's a done deal.  Everything's in place, and

11    it's on paper January 29th of 2020.

12          MR. WHALEN:  Objection as to the form of the

13    question, leading.

14          THE COURT:  Overruled.

15    BY MS. RATTAN:

16    Q.  And does it say who's going to receive this letter?

17    A.  Correct.

18          And I believe the Midland witness testified that

19    these items were mailed.

20          MR. WHALEN:  Objection as to hearsay, your Honor.

21          THE COURT:  Sustained.

22    BY MS. RATTAN:

23    Q.  And this is Count 15 of the Indictment?

24    A.  It is.

25    Q.  Now let's focus on the next page, which is page 24 --

1   25, rather, Count 16.

2          What is this?

3          MR. WHALEN:  Your Honor, we object.  It's improper

4   use of a summary witness, and it's cumulative.

5          THE COURT:  Overruled.

6   A.  Sure.  Count 16.  On May the 20th of 2020, SWIFS, the

7   forensic lab in Dallas, mailed a copy of Mr. Seegan's

8   autopsy to Paul Villarreal.

9          And SWIFS is located in Dallas County and

10  Mr. Villarreal during that time and the address on the

11  letter showed that he was located in the Eastern District

12  of Texas, thus establishing venue for mail fraud, Count 16.

13  BY MS. RATTAN:

14  Q.  Again another mail fraud count?

15  A.  Correct.

16          MS. RATTAN:  And if we can look at the next page,

17  which is 26.

18  BY MS. RATTAN:

19  Q.  You just referenced this.  What is it?

20  A.  Sure.  This is actually a copy of the envelope that was

21  mailed by SWIFS to Mr. Paul Villarreal in Farmersville,

22  Texas, which is in the Eastern District of Texas.

23          And on the right side, this receipt was located

24  inside the envelope.  The payer name is Paul Villarreal.

25  And as you see on the notes section, it indicates it's

 1  for -- related to a case number which we know is connected

 2  to Mr. Seegan's death; and it says, actually, Mr. Seegan's

 3  name on the receipt as well.

 4  Q.  Okay.  So Mr. Seegan's name is right here.  It says the

 5  person who is paying is Paul Villarreal and they are

 6  ordering an autopsy from the Southwestern Institute of

 7  Forensic Sciences?

 8  A.  Correct.

 9        MR. WHALEN:  Objection, form of the question,

10  leading, calls for speculation, improper use of a summary

11  witness.

12        THE COURT:  Overruled.

13  BY MS. RATTAN:

14  Q.  And it was addressed to Mr. Villarreal where?

15  A.  His address was 959 Business 78, Farmersville, Texas,

16  75442.

17        Farmersville is east of McKinney, which is

18  completely within the Eastern District of Texas.

19  Q.  And where was this receipt and the envelope found?

20  A.  The receipt and the envelope were found -- I believe

21  these were -- I believe they were found in the --

22  Mr. Ashley's home.  I can't recall.

23        These were found in one location.  The autopsy was

24  found in another.  So I can't recall at this time if it was

25  the home or the business.  But fair to say it was located

1    in a -- in one of the locations that was searched during

2    the case and both were controlled by the defendant, Keith

3    Ashley.

4    Q.  And that letter mailed by the medical examiner is

5    Count 16?

6    A.  It is.

7    Q.  And then this is also part of the Count 16.  That was

8    the envelope and the receipt.  And then page 27, what is

9    this?

10   A.  This is the actual autopsy report that was located

11   during a search during the investigation.

12   Q.  Okay.  And then if we can focus right here, what does

13   that show?

14   A.  This is the drug screen portion of the autopsy.  And

15   on -- under the --

16          THE WITNESS:  If you could zoom in a bit, it's a

17   little -- no?

18   A.  Under the "Drug Screen (QTOF)," it lists "etomidate

19   detected," which is -- if you look at the lines 1, 2, 3 --

20   lines 4 and 5 from the bottom.

21   BY MS. RATTAN:

22   Q.  Okay.  So it says "Drug Screen (QTOF)" -- Q-T-O-F --

23   A.  Correct.

24   Q.  -- and then "etomidate detected" --

25   A.  Correct.

```
 1   Q.  -- right there?

 2   A.  Right.

 3   Q.  Now, there's not a Count 17; is that right?

 4   A.  That's correct.

 5   Q.  There's no Count 7, no Count 8, and no Count 17?

 6   A.  Correct.

 7   Q.  So let's focus now on Count 18.

 8           Did you evaluate the facts and circumstances of

 9   Count 18 to determine the venue in this count?

10           MR. WHALEN:  Your Honor, once again we would

11   object.  It's an improper summary witness and cumulative.

12           THE COURT:  Overruled.

13   A.  Yes, I did.

14   BY MS. RATTAN:

15   Q.  And, in fact, is this, Government's Exhibit 97, the

16   animation that you prepared based on the AT&T cell site

17   records tracking the defendant's cell phone and Special

18   Agent Rennie Mark Sedwick's presentation of the CAST

19   evaluation that he did?

20   A.  Yes.

21           MS. RATTAN:  And then if we can turn to

22   Government's Exhibit 97 and publish it.

23           (Video presentation to the jury.)

24           MS. RATTAN:  Okay.  If we can pause right there.

25           (Video presentation paused.)
```

```
 1   BY MS. RATTAN:
 2   Q.  Can you tell us what we're seeing here?
 3   A.  Sure.
 4           This is an overhead shot of Mr. Ashley's residence
 5   in Lucas, Texas, in the Eastern District of Texas.
 6   Q.  And so it's this property right here?
 7   A.  Correct.
 8   Q.  So it starts early morning on February 19th of 2020,
 9   the day Mr. Seegan is killed; is that right?
10   A.  Correct.
11   Q.  And then it's going to follow the defendant from his
12   house?
13   A.  Yes.  It will follow -- it will mirror Mr. Sedwick's --
14   Agent Sedwick's testimony, utilizing the same towers that
15   the phones were hitting off on his testimony.  It's just an
16   animation of his testimony utilizing those same data.
17           MS. RATTAN:  Okay.  If we can go forward.
18           (Video presentation resumed.)
19   A.  So as it zooms out, Mr. Ashley headed -- that morning
20   he headed west, his phone hitting off towers as he entered
21   into Allen, Texas, which is in the Eastern District of
22   Texas, ultimately arriving and hitting off the tower behind
23   Nine Band Brewery, which is his business in Allen, Texas.
24   BY MS. RATTAN:
25   Q.  So he goes from his house -- this is 7:29 a.m. -- and
```

1    he goes to the brewery; is that right?

2    A.   That's correct.

3           And you see the tower there --

4           MR. WHALEN:   Your Honor, once again we would

5    object.   It's improper use of a summary witness and

6    cumulative of the testimony.

7           THE COURT:   Overruled.

8    A.   And you see the tower there depicted, 8:43 a.m.,

9    located behind the brewery.

10   BY MS. RATTAN:

11   Q.   Okay.  So at this point he's traveled from his house to

12   the brewery.

13          And what happens next?

14   A.   Sure.  The next portion will be Mr. Ashley's travel

15   south.

16          (Video presentation resumed.)

17   A.   As he travels south, the towers indicate and

18   Mr. Sedwick's testimony would indicate that he was

19   traveling south on 75 towards the George Bush Turnpike.

20          There at 8:49 you see a tower.  8:50 you see a

21   tower.  He's just west of Plano, 8:51 -- that is downtown

22   Plano, west of downtown Plano, 8:52.

23          And then it hits the George Bush Turnpike

24   traveling west, the turnpike.

25                                  *

```
 1   BY MS. RATTAN:

 2   Q.  Okay.  And if we can pause right there.

 3           (Video presentation paused.)

 4   BY MS. RATTAN:

 5   Q.  So that's his consistent consecutive travel that

 6   morning; is that right?

 7   A.  That's correct.

 8           And you see arrival at Mr. Seegan's residence in

 9   Carrollton, Texas.

10   Q.  Now, can you show us --

11           (Video presentation resumed.)

12           MS. RATTAN:  If we can pause and back out just a

13   little bit, if possible.

14   A.  That's actually just perfect, I think, right there.

15           MS. RATTAN:  Okay.  Let's pause right there.

16           (Video presentation paused.)

17   BY MS. RATTAN:

18   Q.  If you can show us where the Eastern District of Texas

19   is versus the Northern District of Texas, using this?

20   A.  The sure.

21           I looked at the Collin -- so the Eastern District

22   of Texas encompasses both Collin County and Denton County.

23           So Denton County -- the Denton County line is

24   really Kelly Boulevard off George Bush.  That's kind of

25   where the breaking point is.
```

1            So if you take this being Kelly Boulevard right

2    here, really this portion is the Eastern District of Texas;

3    and cutting across here essentially, generally, is the

4    Eastern District of Texas and this is the Northern District

5    of Texas.

6            So as he goes southwest on George Bush, when he

7    passes this line going this way, that's when he crosses

8    into the Northern District of Texas.

9            And actually yesterday -- yesterday I actually

10   drove the route --

11           MR. WHALEN:  Objection as to the narrative, your

12   Honor.

13           THE COURT:  Sustained.

14   BY MS. RATTAN:

15   Q.  And as you drove and evaluated this route, what were

16   you able to determine?

17   A.  Sure.

18           On this travel as I passed Kelly Boulevard, I

19   actually started to time how long it took me to get, once I

20   crossed into the Northern District, to Mr. Seegan's

21   residence where he was killed on February the 19th.

22   Q.  Okay.  And once you left the Eastern District of Texas

23   and got to Mr. Seegan's residence, how long did that take?

24   A.  I actually took both times.  I took the time going and

25   the time leaving his house to cross that same start/stop

 1    point.

 2           Driving there, it took me four and a half minutes

 3    because I caught the light at Josey.  Coming back, I was --

 4    the lights were favorable to me; so it took me three and a

 5    half minutes on the way back.

 6           So, essentially, once Mr. Ashley crossed into the

 7    Eastern District, without stopping other than for traffic

 8    signals or stop signs, it would have taken him an average

 9    of four minutes to get to the house, once entering the

10    Northern District of Texas.

11    Q.  So his entire travel that morning, he leaves his house,

12    goes to the brewery and then travels to the Seegan home.

13    What was the length of the travel?

14    A.  The length of the travel was 26 miles, and the last

15    4 minutes were in the Northern District of Texas.

16    Q.  And in terms of estimating the amount of those miles

17    that was in the Northern District of Texas, how much would

18    you say that was?

19    A.  It's approximately 2 and a half miles, which represents

20    about 10 percent of the total travel.

21    Q.  So 90 percent of the travel that morning was in the

22    Eastern District of Texas?

23    A.  Correct.

24    Q.  And then the final 10 percent was in the Northern

25    District of Texas?

 1    A.  Correct.

 2    Q.  Now, was there any evidence that you saw, from the CAST

 3    presentation by Agent Sedwick from the defendant's AT&T

 4    cell phone cell site records, that indicated that the

 5    defendant stopped anywhere after he left the Eastern

 6    District of Texas, exited as you've marked on this

 7    exhibit --

 8            MR. WHALEN:  Objection, calls for speculation,

 9    your Honor.

10            THE COURT:  Overruled.

11            If you can answer.

12    BY MS. RATTAN:

13    Q.  -- that he stopped anywhere where he could obtain a

14    firearm in the Northern District of Texas?

15    A.  No.  He left his house.  He stopped at the brewery in

16    the Eastern District of Texas.  Then he traveled -- again,

17    as Mr. Sedwick testified, it's --

18            MR. WHALEN:  Objection as to hearsay, your Honor.

19    Once again it's an improper summary witness and it's

20    cumulative.

21            THE COURT:  As to hearsay, it's sustained.

22    BY MS. RATTAN:

23    Q.  And what did the CAST evaluation show?

24    A.  The evaluation shows that he did not have time to stop

25    anywhere.  There was no significant stop after the stop at

1  Nine Band Brewing until he reached Mr. Seegan's residence.

2  Q.  Okay.  So, essentially, out of a 26-mile trip, the

3  final 2 to 3 miles was in the Northern District of Texas?

4  A.  Yes.

5  Q.  And there was no evidence that he would have stopped

6  anywhere to obtain anything, much less a firearm?

7  A.  There was not.

8          MS. RATTAN:  Now if we can go back to Government's

9  Exhibit 134, page 18 -- oh, rather, page 28.  Pardon me.

10  BY MS. RATTAN:

11  Q.  Okay.  Again, what is this?

12  A.  This is the map depicting Mr. Ashley's movement from

13  the Eastern District of Texas to Mr. Seegan's residence on

14  the morning of February 19th of 2020.

15  Q.  And then the charge is carrying or possession of a

16  firearm in furtherance of a crime of violence; is that

17  right?

18  A.  Correct.

19  Q.  And that's Count 18?

20  A.  Correct.

21  Q.  Or, rather, Count 19 -- no, it's Count 18.

22  A.  Count 18, correct.

23  Q.  Okay.  And that was February 19th of 2020; is that

24  right?

25  A.  Correct.

1            MS. RATTAN:  Now again focusing on Government's

2    Exhibit Number 134, let's look at page 31.

3    BY MS. RATTAN:

4    Q.  And what is this?

5            MR. WHALEN:  Your Honor, once again we would

6    object as to improper use of a summary witness; and it's

7    cumulative.

8            THE COURT:  Overruled.

9    A.  Count 19, bank theft, $20,000 wire transfer as stated

10   previously on February 21st of 2020.

11           On that date Mr. Ashley takes 20,000 from

12   Mr. Seegan's Texas Capital Bank account which is then

13   transferred to his KBKK BB&T 8725 account which is located

14   in the Eastern District of Texas.

15           MS. RATTAN:  And then page 32.

16   BY MS. RATTAN:

17   Q.  That's the $20,000; is that right?

18   A.  It is.

19   Q.  And this is a bank theft; is that right?

20   A.  It is.

21   Q.  And it's the same facts as the wire fraud which is

22   Count 14, is that right, these events on February 21st of

23   2020?

24   A.  It is.

25   Q.  So I'm going to add here -- it says "Count 14."

 1   Count 14 charges a wire fraud.  And I'm going to put "and

 2   19" because that's the bank theft.

 3          Is that right?

 4   A.  Correct.

 5   Q.  Now, the final count of the Indictment is Count 20.

 6   Did you evaluate Count 20 using the same techniques that

 7   you evaluated the other counts?

 8   A.  I did.

 9          MR. WHALEN:  Your Honor, we'd object.  Once again

10   it's improper use of a summary witness, and it's

11   cumulative.

12          THE COURT:  Overruled.

13   BY MS. RATTAN:

14   Q.  And what did you determine?

15   A.  On February 28th of 2020 -- excuse me -- February 27th

16   of 2018, approximately 11:22 a.m., there was a telephone

17   call from the defendant, Keith Ashley, to Midland National

18   Life Insurance.  The agent was Cindy Nordquist, and the

19   call was related to a life insurance application that had

20   been submitted by the defendant on behalf of Mr. Paul

21   Villarreal.

22   Q.  And that's Count 20, and that's in 2018?

23   A.  That's correct.

24   Q.  And this is the policy where the defendant said he

25   would be the beneficiary and that he was Mr. Villarreal's

1   stepbrother?

2   A.  Correct.

3   Q.  And, let's see, what is this?  It's page 34 of

4   Government's Exhibit 134.

5   A.  Sure.  On the left side is an email from Mr. Ashley to

6   Midland National and then a response from Midland National.

7           The narrative in the email tracks the narrative in

8   the phone call about a mistaken -- essentially, how much he

9   was going to pay in his premiums.  It was adjusted.

10          And then on the right side is the portion of the

11  application which shows the beneficiary, where Mr. Ashley

12  names himself as a beneficiary and states his relationship

13  to the proposed insured is his stepbrother.

14          Again, the address there, 1211 Boerne Court in, as

15  we know Lucas, Texas, is his home address -- was his home

16  address and is located in the Eastern District of Texas.

17  Q.  And did you conduct an investigation as to whether

18  Keith Ashley was, in fact, Paul Villarreal's stepbrother?

19  A.  He was not.

20          MR. WHALEN:  Objection, nonresponsive to the

21  question asked.

22          THE COURT:  Sustained.

23  BY MS. RATTAN:

24  Q.  And did you conduct an investigation into whether the

25  defendant was Paul Villarreal's stepbrother?

1    A.  I did.

2    Q.  As part of your investigation, did you talk to

3    Mr. Villarreal?

4    A.  I did.

5    Q.  Of course, he's died.  But before he died, you spoke to

6    him?

7    A.  I did.

8    Q.  And did you speak to his family?

9    A.  I did.

10   Q.  Based on your investigation, were you able to conclude

11   whether, in fact, Keith Ashley had an insurable interest

12   and was he the stepbrother of Paul Villarreal?

13          MR. WHALEN:  Objection as to hearsay, your Honor.

14          THE COURT:  Overruled.

15   A.  He was not.

16   BY MS. RATTAN:

17   Q.  Now let's shift gears away from interstate nexus and

18   venue and let's focus on the victim, Mr. Seegan, James

19   Seegan.

20          Did you evaluate Mr. Seegan and his business and

21   his participation in the economy?

22   A.  I did.

23   Q.  Were you able to determine --

24          MR. WHALEN:  Your Honor, I'm going to object.

25   This calls for a legal conclusion.  There is no notice

 1  concerning this area of expertise, and we'd object to it.

 2          THE COURT:  Is this being offered as expert

 3  testimony or as a fact witness?

 4          MS. RATTAN:  Well, he's a fact witness.  He's also

 5  been noticed as a financial expert.  I'm not sure that

 6  financial expertise is required in this case; but in an

 7  abundance of caution, he was noticed as a financial expert

 8  and he did evaluate and determine factually whether

 9  Mr. Seegan had a business.

10          THE COURT:  Okay.  Overruled.

11  BY MS. RATTAN:

12  Q.  So did you review the evidence and determine whether,

13  in fact, James Seegan was involved in interstate commerce?

14  A.  I did.

15          MR. WHALEN:  Your Honor, I'm going to object.

16  That calls for a legal conclusion.

17          THE COURT:  Overruled.

18  BY MS. RATTAN:

19  Q.  Did you determine whether Mr. Seegan had a company?

20  A.  I did.

21  Q.  And what was the name of his company?

22  A.  JES2 Properties, LLC.

23  Q.  JES2 Properties, LLC.

24          Does that appear to be his initials?

25  A.  Yes, James E. Seegan 2, LLC -- Properties, LLC, yes.

1   Q.  And then the term "LLC" -- what does "LLC" mean?

2   A.  That's a limited liability company or corporation.

3   Q.  So he had, in fact, filed papers with the State of

4   Texas indicating that he had a business; is that right?

5   A.  He did.  He did.

6   Q.  Where was his business primarily located?

7   A.  His residence, 2114 Cannes Drive, Carrollton, Texas.

8   Q.  And I used the term "primarily located."  Is that the

9   only place his business was located?

10  A.  That's -- yeah -- yes.  When he filed the paperwork

11  with the State of Texas, that is the location of the

12  business.

13  Q.  And was the -- it fair to say that the focus of the

14  business was real estate?

15  A.  It was.

16  Q.  And will you give the jury an overview of what he was

17  involved in?

18  A.  Sure.

19        He had property, real estate property that he

20  managed from that location.  He -- that essentially was the

21  nature of his business.

22  Q.  Did he also invest in Groundfloor?

23  A.  He did.

24  Q.  What is that?

25  A.  Groundfloor was a -- is an investment where you provide

 1   capital which is then lent to people that are buying and

 2   selling and flipping real estate.  Groundfloor, the

 3   investment company, was located in Atlanta, Georgia; and

 4   Mr. Seegan heavily invested in Groundfloor.

 5   Q.  And did he also participate in trading?

 6   A.  He did.

 7   Q.  And will you describe to the jury what you mean by

 8   that?

 9   A.  Sure.

10        He had two -- at least two brokerage accounts

11   which he traded, bought and sold securities, bought and

12   sold assets via the Fidelity trading platform as well as an

13   E*TRADE trading platform.

14   Q.  So he has an incorporated business, an LLC, where he is

15   managing property; he is investing in real estate; and he's

16   trading on two separate platforms.

17   A.  Correct.

18   Q.  Let me direct your attention to Government's

19   Exhibit 79.

20        MS. RATTAN:  If we can look at page 9.

21   BY MS. RATTAN:

22   Q.  What is this?

23   A.  That's Mr. Seegan's office in Cannes Drive.

24   Q.  And is this consistent with what you would expect to

25   see for somebody who's operating a business from their

1   home?

2           MR. WHALEN:  Your Honor, objection, calls for

3   speculation.

4           THE COURT:  Overruled.

5   A.  Yes.

6   BY MS. RATTAN:

7   Q.  And why do you say that?

8   A.  I mean, it has everything you'd need to operate a small

9   business.

10          Computer, printers were located there.

11          His phone is there on the charger, lamps,

12  different, you know, connection devices, at least three

13  computers that I can see there.

14          There is a router there.

15          There is an Internet connection, paperwork --

16  miscellaneous paperwork, calendars, things you would see in

17  a typical office.

18          MS. RATTAN:  And then if we can look at page 13.

19  BY MS. RATTAN:

20  Q.  This is the same room from a different angle; is that

21  right?

22  A.  Sure.  Yes.

23  Q.  And then what's going on here?

24  A.  Sure.  You can see there is a charging stand.

25          There's lights, water bottle.

1          Looks like there is an iPad; like I said multiple

2  computers.

3          There's two printers that are down on the lower

4  right; lights, paperwork, passwords up on the -- on the

5  wall there.

6          His diplomas, I believe, were shown in the other

7  screen, so typical business -- something you would find in

8  a business or small home office business.

9  Q.  And then speaking of small home office business, you

10 said that you determined that he did have a business,

11 JES2, LLC; is that right?

12 A.  Sure.  JES2 Properties, LLC, correct.

13 Q.  And then have you reviewed documents that relate to

14 that business and when it was created?

15 A.  I have.

16 Q.  Let me direct your attention --

17          MS. RATTAN:  Your Honor, it's part of what's

18 previously been admitted as Government's Exhibit 88; and

19 we've marked these specific documents as Government's

20 Exhibit 88A.  So we'll offer 88A.

21          It's a portion of what's already been admitted as

22 Government's 88.

23          THE COURT:  Mr. Whalen?

24          MR. WHALEN:  I'm looking, your Honor.

25          MS. RATTAN:  We just pulled them out for clarity.

1          MR. WHALEN:  I don't know what it is, so I

2    can't --

3          (Off-the-record discussion among counsel.)

4          MR. WHALEN:  No objection.

5          THE COURT:  It will be admitted.

6          MS. RATTAN:  Let's see, may we publish

7    Government's Exhibit 88A, page 1?

8          THE COURT:  Yes, you may.

9    BY MS. RATTAN:

10   Q.  Will you explain what this is?

11   A.  Yes.  This is a Certificate of Filing for JES2

12   Properties, LLC, from the State of Texas.  It's dated

13   March 18th of 2019, and it was effective March 18th of

14   2019.

15   Q.  And there is the name right there, JES2 Properties,

16   LLC, and this is the Certificate of Filing with the

17   Secretary of State; is that right?

18   A.  Correct.

19   Q.  And this "hereby certifies that a Certificate of

20   Formation for the above named Domestic Limited Liability

21   Company (LLC) has been received in this office and has been

22   found to conform to the applicable provisions of law."

23          So his business was created; is that right?

24   A.  Correct.

25          MS. RATTAN:  If we can look at 8A, page 3.

1   BY MS. RATTAN:

2   Q.  What is this?

3   A.  This is the Certificate of Formation for the LLC which

4   is dated March 18th of 2019, for JES2 Properties, LLC.  It

5   has the registered agent there.

6           And then at the bottom, it has the managing

7   member, who is Jim -- James E. Seegan was also referred to

8   as Jim Seegan -- managing member, 2114 Cannes Drive,

9   Carrollton, Texas, 75006, which the pictures that we saw

10  previously are pictures of the office located on the second

11  floor of that residence.

12          MS. RATTAN:  And then if we can look at page 4 of

13  Government's Exhibit 88A.

14  BY MS. RATTAN:

15  Q.  This is just a continuation of the document?

16  A.  Correct.

17          It shows the organizer, Jim Seegan, and then has

18  the signature of the organizer in the Execution.

19  Q.  And let me direct your attention to 88A, page 6.

20          What is this?

21  A.  These are minutes of the -- essentially after it was

22  established with the Secretary of State, the requirement

23  many times for LLCs is to have a meeting of the -- for the

24  organization.  This was the meeting minutes which occurred

25  the day after the organization, on March the 19th of 2019.

1              Mr. Seegan was the only member.  He holds the

2     positions of president and secretary of JES2 Properties,

3     LLC, which again is located at 2114 Cannes Drive,

4     Carrollton, Texas.

5     Q.  And that's right here.

6              And then, as you said, the officers, that was

7     Mr. Seegan?

8     A.  Correct.

9              MS. RATTAN:  And if we can look at the next page,

10    7, 88A page 7.

11    BY MS. RATTAN:

12    Q.  What is this?

13    A.  These are the members and the interest owned by the

14    members.  Mr. Seegan was the only member, and he owned

15    100 percent of the interest.

16    Q.  And, in fact, legally, on page 8, it says where the

17    principal office is.

18    A.  Correct.  Principal office be established and

19    maintained at -- excuse me -- (as read):  "RESOLVED, that a

20    Company office be established and maintained at 2114 Cannes

21    Drive, Carrollton, Texas, and that meetings of the Members

22    from time to time may be held either at the principal

23    office or at other such place as the Members shall from

24    time to time order."

25    Q.  And did the documents anticipate that the business will

1   interact with other states?

2   A.  It did.

3   Q.  And how so?

4   A.  It says that the company can (as read) "do business in

5   any state, territory or dependency of the United States or

6   any foreign country in which it is necessary or expedient

7   for the Company to transact business, the Members" -- which

8   is James Seegan -- "are hereby authorized to appoint and

9   substitute all necessary agents and attorneys for service

10  of process, to designate and change the" -- it continues

11  on.

12  Q.  And then as part of your review of the documents, did

13  you determine whether this company, James Seegan's company,

14  JEC2 *(sic)* Properties, actually participated in the

15  economy, in business?

16  A.  I did.

17  Q.  Did it?

18  A.  It did.

19  Q.  And did it participate in interstate business?

20          MR. WHALEN:  Your Honor --

21  A.  It did.

22          MR. WHALEN:  -- I'm going to object.  It calls for

23  a legal conclusion.

24          THE COURT:  Overruled.

25  A.  It did.

 1  BY MS. RATTAN:

 2  Q.  Let me direct your attention to Government's

 3  Exhibit 88A, page 19.

 4          Would you explain what this is?

 5  A.  Sure.

 6          This is a list of expenses related to JES2, LLC --

 7  Properties, LLC, for January through December of 2019.

 8  Actually, I think the first expense was March 18th or

 9  March 19th of 2019, as that's when the company was

10  established.

11  Q.  And so did you evaluate the companies where he was

12  spending money to determine whether those companies were

13  based out of state?

14  A.  I did.

15  Q.  And what did you determine?

16  A.  So the companies the expenses were incurred from,

17  Albertsons, Amazon -- on this page Albertsons and Amazon, I

18  believe Albertsons is located -- headquartered in

19  Minnesota.  Amazon is based primarily in Seattle,

20  Washington.

21          MS. RATTAN:  And then if we can look at the next

22  page, 88A, page 20.

23  BY MS. RATTAN:

24  Q.  What did you evaluate here?

25  A.  Farmers Insurance is located not -- is not

 1  headquartered in the state of Texas.  I believe it's in

 2  California.

 3          Home Depot is headquartered in Atlanta, Georgia.

 4  Q.  And these are businesses where James Seegan's LLC,

 5  JES2, LLC, is doing business?

 6  A.  Sure.  The.

 7          JES2 Properties, LLC, is incurring expenses based

 8  upon the business from these out-of-state companies.

 9          MS. RATTAN:  And if we can look at page 21 as we

10  continue to look at the finances of JES2.

11  BY MS. RATTAN:

12  Q.  What do we see?

13  A.  Intuit, another company -- it looks like he utilized

14  QuickBooks to manage the expenses of the business -- is

15  located in Silicon Valley, California.

16  Q.  And as we page down to page 22?

17  A.  Yes, Lowe's is another company.  Lowe's is located in

18  North Carolina.

19          And Nest, which is owned by Google, Nest is

20  located in Silicon Valley, California, as well.

21          MS. RATTAN:  And then if we can page down through

22  23 and look at 88A, page 24.

23  BY MS. RATTAN:

24  Q.  And what does this show?

25  A.  This shows the total expenses incurred by JES2

```
 1   Properties, LLC, from approximately the middle of March

 2   of 2019 through December of 2019 was approximately $22,000.

 3   Q.  And based on your review of the records, was James

 4   Seegan, as JES2, LLC, pretty careful about keeping the

 5   records of his business?

 6   A.  He was.

 7   Q.  And after James Seegan died on February 19th of 2020,

 8   what would the effect on interstate commerce have been?

 9   What happened?  Did you look at the --

10           MR. WHALEN:  Your Honor, I'm going to object.

11   That's a legal conclusion.

12           THE COURT:  Ms. Rattan?

13           MS. RATTAN:  I think the witness can testify the

14   difference before and after the date that Mr. Seegan died.

15           THE COURT:  Overruled.

16   BY MS. RATTAN:

17   Q.  And what were you able to determine?

18   A.  Mr. Seegan -- the expenses incurred by Mr. Seegan -- or

19   the expenses incurred by JES2 Properties, LLC, the spending

20   by JES2 Properties, LLC, as well as the trading activity

21   post Mr. Seegan's death from the location of JES2

22   Properties, LLC, was significantly decreased or eliminated

23   altogether.

24   Q.  And did you evaluate the evidence to determine whether

25   the defendant, Keith Ashley, knew about JES2 Properties
```

1  that Mr. Seegan was participating in or had formed?

2  A.  I did.

3  Q.  Did he?

4  A.  He did.

5  Q.  In fact, were there search histories related to the

6  defendant, Keith Ashley, looking for JES2 Properties?

7  A.  There was.

8  Q.  Let me direct your attention to Government's

9  Exhibit 127A, which has previously been admitted as the

10  defendant's Google search history.

11        MS. RATTAN:  And if we can look at page 227.

12  BY MS. RATTAN:

13  Q.  In fact, does this show that the defendant was doing

14  Google searches of Mr. Seegan under the JES2, LLC?

15  A.  He was.

16  Q.  And was he doing this repeatedly?  Is this a

17  representative example?

18  A.  He was.

19        MS. RATTAN:  And if we can look at page 2-3-0,

20  230, 127A, page 230.

21  BY MS. RATTAN:

22  Q.  Here's another example.  We've got "JES2 LLC," "je2

23  investments llc."  And this is the defendant's -- or in the

24  defendant's search history; is that right?

25  A.  Sure.

1              And actually two more down, "jes2 property llc" as

2    well.

3    Q.  Right there.

4    A.  Yes.  Yeah, it's repeated searches to the derivations

5    of "JES2 Properties," "JES2 investments," "JES2, LLC," by

6    the defendant, Keith Ashley.

7              MS. RATTAN:  And then page 233.

8    BY MS. RATTAN:

9    Q.  Here he's doing "James Seegan" and looking at Parkland

10   Securities as well.

11             Is it fair to say that as you reviewed the

12   defendant's search history, that he was repeatedly

13   searching for "JES2 Properties"?

14   A.  He was.

15   Q.  And "James Seegan"?

16   A.  Correct.

17             MS. RATTAN:  If we can look at Government's

18   Exhibit 125B, page 19.

19   BY MS. RATTAN:

20   Q.  This is just another example; is that right?

21   A.  Sure.  "JES2 LLC James Seegan," "jes2 llc james

22   seegan."

23   Q.  So we focused on the creation of the business, what the

24   business did.

25             You said that as a business, that James Seegan was

```
1   also involved in trading, E*TRADE and Fidelity, that he was
2   on these two platforms; is that right?
3   A.  He was.
4   Q.  Can you explain what your review showed about those?
5   A.  Sure.
6          Mr. Seegan -- trading activity would show that he
7   bought and sold securities via the Fidelity platform and
8   via the E*TRADE personal trading platform.
9   Q.  And did you review his E*TRADE records to see if he was
10  actively engaged in business through his E*TRADE records?
11  A.  He was.
12  Q.  Okay.  And let me direct your attention to Government's
13  Exhibit 17.
14         MS. RATTAN:  If we can look at page 1081.
15  BY MS. RATTAN:
16  Q.  What's going on here?
17         Was he trading in June of 2019 with E*TRADE?
18  A.  I would have to see the activity.  I believe June
19  of 2019 was one of the dates of trading, but it would show
20  it on a different -- on a different page.
21  Q.  Okay.
22         MS. RATTAN:  I had 1081 marked.  Maybe 1082 for
23  June?
24  BY MS. RATTAN:
25  Q.  Anyway, you showed that in June of 2019 or, rather --
```

1    yes, 2019, that he was involved in trading?

2    A.  Yes.  I'd have to look at my notes, but there was

3    E*TRADE he had between -- I think I looked at May to May.

4         May to May he had five, six, seven months where he

5    had trading activity; and I believe in Fidelity he had two

6    or three months of trading activity.

7         So essentially during that 12-month time frame, I

8    believe there was two or three months that -- when he was

9    alive, I think there were only two months when he didn't

10   trade; and then after he -- after his death, there was

11   minimal or zero trading activity for the months that

12   followed.

13   Q.  So he was engaged in business with Fidelity and engaged

14   in business with E*TRADE --

15        MR. WHALEN:  Your Honor, I'm going to object to

16   the form of the question.

17        THE COURT:  Just rephrase the question.

18   BY MS. RATTAN:

19   Q.  He was engaged in two different what when he was alive?

20   A.  He was trading -- actively trading securities on two

21   different trading/brokerage platforms.

22   Q.  And then after he died, what happened?

23   A.  There was -- the month that -- the month after he --

24   the time after he died, there was zero trading activity.  I

25   believe the month that followed, there was zero trading

1    activity and --

2          Actually, the month that followed, I believe there

3    was, you know, very, very little trading activity compared

4    to what there were before he died; and then in the months

5    after that, there was zero.

6    Q.  And the trading that he was doing, are these national

7    trades and not just with companies based in Texas?

8    A.  No, he was buying and selling securities that were

9    essentially either investment portfolios or companies that

10   were located -- headquartered elsewhere, outside of the

11   state of Texas.

12   Q.  Now let me talk to you about James Seegan's -- not just

13   his finances and his company that he was operating but

14   about his net worth in February of 2020 when he died.

15   A.  Yes.

16   Q.  Are you familiar with that?

17   A.  I am.

18   Q.  Let me direct your attention to Government's

19   Exhibit 29A, page 190.

20          This is a Midland National Life Insurance form

21   where Mr. Seegan declared what his net worth was; is that

22   correct?

23   A.  That's correct.

24   Q.  And what did he declare as being his net worth?

25   A.  $3 million.

1   Q.  So he's got his net worth right there; is that right?

2   A.  Correct.

3   Q.  Is that consistent with what his net worth would have

4   been, approximately, when he died in February of 2020?

5   A.  Correct.

6   Q.  Now, that's his net worth alive; but we know that he

7   had two life insurance policies.  So the value of the Keith

8   Ashley estate when he died, is it fair to say that it

9   increased?

10  A.  The James Seegan estate, yes.

11  Q.  James Seegan estate.

12          One of the policies was valued at $400,000 and we

13  saw the check that was paid; is that right?

14  A.  Correct.

15  Q.  And the other policy was valued at what?

16  A.  $2 million.

17  Q.  So when you add the net worth of 3 million plus the

18  400,000 plus the 2 million, you get 5.4 million; is that

19  right?

20  A.  That's correct.

21  Q.  But if you subtract the 2 million, you get what?

22  A.  Approximately $3 1/2 million.

23  Q.  So without the 2 million, you have about 3 -- it's

24  point 4 million.

25  A.  3.4.

 1   Q.  Okay.

 2   A.  3.4 million.

 3   Q.  3.4 million if you don't account for the $2 million

 4   life policy?

 5   A.  Correct.

 6   Q.  Now, as part of your investigation, did you look at

 7   whether the defendant had any training in etomidate?

 8   A.  I did.

 9   Q.  And did you determine --

10            MR. WHALEN:  Your Honor, I'm going to object.

11   This is outside his expertise.  It's improper use of a

12   summary witness and cumulative of the testimony.

13            THE COURT:  Sustained.

14            MS. RATTAN:  Your Honor, may I be heard?

15            THE COURT:  Yes.

16            MS. RATTAN:  I believe as the lead agent in the

17   case, he can evidence that he looked at specific evidence

18   and identify it for the jury.

19            THE COURT:  Well, as long as he's not going to

20   give what I would say are expert opinions about etomidate.

21            MS. RATTAN:  Oh, he won't, your Honor.

22            THE COURT:  Okay.  That's where I thought you were

23   going.

24            MR. WHALEN:  We also renew it's improper use of a

25   summary witness.

 1            THE COURT:  Overruled.

 2   BY MS. RATTAN:

 3   Q.  So did you look at whether the defendant had training

 4   in etomidate?

 5   A.  I did.

 6   Q.  And did he?

 7   A.  He did.

 8   Q.  And, in fact, did that training date back to 2004?

 9   A.  It did.

10   Q.  Let me show you Government's Exhibit 109, page 7.

11            Was this a training manual that was found at the

12   defendant's residence when it was searched?

13   A.  It was.

14   Q.  And then let me direct your attention to Government's

15   Exhibit 113, page 1.

16            Is this, in fact, part of the training that the

17   defendant received?

18   A.  It is.

19            MS. RATTAN:  And if we can look at page 25 of

20   Government's Exhibit 113.

21   BY MS. RATTAN:

22   Q.  This dates back to 2004; is that right?

23   A.  Correct.

24   Q.  And then this training in 2004, he received specific

25   questioning and training on etomidate?

 1    A.  He did.

 2            MS. RATTAN:  If we can look at Government's

 3    Exhibit 22, page 7 -- wait -- Government's Exhibit 113,

 4    page 22, Number 7.

 5    BY MS. RATTAN:

 6    Q.  It talks specifically about etomidate; is that right?

 7    A.  Correct.

 8    Q.  And then page 21, Number 16 references etomidate; is

 9    that right?

10    A.  It does.

11    Q.  And then page 19, Number 7, another reference to

12    etomidate; is that right?

13    A.  Correct.

14    Q.  Page 11, Number 57, multiple references to etomidate

15    throughout; is that right?

16    A.  Correct.

17            MS. RATTAN:  May I approach the witness, your

18    Honor?

19            THE COURT:  Yes, you may.

20    BY MS. RATTAN:

21    Q.  So is it fair to say that as early as 2004, that the

22    defendant, Ashley, received training on etomidate?

23    A.  Correct.

24            MS. RATTAN:  May I return, your Honor?

25            THE COURT:  Yes.

```
 1            MS. RATTAN:  And then may I approach the witness
 2   again?
 3            THE COURT:  Yes, you may.
 4   BY MS. RATTAN:
 5   Q.  And then on September 3rd, that manual that we just
 6   reviewed was found at the defendant's residence where he
 7   had information about the etomidate?
 8   A.  Correct.
 9   Q.  And then he also had the medical examiner's report
10   showing etomidate on that date; is that right?
11   A.  Correct.
12            MS. RATTAN:  May I return, your Honor?
13            THE COURT:  Yes, you may.
14   BY MS. RATTAN:
15   Q.  Now let's focus for a minute, if we can, on the
16   timeline.  After --
17            MS. RATTAN:  May I approach the board, your Honor?
18            THE COURT:  Yes.
19   BY MS. RATTAN:
20   Q.  After Mr. Seegan dies, the defendant, Keith Ashley, is
21   sending texts to the defendant and those texts are unread;
22   is that right?
23   A.  Correct.
24   Q.  And the texts that he's sending him, "Nice to chat with
25   you" -- let's review what those texts were.
```

 1          MR. WHALEN:  Your Honor, once again we're going to

 2   object as an improper use of a summary witness and it's

 3   cumulative.

 4          THE COURT:  Overruled.

 5          MR. WHALEN:  Based on hearsay.

 6          THE COURT:  Well --

 7          MS. RATTAN:  If we can look --

 8          THE COURT:  What's your hearsay objection?

 9          MR. WHALEN:  Well, he's basing it on what other

10   witnesses testified to.

11          THE COURT:  Overruled.

12          MS. RATTAN:  If we can look at Government's

13   Exhibit 79, page 43.

14   BY MS. RATTAN:

15   Q.  Is this a picture of Mr. Seegan's phone?

16   A.  It is.

17   Q.  And that was taken by law enforcement on the day that

18   Mr. Seegan died; is that right?

19   A.  It was.

20   Q.  And is that what's included here on the chart, at

21   10:24 a.m. Ashley texts Jim Seegan's phone and it's unread?

22   A.  It is.

23   Q.  What's he saying in the text?

24   A.  He's essentially sent the text, it looks like, to

25   console Mr. Seegan --

1          MR. WHALEN:  Your Honor, I'm going to object.

2    That calls for speculation.

3          THE COURT:  Sustained.

4    BY MS. RATTAN:

5    Q.  Does he say (as read):  "Nice to chat with you this

6    morning.  Stay positive.  I think you need to discuss this

7    with Dida.  She really needs to know how you feel and how

8    much of a struggle you're going through on a daily basis.

9    I really think you should talk to somebody.  I think we

10   both need to sit down and talk to Dida so that she

11   understands that depression is not that big of a deal and

12   you can get through it"?

13         MR. WHALEN:  Objection as to leading.

14         THE COURT:  Well, I don't know that you asked a

15   question yet.

16   BY MS. RATTAN:

17   Q.  Is that what he says?

18   A.  It is.

19         THE COURT:  Overruled.

20         MS. RATTAN:  And may I proceed, your Honor?

21         THE COURT:  Yes.

22   BY MS. RATTAN:

23   Q.  What else does he say?

24   A.  (As read):  "Just remember Dida, Josh, myself, and many

25   others love you.  I will call you later.  See, you have

 1  people that care."

 2          MS. RATTAN:  And then if we can look at

 3  Government's Exhibit 79, page 44.

 4  BY MS. RATTAN:

 5  Q.  What's going on here?

 6  A.  It's a continuation but it's much later in the day,

 7  4:37 p.m.  (As read):  "You need me to come over tonight or

 8  in the morning?  I have called you two times, Buddy.  Stay

 9  positive."

10  Q.  And again none of these are answered; is that right?

11  A.  Correct.

12  Q.  And then, of course, there are other calls that are

13  captured where Dida's calling and the school is calling,

14  and those also go unread; is that right?

15          MR. WHALEN:  Objection as to the leading.

16          THE COURT:  Sustained.

17  BY MS. RATTAN:

18  Q.  Now, let's move away from the text messages that the

19  defendant was sending throughout the day; and let's go and

20  talk about something that was found in the search of the

21  defendant's truck.

22          Was there a letter found that was labeled "open

23  upon my death"?

24  A.  There was.

25  Q.  Let me direct your attention to Government's

 1   Exhibit 124A.

 2          MS. RATTAN:  If we can publish that, page 1.

 3   BY MS. RATTAN:

 4   Q.  What is this?

 5   A.  That's the envelope.

 6   Q.  "Open upon my death," and then it's got a passcode; is

 7   that right?

 8   A.  Correct.

 9          MS. RATTAN:  And then if we can look at page 2.

10   BY MS. RATTAN:

11   Q.  What is this?

12   A.  This is the letter that was contained in the envelope

13   that was found inside the truck.

14   Q.  And just kind of give us an overview of what's going on

15   here.

16   A.  It's just instructions on financial matters related

17   to -- I'll read the first sentence.  (As read):  "As you

18   know, my goal is to take care of you guys.  I love you with

19   all my heart and soul.  If you are reading this, I have

20   passed away."

21          And then there's instructions related to Midland

22   National, related to Lincoln Life, Bank of America, some

23   mortgage stuff.

24          At the bottom there is more narrative related to

25   what I know to be Keith Ashley's mother-in-law.

1  Q.  Now, at the very bottom here, you just mentioned about

2  Keith Ashley's mother-in-law.

3          MS. RATTAN:  If we can just focus on that portion

4  of the "open upon my death" note.

5  BY MS. RATTAN:

6  Q.  What does this say?

7  A.  It says, (as read):  "Brandi, years ago I put your

8  mom's 115,000 into one of my Midland" -- well, it says

9  "MNL," which I know to be Midland National Life --

10  "policies to protect it from IRS deals years ago.  So tell

11  your mom after you receive all the death benefits I have

12  instructed you to give her 130,000.  That is what her cash

13  value should have been.  Trust me, do not try and explain,

14  just tell her the account automatically closes when I die.

15  Tell her upon my death her accounts close out and she will

16  receive money.  You will have to give her from death

17  proceeds."

18  Q.  So does it sound like the defendant had taken his

19  mother-in-law's money as well?

20          MR. WHALEN:  Objection, calls for speculation.

21          THE COURT:  Sustained.

22  BY MS. RATTAN:

23  Q.  Based on your review of this, did you reach a

24  conclusion or have an opinion as to what was going on here?

25  A.  Yes.

1   Q.  And what was that?

2           MR. WHALEN:  Objection, calls for speculation,

3   404(b).

4           THE COURT:  Sustained.

5   BY MS. RATTAN:

6   Q.  Now let me direct your attention to the defendant's

7   Internet search history.  We talked a little bit about it

8   earlier when we were talking about whether the defendant

9   googled or used an Internet search tool to look up JES2

10  Properties.  But is it more extensive than that?

11  A.  It's very extensive.

12  Q.  Okay.  And have you reviewed it?

13  A.  I have.

14  Q.  And does it contain a number of different topics?

15  A.  It does.

16  Q.  Let me direct your attention to Government's Exhibit --

17          THE COURT:  Ms. Rattan, let me go ahead and stop

18  you.  We're going to go ahead and take our morning break.

19          MS. RATTAN:  Okay.

20          THE COURT:  I kind of lost track of time.

21          So, ladies and gentlemen, again, please don't

22  discuss the case among yourself or anyone else.  Don't do

23  any outside research.  We'll take 15 minutes, come back,

24  and continue.

25          (The jury exits the courtroom, 10:43 a.m.)

 1          THE COURT:  Okay.  Anything further from the

 2  government?

 3          MS. RATTAN:  No, your Honor.

 4          THE COURT:  Defense?

 5          MR. WHALEN:  No, your Honor.

 6          THE COURT:  Okay.  See you back in 15.

 7          (Recess, 10:44 a.m. to 11:01 a.m.)

 8          (Open court, defendant present, jury present.)

 9          THE COURT:  Okay.  Please be seated.

10          Ms. Rattan, go ahead and continue.

11          MS. RATTAN:  Thank you, your Honor.

12  BY MS. RATTAN:

13  Q.  Agent Rennie, let me back up for a minute.  We covered

14  the text messages that the defendant was sending that went

15  unread throughout the day and we touched on the fact that

16  there were people trying to reach him, trying to call

17  Mr. Seegan; is that right?

18  A.  Correct.

19  Q.  Let me show you Government's Exhibit 79, page 46.

20          And can you just kind of tell us what's happening

21  here?

22  A.  Sure.  It's just a picture of the call history or the

23  received -- this, actually, is all of his call history for

24  the morning of 2-19.  These pictures were taken by the

25  Carrollton Police Department upon receiving Mr. Seegan's

1    phone.

2            As you see at the bottom there, Mr. Ashley -- at

3    9:11 a.m. he receives a call from Mr. Ashley.  There's two

4    other calls essentially before 10:00.

5            And then all of the red are all of the missed

6    calls.  So there were three unanswered calls from

7    Mr. Ashley at 11:00, two unanswered calls from Country

8    Place Elementary which I know to be the elementary school

9    of his son.

10           Mind you, the movement on Mr. Seegan's phone

11   ceased --

12           MR. WHALEN:  Object to nonresponsive.

13           THE COURT:  Sustained.

14           If you'll rephrase or ask the question again.

15   BY MS. RATTAN:

16   Q.  And what else did you notice?

17   A.  Sure.

18           You know, there was no movement on Mr. Seegan's

19   phone essentially after the last call at 9:42.  So

20   everything in red -- Country Place Elementary is his son's

21   elementary school, so it's clear that the elementary school

22   had called him --

23           MR. WHALEN:  Objection, calls for speculation.

24           THE COURT:  Sustained.

25                                    *

```
 1   BY MS. RATTAN:

 2   Q.  What does the phone show in red there about the

 3   elementary school?

 4   A.  That they attempted to reach Mr. Seegan and there was

 5   no answer.

 6   Q.  And so the phone -- we know Mr. Seegan's phone shows

 7   that his last step was logged at 9:33 a.m. and his final

 8   call was answered at 9:42 a.m.

 9         And that's shown on the exhibit that we're looking

10   at right now, the 888 number ending in 3609?

11   A.  Correct.

12         MR. WHALEN:  Objection as to leading.

13         THE COURT:  Sustained.

14   BY MS. RATTAN:

15   Q.  So what is this?

16   A.  The call history on Mr. Seegan's phone.

17   Q.  So let me shift gears again but also look at the

18   timeline.  Let's look at what is wire fraud as Count 14 and

19   bank theft as Count 19.

20         So let me direct your attention to the events of

21   February 21st of 2020.

22         MS. RATTAN:  And if we can publish Government's

23   Exhibit 133.

24   BY MS. RATTAN:

25   Q.  What is this?
```

1  A.  This is the outline of the activity --

2          MR. WHALEN:  Objection once again, improper

3  summary.  It's cumulative of his previous testimony, your

4  Honor.  We'd object.

5          THE COURT:  Overruled.

6  A.  This is an outline of the summary of events as

7  described by the Texas Capital Bank witness related to the

8  attempt on the morning of 2-21, the access -- the attempted

9  access to Mr. Seegan's account by an IP address tied to

10  Mr. -- the defendant, Keith Ashley.  And then --

11  BY MS. RATTAN:

12  Q.  Located where?

13  A.  In the Eastern District of Texas.

14          And then Number 2 is the successful transfer of

15  money from Mr. Seegan's Texas Capital Bank account from an

16  IP address that's attached to Mrs. Sakdida Seegan.

17          And the evidence shows, Number 3, that it was the

18  $20,000 transfer that went from Mr. Seegan's Texas Capital

19  Bank to KBKK, LLC, BB&T bank ending in 8725 which is owned

20  by the defendant, Keith Ashley, which is -- the bank and

21  all the indicia of the bank related to Mr. Ashley's account

22  is located in the Eastern District of Texas.

23  Q.  Okay.  So he tries first in the Eastern District of

24  Texas --

25          MR. WHALEN:  Your Honor, I'm going to object to

1  the form of the question.

2          THE COURT:  Well, the question isn't over yet.

3          MR. WHALEN:  She's testifying, and it's leading.

4          THE COURT:  Well, let her finish her question

5  before you object.

6  BY MS. RATTAN:

7  Q.  And then what happens?

8  A.  There was an attempt in the Eastern District of Texas.

9  There was a successful transfer which started in the

10  Northern District of Texas and ended in the Eastern

11  District of Texas, which is the $20,000 transfer from Texas

12  Capital Bank.  Again, it went through -- as it was BB&T, it

13  went through North Carolina and then it terminated -- it

14  ended with the deposit into the BB&T 8725 owned by KBKK,

15  LLC, in control of the defendant, Keith Ashley, which is

16  located in the Eastern District of Texas.

17  Q.  And so how far did the defendant drive out of the

18  Northern into the Eastern to get the $20,000?

19  A.  2.5 miles.

20  Q.  And then where did the money go once he accessed it?

21  A.  The money went to his account in the Eastern District

22  of Texas.

23  Q.  So if we look at Government's Exhibit 133 and then we

24  look at the timeline here, it would be, Number 1, the

25  attempt and then, Number 2, when he gets it and then,

 1  Number 3, the money goes back to the EDTX; is that right?

 2  A.  Correct.

 3          So it's a circle.  It starts in the Eastern --

 4          MR. WHALEN:  Objection to the narrative, your

 5  Honor.

 6          THE COURT:  Just ask another question.

 7  BY MS. RATTAN:

 8  Q.  So what happens?

 9  A.  If you think of it as a circle, the attempt was in the

10  Eastern District, the success was in the Northern District,

11  and the actual transfer started in the Northern and ended

12  in the Eastern.

13  Q.  Now, just before break we started to talk about the

14  defendant's Internet search history.  And you said that

15  you've reviewed it?

16  A.  I have.

17  Q.  As you reviewed the Internet search history of the

18  defendant, did he seem to be concerned about the medical

19  examiner and the medical examiner's report?

20          MR. WHALEN:  Your Honor, I'm going to object.

21  That calls for speculation.

22          THE COURT:  Overruled.

23  A.  That's correct.

24          MS. RATTAN:  So let's look at Government's

25  Exhibit 98, the medical examiner's report.

1    BY MS. RATTAN:

2    Q.  This is the medical examiner's report issued by

3    Southwestern Institute of Forensic Sciences.  Does he

4    google that, or does he use an Internet search engine to

5    look that up?

6    A.  He does.

7    Q.  And it's about James Seegan.  Is the defendant

8    repeatedly researching James Seegan?

9             MR. WHALEN:  Once again, your Honor, we'd object.

10   This is an improper use of a summary witness, and it's

11   cumulative of the testimony.

12            THE COURT:  Overruled.

13   A.  That's correct.

14            MS. RATTAN:  And then if we can look at page 5.

15   BY MS. RATTAN:

16   Q.  Of course this is the autopsy report.  Page 5 of

17   Government's Exhibit 98, does this contain the conclusions?

18   A.  It does.

19   Q.  And then you have the medical examiner, Emily Ogden, on

20   April 1st of 2020.  And what does she conclude that the

21   manner of death is?

22   A.  Suicide.

23            MS. RATTAN:  And then if we can back up to the

24   previous page, page 4.  Government's Exhibit 98, page 4.

25                              *

Jury Trial, Volume 6                    1486

```
 1  BY MS. RATTAN:
 2  Q.  This is the toxicology.  And the drug screen right here
 3  shows what?
 4  A.  "Etomidate detected."
 5  Q.  Okay.  And does it indicate something after the drug
 6  screen?  What are those letters?
 7  A.  It is.  Q-T-O-F.
 8  Q.  QTOF.  Do you know what QTOF is?
 9  A.  My understanding is it's a machine used to test the
10  blood.  It's some high-tech machinery that SWIFS has to
11  test the blood for different drugs that is not -- is not
12  available or is not --
13          MR. WHALEN:  Objection, narrative, nonresponsive.
14          THE COURT:  Just go ahead and ask another
15  question.
16  BY MS. RATTAN:
17  Q.  Did the defendant, in his search history, research what
18  QTOF is?
19  A.  He searched that acronym, correct.
20  Q.  Let me direct your attention to Government's
21  Exhibit 127A, page 7.
22          MS. RATTAN:  And if we can do a side-by-side
23  screen.  127A, page 7.
24          1-2-7-A, page 7.
25                              *
```

```
 1   BY MS. RATTAN:
 2   Q.  Okay.  Is this, on the right side of the screen, the
 3   defendant's Internet search history?
 4   A.  Sure.  I believe it's line -- it appears to be lines 77
 5   and 78 and 79, 80, 81 are all searches related to -- the
 6   search -- the search inserted -- typed into Google was
 7   "drug screen (QTOF)."
 8   Q.  "Drug screen (QTOF)"?
 9   A.  Correct.
10   Q.  And, in fact, is that the exact test that was used by
11   the medical examiner?
12   A.  Correct.
13   Q.  And --
14   A.  It's the machinery used by the medical examiner,
15   correct.
16   Q.  And then that test revealed what?
17   A.  "Etomidate detected."
18   Q.  Now, these searches happened at approximately what
19   time, the QTOF searches?
20   A.  It's a little fuzzy for me.  Looks like it's September
21   the 3rd of 2020.  Is it 7:00 a.m. (UTC-5)?
22   Q.  So within 5 minutes of searching "QTOF," was the
23   defendant searching James Seegan's name?
24   A.  Correct.
25   Q.  We can look.  So we have the "QTOF" searches right
```

```
 1    here.
 2            And then what are these searches within the same
 3    5-minute period?
 4    A.  Right.  Prior -- shortly -- just prior to the search of
 5    "QTOF" was "James Seegan Carrollton Tx," "James Seegan
 6    Carrollton Tx."  Yeah, all of those a few minutes
 7    beforehand.
 8    Q.  Now back to the medical examiner.  Did the medical
 9    examiner later revise the death?
10    A.  She did.
11            MS. RATTAN:  If we can look at Government's
12    Exhibit 99, page 1.
13    BY MS. RATTAN:
14    Q.  What is this?
15    A.  This is a Cause of Death Report for Mr. Seegan.
16    Q.  And, of course, the cause of death remains the same,
17    contact gunshot wound to the head.
18            But the manner of death is changed from suicide to
19    what?
20    A.  Undetermined.
21    Q.  And then what's the date here?
22    A.  September 10th of 2020.
23    Q.  So it went from, April of 2020, being suicide to,
24    September of 2020, the medical examiner -- cause of death
25    is the same, but manner of death now is undetermined; is
```

 1  that right?

 2  A.  That's correct.

 3  Q.  Now let's go back and look at the defendant's Internet

 4  search history.

 5        MS. RATTAN:  If we can look at Government's

 6  Exhibit 125B, pages 5 and 6.

 7  BY MS. RATTAN:

 8  Q.  We can look at these searches.  The top one is about

 9  the heat index today, but if we can focus on these searches

10  right here.

11        And these are May 9th of 2020; is that right?

12  A.  Correct.

13  Q.  And what are the searches here?

14  A.  It's, from the bottom, "manslaughter deferred

15  adjudication," "manslaughter deferred adj," "is there

16  different types of manslaughter in Texas," "is there

17  different types of man," "is there different types of

18  manslaughter in Texas," and so on and so forth.

19  Q.  But basically variations on types of ways to charge

20  someone with killing someone; is that right?

21        MR. WHALEN:  Objection to the form of the

22  question, your Honor.

23        THE COURT:  Just rephrase the question.

24  BY MS. RATTAN:

25  Q.  When you see this, what does it mean to you?

```
 1   A.  Well, it looks --
 2          MR. WHALEN:  Objection as to relevance.
 3          THE COURT:  Overruled.
 4   A.  It appears that Mr. Ashley was searching causing the
 5   death of someone else, what are the different types of ways
 6   that that can be charged.
 7          And then at the bottom it appears to be, based
 8   upon the search -- and that's what I have -- that is -- if
 9   with manslaughter you can be eligible for deferred
10   adjudication.
11   BY MS. RATTAN:
12   Q.  And what's deferred adjudication?
13   A.  My understanding of deferred adjudication is if you're
14   given that, then you have a certain period of time where if
15   you don't commit another crime, then -- it's kind of a --
16   in layman's terms, I would say semi-probationary period
17   after the initial charge.
18          MS. RATTAN:  And then if we can look at 125B,
19   page 6, up here at the top.
20   BY MS. RATTAN:
21   Q.  What's happening there?
22   A.  It says "manslaughter jail time," "manslaughter,"
23   "manslaughter deferred adjudication."
24          Again it appears the defendant, based upon his
25   research history, is searching manslaughter and concerned
```

 1    about manslaughter and, at least on Instance 62,

 2    manslaughter along with jail time.

 3              MS. RATTAN:  And then if we can look at

 4    Government's Exhibit 125B, page 7 through 9.  First page 7.

 5    BY MS. RATTAN:

 6    Q.  What's he searching here?

 7    A.  "Dallas county probate records," "Dallas County

 8    probate," "Dallas County."

 9    Q.  Is that where Mr. Seegan's will or estate would have

10    been handled?

11    A.  Right, his will and estate, as he was in Dallas County,

12    would have been handled by Dallas County Probate.

13    Q.  And if we can look at, on that same page below, 81 and

14    82.

15    A.  Searching Mr. Seegan's name and in addition to "Dallas

16    County."

17              MS. RATTAN:  And then if we can focus on page 8.

18    BY MS. RATTAN:

19    Q.  More "James Seegan," and then he starts focusing on

20    "Kirby Keller."  What is that?

21    A.  Mr. Keller is the nephew of Mr. Seegan.

22              MS. RATTAN:  And then if we can page down a little

23    more.

24    BY MS. RATTAN:

25    Q.  He goes back and is focusing on James Seegan; is that

```
 1   right?

 2   A.  Right.  He appears to be looking for Mr. Seegan in

 3   Dallas County, and then at this time the additional search

 4   term is "cemetery."

 5           MS. RATTAN:  And then if we can look on page 9.

 6   BY MS. RATTAN:

 7   Q.  Right here, while he's searching about Mr. Seegan, what

 8   does he search?

 9   A.  "How to find out location someone is buried or

10   cremated."

11           MS. RATTAN:  And then if we can go to Government's

12   Exhibit 125B, page 14.

13           And at the bottom, lines 162 through 165.

14   BY MS. RATTAN:

15   Q.  This is May of 2020, and he's looking at "sample letter

16   to accompany a gift."

17           Were there gift documents that were found when the

18   defendant's house was searched?

19   A.  That's correct.

20   Q.  And then were there documents that it appeared the

21   defendant was manufacturing himself?

22   A.  Evidence that was collected appeared to be that there

23   was some manipulation of documentation within the

24   defendant's custody.

25   Q.  And would those be the documents that were provided to
```

 1   the jury and they passed around when Detective Bonner was

 2   testifying?

 3   A.  Correct.

 4           MS. RATTAN:  And then if we can go to 125B,

 5   page 15, and just look at this.

 6   BY MS. RATTAN:

 7   Q.  Here there's more gift letter, gifting.  What does the

 8   focus turn to next?

 9   A.  Sure.  168 to the bottom, if you read from the bottom

10   up because that's -- that is the timing.  So "nest camera

11   indoor," "nest cam," "nest cam indoor," "nest cam," "can

12   nest camera indoor detect sound if no motion detected,"

13   "can nest camera indoor detect sound if no motion," "nest

14   camera indoor," "nest camera."

15           So the defendant's search history is related to

16   Nest cameras and what the capabilities of the Nest camera

17   are to detect sound if there is no motion.

18   Q.  And was that an important issue in this case?

19   A.  It was.

20   Q.  Did the garage camera in Mr. Seegan's house activate at

21   10:15 a.m.?

22   A.  Right.

23           The garage camera at 10:15 activated --

24           MR. WHALEN:  Objection, nonresponsive.

25           THE COURT:  Just ask the question again.

```
 1   BY MS. RATTAN:

 2   Q.  What happened?

 3   A.  At 10:15 a.m. on February 19th of 2020, the Nest camera

 4   owned by James Seegan in the garage activated with no

 5   motion.

 6   Q.  And then what's the defendant asking?

 7   A.  "Can nest camera indoor detect sound if no motion."

 8            MS. RATTAN:  Then let's look at Government's

 9   Exhibit 125B, page 16.

10   BY MS. RATTAN:

11   Q.  What's he looking at here?

12   A.  "Statute of limitations."

13            MS. RATTAN:  And then if we can look at 125B,

14   page 18, line 215, 2-1-5.

15   BY MS. RATTAN:

16   Q.  What's he asking there?

17   A.  "Can you get a full" -- "can you get full police

18   reports of a suicide" -- and then it just says C-A-R-R,

19   which are the first four letters of "Carrollton," Texas.

20            MS. RATTAN:  And then let's focus on what he wants

21   to know about bank fraud.

22   BY MS. RATTAN:

23   Q.  Let me direct your attention to 125B, page 21,

24   line 253, 254, and 255.

25            On line 253 what's the search?
```

 1  A.  Okay.  If you read from the bottom -- or 253 is

 2  "statute of limitations banking fraud."

 3          And then again 254 and 255 are related to "ring,"

 4  which is a Ring doorbell camera.  That's the assumption.

 5  "Does ring pick up sound if no motion," "does ring pick up

 6  sound if no motion detected."

 7          MS. RATTAN:  And then if we can look at 125B,

 8  page 22, line 261.

 9  A.  The defendant searched "time of death calculator."

10          MS. RATTAN:  125B, page 23.

11          And if we can look through 261 -- or, rather, 281.

12  Pardon me.

13  BY MS. RATTAN:

14  Q.  So again what is this?

15  A.  "JES2 LLC," which is the company owned by Mr. Seegan,

16  "jes22 investments llc," "JES22 property llc."

17  Q.  And then here, focused back on crime, what's going on?

18  A.  (As read):  "Statute of limitations for Texas,"

19  "statute of limitations criminal," and "then Texas Code of

20  Criminal Procedure 12.01, Subsection 2."

21  Q.  And do you know what that is?

22  A.  After review, I believe it's the punishment section of

23  the Rules of Criminal Procedure.

24  Q.  Okay.

25          MS. RATTAN:  If we can look at 125B, page 24,

 1   line 291 through 294.

 2   BY MS. RATTAN:

 3   Q.  What's going on here?

 4   A.  The defendant is searching "penal code on theft,"

 5   "texas penal code on theft."

 6          And then it goes on to -- or, actually, I think

 7   this is previous to those searches -- "can you tell when

 8   someone died time," "can you tell when someone died

 9   timeline."

10          MS. RATTAN:  And then 125B, page 25, lines 303

11   through 310.

12   BY MS. RATTAN:

13   Q.  Again is he looking at the business that Mr. Seegan

14   had?

15   A.  He did.

16   Q.  And is he wondering about a Death Certificate?

17   A.  He is.

18   Q.  And what is that search?

19   A.  "Will a death certificate be issued if suspicious

20   circumstances."

21   Q.  And then more back to the Nest camera; is that right?

22   A.  Yes, many searches related to Nest and sound and

23   motion.

24          MS. RATTAN:  And then if we can look at 125B,

25   page 26, 317 through 321.

 1   BY MS. RATTAN:

 2   Q.  What's happening here?

 3   A.  He's searching the defendant -- excuse me -- the

 4   deceased.  "Jim seegan carrollton texas," "Parkland

 5   Securities compliance," "Parkland Securities compliance

 6   manual," and then "can you get full police reports of a

 7   suicide carrollton," "can you get full police reports of a

 8   suicide."

 9           MS. RATTAN:  And then if we can look at 125B,

10   page 27, at the bottom.

11   BY MS. RATTAN:

12   Q.  What's going on here again?

13   A.  Searching Mr. Seegan's business, the business that

14   Mr. Seegan owned.

15           MS. RATTAN:  And then let's focus on more of the

16   search history.  If we can go now to Government's

17   Exhibit 126, page 1.

18   BY MS. RATTAN:

19   Q.  And what's he searching here?

20   A.  He's searching the deceased, Mr. Seegan, and his name,

21   Carrollton, Texas.

22           On line 7, "copy of me report."  Based upon the

23   evidence, "me," initials M-E is medical examiner.

24           "Copy of me report dallas county medical

25   examiner," "copy of dallas county autopsy."

```
 1           MS. RATTAN:  And 126, page 2.

 2           We can just focus on the searches.

 3  BY MS. RATTAN:

 4  Q.  And what are these searches about?

 5  A.  They are related to, again, the autopsy, medical

 6  examiner online records, autopsy, autopsy, "dallas county

 7  medical examiner online records."

 8           MS. RATTAN:  And then page 3.  126, page 3.

 9  A.  Autopsy report, autopsy results, "dallas county autopsy

10  results," and then he actually searches the deceased's

11  wife, "Dida seegan carrollton."

12           MS. RATTAN:  And 126, page 4.

13  A.  Again Mr. Seegan's wife with the city, the state.  He

14  searches "Sakdida Seegan face," "sakdida seegan facebook."

15           MS. RATTAN:  Then page 5 of 126.

16  A.  Sakdida -- "dida seegan carrollton," Facebook, "Sakdida

17  Seegan face," Facebook, searches related to that.

18           MS. RATTAN:  And then the next page.  126, 6.

19  BY MS. RATTAN:

20  Q.  What's happening here?

21  A.  Again, more searches related to Dida Seegan as well as

22  "James Seegan obituary" searches.

23           MS. RATTAN:  Page 7.

24  A.  More searches related to the deceased, James Seegan.

25  Included in those searches, a search related to "james
```

1    seegan obituary."

2           MS. RATTAN:  Page 8.

3    A.  Again searches related to the deceased, James Seegan,

4    along with obituary.

5           MS. RATTAN:  Now page 9.

6    A.  More searches related to James E. Seegan, related to

7    probate records in Dallas County.

8           MS. RATTAN:  Page 10.

9    A.  James -- related to James Seegan again, Dallas County

10   cemetery, related to again "can you get full police reports

11   of a suicide," Carrollton Texas news, and then "JES2 LLC

12   James Seegan" search as well.

13   BY MS. RATTAN:

14   Q.  And then let me direct your attention to Government's

15   Exhibit 127A.

16          MS. RATTAN:  If we can look at page 2, line 17.

17   BY MS. RATTAN:

18   Q.  And what's he searching here?

19   A.  "Can manner of death be changed by the medical ex" and

20   then it says "can manner of death be changed by medical

21   examiner," "can manner of death be changed by medical ex."

22          So searching on the phone which is seized from the

23   defendant, Keith Ashley, there are searches related to if

24   the cause of death be changed by the medical examiner.

25   Q.  And, in fact, was the information on the ME's report

 1  changed, the medical examiner's report?

 2  A.  It was.

 3  Q.  From suicide to undetermined?

 4  A.  Correct.

 5       MS. RATTAN:  And then if we can look at

 6  Government's Exhibit 127A, page 4.

 7  BY MS. RATTAN:

 8  Q.  What's going on here?

 9  A.  Looks like there's searches related to SWIFS, which is

10  the Southwestern Institute of Forensic Sciences.  Then it

11  says -- asking what an acronym stands for, IFS, what does

12  "IFS" stand for.

13  Q.  And then it continues on.

14       MS. RATTAN:  Just roll through the pages.

15  BY MS. RATTAN:

16  Q.  He keeps searching and searching --

17  A.  Right.

18  Q.  -- about SWIFS; is that right?

19  A.  Many searches about SWIFS, correct.

20       MS. RATTAN:  And then 127A, page 7.

21  BY MS. RATTAN:

22  Q.  This is what we looked at earlier with the QTOF related

23  to the testing of the etomidate; is that right?

24  A.  Correct.

25  Q.  And he does that search at the same time, or around the

 1  same time, within 5 minutes of searching James Seegan's

 2  name?

 3  A.  Well, I'll point out, for instance, on line 81, the way

 4  that it's typed in to the search, "drug screen (QTOF)," is

 5  identical as how it shows up on the autopsy report.

 6          MR. WHALEN:  Objection, nonresponsive.

 7          THE COURT:  Just rephrase the question or reask

 8  it.

 9          MS. RATTAN:  Yes, your Honor.

10  BY MS. RATTAN:

11  Q.  Does this look familiar to you, the way this is typed

12  in?

13  A.  Right.  It's typed in identical to how it's typed -- or

14  written indicated on the autopsy report for Mr. Seegan.

15          MS. RATTAN:  Now let's jump ahead to page 24,

16  Government's Exhibit 127A page 24.

17          If we can look at line 251.

18  BY MS. RATTAN:

19  Q.  What's going on here?

20  A.  There are searches related to "Detective Bonner

21  Carrollton Police," which Detective Bonner was the lead

22  detective of the case related to the death of Mr. Seegan in

23  Carrollton, Texas.

24          MS. RATTAN:  And if we can just jump forward to

25  127A, page 32, line 346.

```
 1  A.  More searches related to Detective Bonner, "who is

 2  detective bonner in carrollton texas," "who is detective

 3  bonner."

 4  BY MS. RATTAN:

 5  Q.  In fact, are there a number of searches related to who

 6  Detective Bonner is?

 7  A.  Correct.

 8          MS. RATTAN:  And going back to 127A, page 25.

 9  BY MS. RATTAN:

10  Q.  More inquiries about autopsy, on line 262.

11  A.  "Dallas county autopsy results," "Dallas County" --

12  yes, correct.

13          MS. RATTAN:  And then page 26.

14  BY MS. RATTAN:

15  Q.  More inquiries about Mr. Seegan's family?

16  A.  Correct, the wife, Ms. Sakdida Seegan.

17  Q.  And then a number of searches about Detective Bonner;

18  is that right?

19  A.  Correct.

20  Q.  Just -- would you say there's at least over 30 on

21  Detective Bonner?

22  A.  There is a voluminous amount.

23          MS. RATTAN:  127A, page 41.

24          MR. WHALEN:  Your Honor, at this time we would

25  object.  Once again, it's improper use of a summary
```

 1   witness and --

 2           THE COURT:  Overruled.

 3           MR. WHALEN:  -- he's just reading from an exhibit.

 4           THE COURT:  Overruled.

 5   BY MS. RATTAN:

 6   Q.  And what's going on here?

 7   A.  Again "Detective Bonner carrollton police department"

 8   searches.

 9   Q.  And then at some point does he also research himself

10   and enter "KBKK"?

11   A.  He does.

12           MS. RATTAN:  127A, page 41.

13   A.  "KBKK LLC," both upper and lower case searched.

14           MS. RATTAN:  And then if we can go to 127A,

15   page 70.

16   BY MS. RATTAN:

17   Q.  Does he focus again on Mr. Seegan's family, both Dida

18   and his nephew, Kerby Keller?

19   A.  He does.

20   Q.  In fact, are there multiple searches about Dida,

21   Sakdida, and Kerby Keller?

22   A.  There are.

23   Q.  And it goes on for several pages; is that right?

24   A.  It does.

25           MS. RATTAN:  And 127A, page 79.

1  BY MS. RATTAN:

2  Q.  Again is he looking at the James Seegan -- mixed in

3  with SMU football schedule?  Is he looking at

4  Mr. Seegan's -- or looking for Mr. Seegan's obituary?

5  A.  He is.

6          MS. RATTAN:  And then if we can look at page 88.

7  BY MS. RATTAN:

8  Q.  Of course, we've been focusing on things that relate to

9  the Seegans and the investigation.  He also does searches

10 looking for the top 10 steakhouses in Dallas; is that

11 right?

12 A.  He does.

13 Q.  And are there also -- for example, on page 90 --

14 searches related to Choctaw?

15         MS. RATTAN:  We can look at 1087.

16 A.  Correct, "choctaw steakhouse," "choctaw steak,"

17 "choctaw steakhouse. "

18         There is a myriad of searches.  There's many, many

19 lines --

20         MR. WHALEN:  Objection, nonresponsive.

21         THE COURT:  If you'll ask the question again.

22 BY MS. RATTAN:

23 Q.  And what are there a number of inquiries related to?

24 A.  There's -- related to the death of Mr. Seegan, his

25 family, the obituary, the medical examiner's office, the

 1    type of equipment used, timing, probate, Dallas County, in

 2    addition to just personal searches related to steakhouses

 3    or SMU football or what the weather is today.

 4          So when the download of the cell phone occurred,

 5    the download of his search history was voluminous and

 6    complete.

 7          MS. RATTAN:  And then if we can just end with

 8    127A, pages 214 and 215, lines 2591 to end.

 9    A.  "Sample letter to accompany a gift" multiple times and

10    then there's searches about "nest cam," "nest camera

11    indoor," "can nest camera indoor detect sound if no

12    motion," multiple searches related to that.

13    BY MS. RATTAN:

14    Q.  The Nest camera.

15          And based on your investigation and review of the

16    evidence, was the Nest camera, in fact, significant in this

17    investigation?

18    A.  Yes.

19    Q.  So it was significant in terms of the activation in the

20    garage?

21    A.  Correct.

22    Q.  And then did the Nest camera also capture coming,

23    leaving, coming back, and leaving again?

24          MR. WHALEN:  Objection as to leading.

25          THE COURT:  Well, I'll overrule the objection.

```
 1  A.  It did.

 2  BY MS. RATTAN:

 3  Q.  And then would you say that the defendant, in his

 4  search history, multiple times and repeatedly searched

 5  issues related to the Nest camera?

 6          MR. WHALEN:  Objection, asked and answered.

 7          THE COURT:  Sustained.

 8  BY MS. RATTAN:

 9  Q.  Did you find it significant that the defendant was

10  repeatedly searching that?

11  A.  It was clear that the defendant was very concerned

12  about the Nest camera.

13          MR. WHALEN:  Objection, nonresponsive and calls

14  for speculation.

15          THE COURT:  Well, sustained.  It's nonresponsive.

16          MS. RATTAN:  Your Honor, may I have just a minute?

17          THE COURT:  Yes.

18          (Off-the-record discussion among counsel for the

19  government.)

20          MS. RATTAN:  Thank you, your Honor.  We'll pass

21  the witness.

22          THE COURT:  Cross-examination?

23              CROSS-EXAMINATION OF JASON RENNIE

24  BY MR. WHALEN:

25  Q.  Agent Rennie, good morning.
```

1   A.  Good morning, sir.

2   Q.  All right.  First, I want to talk to you about -- you

3   mentioned the LLC, correct?

4   A.  Yes, sir.

5   Q.  And you said the LLC owned real estate; is that

6   correct?

7   A.  It did.

8   Q.  Okay.  It owned a single house, correct?

9   A.  It did.

10   Q.  Okay.  And that single house was previously owned by

11   his brother Bob, correct?

12   A.  I believe that's correct.

13   Q.  Okay.  And his -- he got the house from his brother Bob

14   after Bob had killed himself, correct?

15   A.  I don't know what the circumstances of the transfer of

16   the property, but I will say that it was previously owned

17   by his brother and the property is located in Frisco.

18   Q.  Okay.  And the LLC was -- he owned the house for a year

19   or so before he formed the LLC, correct?

20   A.  I believe that it was transferred into his name, then

21   it was transferred into the company name.

22   Q.  Okay.

23   A.  Yes.

24   Q.  And so would you -- and you're familiar with LLCs,

25   correct?

 1   A.  I am no expert and no CPA; but I am aware of what an

 2   LLC is, yes, sir.

 3   Q.  Okay.  So an LLC -- you could have a house owned by an

 4   LLC in order to write off the expenses for the house other

 5   than your primary house; is that fair?

 6   A.  Yes.

 7   Q.  Okay.  And did you ever look at any profit and loss

 8   statements or tax returns from the LLC?

 9   A.  I don't believe we had any tax returns.  If it was an

10   LLC, we didn't have any -- if there were tax returns for

11   the LLC, we did not have access to those.

12   Q.  Okay.  Now, you say you don't have access to tax

13   returns.  I mean, you work for the Federal Bureau of

14   Investigation, correct?

15   A.  I do.

16   Q.  Okay.  And the tax returns are held by the Internal

17   Revenue Service, correct?

18   A.  They are.

19   Q.  And they are a government agency, correct?

20   A.  Correct.

21   Q.  And did you inquire of the IRS to ask for those tax

22   returns?

23   A.  We did not.

24   Q.  So as you sit here today, you cannot say whether or not

25   that LLC generated any type of profit, correct?

1  A.  I cannot.

2  Q.  Okay.  And that -- the expenses that were used to pay

3  for the rental house could also be commingled with what he

4  spent for his own house, correct?

5  A.  Well, the spreadsheet that was shown on the exhibit

6  was -- clearly it was made to track the expenses for the

7  company and the expenses incurred by the company for the

8  property that you mentioned.

9  Q.  Okay.  Is that "no"?

10 A.  Rephrase the question.

11 Q.  Okay.  The question is:  Did you look at to determine

12 whether or not any of the expenses through that credit card

13 account also went to expenses for his own home?

14 A.  All of the expenses on that credit card account

15 appeared to be for the property owned by JES2 Properties,

16 LLC.

17 Q.  Okay.  And all those products and services, like the

18 plumber and everything else, those are located here in the

19 state of Texas, correct?

20 A.  There are some of them that are located in the state of

21 Texas, aside from the ones that we mentioned on direct.

22 Q.  Okay.  So, just so -- just so we're clear, the only

23 piece of property the LLC owned was the house, correct?

24 A.  The LLC owned one piece of property that was located in

25 Frisco.

1   Q.  And the LLC is just simply a flow-through to his

2   personal return, correct?

3   A.  I can't -- I think there's other tax situations on how

4   an LLC can be handled, so I can't speculate on that because

5   I don't have his tax returns.

6   Q.  Okay.  And an LLC is also a vehicle for liability

7   purposes, right?

8   A.  It is.

9   Q.  Okay.  That's why they call -- and "LLC" stands for

10  "limited liability corporation," correct?

11  A.  Even I could figure that one out, right.

12  Q.  Okay.  So do you -- well, how much was the house worth?

13  A.  I believe -- on open source, the most recent taxable

14  value was between 400- and 500,000, I believe.

15  Q.  Okay.  And was there any mortgage or any liens on it?

16  A.  I don't have that information.

17  Q.  Okay.  And just because from an open source -- that's

18  what's on the appraisal district role, correct?

19  A.  Yes.

20  Q.  Okay.  That's not what the house potentially could sell

21  for, correct?

22  A.  Correct.

23  Q.  Okay.  And we all agree that currently the market --

24  maybe it's slowing down a little bit but pretty favorable

25  to the people that own property?

```
 1   A.  If you're selling it.

 2   Q.  Correct.  You would agree with that?

 3   A.  Yes.

 4   Q.  Okay.  So even though it's listed at 450-, $500,000, it

 5   could be worth a lot more on the open market?

 6   A.  Sure.  The taxable value is one number, and the market

 7   value is what the market will bear.  If somebody is willing

 8   to pay you more, then it's worth more.

 9   Q.  Okay.  Did you ever look into the market value of the

10   house at all?

11   A.  I did not.

12   Q.  Okay.  Now, when you talked earlier about his net

13   worth, did you factor in the value of that house into his

14   net worth?

15   A.  I -- the net worth figure that we relied on -- there

16   was multiple documents that Mr. Seegan had filed with

17   different entities that indicated his net worth was

18   3 million, so that's the number we relied on.

19   Q.  Okay.  And so just so people understand net worth, net

20   worth is accumulation of all your assets, correct?

21   A.  Correct.

22   Q.  Okay.  Minus, for lack -- easier -- minus your

23   liabilities, correct?

24   A.  In its simplest terms, yes.

25   Q.  Okay.  So if I own a house that's worth half a million
```

1  dollars but I owe $400,000 to the mortgage company, the

2  only positive is $100,000, correct?

3  A.  Correct.

4  Q.  Okay.  So when you factored in -- looked at his net

5  worth, you came up with over $3 1/2 million; is that

6  correct?

7  A.  We're just using -- the $3 million figure is purely a

8  written statement by Mr. Seegan at the time that it was

9  written.

10  Q.  Okay.  So just so we're clear, you never went in to

11  determine whether or not the total net worth, based on what

12  his -- the Carrollton house was worth, the Frisco house was

13  worth, any personal property, cars, things of that nature,

14  correct?

15  A.  One would assume that Mr. Seegan took that into account

16  when he indicated his net worth.  He was a very -- appeared

17  to be a very intelligent individual.  But, again, it's just

18  the figures that we saw repeatedly on multiple different

19  documents that he himself was indicating that he's worth

20  $3 million.

21  Q.  Okay.  And that LLC was formed in March of 2019,

22  correct?

23  A.  That's correct.

24  Q.  And then that -- also on that form that we showed --

25  that was shown earlier, it said 3 million-plus, correct?

1    Was there a plus sign next to it?

2    A.   I believe it did say plus.

3    Q.   Okay.  So needless to say, it's at least 3 million but

4    going up, correct?

5    A.   3 million is -- is -- in that indication you would have

6    to say 3 million is the floor there.

7    Q.   Okay.  Now, you talked earlier about -- as it related

8    to the bank theft charge.  Do you remember talking about

9    that?

10   A.   I do.

11   Q.   Okay.  And I think we heard from Mr. Nielsen *(sic)* from

12   Capital Bank that the wire that was completed was in -- at

13   the house in Carrollton, Texas; is that correct?

14   A.   Mr. Hilson, yes.

15   Q.   Okay.  And Mr. Hilson -- from what I remember from his

16   testimony, it was performed on a computer, correct?

17   A.   I don't recall that.

18   Q.   Okay.  Is there any way to determine whether it was on

19   a computer or not?

20   A.   I believe Mr. Hilson's testimony was that a multifactor

21   authentication was not required for the successful

22   transfer, which would lead me to believe that it was on a

23   device that was owned by Mr. Seegan.

24   Q.   Okay.  And you looked at the Capital Bank FDIC

25   certificate, correct?

 1    A.  I did.

 2    Q.  Okay.  And they are located in Dallas, Texas, correct?

 3    A.  I believe they're headquartered in Dallas, Texas,

 4    right.

 5    Q.  Okay.  You talked also about his E*TRADE account.

 6    Remember that testimony?

 7    A.  I do.

 8    Q.  His E*TRADE account was in his personal name, correct?

 9    A.  I believe that's correct, yes.

10    Q.  It was not in JES (*sic*), LLC, correct?

11    A.  That's correct.

12    Q.  Okay.  And we also talked -- you also talked about this

13    company called Groundfloor.  Do you remember that?

14    A.  I do.

15    Q.  And then that was in his individual name, too, correct?

16    A.  I believe, it was as an individual investor, yes.

17    Q.  Okay.  And Groundfloor -- my limited knowledge of it is

18    you can buy shares through that company, correct?

19    A.  I think there is a fractional ownership.  It's

20    essentially a debt.  It's a lending company where they

21    utilize investor money to lend to real estate projects.

22    Q.  Okay.  And so -- but I get some -- I invest with them

23    and they give me a return, correct?

24    A.  Yeah.  I think the model is that you provide money

25    which they use to lend; and then the assumption is whatever

1    money they make on the lending side, then that is used to

2    pay returns.

3    Q.   Okay.  And just so we're clear, something like

4    Groundfloor is no different than really a bank in the sense

5    of I deposit my money with a bank in a CD, savings account

6    and things like that, and that gives the bank the ability

7    to then do loans and loan that money out and make money on

8    it, correct?

9    A.   I think it's a little bit different.  A bank -- when

10   you deposit money with a bank, for the most part if you're

11   under the threshold, the FDIC threshold, your money is

12   guaranteed.

13          If you give it to a company as in Groundfloor, I'm

14   sure their prospectus would say there are no guarantees,

15   past performance is not indicative of --

16   Q.   Okay.

17   A.   -- future gains.

18          So it's more of an investment vehicle.  It's more

19   of what's akin to providing capital for debt, right?  So

20   it's a little bit different -- it's a lot different, in my

21   opinion, than a savings or checking account.

22   Q.   That's fair but I'm -- it's an individual investment

23   that he made?

24   A.   He made an investment into what the SEC would consider

25   to be a security, right --

1    Q.  Okay.

2    A.  -- versus deposit -- you know, deposit into a

3    depository account, which is a guarantee --

4    Q.  And if I got shares of Google, that's a security,

5    correct?

6    A.  Correct.

7    Q.  Okay.  So Groundfloor, Google, Amazon, if I buy

8    individual shares, I'm purchasing a security?

9    A.  Right.

10         I think theirs was a little bit different than --

11   you know, I think their investment was directly with the

12   company.  It was more of a prospectus, maybe like buying a

13   fractional share of an oil well or something like that

14   versus going to your brokerage account and buying a share

15   of Google.

16   Q.  Okay.  And then I think you also talked about his

17   Fidelity account, that he had a Fidelity account?

18   A.  Yes, sir.

19   Q.  Okay.  And that was in his individual name as well?

20   A.  I believe so.

21   Q.  Okay.  Did you determine how much money he had in his

22   E*TRADE account at one time?

23   A.  I did.  I saw there was a fluctuating balance, but it

24   was -- it was a hefty balance, you know, give or take, you

25   know, a half a million dollars.

1   Q.  Okay.  And then the Fidelity account?

2   A.  I think it was smaller than that.

3   Q.  Okay.  Did you look at his 401(k)?

4   A.  I did not.

5   Q.  Okay.  Needless to say, the 401(k) would have been part

6   of the $3 million we talked about or --

7   A.  Yes, Mr. -- like I said, Mr. Seegan was a pretty

8   meticulous person; so it didn't seem to me, based upon the

9   evidence, he would be putting numbers that didn't tie to

10  specific values of accounts and assets.

11  Q.  Now I want to talk to you about these searches.

12  A.  Sure.

13          MR. WHALEN:  If we can go to -- I hope I've got

14  this right -- Government's Exhibit 125B, page 16.

15          MS. RATTAN:  Your Honor, may we approach briefly?

16          THE COURT:  Yes.

17          MS. RATTAN:  Thank you.

18          (Sidebar conference, off the record.)

19          MR. WHALEN:  Okay.  If we can look at Government's

20  Exhibit 125B, page 16.

21          Go down a little bit.

22          Okay.  Stop right there.

23  BY MR. WHALEN:

24  Q.  Do you see line 186?

25  A.  I do.

1    Q.  Okay.  And can you read that for me, what it says?

2    A.  "What type of case does ralph freeman handle."

3    Q.  Okay.

4         MR. WHALEN:  You can take that down.

5    BY MR. WHALEN:

6    Q.  And also there is no date next to that, correct?

7    A.  I think on the far right there is a date.  The way it

8    was snipped to show --

9    Q.  Okay.

10   A.  But there is a date there.

11   Q.  In the course of your investigation, you determined

12   that Ralph Freeman was a private investigator, correct?

13   A.  I'm not certain.

14   Q.  Okay.  You were in the courtroom when Detective Bonner

15   testified, correct?

16   A.  I believe there's times when I stepped out, but for the

17   majority I was.

18   Q.  Okay.  And if Detective Bonner testified that Ralph

19   Freeman was a private investigator --

20   A.  I would take his word for it.

21   Q.  Okay.  And that -- if he also testified that

22   Mr. Freeman had contacted Mr. Ashley in approximately

23   April of 2020, you'd take his word for it as well?

24   A.  If Mr. -- if Detective Bonner testified to that, I

25   would take his word for it.

1   Q.  Okay.  Then as we -- you saw a bunch of other searches

2   that occurred in May, correct?

3   A.  Yes.

4   Q.  Okay.  And then we saw the majority of the searches

5   happened on September 3rd of 2020, correct?

6   A.  There were searches before and after that date but --

7   Q.  Okay.  And you were present when Mr. Bonner said that

8   he made contact with Mr. Ashley on September 3rd, correct?

9   A.  Correct.

10          I think he contacted him before that date, but I

11  know he was in contact with him on that date.

12  Q.  Okay.  So if Detective Bonner made contact before that

13  date and on that date, that's around the time these

14  searches were made, correct?

15  A.  Some of the searches shown, yes.

16  Q.  Okay.

17          MR. WHALEN:  Now if we look at, I think,

18  Government's Exhibit 10, page 2.

19  BY MR. WHALEN:

20  Q.  Okay.  And, Agent Rennie, this is the subscriber record

21  as related to the IP address at Cannes Drive in Carrollton,

22  correct?

23  A.  Correct.

24  Q.  Okay.  And you indicated earlier in your testimony that

25  it started from July 26th of 2019 to August 27th of 2020;

1    is that correct?

2    A.  Correct.

3    Q.  And just so we're clear, the subscriber name is Sakdida

4    Seegan, correct?

5    A.  Correct.

6    Q.  All right.

7          MR. WHALEN:  You can take that down.

8    BY MR. WHALEN:

9    Q.  Now, also when we talked about those searches related

10   to QTOF, correct, isn't it true that Detective Bonner

11   relayed some information during that contact to Mr. Ashley

12   about the autopsy and things of that nature?  Isn't that

13   true?

14   A.  I can't recall what was relayed on September 3rd to

15   Mr. Ashley.

16   Q.  Okay.

17   A.  I mean, there was a lot that was relayed.  I can't

18   recall --

19   Q.  Right.

20   A.  -- specifically if that was stated.

21   Q.  And will you agree with me that these searches -- does

22   it appear that these searches relate to around the time he

23   had contact from either law enforcement or Mr. Freeman?

24   A.  Well, it was definitely around the time he was

25   contacted by law enforcement.  That's fair.

1  Q.   Okay.  And so just so I'm clear, the transaction of the

2  $20,000 on the 21st, that was effectuated from Mr. Seegan's

3  house on that date, correct?

4  A.   The successful transfer of the $20,000 went from -- it

5  was connected to an IP address at Mr. Seegan's address and

6  went from a bank in the Northern District to a bank in the

7  Eastern District, correct.

8  Q.   And -- and fair to say that in order to capture that IP

9  address, the device has to be connected, whether hard-wired

10 or Wi-Fi, to that device, correct -- to that IP address,

11 correct?

12 A.   The IP address is connected to, you know, the account

13 which we showed, which is on the network assumably in

14 Mr. Seegan's residence.

15 Q.   And the total, once again, is $20,000, correct?

16 A.   Correct.

17 Q.   And it's your testimony under oath that Mr. Seegan's

18 net worth was well over $3 1/2 million; is that correct?

19 A.   Again, to reiterate, the number that I'm relying on is

20 the number that Mr. Seegan provided on multiple documents

21 that were in evidence; and that's what we're relying on his

22 net worth figure as is $3 million.

23 Q.   Okay.  And there is no reason to doubt that, correct?

24 A.   I don't have any reason to doubt it or question it.  I

25 just take it for what it is.  If Mr. Seegan put it on an

 1    application -- really in that context, it's not a tax

 2    document or anything like that.  There's really no reason

 3    to misstate that number.

 4    Q.  Okay.

 5              MR. WHALEN:  I'll pass the witness.

 6              THE COURT:  Additional questions?

 7              MS. RATTAN:  No, your Honor.

 8              THE COURT:  Agent, you may step down.

 9              THE WITNESS:  Thank you, your Honor.

10              THE COURT:  Okay.  What says the government?

11              MS. RATTAN:  Your Honor, members of the jury, the

12    United States rests its case-in-chief.

13              THE COURT:  Thank you, Ms. Rattan.

14              What says the defense?

15              MR. WHALEN:  May we approach, your Honor?

16              THE COURT:  Yes.

17              (The following proceedings were conducted at

18    sidebar with all parties represented.)

19              THE COURT:  Go ahead.

20              MR. WHALEN:  Your Honor, obviously, we're going to

21    have a Rule 29 motion that is pretty lengthy.  So we want

22    to be able to make that; but then after that, we would

23    rest.

24              THE COURT:  Okay.  You can do it right here.  Go

25    right ahead.

 1          MR. WHALEN:  Let me go get my --

 2          THE COURT:  How long is it going to be?

 3          MR. WHALEN:  We're going to go through every

 4  count.

 5          THE COURT:  Okay.  That's fine.  So then you're

 6  not putting any evidence on, right?

 7          MR. WHALEN:  Correct.

 8          THE COURT:  Okay.  So the question is -- we can

 9  break for lunch but then -- well, I'll send the jury out

10  for lunch and you'll make your motions and everything.  And

11  then how much time do you want for closing argument?

12          MS. RATTAN:  I hope to not use this, but may we

13  please have two and a half hours?

14          THE COURT:  What?

15          MS. RATTAN:  I hope to not use it.  I hope to give

16  the time back to the Court.  But just in an abundance of

17  caution, we're asking for that.

18          THE COURT:  Okay.  I'm not giving you that much

19  time.

20          MS. RATTAN:  I understand.

21          THE COURT:  It seems unreasonable for -- it's only

22  been a six-day case.

23          MS. RATTAN:  Okay.

24          THE COURT:  As you know, Judge Brown's rule was

25  5 minutes per day.  I don't follow that model but --

```
 1              MR. WHALEN:  I appreciate that.

 2              THE COURT:  I was thinking more like an hour and a

 3    half per side but --

 4              MS. RATTAN:  May we please have an hour 45?

 5              THE COURT:  Ms. Rattan, I sense that you are

 6    trying to negotiate with the Court.

 7              MS. RATTAN:  Well, I know.  I understand it's up

 8    to the Court but --

 9              THE COURT:  No, I know.

10              MS. RATTAN:  Of course.

11              THE COURT:  So what we have to do is -- I'm just

12    trying to -- I don't know if -- we'll get the closing

13    arguments done today.  I just don't know if we'll get the

14    charge read because it is also very long.  But I would

15    rather at least get the closing arguments done.

16              The question is what time should I have the jury

17    come back because we'll have to sit down and talk about the

18    charge, which I don't think will take too long based on our

19    previous work on that but -- so should I have them come

20    back at -- what time do you think?

21              MR. WHALEN:  Well, do you want me to rest subject

22    to -- that way that's --

23              THE COURT:  Yes.  I'm going to ask you to do that.

24              MR. WHALEN:  Okay.

25              THE COURT:  You know -- I don't know if we'll do
```

 1   that now or -- but we'll do that here in a second.

 2          MR. WHALEN:  Okay.

 3          THE COURT:  The question is -- because I still

 4   want you to rest in front of the jury --

 5          MR. WHALEN:  Right.

 6          THE COURT:  -- we come back before we start

 7   closing arguments.

 8          MR. WHALEN:  Right.

 9          THE COURT:  Again, what time should I bring the

10   jury back?

11          MS. RATTAN:  Well, you wanted to have the

12   instructions ready when they return?

13          THE COURT:  Correct.

14          MS. RATTAN:  How about 1:45?

15          MR. WHALEN:  Yeah.  I'm not going anywhere.

16          THE COURT:  Okay.  So do you want to go back and

17   just conditionally rest in front of the jury?

18          MR. WHALEN:  Sure.

19          THE COURT:  And then I'll let you make your motion

20   and everything like that.

21          MR. WHALEN:  Yeah, that's fine.

22          THE COURT:  So that they see that you are resting

23   so that I could explain to them --

24          MR. WHALEN:  Yeah, that's fine.

25          THE COURT:  -- what's happening next.

1          MR. WHALEN:  Yeah.

2          THE COURT:  Okay.  Very good.

3          MS. RATTAN:  Thank you.

4          (Sidebar conference concluded.)

5          THE COURT:  So what says the defense?

6          MR. WHALEN:  Your Honor, subject to some motions,

7   we would rest as well.

8          THE COURT:  Okay.  And I assume the government

9   will close?

10          MS. RATTAN:  We close.

11          MR. WHALEN:  Closing as well.

12          THE COURT:  You conditionally close?

13          MR. WHALEN:  Conditionally close, your Honor.

14          THE COURT:  Okay.  So, ladies and gentlemen, at

15   this time all of the evidence has been presented that

16   you're going to be hearing; however, I have to meet with

17   the attorneys to go over the Court's instructions and so

18   they have a right to look at those and -- we've already

19   been working on those, but I have to officially go over

20   that.

21          So we're going to take a little bit longer lunch,

22   and when we come back -- we'll come back at 1:45, and then

23   we'll hear the closing arguments of the attorneys.  I have

24   given them an hour and 45 minutes each, whether they use it

25   all or not.  So my goal will be to try to get all of the

```
 1    closing arguments done today.
 2         It may require spilling over into tomorrow morning
 3    to give you have my instructions which could -- you'll get
 4    a copy of the instructions, but they are quite lengthy
 5    because of the number of counts in the case so that could
 6    take me 45 minutes to an hour to read.  So I don't know if
 7    we'll get to that part.  We'll get all of the arguments
 8    done today, though.
 9         So I just wanted to kind of, again, manage your
10    expectations about what's happening next so I hope you can
11    take a leisurely lunch while -- and we're going to be
12    working, so it's not like we're not working while you're
13    out doing that but --
14         So the one thing I'll just advise you again, as I
15    always do, please don't do any outside research.  Don't
16    talk about the case among yourself or anyone else.  Don't,
17    you know -- there may have been some press coverage of the
18    case, so please avoid reading anything and don't look at
19    any online posts about the case or anything if there's any
20    of that.  And, of course, you guys can't do any online
21    posting because you can't talk to anyone about the case or
22    not.
23         So I give you those admonitions again, like I do
24    at every break, because now you've heard all the evidence
25    and you're like, okay, I'm ready to get going.  But you
```

```
 1   can't because you need to hear their closing arguments and
 2   then my instructions on the law.
 3            So, again, you can't talk to anyone about the
 4   case; and the only thing you can tell people is, again,
 5   that you are on a federal case in the Sherman federal
 6   building.
 7            So I'm going to go ahead and let you go.  Go
 8   upstairs and get your materials, whatever, your phones; and
 9   then you're welcome to leave.  And then just be back in the
10   juror room before 1:45 and we'll start back.  When we come
11   back, we'll hear their closing arguments.
12            Have a great lunch.  Thank you for your patience.
13            (The jury exits the courtroom, 12:07 p.m.)
14            THE COURT:  Okay.  Please be seated.
15            Mr. Whalen, if you want to go ahead and make your
16   motions.
17            MR. WHALEN:  Your Honor, pursuant to Rule 29, we
18   would make a motion for a judgment of acquittal.
19            First, I'm going to say as it relates to all
20   counts, a global motion, because Fifth Circuit says we
21   should do it that way.  But then they also say we should do
22   it specifically, so I'm going to go through each count
23   without waiving any element -- particular element as
24   necessary.
25            As it relates to Count 1, we would urge that there
```

1  was no evidence to prove the specific intent to defraud.

2  There is evidence in the record of the Promissory Note; and

3  so, therefore, the Promissory Note, in fact, could be

4  deemed a loan, which is not a misrepresentation and so,

5  therefore, we would ask for Rule 29 of acquittal on

6  Count 1.

7          As far as it relates to Counts 2, 4, 5, and 6, I

8  think they are related -- the argument is related to that.

9  The wire transfer that they have alleged, we would argue

10 that they have not proved beyond a reasonable doubt or a

11 rational juror could find that was in furtherance of the

12 scheme.  The money was wired to himself and not back to the

13 investors.

14         I would agree that if these were wire transfers

15 going back to investors as potential payments, that would

16 be in furtherance of the scheme.  But Counts 2, 4, 5, and 6

17 was money wired to himself and not back to investors so,

18 therefore, we would argue that it is not in furtherance of

19 any scheme to defraud.

20         The evidence clearly showed that the money was

21 part and parcel of the original amount invested.  One was

22 $20,000 from Denny Willmon which is by form of a check, and

23 the money flowed from there.  And also 4, 5, and 6 is from

24 the original $75,000 from Robert Greening.

25         We'd also argue, too, that 2, 4, 5, and 6 then

1  become multiplicitous because then you are punishing the

2  same conduct which was -- it goes back to the original

3  dollar amount or misrepresentation.

4       And so these wire transfers, based on the evidence

5  and the state of the record, were not in furtherance of any

6  scheme to defraud and convictions on those would result in

7  punishing the same conduct multiple times and so we would

8  ask for a judgment of acquittal on 2, 4, 5, and 6.

9       Counts 1 through 6, we would ask for a Rule 29

10 motion as it relates to the fact there is no evidence in

11 the record that there was a substantial effect on a

12 financial institution and move and make that motion.

13      As it relates to Counts 9 and 13, there is no

14 misrepresentation in any of those counts that Midland

15 National relied on the misrepresentation.  They have

16 alleged a scheme to defraud.  The question becomes --

17 purpose of a scheme to defraud has to be money or property

18 has to be the goal -- or actually obtained, and this was

19 just a change of beneficiary form.

20      In those counts, 9 through 13, there is nothing in

21 the record that those were misrepresentations.  Clearly,

22 the evidence supports that as it relates to the change of

23 beneficiary, one of those phone calls, as testified to, was

24 made at Mr. Seegan's house; so it was Mr. Seegan's

25 representation to them to change the beneficiary.  So it

1    was not a misrepresentation, not part of any scheme to

2    defraud.

3           Also, the question becomes, as it relates to -- I

4    know there was some testimony to suggest that if he was a

5    beneficiary of the trust, that would be a conflict of

6    interest and so that should have been disclosed.  I think

7    Ms. Jacobson testified to something along those lines.

8           However, if you listen to the phone calls,

9    Mr. Ashley is on the phone asking for guidance on how to

10   fill out the form.  There has been no evidence that he had

11   a duty to disclose; and they were looking for

12   beneficiaries, not trustees.

13          And so for Counts 9 and 13, I think they failed to

14   prove that there was a scheme or intent to defraud in the

15   fact that those wire communications contained any false

16   misrepresentations and were in furtherance of that scheme

17   and, therefore, he's entitled to an acquittal on 9 through

18   13.

19          As it relates to 14, the wire transfer of $20,000,

20   there is no evidence in the record how that wire transfer

21   furthered any scheme as it related to Midland.  There is

22   nothing about that transfer of a misrepresentation or

23   anything that that furthered the scheme as it relates to

24   Midland, and so we ask for a judgment of acquittal on 14.

25          Counts 15 and 16.  15 is the mailing of the letter

 1    to Mr. Seegan's house.  I think the testimony established

 2    that the -- it was a matter of course that they would

 3    automatically mail something, and that was not based on any

 4    misrepresentation that they mailed it.  It was part and

 5    parcel of their standard operating procedure that they

 6    would mail it; and they didn't rely on anything that was

 7    material that had they known that, they wouldn't have used

 8    the mails to send it.

 9          And as well as the autopsy report in that there is

10    nothing about that that, one, is false about him requesting

11    it.  It's a public record.  And it was not used in any way

12    and also there is no tieback that that mailing in and of

13    itself furthered any type of scheme or plan to defraud

14    Midland National.  And the question becomes, too, with

15    Midland National, as it relates to that, it's just a change

16    of beneficiary as it relates to that.  So that's our

17    argument for that.

18          As it relates to Count 18, there is no specific

19    evidence that he carried a firearm in the Eastern District

20    and, therefore, venue is not appropriate.

21          There is the evidence that it affected interstate

22    commerce.  I think the definition says that as relates to

23    an individual, it has to deplete the assets of a person

24    customarily engaged in interstate commerce.  And I think

25    the evidence, despite their best attempts to say, well, he

1    owned a rental house -- he was not customarily engaged in

2    interstate commerce.  And the fact he had investment

3    accounts with E*TRADE and Fidelity, in and of itself, is

4    not enough to effect interstate commerce; and there is not

5    sufficient evidence to satisfy that.

6         There is no evidence of a robbery.  There is

7    evidence of a death.  But this alleged $20,000 is two days

8    afterwards; so there was no force used in order to take it

9    from Mr. Seegan.  There was no property taken from

10   Mr. Seegan, so there is no evidence of a robbery.

11        And, obviously, there is -- as it relates to the

12   enhancement for murder, there will be a vigorous debate

13   about whether or not they have satisfied the territorial

14   jurisdiction of the United States.  We believe it's an

15   element they had to satisfy, and they failed to do that as

16   well.

17        THE COURT:  And what do you think they have to do

18   to establish that if that is an element?

19        MR. WHALEN:  It is an element.  I think they -- to

20   me, there is a -- "territorial jurisdiction" is defined and

21   there is a definition for that and so -- and our view is

22   that it's specific to the statute of what they have to

23   prove and we believe they would have to prove that it was

24   within the territorial jurisdiction of the United States.

25        THE COURT:  And why do you think that's an

 1   element?

 2        MR. WHALEN:  It's an element because the way the

 3   924(j) is read -- it says "murder (as defined in 18 USC

 4   1111)."  It doesn't distinguish between (a) and (b).  It

 5   encumbrances the entire statute.

 6        And so then if you look at the elements as defined

 7   in 1111, the four elements to prove that offense is -- and

 8   the Fifth Circuit pattern jury charge does include

 9   territorial jurisdiction of the United States; and,

10   therefore, they are required to prove that as an element to

11   support the enhancement.

12        THE COURT:  And do you have case law that supports

13   that that's an element?

14        MR. WHALEN:  There is a -- I don't have case law

15   specifically that says that.  I know that they have cited a

16   case that cited the Fourth Circuit, but the Fifth Circuit

17   has not ruled on it and has not decided on that.  So it's

18   an open question in the circuit.

19        THE COURT:  But hasn't the Fifth Circuit, in an

20   unpublished decision, addressed it saying it's not an

21   element?

22        MR. WHALEN:  If they have, I'm not aware of it,

23   Judge.

24        THE COURT:  Okay.  Go ahead and continue.

25        MR. WHALEN:  Okay.  Because I've looked.  I've

 1   attempted to look for that.

 2          Then as it relates to Count 19, there is no proof

 3   of an attempted bank theft because there is no substantial

 4   step.  I think what was important that Mr. Hilson testified

 5   to, as it related to the access at the house from that IP

 6   address, simply there was an attempt to log on.  But I

 7   think what you heard from him later was in order to

 8   effectuate the wire, there had to be a form filled out to

 9   then notify Texas Capital Bank to effectuate the wire.  And

10   that would be the substantial step, and so is there is no

11   attempt --

12          THE COURT:  And, Mr. Whalen, on the

13   jurisdictional -- the Fifth Circuit has issued an

14   unpublished decision from 2001.  It's 31 Fed. Appx. 156,

15   where in this case the defendant's name is -- (as read):

16   "Tatum also urges that 18 USC 1111 requires the government

17   to prove the killing in Count 2 occurred within the special

18   maritime or territorial jurisdiction of the United States.

19   He mistakenly reads Section 1111(b) to mandate that death

20   or life imprisonment can only be imposed when a murder

21   occurs within the special maritime or territorial

22   jurisdiction of the United States.  Section 1111(b) merely

23   provides minimal sentences for murders that occur within

24   the special maritime or territorial jurisdiction of the

25   United States; and these minimum sentences are not part of

 1    the definition of murder found in 18 USC, Section 1111(a)."

 2           And it just says (as read):  "Tatum's argument is

 3    frivolous and requires no further analysis."

 4           MR. WHALEN:  Well, I'm still going to stand by my

 5    argument, Judge.

 6           THE COURT:  I understand.  I'm just telling you

 7    that --

 8           MR. WHALEN:  Okay.

 9           THE COURT:  -- there is an --

10           MR. WHALEN:  But I --

11           THE COURT:  -- unpublished decision that --

12           MR. WHALEN:  Right.  And I think that -- I think

13    the other thing that's important about this question, about

14    924(j) as it relates to that, that was a decision from

15    2001.  And I think if you look at the decision -- the

16    definition of 18 USC 1111, it does include "attempt"

17    language in there and -- so it can be the completed offense

18    or the attempted.  And so then you have 924(j) and then you

19    have the Supreme Court's ruling in *Taylor* that you can't

20    have a 924(c) conviction for an attempted crime of

21    violence.

22           And so you have "attempt" language in the 924(j)

23    language; so, therefore, we would object to the inclusion

24    of that under *Taylor* because based on their reasoning, you

25    can't have enhanced punishment for the attempt and,

 1   therefore, that's included in the definition.

 2              THE COURT:  Okay.  Go ahead.

 3              MR. WHALEN:  And so we would object on that.

 4              As it relates to Count 19, since there is no

 5   attempt, the venue -- it occurred in the Northern District,

 6   but there was no evidence to support it was taken or

 7   stolen.  Actually, there is evidence to support that the

 8   potentially Ms. Seegan consented to it and so venue would

 9   be improper.

10              And also we would then object that the special

11   issue about injury or death or assault should not be

12   submitted to the jury because there is no evidence that at

13   the time of taking, that there was any injury, assault, or

14   death that resulted and, therefore, it would be improper to

15   submit that special issue to the jury as relates to that.

16              Also, I think from a -- I think it's important,

17   too, because when you look at that definition, it's about

18   attempting to flee, attempting to conceal and those types

19   of things, that the act has to then have been committed;

20   and there is no evidence in the record to support that.

21              And I think it's important, too, because I think

22   it gives us some analysis on what the intent was of (b) --

23   2113(b) was versus (a) where (a) traditionally is the bank

24   robbery, you have to enter the bank and things of that

25   nature.

1           But, too, how was the bank involved?  And there is

2    no testimony in the record that Capital Bank didn't give

3    consent or is the -- for lack of a better word -- the

4    victim of a bank theft.  I don't think there is any

5    evidence in the record to support that.

6           And then as far as it relates to Count 20, there

7    is no material misrepresentation in the Count 20 and there

8    is no specific intent to defraud.  The testimony clearly

9    indicated that agents know how to write policies in order

10   to get them accepted and so, therefore, there is no intent

11   to defraud.

12          But I think also the object of it was to get an

13   insurance policy and that's not money or property and,

14   therefore, there is no -- which has to be the goal of any

15   type of wire fraud -- any fraud scheme is to obtain money

16   or property.  And getting a life insurance policy would

17   not, in my view, count as money or property for Count 20.

18          And then also, Judge, we would also then -- well,

19   we'll stop there and that's the -- our Rule 29 motion, your

20   Honor.

21          THE COURT:  Okay.  Any response?

22          MS. RATTAN:  Any specific issues the Court wants

23   me to focus on?  But I would just say globally all of those

24   are arguments that would be presented to a jury on is this

25   preponderance of the evidence on venue, is it beyond a

reasonable doubt on the other elements. But in terms of Rule 29, the elements have been established.

The Counts 1 through 6 clearly are going to be a scheme and a fraud on the individual investors. And the remaining counts, how could there be more of a fraud than to lie to an insurance company and kill one of their insureds to try to get the money? I mean, I can't imagine a bigger fraud. It is fraud. It's wire fraud. It's bank fraud. It's mail fraud. It's all kinds of fraud.

And certainly the other bank theft, I mean, I've heard the arguments. Those are the jury arguments, not Rule 29 arguments. This should go to a jury.

THE COURT: Okay. I agree. I'll overrule the defendant's motion. We'll let the jury decide.

What else?

MR. WHALEN: Yes, your Honor. We had filed our motion as it related to an attempt or actual offense in that the government would be -- should be required to elect whether they are going on an attempt or a completed offense.

It would appear to me the way they used the exhibit, the last exhibit with Rennie to establish interstate and venue, they specifically put "wire fraud" and delineated between Count 20 as "attempted wire fraud."

So it appeared to me that the state of the record

 1  that you have in front of you with their exhibit, that

 2  attempted actions for the -- except for Count 20 should all

 3  be wire fraud counts and they shouldn't get any "attempt"

 4  language.

 5          THE COURT:  Ms. Rattan?

 6          MS. RATTAN:  I think it's appropriate to charge

 7  the jury on the attempt.  And the Court has addressed this

 8  issue but with the unanimity of theory instruction.

 9          THE COURT:  Okay.  Yeah, I agree.  And we can talk

10  more when we go through it here in the charge conference to

11  make sure we're all on the same page.

12          What else?

13          MR. WHALEN:  That is all, your Honor, at this

14  time.

15          THE COURT:  Okay.  And then anything from the

16  government?

17          MS. RATTAN:  No, your Honor.

18          THE COURT:  Okay.  And then if you want to take

19  just 5 minutes and then we'll meet in chambers to have our

20  informal charge conference.  And then if we need to, we'll

21  come back into the -- we'll just maybe come back before

22  1:45 to put everything on the record, any objections, maybe

23  start 5 minutes before that.  And then -- and then you'll

24  just need to give times to Ms. Conrad to see if you want

25  warnings.

 1          And then, Mr. Whalen -- well, that's all.  So if

 2   y'all just need 5 minutes to maybe use the facilities, and

 3   then I will see you in chambers and we can discuss the

 4   charge.

 5          (Recess, 12:24 p.m. to 1:45 p.m.)

 6          (Open court, defendant present, jury not present.)

 7          THE COURT:  You can be seated.

 8          Objections to the charge by the government?

 9          MS. RATTAN:  No, your Honor.

10          THE COURT:  Objections to the charge from defense?

11          MR. WHALEN:  Yes, your Honor.  One moment.

12          THE COURT:  Use your mic, Mr. Whalen.

13          MR. WHALEN:  Your Honor, we would object to the

14   jury charge as proposed.

15          We would renew our Rule 29 motion as to each of

16   the counts set forth in the jury charge.

17          We will object to the failure of the Court making

18   the government elect between a completed offense or

19   attempted offense.  The Fifth Circuit has said that the

20   better course of action is to make them elect versus using

21   unanimity of theory instruction, and so we would object to

22   the charge of submitting both to the jury.

23          We would object to -- well, that just renews our

24   Rule 29 motion, the mail fraud, attempted mail fraud and

25   the completed act of mail fraud.  We would object to the

1    jury being allowed to consider either one.

2         As it relates to Count 18, we would object to

3    Count 18 in that the government has failed and no rational

4    jury could find beyond a reasonable doubt that this

5    offense -- that, one, a robbery occurred or, two, that it

6    affected interstate commerce; and we would object to that.

7         We would object to the special issue that the

8    Court is not including a -- that it occurred in the

9    territorial jurisdiction of the United States.  We would

10   object to that portion of the charge.

11        As it relates to bank theft and attempted bank

12   theft, we would object that they have to elect between a

13   completed offense and attempt since they pled both.  It's

14   contrary to Fifth Circuit preference.

15        We would object to the special verdict as it

16   relates to causing assault or death because it has to be

17   contemporaneous with the taking and there is no evidence in

18   the record that that occurred.

19        We would object to the charge as well as the

20   verdict form as relates to affecting a financial

21   institution.  There is no evidence in the record that a

22   rational jury could find that it affected a financial

23   institution.

24        We would also object to the special issue in the

25   verdict form as it relates to Count 18 because, once again,

1   there is no inclusion of territorial jurisdiction and that

2   it affected interstate commerce by robbery.

3          And we would object to 18(a) as a special issue.

4   I think the only special issue they pled was whether it was

5   under (j), not simply causing the death through the use of

6   a firearm, because they have, I think, elected in their

7   jury charge to only say "carry or possess."

8          And so then 18(a) says "in the course of violating

9   18 USC 924(c)(1), cause of death of a person through the

10  use of a firearm."  They've elected not to proceed on a use

11  of a firearm, so it would be improper to have 18(a) as a

12  special issue.

13         THE COURT:  Ms. Rattan, I don't need a response

14  other than the last issue.  Is there some issue with -- I'm

15  going to overrule everything else.

16         On this issue of 18(a)?

17         MS. RATTAN:  Well, this is the first time we've

18  heard this issue.

19         THE COURT:  I understand.  It's the first time

20  I've heard it, too, so I --

21         MS. RATTAN:  Yes.

22         MR. WHALEN:  Well, I didn't believe it would be in

23  there because they've only pled it, so I didn't

24  initially -- I remember it was in 19, but I didn't think it

25  was in 18.  So I apologize, but I don't think I recalled

1    seeing it in 18.

2          MS. RATTAN:  I would just have to check it against

3    the statute and the Indictment.

4          Well, of course, we're looking at it because we

5    want to get it right.  But it looks like, looking at

6    Count 18 of the Indictment, it's been alleged both ways.

7    If you look at the last two lines of Count 18, which is on

8    page 20 (as read):  "in furtherance of the said crime of

9    violence, the defendant's use of said firearm caused the

10   death of a person which was murder as defined under

11   18-1111."

12         So the first half --

13         THE COURT:  Which is exactly how we -- we've

14   broken it up in two questions but --

15         MS. RATTAN:  Yes, so --

16         THE COURT:  Okay.  I just wanted to make sure.

17   That was the first I'd heard of it so --

18         Mr. Whalen, they have alleged that.

19         MR. WHALEN:  But the 924(c) -- what the jury is

20   going to decide on the 924(c) is whether he possessed or

21   carried.

22         MS. RATTAN:  And that's how it's charged.

23         THE COURT:  Right.

24         MS. RATTAN:  So then we'd have to look at the

25   statute to see whether we charged it in a limiting way.

```
 1            I think the instructions track the Indictment.
 2   It's just the question of is the statute different.
 3            THE COURT:  Okay.  Mr. Combs, are you pulling that
 4   up?
 5            MR. COMBS:  I am, your Honor.
 6            THE COURT:  I mean, the statute provides for
 7   possess or carrying.  I mean, the statute provides for
 8   every scenario, basically, under 924(c)(1).  I don't see a
 9   problem.
10            MS. RATTAN:  We think it's correct.
11            THE COURT:  I mean, the 924(c)(1) can be
12   possession or carrying; and that doesn't preclude the
13   enhancement.  So, Mr. Whalen, I'm still not -- I guess I'm
14   not sure your objection.
15            MR. WHALEN:  Well, I think it's one issue and not
16   two.  I think it's one special issue and not two special
17   issues.
18            THE COURT:  Well --
19            MR. WHALEN:  But if we want to leave it that way,
20   that's fine.  I object to it and --
21            THE COURT:  Right, but what's the objection?  I
22   mean, the fact --
23            MR. WHALEN:  The objection is I don't -- I think
24   it's a misstatement of how the enhancement should be
25   applied, but --
```

1          THE COURT:  Ms. Rattan, I don't see an issue with

2     that.  I mean, I'll make sure the government also agrees.

3          MS. RATTAN:  We agree.

4          THE COURT:  Okay.  I will overrule the objections.

5          MR. WHALEN:  And I will conclude my objections to

6     the jury charge, your Honor.

7          THE COURT:  Very good.  Let's bring the jury in.

8          (The jury enters the courtroom, 1:54 p.m.)

9          THE COURT:  Please be seated.

10         Okay.  Ladies and gentlemen, we're going to go

11    ahead and hear closing arguments.  So, again, what the

12    lawyers say is not evidence; but it's their thoughts and

13    summation of what the evidence has shown or in the shown or

14    any inferences they draw from that.

15         But pay attention to both sides of the arguments,

16    and we'll -- again the government, who has the burden of

17    proof, gets to go first.  Then the defense goes, and then

18    the government has the ability to come back in rebuttal.

19         Ms. Rattan.

20         MS. RATTAN:  Thank you, your Honor.  May it please

21    the Court, members of the jury.

22         We'll end where we started, and that is with Keith

23    Todd Ashley.  You know from the evidence now what happened.

24    There were 5.4 million reasons why this man wanted James

25    Seegan dead.  And he did it.  He killed him.

1            There's been a lot of evidence.  It took over a

2   week to put it on, and I saw you all listening carefully to

3   all the evidence.  And after the arguments, Judge Mazzant

4   is going to review with you what the law is and what his

5   instructions to you are in this case.  But what he's going

6   to tell you is to deliberate and use common sense and apply

7   common sense to the evidence in this case.

8            And I know you applied common sense and you

9   listened carefully as the evidence came in, and I don't

10  know that I have to tell you what happened.  We talked last

11  Tuesday in opening statement about what happened.  It was

12  stealing and killing, and that's what he did.  That's what

13  the evidence has shown, and that's what you've heard.

14           This morning through Agent Rennie's testimony,

15  what we tried to put on through the interstate nexus and

16  the venue testimony were the details that would help speed

17  along your deliberations so that you could easily see how

18  the venue was there and how the interstate nexus was

19  established on each one of the counts.

20           But really -- that's the technical legal issues

21  that we're dealing with, but the reality of the facts of

22  the case is what we can't ignore.  He stole from these

23  people, and he killed Mr. Seegan.

24           And it's unspeakably sad; but the evidence in this

25  case supports the charges, each one of the charges that

1   this defendant faces.  And we'll ask you, of course, to

2   carefully review the evidence as you have throughout the

3   trial but find him guilty of each one of the charges.

4           And as you deliberate the evidence, what you have

5   to think about is what did happen on February 19th of 2020.

6   What we have is the very, very strong, irrefutable

7   circumstantial evidence of what happened.

8           What we know is on February 19th of 2019, James

9   Seegan had in his iCalendar "Keith blood."  Nobody's

10  refuted that that was in his calendar.  Why would it be in

11  his calendar?

12          Well, what we know is that Mr. Seegan was in the

13  process of changing the beneficiary on his life insurance

14  policy to his trust.  Midland life came and testified you

15  don't need another blood draw when you change the

16  beneficiary.  But does Mr. Seegan know that?  Do any of us

17  know that necessarily?  He trusts Keith Ashley.  Keith

18  Ashley tells him we have to do a blood draw.  So he puts it

19  on his calendar, "Keith, 9:00 a.m., blood."

20          But as I said, before you ever get to

21  February 19th of 2020, there is a whole lot going on.  And

22  as you read the instructions and as Judge Mazzant gives

23  them to you, you'll see that the government doesn't have to

24  prove motive.  It's not required.  But isn't this case

25  really all about the motive?  Isn't it about that about why

1   he did it, as you saw all of those charts that Matt Wylie

2   the CPA with the FBI prepared?

3            We know you're stealing.  We know you took

4   everybody's money.  It's the motive in this case.  That's

5   why you killed him, so that you could get control over the

6   what was going to be $5.4 million.  But it was the

7   $2 million that he didn't mention to Dida when he went over

8   there to comfort her.  "You're going to get about 3.4,

9   3.5 million and maybe more."

10           Something's missing.  It's the $2 million that was

11  going to go into the trust that he was going to control.

12           So before you ever get to this date right here,

13  the iCalendar, 9:00 a.m., the date literally written in

14  blood, before you ever get here, you have to consider

15  everything that went on before.

16           There are two critical things.  It's right here,

17  April 8th and April 16th, when Ashley becomes the

18  independent executor of James Seegan's will and trust.  The

19  plot is in place.

20           Because what's going to happen if James Seegan

21  dies?  You saw the documents.  Who gets the power, the

22  power and control over the estate?  He's not even going to

23  have to pretend that there is a UIT investment anymore.  He

24  doesn't have to talk about Parkland Securities mumbo-jumbo.

25  He's in control of the entire estate the minute James

1    Seegan dies.

2            So right here, when James Seegan signs this

3    document saying that he agrees to the defendant being the

4    executor of his trust, he's arguably signing his death

5    warrant.

6            He trusts him.  He thinks he'll do the right

7    thing.  He doesn't even know that he's been stealing his

8    money all these years and spending it at the casinos.

9            And what consummates it?  What makes -- what seals

10   the deal?  This right here.  Remember, Keith Ashley's

11   calling Midland life and he's calling them and calling

12   them.  He wants to make sure that this is in place.  He

13   wants to be positive that the beneficiary of the $2 million

14   has been changed to the trust that he controls.

15           So once he becomes the independent executor and

16   then the paperwork is in place making the $2 million go to

17   the trust, he's in charge.  He is in charge.  The only

18   thing left is to get rid of James Seegan.  Then he's going

19   to be in control of everything.

20           The other thing that killing James Seegan does is,

21   ugh, those monthly payments that he's having to make to him

22   to keep the Ponzi scheme alive, the fake payments that he

23   has to keep sending back to him.  That's money every month

24   that he has to send.  Once he kills him, he doesn't have to

25   pay those any longer either.  So here and here, that's the

 1   motive, to get the money.

 2            And, again, you know what he does with money.  He

 3   takes people's money and he spends it at the casino, he

 4   spends it on his mortgage, he spends it on the BMW, all of

 5   those things that you saw Matt Wylie testify to, cash for

 6   him.  Those are the things that he does; and that's what

 7   he's going to do with Dida's 3.4 plus the 2, $5.4 million.

 8            You saw her.  She seems vulnerable.  He could take

 9   advantage of a lawyer, Robert Greening.  He took his

10   $75,000, an attorney.

11            He took advantage of James Seegan.  You saw his

12   records.  He's careful and meticulous.

13            He saw Dida and he was like, "Pfft, are you

14   kidding me?  She's going to be a pushover.  I will be in

15   charge of the $5.4 million."

16            That's what he thought, but he was wrong.  Because

17   when her husband died, she wasn't having it.  She said,

18   "That's not right.  He doesn't have needles.  He doesn't

19   have a firearm.  That's not his right hand.  Something's

20   not right about this situation."  And she hired a lawyer,

21   and she said this situation is not right, not having it.

22            Carrollton Police Department investigated.  He

23   almost got away with it.  You saw the first report from the

24   medical examiner's office.  What did it say?  Suicide.

25            He ordered that report secretly through Paul

1   Villarreal, had Paul Villarreal have it sent to his house.

2   If you're on the up and up, why are you doing that?  It

3   doesn't make sense at all.  It's because he wanted to know

4   do they know what I did?

5          Because as you know from Dr. Stacey Hail's

6   testimony, etomidate is a pretty good drug to accomplish

7   this.  Fast-in/fast-out.  He thought maybe it would have

8   not shown up in a toxicology report.  He thought, wow,

9   they're not going to have an instrument, a test to test the

10  blood for that.

11         Turns out SWIFS, Southwestern Institute of

12  Forensic Sciences, is one of the only places in the country

13  that has the QTOF instrument, the QTOF machine.  And they

14  tested for it, and it showed etomidate.

15         And when you talk about etomidate, whose

16  fingerprints are all over the fact that there's etomidate

17  in his blood?

18         There's no fingerprints on anything in the office.

19  And even if there were, he goes there.  He has legitimate

20  business with Mr. Seegan, so what does it matter if his

21  fingerprints are there?

22         No, the fingerprint in this case is the etomidate.

23  Track the etomidate.  We know in 2004 he was trained on

24  etomidate.  We know in December of 2017 he checked

25  etomidate out of the Pyxis machine at the hospital.

1          Was this the etomidate that he used?  Who knows.

2    But you heard from the head nurse at the hospital what

3    their controls were and what her concern was about how

4    somebody could easily access etomidate.  She even told you,

5    "I did an experiment myself.  I slipped it in my pocket."

6    Six months went by.  Today, as she testified in court,

7    nobody had ever called her on it or said, "What happened to

8    the etomidate?"

9          What happened to the etomidate?  Where did he get

10   the etomidate?  City Hospital.  And he knew just how to use

11   the etomidate.

12         So he tells James Seegan that they're going to

13   draw blood.  He's going to draw blood from him.  Perfect

14   setup.  He doesn't draw blood.  What he does is he has

15   James Seegan sit down.  And you saw the photo.  Here it is

16   right here.

17         Dida Seegan says, "My husband never sat in the

18   room like that.  That's not how he would sit in his

19   office."

20         And it makes perfect sense.  When Jay Combs was

21   questioning Stacey Hail, he sat back down here on the

22   bench.  If you're going to hold out your arm -- and then

23   you see the little shower stool right there underneath

24   where Keith Ashley would have pulled it out and acted like

25   he was going to draw blood from Mr. Seegan.

 1          He doesn't draw blood.  Instead, he puts in,

 2    pushes in etomidate.  And what do you know from Dr. Hail,

 3    the toxicologist?  She tells you you're going to be out

 4    fast.

 5          Once he's out, what does Keith Ashley do?  He

 6    shoots him in the head.  Where did that firearm come from?

 7    The last known sale, last documented transfer of the

 8    firearm was within 5 miles of Keith Ashley's house.

 9    Coincidence?  No.  It's a crime.  It's murder.  The firearm

10    came from Keith Ashley.

11          And you saw on the illustration this morning he's

12    been charged in Count 19 with carrying and possessing a

13    firearm in furtherance of a crime of violence, and the

14    crime of violence is the robbery.  He carried that firearm,

15    he possessed that firearm as he left his house in the

16    Eastern District of Texas, went to the brewery, and came

17    down and crossed the line into Carrollton and went to James

18    Seegan's house.

19          So here's what you have.  He says, "We're going to

20    draw your blood."  Mr. Seegan sits down in the chair.  He's

21    gonna put his arm right there on the table by the

22    microscope that's covered.

23          Then if you look at the top right corner, that's a

24    photograph of syringes that were found when law enforcement

25    searched Keith Ashley's house.

1            And then at the far right section of the screen,

2    you see a sample vial of etomidate.  That's what it looks

3    like.  That's what he would have gotten out of the Pyxis

4    machine on December 17th of 2019.

5            And who had access continually to protective gear?

6            You saw that backpack that he carried into the

7    house, and you heard law enforcement say that the

8    intelligence and information they had was that Keith Ashley

9    always carried a firearm in the backpack.  And when they

10   searched his house and found the backpack, what, in fact,

11   was in it?  A firearm.

12           So doesn't it make sense, when you use common

13   sense, that what he had in the bag was a firearm that he

14   ultimately placed in James Seegan's hand?  He used the

15   etomidate because Mr. Seegan thought he was there to get

16   blood and he used the etomidate, knocked him out, and shot

17   him in the head with the firearm.

18           Dida Seegan told you her husband wouldn't even

19   allow toy firearms in the house.  They were not a firearm

20   family, yet a firearm ends up in her husband's wrong hand

21   in a position where it looks like someone would sit to give

22   blood, with a little stool out beside it.

23           What else do you know?  Who's googling the Nest

24   camera?  Who's Safari searching the Nest camera

25   continually?  This defendant, because that's how he got

 1   caught.

 2          The etomidate may be the fingerprint, but he got

 3   caught by the Nest camera.  Will the Nest camera detect

 4   sound if there is no motion?  We know from the evidence the

 5   answer is yes, it will.  Yes, it did.

 6          And what does the evidence show?  The evidence

 7   shows Ashley arriving at the house with the backpack at

 8   9:31 a.m.  We know he was supposed to be there at 9:00 to

 9   do the blood draw.  He arrives there at 9:31 a.m.

10          Then FBI and Carrollton Police Department have

11   analyzed James Seegan's phone, and it says that the last

12   step logged -- it never moved again -- the last step logged

13   on James Seegan's phone was 9:33 a.m.

14          9:42 a.m., James Seegan takes his final phone call

15   of his life.

16          And then at 10:15 a.m., the Google Nest camera

17   activates, makes a -- it records a sound, the popping

18   sound.

19          And remember the Carrollton Police Department?

20   The only way they were able to re-create that popping

21   sound -- it wasn't through slamming a door, dropping a

22   book, anything like that, not slamming a car door.  They

23   weren't able to re-create it except through one thing, and

24   that was firing a firearm that matched the one that was in

25   James Seegan's wrong hand.

1          So it was at 10:15 a.m. when this defendant, who

2    was going to gain all the power over James Seegan's estate,

3    executed him, shot him in the head.

4          Then at 10:17 a.m., after he's shot in the head, a

5    document is printed at James Seegan's home.  A document.

6          Now, there's a alleged, purported suicide note

7    that's left.  And you see a picture of it right here, and

8    let's look at it right now.  It's interesting because when

9    Keith Ashley's phone is searched, there's a suicide note

10   that he's written in his phone as well.  And there are

11   similarities in the documents, and Detective Bonner went

12   over these with you.

13         But first you have to consider, before you even

14   look at the similarities, this note.  What kind of suicide

15   note is that?  It's written, typed out.  People who respond

16   to suicides all the time, Captain King and the other law

17   enforcement, said this is not common.  This is not usually

18   what they see.

19         "Dida, I have been struggling for a while."  He's

20   running his Roomba that morning.  He's doing the laundry.

21   He's buying things for his son.  He's excited about a new

22   pair of tennis shoes.  He's going to give him a computer.

23   He's going to kill himself that morning?

24         "I have been struggling for a while.  My dad dies

25   years ago and my brother killed himself last year.  My best

 1   friend died, that I found dead in his house.  I want you to

 2   love Josh with all your heart.  I can not take this pain

 3   anymore.  My last friend in the world Keith Ashley will

 4   help you with" -- and then Keith Ashley's phone number.  "I

 5   love you."

 6          He put his own name and phone number in the

 7   suicide note because he's a swindler.  Everybody trusts

 8   him.  Everybody believes him.  He swindled a lawyer out of

 9   $75,000.  Unbelievable.  That's how confident he is.

10          He says, "Dida, call Keith Ashley.  He'll help

11   you," because Keith Ashley wants to go right over there and

12   get his hands right into the money, because it's

13   5.4 million reasons why he committed this murder.

14          But that's not it.  When you look at this

15   exhibit -- and this note is the one that was taken out of

16   the defendant's phone -- you see similarities in the

17   writing style.  Kyler and Kade, no comma.  Dida, no comma.

18          "Can not," there is a space.  That's not how you

19   write it.  It's "cannot."  It's one word.

20          Oh, and look.  The same mistake over here, "can

21   not."  Does it in two words.

22          The phrase that he starts with, "I have been,"

23   you've got it right here in the note to Dida, "I have

24   been."  Oh, and that's how he starts out over here, "I have

25   been."

1          The other thing that he does is there is a space

2   and then the punctuation.  A space and then the

3   punctuation.

4          The similarities in the fake suicide note and the

5   suicide note that the defendant had on his phone, it's

6   another fingerprint.

7          You've got the etomidate, and you've got the fake

8   suicide note.  They're just too similar.  It doesn't make

9   sense.

10         So then going back to what happened on

11  February 19th of 2020.  You've got the pop in the garage,

12  and then you've got the document printed at James Seegan's

13  house at 10:17 a.m.  So this is when he killed him.  The

14  only way they could re-create that sound was with a

15  firearm.

16         And remember he was googling "time of death,"

17  "time of death calculator," "can they tell time of death."

18  Very concerned about that.

19         And the document prints, and then who leaves the

20  house?  He leaves.

21         So all these things happened right here while he's

22  still in the house.

23         Then he starts the fake calling and the fake

24  texts.  "Hey, buddy, hope you're okay."  "Hey, guy.  What's

25  going on?"

1          Well, he's already sent these fake texts to him

2   when he comes back to the house to, I guess, check on him.

3   But you see the video, the Nest video.  The first time he

4   comes up to the door, it looks like someone is greeting him

5   and he says hello.

6          The second time he comes up to the door, boom, he

7   knows that James Seegan is dead.  He walks right into the

8   house.

9          Let's see.  He leaves here for the second time --

10  so he leaves a second time right here.

11         Then what does he do?  Fake, fake, fake contacts;

12  and then Dida comes home and finds her husband.

13         Does he waste any time at all letting the

14  insurance company know?  Very next day he's on the phone.

15         And does he waste any time completing the robbery?

16  Because really he robs him the minute he takes his life

17  because the minute he takes James Seegan's life, who's in

18  charge of the estate?  Who's the executor of the estate?

19  Right then, right there, the minute James Seegan is dead --

20  and that's what the paperwork says.  If James Seegan dies,

21  then Keith Ashley controls, has the power, can control all

22  of James Seegan's money.  And he thinks he can run

23  roughshod over Dida because he's run roughshod over

24  everybody else.

25         So he doesn't waste any time.  He calls and he

     1    says, "Oh, he passed away last night."

     2          Then he makes a second call and he says, "Can you

     3    lock the account down?  I want to make sure there's not any

     4    hanky-panky."

     5          Well, the hanky-panky is him.  He wants to make

     6    sure none of the family can access the account and figure

     7    out there is more to the life insurance than what they may

     8    think.  There's more than just the $400,000 policy.

     9    There's also the $2 million policy.

    10          And James Seegan isn't dead 24 hours, but what is

    11    Keith Ashley doing?  Trying to get into his account.  He

    12    makes the first attempt from his own house, his estate,

    13    really, there in Lucas.  He makes the first attempt from

    14    his estate there in Lucas.  Then -- can't get in, can't get

    15    authenticated.

    16          So what does he do?  He drives down to Dida

    17    Seegan's house.  The nerve.  He's going to steal $20,000

    18    from her when her husband hasn't been dead for but 24, 36

    19    hours?  Oh, yes.  He goes in there and their son Josh.

    20    Helps him get into the phone and he uses the phone --

    21    because you know from the IP address that Arthur Hilson

    22    from Texas Capital testified to -- he uses that IP address

    23    there at the house to complete the $20,000 transfer.

    24          Does one penny of that $20,000 that he took go to

    25    Dida Seegan?  Does it go to crime scene cleanup?  Does it

1   go to funeral expenses?  Does it go to anything to help

2   Dida?  You saw the chart.  It went to two prior investors

3   who he owed money as part of the Ponzi scheme and then, oh,

4   by the way, all the rest to him.

5          Who does that?  Somebody who is overcome with

6   greed, somebody who is addicted to gambling, somebody who

7   is obsessed with getting money.  That's what happened here.

8   Greed, addiction, obsession, 5.4 million reasons for

9   killing James Seegan.  Stealing and killing, that's what

10  we've seen here.

11         Calls Midland life.  Steals the money.  Now he's a

12  little stressed.  People are looking at him.  He wants to

13  get ahold of the medical examiner's report.  What is in the

14  medical examiner's report?  He wants to find out.

15         Well, first time he thinks he got away with it

16  because it says "suicide."  But there is that etomidate

17  problem and the QTOF, so he's googling "QTOF."  What's

18  QTOF?  What did they use?  How did they catch me?  How did

19  they find my fingerprint?  How do they know that I'm the

20  etomidate guy?  He's googling to try to figure it out.

21         Medical examiner mails James Seegan autopsy to

22  Paul Villarreal.  If you're Keith Ashley and you're really

23  trying to help the family, you're trying to help Dida

24  resolve her estate, why do you have to have some guy at the

25  brewery order the autopsy?

 1              Why do you even need the autopsy?  You don't.  You

 2     get a Certificate of Death, you submit it in probate, and

 3     things can be handled.  You don't need to know what the

 4     autopsy says.  We all know he died.  He's dead of a gunshot

 5     wound.  Lead poisoning.  Gunshot wound to the head.  You

 6     don't need the autopsy.  He wants to find out if they know

 7     about his etomidate, and they do.

 8              So he secretly gets Paul Villarreal to mail the

 9     autopsy report to him, and he sees the toxicology.

10              Then what did he say about the Google searches?

11     Can I get manslaughter?  What's the statute for theft?  Can

12     I get probation for killing somebody?  All of these things

13     that he's googling, why google those things?  Because he

14     did it.  He knows what happened.

15              This pop right here was what the police

16     re-created.  It was a gunshot wound to his head.

17              This is a fake suicide note.

18              The etomidate in the blood is the fingerprint of

19     this defendant, Keith Ashley.

20              So we've walked through pretty closely the counts

21     in Agent Rennie's testimony this morning, but what I've

22     done is gone through each one of the counts -- and we're

23     not going to belabor it, but I just wanted to show you each

24     one of the counts.

25              As you know, the defendant has been charged in

 1   Counts 1 through 6 with wire fraud.  The wire fraud is

 2   stealing from the Ponzi scheme victims.

 3           And then the 9 through 14 and the 20, that relates

 4   to the fraudulent things that he did in relation to Midland

 5   life, trying to get the beneficiary changed.

 6           Then Count 20 is this right here.  Kind of eerie.

 7   Paul Villarreal has since died from complications due to

 8   his diabetes.  But when you find out that the defendant

 9   took out a life insurance policy back here in 2018 on

10   somebody who worked at his brewery making beer, who before

11   he came to work for the brewery picked up cans for a

12   living -- why would you take out a $400,000 life insurance

13   policy on Paul Villarreal and say that you're his

14   stepbrother when you're not?  Why would you do that?  What

15   are you thinking?

16           Well, we know what happened here.  Paul Villarreal

17   didn't get approved because he had diabetes.  Maybe that

18   was lucky.  Maybe that was fortunate for him, because it

19   sure looks like the defendant had a plan in place and Paul

20   Villarreal might have been an intended victim.

21           Whether he was or wasn't, this sending in the

22   policy for Paul Villarreal was fraud and it was a lie

23   because he lied about his insurable interest.  He's not his

24   stepbrother.

25           The charges of mail fraud in Counts 15 and 16 is

 1   using the mails and lying.  He used the mail and he lied

 2   when this letter was mailed confirming the beneficiary in

 3   James Seegan's trust to Ashley, and he used the mail down

 4   here when he had Paul Villarreal order the medical

 5   examiner's report.

 6           Carrying a firearm in furtherance of a crime of

 7   violence.  You saw that this morning.  You saw the

 8   animation where for 25 miles he drove all the way down to

 9   James Seegan's house.  And, again, where did that firearm

10   come from?  It came from Keith Ashley's home, or it came

11   from the brewery.  And we know both of those are located in

12   the Eastern District of Texas.  He dropped down about

13   2.6 miles into the Northern District of Texas, but you bet

14   he carried that firearm in furtherance of his plan to rob

15   and kill and steal from James Seegan.

16           And, finally, Count 19 is the bank theft; and

17   we've reviewed that here.  This is charged as a wire fraud

18   because he was using the wire to steal, but it's also

19   charged as a bank theft.

20           So this is Count 1, the money he stole from James

21   Seegan.  Now, I don't know what the defense is going to

22   argue in closing; but James Seegan isn't here to tell you,

23   "He stole my money."

24           So is there going to be some kind of argument that

25   "James really gave me that money and wanted me to have it"?

1   Well, that's unmitigated gall, to kill someone and then

2   say, "You can't prove that I stole their money from them

3   because they're not here to tell you I stole it."

4          But what we have is an email between the two of

5   them where they're talking about investing $150,000, it's

6   going to be a 3 percent grouping on the first contract.

7          And then you have the $150,000 wire that goes from

8   James Seegan's bank account to KBKK, the defendant's bank

9   account.

10         And the theft.  What does he do with the money?

11  That's how you know that he stole it, because there is no

12  investment ever.  He doesn't invest anything except in

13  himself, his own personal gain.

14         The money goes back to James Seegan.  Remember,

15  the first step in a Ponzi scheme is to take a portion of

16  the victims' money and feed it back to them so they

17  immediately think that they're getting a benefit.  It goes

18  to Leonid, who's one of the Ponzi scheme victims, cash,

19  casinos, mortgage.  He steals it all.

20         Here's the Ponzi scheme that we talked about in

21  opening statement.  It's a classic Ponzi scheme.  There's

22  no real investment -- and you know that from Matt Wylie's

23  analysis -- and then the investment money is used to pay

24  other investors.

25         So here's who the investors were:  Robert

1   Greening, James Seegan, Leonid Shteyngart, and Denny

2   Willmon.  And you saw, as the money was stolen, some of it

3   would go back to them.  He even had set up auto pays out of

4   his own account so that he wouldn't miss months with the

5   victims.  Taking stolen money and paying other people, it's

6   a classic Ponzi scheme.

7         Here's the 150,000 -- rather, the email that I

8   quoted in that previous slide where they're emailing back

9   and forth about the money.

10         Here's the actual wire transfer that takes place.

11   It goes from Mr. Seegan's account, $150,000, to the

12   defendant's account, KBKK at Branch Banking and Trust.

13         What do you say when a CPA and a forensic

14   accountant working for the FBI reviews your bank account?

15   And this is what happened to the money.  $532 goes back to

16   James Seegan.  Leonid Shteyngart gets his Ponzi payment of

17   $1,200.  You've got $25,000 of James Seegan's money going

18   to casinos.  The defendant pays $6,800 on his own mortgage.

19   $30,000 of it is cash in his own pocket.

20         Stealing and ultimately killing, that's Count 1.

21         This is another amount of money.  It was $120,000

22   that the defendant took from James Seegan.  And you see

23   what he's doing, spending it at casinos; paying off the

24   other victims; $7,000 in cash; $7,000 on his personal

25   mortgage.

1            Then this morning we went over another instance.

2    Matt Wylie testified again and said in April of 2019 there

3    was a $225,000 wire that went from James Seegan to Keith

4    Ashley.  And you saw he's going to Golden Nugget, he's

5    going to Choctaw, he's stealing their money.

6            Count 2.  Count 2 relates to the money that Denny

7    Willmon provided.  And remember there were the emails.

8    "Just wanted to update you on the KBKK business."  What's

9    happening?  The defendant's missing payments.  Why?

10   Because he's short on money all the time because he's

11   gambling at Choctaw and Golden Nugget.

12           And Mr. Willmon is emailing him -- remember

13   Mr. Willmon?  He was the first witness in the trial.  He's

14   an older man.  He's been married over 50 years, has two

15   daughters.  The defendant was stealing his money.

16           What happened to that money?

17           Okay.  Here's the check that he sent Mr. Ashley.

18           Here's the email about, hey, where is my money?

19           And then here is the forensic accountant's

20   analysis.  He stole it.

21           A small portion of it went back to Mr. Willmon to

22   make Mr. Willmon think everything's fine, everything's

23   legitimate.  2,000 to the casino.  He pays on his mortgage,

24   pays two of the other victims.  Classic Ponzi scheme,

25   stealing.

 1              As part of the wire transfers with Mr. Willmon's

 2     money, he transfers money to himself.  So it goes from his

 3     KBKK bank account to another one of his accounts, and

 4     that's what's charged in Count 2 of the Indictment.

 5              This is Mr. Shteyngart.  Mr. Shteyngart, it's very

 6     clear.  There's texts, the money's exchanged, and then the

 7     theft.  "Hey, are you interested in that 24-month UIT I

 8     spoke to you about?  Percentage of return is 8-9%."

 9              Mr. Shteyngart gives $20,000 and then there's the

10     summary of the theft and you also know -- that's the text

11     messages that I just quoted.

12              There's the money.

13              And here's what happens to it.  It goes to another

14     victim, James Seegan, goes back to Mr. Shteyngart; and then

15     about $3,000 of it goes to his personal mortgage.

16              So Counts 3, 4, 5, and 6 -- and we reviewed those

17     this morning -- all relate to Mr. Greening.  Mr. Greening

18     is the lawyer who had the $75,000 stolen from him.  He's

19     the one who called Mr. Ashley and made the video recording

20     of it where he asked him, "Hey, where is my money" and

21     there was, you know, babble, babble, "Oh, I never said

22     anything about Parkland," oh, but you did because I have it

23     in the text messages.

24              Anyway, the Counts 3, 4, 5, and 6 relate to the

25     theft from Mr. Greening.  That was the $75,000.  And that

1   money -- these are the texts sent between the two of them.

2   "KBKK autopopulated as where I'm supposed to send the

3   money.  Is that right?"  Mr. Greening thinks that sounds

4   weird but, again, he trusts him; so he sends the money to

5   the defendant's personal account.

6           There is the $75,000 wire.

7           And here's what happens to the money.  $14,000 of

8   it goes to casinos.  $6,000 of it is spent to -- on an

9   unpaid gambling debt.  Same thing.  Just stole the money.

10          Counts 4, 5, and 6 are amounts of Mr. Greening's

11  money that again the defendant transferred from his

12  personal account to another personal account of his.  This

13  one, Count 4, is the $16,000.  Count 5 is $12,000.  Count 6

14  is $13,500.  So that's all the stealing.

15          But the ultimate theft caper, as we know, is what

16  resulted in the murder of James Seegan.  It's all preceded

17  by extreme financial stress, and you heard Matt Wylie

18  testify to the stress he was under.  He's got his pet

19  project, his vanity project, the brewery there in Allen.

20  The brewery is not making money.  It's losing money.  It's

21  bleeding.  In 2018 it loses money.  2019, it loses money.

22  January to June of 2020, it's losing money.  Every single

23  month the defendant has to come up with about $30,000 to

24  even break even.  He is in bad financial straits.

25          So what happens?  What's the plan here?  Well, he

1    knows that 2016 he sold a $2 million life policy to James

2    Seegan; and you know from Midland life's testimony that in

3    the first two years, they only pay your premiums back if

4    you commit suicide.  Outside of two years, if you commit

5    suicide you're going to get the full $2 million.

6          Then in April of 2019, Ashley gets all the power

7    in the world.  But to be able to execute that power, to act

8    on that power, James Seegan has to die, because he won't be

9    the executor unless James Seegan is dead.

10         Then January 29th of 2020, James Seegan's trust

11   becomes the beneficiary of the $2 million life policy.  As

12   we've said, upon James Seegan's death, Ashley controls the

13   entire estate and thinks that he can control and manipulate

14   Dida and tells Dida that she's going to get $3.4 million.

15   No, it's not 3.4 million.  You left out the 2.

16         And this is the last will and testament.  This is

17   where he becomes the executor and the trustee.  (As read):

18   "Keith Ashley, to be independent executor of my will and

19   estate and trustee of all my trusts created by my will."

20   That's power.  And Mr. Seegan signed it.

21         Then he becomes the independent executor of the

22   trust, successor trustee.  There's the language.  (As

23   read):  "If James Seegan dies, resigns, becomes

24   incapacitated, or otherwise ceases to serve as trustee

25   under this agreement, then Keith Ashley shall become the

1   trustee of the trust."

2           And the powers are to invest and reinvest and do

3   anything you want basically.  Well, that's what he's

4   already been doing.  Now he's not going to have to go

5   through the ruse of faking to Robert Greening, faking to

6   James Seegan, faking to Leonid that there is going to be an

7   investment.  He can do whatever he wants under the terms of

8   this trust.

9           And here's what the estate's worth.  Mr. Seegan

10  declared that he was with, plus or minus, $3 million.  And

11  this is on the insurance -- life insurance documents, so

12  Keith Ashley well knows how much he's worth.

13          Then there's one policy worth $400,000.  That's

14  the one he's going to tell Dida about.  That's the one he's

15  going to use to distract her.  And then there's the one

16  worth $2 million that's going to go into the trust.

17          So total estate value looks like it's about

18  $5.4 million.  As I've said, you never have to prove

19  motive; but it's always a question.  And here there's

20  5.4 million reasons why Keith Ashley wanted James Seegan

21  dead.

22          Three weeks later.  It's three weeks after the

23  paperwork is finally in place.  He's calling, calling,

24  calling, checking with Midland life, faxing them, emailing

25  them, calling them.  Three weeks after the paperwork is in

 1   place on January 29th of 2020 that what happens?  Can't

 2   even wait three weeks.  Three weeks later there is a

 3   robbery causing the death of a person through the use of a

 4   firearm -- and we know that that's James Seegan.  And as

 5   part of the robbery, we've also charged it as the bank

 6   theft.  There is a bank theft in which the defendant killed

 7   the person.

 8          In one fell swoop he did both of those things on

 9   February 19th of 2020, three weeks after the $2 million

10   goes into the trust that Keith Ashley's going to control if

11   James Seegan dies.

12          And here we get to the chart.  February 19th of

13   2020, 9:00 a.m. James Seegan has on his calendar

14   appointment, "9:00 a.m., Keith blood."  How would Keith

15   Ashley know that?  You can't control what someone puts on

16   their iCalendar.  It's right there written literally in

17   blood that Keith Ashley is the person coming over that

18   morning.

19          And sure enough, here he comes.

20          (Visual presentation to the jury.)

21          Walking up to the door.  Got his backpack on.

22   Captured by the Nest.

23          Watch how he reacts when Mr. Seegan comes to the

24   door.

25          Waiting.  The face of someone getting ready to

 1   commit a murder.

 2          Ooh, there he is.  Smiling like he was being

 3   greeted by somebody.

 4          That's not how he acts when he goes in the second

 5   time.  Remember he goes in quickly the second time.

 6          (Visual presentation to the jury.)

 7          That's him going in again.

 8          We can go forward to the next slide.

 9          This is the backpack.  Do we know that's the exact

10   backpack that he had on his back on February 19th of 2020?

11   No, but it looks similar.

12          And the interesting thing is when law enforcement

13   went in and searched his house in September of 2020, he had

14   a gun in the backpack.  And the information that law

15   enforcement got as they did interviews was that Keith

16   Ashley always carried a gun in his backpack, so what does

17   it make sense was in his backpack when he went to James

18   Seegan's house on February 19th of 2020?

19          We know that 9:33 a.m. the last step was logged on

20   James Seegan's phone.

21          9:42 a.m., he answered his last call.

22          10:15 a.m., the garage camera activates at James

23   Seegan's home.

24          Okay.

25          (Audiovisual presentation to the jury.)

```
 1              Okay.  That was the first time.  And, remember,
 2   law enforcement is responding and they're at James Seegan's
 3   house, the crime scene, and they're looking at Mr. Seegan's
 4   phone and the body camera that one of the police officers
 5   is wearing captures the sound.  So it's a recording of a
 6   recording.  And then they're unable to recapture it after
 7   that.  But that's the first pop.
 8              Let's listen to 94A.  This is when law
 9   enforcement --
10              (Audiovisual presentation to the jury.)
11              That's it.  That's what happened.  That's what the
12   found was at 10:15 a.m.
13              And then 94C is the re-creation.
14              (Audiovisual presentation to the jury.)
15              It's a firearm.  He shot him in the head.
16              Google Nest bookends that he was there.  It
17   captures him coming, it captures him going, and it captures
18   the sound.  Guilty.  He did it.
19              And what searches does he do on Google?  "Can Nest
20   camera indoor detect sound if no motion?"  Well, he wants
21   to know that.  "Does Ring pick up sound if no motion
22   detected?"  "Time of death calendar"?  "Can you tell when
23   someone died, the time"?
24              Well, of course he's going to be worried about
25   that because he knows he's captured at the door coming in
```

1   and going out and he doesn't want the time of death to be

2   when he was there.

3           But he wasn't anticipating the sound.  "Can Nest

4   camera indoor detect sound if there is no motion?"  He

5   wasn't expecting that and it did.  And he killed him at

6   10:15, and then he printed the fake suicide note at 10:17.

7           Documents printed.  We already walked through the

8   document, the things that don't make sense about the

9   document and the things that compare to the defendant's

10  writing style.

11          Same thing.  We've already reviewed this.

12          This is him leaving the house.

13          (Video presentation to the jury.)

14          He's got the note all ready.  It's in place.  Just

15  committed the murder.  He's got his backpack there.  Headed

16  out.

17          Then what does he do?  It's the fake "Oh, buddy,

18  hope you're doing okay" messages, kind of an alibi, I

19  didn't know what was happening.  So he sends these over

20  there.  And then after this, after he sends these messages

21  and makes these phone calls checking on him, then he goes

22  back to the house.

23          So if Mr. Seegan had already committed suicide, he

24  would have found him and called 9-1-1 right here, when he

25  goes back to the housing.

1          Now, we don't know why he went back to the house;

2     but the reasonable inference is he forgot something.  He

3     thought it was going to be the perfect crime.  He thought

4     etomidate was fast-in/fast-out, knock him out, shoot him in

5     the head.  He forgot something.  Did he leave the band on

6     the arm?  Did he think he dropped something?  Did he drive

7     away, ooh, forgot something?  Who knows why he went back.

8          But the thing about him going back is if that had

9     been Mr. Seegan committing suicide and he sent those fake

10    texts, when he went back, he would have found him and

11    called 9-1-1.

12         Now, you'll remember the video.  He goes straight

13    in the house -- the door is unlocked; nobody greets him --

14    because he knows that James Seegan is dead.

15         There he is walking up to the door.  There he is

16    leaving again.  Then he sends more fake texts, calls him

17    again.  Nobody answers throughout the day.

18         And then we all heard the 9-1-1 call.  "Daddy,

19    daddy."  James Seegan is found by his wife and son with a

20    gunshot wound to the head.

21         "My dearest friend Keith Ashley."  He didn't

22    arrange to take care of Dida.  He arranged for her to find

23    her husband with her son in the condition that we all saw.

24         And then he just can't wait.  The very next day,

25    two phone calls to Midland life.  Where's my money?

 1    Where's my money?  This is Count 3.  It's one of the wire

 2    fraud counts.

 3          And then the bank theft.  And you heard the

 4    testimony about the bank theft.  He attempts to reach the

 5    account from his house.  That's what the IP address shows.

 6    He can't get into the account, so he drives down to James

 7    Seegan's -- Dida's house at this point, uses Josh, gets

 8    into the phone, and is able to complete the transfer.

 9          So he tries to get in in the Eastern District.  He

10    does get in at Mr. Seegan's house in the Northern District.

11    And then the money is transferred into his account in the

12    Eastern District.

13          All this talk about venue, Judge Mazzant is going

14    to tell you that there is a lesser burden on venue.  It's

15    by a preponderance of the evidence.  That means if you're

16    reading a book and you turn one page, that's a

17    preponderance of the evidence.

18          The other thing I expect that Judge Mazzant will

19    tell you, that you can find a defendant guilty in a

20    continuing offense in any district where the crime is

21    begun, continued, or completed.  And here -- and you'll see

22    the jury instructions, and Judge Mazzant will read them to

23    you.  Here the crime was begun in the Eastern District,

24    continued in the Northern District, and completed in the

25    Eastern District because that's where he sent the money.

1    So feel confident as you check "guilty" on that count.

2         Here, this is the transfer.  That's the actual

3    wire.  Again, this is charged as Count 14, wire fraud,

4    because he's using a wire to steal money; and it's also

5    charged as Count 19, the bank theft.

6         One thing in Count 19 that you'll see is there is

7    an element, and it says, "Was the bank FDIC-insured?"  It

8    seems like a technical thing, but I just wanted to assure

9    you that Exhibit Number 22 in the evidence is the FDIC's

10   certificate showing that the bank that the money was taken

11   from was insured.

12        And what does he do with the money?  He just

13   steals it.  Like I said, none of the money went to Dida

14   Seegan.  It all went to him.  He pays college tuition.  He

15   goes out to dinner on it, $117 on dinner.  Pays off two of

16   the other victims.  He just spends it all on himself.  He's

17   just killed a man.  He's going to the casino and using the

18   money for himself.

19        What he doesn't anticipate is Dida's resolve.  He

20   thinks he's going to be able to control and manipulate

21   Dida, and he's not.  And, you know, through

22   cross-examination -- really, it's the ultimate indignity to

23   have your husband killed and then have the private details

24   of your marriage exploited.  I mean, that's the ultimate

25   indignity.

     1          But what he doesn't count on is that she has a

     2   support system.  She has a friend.  She hires a lawyer, and

     3   the police start to ask questions because she says this

     4   isn't right from the beginning.

     5          And she's not the only one.  Remember Captain

     6   Patrick King with the fire department?  He walked in that

     7   room.  He's a captain, a supervisor, many years'

     8   experience.  And what does he say?  "Everybody out.  This

     9   doesn't look right."  He called it.  He said this looks

    10   like a staged suicide; and, in fact, it was.

    11          You may fool the medical examiner, but you're not

    12   going to fool somebody with common sense who walks in there

    13   and says this doesn't look right.  He was right.  It was

    14   not a suicide; it was a murder.

    15          Then what does Keith Ashley do?  He starts running

    16   scared.  He gives Robert Greening his money back, $75,000,

    17   because Robert Greening calls him on it.

    18          And he resigns as the trustee and executor.  You

    19   know, you can't unrob a bank.  You can't rob the bank and

    20   give the money back and say, "Oh, sorry."  You can't kill

    21   someone to try to get their money and then resign as the

    22   executor and say, "Oh, I didn't really want the money."

    23   The deed is done.

    24          You stole Robert Greening's money.  Just because

    25   he called you on it and gave it back doesn't mean there

 1  wasn't wire fraud and theft.  There was.

 2          Just because you resign as the trustee and

 3  executor doesn't mean you didn't kill James Seegan.  We all

 4  know what you did.

 5          And we talked about this.  Again, the blood

 6  evidence, the blood evidence, the unexplainable etomidate

 7  in James Seegan's blood and the defendant googling "QTOF."

 8          The letter, the secret letter to Paul Villarreal.

 9  You can't order it on your own; you have to have it sent to

10  Paul Villarreal.

11          The Google searches.  "Manslaughter deferred

12  adjudication," "manslaughter jail time."  What's going to

13  happen if I kill somebody and they figure it out?  "Time of

14  death calculator."  "How can you tell if a case is going to

15  the grand jury?"  "Can manner of death be changed by the

16  medical examiner?"  "Can the police overrule the medical

17  examiner?"

18          He wants to know these things because he thinks he

19  got away with it when it says "suicide."  He doesn't want

20  it to get overruled.  A careful review of the evidence that

21  you've seen shows what happened.

22          So here are the elements of the offense.  Judge

23  Mazzant is going to have these in the instructions that he

24  gives you, and each one of you will have a copy of it.

25  It's the law that applies in this case.  And what you'll

1   look for are what are the elements for each one of the

2   crimes.

3          And I've put it up here, and you'll have these in

4   the jury instructions so you don't have to remember any of

5   this.  But for wire fraud, it's that the defendant

6   knowingly devised a scheme to defraud.

7          And the scheme that's charged in this case is one

8   in which the defendant solicited money from victim

9   investors for purported investments when in reality, the

10  funds were used for personal enrichment and other purposes,

11  okay, other nonbusiness purposes.

12         Did he do that?  Yes.

13         The scheme to defraud deployed *(sic)* false

14  material representations, false material pretenses, or

15  false material promises; and that the defendant transmitted

16  or caused to be transmitted by way of wire communications,

17  in interstate commerce -- that's what we went over this

18  morning -- any writing, sign, signal, picture, or sound for

19  the purpose of executing the scheme; and, finally, that the

20  defendant acted with a specific intent to defraud.

21         Those are the elements.  And then you know in

22  Counts 1 through 6, 9 through 14, and 20 that he's charged

23  with wire fraud.

24         And there is a special question in the wire fraud

25  you'll see in the verdict form for each one of the counts.

 1   As to Count 1 you vote -- we would suggest that the

 2   evidence supports that he's guilty of this crime.  And then

 3   see the question under that?  "If you answered 'guilty' in

 4   response to Question 1, go to Question 1(a)."

 5           "With respect to Count 1, did the defendant's

 6   violation affect a financial institution?"

 7           The law is -- and Judge Mazzant will tell you that

 8   it doesn't have to be an actual effect; it just has to be

 9   the possibility that a financial institution will be

10   affected.

11           And the witness, Ms. Gallot from Branch Banking

12   and Trust, told you that anytime there is fraud involved in

13   any of their accounts, the bank can be held responsible and

14   the bank can be affected.  So we would ask you to check

15   "yes" to that special question.

16           Mail fraud.  Mail fraud is the same thing as wire

17   fraud.  It's lying and based on your lies and based on your

18   fraud and based on your misrepresentations, something is

19   placed in the mail.  And that's Counts 15 and 16.

20           THE COURTROOM DEPUTY:  You have 50 minutes left.

21           MS. RATTAN:  Thank you.

22           Carrying a firearm during the commission of a

23   crime of violence.  These are the elements:  That the

24   defendant committed the crime of affecting commerce by

25   robbery -- that's the robbery that he committed against

```
 1   James Seegan when he murdered him -- and the defendant

 2   knowingly carried a firearm during and in relation to his

 3   commission of the crime of affecting commerce by robbery or

 4   that he knowingly possessed a firearm and that possession

 5   was in furtherance of his commission of the crime affecting

 6   commerce by robbery.

 7           That was the whole CAST presentation that you saw

 8   through Special Agent Mark Sedwick, and then you saw it

 9   again this morning through Agent Rennie where it was a

10   smoother presentation and you saw the route that he

11   followed as he went to James Seegan's house the morning of

12   February 19th of 2020 to rob and murder him.

13           He was carrying a firearm.  He had that firearm on

14   him.  The only place he stopped was at the brewery; and

15   that was in the Eastern District of Texas, too.  Did he

16   pick up the firearm at the brewery?  We don't know.

17           Did it come from the house?  We don't know.

18           But we know that when he got to the house, he had

19   a firearm and he executed James Seegan.  He would have had

20   to have carried it in the Eastern District, gone that final

21   2.6 miles in the Northern District and into James Seegan's

22   house and murdered him.

23           This is the affecting commerce by robbery.  Those

24   are the elements.  And here the final element, that the

25   defendant's conduct in any way or degree obstructed,
```

1    delayed, or affected commerce or the movement of any

2    article or commodity in commerce.

3           That's why we presented the testimony this morning

4    about James Seegan and the fact that that was his office,

5    that was a business, he had incorporated, he was an LLC.

6    So anything that's done to interfere with James Seegan's

7    business -- no matter how minor or how minimal, Judge

8    Mazzant will instruct you -- is sufficient to meet this

9    element.

10          And you heard Special Agent Rennie testify that

11   there were expenditures.  We walked through them.  They

12   were interstate expenditures.  And it makes sense, common

13   sense.  What happens after James Seegan died?  Of course

14   the expenditures stop, so commerce is affected.  He stops

15   buying things.  He starts -- stops spending money on

16   things.

17          So here are the questions as to Count 18:  Do you

18   find the defendant guilty as charged in Count 18 of the

19   Indictment?  That is, possessing or carrying a firearm in

20   furtherance of the crime of violence; and the crime of

21   violence is the robbery.

22          And then 18(a), did the defendant, in the course

23   of violating 924(c)(1) -- the crime that you found him

24   guilty of -- cause the death of a person through the use of

25   a firearm?  Yes, he did.

1           And then the final question, did the killing found

2    in Question 18(a) constitute murder under -- and then

3    you'll see the specific murder statute in the instructions

4    as well.  Basically, it's did the defendant mean to kill

5    him?  And if the answer is yes, then you check "yes" on

6    this.

7           Bank theft.  Bank theft is what happened when he

8    took the money right after killing James Seegan from Texas

9    Capital Bank.  And here's the elements:

10          That the defendant did or did attempt to take or

11   carry away money and property belonging to or in the care,

12   custody, control or management or possession of Texas

13   Capital Bank.  Yes, that's where the money was, the

14   $20,000.

15          That at that time Texas Capital Bank had its

16   deposed insured by the FDIC.  Yes, I showed you that

17   certificate.  I think it's Government's Exhibit 22.

18          Third, that the defendant did or did attempt to

19   take and carry away such money and property with the intent

20   to steal.  Well, you know what he did with the money.  You

21   saw the chart analysis.  He took it.

22          And that such money and property exceeded $1,000

23   in value.  It was 20,000.

24          Check all those elements.  Guilty.

25          And then there is a special question, too, with

 1   regard to Count 19.  This question is if in avoiding or

 2   attempting to avoid apprehension or in freeing himself or

 3   attempting to free himself from arrest or during the crime,

 4   did the defendant kill anybody any person.

 5          So while he's committing the bank theft, as part

 6   of the bank theft or leaving the bank theft, did he kill

 7   any person?  And you'll see the language here.  You'll be

 8   able to read it.  And we'd suggest to you that the answer

 9   to that question is "yes."

10          That's the evidence.  It's really shocking that

11   someone would commit this type of crime, but he's guilty.

12   It's shocking and offensive, but we would ask you to hold

13   him responsible for it.  He thought that he would get away

14   with it.  He -- you have to imagine when he saw the medical

15   examiner's report that it said "suicide," that he was very

16   hopeful.

17          But a careful review of the evidence shows what he

18   did.  He was stealing, and he was ultimately killing James

19   Seegan.

20          He's been charged with wire fraud, mail fraud,

21   carrying a firearm during a crime of violence, and bank

22   theft.  The elements are established for each one of those

23   crimes, and we'd ask you to hold him responsible for each

24   one and find him guilty.

25          Thank you, your Honor.

1            THE COURT:  Thank you, Ms. Rattan.

2            Mr. Whalen, if you'd like to do the defense's

3     closing argument.

4            MR. WHALEN:  Ladies and gentlemen, thank you for

5     your time and I'm going to go through some slides with you

6     to have -- help you evaluate the evidence in this case and

7     tell you what we think the results should be in this case

8     and so let's start with that.

9            So the first slide we're going to talk about is

10    what is your job as a jury, okay?  And your job is to weigh

11    all of the evidence in this case.  You have to hold the

12    government to their burden of proof.  As the Court will

13    instruct you, it's the government's burden to prove each

14    and every element to you beyond a reasonable doubt.  And

15    you have to analyze each count individually, apart from one

16    another; and as I said, they have to prove each and every

17    element of the case to you beyond a reasonable doubt.

18           Okay.  Number 2, what is not your job?  It's not

19    your job to decide what the law is or should be.  It's not

20    your job to help the government get over the finish line.

21    If they didn't prove it to you beyond a reasonable doubt

22    and you have a reasonable doubt, it is a not-guilty.  It is

23    not let's help the government and fill in the blanks for

24    them.

25           In order for you to make the government's

1   narrative work, they're asking you to make inference after

2   inference after inference to try to make it work.  That's

3   not your job.  Your job is to make reasonable inferences.

4          And, finally, you're not here to convict Keith

5   Ashley because the government asked you to.  It's because

6   they have to prove it to you beyond a reasonable doubt.

7          Now, the most important thing in this case is what

8   the definition is of a "reasonable doubt."  A reasonable

9   doubt is a doubt based upon reason and common sense after

10  careful and impartial consideration of all the evidence in

11  the case.  Proof beyond a reasonable doubt, therefore, is

12  proof of such a convincing character that you would be

13  willing to rely and act upon it without hesitation in

14  making the most important decisions of your own affairs.

15         So that's what the -- that's the burden of proof.

16  It never changes.  It never lowers.  That is the burden of

17  proof that they are required to meet in this case.

18         And what are the elements?  Every single element

19  is just as important as the other, okay?  They each have

20  equal weight, and they have to prove each and every element

21  to you beyond a reasonable doubt.

22         And remember, we talked about the analogy of

23  making a cake.  You have to have each ingredient.  If one

24  is missing, they haven't met their burden of proof on that

25  charge.

 1           And if the government fails to prove even a single

 2   element to you by law, you must find him not guilty.

 3           So I'm going to go through the wire fraud counts,

 4   the mail fraud counts, and kind of work through the

 5   Indictment for you.  First is the government is saying and

 6   the judge will instruct you that he knowingly devised or

 7   intended to devise any scheme to defraud, that the scheme

 8   to defraud employed false material representations, caused

 9   a wire to be transmitted for the purpose of executing such

10   a scheme, and he acted with a specific intent to defraud.

11           So let's go through each count as we go through

12   each count.  We go through Count 1, the wire fraud, there

13   has to be a scheme charged in which he solicited money from

14   victim investors for purported investments.

15           Now, if you look at Government's Exhibit 114, in

16   the evidence is this Promissory Note from Mr. Seegan to

17   Mr. Ashley for $150,000.  And so is it the investment, or

18   is it a Promissory Note?  So you need to look at what you

19   find in there.

20           Then you also look at as it relates to

21   Mr. Greening.  And there is also the Gift Letter and also

22   the Promissory Note there that they talked about earlier,

23   the $225,000 and the $65,000 equals 290-.  So go through

24   the exhibits.  Look at what the evidence is there and see

25   whether or not they proved that.

1            Now, the next thing to do is to go to Count 3,

2    which is the wire fraud for Mr. Greening.  Remember you had

3    those emails; but you also had his zoom call that you

4    looked at, okay?  Remember that.  And he says, "All right.

5    I just wanted you to know.  I never can remember exactly

6    what we did, so I'm just trying to remember it."

7            And so in that he says, "I can't remember what we

8    did."  And as the evidence showed to you, as he went -- as

9    he thought about it more he says, "Yeah, I don't want to do

10   that"; and then Mr. Ashley returned the money to him.  So

11   is there a reasonable doubt as to Count 3?

12           Now, if we next go to Counts 2, 4, 5, and 6, I

13   would ask you to look at those collectively, okay, because

14   I think the argument is the same for all of those counts.

15           Defendant transmitted or caused to be transmitted

16   by way of wire communications for the purposes of executing

17   the scheme.  Okay.  If you look at the wire counts that

18   they -- in 2, 4, 5, and 6, there were payments to himself.

19   They weren't any payments to the investor, and they didn't

20   further the scheme in any way.

21           And so when you look at those and analyze the law

22   on each of those counts, those are payments to himself and

23   they didn't further the scheme in any way, shape, or form.

24   And so when you look at those, analyze it with this thought

25   in mind because all of those counts came from that

 1  original -- like in Count 2 it came from that original

 2  $20,000 which was a check, okay?  Well, they can't use wire

 3  fraud for a check because it's not the use of a wire.  So

 4  then they are attempting to use this wire as that's part of

 5  the scheme.  Look at the evidence, and look at the counts.

 6         And the same goes for 4, 5, and 6.  They relate to

 7  Mr. Greening's $75,000.  And those -- all those counts came

 8  through -- all those wire transfers were transferring money

 9  from himself to another account of his.  There's not any

10  wire that they showed you or charged him with that shows

11  it's going back to another investor.  These are simply

12  going to another account.

13         So when you look at the law that you're going to

14  get and analyze those wires, at the end of the day there's

15  no furtherance of the scheme based on those wires.  And so

16  we would ask you to find him not guilty on Counts 2, 4, 5,

17  and 6.

18         Next, on the issue of affecting a financial

19  institution, I think you have to use your common sense

20  about affecting a financial institution.  There is an

21  increase of risk of loss caused by the scheme.  I think

22  when you listen to what the BB&T person said, she had no

23  idea -- she said it could.  "That's really not my area of

24  expertise.  That's not what I do."  And she didn't --

25  there's no evidence in this record from anyone from BB&T

 1  that says that they suffered any type of financial loss or

 2  there was some risk of financial loss to them.

 3         And so look at that when you get to the special

 4  issue and answer that "no" because there is no evidence in

 5  this record beyond a reasonable doubt that it affected a

 6  financial institution.  So look at that when you get back

 7  to the jury room because I don't -- there is not any

 8  evidence to support that.  It's just a suggestion, and

 9  that's not proof beyond a reasonable doubt.

10         Then look at Counts 9 through 13, which is -- they

11  allege is the wire fraud against Midland.  Now, they've

12  alleged certain things about the fraud against Midland; but

13  I don't ever see that there was ever a fraud against

14  Midland, okay?

15         What you have in the evidence was this change in

16  beneficiary form.  And so when you look at all the wire

17  counts as it relates to that, what is about those wires

18  that are false or what misrepresentations were made?

19  Because what the evidence shows, the changes were made with

20  Mr. Seegan's consent, because when you listen to it -- the

21  testimony at Agent Rennie, at one point he testified that

22  one of those phone calls was made at his residence.

23         So we know that there is evidence in the record

24  that he made one of those phone calls from his residence.

25  So what is the intent to defraud here other than to change

1  the beneficiary with Mr. Seegan's consent and he's involved

2  in it?

3         The other thing that I would look at was -- at

4  this point is they talk about wire fraud.  Well, there's

5  nothing about what -- Dida apparently says she didn't know

6  anything about the trust, so there is never any intent to

7  defraud here in these counts.

8         And the other thing, too, is they want to talk

9  about, you know, whether or not it's a trustee; but it was

10 very specific in the language there was a -- it's whether

11 there was a beneficiary.  We wanted to know whether it was

12 a beneficiary.  What did Ms. Jacobson say?  "Well, we don't

13 go down to the second part unless it's a certain type of

14 trust."  Okay?

15        But also if you listen to the phone calls, what is

16 the nature of the phone calls when Mr. Ashley is on the

17 phone?  "How do we fill this out?"  "What do we do?"  "How

18 do we change this to make it so it fits?"  They are

19 instructing him, telling him how to do it throughout this

20 entire process, and so he made no misrepresentations on it.

21 They told him how to fill it out.

22        So when you look at Counts 9 through 13, there's

23 no specific intent to defraud.

24        And then I think what's really important about

25 this, too, is if there really was this specific intent to

 1   defraud -- remember there was a phone conversation about

 2   "Do you need to make any changes to the address?"  And I

 3   think it was after he made the phone call that Mr. Seegan

 4   had passed.  And they said, "Do you need to change the

 5   address."  And what was the answer?  The answer was, "No."

 6          And the question I asked her, I said, "Well, could

 7   the agent say, 'Yeah, no, change the address.  The mailing

 8   address has changed'?"

 9          And what did she say?  "Yeah, we would have done

10   that."

11          So there's no specific intent to defraud on these

12   counts whatsoever because what the evidence shows is that

13   it was at the direction of Midland who is telling him how

14   to fill out the form and then if he could have made a

15   misrepresentation or changed the address, he didn't.

16          And so I don't understand how anything that he did

17   in those 9 through 13 -- and if you look at the law -- that

18   any of these counts furthered any type of scheme against

19   Midland whatsoever.  So look at those -- look at those

20   counts very closely.

21          And then when you get to Count 14, which is the

22   $20,000 payment, that -- how did that further any scheme

23   against Midland?

24          Now, it's related back to the bank theft and we'll

25   get to that, but how does that -- was a misrepresentation?

1    Was there anything -- Midland didn't even know about it.

2    So was there any evidence in the record that Midland knew

3    that $20,000 got transferred and they took any action?

4    What was the false misrepresentation to Midland that they

5    said, "We" -- they came in here and said, "Well, based on

6    that we relied on this and we did X"?

7            There's nothing as it relates to Count 14 that is

8    an intent to defraud Midland whatsoever.  There is no

9    evidence presented of what that meant to Midland and what

10   action Midland took.  So look at Count 14 as relates to

11   that because I think there's -- it's not -- there's not a

12   scheme again Midland.  So look at Count 14 very closely.

13           And then when you get to Count 15, which is the

14   mail fraud, they talk about -- obviously you have the law

15   about the mail fraud; but there's only two mailings that

16   you're talking about here, okay?  Count 15 is changing the

17   beneficiary.  Once again this is done at Mr. Seegan's

18   request.  He's on the -- the call was made from his home.

19           And then they talked about that these forms are

20   mailed as a matter of course.  If there's any change in the

21   policy, they're mailed as a matter of course.  And what was

22   the misrepresentation to Midland that they relied on to

23   then -- that cause the mail to be used?

24           There is nothing to support Count 15 that there

25   was something fraudulent about the change in beneficiary

1    because the evidence, as we said, Agent Rennie talked

2    about, the phone call was made from close to that location

3    or that house.  So what was false about it?  He had a

4    trust.  He wanted to change the beneficiary to the trust,

5    and he did that.  There's nothing false about changing the

6    beneficiary.

7           And then Count 16 as it relates to the autopsy

8    report.  There's -- he's charged -- the scheme has to be to

9    obtain money and property.  So how does knowing about

10   getting the autopsy report that is a public record a

11   misrepresentation that somebody relied on to further the

12   scheme?

13          There's no evidence of any money being solicited

14   or received after it was ordered.  It was never used.  So

15   there's nothing about the mailing of the autopsy to

16   Mr. Villarreal that furthers the scheme or was a

17   misrepresentation.  So look at the law.  Look at the facts.

18          The next thing we'll talk about is Count 20, which

19   is the alleged wire fraud or attempted wire fraud against

20   Midland.  Okay.  They brought up that -- or I think the

21   government tried to suggest that he was taking a life

22   insurance policy out on Mr. Villarreal that he didn't know

23   about.

24          Okay.  Well, that doesn't make any sense because

25   he submitted to a blood test by a third-party independent

 1  person who is going to show up and say, "I'm here to take

 2  your blood for your life insurance policy."  So this idea

 3  that Mr. Ashley took a life insurance policy out on

 4  Mr. Villarreal unbeknownst -- or tried to unbeknownst to

 5  him is just not true.  It defies a reasonable inference.

 6          So think about it.  You heard testimony, I think

 7  from Ms. Nordquist, who said, "Well, agents know what the

 8  cutoffs are for policy limits and qualifications and

 9  everything else that they talked about; and they know there

10  are certain policies that can get approved without a blood

11  test."  So if anybody would know how to obtain a life

12  insurance policy without having to go through a blood test,

13  it would be an agent.

14          But look at the documents.  That was there.  We

15  checked the box we smoke half a pack a day, we smoke

16  marijuana, which is critical for them in their analysis.

17  He says, "We'll order a third-party" -- "We'll order the

18  blood test," which then gets the blood -- the blood test is

19  ordered.  And then because of his untreated diabetes, it's

20  denied.

21          Well, he worked -- Mr. Villarreal worked for

22  Mr. Ashley, and you heard testimony that they were close

23  and they worked together.  Well, he knew he had diabetes,

24  okay?

25          So the inference is, well, why would he do that?

1   Well, maybe Mr. Villarreal, who would never go to the

2   doctor, would finally get some results to be able to

3   convince him to go to the doctor.  Is that a reasonable

4   inference?

5          But at the end of the day, it has to be a scheme

6   to obtain money or property.  The only thing we're trying

7   to obtain is a life insurance policy.  Does that fit the

8   definition of "money or property"?

9          So there's no misrepresentation.  They want to

10  focus on, well, he said he was his stepbrother.  But let's

11  be honest about what we look at in a life insurance policy

12  is insurability.  They want to know are you going to die

13  anytime soon.

14         And when you look at the evidence they have and

15  the representations that were made on the application and

16  his blood test, he got denied.  So this doesn't fit the

17  definition.  This doesn't fit the elements beyond a

18  reasonable doubt.  That's a not-guilty as well.

19         So now we go to Count 18 which we have spent --

20  the government has spent the majority of their time in this

21  case about, and that's really what they focused on.  But

22  really the elements of this count because this is where we

23  talked -- when I talked to you in opening statement.  This

24  is complicated.  This is going to be unpleasant.  But you,

25  as jurors, took an oath to follow the law.

1          And so the first element is the defendant

2    committed the crime of affecting commerce by robbery and

3    then, second, used or carried a firearm in relation to that

4    robbery affecting commerce.

5          Okay.  So you have to first think about -- if we

6    go to the next slide -- he obtained or attempted to obtain

7    personal property in his presence, against his will; did so

8    by means of actual or threatened force; and the conduct in

9    any way or degree or obstructed, delayed, or affected

10   commerce or movement of any article or commodity in

11   commerce.

12         Now, this is a real technical definition.  But

13   it's the law, okay?  When you hear everything about

14   technicalities, "technicalities" means it's the law that

15   you took an oath to follow.

16         So what is the instruction we anticipate you're

17   going to get as it relates to commerce?  A robbery of an

18   individual affects interstate commerce if the robbery

19   depletes the assets of an individual who is directly and

20   customarily engaged in interstate commerce, or the robbery

21   causes or creates the likelihood that the individual will

22   deplete the assets of an entity engaged in interstate

23   commerce, or the number of individuals victimized or the

24   sum at stake is so large that there will be some cumulative

25   effect.

 1            Okay.  The last one, there is not multiple

 2   robberies that they have alleged in this case.  There is a

 3   single robbery, so there is not multiple victims of

 4   robbery.

 5            Second -- the second area is there is no entity

 6   that there was a likelihood that their assets would be

 7   depleted, so Number 2 doesn't fit here.

 8            So you're really -- you're left with Number 1, in

 9   my view of the evidence that's before you.  And, you know,

10   we talked about -- they always ask you to use your common

11   sense.  And you have definitions in the jury charge, but

12   you're also -- the ones that you don't get definitions for

13   them, you're supposed to use their plain and ordinary

14   meaning.  Use your common sense.

15            The word "deplete," when you hear the word

16   "deplete," what does that mean to you?

17            And so you heard testimony that Mr. Seegan's

18   assets were $5.4 million.  So is there -- one, is there a

19   robbery and, two, does it deplete -- did it deplete the

20   assets?  Okay.  That's the first part of that question, and

21   the answer is "no."

22            The second part is "directly and customarily

23   engaged in interstate commerce," okay.  It's directly and

24   customarily.  They're together.

25            They tried/attempted through Agent Rennie to come

1    up here with this he owned a rent house so, therefore, he's

2    engaged in -- customarily engaged in interstate commerce.

3    The evidence is insufficient on that.

4          And then they also asked you because he had an

5    E*TRADE account or he had a Fidelity account.  Well, if

6    that's the standard, then each and every one of us who has

7    a 401(k) is engaged in interstate commerce.  That's not the

8    standard, and you'll have that back in the jury room.

9          So you'll have to focus that and analyze that

10   because if you don't believe that, one, there was a robbery

11   or, two, that it didn't affect interstate commerce, you

12   stop.  You go straight to the verdict form and find not

13   guilty, because you can't get past that element.  As we

14   said, each and every element requires them to prove it to

15   you beyond a reasonable doubt.  And so you have to look at

16   the evidence as it relates to that element, and that is

17   critical.  And look it.  They haven't proven that to you

18   beyond a reasonable doubt.

19         As I said, this was not a robbery.  There is

20   evidence that Dida was with him when the money was

21   transferred.  It was two days later, and it's unrelated to

22   the allegation of the murder.  So look at the evidence that

23   you have and read the law.  They're not connected with one

24   another.

25         Then they have to prove those following elements,

1    that he unlawfully killed him, there was malice

2    aforethought, and it was premeditated.  But you don't even

3    get to this question if you can't get past the robbery or

4    the interstate commerce question.

5           And I know people might get -- might think, well,

6    you're nitpicking.  But it's the law.  The reason why it's

7    the law is because you have to have an interstate commerce

8    to have federal jurisdiction, to be in this courtroom,

9    because Congress and the framers decided we don't want a

10   national police.  That's what state court is for.  So think

11   about that when you go back and deliberate with the

12   instructions that you have.

13          And so as you analyze this specific charge and

14   these elements, the fact it could have been, should have

15   been, may be, or will be charged elsewhere doesn't mean you

16   convict him here.

17          And I know, as I said in opening, some of this was

18   unpleasant.  You saw some things you hoped you didn't have

19   to see.  But the law requires you to find him not guilty on

20   those counts -- on that count.

21          Because the other thing -- and we'll talk about --

22   they have to prove that he carried the firearm, and I'll

23   talk about that as we get later on.  But I think that's

24   a -- that's the threshold element that you have to get to,

25   is whether or not they proved to you beyond a reasonable

1   doubt that he possessed a firearm in the course of this.

2   And we'll talk about that in a second.

3           The next thing is the bank theft.  And once again,

4   you know, this is a -- read these definitions.  Did or --

5   take and carry away money from Texas Capital Bank.  Look at

6   those elements because I think the other thing is whether

7   or not they can prove -- you're charged with either attempt

8   or the actual bank theft, okay?  And so let's talk about

9   that.

10          You heard from Mr. Nielsen (sic) -- or Hilson -- I

11   apologize -- that the actual wire transfer happened at the

12   Cannes address in the Northern District of Texas, okay?  We

13   know it's entirely in the Northern District of Texas.

14          So then what they are trying to say is there was

15   this attempt at his house, okay?  But look at the -- listen

16   to the testimony.  Remember the testimony of Mr. Hilson.

17   You'll see in the instructions that it has to be a

18   substantial step.  You have to take a substantial step to

19   prove an attempt, okay?  And there's -- and it has to

20   amount to more than mere preparation, okay?  So read that

21   in the charge.

22          But what you had was, if I remember the testimony

23   correctly, is what Mr. Hilson said is there was a log-in at

24   the house -- at the IP address at Mr. Ashley's house, okay?

25   He then said -- he goes it then required a two-step

 1   authentication at that point.

 2          And what did he say?  I think this was important.

 3   Nothing was entered.  6 seconds is what he said.  It lasted

 4   the 6 seconds.

 5          So then -- what he also talked about, too, is then

 6   when it occurred at the Cannes residence, the Cannes

 7   address in Carrollton, he said in order to effectuate that

 8   wire transfer, you had to fill out a form.

 9          So when you take that back to the 6 seconds, there

10   was no attempt to fill out a form to effectuate a wire

11   transfer to get a two-step authentication or to do any of

12   that.  So as relates to the attempt, they can't prove that

13   to you.  So then the only thing that they have is whether

14   or not you have the bank theft that occurred in the

15   Northern District of Texas.

16          And so -- and the law will say it can get started

17   in one and get finished in another.  I acknowledge that.

18   But I think when you looked the evidence, they only proved

19   to you that there was a wire transfer effectuated in the

20   Northern District of Texas.

21          Now, the other thing, too, while I'm thinking

22   about it, is you're going to have language in there about

23   attempts.  You have to consider attempts or you have to

24   consider the actual offense, okay?

25          You'll also have an instruction about unanimity of

1   theory, okay?  What that means is you all have to agree

2   whether it was an attempt or a completed offense.  Six of

3   you can't decide, well, I think it was an attempt and six

4   think, no, I think he actually completed it.  That's not a

5   unanimous verdict.  So read that instruction because that's

6   important when it comes to these issues.

7           Now, the next thing is there is a special issue as

8   it relates to causing death, okay?  Once again, I know

9   you'll read the instructions.  Use your common sense when

10  you read this where it says -- you'll need to determine

11  whether the defendant, in committing or attempting to

12  commit the offense, assaulted any person or put in jeopardy

13  the life of any person by the use of a dangerous weapon or

14  device or whether the defendant, in committing or

15  attempting to commit the offense, or avoiding or attempting

16  to avoid apprehension for committing the offense, or in

17  freeing himself or attempting to free himself from the

18  arrest or confinement for the offense, killed JS.

19          If you read that, it's at the time the wire

20  transfer is going through you have to consider, did that in

21  any way cause the death of any person or assault of any

22  person.

23          MS. RATTAN:  Your Honor, I object.  That's a

24  misstatement of the law.

25          MR. WHALEN:  It is not.

1              THE COURT:  Well, okay, the attorneys -- what they

2    say is the lawyer isn't the law.  I will instruct you on

3    what the law is.

4              And you don't respond like that, Mr. Whalen.

5              MR. WHALEN:  I apologize.

6              But read it.  "At the time."  "In committing."

7    Read it.  And read it carefully because they cannot prove

8    that special issue to you beyond a reasonable doubt.

9              And it's also this offense.  It relates to the

10   bank theft, not any other offense but this offense.  They

11   can't prove that to you beyond a reasonable doubt.

12             So then it comes down to the government's

13   narrative, and they want you to follow their narrative and

14   accept it without question.  And there's questions and

15   holes in their narrative, and so we're gonna go through

16   those and ask you to consider those and think about those

17   because those raise reasonable doubts.

18             They talk about Keith Ashley was financially

19   broke.  Okay.  He returned $75,000 to Dr. -- to Robert

20   Greening.  There was testimony that he had a brewery and

21   was selling in the casino out in Osage Nation.  He was a

22   nurse.  He had the net worth or the value of his home.  And

23   they never did an analysis of his net worth to see whether

24   or not he was broke.  They just looked at his bank accounts

25   and said, well, based on his bank accounts, he was

 1  stressed, he was financially broke.

 2         Then they said he spent years planning this trust

 3  scheme, was the statement that we think we heard in

 4  opening.

 5         But Jim Seegan did this on his own.  What did Jim

 6  Cosenza say?  "He reached out to me.  I went to his house.

 7  It was a slam dunk.  He clearly knew what he wanted, and I

 8  drew up the paperwork for him.  It was very simple."

 9         And then we'll talk about he revoked his

10  executorship within seven days.

11         And then they talked about he's a schemer, he's

12  manipulative.  But think about everything that he did was

13  captured on video or in a wire or on a recording.  If

14  you're scheming and if you're trying to plot some type of

15  scheme that you're going to control a trust that nobody

16  knows about, why tell anybody?  Why tell anybody about the

17  life insurance policy?  Why tell his widow, "Hey, you have

18  3 1/2 million and more to come"?  Wouldn't it make sense to

19  say there's only a million dollars there?

20         Why would you disclose that if you're this

21  manipulative schemer who has had this plan in place?

22  Because if nobody knows about the trust and nobody knows

23  that you're the trustee and nobody's supposed to know about

24  the life insurance, why would you tell anybody about it?

25  He's the agent.  He can control, "Let's change the address.

1    Send everything to me" or "Send it to this P.O. Box."

2            And then they said that Mr. Seegan was antidrug

3    and anti-vax, but then we find multiple prescriptions

4    bottles in the house.

5            He was anti-gun, but there's testimony they found

6    a receipt where he purchased a gun.  And Detective Bonner

7    told you that he may have given guns to Larry.

8            And then he must have used the etomidate he took

9    in December of 2019.  Now, it seems like they've backed off

10   of that and said, well, he had access to it; so he must

11   have had some.  Okay.  But why would you put in the Pyxis

12   that you're taking etomidate out because you know it's

13   recorded, you know it's there, you know it's going to get

14   traced back to you who took etomidate out.

15           The patient was actually intubated, okay, so that

16   means etomidate was used.  So the question becomes, well,

17   how much?

18           Dr. Hail testified to the effects of it; but did

19   she review the medical records and say, "Well, this person

20   received this dosage during their treatment and, therefore,

21   that would have left some etomidate"?  They didn't do that

22   for you.

23           And so there is no showing of any missing

24   etomidate.  Ms. Scarbrough comes in here and testifies that

25   the pharmacy would have those logs, and then she says --

1   she also testifies how easy it would be to go get etomidate

2   out of a crash cart that you have to open and put your name

3   on it to say you opened it in the emergency room.

4          But what did she also testify to and which is

5   known is there is a badge system.  In order to get in the

6   ER, you have to swipe your badge.  In order to get in the

7   Pyxis, you have to swipe your badge.

8          So where are the records that show that Mr. Ashley

9   was at the hospital any other time but the 19th?  And they

10  can't show you how much was used that day.  It probably

11  could have been all of it was used.  But they want you to

12  make an inference, well, because he had access, he must --

13  he must have had some.  But they haven't proven that to you

14  beyond a reasonable doubt.

15         The other thing we talked about earlier was their

16  existence of the trust was hidden from the family.  But he

17  immediately tells Dida and he calls Kerby Keller, who is

18  the secondary trustee on the trust and executor on the

19  will.  So if you're trying to hide things and get away with

20  things, why would you tell Kerby Keller anything?

21         And then you also heard that Dida was only --

22  apparently -- she was only getting $400,000.  But he told

23  her, "You have over $3 1/2 million coming and more to

24  come."  Why would you even mention that if your intent is

25  to steal and control the trust?

1          And then they ask you to look at certain things.
2    The underlining of "today" in Greening text messages.  And
3    then he tries to say, "Well, I must have been pressured."
4    The phone system does that automatically so you can put it
5    in your calendar.  There wasn't any pressure.
6          Then they say, "Well, we found the same caliber.
7    The bullet must have come from Keith's home."  But the
8    brands don't even match.  So they want to make an inference
9    because he possessed a firearm, which everyone said he
10   possessed, which is the same one they found in the backpack
11   as well because he possessed the firearm and had firearms,
12   well, the gun they found in Mr. Seegan's house, he must
13   have possessed it.
14         Well, let's look at that.  They want you to
15   believe the gun -- because the gun was purchased in the
16   Eastern District near Keith's home in 2013, he must have
17   bought it secondhand.  And because he lived in Wylie,
18   therefore he must have bought it from Mr. -- I can't
19   remember his name off the top of my head.
20         But what did Agent Gresham say?  Well the best
21   person to ask would be him, right?
22         And think about this.  If you're trying to
23   determine whether or not -- who you sold your firearms to,
24   would it make sense to say, "Hey, would you mind looking at
25   a photo spread" to see if he identified the person that he

1    might have sold it to?

2           But they want you to believe because it was sold

3    in Wylie and owned by somebody in Wylie and then he sold it

4    for cash, that it had to be Mr. Ashley because he lived in

5    Wylie and because he lived in Wylie, therefore, he carried

6    it through the Eastern District to the Northern District.

7           That's inference upon inference upon inference.

8    They're asking you to stretch your logic.  And that goes

9    back to Count 18, that if you have a reasonable doubt of

10   whether he possessed or carried it, it's a not-guilty.  You

11   stop right there.  So they haven't proven that to you

12   beyond a reasonable doubt.

13          And then they want to talk about these Google

14   searches.  But remember what we said in opening statement.

15   Timeline is going to be important, right?  And so what did

16   the evidence tell you?  The searches are done after

17   somebody has contacted him and provided him information,

18   first Mr. Freeman, the private investigator hired by the

19   family.  So the timing of the searches is after that

20   information.

21          Then you see the information in September -- end

22   of August, beginning of September, September 3rd.  That was

23   a big date.  You heard testimony that Detective Bonner said

24   he had contact with Mr. Ashley that day and relayed

25   information to him that day.  And so the information he's

 1    looking up is the information they told him.

 2            And look at the QTOF.  There is no date on it; but

 3    the QTOF is based off of what they told him or what's in

 4    the autopsy report, information that he learned.

 5            The searches are done after he's learned

 6    something.  Is it common sense to go, they said this, well,

 7    what does that mean?

 8            So they want to make it look as some type of

 9    sinister thing, he's doing all these searches to cover his

10    tracks.  He's doing the searches because somebody has told

11    him something he doesn't know anything about.  Is that a

12    reasonable inference?

13            So put everything into context, for when he knew

14    it and when he learned it.

15            Then they want to talk about when he revoked his

16    executorship, the heat was on.  Bonner stated he wasn't a

17    suspect yet.  The autopsy wasn't even done.  The private

18    investigator hadn't even started.  Why resign?

19            Because they want to say, well, the heat was on.

20    He had to resign.  It goes back to if the goal was to

21    steal, why would you tell anybody about what money was out

22    there?  Why was a lawyer hired?  Why was a private

23    investigator hired?  Because he told Dida there's money

24    coming, so she hired a lawyer to probate the estate.

25            Why would you do that if your scheme is to control

 1    everything?

 2           And then we talk about the garage Nest cam being

 3    activated.  The inference is it must have been a gunshot.

 4    No other camera in the house was activated; and we heard

 5    testimony there was a camera in the living room, in the

 6    kitchen.

 7           They didn't preserve the video of that.  You saw

 8    the video and you hear the sound, but they don't show --

 9    they didn't preserve the video for you to see it come on.

10           The acoustics are different.

11           And then I think Detective Bonner -- someone said

12    they manipulated the -- they had to manipulate the settings

13    on the camera because they weren't set -- they reset for

14    some reason.

15           So this idea that, oh, that's a gunshot, we

16    re-created it, can you really rely and act upon that

17    without any type of hesitation?  Is that even remotely

18    reliable to you when they're asking you to find somebody

19    guilty of killing somebody else?

20           Then their narrative is he had specialized skills

21    in nursing and law enforcement.  Inference, this helped him

22    commit the crime.

23           Actually, in actuality, as we said, everything he

24    did was recorded.  Everything was out in the open and

25    traceable to him.

1            The gun was in Seegan's nondominant hand.  He

2   wouldn't have committed suicide that way.  But, of course,

3   the only evidence we have he was right-handed is what his

4   wife said.  But there was some inconsistence about what she

5   said to the officer because remember Detective Bonner

6   said -- "Did you ever hear that she gave him the code?"  He

7   was like, "No, I never heard that before.  That's the first

8   time I heard that."  There's inconsistencies there.

9            And so, you know, the government wants to say

10   well, there are some indignities or we did something

11   improper.  But this is a case that they've got to prove to

12   you beyond a reasonable doubt.  Go through the evidence and

13   analyze that.

14            Also, the other thing, too, is about

15   inconsistencies.  Remember he always locked the door.  But

16   what did they find when they were there?  The back door was

17   open.  The gate was open.  So all these details do matter.

18            And then this case does have reasonable doubt

19   because really what they said in closing and beginning is

20   the medical examiner got it wrong.  She's a medical doctor.

21   Her job is to determine cause of death.  And what did she

22   say in her findings?  Based on the case history and the

23   available investigative information, she deemed it a

24   suicide.  So what they're basically trying to say is even a

25   medical doctor with years of experience in the field of

 1  pathology and autopsies was fooled.

 2          And so -- and they talk about, too, that, well,

 3  the fire captain saw that something wasn't right and this

 4  wasn't right.

 5          "Did she relay that to Detective Duncan?"

 6          "Yes."

 7          "Did she relay that to the medical examiner?"

 8          Detective Bonner:  "I believe she did."  "Maybe

 9  she did."

10          He didn't know for sure.  But is it reasonable

11  that she had some information when she made that

12  determination?  And when she makes that determination, she

13  knows what the toxicology results are.  She still makes

14  that determination.

15          So then they keep investigating -- and you heard

16  this part, too -- and they go in and meet with her and say,

17  "Here's some evidence.  We want you to look at it," really

18  to change her mind.

19          And what does she say?  What did they learn?

20  "Well, could be; but I can't say what it is one way or the

21  other."

22          And she's willing to go to "undetermined."  But

23  that is as far as the trained medical examiner is willing

24  to go.

25          And so they just want you to disregard what the

 1   medical examiner does, what that trained professional said,

 2   what she ruled based on her expertise and analysis in the

 3   case.

 4          And so when you say "undetermined," as hard as I

 5   try, I just don't know for sure, that's a reasonable doubt.

 6          Not guilty, as we said, doesn't equal innocent.

 7   It simply means I'm not convinced beyond a reasonable

 8   doubt.

 9          Remember, if it were the most important of your

10   own personal affairs.  I would at least hesitate.  Would

11   you at least hesitate on the facts that you have before

12   you, on the counts that he's been charged with?

13          And so when you go back in the jury room with the

14   jury charge, just remember, one doubt, one unanswered

15   question, one hesitation, or one missed element, one missed

16   element, means only one verdict; and it's not guilty.

17          MS. RATTAN:  Your Honor, I have to object.  It's

18   not one doubt.  That misstates the burden of proof.  It's

19   just a misstatement.

20          THE COURT:  Sustained.

21          MR. WHALEN:  If there is one reasonable doubt --

22   you'll have the law.  It's a reasonable doubt.  If you have

23   one reasonable doubt, if it would cause you to hesitate to

24   act, it's a not-guilty.

25          Thank you.

 1              THE COURT:  Thank you.

 2              Would the government like to conclude the

 3    argument?

 4              And before you do that, are y'all okay to continue

 5    without a break?  Are you okay finishing?  If you want to

 6    just stand and stretch a second before we start, anybody?

 7    Just take a second.  Everyone just stand and stretch.

 8              Well, maybe I'm the only one.  I needed to get up

 9    and stand and stretch.

10              Okay.  The jury does need a break, so let's go

11    ahead and just take a few minutes.  If you want to go --

12    again, please don't discuss the case among yourself or

13    anyone else.  And we'll just take 10, 15 minutes; and as

14    soon as you're ready, we'll come back and come down, okay?

15    Thank you.

16              (The jury exits the courtroom, 3:45 p.m.)

17              THE COURT:  Okay.  Anything further from either

18    side?

19              MS. RATTAN:  No, your Honor.

20              MR. WHALEN:  No, your Honor.

21              THE COURT:  We'll just take 15 minutes or as soon

22    as the jury is ready, if it's less than that, we'll come

23    back and continue.

24              (Recess, 3:46 p.m. to 3:57 p.m.)

25              (Open court, defendant present, jury present.)

1              THE COURT:  Please be seated.

2              Mr. Combs, if you would like to complete the

3   argument.

4              MR. COMBS:  Thank you, your Honor.

5              So Keith Ashley committed the perfect crime, and

6   he's the perfect criminal to do it.  He's an investment

7   advisor.  Ladies and gentlemen, you are never going to see

8   another set of skills wrapped up into a tight little ball

9   like you find in Mr. Ashley.

10             He's an investment advisor.  He has the money and

11  the trust of his clients.  All of them trust him.

12  Mr. Greening trusted him.  Mr. Seegan trusted him.

13  Mr. Willmon trusted him.  Mr. Shteyngart trusted him.

14  Everybody trusted him.

15             They wrote him the checks because he told them

16  that their money was safe with him.  Told Mr. Greening,

17  "Everything I do is tracked by Parkland.  They're going to

18  know everything we're doing."  He had their money, and they

19  trusted him with it.

20             But that's not enough to commit this crime.  He

21  was a life insurance agent, too, which means that he had

22  the means to ensure that his clients were worth more dead

23  than alive, to him.

24             Paul Villarreal, a man who picked up cans on the

25  side of the road to make ends meet before he came to work

 1  at Mr. Ashley's brewery and doing Mr. Ashley's lawn work.

 2  That's Paul Villarreal.  He wasn't a rich man.  He was just

 3  a normal guy trying to make ends meet.  But he certainly

 4  was worth more dead than alive to Mr. Ashley, and that's

 5  why Mr. Ashley lied on the life insurance form and put

 6  himself down as the stepbrother of Paul Villarreal.

 7        Why did he make that lie?  To make sure that he

 8  was worth more dead than alive.  That's why he did it.

 9  That's why he did what he did to Mr. Seegan.

10        He's a life insurance agent.  He has the trust of

11  a life insurance company, Midland.  He has the trust of his

12  investment clients.

13        He's a former police officer.  He knows how to

14  stage a suicide and cover his tracks.

15        You heard a suggestion by the defense that even a

16  medical doctor was fooled.  First of all, she's not a

17  police officer.

18        Secondly, she wasn't investigating the crime.

19        And, third, she hadn't been planning it for months

20  or years like Keith Ashley had.  She knew what she knew at

21  the time, which was far less than you know today.

22        And he knew how to stage a suicide and cover his

23  tracks.  He was a police officer for several years.  He

24  knew how to get his hands on an untraceable weapon.  He

25  knew how to make sure that there weren't any fingerprints

 1   found at the crime scene.  He knew what he needed to do.

 2   And we'll talk about that in a few minutes.

 3            And he was an emergency room nurse, and that's

 4   what completes the picture of him being the perfect

 5   criminal in this case.  He had access to a very unusual

 6   drug, extremely unusual drug that incapacitates you in

 7   seconds and you wake up from in minutes.  It's used only in

 8   emergency rooms and the ambulances, two places he has

 9   access to.  And he knows how to use them.

10            You saw, of course, that he had drawn out that

11   very drug just a month before he killed Mr. Seegan.  You

12   know he had access to it.

13            And he was a very skilled medical professional,

14   too.  He wasn't just any nurse off the street, as

15   impressive as that is.  He's a guy who Mr. Greening met

16   when Mr. Greening hired him to be an expert witness in one

17   of Mr. Greening's cases.  Mr. Ashley was one of these

18   people who came in and testified as an expert witness in a

19   case, because he has so much knowledge and so much skill

20   that he's qualified to be an expert.

21            Oh, no, he was the perfect criminal for this

22   crime.  He knew absolutely everything you have to know to

23   get away with it, or he thought he did.

24            Ladies and gentlemen, the defense wants to focus

25   on a bunch of different questions; and their questions are

 1   where did it happen, right?  You're going to hear -- you

 2   heard from Ms. Rattan and you're going to hear from the

 3   judge that the venue question is not that hard, right?

 4   Because at the end of the day criminals can't get out of

 5   their crime by crossing county lines all day.

 6          You can't commit a murder and get away with it by

 7   saying, "No, I lived here and had my business here, no, I

 8   was -- I did the crime there."  It just doesn't work like

 9   that.  Anytime the crime is begun, continued, and completed

10   in one district and it continues on to another -- which

11   happens all the time.  You don't get away with the crime

12   because of that.

13          And you only have to find that by preponderance of

14   the evidence.  So that's a red herring and don't let it

15   distract you.  You've received a lot of evidence on venue,

16   going through every single count in the Indictment.  It's

17   overwhelming.  It's well beyond preponderance of the

18   evidence.  It's really not an issue in this case.

19          What about the gift and the Promissory Notes?

20   Where were they found?  They were found in Mr. Ashley's

21   house, right?

22          What do you know about Mr. Ashley?  Well, he's a

23   thief.  He took all the investors' money.  He's a person

24   who is adept at signing other people's signatures.  He

25   signed Dida's signature on an important life insurance

1   document, the change of beneficiary form.

2           So he knows how to dummy up documents, and he

3   knows -- at the time that his house is searched months

4   after the crime is committed, he knows the police are

5   coming looking for him.  Why do you think he's doing all

6   those Google searches?

7           So he's got to come up with a reason for having

8   Mr. Seegan's money because, make no mistake, Mr. Seegan is

9   a businessman.  He didn't give $290,000 to Keith Ashley as

10  a gift.  Come on.  It didn't happen.

11          And to say that he gets away with his fraud, the

12  $150,000 that went into his bank account and immediately he

13  spent it and used it on the Ponzi scheme because he dummied

14  up a gift note the same way he dummied up a suicide note,

15  it doesn't wash.  Ashley was covering his tracks.

16          They want to ask was there a misrepresentation.

17  That's what much of the defense argument was spent talking

18  about.  Was there really a misrepresentation?  I mean, you

19  know, when they're talking -- he's talking to the insurance

20  company, he not really misrepresenting anything.  Was there

21  really a fraud on them?

22          Well, ladies and gentlemen, first of all, the

23  instructions are -- that you're going to get from the judge

24  are that the scheme to defraud employed false material

25  representations or false material pretenses.

1          First, as to the misrepresentations, do you really

2    think that the insurance company would have issued any of

3    those changes of policies or done any of the paperwork they

4    did outlined in the counts if Mr. Ashley had said, "Hey,

5    I'm getting ready to shoot this guy in the head and I'm the

6    trustee; so, you know, we need to get this paperwork right.

7    Have you guys made the beneficiary change yet?  Have you

8    done that?"

9          No, he didn't tell them that.  Why didn't he tell

10   them that?  Why did he withhold the true information and

11   give them false information?  Because he knew what he was

12   going to do and they never would have made the change and

13   they would have called the police.

14         But you actually don't even have to have a false

15   material representation.  You can have a false material

16   pretense.  Well, what's a pretense?  Well, it's a trick.

17   It's a sham.  You say one thing and you're trying to get by

18   and you're tricking the person into doing something so that

19   you can benefit.

20         Well, that's exactly what he did.  So was there a

21   fraud, a wire fraud involving the insurance company?  Was

22   there mail fraud?  Yes, absolutely.

23         Was there a robbery?  Ladies and gentlemen, why,

24   why did he kill Mr. Seegan?  To take his money.  He didn't

25   have a grudge against him.  They weren't enemies.  He did

 1   it to take it from his person; and that's the instruction

 2   you're going to get is, in Count 18, that it's being done

 3   to take it from a person or in his presence.

 4          Now, the money was taken not in the presence of

 5   Mr. Seegan because Mr. Seegan was at the mortuary at that

 6   moment.  But he did take it from his person.

 7          And he also took it in the bank theft from the

 8   custody of the bank.  And that's all that's required in the

 9   bank theft.

10          And what did he need to get out of the way before

11   he took it from the bank?  He had to get Mr. Seegan out of

12   the way.  And that's why it's a bank theft causing death.

13   If you look at the elements, listen to the Judge, it's not

14   difficult.  Defense wants to trip you up.  It is not

15   anything worth being tripped up over.  It's easy.

16          Was Mr. Seegan's business affecting interstate

17   commerce?  It's really not a question.  It says in the

18   instructions that you'll get "however slight."  You heard

19   that he had a rental property.  He used interstate

20   businesses to service that property.  You saw the thousands

21   of dollars that went to those businesses and -- you know,

22   Home Depot, Lowe's Google Nest and on and on.  They are

23   companies engaged in interstate commerce, however slight;

24   and it did affect interstate commerce of Mr. Seegan's

25   business.

 1            And, finally, he wanted to talk to you about why

 2   did he resign the trusteeship so quickly if he -- if he had

 3   something -- if he was really intending to get this money?

 4   And what Mr. Whalen posited you in that regard was that,

 5   no, look, he resigned it so, therefore, he must not have

 6   been guilty of this thing at all.

 7            But, ladies and gentlemen, on the day of

 8   Mr. Seegan's death, Dida wasn't having it.  She knew that

 9   wasn't a suicide.

10            The fire department wasn't having it.

11            The police department, contrary to their normal

12   practice, called out two investigators and their crime

13   scene tech.  And the crime scene tech said something very

14   interesting happened, very unusual, never happened before.

15   Mr. Ashley called them on the phone as they were leaving

16   the scene.

17            MR. WHALEN:  Your Honor, that misstates the

18   evidence.

19            THE COURT:  Overruled.  It's up to the jury to

20   determine what the evidence is.

21            MR. COMBS:  They were in the car -- Parker Powell

22   was in the car driving away, and Mr. Ashley called them on

23   the phone.  They had it on speakerphone.  And he started

24   rattling off all of the stuff that they had just read in

25   the suicide note.

1            He knew the police were looking at him, and he
2     knew the police was looking at him that night.  That's why
3     he called them.  That's why he was getting his alibi in
4     place.  That's why he was getting his alibi in place as
5     soon as he left the home at 10:24.  He's 3 minutes down the
6     street and he starts texting, saying "Hey, Bud, everything
7     is gonna be okay.  It's gonna be all right."  That's why he
8     does it.
9            Then he starts calling and he starts sending more
10    texts.  But after he calls and he texts, he panics, right?
11    He calls and then 3 minutes later he's back at the house.
12    Why is he back at the house?  Because he realized he forgot
13    something.  We'll talk about that in a minute.
14            Ladies and gentlemen, he knew he was being looked
15    at.  He knew he was being looked at that very night.
16    That's why he resigned the trusteeship.  He knew the family
17    was not having it.  His only chance to really get money --
18    he had to try and make what he could of the insurance
19    debacle that was unfolding before him; but he needed money
20    and his first, maybe last, best chance to get that money
21    was to get that $20,000.  And he did.  He did.
22            He shot a man in the head and then went to the
23    man's house 36 hours later and asked that man's boy to put
24    in his fingerprint in the phone.  Unbelievable.
25            What are the better questions?  Defense asked you

1   a lot of questions.  What are the better questions?

2           Where is the money, all his investment money?

3           Who brought the gun?

4           How did etomidate get in James Seegan's blood, and

5   where is the blood?

6           Well, Leonid Shteyngart's money, you know where

7   that is.  That went to James Seegan.  It went to retail

8   restaurants.  It went to cash.

9           Robert Greening's money went to pay off other

10  investors, went to gambling.  It went to cash.  It went to

11  pay off Mr. Ashley's personal mortgage.

12          Denny Willmon's money, the same, to pay off other

13  investors and credit cards and his personal mortgage.  None

14  of it's ever invested.

15          James Seegan's money, the worst of all, because

16  James Seegan isn't in here to come in and tell you that

17  "That was fraud being perpetrated on me.  That wasn't a

18  gift, $150,000 gift."

19          And to say that there is no evidence that he

20  didn't give him a gift when the man can't speak for himself

21  for one very clear reason -- and what happened to James

22  Seegan's money?  It was all spent.  Most of it was spent on

23  the casinos, cash, living the high life, and personal

24  mortgage.

25          And let's talk about Mr. Seegan's money.  He

 1   clearly did very well.  He worked hard.  But he lived in a

 2   normal neighborhood, a normal neighborhood, just a small

 3   front yard, small backyard, house right next to the other

 4   house, just a normal house, a normal guy raising his son in

 5   a normal neighborhood.

 6        Where is Mr. Seegan's money?  Mr. Seegan's money

 7   is right there in front of you, in Keith Ashley's house.

 8   That's where Mr. Seegan's money is, in that estate.  If you

 9   look closely at the pool, you're going to see the palm

10   trees behind it, four palm trees.  You've got the large

11   house, got the pool house behind it, got the car with the

12   trailer out front.  Oh, yeah, Mr. Ashley's living well on

13   Mr. Seegan's money.  He's living very well on it.  That's

14   where his money is.

15        Who brought the gun?  Mr. Seegan had -- rather,

16   Mr. Seegan had no gun, none at all.

17        He did.  That gun got to that house on this day,

18   February 19th, somehow.  And there's only one person who

19   came to that house, only one person who came to that house

20   that day; and that's him.  That's how that gun got to that

21   house.

22        You know that you, sadly, heard the shot that

23   killed James Seegan at 10:15 a.m. on that Nest camera.  And

24   we went through minute by minute how Mr. Ashley left his

25   house, traveled to his brewery, stayed at the brewery for a

 1  little while.  Minute by minute by minute we walked through

 2  every tower he was hitting all the way down to James

 3  Seegan's house, and there were no stops in between.  That

 4  gun started in the Eastern District.  Begun, completed, or

 5  continued, that's the venue.  Begun, completed or

 6  continued.  He carried that firearm in the Eastern District

 7  of Texas on his way to go murder James Seegan.  That's the

 8  crime, right?  That's the crime.

 9        So who brought the gun?  Mr. Ashley brought that

10  gun.  Of that, there is absolutely no doubt.

11        How did etomidate get in James Seegan's blood?

12  How?  Well, it's a question that's easily answered.  You

13  heard some evidence -- or argument, rather, from the

14  defense that, well, you know, it was a hospital.  They were

15  lax and, you know, who knows, you know, what happened with

16  the etomidate.

17        One person saw Mr. Seegan that day.  One person,

18  and that's him.

19        Paramedics, fire department, they didn't even try

20  and revive Mr. Seegan, for obvious reasons.  There was no

21  etomidate in his blood from them.  There was no etomidate

22  in his blood from medical procedures; he had none.

23        He certainly didn't give it to himself.  You heard

24  Dr. Hail testify that that's just not medically possible.

25  You wouldn't be able to shoot yourself with etomidate,

 1  dispose of that blood vial -- or that vial of etomidate,

 2  dispose of the syringe, and clean up the area and then

 3  shoot yourself.  You just wouldn't be able to do it.  And

 4  even if you could, how would he get it?

 5          No.  One person had access to it and one person

 6  did it, and that's Keith Ashley.

 7          Ladies and gentlemen, while I'm thinking about it,

 8  I forgot to hit an important point; and before I go on, I

 9  want to make sure I hit it with you.

10          Take a close look at -- I want to point out two

11  things that were confusing in the argument you just heard,

12  and I just want you to make sure you take a close look at

13  them.  First of all, it's as to Count 14.  There is an

14  insinuation that Count 14 -- and that is the transfer of

15  the $20,000 after -- out of Mr. Seegan's bank account after

16  his death, okay?  It's all wrapped up in the murder.  It's

17  that transfer of the $20,000.

18          There was talk from the defense that that -- you

19  have to acquit on that because it has no relation to

20  Midland, okay?  That's true.  It has no relation to

21  Midland.  It's Texas Capital Bank.  That's the bank account

22  that we're dealing with here.

23          And you're going to have the Indictment.  If you

24  read the Indictment, it's very clear.  We're dealing with

25  the Texas Capital Bank; we're not dealing with Midland

 1   life.  So I'm not sure where that came from, but I wanted

 2   to make sure we cleared that up before we went any further

 3   and were talking about the murder.

 4           But the other thing, as long as we're talking

 5   about that, there was this idea that in regard to that, the

 6   $20,000, the transfer of the $20,000 out of Mr. Seegan's

 7   account, that it had to be, Mr. Whalen suggested, at the

 8   same time or contemporaneous with the killing.  And that's

 9   not the case.  That's not the instruction you're going to

10   get.  That's not the verdict.

11           Here's what the verdict is going to say.  It says,

12   with respect to Count 19, did the defendant, in committing

13   the violation, kill any person?  It's got some other

14   language in there, but the first part is "in committing the

15   violation."  It doesn't say "at the same time as committing

16   the violation"; it says "in committing the violation."

17           Well, I would tell you that the evidence shows

18   that the murder of Mr. Seegan, right here, was done for

19   this purpose.  That's why he did it.  In committing this

20   violation, he did kill somebody, because he couldn't just

21   walk into Mr. Seegan's house on February 21st if Mr. Seegan

22   is alive and say, "Hey, is your son available?  I'd like

23   him to open up your phone so I can transfer money out of

24   your bank account.  You cool with that?"

25           Does anybody here believe that would have

  1    happened?  No, that wouldn't have happened.  Of course not.

  2    The only way this happens is if this happens.

  3           So in committing this offense, the murder is

  4    committed.  That's how it happened, using the etomidate,

  5    using the gun.  So don't get confused with that language.

  6    It's actually not all that confusing, but I wanted to make

  7    sure that we addressed it.

  8           But the last issue I want to address with you is

  9    where is the blood?  This is the issue -- this is what --

 10    the etomidate, you can't get around.  But this absolutely

 11    cannot be explained in any way because there is no vial of

 12    blood found at Mr. Seegan's home.  There's no vial of blood

 13    found at the defendant's home.  None.

 14           The insurance company said they didn't even need a

 15    vial of blood, so why does Mr. Seegan have an appointment

 16    saying "9:00 a.m. Keith blood"?

 17           And why, at 9:00 a.m., does Mr. Seegan not

 18    arrive -- I mean Mr. Ashley not arrive at Mr. Seegan's

 19    "Keith blood" appointment?  Well, you heard why.  Because

 20    when Dida testified -- it moved quickly and it was early in

 21    the trial and it may not have been all that significant to

 22    you at the time, but it is very significant.  She said she

 23    was running late.  She didn't get out of the house at 9:00

 24    like she normally did.

 25           Mr. Ashley was waiting because he couldn't very

 1  well go in the home while Dida was there.  He's waiting.

 2  She leaves about 9:05, and he comes about 9:31.

 3       So he arrives at the house.  There's no need for

 4  any blood.  There's no blood vial ever found.  So where is

 5  the blood?  Well, I would tell you that Mr. Ashley got the

 6  blood he was coming for.  That is the blood that Mr. Ashley

 7  was coming for, right there.  There is the blood.

 8       I'll tell you where else the blood is.  You can

 9  put on all the rubber gloves in the world.  You can put on

10  all the gowns in the world and face masks and head

11  coverings and booties in the world, and he is never going

12  to get the blood off his hands.  The blood is on his hands.

13  It doesn't matter how many pairs of rubber gloves he

14  carried in that backpack to cover his tracks.  He can wash

15  his hands from now until eternity, but that blood remains

16  there.  That's where the blood is as we sit here today.

17       And you know what?  On his subconscious level he

18  knew it, because when he panicked a few minutes later and

19  came back to the house to try and cover his tracks, he knew

20  darn well that there was blood on his hands.  Watch those

21  hands.

22       (Visual presentation to the jury.)

23       He's calm, cool, and collected the first time he

24  comes in; and look at those hands when he comes a second

25  time.  He can't control the shaking.  Why?  Because he

1   knows what he just did.  He took an innocent human being's

2   life for his greed.

3          James Seegan's hands.  It's a picture that was in

4   evidence.  That's Mr. Seegan's hand.  His hands are never

5   going to hug his son.  They're not going to hand his son a

6   Christmas present this Christmas or any other Christmas.

7   They're not going to answer the phone when his son calls,

8   not gonna hold his grandchild; and they're not going to

9   hold his son's hand.

10         And do you know what the most disgusting fact of

11  it all is?  When he posed that firearm, this firearm, when

12  he put that in James Seegan's hand, he was the last person

13  to ever hold James Seegan's hand in this world.

14         And the next thing he did was go to James Seegan's

15  son and ask him to open your dad's phone.  That's what he

16  did.

17         Ladies and gentlemen, justice is in your hands

18  now.  Justice demands a verdict of guilty on all of the

19  counts charged.

20         THE COURT:  Thank you, Mr. Combs.

21         Well, ladies and gentlemen, at this point -- it

22  will probably take me 45 minutes to an hour to read the

23  charge.  So what we're going to do is we're going to stop

24  for the day and then when we come back in the morning at

25  9:00, I will go ahead and read my instructions and then it

 1   will be in your hands.

 2          So even though you've heard all the argument of

 3   both sides, you still can't talk about the case among

 4   yourself or anyone else.  You can't have any deliberations

 5   until I give you my final instructions in the morning, and

 6   then it will be in your hands.

 7          And, again, please don't look at any newspaper

 8   coverage or news media coverage.  Don't get on social

 9   media.  Don't look at anything about the case and just

10   follow all my other instructions.

11          So we'll start back tomorrow morning at 9:00.

12   Please have a safe drive home, and we'll see you back

13   tomorrow morning at 9:00.  Thank you.

14          (The jury exits the courtroom, 4:29 p.m.)

15          THE COURT:  Anything further from the government?

16          MS. RATTAN:  Your Honor, we would move to replace

17   the physical exhibits with photos.

18          THE COURT:  Well, I guess you want to make that

19   motion after the verdict?

20          MS. RATTAN:  Yes, your Honor.

21          THE COURT:  Okay.

22          MS. RATTAN:  Okay.

23          THE COURT:  Well, you don't want to do that now, I

24   mean -- so -- for the jury deliberations, I assume.

25          Okay.  Anything further from defense?

1          MR. WHALEN:  No, your Honor.

2          THE COURT:  Just remember to do that after the

3  verdict so --

4          MS. RATTAN:  Yes, your Honor.

5          THE COURT:  And then I would just ask counsel --

6  we're going to wait and print the jury charge for the jury

7  at 8:00 in the morning.  If you want to look at it again

8  tonight to see if there is any -- to make sure we made

9  all -- effectuated every change.  You didn't have a lot of

10  time to make sure that we made every change that we

11  discussed, if you want to look at that.  You may not want

12  to look at it.  That's fine.  But if you do, just email my

13  lawyer if you see anything and again -- because we are

14  going to print it at 8:00 in the morning.

15          Okay.  If nothing further, I'll see y'all tomorrow

16  at 9:00.  Thank you.

17          (Proceedings adjourned, 4:31 p.m.)

18  COURT REPORTER'S CERTIFICATION

19          I HEREBY CERTIFY THAT ON THIS DATE, OCTOBER 31,

20  2022, THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD

21  OF PROCEEDINGS.

22

23                    ___/s/_____
                      CHRISTINA L. BICKHAM, CRR, RDR
24

25