

3/14/2019: Check from Denny Willmon
Activity shown from 3/14/2019 to 4/02/2019

Denny Willmon

$20,000   $562

Keith or Brandi
Ashley, BoA #4804

$7,075

KBKK LLC, BB&T #8725
3/13/2019 Account Balance: $238.25

$6,000

KBKK LLC, CBTX #4943

$3,728

Business Expenses

$2,072

Casinos

$1,500   $1,000

$2,043

James Seegan

$1,664

Leonid Shteyngart

$181   $2,271

Personal Mortgage

Personal Medical
Expenses

$4,575

Credit Cards

**047001**







75k right?

11:14 AM

Yes.  11:14 AM

Keith: KBKK's address autopopulated as your home address. Is this correct?

11:32 AM

?  11:35 AM

It is attached to parkland so yes and no

11:46 AM

I am a registered rep everything I do is attached to Parkland so yes it will

11:48 AM

Everything I do has to be approved by parkland securities  11:50 AM

I just wanted to make sure that wasnt a mistake

11:52 AM

So after this UIT is purchased will I get a statement or shares





3:25

5G E ⚬ 46% ▮

< +19726586113 📞 🔍 ⋮

Ok  no prob. Also that other 75k will it have a separate account so I can track it or is it going to be dumped into an existing account

12:00 PM

It will be in Parkland as well so you will be able to track it as well

12:01 PM

Awesome thanks Keith

12:02 PM

You should receive parkland statement in the next few weeks via email.

12:02 PM

How much do you want from Williams 529 account?

4:16 PM

Not sure yet

5:02 PM

Ok. Also have Paperwork I need your original signature on I should have got the other day you in office tomorrow . It is updated Client data sheet and UIT disclosures.

5:05 F

**048005**





BB&T Wire Transfer Operations


7200  8710532
KBKK LLC
PO BOX 967
ALLEN
TX  75013-0016



We have completed this wire transfer request.  Your BB&T account
has been credited for the net amount shown below.


**********************************************************************
TRN DATE                   20200206        TRN NUM    00007466
AMOUNT                     75,000.00       ACCOUNT # DDA -        ▮8725
REFERENCE #
DATE                       02/06/2020
TIME                       13:41:30
BENEFICIARY                KBKK LLC
ORIGINATOR TO BENE INFO    INVESTMENT
                           ROBERT L GREENING
                           ACCT # K 69413-36
ORIGINATOR                 ROBERT LEE GREENING
ORIGINATING BANK NAME      NORTH DALLAS BANK & TRUST CO
ORIGINATING BANK #         111000960
ORIGINATING BANK INFORMATION


**********************************************************************

    Thank you for banking with BB&T. Please contact your local BB&T
    financial center or call 1-800-BANK BBT (1-800-226-5228) for
    questions regarding this wire transfer.








BB&T, Member FDIC.

3178

```
00001:01                    EXHIBIT 051

      02 FILE NAME:      Zoom_0.MP4

      03 DURATION:       00:15:57

      04 PARTICIPANTS:   Robert Greening (GREENING)

      05                 Keith Todd Ashley (ASHLEY)

      06

      07 GREENING:       Hello.

      08 ASHLEY:         Hello.

      09 Greening:       Keith?

      10 ASHLEY:         Yeah, hello?

      11 GREENING:       Hey, I can't see you.

      12 ASHLEY:         Hold on. Tryin' a figure this out.

      13 GREENING:       There you are.

      14 ASHLEY:         Hey.

      15 GREENING:       [Laughs] What's up.

      16 ASHLEY:         Oh, man. Hey, uh, let me give you your

      17                 Parkland account number.

      18 GREENING:       Okay. I'm trying to do- get everything

      19                 online. That's why-

      20 ASHLEY:         Oh, that's fine. K4R09423.

      21 GREENING:       Okay. K4R09423. Okay.

      22 ASHLEY:         Yeah.

      23 GREENING:       Um, I think I have everything else online,

      24                 but...

      25 ASHLEY:         so... But, uh... Um... What was I gonna say?
```

```
00002:01                    Uh... Yeah, I don't know. I mean, it's just

     02                     been a whirlwind, so. Ugh.

     03 GREENING:           Um... All right, well. I wanted you to send

     04                     me some stuff. But I wanna ask you about

     05                     this- uh- well, how's that thing going?

     06                     How's my investment going? [Laughs] Hey, the

     07                     other day I was

     08                     at uh, the farmers market, down at our

     09                     old church. They have a farmers market on

     10                     Sun- uh, Saturdays.

     11                     And, uh, I- I saw the, uh, hand

     12                     sanitizer.

     13 ASHLEY:             Oh, did you?

     14 GREENING:           I was like-

     15 ASHLEY:             Yeah- Yeah. I mean, it's- it's- I mean, it's

     16                     doin' good. Everything's doing fine. Uh, you

     17                     know, we're just, uh, they're busy, you

     18                     know? [Laughs]

     19 GREENING:           [U/I]-

     20 ASHLEY:             Everything's going good, uh...

     21 GREENING:           Did y'all get Kroger, like you wanted?

     22 ASHLEY:             [U/I]. Huh?

     23 GREENING:           Did y'all get Kroger like you were hoping?

     24 ASHLEY:             Yeah, I mean, Kroger's still going, uh,

     25                     Houston, uh, Kroger hasn't ordered yet. Uh,
```

```
00003:01                we

      02                have a meeting next week to finalize all-

      03                you know what I mean? Like- Like to find out

      04                what they're

      05                gonna start taking now that they're doin'

      06                gel now. So, that's good.

      07 GREENING:      Yeah. That stuff that they had at the

      08                farmers market was not gel, it was... [U/I].

      09 ASHLEY:        Right. Yeah, yeah. Um, other than that, I

      10                mean, that's... I mean...

      11 GREENING:      What about-

      12 ASHLEY:        Going good.

      13 GREENING:      -school districts?

      14 ASHLEY:        Uh. We're dro- uh, we're- we're pickin' them

      15                up one at a time- you know what I

      16                mean? So, that's-

      17 GREENING:      Yeah.

      18 ASHLEY:        -that's... They're droppin' off a fairly

      19                large order to uh, Belton ISD today, I

      20                think, or

      21                something like that. And then they

      22                dropped off some stuff to DeSoto, they

      23                dropped off stuff to, uh- uh,

      24                Northwestern ISD, or something like that.

      25                I mean, yeah. So, I mean, things are
```

```
00004:01              startin' to, you know, go.

     02 GREENING:     Good. Okay. Um, so, I wanted to ask you one

     03               quick question about this. So, that UIT

     04               stuff, we- I never got like a- any shares

     05               or anything like that, but I think what I

     06               understood was I could

     07               track it through that Parkland account.

     08               But then I could-

     09 ASHLEY:       No. No, no. It's not linked to Parkland. You

     10               invested in an alternative investment with

     11               uh- and so, you get a share each month of

     12               the interest that is, you know, that is-that

     13               is, spit out. So-

     14 GREENING:     Don't I get a share, or something? I mean,

     15               is there a way to track it? Is it- Was it a

     16               three-year deal? And I, uh- It seems like

     17               there'd be some-

     18 ASHLEY:       24 months.

     19 GREENING:     24 months?

     20 ASHLEY:       Yeah. So, I'll get- um... I can, uh- um-

     21               because it's through, it's through my LLC

     22               with

     23               other investors, so, I can get you what

     24               you want. And I mean, you just tell me

     25               what-
```

```
00005:01 GREENING:      Okay.

     02 ASHLEY:         -you want and...

     03 GREENING:       Okay. I mean, but I don't-

     04 ASHLEY:         -I'll get it.

     05 GREENING:       So, I don't get a statement, or anything. I

     06                 mean, I see the money coming into my bank,

     07                 but I don't get-

     08 ASHLEY:         Yeah. Once a year, you go- I'll- I'll

     09                 generate a statement there-

     10 GREENING:       Okay.

     11 ASHLEY:         -there for everybody.

     12 GREENING:       Okay. Okay. Um...

     13 ASHLEY:         And then your Parkland account we never

     14                 funded. It's got a zero balance. It's still

     15                 sitting

     16                 in there, zero balance.

     17 GREENING:       I thought we did- That's one thing I was

     18                 confused about when I started looking at this

     19                 stuff to get ready for this, because I

     20                 thought what we did was, we put- I took 150

     21                 out of that Home

     22                 Bank-

     23 ASHLEY:         You never took 150. You only took 75, and it

     24                 was out of uh- um... your, uh, Bank in

     25                 Dallas, I think.
```

```
00006:01 GREENING:       Home Bank-

      02 ASHLEY:         And then, you wanted, the monthly deposits,

      03                 but you never deposited. Zero dollars into

      04                 Parkland.

      05 GREENING:       Okay, okay. That was what's confusing me.

      06 ASHLEY:         Zero.

      07 GREENING:       Because I wrote down that we did.

      08 ASHLEY:         Never. Never. We were going to, and you

      09                 never did.

      10 GREENING:       Okay. Okay. Okay, then-

      11 ASHLEY:         So, Parkland has a zero balance that you can

      12                 transfer stuff into, if you wanted to, but

      13                 it's

      14                 got a zero balance.

      15 GREENING:       Because tha- 'Cause that's what we were

      16                 gonna do. We were gonna put money in

      17                 there, and then that way you could then

      18                 put it in funds, or whatever.

      19 ASHLEY:         Whatever we agreed on, but we haven't- we've

      20                 never funded that account. It's got

      21                 zero-

      22 GREENING:       Okay.

      23 ASHLEY:         -dollars.

      24 GREENING:       So, that's what I need to do if I wanna-

      25                 with all this- with, like, money I just
```

```
00007:01              bonused

     02              myself and stuff like that, I could-

     03 ASHLEY:      Mm-hm.

     04 GREENING:    -put it in that, and then it'd go from

     05              there. Okay. I was just trying to remember

     06              what

     07              we decided to do. Okay.

     08 ASHLEY:      Yeah.

     09 GREENING:    That makes sense. Okay. Well, so, that's

     10              what I'll do then. And then-

     11 ASHLEY:      But, once- once you do that, then we'll

     12              figure out what you want to do with it.

     13              There's

     14              a lot of different things to do, but your

     15              risk tolerance and that kind of stuff, so, I

     16              mean, there's like, it

     17              kinda scales back a lot of stuff but, I

     18              mean, there's- there's some stuff. You can

     19              do laddered CDs, you

     20              could- I mean, there's a bunch of other

     21              stuff that- that's able to be done.

     22 GREENING:    Okay. And then I-

     23 ASHLEY:      That's not-

     24 GREENING:    Okay. Well, you know me- I- I got the- my

     25              phone's ringing. Somebody's phone's
```

| | | |
|---|---|---|
| 00008:01 | | ringing. I got all these plumbers here. |
| 02 | | Um, the uh, our kitchen has been completely |
| 03 | | messed up since the |
| 04 | | pandemic started and they're just now |
| 05 | | getting it all fixed. 'Cause we had a water |
| 06 | | leak. It's been a |
| 07 | | nightmare. |
| 08 | ASHLEY: | In your house? |
| 09 | GREENING: | Yeah. Um, and, uh, William got coronavirus. |
| 10 | ASHLEY: | Uh-uh. Bullshit. |
| 11 | GREENING: | No, I thought I told you, I thought I t- No, |
| 12 | | I guess I didn't. |
| 13 | ASHLEY: | No. |
| 14 | GREENING: | Um, he got it and he... he's over it. I |
| 15 | | mean, he got it, he left school, he went to |
| 16 | | the lake |
| 17 | | house, he recovered, and now he's back. |
| 18 | ASHLEY: | [U/I]- |
| 19 | GREENING: | He got it within two weeks of being there. |
| 20 | ASHLEY: | My son gets tested twice a week. |
| 21 | GREENING: | Well, my son is not on the football team, |
| 22 | | so... [Laughs] Did he get to play? I didn't |
| 23 | | see |
| 24 | | that he did- |
| 25 | ASHLEY: | Uh, no. He did not get to play at all. And |

| | | |
|---|---|---|
| 00009:01 | | he hurt his knee the other day. |
| 02 | GREENING: | Oh no. |
| 03 | ASHLEY: | But- |
| 04 | GREENING: | I was watching the game, and I didn't think |
| 05 | | I saw him. I doubted that he would get to- |
| 06 | ASHLEY: | No. |
| 07 | GREENING: | -excuse me, play. |
| 08 | ASHLEY: | He probably won't play 'til later on in the |
| 09 | | year, if that. |
| 10 | GREENING: | Yeah. |
| 11 | ASHLEY: | If he's lucky. |
| 12 | GREENING: | Um... Okay. |
| 13 | ASHLEY: | What, um- repeat that [U/I]- |
| 14 | GREENING: | All right. I just wanted to- You know me, I |
| 15 | | never can remember exactly what we did, |
| 16 | | and so, I'm just tryin' a- |
| 17 | ASHLEY: | Parkland Securities is K4- you've got the, |
| 18 | | right? K4R009423, correct? |
| 19 | GREENING: | Oh, it's two zeros. |
| 20 | ASHLEY: | Yes. |
| 21 | GREENING: | Okay. Okay. Um... Oh, I've got one other |
| 22 | | question, 'cause I was looking at these |
| 23 | | accounts. You know that Prudential |
| 24 | | account? We moved from American Funds 'cause |
| 25 | | we were tryin' a |

```
00010:01              get out of the market. We moved 50 into

     02               one of the accounts, which is I think a life

     03               insurance-

     04 ASHLEY:       No. It is- it- Prudential is not life

     05               insurance. Prudential is your variable

     06               annuities.

     07 GREENING:     Okay. We moved 50 into one of them and 50

     08               into the other.

     09 ASHLEY:       Correct.

     10 GREENING:     And, as of, like, January, one of 'em was

     11               339,000 some-odd dollars. After we moved the

     12               50 in, you would expect it to have gone

     13               up, but it- the current balance is

     14               341,329.50-

     15 ASHLEY:       No. Are you looking at your guaranteed value

     16               or the contract value? There's two

     17               different values.

     18 GREENING:     I don't know. But the other one has gone up,

     19               from 165 to 205, which- which- which-

     20               and I'm looking at this-

     21 ASHLEY:       I think we only put fif- I'll look, again. I

     22               don't, uh-

     23 GREENING:     Well, like, okay.

     24 ASHLEY:       It should show on your statement a deposit

     25               of 50,000 thousand in both.
```

```
00011:01 GREENING:      It does. It says, um... They don't call it a

      02                deposit. They call it a... something else.

      03                But the

      04                point is, when I'm looking at this, to

      05                know what the value is, do I look at the

      06                total investment value, or

      07                do I look at the estimated protected

      08                withdrawal value?

      09 ASHLEY:         Your estimated protected withdrawal value is

      10                your value.

      11 GREENING:       Okay. Because-

      12 ASHLEY:         Which is... how much is that?

      13 GREENING:       Well, in March, on one of them, it was 217,

      14                but now it's 205.

      15 ASHLEY:         It- it- it can't be. You're looking at-

      16 GREENING:       No, no, no. I'm sorry, I'm sorry. I'm

      17                looking at the wrong stuff.

      18 ASHLEY:         Yeah.

      19 GREENING:       Um... Oh, I see. They give you- they say

      20                highest daily level income.

      21 ASHLEY:         That's what it is. Yes, yeah.

      22 GREENING:       But, like, when I was trying to figure this

      23                out to get ready for our call, I looked

      24                online,

      25                and for this one, it's 341,329.50, and at
```

```
00012:01              the end of May- or, at the beginning of May
      02              when I got this, it
      03              was 396. Now it's [U/I]-
      04 ASHLEY:      But... [U/I]- Your highest daily can never
      05              go down.
      06 GREENING:    Well, then maybe there- when you call in,
      07              they give you your investment value and not
      08              your-
      09 ASHLEY:      That's what they give you. They give you
      10              your investment value, as in, you're gonna,
      11              like, walk away, take it, see you later,
      12              mail me a check. That's what you would get
      13              if you close it out.
      14 GREENING:    Okay.
      15 ASHLEY:      But if you keep it in there-
      16 GREENING:    This is the real- This one is the real
      17              money. If I call [U/I]-
      18 ASHLEY:      I can't see it. Yeah.
      19 GREENING:    This- this protected withdrawal value is
      20              what [U/I]-
      21 ASHLEY:      Is when you retire, and you want to start
      22              taking income, they're gonna take it from
      23              that
      24              highest number.
      25 GREENING:    Got it. Got it. Got it, got it, got it.
```

```
00013:01 ASHLEY:        So, those numbers- your values are not going

      02                down.

      03 GREENING:       No. I'm not- okay. I'm not coming at- I'm

      04                not comin' after you, I'm just asking if-

      05 ASHLEY:         Oh no, no.

      06 GREENING:       -[U/I] understand.

      07 ASHLEY:         No, no, no, yeah. I understand.

      08 GREENING:       Okay. Um... Okay, so I need to go back and

      09                look at that one, 'cause it- I'm- I must

      10                have-

      11 ASHLEY:         Yeah.

      12 GREENING:       I must have transposed numbers or something.

      13                Okay. That makes sense.

      14 ASHLEY:         Okay.

      15 GREENING:       Okay. All right, well, so, if I wanna invest

      16                more stuff, I need to throw it into that

      17                account

      18                number that-

      19 ASHLEY:         Parkland account, and then once it's in

      20                there, we will- I'll get Parkland, and we'll

      21                kinda

      22                do, uh, an analysis and say hey, you

      23                know, can he put some in laddered CDs, can

      24                he do this, can he do

      25                that? We wanna average of, you know,
```

```
00014:01            let's just say 5 percent returns, 6 percent-
      02            you know what I
      03            mean?
      04 GREENING:  Yeah.
      05 ASHLEY:    Something that's not really aggressive but
      06            just kinda-
      07 GREENING:  And- and that UIT thing, what is the return-
      08            rate of return on that?
      09 ASHLEY:    It's not- We didn't do like, a UIT, because
      10            that's through Parkland- you did an
      11            alternative investment, which is, I think
      12            that rate of return right now is- I think
      13            it's like 4 percent or
      14            something like that?
      15 GREENING:  I thought I did a unit investment uh, trust.
      16 ASHLEY:    Trust? We were gonna do that in Parkland,
      17            but you never funded Parkland.
      18 GREENING:  No, the 75 thousand- I thought that's what
      19            that was for. The unit investment trust.
      20 ASHLEY:    Yeah, well, okay. An alternative investment
      21            can be classified as a UIT, a limited
      22            partnership, a uh- uh- uh- uh- uh- um,
      23            like an ICON or an [U/I]. There's a lot of
      24            different stuff, but
      25            yes. [Laughs]
```

```
00015:01  GREENING:    And so, that's payin' like, what? 'Cause I

      02               don't-

      03  ASHLEY:      I think it's almost 4 percent.

      04  GREENING:    I think it's- Okay.

      05  ASHLEY:      Or...

      06  GREENING:    So, is there a way I can get something? I

      07               mean, I just don't have anything. I don't

      08               have

      09               anything.

      10  ASHLEY:      Yeah, yeah, yeah.

      11  GREENING:    [U/I]-

      12  ASHLEY:      I'll- I'll- I'll... Yes. I will get you

      13               something.

      14  GREENING:    Okay. All right. And then, I'll... look-

      15               I'll get online for this account and figure

      16               out what I

      17               wanna do on this Parkland thing.

      18  ASHLEY:      M'kay.

      19  GREENING:    All right. And K- let me know what I can do

      20               to help you with anything.

      21  GREENING:    Did you go to the game down in, uh...

      22  ASHLEY:      No. No, no, no, no, no. Where? That uh,

      23               um... [U/I]-

      24  GREENING:    Texas [U/I].

      25  ASHLEY:      No, uh-uh.
```

```
00016:01 GREENING:        Some people are sayin' North Texas-

      02 ASHLEY:          If my son's not gonna go or travel, I'm not

      03                  gonna, you know-

      04 GREENING:        Oh, he doesn't- Oh, he doesn't even travel.

      05 ASHLEY:          Well, he didn't travel on this first game,

      06                  because Covid. They're not travelling.

      07                  They've

      08                  cut down how many kids they can travel

      09                  because of the busses and because of the

      10                  hotels. They can't

      11                  have so many on the bus- you know what I

      12                  mean? It's just, it's-

      13 GREENING:        Okay. Okay.

      14 ASHLEY:          -just one big thing, yeah.

      15 GREENING:        So, they play- I think they play UNT this

      16                  weekend.

      17 ASHLEY:          Correct.

      18 GREENING:        But is he gonna-

      19 ASHLEY:          But he hurt his knee, so he got like dry

      20                  needling the other day. They were stucking

      21                  needles in his knee and, ultrasound, and

      22                  doing a whole bunch of stuff. He's startin'

      23                  to feel a lot better

      24                  but I mean, I don't know what's going

      25                  on.
```

```
00017:01 GREENING:        So, he won't go to Denton, I guess.

      02 ASHLEY:          No, uh-uh.

      03 GREENING:        Yeah. Okay. All right. I'll let you go.

      04 ASHLEY:          All right. [Laughs]

      05 GREENING:        Talk to you later.

      06 ASHLEY:          All right, man. [U/I]-

      07 GREENING:        Hey, so, Keith, um... So, how can I get hand

      08                  sanitizer if I want some? Just go up there

      09                  and ask for some? Buy it- Can you buy it

      10                  up there?

      11 ASHLEY:          Where, here? Here at the [U/I]?

      12 GREENING:        Your [U/I] stuff. Yeah.

      13 ASHLEY:          Oh, yeah, I mean. Uh, yeah, they've got a

      14                  little bit here to sell to the public. But,

      15                  uh-

      16 GREENING:        I feel like I should be using it, since

      17                  I've, you know...

      18 ASHLEY:          Yeah. [Laughs] Well, I'll get you some.

      19                  We've got- d- don't worry about it.

      20 GREENING:        [Laughs]

      21 ASHLEY:          I'll take care of it.

      22 GREENING:        All right.

      23 ASHLEY:          I'll send you a case to your house. [Laughs]

      24 GREENING:        All right.

      25 ASHLEY:          All right?
```

```
00018:01 GREENING:        Talk to you later.

      02 ASHLEY:          [U/I]- Okay, bye.

      03 GREENING:        Bye.

      04 .

      05 .

      06 .
```



2/06/2020: Wire from Robert Greening
Activity shown from 2/06/2020 to 2/19/2020

Robert Greening

$75,000

Keith or Brandi Ashley, BoA #4804

$10,200

KBKK LLC, BB&T #8725
2/05/2020 Account Balance: $2,655.69

$2,330

KBLS1996 LLC, ANBT #9251

$10,800

Keith or Brandi Ashley, ANBT #9269

$6,025

Unpaid Gambling Debt

$3,813

$41,996

$34,549

$26,059

$10,800

KBKK LLC, ANBT #9210

$3,685

$10,052

Cash Withdrawn

$2,700

Keith Ashley DBA NTMM, Chase #2589

$12,249

$20,340

$2,337

Personal Mortgage

$4,499

ABB Prestige LLC, HSB #6985

Nine Band Brewery

$2,337

Casinos

$12,249

Credit Cards

$3,899

Loan, 9 Prestige Circle

Page 1 of 1

052A001



BB&T Wire Transfer Operations

```
7200  8710532
KBKK LLC
PO BOX 967
ALLEN
TX  75013-0016
```

We have completed this wire transfer request.  Your BB&T account
has been debited for the net amount shown below.

********************************************************************************

```
TRN DATE                    20200207      TRN NUM   00006045
AMOUNT                      16,496.15     ACCOUNT # DDA - ████████8725
REFERENCE #
DATE                        02/07/2020
TIME                        11:30:21
ORIGINATOR                  KBKK LLC
                            1211 BOERNE CT
                            LUCAS, TX 750027584
BENEFICIARY BANK            JPMORGAN CHASE BANK, NA
BENEFICIARY BANK #          111000614
BENEFICIARY NAME            NTMM-KEITH ASHLEY
BENEFICIARY ACCOUNT         841572589
ORIGINATING BANK INFORMATION
```

********************************************************************************

Thank you for banking with BB&T. Please contact your local BB&T
financial center or call 1-800-BANK BBT (1-800-226-5228) for
questions regarding this wire transfer.

BB&T, Member FDIC.

2470

**052B001**



BB&T Wire Transfer Operations

```
7200  8710532
KBKK LLC
PO BOX 967
ALLEN
TX  75013-0016
```

We have completed this wire transfer request.  Your BB&T account
has been debited for the net amount shown below.

```
****************************************************************
TRN DATE              20200210      TRN NUM   00001857
AMOUNT                12,000.00     ACCOUNT # DDA - ████████8725
REFERENCE #
DATE                  02/10/2020
TIME                  07:45:18
ORIGINATOR            KBKK LLC
                      1211 BOERNE CT
                      LUCAS, TX 750027584
BENEFICIARY BANK      JPMORGAN CHASE BANK, NA
BENEFICIARY BANK #    111000614
BENEFICIARY NAME      NTMM-KEITH ASHLEY
BENEFICIARY ACCOUNT   841572589
ORIGINATING BANK INFORMATION


****************************************************************
```

Thank you for banking with BB&T. Please contact your local BB&T
financial center or call 1-800-BANK BBT (1-800-226-5228) for
questions regarding this wire transfer.

BB&T, Member FDIC.

806

**052C001**



BB&T Wire Transfer Operations

```
7200  8710532
KBKK LLC
PO BOX 967
ALLEN
TX  75013-0016
```

We have completed this wire transfer request.  Your BB&T account
has been debited for the net amount shown below.

```
***********************************************************************
TRN DATE              20200212       TRN NUM   00002185
AMOUNT                13,500.00      ACCOUNT # DDA - ████████8725
REFERENCE #
DATE                  02/12/2020
TIME                  08:50:19
ORIGINATOR            KBKK LLC
                      1211 BOERNE CT
                      LUCAS, TX 750027584
BENEFICIARY BANK      JPMORGAN CHASE BANK, NA
BENEFICIARY BANK #    111000614
BENEFICIARY NAME      NTMM-KEITH ASHLEY
BENEFICIARY ACCOUNT   841572589
ORIGINATING BANK INFORMATION


***********************************************************************
```

Thank you for banking with BB&T. Please contact your local BB&T
financial center or call 1-800-BANK BBT (1-800-226-5228) for
questions regarding this wire transfer.

BB&T, Member FDIC.

833

**052D001**

| | |
|---|---|
| **From:** | J Seegan |
| **To:** | keith@northtexasmoney.com |
| **Bcc:** | grarchive@parklandrep.com |
| **Subject:** | Re: Update |
| **Date:** | Wednesday, April 27, 2016 8:10:49 PM |

Yes. Monday afternoon works. Just about anytime.

---

**From:** "Keith@northtexasmoney.com" <keith@northtexasmoney.com>
**To:** J Seegan <art_vandalay_@yahoo.com>
**Sent:** Wednesday, April 27, 2016 3:19 PM
**Subject:** Re: Update

Ok let me get some info gathered I will call you Monday??

Keith Ashley
Registered Representative
Keith@northtexasmoney.com
Office Phone 972-429-6202
Office Fax 972-442-7141
Cell 972-658-6113

The information contained in this message is intended only for the use of the individual or entity to which it is addressed and may contain information that is legally privileged and/or confidential. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited.  If you have received this communication in error, please notify us immediately by telephone.  Thank you.

On Apr 27, 2016, at 12:06 PM, J Seegan <art_vandalay_@yahoo.com> wrote:

> Next week is starting to look pretty busy, so let's just talk over the phone.
>
> I was just thinking of $150,000 in the 3% grouping for the first contract.
>
> jim

---

**From:** "Keith@northtexasmoney.com" <keith@northtexasmoney.com>
**To:** J Seegan <art_vandalay_@yahoo.com>
**Sent:** Wednesday, April 27, 2016 11:11 AM
**Subject:** Re: Update

Sorry to hear about you guys loss. I remember here you guys speak of him. Let's get together next week. What days are good? Also what is dollar amount you are thinking. I want to way the options on SPIA and other possible strategies???

Puzzle is 3/4 complete .

Keith Ashley
Registered Representative
Keith@northtexasmoney.com
Office Phone 972-429-6202
Office Fax 972-442-7141
Cell 972-658-6113

The information contained in this message is intended only for the use of the individual or entity to which it is addressed and may contain information that is legally privileged and/or confidential. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited.  If you have received this communication in error, please notify us immediately by telephone.  Thank you.

On Apr 26, 2016, at 1:49 AM, J Seegan <art_vandalay_@yahoo.com> wrote:

Keith,

I was wondering what your thoughts were of depositing some more cash in either one of the accounts?  I have a lot of money sitting on the sidelines right now, so 3% might be a good tact at this point in time.

I'm not sure if you were ever around when Bob and I would talk about a heavy guy that worked with him named Ed Dravecky. Weighed a lot.  He died a couple days ago at age 46.

Hate to ask, but did you ever finish the puzzle?

Jim

**053B002**

**From:** "Keith@northtexasmoney.com" <keith@northtexasmoney.com>
**To:** Seegan J <art_vandalay_@yahoo.com>
**Sent:** Thursday, March 17, 2016 3:30 PM
**Subject:** Update

Have you sent firm back yet?

Keith Ashley
Registered Representative
Keith@northtexasmoney.com
Office Phone 972-429-6202
Office Fax 972-442-7141
Cell 972-658-6113

The information contained in this message is intended only for the use of the individual or entity to which it is addressed and may contain information that is legally privileged and/or confidential. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited.  If you have received this communication in error, please notify us immediately by telephone.  Thank you.

**053B003**

From:        SmartTrust <info@smarttrustuit.com>
Sent:        Monday, May 2, 2016 3:48 PM
To:   keith@northtexasmoney.com
Subject:   Trust Form
Attachments:   smarttrust_northtexasmoneymanagement_jimmyseegan_1462222078.pdf


Prepared For:
Client Name:
Jimmy Seegan

Prepared By:
Name:
Keith Ashley
Title:
Wealth Advisor
Firm:
North Texas Money Management
Phone:
(972) 429-6202
Extension:

Email:
keith@northtexasmoney.com

Investment Amount:
$150,000


Selected Trusts:
Trust Name
Price
Tax-Advantaged Growth & Income Trust (Series 10) (SNTAJX)
100%

Total:

100%



**Prepared for:**

# Jimmy Seegan

This report was prepared by:

North Texas Money Management
Keith Ashley
(972) 429-6202
keith@northtexasmoney.com

# Portfolio Proposal

*May 2, 2016*

## About SmartTrust

### Who We Are

SmartTrust is a UIT sponsor focused on diversified income strategies. We are headquartered just out- side NYC, in Parsippany NJ. We deposited our first UIT in 2003 and currently are one of the top 5 sponsors of UITs in the country.

### What We Do

At SmartTrust, our sole focus is on Unit Investment Trusts - not ETFs, not CEFs, not Mutual Funds - only UITs. We aim to deliver alternative income solutions, along with focused growth portfolios. We provide a broad, but focused, suite of products, to help advisors recommend appropriate strategies to their clients more efficiently.

### How We Do It

Led by our Chief Investment Officer; Kevin Mahn, SmartTrust uses a bottoms-up approach to develop our UIT products, based in large part on the input received from the many advisors we work with across the country. In so doing, we look to only bring products to market when the strategy has value in the market and demand from the marketplace. We utilize independent, niche portfolio consultants, with proven track records, and widely known index providers, to complement our own experienced, in- house research team. Finally, we pride ourselves on providing outstanding financial advisor support in all market conditions.

**054003**

**Smart Trust**®

## Portfolio Summary

## Total Investment: $150,000



■ **Tax-Advantaged Growth & Income Trust (Series 10)**

---

## Description

### Tax-Advantaged Growth & Income Trust (Series 10):

The Trust seeks to provide investors with the possibility of a high level of total after-tax return, with an emphasis on income that is exempt from regular federal income tax or that qualifies for federal income taxation at long-term capital gains rates ("tax-advantaged income") while also offering the potential for capital appreciation. There is no guarantee that the investment objective of the Trust will be achieved.

Not FDIC Insured. Not Bank Guaranteed. May Lose Value. The content presented in this Portfolio Report is for informational purposes only and is not a recommendation to purchase or sell any security.

054004

3

**Smart Trust**®

## Holdings Analysis

## Security Allocation



■ Closed-End Funds

■ Common Stock

## Top 10 Holdings (as of 04/29/16)

| Ticker | Security | % of Portfolio |
|--------|----------|----------------|
| HTD | John Hancock Tax-Advantaged Dividend Income Fund | 8% |
| DSM | Dreyfus Strategic Municipal Bond Fund, Inc. | 7.51% |
| IQI | Invesco Quality Municipal Income Trust | 6.5% |
| BTA | BlackRock Long-Term Municipal Advantage Trust | 6.47% |
| MFL | BlackRock MuniHoldings Investment Quality Fund | 6.01% |
| LEO | Dreyfus Strategic Municipals, Inc. | 6% |
| KSM | Deutsche Strategic Municipal Income Trust | 4.5% |
| PMO | Putnam Municipal Opportunities Trust | 4.5% |
| DMF | Dreyfus Municipal Income, Inc. | 3.01% |
| BYM | BlackRock Municipal Income Quality Trust | 2.75% |
| **Top 10 Total** | | **55.25%** |

*Information as of Trust inception dates

### Total Number of Holdings: 37

#### Asset Type Analysis

| | |
|---|---|
| Number of Equity Holdings | 26 |
| Number of Funds | 11 |
| US Equity | 35.80% |
| International Equity | 6.20% |
| Closed-End Fund: | 58.00% |

#### Trust Holdings Overlap Summary

| | |
|---|---|
| Total Number of Holdings | 37 |
| Holdings in more than 1 Trust | 0 |
| Percentage held in more than 1 Trust | 0.00% |
| Assets in Top 10 Holdings | 55.25% |

**054005**

This Report Must Include Attached Fact Cards

**Smart Trust**

## Holdings Details

## Common Stock Details



| Sector Breakdown | |
|---|---|
| Consumer Discretionary | 17.19% |
| Consumer Staples | 14.38% |
| Financials | 25.67% |
| Industrials | 4.79% |
| Information Technology | 7.14% |
| Materials | 16.52% |
| Telecommunication Services | 9.55% |
| Utilities | 4.76% |

*stated as percentages of common stock allocation.

| | Large-Cap | Mid-Cap | Small-Cap | Total |
|---|---|---|---|---|
| Growth | 4.71% | 0.00% | 0.00% | 4.71% |
| Value | 28.57% | 17.21% | 23.31% | 69.09% |
| Core | 13.05% | 6.02% | 7.12% | 26.19% |
| **Total** | **46.33%** | **23.23%** | **30.43%** | **100.00%** |

*stated as percentages of common stock allocation.

## Closed-End Fund Details

| | |
|---|---|
| Tax-Free Income-National | 50.00% |
| US Equity-Equity Tax-Advantaged | 8.00% |
| **Total** | **58%** |

## Exchange-Traded Fund Details

| | |
|---|---|
| **Total** | **0%** |

054006

**Smart Trust**®

## Income Summary

### Total Investment: $150,000

| Trust | Allocation | Term | Offer Price | Units | Estimated Net Annual 1st year Distributions[1] | Estimated Distributions | Estimated Investment |
|-------|-----------|------|-------------|-------|------------------------------------------------|------------------------|----------------------|
| Tax-Advantaged Growth & Income Trust (Series 10) | 100% | 2 yr | $9.9497 | 15,076 | $0.4681 | $7,057.08 | $150,001.68 |

### Historical Annual Dividend Distribution for Portfolio Allocation[2]

$0.4681

### Estimated Net Income Distribution Based on Total Investment Amount

$7,057.08

---

1   Estimated Net Annual First Year Distribution per Unit is computed by dividing the estimated annual income of the underlying securities less the expense per unit by the number of units outstanding. The estimated net annual distributions for subsequent years are expected to be less than estimated distributions for the first year because a portion of the securities included in the Trust portfolio will be sold during the first year to pay for organization costs, the creation and development fee and the deferred sales charge. The actual net annual distributions will vary with changes in the Trust's fees and expenses and income of the underlying securities.

2   Historical Annual Dividend Distribution for Portfolio Allocation is calculated by multiplying the Estimated Net Annual 1st year Distributions by the Allocation for each Trust and summing the results to get a weighted total for the proposed portfolio.

Offer Price: Based on closing value on 04/29/16
Units: Calculated by multiplying the desired total investment amount by the individual Trust allocation then dividing by the Offer Price.
Estimated Distributions: Calculated by multiplying the units by the Estimated Net Annual 1st year distribution.
Estimated Investment: Units multiplied by the Offer Price

**054007**

This Report Must Include Attached Fact Cards

**Smart Trust**

## Holdings

## List All Holdings By Percentage (as of 04/29/16)

| Ticker | Security | % of Portfolio |
|--------|----------|----------------|
| HTD | John Hancock Tax-Advantaged Dividend Income Fund | 8.00% |
| DSM | Dreyfus Strategic Municipal Bond Fund, Inc. | 7.51% |
| IQI | Invesco Quality Municipal Income Trust | 6.50% |
| BTA | BlackRock Long-Term Municipal Advantage Trust | 6.47% |
| MFL | BlackRock MuniHoldings Investment Quality Fund | 6.01% |
| LEO | Dreyfus Strategic Municipals, Inc. | 6.00% |
| KSM | Deutsche Strategic Municipal Income Trust | 4.50% |
| PMO | Putnam Municipal Opportunities Trust | 4.50% |
| DMF | Dreyfus Municipal Income, Inc. | 3.01% |
| BYM | BlackRock Municipal Income Quality Trust | 2.75% |
| EIM | Eaton Vance Municipal Bond Fund | 2.75% |
| CALM | Cal-Maine Foods, Inc. | 2.53% |
| CZNC | Citizens & Northern Corporation | 2.26% |
| GRMN | Garmin Ltd. | 2.24% |
| T | AT&T Inc. | 2.02% |
| ORI | Old Republic International Corporation | 2.01% |
| CSCO | Cisco Systems, Inc. | 2.01% |
| NWBI | Northwest Bancshares, Inc. | 2.01% |
| UVV | Universal Corporation | 2.00% |
| MAT | Mattel, Inc. | 2.00% |
| CHCO | City Holding Company | 2.00% |
| UFS | Domtar Corporation | 1.99% |

**054008**

Smart Trust®

## Holdings

### List All Holdings By Percentage (as of 04/29/16)

| Ticker | Security | % of Portfolio |
|--------|----------|----------------|
| VZ | Verizon Communications Inc. | 1.99% |
| AMCRY | Amcor Ltd. | 1.98% |
| DOW | The Dow Chemical Company | 1.98% |
| CTBI | Community Trust Bancorp, Inc. | 1.51% |
| MO | Altria Group, Inc. | 1.51% |
| WEC | WEC Energy Group, Inc. | 1.02% |
| SUP | Superior Industries International, Inc. | 1.01% |
| EMR | Emerson Electric Co. | 1.01% |
| EBF | Ennis, Inc. | 1.00% |
| REXMY | Rexam PLC | 0.99% |
| WPPGY | WPP plc | 0.99% |
| COLB | Columbia Banking System, Inc. | 0.99% |
| CA | CA, Inc. | 0.99% |
| PEG | Public Service Enterprise Group Incorporated | 0.98% |
| DRI | Darden Restaurants, Inc. | 0.98% |
| **Total** | | **100%** |

This Report Must Include Attached Fact Cards

# Risk Considerations

Unit Trusts are professionally-selected portfolios that utilize a long term "buy and hold" strategy of investing. The portfolios can be designed around various investment themes, sectors, and risk tolerance levels. The trusts invest in specified unmanaged portfolios designed and built by the trust sponsor or professional portfolio consultants. "Buy and hold" investing may help eliminate emotional investing and allow investors to focus on longer-term rewards, rather than short-term performance. Unit Trusts are designed and targeted to meet a variety of investment needs and risk tolerance levels.

There is no assurance an unmanaged unit investment trust will achieve its investment objective(s). An investment in a unit invest- ment trust is subject to market risk. Market risk is the risk that a particular security owned by a trust may fall in value. Additionally, the value of the securities held by a trust may be subject to steep declines or increased volatility due to changes in performance or perception of the issuers.

Unit holders can lose money by investing in this Trust. The Trust is not actively managed and will not sell securities in response to ordinary market fluctuations. An investment in this unit investment trust is subject to market risk, which is the possibility that the market values of securities owned by the Trust will decline and that the value of Trust Units that you receive in connection with the Trust's termination or a redemption of your Units may therefore be less than what you paid for them. There is no guarantee that the Trust will meet its investment objectives, that the securities comprising the portfolio will pay dividends or that the unit price will not decline.

Investing involves risk, including loss of principal. To determine if a Trust is an appropriate investment for you, carefully consider the Trust's investment objectives, risk factors, charges and expenses before investing. This and other information can be found in the Trust's prospectus which may be obtained by calling 1-888-505-2872 or visiting our website at www.smarttrustuit.com. Read it carefully before investing.

Additional risk considerations relating to the individual strategies can be found on the Trust Fact Cards.

**054010**



**Smart Trust**®                                                                                   Fact Card

# Tax-Advantaged Growth & Income Trust

Series 10

## A 2 Year Unit Investment Trust

### Investment Objective

The trust seeks to provide investors with the possibility of a high level of total after-tax return, with an emphasis on income that is exempt from regular federal income tax or that qualifies for federal income taxation at long-term capital gains rates ("tax-advantaged income") while also offering the potential for capital appreciation. There is no guarantee that the investment objectives of the trust will be achieved.

### Investment Strategy

The trust seeks to achieve its investment objective by investing in a portfolio consisting primarily of (i) common stock of closed-end investment companies, known as closed-end funds, whose portfolios consist primarily of municipal bonds, the interest on which is exempt from regular federal income tax; (ii) common stocks that are eligible, as of the initial date of deposit, to pay dividends which qualify for federal income taxation rates applicable to long-term capital gain ("qualified dividend income"); and (iii) common stock of closed-end funds seeking tax-advantaged income as part of their investment strategies and/or policies or that pursue "tax managed" investment strategies and/or policies.

### Description of Portfolio

| | |
|---|---|
| INCEPTION DATE: | April 20, 2016 |
| TERMINATION DATE: | April 25, 2018 |
| INITIAL OFFER PRICE | $10.00 |
| MINIMUM INVESTMENT | 100 units (may vary by selling firm) |
| NUMBER OF ISSUES: | 37 |
| DISTRIBUTIONS:[1] | MONTHLY (if any) |
| EST. NET ANNUAL 1ST YR DISTRIBUTIONS:[2] | $0.4681 (per unit) |
| CUSIP (CASH): | 83183D 106 |
| CUSIP (REINVESTMENT): | 83183D 114 |
| FEE-BASED CUSIP (CASH): | 83183D 122 |
| FEE-BASED CUSIP (REINVESTMENT): | 83183D 130 |
| TICKER: | SMTAJX |

### Volume Discounts

| PURCHASE AMOUNT[3] | SALES CHARGE |
|---|---|
| Less than $50,000 | 3.95% |
| $50,000 but less than $100,000 | 3.70% |
| $100,000 but less than $250,000 | 3.45% |
| $250,000 but less than $500,000 | 3.10% |
| $500,000 but less than $1,000,000 | 2.95% |
| $1,000,000 or greater | 2.45% |

### Sales Charges[4] (based on a $10 public offering price)

Standard Accounts

| | | |
|---|---|---|
| Transactional Sales Charge: | Initial | 1.00% |
| | Deferred | 2.45% |
| Creation & Development Fee[5]: | | 0.50% |
| Maximum Sales Charge: | | 3.95% |

The deferred sales charge is a charge of $0.245 per unit and will be deducted in three monthly installments commencing on September 20, 2016. The initial and deferred sales fees do not apply to fee-based accounts. Please see the prospectus for sales charge details.

Fee/Wrap Accounts

| | |
|---|---|
| Creation & Development Fee[5]: | $0.05 |
| Maximum Sales Charge: | $0.05 |

[1]Distributions, if any, will be made commencing on May 25, 2016. The estimated net annual distribution is expected to decline over time because a portion of the securities included in the portfolio will be sold to pay for organization costs, creation and development fee and deferred sales charge. Distributions will fluctuate as a result of unitholder redemptions in addition to securities being sold within the portfolio. Distributions are also subject to the ability of issuers to make dividend payments in the future.

[2]Estimated Net Annual First Year Distribution per unit is computed by dividing the estimated annual income of the underlying securities less the expense per unit by the number of units outstanding. The estimated net annual distributions for subsequent years are expected to be less than estimated distributions for the first year because a portion of the securities included in the trust portfolio will be sold during the first year to pay for organization costs, the creation and development fee and the deferred sales charge. The actual net annual distributions will vary with changes in the trust's fees and expenses and income of the underlying securities.

[3]The volume discount is also applied on a unit basis utilizing a breakpoint equivalent in the above table of one unit per $10. Please see the trust prospectus for full details. The volume discounts are only offered during the initial offering period.

[4]Percentages are based on a $10.00 per unit offering price. For unit prices other than $10.00, percentages of initial sales charge, creation and development fee, and deferred sales charges will vary. Early redemption will still cause payment of the deferred sales charge. The table above shows the initial offering period sales charges only.

[5]The creation and development fee is a charge of $.050 per unit collected at the end of the initial offering period. If the price you pay exceeds $10 per unit, the creation and development fee will be less than 0.50%; if the price you pay is less than $10 per unit, the creation and development fee will exceed 0.50%. In addition to the sales charges listed, UITs are subject to annual operating expenses and organization costs.

***Investors should consider the trust's investment objective, risks, charges and expenses carefully before investing. The prospectus contains this and other information relevant to an investment in the trust. Please read the prospectus carefully before you invest. If a prospectus did not accompany this literature, please contact SmartTrust at (888) 505-2872 to obtain a free prospectus.***

## Portfolio Allocation as of April 20, 2016:



Equity Securities: Consumer Discretionary: 7.22%
Equity Securities: Consumer Staples 6.04%
Equity Securities: Financials 10.78%
Equity Securities: Industrials 2.01%
Equity Securities: Information Technology 3.00%
Equity Securities: Materials 6.94%
Equity Securities: Telecommunication Services 4.01%
Equity Securities: Utilities 2.00%
Investment Companies: Closed-End Funds 58.00%

## Portfolio Holdings as of April 20, 2016:

| EQUITY SECURITIES — 42.00% | |
|---|---|
| **Consumer Discretionary — 7.22%** | |
| DRI | Darden Restaurants, Inc. |
| GRMN | Garmin Ltd. |
| MAT | Mattel, Inc. |
| SUP | Superior Industries International, Inc. |
| WPPGY | WPP plc |
| **Consumer Staples — 6.04%** | |
| MO | Altria Group, Inc. |
| CALM | Cal-Maine Foods, Inc. |
| UVV | Universal Corporation |
| **Financials — 10.78%** | |
| CZNC | Citizens & Northern Corporation |
| CHCO | City Holding Company |
| COLB | Columbia Banking System, Inc. |
| CTBI | Community Trust Bancorp, Inc. |
| NWBI | Northwest Bancshares, Inc. |
| ORI | Old Republic International Corporation |
| **Industrials — 2.01%** | |
| EMR | Emerson Electric Co. |
| EBF | Ennis, Inc. |
| **Information Technology — 3.00%** | |
| CA | CA, Inc. |
| CSCO | Cisco Systems, Inc. |
| **Materials — 6.94%** | |
| AMCRY | Amcor Ltd. |
| UFS | Domtar Corporation |
| DOW | The Dow Chemical Company |
| REXMY | Rexam PLC |

| Telecommunication Services — 4.01% | |
|---|---|
| T | AT&T Inc. |
| VZ | Verizon Communications Inc. |
| **Utilities — 2.00%** | |
| PEG | Public Service Enterprise Group Incorporated |
| WEC | WEC Energy Group, Inc. |
| **INVESTMENT COMPANIES — 58.00%** | |
| **Closed-End Fund — 58.00%** | |
| BTA | BlackRock Long-Term Municipal Advantage Trust |
| BYM | BlackRock Municipal Income Quality Fund |
| MFL | BlackRock MuniHoldings Investment Quality Fund |
| KSM | Deutsche Strategic Municipal Income Trust |
| DMF | Dreyfus Municipal Income, Inc. |
| DSM | Dreyfus Strategic Municipal Bond Fund, Inc. |
| LEO | Dreyfus Strategic Municipals, Inc. |
| EIM | Eaton Vance Municipal Bond Fund |
| IQI | Invesco Quality Municipal Income Trust |
| HTD | John Hancock Tax-Advantaged Dividend Income Fund |
| PMO | Putnam Municipal Opportunities Trust |

## Risk Considerations

Unitholders can lose money by investing in this trust. An investment in units of the trust should be made with an understanding of the risks related to the trust, such as the following:

- Security prices will fluctuate. The value of your investment may fall over time.

- The financial condition of an issuer may worsen or its credit ratings may drop, resulting in a reduction in the value of your units. This may occur at any point in time, including during the initial offering period.

- The issuer of a security may be unwilling or unable to make income and/or principal payments in the future. This may reduce the level of distributions the trust pays which could reduce your income and cause the value of your units to fall.

- The trust invests in shares of closed-end funds. Shares of closed-end funds tend to trade at a discount from their net asset value and are subject to risks related to factors such as the manager's ability to achieve a fund's objective, market conditions affecting a fund's investments. The trust and underlying funds have management and operating expenses. You will bear not only your share of the trust's expenses, but also the expenses of the underlying funds. By investing in other funds, the trust incurs greater expenses than you would incur if you invested directly in the funds.

- Certain funds held by the trust invest in municipal bonds. Municipal bonds are debt obligations issued by state and local governments or by their political subdivisions or authorities. states, local governments and municipalities issue municipal bonds to raise money for various public purposes such as building public facilities, refinancing outstanding obligations and financing general operating expenses. These bonds include general obligation bonds, which are backed by the full faith and credit of the issuer and may be repaid from any revenue source, and revenue bonds, which may be repaid only from the revenue of a specific facility or source.

- The municipal bonds held by certain funds are fixed-rate obligations will decline in value with increases in interest rates, an issuer's worsening financial condition or a drop in bond ratings. The longer the maturity of a security, the greater the risk of a decline in value with increases in interest rates. The effective maturity of longer term securities may be dramatically different than shorter term obligations. Investors may receive early returns of principal when securities are called or sold before they mature. Investors may not be able to reinvest the proceeds they receive at as high a yield. The default of an issuer in making its payment obligations could result in the loss of interest income and/or principal to investors.

- Certain funds held by the trust may invest in securities rated below investment grade and considered to be "junk" securities. These securities are considered to be speculative and are subject to greater market and credit risks. Accordingly, the risk of default is higher than investment grade securities. In addition, these securities may be more sensitive to interest rate changes and may be more likely to make early returns of principal.

- The trust's investment objective is to provide a high level of total after-tax return, including attractive tax-advantaged income. The attractiveness of investing in securities that generate tax-qualified dividends in relation to other investment alternatives may be affected by changes in federal income tax laws and regulations, including changes in the qualified dividend income provisions. Distributions from the trust may be subject to the alternative minimum tax.

- The trust is not actively managed. Except in limited circumstances, the trust will hold, and continue to buy, shares of the same securities even if their market value declines.

- The sponsor may offer successive trusts with similar portfolios thereby allowing the investor to pursue the same strategy over a number of years. Investors should consider their ability to pursue investing in successive trusts, if available. There may be tax consequences associated with investing in the trust and rolling over an investment from one trust to the next.

```
MTS205                                              DATE: 05/05/2016

SENDER PARTY NOT ON FILE
SENDER'S ID A/111017979


TRN REF #: 20160505-00008216
-------------------------------------------------------------------
  **** MESSAGE ENVELOPE ****                 ( Bank : 102 )

                                       SND DATE: 16/05/05
SRC:FED CALLER:                        EXT:

RPT#          AMT:150,000.00           CUR:USD                 TRDR#
TEST: DUE:                             TYP:FTR/   FNDS:S CHG:DB:N CD:A COM:N CBL:N
-------------------------------------------------------------------
*DBT A/111017979                       CDT D/1440011138725/            ADV:LTR
DEBIT VAL: 16/05/05                    CREDIT VAL: 16/05/05
TEXAS CAPITAL BANK, N.A.               KBNK LLC
DALLAS, TX                             1111 BOERNE CT
                                       LUCAS, TX  75002-7584
COUNTRY OF RESIDENCY: US               COUNTRY OF RESIDENCY: US
SNDR REF NUM:160505125508DIES          ORIG TO BNF INFO:
ORIG:/6112135105                       JAMES SEEGAN ACCOUNT # GFS10789
JAMES SEEGAN
2114 CANNES DRIVE
.
CARROLLTON, TX 75006-


    **** MESSAGE TEXT ****

{1100} Message Disposition:
       Format Version:             30 (New expanded format)
       Test Production Code:       P  (Production)
       Msg Duplication Code:          (Original incoming msg)
       Msg Status Indicator:       N  (Incoming msg)

{1110} Acceptance Timestamp:
       Receipt Date:               05/05
       Receipt Time:               14:14
       Receipt Application Id:     FT03

{1120} OMAD:
       Output cycle date:          2016/05/05
       Output Destination Id:      E3QP021C
       Output sequence number:     002889
       Output date:                05/05
       Output time:                14:14
       Output application Id:      FT03

{1510} Type/Subtype Code:
       Type Code:                  10 (Transfer of funds)
       Subtype Code:               00 (Regular transfer)

{1520} IMAD:
       Input Cycle date:           2016/05/05
       Input Source id:            K1B7041C
       Input Sequence number:      001534

{2000} Amount:                     $150,000.00

{3100} Sending Bank:
       ABA number:                 111017979
       Short name:                 TEXAS CAPITAL BANK
       ABA lookup (AUX):           TEXAS CAPITAL BANK, N.A.
                                   DALLAS, TX

{3320} Sender Reference:           160505125508DIES

{3400} Receiving Bank:
       ABA number:                 111017694
       Short name:                 BRANCH BKING & TRU
       ABA lookup (AUX):           BRANCH BANKING & TRUST COMPANY
                                   DALLAS, TX

{3600} Business Function Code:     CTR (Customer transfer)

{4200} Beneficiary:                D/1440011138725
                                   KBNK
                                   2110 BOCCA RATON DR
                                   AUSTIN TX

{5000} Originator:                 D/6112135105
                                   JAMES SEEGAN
                                   2114 CANNES DRIVE
                                   .
                                   CARROLLTON, TX 75006-
```



Page 1 of 1

056A001



Page 1 of 1

056B001

Exhibit 57

Keith Ashley Financial Overview

057001

# Cash On Hand

Personal Bank Accounts Balance on 2/1/2020: $12,864.52

Business Bank Accounts Balance on 2/1/2020: $5,528.95

Ashley Family Living Trust Accounts Balance on 2/1/2020: $37.80

Total: $18,431.27

057002

# February 2020 Financial Obligations

**Mortgage: $3,731.97**

**Monthly Disbursements Owed to Investors: $13,389.76**

- No monthly disbursements were made to investors in January 2020
- Leonid Shteyngart: $3,485.68
- Denny Willmon: $1,541.58
- James Seegan $8,362.50

**Monthly Payment for Brewery Property/Equipment Loan: $14,001.72**

**Total Outstanding Balance on Credit Cards on 2/1/2020:**

- Chase Credit Card #0600: $17,715.20
- Chase Credit Card #7680: $13,327.65

**Ford Credit Loans: $1,048.07**

**Total: $63,214.37**

057003

# Casino Activity

- Monthly Casino Gains/(Losses)
  - November 2019: ($24,061)
  - December 2019: $10,341
  - January 2020: $2,557
  - 2/1/2020 - 2/19/2020: ($30,052)
  - Total: ($41,215)

057004

# Nine Band Brewery Performance

- Net Income/(Loss) by Year
  - 2018: ($158,226.22)
  - 2019: ($241,501.62)
  - 1/1/2020 - 6/30/2020: ($335,626.81)

057005

# LAST WILL AND TESTAMENT
## OF
## JAMES E SEEGAN

I, JAMES E SEEGAN, of Dallas County, Texas, make this my Last Will and Testament, and I revoke all Wills and Codicils previously made by me.

## ARTICLE I.
### Identification

    **A.**    <u>Wife.</u> My wife's name is SAKDIDA SEEGAN. All references in this Will to "my wife" are to her.

    **B.**    <u>Children</u>. I have one son, J█████ E█████ S████. All references in this Will to "my son" are to him.

## ARTICLE II.
### Memorandum

I request that the beneficiaries of my estate and my Executor honor the provisions of any memorandum written by me directing the disposition of any portion of my personal and household effects.

## ARTICLE III.
### Disposition of Property

I give, bequeath and devise all of my estate to the then-serving trustee under that certain trust agreement (the "Trust Agreement") executed by me on the same day that I am signing this Will, and as may be amended and/or restated in the future, by and between me as settlor and as initial trustee, which Trust Agreement initially created the JAMES E SEEGAN REVOCABLE TRUST, to be allocated, administered, and distributed in accordance with the terms of the Trust Agreement.

## ARTICLE IV.
### Specific Bequests

If the Trust Agreement is not in existence on the date of my death, then (except as may be provided in a memorandum authorized by Article II) I give, bequeath and devise all of my interest in any motor vehicles, boats and personal watercraft, household goods, appliances, furniture and

1

059001

furnishings, pictures, silverware, china, glass, books, clothing, jewelry or other articles of personal use or ornament, and other tangible personal property of a nature, use or classification similar to the foregoing to my wife; provided, however, if my wife fails to survive me, I give, bequeath and devise such property to my Contingent Beneficiaries, with particular items to be allocated as they may agree, or if they cannot agree, as my Executor shall decide. If any beneficiary hereunder is a minor, my Executor may distribute such minor's share to such minor or for such minor's use to any person with whom such minor is residing or who has the care or control of such minor without further responsibility, and the receipt of the person to whom such minor's share is distributed shall be a complete discharge of my Executor. The cost of packing and shipping such property to any such beneficiary shall be charged against my estate as an expense of administration.

## ARTICLE V.
### Contingent Beneficiaries

The provisions of this Article shall apply only if the Trust Agreement is not in existence on the date of my death. In such case, all of the residue of my estate shall be distributed to the same beneficiaries and in the same manner and proportions as provided in the Trust Agreement as if such Trust Agreement were still in existence. If no copy of the Trust Agreement exists or if the terms and provisions of the Trust Agreement cannot otherwise be determined, all of the residue of my estate shall be distributed to the following beneficiaries in the noted percentages:

1.  40% (Forty Percent) shall be distributed to my wife, Sakdida Seegan; provided, however, if she fails to survive me, this share of the residue of my estate shall be distributed to her descendants who survive me per stirpes, or if no such descendant survives me, to the other beneficiaries named in this Article who are entitled to receive a portion of my estate in proportion to their share of the overall distribution being made.

2.  40% (Forty Percent) shall be distributed to my son, J████ E███ S███; provided, however, if he fails to survive me, this share of the residue of my estate shall be distributed to his descendants who survive me per stirpes, or if no such descendant survives me, to the other beneficiaries named in this Article who are entitled to receive a portion of my estate in proportion to their share of the overall distribution being made.

3.  20% (Twenty Percent) shall be distributed to my nephew, Kerby K. Keller; provided, however, if he fails to survive me, this share of the residue of my estate shall be distributed to his descendants who survive me per stirpes, or if no such descendant survives me, to the other beneficiaries named in this Article who are entitled to receive a portion of my estate in proportion to their share of the overall distribution being made.

## ARTICLE VI.
### Executor and Trustee Appointments

**A.**   **Executor and Trustee.**   I appoint my friend, Keith Ashley, to be Independent Executor of my Will and estate and Trustee of all trusts created by my Will. If Keith Ashley fails to qualify, dies, resigns, becomes incapacitated, or otherwise ceases to serve, I appoint my nephew, Kerby K. Keller, to be Independent Executor of my Will and estate and Trustee of all trusts created by my Will.

**B.**   **Bond; Independent Administration.**   No bond or other security shall be required of my Executor or of my Trustee in any jurisdiction. No action shall be required in any court in relation to the settlement of my estate other than the probating and recording of my Will and, if required by law, the return of an inventory, appraisement, and list of claims of my estate. An affidavit in lieu of inventory may be substituted for an inventory, appraisement, and list of claims if permitted by law.

**C.**   **Expenses and Compensation.**   Every Executor and Trustee shall be reimbursed for the reasonable costs and expenses incurred in connection with such Executor's or such Trustee's duties. Every Executor and Trustee shall be entitled to fair and reasonable compensation for services rendered by such Executor or such Trustee in an amount not exceeding the customary and prevailing charges for services of a similar character at the time and place such services are performed.

**D.**   **Multiple Executors and Trustees.**   Unless another meaning is clearly indicated or required by context or circumstances, the term "Executor" or "Trustee" shall also mean and include all persons or entities who may at any time be serving and any alternates or successors. Except as otherwise specifically provided in this Will, if Co-Executors or Co-Trustees are designated to serve hereunder or if Co-Executors or Co-Trustees are already serving, and one such Co-Executor or Co-Trustee declines to serve, fails to qualify, dies, resigns, becomes incapacitated, or otherwise ceases to serve for any reason, then the remaining Executor or Trustee, or Co-Executors or Co-Trustees, as the case may be, shall serve or continue to serve in such capacity.

**E.**   **Actions by Co-Executors and Co-Trustees.**   In all matters relating to my estate or to any trust created by my Will, the decision of a majority of the Executors or Trustees then serving shall control. Any writing signed by the persons whose decision shall control shall be valid and effective for all purposes as if signed by all such Executors or Trustees.

## ARTICLE VII.
### Guardian Provisions

If my wife fails to survive me, or if she dies after my death without having appointed a guardian for my son, I appoint my nephew, Kerby K. Keller, to be guardian of his person and

3

**059003**

estate if he is under the age of legal majority at the time of my death, without requirement of bond or other security. I realize the responsibility of serving as guardian may impose a financial hardship on the guardian serving pursuant to this Article. I request that the Trustee of any trust or trusts created hereunder or under the Trust Agreement provide, as needed, financial assistance to the guardian to assist in obtaining appropriate housing accommodations, financing an addition to an existing residence, and providing for the costs of support, health care, insurance, and education for my son.

## ARTICLE VIII.
### Executor and Trustee Powers

Each Executor and Trustee shall, to the extent permitted by law, act independently and free from the control of any court as to my estate and as to every trust established under this Will (and as to all of the property of my estate and all of the property of every trust created under this Will). Each Executor and Trustee shall have and possess all powers and authorities conferred by statute or common law in any jurisdiction in which such Executor and Trustee may act, including all powers and authorities conferred by the Texas Estates Code and the Texas Trust Code, and by any future amendments thereto, except for any instance in which such powers and authorities may conflict with the express provisions of this Will, in which case the express provisions of this Will shall control.

## ARTICLE IX.
### Contingent Trusts

A.    **Applicability.** Any share of my estate that is to be distributed to a person who is under the age of 40 or who is incapacitated (referred to herein as the "Beneficiary") shall be held by my Trustee as a separate trust for the benefit of such Beneficiary; provided, however, the provisions of this Article shall not apply to property distributed to my wife. Alternatively, my Trustee, in my Trustee's discretion, may hold such property as custodian under the uniform transfers to minors act of any state, as it is my intention to ensure maximum flexibility in the administration of such property.

B.    **Distributions.** My Trustee shall distribute to the Beneficiary of each trust such amounts of the income and principal of such trust as my Trustee, in my Trustee's discretion, deems desirable from time to time to provide for such Beneficiary's health, support, maintenance or education, directly and without the interposition of any guardian or conservator. The beneficiary may receive 1/3 of their trust balance at the age of 25 and another 1/3 at the age of 30 and the final distribution at 40.

C.    **Termination.** Each trust created by this Article for a Beneficiary who is under age

4

40 shall terminate when such Beneficiary attains that age. Each trust created by this Article for a person who is incapacitated shall terminate when the Beneficiary of such trust, in the discretion of my Trustee, is no longer incapacitated. Upon the termination of a trust created by this Article, the remaining property of such trust shall be distributed to the Beneficiary of such trust, but if a Beneficiary dies before the termination of such Beneficiary's trust, then upon such Beneficiary's death the remaining property of such trust shall be distributed to such Beneficiary's estate.

**ARTICLE X.**
**Miscellaneous Provisions**

A.    **Survivorship Provisions.** No person shall be deemed to have survived me if such person shall die within 30 days after my death; however, my Executor may make distributions from my estate within that period for the support of my wife and my son. Any person who is prohibited by law from inheriting property from me shall be treated as having failed to survive me.

B.    **Payment of Debts.** I direct that all of my legal debts, funeral and testamentary expenses, costs and expenses of administration of my estate, and all estate, inheritance, transfer and succession taxes (Federal, State, and others) upon or with respect to any property required to be included in my gross estate under the provisions of any law, and whether or not passing hereunder, shall be paid as soon after my death as in the opinion of my Executor is practical and advisable. If at the time of my death any of my property is subject to a mortgage, lien, or other debt, I direct that the devisee taking such property shall take it subject to such mortgage, lien, or other debt, and that such person shall not be entitled to have the obligation secured thereby paid out of my general estate. My Executor is specifically given the right to renew, refinance and extend, in any form that my Executor deems best, any secured or unsecured debt or charge existing at the time of my death. Under no circumstances shall my Executor be required to prepay any debt of mine.

C.    **Spendthrift Provisions.** Each trust created by this Will shall be a spendthrift trust to the fullest extent allowed by law. Prior to the actual receipt of property by any beneficiary, no property (income or principal) distributable under this Will or under any trust created by this Will shall, voluntarily or involuntarily, be subject to anticipation or assignment by any beneficiary, or to attachment by or to the interference or control of any creditor or assignee of any beneficiary, or taken or reached by any legal or equitable process in satisfaction of any debt or liability of any beneficiary, and any attempted transfer or encumbrance of any interest in such property by any beneficiary hereunder prior to distribution shall be void.

D.    **Accounting.** Within 60 days of receiving a written request from a beneficiary of my estate or of a trust created by my Will who is entitled to receive an accounting, my Trustee shall furnish an accounting to such beneficiary. Any such accounting shall comply with the requirements of the Texas Trust Code and shall be deemed correct and binding one year after

5

receipt by the requesting beneficiary. Notwithstanding the foregoing provisions of this Section, with regard to a beneficiary of a trust who is under 25 years of age, my Trustee shall be relieved of the duty to keep such beneficiary reasonably informed concerning the administration of such trust and the material facts necessary for such beneficiary to protect such beneficiary's interest, and my Trustee shall have no duty to respond to a demand for an accounting.

E.    **Descendants.** References to "descendant" or "descendants" mean lineal blood descendants of the first, second or any other degree of the ancestor designated; provided, however, such references shall include, with respect to any provision of this Will, descendants who have been conceived at any specific point in time relevant to such provision and who thereafter survive birth; and provided, further, an adopted child and such adopted child's lineal descendants by blood or adoption shall be considered under my Will as lineal blood descendants of the adopting parent or parents and of anyone who is by blood or adoption a lineal ancestor of the adopting parent or of either of the adopting parents.

F.    **Discretion.** Whenever in this Will an action is authorized in the discretion of my Executor or Trustee, the term "discretion" shall mean the reasonable discretion of such Executor or Trustee.

G.    **Incapacitated.** A beneficiary shall be deemed "incapacitated" if my Executor or Trustee, in my Executor's or Trustee's discretion, determines that such beneficiary lacks the ability, due to a physical or mental condition, to manage his or her own personal and financial affairs. My Executor or Trustee shall be deemed "incapacitated" if and for as long as (i) a court of competent jurisdiction has made a finding to that effect, (ii) a guardian or conservator of such Executor's or Trustee's person or estate has been appointed by a court of competent jurisdiction and is serving as such, or (iii) one physician (licensed to practice medicine in the state where my Executor or Trustee is domiciled at the time of the certification, and who is board certified in the specialty most closely associated with the cause of such Executor's or Trustee's incapacity) certifies that due to a physical or mental condition my Executor or Trustee lacks the ability to manage his or her own personal and financial affairs. An Executor or Trustee shall immediately cease to serve upon being deemed incapacitated.

H.    **Governing Law.** The construction, validity and administration of each trust created under this Will shall be controlled by the laws of the State of Texas. My Trustee may designate the laws of another jurisdiction as the controlling law with respect to the construction, validity and administration of a particular trust if either (i) my Trustee resides in, or administers that trust in, such designated jurisdiction (or in the case of a corporate Trustee, if such corporate Trustee is chartered in such designated jurisdiction), or (ii) the primary beneficiary of such trust resides in such designated jurisdiction, in which case the laws of such designated jurisdiction shall apply to such trust as of the date specified in such designation. Any such designation shall be in writing and shall be delivered to each beneficiary of the affected trust.

I.    **Per Stirpes.** When a distribution is to be made to a person's descendants "per

6

stirpes," property shall be divided into as many equal shares as there are (i) living children of such person, if any, and (ii) deceased children who left descendants who survive such person. Each living child shall receive one share, and the share that would have passed to each deceased child shall be divided in a similar manner (by reapplying the preceding rule) among his or her descendants who survive such person. For example, if a person has deceased children and surviving children when a distribution is to be made, the assets will be divided into equal shares at the child level and distributed per stirpes below that level; however, if the person has no surviving children at such time, that equal division will still be made at the child level and distributed per stirpes below that level. This definition is intended to override any conflicting or contrary common law definition.

7

I, JAMES E SEEGAN, as testator, after being duly sworn, declare to the undersigned witnesses and to the undersigned authority that this instrument is my will, that I willingly make and execute it in the presence of the undersigned witnesses, all of whom are present at the same time, as my free act and deed, and that I request each of the undersigned witnesses to sign this will in my presence and in the presence of each other. I now sign this will in the presence of the attesting witnesses and the undersigned authority on the _8th_ day of _April_____, in the year 2019.

_____
JAMES E SEEGAN, Testator

The undersigned, _Laurence Edward Ahee_ ~~James Edward Seegan~~ and _Rosalinda Gomez_____, each being above fourteen years of age, after being duly sworn, declare to the testator and to the undersigned authority that the testator declared to us that this instrument is the testator's will and that the testator requested us to act as witnesses to the testator's will and signature. The testator then signed this will in our presence, all of us being present at the same time. The testator is eighteen years of age or over (or being under such age, is or has been lawfully married, or is a member of the armed forces of the United States or of an auxiliary thereof or of the Maritime Service), and we believe the testator to be of sound mind. We now sign our names as attesting witnesses in the presence of the testator, each other, and the undersigned authority on the _08_ day of _April_____, in the year 2019.

_____
Witness Signature

_2813 Panorama dr._
Address

_Carrollton Tx 75007_
Address

_____
Witness Signature

_1902 Country Club dr_
Address

_#E100 Carrollton Tx 75006_
Address

Subscribed and sworn to before me by the said JAMES E SEEGAN, the testator, and by the said _Rosalinda Gomez_ and _Laurence Edward Ahee_ witnesses, on the _08_ day of _April_____, in the year 2019.

_____
Notary Public, State of Texas

ALICIA MOLINA
NOTARY PUBLIC
STATE OF TEXAS
ID. 12916739
EXP. 10-16-2020

8

**Jim Seegan's accounts:  (updated on January 13, 2020)**

BankDirect www.bankdirect.com
 The account number is ████5105.

E*Trade:  www.etrade.com
 Roth IRA:  ████0019
 Money Market:  ████9118
 Main:  ████3458
 Savings:  ████9451

Fidelity:  www.fidelity.com
 Brokerage:  X46614327
 Roth IRA:  ████1095
 Rollover IRA:  ████8780
 IBM 401K:  30200

GroundFloor:  www.groundfloor.us/accounts/status
 Z49B9E32151A

I Bonds:  www.treasurydirect.gov/go_to_login.htm
 Direct:  IAAAA IAAAB IAAAC IAAAD IAAAE IAAAF IAAAG
 IAAAH IAAAL IAAAI IAAAK
 Paperless:  IAAAD IAAAE IAAAA IAAAB IAAAC

MNL – www.midlandnational.com
Policies:  1505085759

Azlo Bank:  https://app.azlo.com/en/a/dashboard
Routing number: 062001186
Account number: ████7385


Contact Numbers:

Kerby Keller:  717-989-5462 (cell)
Dida Seegan: 214-796-9473 (cell)