# United States District Court

**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | § § § | |
| v. | § § | Case No.  4:20-CR-318 Judge Mazzant |
| KEITH TODD ASHLEY | § § § § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Pending before the Court is Defendant Keith Todd Ashley's Motion for Acquittal (Dkt. #207).  Having reviewed the motion, the briefing, and the relevant law, the Court finds that the motion should be **DENIED**.

## BACKGROUND

In the hunt for financial gain, this case concerns an elaborate plan which began with a traditional Ponzi scheme that lasted for years and ended in a murder staged as a suicide all committed by one individual.  On October 5, 2022, a jury convicted Defendant Keith Todd Ashley ("Ashley") for seventeen (17) counts related to those crimes.  Now, Ashley files this motion for acquittal.

Ashley worked numerous jobs in his lifetime, which included being a police officer, an emergency nurse, a financial advisor, a life insurance agent, and most recently, a brewery owner (Dkt. #197 at p. 26).  The various experience, training, and skills Ashley acquired from these multiple positions led the Government to label Ashley as "the perfect criminal" to commit the "perfect crime" (Dkt. #201 at p. 235).  This "crime" consisted of stealing from several victims by defrauding them and using various bank accounts to conceal the crime; it then culminated in the murder of James Seegan ("Seegan")—one of the original victims of Ashley's Ponzi scheme.

## I.      The Ponzi Scheme

For years, Ashley lied and stole from several colleagues, claiming that he was investing their money, when in reality, he was shifting their money across various bank accounts that all belonged to him.  The colleagues that fell victim to Ashley's Ponzi scheme included Seegan, Robert Greening ("Greening"), Denny Willmon, and Leonid Shteyngart.  Ashley used the following bank accounts for his scheme:

- A bank account with Citibank, N.A., which is now Branch Banking & Trust Company, with an account number ending in -8725.  Ashley used this account as a business account under the name KBKK, LLC (the "KBKK Account");

- A bank account with Chase Bank, N.A., with an account number ending in -2589.  Ashley used this account as a personal account under the name North Texas Money Management; and

- A bank account with Bank of America, with an account number ending in -4804.  Ashley operated this as a personal account under his name.

(Dkt. #127 at p. 3).  Following a typical Ponzi scheme operation, Ashley would take money from one victim and give a portion of it to another victim, representing that it was money that they had received from their initial investments.

The scheme began when Ashley first met with Seegan and offered him a chance to invest his money.  Ashley represented that he was investing funds with Parkland Securities and SmartTrust in a "Unit Investment Trust" ("UIT") (Dkt. #127 at p. 4).  After some convincing, Seegan eventually complied and sent Ashley a payment.  This process then continued with Ashley's other victims, each under the impression that Ashley would invest their money in a UIT, which never actually occurred.

Instead, Ashley used the money "given" to him for personal reasons.  At trial, a financial investigator who worked on Ashley's case—Matthew Wylie ("Wylie")—traced the funds given to Ashley and discovered that Ashley used the money to gamble, pay off his credit cards, and support his brewery.  Eventually, Ashley's victims began to ask questions about their investments and the way Ashley was operating.  After Ashley was forced to payback one victim, he shifted course.

## II.   The Life Insurance Schemes

Ashley found another way to get rich quick by receiving the benefits from an individual's life insurance policy.  However, some of the main components of receiving life insurance proceeds are that: (1) you must be entitled to the insured's funds under the policy; and (2) the insured must be dead for the proceeds to be dispersed.  Ultimately, Ashley targeted one of his victims of the Ponzi scheme—Seegan—and agreed to help him with his life insurance policy.  However, Ashley instead tricked Seegan so that he could misappropriate funds after his death.  To make matters worse, instead of waiting for Seegan's death, Ashley accelerated the timeline by murdering Seegan himself.

This was not Ashley's first experience with deception involving life insurance policies.  Given his experience as a life insurance agent, Ashley assisted a Paul Villareal ("Villareal") with completing all the necessary paperwork to receive a valid life insurance policy with Midland National.  However, in doing so, Ashley wrote on the application that he was Villareal's stepbrother, entitling him to a portion of Villareal's proceeds after death.  But, Villareal did not qualify for the life insurance policy due to his medical conditions, so Ashley received nothing.

Ashley then shifted course again and began working with Seegan regarding his life insurance policy with Midland National.  Although the $2 million life insurance policy proceeds were originally intended to go to the victim's wife, Ashley orchestrated a scheme where he would have control over the money after Seegan's death.  This scheme consisted of him encouraging

Seegan to change the beneficiary of the policy to be a trust—a trust in which Ashley was listed as the named trustee after Seegan's passing.  Additionally, under the language of the policy, Seegan would not be entitled to any proceeds if he committed suicide within a certain period of signing the life insurance policy.  After completing the necessary paperwork and after waiting the necessary amount of time, Ashley then murdered the victim and staged it as a suicide.

On February 19, 2021, Ashley had scheduled a meeting with Seegan at his home, where he was expected to "draw blood."[1]  However, while Seegan was sitting in his office chair, instead of drawing blood, Ashley inserted a substance into Seegan called "Etomidate."  This substance knocked Seegan out.  Ashley then shot Seegan in the head and placed the gun in Seegan's left hand, staging it as a suicide.  But, Ashley failed to account for the Etomidate being found in Seegan's system during his autopsy, the Google Nest cameras that caught the sound of the gunshot in Seegan's office, and the cameras that show Ashley both entering and leaving Seegan's home around the relevant time.  More importantly, Seegan was not left-handed.  The so-called weapon that Seegan used to commit suicide was in the wrong hand.

Not long after Seegan's death, Ashley attempted to contact Midland National to let them know that Seegan had passed and that as the trustee, he would be taking care of the financials.  Then, just two days after the murder, Ashley was able to obtain $20,000, by transferring the funds from Seegan's account to his KBKK Account while in Seegan's home.  Ashley was then arrested both for his Ponzi scheme and for his participation in the killing of Seegan before he was ever able to recover any of the life insurance proceeds.

---

[1] At trial, the Government provided context for the likely reason for this meeting between Seegan and Ashley.  The Government explained that it was an outdated practice, but that life insurance policies used to require a blood test upon application for the policy.  While it would be rather unordinary that the person handling the life insurance policy would also be the person drawing blood, such a situation did not raise questions here because of Ashely's background as a nurse.

### III.      Procedural History

On September 15, 2022, the Government filed a Fourth Superseding Indictment against Ashley (Dkt. #127).  On September 26, 2022, the Government began an eight-day trial against Ashley for his actions, where he was found guilty on all counts listed in the Fourth Superseding Indictment.

On December 5, 2022, Ashley filed the pending motion for acquittal (Dkt. #207).  On March 9, 2023, the Government filed a response, opposing Ashley's motion on all grounds.  On March 24, 2023, Ashely filed his reply.

### LEGAL STANDARD

A Rule 29 motion for judgment of acquittal "challenges the sufficiency of the evidence to convict." *United States v. Medina*, 161 F.3d 867, 872 (5th Cir. 1998).  The issue is "whether, viewing the evidence in the light most favorable to the verdict, a rational [finder of fact] could have found the essential elements of the offense charged beyond a reasonable doubt." *United States v. Boyd*, 773 F.3d 637, 644 (5th Cir. 2014) (first citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); then citing *United States v. Miller*, 588 F.3d 897, 907 (5th Cir. 2009)).  "The standard does not require that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." *United States v. Loe*, 262 F.3d 427, 432 (5th Cir. 2001).  The factfinder is "free to choose among reasonable constructions of the evidence," and "it retains the sole authority to weigh any conflicting evidence and to evaluate the credibility of the witnesses." *Id.* (quotations and citations omitted).

A defendant bears a heavy burden in meeting this high standard. *United States v. Achobe*, 560 F.3d 259, 263 (5th Cir. 2008) ("The standard for a sufficiency claim is high.").  Consequently, reviewing courts are "highly deferential to jury verdicts." *United States v. McNealy*, 625 F.3d 858,

870 (5th Cir. 2010) ("We review a jury verdict under a 'highly deferential' standard.").  That deference is underscored by the Fifth Circuit's frequent refrain: "We stress that 'all reasonable inferences and credibility choices must be made in favor of the jury verdict.'" *United States v. Deville*, 278 F.3d 500, 505 (5th Cir. 2002) (internal citation omitted); *see also United States v. Carter*, 953 F.2d 1449, 1456 (5th Cir. 1992) (noting the court must give "the government the benefit of all reasonable inferences and credibility choices").  Thus, a court cannot grant a judgment of acquittal unless it concludes, after viewing the evidence through the lens of this deferential standard, that a rational jury would necessarily have had to entertain a reasonable doubt as to the defendant's guilt.  *See United States v. Burns*, 597 F.2d 939, 941 (5th Cir. 1979).

## ANALYSIS

Ashley challenges each of the seventeen (17) counts that he was convicted of, for various reasons.  The Court will address each of these counts by grouping the arguments together and discussing them according to the four substantive offenses that Ashley was charged with: (1) Wire Fraud; (2) Mail Fraud; (3) Possessing or Carrying a Firearm During Commission of a Crime of Violence; and (4) Bank Theft.  The Court will begin with the Wire Fraud counts.

### I.   Wire Fraud

Ashely was found guilty on thirteen (13) counts of Wire Fraud, which is found at 18 U.S.C. § 1343.[2]  As for the elements of Wire Fraud, the Fifth Circuit has held that "[t]o establish a violation of [§ 1343], the Government must prove: '(1) a scheme to defraud exists, (2) the defendant used wire communications in interstate or foreign commerce to further that scheme, and

---

[2] The specific language of the statute is as follows: "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both."  18 U.S.C. § 1343.

(3) the defendant had specific intent to defraud.'" *United States v. Davis*, 53 F.4th 833, 842 (5th Cir. 2022) (quoting *United States v. del Carpio Frescas*, 932 F.3d 324, 329 (5th Cir. 2019)). Additionally, as a sentencing enhancement, the statute maintains that if the violation "affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both." 18 U.S.C. § 1343.

Ashley challenges the sufficiency of the evidence on all thirteen counts. The Court will discuss these counts in three groups. Counts One through Six were based on an actual "transfer of funds" that occurred with numerous bank accounts as part of his Ponzi scheme (the "Financial Institution Counts") (Dkt. #127 at pp. 13–14). Counts Nine through Fourteen were based on Ashley's communications with various banks regarding Seegan's life insurance policy and bank funds both before and after Seegan's passing (Dkt. #127 at pp. 17–18) (the "Life Insurance Counts"). Finally, Count Twenty was based on Ashley's attempt to make himself a beneficiary for Villareal's life insurance policy and the "wire communications" that he utilized to enact his plan (Dkt. #127 at p. 21). The Court finds that the jury's findings for wire fraud should all be upheld.

### A.  The Financial Institution Counts

Ashley raises four principal reasons why he is entitled to acquittal for the Financial Institution Counts. His arguments concern each of the three elements of Wire Fraud, as well as the sentencing enhancement. The Court will identify which specific counts Ashley is challenging for each argument.

#### 1.  "Scheme to Defraud"

Ashley starts by attacking the first element, stating there is no evidence to support a "scheme to defraud" for Counts One and Three (Dkt. #207 at p. 2). To prove this element, the Government must prove that Ashley "made some kind of a false or fraudulent material

misrepresentation." *United States v. Spalding*, 894 F.3d 173, 181 (5th Cir. 2018).  Count One specifically points toward a transfer of $150,000 to Ashley's KBBK account from Seegan.  The Court need not spend too much time on this point.  The evidence that was presented at trial was clear: Ashley informed Seegan that his money would be invested in a UIT, but such money was never invested.  The Government offered a "Portfolio Proposal" that was given to Seegan with a $150,000 amount listed, the same amount in the transfer.  If that is not enough, the Government called a financial investigator, Wylie, who traced Seegan's payment and concluded that it was utilized by Ashley for purely personal reasons.  The evidence supports a finding that the first element in Count One was satisfied.  To further support this conclusion, the Court will note that Ashley failed to point to any case law that the evidence provided could not be properly considered.

The evidence that was provided at trial for Count Three is considerably similar.  Count Three identifies a transfer of $75,000 to Ashley's KBKK account from Greening.  Greening testified at trial that the payment was made as an investment in a UIT, and with a guaranteed rate of return.  Not only did the evidence show that Ashley did not invest the money and instead used the money for personal reasons, but testimony also indicated that a UIT does *not* have a guaranteed rate of return, and such a representation would be inappropriate.  The Court will also note that the financial investigator traced part of Greening's money to a payment that was made to Seegan, a typical facet of a Ponzi scheme.

Ashley raises an additional argument for Count Three.  Specifically, Ashley argues that because Greening—who was an attorney—requested his money back from Ashley and Ashley complied with that request, it cannot be said that he had a "scheme to defraud" Greening.  The Court disagrees.  The fact that Ashley later gave the money back from his initial investment in an effort to conceal his Ponzi scheme will not change the fact that there was a scheme to defraud in

the first place.  Although the Fifth Circuit has not spoken on this issue, other circuits have and explicitly failed to entertain such an argument.  *See United States v. Vincent*, 416 F.3d 593, 601 (7th Cir. 2005) ("Nor is it a defense to [wire fraud] that the accused voluntarily returned the funds."); *United States v. Gross*, 416 F.2d 1205, 1209 (8th Cir. 1969); *United States v. Zherebchezsky*, 876 F.2d 898 (9th Cir. 1989).  Accordingly, Ashley's arguments regarding the first elements of Counts One and Three will be dismissed.

### 2.   "To Further the Scheme"

Ashley's next argument relates to the second element of Wire Fraud, that the evidence cannot support a finding that "the defendant used wire communications in interstate or foreign commerce to further that scheme" for Counts Two, Four, Five, and Six.  *Davis*, 53 F.4th at 842.  Ashley's argument on all four counts is that they each concern transfers of money from Ashley's business account to one of his personal accounts and therefore, cannot be found "to further the scheme."  It is true, as Ashley argues, that wire transfers cannot satisfy the second element if it is found that the wires are immaterial, the scheme has come to fruition, or the success of the scheme was not dependent on the wire transfer.  *Schmuck v. United States*, 489 U.S. 705 (1989).[3] However, it is sufficient when the wire transfers are "incident to an essential part of the scheme" or "a step in the plot."  *United States v. Traxler*, 764 F.3d 486, 488 (5th Cir. 2014).  Additionally, the communications can be sufficient after the fact when it is used to conceal the scheme.  *See United States v. Phipps*, 595 F.3d 243, 246–47 (5th Cir. 2010)

The Government argues that the internal transfers between Ashley's accounts were a step in the plot because it was then that the illegal conduct began.  Up until then, Ashley had simply

---

[3] As properly noted by both parties, the fact that *Schmuck* was a case dealing with mail fraud does not change its applicability to the charges of wire fraud.  *See United States v. Real Prop. Located at 1407 N. Collins St., Arlington, Tex.*, 901 F.3d 268, 277 (5th Cir. 2018) ("The same standard applies to use of the wires in a wire fraud case.").

been paid money consistent with his agreement with the victims to invest their money.  Ashley argues that the scheme had concluded the moment the victims paid Ashley to his KBKK account. Everything that he did with his money was "meant to allow him to enjoy the fruits of his crime," negating a finding that it was in furtherance of the scheme.  *United States v. Narum*, 577 F. App'x 689, 691 (9th Cir. 2014).

The Court sides with the Government on this point.  The question essentially becomes when the funds are properly classified as misappropriated funds—at the time the money enters Ashley's business account or when Ashley later converted that amount.  *See United States v. Waddell*, 840 F. App'x 421, 443 (11th Cir. 2020) ("To repeat, an integral step of the scheme—in fact, the only reason for the scheme—was Defendant's obtaining personal ownership of the money wired by the victims to the corporate accounts so that Defendant could use that money to pay expenses related to gambling and his other pleasures.).  The Court finds *Waddell* instructive here, because although the Eleventh Circuit found that the wire transfer was not an integral step in the scheme, it only did so because after the initial wire transfer from the victim to the defendant's business account, the defendant converted that money into cash.  *Id.* at 442–43.  The Government attempted to charge the defendant with wire fraud when he later converted that cash to the casino's account.  *Id.* at 442.  Here, that second step is missing.  In the Court's view, the relevant funds that were paid to Ashley only became Ashley's personal funds for his use after it was transferred out of the KBKK Account.  Therefore, the Court sides with the Government on this point, and the convictions will be upheld.

To provide an alternative basis for supporting the Government's position, the evidence also supports a finding that the lulling exception applies.  Communications that occur after initial purchase into the fraudulent scheme, "designed to lull the victim into a false sense of security,

postpone inquiries or complaints, or make the transaction less suspect[,] are [communications] in furtherance of the scheme." *Phipps*, 595 F.3d at 246–47 (quoting *United States v. Toney*, 598 F.2d 1349, 1353 (5th Cir. 1979)).  The Court finds that the evidence supports a finding that by utilizing various bank accounts as part of Ashley's scheme, it made the transactions less suspect.  Ashley could have had the victims send their money to his personal account, but to appear as if he would actually invest the funds, he had the victims send the money to the KBKK Account and then he transferred that money to his personal account.  This finding is further supported by the fact that Greening questioned Ashley's methods in investing his money, but instead of pushing any further, he simply requested his money back.  The Court finds that there had to be some appearance of legitimacy as to what Ashley was doing, and that appearance is due to Ashley using various accounts.

### 3.   "Specific Intent to Defraud"

Ashley's next argument relates to the third element of Wire Fraud for Counts One and Three.  Since Wire Fraud is a specific-intent crime, the Government must prove that Ashley "knew the scheme involved false representations."  *United State v. Stalnaker*, 571 F.3d 428, 436 (5th Cir. 2009).  This is satisfied when a defendant "acts knowingly with the specific intent to deceive for the purpose of causing pecuniary loss to another or bringing some financial gain to himself."  *United States v. Swenson*, 25 F.4th 309, 318 (5th Cir. 2022).  Noting the same evidence that was sufficient for the first element mentioned above, the Court finds that a reasonable jury could find that Ashley had the specific intent to defraud both Seegan and Greening for their respective counts. The evidence supports a finding that Ashley was more than aware of what he was doing, and for that reason, Ashley's arguments regarding the third element will be denied.

### 4.   "Affected a Financial Institution"

Ashley's fourth and final argument on this point is that the evidence cannot support a

finding that Ashley's actions "affected a financial institution" for Counts One through Six.  Ashley argues that the jury instruction provided was an inaccurate statement of the law.

The jury instruction at issue states the following:

A "financial institution" is affected when there is an increased risk of loss caused by the fraudulent scheme.  This remains true even if the "financial institution" suffered no loss—the increased risk of loss is sufficient.

(Dkt. #189 at p. 18).  Ashley cites to a case out of the Fourth Circuit—*United States v. Ubakanma*, 215 F.3d 421, 426 (4th Cir. 2000)—that stands for the proposition that the financial institution must be victimized by the fraud, as mere utilization of a financial institution will not be enough. The Government responds and states that the jury instructions—which were proposed by both parties—explicitly state that there is no requirement that the financial institution suffered a loss. Instead, a financial institution is affected when there is a new or increased risk of loss caused by the defendant's scheme, which is supported by the case law in this district.  *United States v. Fleifel*, No. 3:12-CR-318-D(3), 2015 WL 5567008, at *4 (N.D. Tex. Sept. 22, 2015); *see also United States v. Schinnell*, 80 F.3d 1064, 1070 (5th Cir. 1996).

Admittingly, the case law is not entirely clear on this issue.  The case law as it stands in this circuit certainly supports the jury instruction as it was given to the jury.  This is because the Fifth Circuit has previously found that the financial institution is sufficiently affected by the mere possibility of being subject to civil liability.  *Schinnell*, 80 F.3d at 1070 (rejecting defendant's argument that exposing the banks to a lawsuit was not the type of effect contemplated by Congress because it was reasonably foreseeable that the banks would suffer direct harm as a result).  Such a finding is supported by the evidence that was offered at trial when an employee who worked with Ashley's bank account, Jeanny Gallot ("Gallot"), stated that the bank could be subjected to liability.  However, as Ashley notes for this Court in his reply brief, cases from other circuits that

have interpreted the statute differently, cautioning courts from penalizing every use of a financial institution and providing the sentencing enhancement when the bank truly had no other role than holding the fraudulent funds (Dkt. #218 at pp. 3–7).   The Court will rule in favor of the Government on this issue, as the Court views the current position of the Fifth Circuit to support the jury instruction as it stands.

As an alternative basis for ruling in favor of the Government, the Court finds that the bank's reputation is partially impacted by the fact that Ashley used its accounts to conduct his illegal conduct.  *See United States v. Johnson*, 130 F.3d 1352 (9th Cir. 1997) (finding that the defendant "marred the bank's reputation" and in doing so, it "affect[ed] a financial institution").   At trial, the Government called Gallot, who was maintaining the KBKK Account.   In her testimony, she discussed the bank's various attempts to prevent fraud and other crimes involving their accounts. Based on those efforts, Ashley using its account as a center to his fraudulent scheme would certainly subject it to civil liability as well as negatively affect its reputation to other customers given the fact that they were unable to detect such activity.   Based on Gallot's testimony and the law as it currently stands in the Fifth Circuit, a reasonable jury could find "Yes" in answering the question asked on the jury verdict form.

The Court will now turn to the Life Insurance Counts.

**B.  The Life Insurance Counts**

Counts Nine through Fourteen all are for Wire Fraud concerning Seegan's Life Insurance policy and his bank accounts.   The Government alleges that the victim of this fraud was Midland National, the bank with which Seegan and Ashley both contacted regarding Seegan's life insurance policy.   The Court views the parties' opposing arguments on this matter as one of scope.   Ashley argues that each count must be closely scrutinized, as factors such as nexus or the non-existence of a misrepresentation prevents a finding of supporting the jury verdict on each count.   The

Government answers and contends that the Court look broadly, as the evidence supports a finding that in contacting Midland National and changing the beneficiary of Seegan's life insurance policy to the trust in which Ashley was the listed trustee, the communications support a finding that all charged communications were part of Ashley's scheme to defraud both Midland National and Seegan.

To support their respective positions, the parties discuss the applicability of a Fourth Circuit case with similar facts. In *United States v. Gray*, the Fourth Circuit held that the defendant's convictions for mail and wire fraud should be upheld, because when the defendant created circumstances giving rise to a claim and then made a claim for benefits under the policy, there was a valid scheme in which the insurance company suffers monetary loss. 405 F.3d 227, 235 n.2 (4th Cir. 2005). The Fourth Circuit focused on the fact that by killing the beneficiaries, the defendant "manufactured the occurrences that gave rise to the insurance companies' payment obligations." *Id.* at 234–35.

Ashley argues that this case has two main differences. First, he argues that because Ashley was not the beneficiary of the policy that *Gray* would not apply. Second, Ashley argues that in this case, Midland National was simply fulfilling its obligation to pay the trustee, as Ashley was obligated to "fair and reasonable compensation for services rendered," and based on that obligation, the facts of this case do not support a conviction (Dkt. #218 at p. 8). The Court agrees with the analysis in *Gray* and finds that it applies here.

The evidence provided by the Government at trial supports a finding that Ashley, who was previously an insurance agent, concocted a plan to ensure he was in the proper place to receive Seegan's funds. Ashley's plan consisted of three parts. First, he made sure that he would have *some* access to the funds for Seegan's life insurance policy. The original beneficiary of the policy

14

was Seegan's wife, and suddenly, this was changed to a trust in which Ashley would become the trustee upon Seegan's passing.  This leads to the second part of Ashley's plan, he made sure that suicide was a proper means of death to ensure payment under the policy.  Under the policy, there was a suicide clause that outlined if Seegan committed suicide within two years of the issuance of the policy, then there would be no payout of the policy (Dkt. #198 at p. 155).  If suicide occurred outside of the two-year period, then it would be investigated as any normal claim and the suicide clause would "no longer exist" (Dkt. #198 at p. 155).  Then, the last step in Ashley's plan, after he killed Seegan, he attempted to take control of Seegan's funds by informing Midland National to contact him and not Seegan's family, as he would be taking care of the financials, as Seegan's family had already been through enough.  At no point did Ashley represent that Seegan's death was caused by Ashely's hand.  *See Gray*, 405 F.3d at 235.  The evidence is clear that Ashley's scheme involved pushing Seegan to make the necessary moves which in turn led to Midland National losing funds as a result of Ashley's conduct.  Therefore, a reasonable jury could have found that as the reasoning for Ashley's wire communications, and doing so would be a proper reason for the guilty verdict.

Specifically, Counts Nine, Ten, Eleven, and Twelve all concern communications—phone calls, facsimile, and e-mail—to Midland National or Seegan himself to confirm that part one of Ashley's plan was completed.  Counts Thirteen and Fourteen concern Ashley's use of phones toward Midland National and Texas Capital Bank regarding part three of Ashley's plan, as they took place after he murdered Seegan at his home, and concern Ashley's taking of money from Seegan's account.  Although Count Fourteen does not relate specifically to the life insurance proceeds, the Court does note that the taking of Seegan's money was the ultimate plan from the beginning, to obtain money to deal with Ashley's financial troubles.  *See Waddell*, 840 F. App'x

at 442.  The Court finds that the evidence supports a finding that a reasonable juror could find that a scheme to defraud existed, Ashley used wire communications in interstate or foreign commerce to further that scheme, and Ashley had specific intent to defraud for each of the Life Insurance Counts.

### C.  Count Twenty

The final argument regarding Ashley's Wire Fraud counts is that the evidence does not support a conviction on Count Twenty.  Count Twenty concerns Ashley's misrepresentations that he was Villareal's stepbrother on Villareal's life insurance policy and therefore, would have an insurable interest in Villareal's policy after he died.  While Ashley admits that he lied, he argues that it was an "immaterial" lie, as there was no scheme to defraud the bank and that such a lie failed to have an influence on the insurance carrier.  A statement is material if it has s a natural tendency to influence, or is capable of influencing, the decision of the decision-making body to which it was addressed." *United States v. Bazemore*, 608 F. App'x 207, 210 (5th Cir. 2015) (quoting *United States v. Harms*, 442 F.3d 367, 372 (5th Cir.2006)).

At trial, the Government called an associate chief underwriter, who testified that an insurable interest is required for a policy.  Ashley likely would have known such a fact given his prior work with life insurance policies.  When asked the importance of someone misrepresenting that they are an insurable interest of a policyholder, the witness answered that it would be both "important and material."  Based on that testimony, the Court finds that the misrepresentation was in fact material, and therefore, the elements of wire fraud could have been satisfied for a reasonable juror based on the communications concerning that material misrepresentation.  This is especially true given the evidence provided at trial of Ashley's actions regarding Seegan and what occurred with his life insurance policy.  A reasonable juror could have concluded that Ashley's misrepresentations were part of an attempted scheme to defraud Villareal after his passing.  Again,

16

Ashley fails to point to any case law that would require the Court to hold to the contrary.

## II. Mail Fraud

Mail Fraud under 18 U.S.C. § 1341 has the following three elements: "(1) a scheme to defraud; (2) use of the mails to execute that scheme; and (3) the specific intent to defraud," which are almost identical to the elements of Wire Fraud.[4]  *United States v. Swenson*, 25 F.4th 309, 316 (5th Cir. 2022); *United States v. Sanchez*, 502 F. App'x 375, 382 (5th Cir. 2012).  Because of the similarities, if the evidence is sufficient to show a scheme to defraud for Wire Fraud, it is highly likely that the same will be true for the Mail Fraud counts.  *See Spalding*, 894 F.3d at 173.

Ashley was convicted of mail fraud for Counts Fifteen and Sixteen, and he challenges these counts based on the same arguments that were raised for the Life Insurance Counts.  While the Court need not address those arguments again, it will discuss the sufficiency of the specific communications that were alleged and address the new argument challenging Count Sixteen.

Count Fifteen concerns the first step in Ashley's plan involving Seegan's life insurance policy, as Ashley mailed a letter to confirm the change of beneficiary for Seegan's policy.  This is similar to Counts Nine, Ten, Eleven, and Twelve, in which the Court found the evidence sufficient to support those communications dealing with the confirmation of Seegan's beneficiary change as valid for Wire Fraud.  The Court will come to the same conclusion regarding the mailing of a letter on the same issue.  Count Sixteen refers to the autopsy report that was mailed to Villareal on behalf

---

[4] The specific language of the statute is as follows: "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both." 18 U.S.C. § 1341.

of Ashley.   The evidence supports a finding that this was part of Ashley's plan to hide his participation in Seegan's passing, as he wanted to confirm that Seegan's death had been ruled a suicide, just as he planned.   Accordingly, the Court finds that the jury's verdict on Counts Fifteen and Sixteen should be upheld.

## IV.    Possessing or Carrying a Firearm During Commission of a Crime of Violence

Count Eighteen of the Fourth Superseding Indictment charged Ashley with a multi-part crime.   Under 18 U.S.C. § 924(c)(1), it is a crime to carry or discharge a firearm during a crime of violence or possess a firearm in furtherance of a crime of violence.   For a jury to convict Ashley for this crime based on the Government's theory of the case, three things must be true: (1) Ashley is guilty of a Hobbs Act Robbery under 18 U.S.C. § 1951(a); (2) a Hobbs Act Robbery is properly classified as a crime of violence; and (3) Ashley carried or discharged a firearm during the Hobbs Act Robbery or he possessed the firearm in furtherance of the Hobbs Act Robbery.

The Government also charged Ashley with 18 U.S.C. § 924(j)(1) in Count Eighteen, which is a sentencing enhancement for "in the course of a violation of subsection (c)" a person murders another person—as defined in 18 U.S.C. § 1111—by use of a firearm.   The jury found Ashley guilty of Count Eighteen, meaning they found that Ashley guilty for committing a Hobbs Act Robbery, using a firearm in some matter in furtherance of that crime, and that Ashley murdered Seegan with a firearm in the process.

Ashley attacks this finding with five arguments.   First, he states that the robbery did not impact interstate commerce in this case.   Then, Ashley states that the evidence does not support a finding of a completed robbery.   Third, Ashley argues that venue was improper.   Fourth, Ashley argues that the evidence was insufficient that he utilized a firearm in this case.   Finally, Ashley argues that the evidence cannot support a finding that he murdered Seegan.   The Court finds that all five arguments are without merit.

18

### A. Interstate Commerce

The Court will start by addressing the issue of interstate commerce. The Fifth Circuit requires the prosecution to prove that the defendant committed, attempted to commit, or conspired to commit, a robbery that caused an interference with interstate commerce. *United States v. Mann*, 493 F.3d 484, 494–95 (5th Cir. 2007); *United States v. Robinson,* 119 F.3d 1205, 1212 (5th Cir.1997). In the current case, "sufficient evidence must indicate that each alleged violation of the Hobbs Act . . . resulted in some interference with interstate commerce." *Mann*, 493 F.3d at 494. The Government must then prove that "the defendant's acts had an effect on interstate commerce, which is necessarily more difficult to show when the victim of the crime is an individual and not a business." *Id.* at 494–95. Nonetheless, the effect of commerce for a Hobbs Act Robbery only need to be "slight." *See United States v. Herrera*, 466 F. App'x 409, 418 (5th Cir. 2012) ("Our caselaw provides that illegal activity need only 'slightly' affect interstate commerce to fall under the purview of the Hobbs Act."); *see also United States v. Bolar*, 483 F. App'x 876 (5th Cir. 2012) ("The effect on interstate commerce can be direct or indirect, need only be *de minimis*, and is determined on a case-by-case basis.").

Ashley's specific argument is that in this case Ashley allegedly only robbed a single individual who was retired, and therefore, it cannot be said to have affected interstate commerce. True, it was not the traditional depletion of assets of an entity, but as the Government correctly points out, in this case, Ashley's actions *directly* impacted interstate commerce because of the transaction at the center of this dispute.[5] Specifically, the fact that Ashley directed a transfer from a bank in Texas to one in North Carolina. Since these funds were transferred across state lines,

---

[5] The parties disagree about whether the framework set out by *United States v. Collins*, 40 F.3d 95, 100 (5th Cir. 1994) applies in cases where the effect of interstate commerce is direct, as is the case here. While the Court is operating under the basis that it does not, even assuming that it does, the Court will still uphold the jury's verdict, as Ashley's robbery of Seegan included the depletion of assets of a financial institution.

the Court finds that the "slight" effect of commerce that is necessary for a Hobbs Act Robbery is satisfied. *Herrera*, 466 F. App'x at 418. Therefore, the Court finds that the required element of interstate commerce is satisfied based on the evidence presented.

### B. Completed Robbery

The next argument is whether there was a completed robbery. Under the relevant statute, a robbery is defined as "the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession, or the person or property of a relative or member of his family or of anyone in his company at the time of the taking or obtaining." 18 U.S.C. § 1951(b)(1). A complete robbery must be distinguished from an attempted robbery, because as recently clarified by the Supreme Court, once a Hobbs Act robbery is completed, it is sufficient that it is a crime of violence, whereas a mere attempted Hobbs Act Robbery does not qualify. *United States v. Taylor*, 142 S. Ct. 2015, 2025–26 (2015) (deciding that attempted Hobbs Act Robbery is not a crime of violence but leaving open the question of whether a completed Hobbs Act Robbery is or not); *United States v. Hill*, 63 F.4th 335, 363 (2023) ("Our precedents establish that [a completed] Hobbs Act robbery is a crime of violence under the elements clause.").

Ashley argues that it cannot be found that there was a completed robbery in this case because there was no "taking or obtaining" of property on the day of the murder. The question then becomes—can a transfer of funds that took place two days after Seegan's death be tied back to the murder of Seegan to find there was a completed robbery?

The Court answers this in the affirmative. The Court views the evidence in favor of supporting the jury verdict, and in doing so, Seegan's death cannot be viewed in isolation. The reality is that Seegan's death was only one of the necessary steps of Ashley's plan to commit the

robbery and the fact of whether the transfer of funds took place on the day of Seegan's death or merely two days later should not change the analysis. Traditionally, this "murder-robbery" occurs when the two actions occur immediately after one another. *See Hill*, 63 F.4th at 342. Such a situation is not at play here.

In interpreting a robbery under 18 U.S.C. § 1951, the Court has found no case law in this circuit answering this exact question. For this analysis, the Court will start where all statutory interpretation begins, by looking at the words of the statute. The Court finds that there is no explicit requirement that the unlawful taking or obtaining occurred in conjunction with the use of force. 18 U.S.C. § 1951 ("the unlawful taking or obtaining of personal property from the person . . . against his will, by means of actual or threatened force . . . to his person or property, or property in his custody or possession, or the person or property of a relative or member of his family or of anyone in his company at the time of the taking or obtaining."). While it could be argued that the phrase "at the time of the taking or obtaining" applies to the whole definition of robbery, the Court does not read the statute that way. Instead, the Court reads that phrase to highlight merely one of the various scenarios in which it could be found that a robbery was completed that are described at the end of the statute. *See United States v. Eason*, 953 F.3d 1184, 1191 (11th Cir. 2020) ("Indeed, the next clause—'or of anyone in [the victim's] company at the time of the taking or obtaining' covers an alternative factual scenario in which another person's property is threatened in proximity to the victim."). Indeed, if the property was taken against Seegan's will by means of actual force to himself, the robbery will have been completed. Here, the Court finds that the funds in Seegan's account was taken against his will by means of actual force to himself. The robbery could not have been completed without Seegan's death, as it is highly unlikely that Seegan would have allowed for the transfer of $20,000 to Ashley's account if he was still alive. By murdering

Seegan, Ashley then was provided access to his phone, and in turn his funds, and therefore, the entire robbery was "completed" after the funds were sent to Ashley's KBKK Account.  Since the murder was essential to complete the robbery, the Court finds that the evidence supports the jury's finding of guilty on Count Eighteen.

### C.  Venue

The Court will quickly dispose of Ashley's third argument that venue was improper.  As the Court explained in its jury instructions, "when an offense is begun in one district and completed in another, venue is proper in any district in which the offense was begun, continued, or completed" and the Government must prove venue by a preponderance of the evidence (Dkt. #189 at p. 25).

Both parties note that for a § 924(c)(1) offense, "where venue is appropriate for the underlying crime of violence, it is appropriate for the § 924(c)(1) offense."  *United States v. Rodriguez-Moreno*, 526 U.S. 275, 282 (1999).   Since the underlying offense—Hobbs Act Robbery—is a continuing offense, venue is appropriate "in any district in which such offense was begun, continued, or completed."  *See United States v. Brazell*, 489 F.3d 666, 668 (5th Cir. 2007) (discussing the Supreme Court case—*United States v. Midstate Horticultural Co.*, 306 U.S. 161, 166 (1939)—where it defined a "continuing offense" and found that when the series of acts runs through several jurisdictions, the offense is committed and cognizable in each); *see also* 18 U.S.C. § 3237.[6]  The evidence provided by the Government at trial supports a finding that Ashley took preparatory steps for the robbery while in the Eastern District of Texas before arriving to Seegan's home in the Northern District of Texas.  Therefore, the crime had "begun" while in the Eastern District of Texas, which supports the jury's decision regarding venue.  The Court disagrees with

---

[6] The Court will note that the Fifth Circuit has not explicitly ruled on the point that a Hobbs Act Robbery is a "continuing offense" for the purposes of a venue analysis (Dkt. #92 at p. 3).  The Court adopted a report and recommendation by Magistrate Judge Johnson who concluded that it was a continuing offense and cited to various other courts that have come to the same conclusion (Dkt. #92).  The Court stands by this conclusion.

Ashley's argument that the entire crime occurred "only in Seegan's house" (Dkt. #207 at p. 9). Accordingly, it will deny Ashley's venue arguments.

### D.  Sufficiency of the Evidence

Finally, the Court will consolidate the final two arguments.  Ashley argues that the evidence is insufficient for Count Eighteen because he "did not possess, carry, or use the firearm in question" and that the evidence did not "establish that []Ashely murdered [Seegan]" (Dkt. #207 at p. 10).

While it is true that the Government did not offer any direct evidence that the firearm used to kill Seegan belonged to Ashley, the Government did offer a great deal of circumstantial evidence that a reasonable juror could find that the gun belonged to him.  Alternatively, since the firearm was found in Seegan's lap as part of the façade that Seegan killed himself, if the jury believed Ashley murdered Seegan, then they would have to accept the fact that it was Ashley that "used" the murder weapon.

As for the evidence provided, first, the Government called a special agent with the ATF to testify that the firearm was sold from a pawnshop that was located within five miles of Ashley's home.  Then, the Government provided evidence that they found ammunition in Ashley's home that matched up with the size of ammunition used in the murder weapon.  To attack the alternative theory that Seegan committed suicide and did so using a firearm, Seegan's wife testified regarding their "no guns" policy at home.  If the firearm found in Seegan's hand was not enough to support the jury finding, the black backpack—which cameras found were on Ashley at the time he entered Seegan's home—was later searched by the police and inside, was another firearm.  Together, the circumstantial evidence is clear that there is enough evidence to support a finding that the Government proved the fact that Ashley possessed, carried, or used a firearm in the commission of this crime.

The same is true for the conclusion that Ashley murdered Seegan.  At trial, the Government created a timeline that perfectly lines up the time that Ashely was supposed to meet Seegan in his home—and was confirmed to enter his home around that time because of the doorbell cameras—and the time that Seegan was murdered.  This is merely only one piece of evidence that all points toward one conclusion: Ashley did it.

The only potential alternative that the Court views is that Seegan did in fact commit suicide. Ashley points toward the fact that the first autopsy that was conducted ruled Seegan's death a suicide, but this was later challenged by another medical examiner.  The presence of Etomidate in Seegan's system, the gun in the wrong hand, and Ashley's search history of terms such as "can manner of death be changed by medical examiner" and "manslaughter deferred adjudication" all supports a finding that a reasonable juror could have found that Ashley committed murder, as defined in 18 U.S.C. § 1111.  Accordingly, Ashley's arguments on this matter will be rejected.[7]

### V.   Bank Theft

Ashley's last point argues that he should be acquitted on Count Nineteen of the Fourth Superseding Indictment for Bank Theft.  Under 18 U.S.C. § 2113(b), the Government had to prove that Ashley was in violation of the following: "[w]hoever takes and carries away, with intent to steal or purloin, any property or money or any other thing of value exceeding $1,000 belonging to, or in the care, custody, control, management, or possession of any bank, credit union, or any savings and loan association, shall be fined under this title or imprisoned not more than ten years, or both."   Then, as a sentencing enhancement, the Government requires a finding that "in

---

[7] The Court will also note that Ashley attempts to argue that because Seegan's wife did not identify Ashley during her testimony, the conviction cannot stand.  Ashley briefly makes this point in two sentences and fails to identify any case law to further support its point.  The Court will note that Ashley was properly identified at the trial, just not by Seegan's wife.  The Court is unaware of any requirement that specifically, Seegan's wife would be required to identify the defendant, and therefore, the Court will deny that argument.

committing [18 U.S.C. § 2113(b)], or in avoiding or attempting to avoid apprehension for the commission of such offense, or in freeing himself or attempting to free himself from arrest or confinement for such offense, kills any person, or forces any person to accompany him without the consent of such person, shall be imprisoned not less than ten years, or if death results shall be punished by death or life imprisonment."  18 U.S.C. § 2113(e).  The jury found Ashley guilty for both the substantive offense and for the sentencing enhancement.

Ashley has two main arguments for this point.  First, he argues that Government did not prove the required elements of Bank Fraud and the sentencing enhancement.  Then, Ashley argues that venue was improper.

### A.  18 U.S.C. § 2113 (b) & (e)

Ashley's arguments regarding the required elements are: (1) there was no evidence of a "tak[ing] or carr[ying]" away money; (2) there was no evidence of "intent to steal or purloin" from a bank; and (3) the evidence does not support a finding that Ashley killed a person while committing this offense (Dkt. #207 at p. 11).  The Government opposes all three arguments, stating that the evidence clearly indicates that Ashley took money from Texas Capital Bank when he had Seegan's money wired to his KBKK Account.  The Court agrees.

To start, "taking and carrying away" includes the use of wire transfers, so that is not a problem here.  *See United States v. Politano*, 829 F.2d 1121 (4th Cir. 1987) ("Appellant's remaining argument that he did not 'take and carry away' the funds of the bank because he used wire transfers is patently frivolous.") (cleaned up).  As Ashley admits, the evidence at trial from a representative of Texas Capital Bank stated that an "electronic transaction took place and that the money went into an account controlled by []Ashley" (Dkt. #207 at p. 11).  This finding is further supported by the evidence at trial that was introduced where Ashley attempted to log on to Seegan's account with Texas Capital in Ashley's home, then logged on and transferred $20,000

from Seegan's account to the KBKK Account.

As to the intent element, it is true that the charge requires a specific intent to steal or purloin. *Carter v. United States*, 530 U.S. 255, 267 (2000). However, this does not raise an issue in this case. As the Court has reiterated numerous times, this was all part of Ashley's scheme to ultimately take Seegan's money. He intended to steal the money from Seegan and needed Seegan gone before he could do so. On that same point, the Court will also deny Ashley's argument on the enhancement, where he argues that the evidence does not show that Ashley killed an individual while committing this offense. A reasonable juror could have concluded that Ashley's actions were calculated, and the taking of $20,000 funds was simply just one of many illegal rewards that Ashley was intending to receive.

Assuming that Ashley makes the same argument as it did for the Hobbs Act Robbery in that the temporal proximity destroys any finding that the killing occurred in committing the offense, the Court will again deny such an argument. While the Court did not find any cases in the Fifth Circuit that has spoken on this issue, the Ninth Circuit has, and it rejected such an argument. *See United States v. Jackson*, 756 F.2d 703, 706 (9th Cir. 1985). In *Jackson*, the Ninth Circuit was explicit: "the test is not the time and place of the murder, but its relation to the robbery." *Id.* As the Court previously noted, Seegan being killed was a necessary step before the bank theft could occur and therefore, the Court will reject Ashley's argument on this point. The evidence was sufficient for each of the findings required for Count Nineteen.

### B.  Venue

The final argument concerns venue. Although the Government argues that "Venue for Count 19 is appropriate for the same reasons that venue is appropriate for Count 18," the Court disagrees. Bank theft is an inherently different crime than a Hobbs Act Robbery, as there is an element of force required for a Hobbs Act Robbery. Ashley argues that because the entirety of the

illegal transaction took place because of actions that all occurred within Seegan's home, venue is not proper in the Eastern District of Texas.  Ultimately, this finding hinges on one point—whether bank theft is a continuing offense.

The Court finds that it is.  Under 18 U.S.C. § 3237, the statute states the following:

(a)  Except as otherwise expressly provided by enactment of Congress, any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed.

Any offense involving the use of the mails, transportation in interstate or foreign commerce, or the importation of an object or person into the United States is a continuing offense and, except as otherwise expressly provided by enactment of Congress, may be inquired of and prosecuted in any district from, through, or into which such commerce, mail matter, or imported object or person moves.

The Court finds that the conduct charged in Count Nineteen of the Fourth Superseding Indictment would be included under this statute.

To start, neither subsection (b) nor subsection (e) of § 2113 explicitly provides that it would not be a continuing offense for the purposes of this venue statute.  Further, subsection (b) concerns "transportation in interstate or foreign commerce" since it includes wire transfers as a valid theft, which is at issue in this case.  Additionally, a closer look as to specific language of subsection (e) in conjunction with subsection (b) lends the Court to conclude that it should be interpreted as a continuing offense.  Specifically, subsection (e) is directed at an individual who is "committing any offense defined in this section, or in avoiding or attempting to avoid apprehension for the commission of such offense, or in freeing himself or attempting to free himself from arrest or confinement for such offense."  18 U.S.C. § 2113(e).  The Court reads these two sections together by concluding that the bank theft is not completed at the time the funds are transferred.  Instead, the theft would include certain subsequent actions.  Therefore, the Court concludes that bank theft under 18 U.S.C. § 2113 is a continuing offense.

As a result, the Court finds that venue was proper in the Eastern District of Texas because again, Ashley committed preparatory acts to commit the bank theft in the Eastern District of Texas. A necessary step in "taking and carrying" the funds from Seegan involved Ashley leaving his home in the Eastern District of Texas with a firearm and driving to Seegan's home to murder him, which was a prerequisite for the bank theft to occur. Accordingly, Ashley's venue argument will be denied, as the Court finds that the facts support a finding that venue in the Eastern District of Texas was sufficiently proven at trial.

All other arguments provided by Ashley will be rejected.[8]

## CONCLUSION

It is therefore **ORDERED** that Defendant Keith Todd Ashley's Motion for Acquittal (Dkt. #207) is hereby **DENIED.**

**IT IS SO ORDERED.**

**SIGNED this 17th day of August, 2023.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE

---

[8] In its briefing, Ashley briefly argues that "the sentencing enhancements found in Counts 18 and Counts 19 violate the Double Jeopardy Clause." The Court will deny such an argument, as Count Eighteen requires the use of a firearm, criminalizing different conduct than that of Count Nineteen.  *See United States v. Allen*, 247 F.3d 741, 769 (8th Cir. 2001) ("Congress fully and clearly intended to permit cumulative punishments for violations of § 2113 and § 924(j).").