```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF TEXAS
 2                         SHERMAN DIVISION

 3    UNITED STATES OF AMERICA        |  DOCKET 4:20-CR-318
                                      |
 4                                    |  AUGUST 17, 2023
      VS.                             |
 5                                    |  2:04 P.M.
                                      |
 6    KEITH TODD ASHLEY              |  SHERMAN, TEXAS

 7    ------------------------------------------------------------

 8            VOLUME 1 OF 1, PAGES 1 THROUGH 40

 9         REPORTER'S TRANSCRIPT OF SENTENCING HEARING

10        BEFORE THE HONORABLE AMOS L. MAZZANT, III,
                 UNITED STATES DISTRICT JUDGE
11    ------------------------------------------------------------

12
      FOR THE GOVERNMENT:    HEATHER HARRIS RATTAN
13                           U.S. ATTORNEY'S OFFICE - PLANO
                             101 E. PARK BOULEVARD, SUITE 500
14                           PLANO, TX 75074

15                           JASON FINE
                             DALLAS COUNTY D.A.'S OFFICE
16                           133 N. RIVERFRONT BOULEVARD
                             DALLAS, TX 75207
17

18    FOR THE DEFENDANT:     JAMES P. WHALEN
                             RYNE THOMAS SANDEL
19                           WHALEN LAW OFFICE
                             9300 JOHN HICKMAN PKWY, SUITE 501
20                           FRISCO, TX 75035
                             JASON FINE
21

22    COURT REPORTER:        CHRISTINA L. BICKHAM, CRR, RDR
                             FEDERAL OFFICIAL REPORTER
23                           101 EAST PECAN
                             SHERMAN, TX 75090
24

25        PROCEEDINGS RECORDED USING MECHANICAL STENOGRAPHY;
        TRANSCRIPT PRODUCED VIA COMPUTER-AIDED TRANSCRIPTION.
```

```
 1              (Open court, defendant present.)

 2              THE COURT:  Please be seated.

 3              Okay.  We're here in case 4:20-cr-318, United

 4  States of America versus Keith Todd Ashley.

 5              And for the government?

 6              MS. RATTAN:  Good afternoon, your Honor.  Heather

 7  Rattan and Jason Fine for the United States.

 8              THE COURT:  Thank you.

 9              And for the defendant?

10              MR. WHALEN:  James Whalen and Ryne Sandel for

11  Mr. Ashley, your Honor.  Good afternoon.

12              THE COURT:  Very good.

13              And, Mr. Ashley, if you'll just take the podium at

14  least for a minute so we can discuss some of the

15  preliminary matters -- or stand up by the mic.

16              Okay.  Sir, you're here for your sentencing

17  pursuant to your final presentence report that was filed on

18  July 28th, 2023.  Have you had a chance to review the final

19  presentence report, sir?

20              THE DEFENDANT:  Yes, sir.

21              THE COURT:  Have you had a chance to discuss it

22  with your counsel?

23              THE DEFENDANT:  Yes, sir.

24              THE COURT:  Do you understand it?

25              THE DEFENDANT:  Yes, sir.
```

 1          THE COURT:  Do you believe the report adequately

 2    covers your general background?

 3          THE DEFENDANT:  Yes, sir.

 4          THE COURT:  And are you satisfied with the

 5    accuracy of the report other than the objections your

 6    counsel has filed?

 7          THE DEFENDANT:  Yes.

 8          THE COURT:  And then, Mr. Whalen, have you had a

 9    chance to review the final presentence report with your

10    client; and do you believe he understands it?

11          MR. WHALEN:  I have reviewed it with him; and he

12    understands it, your Honor.

13          THE COURT:  Okay.  And do you have -- other than

14    the objections you filed -- any other comments, additions,

15    or corrections?

16          MR. WHALEN:  No, your Honor.

17          THE COURT:  On behalf of the government,

18    Ms. Rattan, any comments, additions, corrections, or

19    objections?

20          MS. RATTAN:  No, your Honor.

21          THE COURT:  And, Mr. Whalen, you filed a number of

22    objections.  If you will go ahead and start and go through

23    those.

24          MR. WHALEN:  Yes, your Honor.

25          As it relates to the objections, there's 14

1   objections.  As far as it relates to Objections 1 through

2   11, we'll rest on our written objections and re-urge them

3   but just rely on what we have written as it relates to

4   those.  So I just want to focus on 12, 13, and 14.

5          THE COURT:  And, of course, 1 through 11 do not

6   impact the guideline calculations.  They are factual

7   challenges.  Most of them go to the issue of information

8   provided to Probation, that some of the issues may not have

9   come up at trial in terms of testimony, correct?  That's --

10         MR. WHALEN:  That's correct, your Honor.

11         THE COURT:  Ms. Rattan, did you want to make any

12  response to any of those?

13         MS. RATTAN:  No.  Of course, as the Court knows,

14  the probation officer's responses are very thorough.

15         THE COURT:  Yes.  So I will incorporate the

16  responses by Probation and just add that -- and overrule

17  the objections based on a preponderance of the evidence.

18  The statements provided by Probation in the PSR have

19  sufficient indicia of reliability based on preponderance of

20  the evidence to support those; so I will overrule those

21  factual objections.

22         Okay.  If you want to go ahead and address --

23         MR. WHALEN:  Yes, your Honor.  I'm going to start

24  with Objection 14.  Obviously, the Court is aware that we

25  have filed a Rule 29 motion that is still pending.

1          THE COURT:  No.  It's been denied.

2          MR. WHALEN:  Okay.

3          THE COURT:  So -- I signed it this -- well, I

4    signed it sometime -- it was probably docketed in the last

5    hour.

6          MR. WHALEN:  Okay.

7          THE COURT:  So the whole motion, every count --

8    every aspect of the motion was denied.

9          MR. WHALEN:  Well, once again I, out of an

10   abundance of caution, will re-urge the Rule 29 motion as

11   not to waive anything in the presentence report.  We

12   believe that based on the evidence that was presented, that

13   the presentence report does not adequately reflect or

14   calculate it correctly because the evidence was

15   insufficient on the counts that we mentioned in our

16   Rule 29.  And so we re-urge and object to the entirety of

17   the presentence report as written because the evidence did

18   not support those counts and those convictions, and we

19   re-urge those at this time.

20         THE COURT:  I understand.

21         Any response?

22         MS. RATTAN:  We'd rely on our response in

23   Document 217.

24         THE COURT:  Yes.  And the Court will rely -- I

25   know you haven't seen it yet.  You have not had a chance to

1  read it because it literally probably just got docketed

2  before we came out onto the bench.  It was involved; so

3  that's why it took us a long time to get it done.  My goal

4  is to always have those done prior to sentencing.

5          But I will stand on the grounds there and, of

6  course, overrule the objection.  I do believe there is

7  sufficient evidence for the jury finding in this case.

8          MR. WHALEN:  Your Honor, we would then move to

9  Objection 12, which relates to the guideline calculations

10 as it relates to the fraud counts.  They have attributed --

11 first, we'll talk about loss.  Once again, as it relates to

12 the loss, we believe the loss was incorrectly calculated.

13         As we stated in a previous objection as relates to

14 Mr. Greening, the testimony at trial indicated that he did

15 invest $75,000 initially with Mr. Ashley.  Then he invested

16 another $75,000 for the brewery and the hand sanitizer; and

17 then after their call, he then refunded $75,000.  So,

18 therefore, if we were using first in, first out principles,

19 when he made an objection to Mr. Ashley about it, it was

20 returned to him; so we believe that $75,000 should not be

21 included in a loss calculation.

22         Additionally, as it relates to Brenda Stewart,

23 Gloria Dietrick, Ethel White, Alice Newton, and Fred

24 Reeves, there is no evidence other than what I perceive to

25 be is simply their statements that they lost money or were

1    a victim in the case.  It's not charged conduct.  It's

2    remote in time and, therefore, shouldn't count as relevant

3    conduct and be included in a loss calculation.  So we

4    object to that loss calculation.

5           And then also the -- and I'll keep going as it

6    relates to loss.  They indicated an intended loss to

7    Midland National of $2 million.  We don't think that is an

8    accurate -- should be included in loss, for a couple

9    reasons.  One, there was no actual loss to Midland; and

10   there was never going to be any intended loss to Midland

11   National because Mr. Ashley was never the beneficiary of

12   that policy and the evidence showed they were contractually

13   obligated to pay it.  So there is no intended --

14          THE COURT:  But he was the trustee of -- he got

15   the -- he changed the beneficiary from the spouse to

16   himself as trustee; and so isn't it a reasonable inference

17   to do that that he was going to take the money if they --

18          MR. WHALEN:  No, I --

19          THE COURT:  -- did fund it?

20          MR. WHALEN:  No, I don't think it is because I

21   think if you --

22          THE COURT:  Well, how can you say that?  I mean,

23   you sat through this trial and everything he did.  How can

24   you -- how can you even say that with a straight face?

25          MR. WHALEN:  I can say it -- I will say it with a

1    straight face because he was the trustee.  But if you

2    listen to the phone calls that were presented, Mr. Seegan

3    made that change.  He signed it, and he made that change.

4            THE COURT:  At the request of Mr. Ashley.

5            MR. WHALEN:  Right.  But then if you listen to the

6    testimony --

7            THE COURT:  As part of his scheme.

8            MR. WHALEN:  If you listen to the testimony of the

9    trust lawyer who created the trust, he said that Mr. Seegan

10   was very adamant about creating it, was definitive in

11   creating it, and made Mr. Ashley the trustee.

12           Just because you're the trustee -- he was never

13   the beneficiary.  And I think there is a distinction, and I

14   think they got melded at trial that all of a sudden this is

15   part of the government's theory that this was a scheme --

16           THE COURT:  So tell me why Mr. Ashley goes through

17   this process of getting him to increase the amount of the

18   life insurance policy, getting him to change the

19   beneficiary from his wife to Mr. Ashley.

20           MR. WHALEN:  Because that's what the client

21   instructed Midland National and his lawyer that he wanted

22   to do.

23           THE COURT:  Go ahead and go on.

24           MR. WHALEN:  And so it shouldn't be included in

25   loss and, therefore, actual loss is $908,833 and actual

1    loss should be used.  We rely on *United States versus Banks*

2    that actual loss -- the guidelines only intended for actual

3    loss, not intended loss.  And so we believe the correct

4    loss amount should be $908,833.

5           THE COURT:  Ms. Rattan?

6           MS. RATTAN:  Well, as the Court points out, it is

7    disingenuous.  And it's a fraud on this Court to claim that

8    the defendant was not going to get any benefit when James

9    Seegan was murdered.  Midland Life was here.  Multiple

10   witnesses from Midland Life testified.

11          It was the defendant who was swindling and

12   encouraging James Seegan to change the beneficiary.  Was he

13   the trustee?  Yes, but he also changed the beneficiary.

14          Would James Seegan have changed the beneficiary to

15   Keith Ashley had he known Keith Ashley was going to kill

16   him?  Of course not.  It's disingenuous to make that

17   argument.  Of course, the Court heard the evidence and the

18   testimony.

19          And then on Robert Greening, to argue that the

20   defendant, when he is confronted with stealing money from

21   Mr. Greening, gave some of it back so he shouldn't be

22   charged with the loss, that's -- it's disingenuous.

23          And in terms of what the actual loss amount was,

24   the United States -- or intended loss and actual loss

25   amount, the United States probation officer came up with a

1    chart on page 12.  It's in paragraph 41, and it's a very

2    nice summary of what actually the losses were.

3           The only thing I'd point out is at the very bottom

4    it says "Midland National" and the intended loss for

5    Midland National is listed at 1.5 million.  The loss that

6    Midland National had was 2.4 million because there was a

7    $2 million policy that was taken out on James Seegan's

8    life, and that was what was placed in the trust where the

9    defendant was the beneficiary of the trust.  But there was

10   also a $400,000 policy that was to be paid to Mr. Seegan's

11   wife, Dida; and that was a diversionary tactic that the

12   defendant used with Mr. Seegan's wife -- "Oh, I'm so sorry

13   for your loss; but you are going to get $400,000" -- to

14   distract her from knowing that there was actually a

15   $2 million policy that the defendant was the beneficiary

16   of.

17          So this would be -- right there, the Midland Life,

18   it would be $2 million; and then the additional loss to

19   Midland Life because of the defendant's murder would have

20   been the $400,000 that went to Mrs. Seegan.

21          So the loss amount -- intended loss, actual

22   loss -- is accurately calculated.

23          THE COURT:  Wait.  You say it is accurately

24   calculated, but then you assert that the amount for Midland

25   National is incorrect.

1              MS. RATTAN:  Well, in terms of the range that's

2      applied, I don't think it will affect the range.

3              THE COURT:  Okay.

4              MS. RATTAN:  Yes.

5              THE COURT:  But you are -- you point that Midland

6      National, it should be a higher amount for --

7              MS. RATTAN:  It should be.  And in support of

8      that, we would offer as Government's Exhibit Number 1 at

9      sentencing.  It's the timeline and chart that the United

10     States presented to the jury, and it tracks exactly what

11     happened with the life insurance policies.

12             May I approach to offer that, your Honor?

13             THE COURT:  Yes.

14             Okay.  I'll go ahead and admit Government's

15     Exhibit 1 for purposes of sentencing.

16             MS. RATTAN:  And then on the top row, the first

17     two green tiles talk about the life policies and summarize

18     exactly what happened with those.

19             THE COURT:  Mr. Whalen, do you have a copy of

20     that, too?  Just make sure you have a copy.

21             MR. WHALEN:  I do, your Honor.

22             THE COURT:  Okay.  Anything else the government

23     wants to say regarding this?

24             MS. RATTAN:  No, your Honor.

25             THE COURT:  Mr. Whalen, anything else you want to

 1   add?

 2           MR. WHALEN:  No, your Honor.

 3           THE COURT:  Can I just have Probation approach

 4   very quickly.

 5           (Off-the-record discussion between the Court and

 6   probation officer.)

 7           THE COURT:  Okay.  I'm going to overrule

 8   Objection 12.  Based on a preponderance of the evidence, it

 9   is clear that there is enough evidence in this record to

10   support what the loss amount would be --in terms of

11   intended loss -- is all that's required for the guideline

12   calculation.

13           I will add the government is correct that the

14   Midland National -- that intended loss is actually -- is

15   the 2.4 million.  It doesn't impact the guideline

16   calculation because we're still within the range.  It goes

17   up to 9 million.

18           And I know you object to Mr. Greening; but, again,

19   all these amounts are correct other than the Midland

20   National should be 2.4 million.  The other loss -- intended

21   losses are correct.  Mr. Greening did get paid back one of

22   the amounts but never got paid back the second amount.  So

23   those intended losses are supported by the record and by

24   the presentence report and based on a preponderance of the

25   evidence.  So the Court will overrule that objection.

1          I would also indicate that I agree with the

2    government -- their terminology was better than mine --

3    that it is disingenuous for the defendant to make the

4    argument he's making so -- he was the one benefitting from

5    all of these schemes, and he was the one that was intended

6    to benefit from the death of Mr. Seegan.

7          Okay.  What's next?

8          MR. WHALEN:  Your Honor, and maybe I shouldn't

9    have done this but -- and Mr. Sandel told me not to, but I

10   did it anyway -- was that I lumped all of the objections to

11   the guideline calculation in 12 so --

12         THE COURT:  Okay.  Go to the next part of it,

13   then.

14         MR. WHALEN:  Okay.  So --

15         THE COURT:  Yeah, you probably shouldn't have done

16   that.

17         MR. WHALEN:  Yeah, I probably shouldn't have.

18         Paragraph 59 is the two-level enhancement for

19   sophisticated means.  I mean, the Court heard the evidence;

20   and I think -- the objection is based on I don't think it

21   was sophisticated, and I think this is probably one of the

22   most overused enhancements and so does it really have any

23   meaning anymore and should be applied.

24         I mean, I think --

25         THE COURT:  I think it does have meaning.  And if

Sentencing Hearing                    14

```
 1  this isn't a sophisticated means crime, I don't know what
 2  would be.  I mean, look at the steps he took throughout all
 3  of this, from the Ponzi scheme by itself and the financial
 4  crimes to staging a murder suicide and the steps that he
 5  took to do that.  How can that not be sophisticated?
 6        I mean, he even went so far as to do the dual
 7  authentication, going to the widow's house, using his phone
 8  to get the authentication to make the $20,000 transaction.
 9  All of this seems very sophisticated to me.  Why isn't that
10  the case?
11        MR. WHALEN:  Your Honor, I will just rest on my
12  written statements, your Honor.
13        THE COURT:  Any response from the government?
14        MS. RATTAN:  The evidence speaks for itself.
15        THE COURT:  I agree.  This record is clear that
16  this enhancement is appropriately applied.  There were so
17  many -- I mean, I didn't list all of the things that would
18  qualify as being sophisticated; but it is clear through his
19  multiple schemes.  It was clearly a sophisticated
20  operation, and I will overrule the objection based on a
21  preponderance of the evidence.
22        What's your next --
23        MR. WHALEN:  Paragraph 60, the four-level
24  enhancement for broker/dealer as it related to securities
25  law.  We would object on it because Parkland Securities
```

1  stated in paragraph 108 they had terminated him for

2  engaging in outside business; so it wasn't associated with

3  the broker/dealer.  So, therefore -- we believe that,

4  therefore, since it didn't relate to any type of securities

5  law violation or, as far as Parkland was concerned,

6  something he did outside of their broker/dealer license,

7  that the four-level enhancement should not apply.

8           THE COURT:  Ms. Rattan?

9           MS. RATTAN:  He was using that license, and the

10  probation officer chronicles the timeline.  He wasn't

11  barred from acting as a broker until December 10th of 2021.

12  So he had the license, and he was using it during the

13  crime.

14           THE COURT:  I agree.  And, of course, the

15  probation officer -- and I'm not going to read the whole

16  paragraph into the record.  I will incorporate it.  You've

17  seen it, Mr. Whalen.

18           Probation points out that there was no requirement

19  that the defendant be employed at the time for the specific

20  offense characteristic to apply.  But I will incorporate

21  the probation officer's response, which is very detailed,

22  and overrule this objection based on preponderance of the

23  evidence.

24           What's next?

25           MR. WHALEN:  Your Honor, Defendant's Objection 13

Sentencing Hearing                                    16

 1   goes to restitution; and we will -- we believe the proper

 2   restitution amount should be no more than $908,833 for the

 3   reasons stated in the loss calculation and we'll stand on

 4   our written argument as it relates to restitution.

 5             THE COURT:  Okay.  Ms. Rattan?

 6             MS. RATTAN:  Again, paragraph 41 is a summary of

 7   the loss; and I think those should be the values that are

 8   recognized for restitution with the additional amounts to

 9   Midland National.

10             THE COURT:  Okay.  Can I have Probation approach

11   on this.

12             (Off-the-record discussion between the Court and

13   probation officer.)

14             THE COURT:  Okay.  I just wanted to discuss with

15   Probation because looking at the issue of the restitution

16   amount, of course, that goes to actual loss.

17             I know, Ms. Rattan, you're asking the Court to

18   include, I think, the 400,000 or the additional monies; but

19   those aren't actual losses that can be counted.  They are

20   intended losses.  That's what he intended, to get those

21   monies.  But if they had actually paid those monies to the

22   widow or something like that, that doesn't cause -- it only

23   becomes an actual loss if those actually -- he had

24   succeeded in him getting the money.  So I don't believe --

25   I think it should be classified as zero as the actual loss

1   to Midland National for purposes of Mr. Ashley.

2          Otherwise, I do think the appropriate amount is

3   the 1.7 and change for restitution.  I understand you have

4   objection to that, but I believe that is the actual loss.

5   So I think that's supported by the presentence report, and

6   I'll overrule your objection based on preponderance of the

7   evidence.

8          That's your only objection as related to the

9   restitution amount?

10         MR. WHALEN:  Right.

11         THE COURT:  Okay.

12         MR. WHALEN:  Based on the case law we cited in --

13  that some of that restitution is not related to the charged

14  conduct and --

15         THE COURT:  Well, and again, you know, the

16  statute, in terms of the MVRA, looks at general relevant

17  conduct.  So I do believe everything that has been included

18  has been properly included, but I understand you disagree

19  and I'm sure that's something you will take up later with a

20  higher court.

21         What's next, Mr. Whalen?

22         MR. WHALEN:  Your Honor, that would conclude all

23  the objections to the presentence report.

24         THE COURT:  Okay.  So, Mr. Ashley, if you'll stand

25  back up with your counsel.

1           So, Mr. Ashley, of course, you went to trial.  The

2    jury got to consider all of the charges and convicted you

3    of all counts.  And so you were convicted of Counts 1

4    through 6, which is wire fraud affecting a financial

5    institution and attempted wire fraud.  Counts 9 through 14

6    and Count 20 were wire fraud and attempted wire fraud.

7    Counts 15 and 16 were mail fraud and attempted mail fraud.

8    Count 18 was carrying or discharging a firearm during a

9    crime of violence or possession of a firearm in furtherance

10   of a crime of violence causing death or murder by robbery.

11   And, Count 19, attempted bank theft and bank theft.  And,

12   of course, the jury considered all of these, I think after

13   an eight-day trial, and did convict you of all these

14   charges.

15           So the Court finds that the information contained

16   in the presentence report has sufficient indicia of

17   reliability to support its probable accuracy.  The Court

18   adopts the factual findings, undisputed facts, and the

19   guideline applications in the presentence report.

20           Based upon a preponderance of the evidence

21   presented and the facts in the report, while viewing the

22   sentencing guidelines as advisory, the Court concludes as

23   follows:  Your total offense level is a 43, your criminal

24   history category is a 1, which comes to an advisory

25   guideline range of 360 months for Counts 1 through 6;

1   240 months for Counts 9, 10, 11, 12, 13, 14, 15, and 16;

2   life for Count 18; and life for Count 19; and for Count 20,

3   240 months.

4            So I know that the defense has submitted a number

5   of documents to the Court that the Court has looked at as

6   well as the letters, but I will call upon Mr. Whalen if you

7   want to go first on what you think the appropriate sentence

8   should be in this case.

9            MR. WHALEN:  Well, your Honor, I think at this

10  point it's kind of moot what I think the appropriate

11  sentence is because you're kind of -- I think you're stuck

12  statutorily.

13           And we have expressed and I think I have expressed

14  and advocated for my client -- and not being disingenuous

15  about it -- that we have reasons that we've expressed

16  throughout this trial.

17           And so I don't think a sentence of life is

18  appropriate.  I think what we put in our memo that he

19  should be sentenced on the wire fraud counts would be

20  appropriate, but that's not where we stand today.

21           And so we'll leave it to the Court to decide that,

22  but I think statutorily you are stuck where you are.  And

23  so I'll leave it at that.

24           THE COURT:  Ms. Rattan, before I call upon you, I

25  didn't know if there were any victims of his financial

 1   crimes or any of the victims at all that have a desire to

 2   say anything.

 3           MS. RATTAN:  Your Honor, yes, there are victims

 4   who are present; but I don't believe anyone cares to

 5   allocute.

 6           THE COURT:  Okay.  That's fine.  I just wanted to

 7   check.

 8           MS. RATTAN:  No.  Thanks for asking.

 9           THE COURT:  I will call upon you to comment on

10   what you think the appropriate sentence should be in this

11   case.

12           MS. RATTAN:  Well, of course, the appropriate --

13   the only appropriate sentence in this case is life.  The

14   only question is how the Court fashions the sentence.

15           So we filed a motion, as the Court knows, for

16   variance; but we also filed a motion asking the Court to

17   impose consecutive sentencing.  And it's Title 18 United

18   States Code, Section 3584, that speaks to consecutive

19   sentencing.

20           There's a phrase in 3584 that says that

21   consecutive sentencing can be imposed except that the terms

22   may not run consecutively for an attempt and for another

23   offense that was the sole objective of the attempt.

24           So, of course, we've charged attempt in multiple

25   of these counts; but we believe because the defendant was

1   running, essentially, four separate schemes, that there

2   were different objectives of these four separate schemes

3   and, because of that, the Court can impose consecutive

4   sentencing on the counts that involve these separate

5   schemes.

6           So we outlined for the Court in our filing, which

7   is Document 230, what we believe the four separate schemes

8   are.  And you've, of course, got, first, the Ponzi scheme

9   that's reflected in Counts 1 through 6.

10          Then you have the murder of Mr. Seegan, and that's

11  largely reflected in Counts 9 through 13 and then 15 and

12  16.

13          You have the other scheme, which is outlined in

14  Count 14, which is, after Mr. Seegan had been murdered by

15  the defendant, the defendant attempting to steal and, in

16  fact, actually stealing the $20,000 out of Mr. Seegan's

17  Texas Capital Bank.

18          And then the final scheme that was presented in

19  the evidence was the defendant's attempt to get Paul

20  Villareal's life insured for $400,000 and lie about the

21  defendant's relationship to Paul Villareal and claim that

22  he was his brother-in-law.

23          So you have four separate objects --

24          THE COURT:  Was the allegation that he was the

25  brother-in-law or stepbrother?

1          MS. RATTAN:  I think it was -- maybe stepbrother.

2   I'm sure it's on our chart here.

3          It is the blue tile on the top row.  Stepbrother.

4          THE COURT:  Okay.

5          MS. RATTAN:  Stepbrother.

6          THE COURT:  No, I just -- because I made that

7   change in my opinion so I -- from brother-in-law to

8   stepbrother.  So that's why.  Okay.

9          MS. RATTAN:  Anyway, there's four separate schemes

10  so four separate objectives in what he's trying to

11  accomplish; so based on that, we believe it would be

12  appropriate under 3584 to do consecutive sentencing in this

13  case.

14         And what we would suggest is that Counts 1 through

15  6, specifically focusing on either Count 1 or 3, be served

16  consecutively to either Count 9 -- one selected out of

17  Counts 9 through 13, 15, and 16 because 9 through 13 and 15

18  and 16 all relate to the scheme where he's becoming the

19  beneficiary of the $2 million life insurance policy and

20  murdering James Seegan.

21         And then Count 20 reflects the Paul Villareal

22  scheme; and, as I said before, Count 14 is the scheme after

23  James Seegan's been murdered, where he's trying to get the

24  $20,000 out of Mr. Seegan's account.

25         So the Court would select, we would recommend,

1    Count 1 or 3 out of the Ponzi scheme counts.

2            And then in Counts 9 through 13, 15, and 16, we

3    would hope that the Court would select one of those counts

4    to run consecutively to Count 1 or 3.

5            And then Count 14 would run consecutively to the

6    previously listed ones because that's the Texas Capital

7    Bank $20,000.

8            And then, finally, Count 20 would run

9    consecutively to the previous four counts.

10           And then I know we filed a motion for variance and

11   I didn't say this in our motion for variance, but I would

12   ask the Court to consider at sentencing a downward variance

13   on Counts 1 through 6.  It's at 360 now, 360 months.  The

14   reason that the punishment range on Counts 1 through 6 was

15   increased from zero-to-20 to zero-to-30 was because of the

16   effect on a financial institution.  And the jury, of

17   course, found, in each one of those counts, that there was

18   an effect on a financial institution; but I think if the

19   Court sentenced on either Count 1 or 3 at 240, it would

20   obviate that issue in the future.

21           So if the Court downwardly varied to 240 months on

22   either -- well, actually, on Counts 1 through 6 and using

23   Count 1 or Count 3 as the consecutive sentence count and

24   then did the remainder as I've outlined and did consecutive

25   sentencing on those, that's what we would request and

1   recommend; and we believe that the law allows it.

2          And then make a finding that the Court is doing

3   that irrespective of anything that the Court does on

4   Counts 18 and 19.

5          THE COURT:  Anything else, Ms. Rattan?

6          MS. RATTAN:  No, your Honor.  Thank you.

7          THE COURT:  Mr. Whalen, do you want to address --

8   I assume you're not opposed to the government's request for

9   a variance on Counts 1 through 6.

10         MR. WHALEN:  I'll get -- if I can just back up

11  real quick.

12         I know I said that, you know, statutorily you're

13  bound.  But I will say, just to make sure I'm consistent in

14  both our Sentencing Memorandum, is that we think the

15  appropriate sentence, since you overruled the objections,

16  would be what Probation calculated on the wire fraud counts

17  and fraud counts of 135 to 168.  We think it's 135 to 168.

18  That should be the appropriate sentence for that; and they

19  should run concurrently, not consecutively.

20         What I would say about the downward variance is I

21  don't want to say I'm opposed to it -- that's their

22  request -- or I agree with it or not.  But I think what the

23  Court -- I don't think you should run anything

24  consecutively.  You know, his sentence is life.  What more

25  does the government want, okay?

1          So -- but I think it's interesting, and I would --

2     and maybe this is the time to say it or not.  But why would

3     they ask you to vary downward?

4          THE COURT:  Well, I have to presume -- and, of

5     course, I denied this in the motion for acquittal.  I have

6     to assume it's because the law in the Fifth Circuit is a

7     little murky on the effect on a financial institution.

8          Other circuits have -- my understanding in doing

9     the motion for acquittal -- have maybe started whittling

10    away about how expansive that is to the government in terms

11    of charging the effect on a financial institution.

12         The Fifth Circuit hasn't addressed that directly.

13    There is an old case where they have done that, but I don't

14    know if that still would necessarily be good law under this

15    situation so -- and we relied upon that in denying the

16    motion for acquittal because it's really the only statement

17    from the Fifth Circuit, but we recognize that other

18    circuits have -- in more modern times have looked at it a

19    little differently.

20         So I assume -- well, I think the government said

21    she wants to take away that issue, that issue of effect on

22    a financial institution.  If I do a variance down for that

23    reason, it takes away that issue from being a concern on

24    appeal.

25         MR. WHALEN:  So I would say that if the Court is

```
 1   going to vary downward, we're not opposed to the variance

 2   downward.  We think the appropriate sentence should be the

 3   guideline sentence for the wire fraud counts, and we don't

 4   think that any of the counts should run consecutively to

 5   the life sentence.

 6             THE COURT:  Okay.  Ms. Rattan, anything else you

 7   want to say before I call upon the defendant?

 8             MS. RATTAN:  No, your Honor.

 9             THE COURT:  Okay.  Mr. Ashley, you have the right

10   to address the Court prior to sentencing.  Now would be the

11   time if you would like to say anything.

12             MR. WHALEN:  Your Honor, I have instructed

13   Mr. Ashley not to allocute, in fear of any type of waiver;

14   and so he's going to follow that advice and not address the

15   Court at this time.

16             THE COURT:  Okay.  That's fine.

17             Okay.  Any reason why the Court should not

18   pronounce sentence at this time?

19             MS. RATTAN:  No, your Honor.

20             MR. WHALEN:  No, your Honor.

21             THE COURT:  And then can I have Probation approach

22   one more time.

23             (Off-the-record discussion between the Court and

24   probation officer.)

25             THE COURT:  Okay.  So the first step the Court
```

Sentencing Hearing                                                    27

 1   must do is determine the guideline range that is applicable

 2   to this case; and then after that, my obligation is to

 3   determine what's the appropriate sentence for the

 4   defendant.  A sentence should not be greater than necessary

 5   to accomplish the purposes of the sentencing, as set forth

 6   in 18 USC, Section 3553(a).

 7            In reaching the sentence today, I have fully and

 8   thoroughly considered all of the ramification of the

 9   guidelines.  I've considered the nature and circumstance of

10   the offense.  I've considered the need for deterrence and

11   promoting the respect for law of others who might be

12   considering these offenses and to promote proper respect

13   for the law by the defendant.

14            I also looked at the need to protect the public

15   from future crimes of the defendant and also looked at the

16   history and characteristics of the defendant, and then also

17   I looked at the issues of the victims.

18            Now, first off is we have the government

19   requesting the Court vary on Counts 1 through 6 based upon

20   the concern about the effect on the financial institution.

21   The defendant is not opposed to that; so I will grant that

22   request based on motion by the government and it being

23   agreed to by the defendant.  And, again, it just takes away

24   the issue of the impact on the financial institution, which

25   is what caused those counts to go up from zero-to-20 up to

1   zero-to-30.

2            So then the question is, in looking at all these

3   sentences, too, the issue of whether sentences should be

4   consecutive or not in terms of how we look at this.  And,

5   of course, whether I do it as another variance up or as a

6   departure, I do think it's appropriate because I don't

7   think, despite -- I know, Mr. Whalen, you make an eloquent

8   argument about why it shouldn't be -- I shouldn't impose

9   consecutive sentence.  I just strenuously disagree with

10  you.  I have sat through this trial; and, of course, the

11  jury convicted the defendant of all these counts.

12           And so we have a story of fraud and death.  And on

13  the fraud side, the defendant caused, you know, great

14  financial losses to basically fund his own personal

15  lifestyle and expenses.

16           And, you know, as the government pointed out,

17  there were multiple schemes among multiple schemes as we

18  look at this, whether the Ponzi scheme or after the death

19  of Mr. Seegan or after his death the scheme to obtain some

20  of the money from his account; and then we have

21  Mr. Villareal.  So there's all these multiple schemes of

22  fraud.

23           And I look at your conduct as being very extreme.

24  There is a complete lack of remorse, in my view, on your

25  part.  And I understand your attorney doesn't want you to

1  speak, but I thought it was really telling.  One paragraph

2  in the presentence report jumped out at me as relates to

3  you, Mr. Ashley.  It is paragraph 96.  "The defendant

4  advised he still feels caught off guard by his situation.

5  He hopes to be able to return to the community and his

6  children soon."  It just struck me that you're totally

7  oblivious to all of this harm and things you've caused.

8          You also -- the Court has to look to the

9  seriousness of the crimes you've committed.  We have to

10 ensure -- the Court needs to ensure there is adequate

11 deterrence so this does not happen to someone else, and I

12 also have to protect the community from your criminal acts

13 and provide adequate protection.

14         I can't get -- there is nothing I can do about

15 Mr. Seegan in terms of seeking, you know, justice for him,

16 plus the justice for all of the other victims of your

17 financial crimes.  But, you know, when I look at that, the

18 guidelines just don't account for all of these things; and

19 so I do believe that the maximum sentence the Court can

20 impose by doing consecutive is appropriate.

21         And the Court looks at 18 USC,

22 Section 3553(b)(2)(A)(i).  When there is any kind of

23 aggravating circumstances, the Court is allowed to do this;

24 and in the Court's view, the guidelines don't account for

25 all of this.

1          You also had all this specialized knowledge, you

2    know, as a nurse and the use of medicine.  And, you know,

3    from what I remember from the trial -- maybe I'm wrong on

4    this, but it was just basically the drug you used to

5    paralyze him or knock him out for the short five or so

6    minutes that that medicine lasts just happened to be

7    detected because it went to a lab that actually tests for

8    that.

9          And so all of that was really calculated for you

10   hoping to avoid anyone ever finding out what you did, and

11   you did all of this for money because of -- whether it's

12   your gambling or whatever you were doing with all this

13   money, you know, you used that knowledge to perpetuate this

14   scheme and killed somebody.

15          And then there are other victims, too, who are not

16   part of these charges, like your mother-in-law who you also

17   took money from; and these victims of your financial crimes

18   will never be made whole.  That's never going to happen.

19   And some of the victims, you know, won't live enough to see

20   any kind of justice.

21          And the reason why all of the -- consecutive

22   sentences are appropriate, among all these other reasons,

23   is that the Court does have an obligation to protect

24   society.  And the maximum sentence that the Court can give

25   is what should happen because you should never be out of

1    jail ever again for what you've done in this case.

2           And the Court also looks at, you know, deterrence;

3    and, hopefully, someone getting a life sentence will,

4    hopefully, deter others from taking life and doing all of

5    these crimes.

6           And then, of course, I can't say enough about what

7    you did to Mr. Seegan who trusted you and, you know, put

8    his trust in you, unfortunately for him.  I wish he hadn't,

9    but he did.  And you basically murdered him, staged his

10   suicide, and all for the sake of trying to get money and

11   then -- and basically also cheat out his widow in the

12   process.

13          The other thing is that, you know, you did do this

14   in a scheme.  This wasn't -- when the government says you

15   were disingenuous in all of these actions, you definitely

16   were because you put yourself as trustee.  I mean,

17   considering all of the other financial crimes you've

18   committed, it is clear indication; and we can imply that

19   you were going to take that money, too.  And so -- and

20   that's why you had the $400,000 policy is to placate her.

21   She would have never probably ever known about the

22   $2 million policy that you put yourself as the trustee.

23          So -- oh, and then I do want to mention

24   Mr. Villareal because you look at him.  Would he still be

25   alive today if the policy had been approved and -- you

1   know, you took out a policy on somebody else, claiming to

2   be a relative of his.

3          You know, so for all of those reasons, whether

4   it's a variance or a departure up, I am going to do that to

5   stack as many of the sentences as I can.

6          I don't necessarily agree with the government how

7   I'm going to do this.  I did talk with Probation to kind of

8   see how to do that and so I'm trying to accomplish that in

9   grouping even though I don't necessarily agree with the way

10  the government grouped them, but I am going to do it in a

11  way.  And the whole sole purpose for all of the reasons

12  I've stated this should be done is in my desire to give you

13  the maximum sentence I can give you under the law.

14         And just so you know, even if I'm wrong on these

15  objections, for all the reasons I stated -- those were all

16  grounds -- I would give you the same sentence.  So even if

17  you go get me reversed on these objections, I would give

18  you the same sentence I'm giving you today.  So whichever

19  way I have to do it to figure it to get there, I would do

20  that because if I can't make it very clear for what you've

21  done in all of this case -- I've said it before, and I'll

22  say it again -- you should never be out in the public ever

23  again.  You're a complete danger to society and you did

24  this as a calculated move and you should never be out in

25  the public again.

1          So pursuant to the Sentencing Reform Act of 1984,

2    having considered the factors noted in 18 USC,

3    Section 3553(a), and having consulted the advisory

4    sentencing guidelines, it is the Judgment of the Court that

5    the defendant, Keith Todd Ashley, is hereby committed to

6    the custody of the Bureau of Prisons to be imprisoned for a

7    total term of life.

8          The term consists of 240 months on each of

9    Counts 1, 2, 3, 4, 5, and 6; 240 months on Counts 9, 10,

10   11, 12, 13, 14, 15, 16, and 20; and terms of life on each

11   of Counts 18 and 19 of the Fourth Superseding Indictment.

12         The Court is imposing Counts 1, 2, 3, 4, 5, and 6

13   to run consecutively to Counts 9, 10, 11, 12, 13, 14, 15,

14   16, 18, and 19 and Count 20 to run consecutively to all

15   other counts.

16         This sentence is imposed in consideration of the

17   factors set forth in 18 USC, Section 3553(a), and the

18   provisions of 18 USC, Section 3584.

19         The Court makes a factual finding that the

20   offenses involved in Counts 1 through 6 arise from the same

21   course of conduct involving a wire fraud scheme to obtain

22   investment funds from various victims through fraudulent

23   means.

24         Additionally, the Court makes a factual finding

25   that Counts 9 through 19 involve the same course of

1    conduct, which is to commit acts of fraud in order to

2    obtain control over a life insurance policy for the victim.

3           And, finally, the Court makes a factual finding

4    that Count 20 involved a course of conduct to obtain a life

5    insurance policy on victim P.V., which is Mr. Villareal,

6    through fraudulent means.

7           Now, this sentence is to run concurrently with any

8    sentence imposed in Docket Number F2100109 in the 195th

9    District Court in Dallas County, which is the state

10   corresponding parallel count -- or charges here.

11          The Court will recommend to the Bureau of Prisons

12   you receive mental health treatment while in prison.

13          While incarcerated, it is recommended that you

14   participate in the Inmate Financial Responsibility Program

15   in accordance with the requirements of the Inmate Financial

16   Responsibility Program.

17          If you participate in the program, you shall pay

18   50 percent of your earnings per pay period to the

19   defendant's outstanding monetary penalties.

20          It is further ordered the defendant must pay

21   restitution totalling $1,715,249.05 to the victims in the

22   amounts listed in the "Restitution" section of the

23   presentence report, which is due and payable immediately.

24          The Court finds you don't have the ability to pay

25   a fine.  I will waive the fine in this case.

Sentencing Hearing

1          The Court also finds you don't have the ability to

2     pay interest.  I'll waive the interest requirement in this

3     case.

4          It is ordered you will pay the United States a

5     special assessment of $1,700, which is due and payable

6     immediately; and that's $100 per each of the counts that

7     you were convicted by the jury.

8          Any monetary penalty that remains unpaid when your

9     supervision commences is to be paid on a monthly basis at a

10    rate of at least 10 percent of the defendant's gross

11    income.  The percentage of gross income to be paid with

12    respect to any restitution and/or fine is to be changed

13    during supervision, if needed, based on your changed

14    circumstances, pursuant to 18 USC, Section 3664(k) and/or

15    18 USC, Section 3572(d)(3), respectively.

16         If you receive any inheritance, any settlements

17    (including divorce settlement and personal injury

18    settlement), gifts, tax refunds, bonuses, lawsuit awards,

19    and any other receipt of money (to include, but not be

20    limited to, gambling proceeds, lottery winnings, and money

21    found or discovered), you must, within five days of

22    receipt, apply 100 percent of the value of such resources

23    to any financial penalty ordered.

24         None of the terms imposed by this Judgment shall

25    preclude or prohibit the government from enforcing the

 1   unpaid balance of the restitution or monetary penalties

 2   imposed herein.

 3          In the event the defendant is released from

 4   imprisonment -- I mean, I don't know that he needs

 5   supervised release because this is a life sentence; but

 6   just in case, the Court will impose supervised release of a

 7   term of five years.  The term consists of five years on

 8   each of Counts 1, 2, 3, 4, 5, 6, 18, and 19 and a term of

 9   three years on each of Counts 9, 10, 11, 12, 13, 14, 15,

10   16, and 20, all such terms to run concurrently.

11          Within 72 hours of release from the custody of the

12   Bureau of Prisons, you must report in person to the

13   probation office in the district where you are released.

14          You must not commit another federal, state, or

15   local crime and must comply with the standard conditions

16   that have been adopted by the Court.  In addition, you must

17   comply with the mandatory and special conditions and

18   instructions that have been provided to you and your

19   counsel as part of the presentence report prior to

20   sentencing, which the Court hereby adopts.

21          And then, Mr. Whalen, did you get a chance to

22   see -- I know there's been a change in the Fifth Circuit on

23   the standard conditions based on our General Order 17-3.

24          MR. WHALEN:  I think there were some in the

25   presentence report --

1                THE COURT:  These were not in the presentence

2    report.  It's the standard conditions --

3                Do we have a copy of those?

4                Let me look up and let me give you a copy so you

5    can just go over it with your client.  We've just been

6    handing them out as we go.

7                The Fifth Circuit is now requiring us to go over

8    these since they are part of the General Order.  They are

9    not part of -- we're going to be adding them to the

10   presentence reports going forward.  We just -- but --

11               And the question is, I mean, because I've given a

12   life sentence -- do you want to go over those with your

13   client?  I just --

14               MR. WHALEN:  I'll go over them real quick.

15               THE COURT:  Yeah, go ahead, then.

16               (Off-the-record discussion between the defendant

17   and Mr. Whalen.)

18               MR. WHALEN:  Your Honor, we've reviewed them.  He

19   understands.

20               THE COURT:  Okay.  And so, Mr. Ashley, I do have

21   to ask you.  Do you understand those standard conditions?

22               THE DEFENDANT:  Yes.

23               THE COURT:  And I know you just had a chance to go

24   over those, but do you have any questions about those?

25               THE DEFENDANT:  No, sir.

1          THE COURT:  Any objections to the standard

2   conditions?

3          MR. WHALEN:  No, your Honor.

4          THE COURT:  Okay.  And then, sir, you have the

5   right to appeal.  If you are unable to pay the cost of the

6   appeal, you can apply to appeal *in forma pauperis*, which is

7   without payment of fees.  The Clerk of the Court will

8   prepare and file a Notice of Appeal if you make that

9   request.  And with few exceptions, any Notice of Appeal

10  must be filed within 14 days of the Judgment being issued.

11         And, also, would you like me to recommend some

12  geographic location for placement purposes?

13         MR. WHALEN:  Dallas-Fort Worth, your Honor.

14         THE COURT:  Okay.  I'll put DFW in the Judgment.

15  It's not binding on the Bureau of Prisons, but I will -- it

16  will be included as a recommendation.

17         Now, your presentence report is already part of

18  the record; and it is placed under seal.  It will remain

19  under seal unless needed for purposes of appeal.

20         I don't believe there's any charges to dismiss.

21  Are there prior indictments?

22         MS. RATTAN:  Yes.  It was a superseding

23  indictment; so we'd move to dismiss the previous

24  indictments.

25         THE COURT:  Okay.  I'll grant that request.

 1            Anything further from the government?

 2            MS. RATTAN:  No, your Honor.

 3            THE COURT:  Anything further from defense?

 4            MR. WHALEN:  Just briefly, your Honor.

 5            In order to preserve the record, we would object

 6   to the procedural reasonableness of the sentence imposed

 7   for all the presentence report objections and the guideline

 8   calculations.

 9            We object to the substantive reasonableness of the

10   sentence as it -- we believe it's more than sufficient and

11   it's greater than necessary.

12            We would object to the consecutive sentences that

13   have been imposed.

14            And we also object to the sentence in its entirety

15   under the Eighth Amendment.

16            THE COURT:  I understand, Mr. Whalen; and you can

17   take that up with the appellate court.  It is certainly

18   this Court's view that a life sentence is what he deserves,

19   and that's what the Court has imposed.

20            So anything further from the government?

21            MS. RATTAN:  No, your Honor.

22            THE COURT:  Nothing further from defense?

23            MR. WHALEN:  No, your Honor.

24            THE COURT:  Mr. Ashley, you're going to go back

25   into custody of the marshals pending placement by the

Sentencing Hearing

1    Bureau of Prisons.

2         And court will be in recess.

3         (Proceedings concluded, 2:54 p.m.)

4    COURT REPORTER'S CERTIFICATION

5         I HEREBY CERTIFY THAT ON THIS DATE, AUGUST 31,

6    2023, THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD

7    OF PROCEEDINGS.

8

9              /s/
              CHRISTINA L. BICKHAM, CRR, RDR
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25