```
 1                  UNITED STATES MAGISTRATE COURT
                      EASTERN MAGISTRATE OF TEXAS
 2                         SHERMAN DIVISION

 3    UNITED STATES OF AMERICA       | DOCKET 4:20-CR-318
                                     |
 4                                   | SEPTEMBER 9, 2022
      VS.                            |
 5                                   | 11:41 A.M.
                                     |
 6    KEITH TODD ASHLEY              | PLANO, TEXAS

 7    -----------------------------------------------------------

 8            VOLUME 1 OF 1, PAGES 1 THROUGH 18

 9    REPORTER'S TRANSCRIPT OF ARRAIGNMENT AND MOTION HEARING

10        BEFORE THE HONORABLE KIMBERLY C. PRIEST JOHNSON,
                  UNITED STATES MAGISTRATE JUDGE
11
      -----------------------------------------------------------
12

13
      FOR THE GOVERNMENT:      HEATHER HARRIS RATTAN
14                             U.S. ATTORNEY'S OFFICE - PLANO
                               101 E. PARK BOULEVARD, SUITE 500
15                             PLANO, TX 75074

16
      FOR THE DEFENDANT:       JAMES P. WHALEN
17                             RYNE THOMAS SANDEL
                               WHALEN LAW OFFICE
18                             9300 JOHN HICKMAN PKWY, SUITE 501
                               FRISCO, TX 75035
19

20    COURT REPORTER:          CHRISTINA L. BICKHAM, CRR, RDR
                               FEDERAL OFFICIAL REPORTER
21                             101 EAST PECAN
                               SHERMAN, TX 75090
22

23

24         PROCEEDINGS RECORDED USING DIGITAL RECORDING;
       TRANSCRIPT PRODUCED VIA COMPUTER-AIDED TRANSCRIPTION.
25
```

1              (Open court, defendant present.)

2              THE COURT:  All right.  The Court calls Case

3    Number 4:20-cr-318, *United States versus Keith Todd Ashley*.

4              MS. RATTAN:  Heather Rattan for the United States,

5    your Honor.

6              MR. WHALEN:  James Whalen and Ryne Sandel for

7    Mr. Ashley, your Honor.  Good morning.

8              THE COURT:  Good morning.

9              We need to do -- in addition to the suppression

10   motion that was filed, which is the purpose of this

11   hearing, it's my understanding we also need to do an

12   arraignment now -- is that correct --

13             MR. WHALEN:  That's correct, your Honor.

14             THE COURT:  -- on the Third Superseding

15   Indictment?

16             All right.  Why don't we do that first.

17             Ms. Amerson.

18             Mr. Ashley, can you raise your right hand to be

19   sworn, please.

20             (The oath is administered to the defendant.)

21             THE COURT:  All right.  We are here for your

22   arraignment.  You've been charged with violations of

23   federal criminal law now in the Third Superseding

24   Indictment.

25             Have you received a copy of this Indictment?

1       MR. WHALEN:  Your Honor, he has not received a
2  physical copy of it.  We did discuss it over the phone
3  yesterday, what's contained in the new --
4       THE COURT:  So is he aware of the new charges?
5       MR. WHALEN:  He is, your Honor.
6       THE COURT:  Okay.
7       All right.  Mr. Ashley, you have the right to have
8  this Indictment read aloud at this time; or you may waive
9  that right.  What would you like to do?
10      MR. WHALEN:  We'd waive, your Honor.
11      THE COURT:  Okay.  Ms. Rattan, would you please
12 advise Mr. Ashley.  I think for -- it would be sufficient
13 just of the new charges.
14      MS. RATTAN:  Yes, your Honor.
15      The charges -- the new charges would be Counts 18,
16 19, and 20.
17      Count 18 charges a violation of Title 18 United
18 States Code, Section 924(j), which is essentially enhanced
19 punishment off of a 924(c)(1).  And the penalty is death or
20 imprisonment for a term of years or imprisonment for life;
21 a fine not to exceed $250,000, or both; a term of
22 supervised release of not more than five years; and a
23 special assessment of $100.
24      Count 19 charges a violation of Title 18 United
25 States Code, Section 2113(b) and (e), which is bank theft.

1  The penalty is not less than ten years or, if death
2  results, death, imprisonment for life; a fine not to exceed
3  $250,000, or both; a term of supervised release of not more
4  than five years; and a special assessment of $100.
5         And then Count 20 -- Count 20 charges a violation
6  of Title 18 United States Code, Section 1343 and 1349,
7  which is wire fraud and attempted wire fraud.  The penalty
8  is imprisonment for a term not to exceed 20 years; a fine
9  not to exceed $250,000 or if any person derived pecuniary
10 gain from the offense or if the offense results in
11 pecuniary loss to a person other than the defendant, then a
12 fine of not more than the greater of twice the gross gain
13 to the defendant or twice the gross loss to individuals
14 other than the defendant, or both such imprisonment and a
15 fine; and a term of supervised release of not more than
16 three years.  If the violation affects a financial
17 institution, such person shall be imprisoned not more than
18 30 years and fined not more than $1 million or not more
19 than twice the gross pecuniary gain or twice the gross loss
20 of the offense, or both; and a term of supervised release
21 of not more than five years with a special assessment of
22 $100.
23         Those are the new counts, your Honor.
24         THE COURT:  All right.  Thank you.
25         Mr. Ashley, please state your -- well, let me ask

1  you.  Do you understand the nature of the new charges that
2  have been alleged against you?
3          THE DEFENDANT:  Yes.
4          THE COURT:  All right.  Please state your full
5  name and age for the record.
6          THE DEFENDANT:  Keith Todd Ashley, 50.
7          THE COURT:  What is the last grade of school that
8  you've completed?
9          THE DEFENDANT:  Associate's degree.
10         THE COURT:  Have you ever been diagnosed with any
11 mental illness or problem?
12         THE DEFENDANT:  No, ma'am.
13         THE COURT:  Are you currently under the influence
14 of any drug or alcohol?
15         THE DEFENDANT:  No, ma'am.
16         THE COURT:  Mr. Whalen, do you believe your client
17 is competent to proceed here today?
18         MR. WHALEN:  Yes, your Honor.
19         THE COURT:  Mr. Ashley, at this time I'll ask how
20 you plead to Counts 1 through 20 in the Third Superseding
21 Indictment.  Guilty or not guilty?
22         THE DEFENDANT:  Not guilty, your Honor.
23         THE COURT:  We'll accept your plea of not guilty
24 to Counts 1 through 20 of the Third Superseding Indictment.
25         And what's the -- I know that you're specially set

1  for trial at this time on September --
2          MR. WHALEN:  26th, your Honor.
3          THE COURT:  26th?
4          Is that -- are we going to move for continuances
5  or no?
6          MR. WHALEN:  Your Honor, we intend to move for a
7  continuance in light of the new charges.
8          THE COURT:  What's the government's position?
9          MS. RATTAN:  We're going to oppose it.
10         THE COURT:  Okay.  All right.  Well, then, let's
11 go ahead and talk about the motion.
12         I -- it's a pretty clear issue.  I don't need oral
13 argument.  But while you're here, I want to give you the
14 opportunity to make any statements for the record if you
15 would like to do that.
16         I do have a couple of questions for the government
17 and so I'm going to start just by asking those questions
18 and then I'll -- again, I'll allow each of you to make any
19 statements that you want to make on the record.
20         So my first question is with respect to the -- I
21 believe it was three warrants that were subsequently issued
22 after the assets -- that being the car and then the two
23 cell phones -- were seized.  The response from the
24 government says that those warrants were attached, but they
25 were not and I'd like to see them.

1        MS. RATTAN:  Yes, your Honor.
2        THE COURT:  So if we could get an attachment
3  that -- it looks like it was just supposed to be attached
4  and it wasn't, as Exhibit A.
5        MS. RATTAN:  And, your Honor, we may be able to
6  email that to Ms. Amerson right now.
7        THE COURT:  Okay.  That would be great.
8        And, Mr. Whalen, have you -- do you have a copy of
9  those warrants at this time?  Have you seen them?
10       MR. WHALEN:  I've seen the warrants, and I --
11       THE COURT:  Okay.
12       MR. WHALEN:  -- agree that there were warrants
13  obtained --
14       THE COURT:  Okay.
15       MR. WHALEN:  -- subsequent to the initial seizure
16  of those items.
17       THE COURT:  No -- yeah, so -- yes.  Okay.  I just
18  wanted to make sure you'd also seen them because I don't
19  have a copy.
20       So my primary question, Ms. Rattan, is when the
21  government obtained warrants for Mr. Ashley's residence and
22  home, did you not have probable cause at that time to also
23  obtain warrants for his cell phone -- the cell phone that
24  you knew about and his vehicle?
25       MS. RATTAN:  I think the same probable cause

1  certainly would apply, but I don't think that "could you
2  have gotten a warrant" is really the question before the
3  Court.  I think the question before the Court is very
4  narrow, and that question is -- because you're always going
5  to have the "could you have gotten the warrant" question.
6          THE COURT:  Well, but the reason why I think it is
7  a pertinent question is for the government to argue exigent
8  circumstances, there's plenty of case law saying, well,
9  you, the government, can't create the exigent circumstances
10 and then say you had exigent circumstances.
11         And so it seemed to me, from reading the
12 government's response, that the exigent circumstances were
13 you had the information but then you had this interview.  I
14 don't -- but I don't have any information in terms of the
15 substance of the interview.
16         Certainly by -- if a decision was made then to
17 take Mr. Ashley into custody at that time, then seizing the
18 vehicle -- other question while I'm on it is I don't think
19 the actual location of the vehicle was noted.  I'm assuming
20 that's the vehicle that Mr. Ashley drove to the interview.
21 Is that correct?
22         MR. WHALEN:  That's correct.
23         THE COURT:  Okay.
24         MS. RATTAN:  Yes.
25         THE COURT:  So then seizing on the interview upon

```
 1   arrest and -- and the cell phone that was on his person, I
 2   think, is fully supported by case law.  So that was my only
 3   question because the substance of the interview was not
 4   necessarily addressed.
 5              Is that -- is that the government's position in
 6   terms of the creation of exigent circumstances?
 7              MS. RATTAN:  Well, I don't think the government
 8   created the exigent circumstances.  I do think that they
 9   existed, but I don't think they were created by the
10   Carrollton Police Department or by the government.
11              We've cited a couple of cases -- *Mata* and
12   *Babcock* -- that talk about when the defendant becomes aware
13   that the cat's out of the bag and they are the subject or
14   target of the investigation, that's a dangerous moment.
15   That can be an exigent circumstance.
16              And that's what happened at the interview because
17   the investigation, of course, as the Court knows -- the
18   Court's been involved in this and heard the detention
19   hearing evidence -- the crime scene was staged to appear
20   like a suicide.  The medical examiner fell for the staging,
21   and the medical examiner had issued a report that
22   determined that the death was a suicide.
23              So the investigation is arguably kind of a
24   cat-and-mouse game; and the law enforcement, the Carrollton
25   Police Department, had not come out and done anything to
```

1  indicate to the defendant that he might be a focus of the

2  investigation.  In fact, when they called him and asked him

3  to come in for the interview, the way they presented it to

4  him was "This was opened as a financial investigation.

5  It's been transferred to me, Detective Bonner.  The

6  papers -- I've just got to cross my T's and dot my I's.

7  You know it's been ruled a suicide.  Would you mind coming

8  on in?"

9          So the whole time, they've never done anything to

10 focus on or let the defendant know that he might be a

11 target of the investigation so that they can conduct

12 interviews and collect evidence.  And really, I mean, the

13 ME has ruled that it's a suicide; so they are open.  All

14 they know is that the defendant was the last person known

15 to be seen with the victim.  That's what they know; so

16 they're conducting investigation.

17         They bring him in.  Toward the end of the

18 interview, they start asking Mr. Ashley questions and he

19 starts acting cagey.  They say, "Do you work in a

20 hospital?"  They know that he does. And he's cagey about,

21 "Well, let's see, what year was that?"  Doesn't want to

22 answer that question.

23         He is not being direct and not answering their

24 questions.  So it's at the end of the interview that the

25 detective believes -- and it becomes apparent -- that

1  Ashley, the defendant, thinks that he now is a target of
2  the investigation; and that is the exigent circumstance.
3           The detective knows the defendant is former law
4  enforcement.  He knows that the victim's wife has said that
5  in her presence the defendant deleted text messages and
6  said to her that he deletes messages off his phone as well.
7  So these are the circumstances that the detective was aware
8  of when he said, "I need your phone."
9           THE COURT:  And the warrants that were obtained
10 prior to the interview -- that for Mr. Ashley's residence
11 and business -- am I correct that those were being executed
12 while Mr. Ashley was in the interview with the government?
13 Is that accurate?
14          MS. RATTAN:  I'm not sure if it was exactly
15 simultaneous, but they definitely were the same day.
16          THE COURT:  Okay.
17          MR. WHALEN:  And, your Honor, also, to focus on
18 the other warrants, is as we put in our brief, there was a
19 warrant to install a tracking device on his vehicle several
20 days earlier; and what they alleged in that warrant -- and
21 we can provide it to the Court -- in the affidavit was
22 "We're concerned about him destroying evidence."
23          So they had enough probable cause to get a
24 tracking device put on his vehicle, and so nothing -- what
25 changed?  And the only thing that changed was that they did

1  create the exigency.  They reached out to say, "Come back
2  in for another interview"; and they made the choice to then
3  say, near the end of the interview, "You're a suspect in
4  this case."  Okay?  They made that choice.
5          And then now they're saying, well, there is the
6  exigency because now he is a suspect.  Well, they told him
7  that.
8          THE COURT:  Well, but --
9          MR. WHALEN:  So they created --
10         THE COURT:  -- I think what Ms. Rattan said is
11 yes, I mean, telling him, "You're" -- actually saying,
12 "You're a subject."  But she also talked about questions
13 that were being asked -- where she describes Mr. Ashley's
14 answers as being cagey -- that weren't necessarily created
15 by the government.
16         I also think something that Ms. Rattan pointed out
17 as important is that Mr. Ashley did not know at that point
18 in time that he was a suspect, at least for the murder of
19 the victim.  And it is one thing to get a warrant for a
20 business and a residence that you have a planned execution
21 date.  The vehicle that Mr. Ashley's driving to the
22 interview as a -- and the cell phone on his person -- I
23 don't think it can be disputed that certainly the
24 government probably did have sufficient probable cause to
25 also obtain warrants for the cell phone and the vehicle

1  prior -- well, at the same time they obtained the other
2  warrants.
3          But I agree with Ms. Rattan.  That is -- that's
4  not the test.  It's a question that I have because I do
5  think that, you know, the -- being able to articulate how
6  and why the government did not create the exigent
7  circumstances is important, and so that's -- that was the
8  purpose of my question.
9          Other than that, I don't have any other questions
10 other than just needing a copy of the warrants.  But I told
11 you I'd give you a response [*sic*] to make any other
12 statements, if you'd like to, on the record with regards to
13 this issue, Mr. Whalen.  Is there anything else you'd like
14 to note?
15         MR. WHALEN:  No.  I think -- I don't know if they
16 submitted the video of the interview.
17         THE COURT:  I haven't seen it.
18         MS. RATTAN:  We haven't submitted it.
19         MR. WHALEN:  But I think it would be helpful for
20 the Court to review that because I think that would put
21 this whole scenario into context for the Court to review it
22 and -- and we -- we believe -- and I think it's important
23 the Court looks at time frame here, too.  I mean, the time
24 that the death occurred until the time they interview him
25 is seven months later.  I think there is a lot of

1  information the Court should look at as far as whether or
2  not, at this particular time when they seize that, there is
3  an exigent circumstance that they created.
4         I think -- looking at the video, I think, would
5  help that.  And we'll either submit it or the government
6  can, but I think the Court needs to review that.
7         THE COURT:  Okay.  I'm willing to do that.  Who
8  wants to submit it?
9         MS. RATTAN:  Oh, we'll submit it, your Honor.
10        THE COURT:  Okay.
11        MS. RATTAN:  And we just emailed to Ms. Amerson
12 the warrants the Court was asking about.
13        THE COURT:  Okay.  Thank you.
14        MR. WHALEN:  And is the tracking warrant --
15 tracker warrant in that, too?
16        MS. RATTAN:  No.  It's just the warrant for the
17 truck and two phones.
18        THE COURT:  Yes.
19        MS. RATTAN:  The warrant for the --
20        THE COURT:  I'm aware of the tracker warrant --
21        MR. WHALEN:  Okay.
22        THE COURT:  -- that was obtained prior to the
23 seizure of the assets we're talking about.
24        All right.  Anything else, Mr. Whalen?
25        MR. WHALEN:  No, your Honor.

1          THE COURT:  Ms. Rattan?

2          MS. RATTAN:  Well, and I know the Court's going to

3   see the video.  But what we'd highlight in the video is

4   toward the end of the interview of the defendant, the law

5   enforcement asks the defendant why he thinks there would

6   have been a loud noise at the victim's house; and that's

7   when he starts getting cagey.  He starts saying, "Well,

8   there was a microscope.  Maybe it fell off the table."  He

9   starts speculating on why a loud noise would have been

10  created.

11         They asked him "Why did you go back to the house

12  the second time"; and he comes up with a "Well, I was very

13  concerned that he might harm himself; so I had to go back a

14  second time."

15         And then, of course, as I mentioned earlier, the

16  question about "Do you work at a hospital?"  And he acts

17  vague and doesn't want to answer that question.

18         So it's at the end of the interview that they

19  realize that he's going to lie, not going to be

20  cooperative.  And he's got the phone; and they know from

21  what the victim's wife, Dida Seegan, has told them that

22  he's an eraser.  He's going to destroy that evidence if

23  they don't seize it right then.

24         They seized it and very conservatively and very

25  quickly got warrants.  Nobody looked at it.  Nobody did

```
 1   anything with it until they had warrants to go into it,
 2   both the phone and the truck.
 3            THE COURT:  All right.
 4            Yes?  I know you have a different position but --
 5            MR. WHALEN:  Well, but I think it's important to
 6   admit they -- you know, they knew this issue about the text
 7   messages for months, okay?  So I think -- and they invite
 8   him down, to come down for another interview; and then
 9   we're going to tell him he's a suspect.
10            They created the exigency, and they knew all this
11   information before he even stepped in the door.  And so I
12   think -- I just ask you to look at it holistically, not
13   through the lens of what the government thinks the evidence
14   shows.  I think if you look at it objectively, it's a
15   reasonable conclusion that they created the exigency.
16            THE COURT:  Well, and I guess the one -- you're
17   correct that they knew what they knew before he came down.
18   I think probably the one -- maybe an unknown was whether he
19   would answer, you know, in a way that comported with their
20   evidence; and, you know, that was an unknown.  I mean, was
21   that the basis of the arrest at that time?  I don't know.
22            MR. WHALEN:  And it -- just so it's clear, they
23   did not arrest him at that time.
24            THE COURT:  Okay.
25            MR. WHALEN:  Okay.  He did not get arrested.  They
```

1  did not get an arrest warrant until November, after he was
2  indicted here in federal court.
3         And he was in that interview with counsel.  They
4  contacted his counsel and led him to believe that this was
5  an interview just to clear up some items, okay?  So they --
6  I know they are allowed to do it.  But they give this
7  misleading information, "Oh, yeah, come on down"; and then
8  they go through this interview and then tell him at the end
9  he's a suspect.
10        They created it.  It's clear.  And they can't then
11 say, "Oh, no, because he's cagey."  You can't create it and
12 then say, "Well, because he did this."  That is the
13 exigency.
14        They -- it's pretty obvious and they knew
15 everything and they could have had a warrant waiting for
16 him when he drove down with his truck that they had a
17 tracker on.  They knew where it was.  They knew the
18 identity of the truck, the VIN number, the owner to get a
19 tracking warrant.  They certainly had enough to get a
20 warrant right then.  The same with the phone.
21        MS. RATTAN:  Okay.  The question is not did they
22 have probable cause to do the warrant.  It is at the moment
23 when they took the phone, were the circumstances exigent.
24        And in terms of the interview, they don't know
25 what he's going to say at the interview.  They interview

1  him.  He starts acting cagey on these certainly three
2  issues that I've pointed out.  And that's when they say,
3  "We need your phone and you're not taking your truck" but
4  very quickly get warrants.
5          THE COURT:  Okay.  All right.
6          We talked about this before because I wanted to
7  make sure everybody was on notice of the timing issue.  So
8  I'm going to issue an opinion as quickly as I can, and then
9  we'll see what that allows for the objection time period.
10  I'll give you as much time as I can, okay?
11          MS. RATTAN:  Okay.  And then we'll send -- I don't
12  know if the interview will email, but we'll get it to the
13  Court quickly.
14          THE COURT:  Okay.  All right.  Thank you.
15          MR. WHALEN:  Thank you, your Honor.
16          MS. RATTAN:  Thank you, your Honor.
17          THE COURT:  We stand adjourned.
18          (Proceedings concluded, 12:01 p.m.)
19  COURT REPORTER'S CERTIFICATION
20           I, court-approved transcriber, hereby certify on
21  this date, September 5, 2023, that the foregoing is a
22  correct transcript from the official electronic sound
23  recording of the proceedings in the above-entitled matter.
24
                        /s/
25                      CHRISTINA L. BICKHAM, CRR, RDR